**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **EUGENE SCALIA**, Secretary of Labor, United States Department of Labor, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:16-cv-04825 |
| **SHIRLEY T. SHERROD**, *et al.*, | ) | Hon. Andrea R. Wood |
| Defendants. | ) | |

**SECRETARY OF LABOR'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE WITH RESPECT TO SECRETARY'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS SHIRLEY T. SHERROD AND LEROY JOHNSON**

Pursuant to Local Rule 56.1(a)(3), plaintiff submits the following statement of material facts not in dispute.

**Jurisdiction**

1. This court has subject matter jurisdiction because this civil action arises under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, and is brought by the Secretary of Labor ("Secretary") under ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5), to enjoin acts and practices which violate the provisions of Title I of ERISA, to obtain appropriate relief for breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable relief as may be appropriate. Dock. No. 1 ¶ 1. Defendants admit this action was brought by the Secretary under ERISA. Defendants' Answer, Dock. No. 18 ¶ 1.

2. Defendants Shirley T. Sherrod ("Sherrod") and Leroy Johnson ("Johnson") admit to the court's personal jurisdiction over them in their Answer. Dock. No. 18, ¶ 4.

**Venue**

3. Defendants admit venue of this action lies in the Northern District of Illinois, pursuant to ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1), because the Plan is administered in Waukegan, Lake County, Illinois, within this district. Dock. No. 18 ¶ 5.

**The Plan**

4. Sherrod was the owner of Shirley T. Sherrod, M.D., P.C. ("Company" or "Employer"). Exh. C at 12:2-3.

5. The Company was the plan sponsor and established the Shirley T. Sherrod, M.D., P.C. Target Benefit Pension Plan ("Plan") effective January 1, 1987, to provide retirement benefits to the participants in the Plan. Dock. No. 18 ¶ 2. The Plan is a defined benefit plan. Exh. E at 16-18.

6. All of the participants in the Plan were terminated from their employment with the Company on or before December 31, 2008. Exh. F at 4-5.

7. The Plan was funded by Company contributions, Exhibit E at §§ 4.1-4.13, but the Company made no contributions from at least 2011 to 2017, Exhibit A and B.

8. The Plan document was amended in April 2010, effective January 1, 2009 ("2009 Plan Document") and the 2009 Plan Document remained in effect throughout the relevant time period. Exh. E at 4, Exh. N at 5, No. 1.[1]

[1] There is an earlier version of the Plan Document from 2008, but there are no substantive differences between the 2008 and 2009 version of the Plan Document. Don't we need the 2008 plan document for purposes of all the employees being terminated and what that meant as far as distributions? Since they were terminated in 2008?

9. The 2009 Plan Document set forth the powers and responsibilities of the Employer, the Plan Administrator, and the Trustee. Exh. E at 14-16, 38-42, §§ 2.1-2.9, and 7.1-7.12, Exh. N at 5, No. 1.

10. The 2009 Plan Document provided the Trustee had the powers and responsibilities to (i) invest, manage, and control the Plan assets; (ii) pay benefits required to be paid to or on behalf of participants; and (iii) maintain records of receipts and disbursements and furnish a written annual report to the Company; and (iv) prepare a detailed annual report of income or losses for the Fund, gains or losses of the Fund's investments, and distributions paid, Exh. E at 38-42, § 7.1(a)(1)-(3), § 7.8; as well as the basic responsibility to credit and distribute Plan assets as directed by the Plan Administrator, *Id.* at 39, § 7.1(d).

11. The 2009 Plan Document provided the Plan Administrator had the powers and responsibilities of general Plan administration, including to (i) determine eligibility to receive benefits; (ii) compute, certify, and direct the Trustee on the benefit amount payable to a participant; (iii) authorize and direct the Trustee on disbursements from the Plan; and (iv) maintain all records necessary for Plan administration; as well as to keep records of all actions taken and to keep all records and documents required by law. Exh. E at 14-16, §§ 2.4-2.7.

12. The 2009 Plan Document does not permit the Plan Administrator to delegate his duties. Exh. E at 14-16, §§ 2.4-2.7.

13. The 2009 Plan Document provided for "Payment of Expenses," "All reasonable expenses of administration may be paid out of the Plan assets unless paid by the employer." Exh. E at 16, § 2.7.

14. The 2009 Plan Document provided the Trustee may only be reimbursed for reasonable counsel fees incurred by it as Trustee. Exh. E at 41, § 7.7

15. The 2009 Plan Document provided under the section for "Distribution of Benefits," it states that "The Administrator . . . shall direct the Trustee to distribute to a Participant . . . the amount . . . [she] . . . has become entitled to under the Plan . . . ." Exh. E at 26, § 6.5.

16. The 2009 Plan Document provided in the section on distributions, several subsections all detailing the procedures for making "distributions" to participants or their beneficiaries, including ones on "Distribution of Benefits," "Distribution of Benefits Upon Death," "Time of Distribution," etc. Exh. E at 28-38.

**Defendant Sherrod**

17. From at least January 1, 2008 to present, Sherrod was the owner of the employer located in Detroit, Michigan. Exh. C at 11:14-24; 12:2-3.

18. Sherrod was an ophthalmologist. Exh. C at 11:17-24.

19. Sherrod has been the trustee of the Plan since January 1987, and in that capacity was a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Dock. No. 18 ¶ 7.

20. Sherrod attained normal retirement age, as defined in the Plan, at age 65, in May 2011. Exh. E § 1.49; Exh. F at 2, 4.

**Defendant Johnson**

21. Johnson was an ophthalmologist and performed all work related to his medical practice on a full-time basis in Michigan. Exh. D at 10:19-20; 50:23-24 and 51:1-5.

22. Johnson was named the Plan Administrator effective May 30, 2012 and in that capacity Johnson acted as a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Dock. No. 18 ¶ 8; Exh. D at 104:6-10.

23. Johnson created LJ Consulting Services LLC ("LJ Consulting") on August 4, 2014. Exh. D at 48:4-6.

24. LJ Consulting never had any employees, and never maintained any office space, but rather used a box at an Illinois UPS Store to receive mail, Exh. D at 49:23-24, 50:1-22, LJ Consulting only had one client, the Plan, throughout its existence *Id.* at 49:5-22,

25. LJ Consulting maintained no records for the Plan. Exh. D at 50-51.

26. LJ Consulting never received any payments from the Plan. Exh. D at 46:18-23.

**Plan Fiduciaries**

27. The Plan's governing documents identify the named fiduciaries of the Plan as including the Employer, the Plan Administrator, and the Trustee. Exh. E at 48, § 10.11.

28. In the 2009 Plan Document, Sherrod is specifically identified as the Plan's Trustee as of December 29, 2008. Exh. E at 62. Sherrod admits she was a fiduciary to the Plan. Dock. No. 18 at ¶ 7.

29. The duties and responsibilities of the Plan's Trustee had not changed since January 1, 2009. Exh. N at 5, No. 1.

30. The Company appointed Johnson as the Plan Administrator effective May 30, 2012, Johnson accepted the position in writing. Exh. C at 131:9-24 and 132:1; Appointment of Plan Administrator Documents, Exh. O at 1.

31. Johnson had no experience as a plan administrator. Exh. D at 11:21-24, 12:1-9.

32. Johnson asserted he assigned the Plan Administrator position to LJ Consulting LLC, an entity he created, effective August 4, 2014. Exh. D at 132:10-20.; Exh. O at 2.

33. The Plan document did not permit the Plan Administrator to assign a new Plan Administrator. Exh. E at 14-16.

34. Defendants admit Johnson was a fiduciary from May 30, 2012 until August 4, 2014. Dock. No. 18 ¶ 8.

**Other Relevant Parties**

35. The Plan's actuaries included:

a. Jeffrey L. Sinclair & Co. (Jeffrey Sinclair is deceased since 2014) was the actuary for the Plan for at least the 2010 and 2011 Plan Years. Exh. C at 247, 249; Exh. F at 1.

b. "M.S Assoc" was identified as preparing the Plan's 2015 Form 5500 filing. Exh. 2 at 1. No information other than this listing shows an entity by this name did any work for the Plan. Sherrod did not recall an entity by this name performing any work for the Plan. Exh. C at 188:1-3.

c. The Defendants only identified these two entities as performing actuarial services and only provided documents related to work done by Sinclair. Exh. N at 42-43.

36. The Plan's custodians of assets included:

a. Merrill Lynch, Pierce, Fenner, and Smith, Inc. ("Merrill Lynch") from at least December 1, 2010, until approximately July 13, 2013. Exh. G at 1 and 13.

b. Comerica Securities, Inc. ("Comerica") from approximately July 13, 2013, until February 14, 2014. Exh. H; Exh. I.

c. SunTrust Investment Services ("SunTrust") from February 14, 2014 to present. Exh. L; Exh. M ¶ 2.

37. Defendants' attorneys included at least the following 16 firms and individuals:

a. Specifically for the instant case, the following attorneys were retained between May 2016 and February 2020:

i. Joseph Patrick Berglund, Berglund & Mastny PC; terminated February 27, 2020; Dock. No. 167.

ii. Cassidy Schade LLP (Bradford D. Roth, Jeffrey Aaron Hesser and Daniel J. Broderick, Jr.), terminated May 2, 2017; Dock. No. 59.

iii. Groom Law Group (Lars C. Golumbie and Natasha Sophia Fedder), terminated May 2, 2017; Dock. No. 59.

iv. Law Offices of Russell M. Kofoed, terminated December 20, 2017; Dock. No. 85.

v. Sunghee W Sohn, terminated November 7, 2018; Dock. No. 107.

vi. James D. Harbert, Hinshaw & Culbertson LLP, terminated January 3, 2019; Dock. No. 114. and

vii. John Rearden, Jr., Oliver Close, LLC, terminated January 3, 2019. Dock. No. 114.

b. Sherrod testified that several additional law firms were paid to pursue her personal bond or to get the freeze lifted on her assets from 2011 to 2014, with the majority of the work performed in 2014. Exh. N at No. 13 at 41-42:

i. Tenney & Bentley, LLC (Edwin H. Conger (deceased) and David Shannon);

ii. Mark Granzotto PC (Mark Granzotto), worked in 2014;

iii. Roberts Bartolic, LLP (Michael Bartolic);

iv. Law Office of Ben M. Gonek PLLC (Ben Gonek), worked in 2014;

v. Valdemar L. Washington, PLLC (Valdemar Washington), worked in 2014;

vi. The Law Office of Pasquale Ciccodicola PLLC (Pasquale Ciccodicola);

vii. Brooks Wilkins Sharkey & Turco PLLC (Michael Turco); and

viii. Crane, Heyman, Simon, Welch & Clar (John H. Redfield), bankruptcy attorney for Sherrod in 2014.

**Plan Administration**

38. Sherrod signed the Plan's annual government filings, Form 5500-SF—Short Form Annual Return/Report ("Form 5500s"), for Plan Years 2002 through 2011. Exh. A.

39. Johnson signed all Form 5500s for Plan Years 2012 to 2017. Exh. B.[2]

40. Johnson was aware of Sherrod's continuing directives to Plan custodians to distribute Plan assets, however, Johnson did not direct, approve, oversee, or question Sherrod's actions. Exh. D at 77-79.

41. Johnson stated with regard to Sherrod spending money on alleged plan expenses "I only need to hear what she had to say," and never requested or saw any documents to support any of the money allegedly spent on expenses. Exh. D at 80-83; 80:22-23. Johnson claimed he delegated all his duties as plan administrator to Sherrod. Exh. D at 77-82, 133, 150-52.

42. Johnson stated he was not qualified to review the Plan's annual Form 5500s and never tried to review them. Exh. D at 114-116.

43. The Plan never distributed any statements of benefits to the Plan participants to inform them of their accrued benefits in the Plan from at least the 2011 Plan year to present. Exh. C at 50-51; Exh. D at 14-16.

[2] The Form 5500s for Plan Years 2012 to 2017, used four different EINs for Plan Years 2012 to 2017 (*see* Exhibit 2, Box 2b), with the last four digits changing, from -4656 for 2011 and prior Plan Years, to -4645, -1344, -4656, and 4756 in Plan Years, 2012, 2013, 2014-2015, and 2016-2017, respectively. Additionally, the Form 5500s changed the Company's and Plan Administrator's addresses multiple times, as well as the Plan Administrator's name.

**_Sherman vs. Sherrod_ in Michigan State Court and Sherrod's Appeal Bond**

44. Sherrod sold her company in Michigan to Michael Sherman and a dispute arose giving rise to state court litigation in Michigan between Sherman and Sherrod. Sherman received a judgment against Sherrod, individually, for $181,048 on June 25, 2010. Exh. P.

45. Sherman secured a garnishment on all of Sherrod's assets at Merrill Lunch on October 12, 2010, and by Court Order on February 4, 2011, Sherrod's assets at Merrill Lynch were frozen, including three individual, personal accounts held in her name and the amount of her retirement benefit in the Plan account. Exh. Q at 9-10.

46. Sherrod appealed the state court judgment against her and on October 28, 2011, the State of Michigan, Court of Appeals allowed Sherrod's appeal to continue subject to the condition that she either (i) appear for a creditor's examination with documents, or (ii) post a $250,000.00 cash or surety bond, for which the Court of Appeals lifted the freeze on Sherrod's assets to allow Sherrod to use her assets solely to post a bond for herself. Exh. Q at 12. Sherrod had the choice to explain the state of her assets with respect to the Plan in a deposition or she could use her assets to post a personal bond. She chose the bond. Exh. Q at 14-16.

47. Sherrod posted a bond identified herself as the "Principal" for the bond on November 3, 2011, and signed it. Exh. Q at 14-16.

48. Sherrod completed an affidavit stating the assets used to post her bond were from her assets in the Plan, that she reviewed the affidavit with her attorney, and that the distributions complied with the Plan. Exh. Q at 18-20. Specifically stating she was "directing that two (2)

Plan distributions be made," "direct Merrill Lynch to make distributions," "the two distributions . . . do not exceed my individual interest in the Plan." *Id.*

49. Merrill Lynch confirmed that Sherrod instructed them to use her assets from her portion of the Plan account to post the bond and that the distribution from the Plan account "was allocated to her account and not in excess of her account balance." Exh. Q at 3, ¶¶ 6-7.

50. Sherrod's attorney, on February 14, 2012, confirmed Sherrod received a distribution from the Plan to pay the Bond. Sherrod Depo. Exhibit 2 at 31. "Sherrod . . . made several attempts to direct Merrill Lynch . . . to distribute the plan assets to a retired participant, Shirley Sherrod. In all instances . . . Merrill Lynch has refused . . . except once . . . [when] funds would be used to post a bond in a state court proceeding." Exh. Q at 31.

51. The only bond is the one in Sherrod's name for the state court litigation in *Sherrod v. Sherman*. Exh. Q at 14-16.

52. Sherrod admits no documents exist giving the Plan any right to the $250,000 bond. Exh. C at 312:12-14.

**Merrill Lynch's efforts to remove the "freeze" on Sherrod's account**

53. At a December 2, 2011 hearing, Sherrod's counsel sought to have the "freezing of Defendant's assets" removed. Sherrod's attorney repeatedly referred to a freeze only on Sherrod's retirement benefits in the Plan account and never referred to the freeze also applying to the entirety of the Plan's account at Merrill Lynch. State Motion Hearings on Dec. 2, 2011 and April 13, 2012, Exh. R at 8.

54. On February 28, 2012, Merrill Lynch filed a motion to have the freeze on Sherrod's accounts released. Exh. Q at 1.

55. On April 13, 2012, the State Court of Michigan stated that it would lift the freeze on Sherrod's assets in the Plan account. Exh. R at 17:12. However, Sherrod's attorney objected and insisted the freeze stay in place. *Id.* at 17-18.

56. Although the freeze on Sherrod's assets in the Plan account could have been removed on April 13, 2012, Sherrod sued Merrill Lynch in federal court related to the freeze on April 6, 2012. *Sherrod v. Merrill Lynch*, Dock. No. 1, No. 1:12-cv-02545 (N.D. Ill. Apr. 13, 2012).

57. On November 28, 2012, the district court in the Northern District of Illinois ruled in favor of Merrill Lynch, granted its motion to dismiss, and found there was no controversy between the parties, and thus, no subject matter jurisdiction. *Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012).

58. Sherrod appealed to the Seventh Circuit. *Johnson v. Merrill Lynch*, 719 F.3d 601 (7th Cir. 2013).

59. On May 20, 2013, the Seventh Circuit agreed with the district court and upheld its decision, agreeing there was no subject matter jurisdiction. *Johnson,* 719 F.3d 601. Of note, the Court held:

a. "Merrill Lynch only froze the Plan account with respect to Sherrod," and Merrill Lynch stated it would have made distributions to the other participants. *Id.* at 603.

b. "Given that Sherrod had been pursuing every possible avenue to gain relief from the freeze order, Merrill Lynch believed—not surprisingly—that Sherrod's foremost concern was releasing the funds in the Plan account." *Id.*

c. "So imagine Merrill Lynch's surprise at the April 13, 2012 hearing when Sherrod opposed its motion and proposed order to release the Plan account freeze." *Id.*

d. "But arguably, the Plan administrator is responsible for the continuation of the injury past April 13, 2012, when the Plan administrator rejected the proposed agreement to unfreeze the Plan account." *Id.* at 607.

60. For an unknown reason, Sherrod changed course again and agreed to have the state court lift the freeze on Sherrod's assets in the Plan account at Merrill Lynch, and the freeze was lifted in May 2013, and Merrill Lynch acknowledged the termination of the freeze on June 6, 2013. Exh. S.

**Distributions and Payments from the Plan**

61. On November 10, 2011, Sherrod directed Merrill Lynch to make two distributions, totaling $253,000, from the Plan to be used to secure a court-ordered bond for her as follows:

a. Sherrod directed the two distributions by her signed, sworn affidavit ("Affidavit"). Exh. Q at 18-20.

b. Sherrod averred the first distribution in the amount of $250,000.00 was solely for the purpose of securing a bond pursuant to the "Appeal Order." Exh. Q at 18, ¶ 4.

c. The Affidavit stated the second distribution in the amount of $3,000.00 was payable to Bologna Surety for costs of filing the bond. Exh. Q at 19, ¶ 5.

d. The bond was issued in the name of "Dr. Shirley T. Sherrod," individually, as the Principal (Appellant). Exh. Q at 14-16. Sherman is the obligee. *Id.*

e. The Appeal Order dated October 28, 2011, reopened the appeal specifically "with respect to appellant Shirley T. Sherrod, M.D." Exh. Q at 12, first paragraph. The

Court lifted a court-ordered freeze on Sherrod's assets, stating that Sherrod's "assets may be used to post the stay bond . . . ." *Id.* at 12, third paragraph.

f. Merrill Lynch wired $250,000.00 to Wells Fargo Bank on November 20, 2011. Exh. Q at 3-4; Merrill Lynch Distributions from Plan, Exh. T at 2.

g. Merrill Lynch distributed $3,000.00 via check on November 10, 2011, to Bologna Surety Agency, Inc. for bond processing services. Exh. T at 1.

62. Sherrod caused payments in the form of checks to herself from the Plan's assets in 2013 through 2017 as shown in the Plan's bank records, which are summarized in Exh. U.[3]

63. In July 2013, Sherrod directed two payments to herself totaling $50,000.00 paid to "Shirley T. Sherrod MD." Exh. U; Exh. C at 89-92; Exh. K.

64. In 2014, 37 payments totaling $286,905 were paid to Sherrod as "Shirley T. Sherrod," or "Shirley T. Sherrod P/ADM", and two payments to Sherrod's Attorney, Conger, for $1,000 and $3,000. Exh. U; Exh. C at 145:20-22, 163-167. Total payments were $290,905.

| **Date of Distributions 2014** | **Amount** |
|---:|---|
| 1/22/2014 | $ 10,000.00 |
| 1/22/2014 | $ 10,000.00 |
| 1/22/2014 | $ 10,000.00 |
| 1/22/2014 | $ 10,000.00 |
| 1/22/2014 | $ 10,000.00 |
| 2/11/2014 | $ 10,000.00 |
| 2/11/2014 | $ 10,000.00 |
| 2/11/2014 | $ 10,000.00 |
| 2/11/2014 | $ 10,000.00 |
| 3/4/2014 | $ 57,405.00 |
| 3/4/2014 | $ 5,000.00 |
| 3/4/2014 | $ 5,000.00 |

[3] Exhibit U is a Summary Exhibit pursuant to Federal Rule of Evidence 1006 that summarizes seven years of bank and check records for the Plan accounts at three different financial institutions. All of the bank documents were produced from the individual banks in response to subpoenas served on the banks. All of the documents were produced to Defendants in discovery, and the specific bates-stamped pages for specific checks are identified.

| | |
|---|---|
| 3/4/2014 | $ 5,000.00 |
| 3/4/2014 | $ 3,000.00 |
| 3/4/2014 | $ 3,000.00 |
| 4/15/2014 | $ 5,000.00 |
| 4/15/2014 | $ 5,000.00 |
| 4/15/2014 | $ 5,000.00 |
| 4/15/2014 | $ 5,000.00 |
| 4/15/2014 | $ 5,000.00 |
| 4/15/2014 | $ 2,000.00 |
| 4/28/2014 | $ 5,000.00 |
| 4/28/2014 | $ 5,000.00 |
| 4/28/2014 | $ 5,000.00 |
| 4/28/2014 | $ 2,000.00 |
| 5/27/2014 | $ 10,000.00 |
| 5/27/2014 | $ 10,000.00 |
| 5/27/2014 | $ 10,000.00 |
| 5/27/2014 | $ 10,000.00 |
| 5/27/2014 | $ 10,000.00 |
| 6/17/2014 | $ 1,000.00 |
| 7/28/2014 | $ 5,000.00 |
| 9/23/2014 | $ 5,500.00 |
| 10/27/2014 | $ 4,000.00 |
| 10/27/2014 | $ 3,000.00 |
| 11/24/2014 | $ 5,000.00 |
| 11/24/2014 | $ 5,000.00 |
| Total: | $ 290,905.00 |

65. In 2015, 26 distributions to Sherrod totaling $120,016.00 were paid by the Plan to "Shirley T. Sherrod P/ADM." Exh. U; Exh C. at 194-195.

| **Date of Distributions 2015** | **Amount** |
|---|---|
| 1/5/2015 | $ 5,000.00 |
| 1/5/2015 | $ 5,000.00 |
| 1/5/2015 | $ 4,440.00 |
| 2/5/2015 | $ 5,000.00 |
| 2/5/2015 | $ 5,000.00 |
| 2/5/2015 | $ 4,440.00 |
| 3/2/2015 | $ 5,000.00 |
| 3/2/2015 | $ 4,000.00 |
| 4/6/2015 | $ 5,000.00 |

| | |
|---|---|
| 4/6/2015 | $ 4,444.00 |
| 4/22/2015 | $ 4,444.00 |
| 4/22/2015 | $ 5,000.00 |
| 6/1/2015 | $ 5,000.00 |
| 6/1/2015 | $ 2,700.00 |
| 7/1/2015 | $ 5,000.00 |
| 7/1/2015 | $ 4,444.00 |
| 8/10/2015 | $ 4,444.00 |
| 8/10/2015 | $ 4,444.00 |
| 8/19/2015 | $ 4,444.00 |
| 8/19/2015 | $ 4,444.00 |
| 10/8/2015 | $ 5,000.00 |
| 10/8/2015 | $ 4,444.00 |
| 10/21/2015 | $ 5,000.00 |
| 10/21/2015 | $ 4,444.00 |
| 11/30/2015 | $ 5,000.00 |
| 11/30/2015 | $ 4,440.00 |
| Total: | $ 120,016.00 |

66. In 2016, 30 distributions to Sherrod totaling $196,471.50 paid to "Shirley T. Sherrod P/ADM." Exh. U; Exh. C at 208-209.

| **Date of Distributions 2016** | **Amount** |
|---|---|
| 1/6/2016 | $ 4,444.00 |
| 1/6/2016 | $ 4,444.00 |
| 2/1/2016 | $ 5,000.00 |
| 2/1/2016 | $ 4,444.00 |
| 2/22/2016 | $ 5,000.00 |
| 2/22/2016 | $ 4,444.00 |
| 4/4/2016 | $ 5,000.00 |
| 4/4/2016 | $ 4,444.00 |
| 4/18/2016 | $ 5,000.00 |
| 4/18/2016 | $ 4,444.00 |
| 5/18/2016 | $ 5,000.00 |
| 5/18/2016 | $ 4,444.00 |
| 6/28/2016 | $ 5,000.00 |
| 6/28/2016 | $ 4,444.00 |
| 7/29/2016 | $ 5,000.00 |
| 7/29/2016 | $ 4,444.00 |
| 9/1/2016 | $ 5,000.00 |

| | |
|---|---|
| 9/1/2016 | $ 4,444.00 |
| 9/27/2016 | $ 5,000.00 |
| 9/27/2016 | $ 4,444.00 |
| 10/17/2016 | $ 18,255.50 |
| 10/27/2016 | $ 5,000.00 |
| 10/27/2016 | $ 4,444.00 |
| 11/22/2016 | $ 20,000.00 |
| 11/22/2016 | $ 5,000.00 |
| 11/22/2016 | $ 4,444.00 |
| 12/21/2016 | $ 18,000.00 |
| 12/21/2016 | $ 5,000.00 |
| 12/21/2016 | $ 4,444.00 |
| 12/27/2016 | $ 18,000.00 |
| Total: | $ 196,471.50 |

67. In 2017, 28 distributions totaling $173,809.99.00 were paid to "Shirley T. Sherrod P/ADM." Exh. U.

| **Date of Distributions 2017** | **Amount** |
|---|---|
| 2/2/2017 | $ 4,444.00 |
| 2/2/2017 | $ 5,000.00 |
| 3/2/2017 | $ 4,444.00 |
| 3/2/2017 | $ 4,444.00 |
| 4/3/2017 | $ 5,000.00 |
| 4/3/2017 | $ 4,444.00 |
| 4/4/2017 | $ 8,932.91 |
| 4/4/2017 | $ 8,932.91 |
| 5/1/2017 | $ 4,444.00 |
| 5/1/2017 | $ 5,000.00 |
| 6/2/2017 | $ 4,444.00 |
| 6/2/2017 | $ 5,000.00 |
| 6/7/2017 | $ 11,798.93 |
| 6/13/2017 | $ 2,701.69 |
| 6/21/2017 | $ 3,582.62 |
| 6/26/2017 | $ 1,720.93 |
| 6/27/2017 | $ 28,700.00 |
| 7/24/2017 | $ 9,000.00 |
| 7/24/2017 | $ 9,000.00 |
| 7/24/2017 | $ 5,000.00 |
| 8/29/2017 | $ 4,444.00 |

| | |
|---|---|
| 9/18/2017 | $ 5,000.00 |
| 10/5/2017 | $ 5,000.00 |
| 10/5/2017 | $ 4,444.00 |
| 11/2/2017 | $ 5,000.00 |
| 11/2/2017 | $ 4,444.00 |
| 12/4/2017 | $ 5,000.00 |
| 12/4/2017 | $ 4,444.00 |
| Total: | $ 173,809.99 |

68. Sherrod admitted all the checks from 2013, 2014, 2015 and 2016 were directed by her to herself, except for four checks (two in 2013 and two in 2014). Exh. C at 87:14-22; 163-167; 194-195; 208-209.

69. In 2013, Sherrod directed that two checks be issued, one for $12,603.88 payable to a participant (C. Riggleman) and one for $3,150.97 payable to the Internal Revenue Service ("IRS"). Exh. K at 9-10.

a. The money for both checks came out of the Plan's account. Exh. K at 9-10.

b. The check to the participant was never cashed and Comerica attempted to return the money to the Plan in January 2016. Exh. C at 120-121; 169-171; Exh. V at 1.

c. At that time, Sherrod had closed the Plan's account at Comerica, and Comerica contacted Sherrod requesting instructions on where to return the funds. Exh. I; Exh. L; Exh. V at 1.

70. In 2014, Sherrod directed two checks totaling $4,000.00 payable to Sherrod's attorney Mr. Conger (one check for $1,000 and another for $3,000). Exh. C at 84:5-13, 168:7-24, 169:1-10; Exh. U at 2, ¶ 3(A), 4. Sherrod presented no invoices or explanation for these checks other than the vague explanation, "in connection with unfreezing the Plan" in 2011, 2012, and 2013. Exh. N at 7.

71. The Plan's account reflects no deposits in 2014, 2015, 2016 or 2017. Exh. U at 3, ¶ 3(D).

72. In 2017, Sherrod directed six distributions totaling $37,684.99 payable to persons appearing to be participants in the Plan. Two of those distributions, each for $8,932.91, were sent to Sherrod's address in South Carolina. Exh. C at 230:5-15; Exh. U at 2, ¶ 3(B), 6.

73. In 2017, Sherrod directed a distribution of $28,700.00 to the State of Michigan, escheating the value of certain participant accounts. Exh. C at 232; Exh. U at 6.

74. Sherrod admitted that the distributions in 2017 to participants in the Plan were for the wrong amounts. Exh. C at 223-224; 305.

75. Johnson did not approve or review any of Sherrod's distributions or payment activity after Johnson became Plan Administrator on May 30, 2012. Exh. D at 17, 54-60, 77-80.

76. Johnson only took Sherrod's word for expenses she allegedly spent money on from 2014 to 2017 and never reviewed any documents in support. Exh. D at 80-82.

**Reported Plan Distributions**

77. From 2011 to 2017, the checks written to Sherrod were allocated across all participants' account values, having the effect of reducing all participants' retirement benefits. Exh. A; Exh. B.

78. For the 2011 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid, and reported $246,291 as a "loss" to the Plan. Exh. A at 1.

79. For the 2012 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid. Exh. A at 4.

80. For the 2013 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid. Exh. A at 7.

81. For the 2014 Plan Year, Defendants reported $57,000.00 in benefit distributions and $142,000.00 in expenses paid, totaling $199,000.00. Exh. A at 10.

82. For the 2015 Plan Year, Defendants reported $59,000.00 in benefit distributions and $40,000.00 in expenses paid, totaling $99,000.00. Exh. B at 2.

83. For the 2016 Plan Year, Defendants reported $62,550.00 in benefit distributions and $133,922.00 in expenses paid, totaling $196,472.00. Exh. B at 5.

84. For the 2017 Plan Year, Defendants reported $135,187.00 in benefit distributions and $46,890.00 in expenses paid, totaling $182,077.00. Exh. B at 8.

**Sherrod and Johnson's testimony on their use of the Plan's assets**

85. Sherrod testified the money she spent in 2014 related to expenses she "personally assumed over a roughly three-year period in connection with unfreezing the Plan" in 2011, 2012, and 2013. Exh. N at 7.

86. Sherrod described the Plan's accounting for 2014 as "a big mess." Exh. C at 178:1-3.

87. For 2015, Sherrod stated no documents exist for paying any expenses, and she could not recall paying any service providers. Exh. C at 186:5-11; 300-301.

88. For 2016, Sherrod stated no documents exist to support any payments of plan expenses. Exh. C at 300-301. Sherrod claimed the only paid service provider was Groom Law for the work they did in this litigation, she testified she continues to need to pay lawyers from the Plan's assets. *Id.* at 197-99.

89. For 2017, Sherrod stated no documents exist to support any payment of expenses. Exh. C at 300-301. Sherrod claimed the only paid service provider was Reed-Ramsey, Groom Law, and Russell Kofoed for the work they did in this litigation. *Id.* at 17-19.

90. The Investigator for the Department of Labor determined the total amount that must be reallocated for January 1, 2011 to December 31, 2017 was $786,220.34. Exh. U at 2, ¶ 3.

Dated: February 27, 2020

Respectfully submitted,

For the Secretary:

**KATE S. O'SCANNLAIN**
Solicitor of Labor

**CHRISTINE Z. HERI**
Regional Solicitor

/s/ Bruce C. Canetti
**BRUCE C. CANETTI**
Senior Trial Attorney

P.O. ADDRESS:
U.S. Department of Labor
Office of the Solicitor
230 South Dearborn Street, Ste. 844
Chicago, Illinois 60604
Telephone: (312) 353-3271
Facsimile: (312) 353-5698
canetti.bruce@dol.gov
IL Reg. #: 6285867

Attorneys for EUGENE SCALIA,
Secretary of Labor,
U.S. Department of Labor,
Plaintiff