**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4  R. ALEXANDER ACOSTA,           )
5  Secretary of Labor, United     )
6  States Department of Labor,     )
7          Plaintiff,              )
8       -vs-                       ) Case No:
9  SHIRLEY T. SHERROD; LEROY       ) 1:16-cv-04825
10 JOHNSON; and SHIRLEY T.         )
11 SHERROD, M.D., P.C. TARGET      )
12 PENSION PLAN,                   )
13          Defendants.            )
14     The deposition of SHIRLEY T. SHERROD, called
15 for examination, taken pursuant to the Federal
16 Rules of Civil Procedure of the United States
17 District Courts pertaining to the taking of
18 depositions, taken before ALICE M. SCHWINGER, CSR
19 NO. 84-2913, a Notary Public within and for the
20 County of DuPage, State of Illinois, and a
21 Certified Shorthand Reporter of said state, at
22 Suite 844, 230 South Dearborn Street, Chicago,
23 Illinois, on the 2nd day of May, A.D. 2018,
24 commencing at 9:05 a.m.
```

**Page 2**

```
1  PRESENT:
2       UNITED STATES DEPARTMENT OF LABOR,
3       OFFICE OF THE SOLICITOR,
4       (230 South Dearborn Street, Room 844,
5       Chicago, Illinois 60604,
6       312/353-3271), by:
7       MR. BRUCE C. CANETTI,
8            appeared on behalf of the Plaintiff;
9
10      OLIVER CLOSE, LLC,
11      (124 North Water Street,
12      Suite 300 Waterside Center,
13      Rockford, Illinois 61107-3974,
14      815/963-0009), by:
15      MR. JOHN REARDEN, JR.,
16            appeared on behalf of the Defendants.
17
18 ALSO PRESENT:  Scott C. Stieritz, Auditor
19
20
21
22
23 REPORTED BY:  ALICE M. SCHWINGER, CSR
24              CSR No. 84-2913.
```

**Page 3**

```
1       (WHEREUPON, the witness was duly
2        sworn.)
3          SHIRLEY T. SHERROD,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6            EXAMINATION
7  BY MR. CANETTI:
8     Q.   Good morning.  Would you state and spell
9  your name for the record, please.
10    A.   Shirley T. Sherrod.  Last name is
11 spelled S-h-e-r-r-o-d.
12    Q.   All right.  And you're represented by
13 counsel today; correct?
14    A.   Correct.
15    MR. CANETTI:  This deposition is being taken
16 pursuant to the Federal Rules of Civil Procedure 30
17 regarding allegations of ERISA violations with
18 respect to the Shirley T. Sherrod, M.D., P.C.
19 Target Pension Plan.  I'll refer to that as "the
20 plan" throughout our deposition.
21          And this is the matter of the case
22 Acosta V. Sherrod, et al., 1:16-CV-04825, in the
23 Northern District of Illinois.
24          My name is Bruce Canetti.  I'm a senior
```

**Page 4**

```
1  trial attorney for the plaintiff.  And with me is
2  Scott Stieritz.  He's an auditor for the Employee
3  Benefits Security Administration.
4  BY MR. CANETTI:
5     Q.   Have you been deposed before,
6  Ms. Sherrod?
7     A.   Yes.
8     Q.   And just to go over again how these
9  work.  The court reporter is writing down what you
10 and I both say, so we want to make sure we have
11 oral answers.  You can't do shakes of the head or
12 "uh-uh."  We've got to make sure we don't speak
13 over each other, so you've got to let me finish my
14 question and I want to make sure you finish your
15 answer before I start speaking.  It's kind of human
16 nature.  You kind of know sometimes where I'm going
17 with my question and you want to answer it, but
18 we've got to make sure we let each other finish our
19 sentences.
20          I want to make sure you understand my
21 questions.  So if you don't understand something,
22 please let me know.
23          This is your deposition, so do not look
24 to anybody else to answer your questions.  You
```



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD              9–12

Page 9

1  was of the proceeding or what the proceeding
2  involved?
3      A.  I don't recall.
4      Q.  Did you bring any documents with you
5  today?
6      A.  What documents specifically?
7      Q.  Any documents related to this
8  litigation.
9      A.  No.
10     Q.  Where do you currently reside?
11     A.  Illinois.
12     Q.  And what's your address?
13     A.  2631 South Indiana.
14     Q.  Can you give the full address, please.
15     A.  That's it.
16     Q.  What city is that in?
17     A.  Chicago.
18     Q.  And what's the ZIP code?
19     A.  60616.
20     Q.  Are you married?
21     A.  No.
22     Q.  Do you have children?
23     A.  No.
24     Q.  What's the highest level of education

Page 10

1  you've received?
2      A.  Medical doctorate.
3      Q.  And where did you get a medical
4  doctorate from?
5      A.  Wayne State University.
6      Q.  And when was that?
7      A.  1973.
8      Q.  Are you currently employed?
9      A.  By -- you mean employed or
10  self-employed?
11     Q.  Are you currently -- is there somebody
12  that's employing you right now?
13     A.  No.
14     Q.  Do you currently have any income from
15  any type of job?
16     A.  No.
17     Q.  And what was the last place that you did
18  work at?
19     A.  Well, I was self-employed.
20     Q.  You were self-employed?
21     A.  Right.
22     Q.  When was that?
23     A.  I remain self-employed.
24     Q.  What do you do?

Page 11

1      A.  Occasionally consultations.
2      Q.  Consultations about what?
3      A.  Ophthalmology.
4      Q.  Do you currently have any contracts
5  regarding the consultations?
6      A.  No.
7      Q.  Have you ever had any official contracts
8  related to those consultations?
9      A.  Over the period of 40 years, I'm sure,
10  but I don't recall them.
11     Q.  When did you first start becoming
12  self-employed?
13     A.  1977.
14     Q.  At some point you had a business called
15  Shirley Sherrod, M.D., P.C.?
16     A.  Yes.
17     Q.  And what was your title and job duties
18  with Shirley Sherrod, M.D., P.C.?
19     A.  Physician.
20     Q.  What type of physician?
21     A.  Ophthalmologist.
22     Q.  Were you also in charge of running the
23  Shirley Sherrod, M.D., P.C., business?
24     A.  Clarify that, please, when you say

Page 12

1  "running."
2      Q.  Did somebody else run that company?
3      A.  Well, I guess it's really not clear to
4  me what you're asking, but I was the owner.
5      Q.  Did you make all the day-to-day
6  decisions on running the business?
7      A.  No.
8      Q.  Who else helped in the decisionmaking?
9      A.  Well, generally, one would have office
10  managers and other professionals to consult with.
11     Q.  So you consulted with an office manager?
12     A.  Yes.
13     Q.  Was there any other employees of that
14  company that you consulted with in making
15  day-to-day decisions?
16     A.  No.
17     Q.  And Sherrod M.D., P.C., no longer had
18  any employees as of December 31, 2008; is that
19  right?
20     A.  No.
21     Q.  When was the last time Sherrod M.D.,
22  P.C., had employees?
23     A.  It still does.
24     Q.  Who are the employees of Sherrod, M.D.,



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD          17–20

Page 17

1  A.  That would involve -- well, obviously,
2  attorneys, accountants, actuaries, and there is an
3  administrator.
4  Q.  Who are the attorneys that did work for
5  the plan in 2017?
6  A.  I believe that you'd have the names of
7  them, but I believe that was the Groom firm and
8  Mr. Kofoed.
9  Q.  And the work that Groom -- the law firm
10  called Groom and Russell Kofoed did, was that
11  related solely to this litigation?
12  A.  I can't recall exactly.
13  Q.  Is there anything that would help you
14  recall?
15  A.  No.
16  Q.  Can you think of anything, as you sit
17  here today, of something they did that was not
18  related to this litigation?
19  A.  No, I cannot give you an answer to that.
20  Q.  Why not?
21  A.  I can't recall.
22  Q.  And there's nothing that would help you
23  recall; correct?
24  A.  No.

Page 18

1  Q.  And you said that some accountants did
2  work for the plan.  Who was that?
3  A.  I believe the firm is Reed-Ramsey.
4  Q.  And where is Reed-Ramsey located?
5  A.  I don't have the address at the moment.
6  Q.  Do you know what city they're located
7  in?
8  A.  I'd have to guess.  I won't guess.  I'm
9  not sure.
10  Q.  Do you know what state they're located
11  in?
12  A.  Illinois.
13  Q.  Are they in the Chicago area?
14  A.  I'm not sure.
15  Q.  Who do you work with at Reed-Ramsey?
16  A.  I don't recall the person right now.
17  Q.  How long has the plan had work with --
18  how long has Reed-Ramsey done work for the plan?
19  A.  I can't recall exactly.
20  Q.  Is there anything that would help you
21  recall that?
22  A.  No.
23  Q.  And you said there was an actuary that
24  did work for the plan in 2017; correct?

Page 19

1  A.  That would be the actuary.
2  Q.  Reed-Ramsey is the accountant and the
3  actuary?
4  A.  Yes.
5  Q.  And then you said there was an
6  administrator.  Who was that?
7  A.  And that would be L. J. Consultants.
8  Q.  And Leroy Johnson works at L. J.
9  Consultants?
10  A.  Yes.
11  Q.  Is he the only employee there?
12  A.  I don't know the answer to that.
13  Q.  And so what work does the administrator
14  do for the plan?
15  A.  You would have to talk to the
16  administrator on that for specifics.
17  Q.  So you personally don't know what the
18  administrator does?
19  A.  I know that the administrator follows
20  the manual.
21  Q.  So he follows the manual, but you don't
22  have any specific description of the work he does?
23  A.  You should consult with the
24  administrator on that.

Page 20

1  Q.  I'm just trying to understand what you
2  think the administrator does.
3  A.  I think that they follow the rules in
4  the manual.
5  Q.  Has anyone given you any advice to help
6  you do your work as a trustee for the plan?
7  A.  I can't recall.
8  Q.  Is there anything that would help you
9  recall that?
10  A.  No.
11  Q.  Do you as trustee of the plan
12  communicate with the participants at all?
13  A.  I can't recall when I -- I may have, but
14  I can't recall when.
15  Q.  Do you recall how often you've
16  communicated with the participants?
17  A.  I can't recall when.  I can't recall.
18  Q.  Is there anything that would help you
19  recall that?
20  A.  No.
21  Q.  Have you ever sent any letters to any
22  participants?
23  A.  Yes, I think so.
24  Q.  What year was that?



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD          49–52

Page 49

1 documents, I am pleased to inform you that your
2 claim for benefits is approved."
3    A.   Yes.
4    Q.   Do you understand this to be an approval
5 of a claim for benefits on your behalf?
6    A.   I understand that this was part of a
7 process the way in which one would -- I had never
8 done this before. This is something the attorney
9 recommended. And so I signed to follow through to
10 achieve the goal of --
11   Q.   Now, it says, "Upon review of claim,
12 employment history and the relevant plan document."
13 Do you recall what document you reviewed as the
14 plan document?
15   A.   I don't recall. I just recall that this
16 was what was recommended, and if there's more than
17 two needs, you need to go to the lawyer.
18   Q.   Do you recall this document here was the
19 plan document referred to, Exhibit No. 1?
20   A.   I'm not sure.
21   MR. REARDEN: I would like to take a break.
22   MR. CANETTI: Sure.
23        (WHEREUPON, a short break was
24        taken.)

Page 50

1 BY MR. CANETTI:
2    Q.   We're back on the record. I'll remind
3 you you're still under oath.
4        We talked earlier about some
5 communications with the participants. Do you
6 recall if you ever sent anything called participant
7 statements at least once a year to participants?
8    A.   What period of time are you talking
9 about?
10   Q.   At any point between, let's say, 2011
11 and today, have you ever sent something called
12 participant statements on an annual basis to
13 participants?
14   A.   Between 2011 and today?
15        When you say "you," you're speaking
16 about me personally?
17   Q.   Yes.
18   A.   No, I didn't personally send that.
19   Q.   Do you know if anybody else sent
20 participant statements to the participants on an
21 annual basis between 2011 and 2017?
22   A.   That would have been, I believe, the
23 attorney involved, the actuary. They would have
24 been sent by someone other than myself.

Page 51

1    Q.   You're saying an actuary would have sent
2 them?
3    A.   Actuary or attorney.
4    Q.   Do you know if for any -- either 2011,
5 2012, 2013, 2014, 2015, 2016, or 2017, for any of
6 those specific years, do you know -- do you have
7 personal knowledge that a participant statement
8 was, in fact, sent to the participants?
9    A.   What do you mean by "personal
10 knowledge"?
11   Q.   Did you ever see these participant
12 statements sent to -- that were to be sent to the
13 participants?
14   A.   I saw the statements. If you're asking
15 if I saw them in an envelope with a stamp, I can't
16 verify to that amount -- to that extent.
17   Q.   Did you direct either an attorney or
18 actuary to send participant statements to the
19 participants?
20   A.   Yes.
21   Q.   And what year did you do that?
22   A.   Each of the years.
23   Q.   Every year from 2011 to 2017?
24   A.   I'm not sure exactly. You said 2017.

Page 52

1 There may have been a difference in one or two of
2 those years, but I'm not exactly sure at this
3 moment.
4    Q.   Do you know who you directed to send
5 them out in 2011?
6    A.   Between the attorney -- attorney's
7 office and the actuaries who were involved with the
8 account.
9    Q.   What attorney was it in 2011?
10   A.   I believe that that was -- I said
11 between the actuary and attorney, so one or the
12 other, and I think that that would have been the
13 Sinclair office.
14   Q.   I'm sorry. What office?
15   A.   Sinclair.
16   Q.   And that's the actuary?
17   A.   Right.
18   Q.   And who could have been the attorney
19 that sent it?
20   A.   I don't know that he would have been in
21 '11, but I know that there was some coordination
22 with Mr. Conger's office.
23   Q.   C-o-n-g-e-r?
24   A.   Yes.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
81–84

Page 81

1  documents that you did not provide to us that
2  related to payments to Mr. Bartolic?
3      A.   No.  And I think he's also given you the
4  information about what he was paid too.  I saw
5  that.
6      Q.   Now, you engaged an attorney named Ben
7  Gonek; is that right?  Ben Gonek, G-o-n-e-k.
8      A.   Right.
9      Q.   Do you know when you hired him?
10     A.   I don't recall.
11     Q.   And do you know when he stopped working
12  for you?
13     A.   No, I don't recall that.
14     Q.   Is there anything that would help you
15  remember those dates?
16     A.   The information that you possess that we
17  gave you.
18     Q.   And do you know what work he did for
19  you?
20     A.   That would have been on the bond.
21     Q.   What work was he doing with respect to
22  the bond?
23     A.   Well, I believe that these people that
24  you're working with were trying to get the bond,

Page 82

1  same ones that are trying to get it now.
2      Q.   Who is that?  I didn't follow.
3      A.   Sherman.
4      Q.   Oh, Sherman.
5      A.   Mm-hmm.
6      Q.   So he was working on your behalf to
7  prevent Mr. Sherman from getting the bond?
8      A.   Yes.
9      Q.   Do you recall how much you paid him?
10     A.   No.  I think you have that.  This has
11  all been given to you.
12     Q.   And, to your knowledge, are any
13  documents related to payments made to him that you
14  did not provide to us?
15     A.   No.
16     Q.   To your knowledge, did the Shirley T.
17  Sherrod Target Pension Plan sign any contract or
18  engagement agreements hiring any of these
19  attorneys?
20     A.   As I sit here, I don't recall.
21     Q.   Is there anything that would help you
22  recall that?
23     A.   Seeing the documents if I had them.  I
24  don't have -- I don't see them, no.

Page 83

1      Q.   Do you recall if any money was
2  transferred out of the plan and paid directly to
3  any of these attorneys?
4      A.   I believe to Mr. Conger.
5      Q.   Is that the only one?
6      A.   Yes.
7      Q.   Apart from these attorneys, have you
8  engaged any other attorneys to do work related to
9  the plan?
10     A.   At this moment, I don't recall.
11     Q.   Is there anything that would help you
12  recall that?
13     A.   I guess if you were -- you had a time
14  frame.  You never gave me that.  You're looking at
15  a paper here we turned over.  Over the years, I
16  mean, the plan has been here for 40 years.  So you
17  just sort of gave me a broad statement.
18     Q.   From 2011 to the present, have any other
19  attorneys done work for the plan?
20     A.   Okay.  So when you narrow it down like
21  that, I -- everybody that we -- that I know of, I
22  believe to the best of my knowledge, we presented
23  to you with documentation.  So there shouldn't be
24  anybody else.  I don't believe we missed anybody.

Page 84

1      Q.   Okay.  And you said only -- to your
2  knowledge, only one attorney was paid directly?
3      A.   I'm sorry.  I don't hear well and you're
4  going pretty fast.  Slow down.
5      Q.   You said that the only attorney paid
6  directly from the plan was Mr. Conger; correct?
7      A.   To the best of my knowledge, but because
8  there's been some time, I -- you're making me speak
9  from memory.  I'm not speaking from paperwork.  So
10  I may not be accurate and it's not intentional, but
11  I'm doing the best to work with you here.
12          To the best of my knowledge, that was
13  the only one who got anything directly.
14     Q.   Do you recall how any of the other
15  attorneys were paid?
16     A.   For the majority of the attorneys, I
17  paid them myself.
18     Q.   And how did you pay them yourself?
19     A.   When I could muster and have funds
20  available, they were paid by -- from my credit
21  card.  I took loans out.  And primarily that was it
22  was to borrow.  I had to borrow to support the
23  plan.  That was the primary way --
24     Q.   How did the money get to the attorneys?



SHIRLEY SHERROD                                      May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD            85–88

Page 85

1    A.    Generally, I -- from my -- I had checks
2  available from my credit card, so I would write a
3  check to them.
4    Q.    So you wrote checks from your credit
5  card?
6    A.    Yes.
7    Q.    Did you pay them any other way?
8    A.    I don't recall right now.
9    Q.    Did you also pay some of them with money
10 orders?
11   A.    Yeah, I do believe that there were some
12 money orders.  I thought you had copies of those.
13   Q.    Do you have any copies of the checks
14 from your credit cards?
15   A.    No.  Those generally are not returned.
16   Q.    And when did you get the loans on your
17 credit card?
18   A.    When this started.
19   Q.    What year was that?
20   A.    I believe it started in 2011.
21   Q.    Now, you said during the whole time you
22 were self-employed doing consulting work; correct?
23   A.    Yes.
24   Q.    So during 2011, did you have income from

Page 86

1  the consulting work?
2    A.    Very minimal.
3    Q.    What about 2012?
4    A.    It's very minimal.
5    Q.    What does "very minimal" mean?
6    A.    Not enough to support these legal fees.
7    Q.    Do you recall -- how many loans did you
8  take out from your credit card?
9    A.    Too many to count.  There was too much
10 to recall.  It's just been consistent.
11   Q.    You said starting in 2011.  Did you also
12 take loans out in 2012?
13   A.    Every year.
14   Q.    Did you take loans out in 2013?
15   A.    Yes.
16   Q.    Did you take a loan out in 2014?
17   A.    Yes.
18   Q.    In 2015?
19   A.    Yes.
20   Q.    2016?
21   A.    Yes.
22   Q.    2017?
23   A.    Yes.
24   Q.    And the loans you're saying you took out

Page 87

1  from 2011 through 2017 from your credit card all
2  related to paying attorneys; is that right?
3    A.    For the most part.  I don't want to
4  answer incorrectly because I can't think of any
5  other thing that I might have to pay.  But I would
6  certainly say that I don't want you to come along
7  and tell you that I'm telling a tale when I haven't
8  bought anything.  My car is 20 years old.
9         But I -- I can't think of anything else
10 at the moment.  That was the majority reason for
11 them.  And if I'm overlooking something, it's very
12 miniscule, I'm sure, but that was majority -- the
13 reason for the indebtedness on those cards.
14   Q.    When did you first receive a
15 distribution from the plan?
16   A.    I believe that that was in 2013.
17   Q.    And how much was the distribution
18 received in 2013?
19   A.    And I believe that there were some
20 checks that -- you'd know it -- of about 50,000, I
21 believe.  I'm not sure.  I don't have that in front
22 of me at the moment.
23   Q.    What was the process for obtaining the
24 distributions for approximately $50,000 in 2013?

Page 88

1    A.    The process for the distribution?
2    Q.    Mm-hmm.
3    A.    Which is down for expense --
4    MR. REARDEN:  Well, I'm going to object on the
5  basis of when you say the word "distribution," I
6  think that calls for a legal conclusion from her.
7         Answer to the best you can.
8  BY MR. CANETTI:
9    Q.    Did you -- when was the next time you
10 received a distribution?
11   A.    I'll call it funds, and it probably
12 would have been --
13   MR. REARDEN:  I'm going to object again, calls
14 for a legal conclusion.
15        And I'll let you answer and then I want
16 to take a break.
17 BY THE WITNESS:
18   A.    So there would have been funds withdrawn
19 probably, again, '14, I would assume.  I don't
20 recall.  I don't know at this moment.
21 BY MR. CANETTI:
22   Q.    So in 2014 --
23   MR. REARDEN:  I'd like to take a break.
24



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
89–92

Page 89

1          (WHEREUPON, a short break was
2          taken.)
3  BY MR. CANETTI:
4     Q.   Now, we were talking about distributions
5  in 2014.  Did you receive distributions in 2014 for
6  approximately $57,000?
7     A.   You know, I think you're talking from
8  the 5500; is that correct?  You're sort of coming
9  out of thin air on this, and I -- I'd like to see
10  what you're talking about.
11         MR. CANETTI:  I'm going to show you what is
12  going to be marked as Exhibit No. 6.
13         (WHEREUPON, a certain document was
14          marked Sherrod Deposition Exhibit
15          No. 6, for identification, as of
16          May 2, 2018.)
17  BY MR. CANETTI:
18     Q.   These are communications we received
19  between Comerica and yourself.  It's DOL02302 --
20  looks like they're out of order.  Let me look at
21  these again.
22         Looks like it's 2298, 2299, 2300, 2301,
23  2302 and 2303.
24     A.   I don't start at that number.

Page 90

1     Q.   Yeah, I know.  I said they're out of
2  order.  I identified all the Bates numbers.  Let's
3  start on what's the first page on the front here.
4     A.   2302.
5     Q.   2302.
6     A.   Mm-hmm.
7     Q.   And then let's go to the last page in
8  the back which has a handwritten "six" on it.  It
9  says 2303.  This is a letter dated July 15, 2013,
10  from you to Keith Uhler, U-h-l-e-r.
11         Is that your signature on the bottom?
12     A.   Yes, it is.
13     Q.   It says, "Please use this letter as
14  instruction to send two checks to the address of
15  record for the above-mentioned account.  The checks
16  are to be made out as follows:  Dr. Shirley T.
17  Sherrod, M.D., 32,000; Dr. Shirley T. Sherrod,
18  M.D., 18,000."
19     A.   That is correct.
20     Q.   Did I read that correct?
21     A.   That is correct.
22     Q.   Were these checks sent to you?
23     A.   Yes, they would have been.
24     Q.   And did you cash those checks?

Page 91

1     A.   I don't recall whether they were cashed.
2  I don't think they were forwarded to anyone.  I'm
3  not sure right now.
4     Q.   So those funds came out of the plan,
5  though; correct?
6     A.   Those came out of the plan.
7     Q.   And what were those funds used for?
8     A.   Expenses that had been generated for the
9  last three years.
10     Q.   And you're saying 2011, 2012, and 2013?
11     A.   That's right.
12     Q.   And what were the -- and those are the
13  expenses related to the attorneys' fees we talked
14  about before?
15     A.   Legal expenses had to with the plan.
16     Q.   And at this point in July of 2013, the
17  plan was no longer frozen; correct?
18     A.   That would be right.
19     Q.   And then on third page of this packet,
20  2300?
21     A.   Yes.
22     Q.   This is a fax to Keith Uhler from
23  Shirley Sherrod.  It's dated January 21, 2014.  It
24  says "pension withdrawal."

Page 92

1          Is that a cover sheet you used?
2     A.   Yes, that appears to be.
3     Q.   And on the second page, it appears to be
4  the second page of this fax.  It's a letter dated
5  January 20, 2014.  It says "Dear Keith," from
6  Dr. Sherrod.
7          Is that your signature on the bottom?
8     A.   Yes.
9     Q.   And it says, again, "Will you kindly
10  have checks drawn in my name the following amount?
11  Five checks in the amount of $10,000 each"; is that
12  right?
13     A.   That's right.
14     Q.   And what was that money used for?
15     A.   That would be used to pay ongoing
16  expenses or back expenses from the previous three
17  years.
18     Q.   So for expenses -- well, you said -- I'm
19  sorry.  I got confused here, because I think you
20  said ongoing expenses.  So is it now four years
21  you're talking about or three years?
22     A.   Well, I never paid them all off.
23     Q.   So is it -- you're saying this $50,000
24  in January represented expenses from 2011, 2012,



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
117–120

Page 117

1    Q.   Yes.
2    A.   No.  I will tell you that I do not see
3    that captured in here, and I am aware of that.
4    Q.   So this is an act to reflect the money
5    that came out of the plan in 2013; is that right?
6    A.   I think that that was amended later, but
7    I don't see it here, that's correct.
8    Q.   Now, in Part V, 10-F on the page 2067.
9    A.   Mm-hmm.
10   Q.   It says, "Has the plan failed to provide
11   any benefit when due under the plan?"  And it says
12   no.
13        Is that accurate?
14   A.   Wait a minute.  Go back.  Go back.  Go
15   back.
16   Q.   10-F.
17   A.   Okay.  Read that again.
18   Q.   "Has the plan failed to provide any
19   benefit when due under the plan?"  And it says no.
20        Do you agree with that statement?
21   A.   I either agree or disagree.  I'm not
22   really -- "failed to provide any benefit when due."
23   I don't know how to answer that, really.
24   Q.   So you don't understand what that is

Page 118

1    saying?
2    A.   No, because there's a whole time it was
3    frozen and nothing could be provided and I -- you
4    know, I don't know -- that really gets to be a gray
5    area.  I don't know how I could answer that.
6    Probably calls for legal interpretation.
7    Q.   If we go back to -- sorry.  I didn't
8    mark these down -- Exhibit 11, if we turn to 346.
9    A.   Yes.
10   Q.   This is the participant statement for
11   C. Riggleman as of December 31, 2013, and it lists
12   a gain and loss but doesn't list anything else
13   affecting the account balance in that plan.
14        Do you see that?
15   A.   Yes.
16   Q.   Is that accurate to the best of your
17   knowledge?
18   A.   So what you're asking me is there was a
19   prior balance; a gain and loss; a contribution,
20   which would be none; forfeiture, none; expenses;
21   adjustments, apparently nothing was subtracted.
22   There were no withdrawals from her account.  Ending
23   balances.
24   MR. REARDEN:  I'm going to object to your

Page 119

1    question on the basis of it calls for a legal
2    conclusion.
3        Go ahead and answer.
4    BY THE WITNESS:
5    A.   I was -- he's asking -- I don't know.  I
6    mean, I'm just reading to you what I see --
7    BY MR. CANETTI:
8    Q.   Sure.  Let's keep that page open for a
9    moment and go back to the Comerica communications.
10   A.   Mm-hmm.
11   Q.   Which is a different document.
12   A.   Mm-hmm.
13   Q.   Do you want to grab your copy?
14   A.   I got --
15   Q.   Leave that open on that page so you can
16   refer to it.
17   MR. REARDEN:  Can you tell us what deposition
18   exhibit you're referring to?
19   BY MR. CANETTI:
20   Q.   This is Deposition Exhibit No. 6.  I'm
21   referring to page 2301.
22   A.   Mm-hmm.
23   Q.   This looks like a letter dated
24   December 23, 2013.  It says, "Dear Keith," and it's

Page 120

1    from you.  Is that your signature?
2    A.   That's right.
3    Q.   And it says, "A participant needs to opt
4    out of the plan by year's end.  Will you kindly
5    have checks drawn in the following amounts."
6        And it says approximately 12,000 to
7    Carol Riggleman, approximately 3,000 to the IRS.
8    A.   Mm-hmm.
9    Q.   Did you send this letter at that time?
10   A.   To who?
11   Q.   To Keith?
12   A.   Yes.
13   Q.   And then were checks issued pursuant to
14   your instructions at that time?
15   A.   Yes.
16   Q.   So when it says here back on Exhibit
17   No. 11 that there is no withdrawal for
18   Ms. Riggleman, is that accurate?
19   A.   Yes.  I mean, I need to clarify that.
20   These checks were uncashed, so she still had that.
21   Q.   So these checks were issued from the
22   account; right?
23   A.   Yes.
24   Q.   And so the account was reduced by these



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
121–124

Page 121

1  amounts; correct?
2  A.  Not her account.  She didn't -- there
3  were still checks.
4  Q.  So was the plan's account balance
5  reduced by these amounts?
6  A.  We're not looking at the plan's account.
7  You're having me look at hers, and it's not reduced
8  because she didn't get it.
9  Q.  So you're saying this was a reduction
10 just to the plan overall but not to her account?
11 A.  I'm not saying anything.  I'm just
12 telling you because it's confusing and this is why,
13 you know, we're looking to have really good
14 accounting done because it's been so screwy here.
15 But the woman didn't get this.  If she has nothing
16 taken out, you can't make her zero next year.
17 Okay?
18 Q.  So how -- so this money did come out of
19 the plan, though; correct?
20 A.  I believe that that was determined later
21 that it did, I believe.  I'm not -- as I sit here,
22 I don't have sheets in front of me and I'm not
23 going to try to draw the exact conclusion, but I
24 believe that it did.

Page 122

1  Q.  And did you subsequently --
2  A.  Excuse me.  There was -- let me
3  straighten that out.  On paper.
4  Q.  It came out on paper?
5  A.  Yeah.
6  Q.  So the bank account was reduced by these
7  amounts; correct?
8  A.  On paper but not accurately.  It's, you
9  know, it's --
10 Q.  Did you then get notification from
11 Comerica that those amounts were not cashed?
12 A.  I believe that maybe some six months or
13 so later it was brought to our attention that they
14 were uncashed checks.
15         (WHEREUPON, a certain document was
16          marked Sherrod Deposition Exhibit
17          No. 13, for identification, as of
18          May 2, 2018.)
19 BY MR. CANETTI:
20 Q.  Let's just go back to mark this as
21 Exhibit 13.  These are the checks and account
22 statements for 2013 from Comerica.  It lists
23 "Pershing" which must have been some type of bank
24 above Comerica, but you can see in the middle it

Page 123

1  says "Comerica Securities."
2          So the first one is a check, July 16,
3  '13, for $18,000.  Is that your signature on the
4  page 4391 on the bottom right-hand side?
5  A.  Yes.
6  Q.  And then the next page, DOL4396, another
7  Comerica check for 32,000 to Shirley Sherrod.  Is
8  that your signature on the bottom right-hand side?
9  A.  Yes.
10 Q.  And then DOL2301 is, again, that same
11 letter we looked at before; correct?
12 A.  Yes.
13 Q.  And then this is the account statement
14 from Comerica on the last page.  And do you see at
15 the bottom, the last two entries from December 24,
16 2013, it shows the check for 12,600 being
17 subtracted from the account and one for 3150 being
18 subtracted from the account?
19 A.  I see that.
20 Q.  Does that correspond to the letter on
21 the previous page to the amounts?
22 A.  That would correspond to checks that
23 were cut, yes.
24 Q.  Now, back to Exhibit No. 12, the 5500

Page 124

1  for that year.  So on page 2 it shows the changes,
2  the financial information, under section Part 3 on
3  page DOL2067.
4  A.  Hang on.
5          Yeah.
6  Q.  Top part of financial information, was
7  the approximately $15,000 that came out of the
8  account in December, was that reflected at all in
9  the Part 3, financial information?
10 A.  As of -- as of the time that this was
11 being filed in '14, and so let's go back to --
12 again, we're talking about October '14, and so --
13 no.  Give me that question again, please.
14 Q.  The $15,000 we saw that came out in
15 December of 2013, is that reflected at all?
16 A.  Where?
17 Q.  In this section up here related to the
18 financial information --
19 A.  Yeah, I don't -- I don't know.  I really
20 don't know.  Again, you have to talk with the
21 person who did it.  I don't know.
22 Q.  And, again, you don't know who did this,
23 who did this form?
24 A.  No.  I'm not sure.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
129–132

Page 129

1   change it from Google stock to Facebook stock.
2       Did you try and change --
3       A.   I think I see your point.
4       Q.   -- different investment vehicles at
5   Merrill Lynch to different places?
6       A.   Merrill Lynch blocked any administration
7   of that plan off that we were not administrators.
8   We could do nothing.  They would not let us buy,
9   sell, or do anything.
10          There was a lady there, Linda, she said
11  it's closed, protected or whatever.  We could not
12  get any cooperation from Merrill Lynch.  And I
13  think that you'll see -- I don't know which
14  attorney it was, but they took over -- they were
15  the administrator.  They were the trustee.  Merrill
16  Lynch ran this plan for three years.
17      Q.   Do you have any records of any written
18  requests you made to try and move the assets where
19  they were at Merrill Lynch to a different account
20  at Merrill Lynch?
21      A.   There -- there may be some things that
22  existed in e-mail, I think, where Mr. Ciccodicola
23  wanted -- at some point he asked to move it to
24  Mr. Morad, and he asked and they refused.  We -- I

Page 130

1   think I saw something like that.  I don't know
2   whether you have it.  It was an e-mail, I think,
3   that was sent out.
4           We tried everything.  Okay?  This was
5   very important.  These are my life savings, and
6   these are the people that we wanted to help and
7   still feel the same way, and there was nothing.
8   This should not have happened.  I banged on
9   Department of Labor's doors, saw your notes there,
10  Washington, D.C. and everywhere.  Slept in my car
11  one night to get there with no funds just to try to
12  get this undone.  Because it wasn't right and you
13  guys know that.
14          I should stop talking.  This has been a
15  very bad experience and --
16      MR. REARDEN:  We should stop right there.
17  Just answer his questions.
18      THE WITNESS:  I know it wasn't his question,
19  but I feel -- I apologize.  I tried.
20  BY MR. CANETTI:
21      Q.   Now, here is two other pages you
22  produced to us, appear to be related.  This is
23  Exhibit No. 15.
24

Page 131

1           (WHEREUPON, a certain document was
2           marked Sherrod Deposition Exhibit
3           No. 15, for identification, as of
4           May 2, 2018.)
5   BY MR. CANETTI:
6       Q.   It's a DOL23 -- I'm sorry -- Sherrod231
7   and 232.  I'm going to start with the second page
8   first, 232.
9           Is that your signature under Shirley T.
10  Sherrod for the plan?
11      A.   Yes.
12      Q.   And then do you recognize as
13  Mr. Johnson's signature under "Leroy Johnson, Plan
14  Administrator"?
15      A.   I do.
16      Q.   And was this the document that appointed
17  Mr. Johnson to be the plan administrator?
18      A.   14?
19      Q.   First page.
20          I'm sorry.  The second page is what I'm
21  referring to.
22      A.   The second page, that would be correct.
23      Q.   And it says in paragraph No. 2:  "I
24  hereby appoint Leroy Johnson plan administrator as

Page 132

1   successor to myself."
2           Were you the plan administrator up until
3   that point?
4       A.   I think it was Merrill Lynch, but
5   whatever you want to say, yeah, okay.  You know,
6   figuratively, yes.  In actuality, no.
7       Q.   Before the freeze in February of 2011,
8   were you the plan administrator?
9       A.   Yes.
10      Q.   And then on the first page, Sherrod231,
11  it says, "I, Leroy Johnson, administrator of the
12  Shirley T. Sherrod, M.D., P.C., Target Benefit
13  Pension Plan and Trust turn the administration of
14  the plan over to L. J. Consulting Services."
15          Have you seen this document before?
16      A.   I don't recall.  It makes sense, but I
17  don't recall that I've necessarily seen this.
18      Q.   Do you recognize that as Mr. Johnson's
19  signature?
20      A.   It looks like the signature.
21      Q.   Do you know if he had the power to
22  appoint a new administrator as the plan
23  administrator?
24      A.   That's a legal question that I can't



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
145–148

Page 145

1  pocket.
2      Q.    You signed off to the factual accuracy
3  of all these responses; correct?
4      A.    Yes.
5      Q.    So I'm trying to understand.  You're
6  saying this is not accurate, then?
7      A.    I don't know that I would characterize
8  it like that as not accurate.  I think it's a
9  matter of how one characterizes that.
10     Q.    You said earlier you put money -- you
11  paid people by taking loans off your credit cards
12  in 2011, '12 and '13.
13     A.    I did.
14     Q.    Right?  Did you then take money out of
15  the plan and pay yourself back and pay off those
16  credit cards?
17     A.    I think -- I guess it would be
18  confusing.  Pay myself back?  No, I didn't pay
19  myself back.
20     Q.    Did that money go to your credit cards
21  and pay off the loans you had on your credit cards?
22     A.    Yes.  It went towards the credit cards.
23     Q.    Why do you not think it's paying
24  yourself back?

Page 146

1      A.    Because it was a debt that was generated
2  for the plan.
3      Q.    So it was a debt to the plan?
4      A.    Yeah, it was an expense.
5      Q.    So you loaned the plan that money;
6  correct?
7      A.    I don't know that I would consider it a
8  loan at the time that it happened.
9      Q.    You're saying the plan had a debt to
10  you?
11     A.    When all was said and done, there was
12  monies that were owed that had been for the plan,
13  and when the information was given to the attorneys
14  and the actuary, this is the way they summed it up.
15     Q.    So the money that you're saying here in
16  2014, this 193,905, that went and paid off amounts
17  on your credit cards; is that right?
18     A.    I think that the amount of 193 is wrong.
19  You're -- that's -- I think you're looking at the
20  total -- you're including in there what was
21  actually a distribution.
22     Q.    I'm not including that in there.  I'm
23  reading what you said here as what happened in
24  2014.

Page 147

1      A.    I think it's broken down on the 5500.
2  You see, there's one -- apparently the 5500 is not
3  really agreeing with that because it's broken down.
4  And so the 5500 is what was filed, and that's what
5  is -- obviously, there's two different versions,
6  and the 5500 doesn't agree with that.
7      Q.    So you think this 193,905 is not
8  accurate?
9      A.    I have to stand by the 5500 that has
10  broken it down, and I think that that needs to be
11  broken down.  It was not.
12     Q.    Well, if it's 193 -- I'm sorry -- or
13  194, and you're saying you had 57,000, so 50,000
14  off of that would be 144, approximately, and then
15  another 7,000 would be, like, 137,000.
16         So that's still -- even if the
17  distribution you're saying was calculated in there,
18  that still doesn't arrive at the 142,000.
19     A.    I'm not sure what number you're looking
20  at.  I'm looking at the 5500, and this is what the
21  person who does the math was adding up.  And I
22  wouldn't necessarily rely on the addition there.
23     Q.    You wouldn't rely on the -- you're
24  saying you would not rely to these responses you

Page 148

1  gave to us?
2      A.    I would have to rely on the 5500.  It
3  broke it down.  That's one whole sum, and it's not
4  broken down as it is here with an explanation.
5  There's no explanation there.
6      Q.    What are you referring to -- you said
7  you gave, like, a spreadsheet that had the 142,000
8  broken out; is that right?
9      A.    I believe.  I don't have it in front of
10  me, so I guess you'll have to go back and look.
11     Q.    But there's no changes to these
12  interrogatories that you signed off as being
13  factually accurate; is that correct?
14     A.    I'm not sure what you're talking about.
15     Q.    These -- this response here, you did not
16  amend these responses another time; correct?
17     A.    I don't know.
18     MR. CANETTI:  Let's go off the record.
19         (WHEREUPON, a discussion was had off
20          the record.)
21         (WHEREUPON, a short break was
22          taken.)
23  BY MR. CANETTI:
24     Q.    I would like to remind you you're under



SHIRLEY SHERROD

May 02, 2018

R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

161–164

Page 161

1  to sit here and tell you any of these numbers are
2  correct. I don't know.
3      Q.   Let's just double-check and see if
4  anything jogs your memory.
5          So 2013, it says actuary expense of
6  thousand; legal expense to Conger of 3,000; and
7  travel expenses for 4391.
8      A.   I don't know. I don't have the things
9  in front of me that would help me to make the
10  decision and so it's -- it would be -- to sit here
11  and tell you that is either, you know, you want me
12  to make something up for you, but it would be
13  inaccurate, and I just don't know.
14      Q.   Now, in 2014, it says an actuary expense
15  of a thousand; legal expense to Conger and BK for
16  11,000; Redfield for 10,000; Gonek for 8,000; Turc
17  for 7,000; Granz, 17,000; Valdemar, 3,000; Granz,
18  7,000; and a total of $63,000 for actuary and legal
19  expenses.
20          Do you know if that information is
21  accurate?
22      A.   I'm not going to say yes or no. I don't
23  know.
24      Q.   And at this point in 2014, the plan was

Page 162

1  no longer frozen, though; right?
2      A.   No, it was not frozen.
3      Q.   Now, if you total these numbers up, they
4  come to approximately $118,000.
5      A.   I don't know where they came from.
6      Q.   Well, I totaled them up. It's
7  117,921 --
8      A.   You totaled them from what, though?
9      Q.   From what is on this list.
10      A.   I'm really not going to say this is
11  correct. I don't know if this list is correct,
12  sir. So you may be dealing with very erroneous
13  material, and I can't accept that.
14      Q.   So I have -- this list here says 117. I
15  have your interrogatory that says 194, and I have
16  the 5500 that says 142.
17          What is the correct amount?
18      A.   Well, I believe that the 5500 -- excuse
19  me. Let me go back.
20          Again, I'm speaking for other people and
21  so I'm sitting here guessing, and this is why there
22  has to be more in-depth work. However, I believe
23  that the interrogatory added the figures and that
24  the 5500 wrote them down the way the actuary saw.

Page 163

1          You have to speak to Mr. Kofoed or
2  whomever and see how he arrived at these things. I
3  don't know.
4      MR. CANETTI:   Let's look at the withdrawals,
5  the checks that came out of the account in 2014,
6  see if that helps us reconcile this.
7          So these are all the checks in 2014.
8  We'll mark this as Exhibit No. 20.
9          (WHEREUPON, a certain document was
10              marked Sherrod Deposition Exhibit
11              No. 20, for identification, as of
12              May 2, 2018.)
13  BY MR. CANETTI:
14      Q.   So there's a check January 22nd for
15  10,000 to Shirley Sherrod. Is that your signature
16  on the bottom right side?
17      A.   Right.
18      Q.   Was that a check that came out of the
19  account?
20      A.   Yes.
21      Q.   And then we have another check on
22  January 22, 2014, for 10,000, and that says paid to
23  the order of something -- I can't read exactly --
24  and then it looks like -- is that your signature

Page 164

1  there?
2      A.   Yes, looks like that's my signature.
3      Q.   There's another check for January 22,
4  2014, for $10,000 at -- and, I'm sorry, these pages
5  were 4392, 4393 and 4394.
6          Is that your signature as well?
7      A.   Which page are you on?
8      Q.   4394.
9      A.   24 -- wait a minute.
10      Q.   The third page, way back in the
11  beginning.
12      A.   Yeah, 4394. Yes.
13      Q.   Is that your signature?
14      A.   Right.
15      Q.   And then on -- there's another check for
16  January 22, 2014, for 10,000 on 4395.
17          Is that your signature?
18      A.   Yes. Mm-hmm.
19      Q.   The next page, another check on
20  January 22, 2014, for 10,000.
21          Is that your signature on 4397?
22      A.   I'm sure I would have signed all of
23  these, if you want to continue. There's no denying
24  that these are checks that were drawn on the



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
165–168

Page 165

1   account by me and my signature.
2       Q.   Now, in February 11, 2014, on page
3   DOL2298, there's a letter from you dated
4   February 11, 2014, to Keith.
5           Is that your signature on that page?
6           It's out of order.  It's right after
7   4397, just the next page.
8       A.   Yes.
9       Q.   Is that your signature?
10      A.   Yes.
11      Q.   And this was a letter saying to have
12  checks drawn in your name for four checks for
13  $10,000?
14      A.   Right.  Mm-hmm.
15      Q.   And then if you look two pages, and for
16  some reason I did not have a Bates stamp copy of
17  this, this is an excerpt of a bank statement with
18  Comerica, and it shows $10,000 coming out, four
19  checks, on February 11, 2014?
20      A.   Mm-hmm.
21      Q.   Do you see that?
22      A.   Right.  Right.
23      Q.   Do you have any reason to doubt the
24  accuracy of this bank statement?

Page 166

1       A.   No.
2       Q.   Now, let's proceed along.  And these
3   ones are -- were produced double-sided, not on one
4   page.
5           So 2374 is a check for 57,405 to you.
6   And then on page 2375, it appears -- is that your
7   signature there?
8       A.   I'm sure -- that's the only signature
9   because they were all made out to me.  Mm-hmm.
10      Q.   And 2376 and 2377.
11      A.   Mm-hmm.
12      Q.   Is that your signature as well, a check
13  for 5,000 on March 4th?
14      A.   I don't deny any signatures.  They're
15  all mine.
16      Q.   We haven't looked at all of them.
17      A.   I'm sure that they're mine.  This is for
18  your protection, and I've read your protection.  I
19  don't see any checks that were -- they were all
20  made out to me, I think, with exception of
21  Mr. Conger.
22      Q.   So in 2014, all the checks were made to
23  you and signed by you in Exhibit No. 20; is that
24  right?

Page 167

1       A.   To the best of my knowledge, unless
2   something -- yeah.
3       Q.   Now, the total amount of these checks,
4   if you want to go through and add them up, which
5   I've done, is $290,900 -- yeah, 2,900 and 905
6   dollars.
7       A.   You said 2,000?
8       Q.   I mean, I'm sorry, 290,905.
9       A.   Mm-hmm.
10      Q.   Do you have any reason to doubt the
11  accuracy of that number?
12      A.   Yes.
13      Q.   Okay.  And why do you think that number
14  is not accurate?
15      A.   Because these have been looked at
16  before.  All of your accounting work was spent --
17  looked at cursorily before and found them to be
18  incorrect.
19          And in this particular one, there were,
20  like, $40,000, I think, in checks that were
21  uncashed.  So you added those up, and it's sort of
22  throwing everything off.  It's been like a
23  domino effect --
24      Q.   So apart from that 40,000 would make it

Page 168

1   250,000?
2       A.   It's been like a domino effect.  It just
3   keeps, you know, multiplying itself.
4       Q.   No, I understand that.  So there was
5   40,000 in checks that weren't cashed, which would
6   make it 250; correct?
7       A.   There was that, and also I believe there
8   was another one.  I don't have it.  I think it went
9   to Mr. Conger, I think -- so there's errors that
10  are in here.
11      Q.   In 2014.
12      A.   Yeah, 2014.
13      Q.   None of these checks were written to
14  Mr. Conger in 2014.
15      MR. REARDEN:  I beg to differ because --
16  BY THE WITNESS:
17      A.   Yeah.  You're wrong.
18  BY MR. CANETTI:
19      Q.   Let me see.  Which one is that one?
20      A.   It's the only --
21      MR. REARDEN:  Page 2384.
22      MR. CANETTI:  I'm sorry.  You're correct.
23  BY THE WITNESS:
24      A.   Yeah.  There's several there written --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
169–172

Page 169

1
2  BY MR. CANETTI:
3    Q.   You're right.  There's one for 3,000 and
4  one for 1,000.
5    A.   Should be another one in there, too.
6    Q.   So that's $4,000; correct?
7    A.   There -- no.  There's another one that I
8  was -- it was pointed out to me.  I don't know -- I
9  don't have -- I see it right there in front of me,
10  but it's -- your math is off.
11    Q.   We're here to figure out what's off
12  about that.
13    A.   You know what?  And I'm not --
14    Q.   So the 40,000, let's talk about that
15  first and then we'll move on to whatever the next
16  thing.
17        So 40,000 did come out of the plan.
18  That was that Bates stamp we looked at on
19  February 11, 2014.  And then you received a
20  notification, which you provided to us, from
21  Comerica.
22        This is Exhibit No. 21.
23
24

Page 170

1        (WHEREUPON, a certain document was
2         marked Sherrod Deposition Exhibit
3         No. 21, for identification, as of
4         May 2, 2018.)
5  BY MR. CANETTI:
6    Q.   Now, this is uncashed check
7  notifications.  So this refers to first at Sherrod
8  663 to the uncashed check for 12,600 in December
9  of 2013, which ties to the Riggleman check you said
10  that didn't go cashed.
11        Then this DOL664, 665, 666, and 667,
12  those are the four checks all in February 11th
13  related to $10,000.
14        Did I state that accurately?
15    A.   Yeah, from -- from what I see, that's
16  what's there at the moment.
17    Q.   Now, it says in the second sentence on
18  the first page, which is consistent on all these
19  pages, "Currently your investment account is closed
20  and we're unable to credit back the funds to your
21  account at this time."
22        Did you ever get the funds back from
23  these uncashed checks representing approximately
24  $52,000?

Page 171

1    A.   I'm not sure about the 52, and yes, they
2  were recovered.
3    Q.   Were they deposited back in the plan
4  account?
5    A.   They were.
6    Q.   What date was that?
7    A.   I don't recall the date.  I don't have
8  it.
9    Q.   And if we look at all the bank
10  statements, and there's nothing showing a deposit
11  that total up to 52,600, how would you explain
12  that?
13    A.   You're not looking in the right place, I
14  guess.
15    Q.   So your understanding is you went and
16  got this money back and put it back in the bank for
17  the plan; correct?
18    A.   That's right.
19    Q.   And these are dated January in 2016.  So
20  to the extent it was done, it would have been
21  sometime after January 14, 2016?
22    MR. REARDEN:  I'm going to object on the basis
23  of misstatement of the record.
24

Page 172

1  BY MR. CANETTI:
2    Q.   All these are dated January 14, 2016.
3  I'm not making that date up.
4    A.   No, they're not all dated, because
5  you've got Riggleman here was different.
6    MR. CANETTI:  Could you clearly state what
7  you're objecting to?  I don't understand what
8  you're saying.
9    MR. REARDEN:  Are you referring to Deposition
10  Exhibit No. 21?
11    MR. CANETTI:  Correct.
12    MR. REARDEN:  These are checks dated -- issue
13  dates of checks --
14    MR. CANETTI:  Hold on.  I think you misheard
15  me.  I think you misheard me.  These were notified
16  to Ms. Sherrod on January 14, 2016, according to on
17  those dates they were unclaimed funds.
18    MR. REARDEN:  I thought you were talking about
19  the date --
20    MR. CANETTI:  Yeah, the date there.  So as of
21  January 14, 2016, this bank is saying these funds
22  have not been claimed yet.
23    MR. REARDEN:  I see what you're saying.
24



Page 177

1 testifying.
2      MR. CANETTI:  Would you like to go through and
3 add them up?
4      MR. REARDEN:  No.
5 BY MR. CANETTI:
6      Q.   So it says 290,905 is how much came out
7 of the account.  Now, this here is showing 142,000
8 plus 57,000 that equals, as reported on the 5500,
9 199,000.
10      I'm trying to understand where the other
11 approximately 90,000 is at.
12      A.   Well, we've been trying to understand
13 how you came up with some of these figures, where
14 this 40,000 was missing in checks.  You know,
15 there's errors in what you're saying.  We have
16 errors -- there's errors all over the place here,
17 and I can't sit here, sir, and try to, you know,
18 see what someone who doesn't really do this is
19 trying to add and show me when what's happened.
20      I'm sorry.  I'll have to say that you're
21 confusing me to the point that I'm not able to say
22 anything else about it.  I don't know.
23      Q.   And you can't tell us who filled out
24 this form; right?

Page 178

1      A.   I think we'll need to find somebody who
2 was able to go over these with more clarity for
3 everybody.  I would say this is a big mess.
4      Q.   But you can't tell us who put these
5 numbers in here; right?
6      A.   It wasn't me, and I know that it would
7 have been an actuary.
8      Q.   But we have no idea who it was?
9      A.   There was somebody local.  I was just
10 trying to think.  Neihus or Niehaus
11 (phonetic).  I don't know right now.  It was
12 someone from the area very skilled at doing this.
13      MR. CANETTI:  Now, something else that I was
14 hoping to help me reconcile here.  You had the
15 account at Comerica in January of 2014 I'm going to
16 mark as Exhibit 22.
17      (WHEREUPON, a certain document was
18      marked Sherrod Deposition Exhibit
19      No. 22, for identification, as of
20      May 2, 2018.)
21 BY MR. CANETTI:
22      Q.   And then you had in SunTrust from
23 February 1 to December 31, 2014; is that right?
24      A.   I'm not exactly sure, but obviously

Page 179

1 there was a transfer to the dates.  I don't know
2 exactly.
3      (WHEREUPON, a certain document was
4      marked Sherrod Deposition Exhibit
5      No. 23, for identification, as of
6      May 2, 2018.)
7 BY MR. CANETTI:
8      Q.   Now, if you look at the SunTrust
9 statement, which is -- it says Fidel000262, it says
10 for the year-to-date, and this is for ending
11 December 31, 2014, that the income was
12 approximately $74,000, and --
13      A.   Hang on for a minute.  Where are you
14 reading from?
15      Q.   I'm on this one here, income,
16 year-to-date, 74,000.  Do you see that?
17      MR. CANETTI:  You want me to show you, John,
18 the SunTrust one?
19      MR. REARDEN:  So this is 22 and this is 23.
20 BY MR. CANETTI:
21      Q.   Do you see on the SunTrust one?
22      A.   I see on the SunTrust.
23      Q.   Says income 74,000 and --
24      A.   Wait, wait, wait.  Slow down.  Slow

Page 180

1 down.  Slow down.
2      74,000?
3      Q.   In the year-to-date column.
4      A.   The year-to-date column.
5      Q.   Approximately 74,000.  And then it says
6 change in investment value, 168,000, approximately.
7 Do you see that?
8      A.   That would have been a gain, I guess.
9      Q.   Yep.  And so you add those together,
10 it's about $243,000, just ballparking it.
11      A.   Where are you getting 243?
12      Q.   74 plus 168.
13      A.   I don't mean to be disrespectful, but
14 normally when I go through these things, I have my
15 accountant or somebody go through and I -- this --
16 I feel very uncomfortable with -- you know, this
17 is --
18      Q.   74 plus 168 is 242,978 is what those add
19 up to.
20      Now, if you go and look at your -- the
21 one month you had at Comerica, this page over here,
22 it says that the dividends was $586, and there was
23 a loss of $30,848.  Do you see that, these figures
24 here?



Page 185

1  you have something invested that you want to gain
2  or to realize a gain on doesn't treat the account
3  as it should.  You know, that account is there
4  to -- for my retirement and for the other people,
5  and to do the least damage or least amount of
6  withdrawal possible is what I always tried to do
7  since I've had it 40 years ago.
8      Q.   Now, in 2015, did anybody else provide
9  services to the plan?
10     A.   Well, the plan is required having
11 services provided since its inception.  It's just
12 been a greater degree as these cases or these
13 things have gone on, like today as we sit here,
14 unfortunately, these services have become
15 necessary.
16     Q.   So who did you retain to provide service
17 to the plan in 2015?
18     A.   Well, I'm going to give you the same
19 answer I did before.  It should be on the -- I
20 believe it should be on the spreadsheet.  It was, I
21 think, given to Mr. Kofoed.  I saw something there,
22 but I don't know if the complete breakdown is
23 there.
24     Q.   The one we looked at earlier only went

Page 186

1  through 2014, and you said that one was inaccurate.
2      A.   It only went through '14?
3      Q.   Yeah.
4      A.   Well, then, I don't know what he's done
5  with the others.  Starting to get reckless --
6      Q.   Can you recall as we sit here of any
7  names of any entities that provided services to the
8  plan in 2015?
9      A.   No, I can't recall because it would be
10 partial, and that's something that -- no, I can't
11 just sit and recall.  I think it was given to him.
12     Q.   We looked at some of these plan account
13 statements, for example -- just going to grab this
14 one real quick -- No. 17 for 2014.
15     A.   Mm-hmm.
16     Q.   Was one of those made for 2015?
17     A.   Sure.
18     Q.   That was not provided to us.  We did not
19 see any plan statements for 2015.  Are you sure
20 that that exists?
21     A.   Absolutely.  There's never been a year
22 we haven't done that.
23     Q.   Do you know who would have drafted it or
24 put it --

Page 187

1      A.   I think Reed-Ramsey.  I'm not sure what
2  year it was, but it exists.  And why you don't have
3  it, I don't know.
4      MR. CANETTI:  Let's look at the Form 5500 for
5  2017.  This is Exhibit 24.
6          (WHEREUPON, a certain document was
7           marked Sherrod Deposition Exhibit
8           No. 24, for identification, as of
9           May 2, 2018.)
10 BY THE WITNESS:
11     A.   You said 2017.  This says 2015.
12 BY MR. CANETTI:
13     Q.   I'm sorry.  I meant 2015.  My apologies.
14 Exhibit No. 24.
15         Did you review this document before?
16     A.   No, I -- I'm just really looking at it
17 now and -- but, no, I have not.
18     Q.   On the first page, it says that it was
19 filed with authorized/valid electronic signature by
20 Leroy Johnson on October 24, 2016.  Any reason to
21 doubt the accuracy of that?
22     A.   Any doubt of the accuracy on the --
23     Q.   The date that he filed it?
24     A.   No.

Page 188

1      Q.   And then it says preparer's name, it
2  says M.S. ASSOC.  Do you know who that is?
3      A.   No, I do not.  Apparently, that's the
4  actuarial firm.  Just trying to think of that name.
5  I thought it was an N, Niehaus.
6          I don't know that I recognize it right
7  offhand, but I know it was definitely a certified
8  actuary.
9      Q.   And do you know who would have put this
10 address in here for them?
11     A.   No, I'm not -- I don't know.
12     Q.   The address here is not an actual
13 address.  The ZIP code does not match up with the
14 street address.
15     A.   That was brought to our attention
16 before, and I thought that Mr. Kofoed spoken --
17 Mr. Kofoed said he supplied --
18     Q.   He gave an address of someplace in
19 Skokie.
20     A.   Then that's probably what -- if he gave
21 it to you, that's probably what it is.
22     Q.   We contacted that address, and there was
23 nobody at that address with the name M.S.
24 Associates.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
193—196

Page 193

1  reported in the 5500?

2      A.  If you mean to go back and check on the
3  work that the accountant does, I have to rely on
4  the professional.  It's not my role to question.
5  If they come up with something and they're
6  professional, they know more about this.  They know
7  this field.  That's where I put my reliance.  And
8  they know what they're doing.

9      Q.  Is it Mr. Johnson's role to review the
10  accuracy of the information in the 2500?

11      A.  Well, I'm not sure that it's inaccurate.
12  I don't know how -- whatever that number -- you
13  asked me if this is --

14      Q.  I didn't say it wasn't accurate.  I said
15  is it his role to review the accuracy of that?

16      A.  He certainly can, right.  He certainly
17  can.

18      Q.  But is it his role to do that?

19      A.  A role to go over and to check the
20  actuary's work?

21      Q.  To make sure the 5500 is accurate.

22      A.  I'm not sure that I've ever seen that
23  particularly spelled out.  As such, we can look in
24  the manual and we can see because that's the only

Page 194

1  fair way for me to answer that question, if it was
2  spelled out with that amount of specificity.

3      Q.  Okay.

4          (WHEREUPON, a certain document was
5           marked Sherrod Deposition Exhibit
6           No. 26, for identification, as of
7           May 2, 2018.)

8  BY MR. CANETTI:

9      Q.  Now, these are the checks in 2015,
10  Exhibit No. 26.  Now, some reason the way these are
11  processed to -- from Fidelity, I believe they were
12  sent upside down for some reason.  So they got
13  Bates stamped on the upside down page there, so I
14  apologize for that.

15          But these are the checks for 2015.  They
16  start with DOL2432, and they go to DOL -- or they
17  go to -- sorry.  They go to DOL2463.  And then it
18  starts with a new set at 12916000354 to 356.

19          So the first check is for -- on
20  January 5, 2015, for $5,000.  And on the second
21  page, 2433, is that your signature?

22      A.  I would certainly say offhand that those
23  are my signatures.  I have no reason to feel that
24  they are not.

Page 195

1      Q.  Now, for all the checks in 2015, they
2  were written to you, to Shirley T. Sherrod, and
3  appear to all have your signature.

4      A.  Yes.

5      Q.  Is there any reason to doubt the
6  accuracy of that?

7      A.  No.

8      Q.  Now, if we total up the amount that came
9  out of the plan in 2015, it was $120,000.  That's
10  what these checks represent here.

11      A.  Mm-hmm.

12      Q.  And, sorry, I lost my 5500.  Too many
13  exhibits here.

14          Again, this shows benefits paid to you
15  were 59,000 and 40,000 in expenses, so that's
16  approximately $99,000 -- or it is 99,000, which is
17  reported right there.

18      A.  Mm-hmm.

19      Q.  But $120,000 in checks came out, so it
20  was $21,000 missing in 2015.

21      A.  I don't know that it's missing, but I'm
22  looking at -- I'm wondering as I tried to
23  understand what this minus 16 meant.  Because that
24  apparently has got to figure in there some way.  I

Page 196

1  don't know.

2      Q.  The 16,000 is saying that the plan lost
3  money that year.  That's a loss.

4      A.  Well, I don't know.  I'm not really
5  sure.  I hear what you're trying to tell me, but
6  whoever -- whatever they did, whatever they started
7  out with and however they were characterizing it,
8  because strangely enough, it seems to start to come
9  back to that -- whatever amount you said it was.

10          I am not certain what or how -- why they
11  characterize it like this.  But, obviously, there,
12  you know, there needs to be -- we'll get through
13  some more explanation of it because I really can't,
14  again, sit and discuss with you some of these, you
15  know, variances and -- this not something I'm
16  skilled to do.

17      Q.  And we have no idea who the person is
18  that we would be able to talk to about this;
19  correct?

20      A.  I thought I told you -- how many times
21  have you asked me?  I'm trying --

22      Q.  You keep saying there's somebody else we
23  should talk to, and I don't know who the person is.

24      A.  Right.  And I just told you, nor do I.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
197–200

Page 197

1    MR. REARDEN:  Objection.  Asked and answered.
2  BY MR. CANETTI:
3    Q.    Now, in 2016, did you engage any service
4  providers to provide work for the plan?
5    A.    Seems to me in 2016 this is when the
6  Department of Labor filed this gigantic lawsuit,
7  and so absolutely that was a requirement then.  We
8  needed all type of help, like we do today.
9    Q.    So who were the service providers you
10  engaged in 2016?
11    A.    I do recall there was primarily Groom, I
12  believe.
13    Q.    And you paid Groom from the assets of
14  the plan; correct?
15    A.    That was correct.
16    Q.    And why did you do that?
17    A.    Because that was apparently laid out in
18  the plan, and I think there was some communication
19  between you and Groom.  You questioned, they sent
20  you a letter, and there we are.
21    Q.    Your understanding is they sent a letter
22  explaining why they took money out of the plan?
23    A.    They sent a letter to you.
24    Q.    That's what you understand?

Page 198

1    A.    I saw it.  That's what I know.  Now,
2  don't ask me anything beyond that legally because I
3  don't know, but I'm saying that because you're not
4  entirely ignorant on that subject.
5    Q.    I have not seen any explanation of why
6  you've been taking money out of the plan to pay for
7  your attorneys in this litigation.
8    A.    Well, you probably have not and won't,
9  but that's something, I guess, if we get a chance
10  to go to court we will prove and show why this is
11  what we need to do.
12    Q.    Can you explain to me why you feel you
13  can take money for the plan to pay for your
14  attorneys in this litigation?
15    A.    Legal opinion.
16    Q.    I don't understand what you mean by
17  that.
18    A.    Attorney's advice.
19    Q.    You're saying Groom provided you advice
20  to use the plan assets to pay for your attorney in
21  this litigation?
22    A.    I'm saying that everything that we've
23  ever done, you know, that we have done in any way,
24  we've consulted with an attorney and we followed

Page 199

1  the advice of the attorney.  We have not just made
2  decisions out of the blue.
3    Q.    In this case was it Groom who gave you
4  that advice for this current litigation?
5    A.    As I mentioned to you before, sir, I
6  think you yourself had some communication with
7  Groom.  I saw that the other day in your notes.
8  And I would ask you to refer back to what Groom
9  told you, not to try to hold me responsible for
10  legalities that I can't explain to you, and Groom,
11  I thought, did a very adequate job in doing that.
12    Q.    Well, who makes the decision about how
13  money getting paid out of the plan?
14    A.    We -- I'm going to repeat to you what I
15  said it a few moments ago.  We consult with --
16    Q.    You consult?
17    A.    -- take legal advice, and this is what
18  was done every case all along the way.
19    Q.    But who makes the actual decision about
20  whether to pay out of the plan assets or not?
21    A.    Once you get legal advice, you follow
22  through.
23    Q.    So did you make that decision?
24    A.    I don't recall who it was.  I think

Page 200

1  there was some discussion.  The attorney told us
2  what needs to be done.  We have to protect this
3  plan.
4    Q.    You said you got advice from them?
5    A.    Yes.
6    Q.    I'm saying that advice came to you,
7  then; right?
8    A.    Right.
9    Q.    And then did you make the decision,
10  then, to use the plan assets to pay for the
11  lawyers?
12    A.    I believe that we did.
13    Q.    When you say "we," who is the other
14  person?
15    A.    I think there was some discussion,
16  perhaps, with the administrator.  We followed
17  advice.  We followed legal advice, expert advice
18  that we were given.
19    Q.    So the decision to use that money was
20  made by you and Mr. Johnson together?
21    A.    Well, you know, this is sort of going
22  around in circles.
23    MR. REARDEN:  Objection.  Asked and answered.
24



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
205—208

Page 205

1 speaking without records that are in front of me.
2      Q.   Let's get those records there.
3          So we have here on the second page, 8D,
4 it says benefit paid -- benefits paid, 62,550, and
5 we did get the plan statement for you for 2016.
6 Again, we'd like to see the 2015 one.
7          (WHEREUPON, a certain document was
8          marked Sherrod Deposition Exhibit
9          No. 28, for identification, as of
10          May 2, 2018.)
11 BY MR. CANETTI:
12      Q.   Do you recognize this document?
13      A.   I don't.
14      Q.   You do not?
15      A.   No.  I haven't -- I don't believe I've
16 seen this before, but maybe again --
17      Q.   It's a document you provided to us.  It
18 says SherrodJR000690 through SherrodJR000696.
19      A.   It's relatively new, and I haven't
20 really looked at it in any great detail.
21      Q.   It says on the second page for employee
22 account withdrawal, 62,550.  And then if you go to
23 SherrodJR000694, it lists your name, Shirley
24 Sherrod, and shows a withdrawal of 62,550.

Page 206

1      A.   Mm-hmm.  I see that.
2      Q.   Based on those two documents, you're the
3 only one that received a distribution in 2016?
4      A.   That sounds about right, the
5 distribution amount being 62,550.
6      Q.   And, again, you don't know why it says
7 there's only one participant at the start of the
8 year and one at the end of the year; right?
9      A.   No.  I think it's probably a typo,
10 something that's left off -- because right at the
11 end, I'm looking where you are on this page.  That
12 looks like the -- you're right at that line, and it
13 looks like something is -- got thrown out with the
14 computer.
15      Q.   We can verify that.  I'm fairly certain
16 that it says one on the --
17      A.   I see the one.
18      Q.   If you look at the computer, it was not
19 cut off.
20      A.   I don't know about that.
21      Q.   Now, the administrative service
22 providers, the 133,922, that was money that was all
23 paid to Groom, then?
24      A.   Let's see.  I think maybe Mr. Kofoed

Page 207

1 came in at the tail end of that also.
2      Q.   In 2016?
3      A.   I believe that --
4      Q.   Okay.  So some of it went to Mr. Kofoed
5 and some went to Groom?
6      A.   To the best of my knowledge.  Again, I'm
7 looking -- off the top of my head, I mean, I'm
8 saying things without seeing them.  And there's a
9 certain amount of inaccuracy, just like those
10 figures were inaccurate, and what I'm telling you,
11 I can't -- I know I'm under oath, but I can't
12 really say because I'm not looking at what you're
13 asking me.
14          And so, you know, not really an omission
15 of deliberate, but I simply don't have, you know,
16 those things in front of me and so I'm asking
17 you -- answering you to the best of my ability.  So
18 you have to realize that these may not be exactly
19 correct.  I know, just generally, I can think of
20 Mr. Kofoed and Mr. -- and the Groom firm, but there
21 may be other people.
22      Q.   To the extent you had any documents
23 related to that, you provided those to us; is that
24 right?

Page 208

1      A.   I want to say that, what was it,
2 Mr. Kofoed at some point in time would have had --
3 this is '16 -- probably would be the person --
4 yeah, should have been provided.  Yes, yes.
5      Q.   Same with 2015, to the extent you had
6 any documents to support those expenses, they were
7 provided to us?
8      A.   There were always documents.  Yes, yes.
9      Q.   We have not seen those.  Again, we have
10 checks here from 2016.  This is all with SunTrust.
11      MR. CANETTI:  Mark this as Exhibit No. 29.
12          (WHEREUPON, a certain document was
13          marked Sherrod Deposition Exhibit
14          No. 29, for identification, as of
15          May 2, 2018.)
16 BY MR. CANETTI:
17      Q.   These are the SunTrust 12916 --
18 12.9.16000364 to 382, and these are all checks that
19 were written to you and then signed by you; is that
20 right?
21      A.   I don't want to put it that way because
22 I thought some were signed over to Groom, so...
23      Q.   Would you sign them and then sign them
24 over to Groom?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
209–212

Page 209

1    A.   I don't know how it happened, but I know
2    that they had to -- they --
3    Q.   Let's see if we can jump to that page.
4        All the ones that just have your
5    signature on it, that's your signature, though;
6    right?
7    A.   That is my signature, yes.
8    Q.   So if we go to on one that's 390.
9    A.   Pardon me, please?
10   Q.   390. I know they're kind of a small
11   font. I apologize for that.
12   A.   I don't see them. Are they in order?
13   They're not in order.
14   MR. REARDEN:  They're out of order.
15   BY MR. CANETTI:
16   Q.   I apologize. I think they're organized
17   by dates and maybe they were produced to us in
18   funny order.
19       The reason I think they're out of order,
20   I don't know if you know the answer to this, but
21   some of the check numbers, they're out of sequence.
22   Some start with the 200 series and some start with
23   the 300 series. Do you have any idea why they're a
24   different series of check numbers?

Page 210

1    A.   Do I know why the bank is doing that?
2    Please.
3    Q.   So that's why I think they're jumbled up
4    because for some reason the bank issues the checks
5    in different series.
6    A.   Should go by date, though. I don't
7    understand why you don't have it by date. You're
8    speaking of 390, and I'm not finding 390.
9    Q.   So it goes --
10   MR. REARDEN:  Right after 375.
11   BY THE WITNESS:
12   A.   What a mess.
13       Okay. I found 390.
14   BY MR. CANETTI:
15   Q.   So is that your signature? It says
16   Shirley Sherrod and says something like "Pay to the
17   Order of Groom"?
18   A.   Yes.
19   Q.   So that's your signature and that's your
20   handwriting?
21   A.   That is correct.
22   Q.   And then if you go forward a couple more
23   pages, which, again, these are out of order. I
24   apologize.

Page 211

1    A.   What number are you looking for now?
2    Q.   At 387 which is --
3    A.   I got it.
4    Q.   -- November 22, 2016.
5    A.   Yes.
6    Q.   Says -- looks like it says "Pay to the
7    Order of Groom Law Group" and has then it has
8    Shirley Sherrod written under there?
9    A.   That is correct.
10   Q.   Is that all accurate?
11   A.   That is correct.
12   Q.   I think that's the last one that
13   referred to Groom.
14       I think there's one more. Sorry.
15       On 382, there's a December 27, 2016,
16   check for 18,000. It says "Pay to the order of
17   Groom." It says Shirley Sherrod. Is that your
18   signature?
19   A.   That would be correct.
20   Q.   So I think these are all in date order,
21   but they're not Bates stamp number order because
22   they're Bates stamped in the order that the bank
23   produced it to us, which they did not produce them
24   in order. So I think it starts with January and

Page 212

1    goes to December.
2    MR. CANETTI:  Let's take a break and go off
3    the record.
4        (WHEREUPON, a short break was
5        taken.)
6    BY MR. CANETTI:
7    Q.   I'll remind you you're still under oath.
8        Now, in 2015, did you complete any loan
9    documents or anything related to money that you
10   loaned the plan?
11   MR. REARDEN:  What year are you asking?
12   MR. CANETTI:  2015.
13   BY THE WITNESS:
14   A.   No, I don't believe so.
15   BY MR. CANETTI:
16   Q.   And we looked at the checks in 2015, and
17   all those were written to you and cashed by you;
18   correct?
19   A.   I have to go back. I think -- you know,
20   it's getting late, but I believe -- I think that we
21   know in '14, that was Mr. Conger. We know -- I
22   just showed you '16, they were -- I believe that
23   you're correct in stating that. But you could be
24   wrong, but --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
221–224

Page 221

1  just -- this is 12/31.
2        But this was not available.  I don't
3  think I'm -- the extension is sort of confusing me,
4  but this would not have been available, I don't
5  believe, in '17.  I don't think this became
6  available until about October.  And they would have
7  been paid probably prior to that, I believe.
8      Q.   So you're referring to Exhibit 28.  This
9  is called an asset reconciliation of 12/31/16, and
10 you believe this document was completed sometime
11 around October of 2017?
12     A.   I can't say that.  I'm not going -- I
13 just -- very often, I think, and so -- I think the
14 5500 -- I think historically the 5500 was done in
15 October and the valuations came after the 5500, I
16 believe, that I -- I'd have to think about that.
17     Q.   And this document here was prepared by
18 Reed-Ramsey?
19     A.   Yes.
20     Q.   Exhibit 28?
21     A.   Yes.
22     Q.   And so if your understanding this was
23 done after you made the distributions, who was
24 involved in coming up with the distribution amounts

Page 222

1  to make in the middle of 2017?
2      A.   We referred to the prior distribution,
3  and I think this was what you keep asking me who
4  the person was, but the prior evaluation sheets
5  were what was used to make the determination.
6      Q.   So the 2015 ones --
7      A.   That sound about right.
8      Q.   -- which were probably done about 2016?
9      A.   Yes.
10     Q.   And that's the one that we don't have a
11 copy of.
12     A.   You don't have a copy of what?
13     Q.   The 2015 plan statement -- account
14 statements.
15     A.   Those -- so, excuse me, you don't have
16 the -- you don't have the -- you mean those
17 valuations for 15 you don't have?
18     Q.   Like this I'm calling an account
19 statement --
20     A.   Yeah.
21     Q.   -- and the other ones we looked at for,
22 like -- let's see -- like this one here for 2014,
23 that's what I'm referring to as the plan account
24 statements.

Page 223

1      A.   So you're saying that you're missing 15?
2      Q.   Yes.  We do not have 15.
3      A.   I don't know why because obviously it
4  was done a long time ago.  So that is -- that
5  definitely exists.  Why you don't have them, I
6  can't -- because that would have been given to one
7  of the attorneys, but absolutely those have been in
8  existence since -- what? -- '16.  So if you don't
9  have them, it's not because they -- they were
10 absolutely done.  That was always something that we
11 insisted upon.
12     Q.   So you used the account balances they
13 had as of 12/31/15 to determine how much to pay
14 them in the summer of 2017?
15     A.   I want to say that's right.
16     Q.   Why did you not get a more up-to-date
17 and use their account balances as of the date they
18 were making the distributions?
19     A.   That's a good question because we know
20 that there was a discrepancy, we can always catch
21 up for it later.  We had no intention except to
22 give people what they had coming, and that's
23 something that, you know, will be and can be done.
24        Now, at the particular time that wasn't

Page 224

1  available, and I think that -- and, obviously, it
2  was not, then you go with what you have.  And
3  there's always the option to correct that later,
4  but we're very well aware of that as is the
5  actuary.
6        Again, there's some more work that needs
7  to be done because I remember asking -- questioning
8  them, and they made the comment to me that they
9  felt there had been overpayments.  So that is
10 something that's going to require a good deal of
11 accounting.  I didn't go into it, but if, you know,
12 that will be -- that will need to be -- you'll have
13 to look at that again.
14     Q.   And you're saying somebody from
15 Reed-Ramsey is the one that said that there may be
16 some discrepancies between the amounts they were
17 paid in December of 2017 and amounts they were due?
18     A.   Comment that was made to me is that they
19 had been overpaid, so I don't -- you know, I'll
20 need to get his -- you know, let them run those
21 numbers.
22     Q.   When you say "he," who are you referring
23 to?
24     A.   The person whose name I keep forgetting



Page 229

1    A.    Mm-hmm.
2    Q.    So is this just mailed to her house,
3  then, or some address to her?
4    A.    That's her home.
5    Q.    And you're saying this 2701.69
6  represents what her account balance was as of
7  December 31, 2015?
8    A.    Right.  And she would have really
9  supplied us with the bank information that she was
10  going to use.  Normally something came up from the
11  bank, but it was mailed to her home.
12    Q.    So that's S-p-o-r-y-s-z.
13        And then I see the next page after that,
14  two pages after is SunTrust2018000231.  It's a
15  check for Wesley Smith for 3,582?
16    A.    Right.
17    Q.    That was another example of a rollover?
18    A.    Uh-huh.
19    Q.    And then the next one is
20  SunTrust2018000233.  That was for Hollie Howell?
21    A.    Mm-hmm.
22    Q.    For 1,720?
23    A.    Right.
24    Q.    Was that another rollover?

Page 230

1    A.    Yes.
2    Q.    And, again, all three of these were
3  based on 2015 figures; right?
4    A.    That is correct.
5    Q.    Do you have the next page?  I see one
6  for Albert Waters, SunTrust2018000215 for --
7    A.    I think -- you see the writing on there?
8  Does that say Carol Riggleman on there?
9    Q.    It says "Settlement estate Carol
10  Riggleman."
11    A.    Yeah.  I think this is where I had the
12  checks mailed so I could put that on the check.
13  That was my handwriting there.
14    Q.    So this is care of Shirley Sherrod,
15  Johns Island, South Carolina?
16    A.    Mm-hmm.  And then the note below is -- I
17  think this is what the attorney wanted.  So that's
18  one of the reasons we had it mailed, so we can make
19  that clear.
20    Q.    And what attorney did you work with on
21  this?
22    A.    That would, I think, have been someone
23  who does probate in the -- I think he was in the
24  Michigan area.

Page 231

1    Q.    But you don't recall their names right
2  now?  No?  All right.
3        And then the next check,
4  SunTrust2018000217, again, it says settlement Carol
5  Riggleman, it's another check for 8,932 to Paula
6  Keasey?
7    A.    Keasey.
8    Q.    Keasey.  And that was sent to you and
9  then you sent it on to them?
10    A.    After I made the notation on the bottom
11  of it.
12    Q.    Then looks like there's one for Caine
13  Everett.  That's SunTrust2018000227 for 11,798.
14  That was another rollover?
15    A.    Mm-hmm.
16    Q.    And then I think we're back.
17        So it looks like we have Sporsyz, Smith,
18  Howell and Everett, four rollovers, and then one
19  person, which ended up going to two beneficiaries,
20  a fifth person, Riggleman, that received
21  distributions in 2017; is that right?
22    A.    Yes.  That's right.
23    Q.    And then also another subset you said
24  that you couldn't locate them so you escheated

Page 232

1  their amounts to the state?
2    A.    Looks like the top page.
3    Q.    SunTrust 201800179, the 28,700 check on
4  June 27, that represents the total amount owed to
5  all the other --
6    A.    No, we have a sheet there.
7    Q.    Is this -- I'm looking at Exhibit 28,
8  which is the 2016 statement.  In the far right-hand
9  column, it has a column called "2017 Activity."
10  This one right here.
11    A.    This is -- okay.
12    Q.    So it's saying Mr. Alexander's amount is
13  escheated to the state?
14    A.    Mm-hmm.
15    MR. REARDEN:  You mean state, not "estate."
16    MR. CANETTI:  To the state, escheat to the
17  state.
18    MR. REARDEN:  Yeah.
19  BY MR. CANETTI:
20    Q.    And what efforts did you go through to
21  try and find Mr. Alexander?
22    A.    Well, I would certainly say we didn't
23  have the resources that the Department of Labor
24  would have, but we worked -- had worked this for a



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
245–248

Page 245

1    Q.   I agree with that statement.
2    A.   You know, for instance, here, it's
3  not -- that's not a good example.  Let's just see.
4    Q.   Can we start at the beginning and go
5  through --
6    A.   I don't know that I'm going to be able
7  to.
8      MR. REARDEN:  Shirley, you've got to let him
9  ask you a question.  Then you can give him an
10  answer.
11     THE WITNESS:  Okay.  Fine.
12  BY MR. CANETTI:
13    Q.   The first page here, and I can see it
14  looks like it says Jeffrey Sinclair at the top, but
15  can you make out any other information on this
16  sheet for Sherrod 604?
17    A.   No.  What I was going to say, and excuse
18  me, is the Excel sheet made this much more clear,
19  because I do believe that the Excel sheet had these
20  duplicated.  In other words, it was Sinclair in one
21  column, the amount paid in another column.  And
22  there was also an attempt to -- for instance, there
23  was -- how could I describe it?  I mean, these are
24  on the same page here, and that's pretty good, some

Page 246

1  of these, so you can see where they are.
2      But sometimes some of these turn up.
3  They were like numbers that corresponded with the
4  Excel column that was also put on the page, so you
5  could refer to the expense and in -- you know, in H
6  number one, for instance, and there was an H number
7  one so you could read that this was where -- who
8  and where the payment went to.  Some of this is --
9  so, you know, I'm at a great disadvantage to try --
10  I don't know why it was presented.
11    Q.   This is what we have.
12    A.   I didn't --
13    Q.   Your attorneys provided to us.  So we're
14  here today, so let's go through it and make the
15  best of it.
16      Like I said, on the first page I can see
17  Jeffrey Sinclair.  I'm not sure of anything else on
18  the first page 604.  Can you identify any
19  information on here for me?
20    A.   No.
21    Q.   On the next page, I see Jeffrey
22  Sinclair, August 1, 2010.  There appears to be a
23  posted money order for a thousand dollars, and it's
24  dated -- if you look at the very bottom here, it

Page 247

1  says 11/16/2010.
2    A.   Just trying to see something.
3    Q.   Looks like there's a receipt for the
4  money order.  So looks like there's one more money
5  order and a receipt for the money order.
6    A.   All right.
7    Q.   So is this saying that you paid
8  Mr. Sinclair a thousand dollars around November 16,
9  2010?
10    A.   Yeah.  Personally paid.
11    Q.   You're saying you personally paid that
12  amount?
13    A.   Yeah, that didn't come -- that came from
14  my pocket.
15    Q.   And did you get reimbursed or paid from
16  the plan for that amount?
17    A.   No.  I didn't go back that far, because
18  this didn't involve all of the legal work and this
19  was something that I mentioned to you before I had
20  done, so it was just paid by me.
21    Q.   Now, on the next page, 606, it looks
22  like it's another invoice from August 12, 2010.  It
23  looks like it says it's for $1,850.
24    A.   Mm-hmm.

Page 248

1    Q.   And it looks like there are four money
2  orders totaling 1850, and it looks like they're all
3  from July 9, 2010; is that right?
4    A.   From what I can see, I guess.
5    Q.   So is that money you paid personally?
6    A.   Yes.
7    Q.   Were you paid back that money from the
8  plan?
9    A.   As I mentioned, I believe that the --
10  you said before and we said that was spelled it
11  out, '11, '12, and '13.
12    Q.   I just want to make sure as we look at
13  these documents, this is accurate.  I don't want to
14  make any assumptions.
15      So you said, I think, you thought you
16  paid this money yourself and didn't get reimbursed,
17  and I just want to verify as we look at the
18  documents that is accurate.
19    A.   No reimbursement until '11, '12, and
20  '13, that was what that -- shows up on the '14
21  5500, and those are three years' worth of expenses,
22  that $142,000 for those years.
23    Q.   '11, '12 and '13?
24    A.   That's correct.  Anything prior --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
249–252

Page 249

1    Q.   Anything prior, you didn't get
2  reimbursed for?
3    A.   However, the attorney wanted, I guess,
4  everything that was anywhere.
5    Q.   Now, the next page, 607, is another
6  invoice from Mr. Sinclair dated October 12, 2011.
7  And there's two receipts, we don't have copies of
8  the money orders, for $1,500 around 12 -- or one
9  was September 26, 2012, one was December 24, 2011.
10       So this is an example of an expense you
11  paid out of pocket that you were reimbursed for in
12  2014?
13   A.   I think that's supposed to be '11 that
14  may have been reimbursed.  Here again, that's why
15  that Excel sheet would make a difference because
16  this is where the numbers were tallied and added
17  up.  So I'm at a great disadvantage here trying to
18  figure this out for you.
19   Q.   This is the time period you talked about
20  where you said 2011 and '12 were reimbursed?
21   A.   Right.
22   Q.   So does this $1500 represent amount you
23  paid out of pocket with your own funds and then the
24  plan paid you back in 2014?

Page 250

1    A.   Right.
2    Q.   Is that accurate?
3    A.   That -- well, didn't pay me back.  It's
4  not accurate to say the plan ever paid me back.  I
5  never got any money back.
6    Q.   We talked about that earlier.  I'm still
7  confused about that.  If you paid it out of your
8  own pocket, and then you said in 2014 the plan
9  reimbursed you, how did that money not go to you?
10   A.   I don't like the word "reimbursement."
11  Because it was owed already.  It was a big amount
12  of -- a big chunk of --
13   Q.   So the plan had a debt to you for $1500,
14  and then it paid off that debt in 2014?
15   A.   No.  Did not get paid off in 2014.
16   Q.   Did you pay money to yourself for this
17  amount right here, $1500, in 2014?
18   A.   Did I pay money to myself in 2014?
19   Q.   Yes.
20       MR. REARDEN:  I'm going to object to the
21  question as vague and confusing.
22  BY THE WITNESS:
23   A.   Yeah.  I don't understand.
24

Page 251

1  BY MR. CANETTI:
2    Q.   You said, which I think you said several
3  times now, that this $1500 on this page represents
4  money you paid out of your own pocket to
5  Mr. Sinclair for expenses that you think the plan
6  should have paid at this time frame.
7    A.   Well, I knew they should have paid the
8  actuary.
9    Q.   And the time you couldn't take it out of
10  the plan because the plan -- you believe the plan
11  account was frozen?
12   A.   Right.
13   Q.   Right?
14   A.   Right.
15   Q.   And then you said these expenses that
16  you paid out of your pocket from 2011, '12 and '13
17  got paid back in 2014?
18   A.   Generally, yeah, they got paid back to
19  whatever -- whatever that fund that the money had
20  come from, in other words, not from me.  They
21  didn't go into my bank account or they didn't go
22  and buy me, you know, a nice dinner.  That didn't
23  happen.
24       As I was taking debts on, I think we

Page 252

1  mentioned the charge cards.
2    Q.   Okay.  So maybe this is what you're
3  trying to say is you still had a credit card debt
4  of $1500 of 2014 --
5    A.   I still --
6    Q.   Let me finish.
7        So you had a credit card debt in 2014 of
8  $1500 that corresponded to this $1500.  You then
9  took money out of the plan and used that to pay off
10  the debt you had on your credit card of $1500?
11   A.   Right.  That's close, but, I mean, I'm
12  just going to say that's the idea.  That's close.
13  Because there would have been a lot of credit card
14  debt, not even just for that but --
15   Q.   I know.  We're going to get to the rest.
16  Just focus on this one thing here so we can talk
17  about something concrete.
18   A.   Well, that one, this one thing is not --
19  because this is obviously paid.  This is not
20  going -- this is a money order.  This is not a
21  credit card.
22   Q.   So maybe this wasn't from the credit
23  card but some other source you supplied $1500 to
24  pay Mr. Sinclair?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
297—300

Page 297

1  checks or money orders from Mr. Granzotto?

2      A.   Mm-hmm.

3      Q.   I can make out one for a thousand,

4  another for a thousand, another for 700. Does this

5  appear to be a representation of another -- or

6  $2700 was paid to Mr. Granzotto around 2014?

7      A.   As I told you, I'm not -- that is --

8  that would not be a correct assumption.

9      Q.   I'm saying that it was paid to him in

10  2014?

11      A.   In 2014?

12      Q.   Mm-hmm.

13      A.   That's what I'm saying. I don't believe

14  that's -- I think that this may be a collection of

15  Mr. Granzotto's work from 2011 forward. I don't

16  believe -- this is not all for one year because he

17  was involved year after year after year, and I --

18      MR. REARDEN: Right. But he asked you was

19  this paid to him -- were these money orders paid to

20  him in 2014?

21      THE WITNESS: I don't -- that's what I'm

22  saying. I don't know. Because his involvement was

23  so long, I think we're just seeing his section.

24      MR. REARDEN: Right. But he's not asking you

Page 298

1  when the legal work was done. He's asking you --

2      THE WITNESS: Right. I understand.

3      MR. REARDEN: -- when these were given to him.

4  You either know or you don't know; right?

5  BY THE WITNESS:

6      A.   I don't know.

7  BY MR. CANETTI:

8      Q.   If you look in the middle of the page,

9  looks like one of them says June 11, 2014, the one

10  for a thousand dollars.

11      A.   Which page are you on?

12      Q.   We're still on 659.

13      A.   And 659, I can't read a thing there. I

14  do -- that says 6/11/14?

15      Q.   Yes.

16      A.   So that would have been -- looks like

17  the purchase date of that money order, so it should

18  have been.

19      Q.   Would you have grouped these other two

20  as occurring around the same time?

21      A.   Maybe. I don't know what to tell you.

22  Because this -- the way this is put together, I

23  can't tell you that -- you know, I would rather see

24  them associated with an invoice, and I'm not seeing

Page 299

1  that. And, you know, I'm not speaking against my

2  own party, but it was not the last way that I saw

3  it organized, so I don't understand.

4      Q.   This is what the documents are that you

5  decided to produce for this litigation. So it is

6  what it is.

7      A.   Right. Well, they're accurate -- you

8  know, they're payments that are made, there's no

9  doubt about it, but the chronologic sequence I --

10      Q.   On page 660, it looks like it says

11  Granzotto again for $500. I can't make out the

12  date. Do you have any idea when this may have

13  occurred?

14      A.   That one, I really can't. I'm looking

15  at that date on that, and it looks like it says

16  6/5/10. So, you know, I don't know -- I do not

17  know what date that money order says.

18      Q.   On 661, again, this looks to be four

19  money orders to Mr. Granzotto.

20      A.   Mm-hmm.

21      Q.   I can see the one on the right says 500,

22  the one in the middle I can't read, the one on the

23  left says 500, and the one on the bottom says a

24  thousand dollars.

Page 300

1      A.   Mm-hmm.

2      Q.   Does that look right to you?

3      A.   That's correct.

4      Q.   And then the best date that I can see is

5  the one on the left-hand side. Looks like it says

6  something -- 2015 and something.

7      A.   I see that.

8      Q.   So do you think these may have been all

9  checks sent to him or money orders sent to him in

10  2015?

11      A.   I don't know all of them. I know that

12  one that we can see says '15, sure.

13      Q.   The only thing we can make out is this

14  represents about $2,000 that was sent to

15  Mr. Granzotto, at least 500 in 2015 and the other

16  1500 we don't know about?

17      A.   That would be correct.

18      Q.   And then as far as any funds that were

19  paid at any other time in 2015, 2016 or 2017, you

20  have no money orders, checks, or invoices for those

21  time periods; correct?

22      A.   Not to my knowledge.

23           Well, did you say '17?

24      Q.   2015, 2016, and 2017.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
301–304

Page 301

1    A.    Yeah, I don't know at this point.
2  Everything that I know that we -- I believe we've
3  given you everything at this point in time.
4    Q.    That we've seen no invoices, no money
5  orders for 20 -- well, other than what we looked at
6  today, we have not seen any other invoices,
7  receipts or money orders for 2015, 2016 or 2017?
8    A.    Okay.
9    Q.    Is that right?
10   A.    That's right.
11      MR. CANETTI:  Let's go off the record.
12         (WHEREUPON, a short break was
13         taken.)
14  BY MR. CANETTI:
15   Q.    I will remind you you're under oath.
16      MR. CANETTI:  And we have another exhibit
17  here, Exhibit No. 32.
18         (WHEREUPON, a certain document was
19         marked Sherrod Deposition Exhibit
20         No. 32, for identification, as of
21         May 2, 2018.)
22  BY MR. CANETTI:
23   Q.    This is something you produced to us.
24  Have you seen this document before?

Page 302

1    A.    I have.
2    Q.    And what does this represent?
3    A.    This appears to be the escheated funds
4  and the amounts of the escheatments.
5    Q.    Do you know who -- how this document was
6  created?
7    A.    I don't remember exactly how it was
8  created.  I guess if there's just a form that you
9  fill out.
10   Q.    Do you know who filled out this form?
11   A.    I don't recall that.
12   Q.    And do you know if this form was filed
13  in with the Michigan Department of Treasury?
14   A.    That, I'm pretty sure about.
15   Q.    Do you know who did that?
16   A.    I don't recall who did it.
17   Q.    Was it possibly you?
18   A.    I don't know that it was myself or I
19  signed off on it.  I don't really recall right now.
20   Q.    Is it possible it was Mr. Johnson?
21   A.    I don't know.  I don't know.
22   Q.    You don't think it was him?
23   A.    I don't believe it was.
24   Q.    Would it have been the accounting firm?

Page 303

1    A.    It's possible.  I'm really not sure.
2  I'm not sure right now.
3    Q.    And, again, this corresponds, if you
4  look on the -- there's the 27,000 -- or, I mean,
5  there's a 2017 check for 28,700, and on the last
6  page it says 28,700.  So this corresponds to the
7  check amount that was sent to the State of Michigan
8  on June 27, 2017, at SunTrust 2018000179?
9    A.    Okay.
10   Q.    This one here.
11   A.    Yes.
12   Q.    And looking at these amounts and the
13  Exhibit 28, did you put these in order or --
14   A.    No, they're not in order.
15   Q.    Exhibit 28 is this one here.  So this
16  shows what their balances were as of December 31,
17  2016, on the Exhibit 28; correct?
18   A.    I thought we said 2015?
19   Q.    If you look at the --
20   A.    Oh, you're talking about -- you're not
21  talking about this.  You're talking about something
22  else.
23   Q.    Yeah, this one here.  If you look at the
24  second page.  Sorry.

Page 304

1    A.    This one right here?
2    Q.    Page 691 says asset reconciliation as of
3  12/31/16.
4    A.    Yes, I see that.
5    Q.    And you said these numbers on Exhibit 32
6  are based on 2015, but you thought they were
7  possibly overestimated, overreported?
8    A.    That's -- you know, I believe that
9  that's what I understood.
10   Q.    Looking at this here on Exhibit 28, for
11  example, on page 692, it says Mr. Alexander's
12  balance is 2493.  And then --
13   A.    Okay.  Where are you?  You're in the
14  first column?
15   Q.    So Mr. Alexander, right here, and then
16  I'm reading down here, it's a little blurry --
17   A.    $2,493.  Mm-hmm.
18   Q.    Now, it looks like the amount that was
19  deposited with the State of Michigan was 2,031 on
20  Exhibit 32.
21   A.    I see that.  Mm-hmm.
22   Q.    And then if we look at the next page, on
23  693, there's an amount for Anna --
24   A.    The next page.  Hang on.  Hang on.  Hang



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
305–308

Page 305

1  on. Hang on. Okay. Yes, I see.
2      Q.   On the top there's Anna Calderone.
3      A.   Right.
4      Q.   And it says 4,229?
5      A.   Mm-hmm.
6      Q.   And then it looks over here on
7  Exhibit 32, it says 3,446.
8      A.   Mm-hmm. Right.
9      Q.   We can keep going through them, but if
10  you want to check and look, it looks like
11  everybody's balance as of 12/31/16 is higher than
12  the amount that you escheated to the state for them
13  in 2017?
14     A.   Yeah. What I don't know, I'm not sure
15  of, is whether -- I do see the balance here.
16  There's no question about the IRS tax. So that
17  would have to, I think, be looked into. I recall
18  something about the State of Michigan because
19  there's supposed to be taxes and all that, but I'm
20  not really sure whether there -- there was
21  something, some reconciliation with the IRS taxes
22  that are owed or will be owed. I'm not really
23  sure.
24         I understand what you're saying. I see

Page 306

1  the difference. I do know, of course, there was
2  some question because we knew that the fund did
3  grow, and there was no doubt about the fact that
4  there may be some more owed. So there's not any
5  dispute of that in the case -- the fact. That's --
6  you know, I think I told you that before.
7         I do wonder too something about the
8  taxes and something about the State of Michigan,
9  but that's something that has to be worked out a
10  bit.
11     Q.   At this stage there hasn't been any
12  checks written to the IRS or the State of Michigan
13  to pay any taxes on these amounts; correct?
14     A.   And I don't know how the State of
15  Michigan -- that has to be checked in to with a
16  little bit more certainty because I just know that
17  as the trustee, there's some notification that I
18  received from the State the other day regarding
19  this. So there's more that's being done on it.
20  It's just not -- no one said that it's final.
21  There's more that's being done and more that has to
22  be computed on it.
23     Q.   So sounds like you're saying it's
24  possible you may have to pay additional amounts for

Page 307

1  taxes based on these distributions?
2      A.   Taxes, and if they are owed more,
3  absolutely. We're not trying to short anybody.
4  It's not something we'll do. This is money that --
5  funds that were given to them anyway, and I won't
6  take them away ever. I think I mentioned to you
7  before, this was not the final, you know, figure.
8      Q.   And you had mentioned a letter we had
9  gotten from Mr. Kofoed.
10         MR. CANETTI: That's Exhibit No. 33.
11         (WHEREUPON, a certain document was
12         marked Sherrod Deposition Exhibit
13         No. 33, for identification, as of
14         May 2, 2018.)
15  BY MR. CANETTI:
16     Q.   It's a letter dated August 24, 2017, to
17  me from Mr. Russell Kofoed. And in paragraph 3, it
18  states that you sent checks of 8500 to the two
19  children of Ms. Riggleman. Do you see that?
20     A.   I see that.
21     Q.   Did you send them checks for 8500?
22     A.   You have the copies there, so the -- if
23  his -- you know, whatever is on the check is what's
24  correct. If this is not correct, I don't take

Page 308

1  responsibility for that.
2      Q.   I did not get copies of the checks --
3      A.   You have them.
4      Q.   -- that you sent to the Rigglemans. We
5  have copies of the checks that were sent to you
6  that was approximately $8900.
7      A.   And those went to -- well, they're not
8  Rigglemans. They're actually keys I and waters.
9  That's what they got.
10     Q.   So you're saying this representation
11  here that only 8500 was sent to them was not
12  accurate. Whatever those checks were from 2017,
13  that's the amount that was sent to them?
14     A.   That is the amount that was sent, and
15  I'm sure if you, you know, want to do to follow
16  through and get the bank statements, you'll find
17  the numbers correspond to what's on those checks,
18  not what Mr. Kofoed has stated here.
19     Q.   And then something I was confused about
20  you talked about a few times, I thought you said
21  earlier that the Sherman-Sherrod litigation in the
22  state of Michigan is still ongoing. Is that true?
23     A.   That's true.
24     Q.   Is the bond still being held pursuant to



Page 309

1   that litigation?
2       A.   I can't give you a direct exact answer
3   to that.  I'm not the attorney.  It's still
4   ongoing.  It's in litigation and only the people
5   involved would be able to answer you specifically.
6   I cannot.
7       Q.   So, to your knowledge, the bond has not
8   been paid out to Mr. Sherman?
9       A.   Oh, no, that bond has not been paid out.
10  Probably see that it never will be paid out.  No,
11  that is not paid out.
12      Q.   And has not been paid out to you either;
13  correct?
14      A.   I would never be -- first of all, it
15  can't be.  I would never -- it says clearly it's
16  not to be used -- given to me in that affidavit.
17      Q.   The affidavit we looked at earlier with
18  Merrill Lynch?
19      A.   That affidavit spells out the fact that
20  it is not -- it was to be used for one purpose
21  only, and it was never to be used by me, and it was
22  never intended to be used by me.
23      Q.   The bond is made out to you as the
24  principal; isn't that right?

Page 310

1       A.   I don't know how it's made out, but I do
2   know there's an affidavit for my statements as to
3   what the -- how that bond would be handled, and
4   that's my affidavit, and that's just what I stand
5   by.
6       Q.   Let's look at that affidavit, then,
7   because I did not see anywhere where it says that
8   the bond is to be paid out to the plan.
9       A.   It may -- well --
10      Q.   If you want to get Exhibit 2 there
11  handy, and I'll do my best to put my finger on
12  Exhibit 2.
13      A.   I think I know it well.
14      MR. REARDEN:  Don't think you know it well.
15  Get the exhibit and look at the exhibit.
16      THE WITNESS:  All right.  Okay.
17  BY MR. CANETTI:
18      Q.   Now, if you think -- I think if you go
19  to 2041, DOL2041, that's your affidavit, and it
20  continues to 242 and 243.
21          Can you point to where it says how the
22  bond should be distributed if it's paid out to you?
23      A.   Page 4, and I guess we'll go on to
24  page 5, "This distribution shall be used for the

Page 311

1   sole purpose of securing a bond pursuant to" --
2       Q.   I'm sorry.  You said page 4?
3       A.   Well, I'm so sorry.  Exhibit 4 is what
4   I'm looking at.  I'm looking at paragraph -- you
5   put me to that page, paragraph 4.  And this goes --
6   continues on the next page, very last word and
7   that -- and then that paragraph, "This distribution
8   shall be used for the sole purpose of securing a
9   bond pursuant to the appeal order."
10      Q.   Mm-hmm.
11      A.   That's the sole purpose.  It is not to
12  be -- ever was it intended to come to me, and it
13  was -- as I said, I didn't write this.
14      Q.   It says it's a distribution for securing
15  a bond, and the appeal order said that your assets
16  could be used to secure the bond.
17      A.   Well, I didn't write this, and I -- this
18  was something that the court ordered, was forced on
19  me, and it was never ever my understanding or
20  intent to take $250,000 out of my account.  That
21  was not an option, and it certainly is -- says this
22  doesn't go for anything else, and it shall never go
23  for anything else with my -- if I have anything to
24  do with it.

Page 312

1       Q.   Well, on the Exhibit 3 on 2037, we
2   talked about before, the bond is in your name.  So
3   if this bond does not get paid out to Mr. Sherman,
4   the only person that it can get paid to is you,
5   then.
6       A.   Well, that bond -- well, you know, it
7   may be me via the pension, but it was an
8   understanding of everybody who dealt with this
9   the -- the administrator, Mr. Conger, everyone, and
10  that bond goes back to where it came from.  That's
11  the pension.
12      Q.   But there's no documents that actually
13  say that; correct?
14      A.   It doesn't -- no, right.  So we have to
15  emphasize the negative of what can't be done with
16  it.  The positive is what must be done with it is
17  not there.  You're exactly right.  It doesn't say
18  where it must go, but it does say where it can't
19  go.
20      Q.   And on the other page you're looking at,
21  on page 2042 refers to it as in paragraph 9, two
22  distributions.
23      A.   That's Merrill Lynch terminology, and I
24  see what it says.  It's not a distribution because



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
313—316

Page 313

1  I don't have it.  Distribution is something that,
2  you know, I put in my back pocket and I can use.  I
3  can't use that, and I'm not using it.
4      Q.   It also said in paragraph 9 that "those
5  two distributions do not exceed my individual
6  interest in the plan."  Why is that language in
7  there?
8      A.   Why is it in there?  You know, Merrill
9  Lynch wrote that up, and I guess it was to protect
10  themselves and what -- this was nothing that I was
11  consulted on.  I was just told this is the way it
12  had to be.
13      Q.   But you did sign it; right?
14      A.   I had no choice.  At the same time, I
15  couldn't withdraw one dollar for something that I
16  did need when this was made to happen.
17      Q.   When did you reach retirement age?
18      A.   I was born in '46.  Few years ago.
19      Q.   You don't recall what year you reached
20  retirement age?
21      A.   Subtract 46 from whatever and you'll get
22  there.  At the moment, I don't want to do the math.
23      Q.   Because I'm confused.  You said you
24  couldn't take any money out, but if you weren't at

Page 314

1  retirement age, would you be able to take money out
2  of it?
3      A.   That's why you read the letter from
4  Mr. Bartolic asking, and I was denied.  Merrill
5  Lynch sat on this and wouldn't let me take anything
6  from my account.
7      Q.   So at that stage when this 250 --
8  $250,000 came out, you could get distributions from
9  the plan because you had reached your retirement
10  age; is that right?
11      A.   I was eligible -- I believe I was
12  eligible, if we're doing the math right, I was
13  eligible, but I was barred from doing that because
14  of the court order.
15      Q.   That's what I'm referring to.  At the
16  time this $250,000 came out, you were eligible for
17  distributions from the plan; right?
18      A.   That is right.
19      MR. CANETTI:  I have no more questions at this
20  time.
21          EXAMINATION
22  BY MR. REARDEN:
23      Q.   Dr. Sherrod, when you made -- had the
24  plan issue checks to you -- let me back up.

Page 315

1          Were there occasions where you had the
2  Target Pension Plan issue checks to you for payment
3  of plan expenses?
4      A.   Yes, sir.
5      Q.   And when that was done, were the
6  expenses that you were paying always expenses that
7  were incurred in the year that the check was
8  actually issued?
9      A.   No, sir, they weren't.
10      Q.   So there were times when you had a --
11  the plan issue a check to you where it paid
12  something that occurred in a prior year?
13      A.   Yes, that's correct.
14      Q.   Dr. Sherrod, I want to refer you back to
15  Deposition Exhibit 31.  I want to refer you to the
16  page with the Bates stamp number ending in 607,
17  lower right-hand corner.
18      A.   Yes.
19      Q.   Do you see that page?
20      A.   I do, yes.
21      Q.   On the top part of that page, it -- I
22  see what appears to be an invoice from Jeffrey L.
23  Sinclair and Company?
24      A.   That's right.

Page 316

1      Q.   And can you carefully read the text
2  underneath "professional services" there?
3      A.   Preparation --
4      Q.   You don't have to read it out loud.
5  Just read it to yourself.
6      A.   Okay.
7      Q.   And this invoice, does this invoice
8  refer to work that Sinclair and Company did for the
9  2010 plan year, or does it refer to work that it
10  did for the 2011 plan year?
11      A.   It says here -- it says here 2010.
12      Q.   So do you know whether or not you paid
13  this invoice out of your own personal funds and
14  were not reimbursed for this, or was this something
15  that you were reimbursed for through the Target
16  Pension Plan?
17      A.   I believe that I paid; it was later
18  reimbursed.
19      Q.   Even though it was in the -- for the
20  plan year ending December 31, 2010?
21      A.   2010.  Looking at the date for 2011.
22      Q.   If you know.
23      A.   I'm not sure if I know because the
24  year's different.  Theoretically --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
317—320

Page 317

1    MR. REARDEN:  I don't have anymore additional
2  questions for you.
3    MR. CANETTI:  That's it.
4    MR. REARDEN:  We will reserve signature.
5        (WHEREUPON, the deposition concluded
6        at 4:54 p.m.)

Page 319

1        IN WITNESS WHEREOF, I do hereunto set my
2   hand and affix my seal of office at Woodridge,
3   Illinois, this 21st day of May, A.D. 2018.

8        Notary Public, DuPage County, Illinois.
9        My commission expires 8/21/18.

11   ALICE M. SCHWINGER, CSR No. 84-2913

Page 318

1   STATE OF ILLINOIS   )
2                       ) SS:
3   COUNTY OF DUPAGE    )
4        I, ALICE M. SCHWINGER, CSR No. 84-2913,
5   a Notary Public within and for the County of
6   DuPage, State of Illinois, and a Certified
7   Shorthand Reporter of said state, do hereby
8   certify:
9        That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13       That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony
17  given and the proceedings had;
18       That the said deposition was taken
19  before me at the time and place specified;
20       That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.

Page 320

1              I N D E X
2  EXAMINATION                              PAGE
   SHIRLEY T. SHERROD
3  EXAMINATION                                 3
   BY MR. CANETTI:
5  EXAMINATION                               314
   BY MR. REARDEN:
          E X H I B I T S
7  EXHIBIT NO.                              PAGE
8  No. 1                                      23
   No. 2                                      37
9  No. 3                                      56
   No. 4                                      59
10 No. 5                                      61
   No. 6                                      89
11 No. 7                                     100
   No. 8                                     103
12 No. 9                                     104
   No. 10                                    107
13 No. 11                                    114
   No. 12                                    115
14 No. 13                                    122
   No. 14                                    126
15 No. 15                                    131
   No. 16                                    134
16 No. 17                                    137
   No. 18                                    153
17 No. 19                                    156
   No. 20                                    163
18 No. 21                                    170
   No. 22                                    178
19 No. 23                                    179
   No. 24                                    187
20 No. 25                                    191
   No. 26                                    194
21 No. 27                                    203
   No. 28                                    205
22 No. 29                                    208
   No. 30                                    228
23 No. 31                                    244
   No. 32                                    301
24 No. 33                                    307



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD                  318

```
 1   STATE OF ILLINOIS    )

 2                        )  SS:

 3   COUNTY OF DUPAGE     )

 4             I, ALICE M. SCHWINGER, CSR No. 84-2913,

 5   a Notary Public within and for the County of

 6   DuPage, State of Illinois, and a Certified

 7   Shorthand Reporter of said state, do hereby

 8   certify:

 9             That previous to the commencement of the

10   examination of the witness, the witness was duly

11   sworn to testify the whole truth concerning the

12   matters herein;

13             That the foregoing deposition transcript

14   was reported stenographically by me, was thereafter

15   reduced to typewriting under my personal direction

16   and constitutes a true record of the testimony

17   given and the proceedings had;

18             That the said deposition was taken

19   before me at the time and place specified;

20             That I am not a relative or employee or

21   attorney or counsel, nor a relative or employee of

22   such attorney or counsel for any of the parties

23   hereto, nor interested directly or indirectly in

24   the outcome of this action.
```



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
319

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2    hand and affix my seal of office at Woodridge,

 3    Illinois, this 21st day of May, A.D. 2018.

 4

 5

 6

 7

 8              Notary Public, DuPage County, Illinois.

 9              My commission expires 8/21/18.

10

11    ALICE M. SCHWINGER, CSR No. 84-2913

12

13

14

15

16

17

18

19

20

21

22

23

24
```

