Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   R. ALEXANDER ACOSTA,        )
 5   Secretary of Labor, United  )
 6   States Department of Labor, )
 7        Plaintiff,             )
 8      -vs-                     ) Case No:
 9   SHIRLEY T. SHERROD; LEROY   ) 1:16-cv-04825
10   JOHNSON; and SHIRLEY T.     )
11   SHERROD, M.D., P.C. TARGET  )
12   PENSION PLAN,               )
13        Defendants.            )
14       The deposition of LEROY JOHNSON, called for
15   examination, taken pursuant to the Federal Rules of
16   Civil Procedure of the United States District
17   Courts pertaining to the taking of depositions,
18   taken before ALICE M. SCHWINGER, CSR NO. 84-2913, a
19   Notary Public within and for the County of DuPage,
20   State of Illinois, and a Certified Shorthand
21   Reporter of said state, at Suite 844, 230 South
22   Dearborn Street, Chicago, Illinois, on the 3rd day
23   of May, A.D. 2018, commencing at 9:05 a.m.
24
```

Page 2

```
 1   PRESENT:
 2        UNITED STATES DEPARTMENT OF LABOR,
 3        OFFICE OF THE SOLICITOR,
 4        (230 South Dearborn Street, Room 844,
 5        Chicago, Illinois 60604,
 6        312/353-3271), by:
 7        MR. BRUCE C. CANETTI,
 8           appeared on behalf of the Plaintiff;
 9
10        OLIVER CLOSE, LLC,
11        (124 North Water Street,
12        Suite 300 Waterside Center,
13        Rockford, Illinois 61107-3974,
14        815/963-0009), by:
15        MR. JOHN REARDEN, JR.,
16           appeared on behalf of the Defendants.
17
18   ALSO PRESENT:  Scott C. Stieritz, Auditor
19
20
21
22
23   REPORTED BY:  ALICE M. SCHWINGER, CSR
24         CSR No. 84-2913
```

Page 3

```
 1       (WHEREUPON, the witness was
 2        duly sworn.)
 3       LEROY JOHNSON,
 4   having been first administered an oath, was
 5   examined and testified as follows:
 6              EXAMINATION
 7   BY MR. CANETTI:
 8   Q.   Could you state and spell your name for
 9   the record.
10   A.   Leroy Johnson.
11   Q.   Could you spell your name.
12   A.   L-e-r-o-y J-o-h-n-s-o-n.
13   Q.   Are you represented by counsel today?
14   A.   Yes, I am.
15   MR. CANETTI:  This deposition is being taken
16   pursuant to Federal Rule of Civil Procedure 30
17   regarding allegations of ERISA violations with
18   respect to the Shirley T. Sherrod, M.D., P.C.
19   Target Pension Plan in the matter of Acosta V.
20   Sherrod, et al., 1:16-CV- --
21       (WHEREUPON, there was a brief
22        interruption.)
23   MR. CANETTI:  As I was saying, in the matter
24   of Acosta V. Sherrod, et al., 1:16-CV-04825 in the
```

Page 4

```
 1   Northern District of Illinois.
 2   BY MR. CANETTI:
 3   Q.   My name is Bruce Canetti.  I'm an
 4   attorney for the plaintiff, U.S. Department of
 5   Labor.  With me is Mr. Scott Stieritz.  He's an
 6   auditor with the Employee Benefits Security
 7   Administration known as EBSA.
 8       Have you ever been deposed before,
 9   Mr. Johnson?
10   A.   I don't believe so.
11   Q.   Have you ever testified at a hearing
12   before a judge or jury?
13   A.   I have.
14   Q.   How many times have you done that?
15   A.   Maybe twice.
16   Q.   Well, in depositions, we need oral
17   answers.  The court reporter is writing down what
18   you and I say, so we need to make sure we verbalize
19   our responses.  Also, we need to make sure we don't
20   speak over each other.  So if I'm asking a
21   question, let me finish it and I'll do my best to
22   let you finish your answers so we're not speaking
23   at the same time.
24       I want to make sure you understand my
```



Page 9
1  A. That is correct.
2  Q. And you said you may have testified
3  another time. What other case was that?
4  A. It was really in the same case. Part of
5  it was in the bankruptcy and part of it was in the
6  state court, but it was still the same case.
7  Q. What was the state court action called?
8  A. Same.
9  Q. Re v. Reed?
10 A. That is correct.
11 Q. R-E?
12 A. R-e-e-d.
13 Q. Reed v. Reed?
14 A. Yes.
15 Q. I didn't catch that.
16    That was a state Michigan case then?
17 A. That is correct.
18 Q. Where do you currently reside?
19 A. 1201 Woodslea Drive, Flint, Michigan.
20 Q. What's the ZIP code?
21 A. 48507.
22 Q. Are you currently married?
23 A. Yes, I am.
24 Q. Do you have children?

Page 10
1  A. Yes.
2  Q. And what's the highest level of
3  education you've completed?
4  A. Medical school.
5  Q. And what school was that?
6  A. Wayne State University.
7  Q. What area of medicine do you practice
8  in?
9  A. I practice -- specialty, ophthalmology.
10 Q. And have you known Ms. Sherrod since
11 medical school?
12 A. Yes.
13 Q. Are you currently employed?
14 A. Yes, I am.
15 Q. What's your current occupation -- where
16 are you currently employed?
17 A. I am employed at the Hamilton Community
18 Health Network Center.
19 Q. As an ophthalmologist?
20 A. That is correct.
21 Q. And is that in Flint?
22 A. That is correct.
23 Q. How long have you been there?
24 A. I started there in about 2011.

Page 11
1  Q. Is that a full-time position?
2  A. Yes, it is.
3  Q. Did you ever work with Dr. Sherrod?
4  A. No.
5  Q. Did you work in any capacity with the
6  Sherrod M.D., P.C. entity?
7  A. No.
8  Q. Have you ever provided any services to
9  any ERISA covered plans before?
10    MR. REARDEN: Before?
11 BY MR. CANETTI:
12 Q. Before today.
13 A. Before this plan we're involved in?
14 Q. L.J. Consulting is currently the plan
15 administrator for the plan; correct?
16 A. That is correct.
17 Q. And starting in 2012, I believe, you
18 personally were the plan administrator for the
19 plan; correct?
20 A. That is correct, sir.
21 Q. Prior to that, had you provided any
22 services to any ERISA-covered plans?
23 A. No.
24 Q. And since 2012 to the present, have you

Page 12
1  provided any services to any other ERISA-covered
2  plans besides the plan in this litigation?
3  A. No.
4  Q. Do you have any training with respect to
5  ERISA?
6  A. No.
7  Q. Have you done any courses or any type of
8  educational opportunities to learn about ERISA?
9  A. No more than what I took upon myself to
10 read.
11 Q. What did you take upon yourself to read?
12 A. Articles on the internet.
13 Q. And when did you read those articles?
14 A. I can't give you an exact date, sir.
15 Q. Do you still have copies of any of those
16 articles?
17 A. I don't believe so.
18 Q. So what do you do as the plan
19 administrator for the plan?
20 A. I strictly follow the plans.
21 Q. Follow the plan document?
22 A. That is correct.
23 Q. Do you have a copy of that document?
24 A. Yes, I do.



Page 13
1  Q.  Where do you keep that at?
2  A.  On my iPad.
3  Q.  So what are some of your day-to-day
4  activities that you do as plan administrator?
5  A.  I don't have any day-to-day activities
6  as a plan administrator.
7  Q.  Do you have any annual activities that
8  you do?
9  A.  There is an annual activity.
10  Q.  What's your annual activity that you do?
11  A.  The main annual activity is to get that
12  5500 filed.
13  Q.  Anything else?
14  A.  That's the primary one.
15  Q.  What are the ones that aren't primary?
16  A.  Meaning?
17  Q.  You said that there are annual
18  activities, and the primary one was to get the 5500
19  filed.  What are the other ones besides that
20  primary one?
21  A.  I don't recall all of them right now.
22  Q.  Can you think of any other activity you
23  do besides getting the 5500 filed?
24  A.  No.

Page 14
1  Q.  Do you have any involvement with -- are
2  you aware that there are participant statements
3  that are done?
4  A.  I'm aware of those.
5  Q.  Do you have any involvement with those
6  participant statements getting done?
7  A.  I delegated that responsibility, as
8  administrator, to Dr. Sherrod to get those done.
9  Q.  Are you involved with any communications
10  with the participants in the plan?
11  A.  No, I'm not.
12  Q.  Have you ever sent any letters to
13  participants in the plan?
14  A.  I delegated all of those
15  responsibilities to Dr. Sherrod.
16  Q.  So all communications with the
17  participants you delegated to Dr. Sherrod to
18  handle?
19  A.  That is correct, sir.
20  Q.  Have you seen any communications that
21  were sent to participants?
22  A.  No, I have not.
23  Q.  Do you ever review those participant
24  statements after you delegated the responsibility

Page 15
1  for them to Sherrod?
2  A.  I've not received any.
3  Q.  Never seen any?
4  A.  If she got them back, then we may have
5  talked about them.
6  Q.  But you personally haven't looked at any
7  of them?
8  A.  The statements from?  Repeat that
9  question again, sir.
10  Q.  There are these annual kind of
11  participant summary statements that we've seen, and
12  we can look at some of those and you can answer my
13  question more precisely.  I'm just wondering if
14  you've ever seen any of those types of things?
15  A.  Yes, I have.  Yes, I have, yes.
16  Q.  Why did you see those?
17  A.  I don't understand the question.
18  Q.  Did you see them in some capacity to
19  help you do your work as the plan administrator?
20  A.  There wasn't really much for me to do
21  because, as I stated before, I delegated those
22  responsibilities to Dr. Sherrod.
23  Q.  So did you have any reason in performing
24  your duties to review those statements?

Page 16
1  A.  Only in terms of since I asked for them
2  to be done, that they were done.
3  Q.  Just to know that they were completed?
4  A.  That is correct.
5  Q.  Are you involved at all with
6  distributions to participants in the plan?
7  A.  Involved in what way?
8  Q.  Are you aware that there have been
9  distributions to some participants in this plan?
10  A.  Yes, I am.
11  Q.  And have you been involved in any of
12  those distributions?
13  A.  I have.
14  Q.  And what was that involvement?
15  A.  I met with Dr. Sherrod and we discussed
16  it.
17  Q.  When was the first time you met with
18  Dr. Sherrod to discuss distributions?
19  A.  I don't recall that.
20  Q.  When was the first time you were aware
21  that there were distributions from the plan?
22  A.  I believe the first distributions
23  occurred -- you're speaking in terms of a
24  distribution to a participant?



Page 17
1   Q.   To any participant in the plan.
2   A.   That would occur around 2014.
3   Q.   Was that distribution to Dr. Sherrod?
4   A.   Yes.
5   Q.   And so what did you discuss with
6   Dr. Sherrod regarding the distributions to her in
7   2014?
8   A.   I didn't discuss anything with her
9   regarding the distributions to her.
10  Q.   Did you have any involvement with the
11  distributions to Dr. Sherrod in 2014?
12  A.   I know that she was getting the
13  distributions because that had been previously set
14  up, you know, with her -- you know, with the
15  actuary.
16  Q.   Did you see any requests for
17  distributions?
18  A.   Yes, I have seen requests.
19  Q.   From 2014 from Dr. Sherrod?
20  A.   I don't recall.
21  Q.   Is there anything that would help you to
22  remember that?
23  A.   No.
24  Q.   Did you see any distribution requests

Page 18
1   for 2015?
2   A.   To?
3   Q.   For a participant to get a distribution
4   from the plan for 2015.
5   A.   I may have. I would have to look at --
6   I may have. I don't know.
7   Q.   Is there anything that would help you
8   to -- any documents that would help you answer that
9   question?
10  A.   No.
11  Q.   Which participants received
12  distributions in 2015?
13  A.   That would be Dr. Sherrod.
14  Q.   And then in 2016, did you see any
15  distribution requests for a participant to receive
16  a distribution in 2016?
17  A.   No.
18  Q.   And was it just Dr. Sherrod who received
19  distributions in 2016?
20  A.   I'm confused. I don't understand
21  exactly -- there are different types of
22  distributions that take place --
23  Q.   I apologize for interrupting.
24      So in 2016, who do you think received a

Page 19
1   distribution from the plan?
2   A.   When you say "a distribution," would you
3   please define distribution so I know exactly what
4   you are referring to, because there are different
5   types of distributions.
6   Q.   A distribution in ERISA refers to
7   getting benefits paid under the plan.
8       So who received a distribution in 2016
9   as a participant in the plan?
10  A.   I don't recall.
11  Q.   Is there anything that would help you
12  recall that?
13  A.   No.
14  Q.   In 2017, did some participants receive
15  distributions from the plan?
16  A.   Yes.
17  Q.   Who received distributions from the plan
18  in 2017?
19  A.   I can't name them.
20  Q.   Was it more than just Dr. Sherrod?
21  A.   Yes.
22  Q.   And in 2016, do you know if Dr. Sherrod
23  received distributions?
24  A.   I believe she did.

Page 20
1   Q.   And I think we talked about 2015 about
2   whether there was any documents you saw requesting
3   distributions, and you say you didn't see any for
4   2015. Was that right?
5   A.   Is that what I said?
6   Q.   I believe so. If that's something
7   different, correct me if I'm wrong.
8   A.   I'll have to stay with my answer, sir.
9   Q.   Well, if you said something you think is
10  incorrect, you're free to change your answer.
11  There's nothing binding upon you. If you said
12  something you think it was wrong, you should, you
13  know, feel free to state what you think is more
14  accurate.
15      What about 2016? Did you see any
16  distribution requests in 2016?
17  A.   I don't recall.
18  Q.   In 2017, did you see some distribution
19  requests?
20  A.   I don't recall.
21  Q.   Is there anything that would help you
22  recall that for 2016 or 2017?
23  A.   No.
24  Q.   Does the plan have an accountant or



Page 45
1  review for accuracy?
2  Q.  Did you read it to make sure everything
3  on there made sense and was correct?
4  A.  I looked at it.  I can't vouch for the
5  correctness of it because that was prepared by a
6  professional.
7  Q.  I believe it was in 2013 -- and we can
8  look at it -- you started signing the 5500; is that
9  right?
10  A.  That I was authorizing her to sign, yes,
11  that's correct.
12  Q.  So from 2013, I think, to the last one
13  that was filed was 2016, you authorized your
14  signature to be put on those documents; is that
15  right?
16  A.  Yes.
17  Q.  And so when you put your signature on
18  those documents, what did you think was the purpose
19  of you signing those?
20  A.  Well, I was a plan administrator.
21  Q.  Do you think that by signing those, you
22  were representing that the information on there was
23  true and accurate?
24  A.  Yes, I do.

Page 46
1  Q.  And so what did you do to make sure that
2  information was true and accurate?
3  A.  There's nothing that I could do to make
4  sure that that information was accurate.  I would
5  have to assume that the information is accurate
6  because we'd hired a professional to do so.
7  Q.  Do you know who actually filled out the
8  5500s and put the information on it?
9  A.  I can't answer that with certainty.
10  Q.  Who do you think did it?
11  A.  I think Dr. Sherrod did it.
12  Q.  Is that for 2012 to 2016?
13  A.  That is correct.
14  MR. CANETTI:  Go off the record for a second.
15      (WHEREUPON, a short break was
16       taken.)
17  BY MR. CANETTI:
18  Q.  Now, were you ever paid for any of the
19  work you did as the plan administrator?
20  A.  No, sir.
21  Q.  Was L.J. Consulting ever paid for any
22  work as a plan administrator?
23  A.  No, sir.
24  Q.  And why were you selected to be the plan

Page 47
1  administrator in 2012?
2  A.  I was selected because the call came in
3  from Mr. Conger's office because, as I understood
4  it, a great wrong had been done and I felt that I
5  needed to do something because in my -- you know,
6  in my opinion, it was a great injustice had been
7  done to Dr. Sherrod.
8  Q.  Are you finished?
9  A.  I am finished.
10  Q.  And before being selected to be the plan
11  administrator for this plan, you had never worked
12  as a plan administrator before; is that right?
13  MR. REARDEN:  Objection.  Asked and answered.
14  BY MR. CANETTI:
15  Q.  Is that right?
16  A.  I have not worked before as a plan
17  administrator.
18  Q.  So what qualified you to work as a plan
19  administrator?
20  MR. REARDEN:  Objection.  Asked and answered.
21  BY THE WITNESS:
22  A.  My compassion, my desire to help others,
23  the ability to see that things are done.
24

Page 48
1  BY MR. CANETTI:
2  Q.  Are you finished?
3  A.  I am finished.
4  Q.  Now, in 2014 you started the entity
5  L.J. Consulting; is that right?
6  A.  That is correct.
7  Q.  Why did you start that entity?
8  A.  There was a discussion with the
9  attorney, Mr. Conger, at that time.
10  Q.  And what was the rationale for starting
11  L.J. Consulting with Mr. Conger at that time?
12  MR. REARDEN:  I am going to object to this to
13  the extent it calls for attorney-client
14  communication.
15  BY MR. CANETTI:
16  Q.  Did he provide advice to you as a plan
17  administrator of the plan in setting up L.J.
18  Consulting?
19  A.  No.
20  Q.  So what do you understand to be the
21  reason why you started L.J. Consulting?
22  A.  I don't have a specific reason as to why
23  I did it at that time.
24  Q.  Why did you just not continue as Leroy



Page 49
1  Johnson as the plan administrator in 2014?
2    A.   I don't know why.
3    Q.   You have no reason why you did that?
4    A.   Correct.
5    Q.   And L.J. Consulting, does it have any
6  employees?
7    A.   One.
8    Q.   And is that you?
9    A.   That is correct.
10   Q.   Are you paid for your work at L.J.
11 Consulting?
12   A.   No, I am not.
13   Q.   Does L.J. Consulting have any clients
14 other than the plan?
15   A.   It does not.
16   Q.   And has that been true from the
17 inception of L.J. Consulting to the present?
18   A.   Repeat that again.
19   Q.   Has that been true that the only client
20 has been the plan from the start of L.J. Consulting
21 to the present?
22   A.   That is correct.
23   Q.   Does L.J. Consulting have any office
24 space?

Page 50
1    A.   No.
2    Q.   Is the address L.J. Consulting uses in
3  Illinois a box at a UPS store?
4    A.   Yes, it is.
5    Q.   And why did you set up L.J. Consulting
6  in Illinois if you live in Michigan?
7    A.   Everything that I've done with this plan
8  has always been in Illinois.
9    Q.   And do you know why that is?
10   A.   Why what is?
11   Q.   Why you set things up to do work with
12 the plan in Illinois when you reside in Michigan?
13   A.   I reside more than in Michigan.
14   Q.   Where else do you reside besides Flint,
15 Michigan?
16   A.   I reside here in Illinois.
17   Q.   You have another address here in
18 Illinois?
19   A.   Yes, I do.
20   Q.   What's your address here?
21   A.   The address is 105 Wood Lake Boulevard,
22 Apartment 3111, Gurnee, Illinois.
23   Q.   So do you also work here in Illinois as
24 part of your medical practice?

Page 51
1    A.   No, I do not.
2    Q.   All the work you do is in Michigan?
3    A.   That is correct.
4    Q.   That's a full-time position?
5    A.   Yes.
6        MR. REARDEN:  Objection.  Asked and answered.
7  BY MR. CANETTI:
8    Q.   And you mentioned you have a copy of the
9  plan document.  Are there any records that
10 L.J. Consulting keeps related to the plan?
11   A.   There are documents.  There are many
12 documents that have been turned -- you know, turned
13 over.  I don't know specifically which ones you
14 want, you're asking about.
15   Q.   Are there any documents L.J. Consulting
16 maintains as part of its -- to assist in doing its
17 work as the plan administrator?
18   A.   No.
19   Q.   Are there any records it keeps as part
20 of its role as the plan administrator?
21   A.   No.

Page 52
1        (WHEREUPON, a certain document was
2         marked Johnson Deposition Exhibit
3         No. 1, for identification, as of
4         May 3, 2018.)
5  BY MR. CANETTI:
6    Q.   I'm going to show you what's marked as
7  Exhibit 1.  This is Sherrod 1 through 71.  This was
8  the plan document that you filed in the Illinois
9  litigation.  In the complaint with Mr. Conger, this
10 also is the document that was identified as a plan
11 document in your interrogatory responses.
12       Is this a copy of the plan document that
13 you referred to earlier?
14   A.   It is the one that was filed, as you say
15 it was.  It is.
16   Q.   It has the marking on the top that's the
17 case number for that, 1:12-CV-02545, Document 11,
18 filed on April 6, 2012.
19       Do you see that?  Did I read that
20 correctly?
21   A.   Yes, I see.
22   Q.   And so you did attach the plan document
23 to the complaint as part of the Illinois litigation
24 against Merrill Lynch; correct?



Page 53

1  A.  Oh, I don't know that -- this is the
2  first time that I've been aware that a document was
3  really filed with that lawsuit.
4  Q.  Are you aware that you identified in
5  your interrogatory responses that this document was
6  the plan document?
7  A.  Could I see where I said that in the
8  interrogatories?
9  Q.  Sure.  Page 5 of interrogatory
10  responses, answer to Interrogatory No. 1.  I'll let
11  him look at this in a minute, read it for the
12  record.
13      It says, "Article 2 of the plan document
14  effective January 1, 2009, set forth the duties and
15  responsibilities of plan administrator."
16      And you cite Sherrod 36 to Sherrod 71
17  down there at the bottom of the page.
18  A.  Yes, I see it.
19  Q.  Again, this is -- Sherrod 36 actually
20  starts in the middle of this document where it
21  starts with some more information.  Sherrod 1
22  actually is the first page and it goes to, as we
23  said here, to 71.
24      So is this the copy of the plan document

Page 54

1  referred to earlier that you have and use as the
2  plan administrator?
3  A.  It appears to be.
4  Q.  Now, on page 36 is where you identified
5  where your duties are described.  And I believe
6  that may have been a -- may have put the wrong page
7  numbers in there.  Let's see if we can locate what
8  you're referring to.
9      So I believe what you were referring to
10  is on page Sherrod 15, Section 2.4, you turn to
11  Sherrod 15, that describes the power and duties of
12  the administrator.  Do you see that at the top of
13  the page?
14      You're on Sherrod 18.  It also has the
15  page number 15 on the bottom of the document, the
16  page number is 12 and the Bates-stamped number is
17  Sherrod 15.  I know it gets confusing having the
18  duplicate page numbers.  It says "Power and Duties
19  of the Administrator" at the top.
20      Is this a list of your powers and duties
21  as the administrator of the plan?
22  A.  I've not read all of this before.
23  Q.  Have you seen this before?
24  A.  I have seen it, but to sit down and go

Page 55

1  through it line by line and checking off doing this
2  and doing that.
3      MR. REARDEN:  You have the right to read it.
4  If he's going to ask you questions about it, you
5  can read it right now before you answer any
6  questions about it.  So I suggest you read
7  Section 2.4 because I think he's going to ask you
8  questions about it.
9      MR. CANETTI:  Let's go off the record and let
10  me know when you're done reading and we'll go back
11  on the record.
12      THE WITNESS:  Yes.
13      (Witness reviews document.)
14  BY MR. CANETTI:
15  Q.  You had time to review Section 2.4, 2.5,
16  2.6 and 2.7 of Sherrod 00015 and 16?
17  A.  Yes.
18  Q.  In 2.5, it lists, "The administrator
19  shall be charged with the duties of the general
20  administration of the plan as set forth under the
21  terms of plan, including but not limited to the
22  following."
23      Under A, it says, "The discretion to
24  determine all questions" --

Page 56

1      MR. REARDEN:  I think you said 2.5.  I think
2  you mean 2.4.
3      MR. CANETTI:  Correct.  Thank you, John.
4  BY MR. CANETTI:
5  Q.  2.4, "The discretion to determine all
6  questions relating to the eligibility of employees
7  to participate or remain a participant herein under
8  and to receive benefits under the plan."
9      What do you do with respect to your duty
10  under 2.4(a)?
11  A.  I'm not so sure of what the question
12  that you're asking is.  Will you be a little bit
13  more specific?
14  Q.  What do you do with your duty to
15  determine all questions relating to participants
16  receiving benefits under the plan?
17  A.  For now, for the present, you know,
18  there are no employees other than Dr. Sherrod.
19  Q.  So do you do anything to determine if
20  participants can receive benefits under the plan?
21  A.  I don't do any of that myself.
22  Q.  Who does that?
23  A.  That would be -- the actuary has
24  actually done that.



Page 57

1   Q.   So it's up to the actuary to determine
2   if participants can receive benefits under the
3   plan?
4   A.   The one document that I know for sure,
5   and I don't know which one it is, but one of the
6   documents stated that those employees that
7   Dr. Sherrod had, that they would be eligible once
8   they reach retirement age, you know, for their --
9   start receiving their benefits.
10   Q.   So before they actually receive
11   benefits, do you do anything to determine it's
12   proper to pay benefits to a participant?
13   A.   No.
14   Q.   Now, in 2.4(d) it says one of your other
15   duties is to authorize and direct the trustee with
16   respect to all discretionary or otherwise directed
17   disbursements from the trust.
18        Do you understand money has been paid
19   out or taken out of the trust since 2011 to the
20   present?
21   A.   Correct.
22   Q.   And have you had any involvement in
23   directing the trustee on disbursements from the
24   trust?

Page 58

1   A.   None other than verbal.
2   Q.   And what verbal direction have you given
3   the trustee regarding disbursements from the trust?
4   A.   Primarily the -- in conversation with
5   meeting is those monies removed to pay the expenses
6   of the plan.
7   Q.   And what expenses have been removed or
8   disbursed from the trust to pay expenses?
9        I'm sorry.
10        What disbursements have you directed to
11   be made from the trust to pay expenses?
12   A.   Oh, I can't do that right now off the
13   top of my head.  I don't recall.
14   Q.   And you have nothing to document any of
15   the direction you gave regarding the disbursements
16   from the trust?
17   A.   No, I do not.
18   Q.   Did you approve every disbursement from
19   the trust?
20   A.   No, I did not.
21   Q.   Approximately how many disbursements did
22   you approve or authorize or direct be made from the
23   trust?
24   A.   I don't know the number.

Page 59

1   Q.   Was it most of them or only a few of
2   them?
3   A.   I can't be sure.
4   Q.   If we go through and look at the
5   disbursements from the trust, would that help you
6   to answer that question?
7   A.   I don't know.
8   Q.   Did you authorize or direct
9   disbursements of the trust on a weekly basis?
10   A.   No.
11   Q.   Did you do it on a monthly basis?
12   A.   I don't recall.
13   Q.   Did you do it on an annual basis?
14   A.   I do not have any documentation as to
15   the number of times that that was directed.  I
16   don't know.
17   Q.   In 2.4(e) it says "to maintain all
18   necessary records for the administration of the
19   plan."
20        Do you maintain all necessary records
21   for the administration of the plan?
22   A.   When you say all records to the
23   administration of the plan, could you be more
24   specific?

Page 60

1   Q.   Well, this is your document that you
2   said you used to help you do your work; correct?
3   A.   That is true, I did say that.
4   Q.   So what does that mean to you and how do
5   you read that to do your work?
6   MR. REARDEN:  Objection.  Calls for a legal
7   conclusion.
8   BY THE WITNESS:
9   A.   The things that I did, as I stated
10   before, and Dr. Sherrod, you know, worked, you
11   know, very hard to see that these participants,
12   things were done properly and service providers
13   paid -- paid for.
14   BY MR. CANETTI:
15   Q.   Did you have any files or recordkeeping
16   that you maintained records for the plan?
17   A.   There may be some documents.
18   Q.   Do you have, like, a file or book or
19   binder, something wherein you keep all the records
20   for the plan?
21   A.   When you say "all records," specifically
22   when you say "all," what are you referring to when
23   you say "all"?
24   Q.   You said there may be some documents you



Page 77
1  BY MR. CANETTI:
2    Q.   So you think that her -- she did not
3  have a right to that money in 2014, but she still
4  took the money out in 2014?  Is that what you're
5  saying?
6    A.   No.  She had a right to the money.
7    Q.   Was it in compliance with the court
8  order freezing her account that she took money out
9  of it in 2014?
10   A.   I'm not going to comment on that because
11 I'm not an attorney.  I'm not a lawyer.
12   Q.   So you believe the account was still her
13 right to -- her assets were still frozen under the
14 court order in 2014 and she was taking money out in
15 2014?
16   A.   I'm not -- the exact date that the
17 freeze was lifted on that account, I need to see
18 that date.
19   Q.   Do you know if Dr. Sherrod paid any
20 expenses on behalf of the plan in 2011?
21   A.   I believe she did.
22   Q.   And why do you believe that?
23   A.   Because during that period, the account
24 was frozen and she utilized some of her own private

Page 78
1  funds to do so.
2    Q.   Did she provide you any copies of any
3  checks or money orders or invoices for amounts she
4  paid in 2011 that she thought were plan expenses?
5    A.   I came on as administrator in May
6  of 2012, I think.  I don't recall that she gave me
7  anything from 2011.
8    Q.   Did she pay any expenses -- did she
9  believe she paid any expenses on behalf of the plan
10 in 2012?
11   A.   I believe she did.
12   Q.   Did she provide you copies of any
13 invoices, checks or money orders related to those
14 expenses?
15   A.   No.
16   Q.   In 2013, does Sherrod believe she paid
17 any expenses on behalf of the plan?
18   A.   I believe she did.
19   Q.   Did she provide you any copies of
20 invoices, checks, or money orders related to those
21 expenses?
22   A.   No.
23   Q.   In 2014, did Dr. Sherrod take money from
24 the plan to reimburse herself for some expenses she

Page 79
1  believed she incurred in 2011, 2012, and 2013?
2    A.   She may have.
3    Q.   Did you provide any oversight of her
4  doing that?
5    A.   No.
6    Q.   Did you do anything to verify the amount
7  she was taking out to reimburse herself was, in
8  fact, expenses that were incurred?
9    A.   I knew what Dr. Sherrod did was
10 justified and correct.
11   Q.   What did you do to come to the
12 conclusion that what she did was justified and
13 correct?
14   A.   Because she is an honorable, honest
15 woman, and that is not her makeup to be a
16 law-breaker.
17   Q.   So other than your view of her being an
18 honorable and honest person, did you do anything to
19 verify that those amounts were correct?
20   A.   At the time that they were done, no.
21   Q.   Did you do anything to review any of
22 these expenses to decide that those were reasonable
23 expenses that should be paid from the plan's
24 assets?

Page 80
1    A.   When we met, we always discussed bills
2  and trying to keep things at a minimum.  That was
3  always a discussion topic.
4    Q.   I'm talking just specifically about in
5  2014, you said she took money out of the plan to
6  reimburse herself for expenses from 2011, 2012, and
7  2013.  And I'm asking what, if anything, you did to
8  determine those were reasonable expenses that
9  should be paid from the plan's assets?
10      MR. REARDEN:  Objection.  Asked and answered.
11 BY THE WITNESS:
12   A.   I just know that whatever was taken, it
13 was necessary to pay those persons who had done
14 work for the plan.
15 BY MR. CANETTI:
16   Q.   And you never saw any documents, though,
17 that substantiated those amounts; correct?
18   A.   Dr. Sherrod kept all of the documents.
19   Q.   But to make your decision that it was
20 correct, you didn't review any documents to assist
21 you in making that decision; correct?
22   A.   I only needed to hear what she had to
23 say.
24   Q.   And, in fact, that's all you did was



Page 81

1  hear what she had to say. You didn't do anything
2  beyond that; correct?
3     A.   Usually that would be true.
4     Q.   Specifically about in 2014 where she
5  took money out to repay herself for the expenses in
6  2011, '12 and '13, you just took her word that
7  those were proper expenses to pay. You didn't do
8  anything other than taking her word to review that
9  those were proper expenses to pay; correct?
10    A.   That is correct.
11    Q.   Now, in 2014, did Dr. Sherrod also take
12 money out to pay for expenses she thought the plan
13 incurred in 2014?
14    A.   I believe she did.
15    Q.   And did you do anything to review those
16 expenses and see that those are reasonable and
17 necessary expenses of the plan in 2014?
18    A.   No.
19    Q.   So was it the same for any expenses
20 incurred in 2014 that you took Dr. Sherrod's word
21 that those were proper expenses for the plan?
22    A.   Yes.
23    Q.   For 2015 and 2016 and 2017, is it your
24 understanding that Dr. Sherrod also took money out

Page 82

1  of the plan to pay for expenses that she thought
2  were reasonable and necessary for the plan?
3     A.   She did.
4     Q.   And did you do anything other than take
5  Dr. Sherrod's word that those were proper,
6  reasonable, and necessary expenses for the plan and
7  that she should pay those?
8     A.   No.
9     Q.   So you only took her word. You didn't
10 review any documents for expenses paid in 2015,
11 2016, and 2017; correct?
12    A.   That is correct.
13    Q.   Do you know if attorney Mr. Turco did
14 any work for the plan?
15    A.   I'm not sure.
16    Q.   Is there anything that would help you to
17 remember?
18    A.   Only thing that I know for sure in the
19 state court proceedings there, there were a number
20 of individuals involved. He may have been one of
21 them.
22    Q.   And you're referring to the state court
23 proceeding of Sherman v. Sherrod?
24    A.   Yes.

Page 83

1     Q.   Apart from his possibly being involved
2  in that, was he involved with any other work for
3  the plan, to your knowledge?
4     A.   Not to my knowledge he was not.
5     Q.   Do you know if an attorney named John
6  Redfield did any work for the plan?
7     A.   He did not do any work for the plan. He
8  was...
9        Something happened in a bankruptcy
10 proceeding that he was representing Dr. Sherrod in.
11 Something came up about the plan in that situation.
12 And I don't know exactly what the situations were,
13 but certain individuals at certain points had to do
14 certain things or made certain statements, you
15 know, about the account.
16    Q.   Was Mr. John Redfield Dr. Sherrod's
17 attorney for her bankruptcy filing?
18    A.   I believe he was.
19    Q.   And you believe her bankruptcy filing
20 had something to do with the bond in the Sherman v.
21 Sherrod litigation?
22    A.   I don't have any of that belief. I
23 don't know what the connection is.
24    Q.   I thought you just said you thought he

Page 84

1  had something to do with the bond in the bankruptcy
2  filing?
3     A.   No.
4     Q.   Did Mr. Redfield have any --
5     A.   Wait.
6     Q.   Sorry. Go ahead.
7     A.   Not the bond -- yes, he did. That's
8  where I'm confused. I don't think I should be
9  commenting because I don't know that case that well
10 to make these types of remembrances about it.
11    Q.   Do you have any personal knowledge of
12 any work that Mr. Redfield did related to the plan?
13    A.   There is some paperwork and maybe we can
14 get that and show it to you later on.
15    Q.   So I need to understand what is it that
16 you think he did for the plan.
17    A.   When you say "work for the plan," in
18 what way?
19    Q.   I don't know. You keep saying you think
20 there's something. I'm trying to figure out what
21 it is you think it is.
22    A.   There was some argument, you know, in
23 the court, either with -- it is probably
24 centering -- I'm not sure. It centers something



Page 101
1  and 8(g); correct?
2  A.  I see that.
3  Q.  So to the extent any expenses were paid
4  in '11, '12 and '13, they are not captured in the
5  5500s; correct?
6  A.  It would appear so.
7  Q.  So to the extent any expenses that were
8  paid in those years or in 2014, those were all
9  captured in the 2014 5500; is that correct?
10  A.  I don't know the accuracy of that, sir.
11  Q.  Do you know who would know the
12  accuracy -- who would be able to answer that
13  question?
14  A.  At all times, an actuary was used to, I
15  guess, get these figures together, you know, for
16  the 5500.  So it would have to be that individual.
17  Q.  Now, for example, in 2014, on
18  Exhibit No. 16, if you just look at the bank
19  statements and looked at the withdrawals coming
20  out.
21  A.  Which one are you looking at?
22  Q.  I'm looking at 2014, No. 16.
23  You said the primary document you would
24  look at to put these numbers in here in Part 3 on

Page 102
1  page 2 of the 5500, that would come primarily from
2  the bank statements; correct?
3  A.  The beginning of the year balance and
4  end of the year.
5  Q.  As well as any of the money that came
6  out of the plan that are listed below and any
7  income for the plan; correct?
8  A.  Yes.
9  Q.  That would all come from the bank
10  statements?
11  A.  A large majority would.
12  Q.  If you look at the bank statements, how
13  is it possible to know on the bank statements or
14  checks alone what is a benefit payment or an
15  administrative service fee or any other expenses
16  that were paid?
17  A.  There obviously would be some other
18  supporting documents.
19  Q.  And so who would have those supporting
20  documents to determine that there were $12,562 and
21  other expenses?
22  A.  As I have stated, you know, before, I
23  gave this -- delegated this to Dr. Sherrod and have
24  her do this.

Page 103
1  Q.  So to the extent there are supporting
2  documents, for example, for the number in 8(g) that
3  says $12,562, Dr. Sherrod would be the one that
4  knows why that number was there and would have the
5  documents that supports that figure; correct?
6  A.  I believe so.
7  Q.  Is there anybody else besides
8  Dr. Sherrod that would have that information?
9  A.  The preparer of the document.
10  Q.  Who may have been Dr. Sherrod or
11  somebody else?  We're not sure who prepared it?
12  A.  The actuary.
13  Q.  It's possible the actuary prepared this?
14  A.  Yes.  It is my understanding that the
15  actuary always, you know, prepared the forms 5500
16  to be turned in.
17  Q.  I thought you had testified earlier that
18  it may have been Dr. Sherrod who filled out some of
19  the 5500?
20  A.  No.  No.  That would not be true.
21  Q.  So for the actuary to know what were the
22  expenses or payments of service providers, somebody
23  would have to supply the documents to them to make
24  that determination; correct?

Page 104
1  A.  That is correct.
2  Q.  And I believe you said that to the
3  extent somebody did that, it would have been
4  Dr. Sherrod and not yourself; correct?
5  A.  That is correct.
6  Q.  And is that true for all of the time
7  that you were a fiduciary -- or, I'm sorry, when
8  you were the plan administrator from 2012 to the
9  present?
10  A.  Yes, as she interfaced with the plan
11  actuary on preparing the form 5500.
12  Q.  Although you authorized to put your
13  electronic signature, you did not, on your own,
14  look at any bank documents or review any of these
15  invoices or payments for these expenses to verify
16  that these number are accurate; right?
17  A.  That is correct.
18  (WHEREUPON, a certain document was
19  marked Johnson Deposition Exhibit
20  No. 24, for identification, as of
21  May 3, 2018.)
22  BY MR. CANETTI:
23  Q.  I'll show you what I'm marking as
24  Exhibit 24, the 5500 for 2015.



Page 113
1  A.  The only thing I know about checks is
2  that some checks went for different things.  And
3  although the checks were really written directly to
4  her, some of the checks were earmarked for other
5  things, plan expenses and different things and not
6  directly a direct distribution that went into
7  Dr. Sherrod's pocket.
8      Q.  Were there other documents besides the
9  checks or the bank statements that demonstrated
10 that to you?
11     A.  Repeat that again.
12     Q.  Are there other documents besides the
13 bank statements and the checks that show how the
14 money was distributed in 2015?
15     A.  I'm not so sure what you're getting -- I
16 understand your question.
17     Q.  You said that if you just look at all
18 these checks, all the checks were paid to
19 Dr. Sherrod; right?
20     A.  That is correct.
21     Q.  But you're saying actually although the
22 money all went to her, after that, some of the
23 money went to other people as well; right?
24     A.  I believe that's true.

Page 114
1      Q.  And so are there any documents to show
2  how that money traveled after it was with
3  Dr. Sherrod?
4      A.  I don't have a clear view of that.
5      Q.  Did you ever have those documents?
6      A.  No.
7      Q.  So without those documents, it's not
8  possible to determine if the information on the
9  5500 is accurate.  Is that what you're saying?
10     A.  I can't determine its accuracy.  That
11 would have to be left to someone who's -- the
12 preparer of this document and the documents that
13 they were looking at to put this together.
14     Q.  If you had all the bank statements and
15 the documents that they had to put that together,
16 would you be able to review those documents and
17 ensure that the 5500 is accurate?
18     A.  I don't think that I'm qualified to
19 really get down to that type of accuracy.  That's
20 why we had a professional do it in the first place.
21     Q.  So if you did have all the documents the
22 professionals had, you would not be able to review
23 those documents and compare it to the information
24 on the 5500 to determine if the 5500 is accurate;

Page 115
1  correct?
2      MR. REARDEN:  Objection.  Asked and answered.
3  BY MR. CANETTI:
4      Q.  Is that correct?
5      A.  Repeat that again.
6      MR. CANETTI:  Could you read the question
7  back?
8          (WHEREUPON, the record was read as
9           requested.)
10     MR. REARDEN:  Same objection.
11 BY THE WITNESS:
12     A.  I would still say my same response.
13 BY MR. CANETTI:
14     Q.  What's your response?
15     MR. REARDEN:  Objection.  Asked and answered.
16 BY THE WITNESS:
17     A.  The preparer of the document and getting
18 everything in the proper category to get the right
19 figure.
20 BY MR. CANETTI:
21     Q.  My question was, if you had all that
22 information they had, could you look at that
23 information and extract from that whatever
24 information is necessary for the 5500 to determine

Page 116
1  if the information in the 5500 accurately
2  represents the information that's in the supporting
3  documents?
4      MR. REARDEN:  Objection.  Asked and answered.
5  BY THE WITNESS:
6      A.  That might be possible.
7      MR. REARDEN:  Objection.  Asked and answered
8  three times.
9  BY MR. CANETTI:
10     Q.  It might be possible?
11     A.  It might be possible.
12     Q.  And you never have done that before,
13 though; correct?
14     A.  That is correct.  That's because I
15 relied upon the accuracy of the work, you know,
16 that the actuary did in putting the document
17 together.
18     Q.  Do you ensure that the actuary has all
19 the documents it needs to put the information in
20 correctly?
21     A.  As I stated, you know, before,
22 Dr. Sherrod turned all of the documents over to the
23 actuary for the preparation of the 5500.
24     MR. REARDEN:  It's noon.



Case: 1:16-cv-04825 Document #: 168-5 Filed: 02/27/20 Page 13 of 18 PageID #:1249

LEROY JOHNSON
ACOSTA vs SHERROD, et al.
May 03, 2018
129–132

Page 129
1 different format?
2  A.  I didn't say it was from Reed-Ramsey. I
3 just seen some numbers. I recognize these names,
4 you know, here.
5       (WHEREUPON, a certain document was
6        marked Johnson Deposition Exhibit
7        No. 17, for identification, as of
8        May 3, 2018.)
9 BY MR. CANETTI:
10  Q.  I'll show you a document marked as
11 Exhibit 17. This is an account summary statement
12 for the plan as of December 31, 2014. This is a
13 document received from you or Dr. Sherrod in your
14 production.
15       Have you seen this document before?
16  A.  I have seen this document before.
17  Q.  Is this the format that you were
18 referring to?
19  A.  No, I don't believe so. I don't believe
20 so.
21  Q.  So you've seen documents that have
22 similar information to Exhibit 17 as well but in a
23 different format?
24  A.  This document here just shows

Page 130
1 participants and, you know, what their holdings
2 are. And this one has some of the same and those
3 that have been turned over to the state. I don't
4 think it is exactly, you know, the same.
5  Q.  For Exhibit 17, have you seen
6 information about the plan as of December 31, 2014,
7 in a different format than what you've seen in
8 Exhibit 17?
9  A.  I don't recall.
10  Q.  But you do recall seeing this document,
11 Exhibit 17?
12  A.  Yes. I've seen this.
13  Q.  And is that something you have seen as
14 you performed your duties as the plan
15 administrator?
16  A.  I believe so, yes.
17  Q.  Or did you only see it for this
18 litigation?
19  A.  No. I've seen this before.
20  Q.  Now, the one that's Exhibit 28, when you
21 saw this in a different format, what do you mean?
22 Can you describe for me what format you're talking
23 about?
24  A.  My eye doesn't catch it.

Page 131
1  Q.  So you're not saying you've seen this
2 information in some format that's like Exhibit 17,
3 some other type of format; correct?
4  A.  I'm not sure on the comparison between
5 these two.
6  Q.  But you believe there's some type of
7 end-of-the-year statement for the plan talking
8 about the plan participant balances that's in a
9 different format than what we have here in
10 Exhibit 28; right?
11  A.  This one shows those that were sent off
12 to the state. That's not in that one over there.
13  Q.  So you're referring to the column on the
14 right-hand side of Exhibit 28 that's titled
15 "2017 Activity"? You're saying that's something
16 different and doesn't have information like that in
17 Exhibit 17; right?
18  A.  Where are you looking right now?
19  Q.  On Sherrod JR00692 to 696. On
20 right-hand column of all those pages, it says "2017
21 Activity" at the top.
22  A.  Sure.
23  Q.  That's what you were referring to as
24 having different information than what's in

Page 132
1 Exhibit 17?
2  A.  It looks different.
3  Q.  I'm just confused.
4       Are you saying it just looks different?
5 It's the same information, just a different format,
6 or are you saying it's different information?
7  A.  It just looks different to me.
8  Q.  Did you review this document as part of
9 your work as a plan administrator, Exhibit 28?
10  A.  This was -- Dr. Sherrod did the work,
11 you know, on this. She communicated with me. I
12 knew it was being done.
13  Q.  So this is referring to -- are you
14 referring to the 2017 activity, that there were
15 rollovers and something called escheat down in
16 2017?
17  A.  That is correct.
18  Q.  As far as the information in this thing
19 relating to 2016, did you review any of the
20 information for 2016?
21  A.  I thought this was 2017. This is 2016?
22  Q.  If you looked at the column to the left
23 where it says "2017 Activity," it says "Balance on
24 12/31/16."



Page 133

1  A.  Yes.
2  Q.  Did you review any of that information
3  in performing your duties as the plan administrator
4  for what the end balances were as of December 31,
5  2016?
6  A.  No, I did not.
7  Q.  Now, as far as the distribution -- there
8  were distributions made in 2017.  I think we talked
9  about that earlier; right?
10  A.  There were some distributions made.
11  Q.  And then were there also payments to the
12  State of Michigan for participants that you didn't
13  locate?
14  A.  That is correct.
15  Q.  And were you involved at all in trying
16  to locate participants in 2016 or 2017?
17  A.  I again -- I had delegated that, you
18  know, to Dr. Sherrod to do.
19  Q.  So Dr. Sherrod was responsible for
20  trying to locate the participants in 2016 and 2017;
21  correct?
22  A.  I gave the duty to her.  I don't know
23  all what was involved in her, you know, locating
24  these individuals.

Page 134

1  Q.  But your understanding is either Sherrod
2  did it herself or she oversaw somebody else doing
3  it on her behalf; correct?
4  A.  That would be correct.
5  Q.  You weren't involved in it in any
6  fashion; right?
7  A.  That is correct.
8  Q.  Do you know what steps either
9  Dr. Sherrod or somebody working on her behalf took
10  to try to locate the participants?
11  A.  No, I don't.
12  Q.  Did you maintain a list of any of the
13  addresses for the participants?
14  A.  I don't have a list of addresses.
15  Q.  Do you have --
16  A.  I do know that Dr. Sherrod may have had
17  the list because she was closer to this than I was.
18  Q.  Do you have a list of any contact
19  information, be it addresses, phone numbers, e-mail
20  addresses, for the participants in the plan?
21  A.  Dr. Sherrod retains that information.
22  Q.  So L.J. Consulting does not have any of
23  that information; correct?
24  A.  It does not have any of that

Page 135

1  information.
2  Q.  And you personally don't have any
3  contact information for any of the participants in
4  the plan; correct?
5  A.  That is correct.
6  Q.  Except Dr. Sherrod, she's a participant.
7  You have her contact information, I assume?
8  A.  Yes.
9  Q.  So to the extent anyone has any contact
10  information for these people, that would only be
11  Dr. Sherrod or somebody she retained to help her
12  with having the contact information for them;
13  correct?
14  A.  I believe so.
15  Q.  And do you know any person or entity
16  that she did engage to help locate these
17  participants?
18  A.  No, I do not.
19  Q.  Do you know any of the activities she
20  undertook to try to locate contact information for
21  these participants?
22  A.  No, I do not.
23  Q.  Now, it looks like for some of these
24  people there's not an entry.  So if you look at

Page 136

1  page 1, Mr. Alexander, says escheat.
2  Mr. Armstrong, there's nothing by his name.  And
3  then on the third one, for example, Ollie Bottropf,
4  B-o-t-t-r-o-p-f, says "rollover."
5      Do you know why there is no entry for
6  John Armstrong?
7  A.  I do not know why.
8  Q.  Were you involved in the decision at all
9  to escheat some of the money for the participants?
10  A.  No.
11  Q.  Again, that was just Dr. Sherrod?
12  A.  Yes.
13  Q.  Do you know if she consulted with
14  anybody to get advice on making these distributions
15  to the participants?
16  A.  I'm sure that she must have.
17  Q.  But do you have personal knowledge of
18  any person she actually did talk to to get advice
19  about making these distributions?
20  A.  No, I do not.
21  MR. CANETTI:  I'll show you Exhibit 32.



Page 149
1  A.  I do not know for sure, no.
2  Q.  Did you authorize or direct either one
3  of these disbursements?
4  MR. REARDEN: First of all, I object because
5  you said they total $52,000.
6  MR. CANETTI: 50,000, I misspoke.
7  BY MR. CANETTI:
8  Q.  Did you authorize or direct the
9  disbursements of either one of these checks?
10  A.  No, I did not.
11  Q.  And then on DOL2301, the third page of
12  this document, it's a letter from Dr. Sherrod to
13  Keith dated December 23, 2013, asking to have two
14  checks drawn on the account, one approximately for
15  12,000, one for 3,000.
16  Did you authorize or direct these
17  disbursements from the account?
18  A.  No, I did not. This would have been
19  something delegated to Dr. Sherrod.
20  Q.  Were you aware that these checks were
21  issued in 2013?
22  A.  Yes.
23  Q.  And who informed you of that?
24  A.  Dr. Sherrod.

Page 150
1  Q.  Do you know the current status of the
2  bond in the Sherman-Sherrod litigation?
3  A.  You mean where it's located or what?
4  Q.  Do you know if it still exists or if
5  it's been paid out?
6  A.  The bond -- my understanding is that the
7  bond exists.
8  Q.  No one's been paid from that bond;
9  correct?
10  A.  The bond is sitting in Wells Fargo Bank.
11  The money is sitting in Wells Fargo Bank.
12  Q.  Do you know why the distributions were
13  made to the other participant that we saw in
14  Exhibit 28 in 2017?
15  A.  Why --
16  Q.  In Exhibit 28, it describes
17  distributions to participants as either being an
18  escheat going to the State or a rollover account.
19  Do you recall that?
20  A.  I knew that Dr. Sherrod was working on
21  that.
22  Q.  Do you know why that was done in 2017?
23  A.  I don't know exactly why.
24  Q.  Do you know why it was not done earlier,

Page 151
1  say, in 2008 or 2009 or any year prior to after the
2  company closed down and before 2017?
3  A.  No. You would have to ask Dr. Sherrod
4  that question.
5  Q.  So you weren't involved in the
6  decisionmaking for making the distributions in
7  2017; is that correct?
8  A.  We talked. I knew that there -- these
9  were going on.
10  Q.  So you were informed that it was going
11  to happen, but you were not involved in the
12  decision to make those distributions; correct?
13  A.  Primarily, Dr. Sherrod.
14  Q.  Well, what was your involvement in the
15  decisionmaking?
16  A.  I wasn't directly -- had any great
17  decisionmaking process going on there. She was
18  informing me of what was going on.
19  Q.  So she informed you, but you did not
20  make any of the decision to make those
21  distributions; correct?
22  A.  Well, we knew from our discussion, we
23  knew that they had to be made.
24  Q.  Did you make the decision to make those

Page 152
1  distributions?
2  A.  No, I did not.
3  Q.  Was it Sherrod who made that decision?
4  A.  I believe she did.
5  Q.  Well, if it wasn't you and it wasn't
6  Sherrod, was there anybody else who could have made
7  that decision?
8  MR. REARDEN: Objection.
9  BY THE WITNESS:
10  A.  This was turned over to Dr. Sherrod and
11  I believe she made the decision.
12  BY MR. CANETTI:
13  Q.  And you don't know why the decision was
14  made to make those distributions in 2017; correct?
15  A.  I do not know.
16  MR. CANETTI: I have no further questions.
17  EXAMINATION
18  BY MR. REARDEN:
19  Q.  Mr. Johnson, I want to refer you back to
20  Deposition Exhibit No. 26.
21  You previously reviewed all the checks
22  in Deposition Exhibit 26; correct?
23  A.  I did.
24  Q.  Can you tell from looking at the checks



Case: 1:16-cv-04825 Document #: 168-5 Filed: 02/27/20 Page 16 of 18 PageID #:1252

LEROY JOHNSON  
ACOSTA vs SHERROD, et al.  
May 03, 2018  
153–156

Page 153

1  in Deposition Exhibit 26 what those payments were
2  for?
3     A.   No, I cannot.
4     Q.   You previously were asked some questions
5  about maintaining records for the plan.  Do you
6  recall those questions?
7     A.   I do recall.
8     Q.   Does the Target Pension Plan maintain
9  records?
10    A.   Yes, it does maintain records.
11    Q.   And who maintains the records for the
12 Target Pension Plan?
13    A.   Dr. Sherrod maintains records.
14    MR. REARDEN:  I don't have any other questions
15 for you, Mr. Johnson.
16    MR. CANETTI:  I have no more questions.
17    THE COURT REPORTER:  Signature?
18    MR. REARDEN:  We will reserve signature.
19         (WHEREUPON, the proceedings
20          concluded at 1:55 p.m.)
21
22
23
24

Page 154

1  STATE OF ILLINOIS   )
2                      ) SS:
3  COUNTY OF DUPAGE   )
4         I, ALICE M. SCHWINGER, CSR No. 84-2913,
5  a Notary Public within and for the County of
6  DuPage, State of Illinois, and a Certified
7  Shorthand Reporter of said state, do hereby
8  certify:
9         That previous to the commencement of the
10 examination of the witness, the witness was duly
11 sworn to testify the whole truth concerning the
12 matters herein;
13        That the foregoing deposition transcript
14 was reported stenographically by me, was thereafter
15 reduced to typewriting under my personal direction
16 and constitutes a true record of the testimony
17 given and the proceedings had;
18        That the said deposition was taken
19 before me at the time and place specified;
20        That I am not a relative or employee or
21 attorney or counsel, nor a relative or employee of
22 such attorney or counsel for any of the parties
23 hereto, nor interested directly or indirectly in
24 the outcome of this action.

Page 155

1         IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Woodridge,
3  Illinois, this 22nd day of May, A.D. 2018.
4
5
6         *Alice M. Schwinger*
7
8         Notary Public, DuPage County, Illinois.
9         My commission expires 8/21/18.
10
11 ALICE M. SCHWINGER, CSR No. 84-2913

Page 156

```
             INDEX
WITNESS                            EXAMINATION

LEROY JOHNSON

EXAMINATION BY MR. CANETTI              3
EXAMINATION BY MR. REARDEN            152


             EXHIBITS

NUMBER                              MARKED FOR ID
Johnson Deposition Exhibit
No. 1                                    52
No. 2                                    65
No. 16                                   89
No. 10                                   96
No. 7                                    97
No. 12                                   98
No. 24                                  104
No. 26                                  107
No. 25                                  117
No. 15                                  125
No. 27                                  127
No. 28                                  128
No. 17                                  129
No. 32                                  137
No. 21                                  145
No. 13                                  148
```



```
 1   STATE OF ILLINOIS     )
 2                         )  SS:
 3   COUNTY OF DUPAGE      )
 4              I, ALICE M. SCHWINGER, CSR No. 84-2913,
 5   a Notary Public within and for the County of
 6   DuPage, State of Illinois, and a Certified
 7   Shorthand Reporter of said state, do hereby
 8   certify:
 9              That previous to the commencement of the
10   examination of the witness, the witness was duly
11   sworn to testify the whole truth concerning the
12   matters herein;
13              That the foregoing deposition transcript
14   was reported stenographically by me, was thereafter
15   reduced to typewriting under my personal direction
16   and constitutes a true record of the testimony
17   given and the proceedings had;
18              That the said deposition was taken
19   before me at the time and place specified;
20              That I am not a relative or employee or
21   attorney or counsel, nor a relative or employee of
22   such attorney or counsel for any of the parties
23   hereto, nor interested directly or indirectly in
24   the outcome of this action.
```



1     IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Woodridge,
3  Illinois, this 22nd day of May, A.D. 2018.
4
5
6           *Alice M. Schwinger* (signature)
7
8           Notary Public, DuPage County, Illinois.
9           My commission expires 8/21/18.
10
11 ALICE M. SCHWINGER, CSR No. 84-2913

