**FILED**

**11/9/2020 KE**

**Thomas G. Bruton**
**Clerk, U.S. District Court**

## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE SCALIA, Secretary of Labor, United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:16-CV-04825 |
| v. | ) ) | Hon. Andrea Wood |
| SHIRLEY T. SHERROD and LEROY JOHNSON, | ) ) | |
| Defendants. | ) | |

**DEFENDANT LEROY JOHNSON'S RESPONSE TO PLAINTIFF'S
STATEMENT OF MATERIAL FACTS NOT IN DISPUTE WITH
RESPECT TO SECRETARY'S MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANTS SHIRLEY T. SHERROD AND LEROY
JOHNSON AND STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
SUBMITTED IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT**

Defendant, Leroy Johnson ("Johnson"), submits the following objections and responses

to Plaintiff's statements of material facts Plaintiff claims are not in dispute, pursuant to Local

Rule 56.1(b)(3):

### General Objections

A.       Johnson objects to each and every numbered statement because Plaintiff has

submitted more than 80 separately-numbered statements in violation of Local Rule 56.1(a).

B.       Johnson objects to each and every numbered statement to the extent they

constitute legal conclusions and suggest liability rather than being assertions of fact.

### Response to Statement of Facts

1.       This court has subject matter jurisdiction because this civil action arises under
Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29
U.S.C. § 1001, *et seq.*, and is brought by the Secretary of Labor ("Secretary") under ERISA §§
502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5), to enjoin acts and practices which violate the
provisions of Title I of ERISA, to obtain appropriate relief for breaches of fiduciary duty under

ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable relief as may be appropriate. Dock. No. 1 ¶ 1. Defendants admit this action was brought by the Secretary under ERISA. Defendants' Answer, Dock. No. 18 ¶ 1.

**ANSWER:** Johnson denies the allegations of paragraph 1 to the extent they constitute legal conclusions and allege liability against Defendants. Johnson admits this Court has subject matter jurisdiction.

2. Defendants Shirley T. Sherrod ("Sherrod") and Leroy Johnson ("Johnson") admit to the court's personal jurisdiction over them in their Answer. Dock. No. 18, ¶ 4.

**ANSWER:** Admit.

3. Defendants admit venue of this action lies in the Northern District of Illinois, pursuant to ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1), because the Plan is administered in Waukegan, Lake County, Illinois, within this district. Dock. No. 18 ¶ 5.

**ANSWER:** Admit.

4. Sherrod was the owner of Shirley T. Sherrod, M.D., P.C. ("Company" or "Employer"). Exh. C at 12:2-3.

**ANSWER:** Admit.

5. The Company was the plan sponsor and established the Shirley T. Sherrod, M.D., P.C. Target Benefit Pension Plan ("Plan") effective January 1, 1987, to provide retirement benefits to the participants in the Plan. Dock. No. 18 ¶ 2. The Plan is a defined benefit plan. Exh. E at 16-18.

**ANSWER:** Johnson admits the first sentence of Par. 5. Johnson denies the second sentence of Par. 5. The Plan is a target benefit plan not a defined benefit plan. *See* Plaintiff's Ex. E at 18 (SHERROD_0000018).

6. All of the participants in the Plan were terminated from their employment with the Company on or before December 31, 2008. Exh. F at 4-5.

**ANSWER:** Deny. *See* Defendant's Ex. 2, Transcript of Deposition of Shirley T. Sherrod, pp. 12-13.

2

7.      The Plan was funded by Company contributions, Exhibit E at §§ 4.1-4.13, but the Company made no contributions from at least 2011 to 2017, Exhibit A and B.

**ANSWER:**      Admit.

8.      The Plan document was amended in April 2010, effective January 1, 2009 ("2009 Plan Document") and the 2009 Plan Document remained in effect throughout the relevant time period. Exh. E at 4, Exh. N at 5, No. 1. Fn 1. There is an earlier version of the Plan Document from 2008, but there are no substantive differences between the 2008 and 2009 version of the Plan Document. Don't we need the 2008 plan document for purposes of all the employees being terminated and what that meant as far as distributions? Since they were terminated in 2008?

**ANSWER:**      Johnson admits that the Plan document was amended in April 2010, effective January 1, 2009 ("2009 Plan Document") and that there is an earlier version of the Plan Document from 2008. Johnson denies that the 2009 Plan Document remained in effect throughout the "relevant time period" because Plaintiffs have not defined "relevant time period." Johnson denies that there are "no substantive differences between the 2008 and 2009 version of the Plan Document" because Plaintiff has provided no support for that claim. Johnson admits that Plaintiff needs the 2008 plan document for purposes of the employees being terminated and what that meant as far as distributions since they were terminated in 2008.

9.      The 2009 Plan Document set forth the powers and responsibilities of the Employer, the Plan Administrator, and the Trustee. Exh. E at 14-16, 38-42, §§ 2.1-2.9, and 7.1-7.12, Exh. N at 5, No. 1.

**ANSWER:**      Admit.

10.      The 2009 Plan Document provided the Trustee had the powers and responsibilities to (i) invest, manage, and control the Plan assets; (ii) pay benefits required to be paid to or on behalf of participants; and (iii) maintain records of receipts and disbursements and furnish a written annual report to the Company; and (iv) prepare a detailed annual report of income or losses for the Fund, gains or losses of the Fund's investments, and distributions paid, Exh. E at 38-42, § 7.1(a)(1)-(3), § 7.8; as well as the basic responsibility to credit and distribute Plan assets as directed by the Plan Administrator, *Id.* at 39, § 7.1(d).

**ANSWER:**      Admit.

11.     2009 Plan Document provided the Plan Administrator had the powers and responsibilities of general Plan administration, including to (i) determine eligibility to receive benefits; (ii) compute, certify, and direct the Trustee on the benefit amount payable to a participant; (iii) authorize and direct the Trustee on disbursements from the Plan; and (iv) maintain all records necessary for Plan administration; as well as to keep records of all actions taken and to keep all records and documents required by law. Exh. E at 14-16, §§ 2.4-2.7.

**ANSWER:**     Admit.

12.     The 2009 Plan Document does not permit the Plan Administrator to delegate his duties. Exh. E at 14-16, §§ 2.4-2.7.

**ANSWER:**     Deny. The 2009 Plan Document specifically provides that:

The Administrator [] may appoint counsel, specialists, advisers, agents (including nonfiducary agents) and other persons as the Administrator [] deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fidμciaries.

Plaintiff's Exh. E at 12, § 2.6. There is no non-delegation clause in the Plan.

13.     The 2009 Plan Document provided for "Payment of Expenses," "All reasonable expenses of administration may be paid out of the Plan assets unless paid by the employer." Exh. E at 16, § 2.7.

**ANSWER:**     Admit.

14.     The 2009 Plan Document provided the Trustee may only be reimbursed for reasonable counsel fees incurred by it as Trustee. Exh. E at 41, § 7.7

**ANSWER:**     Deny. Section 7.7 of the Plan states, "the Trustee shall be reimbursed for any reasonable expenses, including reasonable counsel fees." *See* Plaintiff's Exh. E at 41.

15.     The 2009 Plan Document provided under the section for "Distribution of Benefits," it states that "The Administrator . . . shall direct the Trustee to distribute to a Participant . . . the amount . . . [she] . . . has become entitled to under the Plan . . . ." Exh. E at 26, § 6.5.

**ANSWER:**     Admit.

16.     The 2009 Plan Document provided in the section on distributions, several subsections all detailing the procedures for making "distributions" to participants or their beneficiaries, including ones on "Distribution of Benefits," "Distribution of Benefits Upon Death," "Time of Distribution," etc. Exh. E at 28-38.

**ANSWER:**     Admit.

17.     From at least January 1, 2008 to present, Sherrod was the owner of the employer located in Detroit, Michigan. Exh. C at 11:14-24; 12:2-3.

**ANSWER:**     Admit.

18.     Sherrod was an ophthalmologist. Exh. C at 11:17-24.

**ANSWER:**     Admit.

19.     Sherrod has been the trustee of the Plan since January 1987, and in that capacity was a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Dock. No. 18 ¶ 7.

**ANSWER:**     Admit.

20.     Sherrod attained normal retirement age, as defined in the Plan, at age 65, in May 2011. Exh. E § 1.49; Exh. F at 2, 4.

**ANSWER:**     Admit.

21.     Johnson was an ophthalmologist and performed all work related to his medical practice on a full-time basis in Michigan. Exh. D at 10:19-20; 50:23-24 and 51:1-5.

**ANSWER:**     Admit.

22.     Johnson was named the Plan Administrator effective May 30, 2012 and in that capacity Johnson acted as a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Dock. No. 18 ¶ 8; Exh. D at 104:6-10.

**ANSWER:**     Admit.

23.     Johnson created LJ Consulting Services LLC ("LJ Consulting") on August 4, 2014. Exh. D at 48:4-6.

**ANSWER:**     Admit.

24.     LJ Consulting never had any employees, and never maintained any office space, but rather used a box at an Illinois UPS Store to receive mail, Exh. D at 49:23-24, 50:1-22, LJ Consulting only had one client, the Plan, throughout its existence *Id.* at 49:5-22,

5

**ANSWER:**     Admit.

25.     LJ Consulting maintained no records for the Plan. Exh. D at 50-51.

**ANSWER:**     Deny. Defendant testified as follows: Q. And you mentioned you have a copy of

the plan document. Are there any records that L.J. Consulting keeps related to the plan? A. There

are documents. There are many documents that have been turned—you know, turned over. I

don't know specifically which ones you want, you're asking about. Q. Are there any documents

L.J Consulting maintains as part of its—to assist in doing its work as plan administrator? A. No.

Q. Are there any records it keeps as part of its role as the plan administrator? A. No. The

questions posed to Defendant were in the present tense. Defendants answered that the records

L.J. Consulting has in its possession concerning the plan had been turned over in discovery. *See*

Plaintiff's Exh. D at 50-51. In his Amended Responses and Objections to Secretary of Labor's

First Set of Interrogatories, Johnson stated: "Defendant further responds that he has produced

copies of invoices ad written communications in his possession, custody, and control that contain

this information, including SHERROD_0000598 -SHERROD_0000599; SHERROD_0000604

-SHERROD_0000627;     SHERROD_0000628     -SHERROD_0000661;     SHERROD_0000662

-SHERROD_0000662. *See* Defendant's Ex. 21 at 39-40.

26.     LJ Consulting never received any payments from the Plan. Exh. D at 46:18-23.

**ANSWER:**     Admit.

27.     The Plan's governing documents identify the named fiduciaries of the Plan as
including the Employer, the Plan Administrator, and the Trustee. Exh. E at 48, § 10.11.

**ANSWER:**     Admit.

28.     In the 2009 Plan Document, Sherrod is specifically identified as the Plan's
Trustee as of December 29, 2008. Exh. E at 62. Sherrod admits she was a fiduciary to the Plan.
Dock. No. 18 at ¶ 7.

6

**ANSWER:**    Admit.

29.    The duties and responsibilities of the Plan's Trustee had not changed since January 1, 2009. Exh. N at 5, No. 1.

**ANSWER:**    Admit.

30.    The Company appointed Johnson as the Plan Administrator effective May 30, 2012, Johnson accepted the position in writing. Exh. C at 131:9-24 and 132:1; Appointment of Plan Administrator Documents, Exh. O at 1.

**ANSWER:**    Admit.

31.    Johnson had no experience as a plan administrator. Exh. D at 11:21-24, 12:1-9.

**ANSWER:**    Deny. Johnson sought advice from ERISA professionals including Mr. Edwin Conger, the Plan's attorney. Johnson has over 40 years of experience with investing, including taking classes pertaining to investing. Johnson possesses a genuine desire to help other save for retirement. *See* Defendant's Ex. 14; Defendant's Ex. 21 at 45; Plaintiff's Exh. N at 38.

32.    Johnson asserted he assigned the Plan Administrator position to LJ Consulting LLC, an entity he created, effective August 4, 2014. Exh. D at 132:10-20.; Exh. O at 2.

**ANSWER:**    Admit.

33.    The Plan document did not permit the Plan Administrator to assign a new Plan Administrator. Exh. E at 14-16.

**ANSWER:**    Deny. The 2009 Plan Document specifically provides that:

> The Administrator [] may appoint counsel, specialists, advisers, agents (including nonfiducary agents) and other persons as the Administrator [] deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries.

Plaintiff's Exh. E at 12, § 2.6. There is no non-delegation clause in the Plan.

34.    Defendants admit Johnson was a fiduciary from May 30, 2012 until August 4, 2014. Dock. No. 18 ¶ 8.

**ANSWER:**     Admit.

35.     The Plan's actuaries included:

a.     Jeffrey L. Sinclair & Co. (Jeffrey Sinclair is deceased since 2014) was the actuary for the Plan for at least the 2010 and 2011 Plan Years. Exh. C at 247, 249; Exh. F at 1.

b.     "M.S Assoc" was identified as preparing the Plan's 2015 Form 5500 filing. Exh. 2 at 1. No information other than this listing shows an entity by this name did any work for the Plan. Sherrod did not recall an entity by this name performing any work for the Plan. Exh. C at 188:1-3.

c.     The Defendants only identified these two entities as performing actuarial services and only provided documents related to work done by Sinclair. Exh. N at 42-43.

**ANSWER:**     Defendant admits paragraphs 35(a) and 35(b). Defendant denies paragraph 35(c).

Sherrod testified that Reed-Ramsey also performed actuarial services for the Plan *See* Plaintiff's

Exh. C at 18: 3-4, 19:2, 186-87:1, 221:18. *See* Defendant's Ex. 2 at 113: 14 & 24, 182:15-23,

203:12-24, 216:1-6, 218:2-8, 242:3-14.

36.     The Plan's custodians of assets included:

a.     Merrill Lynch, Pierce, Fenner, and Smith, Inc. ("Merrill Lynch") from at least December 1, 2010, until approximately July 13, 2013. Exh. G at 1 and 13.

b.     Comerica Securities, Inc. ("Comerica") from approximately July 13, 2013, until February 14, 2014. Exh. H; Exh. I.

c.     SunTrust Investment Services ("SunTrust") from February 14, 2014 to present. Exh. L; Exh. M ¶ 2.

**ANSWER:**     Admit.

37.     Defendants' attorneys included at least the following 16 firms and individuals:

a.     Specifically for the instant case, the following attorneys were retained between May 2016 and February 2020:

i.     Joseph Patrick Berglund, Berglund & Mastny PC; terminated February 27, 2020; Dock. No. 167.

ii.     Cassidy Schade LLP (Bradford D. Roth, Jeffrey Aaron Hesser and Daniel J. Broderick, Jr.), terminated May 2, 2017; Dock. No. 59.

iii.     Groom Law Group (Lars C. Golumbie and Natasha Sophia Fedder), terminated May 2, 2017; Dock. No. 59.

iv.     Law Offices of Russell M. Kofoed, terminated December 20, 2017; Dock. No. 85.

v.     Sunghee W Sohn, terminated November 7, 2018; Dock. No. 107.

vi.     James D. Harbert, Hinshaw & Culbertson LLP, terminated January 3, 2019; Dock. No. 114. and

8

       vii.    John Rearden, Jr., Oliver Close, LLC, terminated January 3, 2019. Dock. No. 114.

  b.    Sherrod testified that several additional law firms were paid to pursue her personal bond or to get the freeze lifted on her assets from 2011 to 2014, with the majority of the work performed in 2014. Exh. N at No. 13 at 41-42:

       i.    Tenney & Bentley, LLC (Edwin H. Conger (deceased) and David Shannon);

       ii.    Mark Granzotto PC (Mark Granzotto), worked in 2014;

       iii.    Roberts Bartolic, LLP (Michael Bartolic);

       iv.    Law Office of Ben M. Gonek PLLC (Ben Gonek), worked in 2014;

       v.    Valdemar L. Washington, PLLC (Valdemar Washington), worked in 2014;

       vi.    The Law Office of Pasquale Ciccodicola PLLC (Pasquale Ciccodicola);

       vii.    Brooks Wilkins Sharkey & Turco PLLC (Michael Turco); and

       viii.    Crane, Heyman, Simon, Welch & Clar (John H. Redfield), bankruptcy attorney for Sherrod in 2014.

**ANSWER:** Defendant admits paragraph 37(a). Defendant denies paragraph 37(b) to the extent it claims Sherrod testified that the bond at issue was personal to her or that she was attempting to get a freeze on her personal assets lifted. Sherrod did not testify that any "law firms were paid to pursue her personal bond or to get the freeze lifted on her assets from 2011 to 2014." Sherrod testified that the listed law firms "were retained to represent herself and/or Mr. Johnson, in their capacity as Plan fiduciaries, in connection with legal action they took in those capacities to unfreeze the Plan." *See* Plaintiff's Exh. N at No. 13 at 41-42. Additionally, the characterization of the bond and assets as being "personal" to Sherrod is a legal conclusion which is disputed to the extent that it is construed as alleging liability against Defendants. The pertinent document(s) indicate that Merrill Lynch was custodian to "RCMA account (Account No. XXX-XXC64) titled 'SHIRLEY T SHERROD MD PC TROT PENSION PLAN U/A 06/01/1988' which is a self-directed retirement account according to Dr. Sherrod has 18 participants," and that "[b]ased on the garnishment filed by Plaintiff Michael S. Sherman ('Sherman') in October 2010 and this Court's Order of February 4, 2011, Sherrod's accounts at

Merrill Lynch (including the RCMA Account) were frozen." See Plaintiff's Exh. Q at 3, ¶¶3 & 4. Johnson admits that Sherrod retained the attorneys listed in paragraph 37(b).

38.     Sherrod signed the Plan's annual government filings, Form 5500-SF—Short Form Annual Return/Report ("Form 5500s"), for Plan Years 2002 through 2011. Exh. A.

**ANSWER:**     Admit.

39.     Johnson signed all Form 5500s for Plan Years 2012 to 2017. Exh. B. Fn 2. The Form 5500s for Plan Years 2012 to 2017, used four different EINs for Plan Years 2012 to 2017 (*see* Exhibit 2, Box 2b), with the last four digits changing, from -4656 for 2011 and prior Plan Years, to -4645, -1344, -4656, and 4756 in Plan Years, 2012, 2013, 2014-2015, and 2016-2017, respectively. Additionally, the Form 5500s changed the Company's and Plan Administrator's addresses multiple times, as well as the Plan Administrator's name.

**ANSWER:**     Admit.

40.     Johnson was aware of Sherrod's continuing directives to Plan custodians to distribute Plan assets, however, Johnson did not direct, approve, oversee, or question Sherrod's actions. Exh. D at 77-79.

**ANSWER:**     Deny. The time period covered in the testimony cited by Plaintiff was 2011 to 2014, Johnson's testimony was that from 2011 to 2013 Sherrod paid Plan expenses using her own money and that she "may have" sought reimbursement from the Plan for those expenses in 2014. No exhibits were provided to Johnson to review and Johnson was not asked about any specific expenses for which Sherrod "may have" sought reimbursement. *See* Plaintiff's Exh. D at 77-79.

41.     Johnson stated with regard to Sherrod spending money on alleged plan expenses "I only need to hear what she had to say," and never requested or saw any documents to support any of the money allegedly spent on expenses. Exh. D at 80-83; 80:22-23. Johnson claimed he delegated all his duties as plan administrator to Sherrod. Exh. D at 77-82, 133, 150-52.

**ANSWER:**     Johnson admits he testified that he "[o]nly needed to hear what [Sherrod] had to say." But Plaintiff has mischaracterized the scope of that statement. Prior to that statement, Johnson was only being asked about 2014 and Sherrod reimbursing herself for Plan expenses for

2011-2013. Johnson later testified that he was involved with participant distributions. *See* Johnson Ex. 7 at 16. He also testified that he reviewed cancelled checks for expenses paid to M.S. Associates and that he kept copies of the checks for his records. *Id*. at 28-30. Johnson further testified that he authorized and directed payments to the Groom Law Firm in 2017. *Id*. at 145. In his Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories, Johnson stated: "Defendant further responds that he has produced copies of invoices ad written communications in his possession, custody, and control that contain this information, including SHERROD_0000598 -SHERROD_0000599; SHERROD_0000604 -SHERROD_0000627; SHERROD_0000628 -SHERROD_0000661; SHERROD_0000662 -SHERROD_0000662. *See* Defendant's Ex. 21 at 39-40.

42.     Johnson stated he was not qualified to review the Plan's annual Form 5500s and never tried to review them. Exh. D at 114-116.

**ANSWER:**     Deny. When asked if he had all of the information the actuary had when it completed the Plan's 5500s whether he could determine if the 5500 was accurate, Johnson's response was "That might be possible" and "It might be possible." Plaintiff's Exh. D at 115:21-116:11. Johnson then testified that he did not review the Plan's 5500s in that detail because he "relied upon the accuracy of the work, you know, that the actuary did in putting the document together." *Id*. at 116:12-17. Johnson also discussed his process for reviewing the Plan's 5500s in his Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories. *See* Defendant's Ex. 21 at 39-40.

43.     The Plan never distributed any statements of benefits to the Plan participants to inform them of their accrued benefits in the Plan from at least the 2011 Plan year to present. Exh. C at 50-51; Exh. D at 14-16.

11

**ANSWER:** Deny. While Sherrod admitted that she did not personally distribute the statements of benefits to Plan participants, she testified that she saw the statements of benefits for 2011 to the present, that she directed the statements of benefits to be sent to Plan participants and that the statements of benefits would have been sent by either the Plan attorney or actuary. *See* Plaintiff's Exh. C at 50-51.

44. Sherrod sold her company in Michigan to Michael Sherman and a dispute arose giving rise to state court litigation in Michigan between Sherman and Sherrod. Sherman received a judgment against Sherrod, individually, for $181,048 on June 25, 2010. Exh. P.

**ANSWER:** Johnson denies the allegations in paragraph 44 to the extent they are legal conclusions and seek to allege liability against Defendants. Further, the pertinent materials indicate that judgment was also entered against "Shirley T. Sherrod, M.D., P.C. *See* Plaintiff's Exh. Q at 9.

45. Sherman secured a garnishment on all of Sherrod's assets at Merrill Lunch [sic] on October 12, 2010, and by Court Order on February 4, 2011, Sherrod's assets at Merrill Lynch were frozen, including three individual, personal accounts held in her name and the amount of her retirement benefit in the Plan account. Exh. Q at 9-10.

**ANSWER:** Johnson denies the allegations in paragraph 45 to the extent they are legal conclusions and seek to allege liability against Defendants. Johnson admits that an asset freeze was issued by the Michigan State Court on February 4, 2011. However, the pertinent document(s) indicate that Merrill Lynch was custodian to "RCMA account (Account No. XXX-XXC64) titled 'SHIRLEY T SHERROD MD PC TROT PENSION PLAN U/A 06/01/1988' which is a self-directed retirement account according to Dr. Sherrod has 18 participants," and that "[b]ased on the garnishment filed by Plaintiff Michael S. Sherman ('Sherman') in October 2010 and this Court's Order of February 4, 2011, Sherrod's accounts at Merrill Lynch (including the RCMA Account) were frozen." See Plaintiff's Exh. Q at 3, ¶¶3 &

4. Merrill Lynch sought an order "releasing the freeze . . . the RCMA account." *See id*. at 6. *See also Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012) ('the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze on those assets, such as by naming a new administrator to the Plan"); Plaintiff's Exh. Q at 31 ("This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets.").

46.     Sherrod appealed the state court judgment against her and on October 28, 2011, the State of Michigan, Court of Appeals allowed Sherrod's appeal to continue subject to the condition that she either (i) appear for a creditor's examination with documents, or (ii) post a $250,000.00 cash or surety bond, for which the Court of Appeals lifted the freeze on Sherrod's assets to allow Sherrod to use her assets solely to post a bond for herself. Exh. Q at 12. Sherrod had the choice to explain the state of her assets with respect to the Plan in a deposition or she could use her assets to post a personal bond. She chose the bond. Exh. Q at 14-16.

**ANSWER:**     Johnson denies the allegations in paragraph 46 to the extent they are legal conclusions and seek to allege liability against Defendants. Johnson admits that Sherrod posted a $250,000 bond in response to the court order dated October 28, 2011. However, the Order cited by Plaintiff is captioned "Michael S. Sherman DO PC v. Shirley T. Sherrod MD PC," and the order does not recite that it "lifted the freeze on Sherrod's assets to allow Sherrod to use her assets solely to post a bond for herself,: as Plaintiff asserts. Instead, it recites that "appellants' [plural] assets may be used to post the stay bond as modified by this order." *See* Plaintiff's Exh. Q at 12.

47.     Sherrod posted a bond identified herself as the "Principal" for the bond on November 3, 2011, and signed it. Exh. Q at 14-16.

**ANSWER:**     Denied in part. The quoted word is accurate but omits the context. The document cited is captioned "Shirley T. Sherrod M.D., P.C., a Michigan Professional corporation and Shirley T. Sherrod M.D." *See* Plaintiff's Exh. C at 14.

13

48.     Sherrod completed an affidavit stating the assets used to post her bond were from her assets in the Plan, that she reviewed the affidavit with her attorney, and that the distributions complied with the Plan. Exh. Q at 18-20. Specifically stating she was "directing that two (2) Plan distributions be made," "direct Merrill Lynch to make distributions," "the two distributions . . . do not exceed my individual interest in the Plan." *Id.*

**ANSWER:**     Denied to the extent the cited materials do not recite that "the assets used to post" were for "her bond," nor do they recite that assets "were from her assets in the Plan." The pertinent document(s) indicate that Merrill Lynch was custodian to "RCMA account (Account No. XXX-XXC64) titled 'SHIRLEY T SHERROD MD PC TROT PENSION PLAN U/A 06/01/1988' which is a self-directed retirement account according to Dr. Sherrod has 18 participants," and that "[b]ased on the garnishment filed by Plaintiff Michael S. Sherman ('Sherman') in October 2010 and this Court's Order of February 4, 2011, Sherrod's accounts at Merrill Lynch (including the RCMA Account) were frozen." *See* Plaintiff's Exh. Q at 3, ¶¶3 & 4. Merrill Lynch sought an order "releasing the freeze . . . the RCMA account." *See id.* at 6. *See also Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012) ('the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze on those assets, such as by naming a new administrator to the Plan"); Plaintiff's Exh. Q at 31 ("This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets."). The full context of the first quote is: "I am hereby directing that two (2) Plan distributions be made as described more fully below, pursuant to the October 28, 2011 Order from the Michigan Court of Appeals ('Appeal order') (attached as Exhibit A) allowing the use of $250,000 of Plan assets for the sole purpose of posting a bond with the Court." Plaintiff's Exh. Q at 18, ¶ 2. The cited document likewise recites that "$250,000.00" be wired "from the Plan." *Id.* ¶ 4.

14

49. Merrill Lynch confirmed that Sherrod instructed them to use her assets from her portion of the Plan account to post the bond and that the distribution from the Plan account "was allocated to her account and not in excess of her account balance." Exh. Q at 3, ¶¶ 6-7.

**ANSWER:** Johnson admits that the quoted language is accurate but omits the context. The other attachments forming Exhibit Q indicate that the action was undertaken "pursuant to the October 28, 2011 Order from the Michigan Court of Appeals ('Appeal order') (attached as Exhibit A) allowing the use of $250,000 of Plan assets for the sole purpose of posting a bond with the Court." Plaintiff's Exh. Q at 18, ¶ 2. The cited document likewise recites that "$250,000.00" be wired "from the Plan." *Id*. ¶ 4.

50. Sherrod's attorney, on February 14, 2012, confirmed Sherrod received a distribution from the Plan to pay the Bond. Sherrod Depo. Exhibit 2 at 31. "Sherrod . . . made several attempts to direct Merrill Lynch . . . to distribute the plan assets to a retired participant, Shirley Sherrod. In all instances . . . Merrill Lynch has refused . . . except once . . . [when] funds would be used to post a bond in a state court proceeding." Exh. Q at 31.

**ANSWER:** Admit.

51. The only bond is the one in Sherrod's name for the state court litigation in *Sherrod v. Sherman*. Exh. Q at 14-16.

**ANSWER:** Admit.

52. Sherrod admits no documents exist giving the Plan any right to the $250,000 bond. Exh. C at 312:12-14.

**ANSWER:** Deny. Sherrod testified that she submitted an affidavit to Merrill Lynch instructing that the sole use of the $250,000 was for the bond. And Sherrod's affidavit states that the purpose of the distribution was for "allowing the use of $250,000.00 of Plan assets for the sole purpose of posting a bond with the Court." *See* Plaintiff's Exh. C at 309-311; Plaintiff's Exh. Q, p. 18.

53. At a December 2, 2011 hearing, Sherrod's counsel sought to have the "freezing of Defendant's assets" removed. Sherrod's attorney repeatedly referred to a freeze only on Sherrod's retirement benefits in the Plan account and never referred to the freeze also applying to

15

the entirety of the Plan's account at Merrill Lynch. State Motion Hearings on Dec. 2, 2011 and April 13, 2012, Exh. R at 8.

**ANSWER:** Deny. Sherrod's attorney stated that an affidavit related to the freeze "is not between Dr. Sherrod as a Defendant in this case," but involved "Dr. Sherrod as a trustee of a pension plan." *See* Plaintiff's Exh. R at 7. The pertinent document(s) indicate that Merrill Lynch was custodian to "RCMA account (Account No. XXX-XXC64) titled 'SHIRLEY T SHERROD MD PC TROT PENSION PLAN U/A 06/01/1988' which is a self-directed retirement account according to Dr. Sherrod has 18 participants," and that "[b]ased on the garnishment filed by Plaintiff Michael S. Sherman ('Sherman') in October 2010 and this Court's Order of February 4, 2011, Sherrod's accounts at Merrill Lynch (including the RCMA Account) were frozen." *See* Plaintiff's Exh. Q at 3, ¶¶3 & 4. Merrill Lynch sought an order "releasing the freeze . . . the RCMA account." *See id.* at 6. *See also Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012) ('the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze on those assets, such as by naming a new administrator to the Plan"); Plaintiff's Exh. Q at 31 ("This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets."). The full context of the first quote is: "I am hereby directing that two (2) Plan distributions be made as described more fully below, pursuant to the October 28, 2011 Order from the Michigan Court of Appeals ('Appeal order') (attached as Exhibit A) allowing the use of $250,000 of Plan assets for the sole purpose of posting a bond with the Court." Plaintiff's Exh. Q at 18, ¶ 2. The cited document likewise recites that "$250,000.00" be wired "from the Plan." *Id.* ¶ 4.

54.     On February 28, 2012, Merrill Lynch filed a motion to have the freeze on Sherrod's accounts released. Exh. Q at 1.

**ANSWER:**     Admit.

55.     On April 13, 2012, the State Court of Michigan stated that it would lift the freeze on Sherrod's assets in the Plan account. Exh. R at 17:12. However, Sherrod's attorney objected and insisted the freeze stay in place. *Id.* at 17-18.

**ANSWER:**     Deny. Plaintiff has misrepresented the substance of the April 13, 2013 hearing. While the State Court of Michigan initially indicated that it would lift the freeze on Sherrod's assets in the Plan before hearing from Sherrod's attorney, after Sherrod's attorney pointed out that the State Court of Michigan did not have jurisdiction to lift the freeze while Sherrod's appeal was pending the State Court of Michigan determined that it did not have jurisdiction to lift the freeze while the appeal was pending. *See* Plaintiff's Exh. R at DOL003625-3631.

56.     Although the freeze on Sherrod's assets in the Plan account could have been removed on April 13, 2012, Sherrod sued Merrill Lynch in federal court related to the freeze on April 6, 2012. *Sherrod v. Merrill Lynch*, Dock. No. 1, No. 1:12-cv-02545 (N.D. Ill. Apr. 13, 2012).

**ANSWER:**     Defendant admits that Sherrod sued Merrill Lynch in federal court related to the freeze on April 6, 2012. *Sherrod v. Merrill Lynch*, Dock. No. 1, No. 1:12-cv-02545 (N.D. Ill. Apr. 13, 2012). Defendant denies the remaining statements in paragraph 56. Plaintiff has misrepresented the substance of the April 13, 2013 hearing. While the State Court of Michigan initially indicated that it would lift the freeze on Sherrod's assets in the Plan before hearing from Sherrod's attorney, after Sherrod's attorney pointed out that the State Court of Michigan did not have jurisdiction to lift the freeze while Sherrod's appeal was pending the State Court of Michigan determined that it did not have jurisdiction to lift the freeze while the appeal was pending. *See* Plaintiff's Exh. R at DOL003625-3631.

57.     On November 28, 2012, the district court in the Northern District of Illinois ruled in favor of Merrill Lynch, granted its motion to dismiss, and found there was no controversy between the parties, and thus, no subject matter jurisdiction. *Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012).

**ANSWER:** Admit. Further answering, the Court stated that "the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze of those assets, despite Plaintiff's efforts to make those assets distinct from Sherrod's other assets, such as by naming a new administrator to the Plan." *Johnson v. Merrill Lynch*, 2012 WL 5989345, at *4 (N.D. Ill. Nov. 28, 2012).

58. Sherrod appealed to the Seventh Circuit. *Johnson v. Merrill Lynch*, 719 F.3d 601 (7th Cir. 2013).

**ANSWER:** Denied. Johnson, as administrator of the Plan, is the plaintiff in the cited case.

59. On May 20, 2013, the Seventh Circuit agreed with the district court and upheld its decision, agreeing there was no subject matter jurisdiction. *Johnson,* 719 F.3d 601. Of note, the Court held:

   a. "Merrill Lynch only froze the Plan account with respect to Sherrod," and Merrill Lynch stated it would have made distributions to the other participants. *Id.* at 603.
   b. "Given that Sherrod had been pursuing every possible avenue to gain relief from the freeze order, Merrill Lynch believed—not surprisingly—that Sherrod's foremost concern was releasing the funds in the Plan account." *Id.*
   c. "So imagine Merrill Lynch's surprise at the April 13, 2012 hearing when Sherrod opposed its motion and proposed order to release the Plan account freeze." *Id.*
   d. "But arguably, the Plan administrator is responsible for the continuation of the injury past April 13, 2012, when the Plan administrator rejected the proposed agreement to unfreeze the Plan account." *Id.* at 607.

**ANSWER:** Johnson admits that the quoted language is accurate but omits the context. The Seventh Circuit opinion indicates that it affirmed the "dismissal of the case for lack of subject-matter jurisdiction," making the quoted language *dicta*. The Seventh Circuit noted that "although Merrill Lynch concedes that a Plan participant has been injured, Johnson concedes that the Plan participant's injury is fairly traceable to a Michigan state court order, and not the defendant, Merrill Lynch." *Johnson*, 719 F.3d at 602. The Court further noted that "[a]lthough Merrill Lynch did not believe that it could exercise control over the Plan, the Wayne County Circuit Court believed that it could." *Id*. at 603. The Court explained that "[i]n spite of the fact that both the Plan administrator and Merrill Lynch viewed the Plan as an 'ERISA qualified

pension account' not subject to garnishment, the Wayne County judge denied the administrator's motion to quash." *Id*. The opinion also recites that "Merrill Lynch is not responsible for the freeze on the Plan account; the Wayne County Circuit Court judge is responsible for the freeze." *Id*. And the Seventh Circuit also recognized that, "Sherrod urged the Wayne County judge to deny Merrill Lynch's motion until the Michigan Court of Appeals had reached a decision on Sherrod's January 2012 appeal." *Id*. Further, the pertinent document(s) indicate that Merrill Lynch was custodian to "RCMA account (Account No. XXX-XXC64) titled 'SHIRLEY T SHERROD MD PC TROT PENSION PLAN U/A 06/01/1988' which is a self-directed retirement account according to Dr. Sherrod has 18 participants," and that "[b]ased on the garnishment filed by Plaintiff Michael S. Sherman ('Sherman') in October 2010 and this Court's Order of February 4, 2011, Sherrod's accounts at Merrill Lynch (including the RCMA Account) were frozen." *See* Plaintiff's Exh. Q at 3, ¶¶3 & 4. Merrill Lynch sought an order "releasing the freeze . . . the RCMA account." *See id*. at 6. *See also Johnson v. Merrill Lynch*, 2012 WL 5989345, No. 1:12-cv-02545 (N.D. Ill. Nov. 28, 2012) ('the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze on those assets, such as by naming a new administrator to the Plan"); Plaintiff's Exh. Q at 31 ("This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets.").

60.     For an unknown reason, Sherrod changed course again and agreed to have the state court lift the freeze on Sherrod's assets in the Plan account at Merrill Lynch, and the freeze was lifted in May 2013, and Merrill Lynch acknowledged the termination of the freeze on June 6, 2013. Exh. S.

**ANSWER:**     Defendant admits that the freeze was lifted in May 2013, and Merrill Lynch acknowledged the termination of the freeze on June 6, 2013. Defendant denies the remaining

allegations of paragraph 60 as the cited exhibit states that "the Michigan Appellate Court has ruled and terminated the freeze orders affecting the Plan's RCMA account." *See* Plaintiff's Exh. S.

61.    On November 10, 2011, Sherrod directed Merrill Lynch to make two distributions, totaling $253,000, from the Plan to be used to secure a court-ordered bond for her as follows:

    a.    Sherrod directed the two distributions by her signed, sworn affidavit ("Affidavit"). Exh. Q at 18-20.

    b.    Sherrod averred the first distribution in the amount of $250,000.00 was solely for the purpose of securing a bond pursuant to the "Appeal Order." Exh. Q at 18, ¶ 4.

    c.    The Affidavit stated the second distribution in the amount of $3,000.00 was payable to Bologna Surety for costs of filing the bond. Exh. Q at 19, ¶ 5.

    d.    The bond was issued in the name of "Dr. Shirley T. Sherrod," individually, as the Principal (Appellant). Exh. Q at 14-16. Sherman is the obligee. *Id.*

    e.    The Appeal Order dated October 28, 2011, reopened the appeal specifically "with respect to appellant Shirley T. Sherrod, M.D." Exh. Q at 12, first paragraph. The Court lifted a court-ordered freeze on Sherrod's assets, stating that Sherrod's "assets may be used to post the stay bond . . . ." *Id.* at 12, third paragraph.

    f.    Merrill Lynch wired $250,000.00 to Wells Fargo Bank on November 20, 2011. Exh. Q at 3-4; Merrill Lynch Distributions from Plan, Exh. T at 2.

    g.    Merrill Lynch distributed $3,000.00 via check on November 10, 2011, to Bologna Surety Agency, Inc. for bond processing services. Exh. T at 1.

**ANSWER:**    Denied to the extent that the bond and frozen assets are characterized as belonging to Sherrod "individually." The characterization of the disbursements as "distributions" is a legal conclusion which is denied to the extent it alleges liability against Defendants. In addition, the cited documents make clear that the action was undertaken "pursuant to the October 28, 2011 Order from the Michigan Court of Appeals ('Appeal order') (attached as Exhibit A) allowing the use of $250,000 of Plan assets for the sole purpose of posting a bond with the Court." Plaintiff's Exh. Q at 18, ¶ 2. The cited document likewise recites that "$250,000.00" be wired "from the Plan." *Id.* ¶ 4. The cited materials also indicate that said actions were "proper under the terms of the Plan." *See* Plaintiff's Exh. Q at 19, ¶ 9. Sherrod further testified that the distribution was to be used for the sole purpose of securing a bond pursuant to the appeal order

and that everybody understood that when the bond was released it was to go back to where it came from. *See* Plaintiff's Exh. C at 311:2-312:11.

62.     Sherrod caused payments in the form of checks to herself from the Plan's assets in 2013 through 2017 as shown in the Plan's bank records, which are summarized in Exh. U. Fn 3. Exhibit U is a Summary Exhibit pursuant to Federal Rule of Evidence 1006 that summarizes seven years of bank and check records for the Plan accounts at three different financial institutions. All of the bank documents were produced from the individual banks in response to subpoenas served on the banks.  All of the documents were produced to Defendants in discovery, and the specific bates-stamped pages for specific checks are identified.

**ANSWER:**     Admit. However, this purported fact is immaterial as it does not concern any

allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the

Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in

conclusory fashion that Defendants "fail to account for [] distributions properly" from "January

1, 2015 to the present." Plaintiff never sought to amend the Complaint.

63.     In July 2013, Sherrod directed two payments to herself totaling $50,000.00 paid to "Shirley T. Sherrod MD." Exh. U; Exh. C at 89-92; Exh. K.

**ANSWER:**     Admit.

64.     In 2014, 37 payments totaling $286,905 were paid to Sherrod as "Shirley T. Sherrod," or "Shirley T. Sherrod P/ADM", and two payments to Sherrod's Attorney, Conger, for $1,000 and $3,000. Exh. U; Exh. C at 145:20-22, 163-167. Total payments were $290,905.

| Date of Distributions 2014 | Amount |
|---|---|
| 1/22/2014 | $    10,000.00 |
| 1/22/2014 | $    10,000.00 |
| 1/22/2014 | $    10,000.00 |
| 1/22/2014 | $    10,000.00 |
| 1/22/2014 | $    10,000.00 |
| 2/11/2014 | $    10,000.00 |
| 2/11/2014 | $    10,000.00 |
| 2/11/2014 | $    10,000.00 |
| 2/11/2014 | $    10,000.00 |
| 3/4/2014 | $    57,405.00 |

| | | |
|---|---|---|
| 3/4/2014 | $ | 5,000.00 |
| 3/4/2014 | $ | 5,000.00 |
| 3/4/2014 | $ | 5,000.00 |
| 3/4/2014 | $ | 3,000.00 |
| 3/4/2014 | $ | 3,000.00 |
| 4/15/2014 | $ | 5,000.00 |
| 4/15/2014 | $ | 5,000.00 |
| 4/15/2014 | $ | 5,000.00 |
| 4/15/2014 | $ | 5,000.00 |
| 4/15/2014 | $ | 5,000.00 |
| 4/15/2014 | $ | 2,000.00 |
| 4/28/2014 | $ | 5,000.00 |
| 4/28/2014 | $ | 5,000.00 |
| 4/28/2014 | $ | 5,000.00 |
| 4/28/2014 | $ | 2,000.00 |
| 5/27/2014 | $ | 10,000.00 |
| 5/27/2014 | $ | 10,000.00 |
| 5/27/2014 | $ | 10,000.00 |
| 5/27/2014 | $ | 10,000.00 |
| 5/27/2014 | $ | 10,000.00 |
| 6/17/2014 | $ | 1,000.00 |
| 7/28/2014 | $ | 5,000.00 |
| 9/23/2014 | $ | 5,500.00 |
| 10/27/2014 | $ | 4,000.00 |
| 10/27/2014 | $ | 3,000.00 |
| 11/24/2014 | $ | 5,000.00 |
| 11/24/2014 | $ | 5,000.00 |
| Total: | $ 290,905.00 | |

**ANSWER:**   Deny. *See* Declaration of Leroy Johnson in Opposition to the Secretary's Motion for Summary Judgment Against Defendants Shirley T Sherrod and Leroy Johnson ("Johnson Declaration"), ¶ 10; Defendant's Ex. 22.

65.    In 2015, 26 distributions to Sherrod totaling $120,016.00 were paid by the Plan to "Shirley T. Sherrod P/ADM." Exh. U; Exh C. at 194-195.

| **Date of Distributions 2015** | **Amount** |
|---|---|

| | | |
|---|---|---|
| 1/5/2015 | $ | 5,000.00 |
| 1/5/2015 | $ | 5,000.00 |
| 1/5/2015 | $ | 4,440.00 |
| 2/5/2015 | $ | 5,000.00 |
| 2/5/2015 | $ | 5,000.00 |
| 2/5/2015 | $ | 4,440.00 |
| 3/2/2015 | $ | 5,000.00 |
| 3/2/2015 | $ | 4,000.00 |
| 4/6/2015 | $ | 5,000.00 |
| 4/6/2015 | $ | 4,444.00 |
| 4/22/2015 | $ | 4,444.00 |
| 4/22/2015 | $ | 5,000.00 |
| 6/1/2015 | $ | 5,000.00 |
| 6/1/2015 | $ | 2,700.00 |
| 7/1/2015 | $ | 5,000.00 |
| 7/1/2015 | $ | 4,444.00 |
| 8/10/2015 | $ | 4,444.00 |
| 8/10/2015 | $ | 4,444.00 |
| 8/19/2015 | $ | 4,444.00 |
| 8/19/2015 | $ | 4,444.00 |
| 10/8/2015 | $ | 5,000.00 |
| 10/8/2015 | $ | 4,444.00 |
| 10/21/2015 | $ | 5,000.00 |
| 10/21/2015 | $ | 4,444.00 |
| 11/30/2015 | $ | 5,000.00 |
| 11/30/2015 | $ | 4,440.00 |
| Total: | $ 120,016.00 | |

**ANSWER:** Deny. *See* Johnson Declaration, ¶ 12; Defendant's Ex. 23. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

23

66.    In 2016, 30 distributions to Sherrod totaling $196,471.50 paid to "Shirley T. Sherrod P/ADM." Exh. U; Exh. C at 208-209.

| Date of Distributions 2016 | Amount |
|---|---|
| 1/6/2016 | $    4,444.00 |
| 1/6/2016 | $    4,444.00 |
| 2/1/2016 | $    5,000.00 |
| 2/1/2016 | $    4,444.00 |
| 2/22/2016 | $    5,000.00 |
| 2/22/2016 | $    4,444.00 |
| 4/4/2016 | $    5,000.00 |
| 4/4/2016 | $    4,444.00 |
| 4/18/2016 | $    5,000.00 |
| 4/18/2016 | $    4,444.00 |
| 5/18/2016 | $    5,000.00 |
| 5/18/2016 | $    4,444.00 |
| 6/28/2016 | $    5,000.00 |
| 6/28/2016 | $    4,444.00 |
| 7/29/2016 | $    5,000.00 |
| 7/29/2016 | $    4,444.00 |
| 9/1/2016 | $    5,000.00 |
| 9/1/2016 | $    4,444.00 |
| 9/27/2016 | $    5,000.00 |
| 9/27/2016 | $    4,444.00 |
| 10/17/2016 | $    18,255.50 |
| 10/27/2016 | $    5,000.00 |
| 10/27/2016 | $    4,444.00 |
| 11/22/2016 | $    20,000.00 |
| 11/22/2016 | $    5,000.00 |
| 11/22/2016 | $    4,444.00 |
| 12/21/2016 | $    18,000.00 |
| 12/21/2016 | $    5,000.00 |
| 12/21/2016 | $    4,444.00 |
| 12/27/2016 | $    18,000.00 |
| Total: | $ 196,471.50 |

24

**ANSWER:** Deny. *See* Johnson Declaration, ¶ 14; Defendant's Ex. 24. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

67. In 2017, 28 distributions totaling $173,809.99.00 were paid to "Shirley T. Sherrod P/ADM." Exh. U.

| Date of Distributions 2017 | Amount | |
|---|---|---|
| 2/2/2017 | $ | 4,444.00 |
| 2/2/2017 | $ | 5,000.00 |
| 3/2/2017 | $ | 4,444.00 |
| 3/2/2017 | $ | 4,444.00 |
| 4/3/2017 | $ | 5,000.00 |
| 4/3/2017 | $ | 4,444.00 |
| 4/4/2017 | $ | 8,932.91 |
| 4/4/2017 | $ | 8,932.91 |
| 5/1/2017 | $ | 4,444.00 |
| 5/1/2017 | $ | 5,000.00 |
| 6/2/2017 | $ | 4,444.00 |
| 6/2/2017 | $ | 5,000.00 |
| 6/7/2017 | $ | 11,798.93 |
| 6/13/2017 | $ | 2,701.69 |
| 6/21/2017 | $ | 3,582.62 |
| 6/26/2017 | $ | 1,720.93 |
| 6/27/2017 | $ | 28,700.00 |
| 7/24/2017 | $ | 9,000.00 |
| 7/24/2017 | $ | 9,000.00 |
| 7/24/2017 | $ | 5,000.00 |
| 8/29/2017 | $ | 4,444.00 |
| 9/18/2017 | $ | 5,000.00 |
| 10/5/2017 | $ | 5,000.00 |

| | | |
|---|---|---|
| 10/5/2017 | $ | 4,444.00 |
| 11/2/2017 | $ | 5,000.00 |
| 11/2/2017 | $ | 4,444.00 |
| 12/4/2017 | $ | 5,000.00 |
| 12/4/2017 | $ | 4,444.00 |
| Total: | $ 173,809.99 | |

**ANSWER:** Deny. *See* Johnson Declaration, ¶ 16; Defendant's Ex. 25. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

68.     Sherrod admitted all the checks from 2013, 2014, 2015 and 2016 were directed by her to herself, except for four checks (two in 2013 and two in 2014). Exh. C at 87:14-22; 163-167; 194-195; 208-209.

**ANSWER:** Admit.

69.     In 2013, Sherrod directed that two checks be issued, one for $12,603.88 payable to a participant (C. Riggleman) and one for $3,150.97 payable to the Internal Revenue Service ("IRS"). Exh. K at 9-10.
   a.     The money for both checks came out of the Plan's account. Exh. K at 9-10.
   b.     The check to the participant was never cashed and Comerica attempted to return the money to the Plan in January 2016. Exh. C at 120-121; 169-171; Exh. V at 1.
   c.     At that time, Sherrod had closed the Plan's account at Comerica, and Comerica contacted Sherrod requesting instructions on where to return the funds. Exh. I; Exh. L; Exh. V at 1.

**ANSWER:** Admit.

70.     In 2014, Sherrod directed two checks totaling $4,000.00 payable to Sherrod's attorney Mr. Conger (one check for $1,000 and another for $3,000). Exh. C at 84:5-13, 168:7-24, 169:1-10; Exh. U at 2, ¶ 3(A), 4. Sherrod presented no invoices or explanation for these checks other than the vague explanation, "in connection with unfreezing the Plan" in 2011, 2012, and 2013. Exh. N at 7.

26

**ANSWER:** Defendant admits the first sentence of paragraph 70. Defendant denies the remaining allegations of paragraph 70. In her Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories, Sherrod identified multiple documents supporting her explanation of the purpose of the two checks: SHERROD _0000604 -SHERROD _0000627; SHERROD _0000628 -SHERROD _0000661; SHERROD _0000470 -SHERROD _0000471; SHERROD _0000354 -SHERROD _0000371. *See* Plaintiff's Exh. N at 7.

71. The Plan's account reflects no deposits in 2014, 2015, 2016 or 2017. Exh. U at 3, ¶ 3(D).

**ANSWER:** Admit.

72. In 2017, Sherrod directed six distributions totaling $37,684.99 payable to persons appearing to be participants in the Plan. Two of those distributions, each for $8,932.91, were sent to Sherrod's address in South Carolina. Exh. C at 230:5-15; Exh. U at 2, ¶ 3(B), 6.

**ANSWER:** Admit. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

73. In 2017, Sherrod directed a distribution of $28,700.00 to the State of Michigan, escheating the value of certain participant accounts. Exh. C at 232; Exh. U at 6.

**ANSWER:** Admit. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

27

74.     Sherrod admitted that the distributions in 2017 to participants in the Plan were for the wrong amounts. Exh. C at 223-224; 305.

**ANSWER:**     Deny. Sherrod testified that she was "not sure" whether the distributions were for the wrong amounts. Sherrod further testified that any difference between distributions and the amount owed could be due to taxes or "some [other] reconciliation" consideration, and further emphasized that "this was not the final . . . figure." *See* Plaintiff's Exh. C at 305-07. However, this purported fact is immaterial as it does not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

75.     Johnson did not approve or review any of Sherrod's distributions or payment activity after Johnson became Plan Administrator on May 30, 2012. Exh. D at 17, 54-60, 77-80.

**ANSWER:**     Deny. Johnson testified that when he met with Sherrod, "we always discussed bills and trying to keep things to a minimum. That was always a discussion topic." *See* Plaintiff's Exh. D at 80.

76.     Johnson only took Sherrod's word for expenses she allegedly spent money on from 2014 to 2017 and never reviewed any documents in support. Exh. D at 80-82.

**ANSWER:**     Deny. Johnson testified that when he met with Sherrod, "we always discussed bills and trying to keep things to a minimum. That was always a discussion topic." *See* Plaintiff's Exh. D at 80. However, any reference to Plan expenses after 2014 are irrelevant because those years do not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it

merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

77.    From 2011 to 2017, the checks written to Sherrod were allocated across all participants' account values, having the effect of reducing all participants' retirement benefits. Exh. A; Exh. B.

**ANSWER:**    Admit to the extent Plaintiff references the years 2011 to 2014. However, any reference to Plan expenses after 2014 are irrelevant because those years do not concern any allegations in the Complaint, which lack allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

78.    For the 2011 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid, and reported $246,291 as a "loss" to the Plan. Exh. A at 1.

**ANSWER:**    Admit.

79.    For the 2012 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid. Exh. A at 4.

**ANSWER:**    Admit.

80.    For the 2013 Plan Year, Defendants reported $0.00 benefit distributions and $0.00 expenses paid. Exh. A at 7.

**ANSWER:**    Admit.

81.    For the 2014 Plan Year, Defendants reported $57,000.00 in benefit distributions and $142,000.00 in expenses paid, totaling $199,000.00. Exh. A at 10.

**ANSWER:**    Admit.

82.    For the 2015 Plan Year, Defendants reported $59,000.00 in benefit distributions and $40,000.00 in expenses paid, totaling $99,000.00. Exh. B at 2.

29

**ANSWER:** Admit. However, the asserted facts are irrelevant because they concern Plan distributions and expenses for 2015. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

83. For the 2016 Plan Year, Defendants reported $62,550.00 in benefit distributions and $133,922.00 in expenses paid, totaling $196,472.00. Exh. B at 5.

**ANSWER:** Admit. However, the asserted facts are irrelevant because they concern Plan distributions and expenses for 2015. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

84. For the 2017 Plan Year, Defendants reported $135,187.00 in benefit distributions and $46,890.00 in expenses paid, totaling $182,077.00. Exh. B at 8.

**ANSWER:** Admit. However, the asserted facts are irrelevant because they concern Plan distributions and expenses for 2015. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

85. Sherrod testified the money she spent in 2014 related to expenses she "personally assumed over a roughly three-year period in connection with unfreezing the Plan" in 2011, 2012, and 2013. Exh. N at 7.

**ANSWER:** Johnson admits the quoted statement is accurate However, the statement is misleading because it is taken out of context. Sherrod stared in her interrogatory answers that, "In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr.

Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers." *See* Plaintiff's Exh. N at 7. That is consistent with the grant of authority in the Plan documents. Section 7.7 states that "the Trustee shall be reimbursed for any reasonable expenses, including reasonable counsel fees[.]" *See* Plaintiff's Exh. E at 41.

86.     Sherrod described the Plan's accounting for 2014 as "a big mess." Exh. C at 178:1-3.

**ANSWER:**     Denied. When Sherrod testified that she "would say this is a big mess," Sherrod was referring to Plaintiff's exhibits at the deposition not the Plan's accounting for 2014. Sherrod testified as follows:

> Q.     So it says 290,905 is how much came out of the account. Now, this here is showing 142,000 plus 57,000 that equals, as reported on the 5500, 199,000. I'm trying to understand where the other approximately 90,000 is at.
> A.     Well, we've been trying to understand how you came up with some of these figures, where this 40,000 was missing in checks. You know, there's errors in what you're saying. We have errors—there's errors all over the place here, and I can't sit here, sir, and try to, you know, see what someone who doesn't really do this is trying to add, and show me when what's happened. I'm sorry. I'll have to say that you're confusing me to the point that I'm not able to say anything else about it. I don't know.
> Q.     And you can't tell us who filled out this form, right?
> A.     I think we'll need to find somebody who was able to go over these with more clarity for everybody. I would say this is a big mess.
> Q.     But you can't tell us who put these numbers in here, right?
> A.     It wasn't me, and I know that it would have been an actuary.

*See* Plaintiff's Exh. C at 177:6-178:7.

87.     For 2015, Sherrod stated no documents exist for paying any expenses, and she could not recall paying any service providers. Exh. C at 186:5-11; 300-301.

**ANSWER:**     Deny. Sherrod testified that she did not recall the names of any entities who provided services to the Plan in 2015, that she did not have any records that related to Plan

expenses in 2015, and "I believe we've given you everything at this point in time." *See* Plaintiff's Exh. C at 186:5-11; 300-301. Sherrod further testified that "other than what we looked at today, we have not seen any other invoice" for the years after the plan years that are the subject of the Complaint. *Id.* at 301. Furthermore, the asserted facts are irrelevant because they concern Plan expenses for 2015. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

88.     For 2016, Sherrod stated no documents exist to support any payments of plan expenses. Exh. C at 300-301. Sherrod claimed the only paid service provider was Groom Law for the work they did in this litigation, she testified she continues to need to pay lawyers from the Plan's assets. *Id.* at 197-99.

**ANSWER:**     Deny. Sherrod testified that she did not have any records that related to Plan expenses in 2016. *See* Plaintiff's Exh. C at 300-301. When asked about service providers who were "engaged" for the Plan in 2016, Sherrod testified that "I do recall there was primarily Groom." *See* Plaintiff's Exh. C at 197:9-12. Sherrod did not testify that she continues to need to pay lawyers from the Plan's assets in the exhibit cited by Plaintiff. *See* Plaintiff's Exh. C at 197-99. Furthermore, the asserted facts are irrelevant because they concern Plan expenses for 2016. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

89.     For 2017, Sherrod stated no documents exist to support any payment of expenses. Exh. C at 300-301. Sherrod claimed the only paid service provider was Reed-Ramsey, Groom Law, and Russell Kofoed for the work they did in this litigation. *Id.* at 17-19.

**ANSWER:** Deny. Sherrod testified that she did not have any records that related to Plan expenses in 2017. *See* Plaintiff's Exh. C at 300-301. The question posed to Sherrod at her deposition that elicited her responses concerning Reed-Ramsey, Groom Law, and Russell Kofoed was, "[i]n 2017, did anybody else besides yourself do any work for the plan?" *See* Plaintiff's Exh. C at 16. When asked if Groom Law and Russell Kofoed only performed work related to this litigation, Sherrod responded that she "can't recall exactly." Sherrod was not asked any questions about whether Reed-Ramsey performed any work in 2017 concerning this litigation. Nor did Sherrod offer any testimony concerning Reed-Ramsey performing any work in 2017 concerning this litigation. *See* Plaintiff's Exh. C at 16-19. Furthermore, the asserted facts are irrelevant because they concern Plan and expenses for 2017. The Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

90. The Investigator for the Department of Labor determined the total amount that must be reallocated for January 1, 2011 to December 31, 2017 was $786,220.34. Exh. U at 2, ¶ 3.

**ANSWER:** Johnson admits that $786,220.34 is the figure generated by the Plaintiff's investigator. However, the determination that the amount must be reallocated is a legal conclusion that Johnson denies. Furthermore, any amounts the investigator concluded must be reallocated after 2014 are irrelevant because the Complaint lacks allegations for Plan years after 2014. The Counts of the Complaint specifically indicate that it is directed to 2012-2014 and it merely alleges in conclusory fashion that Defendants "fail to account for [] distributions properly" from "January 1, 2015 to the present." Plaintiff never sought to amend the Complaint.

33

**Statement of Facts in Opposition**

1.      It was Sherrod's understanding that the freeze on Plan assets was on all Plan assets not just her assets. Sherrod's understanding was based upon her communications with Merrill Lynch. Sherrod contacted the Department of Labor ("DOL") to discuss this and the DOL advised Sherrod she needed a lawyer and emailed her a list of lawyers from the National Pension Lawyer Network. The DOL further advised Sherrod that as Plan "trustee she has an obligation to make sure her plan is operating properly and to protect as needed." *See* Defendant's Ex. 1 (DOL001966, 3656; Declaration of Shirley T. Sherrod, ¶¶ 2-4); Defendant's Ex. 2 at 28:11-32:2, 79:13-80:10.

2.      Johnson and Sherrod kept in touch about Plan expenses in 2014. These communications were usually verbal. *See* Defendant's Ex. 2 at 99:17-100:15.

3.      Johnson and Sherrod relied upon accountants, lawyers, and other professionals for preparing the Plan's Form 5500s and other advice. Defendant's Ex. 2 at 192:10-193:8, 199:12-202:18; Defendant's Ex. 7 at 44:21-46:13, 103:7-20. Sherrod specifically relied upon the advice of lawyers concerning using Plan assets to pay lawyers. *Id*. at 198:5-202:18.

4.      LJ Consulting kept documents related to the Plan, many of which were turned over to Plaintiff. *See* Defendant's Ex. 7 at 51:8-21.

5.      On January 6, 2014, Johnson's lawyer informed American Contractors Indemnity Company ("ACIC") that the bond collateral that was posted by the Plan on November 10, 2011 should be returned to the Plan. *See* Defendant's Ex. 14. Sherrod agreed that the collateral should be returned to the Plan. *See* Defendant's Ex. 15.

6. Sherrod made herself available for a creditor's examination rather than having to file an appeal bond. *See* Defendant's Ex. 8.

7. On January 14, 2016, four checks from the Plan account to Sherrod were voided: (1) No. 4015447616 in the amount of $12.603.88; (2) 4015705847 in the amount of $10,000.00; (3) 4015705854 in the amount of $10,000.00, and (4) 4015705858 in the amount of $10,000.00. *See* Defendant's Ex. 13.

8. In 2014, the Plan reimbursed Sherrod for reasonable and necessary expenses for actuarial, legal, and other administrative work in the amount of $117,591.02. *See* Defendant Leroy Johnson's Declaration in Opposition to the Secretary's Motion for Summary Judgment Against Defendants Shirley T. Sherrod and Leroy Johnson ("Johnson Declaration"), ¶¶ 10 & 11; Defendant's Ex. 22.

9. In 2015, the Plan reimbursed Sherrod for reasonable and necessary expenses for actuarial, legal, and other administrative work in the amount of $40,000.00. *See* Johnson Declaration, ¶¶ 12 & 13; Defendant's Ex. 23.

10. In 2016, the Plan reimbursed Sherrod for reasonable and necessary expenses for actuarial, legal, and other administrative work in the amount of $133,922.00. *See* Johnson Declaration, ¶¶ 14 & 15; Defendant's Ex. 24.

11. In 2017, the Plan reimbursed Sherrod for reasonable and necessary expenses for actuarial, legal, and other administrative work in the amount of $46,890.00. *See* Johnson Declaration, ¶¶ 16 & 17; Defendant's Ex. 25.

12.     The reason the amounts of the reimbursements to Sherrod do not directly match vendor invoices is because Sherrod and Johnson had payment plans with the vendors. *See* Johnson Declaration, ¶ 19.

Respectfully submitted,

Leroy Johnson

/s/ Leroy Johnson

Leroy Johnson, Pro Se
1146 S. Waukegan Rd. #278
Waukegan, IL 60085
Tel. 810.394.5415

**<u>CERTIFICATE OF SERVICE</u>**

Leroy Johnson certifies that a copy of the foregoing document was served upon all of those set up to receive service by the Court's CM-ECF System on November 9, 2020.

<u>/s/ Leroy Johnson</u>

37

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| EUGENE SCALIA, Secretary of Labor, United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:16-CV-04825 |
| v. | ) ) | Hon. Andrea Wood |
| SHIRLEY T. SHERROD and LEROY JOHNSON, | ) ) | |
| Defendants. | ) | |

**DEFENDANT LEROY JOHNSON'S DECLARATION IN OPPOSITION**
**TO THE SECRETARY'S MOTION FOR SUMMARY JUDGMENT**
**AGAINST DEFENDANTS SHIRLEY T. SHERROD AND LEROY JOHNSON**

I, Leroy Johnson, declare as follows:

1.      I am one of the Defendants in this matter.

2.      I became the administrator of the Shirley T. Sherrod, M.D., P.C. Target Benefit Pension Plan ("Plan") on May 30, 2012.

3.      I created LJ Consulting Services LLC ("LJ Consulting") on August 4, 2014.

4.      I assigned my Plan administrator position to LJ Consulting on August 4, 2014.

5.      At all relevant times, I have been the sole manager and member of LJ Consulting.

6.      As the administrator of the Plan from May 30, 2012 to August 4, 2014 and the manager of LJ Consulting from August 4, 2014 to the present I have been intimately involved with the administration of the Plan.

7.      From May 30, 2012 to the present, I worked closely with Shirley T. Sherrod ("Sherrod"), who is the trustee of the Plan and my co-Defendant in this case, to administer the Plan.

8.      From May 30, 2012 to the present, I conferred with Sherrod on a regular basis to discuss Plan expenses.

9.      From May 30, 2012 to the present, LJ Consulting and I maintained records related to Plan expenses most of which concerned work performed by Plan accountants, actuaries, and lawyers. I turned over the records to Plaintiff.

10.     I am submitting as Exhibit 22 in opposition to the Secretary's Motion for Summary Judgment Against Defendants Shirley T. Sherrod and Leroy Johnson ("MSJ"), a true and correct copy of the Plan's 2014 Form 5500-SF. Also attached is a spreadsheet summarizing reimbursements the Plan made to Sherrod for expenses she paid for expenses incurred by the Plan for 2011 through 2014. Also attached are invoices from Plan vendors, money order receipts for payments made to the vendors, and receipts for when Sherrod paid cash to the vendors.

11.     It is my belief that the reimbursements Sherrod received in 2014 were for reasonable and necessary Plan expenses.

12.     I am submitting as Exhibit 23 in opposition to the MSJ, a true and correct copy of the Plan's 2015 Form 5500-SF. Also attached is a spreadsheet summarizing reimbursements the Plan made to Sherrod for expenses she paid for expenses incurred by the Plan for 2015. Also attached are invoices from Plan vendors.

13.     It is my belief that the reimbursements Sherrod received in 2015 were for reasonable and necessary Plan expenses.

14.     I am submitting as Exhibit 24 in opposition to the MSJ, a true and correct copy of the Plan's 2016 Form 5500-SF. Also attached is a spreadsheet summarizing reimbursements the

Plan made to Sherrod for expenses she paid for expenses incurred by the Plan for 2016. Also attached are invoices from Plan vendors.

15.    It is my belief that the reimbursements Sherrod received in 2016 were for reasonable and necessary Plan expenses.

16.    I am submitting as Exhibit 25 in opposition to the MSJ, a true and correct copy of the Plan's 2017 Form 5500-SF. Also attached is a spreadsheet summarizing reimbursements the Plan made to Sherrod for expenses she paid for expenses incurred by the Plan for 2017. Also attached are invoices from Plan vendors.

17.    It is my belief that the reimbursements Sherrod received in 2017 were for reasonable and necessary Plan expenses.

18.    The reason Plan expenses were not paid directly to the vendors was because except for one vendor the trust account could only issue payments to Plan participants.

19.    The reason the amounts of the reimbursements to Sherrod do not directly match vendor invoices is because Sherrod and I had payment plans with the vendors.

20.    I am submitting as Exhibit 1 in opposition to the MSJ, true and correct copies documents produced by the Secretary and the Declaration of Shirley T. Sherrod dated December 30, 2016.

21.    I am submitting as Exhibit 2 in opposition to the MSJ, a true and correct copy of the Deposition Transcript of Shirley T. Sherrod dated May 2, 2018.

22.    I am submitting as Exhibit 3 in opposition to the MSJ, true and correct copies of Plan documents.

23.    I am submitting as Exhibit 4 in opposition to the MSJ, a true and correct copy of the Plan.

24.    I am submitting as Exhibit 5 in opposition to the MSJ, true and correct copies of corporate resolutions from Shirley T. Sherrod M.D., P.C. and Plan amendments.

25.    I am submitting as Exhibit 6 in opposition to the MSJ, true and correct copies documents produced by the Secretary.

26.    I am submitting as Exhibit 7 in opposition to the MSJ, a true and correct copy of the Deposition Transcript of Leroy Johnson dated May 3, 2018.

27.    I am submitting as Exhibit 8 in opposition to the MSJ, true and correct copies of letters from Plan attorneys.

28.    I am submitting as Exhibit 9 in opposition to the MSJ, a true and correct copy of a letters from a Plan attorney.

29.    I am submitting as Exhibit 10 in opposition to the MSJ, a true and correct copy of the transcript of proceedings on April 13, 2012 in *Sherman v. Sherrod*, No. 08-014212-CK in the Michigan State Court.

30.    I am submitting as Exhibit 11 in opposition to the MSJ, a true and correct copy of Plaintiff-Appellant's Reply Brief in *Johnson v. Merrill Lynch*, No. 12-3869 in the United States Court of Appeals for the Seventh Circuit.

31.    I am submitting as Exhibit 12 in opposition to the MSJ, true and correct copies of invoices the Plan received from Plan attorneys.

32.    I am submitting as Exhibit 13 in opposition to the MSJ, true and correct copies of uncashed check notifications the Plan received from its bank dared January 14, 2016.

4

33.     I am submitting as Exhibit 14 in opposition to the MSJ, true and correct copies of letters from Plan attorneys.

34.     I am submitting as Exhibit 15 in opposition to the MSJ, a true and correct copy of a letter from Shirley T. Sherrod dated August 3, 2012.

35.     I am submitting as Exhibit 16 in opposition to the MSJ, true and correct copies of Plan documents produced to the Secretary on February 27, 2018.

36.     I am submitting as Exhibit 17 in opposition to the MSJ, a true and correct copy of a letter received by a Plan attorney from the bond company.

37.     I am submitting as Exhibit 18 in opposition to the MSJ, a true and correct copy of an email sent by one of the Plan attorneys.

38.     I am submitting as Exhibit 19 in opposition to the MSJ, a true and correct copy of an email sent by one of the Plan attorneys.

39.     I am submitting as Exhibit 20 in opposition to the MSJ, a true and correct copy of a portion of the Opinion in *Johnson v. Merrill Lynch*, No. 12-3869 in the United States Court of Appeals for the Seventh Circuit.

40.     I am submitting as Exhibit 21 in opposition to the MSJ, a true and correct copy of my Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed: This 9th day of November 2020.

/s/ Leroy Johnson

5

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| EUGENE SCALIA, Secretary of Labor, United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:16-CV-04825 |
| v. | ) ) | Hon. Andrea Wood |
| SHIRLEY T. SHERROD and LEROY JOHNSON, | ) ) | |
| Defendants. | ) | |

**DEFENDANT LEROY JOHNSON'S RESPONSE TO**
**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES AND**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AGAINST DEFENDANTS SHIRLEY T. SHERROD AND LEROY JOHNSON**

Defendant, Leroy Johnson ("Johnson"), submits the following response to the Memorandum of Points and Authorities Supporting His Motion for Summary Judgment Against Defendants Shirley T. Sherrod and Leroy Johnson ("Memorandum") submitted by Plaintiff, Eugene Scalia, Secretary of Labor, United States Department of Labor ("Secretary"), pursuant to Local Rule 56.1(b)(2):

**Introduction**

The Secretary is correct that the Employee Retirement Income Security Act of 1947, 29 U.S.C. § 1001 *et seq.*, as amended, ("ERISA"), imposed upon Shirley T. Sherrod ("Sherrod") and Johnson, as fiduciaries of the Shirley T. Sherrod, M.D., P.C. Target Benefit Pension Plan ("Plan"), the duties of complete loyalty to the interests of Plan participants (ERISA § 404(a)(1)(A)), to act prudently in performing their duties to Plan participants (ERISA § 404(a)(1)(B)), and to follow Plan documents in performing their duties, unless it would violate ERISA (ERISA § 404(a)(1)(D)). But the Secretary has failed to demonstrate that there is no

genuine issue of material fact that would entitle the Secretary to summary judgment against Johnson for breaching his fiduciary duties to Plan participants as it relates to the reasonable Plan expenses that were reimbursed to Sherrod from 2011 to 2017. Furthermore, Johnson objects to the motion to the extent it seeks relief related to activities that occurred from 2015 to the present because the Complaint does not state a claim for those years.

### Statement of the Case

The Secretary alleges that

### Argument

### Standard for Summary Judgment

Federal Rule of Civil Procedure 56 states "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Secretary has the burden of demonstrating he is entitled to summary judgment. To overcome a motion for summary judgment, the non-moving party is only required to demonstrate that there is a genuine issue of material fact for trial. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

2

**The Plan is an ERISA Plan and the Court Has Jurisdiction**

ERISA covers employee benefit plans under ERISA § 3(3). 29 U.S.C. § 1002(3). The Plan is an employee benefit plan covered by ERISA § 3(3). This Court has jurisdiction over this action. Defendant Leroy Johnson's Response to Plaintiff's Statement of Material Facts Not in Dispute with Respect to Secretary's Motion for Summary Judgment Against Defendants Shirley T. Sherrod and Leroy Johnson ("Response to SOF") and Statement , ¶¶ 1-2.[1]

**Johnson was a Plan Fiduciary from May 30, 2012 to August 4, 2014**

ERISA defines fiduciaries as those named as fiduciaries in plan documents giving them discretionary authority or discretionary responsibility in the administration of a plan. 29 U.S.C. § 1002(3)(21).

Sherrod, as Plan trustee, appointed Johnson as the Plan administrator on May 30, 2012. Johnson remained as a Plan administrator until August 4, 2014. Johnson acted as a fiduciary to the Plan between those dates. Response to SOF, ¶¶22, 30 & 34. Johnson created LJ Consulting Services, LLC ("LJ Consulting") on August 4, 2014. Response to SOF, ¶ 23. In his capacity as Plan administrator, Johnson assigned his Plan administrator position to LJ Consulting on August 4, 2014. Response to SOF, ¶ 32. The Plan was and is LJ Consulting's only client. Response to SOF, ¶ 24. The Secretary claims that the Plan's governing documents did not permit Johnson to assign his duties as Plan administrator to LJ Consulting. Memorandum at 5; SOF, ¶ 33. However, the Plan states:

---

[1] Johnson is submitting herewith his "Response to Plaintiff's Statement of Material Facts Not in Dispute with Respect to Secretary's Motion for Summary Judgment Against Defendants Shirley T. Sherrod and Leroy Johnson and Statement of Facts of Material Facts Not in Dispute Submitted in Opposition to the Motion for Summary Judgment." Johnson's response to the Secretary's statement of facts is referred to as "Response to SOF" and Johnson's statement of facts is referred to as "SOF in Opposition."

3

> The Administrator . . . may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator . . . deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration sand management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries.

Response to SOF, ¶ 33. There is no non-delegation clause in the Plan. LJ Consulting was the Plan administrator from August 4, 2014 to the present. Accordingly, Johnson was a Plan fiduciary from May 30, 2012 to August 4, 2014—not to present, as the Secretary argues.

**Johnson Was Required to Defray Reasonable Plan Expenses**

ERISA is a comprehensive remedial statute designed to promote and protect the interests of participants and their beneficiaries in employee benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Through the enactment of ERISA, Congress intended to ensure the equitable character and financial soundness of employee benefit plans "by establishing standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans." Congress' chief concern was the misuse and mismanagement of plan assets by plan fiduciaries. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140, n.8 (1985). ERISA § 404(a) states:

> (a) Prudent man standard of care

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

>> (A) for the exclusive purpose of:

>>> (i) providing benefits to participants and their beneficiaries; and

>>> (ii) defraying reasonable expenses of administering the plan;

>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

4

with such matters would use in the conduct of an enterprise of a like character and with like aims;

* * * *

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a). Thus, a plan fiduciary's duties include "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii).

At issue in this case is whether Sherrod and Johnson acted prudently and in the best interests of Plan participants when the Plan reimbursed Sherrod—with Johnson's approval—for expenses that were reasonably related to the administration of the Plan. The Secretary takes issue with Sherrod's and Johnson's assertion that the reimbursements were related to reasonable Plan expenses and should be treated as Plan distributions that were made for Sherrod's personal benefit.

Payment of Plan "expenses" usually refers to payments to third party service providers for "reasonable and necessary" expenses charged to the Plan for services provided to the Plan. Whether an expense is "reasonable" is determined by a "prudent" fiduciary governed by ERISA §§ 404, 406, and 408; 29 U.S.C. §§ 1104, 1106, 1108. The Plan follows this standard and customary [practice with the term "payments." The Plan document states in Section 2.7 Payment of expenses that "[a]ll reasonable expenses of administration may be paid out of the Plan assets unless paid by the employer." Response to SOF, ¶ 13.

The first expense the Secretary identifies that he believes was not a reasonable and necessary expense of the Plan was the payment of appeal bond collateral in 2011 in the amount of $253,000 in a case brought in Michigan state court by Michael Sherman, the purchaser of

5

Sherrod's medical practice, Shirley T. Sherrod, M.D. P.C.—the Plan sponsor ("Company"). Sherman was awarded a judgment against Sherrod and the Company in the amount of $181,048. Response to SOF, ¶¶ 5 & 44. On February 4, 2011, the Michigan State Court issued an asset freeze against Sherrod's assets, including her assets in the Plan. Merrill Lynch was the custodian of the Plan assets. Unfortunately, Merrill Lynch construed the freeze to apply to all Plan assets. Response to SOF, ¶ 45. Sherrod signed an affidavit which stated ""I am hereby directing that two (2) Plan distributions be made as described more fully below, pursuant to the October 28, 2011 Order from the Michigan Court of Appeals ('Appeal order') (attached as Exhibit A) allowing the use of $250,000 of Plan assets for the sole purpose of posting a bond with the Court." Response to SOF, ¶ 48.

The Secretary makes much out of the fact that Merrill Lynch identified the funds as distributions, Sherrod's affidavit stated that the two payments that made up the bond collateral were distributions, Sherrod's lawyer referred to the funds as distributions, and the Plan's 5500 reflected the payments as a "loss" rather than an expense. But that is merely inviting the Court to accept form over substance given Merrill Lynch's belief that the freeze applied to all Plan assets rather than just Sherrod's Plan assets. Indeed, this Court in *Johnson v. Merrill Lynch*, 2012 WL 5989345, at *4 (N.D. Ill. Nov. 28, 2012) stated that "the Michigan court asserted its jurisdiction over the Plan assets and ordered a freeze of those assets, despite Plaintiff's efforts to make those assets distinct from Sherrod's other assets, such as by naming a new administrator to the Plan." Johnson had sued Merrill Lynch to unfreeze the Plan assets not belonging to Sherrod but this Court found that it did not have subject matter jurisdiction. On appeal, the Seventh Circuit upheld the dismissal. The Seventh Circuit noted that "although Merrill Lynch concedes that a

Plan participant has been injured, Johnson concedes that the Plan participant's injury is fairly traceable to a Michigan state court order, and not the defendant, Merrill Lynch." *Johnson*, 719 F.3d at 602. The Court further noted that "[a]lthough Merrill Lynch did not believe that it could exercise control over the Plan, the Wayne County Circuit Court believed that it could." *Id*. at 603. The Court explained that "[i]n spite of the fact that both the Plan administrator and Merrill Lynch viewed the Plan as an 'ERISA qualified pension account' not subject to garnishment, the Wayne County judge denied the administrator's motion to quash." *Id*. The opinion also recites that "Merrill Lynch is not responsible for the freeze on the Plan account; the Wayne County Circuit Court judge is responsible for the freeze." *Id*. And the Seventh Circuit also recognized that, "Sherrod urged the Wayne County judge to deny Merrill Lynch's motion until the Michigan Court of Appeals had reached a decision on Sherrod's January 2012 appeal." *Id*. Whether Merrill Lynch was correct about the freeze applying to all Plan assets, that is what occurred.

It was Sherrod's understanding that the freeze on Plan assets was on all Plan assets not just her assets. Sherrod's understanding was based upon her communications with Merrill Lynch. Sherrod contacted the Department of Labor ("DOL") to discuss this and the DOL advised Sherrod she needed a lawyer and emailed her a list of lawyers from the National Pension Lawyer Network. The DOL further advised Sherrod that as Plan "trustee she has an obligation to make sure her plan is operating properly and to protect as needed." SOF in Opposition, ¶ 1. On January 6, 2014, Johnson's lawyer informed American Contractors Indemnity Company ("ACIC") that the bond collateral that was posted by the Plan on November 10, 2011 should be returned to the Plan. Sherrod agreed that the collateral should be returned to the Plan. SOF in Opposition, ¶ 5. On February 3, 2017, ACIC informed the Plan's lawyer that it was holding the bond collateral.

7

SOF in Opposition, ¶ 8. Contrary to the Secretary's claims, all the facts do not indicate that the bond was a distribution to Sherrod and the money will going back to Sherrod.

**It is Not Undisputed that the Checks Directed to Sherrod from 2013 through 2017 Were Distributions of Benefits Rather than Reimbursement of Plan Expenses**

As an initial matter, Johnson objects to this Court granting the Secretary any relief against him for checks that were directed to Sherrod after August 4, 2014. First, as is discussed above, Johnson was Plan administrator only through August 4, 2014. Second, the Secretary's Complaint fails to state a claim against Johnson after 2014. Allegations that "are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* at 678, offers "'a formulaic recitation of the elements of a cause of action,'" *id.*, and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). While legal conclusions "can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

The Complaint did not state a claim against Johnson after 2014. It references Plan Form 5500s for 2012, 2013, and 2014. Complaint ¶ 19 (Docket #4). It references the payment of the bond collateral in 2011 and how it was incorrectly categorized in the Form 5500 for 2012. Complaint ¶¶ 16 & 17. It references Johnson's unsuccessful attempt to get the freeze lifted in 2012 and the stay being lifted in 2013. Complaint ¶ 18. It mentions Sherrod withdrawing $50,000 from the Plan in 2013. Complaint ¶ 21. It references withdrawals totaling $296,000 that were allegedly improperly accounted for in the Form 5500 for 2014. Complaint, ¶¶ 22-24. But it merely alleges in conclusory fashion that "[f]rom January 1, 2015 to the present, Defendant

8

Sherrod continues to withdraw funds from the Plan and Defendants Sherrod and Johnson fail to account for these distributions properly." Complaint ¶ 25.

The Secretary should have sought leave to amend his Complaint if he discovered facts during discovery which supported the bare conclusions in his Complaint regarding the years 2015 to the present. But he did not. And he cannot seek to amend his Complaint at this stage of the proceeding or proceed to seek summary judgment for those years over Johnson's objection. Federal Rule of Civil Procedure 15 provides that:

> [w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue . . . .

Fed R. Civ. P. 15(b)(2). Some courts have even applied Rule 15(b) to conform pleadings to the proof offered at summary judgment. *See Clomon v. Jackson*, 988 F.2d 1314, 1323 (2d Cir. 1993) ("[T]he undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to Fed. R. Civ. P. 15(b)."). But Rule 15(b) "permits amendment only when the unpleaded issues are [litigated] with the express or implied consent of the parties." *Silverstein v. Penguin Putnam, Inc*., 522 F. Supp. 2d 579, 604 (S.D.N.Y. 2007) (citing *Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd*., 780 F.2d 1082, 1089 (2d Cir. 1986) ("[T]he crucial test is whether the parties have consented to litigation of the issue.")). And Johnson does not consent to litigating issues beyond 2014.

The Secretary claims that there is no support for the assertion the funds paid to Sherrod in 2014 represented reasonable and necessary Plan expenses for 2011, 2012, and 2013. As support for this claim, the Secretary retreats to his flawed assertion that there was no freeze on Plan assets. As was previously discussed, neither Merrill Lynch, this Court nor the Seventh Circuit

9

agree with that assertion. Moreover, Sherrod contacted the Department of Labor ("DOL") to discuss the asset freeze and the DOL advised Sherrod she needed a lawyer and emailed her a list of lawyers from the National Pension Lawyer Network. The DOL further advised Sherrod that as Plan "trustee she has an obligation to make sure her plan is operating properly and to protect as needed." SOF in Opposition, ¶ 1. Johnson and Sherrod relied upon accountants, lawyers, and other professionals for preparing the Plan's Form 5500s and other advice. Sherrod specifically relied upon the advice of lawyers concerning using Plan assets to pay lawyers. SOF in Opposition, ¶ 3. Sherrod and Johnson provided the Secretary with significant documentation supporting reimbursements made to Sherrod for Plan expenses in the amount of $117,591.02 she personally paid from 2011 through 2013 while the Plan assets were frozen, including vendor invoices, money orders and checks. SOF in Opposition, ¶ 8. Without waiving his objection to this Court granting the Secretary any relief against him for checks that were directed to Sherrod after August 4, 2014, Sherrod and Johnson provided the Secretary with significant documentation supporting reimbursements made to Sherrod for Plan expenses she personally paid from 2015 through 2017, including vendor invoices, money orders and checks. SOF in Opposition, ¶¶ 9-11. The Secretary complains that the amounts Sherrod received from the Plan do not match up with any particular invoices. But Johnson has explained that they do not match because he and Sherrod had payment plans with vendors. SOF in Opposition, ¶ 12.

The Secretary has failed to demonstrate there is no genuine issue of material fact concerning his oversight of the Plan and reimbursements to Sherrod. The Secretary complains that Johnson kept no records. But Johnson testified that he had many documents related to the Plan and they were turned over to the Secretary during discovery. Response to SOF, ¶ 25. The

10

Secretary also accuses Johnson of using LJ Consulting to create a legal fiction and to violate the Plan. But the Secretary has not demonstrated that the Plan prohibited Johnson from assigning his position as Plan administrator to LJ Consulting. Response to SOF, ¶ 33. The Secretary accuses Johnson of abdicating his responsibilities as Plan administrator to Sherrod. But Johnson was involved in Plan distributions. Response to SOF, ¶ 41. Johnson also met with Sherrod regularly to discuss the Plan's bills and to try to keep expenses to a minimum. Response to SOF, ¶ 75. The Secretary also accuses Johnson of not reviewing the Plan's Form 5500s. But Johnson's tesdtimony when asked about that issue was that he did not review them in detail because he relied upon the accuracy of the work performed by the Plan's actuary who prepared the forms. Response to SOF, ¶ 42.

## Conclusion

These allegations are preposterous and lacking credulity that Defendants, particularly Sherrod who has absolute dependability on the Plan (and which took Sherrod over 40 years to independently create) as her sole means of support. At issue is why these Defendants were never considered worthy of an opportunity for voluntary compliance which is liberally forthcoming and offered by the Secretary in instances of demonstrable harm and loss which does not exist in this case. Steadfast investing and defense of the Plan have resulted in gains that we pray will not be taken away from Defendants and participants whose stated mission is to afford them protection, especially in their advanced senior years. Defendant Sherrod who has suffered greatly faces an unsustainable future. We pray for rejection of the Secretary's harsh and heartless demands.

11

Respectfully submitted,

Leroy Johnson

/s/ Leroy Johnson

Leroy Johnson, Pro Se
1146 S. Waukegan Rd. #278
Waukegan, IL 60085
Tel. 810.394.5415

**<u>CERTIFICATE OF SERVICE</u>**

Leroy Johnson certifies that a copy of the foregoing document was served upon all of those set up to receive service by the Court's CM-ECF System on November 9, 2020.


Leroy Johnson

13

EXHIBIT INDEX

1- DOL NOTE RE SEEK COUNSEL
2- DOC S DEP
3- 2008-PLAN MANUAL
4- 4A-4E-2016 PLAN MANUAL
5- PLAN AMENDMENT RE EXPENSES
6- DOL NOTE TO SEND ON LAWYERS NAMES
7- DOC J DEP
8- ATTY PHONE EMAIL CONVERSATIONS RE BOND/CRED EXAM
9- BARTOLIC LETTERS TO MERRILL
10- TRANSCRIPT PASQ W GILLIS RE LACK OF JURISDICTION
11- CONGER BRIEF RESPONSE W GRIER
12- CONGER BILLS
13- UNCASHED CHECKS
14- REARDON RE ADDIT DOC PRODUCTION FOR DOC J
15- NOTE TO DOC J RE BOND RETURN
16- REARDON DOCS RE ESCHEAT
17- BOND WHEREABOUT LETTER
18- MORAD PASQ RE AFFIDAVIT
19- PASQ RE PLAN PARTICIPANTS ENTRY
20- 7TH DIST COA RE NOT ERISA CASE
21- JOHNS INTERROG
22- y2011-2014
23- y2015
24- y2016
25- y2017
26 - Sherrod - Interrogatories

EXHIBIT 1

EXH 1



U.S. Department of Labor

Employee Benefits Security Administration

Generated by: BRUBAKE, KARL J

Report Date: 04/08/2015 02:24:39 PM

Visitor
201243-15151
CIN
Closed
05/14/2012

03/12/2012
03/13/2012
PARKER, LINDA M

[52-012288]

Participant/Beneficiary
O

No
No

No

Shirley
Sherrod

P.O. Box 515

SOUTHFIELD          State:    Michigan                          Zip Code:      48037

(313) 715-6606                                              Mobile

**E-Mail Addresses**
sshe464538@aol.com

Benefit Distributions            03/12/2012

03/12/2012

| | | | |
|---|---|---|---|
| In-person | Yes | 03/12/2012 | |
| Telephone | No | 03/26/2012 | with pa |
| Telephone | No | 03/27/2012 | SBA |
| Reassigned | No | 04/06/2012 | to SBA |
| Telephone | No | 04/12/2012 | |
| Telephone | No | 04/12/2012 | to R. Morad |
| E-Mail | No | 04/12/2012 | |
| Telephone | No | 04/16/2012 | from R. Morad |

individual benefit dispute and that pa should seek legal counsel if she wants to pursue the matter. afh advised that sba not in today and she will probably let afh know her final decision sometime this week and afh will then call her (the pa).

03/27/2012 11:24:27 AM email from patty arroyo that dr. sherrod has called again. jb advised that if dr calls again, front desk should route her to jean.

03/27/2012 01:23:33 PM SBA spoke with P who wanted to know what EBSA was going to do about her situation. SBA advised P that she had reviewed the letter her attorney wrote, as well as the court order, and it was her initial opinion that P needed to seek legal counsel. SBA also advised P that she asked the enforcement side of the office to look at her documents, since the Benefits Advisors informally resolve disputes and they agree. P advised SBA that she does not have the money to hire an attorney, and three attorneys have told her that this is a violation of ERISA that EBSA needs to investigate. SBA advised P that Merrill Lynch has interpreted a court order as preventing them for making distributions, and the only way that will get cleared up is through the court system. SBA offered to send P the list of lawyers from the National Pension Lawyer Network, and P asked if it could be emailed to her. P gave SBA her email address.

████████████████████████████████████████████████████████████ Merrill Lynch filed a Motion for Interpleader, which the court denied, and P has filed an appeal and had to post bond. Everything is stayed pending the outcome of P's appeal.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

04/02/2012 01:34:32 PM D. Lovendale received 170 pages electronically from Merrill Lynch's attorneys and forwarded them to SBA. The documents are attached to the inquiry. SBA reviewed the documents and it appears that the parties are willing to drop the attempted garnishment of the Plan if P will provide proof that the plan is an ERISA covered plan. P has not complied with the requests for documents, which is why the judge ultimately denied Merrill Lynch's motion for Interpleader.

04/12/2012 11:43:30 AM JB called Robert Morad, Merrill Lynch's attorney, regarding documents sent to D. Lovendale and left message requesting return call. JB called P and she claims that she had the "manual" and the Form 5500. JB clarified that when P says "manual" she means the plan document. According to P, the plaintiff does not care whether it is an ERISA covered plan or not, he just wants money. P claims that Merrill Lynch has had the plan for 30 years. P has the largest balance in the plan but there are 18 participants in the plan with account balances. P says that plan was updated in 2008, she believes. P is resistant to providing any information that might pertain to account balances or other participants. P is going to email some documents to JB.

04/12/2012 02:08:02 PM JB spoke with Mr. Morad about the court proceedings tomorrow. Merrill Lynch has a motion in the Michigan court asking the judge to release the freeze on the plan. P intends to object to the motion on the grounds that the court does not have jurisdiction over the plan. Mr. Morad had gotten the plaintiff to agree to stipulate to releasing their garnishment and allowing the court to release the freeze and P refused to go along with that as well. Mr. Morad also advised JB that P filed a federal lawsuit against Merrill Lynch in the Northern District of Illinois on 4/6/2012. Mr. Morad agreed to call JB tomorrow to let her know what happens in state court. He also indicated that P's Chicago lawyer had indicated that he was going to withdraw the federal lawsuit.

04/12/2012 02:11:54 PM JB received email from P with nine items attached. P called JB and she confirmed receipt of the email.

4/16/2012 JB retrieved vm msg from Mr. Morad advising that the judge denied Merrill Lynch's motion to release the freeze on the plan because P's lawyer objected to the court's jurisdiction, among other things. Mr. Morad believes that the judge would have granted the motion but for P's objections. Mr. Morad would like to discuss what Merrill Lynch should do next with the DOL.

04/17/2012 09:30:13 AM JB attached P's email with its attachments to the record.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

04/17/2012 05:05:19 PM JB called Mr. Morad and asked him about the proceedings on Friday. Mr. Morad indicated that the motion was included in the 170 pages he previously provided, but he agreed to send it separately by email to JB. JB gave him her direct email address. Mr. Morad sent an email to JB with the motion attached. He also sent a second email containing the proposed order that the plaintiff was willing to agree to and which Dr. Sherrod refused to sign. Mr. Morad explained to JB that the money for the appeal bond was taken out of the plan's assets and is no longer part of the account. Mr. Morad feels that the judge should have released the garnishment at that point because the plaintiff's judgment is protected by the appeal bond. Mr. Morad also indicated that P wants the plaintiff to drop their underlying judgment before she will agree to any of their proposals, which they are not willing to do. JB attached the motion from Mr. Morad and the email with the proposed order to the record.

04/18/2012 08:33:14 AM JB retrieved email from Mr. Morad advising that he sent the wrong proposed order regarding P. The email had another proposed order attached. JB attached email and new order to the record.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

05/10/2012 04:22:42 PM ████████████████████████ JB called P and advised her that the Chicago inquiry was going to be closed and that D. Lovendale would be her contact from now on regarding the issue of the freezing of the

# Exhibit 1

Page 3 of 5

03/28/2012 04:34:20 PM spoke with Attorney Morad and Attorney Clarence Poser. The are the attorney's representing Merrill Lynch. We apparently have a state/county judge that doesn't understand ERISA. (Judge Gillis) They (attorneys) did file an interpleader motion with County/State Judge and the motion was denied. The judge ordered Merrill Lynch to dispurse funds from the pension plan to the plaintiff - under the garnishment order. The participant/owner/doctor/plan administrator (Shirley Sherrod) filed an appeal of the order to dispurse pension funds in state appeals court - matter is pending. They-Merrill Lynch continue to keep plan assets frozen. They would love to have these funds removed. They would be please to talk with DOL and provide copies of documents from their files. There was no thought or action to remove this to Federal Court. Merrill Lynch has been trying to work informally with the parties in the law suit to get the judge to drop the order...but that has not happened as yet. Told them I would address this situation with my CRO....and pass on the contact information to use as needed. They stated the garnishment amount is just under $200,000.

Note to file - copy of garnishment order is attached to the CRO TAIS.

03/29/2012

03/29/2012

03/29/2012 05:26:59 PM spoke with Rob be to e-mail same (sent my e-mail for response)

03/29/2012 05:29:43 PM spoke with Shirley - updated on calls.

4.2.12 rec. e-mail from atty Morad - attached. (forwarded to SBA - Chicago)

04/12/2012 spoke with Dr. S....told her docs sent to CRO and SBA reviewed - they intend to contact the attorney's to see what documents the court/plaintiff's counsel needs in order to understand this is an ERISA plan. Dr. S said there is a hearing tomorrow about the interpleader again - and merrill lynch wants to turn over the funds to the county court - which she doesn't want to happen.

04/12/2012 sent e-mail to SBA about the hearing tomorrow.

Discussed w/SBA that Merrill Lynch said that defendant (Dr. Sherrod) was represented by counsel and that her counsel object to the unfreezing of the accounts at the 4/13/2012 hearing.

04/17/2012 Dr. Sherrod called 2 times to discuss the hearing on last Friday. First - I asked if she is represented by counsel and she said no - I said that did not comport with comments from Merrill Lynch's attorney - she said that she did have attorney but "just for the day" a friend doing a favor. Told her that it seems her attorney argued to not have the freeze relinquished on her account —this didn't make sense....she stated that there were conditions to the release that she was not willing to accept. Wanted to know what the department was going to do about this clear violation of the law...asked if we would open an investigation....told her that typically we would open an investigation on a plan and that would mean her as trustee....and that didn't seem appropriate at this time...she agreed. Told her that as trustee she has an obligation to make sure her plan is operating properly and to protect as needed....she stated that she was going to get a copy of the transcript of the motion hearing so we could see what is going on....she will get that certified and it will take about a week. Told her that I would be speaking with CRO-SBA later today and we would see what we could do to assist....she can try to reach me tomorrow.

04/23/2012 11:07:11 AM spoke to Dr. Sherrod - still has not gotten the transcript....told her we would talk with our legal unit to see if there is anything that we can do to assist further.

05/01/2012 Dr. S called to let me know that she still has not received the transcript.

05/17/2012 12:32:31 PM spoke w/ Dr. S....she has the transcripts now and will e-mail them to me.

06/21/2012 12:59:23 PM

on 5/21/2092 -

08/07/2012 received a call from Shirley Sherrod....wanted to know what we were doing....said I'd get back with her.                    08/09/2012 spoke with Shirley Sherrod and told you can expect to hear from Detroit District office w/in 2 weeks...she indicated that she is presently residing in Chicago and that the address on the 5500 is no longer good for contact her. gave me 2631 South Indiana Apt 1911, Chicago, IL 60616 for her home address.



Name:           2012040200075.pdf
Box Number:     e-mail 4.2.2012      Document Number: e-mail        Last Modified: 04/02/2012 02:00:17 PM EDT
                attorney Morad                        4.2.2012
                (represents                           attorney
                Merrill Lyncy)                         Morad



EXHIBIT

DOL003656
3/8/2017

# Exhibit 1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **THOMAS E. PEREZ**, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff<br><br>v.<br><br>**SHIRLEY T. SHERROD**, *et al.*,<br><br>Defendants. | Civil Action No. 1:16-cv-04825-MIS |

## DECLARATION OF DR. SHIRLEY T. SHERROD

Pursuant to section 1746 of Title 28 of the United States Code, I, DR. SHIRLEY T. SHERROD, declare as follows:

1.     I am over eighteen years of age, have never been convicted of a crime and I am fully competent to make this declaration.  I have personal knowledge of the facts stated herein and they are all true and correct.

2.     In February 2012, I sought the Department of Labor's ("Department") assistance with unfreezing my account in the Shirley T. Sherrod, M.D., P.C. Target Benefit Pension Plan ("Plan").

3.     I believed that I was acting in the best interests of the Plan in seeking the Department's assistance with unfreezing my Plan account.

4.     The freeze of my Plan account harmed all Plan participants because it prevented the purchase and sale of Plan investments.  The Plan assets could not be invested optimally while my Plan account was frozen.

5.     The Department has done nothing to help unfreeze my Plan account.

6.      On behalf of the Plan, I retained service providers to assist me in carrying out my fiduciary duties to the Plan.

7.      In 2012, the Plan's two key service providers were its actuary, Jeffrey Sinclair, and its attorney, Edwin Conger.

8.      Mr. Sinclair, as the Plan's actuary, prepared required Plan reports, including Form 5500s and participant allocation reports.  Mr. Sinclair provided copies of those reports to me and to Mr. Conger for our review.

9.      Mr. Sinclair functioned as the primary custodian of the Plan's records.

10.      Mr. Sinclair assisted me in responding to requests for information the Department issued during its investigation of the Plan.

11.      Mr. Conger provided counsel regarding the unfreezing of my Plan account.

12.      Mr. Conger took the lead on communicating with the Department to solicit its assistance with unfreezing my Plan account.

13.      On or about August 26, I discovered email communications from me to the Department dated 2012 in an older email account.  I located the attachments to those emails on or about October 6.

14.      After Mr. Sinclair died, I sought to obtain Plan records that had been in his possession by calling his office number and contacting his widow.  I was unable to obtain any Plan records from either of those sources.

15.      I searched for communications from Mr. Conger to myself.  I located one email communication.

16.      I believe that virtually all of Mr. Conger's communications with me, with Mr. Johnson, and with the Department were telephonic.

2

17.     I do not have in my possession any notes from any telephonic conversations that involved Mr. Conger.

18.     On October 26, in response to a request from my counsel in the above-captioned case, we received a copy of the Plan's client file from Mr. Conger's firm, Tenney & Bentley, LLC.

19.     In 2011 and 2012, due to the Plan freeze, I paid Plan service providers from my own personal assets.

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 30th day of December, 2016.

s/ _____
Dr. Shirley T. Sherrod

EXHIBIT 2

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   R. ALEXANDER ACOSTA,            )
 5   Secretary of Labor, United     )
 6   States Department of Labor,    )
 7         Plaintiff,               )
 8      -vs-                        ) Case No:
 9   SHIRLEY T. SHERROD; LEROY      ) 1:16-cv-04825
10   JOHNSON; and SHIRLEY T.        )
11   SHERROD, M.D., P.C. TARGET     )
12   PENSION PLAN,                  )
13         Defendants.             )
14        The deposition of SHIRLEY T. SHERROD, called
15   for examination, taken pursuant to the Federal
16   Rules of Civil Procedure of the United States
17   District Courts pertaining to the taking of
18   depositions, taken before ALICE M. SCHWINGER, CSR
19   NO. 84-2913, a Notary Public within and for the
20   County of DuPage, State of Illinois, and a
21   Certified Shorthand Reporter of said state, at
22   Suite 844, 230 South Dearborn Street, Chicago,
23   Illinois, on the 2nd day of May, A.D. 2018,
24   commencing at 9:05 a.m.
```

**Page 2**

```
 1   PRESENT:
 2        UNITED STATES DEPARTMENT OF LABOR,
 3        OFFICE OF THE SOLICITOR,
 4        (230 South Dearborn Street, Room 844,
 5        Chicago, Illinois 60604,
 6        312/353-3271), by:
 7        MR. BRUCE C. CANETTI,
 8           appeared on behalf of the Plaintiff;
 9
10        OLIVER CLOSE, LLC,
11        (124 North Water Street,
12        Suite 300 Waterside Center,
13        Rockford, Illinois 61107-3974,
14        815/963-0009), by:
15        MR. JOHN REARDEN, JR.,
16           appeared on behalf of the Defendants.
17
18   ALSO PRESENT:  Scott C. Stieritz, Auditor
19
20
21
22
23   REPORTED BY:  ALICE M. SCHWINGER, CSR
24              CSR No. 84-2913.
```

**Page 3**

1  (WHEREUPON, the witness was duly
2  sworn.)
3  SHIRLEY T. SHERROD,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6  EXAMINATION
7  BY MR. CANETTI:
8  Q.  Good morning.  Would you state and spell
9  your name for the record, please.
10  A.  Shirley T. Sherrod.  Last name is
11  spelled S-h-e-r-r-o-d.
12  Q.  All right.  And you're represented by
13  counsel today; correct?
14  A.  Correct.
15  MR. CANETTI:  This deposition is being taken
16  pursuant to the Federal Rules of Civil Procedure 30
17  regarding allegations of ERISA violations with
18  respect to the Shirley T. Sherrod, M.D., P.C.
19  Target Pension Plan.  I'll refer to that as "the
20  plan" throughout our deposition.
21  And this is the matter of the case
22  Acosta V. Sherrod, et al., 1:16-CV-04825, in the
23  Northern District of Illinois.
24  My name is Bruce Canetti.  I'm a senior

**Page 4**

1  trial attorney for the plaintiff.  And with me is
2  Scott Stieritz.  He's an auditor for the Employee
3  Benefits Security Administration.
4  BY MR. CANETTI:
5  Q.  Have you been deposed before,
6  Ms. Sherrod?
7  A.  Yes.
8  Q.  And just to go over again how these
9  work.  The court reporter is writing down what you
10  and I both say, so we want to make sure we have
11  oral answers.  You can't do shakes of the head or
12  "uh-uh."  We've got to make sure we don't speak
13  over each other, so you've got to let me finish my
14  question and I want to make sure you finish your
15  answer before I start speaking.  It's kind of human
16  nature.  You kind of know sometimes where I'm going
17  with my question and you want to answer it, but
18  we've got to make sure we let each other finish our
19  sentences.
20  I want to make sure you understand my
21  questions.  So if you don't understand something,
22  please let me know.
23  This is your deposition, so do not look
24  to anybody else to answer your questions.  You



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD                  5—8

Page 5

1  answer them yourself.  If you do need to clarify or
2  add something to an earlier answer, just let us
3  know and you're able to do so.  We will take breaks
4  during the day, and if you need a break, let us
5  know.  The only thing is if we are -- I have a
6  pending question or in the line of questioning, I
7  want to finish that before we go on any breaks.
8      I do want to remind you that you are
9  under oath and subject to prosecution for perjury.
10     Currently, are you taking any
11 medications?
12     A.  Specifically, what do you mean?
13     Q.  Are you taking any medications?
14     MR. REARDEN:  I'm going to object to that.  If
15 you want to ask her if she's taking any medications
16 that could affect her ability to testify, I
17 wouldn't object to that.
18 BY MR. CANETTI:
19     Q.  Are you taking any medications?
20     A.  Nothing that would affect my ability to
21 testify.
22     Q.  Are you under the influence of any other
23 drugs or any other mental state that would impair
24 your ability to answer my questions truthfully and

Page 6

1  accurately?
2      A.  No.
3      Q.  We'll be referring to ERISA throughout
4  this deposition, and I'm -- with ERISA, I'm
5  referring to the Employee Retirement Income
6  Security Act.
7      Now, did you do anything to prepare for
8  this deposition today?
9      A.  When you say "anything," what do you
10 mean?  I don't understand.  Clarify that.
11     Q.  Did you do anything to prepare for this
12 deposition?
13     A.  I don't know the answer to that.  You
14 have to define "anything."
15     Q.  Did you review any documents --
16     A.  I mean, I came here.  I don't know what
17 you mean specifically.
18     Q.  Did you review any documents before this
19 deposition?
20     A.  I have periodically reviewed documents.
21     Q.  Did you review anything for this
22 deposition?
23     A.  I don't know that there was anything for
24 the deposition.  I don't know the answer to that.

Page 7

1      Q.  Did you speak with anyone about what
2  would transpire at this deposition today?
3      A.  My attorney.
4      Q.  And was anybody else present when you
5  spoke with your attorney?
6      A.  I believe so.
7      Q.  And who was that?
8      A.  I believe the other party involved.
9      Q.  Who is that?
10     A.  That would be from L. J. Consultants'
11 office.
12     Q.  So you're referring to Leroy Johnson?
13     A.  Yes.
14     Q.  Was anybody present at that time when
15 you met with your attorney besides yourself and
16 Mr. Johnson?
17     A.  I don't recall if there was.
18     Q.  Did you have any meetings with just
19 Mr. Johnson to prepare for this deposition?
20     A.  I don't recall.
21     Q.  Is there anything that would help you
22 recall that?
23     A.  No.
24     Q.  Did you take any notes of any meetings

Page 8

1  you had with your attorney or Mr. Johnson?
2      A.  I don't recall.
3      Q.  Now, is there anybody else you met with
4  to prepare for your deposition besides your
5  attorney and Mr. Johnson?
6      A.  I don't recall.
7      Q.  Is there anything that would help you to
8  recall that?
9      A.  No.
10     Q.  Now, you said you have been deposed
11 before; correct?
12     A.  Yes.
13     Q.  How many times have you been deposed?
14     A.  I don't know the answer to that.
15     Q.  So you've been deposed, though, at least
16 one other time?
17     A.  I would say at least once.
18     Q.  And in what proceeding was that?
19     A.  I don't recall.
20     Q.  You don't know -- you've only been
21 deposed one time.  You don't know when it was or
22 what it was?
23     A.  I don't recall the answer to that.
24     Q.  Do you know what the -- what the content



Page 9

1  was of the proceeding or what the proceeding
2  involved?
3      A.   I don't recall.
4      Q.   Did you bring any documents with you
5  today?
6      A.   What documents specifically?
7      Q.   Any documents related to this
8  litigation.
9      A.   No.
10     Q.   Where do you currently reside?
11     A.   Illinois.
12     Q.   And what's your address?
13     A.   2631 South Indiana.
14     Q.   Can you give the full address, please.
15     A.   That's it.
16     Q.   What city is that in?
17     A.   Chicago.
18     Q.   And what's the ZIP code?
19     A.   60616.
20     Q.   Are you married?
21     A.   No.
22     Q.   Do you have children?
23     A.   No.
24     Q.   What's the highest level of education

Page 10

1  you've received?
2      A.   Medical doctorate.
3      Q.   And where did you get a medical
4  doctorate from?
5      A.   Wayne State University.
6      Q.   And when was that?
7      A.   1973.
8      Q.   Are you currently employed?
9      A.   By -- you mean employed or
10 self-employed?
11     Q.   Are you currently -- is there somebody
12 that's employing you right now?
13     A.   No.
14     Q.   Do you currently have any income from
15 any type of job?
16     A.   No.
17     Q.   And what was the last place that you did
18 work at?
19     A.   Well, I was self-employed.
20     Q.   You were self-employed?
21     A.   Right.
22     Q.   When was that?
23     A.   I remain self-employed.
24     Q.   What do you do?

Page 11

1      A.   Occasionally consultations.
2      Q.   Consultations about what?
3      A.   Ophthalmology.
4      Q.   Do you currently have any contracts
5  regarding the consultations?
6      A.   No.
7      Q.   Have you ever had any official contracts
8  related to those consultations?
9      A.   Over the period of 40 years, I'm sure,
10 but I don't recall them.
11     Q.   When did you first start becoming
12 self-employed?
13     A.   1977.
14     Q.   At some point you had a business called
15 Shirley Sherrod, M.D., P.C.?
16     A.   Yes.
17     Q.   And what was your title and job duties
18 with Shirley Sherrod, M.D., P.C.?
19     A.   Physician.
20     Q.   What type of physician?
21     A.   Ophthalmologist.
22     Q.   Were you also in charge of running the
23 Shirley Sherrod, M.D., P.C., business?
24     A.   Clarify that, please, when you say

Page 12

1  "running."
2      Q.   Did somebody else run that company?
3      A.   Well, I guess it's really not clear to
4  me what you're asking, but I was the owner.
5      Q.   Did you make all the day-to-day
6  decisions on running the business?
7      A.   No.
8      Q.   Who else helped in the decisionmaking?
9      A.   Well, generally, one would have office
10 managers and other professionals to consult with.
11     Q.   So you consulted with an office manager?
12     A.   Yes.
13     Q.   Was there any other employees of that
14 company that you consulted with in making
15 day-to-day decisions?
16     A.   No.
17     Q.   And Sherrod M.D., P.C., no longer had
18 any employees as of December 31, 2008; is that
19 right?
20     A.   No.
21     Q.   When was the last time Sherrod M.D.,
22 P.C., had employees?
23     A.   It still does.
24     Q.   Who are the employees of Sherrod, M.D.,

Page 13

1  P.C.?

2  A.  Myself.

3  Q.  Was December 31, 2008, the last time

4  there were any employees besides yourself employed

5  by Sherrod, M.D., P.C.?

6  A.  I can't recall exactly.

7  Q.  Is there something that would help you

8  recall that?

9  A.  No.

10  Q.  Do you still file tax documents on

11  behalf of Sherrod, M.D., P.C.?

12  MR. REARDEN:  I'm going to object on the basis

13  of vagueness when you say "you."

14  BY MR. CANETTI:

15  Q.  Go ahead and answer.

16  A.  Please repeat the question.

17  Q.  Do you or somebody else file tax

18  documents on behalf of Sherrod, M.D., P.C.?

19  A.  Yes.

20  Q.  When was the last year that that was

21  done?

22  A.  I believe it was last year.

23  Q.  Are you referring to 2017 or 2016?

24  A.  Well, it would have occurred in 2017.

Page 14

1  That was the last year.

2  Q.  So you're saying you filed in 2017 for

3  the 2016 tax year?

4  A.  Likely that was the way it was done.

5  Q.  So you haven't filed any taxes in 2018

6  for 2017 for Sherrod, M.D., P.C.; correct?

7  A.  Correct.

8  Q.  Now, with respect to this plan, the

9  Sherrod, M.D., P.C., Target Pension Plan, you

10  stated that you were a fiduciary to that plan; is

11  that right?

12  A.  Yes.

13  Q.  And what are your duties as a fiduciary

14  to the plan?

15  MR. REARDEN:  Objection.  Calls for a legal

16  conclusion.

17  BY MR. CANETTI:

18  Q.  Go ahead and answer it.

19  A.  So I don't feel that I'm qualified to

20  answer that.  There is a description that's in the

21  manual.  I would ask you to refer to that, please.

22  Q.  So describe to me what you do on a

23  day-to-day basis as the fiduciary.

24  A.  Again, I would ask you to refer to the

Page 15

1  manual and for the description there.

2  Q.  That has a general description, but I'm

3  asking specifically what you do in your role as a

4  fiduciary to the plan?

5  A.  I would have to follow the manual.

6  Q.  So there isn't anything you actually do?

7  Is that your testimony?

8  A.  No, that's not my testimony.

9  MR. REARDEN:  Objection.  Misstates the

10  testimony.

11  BY MR. CANETTI:

12  Q.  Well, let's talk about 2017.

13  Last year, what, if anything, did you do

14  specifically as a fiduciary to the plan?

15  A.  I would, again, refer you to the manual.

16  Q.  So as you sit here today, you can't

17  think of anything specific that you did?

18  A.  You didn't ask anything specific.

19  Q.  I did.  I said tell me something

20  specific that you did.  That's precisely what I

21  said.

22  A.  Well, then I perhaps didn't understand,

23  and I would again refer you to the manual.

24  Q.  Is there any one thing you can tell me

Page 16

1  you did in 2017 for this plan?

2  A.  I would use the manual as a guideline

3  and speak from there.

4  Q.  So what is an example of something

5  you've done in 2017?

6  A.  The manual is not in front of me at the

7  moment.

8  Q.  So you're unable to answer -- you can't

9  think of anything specifically on your own as

10  something you could do without a manual in front of you?

11  A.  That is the operating document and that

12  is what I use.

13  Q.  Okay.  Does anybody else do any work for

14  this plan?

15  A.  Whomever -- whatever the cast may call

16  for, then that's who else would do whatever it is

17  you're referring to.

18  Q.  In 2017, did anybody else besides

19  yourself do any work for the plan?

20  A.  Would you specify "work"?

21  Q.  Did anybody do anything related to the

22  plan?

23  A.  Yes.

24  Q.  Who was that?



Page 17

1    A.   That would involve -- well, obviously,
2 attorneys, accountants, actuaries, and there is an
3 administrator.
4    Q.   Who are the attorneys that did work for
5 the plan in 2017?
6    A.   I believe that you'd have the names of
7 them, but I believe that was the Groom firm and
8 Mr. Kofoed.
9    Q.   And the work that Groom -- the law firm
10 called Groom and Russell Kofoed did, was that
11 related solely to this litigation?
12   A.   I can't recall exactly.
13   Q.   Is there anything that would help you
14 recall?
15   A.   No.
16   Q.   Can you think of anything, as you sit
17 here today, of something they did that was not
18 related to this litigation?
19   A.   No, I cannot give you an answer to that.
20   Q.   Why not?
21   A.   I can't recall.
22   Q.   And there's nothing that would help you
23 recall; correct?
24   A.   No.

Page 18

1    Q.   And you said that some accountants did
2 work for the plan.  Who was that?
3    A.   I believe the firm is Reed-Ramsey.
4    Q.   And where is Reed-Ramsey located?
5    A.   I don't have the address at the moment.
6    Q.   Do you know what city they're located
7 in?
8    A.   I'd have to guess.  I won't guess.  I'm
9 not sure.
10   Q.   Do you know what state they're located
11 in?
12   A.   Illinois.
13   Q.   Are they in the Chicago area?
14   A.   I'm not sure.
15   Q.   Who do you work with at Reed-Ramsey?
16   A.   I don't recall the person right now.
17   Q.   How long has the plan had work with --
18 how long has Reed-Ramsey done work for the plan?
19   A.   I can't recall exactly.
20   Q.   Is there anything that would help you
21 recall that?
22   A.   No.
23   Q.   And you said there was an actuary that
24 did work for the plan in 2017; correct?

Page 19

1    A.   That would be the actuary.
2    Q.   Reed-Ramsey is the accountant and the
3 actuary?
4    A.   Yes.
5    Q.   And then you said there was an
6 administrator.  Who was that?
7    A.   And that would be L. J. Consultants.
8    Q.   And Leroy Johnson works at L. J.
9 Consultants?
10   A.   Yes.
11   Q.   Is he the only employee there?
12   A.   I don't know the answer to that.
13   Q.   And so what work does the administrator
14 do for the plan?
15   A.   You would have to talk to the
16 administrator on that for specifics.
17   Q.   So you personally don't know what the
18 administrator does?
19   A.   I know that the administrator follows
20 the manual.
21   Q.   So he follows the manual, but you don't
22 have any specific description of the work he does?
23   A.   You should consult with the
24 administrator on that.

Page 20

1    Q.   I'm just trying to understand what you
2 think the administrator does.
3    A.   I think that they follow the rules in
4 the manual.
5    Q.   Has anyone given you any advice to help
6 you do your work as a trustee for the plan?
7    A.   I can't recall.
8    Q.   Is there anything that would help you
9 recall that?
10   A.   No.
11   Q.   Do you as trustee of the plan
12 communicate with the participants at all?
13   A.   I can't recall when I -- I may have, but
14 I can't recall when.
15   Q.   Do you recall how often you've
16 communicated with the participants?
17   A.   I can't recall when.  I can't recall.
18   Q.   Is there anything that would help you
19 recall that?
20   A.   No.
21   Q.   Have you ever sent any letters to any
22 participants?
23   A.   Yes, I think so.
24   Q.   What year was that?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
21–24

Page 21

1    A.   I don't know at this moment.  I can't
2  recall.
3    Q.   Do you have any copies of those letters
4  anymore?
5    A.   I don't know the answer to that.
6    Q.   Who would know the answer to that?
7    A.   I don't know.
8    Q.   So as you sit here today, you don't --
9  you don't know if you have any copies of any
10  letters sent to any participants in your
11  possession; correct?
12    A.   Repeat that, please.
13    Q.   As you sit here today, you don't know if
14  you have any copies of any letters sent to any of
15  the participants; correct?
16    A.   I don't know the answer to that, no.  I
17  don't recall.
18    Q.   Now, you referred to a manual.  Is that
19  something your attorneys identified as the plan
20  document in the discovery responses we received?
21    A.   Repeat that, please.
22    MR. CANETTI:  Can you read the question back?
23      (WHEREUPON, the record was read
24        as requested.)

Page 22

1  BY THE WITNESS:
2    A.   I guess so.  I don't know what you
3  received.
4  BY MR. CANETTI:
5    Q.   Did you review any of the responses that
6  your attorneys sent to us during discovery?
7    A.   Did -- repeat that, I guess.
8    MR. CANETTI:  Can you repeat that back,
9  please.
10      (WHEREUPON, the record was read
11        as requested.)
12  BY THE WITNESS:
13    A.   I can't recall whether I did or not.
14  BY MR. CANETTI:
15    Q.   Did you recall specifically reviewing
16  interrogatory responses and attesting to the
17  factual accuracy of the statements therein?
18    A.   At some point, I believe so.
19    Q.   And do you recall in those -- in those
20  factual statements and those responses that you
21  identified a plan document in there?
22    A.   I guess your question confuses me.  I'm
23  sorry.
24    Q.   In those responses that you said you

Page 23

1  recall verifying the factual accuracy of, do you
2  recall just stating that?
3    A.   Do I --
4    Q.   You said you reviewed those responses to
5  interrogatories and attested to the factual
6  accuracy of them; correct?
7    A.   I'm just repeating after you.  I'm
8  trying to understand just a little bit.
9      But go ahead.  Say that again.
10    Q.   In those documents, those responses did
11  identify a plan document.  Do you recall that?
12    A.   Well, I don't have that in front of me.
13  I would -- perhaps they did, but I can't verify
14  what you're saying.  I don't have the document.
15      (WHEREUPON, a certain document was
16        marked Sherrod Deposition Exhibit
17        No. 1, for identification, as of
18        May 2, 2018.)
19  BY MR. CANETTI:
20    Q.   This is a lengthy document that's marked
21  Sherrod 0000001, and it goes all the way to Sherrod
22  0000071.
23      Is this the -- a copy of the manual that
24  you were referring to?

Page 24

1    A.   I'm not so sure.
2    Q.   How often do you refer to the document
3  referred to as the manual?
4    A.   There was more than one manual, and I
5  think that you had been given copies of more than
6  one, so...
7    Q.   So what one do you refer to?
8    A.   Well, as you proceed, I guess I'll try
9  my best to answer, but I -- you put everything in
10  one document here.  There was more than one.  And
11  to say this was it, I can't say that, actually,
12  because you were told that there was more than one.
13  There is another one.
14    Q.   When was the last time there were
15  changes done to the manual?
16    A.   I don't recall at the moment.
17    Q.   You don't recall if it was January 1,
18  2009?
19    A.   No.
20    Q.   And so what document do you have in your
21  possession that you referred to as the manual?
22    A.   I know that there was another one prior
23  to this that you have because I saw it in your
24  notes.  It was in your possession.  You had a lot



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
25–28

Page 25

1 of redactions on your pages, so maybe it's been
2 redacted out. But I'm concerned that there's
3 another document that maybe it's not being
4 represented here.
5     Q. I'm asking you what you referred to.
6 You said you consult the manual when you make your
7 decisions; correct? What manual do you refer to?
8     A. Well, it may have been this one, but
9 there's another one.
10     Q. And do you know if you provided us this
11 other one that you're talking about?
12     A. I'm certain of it. I believe that I saw
13 it in your notes, your productions.
14     Q. So over the years you referred to a
15 manual to know what you need to do with respect to
16 this plan; correct?
17     A. That's the operating document.
18     Q. And is there only one version of it, or
19 you're saying you consult multiple versions of it
20 when you look to see what your duties are?
21     A. Well, the manuals are updated
22 periodically, and at any given time that's what one
23 would consult.
24     Q. And so which one do you consult with

Page 26

1 currently?
2     A. Currently? It -- well, it depends on
3 what the issue is, I guess.
4     Q. So do you have more than one manual that
5 you're referring to?
6     A. I just told you there's another one.
7     Q. I'm talking about what you currently
8 refer to. Do you currently have a different -- do
9 you have one manual you refer to currently or more
10 than one?
11     A. There's more than one.
12     Q. And why is there more than one?
13     A. Well, one has to update them
14 periodically.
15     Q. The one you referred to in 2017, was
16 there just one that you referred to in 2017 or
17 multiple ones?
18     A. There may have been multiple. I don't
19 recall at the moment.
20     Q. To the extent you have multiple versions
21 of this, is it your representation that you
22 provided all those versions to us in discovery?
23     A. To the best of my knowledge, because
24 I've seen it in your -- you know, in the things

Page 27

1 that you presented. You must have it there
2 someplace.
3     Q. You said here in your interrogatory
4 responses, that Article 7 of the plan document
5 effective January 1, 2009, set forth the duties and
6 responsibilities of the plan trustee, and you
7 listed the Bate numbers Sherrod 36 to Sherrod 71.
8     This contains the Bates number Sherrod
9 36 to Sherrod 71. Are these -- is this the
10 document that describes your duties as plan
11 trustee?
12     A. May I see what you're reading from?
13     (Witness peruses document.)
14 BY THE WITNESS:
15     A. Well, certainly if this is what the
16 attorney wrote.
17 BY MR. CANETTI:
18     Q. So if we look at page 36, does this look
19 like the first page of what you referred to --
20     MR. REARDEN: When you say -- when you say
21 "36," are you referring to the Bates numbers?
22     MR. CANETTI: Yeah. I apologize.
23 BY MR. CANETTI:
24     Q. For Sherrod 000036 -- I'm sorry -- yeah,

Page 28

1 you identified as 36 in your response, because I'm
2 looking at this, I think you probably meant 38. So
3 looks like this is not completely accurate, but if
4 you look at page 38 at the bottom it says,
5 "Article 7 Trustee" and has highlighted 7.1, "Basic
6 Responsibilities of the Trustee."
7     Is this the start of what you referred
8 to as the manual describes your responsibilities as
9 the trustee?
10     A. Seems that it would be.
11     Q. Okay. You can set that aside for now.
12     Now, you were involved in some
13 litigation with a person named Michael Sherman;
14 correct?
15     A. Yes.
16     Q. Is that still continuing?
17     A. Yes.
18     Q. And during that litigation, there was an
19 order entered by the state judge that froze your
20 assets; is that correct?
21     MR. REARDEN: Objection. Calls for a legal
22 conclusion.
23     You can answer.
24



Page 29

1  BY THE WITNESS:
2      A.   Froze -- speak more specific.  Froze
3  what assets?
4  BY MR. CANETTI:
5      Q.   All your assets.
6      A.   That's not correct.
7      Q.   That's not true?  Was there an order
8  that froze some of your assets?
9      A.   Yes.
10     Q.   And this freeze covered your assets in
11 the pension plan; correct?
12     A.   Well, that would have to be a legal
13 discussion that I can't describe because that, of
14 course, went -- it was a legal question that I
15 don't feel I'm capable of answering at all.
16     Q.   Did you hire attorneys to work on
17 lifting the freeze on your assets in the pension
18 plan?
19     A.   Yes.
20     Q.   Now, the rest of the assets in the plan
21 that were not yours, they were not frozen; correct?
22     MR. REARDEN:  Objection.  Calls for a legal
23 conclusion of the witness.
24

Page 30

1  BY THE WITNESS:
2      A.   No, that's not my understanding.
3  BY MR. CANETTI:
4      Q.   What is your understanding?
5      A.   That the entire plan was frozen.
6      Q.   And what is your basis for believing
7  that?
8      A.   The comments from the custodian.
9      Q.   The comments from Merrill Lynch?
10     A.   Yes.
11     Q.   And how did they convey that to you?
12     A.   I believe everything was verbal.
13     Q.   So there's nothing in writing that said
14 that the assets of the plan that were not your
15 assets were frozen; correct?
16     A.   I'm not sure of that.
17     Q.   As you sit here today, you don't recall
18 anything?
19     A.   As far as the specifics, what you're
20 asking me, I am not sure of that.
21     Q.   Well, is there something that you do
22 recall where they said in writing that the whole
23 plan was frozen apart -- including your assets and
24 the assets of other participants?

Page 31

1      A.   Because of the volume of documentation
2  resulted, I am not certain as I sit here that your
3  statement is correct.
4      Q.   I'm just asking if you recall -- can you
5  tell me anything today that you got in writing from
6  Merrill Lynch that said the whole plan was frozen?
7      A.   And so, again, my answer is I'm not
8  sure.
9      Q.   You're not sure if you recall or not?
10     A.   There may be; there may not.  I cannot
11 recall exactly on that one.
12     Q.   Okay.  Now, do you recall Merrill Lynch
13 filing court documents in February 2012 to lift the
14 freeze on your assets in that account?
15     MR. REARDEN:  Again, calls for a legal
16 conclusion.  Objection.
17 BY THE WITNESS:
18     A.   I don't -- I know there were multiple
19 actions; but as to what the purposes were, I am not
20 sure, and I can't speak to any of them.  I'm sorry.
21 BY MR. CANETTI:
22     Q.   Now, you recall, you said that you hired
23 attorneys to try and lift the freeze on the -- your
24 assets in the plan, though; right?

Page 32

1      A.   Per the advice of the Department of
2  Labor, sure did.
3      Q.   And then at some point, there was a
4  court order that said if you wanted to proceed, you
5  either had to pay a bond or sit for a deposition to
6  proceed.  Do you recall that?
7      MR. REARDEN:  Again, objection.  Calls for a
8  legal conclusion.
9  BY THE WITNESS:
10     A.   I don't -- I'm sorry, but my attorneys
11 took care of all of that, and the only accurate
12 answer -- I really feel at a disadvantage for you
13 asking me legal questions others handle.  I can't
14 answer -- I don't know the answer to those
15 questions.
16 BY MR. CANETTI:
17     Q.   Do you recall that you paid a bond in
18 2011?
19     MR. REARDEN:  I'm going to object on the basis
20 of vagueness and the question of who "you" is in
21 that question.
22 BY MR. CANETTI:
23     Q.   Go ahead.
24     A.   I, again, would have to -- I don't



Page 33

1   recall enough of the legalities to answer that.  I
2   hear the verbiage that you're using.  I don't
3   recall enough and know the legal -- the legalities
4   of it to answer that question accurately on my own
5   behalf.  You'll need to refer that out.  The
6   attorney is not here.  I'm sorry, but I don't have
7   that information that I could give you.
8       Q.   Is there still a bond pending related to
9   that litigation?
10      A.   Again, I don't know the exact answer to
11  that.  It's a legal question and I couldn't answer
12  it accurately.  I'm not going to do that.
13      Q.   So it's a legal question to you whether
14  or not the bond still exists or not?
15      A.   It's the verbiage that you use.  And
16  because there's some discrepancy, I guess, I can't
17  agree with the question, and I can't answer it.  I
18  don't know the answer.
19      Q.   So as you sit here today, you don't know
20  if there's still the bond -- there's still a bond
21  pending related to your litigation involving
22  Mr. Sherman; is that correct?
23      A.   The matter is in litigation.  The
24  terminology has been referred to in different

Page 34

1   manners, and so as to not over -- talk -- overrule
2   the attorneys who are handling it, I can't comment
3   on it any further because I may say something
4   that's inaccurate.  I just can't.
5       Q.   So you don't know -- do you know if
6   there was ever a bond entered for the Sherman v.
7   Sherrod litigation?
8       A.   I do know that there was one entered.
9       Q.   And do you know if that bond still
10  exists?
11      A.   The terminology confuses me, and I can't
12  give you -- I can't answer that.  I don't know the
13  answer.
14      Q.   Did you ever receive any payment on that
15  bond?
16      A.   What do you mean by "payment"?
17      Q.   Do you understand how a bond works?
18      A.   Like an investment?  I'm not sure what
19  you're trying to say to me.
20      Q.   You said you agree that there was a bond
21  entered in the Sherman-Sherrod litigation; correct?
22      A.   There was a bond.
23      Q.   Do you understand how that bond works in
24  Sherman-Sherrod litigation?

Page 35

1       A.   I guess I would have to refer you to the
2   attorneys and the people who handled it and set it
3   up.
4       Q.   So you don't understand how the bond
5   works in the Sherman-Sherrod litigation?
6       A.   It was all handled by someone else.  I
7   was following legal orders and advice, and this is
8   all I can tell you on it.
9       Q.   Would you agree with the statement that
10  it is a possibility the bond may get paid out to
11  Mr. Sherman?
12      A.   I would disagree on that.  I -- it's in
13  litigation.
14      Q.   So there's no possibility to you that
15  the bond would ever get paid out to Mr. Sherman;
16  correct?
17      A.   Because of the fact that this is being
18  currently litigated.
19      Q.   I'm asking about the possibilities, not
20  about what's going to happen, just what the
21  possibilities are.
22      A.   Possibilities are speculation, and I
23  can't speculate.
24      Q.   Do you know if the bond may get -- the

Page 36

1   amount of bond may get paid back to you at some
2   point?
3       A.   Again, you're saying "if."
4       Q.   Is that a possibility?
5       A.   I can't discuss possibilities.  I don't
6   know -- you know, speculation.
7       Q.   So you don't know as you sit here today
8   whether it's possible the bond will be paid to
9   Sherman or if it's even possible the bond would be
10  paid to you; is that correct?
11      MR. REARDEN:  And I'm going to also object on
12  the basis of vagueness as to who "you" is in this
13  question.
14      MR. CANETTI:  "You" is Ms. Sherrod.
15      MR. REARDEN:  Individually.
16  BY THE WITNESS:
17      A.   You've said about six different things.
18  Perhaps you need to give me a clean question, and
19  I'll try to answer it.
20  BY MR. CANETTI:
21      Q.   As you sit here today, you don't know if
22  it's possible that the bond would get paid to
23  Mr. Sherman; correct?
24      A.   I don't know about possibilities.



Page 37

1    Q.   And you don't know if it's possible the
2  bond would get paid to you individually; correct?
3    A.   It calls for speculation, and I can't
4  speculate.
5    Q.   I'm asking if you can say if it's
6  possible or not.  Are you saying you can't say
7  anything; right?
8    A.   I'm telling you when you use the word
9  "if" or "possibilities," it calls for speculation.
10  I cannot speculate.
11    Q.   Do you know if it's possible the amount
12  would get paid to the plan?
13    A.   I cannot speculate.
14    MR. CANETTI:  Showing you what we will mark as
15  Exhibit 2.
16         (WHEREUPON, a certain document was
17              marked Sherrod Deposition Exhibit
18              No. 2, for identification, as of
19              May 2, 2018.)
20  BY MR. CANETTI:
21    Q.   This is a request for hearing on a
22  motion in the Sherman v. Sherrod litigation.  It
23  was filed February 28, 2012, by attorney Robert
24  Morad representing Merrill Lynch.  It is

Page 38

1  Bates-stamped No. DOL002024, including exhibits, it
2  goes to DOL002058.
3         Do you recall ever seeing this document
4  before?
5    A.   I can't recall at this moment.
6    Q.   If you turn to page 2 of the motion,
7  DOL002026, it states in paragraph 4, "Based on the
8  garnishment filed by plaintiff Michael S. Sherman
9  in October 2010 and this Court's order of February
10  4, 2011, Sherrod's accounts at Merrill Lynch were
11  frozen, and Sherrod was prohibited from
12  transferring or otherwise disposing of her assets."
13         Did I read that correctly?
14    A.   You read it correctly.
15    Q.   And then if we go to Exhibit 1 that's
16  referring to, this is DOL002033, it's also
17  handwritten number 10 at the bottom.
18    A.   202 -- what page?
19    Q.   2033.  We'll start at -- I'm sorry,
20  2032.
21         So 2032 is the order prohibiting
22  third-party plaintiff from transferring or
23  otherwise disposing of assets dated February 4,
24  2011.

Page 39

1         And on 30 -- DOL2033, in the first full
2  paragraph, it says, "It is hereby ordered that
3  third-party plaintiff Shirley T. Sherrod, M.D. and
4  Shirley T. Sherrod, M.D., P.C., as well as anyone
5  or any entity acting for or on their behalf or in
6  active concert or participation with them are
7  prohibited from directly or indirectly selling,
8  transferring, assigning, destroying, concealing,
9  encumbering, hypothecating, or otherwise disposing
10  of in any manner the assets, real or personal
11  property, money or things in action now held or
12  hereafter acquired by or becoming due to them until
13  further order of the court."
14         Did I read that correctly?
15    A.   You did read it as I see it here.
16  Mm-hmm.
17    Q.   And do you understand that that is
18  the -- this is the order that froze the assets of
19  you individually, Shirley T. Sherrod, and your
20  company, Shirley T. Sherrod, M.D., P.C.?
21    MR. REARDEN:  Objection.  Calls for legal
22  conclusion.
23  BY THE WITNESS:
24    A.   I'm not able to try to translate this

Page 40

1  for you or tell you that I understand.  I hired
2  legal counsel to do this, so to discuss it with me
3  is fruitless.  I can't --
4  BY MR. CANETTI:
5    Q.   Do you have any reason to dispute that
6  this is the order that froze your assets?
7    MR. REARDEN:  Again, objection.  Legal
8  conclusion.
9  BY THE WITNESS:
10    A.   I don't know for sure.  It may be.
11  BY MR. CANETTI:
12    Q.   If we go back to DOL2026, paragraph 5.
13  Paragraph 5 on that page, it says, "October 28,
14  2011, the Court of Appeals modified this Court's
15  order to allow Sherrod to use her assets
16  exclusively to post a $250,000 bond as security for
17  the underlying judgment and thereby stay any
18  collection and enforcement proceedings."
19         Did I read that correctly?
20    A.   You did read that correctly.
21    Q.   Do you have any reason to dispute the
22  accuracy of that statement?
23    MR. REARDEN:  Objection.  Legal conclusion.
24



SHIRLEY SHERROD                                May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD       41–44

Page 41

1  BY THE WITNESS:
2      A.   I am aware that you're reading me
3  something that comes from an attorney who we sued.
4  And this is garbage as far as I'm concerned.  It's
5  there.  They put it in the court, but this is the
6  opposing attorney.  So you can read it, this is
7  fine; but whether it's accurate, there's a problem
8  with that.
9  BY MR. CANETTI:
10     Q.   What's your basis for saying it's not
11  accurate?
12     A.   Because this is -- these people we took
13  to court, and this is the opposing -- you're
14  showing me the opposing attorney's view and asking
15  me to accept inaccuracy.
16     Q.   I'm just trying to understand why you
17  think it's not accurate?
18     A.   I just told you.
19     Q.   No, I didn't follow.  Why is it not
20  accurate?
21     A.   Because this is written by somebody who
22  we were actively suing, and I don't see that that
23  would necessarily -- this is his opinion or
24  whatever.  I don't accept that.

Page 42

1      Q.   So apart from it being from different
2  attorneys, what is your factual basis for why you
3  think this is inaccurate?
4      MR. REARDEN:  Objection.  Calls for a legal
5  conclusion.
6  BY THE WITNESS:
7      A.   I'll repeat what I said before.  This
8  is an -- you're giving me something from an
9  opposing attorney who wasn't too nice.  That's my
10  term, not the legal term.  But they had my life
11  savings and didn't want to release them and --
12  BY MR. CANETTI:
13     Q.   This is a motion they filed to release
14  the freeze on your account at that plan; correct?
15     A.   But that -- no, that wasn't my
16  understanding.  So you really -- this is why it
17  was -- there was a counter.  You need to get all
18  the facts and talk to the other people.  You're
19  giving me half a story.  This is not good.
20     Q.   This says on DOL2025, it says this is
21  garnishee defendant Merrill Lynch's motion to
22  release the freeze on defendant Shirley T.
23  Sherrod's account held with garnishee defendant
24  Merrill Lynch.

Page 43

1      Is that accurate?
2      A.   On the face that's what it says.  As far
3  as what was happening, I was sort of there behind
4  the scenes.  My attorneys didn't agree with this.
5  You need to talk with them.  I can't explain all of
6  them to you that you're presenting what -- you were
7  talking, I guess, always talking with them, not our
8  side.
9      Q.   Now, in April 2012, do you recall that
10  Merrill Lynch and the Court and Mr. Sherman had
11  agreed to release the freeze on your assets with
12  Merrill Lynch?
13     A.   No.
14     Q.   Do you recall that after they all had
15  agreed to do it, that your attorney said they
16  objected to that and wanted the freeze to remain in
17  place in April 2012?
18     A.   Yes.
19     Q.   And why did they object to releasing the
20  freeze?
21     A.   Again, it's a legal question and
22  something that the attorney, a conclusion they
23  reached for the benefit of the plan, the
24  participants.  And they were acting on the

Page 44

1  long-term behalf of that plan, and that was not the
2  way to go.  You must talk with them.  These are
3  legal questions that you're throwing at me.  This
4  is unfair.
5      Q.   And is it your understanding if your
6  attorney hadn't objected that the freeze would have
7  been lifted at that point in April 2012?
8      A.   I don't know --
9      MR. REARDEN:  Objection.  Calls for a legal
10  conclusion.
11  BY THE WITNESS:
12     A.   Yeah, you have to speak with the
13  attorney.  You're saying a lot of crazy stuff I
14  never heard before, and I -- you have to speak with
15  the attorneys present.
16  BY MR. CANETTI:
17     Q.   And what attorney represented you with
18  respect to that hearing?
19     A.   The name should be there somewhere.
20     Q.   You don't know as you sit here today?
21     A.   There's been -- this has been going on
22  for -- what? -- ten years.  It should be on the
23  paper.  I'm not just going to pull something out of
24  the air.  Read the papers --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
45–48

Page 45

1     Q.    On the first page here it says it's
2 Rhonda Williams, defendant's attorney. Was that
3 your attorney, Rhonda Williams?
4     A.    That's what it says, I guess.
5     Q.    Do you have any reason to dispute the
6 accuracy of that?
7     A.    Well, you're telling me everything on
8 the paper is accurate. I don't know what to tell
9 you. I -- you know, you're throwing this stuff in
10 front of me and saying this is what it is. It's
11 there. I don't know.
12     Q.    So in 2012, you don't recall the
13 attorney that specifically represented you at that
14 time; correct?
15     A.    Well, if this is wrong, then the rest of
16 it's wrong. So, I mean, this can't be totally
17 right and then this other below is -- you know, if
18 that's wrong, and it may be, but the rest of it is
19 wrong. So it's very confusing here, Mr. Canetti.
20     Q.    I'm just trying to understand if you
21 recall if anybody else represented you during this
22 time period in 2012 besides Rhonda Williams?
23     A.    I don't recall.
24     Q.    Now, on DOL002037, it's also marked as

Page 46

1 Exhibit 3 and handwritten page 14, this is the bond
2 on appeal for the Sherman v. Sherrod litigation.
3     Have you seen this document before?
4     A.    I believe I have.
5     Q.    And it says the amount of the bond is
6 $250,000 in the middle of the page there, and it
7 says the principal for the bond is Dr. Shirley T.
8 Sherrod.
9     Do you see that?
10     A.    I see that.
11     Q.    And is that your signature on the bottom
12 of the page under signature of principal?
13     A.    It is.
14     Q.    And is that dated November 3, 2011?
15     A.    That's what it appears to be.
16     Q.    Do you have any reason to dispute the
17 accuracy of this document?
18     A.    No.
19     Q.    Now, on Exhibit 4 of this document,
20 which is DOL2041 to 2043, handwritten pages 18, 19
21 and 20, this is titled an "Affidavit of Shirley T.
22 Sherrod."
23     On page 2043, is that your signature for
24 Dr. Shirley T. Sherrod?

Page 47

1     A.    It is.
2     Q.    Do you recall why you signed this
3 affidavit?
4     A.    I was under great duress. Merrill Lynch
5 wrote it, and I got legal advice to sign it.
6     Q.    Do you recall who gave you that advice?
7     A.    The attorneys.
8     Q.    Which attorneys were that?
9     A.    I don't recall at the time. You'll have
10 to look and see who was on the case.
11     Q.    Do you dispute the accuracy of anything
12 in this affidavit that you signed?
13     A.    I was -- I mean, I was given it -- it's
14 legal. I can't -- I can't interpret it. That's my
15 signature.
16     Q.    So as you sit here today, you don't have
17 any specific dispute with this affidavit; is that
18 correct?
19     A.    It's my signature. I was told to -- I
20 was made to sign. That's all I can say.
21     Q.    Now, on Exhibit 6 to this, DOL002048 and
22 on DOL002049, these appear to be two letters
23 between yourself as a participant and yourself as
24 the plan administrator.

Page 48

1     On DOL2048, is that your signature on
2 that page?
3     A.    That is my signature.
4     Q.    And have you seen this letter before?
5     A.    I have seen this letter.
6     Q.    What was the purpose of this letter?
7     A.    We were trying to get control of this
8 alienated and highjacked pension plan, and I --
9 that's my signature -- to try to take back the --
10 to get control of the funds.
11     Q.    The two sentences here referring to
12 distribution, this is a request for a distribution
13 from the plan for you?
14     A.    That was the letter that the attorney
15 recommended, I believe, to understand that this was
16 a process that he needed to get to avoid a lawsuit
17 and just to see if they would release the funds
18 simply by these letters.
19     Q.    And in the second page, DOL002049, is
20 that your signature as well?
21     A.    Yes.
22     Q.    And it says, "Upon review of your claim,
23 your employment history with Shirley Sherrod, M.D.,
24 P.C. sponsor of the plan, and the relevant plan



Page 49

1  documents, I am pleased to inform you that your
2  claim for benefits is approved."
3     A.   Yes.
4     Q.   Do you understand this to be an approval
5  of a claim for benefits on your behalf?
6     A.   I understand that this was part of a
7  process the way in which one would -- I had never
8  done this before.  This is something the attorney
9  recommended.  And so I signed to follow through to
10  achieve the goal of --
11     Q.   Now, it says, "Upon review of claim,
12  employment history and the relevant plan document."
13  Do you recall what document you reviewed as the
14  plan document?
15     A.   I don't recall.  I just recall that this
16  was what was recommended, and if there's more than
17  two needs, you need to go to the lawyer.
18     Q.   Do you recall this document here was the
19  plan document referred to, Exhibit No. 1?
20     A.   I'm not sure.
21     MR. REARDEN:  I would like to take a break.
22     MR. CANETTI:  Sure.
23          (WHEREUPON, a short break was
24           taken.)

Page 50

1  BY MR. CANETTI:
2     Q.   We're back on the record.  I'll remind
3  you you're still under oath.
4          We talked earlier about some
5  communications with the participants.  Do you
6  recall if you ever sent anything called participant
7  statements at least once a year to participants?
8     A.   What period of time are you talking
9  about?
10     Q.   At any point between, let's say, 2011
11  and today, have you ever sent something called
12  participant statements on an annual basis to
13  participants?
14     A.   Between 2011 and today?
15          When you say "you," you're speaking
16  about me personally?
17     Q.   Yes.
18     A.   No, I didn't personally send that.
19     Q.   Do you know if anybody else sent
20  participant statements to the participants on an
21  annual basis between 2011 and 2017?
22     A.   That would have been, I believe, the
23  attorney involved, the actuary.  They would have
24  been sent by someone other than myself.

Page 51

1     Q.   You're saying an actuary would have sent
2  them?
3     A.   Actuary or attorney.
4     Q.   Do you know if for any -- either 2011,
5  2012, 2013, 2014, 2015, 2016, or 2017, for any of
6  those specific years, do you know -- do you have
7  personal knowledge that a participant statement
8  was, in fact, sent to the participants?
9     A.   What do you mean by "personal
10  knowledge"?
11     Q.   Did you ever see these participant
12  statements sent to -- that were to be sent to the
13  participants?
14     A.   I saw the statements.  If you're asking
15  if I saw them in an envelope with a stamp, I can't
16  verify to that amount -- to that extent.
17     Q.   Did you ever direct either an attorney or
18  actuary to send participant statements to the
19  participants?
20     A.   Yes.
21     Q.   And what year did you do that?
22     A.   Each of the years.
23     Q.   Every year from 2011 to 2017?
24     A.   I'm not sure exactly.  You said 2017.

Page 52

1  There may have been a difference in one or two of
2  those years, but I'm not exactly sure at this
3  moment.
4     Q.   Do you know who you directed to send
5  them out in 2011?
6     A.   Between the attorney -- attorney's
7  office and the actuaries who were involved with the
8  account.
9     Q.   What attorney was it in 2011?
10     A.   I believe that that was -- I said
11  between the actuary and attorney, so one or the
12  other, and I think that that would have been the
13  Sinclair office.
14     Q.   I'm sorry.  What office?
15     A.   Sinclair.
16     Q.   And that's the actuary?
17     A.   Right.
18     Q.   And who could have been the attorney
19  that sent it?
20     A.   I don't know that he would have been in
21  '11, but I know that there was some coordination
22  with Mr. Conger's office.
23     Q.   C-o-n-g-e-r?
24     A.   Yes.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
53–56

Page 53

1    Q.    So in 2012, do you know who you would
2  have directed to send the participant statements
3  out?
4    A.    Should have been the same person.
5    Q.    Either at Conger or Jeffrey Sinclair?
6    A.    One or the other.
7    Q.    And 2013, who would it have been?
8    A.    I believe, but I can't recall with any
9  accuracy, I'm just generally saying that -- so
10  given your specifics, I can't.
11    Q.    So your best guess is Ed Conger or
12  Jeffrey Sinclair for 2013?
13    A.    One or the other.
14    Q.    And for 2014?
15    A.    I really don't recall exactly and so --
16  I just know that it was something that had to be
17  done and was done.
18    Q.    Do you know who you directed to do it in
19  2014?
20    A.    I don't recall.
21    Q.    What about 2015?
22    A.    I don't recall that either.
23    Q.    Is there anything that would help you
24  recall for 2015?

Page 54

1    A.    No.
2    Q.    Anything that would help you recall for
3  2014?
4    A.    No.
5    Q.    2016, do you know who you directed to
6  send out the participant statements?
7    A.    I don't recall.
8    Q.    Is there anything that would help you
9  recall?
10    A.    No.
11    Q.    In 2017, do you recall who you directed
12  to send out participant statements?
13    A.    No, I don't recall.
14    Q.    Is there anything that would help you to
15  remember that?
16    A.    No.
17    Q.    Do you recall if these participant
18  statements, you did, in fact, direct somebody to
19  send them out for 2017?
20    A.    I don't recall right now.  I just know
21  they were always done.  But specifically who got
22  the direction to do it, I can't tell you with any
23  accuracy.
24    Q.    Would anybody else have given somebody

Page 55

1  direction to do it besides yourself?
2    A.    I'm not sure.
3    Q.    Who else could have possibly given
4  direction for somebody to do it?
5    A.    It may have been the administrator.
6    Q.    Mr. Johnson?
7    A.    L. J. Consultants.
8    Q.    Is there anybody else that works at
9  L. J. Consulting besides Leroy Johnson, to your
10  knowledge?
11    MR. REARDEN:  Objection.  Asked and answered.
12  BY THE WITNESS:
13    A.    I think you asked me that.  Somewhere
14  down there is the answer.  You can go back and find
15  it.
16  BY MR. CANETTI:
17    Q.    So have you ever worked with anybody
18  else at L. J. Consulting besides Mr. Johnson?
19    A.    Not that I can recall.
20    Q.    Is there anything that would help you
21  recall that?
22    A.    No.
23    MR. CANETTI:  This was a document you provided
24  to us during discovery.  I'm going to mark this as

Page 56

1  Exhibit No. 3.
2          (WHEREUPON, a certain document was
3          marked Sherrod Deposition Exhibit
4          No. 3, for identification, as of
5          May 2, 2018.)
6  BY MR. CANETTI:
7    Q.    This is a motion hearing.  It says
8  there's an attorney representing your name,
9  Pasquale Ciccodicola.  I'm not sure if I'm saying
10  that right.  The Bates-stamped numbers are very
11  small.  I apologize, but that's the way we got them
12  from you.  It says Sherrod 0000436 to 0000447.
13          On page 8 of this, in the middle of the
14  page, which is Sherrod 000043, there's a part that
15  has highlight and has a box around it.  Did you put
16  that box there?
17    A.    I don't remember.
18    Q.    Now, it says at the top of the page, the
19  first person identified speaking, it says "The
20  Court."  It says, "Yes, the motion is denied."
21          Mr. Ciccodicola, who is representing
22  you --
23    A.    Slow down.  You said at the top of the
24  page.



SHIRLEY SHERROD                                    May 02, 2018
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD          57–60

Page 57

1    Q.   On line 3. Line 3.
2    A.   Okay. All right. Go ahead.
3    Q.   The Court said, "Yes, the motion is
4  denied."
5         Mr. Ciccodicola states, "Now there's
6  a -- on February 11, 2011, this Court entered its
7  order freezing Defendant's assets."
8         Do you have any reason to dispute the
9  accuracy of that statement by your attorney?
10   MR. REARDEN:  Objection.  Calls for a legal
11 conclusion.
12 BY THE WITNESS:
13   A.   That the Court entered its order.  Yeah,
14 he said that.
15 BY MR. CANETTI:
16   Q.   Do you have any reason to dispute that
17 what he said is accurate, that the Court entered an
18 order freezing your assets?
19   A.   I can't dispute what we're looking at on
20 this page is being said.
21        In terms of me ascertaining my
22 attorney's accuracy, I can't go there.  I don't --
23   Q.   Do you agree with that statement, or do
24 you think that statement is false?

Page 58

1    A.   You know, if he's making false
2  statements, he shouldn't have been my attorney.  I
3  don't know.  I don't know.
4    Q.   So as you sit here today, you have no
5  basis to say that that statement is false; is that
6  correct?
7    A.   I agree with -- I don't know all of the
8  moving parts behind this statement.  I don't think
9  he would have made a false statement.  But that's
10 all I can say.
11   Q.   And then in the part that has a box
12 around it that was emphasized for this, it says,
13 "And at this point, there's no reason for freezing
14 the doctor's assets," again, alluding to the fact
15 your assets were frozen.  And as you said as you
16 sit here today, do you have any reason to dispute
17 that that was a true statement?
18   MR. REARDEN:  Objection.  Calls for a legal
19 conclusion.
20 BY THE WITNESS:
21   A.   I -- to -- I see what's there.  As far
22 as commenting on this gentleman's statement of
23 what's going on, you need to speak to them.  I come
24 behind without any legal knowledge trying to

Page 59

1  determine the motives or whatever was going on.  I
2  can't comment on it except to say that I see what's
3  there.  I'm not going to pass judgment on accuracy.
4  I can't.
5  BY MR. CANETTI:
6    Q.   So you can't say if there's any reason
7  to say that this is a false statement?
8    A.   I can't say anything one way or the
9  other, sir.
10   Q.   Now, do you recall when the freeze in
11 that state court proceeding was lifted?
12   MR. REARDEN:  Objection.  Legal conclusion.
13 BY THE WITNESS:
14   A.   I don't know the answer to that.
15 BY MR. CANETTI:
16   Q.   Do you recall receiving a letter from
17 Merrill Lynch where they resigned from being the
18 asset custodian for the plan?
19   A.   Yes.
20        (WHEREUPON, a certain document was
21         marked Sherrod Deposition Exhibit
22         No. 4, for identification, as of
23         May 2, 2018.)
24 BY MR. CANETTI:

Page 60

1    Q.   I've marked as Exhibit 4, this is a
2  letter dated June 6, 2013 -- I'm sorry.  It's two
3  letters.  One is from the attorneys of Merrill
4  Lynch to the attorneys at Tenney & Bentley and
5  Pasquale Ciccodicola.
6         And then on the next page -- or two
7  pages in, 2230, there's a letter from Merrill Lynch
8  to Dr. Sherrod and Mr. Johnson saying, "This letter
9  is to inform you that effective as of July 6 hereby
10 resigns as custodian to the plan."
11        Do you recall getting the letter on
12 DOL002230 to -- I guess it's just one page?
13   A.   I recall this letter.
14   Q.   And is it -- do you have any reason to
15 dispute that Merrill Lynch said it was going to
16 resign as -- told you it was going to resign on
17 June 6, 2013?
18   A.   No.
19   Q.   And so on the first page on DOL00228, it
20 says, in the second paragraph, "The Michigan
21 Appellate Court has ruled and terminated the freeze
22 order affecting the plan's account."
23        Does that refresh your recollection upon
24 approximately when the freeze was lifted with


ESQUIRE

Page 61

1  respect to the plan?

2  A.  No.

3  Q.  Did you then subsequently move the money

4  that was with Merrill Lynch to a different account?

5  A.  We had to, yeah.

6  Q.  And did you do that around that time in

7  June of 2013?

8  A.  As close to possible as the date that

9  they wanted it to happen.  I don't recall the date

10  at this time.

11  (WHEREUPON, a certain document was

12  marked Sherrod Deposition Exhibit

13  No. 5, for identification, as of

14  May 2, 2018.)

15  BY MR. CANETTI:

16  Q.  Show you what I'm going to mark as

17  Exhibit No. 5.  This is a packet of documents --

18  marked as Exhibit No. 5.  This is a packet of

19  documents from Comerica.

20  MR. REARDEN:  If you're going to answer any

21  questions about this, you probably should read

22  through the entire --

23  THE WITNESS:  This one right here?

24  MR. REARDEN:  Yes.

Page 62

1  BY MR. CANETTI:

2  Q.  It's DOL002253 to DOL002274.

3  On the second page, it refers to a

4  client signature on DOL002254.  Is that your

5  signature?

6  A.  Yes.

7  Q.  It's dated June 14, '13.  Is that an

8  accurate date?

9  A.  No.

10  Q.  When do you think you signed this

11  document?

12  A.  Looks like it says June 4th.

13  Q.  Looks like it says June 4th?

14  A.  That's what it looks like to me.

15  Q.  Now, on page DOL002263, there's a

16  document called "Retirement Plan Services

17  Comerica," and it appears to be three pages long.

18  Did you fill out this document?

19  A.  No.

20  Q.  Is this your handwriting on this

21  document?

22  A.  No.

23  Q.  Do you know who filled this out?

24  A.  I don't recall.

Page 63

1  Q.  Do you know if you supplied the

2  information that is represented on this document?

3  A.  I don't know where they would have

4  gotten it from.

5  Q.  Is there somebody besides you that would

6  have given information to Comerica?

7  A.  Merrill Lynch.

8  Q.  Do you believe Merrill Lynch gave the

9  information to Comerica for setting up your account

10  or the plan account at Comerica?

11  A.  I don't know.

12  Q.  Do you have any direct knowledge that

13  Merrill Lynch gave information to Comerica?

14  A.  I don't know.

15  Q.  Did you give information to Comerica

16  about setting up the account?

17  A.  At some point I believe I did.  I

18  obviously spoke with them.

19  Q.  DOL002272, it says, "Primary Account

20  Holder's Signature."  Is that your own signature

21  there?

22  A.  Yes.

23  Q.  And then on DOL002273 and DOL002274,

24  it's a two-page document, says "Trustee

Page 64

1  Certification of Investment Powers."

2  On the second page, is that your

3  signature by the trustee name?

4  A.  Yes.

5  Q.  And you are identified as a trustee in

6  this document; correct?

7  A.  Yes.

8  Q.  On DOL002264, on part of the form that's

9  titled "Retirement Plan Services Comerica

10  Securities, Inc., member FINRA/SIPC," under

11  "Recordkeeping," it says, "Does HR, executive

12  management, board of directors, or ownership make

13  the plan decisions?"  And it says, "Shirley T.

14  Sherrod makes the decisions."

15  Do you have any reason to dispute that

16  that's an accurate decision of how the

17  decisionmaking was done for the plan?

18  MR. REARDEN:  I'm sorry.  Can you point

19  again -- we're on 2266?

20  BY MR. CANETTI:

21  Q.  2264, under "Recordkeeping," it says,

22  "Does HR, executive management, board of directors,

23  or ownership make the plan decisions?"

24  It says, "Shirley T. Sherrod makes



Page 65

1  decisions."

2      Do you have any reason to dispute that

3  that -- Shirley T. Sherrod did make the plan

4  decisions at this time?

5      A.   No.

6      Q.   On page DOL2263, the page before, it

7  says, "Total number of employees." It says, "18."

8  "Number of eligible employees, 18; number of

9  participants, 18."

10      Do you have any reason to dispute that

11  there are 18 employees and participants in the plan

12  at this time?

13      A.   No.

14      Q.   And so as of June 2013, based on this

15  document, the money was transferred from Merrill

16  Lynch to Comerica; is that right?

17      MR. REARDEN:  Objection.  Vague.

18  BY MR. CANETTI:

19      Q.   On the account transfer form, you say

20  you signed it around June 4th, and it looked like

21  the other date said June 14th.

22      Do you have any reason to doubt that you

23  signed this in June of 2013 based on the signature

24  pages we looked at?

Page 66

1      A.   Looks like approximately that time.

2      Q.   Now, you mentioned a few law firms that

3  you worked with in the past.  You said that one of

4  the people -- attorneys you worked with was

5  Pasquale Ciccodicola; is that right?

6      A.   Right.

7      Q.   Do you know what years he worked with

8  you as an attorney?

9      A.   I don't have that in front of me.  I

10  don't recall.

11      Q.   Did he do work for you individually?

12      A.   "You individually," specifically what do

13  you mean?

14      Q.   Did he represent you, Shirley Sherrod?

15      A.   I believe over the years he did, yeah.

16      Q.   Do you know when he stopped working for

17  you?

18      A.   I can't recall that.

19      Q.   Do you know approximately what year?

20      A.   No, I can't recall.

21      Q.   Is there anything that would help you to

22  recall that?

23      A.   No.

24      Q.   Do you know how much you paid him during

Page 67

1  that time period when he represented you?

2      A.   I can't recall that.

3      Q.   Is there anything that would help you to

4  recall that?

5      A.   Well, I believe if there were documents

6  turned in to you as part of the -- your

7  investigation, so you have those.

8      Q.   And were those all the documents showing

9  how much you paid him in that set of documents you

10  gave us?

11      A.   Well, I won't agree to a hundred percent

12  of anything.  Sometimes there's stragglers, so

13  there could be one or two things that were not

14  found and turned over after such a period of time.

15  Certainly did the best to present you with

16  everything that was available, but --

17      Q.   As you sit here today, is there anything

18  that you know that was not provided to us related

19  to any payments you would have made to him?

20      A.   Nothing that I know.  I just -- but

21  there's no such thing as perfection.

22      Q.   And what -- in what capacity did he

23  represent you, meaning what cases did he

24  represent you for?

Page 68

1      A.   I don't recall.

2      Q.   You don't know what case he represented

3  you for?

4      He represented you in Sherman v.

5  Sherrod, though; right?

6      A.   That would have been one of the cases,

7  yes.

8      Q.   Were there any other cases he

9  represented you on?

10      A.   I mentioned to you that over the years,

11  but I don't recall.

12      Q.   So apart from Sherman-Sherrod, you don't

13  recall any other specific cases he represented you

14  for; correct?

15      A.   You mentioned that one, and I'm

16  recalling it because you're mentioning it.

17      Q.   I'm saying besides that one, is there

18  anything else?

19      A.   I just told you.

20      Q.   Nothing you remember; right?  Okay.

21      Now, you also engaged a law firm called

22  Brooks Wilkins, an attorney Michael Turco;

23  is that right?

24      A.   That's right.



Page 69

1    Q.    And when did you hire him?
2    A.    I don't recall the dates.
3    Q.    Do you know when he stopped working for
4  you?
5    A.    I don't recall the exact dates.
6    Q.    Is there anything that would help you as
7  to the date that he started or ended working for
8  you?
9    A.    No.
10   Q.    And what work did he do for you?
11   A.    I think you just said that he was
12  represented -- represented me and myself as well as
13  the plan in the -- against Sherman, sir.
14   Q.    So Michael Turco represented you in the
15  Sherman v. Sherrod matter?
16   A.    As well as in and out -- as well as the
17  pension plan because these things intersected
18  constantly.
19   Q.    In what capacity did he represent
20  litigation involving the pension plan?
21   A.    Well, I thought that was turned over to
22  you.  As I sit here, I can't recall each instance;
23  but, unfortunately, they intersected.  There was
24  always things that were going back and forth, and

Page 70

1  they, unfortunately, got drawn into many aspects.
2    Q.    Well, there are two cases that I know
3  about based on documents you provided to me was
4  there was a Sherman v. Sherrod state action case,
5  and then there was a district court case, a federal
6  court case, where you sued Merrill Lynch and then
7  the name changed from you to Mr. Johnson that sued
8  Merrill Lynch?
9    A.    But you're saying that was Turco?
10   Q.    No.  I'm just trying -- those are the
11  only two cases I know about based on what you gave
12  me.  Are there more cases you're talking about than
13  those two cases?
14   A.    I'm totally confused.  I don't know what
15  you're -- I know there were several lawyers
16  throughout and that the cases -- the Target plan
17  continued to come in because one of the opponents
18  that you've been in contact with was constantly
19  trying to get ahold of this plan.  So often the
20  attorneys had to put on another hat.
21      So I don't know, you know -- I can't
22  give you -- I can't delineate.  I can't draw the
23  lines for you that you're looking for.
24   Q.    So we agree one of the cases was Sherman

Page 71

1  v. Sherrod in state court of Michigan; correct?
2    A.    That would have been one.
3    Q.    And there was another case in the
4  Northern District of Illinois, which was Sherrod
5  versus Merrill Lynch; is that right?
6    A.    Yes.
7    Q.    And apart from those two cases, was
8  there a third case?
9    A.    I don't remember right now.
10   Q.    Do you recall any other litigation
11  specifically besides those two cases?
12   A.    There probably are, but I cannot answer
13  you accurately.  So I can only tell you I don't
14  recall, because if I leave it open, you're going to
15  say I'm not telling you the truth and I'm doing my
16  best to cooperate.  I just don't recall.  But this
17  has gone on for ten years, sir.  I'm doing my best
18  here, but I can't recall.
19   Q.    Do you recall of any actions in any
20  specific type of form?  Are there any other
21  district court actions or state court actions --
22   A.    I don't recall.  I've told you --
23   MR. REARDEN:  I'm going to object on
24  vagueness.  Are you still asking about Turco?

Page 72

1    MR. CANETTI:  She said he represented her in
2  different capacities.  I'm trying to find out what
3  cases he could have been involved in.
4  BY THE WITNESS:
5    A.    I thought I was talking about Turco,
6  too.
7  BY MR. CANETTI:
8    Q.    Turco, you said he could have
9  represented you in the Sherman v. Sherrod matter,
10  right, but you're not sure?
11   A.    But you're going on to Illinois.
12  Sherman v. Sherrod wasn't Illinois, and I'm -- you
13  know, I can't recall.  This is all messed up right
14  now.  I don't know what you're saying to me.  I
15  lost you about ten minutes ago.
16   Q.    What do you mean by Illinois?  I'm going
17  on to Illinois?
18   A.    I don't know because you mentioned --
19  you said -- I thought I heard you mention the
20  case -- you said Sherrod versus Merrill Lynch.
21  That's what I thought I heard you say.  And that
22  was in Illinois.  So it wasn't --
23   Q.    Do you have any specific memory as you
24  sit here today of what cases Mr. Turco worked on



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
73–76

Page 73

1  for you?
2      A.    I just told you I can't recall.
3      Q.    And there's nothing that would help you
4  recall that; is that right?
5      A.    No.
6      Q.    Is your answer no?
7      A.    No.
8      Q.    Do you know how much you paid him?
9      A.    I don't recall that either.
10     Q.    And you gave some documents; you
11  mentioned discovery.
12          Do you have any reason as you sit here
13  today to doubt that you gave us all the documents
14  related to the payments that you made to Mr. Turco?
15     A.    I have no reason to doubt except, as I
16  told you before, you try to be a hundred percent
17  accurate and sometimes, months later, things show
18  up.  I don't think that's the case, but I'm not
19  going to tie myself to a hundred percent.  We do
20  the best we can.
21     Q.    But as you sit here today, you have no
22  knowledge of any documents -- I just want to be
23  clear.
24          So as we sit here today, there's no

Page 74

1  other documents you know about that are in your
2  possession that you did not give to us?
3      A.    Nothing that I know about.
4      Q.    Now, you also engaged a law firm, Tenney
5  & Bentley, which had the attorneys Ed Conger and
6  David Shannon working at them; correct?
7      A.    Correct.
8      Q.    And do you know when you hired them?
9      A.    I believe, I could be wrong, it was
10  2012.  That may not be right.
11     Q.    2012?  And do you know what cases they
12  worked on?
13     A.    I believe it was a Merrill Lynch case.
14     Q.    And that's the one in Illinois; correct?
15     A.    Correct.
16     Q.    And do you know when they stopped
17  working for you?
18     A.    I don't recall.
19     Q.    And do you recall how much you paid
20  them?
21     A.    I don't.
22     Q.    And, again, as you sit here today, you
23  don't -- do you know of any documents that's in
24  your possession that you did not give to us that

Page 75

1  relates to payments to Tenney & Bentley?
2      A.    I don't know -- I don't know of anything
3  that I did not give you.
4      Q.    Now, you also engaged a law firm, you
5  said, named Crane Heyman Simon, an attorney named
6  Jeffrey Dann; is that right?
7      A.    No.  I've never heard that name.
8      Q.    Have you ever heard of Crane, Heyman and
9  Simon?
10     A.    I don't recall right now.
11     Q.    I'm sorry.  Not Jeffrey Dann.  It was
12  John Redfield.
13     A.    That, I recall.
14     Q.    Sorry.
15          And do you know when you hired
16  Mr. Redfield?
17     A.    I don't remember the exact date.
18     Q.    And what work did he do for you?
19     A.    I don't recall exactly.  I believe it
20  had something to do with the bond, but I'm not
21  exactly sure.
22     Q.    Did he have anything to do with any of
23  the filing for bankruptcy on your behalf?
24     A.    Yes.

Page 76

1      Q.    And was that filing done in
2  approximately 2014?
3      A.    That sounds right.
4      Q.    Do you know when they stopped working
5  for you?
6      A.    No, I don't recall.
7      Q.    Do you recall how much you paid
8  Mr. Redfield?
9      A.    I don't.
10     Q.    And, to your knowledge, are there any
11  documents you have in your possession that you did
12  not give to us related to payments given to
13  Mr. Redfield?
14     A.    No.  To my knowledge, I don't.
15     Q.    And then you also said you hired a
16  person named Mark Granzotto; is that right?
17     A.    Yes.
18     Q.    And do you know when you hired him?
19     A.    I don't recall the exact time.
20     Q.    Do you know when he stopped working for
21  you?
22     A.    No.
23     Q.    Anything that would help you remember
24  that?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
77–80

Page 77

1   A.   No.
2   Q.   And what work did he do for you?
3   A.   Appellate work.
4   Q.   And was that appellate work for the
5   Illinois case?
6   A.   I believe he was involved in all aspects
7   of this very bad situation.
8   Q.   So like we talked before, there was a
9   state Michigan -- a Michigan case, which was a
10  state action, and there was a federal action in
11  Illinois.  Was he involved in both -- was he
12  involved in the Michigan case?
13  A.   Yes.
14  Q.   Was he involved in the Illinois case?
15  A.   Yes.
16       When you say "involved," you're talking
17  about going to court, or what are you talking about
18  exactly?
19  Q.   Well, you said he did appellate work --
20  A.   Yes.
21  Q.   -- correct?
22  A.   Right.
23  Q.   Was he involved in the appellate work
24  for the Illinois case?

Page 78

1   A.   Sometimes that involves consultations or
2   consulting with the other attorneys.  So the word
3   "involved," I guess I didn't get your definition of
4   it, but probably that should be made more clear.
5   I'm just going to assume that involved means court,
6   appellate, briefs, they were the whole thing.  But,
7   yes, he was involved.
8   Q.   Do you recall how much you paid him?
9   A.   No.
10  Q.   And, to your knowledge, do you have any
11  documents regarding payments to him that were not
12  provided to us?
13  A.   No, not to my knowledge.
14  Q.   And then you also said you engaged a
15  person named Vladimar Washington or Valdemar
16  Washington?
17  A.   Yes.
18  Q.   Do you know when you hired him?
19  A.   I don't recall.
20  Q.   Do you know when he stopped working for
21  you?
22  A.   I don't recall that either.
23  Q.   Do you know what work he did for you?
24  A.   I don't have that information.

Page 79

1   Q.   Do you recall how much you paid him?
2   A.   I don't.
3   Q.   And, to your knowledge, did you provide
4   us all records related to payments made to
5   Mr. Washington?
6   A.   I've given you everything.  And
7   basically the -- the questions that you're asking
8   me should be available on what we turned in to you,
9   so my recollection is that to sit here and say
10  something to you, I don't know that would be
11  necessary, to refer back to what we gave you.  You
12  have those records.
13  Q.   Now, you also said you engaged a law
14  firm named Roberts Bartolic, an attorney named
15  Michael Bartolic; is that right?
16  A.   That's right.
17  Q.   Do you recall when you hired him?
18  A.   No.
19  Q.   Do you recall when he stopped working
20  for you?
21  A.   No.
22  Q.   Do you know what work Mr. Bartolic did
23  for you?
24  A.   It was regarding work for the pension

Page 80

1   plan.
2   Q.   What work was that?
3   A.   To get the pension plan released.
4   Q.   What do you mean by "get the pension
5   plan released"?
6   A.   As I recall, it had been alienated and
7   frozen.  I think we had come to the Department of
8   Labor, and you guys told us that you could do
9   nothing and to get a lawyer.  So that's why -- we
10  did that.
11  Q.   So was he involved in the Illinois
12  litigation at all?
13  A.   I can't give you all the specifics.  I
14  just know that I did what I was told.
15  Q.   So he worked to get the freeze lifted
16  from the Michigan state court action?
17  A.   That, you know -- it's getting to be
18  sort of confusing legally because there was so much
19  going on and so much to do, but I would just say
20  that he was -- he was trying to get the freeze --
21  get the account released from Merrill Lynch.
22  Q.   Do you recall how much you paid him?
23  A.   No.  You have that information.
24  Q.   To your knowledge, are there any



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
81–84

Page 81

1  documents that you did not provide to us that
2  related to payments to Mr. Bartolic?
3      A.   No.  And I think he's also given you the
4  information about what he was paid too.  I saw
5  that.
6      Q.   Now, you engaged an attorney named Ben
7  Gonek; is that right?  Ben Gonek, G-o-n-e-k.
8      A.   Right.
9      Q.   Do you know when you hired him?
10     A.   I don't recall.
11     Q.   And do you know when he stopped working
12  for you?
13     A.   No, I don't recall that.
14     Q.   Is there anything that would help you
15  remember those dates?
16     A.   The information that you possess that we
17  gave you.
18     Q.   And do you know what work he did for
19  you?
20     A.   That would have been on the bond.
21     Q.   What work was he doing with respect to
22  the bond?
23     A.   Well, I believe that these people that
24  you're working with were trying to get the bond,

Page 82

1  same ones that are trying to get it now.
2      Q.   Who is that?  I didn't follow.
3      A.   Sherman.
4      Q.   Oh, Sherman.
5      A.   Mm-hmm.
6      Q.   So he was working on your behalf to
7  prevent Mr. Sherman from getting the bond?
8      A.   Yes.
9      Q.   Do you recall how much you paid him?
10     A.   No.  I think you have that.  This has
11  all been given to you.
12     Q.   And, to your knowledge, are any
13  documents related to payments made to him that you
14  did not provide to us?
15     A.   No.
16     Q.   To your knowledge, did the Shirley T.
17  Sherrod Target Pension Plan sign any contract or
18  engagement agreements hiring any of these
19  attorneys?
20     A.   As I sit here, I don't recall.
21     Q.   Is there anything that would help you
22  recall that?
23     A.   Seeing the documents if I had them.  I
24  don't have -- I don't see them, no.

Page 83

1      Q.   Do you recall if any money was
2  transferred out of the plan and paid directly to
3  any of these attorneys?
4      A.   I believe to Mr. Conger.
5      Q.   Is that the only one?
6      A.   Yes.
7      Q.   Apart from these attorneys, have you
8  engaged any other attorneys to do work related to
9  the plan?
10     A.   At this moment, I don't recall.
11     Q.   Is there anything that would help you
12  recall that?
13     A.   I guess if you were -- you had a time
14  frame.  You never gave me that.  You're looking at
15  a paper here we turned over.  Over the years, I
16  mean, the plan has been here for 40 years.  So you
17  just sort of gave me a broad statement.
18     Q.   From 2011 to the present, have any other
19  attorneys done work for the plan?
20     A.   Okay.  So when you narrow it down like
21  that, I -- everybody that we -- that I know of, I
22  believe to the best of my knowledge, we presented
23  to you with documentation.  So there shouldn't be
24  anybody else.  I don't believe we missed anybody.

Page 84

1      Q.   Okay.  And you said only -- to your
2  knowledge, only one attorney was paid directly?
3      A.   I'm sorry.  I don't hear well and you're
4  going pretty fast.  Slow down.
5      Q.   You said that the only attorney paid
6  directly from the plan was Mr. Conger; correct?
7      A.   To the best of my knowledge, but because
8  there's been some time, I -- you're making me speak
9  from memory.  I'm not speaking from paperwork.  So
10  I may not be accurate and it's not intentional, but
11  I'm doing the best to work with you here.
12         To the best of my knowledge, that was
13  the only one who got anything directly.
14     Q.   Do you recall how any of the other
15  attorneys were paid?
16     A.   For the majority of the attorneys, I
17  paid them myself.
18     Q.   And how did you pay them yourself?
19     A.   When I could muster and have funds
20  available, they were paid by -- from my credit
21  card.  I took loans out.  And primarily that was it
22  was to borrow.  I had to borrow to support the
23  plan.  That was the primary way --
24     Q.   How did the money get to the attorneys?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
85—88

Page 85

1    A.    Generally, I -- from my -- I had checks
2    available from my credit card, so I would write a
3    check to them.
4    Q.    So you wrote checks from your credit
5    card?
6    A.    Yes.
7    Q.    Did you pay them any other way?
8    A.    I don't recall right now.
9    Q.    Did you also pay some of them with money
10   orders?
11   A.    Yeah, I do believe that there were some
12   money orders.  I thought you had copies of those.
13   Q.    Do you have any copies of the checks
14   from your credit cards?
15   A.    No.  Those generally are not returned.
16   Q.    And when did you get the loans on your
17   credit card?
18   A.    When this started.
19   Q.    What year was that?
20   A.    I believe it started in 2011.
21   Q.    Now, you said during the whole time you
22   were self-employed doing consulting work; correct?
23   A.    Yes.
24   Q.    So during 2011, did you have income from

Page 86

1    the consulting work?
2    A.    Very minimal.
3    Q.    What about 2012?
4    A.    It's very minimal.
5    Q.    What does "very minimal" mean?
6    A.    Not enough to support these legal fees.
7    Q.    Do you recall -- how many loans did you
8    take out from your credit card?
9    A.    Too many to count.  There was too much
10   to recall.  It's just been consistent.
11   Q.    You said starting in 2011.  Did you also
12   take loans out in 2012?
13   A.    Every year.
14   Q.    Did you take loans out in 2013?
15   A.    Yes.
16   Q.    Did you take a loan out in 2014?
17   A.    Yes.
18   Q.    In 2015?
19   A.    Yes.
20   Q.    2016?
21   A.    Yes.
22   Q.    2017?
23   A.    Yes.
24   Q.    And the loans you're saying you took out

Page 87

1    from 2011 through 2017 from your credit card all
2    related to paying attorneys; is that right?
3    A.    For the most part.  I don't want to
4    answer incorrectly because I can't think of any
5    other thing that I might have to pay.  But I would
6    certainly say that I don't want you to come along
7    and tell you that I'm telling a tale when I haven't
8    bought anything.  My car is 20 years old.
9         But I -- I can't think of anything else
10   at the moment.  That was the majority reason for
11   them.  And if I'm overlooking something, it's very
12   miniscule, I'm sure, but that was majority -- the
13   reason for the indebtedness on those cards.
14   Q.    When did you first receive a
15   distribution from the plan?
16   A.    I believe that that was in 2013.
17   Q.    And how much was the distribution
18   received in 2013?
19   A.    And I believe that there were some
20   checks that -- you'd know it -- of about 50,000, I
21   believe.  I'm not sure.  I don't have that in front
22   of me at the moment.
23   Q.    What was the process for obtaining the
24   distributions for approximately $50,000 in 2013?

Page 88

1    A.    The process for the distribution?
2    Q.    Mm-hmm.
3    A.    Which is down for expense --
4    MR. REARDEN:  Well, I'm going to object on the
5    basis of when you say the word "distribution," I
6    think that calls for a legal conclusion from her.
7         Answer to the best you can.
8    BY MR. CANETTI:
9    Q.    Did you -- when was the next time you
10   received a distribution?
11   A.    I'll call it funds, and it probably
12   would have been --
13   MR. REARDEN:  I'm going to object again, calls
14   for a legal conclusion.
15        And I'll let you answer and then I want
16   to take a break.
17   BY THE WITNESS:
18   A.    So there would have been funds withdrawn
19   probably, again, '14, I would assume.  I don't
20   recall.  I don't know at this moment.
21   BY MR. CANETTI:
22   Q.    So in 2014 --
23   MR. REARDEN:  I'd like to take a break.
24



Page 89

1          (WHEREUPON, a short break was
2          taken.)
3   BY MR. CANETTI:
4      Q.    Now, we were talking about distributions
5   in 2014.  Did you receive distributions in 2014 for
6   approximately $57,000?
7      A.    You know, I think you're talking from
8   the 5500; is that correct?  You're sort of coming
9   out of thin air on this, and I -- I'd like to see
10  what you're talking about.
11         MR. CANETTI:  I'm going to show you what is
12  going to be marked as Exhibit No. 6.
13         (WHEREUPON, a certain document was
14         marked Sherrod Deposition Exhibit
15         No. 6, for identification, as of
16         May 2, 2018.)
17  BY MR. CANETTI:
18     Q.    These are communications we received
19  between Comerica and yourself.  It's DOL02302 --
20  looks like they're out of order.  Let me look at
21  these again.
22         Looks like it's 2298, 2299, 2300, 2301,
23  2302 and 2303.
24     A.    I don't start at that number.

Page 90

1      Q.    Yeah, I know.  I said they're out of
2   order.  I identified all the Bates numbers.  Let's
3   start on what's the first page on the front here.
4      A.    2302.
5      Q.    2302.
6      A.    Mm-hmm.
7      Q.    And then let's go to the last page in
8   the back which has a handwritten "six" on it.  It
9   says 2303.  This is a letter dated July 15, 2013,
10  from you to Keith Uhler, U-h-l-e-r.
11         Is that your signature on the bottom?
12     A.    Yes, it is.
13     Q.    It says, "Please use this letter as
14  instruction to send two checks to the address of
15  record for the above-mentioned account.  The checks
16  are to be made out as follows:  Dr. Shirley T.
17  Sherrod, M.D., 32,000; Dr. Shirley T. Sherrod,
18  M.D., 18,000."
19     A.    That is correct.
20     Q.    Did I read that correct?
21     A.    That is correct.
22     Q.    Were these checks sent to you?
23     A.    Yes, they would have been.
24     Q.    And did you cash those checks?

Page 91

1      A.    I don't recall whether they were cashed.
2   I don't think they were forwarded to anyone.  I'm
3   not sure right now.
4      Q.    So those funds came out of the plan,
5   though; correct?
6      A.    Those came out of the plan.
7      Q.    And what were those funds used for?
8      A.    Expenses that had been generated for the
9   last three years.
10     Q.    And you're saying 2011, 2012, and 2013?
11     A.    That's right.
12     Q.    And what were the -- and those are the
13  expenses related to the attorneys' fees we talked
14  about before?
15     A.    Legal expenses had to with the plan.
16     Q.    And at this point in July of 2013, the
17  plan was no longer frozen; correct?
18     A.    That would be right.
19     Q.    And then on third page of this packet,
20  2300?
21     A.    Yes.
22     Q.    This is a fax to Keith Uhler from
23  Shirley Sherrod.  It's dated January 21, 2014.  It
24  says "pension withdrawal."

Page 92

1          Is that a cover sheet you used?
2      A.    Yes, that appears to be.
3      Q.    And on the second page, it appears to be
4   the second page of this fax.  It's a letter dated
5   January 20, 2014.  It says "Dear Keith," from
6   Dr. Sherrod.
7          Is that your signature on the bottom?
8      A.    Yes.
9      Q.    And it says, again, "Will you kindly
10  have checks drawn in my name the following amount?
11  Five checks in the amount of $10,000 each"; is that
12  right?
13     A.    That's right.
14     Q.    And what was that money used for?
15     A.    That would be used to pay ongoing
16  expenses or back expenses from the previous three
17  years.
18     Q.    So for expenses -- well, you said -- I'm
19  sorry.  I got confused here, because I think you
20  said ongoing expenses.  So is it now four years
21  you're talking about or three years?
22     A.    Well, I never paid them all off.
23     Q.    So is it -- you're saying this $50,000
24  in January represented expenses from 2011, 2012,



Page 93

1  2013, and 2014?
2      A.   Primarily I would say so, yes.
3      Q.   And why did you get five checks in the
4  amount of $10,000 each?
5      A.   I don't know the answer to that.
6      Q.   And do you know what you used that money
7  for?
8      A.   I just told you.
9      Q.   So it went to your credit card?
10     A.   To the credit card and whomever might
11  have been owed a debt.  I don't recall at the
12  moment.
13     Q.   And same with the other money, you're
14  talking about the 50,000.  Did that go to payments
15  to your credit card, the ones in July of 2013?
16     A.   Well, I don't know that it would be --
17  everything -- absolutely everything was on the
18  credit card.  I think you seem to be making that
19  exception and not everything was on the credit
20  card.  But those were debts that either were likely
21  owed to attorneys, so may not have taken credit
22  card.
23          So I won't say that that's exactly where
24  it went, but it was debt that was owed.

Page 94

1      Q.   So the attorneys were either paid from
2  your credit card or from money orders; right?
3      A.   I don't recall exactly.  I just know
4  that they were paid and had to be paid, but how
5  exactly it happened at that time, I don't know.
6      Q.   Did you claim any benefit distributions
7  in 2013 on your taxes?
8      A.   I don't recall at this moment.
9      Q.   And if you could review your tax form,
10  would that help you to recall that?
11     A.   I would assume it would.
12     Q.   Do you recall if you claimed any
13  benefits paid to you in 2014 on your taxes?
14     A.   I don't know.  I don't have that
15  information in front of me, so I can't tell you
16  exactly.
17     Q.   Would you need to see your tax forms to
18  answer that?
19     A.   Probably.
20     Q.   Now, in 2014, did you make any requests
21  for distributions?
22     A.   Well, again, I think that there was a
23  little concern about distributions or expenses, and
24  that needs to be clear.  Because my assumption is

Page 95

1  when you're saying "distributions" it goes to me,
2  and that's not always the case.
3      Q.   Were there any --
4      A.   -- there was -- I'm going to call them
5  withdrawals because I understand that better, you
6  know.  This is something that can be going in many
7  different directions.  But distribution wholly,
8  that means to me, and that would be misleading, not
9  an untruth.  And that I think I may have answered
10  that previously.  I need to clarify that.
11     Q.   Now, you sent a letter to Merrill Lynch
12  back in 2012, we looked at earlier today, where you
13  requested a distribution.  Do you recall that?
14     A.   No, I don't recall.  Show it to me.
15     Q.   On Exhibit No. 2, DOL2048.  It says, "I
16  have retired from employment and meet the
17  eligibility requirements for distribution from the
18  plan.  Please make a distribution to me."
19          Did I read that correctly?
20     A.   You did, and there's no amount there, so
21  hardly wasn't going to be made --
22     Q.   Did you make any distribution requests
23  like that one in 2014?
24     A.   In 2014?

Page 96

1      Q.   Yes.
2      A.   Like that?  I don't -- I don't see one
3  at the moment unless you have one to point out.
4      Q.   Do you recall ever making any
5  distribution requests like we just read in 2014?
6      A.   In 2014?
7      Q.   Yes.
8      A.   You said requests like the one we just
9  read.
10     Q.   The letter that -- the distribution
11  letter that we just read.
12     A.   I don't recall a letter like that in
13  '14.
14     Q.   Have you ever done a letter like that in
15  any year after the one you did in 2012?
16     A.   I don't recall.
17     Q.   Is there anything that would help you
18  recall that?
19     A.   Yeah, I imagine if you had one, because
20  I'm not recalling.
21     Q.   Do you know if there -- any letters
22  exist, to your knowledge?
23     A.   I don't know.
24     Q.   Now, for the withdrawals you called and



Page 97

came out of the plan in 2013, did you get any advice on making those withdrawals?
A. Like what exactly?
Q. Get any legal advice on making that withdrawal?
A. Any legal -- I'm certain that I've had legal advice throughout, and nothing was done without it, sure.
Q. So who gave you advice in 2013 to make the withdrawal of $50,000 from the plan?
A. I likely would have been speaking at that point with Mr. Conger.
Q. And how would you characterize -- what capacity was he giving you advice?
A. He was an attorney, and I relied on it.
Q. Was he providing advice as to help you perform your duties as a trustee to the plan?
A. Well, if there was a question, generally I defer to experts on every aspect; and as things came up, they would be consulted and give the answer and would follow it.
Q. What was the advice he gave you in 2013?
MR. REARDEN: Now I'm going to object on the basis of attorney-client privilege.

Page 98

MR. CANETTI: And there's an exception to attorney-client privilege, if she received advice related to help her perform her duties as trustee of the plan, it's not covered by the attorney-client privilege.
BY THE WITNESS:
A. But I don't recall. You know, that's just so broad, I don't recall -- you're saying "advice." I mean, you know, it's like -- it could be anything.
BY MR. CANETTI:
Q. Now, in 2014, did you take some withdrawals that you considered payments to you individually as benefits payments?
A. In 2014? Probably.
Q. And was that approximately -- or was that $57,000?
A. You said that, and I'll ask you to -- that sounds correct, but there was an actual form that was filled out, and I really would like to have that in front of me as I'm responding to you. Because, otherwise, I'm sure that, you know, you're right, but I trust to verify. So let me see that form.

Page 99

Q. And then there was other money that was taken -- other withdrawals from the account as well, you said, that year to pay for attorneys' fees and expenses; is that right?
A. I need to see the form. Right now I'm confused. I need to see -- you're telling me -- you may be right, but I need to see what you're looking at in terms of a breakdown of those amounts, please.
Q. Did Mr. Johnson or L. J. Consulting play any role with respect to any money that came out of the plan in 2014?
MR. REARDEN: Objection. Vague. Confusing.
BY THE WITNESS:
A. I don't know what you're talking about.
BY MR. CANETTI:
Q. You agree that money came out of the plan in 2014; right?
A. I do.
Q. And did Mr. Johnson have any involvement with the money that came out of the plan in 2014?
A. What kind of involvement?
Q. Did you communicate with him about the amounts that were coming out of the plan?

Page 100

A. Normally I kept in touch with him and Mr. Conger, whomever, and we would keep in touch with the expenses and the goings-on and try to keep things up to date. So I'm pretty sure something, there would have been some communication to keep the -- want to take good care of this plan, sure.
Q. And how did you communicate with Mr. Johnson? Was it by phone, letter, or e-mail?
A. Not by letter or e-mail. Normally it would be verbal.
Q. Did you meet him in person?
A. Did I meet him -- I don't recall, really, how it happened, whether it was at Mr. Conger's -- I don't know. It's been too long. I'm afraid that I can't help you there.
MR. CANETTI: Let's go off the record and take a short break.
(WHEREUPON, a short break was taken.)
(WHEREUPON, a certain document was marked Sherrod Deposition Exhibit No. 7, for identification, as of May 2, 2018.)
BY MR. CANETTI:



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
101–104

Page 101

1  Q.  I'll remind you you're still under oath.
2      I'll hand you what I have marked as
3  Exhibit No. 7.  This is a Form 5500 for plan year
4  2011 for the Sherrod pension plan, DOL002124 and
5  2125.
6      Have you seen this document before?
7  A.  I probably did.  It's been a while.
8  Q.  On the second page, 2125, it says,
9  "Filed with authorized valid electronic signature"
10  and has your name, dated October 20, 2012.
11     Did you authorize or apply your
12  electronic signature for this filing?
13  A.  I would have, yes.
14  Q.  Now, it says on the first page in 5A, it
15  says "total number of participants."  The beginning
16  of the year is 18 and at the end of the year is 18.
17  Do you have any reason to dispute the accuracy of
18  that?
19  A.  No.
20  Q.  Now, it says under -- back up a second.
21     Did you fill out this form?
22  A.  No.
23  Q.  Do you know who filled this out?
24  A.  Mr. Sinclair.

Page 102

1  Q.  And did you review it for accuracy?
2  A.  I would say that I don't generally
3  question those people who have much more knowledge
4  in this field and would accept what they did.
5  Q.  Did you provide any documents to
6  Mr. Sinclair to complete this form?
7  A.  He would have had documents to the best
8  of my knowledge.
9  Q.  Do you know what those documents were?
10  A.  I don't.
11  Q.  It says at the beginning of the year,
12  under Part 7, the plan had $1,730,000; at the end
13  of the year had $1,483,709.
14     And then under 8(b) it says "loss," says
15  $246,291.  Is that the same year that there was a
16  bond paid for 250,000 and a $3,000 bond fee?
17  A.  I believe it was.
18  Q.  Why is that -- was that included in the
19  loss amount?
20  A.  Here again, you would have to -- I have
21  to refer to the maker of this document, who I had
22  all the reasons to rely on, and whatever
23  conclusions he had in front of him and why he would
24  have done this, he was an expert in this area, and

Page 103

1  why this -- he did this, I can't exactly tell you.
2  Q.  But you signed it, you said earlier;
3  right?
4  A.  I did tell you that I signed it.
5  Q.  As you sit here today, you don't know
6  what's included in that loss amount?
7  A.  That is true.  Why he would have -- he
8  did this for some 30, 40 years.  He was a very good
9  actuary.  And whatever he was looking at, I had
10  reason to rely and I believe that he had reasons to
11  come to that conclusion, but I can't explain this.
12  MR. CANETTI:  I'm going to show you what I'm
13  marking as Exhibit No. 8.
14     (WHEREUPON, a certain document was
15      marked Sherrod Deposition Exhibit
16      No. 8, for identification, as of
17      May 2, 2018.)
18  BY MR. CANETTI:
19  Q.  This is DOL2070 and -- again, these are
20  out of order -- 2069.  I apologize for that.
21     The first page is a document from
22  Merrill Lynch and has the pension plan's name on
23  the first page as well.  First check amount for
24  $3,000 on the first page.

Page 104

1      Second page, again, a document from
2  Merrill Lynch, both dated November 10, 2011, and it
3  talks about a wire transfer amount of 250,000.
4      Do you know if these two documents
5  relate to the withdrawals from the plan around
6  November 10, 2011, for payments to the bond in the
7  Sherman v. Sherrod litigation?
8  A.  That appears to be the amount that was
9  associated with that transaction.
10  MR. CANETTI:  Now, in 2012, you provided us
11  some documents, which I will mark as Exhibit No. 9.
12     (WHEREUPON, a certain document was
13      marked Sherrod Deposition Exhibit
14      No. 9, for identification, as of
15      May 2, 2018.)
16  BY MR. CANETTI:
17  Q.  These are Bates stamped Shirley -- or,
18  I'm sorry, Sherrod 000372 to 391.
19     Do you recognize this document?
20  A.  I believe I've seen this before.
21  Q.  And what is this?
22  A.  This appears to be -- let's see, 2013 --
23  probably the computations, the valuations for the
24  plan.  Looks like they would have been done and

Page 105

1  completed in December 13, 2013.
2       Q.   You're referring to the date on the
3  bottom left-hand side?
4       A.   That is correct.  And it would be based
5  upon the previous year because this would have been
6  an extension, so...
7       Q.   So like on the third page, Sherrod374,
8  it says in the middle of the page "Account Summary
9  as of December 31, 2012."
10      A.   Mm-hmm.  I see that.
11      Q.   Do you see statements for the
12  participant balances at the end of 2012?
13      A.   Right.
14      Q.   Do you know who prepared these
15  documents?
16      A.   Sinclair.  I don't recall at the moment.
17      Q.   I'm sorry.  Did you say Sinclair --
18      A.   Yeah, perhaps Mr. Sinclair.  I don't
19  recall.
20      Q.   I'm sorry.  You're saying it may have
21  been Sinclair, but you're not sure?
22      A.   Yeah, I don't recall.
23      Q.   Is the first page and the second page
24  part of the same -- is this all one set of

Page 106

1  documents, or is this two sets of documents?
2       A.   I'm looking at the type, the font size,
3  so I don't know.
4       Q.   I notice on the bottom of the first
5  page, it has some -- like an address, and it says
6  "Janet" on the first page.
7       A.   Here?
8       Q.   Down here.  Do you know who Janet would
9  be referring to?
10      A.   I'm not recalling that at the moment.
11      Q.   So you don't have any idea who prepared
12  that first page?
13      A.   I don't recall right at the moment.  I
14  don't recall.
15      Q.   Now, on the second page there's a
16  handwritten note at the top, it says "C.
17  Riggleman."
18      A.   I see that.
19      Q.   Do you know what this sheet was done
20  for?
21      A.   Well, that is certainly the name of a
22  participant.  I can only read to you what -- you
23  know, you're asking me and I can only read to you
24  what it says here.  I don't know --

Page 107

1       Q.   Do you know why this one page here was
2  prepared?
3       A.   I'm not -- I don't know what actuaries
4  do.  I just know that they do their job and that
5  the accounting was done, but to explain any of this
6  is beyond my level of -- to comprehension.  I can't
7  explain it to you.
8       MR. CANETTI:  If we look at the form 5500 for
9  this year, mark this as Exhibit 10.
10           (WHEREUPON, a certain document was
11           marked Sherrod Deposition Exhibit
12           No. 10, for identification, as of
13           May 2, 2018.)
14  BY MR. CANETTI:
15      Q.   Now, do you recognize this as the Form
16  5500 for the plan for 2012?
17      A.   That's what it says.
18      Q.   And then it says for the person that
19  signed it, it says Leroy Johnson?
20      A.   I see that.
21      Q.   Is it your knowledge that he is the one
22  that authorized or applied his electronic signature
23  for this document?
24      A.   That's what it says.

Page 108

1       Q.   Now, on the bottom box, preparer's name,
2  it doesn't have anybody identified.  Do you see
3  that?
4       A.   It says that's optional.
5       Q.   And do you know who prepared it for
6  2012?
7       A.   I don't recall.
8       Q.   Now, it says in 5(a), it says the
9  participants are 17 beginning and end of the year.
10  Do you know why it changed from 18 to 17?
11      A.   I could only guess and my -- that -- I
12  don't like to guess.  But I don't think --
13      Q.   Who do you think could answer that
14  question?
15      A.   No.  Let me guess for you because it's
16  not nefarious.  I believe I've been listed twice on
17  the other and so I think that there were 18
18  figures -- 18 different valuations, and there were
19  17 people because there -- you know, I'm listed
20  twice because I had done a rollover, and it's a
21  part from the other.
22           So it's probably confusing, but I think
23  that it's a matter, when you start counting the
24  names, I think in the past my name had been counted



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
109–112

Page 109

1 twice. That's just -- but, here again, I'm
2 speculating. I shouldn't do that, but it was
3 not -- I don't think that there was anybody --
4 well, you go ahead.
5     Q.   Was there a participant named Yang who
6 was identified in 2011 and then not in 2012?
7     A.   That may be possible. I think that
8 there was -- Yang was -- had been previously paid
9 off or may have been followed up. But I'm still
10 not certain that that's why that says 17. I'm not
11 going to agree to that. I don't think so.
12     Q.   Now, it says on 264, it says on line
13 item I, net income, it says 69,158 for the income.
14     Do you -- did you review that for
15 accuracy?
16     A.   Yes. To interpret something to you,
17 again, this is not my area of expertise, and I
18 would be guessing. I'd have to sit here all day
19 and try to say something. I don't know.
20     Q.   Now, if you go back to Exhibit No. 9,
21 would the same person that prepared these
22 documents, Exhibit 9, been the one that prepared
23 the 5500?
24     A.   We're dealing with the same -- if we're

Page 110

1 dealing with the same year, then probably so.
2     Q.   Exhibit 9 we saw was for what their
3 statement was at the end of December 31, 2012;
4 correct? And now we're looking at the 5500 --
5     A.   Slow down, slow down, slow down. What
6 are you --
7     Q.   Exhibit 9, you said you believed it was
8 done in December of 2013?
9     A.   Yes.
10     Q.   Then we looked at the second page, it
11 said it was their account summary as of December
12 31, 2012.
13     And now we're looking at Exhibit 10,
14 5500 for 2012.
15     So my question is, did the same person
16 prepare the 5500 and these documents?
17     A.   You know, I think so, but I'm not sure.
18 It's always a little bit confusing to me -- well, I
19 guess -- there was always an extension, and it does
20 say 12 -- the year ending 12/31/12. Okay. That's
21 -- all right. Because I'm thinking -- I believe
22 this has been -- it's actually filed in '13, so --
23     Q.   If you look at Mr. Johnson's signature,
24 it has date of file --

Page 111

1     A.   Yeah, yeah. So it would be a little
2 bit -- I'm trying to help you out on it, but you're
3 not going to get a good explanation from me. It's
4 going to be messed up. Okay? If you're taking
5 this down to have any accuracy, you're in trouble.
6 I'm doing the best that I can.
7     Q.   So do you have any reason to doubt that
8 the person that would have performed these
9 documents sometime in 2013 for plan year 2012,
10 that's Exhibit 9, and the person that's helped
11 prepare the documents in 2013 for the 5500 for
12 2012, would have prepared all these documents
13 together?
14     A.   Generally, I believe it's the way that
15 it was done because the documents were always
16 prepared. That's one of the rules. They were
17 always done. And generally you would need the 5500
18 or you would need these -- you'd need the two to go
19 together.
20     Q.   Now, in the first page of Exhibit 9, it
21 has a gain/loss column on the third column;
22 correct?
23     A.   I see that and I'm -- I can't -- I
24 cannot explain that and I'm not going to even try.

Page 112

1 I don't know.
2     Q.   If you total it up, which I did, and you
3 can assume it to be true, it's $76,589.
4     A.   Right. Mr. Canetti, this was out of my
5 area, and we would need -- which we, I think --
6     MR. REARDEN: You just have to let him ask.
7     THE WITNESS: I'm sorry. Go ahead. Go ahead.
8 BY MR. CANETTI:
9     Q.   So it totals up to 76,589. And then we
10 looked at DOL2064, it said the net income was
11 69,158.
12     Can you explain why those numbers are
13 different?
14     A.   I can't explain any of this to you. I
15 think I told you that before.
16     Q.   And the only -- and to your -- best of
17 your knowledge, the person that could answer that
18 would be the accountant or actuary who completed
19 these documents?
20     A.   Perhaps. I don't know.
21     Q.   Is there anybody else who would be able
22 to answer it?
23     A.   Well, I -- I would say that is to be
24 determined.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

Page 113

1  Q.   Would you assume the accountant or
2  actuary who did these for No. 9 and No. 10 would be
3  able to account for that discrepancy?
4  A.   I can't assume anything.
5  Q.   Is there anybody that would be able to
6  explain why those numbers are different?
7  A.   The person who did it, I guess.  I don't
8  know.
9  Q.   And you don't know who did these
10  documents; is that correct?
11  A.   I'm not sure who the -- whether it was
12  Mr. Sinclair, I'm not exactly sure at the moment.
13  Q.   Now, the only accountant and actuaries
14  you mentioned was Sinclair and Reed-Ramsey; is that
15  right?
16  A.   Right.
17  Q.   Were there any other ones?
18  A.   Not that I can think of at the moment.
19  Q.   So based on your current knowledge right
20  now, it would have been one of those two who would
21  be able to answer that question, then?
22  A.   Yeah, I believe.
23  Q.   And you don't recall who it was at
24  Reed-Ramsey that did any work for you; right?

Page 114

1  A.   I think you asked me that before, and I
2  told you I couldn't recall.
3  MR. CANETTI:  Now, in 2013, you also provided
4  us what appears to be a plan account summary.  I'm
5  marking this as Exhibit No. 11.
6        (WHEREUPON, a certain document was
7         marked Sherrod Deposition Exhibit
8         No. 11, for identification, as of
9         May 2, 2018.)
10  BY MR. CANETTI:
11  Q.   And this is Sherrod0000336 to 0000353.
12  Do you recognize this document?
13  A.   These look familiar.
14  Q.   What are these?
15  A.   These would be valuations, the yearly
16  valuations that would have been, I think you asked,
17  mailed out and given to the participants, yeah.
18  Q.   Do you know who would have prepared this
19  document for 2013?
20  A.   Again, I'm assuming perhaps Sinclair.  I
21  don't know exactly for sure, sir.
22  Q.   Would there have been any other pages
23  with this, perhaps a cover page, that had the name
24  of the firm who provided this?

Page 115

1  A.   You know, I don't know because we
2  produced these to the attorney, and it looks -- I
3  don't know whether there was something else that
4  was attached to it or not.  I don't know.
5        (WHEREUPON, a certain document was
6         marked Sherrod Deposition Exhibit
7         No. 12, for identification, as of
8         May 2, 2018.)
9  BY MR. CANETTI:
10  Q.   I'm going to mark this as Exhibit
11  No. 12.  This is the 5500 for plan year 2013.
12  Again, this says that on October 13, 2014, Leroy
13  Johnson either authorized or provided his
14  electronic signature.
15        Do you have any reason to doubt it
16  occurred around that date?
17  A.   No.
18  Q.   Then it says on the second page here,
19  2067 -- first let me back up.
20        Do you know who prepared this for
21  sometime in 2014 for plan year 2013?
22  A.   Would definitely have been actuary, but
23  which one and who, I don't know.
24  Q.   Did Sinclair still do work for you in

Page 116

1  2014?
2  A.   I don't know because I know that
3  Mr. Sinclair had passed away, and whether it was
4  him or some referral source, I don't know.  But --
5  Q.   How did you find Reed-Ramsey?
6  A.   Word-of-mouth.
7  Q.   Who referred you to them?
8  A.   Word-of-mouth.  You talk to people.
9  Q.   Did you review any other actuaries
10  before you retained Reed-Ramsey?
11  A.   I don't recall.
12  Q.   Do you have any documents or records
13  about that that would help you recall?
14  A.   No.
15  Q.   Now, do you know what documents were
16  provided to the actuary that completed this
17  document?
18  A.   No, I don't recall.
19  Q.   Now, you recall we talked about in 2013,
20  which is what this is representing, $50,000 was
21  paid out to you.
22        Do you know how that is captured in
23  here?
24  A.   This is '13?

SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
117–120

Page 117

1    Q.   Yes.
2    A.   No.  I will tell you that I do not see
3  that captured in here, and I am aware of that.
4    Q.   So this is an act to reflect the money
5  that came out of the plan in 2013; is that right?
6    A.   I think that that was amended later, but
7  I don't see it here, that's correct.
8    Q.   Now, in Part V, 10-F on the page 2067.
9    A.   Mm-hmm.
10   Q.   It says, "Has the plan failed to provide
11 any benefit when due under the plan?"  And it says
12 no.
13        Is that accurate?
14   A.   Wait a minute.  Go back.  Go back.  Go
15 back.
16   Q.   10-F.
17   A.   Okay.  Read that again.
18   Q.   "Has the plan failed to provide any
19 benefit when due under the plan?"  And it says no.
20      Do you agree with that statement?
21   A.   I either agree or disagree.  I'm not
22 really -- "failed to provide any benefit when due."
23 I don't know how to answer that, really.
24   Q.   So you don't understand what that is

Page 118

1  saying?
2    A.   No, because there's a whole time it was
3  frozen and nothing could be provided and I -- you
4  know, I don't know -- that really gets to be a gray
5  area.  I don't know how I could answer that.
6  Probably calls for legal interpretation.
7    Q.   If we go back to -- sorry.  I didn't
8  mark these down -- Exhibit 11, if we turn to 346.
9    A.   Yes.
10   Q.   This is the participant statement for
11 C. Riggleman as of December 31, 2013, and it lists
12 a gain and loss but doesn't list anything else
13 affecting the account balance in that plan.
14       Do you see that?
15   A.   Yes.
16   Q.   Is that accurate to the best of your
17 knowledge?
18   A.   So what you're asking me is there was a
19 prior balance; a gain and loss; a contribution,
20 which would be none; forfeiture, none; expenses;
21 adjustments, apparently nothing was subtracted.
22 There were no withdrawals from her account.  Ending
23 balances.
24   MR. REARDEN:  I'm going to object to your

Page 119

1  question on the basis of it calls for a legal
2  conclusion.
3        Go ahead and answer.
4  BY THE WITNESS:
5    A.   I was -- he's asking -- I don't know.  I
6  mean, I'm just reading to you what I see --
7  BY MR. CANETTI:
8    Q.   Sure.  Let's keep that page open for a
9  moment and go back to the Comerica communications.
10   A.   Mm-hmm.
11   Q.   Which is a different document.
12   A.   Mm-hmm.
13   Q.   Do you want to grab your copy?
14   A.   I got --
15   Q.   Leave that open on that page so you can
16 refer to it.
17   MR. REARDEN:  Can you tell us what deposition
18 exhibit you're referring to?
19 BY MR. CANETTI:
20   Q.   This is Deposition Exhibit No. 6.  I'm
21 referring to page 2301.
22   A.   Mm-hmm.
23   Q.   This looks like a letter dated
24 December 23, 2013.  It says, "Dear Keith," and it's

Page 120

1  from you.  Is that your signature?
2    A.   That's right.
3    Q.   And it says, "A participant needs to opt
4  out of the plan by year's end.  Will you kindly
5  have checks drawn in the following amounts."
6        And it says approximately 12,000 to
7  Carol Riggleman, approximately 3,000 to the IRS.
8    A.   Mm-hmm.
9    Q.   Did you send this letter at that time?
10   A.   To who?
11   Q.   To Keith?
12   A.   Yes.
13   Q.   And then were checks issued pursuant to
14 your instructions at that time?
15   A.   Yes.
16   Q.   So when it says here back on Exhibit
17 No. 11 that there is no withdrawal for
18 Ms. Riggleman, is that accurate?
19   A.   Yes.  I mean, I need to clarify that.
20 These checks were uncashed, so she still had that.
21   Q.   So these checks were issued from the
22 account; right?
23   A.   Yes.
24   Q.   And so the account was reduced by these



Page 121

1 amounts; correct?
2    A.   Not her account.  She didn't -- there
3 were still checks.
4    Q.   So was the plan's account balance
5 reduced by these amounts?
6    A.   We're not looking at the plan's account.
7 You're having me look at hers, and it's not reduced
8 because she didn't get it.
9    Q.   So you're saying this was a reduction
10 just to the plan overall but not to her account?
11    A.   I'm not saying anything.  I'm just
12 telling you because it's confusing and this is why,
13 you know, we're looking to have really good
14 accounting done because it's been so screwy here.
15 But the woman didn't get this.  If she has nothing
16 taken out, you can't make her zero next year.
17 Okay?
18    Q.   So how -- so this money did come out of
19 the plan, though; correct?
20    A.   I believe that that was determined later
21 that it did, I believe.  I'm not -- as I sit here,
22 I don't have sheets in front of me and I'm not
23 going to try to draw the exact conclusion, but I
24 believe that it did.

Page 122

1    Q.   And did you subsequently --
2    A.   Excuse me.  There was -- let me
3 straighten that out.  On paper.
4    Q.   It came out on paper?
5    A.   Yeah.
6    Q.   So the bank account was reduced by these
7 amounts; correct?
8    A.   On paper but not accurately.  It's, you
9 know, it's --
10    Q.   Did you then get notification from
11 Comerica that those amounts were not cashed?
12    A.   I believe that maybe some six months or
13 so later it was brought to our attention that they
14 were uncashed checks.
15         (WHEREUPON, a certain document was
16          marked Sherrod Deposition Exhibit
17          No. 13, for identification, as of
18          May 2, 2018.)
19 BY MR. CANETTI:
20    Q.   Let's just go back to mark this as
21 Exhibit 13.  These are the checks and account
22 statements for 2013 from Comerica.  It lists
23 "Pershing" which must have been some type of bank
24 above Comerica, but you can see in the middle it

Page 123

1 says "Comerica Securities."
2         So the first one is a check, July 16,
3 '13, for $18,000.  Is that your signature on the
4 page 4391 on the bottom right-hand side?
5    A.   Yes.
6    Q.   And then the next page, DOL4396, another
7 Comerica check for 32,000 to Shirley Sherrod.  Is
8 that your signature on the bottom right-hand side?
9    A.   Yes.
10    Q.   And then DOL2301 is, again, that same
11 letter we looked at before; correct?
12    A.   Yes.
13    Q.   And then this is the account statement
14 from Comerica on the last page.  And do you see at
15 the bottom, the last two entries from December 24,
16 2013, it shows the check for 12,600 being
17 subtracted from the account and one for 3150 being
18 subtracted from the account?
19    A.   I see that.
20    Q.   Does that correspond to the letter on
21 the previous page to the amounts?
22    A.   That would correspond to checks that
23 were cut, yes.
24    Q.   Now, back to Exhibit No. 12, the 5500

Page 124

1 for that year.  So on page 2 it shows the changes,
2 the financial information, under section Part 3 on
3 page DOL2067.
4    A.   Hang on.
5         Yeah.
6    Q.   Top part of financial information, was
7 the approximately $15,000 that came out of the
8 account in December, was that reflected at all in
9 the Part 3, financial information?
10    A.   As of -- as of the time that this was
11 being filed in '14, and so let's go back to --
12 again, we're talking about October '14, and so --
13 no.  Give me that question again, please.
14    Q.   The $15,000 we saw that came out in
15 December of 2013, is that reflected at all?
16    A.   Where?
17    Q.   In this section up here related to the
18 financial information --
19    A.   Yeah, I don't -- I don't know.  I really
20 don't know.  Again, you have to talk with the
21 person who did it.  I don't know.
22    Q.   And, again, you don't know who did this,
23 who did this form?
24    A.   No.  I'm not sure.



Page 125

1    Q.   Is it possible somebody besides
2    Mr. Sinclair, somebody from Reed-Ramsey?
3    A.   I'm not sure.
4    Q.   Now, I wanted to just confirm, the
5    litigation you had in Illinois with -- involving
6    Merrill Lynch, did that conclude on June 11, 2013?
7    A.   That sounds right.
8    Q.   I can show you this for reference, but
9    we can put it in if you want to look at it.  But
10   this is the decision from the United States Court
11   of Appeals for the 7th Circuit, captioned Leroy
12   Johnson versus Merrill Lynch.  At the top it says,
13   "Filed:  June 11, 2013."
14        Do you recall ever seeing this document?
15   A.   No, I was not -- and at that point LJ,
16   Leroy and Mr. Conger were working together on this,
17   and I really was not so involved.  So, no, I don't
18   know.
19   Q.   But it sounds that that could be right,
20   that approximately June of 2013 was when the
21   Illinois litigation came to a close?
22        MR. REARDEN:  I'm going to object on the basis
23   of calling for a legal conclusion.
24

Page 126

1    BY THE WITNESS:
2    A.   The date is what I can verify.  Anything
3    else, it's out of my wheelhouse.
4    BY MR. CANETTI:
5    Q.   There was one point here I wanted to --
6    I guess I'll mark this as an exhibit.
7         (WHEREUPON, a certain document was
8          marked Sherrod Deposition Exhibit
9          No. 14, for identification, as of
10         May 2, 2018.)
11   BY MR. CANETTI:
12   Q.   Exhibit No. 14, and I wanted you to turn
13   to page 22225.  It's also page 13 of the decision.
14        Now, in the second paragraph on the page
15   that starts "Merrill Lynch," in the last two
16   sentences it starts out "throughout the pendency
17   of" --
18   A.   Hang on.  I'm sorry.  The -- which
19   paragraph?
20   Q.   The middle paragraph.
21   A.   The middle paragraph that starts with
22   "Merrill Lynch"?
23   Q.   Yes.
24   A.   Go ahead.

Page 127

1    Q.   Then we see a few lines down, it says
2    "throughout the pendency."
3    A.   Okay.
4    Q.   It says, "Throughout the pendency of
5    this suit, Sherrod is the only participant in the
6    plan who has requested distribution.  Had any other
7    of the plan's 18 participants requested
8    distribution, Merrill Lynch maintains that it would
9    not refuse instructions from the plan
10   administrator."
11        Do you dispute the factual accuracy of
12   what Merrill Lynch represented, that it would have
13   made distributions to other participants?
14   A.   Absolutely.
15   Q.   Why is that?
16   A.   Because of conversations that I had with
17   Merrill Lynch personally, person to person.
18   Q.   Did you ever try to secure distribution
19   for any other participants at that time while it
20   was frozen?
21   A.   No one else came forward.  We discussed
22   it.  But I tried everything.  I would say generally
23   I tried everything that I could do on earth to get
24   this undone because it should not have ever

Page 128

1    happened.  And that was including going to the
2    Department of Labor and knocking and banging on
3    your doors forever and ever.
4    Q.   Did you try and change where assets were
5    invested with Merrill Lynch during the time when
6    the account was frozen?
7    A.   You want the answer to that?  Sure.  I
8    guess you asked the question.
9         There was at one point in time a -- I
10   guess you call it a settlement conference that we
11   had to attend, and Mr. Conger advised the Merrill
12   Lynch attorney, you can get out of this, just
13   change custodian; and they refused, until we spent
14   all those funds and went through all of this.  But
15   that was certainly asked.  There's probably records
16   of it.
17   Q.   Did you try and change where they were
18   invested at Merrill Lynch?  Has it changed your
19   investment allocation at any point?
20   A.   I just told you.  That was my answer.
21   Q.   At Merrill Lynch.  Let's say, for
22   example, I don't know exactly how they were
23   invested but just hypothetically, say you had them
24   all invested in Google stock, and you wanted to



Page 129

1   change it from Google stock to Facebook stock.
2        Did you try and change --
3     A.   I think I see your point.
4     Q.   -- different investment vehicles at
5   Merrill Lynch to different places?
6     A.   Merrill Lynch blocked any administration
7   of that plan off that we were not administrators.
8   We could do nothing.  They would not let us buy,
9   sell, or do anything.
10         There was a lady there, Linda, she said
11  it's closed, protected or whatever.  We could not
12  get any cooperation from Merrill Lynch.  And I
13  think that you'll see -- I don't know which
14  attorney it was, but they took over -- they were
15  the administrator.  They were the trustee.  Merrill
16  Lynch ran this plan for three years.
17    Q.   Do you have any records of any written
18  requests you made to try and move the assets where
19  they were at Merrill Lynch to a different account
20  at Merrill Lynch?
21    A.   There -- there may be some things that
22  existed in e-mail, I think, where Mr. Ciccodicola
23  wanted -- at some point he asked to move it to
24  Mr. Morad, and he asked and they refused.  We -- I

Page 130

1   think I saw something like that.  I don't know
2   whether you have it.  It was an e-mail, I think,
3   that was sent out.
4          We tried everything.  Okay?  This was
5   very important.  These are my life savings, and
6   these are the people that we wanted to help and
7   still feel the same way, and there was nothing.
8   This should not have happened.  I banged on
9   Department of Labor's doors, saw your notes there,
10  Washington, D.C. and everywhere.  Slept in my car
11  one night to get there with no funds just to try to
12  get this undone.  Because it wasn't right and you
13  guys know that.
14         I should stop talking.  This has been a
15  very bad experience and --
16    MR. REARDEN:  We should stop right there.
17  Just answer his questions.
18    THE WITNESS:  I know it wasn't his question,
19  but I feel -- I apologize.  I tried.
20  BY MR. CANETTI:
21    Q.   Now, here is two other pages you
22  produced to us, appear to be related.  This is
23  Exhibit No. 15.
24

Page 131

1          (WHEREUPON, a certain document was
2          marked Sherrod Deposition Exhibit
3          No. 15, for identification, as of
4          May 2, 2018.)
5   BY MR. CANETTI:
6     Q.   It's a DOL23 -- I'm sorry -- Sherrod231
7   and 232.  I'm going to start with the second page
8   first, 232.
9          Is that your signature under Shirley T.
10  Sherrod for the plan?
11    A.   Yes.
12    Q.   And then do you recognize as
13  Mr. Johnson's signature under "Leroy Johnson, Plan
14  Administrator"?
15    A.   I do.
16    Q.   And was this the document that appointed
17  Mr. Johnson to be the plan administrator?
18    A.   14?
19    Q.   First page.
20         I'm sorry.  The second page is what I'm
21  referring to.
22    A.   The second page, that would be correct.
23    Q.   And it says in paragraph No. 2:  "I
24  hereby appoint Leroy Johnson plan administrator as

Page 132

1   successor to myself."
2          Were you the plan administrator up until
3   that point?
4     A.   I think it was Merrill Lynch, but
5   whatever you want to say, yeah, okay.  You know,
6   figuratively, yes.  In actuality, no.
7     Q.   Before the freeze in February of 2011,
8   were you the plan administrator?
9     A.   Yes.
10    Q.   And then on the first page, Sherrod231,
11  it says, "I, Leroy Johnson, administrator of the
12  Shirley T. Sherrod, M.D., P.C., Target Benefit
13  Pension Plan and Trust turn the administration of
14  the plan over to L. J. Consulting Services."
15         Have you seen this document before?
16    A.   I don't recall.  It makes sense, but I
17  don't recall that I've necessarily seen this.
18    Q.   Do you recognize that as Mr. Johnson's
19  signature?
20    A.   It looks like the signature.
21    Q.   Do you know if he had the power to
22  appoint a new administrator as the plan
23  administrator?
24    A.   That's a legal question that I can't

Page 133

1  answer.

2     Q.   And your understanding is whatever

3  powers they have would be defined in what you refer

4  to as the manual or the plan document?

5     A.   The operating manual.  That's my

6  understanding.  Again, I'm not an attorney, and

7  if -- the plan attorney would probably make the

8  ultimate decision.  I don't know.

9     Q.   So you think the plan attorney could

10  make the decision?

11     A.   Well, I would assume that they would

12  give advice and direction.  That's what I would

13  assume.  I don't know otherwise.

14     Q.   So the attorneys would give advice, but

15  they wouldn't make the decision?

16     A.   I -- you know, I don't know.  That's --

17  you know, there's the attorney.  There's the

18  manual.

19     Q.   So would the manual provide the answer

20  to that question?

21     A.   I, you know --

22     MR. REARDEN:  Objection.  Calls for a legal

23  conclusion.

24

Page 134

1  BY THE WITNESS:

2     A.   I don't know.

3  BY MR. CANETTI:

4     Q.   Where would you look to find an answer

5  to know who had the powers to appoint the plan

6  administrator?

7     A.   Between the attorney and the manual.

8        (WHEREUPON, a certain document was

9         marked Sherrod Deposition Exhibit

10         No. 16, for identification, as of

11         May 2, 2018.)

12  BY MR. CANETTI:

13     Q.   Marking this as Exhibit No. 16.  This is

14  the Form 5500 for 2014.  It says it was filed on

15  October 12, 2015, with an authorized/valid

16  signature for Mr. Johnson.

17        Have you reviewed this document before?

18     A.   I may have seen it, but I don't recall.

19     Q.   Do you know who prepared this document?

20     A.   Again, I'm not exactly sure.

21     Q.   Now, it's in -- would it have been

22  prepared around the time that it was filed in

23  October of 2015?

24     A.   It would have been prepared by --

Page 135

1     Q.   Around the time it was filed.

2     A.   I'm not certain about that.  I just know

3  that it was -- met the deadline.

4     Q.   Do you know when Mr. Sinclair passed

5  away?

6     A.   No.

7     Q.   It's my understanding Mr. Sinclair

8  passed away on December 24, 2014.  Do you have any

9  reason to doubt that date?

10     A.   No, if that's what you have.

11     Q.   So if he did die in December of 2014,

12  would he have assisted at all in the preparation of

13  this 5500?

14     A.   I can't give you that answer.  I don't

15  know.

16     Q.   Well, would this have been -- since it

17  talked about information the end of 2014, that it

18  would have been prepared sometime after the end of

19  the year?

20     A.   I don't know.

21     Q.   So it's possible this was prepared

22  before the fiscal year ended?

23     A.   I don't know.

24     Q.   Because it has information about where

Page 136

1  the plan assets were at the end of the year, as of

2  December 31, 2014.

3     A.   Mm-hmm.

4     Q.   So it seems you could only make that

5  representation after the end of the year when

6  you're in 2015.  Do you agree with that?

7     A.   No.  I told you I don't know, sir.  I

8  don't know what kind of conclusion you're trying to

9  have me come to.  I don't know.  I don't have the

10  answers to these questions.

11     Q.   So you think maybe somebody prepared

12  this in 2014?

13     A.   Well, obviously it was prepared; we have

14  it here in front of us, but I don't know.

15     Q.   Even though Sinclair passed away in

16  December of 2014, you think he may have prepared

17  this?

18     A.   I didn't tell you that.  I told you I

19  didn't know.

20     Q.   Well, if Sinclair didn't prepare this,

21  is Reed-Ramsey the only other person that could

22  have prepared this?

23     A.   I just -- again, I don't know.

24     Q.   You have no idea who prepared this?



Page 137

1    A.    At the moment, no, I don't recall.  I
2 don't know.
3            (WHEREUPON, a certain document was
4            marked Sherrod Deposition Exhibit
5            No. 17, for identification, as of
6            May 2, 2018.)
7 BY MR. CANETTI:
8    Q.    Marked this as Exhibit No. 17.  This
9 appears to be participant statements for 2014.
10 These are provided by you, Sherrod0000354 to
11 000371.
12           Do you know who prepared these?
13    A.    If it was anything like what it had been
14 before, if this is '14, then likely -- and here
15 again, I'm not sure -- whoever did the 5500 would
16 have done these.
17    Q.    And do you know when this was prepared?
18    A.    No.
19    Q.    But you don't know who did it, but you
20 think whoever prepared this probably prepared the
21 5500 as well?
22    A.    Account summary as of December 31, 2014,
23 so it looks like it would have been after the end
24 of December, probably after '15.

Page 138

1    Q.    Again, you think that the 5500 was
2 prepared in 2015, then; right?
3    A.    It would appear to be the case, but I'm
4 not exactly certain.  Was certainly after the
5 documentation.
6    Q.    And then on page Sherrod370, it lists
7 withdrawal for 57,000 under your name for Shirley
8 Sherrod?
9    A.    I see that.
10    Q.    Does that accurately reflect the amount
11 of distribution you received in 2014?
12    A.    I'm going to -- let's just --
13    Q.    If you look on page 2 of the Form 5500,
14 line number 7D, it says 57,000 under benefits paid.
15    A.    Yeah, those things seem to comport with
16 each other.
17    Q.    Now, under each person's page, it also
18 lists expenses/adjustments.  Do you see that line
19 item?
20    A.    I see that.
21    Q.    And it's your understanding that that
22 sum relates to the amount under -- on 5500 under 7F
23 and 7G for administrative service providers and
24 other expenses?

Page 139

1    A.    Well, I understand what you're saying.
2 However, I'm not preparing this.  I'm not the
3 expert who was putting all this together.  So I
4 really prefer to take -- and no insult to you --
5 but the information from a certified actuary.  I
6 know that you're reading from what they're doing
7 and not necessarily seeing, so to come to
8 conclusions, I'm not going to make any
9 understanding.
10    Q.    You can't identify for us who that
11 person was; right?
12    A.    At the moment, no, I don't have that
13 information, sir.
14    Q.    Now, it says here on the Form 5500, if
15 you add the 129,438 --
16    A.    Wait, wait, wait.  Wait a moment.
17    Q.    7F and 7G.
18    A.    Year '14.  Okay.  And for 7F --
19    MR. REARDEN:  You mean 8F?
20 BY MR. CANETTI:
21    Q.    I'm sorry.  I apologize.  Yes, you're
22 right.  8F and 8G.
23           It says administrative expenses were
24 129,438, and other expenses were 12,562, and that

Page 140

1 totals to $142,000.
2    A.    Mm-hmm.
3    Q.    Is that the total amount of expenses
4 that were paid in 2014?
5    A.    I have to make the assumption.  You
6 know, I'm looking at this.  I do know that we
7 provided you with the breakdown of all those
8 expenses.  You should have that, and it was
9 provided -- I remember seeing an Excel sheet or
10 something like that, along with the payments.  So I
11 would assume.  I don't have everything in front of
12 me that went to you, so right now I'm doing
13 guesswork.  And I don't know what to tell you --
14    Q.    Did that money, was that all paid to
15 you?
16    A.    What all paid to me?
17    Q.    The 142,000.
18    A.    No.  It says expenses; right?
19    Q.    It says "administrative service
20 providers and other expenses."
21    A.    It's not me.  That -- I'm not an
22 administrator service provider.
23    Q.    Was any money paid to you for
24 administrative services or other expenses in 2014?



Page 141

1    A.   I don't charge for administrative
2   services. Benefit. Distribution.
3    Q.   Now, you said previously that you paid
4   for expenses in 2011, '12 and '13, and then that
5   you got reimbursed in 2014. Is that right?
6    A.   I really wouldn't call it a
7   reimbursement. When there's bills that are owed
8   out there, you pay the people that are owed.
9   Nothing went in my pocket. I didn't get reimbursed
10  for what had been done.
11   Q.   So when you paid some bills in 2011,
12  2012 --
13   A.   Right.
14   Q.   -- were there any -- did you consider
15  that a loan to the plan?
16   A.   I don't know exactly, in speaking with
17  whoever, Sinclair, how they interpreted that.
18  That, again, goes back to the professional doing
19  this. You simply give them the numbers, and they
20  put it in a column they think it belongs in.
21  That's not something I do or explain to you.
22   Q.   You said you gave them the numbers.
23  What number do you give them?
24   A.   In other words, basically it's like the

Page 142

1   same thing I gave you. This is, you know, legal
2   expense or whatever, and they break it down and
3   they make the decisions how they think it should
4   be.
5    Q.   So you think they make the decisions on
6   how things should be allocated?
7    A.   That's correct.
8    Q.   You don't have -- do you have any role
9   in that decisionmaking?
10   A.   Only to give a receipt. I'm not an
11  actuary. This is why we hire -- you know, rely on
12  their opinion.
13   Q.   Did you execute any loan documents for
14  any lending of money made to the plan in 2011, '12,
15  or '13?
16   A.   I don't know if they were considered
17  loans or how they were looked upon at the time.
18   Q.   Do you believe you paid money on behalf
19  of the plan in 2011, '12, and '13?
20   A.   Yes.
21   Q.   And did you get that money paid back to
22  you at a later date?
23   A.   No money was ever paid back to me.
24   Q.   So this $142,000 that came in, none of

Page 143

1   that money went to you?
2    A.   No.
3    Q.   Were there checks written to you that
4   you signed?
5    A.   Checks were certainly written to me, but
6   they didn't -- but I didn't keep those for any
7   personal use. They were applied to those
8   outstanding expenses.
9    Q.   You said in your interrogatory
10  responses, "The plan paid 193" -- no. I'm sorry.
11      "In 2014, the plan paid $193,905 to
12  Dr. Sherrod to reimburse her for the attorneys'
13  fees and expenses she personally assumed over a
14  roughly three-year period in connection with
15  unfreezing the plan."
16      Is that an accurate statement?
17   A.   I think that the characterization is not
18  exactly correct. It didn't -- I didn't get any
19  reimbursement. Those were outstanding bills and
20  sort of obvious because you've been checking my
21  credit card statements all along, but I --
22   Q.   Do you believe you provided us your
23  credit card statements?
24   A.   Oh, you have them.

Page 144

1    Q.   We have your credit card statements?
2    A.   Yeah. He's been getting them, and he's
3   been subpoenaing people all over the place.
4    Q.   What makes you believe we have your
5   credit cards statements?
6    A.   Your disk that you turned in. Now, you
7   got a lot of redactions, so there's probably more
8   there that I'm not -- thousands pages of
9   redactions, but my statements are on the disk.
10      MR. REARDEN: You've just got to answer his
11  questions.
12      THE WITNESS: Okay. I'm sorry.
13  BY MR. CANETTI:
14   Q.   So you're saying this representation
15  here that you signed off on that said you got
16  reimbursed in 2014 for $193,905 is not correct?
17      MR. REARDEN: Can you hand her the
18  interrogatory answers so she can take a look?
19  BY MR. CANETTI:
20   Q.   You can look at it, sure.
21      Did you have a chance to review that?
22   A.   Yeah. It's not -- there was not -- I
23  think it's a matter of the language that was used,
24  but it's not a reimbursement that went into my



Page 145

1  pocket.
2     Q.   You signed off to the factual accuracy
3  of all these responses; correct?
4     A.   Yes.
5     Q.   So I'm trying to understand.  You're
6  saying this is not accurate, then?
7     A.   I don't know that I would characterize
8  it like that as not accurate.  I think it's a
9  matter of how one characterizes that.
10    Q.   You said earlier you put money -- you
11  paid people by taking loans off your credit cards
12  in 2011, '12 and '13.
13    A.   I did.
14    Q.   Right?  Did you then take money out of
15  the plan and pay yourself back and pay off those
16  credit cards?
17    A.   I think -- I guess it would be
18  confusing.  Pay myself back?  No, I didn't pay
19  myself back.
20    Q.   Did that money go to your credit cards
21  and pay off the loans you had on your credit cards?
22    A.   Yes.  It went towards the credit cards.
23    Q.   Why do you not think it's paying
24  yourself back?

Page 146

1     A.   Because it was a debt that was generated
2  for the plan.
3     Q.   So it was a debt to the plan?
4     A.   Yeah, it was an expense.
5     Q.   So you loaned the plan that money;
6  correct?
7     A.   I don't know that I would consider it a
8  loan at the time that it happened.
9     Q.   You're saying the plan had a debt to
10  you?
11    A.   When all was said and done, there was
12  monies that were owed that had been for the plan,
13  and when the information was given to the attorneys
14  and the actuary, this is the way they summed it up.
15    Q.   So the money that you're saying here in
16  2014, this 193,905, that went and paid off amounts
17  on your credit cards; is that right?
18    A.   I think that the amount of 193 is wrong.
19  You're -- that's -- I think you're looking at the
20  total -- you're including in there what was
21  actually a distribution.
22    Q.   I'm not including that in there.  I'm
23  reading what you said here as what happened in
24  2014.

Page 147

1     A.   I think it's broken down on the 5500.
2  You see, there's one -- apparently the 5500 is not
3  really agreeing with that because it's broken down.
4  And so the 5500 is what was filed, and that's what
5  is -- obviously, there's two different versions,
6  and the 5500 doesn't agree with that.
7     Q.   So you think this 193,905 is not
8  accurate?
9     A.   I have to stand by the 5500 that has
10  broken it down, and I think that that needs to be
11  broken down.  It was not.
12    Q.   Well, if it's 193 -- I'm sorry -- or
13  194, and you're saying you had 57,000, so 50,000
14  off of that would be 144, approximately, and then
15  another 7,000 would be, like, 137,000.
16         So that's still -- even if the
17  distribution you're saying was calculated in there,
18  that still doesn't arrive at the 142,000.
19    A.   I'm not sure what number you're looking
20  at.  I'm looking at the 5500, and this is what the
21  person who does the math was adding up.  And I
22  wouldn't necessarily rely on the addition there.
23    Q.   You wouldn't rely on the -- you're
24  saying you would not rely to these responses you

Page 148

1  gave to us?
2     A.   I would have to rely on the 5500.  It
3  broke it down.  That's one whole sum, and it's not
4  broken down as it is here with an explanation.
5  There's no explanation there.
6     Q.   What are you referring to -- you said
7  you gave, like, a spreadsheet that had the 142,000
8  broken out; is that right?
9     A.   I believe.  I don't have it in front of
10  me, so I guess you'll have to go back and look.
11    Q.   But there's no changes to these
12  interrogatories that you signed off as being
13  factually accurate; is that correct?
14    A.   I'm not sure what you're talking about.
15    Q.   These -- this response here, you did not
16  amend these responses another time; correct?
17    A.   I don't know.
18    MR. CANETTI:  Let's go off the record.
19         (WHEREUPON, a discussion was had off
20          the record.)
21         (WHEREUPON, a short break was
22          taken.)
23  BY MR. CANETTI:
24    Q.   I would like to remind you you're under



Page 149

1   oath.
2        The plaintiffs want to clarify from this
3   morning.  Now, back to when the bond was entered in
4   2011, the courts -- the appellate court actually
5   ordered that you could pay a bond or you could sit
6   for a deposition.
7        Do you recall that?
8    A.   You know, that would have all gone
9   through the attorney, and so what you're asking me
10  is something that I didn't make arrangements for.
11  I don't know.  And I can't really give you --
12  there's no comment I can give you on that.  I'm
13  sorry.
14   Q.   I will give you -- if you turn to
15  Exhibit 2 and page 2085 -- or, I'm sorry, that's a
16  3 -- 2035.
17   A.   Which exhibit was it?
18   Q.   It's the one that looks like this on the
19  front.
20       So if you turn to what is marked as
21  Exhibit 2 on this exhibit on 2035.  This is an
22  order from the Court of Appeals, State of Michigan,
23  dated October 28, 2011.  And in the -- one, two,
24  third -- fourth paragraph, the second sentence, it

Page 150

1   says, "Continuation of the appeals is conditioned
2   upon appellants," which was you at that point,
3   "either posting bond in the amount or presenting
4   appellant, Shirley T. Sherrod, M.D., for a
5   creditor's examination under oath and producing
6   relevant discovery documents requested by
7   appellees; that is, the appeals may proceed without
8   the posting of the bond if Dr. Sherrod appears for
9   a creditor's examination and produces the requested
10  documents."
11       Did I read that right?
12   A.   You did.
13   Q.   And so why did you not sit -- or chose
14  to sit for a creditor's examination and produce
15  requested documents in lieu of posting a bond?
16   A.   Tried and refused --
17       MR. REARDEN:  Calls for a legal conclusion.
18       You can go ahead and answer.
19  BY THE WITNESS:
20   A.   Tried and refuse from the other side.
21  There's documentation.
22  BY MR. CANETTI:
23   Q.   You're saying the other side refused to
24  take your deposition or creditor's examination?

Page 151

1    A.   They wanted the money.  They didn't take
2   it.  They wouldn't take it.  Refuse -- it's
3   documented.
4    Q.   And do you still -- are you still in
5   possession of those documents?
6    A.   I believe that the -- there's e-mail
7   between the attorney, I think.  I'm sure that the
8   other -- the Groom firm had that documentation.  I
9   haven't seen it, but it exists.  And that's the
10  only answer I could give you on that.
11   Q.   What did the other side refuse exactly?
12   A.   You probably need to see -- I'm not
13  going to quote because I would be saying the wrong
14  thing.  What you need is the documentation.
15   Q.   So you're saying you offered to sit for
16  a creditor's examination consistent with this court
17  order, and they refused to do that?
18   A.   Yes.
19   Q.   Why did you not bring that before the
20  court, then?
21   A.   It was their choice.
22   Q.   Actually, it says it's your choice.
23   A.   Well, from what I know, that would have
24  been a lot easier, that was my choice to do that.

Page 152

1   I think that that document, if you look into it,
2   you'll see it says that.
3    Q.   So no court action was taken to try and
4   get them to comply with this order saying that you
5   could do a creditor's examination instead of
6   posting a bond?
7    A.   If they didn't -- I don't know.  You
8   know, I'm not an attorney.  All that I know is that
9   I told my attorney, yeah, fine, and they wouldn't
10  do it.  So what do you want me to do?
11   Q.   What you could do is challenge that in
12  court.
13   A.   That's --
14       MR. REARDEN:  Objection.  Calls for a legal
15  conclusion.
16  BY MR. CANETTI:
17   Q.   There's no record of that.
18   A.   Talk with the attorney.
19   Q.   And what attorney would that be?
20   A.   Whoever was on the case at that time,
21  I'm sure that they would be more than happy, but --
22   Q.   But you don't know who that attorney was
23  on the case at the time?
24   A.   Is it not on your records there?



Page 153

1    Q.   It's not listed on it.
2    A.   Well, it's not hard to find, so you
3  could talk with them.  They know.
4    Q.   Now, did you move the plan assets from
5  the Comerica account to a SunTrust account in
6  February of 2014?
7    A.   I believe that did happen.
8    Q.   Why did you do that?
9    A.   Better returns, better service.
10   Q.   Did you look at any other investment
11  choices or investment options before choosing
12  SunTrust?
13   A.   Probably.
14   Q.   What were the other places you looked
15  at?
16   A.   I don't recall at this time.
17   MR. CANETTI:  Now, in your interrogatory
18  response, we'll mark this as an exhibit so you have
19  your own copy.
20       (WHEREUPON, a certain document was
21        marked Sherrod Deposition Exhibit
22        No. 18, for identification, as of
23        May 2, 2018.)
24

Page 154

1  BY MR. CANETTI:
2    Q.   Number 18, these are the pages we were
3  looking at earlier today.  And I put a line and a
4  star there by what we were talking about earlier.
5  And that said in 2014, paid 193,000, and also says
6  for expenses assumed over roughly a three-year
7  period.
8       What three-year period was that
9  referring to?
10   A.   '11, '12, '13.
11   Q.   So no expenses in 2014, then?
12   A.   That's not true.
13   Q.   So was it a four-year period you're
14  saying?
15   A.   I don't know what you're -- the
16  interrogatory question was.  It looks like maybe
17  you're talking about a certain amount of money,
18  that this is what they were trying to cover.  So I
19  can't -- you know, this is part -- and I don't
20  know, you know, what or how the attorney
21  interpreted that, why it was answered.  I don't
22  understand so well your question or what's
23  happening here.
24   Q.   Well, it says that you were paid money

Page 155

1  to reimburse you for the attorneys' fees and
2  expenses you personally assumed over a roughly
3  three-year period in connection with unfreezing the
4  plan.
5    A.   Mm-hmm.
6    Q.   And for the fees and expenses she
7  assumed in paying plan service providers.
8       So what was a three-year period in
9  connection with unfreezing the plan that you paid
10  attorneys' fees and expenses?
11   A.   I will repeat.  '11, '12, '13.
12   Q.   And then you're saying you sent me an
13  e-mail that -- or your -- there's a spreadsheet or
14  something that was -- explained what those expenses
15  were?
16   A.   Yes.
17   Q.   And you also said that Form 5500,
18  Exhibit 16, has the accurate figures, which is the
19  142,000 in expenses, 57,000 in benefits, and
20  165,914 in income for the plan; is that right?
21   A.   It should comport with the spreadsheet.
22  Now, again, I don't know how -- when an actuary or
23  accountant gets these figures, how they perhaps
24  reclassify them.  So you're asking me about

Page 156

1  something that I didn't fill out and that I don't
2  necessarily understand everything --
3    Q.   Did you supply -- sorry -- did you
4  supply the documents to the actuary that they used
5  to come up with these numbers?
6    A.   They probably would have been supplied
7  from the bank or wherever.  I'm not certain.  It's
8  for them to -- like an accountant does your taxes,
9  that's in their field of expertise, and however
10  they ultimately characterize or do that is what we
11  rely on.
12   MR. CANETTI:  Now, I was able to locate what
13  you're referring to.  This is an e-mail from
14  Mr. Kofoed, November 9, 2017.  I will mark this as
15  Exhibit 19.
16       (WHEREUPON, a certain document was
17        marked Sherrod Deposition Exhibit
18        No. 19, for identification, as of
19        May 2, 2018.)
20  BY MR. CANETTI:
21   Q.   If you look at the next couple pages,
22  it's -- one, two, three -- four pages.  It has,
23  like, expenses broken down for 2011, 2012, 2013,
24  and 2014.  Is that right?



Page 157

1    A.   I have not seen this before, and I'm not
2   sure what he was generating this from.  I don't
3   know.
4    Q.   You never signed off to the factual
5   accuracy of what's on this e-mail; correct?
6    A.   I have never seen it.
7    Q.   So you couldn't have signed off on it
8   because you've never seen it; right?
9    A.   It's the first time I saw this.  I don't
10   know.  I can't tell you anything about it.
11    Q.   So 2011, if you go to the second page,
12   it says that you paid a thousand dollars from
13   actuary expense and $9,000 to unfreeze the plan to,
14   I assume it's Pasquale Ciccodicola.  I can't
15   remember his last name.
16    MR. REARDEN:  I'm sorry.  I'm lost.
17   BY MR. CANETTI:
18    Q.   On page 2, calendar year 2011, it says
19   you paid an actuary expense of a thousand dollars
20   and 9,000 legal expense to unfreeze the plan to
21   PASQ, which I assume was Pasquale Ciccodicola.
22    A.   Right.
23    Q.   And was that -- do you think that number
24   is right there?

Page 158

1    A.   I cannot speak to this number, sir.
2   Again, please go back to the spreadsheet, and I
3   think it --
4    Q.   This is not the spreadsheet you're
5   talking about?
6    A.   Excel spreadsheet.  This is not an Excel
7   spreadsheet.
8    Q.   I do not have any Excel spreadsheet.
9   None was produced to me.  This is what I have from
10   Mr. Kofoed.
11    A.   It was produced to Groom, and I don't --
12   I don't know why or what happened.
13    Q.   I did not receive any instruction from
14   Groom either.
15    A.   So what am I to do?
16    Q.   What am I to do if I don't have the
17   information?
18    A.   Well, then, obviously, there's going to
19   be errors on everything you're calculating there
20   because you don't have all -- you know, that was a
21   concern.
22    Q.   So this -- so 2011, you don't know if
23   that's accurate or not; right?
24    A.   I would not --

Page 159

1    Q.   2012, it says you paid an actuary
2   expense of a thousand dollars, some legal expense
3   to something called Beat for 5,000, Conger for
4   15,000, again, PASQ for 3500.
5    Do you think those numbers are accurate?
6    A.   If you were looking at the spreadsheet,
7   I could stand by it.  I don't know what this is.
8    Q.   There's also travel expenses listed.  Do
9   you know what those relate to?
10    A.   Well, I don't know.  Normally I would
11   like to see more information myself as to where it
12   went.  And I know that -- this is '14, you said?
13    Q.   I'm just talking about 2012 right now.
14    Now, are travel expenses a proper
15   expense that a plan should pay?
16    MR. REARDEN:  Objection.  Calls for a legal
17   conclusion.
18   BY THE WITNESS:
19    A.   You know, when you do these, you talk
20   with the actuary and the -- your accountants, and
21   they look at what it involves.  The plan was
22   frozen.  I know personally that I had to --
23   BY MR. CANETTI:
24    Q.   I'm just talking about the travel

Page 160

1   expenses.  Do you know what those are for?
2    A.   I tried to answer.  I basically could
3   only answer you in generalities.  Okay?  But there
4   were many people that -- in places that I went to
5   personally to try to get this thing undone.
6    Q.   So this is a list of your personal
7   travel expenses?
8    A.   Not personal.  Traveling for the plan.
9    Q.   Well, the travel you made as an
10   individual?
11    A.   I think that you have notes within your
12   notes that I was knocking on the door of the DC
13   DOL.  Those were travel --
14    Q.   Was there anybody else besides you that
15   traveled that this expense relates to?
16    A.   I don't think so.
17    Q.   Now in 2013 --
18    A.   However -- hang on for a second.
19    Q.   Okay.
20    A.   I'm not sure about that number.  Again,
21   I'm not -- you know, about the fact that there were
22   travel expenses, yes.
23    About the numbers on here, the accuracy
24   of these numbers, I am not saying that I am going



Page 161

to sit here and tell you any of these numbers are correct. I don't know.
Q. Let's just double-check and see if anything jogs your memory.
So 2013, it says actuary expense of thousand; legal expense to Conger of 3,000; and travel expenses for 4391.
A. I don't know. I don't have the things in front of me that would help me to make the decision and so it's -- it would be -- to sit here and tell you that is either, you know, you want me to make something up for you, but it would be inaccurate, and I just don't know.
Q. Now, in 2014, it says an actuary expense of a thousand; legal expense to Conger and BK for 11,000; Redfield for 10,000; Gonek for 8,000; Turc for 7,000; Granz, 17,000; Valdemar, 3,000; Granz, 7,000; and a total of $63,000 for actuary and legal expenses.
Do you know if that information is accurate?
A. I'm not going to say yes or no. I don't know.
Q. And at this point in 2014, the plan was

Page 162

no longer frozen, though; right?
A. No, it was not frozen.
Q. Now, if you total these numbers up, they come to approximately $118,000.
A. I don't know where they came from.
Q. Well, I totaled them up. It's 117,921 --
A. You totaled them from what, though?
Q. From what is on this list.
A. I'm really not going to say this is correct. I don't know if this list is correct, sir. So you may be dealing with very erroneous material, and I can't accept that.
Q. So I have -- this list here says 117. I have your interrogatory that says 194, and I have the 5500 that says 142.
What is the correct amount?
A. Well, I believe that the 5500 -- excuse me. Let me go back.
Again, I'm speaking for other people and so I'm sitting here guessing, and this is why there has to be more in-depth work. However, I believe that the interrogatory added the figures and that the 5500 wrote them down the way the actuary saw.

Page 163

You have to speak to Mr. Kofoed or whomever and see how he arrived at these things. I don't know.
MR. CANETTI: Let's look at the withdrawals, the checks that came out of the account in 2014, see if that helps us reconcile this.
So these are all the checks in 2014. We'll mark this as Exhibit No. 20.
(WHEREUPON, a certain document was marked Sherrod Deposition Exhibit No. 20, for identification, as of May 2, 2018.)
BY MR. CANETTI:
Q. So there's a check January 22nd for 10,000 to Shirley Sherrod. Is that your signature on the bottom right side?
A. Right.
Q. Was that a check that came out of the account?
A. Yes.
Q. And then we have another check on January 22, 2014, for 10,000, and that says paid to the order of something -- I can't read exactly -- and then it looks like -- is that your signature

Page 164

there?
A. Yes, looks like that's my signature.
Q. There's another check for January 22, 2014, for $10,000 at -- and, I'm sorry, these pages were 4392, 4393 and 4394.
Is that your signature as well?
A. Which page are you on?
Q. 4394.
A. 24 -- wait a minute.
Q. The third page, way back in the beginning.
A. Yeah, 4394. Yes.
Q. Is that your signature?
A. Right.
Q. And then on -- there's another check for January 22, 2014, for 10,000 on 4395.
Is that your signature?
A. Yes. Mm-hmm.
Q. The next page, another check on January 22, 2014, for 10,000.
Is that your signature on 4397?
A. I'm sure I would have signed all of these, if you want to continue. There's no denying that these are checks that were drawn on the



Page 165

1   account by me and my signature.
2       Q.   Now, in February 11, 2014, on page
3   DOL2298, there's a letter from you dated
4   February 11, 2014, to Keith.
5           Is that your signature on that page?
6           It's out of order.  It's right after
7   4397, just the next page.
8   A.   Yes.
9       Q.   Is that your signature?
10  A.   Yes.
11      Q.   And this was a letter saying to have
12  checks drawn in your name for four checks for
13  $10,000?
14  A.   Right.  Mm-hmm.
15      Q.   And then if you look two pages, and for
16  some reason I did not have a Bates stamp copy of
17  this, this is an excerpt of a bank statement with
18  Comerica, and it shows $10,000 coming out, four
19  checks, on February 11, 2014?
20  A.   Mm-hmm.
21      Q.   Do you see that?
22  A.   Right.  Right.
23      Q.   Do you have any reason to doubt the
24  accuracy of this bank statement?

Page 166

1   A.   No.
2       Q.   Now, let's proceed along.  And these
3   ones are -- were produced double-sided, not on one
4   page.
5           So 2374 is a check for 57,405 to you.
6   And then on page 2375, it appears -- is that your
7   signature there?
8   A.   I'm sure -- that's the only signature
9   because they were all made out to me.  Mm-hmm.
10      Q.   And 2376 and 2377.
11  A.   Mm-hmm.
12      Q.   Is that your signature as well, a check
13  for 5,000 on March 4th?
14  A.   I don't deny any signatures.  They're
15  all mine.
16      Q.   We haven't looked at all of them.
17  A.   I'm sure that they're mine.  This is for
18  your protection, and I've read your protection.  I
19  don't see any checks that were -- they were all
20  made out to me, I think, with exception of
21  Mr. Conger.
22      Q.   So in 2014, all the checks were made to
23  you and signed by you in Exhibit No. 20; is that
24  right?

Page 167

1   A.   To the best of my knowledge, unless
2   something -- yeah.
3       Q.   Now, the total amount of these checks,
4   if you want to go through and add them up, which
5   I've done, is $290,900 -- yeah, 2,900 and 905
6   dollars.
7   A.   You said 2,000?
8       Q.   I mean, I'm sorry, 290,905.
9   A.   Mm-hmm.
10      Q.   Do you have any reason to doubt the
11  accuracy of that number?
12  A.   Yes.
13      Q.   Okay.  And why do you think that number
14  is not accurate?
15  A.   Because these have been looked at
16  before.  All of your accounting work was spent --
17  looked at cursorily before and found them to be
18  incorrect.
19          And in this particular one, there were,
20  like, $40,000, I think, in checks that were
21  uncashed.  So you added those up, and it's sort of
22  throwing everything off.  It's been like a
23  domino effect --
24      Q.   So apart from that 40,000 would make it

Page 168

1   250,000?
2   A.   It's been like a domino effect.  It just
3   keeps, you know, multiplying itself.
4       Q.   No, I understand that.  So there was
5   40,000 in checks that weren't cashed, which would
6   make it 250; correct?
7   A.   There was that, and also I believe there
8   was another one.  I don't have it.  I think it went
9   to Mr. Conger, I think -- so there's errors that
10  are in here.
11      Q.   In 2014.
12  A.   Yeah, 2014.
13      Q.   None of these checks were written to
14  Mr. Conger in 2014.
15      MR. REARDEN:  I beg to differ because --
16  BY THE WITNESS:
17  A.   Yeah.  You're wrong.
18  BY MR. CANETTI:
19      Q.   Let me see.  Which one is that one?
20  A.   It's the only --
21      MR. REARDEN:  Page 2384.
22      MR. CANETTI:  I'm sorry.  You're correct.
23  BY THE WITNESS:
24  A.   Yeah.  There's several there written --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
169–172

Page 169

1
2 BY MR. CANETTI:
3     Q.    You're right.  There's one for 3,000 and
4 one for 1,000.
5     A.    Should be another one in there, too.
6     Q.    So that's $4,000; correct?
7     A.    There -- no.  There's another one that I
8 was -- it was pointed out to me.  I don't know -- I
9 don't have -- I see it right there in front of me,
10 but it's -- your math is off.
11     Q.    We're here to figure out what's off
12 about that.
13     A.    You know what?  And I'm not --
14     Q.    So the 40,000, let's talk about that
15 first and then we'll move on to whatever the next
16 thing.
17         So 40,000 did come out of the plan.
18 That was that Bates stamp we looked at on
19 February 11, 2014.  And then you received a
20 notification, which you provided to us, from
21 Comerica.
22         This is Exhibit No. 21.
23
24

Page 170

1         (WHEREUPON, a certain document was
2         marked Sherrod Deposition Exhibit
3         No. 21, for identification, as of
4         May 2, 2018.)
5 BY MR. CANETTI:
6     Q.    Now, this is uncashed check
7 notifications.  So this refers to first at Sherrod
8 663 to the uncashed check for 12,600 in December
9 of 2013, which ties to the Riggleman check you said
10 that didn't go cashed.
11         Then this DOL664, 665, 666, and 667,
12 those are the four checks all in February 11th
13 related to $10,000.
14         Did I state that accurately?
15     A.    Yeah, from -- from what I see, that's
16 what's there at the moment.
17     Q.    Now, it says in the second sentence on
18 the first page, which is consistent on all these
19 pages, "Currently your investment account is closed
20 and we're unable to credit back the funds to your
21 account at this time."
22         Did you ever get the funds back from
23 these uncashed checks representing approximately
24 $52,000?

Page 171

1     A.    I'm not sure about the 52, and yes, they
2 were recovered.
3     Q.    Were they deposited back in the plan
4 account?
5     A.    They were.
6     Q.    What date was that?
7     A.    I don't recall the date.  I don't have
8 it.
9     Q.    And if we look at all the bank
10 statements, and there's nothing showing a deposit
11 that total up to 52,600, how would you explain
12 that?
13     A.    You're not looking in the right place, I
14 guess.
15     Q.    So your understanding is you went and
16 got this money back and put it back in the bank for
17 the plan; correct?
18     A.    That's right.
19     Q.    And these are dated January in 2016.  So
20 to the extent it was done, it would have been
21 sometime after January 14, 2016?
22         MR. REARDEN:  I'm going to object on the basis
23 of misstatement of the record.
24

Page 172

1 BY MR. CANETTI:
2     Q.    All these are dated January 14, 2016.
3 I'm not making that date up.
4     A.    No, they're not all dated, because
5 you've got Riggleman here was different.
6         MR. CANETTI:  Could you clearly state what
7 you're objecting to?  I don't understand what
8 you're saying.
9         MR. REARDEN:  Are you referring to Deposition
10 Exhibit No. 21?
11         MR. CANETTI:  Correct.
12         MR. REARDEN:  These are checks dated -- issue
13 dates of checks --
14         MR. CANETTI:  Hold on.  I think you misheard
15 me.  I think you misheard me.  These were notified
16 to Ms. Sherrod on January 14, 2016, according to on
17 those dates they were unclaimed funds.
18         MR. REARDEN:  I thought you were talking about
19 the date --
20         MR. CANETTI:  Yeah, the date there.  So as of
21 January 14, 2016, this bank is saying these funds
22 have not been claimed yet.
23         MR. REARDEN:  I see what you're saying.
24

ESQUIRE

Page 173

1 BY MR. CANETTI:
2    Q.   It was sometime after that date, if you
3 did deposit them, that's when it would have
4 occurred; correct?
5    A.   Yes.
6    Q.   So back to the 2014 checks.  Now, we
7 have -- the $40,000 we have there we think went
8 back to the plan sometime in 2016 and 2017;
9 correct?
10    A.   Yes.
11    Q.   And then there was a check, I believe,
12 for 3,000 -- let me see where that one was.
13       All right.  The one for 1,000 was on
14 June 17, 2014, to Mr. Conger.  That's on Bates
15 stamp number 2418.  And that money came out of the
16 account; correct?
17    A.   If it says Mr. Conger, it says the
18 account, it did.
19    Q.   And do you see for the 3,000?  Do you
20 have that page number?  Is that the one that went
21 to Conger.  It just says Shirley Sherrod, doesn't
22 it?
23       And then 2384 is the other check for
24 $3,000 to Mr. Conger, which, again, came out of the

Page 174

1 account; correct?
2    A.   Yes.
3    Q.   So apart from the 40,000 that lowers the
4 amount to 250, are there any other of these checks
5 you're saying that are not accurately -- accurate
6 withdrawals that came out of the account?
7    A.   You know, I would -- I would have to
8 have someone who was -- has a certain amount of
9 expertise to go through there as I did before.
10 There's been so many errors, the fact that you
11 already missed 40, 50, $60,000 --
12    Q.   Actually, I didn't miss any error there.
13    A.   Actually, that was missed because --
14 well, I shouldn't be -- but, you know, I won't say
15 anymore.  I think when a more accurate way of
16 accounting is done by, you know, really, people
17 that are qualified to do it, that we will see how
18 all this came about, because these initial things
19 are inaccurate.
20    Q.   The 2014 filing was done in October
21 of 2015; is that correct?  That's what it says on
22 Exhibit 16?
23    A.   Now where are you?
24    Q.   Exhibit 16 for the 5500, it says it was

Page 175

1 filed October 12, 2015.
2    A.   Slow down.  Slow down.
3       Exhibit 16, you said?
4    Q.   Correct.
5    A.   And, now, what are you talking about?
6    Q.   On the third page -- I'm sorry -- the
7 first page, the very first page, it says, "Signed
8 October 12, 2015, by Leroy Johnson."
9    A.   Mm-hmm.
10    Q.   And as of January of 2016, that 40,000
11 had not been deposited back into the plan, so it
12 still was showing as being out of the plan;
13 correct?
14    A.   As of January '16, I guess the notice
15 came -- I'm not sure when the notice came, but --
16    Q.   We just looked at it.  It was
17 January 2016.
18    A.   No, it came -- in '16, I don't know how
19 it could be on '14.
20    Q.   So as of -- and this is filed
21 October 2015, that 40,000 still was not in the
22 plan's account; correct?
23    A.   I am not certain.  I don't know what
24 you're seeing.

Page 176

1    Q.   You were looking right here --
2    MR. REARDEN:  Let me object on the basis of a
3 legal conclusion.
4 BY THE WITNESS:
5    A.   I don't know.
6 BY MR. CANETTI:
7    Q.   This says January 14, 2016, that money
8 was not -- was remained on cash and sitting at
9 Comerica; correct?
10    A.   I don't know.
11    Q.   You don't know what this says?
12    A.   I see that, but this isn't '16.  You're
13 showing me '14, and as I said to you, this is going
14 to require somebody with some -- I'm not going to
15 sit here and agree to these figures, any of these
16 things you're trying to put out, here because they
17 were sort of fuzzy math from the very beginning and
18 I cannot agree with any of them.  I mean, you can
19 keep adding, but I can't agree to them because --
20    Q.   Well, the total here, I'll tell you for
21 a fact, is 290,905, that's all these checks here in
22 2014.
23       Now, you reported --
24    MR. REARDEN:  I'm going to object to counsel



Page 177

1  testifying.
2      MR. CANETTI:  Would you like to go through and
3  add them up?
4      MR. REARDEN:  No.
5  BY MR. CANETTI:
6      Q.   So it says 290,905 is how much came out
7  of the account.  Now, this here is showing 142,000
8  plus 57,000 that equals, as reported on the 5500,
9  199,000.
10      I'm trying to understand where the other
11  approximately 90,000 is at.
12      A.   Well, we've been trying to understand
13  how you came up with some of these figures, where
14  this 40,000 was missing in checks.  You know,
15  there's errors in what you're saying.  We have
16  errors -- there's errors all over the place here,
17  and I can't sit here, sir, and try to, you know,
18  see what someone who doesn't really do this is
19  trying to add and show me when what's happened.
20      I'm sorry.  I'll have to say that you're
21  confusing me to the point that I'm not able to say
22  anything else about it.  I don't know.
23      Q.   And you can't tell us who filled out
24  this form; right?

Page 178

1      A.   I think we'll need to find somebody who
2  was able to go over these with more clarity for
3  everybody.  I would say this is a big mess.
4      Q.   But you can't tell us who put these
5  numbers in here; right?
6      A.   It wasn't me, and I know that it would
7  have been an actuary.
8      Q.   But we have no idea who it was?
9      A.   There was somebody local.  I was just
10  trying to think.  Neihus or Niehaus
11  (phonetic).  I don't know right now.  It was
12  someone from the area very skilled at doing this.
13      MR. CANETTI:  Now, something else that I was
14  hoping to help me reconcile here.  You had the
15  account at Comerica in January of 2014 I'm going to
16  mark as Exhibit 22.
17      (WHEREUPON, a certain document was
18      marked Sherrod Deposition Exhibit
19      No. 22, for identification, as of
20      May 2, 2018.)
21  BY MR. CANETTI:
22      Q.   And then you had in SunTrust from
23  February 1 to December 31, 2014; is that right?
24      A.   I'm not exactly sure, but obviously

Page 179

1  there was a transfer to the dates.  I don't know
2  exactly.
3      (WHEREUPON, a certain document was
4      marked Sherrod Deposition Exhibit
5      No. 23, for identification, as of
6      May 2, 2018.)
7  BY MR. CANETTI:
8      Q.   Now, if you look at the SunTrust
9  statement, which is -- it says Fidel000262, it says
10  for the year-to-date, and this is for ending
11  December 31, 2014, that the income was
12  approximately $74,000, and --
13      A.   Hang on for a minute.  Where are you
14  reading from?
15      Q.   I'm on this one here, income,
16  year-to-date, 74,000.  Do you see that?
17      MR. CANETTI:  You want me to show you, John,
18  the SunTrust one?
19      MR. REARDEN:  So this is 22 and this is 23.
20  BY MR. CANETTI:
21      Q.   Do you see on the SunTrust one?
22      A.   I see on the SunTrust.
23      Q.   Says income 74,000 and --
24      A.   Wait, wait, wait.  Slow down.  Slow

Page 180

1  down.  Slow down.
2      74,000?
3      Q.   In the year-to-date column.
4      A.   The year-to-date column.
5      Q.   Approximately 74,000.  And then it says
6  change in investment value, 168,000, approximately.
7  Do you see that?
8      A.   That would have been a gain, I guess.
9      Q.   Yep.  And so you add those together,
10  it's about $243,000, just ballparking it.
11      A.   Where are you getting 243?
12      Q.   74 plus 168.
13      A.   I don't mean to be disrespectful, but
14  normally when I go through these things, I have my
15  accountant or somebody go through and I -- this --
16  I feel very uncomfortable with -- you know, this
17  is --
18      Q.   74 plus 168 is 242,978 is what those add
19  up to.
20      Now, if you go and look at your -- the
21  one month you had at Comerica, this page over here,
22  it says that the dividends was $586, and there was
23  a loss of $30,848.  Do you see that, these figures
24  here?



Page 181

1    A.   Mm-hmm.  Change in portfolio, mm-hmm.

2    Q.   So approximately at a 242,000 gain for

3  11 months and loss of about $30,000.  So a total

4  gain was about $212,000, according if these bank

5  statements are accurate.

6           Did you follow my math on that?

7    A.   I didn't follow your math.  I haven't

8  followed anything you said, and as I mentioned, I

9  think that is a conversation that we need to be

10  having with an actuary, somebody who can go over

11  this.  I absolutely cannot accept the fact that I

12  should be taking any type of figures.  Sorry.

13    Q.   Let's assume for a second --

14    A.   It's wrong.

15    Q.   -- these bank statements are accurate

16  and it's 212,000, do you have any idea why they

17  would then say that the income over here on your

18  5500 on Exhibit 16 on line 8B is 165,914?

19    A.   I'm not certain why.  I don't know what

20  they were looking at, how they characterize it.  I

21  can't tell you.  We need to speak with the person

22  or have an actuarial -- somebody who can -- with

23  expertise to explain these.

24    Q.   And do you have any idea who would be

Page 182

1  able to tell us who did these forms?

2    A.   I would think that's to be determined,

3  but right now it's all guesswork as far as I'm

4  concerned and --

5    Q.   Is there anybody who can tell us who

6  figure out -- filled out this form?

7    A.   Well, it was done professionally that I

8  know --

9    Q.   I'm saying who could tell us?

10    A.   Who can tell us?  I don't know at the

11  moment.  We'll have to see.  But I think that, more

12  importantly, we need to go have these figures gone

13  all over again and do that.  Because this is right

14  now hocus pocus.  I'm not agreeing with any of it.

15    Q.   Do you know who the current actuary or

16  accountant that does the work for the plan is?

17    A.   That was asked and answered hours ago.

18    Q.   Who is the current one?

19    A.   Didn't I say it to you?

20    Q.   Who is it?

21    A.   Reed-Ramsey.

22    Q.   Reed-Ramsey.

23    A.   I told you that a long time ago.

24    Q.   And, again, we don't know who it is at

Page 183

1  Reed-Ramsey that you're dealing with?

2    A.   No.  I told you that also.

3    Q.   And you don't know the first year that

4  Reed-Ramsey started doing work for the plan; right?

5    A.   I probably told you I couldn't recall.

6    Q.   Now, for these checks that came out in

7  2014, Exhibit 20, can you identify any of these

8  that went to reimburse you for expenses that you

9  incurred in '11, '12 and '13?

10    A.   I don't believe that it was any -- it

11  was broken down by check.  I think that you'll have

12  to, again, refer that to the sheet and what was

13  given to you.

14    Q.   So, for example, you may have just

15  decided to reimburse yourself 5,000 one month and

16  then $4,000 another month?

17    A.   No, I wouldn't agree with anything like

18  that.  I think you'll need to look simply at the

19  overall sheet that was provided for the expenses.

20    Q.   You're referring to the Excel

21  spreadsheet that I don't have; right?

22    A.   I guess, yes, but that would be the

23  case.  Because there should be -- you should have

24  also received invoices.

Page 184

1    Q.   I did get some documents, which we will

2  go over in a minute, relating to bills you paid for

3  attorneys and some actuaries.

4    A.   That should have been there along with

5  the payments.

6    Q.   But there wasn't any kind of lump sum of

7  the 142,000 reimbursing you; it was done a few

8  small checks at a time.  Is that your

9  understanding?

10    A.   Yes.  Most of the attorneys were

11  willing -- and providers were willing to wait, so

12  it was done a bit at a time.

13    Q.   Is there anything that would prevent you

14  from just taking the money out at once?

15    A.   I never treated the account like that.

16  I think it's reckless.  It's my life savings.  And

17  I tried to economize wherever I can.

18    Q.   And how would it -- taking the money out

19  all at once be different than taking it out over

20  several months to pay back yourself for the

21  expenses you incurred over three years?

22    A.   Well, the payment of myself was

23  unfortunately a necessity because not one penny

24  ever came out before.  And taking it all out when



Page 185

1  you have something invested that you want to gain
2  or to realize a gain on doesn't treat the account
3  as it should. You know, that account is there
4  to -- for my retirement and for the other people,
5  and to do the least damage or least amount of
6  withdrawal possible is what I always tried to do
7  since I've had it 40 years ago.
8      Q.   Now, in 2015, did anybody else provide
9  services to the plan?
10     A.   Well, the plan is required having
11  services provided since its inception. It's just
12  been a greater degree as these cases or these
13  things have gone on, like today as we sit here,
14  unfortunately, these services have become
15  necessary.
16     Q.   So who did you retain to provide service
17  to the plan in 2015?
18     A.   Well, I'm going to give you the same
19  answer I did before. It should be on the -- I
20  believe it should be on the spreadsheet. It was, I
21  think, given to Mr. Kofoed. I saw something there,
22  but I don't know if the complete breakdown is
23  there.
24     Q.   The one we looked at earlier only went

Page 186

1  through 2014, and you said that one was inaccurate.
2      A.   It only went through '14?
3      Q.   Yeah.
4      A.   Well, then, I don't know what he's done
5  with the others. Starting to get reckless --
6      Q.   Can you recall as we sit here of any
7  names of any entities that provided services to the
8  plan in 2015?
9      A.   No, I can't recall because it would be
10  partial, and that's something that -- no, I can't
11  just sit and recall. I think it was given to him.
12     Q.   We looked at some of these plan account
13  statements, for example -- just going to grab this
14  one real quick -- No. 17 for 2014.
15     A.   Mm-hmm.
16     Q.   Was one of those made for 2015?
17     A.   Sure.
18     Q.   That was not provided to us. We did not
19  see any plan statements for 2015. Are you sure
20  that that exists?
21     A.   Absolutely. There's never been a year
22  we haven't done that.
23     Q.   Do you know who would have drafted it or
24  put it --

Page 187

1      A.   I think Reed-Ramsey. I'm not sure what
2  year it was, but it exists. And why you don't have
3  it, I don't know.
4      MR. CANETTI:   Let's look at the Form 5500 for
5  2017. This is Exhibit 24.
6          (WHEREUPON, a certain document was
7           marked Sherrod Deposition Exhibit
8           No. 24, for identification, as of
9           May 2, 2018.)
10  BY THE WITNESS:
11     A.   You said 2017. This says 2015.
12  BY MR. CANETTI:
13     Q.   I'm sorry. I meant 2015. My apologies.
14  Exhibit No. 24.
15         Did you review this document before?
16     A.   No, I -- I'm just really looking at it
17  now and -- but, no, I have not.
18     Q.   On the first page, it says that it was
19  filed with authorized/valid electronic signature by
20  Leroy Johnson on October 24, 2016. Any reason to
21  doubt the accuracy of that?
22     A.   Any doubt of the accuracy on the --
23     Q.   The date that he filed it?
24     A.   No.

Page 188

1      Q.   And then it says preparer's name, it
2  says M.S. ASSOC. Do you know who that is?
3      A.   No, I do not. Apparently, that's the
4  actuarial firm. Just trying to think of that name.
5  I thought it was an N, Niehaus.
6          I don't know that I recognize it right
7  offhand, but I know it was definitely a certified
8  actuary.
9      Q.   And do you know who would have put this
10  address in here for them?
11     A.   No, I'm not -- I don't know.
12     Q.   The address here is not an actual
13  address. The ZIP code does not match up with the
14  street address.
15     A.   That was brought to our attention
16  before, and I thought that Mr. Kofoed spoken --
17  Mr. Kofoed said he supplied --
18     Q.   He gave an address of someplace in
19  Skokie.
20     A.   Then that's probably what -- if he gave
21  it to you, that's probably what it is.
22     Q.   We contacted that address, and there was
23  nobody at that address with the name M.S.
24  Associates.



Page 189

1    A.   Yeah, I know that there was some
2  discussion about -- it may be somebody who's
3  retired.  I think there was some discussion the
4  other day.  I think the name, it starts with
5  Niehaus or Neihus or someone like that.
6  N-i-e-h-a-u-s.  I'm not sure.
7        I'm doing my best to help you out, but
8  some of these people passed away, retired or
9  whatever, so -- however, they were extremely -- you
10  know, I guess listed previously in places you could
11  find them.
12    Q.   Yeah, this address was not accurate.
13  It's not a real address.  And then when we got the
14  other address, nobody was at that address either.
15  So we never got an address where we could locate --
16    A.   People move around and retire, and
17  that's what you run across.
18    Q.   Do you know what kind of company this
19  was?
20    A.   Actuarial services.
21    Q.   Actuarial service firm?
22    A.   Mm-hmm.
23    Q.   Do you know if it was a company or
24  partnership or LLC?

Page 190

1    A.   Generally, no.  I mean, I don't know
2  that with any specificity.  Just go to -- you'll
3  find somebody who is qualified.
4    Q.   How did you find that -- did you find
5  this company?
6    A.   Again, it's word-of-mouth.  You ask
7  people, the bank, whomever who knows somebody who
8  does this and doesn't charge a lot.  Again, we're
9  looking at expenses always.
10    Q.   Did you hire this firm, or did
11  Mr. Johnson hire this firm?
12    A.   I don't recall now who the -- there
13  would have been discussion, and I don't remember
14  how it came about.  As long as they could do a good
15  job and don't charge a heck of a lot of money.
16    Q.   Now, in 2015 here on the next page, it
17  says that there are benefits paid of 59,000.  Was
18  that 59,000 paid to you for your benefits?
19    A.   That would be correct.
20    Q.   And then it said there was 40,000 --
21  32,000, 8,000 -- for administrative services and
22  other expenses, so a total of 40,000.  Do you see
23  that?
24    A.   I see that.

Page 191

1    Q.   Do you know what services were paid for
2  in 2015?
3    A.   Unfortunately, most of the expenses have
4  been legal.
5    Q.   What litigation would that be referring
6  to in 2015?
7    A.   Right off the top of my head, I can't
8  tell you; but whether it was regarding something
9  with the bond, I'm guessing now and I shouldn't do
10  that, so -- but it's always been something that's
11  been legal.
12        (WHEREUPON, a certain document was
13        marked Sherrod Deposition Exhibit
14        No. 25, for identification, as of
15        May 2, 2018.)
16  BY MR. CANETTI:
17    Q.   We will mark this as Exhibit No. 25.
18  Now, this is the account summary for SunTrust from
19  January 1, 2015, to December 31, 2015.
20    MR. REARDEN:  Well, this is page 2 of 32.
21    MR. CANETTI:  Yes, it's an excerpt of this
22  summary.
23  BY MR. CANETTI:
24    Q.   Again, this is similar to the one we

Page 192

1  looked at before.  It says the change in account
2  value for the year says income 64,888, and then
3  change in investment value was 59,946.  So
4  approximately income was 65,000, change in
5  investment value was 60,000, so there was a gain of
6  about $5,000.
7    A.   Mm-hmm.
8    Q.   Does that make sense?
9    A.   That's what I see there.
10    Q.   Now, I'm looking at your 5500 on page 2,
11  under total income on 8C on Exhibit 24.  It says a
12  loss of 16,000.
13        Are you able to explain that
14  inconsistency to me?
15    A.   I'm not able -- I didn't fill this out,
16  and as to how or why I think I did recall seeing
17  that at one point and was curious.  Then, again,
18  accountants have ways of looking at things that I
19  can't explain what it is, how they put these
20  numbers together.  That would have to be explained
21  by the accountant, and I don't really have the
22  answers.
23    Q.   Is it your role as trustee of the plan
24  to verify the accuracy of this information that's



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
193—196

Page 193

1 reported in the 5500?

2    A.   If you mean to go back and check on the
3 work that the accountant does, I have to rely on
4 the professional.  It's not my role to question.
5 If they come up with something and they're
6 professional, they know more about this.  They know
7 this field.  That's where I put my reliance.  And
8 they know what they're doing.

9    Q.   Is it Mr. Johnson's role to review the
10 accuracy of the information in the 2500?

11    A.   Well, I'm not sure that it's inaccurate.
12 I don't know how -- whatever that number -- you
13 asked me if this is --

14    Q.   I didn't say it wasn't accurate.  I said
15 is it his role to review the accuracy of that?

16    A.   He certainly can, right.  He certainly
17 can.

18    Q.   But is it his role to do that?

19    A.   A role to go over and to check the
20 actuary's work?

21    Q.   To make sure the 5500 is accurate.

22    A.   I'm not sure that I've ever seen that
23 particularly spelled out.  As such, we can look in
24 the manual and we can see because that's the only

Page 194

1 fair way for me to answer that question, if it was
2 spelled out with that amount of specificity.

3    Q.   Okay.

4         (WHEREUPON, a certain document was
5         marked Sherrod Deposition Exhibit
6         No. 26, for identification, as of
7         May 2, 2018.)

8 BY MR. CANETTI:

9    Q.   Now, these are the checks in 2015,
10 Exhibit No. 26.  Now, some reason the way these are
11 processed to -- from Fidelity, I believe they were
12 sent upside down for some reason.  So they got
13 Bates stamped on the upside down page there, so I
14 apologize for that.

15         But these are the checks for 2015.  They
16 start with DOL2432, and they go to DOL -- or they
17 go to -- sorry.  They go to DOL2463.  And then it
18 starts with a new set at 12916000354 to 356.

19         So the first check is for -- on
20 January 5, 2015, for $5,000.  And on the second
21 page, 2433, is that your signature?

22    A.   I would certainly say offhand that those
23 are my signatures.  I have no reason to feel that
24 they are not.

Page 195

1    Q.   Now, for all the checks in 2015, they
2 were written to you, to Shirley T. Sherrod, and
3 appear to all have your signature.

4    A.   Yes.

5    Q.   Is there any reason to doubt the
6 accuracy of that?

7    A.   No.

8    Q.   Now, if we total up the amount that came
9 out of the plan in 2015, it was $120,000.  That's
10 what these checks represent here.

11    A.   Mm-hmm.

12    Q.   And, sorry, I lost my 5500.  Too many
13 exhibits here.

14         Again, this shows benefits paid to you
15 were 59,000 and 40,000 in expenses, so that's
16 approximately $99,000 -- or it is 99,000, which is
17 reported right there.

18    A.   Mm-hmm.

19    Q.   But $120,000 in checks came out, so it
20 was $21,000 missing in 2015.

21    A.   I don't know that it's missing, but I'm
22 looking at -- I'm wondering as I tried to
23 understand what this minus 16 meant.  Because that
24 apparently has got to figure in there some way.  I

Page 196

1 don't know.

2    Q.   The 16,000 is saying that the plan lost
3 money that year.  That's a loss.

4    A.   Well, I don't know.  I'm not really
5 sure.  I hear what you're trying to tell me, but
6 whoever -- whatever they did, whatever they started
7 out with and however they were characterizing it,
8 because strangely enough, it seems to start to come
9 back to that -- whatever amount you said it was.

10         I am not certain what or how -- why they
11 characterize it like this.  But, obviously, there,
12 you know, there needs to be -- we'll get through
13 some more explanation of it because I really can't,
14 again, sit and discuss with you some of these, you
15 know, variances and -- this not something I'm
16 skilled to do.

17    Q.   And we have no idea who the person is
18 that we would be able to talk to about this;
19 correct?

20    A.   I thought I told you -- how many times
21 have you asked me?  I'm trying --

22    Q.   You keep saying there's somebody else we
23 should talk to, and I don't know who the person is.

24    A.   Right.  And I just told you, nor do I.



Page 197

1    MR. REARDEN:  Objection.  Asked and answered.
2    BY MR. CANETTI:
3    Q.    Now, in 2016, did you engage any service
4    providers to provide work for the plan?
5    A.    Seems to me in 2016 this is when the
6    Department of Labor filed this gigantic lawsuit,
7    and so absolutely that was a requirement then.  We
8    needed all type of help, like we do today.
9    Q.    So who were the service providers you
10   engaged in 2016?
11   A.    I do recall there was primarily Groom, I
12   believe.
13   Q.    And you paid Groom from the assets of
14   the plan; correct?
15   A.    That was correct.
16   Q.    And why did you do that?
17   A.    Because that was apparently laid out in
18   the plan, and I think there was some communication
19   between you and Groom.  You questioned, they sent
20   you a letter, and there we are.
21   Q.    Your understanding is they sent a letter
22   explaining why they took money out of the plan?
23   A.    They sent a letter to you.
24   Q.    That's what you understand?

Page 198

1    A.    I saw it.  That's what I know.  Now,
2    don't ask me anything beyond that legally because I
3    don't know, but I'm saying that because you're not
4    entirely ignorant on that subject.
5    Q.    I have not seen any explanation of why
6    you've been taking money out of the plan to pay for
7    your attorneys in this litigation.
8    A.    Well, you probably have not and won't,
9    but that's something, I guess, if we get a chance
10   to go to court we will prove and show why this is
11   what we need to do.
12   Q.    Can you explain to me why you feel you
13   can take money for the plan to pay for your
14   attorneys in this litigation?
15   A.    Legal opinion.
16   Q.    I don't understand what you mean by
17   that.
18   A.    Attorney's advice.
19   Q.    You're saying Groom provided you advice
20   to use the plan assets to pay for your attorney in
21   this litigation?
22   A.    I'm saying that everything that we've
23   ever done, you know, that we have done in any way,
24   we've consulted with an attorney and we followed

Page 199

1    the advice of the attorney.  We have not just made
2    decisions out of the blue.
3    Q.    In this case was it Groom who gave you
4    that advice for this current litigation?
5    A.    As I mentioned to you before, sir, I
6    think you yourself had some communication with
7    Groom.  I saw that the other day in your notes.
8    And I would ask you to refer back to what Groom
9    told you, not to try to hold me responsible for
10   legalities that I can't explain to you, and Groom,
11   I thought, did a very adequate job in doing that.
12   Q.    Well, who makes the decision about how
13   money getting paid out of the plan?
14   A.    We -- I'm going to repeat to you what I
15   said it a few moments ago.  We consult with --
16   Q.    You consult?
17   A.    -- take legal advice, and this is what
18   was done every case all along the way.
19   Q.    But who makes the actual decision about
20   whether to pay out of the plan assets or not?
21   A.    Once you get legal advice, you follow
22   through.
23   Q.    So did you make that decision?
24   A.    I don't recall who it was.  I think

Page 200

1    there was some discussion.  The attorney told us
2    what needs to be done.  We have to protect this
3    plan.
4    Q.    You said you got advice from them?
5    A.    Yes.
6    Q.    I'm saying that advice came to you,
7    then; right?
8    A.    Right.
9    Q.    And then did you make the decision,
10   then, to use the plan assets to pay for the
11   lawyers?
12   A.    I believe that we did.
13   Q.    When you say "we," who is the other
14   person?
15   A.    I think there was some discussion,
16   perhaps, with the administrator.  We followed
17   advice.  We followed legal advice, expert advice
18   that we were given.
19   Q.    So the decision to use that money was
20   made by you and Mr. Johnson together?
21   A.    Well, you know, this is sort of going
22   around in circles.
23   MR. REARDEN:  Objection.  Asked and answered.
24



Page 201

1  BY THE WITNESS:
2      A.   I can't answer you.  Whatever conclusion
3  you want to take, take it.  I'm done.  I can't
4  answer.  I don't know what you're talking about,
5  and I can't do a better answer than I just gave
6  you.  It's been asked and answered.
7  BY MR. CANETTI:
8      Q.   I'm not making a conclusion here.  I'm
9  trying to understand what you're saying.
10         You said Groom gave you the advice.  And
11 I said, "Who made the decision?"  And you said, "We
12 made the decision," and I want to know who that
13 "we" is.
14     A.   I answered that.
15     Q.   Who is the "we"?
16     A.   Do you want to have her read it back to
17 you?
18     Q.   Just tell me who the "we" is.
19     MR. REARDEN:  Objection.  Asked and answered.
20 BY THE WITNESS:
21     A.   It's been asked and answered, sir.
22 BY MR. CANETTI:
23     Q.   Is there anybody else besides
24 Mr. Johnson who is involved with decisions for this

Page 202

1  plan?
2      A.   No, I don't believe so.
3      Q.   So all the decisions that have been made
4  for this plan have either been made by you or
5  Mr. Johnson or the two of you together; is that
6  accurate?
7      A.   Or the attorneys, actuaries or experts
8  who tell us -- you know, you have to have experts
9  who help you on things like this, and you follow
10 their advice.  We're not experts.  We -- it is our
11 fiduciary duty to obtain the best information that
12 we can and follow through on it, and that is what's
13 in that manual, and that's what we're doing.
14     Q.   So you get advice from other people, but
15 the actual decisions, the final decisions are made
16 by either you or Mr. Johnson or the two of you
17 together; is that right?
18     A.   That would be, I believe, our duty.
19     Q.   Now, were there any other service
20 providers in 2016 besides Groom?
21     A.   Is that the -- I think -- haven't you
22 asked me that, that was the named you couldn't
23 read?
24     Q.   That was in 2015, this Ms. M.S. Asash.

Page 203

1  I'm not sure what that's saying.
2      A.   I think -- I thought -- have we not got
3  to '16 yet?
4      Q.   You want to look at the 2016 form?
5  Doesn't ever say the names of the service
6  providers, but you're welcome to look at it.
7          (WHEREUPON, a certain document was
8           marked Sherrod Deposition Exhibit
9           No. 27, for identification, as of
10          May 2, 2018.)
11 BY MR. CANETTI:
12     Q.   This is the 2016 5500.  It's Exhibit 27.
13 There you are.
14         Now, again, the preparer's name is
15 blank, so we don't know who prepared this.  Do you
16 know who prepared it?
17     A.   I believe that I told you this would
18 have been Reed-Ramsey.  I told you that.
19     Q.   Reed-Ramsey?
20     A.   I told you that.
21     Q.   You said for 2017 they did work.
22     A.   They would have done work for '16.
23     Q.   Okay.  Now I understand what you mean,
24 because it was filed in 2017.

Page 204

1          Now, it says here that at the beginning
2  of the plan year, there was only one participant;
3  at the end of the plan year, there was one
4  participant.
5          Do you know why it says that?
6      A.   I don't know why it says that.
7      Q.   Refer back to 15, Exhibit 24, it said at
8  the end of the year there were 17 participants.
9      A.   Yeah, I don't know that I said that.
10 The 17 has changed.  I don't have the exact number,
11 but I don't know why it says one.
12     Q.   So do you believe some people were --
13 received distributions in 2016?
14     A.   Yes.
15         Oh, no, no, no, no.  It would have been
16 in -- that would be '16.  No.  I don't think -- no,
17 I don't think so, besides myself.
18     Q.   So some people received distributions.
19 I believe some documents you provided to us showed
20 it was in 2017; is that right?
21     A.   I believe that is correct.
22     Q.   But 2016, to your knowledge, there are
23 no distributions besides to yourself?
24     A.   I think that that is correct, but I'm



Page 205

1 speaking without records that are in front of me.

2    Q.   Let's get those records there.

3         So we have here on the second page, 8D,
4 it says benefit paid -- benefits paid, 62,550, and
5 we did get the plan statement for you for 2016.
6 Again, we'd like to see the 2015 one.

7         (WHEREUPON, a certain document was
8         marked Sherrod Deposition Exhibit
9         No. 28, for identification, as of
10        May 2, 2018.)

11 BY MR. CANETTI:

12   Q.   Do you recognize this document?

13   A.   I don't.

14   Q.   You do not?

15   A.   No.  I haven't -- I don't believe I've
16 seen this before, but maybe again --

17   Q.   It's a document you provided to us.  It
18 says SherrodJR000690 through SherrodJR000696.

19   A.   It's relatively new, and I haven't
20 really looked at it in any great detail.

21   Q.   It says on the second page for employee
22 account withdrawal, 62,550.  And then if you go to
23 SherrodJR000694, it lists your name, Shirley
24 Sherrod, and shows a withdrawal of 62,550.

Page 206

1    A.   Mm-hmm.  I see that.

2    Q.   Based on those two documents, you're the
3 only one that received a distribution in 2016?

4    A.   That sounds about right, the
5 distribution amount being 62,550.

6    Q.   And, again, you don't know why it says
7 there's only one participant at the start of the
8 year and one at the end of the year; right?

9    A.   No.  I think it's probably a typo,
10 something that's left off -- because right at the
11 end, I'm looking where you are on this page.  That
12 looks like the -- you're right at that line, and it
13 looks like something is -- got thrown out with the
14 computer.

15   Q.   We can verify that.  I'm fairly certain
16 that it says one on the --

17   A.   I see the one.

18   Q.   If you look at the computer, it was not
19 cut off.

20   A.   I don't know about that.

21   Q.   Now, the administrative service
22 providers, the 133,922, that was money that was all
23 paid to Groom, then?

24   A.   Let's see.  I think maybe Mr. Kofoed

Page 207

1 came in at the tail end of that also.

2    Q.   In 2016?

3    A.   I believe that --

4    Q.   Okay.  So some of it went to Mr. Kofoed
5 and some went to Groom?

6    A.   To the best of my knowledge.  Again, I'm
7 looking -- off the top of my head, I mean, I'm
8 saying things without seeing them.  And there's a
9 certain amount of inaccuracy, just like those
10 figures were inaccurate, and what I'm telling you,
11 I can't -- I know I'm under oath, but I can't
12 really say because I'm not looking at what you're
13 asking me.

14        And so, you know, not really an omission
15 of deliberate, but I simply don't have, you know,
16 those things in front of me and so I'm asking
17 you -- answering you to the best of my ability.  So
18 you have to realize that these may not be exactly
19 correct.  I know, just generally, I can think of
20 Mr. Kofoed and Mr. -- and the Groom firm, but there
21 may be other people.

22   Q.   To the extent you had any documents
23 related to that, you provided those to us; is that
24 right?

Page 208

1    A.   I want to say that, what was it,
2 Mr. Kofoed at some point in time would have had --
3 this is '16 -- probably would be the person --
4 yeah, should have been provided.  Yes, yes.

5    Q.   Same with 2015, to the extent you had
6 any documents to support those expenses, they were
7 provided to us?

8    A.   There were always documents.  Yes, yes.

9    Q.   We have not seen those.  Again, we have
10 checks here from 2016.  This is all with SunTrust.

11   MR. CANETTI:  Mark this as Exhibit No. 29.

12        (WHEREUPON, a certain document was
13        marked Sherrod Deposition Exhibit
14        No. 29, for identification, as of
15        May 2, 2018.)

16 BY MR. CANETTI:

17   Q.   These are the SunTrust 12916 --
18 12.9.16000364 to 382, and these are all checks that
19 were written to you and then signed by you; is that
20 right?

21   A.   I don't want to put it that way because
22 I thought some were signed over to Groom, so...

23   Q.   Would you sign them and then sign them
24 over to Groom?



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
209–212

Page 209

1    A.   I don't know how it happened, but I know
2  that they had to -- they --
3    Q.   Let's see if we can jump to that page.
4        All the ones that just have your
5  signature on it, that's your signature, though;
6  right?
7    A.   That is my signature, yes.
8    Q.   So if we go to on one that's 390.
9    A.   Pardon me, please?
10   Q.   390. I know they're kind of a small
11  font. I apologize for that.
12   A.   I don't see them. Are they in order?
13  They're not in order.
14   MR. REARDEN: They're out of order.
15  BY MR. CANETTI:
16   Q.   I apologize. I think they're organized
17  by dates and maybe they were produced to us in
18  funny order.
19       The reason I think they're out of order,
20  I don't know if you know the answer to this, but
21  some of the check numbers, they're out of sequence.
22  Some start with the 200 series and some start with
23  the 300 series. Do you have any idea why they're a
24  different series of check numbers?

Page 210

1    A.   Do I know why the bank is doing that?
2  Please.
3    Q.   So that's why I think they're jumbled up
4  because for some reason the bank issues the checks
5  in different series.
6    A.   Should go by date, though. I don't
7  understand why you don't have it by date. You're
8  speaking of 390, and I'm not finding 390.
9    Q.   So it goes --
10   MR. REARDEN: Right after 375.
11  BY THE WITNESS:
12   A.   What a mess.
13       Okay. I found 390.
14  BY MR. CANETTI:
15   Q.   So is that your signature? It says
16  Shirley Sherrod and says something like "Pay to the
17  Order of Groom"?
18   A.   Yes.
19   Q.   So that's your signature and that's your
20  handwriting?
21   A.   That is correct.
22   Q.   And then if you go forward a couple more
23  pages, which, again, these are out of order. I
24  apologize.

Page 211

1    A.   What number are you looking for now?
2    Q.   At 387 which is --
3    A.   I got it.
4    Q.   -- November 22, 2016.
5    A.   Yes.
6    Q.   Says -- looks like it says "Pay to the
7  Order of Groom Law Group" and has then it has
8  Shirley Sherrod written under there?
9    A.   That is correct.
10   Q.   Is that all accurate?
11   A.   That is correct.
12   Q.   I think that's the last one that
13  referred to Groom.
14       I think there's one more. Sorry.
15       On 382, there's a December 27, 2016,
16  check for 18,000. It says "Pay to the order of
17  Groom." It says Shirley Sherrod. Is that your
18  signature?
19   A.   That would be correct.
20   Q.   So I think these are all in date order,
21  but they're not Bates stamp number order because
22  they're Bates stamped in the order that the bank
23  produced it to us, which they did not produce them
24  in order. So I think it starts with January and

Page 212

1  goes to December.
2    MR. CANETTI: Let's take a break and go off
3  the record.
4       (WHEREUPON, a short break was
5       taken.)
6  BY MR. CANETTI:
7    Q.   I'll remind you you're still under oath.
8       Now, in 2015, did you complete any loan
9  documents or anything related to money that you
10  loaned the plan?
11   MR. REARDEN: What year are you asking?
12   MR. CANETTI: 2015.
13  BY THE WITNESS:
14   A.   No, I don't believe so.
15  BY MR. CANETTI:
16   Q.   And we looked at the checks in 2015, and
17  all those were written to you and cashed by you;
18  correct?
19   A.   I have to go back. I think -- you know,
20  it's getting late, but I believe -- I think that we
21  know in '14, that was Mr. Conger. We know -- I
22  just showed you '16, they were -- I believe that
23  you're correct in stating that. But you could be
24  wrong, but --



Page 213

1    Q.   To the extent any of those service
2  providers got paid, it was money that you came and
3  cashed and you paid them out of your own account of
4  some sort?
5    A.   Out of my own pocket, right.
6    Q.   And 2016, you saw those couple checks to
7  Groom.  Apart from those, all the checks were
8  written and cashed by you; correct?
9    A.   That is right, but Groom was still paid.
10  In other words, you'll see, I think, two or three,
11  but they still had other -- that was not all that
12  they were paid is the ones that you saw endorsed.
13    Q.   But in 2016, you didn't do any loan
14  documents with the plan; correct?
15    A.   No.
16    Q.   So apart from the ones that went to
17  Groom, the money came to you, deposited in your
18  account, and then you wrote checks or made some
19  types of payment to any other service providers in
20  the plan in 2016; is that right?
21    A.   That's right.
22    Q.   Now, in 2017, I believe at that point
23  Groom was no longer working on this litigation; is
24  that right?

Page 214

1    A.   That's right.
2    Q.   So I'm trying to think here.  Actually,
3  I think Groom -- we'll have to look at the dates.
4  For some reason I thought Groom worked until early
5  2017, and then Mr. Kofoed came on --
6    A.   That may be right because as you
7  approach 2017, I'll tell you, that is not something
8  that has been prepared, so I'm really -- that's a
9  big question mark.  I don't -- you know, this 5500
10  is way away and all these figures and so this is
11  entirely guesswork, and that is --
12    Q.   My recollection in the litigation, which
13  obviously we can look at the records and see, but
14  sometime in, I think, the spring, March or
15  April 2017, Groom withdrew and Mr. Kofoed came
16  in --
17    A.   That sound right.
18    Q.   -- and Mr. Kofoed was there until, I
19  think, December of 2017.
20    A.   Yeah.  So I may have made a mistake.  I
21  think when you mentioned in '16, I mentioned
22  Mr. Kofoed in '16 and I don't think he would have
23  been in '16.  So that was mistake.  That's why I
24  said, you know, when you're looking at -- talking

Page 215

1  like this and not looking at hard copies, there's
2  mistakes.  And so that's one mistake that I know
3  that I made.  You asked me and I think I told you
4  Groom and Kofoed, and that was wrong.  That was
5  '17.
6    Q.   So in '16 the only one that you recall,
7  as you sit here today, was Groom doing work for you
8  and the plan?
9    A.   Well, right.  I don't know that anything
10  else had happened.  It seems like this -- again, I
11  don't have it in front of me.  And it seems there's
12  always been some party or another that's been
13  trying to reach in and grab money from the plan.
14        So it's been under siege and a lot of
15  necessary legal -- I can't say that Groom -- I
16  don't recall -- I mean, the big to do thing is when
17  you sued us.  And prior to that, in '16, I'm not
18  sure if there was anything else, but I -- just like
19  I made a mistake, I'm not going to sit here and say
20  there wasn't.  There may have been.
21    Q.   And then 2017, Groom was still there and
22  then Mr. Kofoed was there for most of 2017 as well;
23  correct?
24    A.   That is correct.

Page 216

1    Q.   Do you recall anybody else from last
2  year that did work for you in the plan in 2017
3  besides the Groom Law Group and Mr. Kofoed?
4    A.   The actuary.
5    Q.   And that's the Reed-Ramsey?
6    A.   Right.
7    Q.   Do you know how much they were paid?
8    A.   I don't have that figure.  And I will
9  say, since you're asking, that between -- that
10  there were other consultations regarding -- and I
11  don't remember whether they charged -- regarding
12  this accounting that was so questionable with
13  people that did -- other accountants.  There have
14  been consultations.  Let's put it that way.  No
15  contracts.
16        But this has certainly required a very
17  broad approach as to what was happening with this
18  stuff, and I know we talked with people, but I
19  can't give you names.  So when that finally gets
20  all put together, those things will likely appear
21  because this has entailed a lot of expense.
22    Q.   And you don't recall any of those other
23  people you may have consulted with in 2017?
24    A.   I just gave you the generalities of type

SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
217–220

Page 217

1  of people, but sometimes it was just a -- you know,
2  a phone call and -- I don't recall any contractual
3  work.
4      Q.    And in 2017, did you also -- we can look
5  at the checks too -- did you send some checks to
6  Groom in 2017?
7      A.    Probably so.  But here again, I'm not --
8  I'm just talking broadly and I -- I don't have any
9  basis for fact in that.  I'm just guessing.
10     Q.    We can look at the 2017 checks.
11     A.    I don't know that it would be helpful
12 because -- we can look at them, but as I said to
13 you before, each instance did not involve a cosign
14 on the back.  So Groom was paid many times without
15 that particular method being used.
16     Q.    So you would have wrote a check to
17 yourself, signed it and cashed it, and then paid
18 them through some other source through your own
19 funds?
20     A.    Did I write a check to myself?  I don't
21 think I ever wrote a check to myself.
22     Q.    I mean, the checks were written to you
23 and you signed the checks and deposited them?
24     A.    That's correct, and saw they were paid

Page 218

1  appropriately as was affordable at the time.
2      Q.    Now, you said Groom and Mr. Kofoed and
3  the actuary Reed-Ramsey and possible consultations.
4  Were there any other type of service providers in
5  2017?
6      A.    Again, this is all I can think of, but
7  there may be more.  I just can't tell you who
8  everybody was at this particular time.
9      Q.    And then did you make some distributions
10 in 2017?
11     A.    That is correct, we did.
12     Q.    And why were distributions made in 2017?
13     A.    At that time, we were -- had been trying
14 to contact people over the years and finally with
15 computer skills and getting back on track, we
16 lost -- we had deaths and we were able to get back
17 on our feet and tried to locate people because
18 there was an expense.  As you carry these things
19 forward and have to do those valuations every year,
20 you get billed for that, and we were getting to a
21 point where it was, I think, a threat to the plan.
22 We just had to start to save money.
23     Q.    What was the threat to the plan?
24     A.    The expense that it cost to carry the

Page 219

1  load of people, the val -- these valuations is more
2  of accounting.
3      Q.    So the valuations, the annual valuations
4  and the accounting work was the --
5      A.    That's true.
6      Q.    -- threat to the plan?
7      A.    Yeah.  Well, yes.  I mean, that was
8  just -- prior to -- I'd always pay them myself for
9  the last 30 years, but with all of this happening,
10 I could no longer afford to do that, and it was
11 just tremendous expense here now in trying to
12 defend where we are with this.
13     Q.    So you said you usually paid them
14 yourself.  When did you stop paying it yourself for
15 the valuation accounting work?
16     A.    That would have been 2014, because I
17 assumed the expenses, '11, '12, '13, I think, as we
18 mentioned before.  And it got to the point the
19 place that I could no longer do that.  It was just
20 too expensive.
21     Q.    You're saying '11, '12 and '13 and
22 earlier than that, you personally paid for the
23 valuation accounting work, and 2014 and subsequent
24 years, the plan paid for the valuation and

Page 220

1  accounting work?
2      A.    Well, we had to charge it back.  Sure.
3  Right.  That's correct.  The plan had to be --
4  yeah.  I don't know how to say that right, but
5  that's correct.
6            At this point when we started getting
7  hit with these horrible legal expenses, there was
8  no option.  I had exhausted everything that I had
9  with trying to hold things straight for especially
10 those three years.
11     Q.    And who was involved in determining the
12 amount of the individual distributions that you
13 made in 2017?
14     A.    We had the valuations.  You have that in
15 front of you, the 16 valuations.
16     Q.    You're referring to Exhibit 28?
17     A.    Yeah.  That would have been -- yeah,
18 that would have --
19     Q.    And for this -- sorry --
20     A.    No.  This is confusing me because we're
21 always a year behind.  And we paid them in '17, mid
22 year '17.  This was not done -- that would have
23 been paid prior to these valuations, this year's --
24 these valuations, I do believe, because these were



Page 221

1  just -- this is 12/31.

2       But this was not available.  I don't

3  think I'm -- the extension is sort of confusing me,

4  but this would not have been available, I don't

5  believe, in '17.  I don't think this became

6  available until about October.  And they would have

7  been paid probably prior to that, I believe.

8     Q.   So you're referring to Exhibit 28.  This

9  is called an asset reconciliation of 12/31/16, and

10  you believe this document was completed sometime

11  around October of 2017?

12     A.   I can't say that.  I'm not going -- I

13  just -- very often, I think, and so -- I think the

14  5500 -- I think historically the 5500 was done in

15  October and the valuations came after the 5500, I

16  believe, that I -- I'd have to think about that.

17     Q.   And this document here was prepared by

18  Reed-Ramsey?

19     A.   Yes.

20     Q.   Exhibit 28?

21     A.   Yes.

22     Q.   And so if your understanding this was

23  done after you made the distributions, who was

24  involved in coming up with the distribution amounts

Page 222

1  to make in the middle of 2017?

2     A.   We referred to the prior distribution,

3  and I think this was what you keep asking me who

4  the person was, but the prior evaluation sheets

5  were what was used to make the determination.

6     Q.   So the 2015 ones --

7     A.   That sound about right.

8     Q.   -- which were probably done about 2016?

9     A.   Yes.

10     Q.   And that's the one that we don't have a

11  copy of.

12     A.   You don't have a copy of what?

13     Q.   The 2015 plan statement -- account

14  statements.

15     A.   Those -- so, excuse me, you don't have

16  the -- you don't have the -- you mean those

17  valuations for 15 you don't have?

18     Q.   Like this I'm calling an account

19  statement --

20     A.   Yeah.

21     Q.   -- and the other ones we looked at for,

22  like -- let's see -- like this one here for 2014,

23  that's what I'm referring to as the plan account

24  statements.

Page 223

1     A.   So you're saying that you're missing 15?

2     Q.   Yes.  We do not have 15.

3     A.   I don't know why because obviously it

4  was done a long time ago.  So that is -- that

5  definitely exists.  Why you don't have them, I

6  can't -- because that would have been given to one

7  of the attorneys, but absolutely those have been in

8  existence since -- what? -- '16.  So if you don't

9  have them, it's not because they -- they were

10  absolutely done.  That was always something that we

11  insisted upon.

12     Q.   So you used the account balances they

13  had as of 12/31/15 to determine how much to pay

14  them in the summer of 2017?

15     A.   I want to say that's right.

16     Q.   Why did you not get a more up-to-date

17  and use their account balances as of the date they

18  were making the distributions?

19     A.   That's a good question because we know

20  that there was a discrepancy, we can always catch

21  up for it later.  We had no intention except to

22  give people what they had coming, and that's

23  something that, you know, will be and can be done.

24       Now, at the particular time that wasn't

Page 224

1  available, and I think that -- and, obviously, it

2  was not, then you go with what you have.  And

3  there's always the option to correct that later,

4  but we're very well aware of that as is the

5  actuary.

6       Again, there's some more work that needs

7  to be done because I remember asking -- questioning

8  them, and they made the comment to me that they

9  felt there had been overpayments.  So that is

10  something that's going to require a good deal of

11  accounting.  I didn't go into it, but if, you know,

12  that will be -- that will need to be -- you'll have

13  to look at that again.

14     Q.   And you're saying somebody from

15  Reed-Ramsey is the one that said that there may be

16  some discrepancies between the amounts they were

17  paid in December of 2017 and amounts they were due?

18     A.   Comment that was made to me is that they

19  had been overpaid, so I don't -- you know, I'll

20  need to get his -- you know, let them run those

21  numbers.

22     Q.   When you say "he," who are you referring

23  to?

24     A.   The person whose name I keep forgetting



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
225–228

Page 225

1  at Reed-Ramsey. Okay?

2      Q.  How did you make the distributions in

3  2017?

4      A.  I believe that everyone was rolled over,

5  and those who could not be located were escheated

6  to the state.

7      Q.  Who did you -- for the first set, you

8  said there were a set of people that got rolled

9  over. How did you get -- how did you effectuate

10  that rollover?

11      A.  We were able to contact them, and, of

12  course, there's a certain amount of paperwork, you

13  know, that they have to fill out depending on their

14  marital status, whether they're going to take

15  annuity, et cetera. And the decision was theirs as

16  to whether they wanted to remain with the plan or

17  roll over. And once the information was obtained,

18  then those checks went straight to their retirement

19  accounts.

20      Q.  Were some of the checks sent to you?

21      A.  I think that there were -- okay.

22  There's -- let me clarify something. There was one

23  person, Mrs. Riggleman, who had expired, and

24  because they were being sent to -- given to the --

Page 226

1  they were her heirs, her beneficiaries, those were

2  mailed to me so that I could see -- try to verify

3  the receipt of those. There was some concerns

4  about -- some concerns, the fact that we verified

5  that those amounts would be and had been received.

6      Q.  So how much was sent to you for the

7  Riggleman, Ms. Riggleman?

8      A.  Whatever their amount -- whatever the

9  amount was owed. It wasn't sent to me. It was

10  the -- it was basically mailed so I could mail them

11  on to those people.

12      Q.  I think you had -- or Mr. Kofoed had

13  told us that you sent a check for 8,500, two checks

14  to two children?

15      A.  Correct.

16      Q.  So 17,000?

17      A.  Correct.

18      Q.  And how did you determine that that was

19  the amount that was due, 17,000?

20      A.  Again --

21      Q.  From the December 31, 2015, statement?

22      A.  Right. Right.

23      Q.  And it was an exact figure like that,

24  17,000?

Page 227

1      A.  No, I don't think it was 17. Well,

2  there was -- that amount was divided to 8,000

3  something or other, but she was owed 17,000

4  something or other, and she had expired. But we

5  added six months on. She had expired sometime

6  before, but we -- before -- she had expired before

7  that calculation.

8      Q.  So you added a six-month approximation

9  on to some figure to get to 17,000?

10      A.  No, no, no, no, no. The 17 is what was

11  there.

12      Q.  So you're saying if we had the

13  December 31, 2015, statement and returned to

14  Mr. Riggleman's page --

15      A.  Mrs. Riggleman.

16      Q.  Sorry.

17          -- Mrs. Riggleman's page, it would say

18  17,000 at the end of 12/31/15?

19      A.  That's right. Whatever she had is --

20  but she had expired long before that date, though,

21  but we just went ahead and we used that date

22  because apparently it works like social security

23  where when they expire, that's it, but we went on

24  beyond that time.

Page 228

1      Q.  You're saying that checks were made out

2  to her children, but they were mailed to you and

3  then you sent them to them?

4      A.  Yes, that's the way they do it.

5      MR. CANETTI:  This is Exhibit No. 30.

6          (WHEREUPON, a certain document was

7          marked Sherrod Deposition Exhibit

8          No. 30, for identification, as of

9          May 2, 2018.)

10  BY MR. CANETTI:

11      Q.  These are the 2017 checks. Did you find

12  the check that's written to --

13      A.  To them? I saw this when I -- no, I did

14  not. I really wasn't looking for it.

15      Q.  What was the one you were first looking

16  at that was written to somebody?

17      A.  Aleksandra Sporysz.

18      Q.  What's the number on the bottom?

19      A.  Page No. 229.

20      Q.  So you're saying this was a check sent

21  over as a rollover check to him --

22      A.  Her.

23      Q.  I'm sorry.

24          -- to her?



Page 229

1    A.   Mm-hmm.

2    Q.   So is this just mailed to her house,

3  then, or some address to her?

4    A.   That's her home.

5    Q.   And you're saying this 2701.69

6  represents what her account balance was as of

7  December 31, 2015?

8    A.   Right.  And she would have really

9  supplied us with the bank information that she was

10  going to use.  Normally something came up from the

11  bank, but it was mailed to her home.

12    Q.   So that's S-p-o-r-y-s-z.

13       And then I see the next page after that,

14  two pages after is SunTrust2018000231.  It's a

15  check for Wesley Smith for 3,582?

16    A.   Right.

17    Q.   That was another example of a rollover?

18    A.   Uh-huh.

19    Q.   And then the next one is

20  SunTrust2018000233.  That was for Hollie Howell?

21    A.   Mm-hmm.

22    Q.   For 1,720?

23    A.   Right.

24    Q.   Was that another rollover?

Page 230

1    A.   Yes.

2    Q.   And, again, all three of these were

3  based on 2015 figures; right?

4    A.   That is correct.

5    Q.   Do you have the next page?  I see one

6  for Albert Waters, SunTrust2018000215 for --

7    A.   I think -- you see the writing on there?

8  Does that say Carol Riggleman on there?

9    Q.   It says "Settlement estate Carol

10  Riggleman."

11    A.   Yeah.  I think this is where I had the

12  checks mailed so I could put that on the check.

13  That was my handwriting there.

14    Q.   So this is care of Shirley Sherrod,

15  Johns Island, South Carolina?

16    A.   Mm-hmm.  And then the note below is -- I

17  think this is what the attorney wanted.  So that's

18  one of the reasons we had it mailed, so we can make

19  that clear.

20    Q.   And what attorney did you work with on

21  this?

22    A.   That would, I think, have been someone

23  who does probate in the -- I think he was in the

24  Michigan area.

Page 231

1    Q.   But you don't recall their names right

2  now?  No?  All right.

3       And then the next check,

4  SunTrust2018000217, again, it says settlement Carol

5  Riggleman, it's another check for 8,932 to Paula

6  Keasey?

7    A.   Keasey.

8    Q.   Keasey.  And that was sent to you and

9  then you sent it on to them?

10    A.   After I made the notation on the bottom

11  of it.

12    Q.   Then looks like there's one for Caine

13  Everett.  That's SunTrust2018000227 for 11,798.

14  That was another rollover?

15    A.   Mm-hmm.

16    Q.   And then I think we're back.

17       So it looks like we have Sporsyz, Smith,

18  Howell and Everett, four rollovers, and then one

19  person, which ended up going to two beneficiaries,

20  a fifth person, Riggleman, that received

21  distributions in 2017; is that right?

22    A.   Yes.  That's right.

23    Q.   And then also another subset you said

24  that you couldn't locate them so you escheated

Page 232

1  their amounts to the state?

2    A.   Looks like the top page.

3    Q.   SunTrust 201800179, the 28,700 check on

4  June 27, that represents the total amount owed to

5  all the other --

6    A.   No, we have a sheet there.

7    Q.   Is this -- I'm looking at Exhibit 28,

8  which is the 2016 statement.  In the far right-hand

9  column, it has a column called "2017 Activity."

10  This one right here.

11    A.   This is -- okay.

12    Q.   So it's saying Mr. Alexander's amount is

13  escheated to the state?

14    A.   Mm-hmm.

15    MR. REARDEN:  You mean state, not "estate."

16    MR. CANETTI:  To the state, escheat to the

17  state.

18    MR. REARDEN:  Yeah.

19  BY MR. CANETTI:

20    Q.   And what efforts did you go through to

21  try and find Mr. Alexander?

22    A.   Well, I would certainly say we didn't

23  have the resources that the Department of Labor

24  would have, but we worked -- had worked this for a



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
233–236

Page 233

1  long time and number of years.  Finally, online I
2  think there was another service or something we
3  were able to hook up with, and they -- well, also
4  they couldn't -- they perhaps tried, I believe, and
5  sent out communications to these people that this
6  is Dr. Sherrod's office, and we are -- I forget
7  what the letter said, but there was a letter
8  saying -- asking them to contact the office
9  regarding or -- I don't think it was the office,
10  actually.  It was L. J. Consultants referring
11  possible or -- I'm quoting, and that's just not
12  good -- they were asked to contact regarding monies
13  that were being held for them.  That's off the top
14  of my head.
15         But they -- we asked them to make
16  contact.  And many people, as I recall, got those
17  letters, and there was no response.
18     Q.    Do you have a copy of that letter still?
19     A.    I -- probably when you depose Mr. --
20  L. J. Consultants, I think that they have most of
21  those letters, I believe.
22     Q.    Was it L. J. Consulting who mailed those
23  out?
24     A.    Yes, I believe that that's where the

Page 234

1  mailing came from.
2     Q.    Do you know who wrote the letter?
3     A.    I don't remember who wrote -- they were
4  working with Mr. Kofoed.  I don't remember how it
5  happened, but it was mailed out and some people
6  had told us that they had had previous -- I
7  guess -- I don't know.  They had been contacted by
8  the Department of Labor and were not in the most
9  cooperative mood.
10     Q.    So you sound like you said you hired a
11  service to try and find these people?
12     A.    There was -- no, I don't think it was a
13  service.  I don't remember how it was done this
14  time, but -- I don't remember how exactly.  I have
15  to --
16     Q.    Do you know how the address was obtained
17  for Mr. Alexander?
18     A.    All online, probably all online.
19     Q.    So did you yourself do, like, a Google
20  search or something to try and find his name?
21     A.    No, I don't think it was Google.  They
22  have other resources.  But because I know that I
23  had to help as far as -- when -- I knew the people
24  and knew from family names or other -- who likely

Page 235

1  that was who needed to get the mailer.  And so it
2  was just -- I'm not exactly sure who did it.
3         I think that some -- one of the
4  actuaries may have helped.  I'm not really sure
5  right now.  I'm just guessing.  But I do know
6  contacts were made.
7     Q.    Sounds like you mentioned perhaps
8  Mr. Johnson worked on it?
9     A.    I know that he -- I believe that he did,
10  yes.  I believe he did the mailing.
11     Q.    And you may have done some work on it?
12     A.    Yes.  I -- I know that I did help get
13  some of those things out.  Because, see, I knew --
14  I knew all of them.  They were all my employees.
15  So where contact would be made, you know, I was
16  glad to talk with them.
17         We were concerned because, after all,
18  these -- they're not funds that they put in.  All
19  of this was put in for them and over the years.
20  This has grown from zero to where they were today.
21  So we were glad to be able to give it back.  We
22  would have liked to have given them more, but
23  that's where things have broken out here.
24     Q.    Now, for Mr. Armstrong, he does not have

Page 236

1  a rollover or escheat listed for 2017 activity.
2     A.    You're too fast for me.
3     Q.    For Mr. Armstrong, the second person
4  there?
5     A.    Yes.  Yes.  Yes.
6     Q.    If you look at the 2017 activity column
7  on the right-hand side --
8     A.    Yeah.
9     Q.    -- there's nothing by his name.  Doesn't
10  say rollover or -- let me get my question out.
11  Sorry.
12         It doesn't say rollover or escheat.  Do
13  you know what decision was made with respect to
14  Mr. Armstrong?
15     A.    I'm trying to tell you.  I think there
16  were two or three who remained, and some of them I
17  had worked with over the years.  One of them, Rosa
18  Mitchell, I think you contacted her, she's probably
19  the oldest of the bunch there.  And this would have
20  been Rosa's second payout.  She -- the first payout
21  she had got quite a bit of money, and was still
22  trying to contact her because of her age.  We would
23  like to try to put something directly in her hand,
24  but apparently -- well, there's some issues that



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
237–240

Page 237

1 I'm sure will come out later as things --

2    Q.    So you're saying Ms. Mitchell, you were

3 unable to contact her?

4    A.    That's correct.  We could not.

5    Q.    Were you able to contact Mr. Armstrong?

6    A.    No.

7    Q.    Were you able to contact Mr. Fair --

8    A.    No.

9    Q.    -- on the next page?

10    A.    No.  I heard -- heard through the

11 grapevine that he was out there.  I think he had

12 been contacted by the Department of Labor.

13    Q.    So those are the only ones that don't

14 have anything by their name.

15    A.    That would be correct.

16    Q.    Now, who made the decision to escheat

17 those amounts to these participants looked at here,

18 one, two, three, four, five, six, seven, eight?

19    A.    That had been a long time coming,

20 actually.  And this is sort of the final go-round

21 on all of those, especially when we were not able

22 to -- with the effort that was put out this time,

23 there had been just an exhaustion of funds to be

24 able to keep this up.

Page 238

1    Q.    So who gave the advice to escheat that

2 money to the state?

3    A.    Sir, we had been -- this has been since

4 Mr. Sinclair.  This has been going on for a number

5 of years.  So we've been talking.  I think every

6 actuary we've talked with for the last number of

7 years, people had not been successful.  I mean, the

8 computer has come along.  These things are easier

9 now than they were some years ago, and -- but this

10 had been looked at for a number of years.

11    Q.    So, again, why -- it has been looked at

12 for a number of years and you've been getting that

13 advice for years, why was there a decision made in

14 2017 to finally do that?

15    A.    I think I mentioned to you before.

16 Money.

17    Q.    Because of the cost for the valuation

18 for the accounting firm?

19    A.    Could not bear it any longer.

20    Q.    But in 2016 and 2017, I thought you said

21 that was being borne by the plan?

22    A.    It would still be borne by the plan.

23 But, you know, the plan is -- those people,

24 including myself, were there.  You know, this is

Page 239

1 life savings and retirement that I'd like to be

2 able to live off of for, you know, for a number of

3 years and you just have to use it for something

4 that makes common sense.

5    Q.    Can you tell me is there any distinction

6 between these three people who you didn't have the

7 money escheat to and the ones you did have it

8 escheat to?

9    A.    I think that, as I told you before, once

10 there was contact, some people who apparently had

11 actually got the communication and weren't

12 cooperative.

13    Q.    So did Mr. -- did you get any

14 communication from Mr. Armstrong?

15    A.    No.  As I told you, we did not get

16 any --

17    Q.    Did you get any communication from

18 Mr. Fair?

19    A.    Not directly.

20    Q.    Did you get any -- I think you said

21 earlier you did not get any communication from

22 Ms. Mitchell?

23    A.    That's correct.  And I was concerned

24 about her age, as I mentioned before.

Page 240

1    Q.    And so what was the indirect

2 communication you got from Mr. Fair?

3    A.    Well, I'm not going to repeat that.  He

4 spoke with someone, I guess, from the Department of

5 Labor, and it was not a very kind remark.

6    Q.    But did he give you any direction as to

7 what to do with the benefits he had in this plan?

8    A.    I said it was indirect.  It wasn't to

9 me.  It was through someone else.

10    Q.    So sounds like you got some type of

11 negative feedback --

12    A.    Very.

13    Q.    -- in general, but was there any

14 feedback in direct relation to the amount of

15 benefits he's owed under the plan?

16    A.    No.  Unless someone told him that he was

17 owed a lot of money and they were promising him

18 things, but I guess that will come out with time.

19    Q.    What's your plan with the balances left

20 for Mr. Armstrong, Mr. Fair, and Ms. Mitchell?

21    A.    To continue on and I especially would

22 like to be in touch with Ms. Mitchell.  I know some

23 of these people in that area, still my practice,

24 and think one way or the other I will be able to


ESQUIRE

SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
241–244

Page 241

1   reach out and make some contact with them.
2       Q.   Keep them in the plan until you get
3   contact from the three of them?
4       A.   I think it's fair in that situation
5   because of -- yes.  Because I know these people and
6   I know what that participation meant to them.
7       Q.   You said the reason you did the ones to
8   escheat was because of all the cost of the
9   valuation and accounting work for the plan.  Now
10  with the less people in the plan, isn't it going to
11  be an even greater cost borne on yourself and the
12  other three people that are still in the plan?
13      A.   No.
14      Q.   Why will it be less?
15      A.   Because those things were done by head
16  count.
17      Q.   By what?
18      A.   Head count.  In other words, you just
19  have fewer figures to work with.
20      Q.   So when you get a valuation report from
21  Reed-Ramsey, they price it out based on the number
22  of participants in the plan?
23      A.   I don't want to speak for them, but
24  that's generally what has been quoted to me.

Page 242

1   Obviously, it's just common sense.  They have to
2   run less data and -- sure.
3       Q.   And you're saying there's a plan to
4   reconcile the amounts that you paid out based on
5   the 2015 activity based on the date?
6       A.   Absolutely.  This plan existed to help
7   people over the years, and whatever they have
8   coming, that was one of the first things I
9   mentioned to Reed-Ramsey.  We don't want to take
10  one cent away from them.  These are people that
11  have worked for me for many, many years, gave me
12  good service, and I appreciate -- I can't tell you
13  what good employees they were and how much I
14  appreciated them.
15          And so we put this money in to help
16  them, and they were happy to hear -- to have it,
17  and whatever we, you know, can do will be done.
18      Q.   Now, I know this was a long time ago,
19  but I was still unclear.  You said there was,
20  correct me if I'm wrong here, but there was
21  somebody whose last name was Yang who was also
22  listed as participant and there was some confusion
23  about her?
24      A.   Yes.

Page 243

1       Q.   Do you know when she was paid out?
2       A.   Yes.  She was paid out in '08.  As a
3   matter of fact, you weren't -- you were sent that.
4   I saw that paperwork and --
5       Q.   Do you know how her benefit was
6   calculated?
7       A.   She -- well, she was on-site at the
8   time.  This was in '08, as a matter of fact, when
9   she was paid out.
10      Q.   While she still was an employee?
11      A.   Yeah.  Well, probably a couple weeks
12  after, you know, we had left -- the employees had
13  left.  But, yes, absolutely.  And so it was paid
14  out in '08, and for some reason or another the
15  message did not get sent through to Mr. Sinclair,
16  and she continued to show up on the roster.
17          But, in fact, she was -- she had been
18  paid off long before that.  So that was just a
19  mistake, a miscalculation.  And you do have that
20  along with the bank and everything that it was paid
21  out.  I remember seeing those forms.  So that's
22  part of what was presented to you.
23
24

Page 244

1           (WHEREUPON, a certain document was
2           marked Sherrod Deposition Exhibit
3           No. 31, for identification, as of
4           May 2, 2018.)
5   BY MR. CANETTI:
6       Q.   Now, you referred to the receipts and
7   bills for 2014 that you provided to us.  These are
8   them marked as Exhibit 31.  And these you
9   identified in your interrogatory responses as a
10  receipt.  They're Sherrod 604 to 661.
11      A.   Mm-hmm.
12      Q.   Do these look like the documents you
13  referred to?
14      A.   Yes and no.  Yes, they are.  I see some
15  of them --
16      Q.   I'm sorry.  That's my copy.  Let me see
17  that one.  I highlighted some things in there so I
18  could find things easier.
19      A.   Because I think that what's missing is
20  the Excel sheet and --
21      Q.   Correct.  There is not a Excel sheet in
22  this set of documents.
23      A.   And that was explanatory as to what --
24  these are horrible copies here.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
245–248

Page 245

1    Q.   I agree with that statement.
2    A.   You know, for instance, here, it's
3  not -- that's not a good example.  Let's just see.
4    Q.   Can we start at the beginning and go
5  through --
6    A.   I don't know that I'm going to be able
7  to.
8    MR. REARDEN:  Shirley, you've got to let him
9  ask you a question.  Then you can give him an
10  answer.
11    THE WITNESS:  Okay.  Fine.
12  BY MR. CANETTI:
13    Q.   The first page here, and I can see it
14  looks like it says Jeffrey Sinclair at the top, but
15  can you make out any other information on this
16  sheet for Sherrod 604?
17    A.   No.  What I was going to say, and excuse
18  me, is the Excel sheet made this much more clear,
19  because I do believe that the Excel sheet had these
20  duplicated.  In other words, it was Sinclair in one
21  column, the amount paid in another column.  And
22  there was also an attempt to -- for instance, there
23  was -- how could I describe it?  I mean, these are
24  on the same page here, and that's pretty good, some

Page 246

1  of these, so you can see where they are.
2    But sometimes some of these turn up.
3  They were like numbers that corresponded with the
4  Excel column that was also put on the page, so you
5  could refer to the expense and in -- you know, in H
6  number one, for instance, and there was an H number
7  one so you could read that this was where -- who
8  and where the payment went to.  Some of this is --
9  so, you know, I'm at a great disadvantage to try --
10  I don't know why it was presented.
11    Q.   This is what we have.
12    A.   I didn't --
13    Q.   Your attorneys provided to us.  So we're
14  here today, so let's go through it and make the
15  best of it.
16    Like I said, on the first page I can see
17  Jeffrey Sinclair.  I'm not sure of anything else on
18  the first page 604.  Can you identify any
19  information on here for me?
20    A.   No.
21    Q.   On the next page, I see Jeffrey
22  Sinclair, August 1, 2010.  There appears to be a
23  posted money order for a thousand dollars, and it's
24  dated -- if you look at the very bottom here, it

Page 247

1  says 11/16/2010.
2    A.   Just trying to see something.
3    Q.   Looks like there's a receipt for the
4  money order.  So looks like there's one more money
5  order and a receipt for the money order.
6    A.   All right.
7    Q.   So is this saying that you paid
8  Mr. Sinclair a thousand dollars around November 16,
9  2010?
10    A.   Yeah.  Personally paid.
11    Q.   You're saying you personally paid that
12  amount?
13    A.   Yeah, that didn't come -- that came from
14  my pocket.
15    Q.   And did you get reimbursed or paid from
16  the plan for that amount?
17    A.   No.  I didn't go back that far, because
18  this didn't involve all of the legal work and this
19  was something that I mentioned to you before I had
20  done, so it was just paid by me.
21    Q.   Now, on the next page, 606, it looks
22  like it's another invoice from August 12, 2010.  It
23  looks like it says it's for $1,850.
24    A.   Mm-hmm.

Page 248

1    Q.   And it looks like there are four money
2  orders totaling 1850, and it looks like they're all
3  from July 9, 2010; is that right?
4    A.   From what I can see, I guess.
5    Q.   So is that money you paid personally?
6    A.   Yes.
7    Q.   Were you paid back that money from the
8  plan?
9    A.   As I mentioned, I believe that the --
10  you said before and we said that was spelled it
11  out, '11, '12, and '13.
12    Q.   I just want to make sure as we look at
13  these documents, this is accurate.  I don't want to
14  make any assumptions.
15    So you said, I think, you thought you
16  paid this money yourself and didn't get reimbursed,
17  and I just want to verify as we look at the
18  documents that is accurate.
19    A.   No reimbursement until '11, '12, and
20  '13, that was what that -- shows up on the '14
21  5500, and those are three years' worth of expenses,
22  that $142,000 for those years.
23    Q.   '11, '12 and '13?
24    A.   That's correct.  Anything prior --



Page 249

1    Q.   Anything prior, you didn't get
2  reimbursed for?
3    A.   However, the attorney wanted, I guess,
4  everything that was anywhere.
5    Q.   Now, the next page, 607, is another
6  invoice from Mr. Sinclair dated October 12, 2011.
7  And there's two receipts, we don't have copies of
8  the money orders, for $1,500 around 12 -- or one
9  was September 26, 2012, one was December 24, 2011.
10       So this is an example of an expense you
11  paid out of pocket that you were reimbursed for in
12  2014?
13    A.   I think that's supposed to be '11 that
14  may have been reimbursed.  Here again, that's why
15  that Excel sheet would make a difference because
16  this is where the numbers were tallied and added
17  up.  So I'm at a great disadvantage here trying to
18  figure this out for you.
19    Q.   This is the time period you talked about
20  where you said 2011 and '12 were reimbursed?
21    A.   Right.
22    Q.   So does this $1500 represent amount you
23  paid out of pocket with your own funds and then the
24  plan paid you back in 2014?

Page 250

1    A.   Right.
2    Q.   Is that accurate?
3    A.   That -- well, didn't pay me back.  It's
4  not accurate to say the plan ever paid me back.  I
5  never got any money back.
6    Q.   We talked about that earlier.  I'm still
7  confused about that.  If you paid it out of your
8  own pocket, and then you said in 2014 the plan
9  reimbursed you, how did that money not go to you?
10    A.   I don't like the word "reimbursement."
11  Because it was owed already.  It was a big amount
12  of -- a big chunk of --
13    Q.   So the plan had a debt to you for $1500,
14  and then it paid off that debt in 2014?
15    A.   No.  Did not get paid off in 2014.
16    Q.   Did you pay money to yourself for this
17  amount right here, $1500, in 2014?
18    A.   Did I pay money to myself in 2014?
19    Q.   Yes.
20       MR. REARDEN:  I'm going to object to the
21  question as vague and confusing.
22  BY THE WITNESS:
23    A.   Yeah.  I don't understand.
24

Page 251

1  BY MR. CANETTI:
2    Q.   You said, which I think you said several
3  times now, that this $1500 on this page represents
4  money you paid out of your own pocket to
5  Mr. Sinclair for expenses that you think the plan
6  should have paid at this time frame.
7    A.   Well, I knew they should have paid the
8  actuary.
9    Q.   And the time you couldn't take it out of
10  the plan because the plan -- you believe the plan
11  account was frozen?
12    A.   Right.
13    Q.   Right?
14    A.   Right.
15    Q.   And then you said these expenses that
16  you paid out of your pocket from 2011, '12 and '13
17  got paid back in 2014?
18    A.   Generally, yeah, they got paid back to
19  whatever -- whatever that fund that the money had
20  come from, in other words, not from me.  They
21  didn't go into my bank account or they didn't go
22  and buy me, you know, a nice dinner.  That didn't
23  happen.
24       As I was taking debts on, I think we

Page 252

1  mentioned the charge cards.
2    Q.   Okay.  So maybe this is what you're
3  trying to say is you still had a credit card debt
4  of $1500 of 2014 --
5    A.   I still --
6    Q.   Let me finish.
7       So you had a credit card debt in 2014 of
8  $1500 that corresponded to this $1500.  You then
9  took money out of the plan and used that to pay off
10  the debt you had on your credit card of $1500?
11    A.   Right.  That's close, but, I mean, I'm
12  just going to say that's the idea.  That's close.
13  Because there would have been a lot of credit card
14  debt, not even just for that but --
15    Q.   I know.  We're going to get to the rest.
16  Just focus on this one thing here so we can talk
17  about something concrete.
18    A.   Well, that one, this one thing is not --
19  because this is obviously paid.  This is not
20  going -- this is a money order.  This is not a
21  credit card.
22    Q.   So maybe this wasn't from the credit
23  card but some other source you supplied $1500 to
24  pay Mr. Sinclair?



Page 253

1     A.    Right.  Exactly.  Everything was not
2   from -- not credit card.  I had minimal funds, and
3   I used those.  I had a few small bank accounts
4   left, and I used those.  But everything didn't go
5   on the credit card.
6     Q.    So for this $1500, since you're saying
7   it was a cash payment, you believe this came out of
8   your own personal funds?
9     A.    Sure it did.
10    Q.    And so then did you pay yourself back in
11  2014 this $1500 back into your bank account?
12    A.    I haven't paid myself -- no, I have not
13  put one penny back into my bank account for any of
14  this.  I'm indebted today and put nothing back in
15  my bank -- I have no bank account.  Nothing has
16  gone into any bank account.  Never.  I've got
17  nothing but debt that's been paid one way or the
18  other, but nothing has gone personally from me at
19  all.
20    Q.    So you're saying the money that came
21  back from 2014, the 142,000 you're referring to,
22  did not go to pay off any debt associated with this
23  $1500?
24    A.    I guess to be -- this was already paid.

Page 254

1   So how can you pay back what was -- what was
2   already paid?  So this 1500, I don't know how to
3   explain this to you, but, you know, this particular
4   amount was paid, so you can't pay it again.
5     Q.    So the $142,000 we talked about in 2014,
6   none of that money was used to cover this expense
7   of $1500 --
8     A.    It may have -- yeah, I understand what
9   you're saying.  It may have been added on as an
10  expense to show what had, you know, been.  But by
11  that time there want any number of other expenses
12  that had begun to appear, and it wasn't just
13  Mr. Sinclair.  So as best I could try to explain it
14  to you, I'm not doing the best job that I can, but
15  by that time there were other expenses that needed
16  to be addressed.
17        Mr. Sinclair was paid.  I had already
18  used my money to pay Mr. Sinclair.
19        MR. REARDEN:  Can we go off the record for a
20  second?  Can we step outside?
21        (WHEREUPON, a short break was
22        taken.)
23  BY MR. CANETTI:
24    Q.    We were looking at Sherrod 0000607.  At

Page 255

1   this time can you better explain how this was
2   handled?
3         MR. REARDEN:  You're not on the right page.
4   607.
5   BY THE WITNESS:
6     A.    Okay.  I have to ask you -- ask me the
7   question again.
8   BY MR. CANETTI:
9     Q.    This is showing that $1500 was paid to
10  Mr. Sinclair's firm around September of 2012 and
11  December of 2011; is that right?
12    A.    Yes.  12 -- okay.  Mm-hmm.  Yeah.  I see
13  that now.
14    Q.    And was this money repaid to you in some
15  form with the $142,000 you said came out of plan in
16  2014 to reimburse you for expense you incurred in
17  2011 and 2012?
18    A.    Yes.
19    Q.    Do you know why for this October 2011
20  invoice that it was -- there's a receipt saying it
21  paid it in September of 2012?
22    A.    I didn't have any money to do that
23  before that.  Account was frozen.
24    Q.    Now, the next one we have on 608, that

Page 256

1   says July 25, 2012, there's a fee owed to
2   Mr. Sinclair for $1,000 for the work they did for
3   December 31, 2011.
4     A.    Mm-hmm.
5     Q.    On the next page, I can see a money
6   order for $500 from May 28, 2010.  Does this relate
7   to the invoice on 608?
8     A.    I see that it says Sinclair.
9     Q.    Let me ask you this:  It says it's from
10  May 2010.  You didn't reimburse yourself for any
11  expenses in 2010; is that right?  I'm just looking
12  at the money order.
13    A.    Right.  Because this is '12.  It seems
14  like something has gotten shifted, so -- and I
15  don't -- in 2010, I don't believe so from what I
16  understand.  I really would like to see the Excel
17  sheet to be more specific.  I don't -- well, it
18  would explain.
19    Q.    I would too.
20    A.    It's around someplace.  We'll have to --
21    Q.    Let me get a question out.  Maybe we can
22  move on.
23        For the one that said Sherrod 609, the
24  money order for $500 from May 28, 2010.



Page 257

A. I see that.
Q. That was not money that was reimbursed to you from the funds in 2014; is that right?
A. I don't believe so, but I don't have the sheet.
Q. Now, the next page, Sherrod 610, another check for $500, May 28, 2010. My understanding is that would not have been an expense that reimbursed -- was reimbursed to you from the 2014 funds; is that correct?
A. That is my belief.
Q. Now, 611, Sherrod 611, do you know -- this looks like a letter from you to an actuary. Do you know what actuary that was sent to?
A. That's the one we were trying to hunt down.
Q. This is for year end 2012.
A. Year end '11. 5500 -- wait a minute.
Q. It says, "As per our telephone discussion, I'm providing the information for preparation of Form 5500 for year end 2012."
A. Okay. '12. Okay.
Q. Is this a letter you would have sent sometime in maybe 2013?

Page 258

A. Well, for year-end '12, we would have done year-end '12 by October '13.
Q. So this is -- looks like you were planning to pay an actuary $900 for the preparation of the 5500 for 2012?
A. Has to be.
Q. Now, the next page, this appears to be, obviously, a bad copy, Sherrod 612. As best I can read it, it looks like it says "Preparation of 2012 Form 5500-SF." And I can't make out the exact numbers, but looks like it says "Total Due" and it says $1400.
A. I see that.
Q. Does it look like it's $1400?
A. That amount looks right.
Q. This is for July to December 2013, it looks like it says it towards the third line on the top there.
A. Yeah. I mean, I see that. I'm trying to recall. Normally those things are done yearly, not six months. I'm not -- this is a bad copy, and I don't know what's happening here.
Q. At the top it says December 18, 2013.
A. Mm-hmm. Yeah, I see that. I don't

Page 259

know -- I don't know what they would have done in July, but I see that, yeah.
Q. So this $1400, is that something you paid out of your personal funds in some capacity?
A. Well, '13, the pension was perhaps unfrozen that time.
Q. Correct. It was unfrozen at that time.
A. So I would have been able to take that from there and not from my pocket at that time, I believe.
Q. So you believe you would have taken money out of the account, as we saw those checks went to you directly, and then use those funds to pay them?
A. Mm-hmm. Right.
Q. So this doesn't -- is not included in the 142,000 that you reimbursed yourself from 2014; correct?
A. It should not be, but I'm not -- I don't have --
Q. 613, I can't read anything from there. If you can read something, please shed some light on it.
A. I don't know. Looks like redacted. I

Page 260

can't --
Q. Correct. It looks like somebody redacted something from it. I did not do that. That's how it was provided to us.
A. Glad you didn't. I wouldn't have redacted it, so I don't know.
Q. Can you read anything on this?
A. Not really.
Q. And this is, obviously, the best copy available; right?
A. Generally things were, like, e-mailed, so I don't know. I'd -- I don't know.
Q. I made a request for better copies, and I was told that none existed, that these were the best available copies. Any reason to dispute that?
A. No, I'm not going to --
Q. All right. Now, moving on to 614, this looks like on January 12, 2011, there are two postal money orders for $100, so a total of $200 that were paid to Pasquale Ciccodicola.
A. Yeah. And there's a check that's made below that.
Q. Mm-hmm.
A. Which it looks to me like things didn't

Page 261

1  wind up on that page, and there's actually more
2  there.  Be no reason for the check to be there, you
3  know, so...
4      Q.    And, again, we requested a copy of that
5  check or a better version of this, and we were told
6  none exist.  So this is the best copy we have.  Do
7  you have any reason to doubt that?
8      A.    I just know that it's not -- it might
9  affect the bottom -- or the addition because
10  there's something that we can't add up there.
11      Q.    Now, this is from January of 2011, and
12  the freeze took place in February of 2011.  Is this
13  something that you would have paid out of pocket
14  and had to be reimbursed in 2014?
15      A.    Yeah.  I'm trying to think how -- how
16  things -- but it's -- I think that there were some
17  things that predated.  I believe that, best of
18  my knowledge, these actions, to get a freeze
19  started before the actual freeze -- what do they
20  call these?  Motions and things like that?  So even
21  though your order comes out one date, that doesn't
22  mean that there is an inviting, call it prior to
23  that, it would have been -- would have affected the
24  plan.  It was --

Page 262

1      Q.    So is it your belief that you reimbursed
2  yourself from the 2014 funds for this $200 from
3  January 13th of 2011?
4      A.    Yeah, it would have had to have been --
5  yeah, there's some time things that have to be, I
6  guess, brought up at a later date.
7      Q.    Looks like on the next page, 615,
8  there's another check for January 12th, again 2011,
9  for a thousand -- I apologize, a money order -- and
10  looks like there's another one --
11      A.    You're on 16?
12      Q.    It says January 12, 2011 -- page 615.
13  You got a page ahead of us.
14      A.    All right.
15      Q.    So you see in the middle, there's a
16  money order, January 12, 2011, for a thousand
17  dollars.  Again, that was before the freeze took
18  effect in February; correct?
19      A.    That's before the freeze, that is
20  correct.
21      Q.    Is this some -- part of the funds that
22  you paid out of pocket that you then reimbursed
23  yourself in 2014?
24      A.    It may be.  That's what I was explaining

Page 263

1  to you because that -- the inception of the freeze
2  was not when the problem started.  There is also --
3  I was pointing out, there's a check, it seems that
4  you have a tail end of a check, I see number 76 or
5  something like that, that apparently is part of,
6  you know, an addition but we're not getting that
7  entire copy of a check.
8      Q.    Now, there's also a $50 check that's
9  upside down.
10      A.    Where?
11      Q.    On the same page -- I mean money order,
12  not a check.  See that one that's upside down
13  there?
14      A.    Yeah, I see that.  I see 50; I see
15  1,000.
16      Q.    I see $50 on September 14, 2010.  Is
17  that money that you would have used to reimburse
18  yourself in 2014?
19      A.    9/10/14.  I don't think that -- no, I
20  don't know who that was.  I don't think that
21  that was -- and, again, as I mentioned, there's a
22  check underneath here that you -- then are the
23  checks -- it says number 76.
24      Q.    Let's go to page 616.  Now, this is a

Page 264

1  letter to you in January 2011.  It looks like
2  there's a check that ends in 76, a couple zeros,
3  like 500, and the bottom says 5,000, which if you
4  look at the other page, you can see 5,000.
5          So do you think that's the check we saw
6  partially on the other pages?
7      A.    Yes, I do believe it is.
8      Q.    And this is saying you paid him $500.
9  There isn't a date on the check that I see, but I
10  assume it was around January of 2011?
11      A.    Yeah.  You can see there that there --
12  Merrill Lynch and IRS Department of Labor, Western
13  Division, et cetera, et cetera, we're talking about
14  because the -- there was an attempt made on this
15  account.
16      Q.    Now, is that something that you would
17  have used the 2014 money to reimburse yourself,
18  with this $500 check?
19      A.    That probably had to be because it
20  was -- I have to --
21      Q.    Again, this is dated before the freeze
22  went in place?
23      A.    That's correct.  But, again, this -- we
24  had issues, you know, with this account where there



Page 265

1 was a challenge about the ERISA status of it, and
2 there were any number of things that were being
3 done and prior to filing them.
4     Q.   617 appears to be an e-mail
5 communication but doesn't have anything other -- it
6 says there's a note for cash of 350.  Is this
7 saying you paid Mr. Pasquale 350 in cash on --
8 around the date of this note in February of 2011?
9     A.   Right.
10    Q.   Is that something you would have
11 reimbursed yourself for with the 2014 funds?
12    A.   Yes, it would have had to have been.
13    Q.   Do you believe that to be true?
14    A.   I think you see there the filing fee.
15 Above it tells you what it was for.
16    Q.   350, I see that.  Do you believe you
17 paid him cash around at that time?
18    A.   If that's what I put there, that's what
19 I did.  That's the only way you could pay him.
20    Q.   Or money order or check --
21    A.   Cash.
22    Q.   -- because we saw check and money
23 orders.
24    A.   Most often cash.

Page 266

1     Q.   Now, it looks like on December 22, 2011,
2 this is saying he received from you $500.  This is
3 618.
4     A.   That is correct.  Mm-hmm.  Retainer for
5 declaratory judgment action in federal court.  That
6 was again --
7     Q.   So this is something else that you paid
8 him that you then reimbursed yourself in 2014?
9     A.   Right.  Correct.
10    Q.   This looks to be some other e-mail
11 communications, and then there's a receipt for a
12 money order at the bottom --
13    A.   I see that.
14    Q.   -- that's from May 20, 2010, for $500.
15 That's the time period you said that was not
16 covered.  Is that money you would have reimbursed
17 yourself for at that time?
18    A.   Excuse me.  But I -- I wonder if that's
19 not date of purchase of the money order that's on
20 there and not necessarily the transactional date of
21 the money order.  I can't -- because, you know, on
22 July, the date is saying July.  He's saying, "As
23 indicated, I will need X amount of dollars."  And I
24 think of those dates that you're seeing may be date

Page 267

1 of purchase of the money order instead of the
2 actual cashing -- put -- instead of when it was
3 cashed.  I think that this was the purchase -- may
4 be the purchase date.
5         Because, you know, here again, if you
6 look at the date of that communication, and then
7 this appears below, that that's more likely -- as
8 far as money orders, as to where they end up with
9 the actual transaction dates, I don't know, but I
10 tend to feel that the date is the date that the
11 money order was purchased, not the date that it was
12 cashed.
13    Q.   So you're saying you purchased a money
14 order in May 20, 2010, for $500.  You kept that in
15 your possession, and then sent it to Mr. Pasquale
16 around June 15, 2011, over a year later?
17    A.   That is correct.
18    Q.   Why would you purchase a money order a
19 year in advance?
20    A.   Because I had to keep the funds liquid
21 because the -- these folks who wanted to get into
22 the account were trying to take every penny that I
23 had that they could find.
24    Q.   So approximately how many money orders

Page 268

1 did you buy year or more in advance before using
2 them to pay somebody?
3     A.   I don't remember the amount, but it was
4 the only way that I could live, but I don't
5 remember the amount.
6     Q.   So you're saying this date here, May 20,
7 2010, would not correspond to the -- an approximate
8 day when this money was sent to Mr. Pasquale?
9     A.   Correct.
10    Q.   Are you saying that this is -- $500
11 represents money that you reimbursed yourself for
12 in 2014?
13    A.   That would have -- yeah, that would have
14 had to have been, that is correct.
15    Q.   On the next page, it's a handwritten
16 note.  It says April 20, 2012, received of
17 Dr. Sherrod $500 for objections to entry of order
18 and appearance of court on motion.
19        Then there's a check dated May 29, 2010,
20 for a thousand dollars, and May 28, 2010, for a
21 thousand dollars.
22        Is it your testimony that these are
23 money orders you purchased again over approximately
24 a year in advance that you then used to pay him --



Page 269

1  or, I'm sorry, two years in advance, and you then
2  paid him in April of 2012?
3      A.   Correct.  Those money orders never
4  expire.
5      Q.   So you're saying this is money used to
6  pay him in -- for April of 2012?
7      A.   Correct.  I didn't have a bank account.
8      Q.   This says he received $500, and these
9  are two receipts, each for a thousand, which
10 represents $2,000?
11     A.   Right.  I see that.  And -- but if you
12 go back a bit, he was at one point needing $2500.
13 Those amounts will vary.  He was constantly on the
14 case and so there was generally a running balance
15 that I had with him, and I had to pay him -- I
16 couldn't afford to pay him all at once, but I
17 generally was paying currently and back paying him.
18     Q.   So you believe this is money you sent
19 him around April of 2012; correct?
20     A.   Yeah.  Normally -- yeah, gave it to him.
21     Q.   And you reimbursed yourself for this in
22 2014; correct?
23     A.   Right.
24     Q.   Now, on April 16, 2012, there's a letter

Page 270

1  you wrote.  Is this to him, and you spelled his
2  name wrong, or is there a different person who is
3  Cucinella?
4      A.   Cucinella, as I recall, is a court
5  reporter.
6      Q.   You sent Cucinella $50?
7      A.   To obtain a transcript.
8      Q.   And now on this next page --
9      A.   Well --
10     MR. REARDEN:  If he doesn't ask you, you don't
11 have to answer.
12     THE WITNESS:  Okay.  I'm sorry.
13 BY MR. CANETTI:
14     Q.   So I just want to make sure the previous
15 page, these are different and the numbers do look
16 different.  So this is saying at the bottom of the
17 page again on 6/21, there is another money order
18 for a thousand dollars from May 28, 2010.
19          When are you saying you sent this money
20 to Mr. Pasquale?
21     A.   The date -- more than likely the date
22 you see -- you see there, look on the receipt and
23 it says Pasquale for 4/13/12.  You can see it
24 there.

Page 271

1      Q.   So that's another thousand dollars you
2  paid him?
3      A.   That is right.
4      Q.   And then you reimbursed yourself in 2014
5  for that amount?
6      A.   Right.  And you'll see, the purchase
7  date, again, does not correspond to the payment
8  date.  So just to bring it your attention, I think
9  that you had some of those other things when you
10 started out where it was looking like something
11 happened in '10 and that just meant that the
12 purchase date was in '10, but that wasn't the
13 payment date.  So your figures may not be correct.
14     Q.   It's the same -- you're saying you
15 purchased it in May of 2010, kept it for
16 approximately two years, and then used it to pay
17 him about two years later?
18     A.   That is right.
19     Q.   Now, on page 622, it's a letter from
20 Michael Bartolic to Mr. Morad, who I believe was
21 the attorney for Merrill Lynch.  This is a letter
22 wherein your attorney said, on the third sentence,
23 it says, "Ms. Sherrod, or previous counsel on her
24 behalf, made several attempts to direct Merrill

Page 272

1  Lynch, the directed trustee of the plan, to
2  distribute the plan assets to retired participant
3  Shirley Sherrod.
4          "In all instances, your firm, acting on
5  behalf of Merrill Lynch, has refused to follow the
6  direction from the plan administrator except once
7  where Merrill Lynch forced Ms. Sherrod to sign an
8  affidavit saying the funds would be used to post a
9  bond in a state court proceeding."
10         Did I read that accurately?
11     A.   You read it accurately.
12     Q.   So your attorney is saying they granted
13 your request for distribution once, and that was
14 used to pay the bond; is that right?
15     A.   It was a court request, but yeah, that
16 was -- that's generally.  I think that you're maybe
17 saying it differently than it happened, but it was
18 a court order.  I don't know that it was ever a
19 request, but...
20     Q.   On the next page, it looks like on 623,
21 this is an e-mail with you and Mr. Bartolic about
22 some fees to pay him?
23     A.   Yes.
24     Q.   And then 624, there's a money order,



Page 273

1  looks like it's dated March 30, 2012, for $800?
2      A.   That is right.
3      Q.   And is that -- it's hard to read, but I
4  believe you're referring that this payment went to
5  Mr. M. Bartolic?
6      A.   That's right.
7      Q.   And is this something you paid from your
8  own funds that you reimbursed yourself for from the
9  funds in 2014?
10     A.   That's right.
11     Q.   Then on 625, it looks like there's a
12 money order for $500?
13     A.   Right.
14     Q.   I cannot locate a date on this, but it
15 looks like it was a check to Mr. Bartolic; right?
16     A.   Yeah, that is right.  I don't see a date
17 on there either.
18     Q.   Do you think you paid Mr. Bartolic this
19 amount and --
20     A.   Oh, I know I paid Mr. Bartolic.
21     Q.   I'm sorry.
22          -- in the year 2012 or 2013?
23     A.   '12 is when he was involved.
24     Q.   And is this money that you then

Page 274

1  reimbursed yourself with in 2014?
2      A.   Yes.
3      Q.   Again, there's another check, a money
4  order, for $500 to Mr. Bartolic without a date.  Is
5  this something you paid out of your own funds in
6  2012 to Mr. Bartolic?
7      A.   Yes.
8      Q.   And then did you pay yourself this money
9  back with the 2014 funds?
10     A.   Yes.
11     Q.   The next page, 627, money order dated
12 March 27, 2012, for $700 to Mr. Bartolic.  Is this
13 something you paid to him?
14     A.   Yes.
15     Q.   And then did you reimburse yourself with
16 the 2014 funds?
17     A.   Yes.
18     Q.   This looks like the e-mail from you or
19 to you from Mr. Conger.  I have trouble reading.
20 Is this saying that you paid him any money, or is
21 it saying you're owed money?
22     A.   Well, could be both.  Looks like he's
23 saying that he needs an additional retainer, so
24 obviously it's a bill.  Disbursements.  It says

Page 275

1  disbursements of 6,963.  $300 is owing, leaving a
2  credit balance.  Looks like it's an interim --
3  well, additional retainer.  I don't know.
4      Q.   This is not showing you paid him any
5  money at this time?
6      A.   Yes, he -- that doesn't show -- I know
7  that he had been paid, but -- well, yeah, I think
8  isn't he saying there -- leaving a credit balance
9  of -- so thousand.  So, obviously, he's got
10 something at some point, but he's -- the balance
11 is -- he's applying balance.  Additional retainer
12 hopefully should cover.  So he's got more he wants.
13     Q.   So you think this says that you paid him
14 a thousand dollars?
15     A.   Well, I do believe it was more than that
16 ultimately, much more than that.  Where do you see
17 a thousand dollars?
18     Q.   I thought that's what you said.  What
19 did you say?
20     A.   Oh, no, no, no.  He said a credit
21 balance.  Apparently, there's another figure up
22 there, 6963.86 at the top, first sentence, and he
23 wants an additional retainer of 6500.
24     Q.   You think that says 6500?

Page 276

1      A.   That looks like the last sentence there.
2  Should cover cost of the appeal, including brief
3  and oral argument.
4      Q.   Can you make out any of the dates on
5  here, the time periods he's talking about?
6      A.   I don't know why these copies are coming
7  through, so I don't understand that.  But I don't
8  see -- it looks like for whatever reason the dates
9  are not on here.  I don't know that.  But I guess I
10 would have to refer you to the court record, which
11 would give you the times that -- and the things
12 that he did.
13     Q.   The next two pages appear to be an
14 invoice from Tenney & Bentley on 629, I have a date
15 on maybe November 30, 2012.  Does that look like
16 that to you?
17     A.   I don't know where you're looking.
18          Yeah, I see it now.
19     Q.   And on the page 630, it says the total
20 is 875.
21     A.   Mm-hmm.  That looks right.
22     Q.   The next page on 631, looks like -- I'm
23 not sure what that is, a check maybe?
24     A.   That is right.


ESQUIRE

Page 277

1    Q.    To Tenney & Bentley for -- I don't know.
2    What amount is that?
3    A.    That's probably $7500, I just vaguely
4    remember.  Looks like it's May 18th.  That would be
5    from the charge card.
6    Q.    And that's May 18th.  What year do you
7    think it says?
8    A.    '12.  That's when he was involved.
9    Q.    You think this corresponds to this
10   invoice from 875 -- or, no, I'm sorry.  That
11   check's for May, and the invoice was in November.
12   So that's probably not related.
13   A.    Probably not.  I believe May is when he
14   started.
15   Q.    Now, it says that on 632, Tenney &
16   Bentley received, looks like it says May 24, 2013,
17   at the top; is that right?
18   A.    Looks like it.
19   Q.    And this says -- I'm not sure what it
20   says on 633, but looks like it's billing you for
21   5,000 something, and you paid some amount, and
22   there's 5,000 something owed?
23   A.    That looks right.
24   Q.    So maybe it was 900 some dollars you

Page 278

1    paid him?
2    A.    This is sort of guesswork.  I can't see
3    it well, and I -- this is, I guess, what they sent
4    you.  So I don't know.
5    Q.    Now, then there's -- on page 634, looks
6    like there might be an invoice behind a money order
7    from Tenney & Bentley, but there's a check that
8    doesn't say who it's made out to for $230 in
9    February of 2013 -- I'm sorry -- a money order?
10   A.    Money order, correct.  Yeah.
11   Q.    Do you think this is money you paid to
12   Tenney & Bentley?
13   A.    Yes.
14   Q.    On page 635, this is for Ben Gonek.
15   A.    That's right.
16   Q.    It says July 28, 2014.  And all the
17   work, looks like it starts sometime in 2014 and
18   ends maybe July 2014?
19   A.    That sounds right.
20   Q.    Is this any money that you would have
21   reimbursed yourself from the 2014 funds?
22   A.    Yes.  I'm looking at, for instance, the
23   note there, 7/12 review of the e-mails, matters
24   regarding -- ERISA matters and trust issues.  So

Page 279

1    this, again, was centered around people trying to
2    get that and do things.
3    Q.    I thought you said you reimbursed
4    yourself in 2014 for fees and expenses you incurred
5    in '11, '12 and '13?
6    A.    Yeah.  They were -- '11, '12 and '13,
7    but '14 there were still ongoing, as you can see
8    here, ongoing issues.  I think this is how you came
9    across Mr. Redfield.  So there were still things
10   that were happening.
11        What I -- my expenses, my out-of-pocket
12   would have happened '11, '12 and '13, when things
13   were frozen.  Afterwards, then there could be
14   payments in '14 directly.  Best way I could
15   describe.  There was no longer out of my pocket.
16   Q.    So you would deposit money from the plan
17   account into your own personal account and then
18   send a check to Mr. Gonek?
19   A.    That -- likely.  I know that he wasn't
20   paid from the account, no one was, because the bank
21   wouldn't allow it.  And so --
22   Q.    So that's true?
23   A.    That's true.  He would have been -- I
24   would have had to take the funds and pay him.

Page 280

1    Q.    Take the funds put in your own account
2    and then use your own personal account or credit
3    card to pay it?
4    A.    Yeah, however.
5    Q.    Right.  Okay.  But you're saying the
6    work that Mr. Gonek did for you during this time
7    period related to the bonds?
8    A.    You see ERISA there.  7/21/14.
9    Q.    So this does not relate to unfreezing
10   the account at this point; right?
11   A.    No.  There were other things that were
12   transpiring with the account.
13   Q.    Was there anything else besides things
14   related to the bond that he worked on for you?
15   A.    No.  This whole -- whole incident was
16   regarding the Sherman opponent wanting to take this
17   bond.  I had to be protected.
18   Q.    On the next page, 636, it's an e-mail to
19   you from Mr. Gonek, and it looks like he's talking
20   about the work he did related to the bond again?
21   A.    Yes.
22   Q.    On 637, I honestly cannot read anything
23   of that.  Anything you can decipher, please let me
24   know.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
281–284

Page 281

1    A.   Looks like a payment, but I don't know
2 to whom.  May have been something I think -- some
3 of it may have been from Mr. Gonek.  I think he got
4 some money orders.  Those are not --
5    Q.   But there's nothing you can read on that
6 page; right?
7    A.   No.  These things are not coming through
8 clearly.  I don't know where you all got these
9 from.
10    Q.   Now 638 --
11    A.   I can't read any of them.
12    Q.   I can see there's a money order.  Looks
13 like it's saying sometime in 2013 and $500.  You
14 see that?
15    A.   Okay.  Which one are you on?
16    Q.   Sideways on 638.
17    A.   I see that there's a postal money order,
18 once again, and -- but I'm not really making out
19 enough on it to tell you who -- I can't really even
20 see the purchase date on there.  But then, again,
21 as I said, it doesn't really correspond to the
22 payment date.
23    Q.   That's --
24    A.   $500.

Page 282

1    Q.   But you don't know who it's to?
2    A.   No.  I thought that -- this -- I never
3 seen this poor quality.  I don't know that -- I
4 don't know why this would look like that.
5    Q.   On 639, again, I don't think I can make
6 out anything on there, but if you can, please --
7    A.   I cannot.
8    Q.   -- read that to me.
9    A.   No.
10    Q.   On 640, it looks like it's another
11 invoice from --
12    A.   Mr. Gonek, I think.
13    Q.   -- Mr. Gonek.  Looks like this is a
14 repeat of your earlier invoice from 635.
15    A.   721 on there, yeah, looks like it is.  I
16 don't know whether it's the same page.
17    Q.   Only thing that looks different between
18 635 and 640 is it's showing a credit of 2500.
19    A.   Okay.  Maybe the money order number is
20 different.  There are two different numbers, I see.
21 11566, 11555.
22    Q.   We can't make out the amounts on there;
23 right?
24    A.   Well, no, but whatever he -- his total

Page 283

1 charge was, I think he had to be paid.  So
2 sometimes things were not paid all in one fell
3 swoop, but, really, they would have to go month to
4 month as funds were available.
5    Q.   So you think maybe that represents the
6 2500 that was paid on 635?
7    A.   If he billed -- I know he's been paid
8 all he was owed; so, yes, I'm certain that if
9 you -- that whatever you see going on the line
10 there was paying that off.
11    Q.   On 641, looks like you sent another $500
12 to Mr. Gonek?
13    A.   Mm-hmm.  Yes.
14    Q.   And all the money you sent to Mr. Gonek
15 was in 2014; right?
16    A.   That is right.
17    Q.   642, looks like it's another money order
18 to Mr. Gonek, but I cannot make out the amount or
19 the date.  Can you see anything on 642?
20    A.   No, I cannot.
21    Q.   And on 643, it looks like there's a
22 money order for $500 to Mr. Gonek in the middle is
23 the best I can read.
24    A.   I can't make out that much.  I'm not

Page 284

1 sure --
2    Q.   $500 right over here.
3    A.   I assume it's Gonek.  I mean --
4    Q.   Does it look like you wrote Gonek there
5 or somebody did?
6    A.   I don't like to make assumptions.
7    Q.   So you're not sure where that $500 went
8 to?
9    A.   Just know it was legal.
10    Q.   On 644, it looks like it's a bill in
11 June of 2014 from Crane, Heyman, Simon, Welch and
12 Clar?
13    A.   Mm-hmm.
14    Q.   And I think you had mentioned before
15 they did work for you for your personal bankruptcy?
16    A.   Yes.
17    Q.   Was this something anything you would
18 have reimbursed yourself for for the plan for the
19 personal bankruptcy?
20    A.   Some portions of it, and those portions
21 specifically had to do with the bond again.
22    Q.   So how did the work on the bond relate
23 to your personal bankruptcy?
24    A.   Once again, the opponent there was



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
285—288

Page 285

1  trying to get the bond.  We had to protect it.
2  This is why the bankruptcy was done.  We had to put
3  it into a protective mode, and they challenged
4  that.  And so the person had to subsequently go in
5  and prepare numerous briefs, or whatever you call
6  them, to keep their hands off of the bond.
7      Q.    So you think somebody from this law firm
8  filed documents in court related to the bond in
9  2014?
10     A.   I know we did.
11     Q.    But this law firm, Crane, Hayman, Simon
12  Welch and Clar?
13     A.   Yeah.
14     Q.    How much do you think you paid them for
15  work on the plan?
16     A.    They were -- I don't remember right now,
17  but I know it was parsed out to try to isolate
18  specifically the bond work because there was not --
19  the whole thing was not the bond and just where we
20  were able to see the specific times that he put in
21  on that.  This was -- part of that was mine, part
22  of it was the bond, and that bond was all that was
23  charged back, not what would have been personal for
24  myself.

Page 286

1      Q.    646 looks like it's a letter you gave us
2  from Valdemar Washington?
3      A.   Yes.
4      Q.   I can't read what this is saying.
5      A.   No, I can't either.
6      Q.   Okay.  And did you work with him in
7  2014?
8      A.   Yes.
9      Q.   On page 647, looks like there's a check
10  to Mr. Leroy Johnson for $3,000 in January of 2013?
11     A.    That is correct.
12     Q.    Was that a personal check you wrote him?
13     A.    That was a bank check, and he, in turn,
14  reimbursed that had to Mr. Washington.  This was
15  not money that he took.  I believe that he has
16  proof to show you, in fact, where he paid
17  Mr. Washington, but I don't recall why
18  Mr. Washington wanted his check instead of mine,
19  but that's what happened.
20     Q.    This is from January 2013, and I thought
21  you worked with Mr. Washington in 2014?
22     A.   It is, and that was right beginning of
23  the year, and I will tell you simply that year
24  should have been 2014.

Page 287

1      Q.    You think it was just a typ- --
2      A.   Yeah, I do that quite frequently.
3      Q.   So you think this was a check in
4  January 2014?
5      A.   I'm sure it was.
6      Q.   648 looks like it's an invoice from
7  Brooks, Wilkins, Sharkey and Turco from August
8  of 2014.
9      A.   Mm-hmm.
10     Q.    What work were they doing for you in
11  2014?
12     A.    Again, they become involved with the
13  bond and ended up working with Mr. Gonek who they
14  had to consult with to go -- they knew the case,
15  and he was brought in because he supposedly charged
16  less.  And they had to consult with him on all of
17  the ramifications, what was going on, so he could
18  go into the court and prevent the judge from giving
19  that bond up.
20     Q.    I forgot.  Did Mr. Washington also do
21  work on the bond?
22     A.   He did.  And I, again, the issue has
23  been to -- this bond should have been returned when
24  the case was won.  The date is escaping me, the

Page 288

1  first case, but the bond contact was over, and the
2  judge who froze the accounts elected to let them
3  keep the bond and so a lot has been -- effort has
4  been spent on something that should not have
5  happened because this bond belongs to the pension.
6      Q.    On the next page on 649, it looks like
7  there's four different receipts.  I can't make out
8  the amounts or dates of any of those.  Are you able
9  to decipher anything from there?
10     A.    I cannot.  It looks like one of them --
11  it looks like maybe I could make out something that
12  says Turco, but that's a guess.
13     Q.    So looks like maybe there's some
14  payments to Mr. Turco, but we can't see the amounts
15  or the dates?
16     A.    That's right.  That would be in
17  reference to what he had to do to get Mr. Gonek to
18  go and save the bond, which he did.
19     Q.    650, there's another receipt, looks like
20  it says 22/26 Turco or 22126 Turco, but I can't see
21  an amount or date on that middle one.
22     A.   Let's see.  July 14th.
23     Q.   Where is that?
24     A.   Which page?  I'm sorry.



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
289–292

Page 289

1    Q.    I was looking at the receipts.
2    A.    But which page are you on?
3    Q.    650.
4    A.    Okay.  I am as well.  I see something
5  655 -- maybe that could be 855.  Balance now due.
6  Turco.  Yeah --
7    MR. REARDEN:  I think he's primarily asking
8  you about the customer receipts rather than the
9  bill.
10  BY THE WITNESS:
11    A.    Right.  I think it's Turco.
12  BY MR. CANETTI:
13    Q.    But you don't know how much you paid him
14  that corresponds to these receipts here on this
15  page on 650?
16    A.    The exact amount, no.  Just generally
17  paying down the balance.  They carry these balances
18  for us, and we're just paying them down.
19    Q.    And you think you paid some amount and
20  the balance of that was either 855 or 655?  Is that
21  what you said?
22    A.    Yes, that most likely would have
23  corresponded to that bill.  This is why it's there.
24  I'm looking -- it seems like I'm making out

Page 290

1  something on that receipt that says 22.  It looks
2  like it says 22126, and then I look over to the
3  right, and it looks like that's the number that
4  corresponds to that bill.
5    Q.    Okay.  On page 651, this looks like it
6  says Sherrod, page 3, so I'm not sure what this is
7  part of.
8    A.    State of Michigan.  I am going -- I have
9  to guesstimate it -- no, no, no, no.  Let's just
10  see here.
11      Okay.  Yeah, there's something here.  I
12  think that this comes from Mr. Granzotto, the
13  appeal attorney, and I see that -- his phone
14  conversation with Edwin Conger.
15      So here, again, this continues through
16  the appellate court in Michigan.  And 11/15/14,
17  there were -- I don't recall at the moment as we
18  speak, but, again, it was always the bond, trying
19  to get that back to where it belonged and that
20  there were probably some other ERISA matters that
21  had come up.
22    Q.    Did he do -- any of this work in 2014
23  relate to your individual -- appeal for your
24  individual lawsuit with Mr. Sherman apart from the

Page 291

1  bond?
2    A.    Yes, some of it would have.  And, again,
3  that portion I know has been carved out.  That
4  would show on the sheet that that apparently you
5  don't have.  That would be the spreadsheet.  But,
6  you know, he has here -- I don't see the entire
7  thing, but he's talking to Mr. Conger, and
8  Mr. Conger, as you know, is the ERISA attorney who
9  is here, was here.  And there had to be
10  collaboration to work on ERISA matters.
11    Q.    On page 652, it looks like there's a
12  money order for a thousand dollars, another money
13  order for a thousand dollars, looks like in the
14  middle it says maybe Granzotto.  Is this -- does
15  that sound right to you?
16    A.    Yeah, that would be right.
17  Mr. Granzotto has had a running balance for ten
18  years.
19    Q.    Do you think you paid him approximately
20  $2,000 at some point in 2014, and that's what this
21  represents?
22    A.    At some point, that is correct.
23    Q.    And that's for the work related to the
24  bond that was done in 2014, the appellate work

Page 292

1  related to the bond in 2014?
2    A.    Right.  And there likely was more than
3  that.  I think that all he had to do came to more
4  than just 2,000, but this is what we're seeing
5  here.  I don't see what I felt had been more
6  payments.  I don't know.
7    Q.    But, again, you paid him more money
8  because he also did other appellate work that was
9  just for you that didn't relate to the bond?
10    A.    That is right, yes.  He -- this became
11  part of -- it just sort of keeps reappearing.
12    Q.    On page 653, it looks like there's a
13  money order for a thousand dollars.  I don't -- I
14  can't make out the date there, and it doesn't seem
15  like it has anybody paid to on it.
16    A.    I'm going to assume that it probably --
17  I have to assume, I don't know why it's not showing
18  up, Mr. Granzotto, but I'll see.  We don't have the
19  date.  Looks like it may be '14 to the right of the
20  money order.
21    Q.    You think this was 2014, money paid to
22  Mr. Granzotto, and a thousand dollars?
23    A.    Yeah.  So go to the next page, it seems
24  like these are in some type of order associated



Page 293

1 with each attorney, and this seems to be his
2 section.
3 Q. So then it looks like there's four money
4 orders on this sheet, each for a thousand dollars
5 to Mr. Granzotto?
6 A. That's correct.
7 Q. And you're saying this money paid in
8 2014 to Granzotto all related to appellate work for
9 the bond?
10 A. Yes.
11 Q. And it looks like on page 655, there's
12 three more money orders to Mr. Granzotto -- one for
13 700, one for a thousand, one for a thousand. Looks
14 like at least two of them I can make out 2014.
15 Does that sound right?
16 A. That sounds right.
17 Q. 656, I can see, looks like, two money
18 orders, each for 900 to Mr. Granzotto.
19 A. Yes, I see that. I was trying to see.
20 Actually make sure there's no duplication with
21 numbers.
22 Q. Was that in 2014 or 2015?
23 A. Did he do anything in 2015? You know,
24 here again, I don't have his invoice in front of

Page 294

1 me, and Mr. Granzotto has been on this case since
2 the beginning in 2010, and at one point or another
3 had to encounter the situation with the bond. He
4 was one, I think, that was involved with the
5 establishment of the bond and so a lot of what you
6 see here may not necessarily be work that he did.
7 He had a running balance for years and so there was
8 always a balance. I always owed Mr. Granzotto
9 something.
10 So these payments that you see don't
11 necessarily have to be something that happened in
12 '14. It likely was something that happened from
13 the very beginning and just was the ongoing balance
14 to always pay him off.
15 Q. And the only work that you paid
16 Mr. Granzotto for was appellate work related to the
17 bond?
18 A. That's right. He's an appellate
19 attorney -- well, no, because there were other --
20 he dealt with the Sherman case in some aspects,
21 but --
22 Q. I misspoke. I'm sorry. The only thing
23 you're saying you used the plan's money to pay him
24 for was for the appellate work he did for the bond?

Page 295

1 A. That is right. We carved everything
2 else out. We did not pay any personal work.
3 Q. You didn't use the plan's money to pay
4 for the work he did. That was just for you?
5 A. That is correct. But it was always,
6 every billing, something with the bond.
7 Q. Page 657 looks like it's four money
8 orders again for -- each for a thousand dollars.
9 A. I think you're --
10 Q. Is this a duplicate of the page 654?
11 Looks very similar.
12 A. I didn't make these copies.
13 Q. Looks like I'm looking at the money
14 order numbers.
15 A. 65 -- wait a minute. 654. And you're
16 saying which one, sir?
17 Q. And 657, looks like it's a duplicate
18 page.
19 A. Yep. You're right.
20 Q. So 657 is not representing anything new.
21 It's just an accidental double copy of what's on
22 654; correct?
23 A. I didn't do this.
24 Q. I'm not blaming you. I'm just trying to

Page 296

1 get to the bottom of --
2 A. The bills are still there and -- no,
3 this is not -- I don't do things like this.
4 Q. And then there's 658, which appears to
5 be two money orders, possibly to Mr. Granzotto, but
6 I can't make out dates or amounts on here.
7 A. I'm thinking it looks like this was
8 Mr. Granzotto's section, and as I said, he was the
9 person who handled just about everything.
10 Q. It's possible this could be a duplicate
11 though, too, of some earlier one we got from him?
12 A. You know, I don't know. It certainly
13 got to fix and re-adding because I don't want -- I
14 put money out, and I want every penny accounted for
15 on my behalf. So I honestly don't know, though. I
16 -- and it's so concerning to me that there -- if
17 there's duplicates, there may be things may have
18 been lost in the transition. So I don't know. I
19 never seen this before.
20 Q. You haven't seen --
21 A. This reproduction, I have not seen this,
22 and I don't know that it's complete as it -- I
23 can't read things I don't know. It's not --
24 Q. On 659, it looks like there's some more



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
297—300

Page 297

1  checks or money orders from Mr. Granzotto?
2      A.   Mm-hmm.
3      Q.   I can make out one for a thousand,
4  another for a thousand, another for 700.  Does this
5  appear to be a representation of another -- or
6  $2700 was paid to Mr. Granzotto around 2014?
7      A.   As I told you, I'm not -- that is --
8  that would not be a correct assumption.
9      Q.   I'm saying that it was paid to him in
10  2014?
11      A.   In 2014?
12      Q.   Mm-hmm.
13      A.   That's what I'm saying.  I don't believe
14  that's -- I think that this may be a collection of
15  Mr. Granzotto's work from 2011 forward.  I don't
16  believe -- this is not all for one year because he
17  was involved year after year after year, and I --
18      MR. REARDEN:  Right.  But he asked you was
19  this paid to him -- were these money orders paid to
20  him in 2014?
21      THE WITNESS:  I don't -- that's what I'm
22  saying.  I don't know.  Because his involvement was
23  so long, I think we're just seeing his section.
24      MR. REARDEN:  Right.  But he's not asking you

Page 298

1  when the legal work was done.  He's asking you --
2      THE WITNESS:  Right.  I understand.
3      MR. REARDEN:  -- when these were given to him.
4  You either know or you don't know; right?
5  BY THE WITNESS:
6      A.   I don't know.
7  BY MR. CANETTI:
8      Q.   If you look in the middle of the page,
9  looks like one of them says June 11, 2014, the one
10  for a thousand dollars.
11      A.   Which page are you on?
12      Q.   We're still on 659.
13      A.   And 659, I can't read a thing there.  I
14  do -- that says 6/11/14?
15      Q.   Yes.
16      A.   So that would have been -- looks like
17  the purchase date of that money order, so it should
18  have been.
19      Q.   Would you have grouped these other two
20  as occurring around the same time?
21      A.   Maybe.  I don't know what to tell you.
22  Because this -- the way this is put together, I
23  can't tell you that -- you know, I would rather see
24  them associated with an invoice, and I'm not seeing

Page 299

1  that.  And, you know, I'm not speaking against my
2  own party, but it was not the last way that I saw
3  it organized, so I don't understand.
4      Q.   This is what the documents are that you
5  decided to produce for this litigation.  So it is
6  what it is.
7      A.   Right.  Well, they're accurate -- you
8  know, they're payments that are made, there's no
9  doubt about it, but the chronologic sequence I --
10      Q.   On page 660, it looks like it says
11  Granzotto again for $500.  I can't make out the
12  date.  Do you have any idea when this may have
13  occurred?
14      A.   That one, I really can't.  I'm looking
15  at that date on that, and it looks like it says
16  6/5/10.  So, you know, I don't know -- I do not
17  know what date that money order says.
18      Q.   On 661, again, this looks to be four
19  money orders to Mr. Granzotto.
20      A.   Mm-hmm.
21      Q.   I can see the one on the right says 500,
22  the one in the middle I can't read, the one on the
23  left says 500, and the one on the bottom says a
24  thousand dollars.

Page 300

1      A.   Mm-hmm.
2      Q.   Does that look right to you?
3      A.   That's correct.
4      Q.   And then the best date that I can see is
5  the one on the left-hand side.  Looks like it says
6  something -- 2015 and something.
7      A.   I see that.
8      Q.   So do you think these may have been all
9  checks sent to him or money orders sent to him in
10  2015?
11      A.   I don't know all of them.  I know that
12  one that we can see says '15, sure.
13      Q.   The only thing we can make out is this
14  represents about $2,000 that was sent to
15  Mr. Granzotto, at least 500 in 2015 and the other
16  1500 we don't know about?
17      A.   That would be correct.
18      Q.   And then as far as any funds that were
19  paid at any other time in 2015, 2016 or 2017, you
20  have no money orders, checks, or invoices for those
21  time periods; correct?
22      A.   Not to my knowledge.
23          Well, did you say '17?
24      Q.   2015, 2016, and 2017.



Page 301

1    A.    Yeah, I don't know at this point.
2    Everything that I know that we -- I believe we've
3    given you everything at this point in time.
4    Q.    That we've seen no invoices, no money
5    orders for 20 -- well, other than what we looked at
6    today, we have not seen any other invoices,
7    receipts or money orders for 2015, 2016 or 2017?
8    A.    Okay.
9    Q.    Is that right?
10   A.    That's right.
11       MR. CANETTI:  Let's go off the record.
12           (WHEREUPON, a short break was
13           taken.)
14   BY MR. CANETTI:
15   Q.    I will remind you you're under oath.
16       MR. CANETTI:  And we have another exhibit
17   here, Exhibit No. 32.
18           (WHEREUPON, a certain document was
19           marked Sherrod Deposition Exhibit
20           No. 32, for identification, as of
21           May 2, 2018.)
22   BY MR. CANETTI:
23   Q.    This is something you produced to us.
24   Have you seen this document before?

Page 302

1    A.    I have.
2    Q.    And what does this represent?
3    A.    This appears to be the escheated funds
4    and the amounts of the escheatments.
5    Q.    Do you know who -- how this document was
6    created?
7    A.    I don't remember exactly how it was
8    created.  I guess if there's just a form that you
9    fill out.
10   Q.    Do you know who filled out this form?
11   A.    I don't recall that.
12   Q.    And do you know if this form was filed
13   in with the Michigan Department of Treasury?
14   A.    That, I'm pretty sure about.
15   Q.    Do you know who did that?
16   A.    I don't recall who did it.
17   Q.    Was it possibly you?
18   A.    I don't know that it was myself or I
19   signed off on it.  I don't really recall right now.
20   Q.    Is it possible it was Mr. Johnson?
21   A.    I don't know.  I don't know.
22   Q.    You don't think it was him?
23   A.    I don't believe it was.
24   Q.    Would it have been the accounting firm?

Page 303

1    A.    It's possible.  I'm really not sure.
2    I'm not sure right now.
3    Q.    And, again, this corresponds, if you
4    look on the -- there's the 27,000 -- or, I mean,
5    there's a 2017 check for 28,700, and on the last
6    page it says 28,700.  So this corresponds to the
7    check amount that was sent to the State of Michigan
8    on June 27, 2017, at SunTrust 2018000179?
9    A.    Okay.
10   Q.    This one here.
11   A.    Yes.
12   Q.    And looking at these amounts and the
13   Exhibit 28, did you put these in order or --
14   A.    No, they're not in order.
15   Q.    Exhibit 28 is this one here.  So this
16   shows what their balances were as of December 31,
17   2016, on the Exhibit 28; correct?
18   A.    I thought we said 2015?
19   Q.    If you look at the --
20   A.    Oh, you're talking about -- you're not
21   talking about this.  You're talking about something
22   else.
23   Q.    Yeah, this one here.  If you look at the
24   second page.  Sorry.

Page 304

1    A.    This one right here?
2    Q.    Page 691 says asset reconciliation as of
3    12/31/16.
4    A.    Yes, I see that.
5    Q.    And you said these numbers on Exhibit 32
6    are based on 2015, but you thought they were
7    possibly overestimated, overreported?
8    A.    That's -- you know, I believe that
9    that's what I understood.
10   Q.    Looking at this here on Exhibit 28, for
11   example, on page 692, it says Mr. Alexander's
12   balance is 2493.  And then --
13   A.    Okay.  Where are you?  You're in the
14   first column?
15   Q.    So Mr. Alexander, right here, and then
16   I'm reading down here, it's a little blurry --
17   A.    $2,493.  Mm-hmm.
18   Q.    Now, it looks like the amount that was
19   deposited with the State of Michigan was 2,031 on
20   Exhibit 32.
21   A.    I see that.  Mm-hmm.
22   Q.    And then if we look at the next page, on
23   693, there's an amount for Anna --
24   A.    The next page.  Hang on.  Hang on.  Hang



Page 305

1  on. Hang on. Okay. Yes, I see.
2  Q.  On the top there's Anna Calderone.
3  A.  Right.
4  Q.  And it says 4,229?
5  A.  Mm-hmm.
6  Q.  And then it looks over here on
7  Exhibit 32, it says 3,446.
8  A.  Mm-hmm. Right.
9  Q.  We can keep going through them, but if
10  you want to check and look, it looks like
11  everybody's balance as of 12/31/16 is higher than
12  the amount that you escheated to the state for them
13  in 2017?
14  A.  Yeah. What I don't know, I'm not sure
15  of, is whether -- I do see the balance here.
16  There's no question about the IRS tax. So that
17  would have to, I think, be looked into. I recall
18  something about the State of Michigan because
19  there's supposed to be taxes and all that, but I'm
20  not really sure whether there -- there was
21  something, some reconciliation with the IRS taxes
22  that are owed or will be owed. I'm not really
23  sure.
24        I understand what you're saying. I see

Page 306

1  the difference. I do know, of course, there was
2  some question because we knew that the fund did
3  grow, and there was no doubt about the fact that
4  there may be some more owed. So there's not any
5  dispute of that in the case -- the fact. That's --
6  you know, I think I told you that before.
7        I do wonder too something about the
8  taxes and something about the State of Michigan,
9  but that's something that has to be worked out a
10  bit.
11  Q.  At this stage there hasn't been any
12  checks written to the IRS or the State of Michigan
13  to pay any taxes on these amounts; correct?
14  A.  And I don't know how the State of
15  Michigan -- that has to be checked in to with a
16  little bit more certainty because I just know that
17  as the trustee, there's some notification that I
18  received from the State the other day regarding
19  this. So there's more that's being done on it.
20  It's just not -- no one said that it's final.
21  There's more that's being done and more that has to
22  be computed on it.
23  Q.  So sounds like you're saying it's
24  possible you may have to pay additional amounts for

Page 307

1  taxes based on these distributions?
2  A.  Taxes, and if they are owed more,
3  absolutely. We're not trying to short anybody.
4  It's not something we'll do. This is money that --
5  funds that were given to them anyway, and I won't
6  take them away ever. I think I mentioned to you
7  before, this was not the final, you know, figure.
8  Q.  And you had mentioned a letter we had
9  gotten from Mr. Kofoed.
10  MR. CANETTI: That's Exhibit No. 33.
11        (WHEREUPON, a certain document was
12        marked Sherrod Deposition Exhibit
13        No. 33, for identification, as of
14        May 2, 2018.)
15  BY MR. CANETTI:
16  Q.  It's a letter dated August 24, 2017, to
17  me from Mr. Russell Kofoed. And in paragraph 3, it
18  states that you sent checks of 8500 to the two
19  children of Ms. Riggleman. Do you see that?
20  A.  I see that.
21  Q.  Did you send them checks for 8500?
22  A.  You have the copies there, so the -- if
23  his -- you know, whatever is on the check is what's
24  correct. If this is not correct, I don't take

Page 308

1  responsibility for that.
2  Q.  I did not get copies of the checks --
3  A.  You have them.
4  Q.  -- that you sent to the Rigglemans. We
5  have copies of the checks that were sent to you
6  that was approximately $8900.
7  A.  And those went to -- well, they're not
8  Rigglemans. They're actually keys I and waters.
9  That's what they got.
10  Q.  So you're saying this representation
11  here that only 8500 was sent to them was not
12  accurate. Whatever those checks were from 2017,
13  that's the amount that was sent to them?
14  A.  That is the amount that was sent, and
15  I'm sure if you, you know, want to do to follow
16  through and get the bank statements, you'll find
17  the numbers correspond to what's on those checks,
18  not what Mr. Kofoed has stated here.
19  Q.  And then something I was confused about
20  you talked about a few times, I thought you said
21  earlier that the Sherman-Sherrod litigation in the
22  state of Michigan is still ongoing. Is that true?
23  A.  That's true.
24  Q.  Is the bond still being held pursuant to



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
309–312

Page 309

1  that litigation?
2      A.   I can't give you a direct exact answer
3  to that. I'm not the attorney. It's still
4  ongoing. It's in litigation and only the people
5  involved would be able to answer you specifically.
6  I cannot.
7      Q.   So, to your knowledge, the bond has not
8  been paid out to Mr. Sherman?
9      A.   Oh, no, that bond has not been paid out.
10  Probably see that it never will be paid out. No,
11  that is not paid out.
12      Q.   And has not been paid out to you either;
13  correct?
14      A.   I would never be -- first of all, it
15  can't be. I would never -- it says clearly it's
16  not to be used -- given to me in that affidavit.
17      Q.   The affidavit we looked at earlier with
18  Merrill Lynch?
19      A.   That affidavit spells out the fact that
20  it is not -- it was to be used for one purpose
21  only, and it was never to be used by me, and it was
22  never intended to be used by me.
23      Q.   The bond is made out to you as the
24  principal; isn't that right?

Page 310

1      A.   I don't know how it's made out, but I do
2  know there's an affidavit for my statements as to
3  what the -- how that bond would be handled, and
4  that's my affidavit, and that's just what I stand
5  by.
6      Q.   Let's look at that affidavit, then,
7  because I did not see anywhere where it says that
8  the bond is to be paid out to the plan.
9      A.   It may -- well --
10      Q.   If you want to get Exhibit 2 there
11  handy, and I'll do my best to put my finger on
12  Exhibit 2.
13      A.   I think I know it well.
14      MR. REARDEN: Don't think you know it well.
15  Get the exhibit and look at the exhibit.
16      THE WITNESS: All right. Okay.
17  BY MR. CANETTI:
18      Q.   Now, if you think -- I think if you go
19  to 2041, DOL2041, that's your affidavit, and it
20  continues to 242 and 243.
21          Can you point to where it says how the
22  bond should be distributed if it's paid out to you?
23      A.   Page 4, and I guess we'll go on to
24  page 5, "This distribution shall be used for the

Page 311

1  sole purpose of securing a bond pursuant to" --
2      Q.   I'm sorry. You said page 4?
3      A.   Well, I'm so sorry. Exhibit 4 is what
4  I'm looking at. I'm looking at paragraph -- you
5  put me to that page, paragraph 4. And this goes --
6  continues on the next page, very last word and
7  that -- and then that paragraph, "This distribution
8  shall be used for the sole purpose of securing a
9  bond pursuant to the appeal order."
10      Q.   Mm-hmm.
11      A.   That's the sole purpose. It is not to
12  be -- ever was it intended to come to me, and it
13  was -- as I said, I didn't write this.
14      Q.   It says it's a distribution for securing
15  a bond, and the appeal order said that your assets
16  could be used to secure the bond.
17      A.   Well, I didn't write this, and I -- this
18  was something that the court ordered, was forced on
19  me, and it was never ever my understanding or
20  intent to take $250,000 out of my account. That
21  was not an option, and it certainly is -- says this
22  doesn't go for anything else, and it shall never go
23  for anything else with my -- if I have anything to
24  do with it.

Page 312

1      Q.   Well, on the Exhibit 3 on 2037, we
2  talked about before, the bond is in your name. So
3  if this bond does not get paid out to Mr. Sherman,
4  the only person that it can get paid to is you,
5  then.
6      A.   Well, that bond -- well, you know, it
7  may be me via the pension, but it was an
8  understanding of everybody who dealt with this
9  the -- the administrator, Mr. Conger, everyone, and
10  that bond goes back to where it came from. That's
11  the pension.
12      Q.   But there's no documents that actually
13  say that; correct?
14      A.   It doesn't -- no, right. So we have to
15  emphasize the negative of what can't be done with
16  it. The positive is what must be done with it is
17  not there. You're exactly right. It doesn't say
18  where it must go, but it does say where it can't
19  go.
20      Q.   And on the other page you're looking at,
21  on page 2042 refers to it as in paragraph 9, two
22  distributions.
23      A.   That's Merrill Lynch terminology, and I
24  see what it says. It's not a distribution because



Page 313

1   I don't have it.  Distribution is something that,
2   you know, I put in my back pocket and I can use.  I
3   can't use that, and I'm not using it.
4       Q.   It also said in paragraph 9 that "those
5   two distributions do not exceed my individual
6   interest in the plan."  Why is that language in
7   there?
8       A.   Why is it in there?  You know, Merrill
9   Lynch wrote that up, and I guess it was to protect
10  themselves and what -- this was nothing that I was
11  consulted on.  I was just told this is the way it
12  had to be.
13      Q.   But you did sign it; right?
14      A.   I had no choice.  At the same time, I
15  couldn't withdraw one dollar for something that I
16  did need when this was made to happen.
17      Q.   When did you reach retirement age?
18      A.   I was born in '46.  Few years ago.
19      Q.   You don't recall what year you reached
20  retirement age?
21      A.   Subtract 46 from whatever and you'll get
22  there.  At the moment, I don't want to do the math.
23      Q.   Because I'm confused.  You said you
24  couldn't take any money out, but if you weren't at

Page 314

1   retirement age, would you be able to take money out
2   of it?
3       A.   That's why you read the letter from
4   Mr. Bartolic asking, and I was denied.  Merrill
5   Lynch sat on this and wouldn't let me take anything
6   from my account.
7       Q.   So at that stage when this 250 --
8   $250,000 came out, you could get distributions from
9   the plan because you had reached your retirement
10  age; is that right?
11      A.   I was eligible -- I believe I was
12  eligible, if we're doing the math right, I was
13  eligible, but I was barred from doing that because
14  of the court order.
15      Q.   That's what I'm referring to.  At the
16  time this $250,000 came out, you were eligible for
17  distributions from the plan; right?
18      A.   That is right.
19      MR. CANETTI:  I have no more questions at this
20  time.
21              EXAMINATION
22  BY MR. REARDEN:
23      Q.   Dr. Sherrod, when you made -- had the
24  plan issue checks to you -- let me back up.

Page 315

1              Were there occasions where you had the
2   Target Pension Plan issue checks to you for payment
3   of plan expenses?
4       A.   Yes, sir.
5       Q.   And when that was done, were the
6   expenses that you were paying always expenses that
7   were incurred in the year that the check was
8   actually issued?
9       A.   No, sir, they weren't.
10      Q.   So there were times when you had a --
11  the plan issue a check to you where it paid
12  something that occurred in a prior year?
13      A.   Yes, that's correct.
14      Q.   Dr. Sherrod, I want to refer you back to
15  Deposition Exhibit 31.  I want to refer you to the
16  page with the Bates stamp number ending in 607,
17  lower right-hand corner.
18      A.   Yes.
19      Q.   Do you see that page?
20      A.   I do, yes.
21      Q.   On the top part of that page, it -- I
22  see what appears to be an invoice from Jeffrey L.
23  Sinclair and Company?
24      A.   That's right.

Page 316

1       Q.   And can you carefully read the text
2   underneath "professional services" there?
3       A.   Preparation --
4       Q.   You don't have to read it out loud.
5   Just read it to yourself.
6       A.   Okay.
7       Q.   And this invoice, does this invoice
8   refer to work that Sinclair and Company did for the
9   2010 plan year, or does it refer to work that it
10  did for the 2011 plan year?
11      A.   It says here -- it says here 2010.
12      Q.   So do you know whether or not you paid
13  this invoice out of your own personal funds and
14  were not reimbursed for this, or was this something
15  that you were reimbursed for through the Target
16  Pension Plan?
17      A.   I believe that I paid; it was later
18  reimbursed.
19      Q.   Even though it was in the -- for the
20  plan year ending December 31, 2010?
21      A.   2010.  Looking at the date for 2011.
22      Q.   If you know.
23      A.   I'm not sure if I know because the
24  year's different.  Theoretically --



SHIRLEY SHERROD
R. ALEXANDER ACOSTA vs SHIRLEY T. SHERROD

May 02, 2018
317—320

Page 317

1      MR. REARDEN:  I don't have anymore additional
2  questions for you.
3      MR. CANETTI:  That's it.
4      MR. REARDEN:  We will reserve signature.
5          (WHEREUPON, the deposition concluded
6          at 4:54 p.m.)

Page 319

1          IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Woodridge,
3  Illinois, this 21st day of May, A.D. 2018.
4
5
6
7
8          Notary Public, DuPage County, Illinois.
9          My commission expires 8/21/18.
10
11  ALICE M. SCHWINGER, CSR No. 84-2913

Page 318

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF DUPAGE    )
4          I, ALICE M. SCHWINGER, CSR No. 84-2913,
5  a Notary Public within and for the County of
6  DuPage, State of Illinois, and a Certified
7  Shorthand Reporter of said state, do hereby
8  certify:
9          That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13          That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony
17  given and the proceedings had;
18          That the said deposition was taken
19  before me at the time and place specified;
20          That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.

Page 320

1              I N D E X
2  EXAMINATION                              PAGE
3    SHIRLEY T. SHERROD
4  EXAMINATION                                 3
   BY MR. CANETTI:
5  EXAMINATION                               314
   BY MR. REARDEN:
6
          E X H I B I T S
7
   EXHIBIT NO.                              PAGE
8  No. 1                                      23
   No. 2                                      37
9  No. 3                                      56
   No. 4                                      59
10  No. 5                                     61
   No. 6                                      89
11  No. 7                                     100
   No. 8                                     103
12  No. 9                                     104
   No. 10                                    107
13  No. 11                                    114
   No. 12                                    115
14  No. 13                                    122
   No. 14                                    126
15  No. 15                                    131
   No. 16                                    134
16  No. 17                                    137
   No. 18                                    153
17  No. 19                                    156
   No. 20                                    163
18  No. 21                                    170
   No. 22                                    178
19  No. 23                                    179
   No. 24                                    187
20  No. 25                                    191
   No. 26                                    194
21  No. 27                                    203
   No. 28                                    205
22  No. 29                                    208
   No. 30                                    228
23  No. 31                                    244
   No. 32                                    301
24  No. 33                                    307



**EXHIBIT 3**

EXHIBIT 3

**ADOPTION AGREEMENT FOR**

**THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)**

**STANDARDIZED TARGET BENEFIT**
**PLAN AND TRUST**

The undersigned Employer adopts The Manufacturers Life Insurance Company (U.S.A.) Prototype Standardized Target Benefit Plan and Trust and elects the following provisions:

**CAUTION:** Failure to properly fill out this Adoption Agreement may result in disqualification of the Plan.

**EMPLOYER INFORMATION**
(An amendment to the Adoption Agreement is not needed solely to reflect a change in the information in this Employer Information Section.)

1. EMPLOYER'S NAME, ADDRESS AND TELEPHONE NUMBER

    Name: _SHIRLEY T SHERROD MP PC_

    Address: _PO BOX 515_
    _SOUTHFIELD_ (Street) _MI_ (State) _48037_ (Zip)

    Telephone: _248-341-5100_ (City)

2. EMPLOYER'S TAXPAYER IDENTIFICATION NUMBER _____

3. TYPE OF ENTITY
    a. [X] Corporation (including Tax-exempt or Non-profit Corporation)
    b. [X] Professional Service Corporation
    c. [ ] S Corporation
    d. [ ] Limited Liability Company that is taxed as:
        1. [ ] a partnership or sole proprietorship
        2. [ ] a Corporation
        3. [ ] an S Corporation
    e. [ ] Sole Proprietorship
    f. [ ] Partnership (including Limited Liability)
    g. [ ] Other: _____

    AND, the Employer is a member of (select all that apply):
    h. [ ] a controlled group
    i. [ ] an affiliated service group

4. EMPLOYER FISCAL YEAR means the 12 consecutive month period:

    Beginning on ___1___ / ___1___ (e.g., January 1st)
                   (month)  (day)
    and ending on ___12___ / ___31___
                   (month)  (day)

**PLAN INFORMATION**
(An amendment to the Adoption Agreement is not needed solely to reflect a change in the information in Questions 9. through 11.)

5. PLAN NAME:
    _SHIRLEY T SHERROD MP PC_
    _TARGET BENEFIT PENSION PLAN_

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Standardized Target Benefit Plan**

6. EFFECTIVE DATE
   a. [ ] This is a new Plan effective as of _____ (hereinafter called the "Effective Date").
   b. [✗] This is an amendment and restatement of a previously established qualified plan of the Employer which was originally effective _7/1/87_ (hereinafter called the "Effective Date"). The effective date of this amendment and restatement is _1/1/02_.
   c. [✗] FOR GUST RESTATEMENTS: This is an amendment and restatement of a previously established qualified plan of the Employer to bring the Plan into compliance with GUST (GATT, USERRA, SBJPA and TRA '97). The original Plan effective date was _7/1/87_ (hereinafter called the "Effective Date"). Except as specifically provided in the Plan, the effective date of this amendment and restatement is _1/1/02_.

   (May enter a restatement date that is the first day of the current Plan Year. The Plan contains appropriate retroactive effective dates with respect to provisions for the appropriate laws.)

7. PLAN YEAR means the 12 consecutive month period:

   Beginning on _____1_____ / _____1_____ (e.g., January 1st)
              month     day

   and ending on _____12_____ / _____31_____
              month     day

   EXCEPT that there will be a Short Plan Year:
   a. [ ] N/A
   b. [ ] beginning on _____ (e.g., July 1, 2000)
                     month  day,  year

   and ending on _____
                  month  day,  year

8. VALUATION DATE means:
   a. [ ] Every day that the Trustee, any transfer agent appointed by the Trustee or the Employer, and any stock exchange used by such agent are open for business (daily valuation).
   b. [✗] The last day of each Plan Year.
   c. [ ] The last day of each Plan Year half (semi-annual).
   d. [ ] The last day of each Plan Year quarter.
   e. [ ] Other (specify day or dates): _____ (must be at least once each Plan Year).

9. PLAN NUMBER assigned by the Employer
   a. [ ] 001
   b. [✗] 002
   c. [ ] 003
   d. [ ] Other: _____

10. TRUSTEE(S):
    a. [✗] Individual Trustee(s) who serve as discretionary Trustee(s) over assets not subject to control by a corporate Trustee.

    Name(s)                                        Title(s)
    _SHIRLEY SHERROD_ _____
    _____           _____
    _____           _____

    Address and Telephone number
    1. [✗] Use Employer address and telephone number.
    2. [ ] Use address and telephone number below:

    Address: _____
                                        Street

    _____                    _____       _____
                       City                        State         Zip

    Telephone: _____

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

2

PC2001ASTB

**Standardized Target Benefit Plan**

b. [ ] Corporate Trustee

Name: _____

Address: _____
Street

_____
City                          State                    Zip

Telephone: _____

AND, the corporate Trustee shall serve as:

1. [ ] a directed (nondiscretionary) Trustee over all Plan assets except for the following:

_____

2. [ ] a discretionary Trustee over all Plan assets except for the following:

_____

AND, shall a separate trust agreement be used with this Plan?
c. [ ] Yes
d. [X] No
NOTE: If Yes is selected, an executed copy of the trust agreement between the Trustee and the Employer must be attached to this Plan. The Plan and trust agreement will be read and construed together. The responsibilities, rights and powers of the Trustee shall be those specified in the trust agreement.

11. PLAN ADMINISTRATOR'S NAME, ADDRESS AND TELEPHONE NUMBER:
(If none is named, the Employer will become the Administrator.)
a. [X] Employer (Use Employer address and telephone number).
b. [ ] Use name, address and telephone number below:

Name: _____

Address: _____
Street

_____
City                          State                    Zip

Telephone: _____

12. CONSTRUCTION OF PLAN
This Plan shall be governed by the laws of the state or commonwealth where the Employer's (or, in the case of a corporate Trustee, such Trustee's) principal place of business is located unless another state or commonwealth is specified: _____

## ELIGIBILITY REQUIREMENTS

13. ELIGIBLE EMPLOYEES (Plan Section 1.18) means all Employees (including Leased Employees) EXCEPT:
a. [ ] N/A. No exclusions.
b. [X] The following are excluded, except that if b.3. is selected, such Employees will be included (select all that apply):
1. [X] Union Employees (as defined in Plan Section 1.18)
2. [X] Non-resident aliens (as defined in Plan Section 1.18)
3. [X] Employees who became Employees as the result of a "Code Section 410(b)(6)(C) transaction" (as defined in Plan Section 1.18)

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

14.   THE FOLLOWING AFFILIATED EMPLOYER (Plan Section 1.6) will adopt this Plan as a Participating Employer (if there is more than one, or if Affiliated Employers adopt this Plan after the date the Adoption Agreement is executed, attach a list to this Adoption Agreement of such Affiliated Employers including their names, addresses, taxpayer identification numbers and types of entities):

      **NOTE:** Regardless of the election below, Employees of an Affiliated Employer are generally treated as Employees of the Employer. However, if the transition rule for certain acquisitions and dispositions applies (Code Section 410(b)(6)(C)), then Employees of the Affiliated Employer will not be considered Employees of the Employer until the expiration of the transition period unless the Affiliated Employer actually adopts the Plan prior to such date.

    a. [X] N/A

    b. [ ] Name of First Affiliated Employer: _____

       Address: _____

                                                 Street

                     City                           State              Zip

       Telephone: _____

       Taxpayer Identification Number: _____

    AND, the Affiliated Employer is:

    c. [ ] Corporation (including Tax-exempt, Non-profit or Professional Service Corporation)

    d. [ ] S Corporation

    e. [ ] Limited Liability Company that is taxed as:

       1. [ ] a partnership or sole proprietorship

       2. [ ] a Corporation

       3. [ ] an S Corporation

    f. [ ] Sole Proprietorship.

    g. [ ] Partnership (including Limited Liability)

    h. [ ] Other _____

15.   CONDITIONS OF ELIGIBILITY (Plan Section 3.1)

    Any Eligible Employee will be eligible to participate in the Plan upon satisfaction of the following (select either a. **OR** b. and c., and if applicable, d.):

    a. [ ] No age or service required.

    b. [X] Completion of the following service requirement which is based on Years of Service (or Periods of Service if the Elapsed Time Method is elected):

       1. [ ] No service requirement

       2. [ ] 1/2 Year of Service or Period of Service

       3. [X] 1 Year of Service or Period of Service

       4. [X] _1000_ (not to exceed 1,000) Hours of Service within _12_ (not to exceed 12) months from the Eligible Employee's employment commencement date. If an Employee does not complete the stated Hours of Service during the specified time period, the Employee is subject to the Year of Service requirement in b.3. above.

       5. [ ] 1 1/2 Years of Service or Periods of Service

       6. [ ] 2 Years of Service or Periods of Service

       7. [ ] Other: _____

          (may not exceed two (2) Years of Service or Periods of Service)

      **NOTE:** If more than one (1) Year of Service is elected 100% immediate vesting is required.

      **NOTE:** If the Year(s) of Service selected is or includes a fractional year, an Employee will not be required to complete any specified number of Hours of Service to receive credit for such fractional year. If expressed in months of service, an Employee will not be required to complete any specified number of Hours of Service in a particular month, unless elected in b.4.

    c. [ ] Attainment of age:

       1. [ ] No age requirement

       2. [ ] 20 1/2

       3. [X] 21

       4. [ ] Other: _____ (may not exceed 21)

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

    d. [ ]  The service and/or age requirements specified above shall be waived with respect to any Eligible Employee who was employed on _____ and such Eligible Employee shall enter the Plan as of such date.

          The requirements to be waived are (select one or both):
          1. [ ]  service requirement (will let part-time Eligible Employees in Plan)
          2. [ ]  age requirement

16.    **EFFECTIVE DATE OF PARTICIPATION (Plan Section 3.2)**
An Eligible Employee who has satisfied the eligibility requirements will become a Participant of the Plan as of:
    a. [X]  the first day of the month coinciding with or next following the date on which such requirements are satisfied.
    b. [ ]  the first day of the Plan Year quarter coinciding with or next following the date on which such requirements are satisfied.
    c. [ ]  the first day of the Plan Year in which such requirements are satisfied.
    d. [ ]  the first day of the Plan Year in which such requirements are satisfied, if such requirements are satisfied in the first 6 months of the Plan Year, or as of the first day of the next succeeding Plan Year if such requirements are satisfied in the last 6 months of the Plan Year.
    e. [ ]  the earlier of the first day of the seventh month or the first day of the Plan Year coinciding with or next following the date on which such requirements are satisfied.
    f. [ ]  the first day of the Plan Year next following the date on which such requirements are satisfied. (Eligibility must be 1/2 (or 1 1/2 if 100% immediate Vesting is selected) Year of Service (or Period of Service) or less and age must be 20 1/2 or less.)
    g. [ ]  other: _____,
          provided that an Eligible Employee who has satisfied the maximum age (21) and service requirements (one (1) Year or Period of Service (or more than one (1) year if full and immediate vesting)) and who is otherwise entitled to participate, shall commence participation no later than the earlier of (a) 6 months after such requirements are satisfied, or (b) the first day of the first Plan Year after such requirements are satisfied, unless the Employee separates from service before such participation date.

## SERVICE

17.    **RECOGNITION OF SERVICE WITH PREDECESSOR EMPLOYER (Plan Sections 1.57 and 1.85)**
    a. [X]  No service with a predecessor Employer shall be recognized.
    b. [ ]  Service with _____
          will be recognized except as follows (select 1. or all that apply of 2. through 4.):
          1. [ ]  N/A, no limitations.
          2. [ ]  service will only be recognized for vesting purposes.
          3. [ ]  service will only be recognized for eligibility purposes.

          4. [ ]  service prior to _____ will not be recognized.
          **NOTE:**  If the predecessor Employer maintained this qualified Plan, then Years of Service (and/or Periods of Service) with such predecessor Employer shall be recognized pursuant to Plan Sections 1.57 and 1.85 and b.1. will apply.

18.    **SERVICE CREDITING METHOD (Plan Sections 1.57 and 1.85)**
**NOTE:**  If no elections are made in this Section, then the Hours of Service Method will be used and the provisions set forth in the definition of Year of Service in Plan Section 1.85 will apply.
ELAPSED TIME METHOD shall be used for the following purposes (select all that apply):
    a. [X]  N/A. Plan only uses the Hours of Service Method.
    b. [ ]  all purposes. (If selected, skip to Question 19.)
    c. [ ]  eligibility to participate.
    d. [ ]  vesting.
    e. [ ]  sharing in allocations or contributions.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

HOURS OF SERVICE METHOD shall be used for the following purposes (select all that apply):

f. [ ] N/A. Plan only uses the Elapsed Time Method.

g. [X] eligibility to participate in the Plan. The eligibility computation period after the initial eligibility computation period shall...
  1. [X] shift to the Plan Year after the initial computation period.
  2. [ ] be based on the date an Employee first performs an Hour of Service (initial computation period) and subsequent computation periods shall be based on each anniversary date thereof.

h. [ ] vesting. The vesting computation period shall be...
  1. [ ] the Plan Year.
  2. [ ] the date an Employee first performs an Hour of Service and each anniversary thereof.

i. [ ] sharing in allocations or contributions (the computation period shall be the Plan Year).

AND, IF THE HOURS OF SERVICE METHOD IS BEING USED, the Hours of Service will be determined on the basis of the method selected below. Only one method may be selected. The method selected below will be applied to (select j. or k.):

j. [X] all Employees.

k. [ ] salaried Employees only (for hourly Employees, actual Hours of Service will be used).

ON THE BASIS OF:

l. [ ] actual hours for which an Employee is paid or entitled to payment.

m. [ ] days worked. An Employee will be credited with ten (10) Hours of Service if under the Plan such Employee would be credited with at least one (1) Hour of Service during the day.

n. [ ] weeks worked. An Employee will be credited with forty-five (45) Hours of Service if under the Plan such Employee would be credited with at least one (1) Hour of Service during the week.

o. [ ] semi-monthly payroll periods worked. An Employee will be credited with ninety-five (95) Hours of Service if under the Plan such Employee would be credited with at least one (1) Hour of Service during the semi-monthly payroll period.

p. [ ] months worked. An Employee will be credited with one hundred ninety (190) Hours of Service if under the Plan such Employee would be credited with at least one (1) Hour of Service during the month.

AND, a Year of Service means the applicable computation period during which an Employee has completed at least:

q. [ ] _____ (may not be more than 1,000) Hours of Service
(if left blank, the Plan will use 1,000 Hours of Service).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**VESTING**

19.    VESTING OF PARTICIPANT'S INTEREST (Plan Section 6.4(b))
The vesting schedule, based on a Participant's Years of Service (or Periods of Service if the Elapsed Time Method is elected), shall be as follows:

a.  [ ]    100% upon entering Plan. (Required if eligibility requirement is greater than one (1) Year of Service or Period of Service.)

| b. [ ] 3 Year Cliff: | | c. [ ] 5 Year Cliff: | |
|---|---|---|---|
| 0-2 years | 0 % | 0-4 years | 0 % |
| 3 years | 100 % | 5 years | 100 % |

| d. [X] 6 Year Graded: | | e. [ ] 4 Year Graded: | |
|---|---|---|---|
| 0-1 year | 0 % | 1 year | 25 % |
| 2 years | 20 % | 2 years | 50 % |
| 3 years | 40 % | 3 years | 75 % |
| 4 years | 60 % | 4 years | 100 % |
| 5 years | 80 % | | |
| 6 years | 100 % | | |

| f. [ ] 5 Year Graded: | | g. [ ] 7 Year Graded: | |
|---|---|---|---|
| 1 year | 20 % | 0-2 years | 0 % |
| 2 years | 40 % | 3 years | 20 % |
| 3 years | 60 % | 4 years | 40 % |
| 4 years | 80 % | 5 years | 60 % |
| 5 years | 100 % | 6 years | 80 % |
| | | 7 years | 100 % |

h.  [ ]    Other - Must be at least as liberal as either c. or g. above.

| Service | Percentage |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

20.    FOR AMENDED PLANS (Plan Section 6.4(f))
If the vesting schedule has been amended to a less favorable schedule, enter the pre-amended schedule below:

a.  [ ]    Vesting schedule has not been amended, amended schedule is more favorable in all years or prior schedule was immediate 100% vesting.

b.  [ ]    Pre-amended schedule:

| Service | Percentage |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

21.   TOP HEAVY VESTING (Plan Section 6.4(c))
      If this Plan becomes a Top Heavy Plan, the following vesting schedule, based on number of Years of Service (or Periods of Service if the Elapsed Time Method is elected), shall apply and shall be treated as a Plan amendment pursuant to this Plan. Once effective, this schedule shall also apply to any contributions made before the Plan became a Top Heavy Plan and shall continue to apply if the Plan ceases to be a Top Heavy Plan unless an amendment is made to change the vesting schedule.

      a.  [  ]  N/A (the regular vesting schedule already satisfies one of the minimum top heavy schedules).

      b.  [X]  6 Year Graded:

              0-1 year        0 %
              2 years        20 %
              3 years        40 %
              4 years        60 %
              5 years        80 %
              6 years       100 %

      c.  [  ]  3 Year Cliff:

              0-2 years       0 %
              3 years       100 %

      d.  [  ]  Other - Must be at least as liberal as either b. or c. above.

                  Service                          Percentage
              _____         _____
              _____         _____
              _____         _____
              _____         _____
              _____         _____
              _____         _____

      NOTE:  This Section does not apply to the account balances of any Participant who does not have an Hour of Service after the Plan has initially become top heavy. Such Participant's Account balance attributable to Employer contributions and Forfeitures will be determined without regard to this Section.

22.   EXCLUDED VESTING SERVICE
      a.  [X]  No exclusions.
      b.  [  ]  Service prior to the Effective Date of the Plan or a predecessor plan.
      c.  [  ]  Service prior to the time an Employee has attained age 18.

23.   VESTING FOR DEATH AND TOTAL AND PERMANENT DISABILITY
      Regardless of the vesting schedule, Participants shall become fully Vested upon (select a. or all that apply to b. and c.)
      a.  [X]  N/A. Apply vesting schedule, or all contributions to the Plan are fully Vested.
      b.  [  ]  Death.
      c.  [  ]  Total and Permanent Disability.

24.   NORMAL RETIREMENT AGE ("NRA") (Plan Section 1.45) means the:

      a.  [  ]  date of a Participant's _____ birthday (not to exceed 65th).
      b.  [X]  later of a Participant's _65_ birthday (not to exceed 65th) or the _5_ (not to exceed 5th) anniversary of the first day of the Plan Year in which participation in the Plan commenced.

25.   NORMAL RETIREMENT DATE (Plan Section 1.46) means the:
      a.  [X]  Participant's "NRA."

      OR (select one)
      b.  [  ]  first day of the month coinciding with or next following the Participant's "NRA."
      c.  [  ]  first day of the month nearest the Participant's "NRA."
      d.  [  ]  Anniversary Date coinciding with or next following the Participant's "NRA."
      e.  [  ]  Anniversary Date nearest the Participant's "NRA."

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTR

**Standardized Target Benefit Plan**

26. EARLY RETIREMENT DATE (Plan Section 1.15) means the:
  a. [X] No Early Retirement provision provided.
  b. [ ] date on which a Participant...
  c. [ ] first day of the month coinciding with or next following the date on which a Participant...
  d. [ ] Anniversary Date coinciding with or next following the date on which a Participant...

  AND, if b., c. or d. is selected...

  e. [ ] attains age _____.
  f. [ ] attains age _____ and completes at least _____ Years of Service (or Periods of Service) for vesting purposes.

  AND, if b., c. or d. is selected, shall a Participant become fully Vested upon attainment of the Early Retirement Date?
  g. [ ] Yes
  h. [ ] No

## COMPENSATION

27. COMPENSATION (Plan Section 1.11) with respect to any Participant means:
  a. [X] Wages, tips and other compensation on Form W-2.
  b. [ ] Section 3401(a) wages (wages for withholding purposes).
  c. [ ] 415 safe-harbor compensation.

  COMPENSATION shall be based on the following determination period:
  d. [X] the Plan Year.
  e. [ ] the Fiscal Year coinciding with or ending within the Plan Year.
  f. [ ] the calendar year coinciding with or ending within the Plan Year.

  **NOTE:** The Limitation Year for Code Section 415 purposes shall be the same as the determination period for Compensation unless an alternative period is specified: _____ (must be a consecutive twelve month period).

  ADJUSTMENTS TO COMPENSATION
  g. [X] N/A. No adjustments.
  h. [ ] Compensation shall be adjusted by: (select all that apply)
    1. [ ] including compensation which is not currently includible in the Participant's gross income by reason of the application of Code Sections 125 (cafeteria plan), 132(f)(4) (qualified transportation fringe), 402(e)(3) (401(k) plan), 402(h)(1)(B) (simplified employee pension plan), 414(h) (employer pickup contributions under a governmental plan), 403(b) (tax sheltered annuity) or 457(b) (eligible deferred compensation plan)
    2. [ ] excluding reimbursements or other expense allowances, fringe benefits (cash or non-cash), moving expenses, deferred compensation (other than deferrals specified in 1. above) and welfare benefits
    3. [ ] excluding Compensation paid during the determination period while not a Participant in the component of the Plan for which the definition is being used

  AND, if this Plan was subject to the family aggregation rules of Code Section 401(a)(17) as in effect under Code Section 414(q)(6) prior to the enactment of SBJPA, are the rules deemed to have been repealed on a retroactive basis with respect to years prior to the effective date of the repeal of such rules with respect to this Plan?
  i. [ ] N/A. This Plan was never subject to the pre-SBJPA family aggregation rules.
  j. [ ] No.
  k. [ ] Yes, the repeal is applied on a retroactive basis (this will require the recalculation of Average Monthly Compensation).

28. AVERAGE MONTHLY COMPENSATION shall be based on...
  a. [ ] N/A. Question 29.c. is selected (i.e., the formula is based on a dollar amount per unit).
  b. [ ] Plan Years of Service
  c. [X] Total Years of Service (or Periods of Service if the Elapsed Time method is elected)

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

AND shall be averaged over the ...

d. [X] _5_ consecutive year period which produces the highest average within the last ten (10) years to date of termination of employment.

e. [ ] _____ consecutive year period which produces the highest average.

f. [ ] all years. (Career Average)

g. [ ] highest _____ consecutive years within the last ten (10) years excluding the five (5) years preceding Normal Retirement Date.

h. [ ] final _____ years to date of termination of employment.

**NOTE:** Compensation must be averaged over a period of not less than three (3) years.

## CONTRIBUTIONS AND ALLOCATIONS

29.   TARGET BENEFIT FORMULA
A Participant's targeted monthly benefit payable as a straight life annuity beginning at Normal Retirement Age shall be:

### FOR A NON-INTEGRATED PLAN

### FIXED BENEFIT

a. [X] _1.33_ of Average Monthly Compensation, reduced pro rata for Years of Projected Participation less than _25_ (may not be less than 25).

### UNIT BENEFIT

b. [ ] _____% of Average Monthly Compensation, multiplied by Years of Projected Participation, up to a maximum of _____ (may not be less than 25).

c. [ ] $_____ per month, multiplied by Years of Projected Participation, up to a maximum of _____ (may not be less than 25).

### FOR AN INTEGRATED PLAN (PERMITTED DISPARITY)
### FLAT BENEFIT EXCESS

d. [ ] _____% of Average Monthly Compensation up to the integration level for the Plan Year (base benefit percentage) plus _____% (excess benefit percentage) (not to exceed the base benefit percentage by more than the maximum excess allowance) of Average Monthly Compensation in excess of the integration level for the Plan Year.

The maximum excess allowance is equal to the lesser of: (1) the base benefit percentage, or (2) 35 times the applicable factor determined from Tables I or II in Question 30.

For a Participant with less than 35 Years of Projected Participation, the base benefit percentage and the excess benefit percentage will be reduced by being multiplied by a fraction, the numerator of which is the Participant's Years of Projected Participation, and the denominator of which is 35.

Cumulative permitted disparity reduction: If the number of the Participant's cumulative permitted disparity years exceeds 35, the excess benefit percentage will be further reduced as provided below. A Participant's cumulative permitted disparity years consists of the sum of: (1) the Participant's Years of Projected Participation (up to 35), (2) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (3) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer (other than years counted in (1) or (2)). For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

If the cumulative permitted disparity reduction is applicable, the excess benefit percentage will be reduced as follows:

(A)   Subtract the Participant's base benefit percentage from the Participant's excess benefit percentage, (after modification in accordance with the paragraph preceding this cumulative permitted disparity reduction).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

      (B)    Multiply the result determined in (A) by a fraction (not less than 0), the numerator of which is 35 minus the sum of the years in (2) and (3) above, and the denominator of which is 35.

      (C)    The Participant's excess benefit percentage is equal to the sum of the result in (B) and the Participant's base benefit percentage, as otherwise modified.

Overall permitted disparity limit: Notwithstanding the above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the Target Benefit for all Participants under this Plan will be equal to the excess benefit percentage entered into the benefit formula above multiplied by the Participant's Average Compensation under the Plan (prorated for Years of Projected Participation less than 35).

**UNIT CREDIT EXCESS**

e.  [   ]  A benefit equal to the sum of (1) and (2) below:

    (1) _____% (base benefit percentage) of Average Monthly Compensation up to the integration level for the Plan Year times the Participant's Years of Projected Participation plus _____% (excess benefit percentage, not to exceed the base benefit percentage by more than the maximum excess allowance) of Average Monthly Compensation in excess of the integration level for the Plan Year times the Participant's Years of Projected Participation. The maximum number of Years of Projected Participation taken into account under this paragraph will be_____ (may not be less than 25 and may not exceed 35). However, the number of Years of Projected Participation taken into account in the preceding sentence for any Participant may not exceed the Participant's cumulative permitted disparity limit.

The Participant's cumulative permitted disparity limit is equal to 35 minus: (1) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (2) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer other than years counted in (1) or counted toward a Participant's Years of Projected Participation. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

    (2) _____% (not to exceed the gross benefit percentage) of Average Monthly Compensation for each Year of Projected Participation after the period taken into account under paragraph (1). (If the number of Years of Projected Participation set forth in paragraph (1) is less than 35 (as modified by the Participant's cumulative permitted disparity limit), then for each Year of Projected Participation after the period taken into account under paragraph (1) up to and including the 35th Year of Participation (as modified by the Participant's cumulative permitted disparity limit), this percentage will be equal to the excess benefit percentage.) The maximum number of Years of Projected Participation taken into account under this paragraph will be _____.

The maximum excess allowance is equal to the lesser of: (1) the base benefit percentage or (2) the applicable factor determined from Tables I or II in Question 30.

Overall permitted disparity limit: Notwithstanding paragraphs (1) and (2) above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the Target Benefit for all Participants under this Plan will be equal to the excess benefit percentage above times the Participant's Average Monthly Compensation times that Participant's Years of Projected Participation under the plan up to the maximum Years of Projected Participation taken into account in paragraphs (1) and (2).

**FLAT BENEFIT OFFSET**

f.  [   ]  _____% of Average Monthly Compensation offset by _____% (not to exceed the maximum offset allowance) of Final Average Compensation up to the offset level.

The maximum offset allowance will not exceed the lesser of: (1) the applicable factor from Tables I or II in Question 30, multiplied by 35, and (2) one-half of the gross benefit percentage, multiplied by a fraction (not to exceed one), the numerator of which is the Participant's Average Monthly Compensation, and the denominator of which is the Participant's Final Average Compensation up to the offset level.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

For a Participant with less than 35 Years of Projected Participation, both the gross benefit percentage and the offset percentage will be reduced by a fraction, the numerator of which is the number of the Participant's Years of Projected Participation, and the denominator of which is 35.

Cumulative permitted disparity reduction: If the number of the Participant's cumulative permitted disparity years exceeds 35, the gross benefit percentage and the offset will be further reduced as provided below. A Participant's cumulative permitted disparity years consists of the sum of: (1) the Participant's Years of Projected Participation (up to 35), (2) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (3) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer (other than years counted in (1) or (2)). For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

If the cumulative permitted disparity reduction is applicable, the gross benefit percentage and the offset will be reduced as follows:

    (A)    The offset will be reduced by multiplying it by a fraction (not less than 0), the numerator of which is 35 minus the sum of the years in (2) and (3) above, and the denominator of which is 35.

    (B)    The gross benefit percentage will be reduced by the number of percentage points by which the offset was reduced in (A) above.

Overall permitted disparity limit: Notwithstanding the above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the Target Benefit for all Participants under this Plan will be equal to the gross benefit percentage entered in the benefit formula above (without regard to the offset) multiplied by the Participant's Average Monthly Compensation under the Plan (prorated for Years of Projected Participation less than 35).

## UNIT CREDIT OFFSET

g.  [   ]  A benefit equal to the sum of (1) and (2) below:

    (1)    _____% (gross benefit percentage) of Average Monthly Compensation for the Plan Year times the Participant's Years of Projected Participation offset by _____% (not to exceed the maximum offset allowance) of Final Average Compensation up to the offset level times the Participant's total Years of Projected Participation. The maximum number of Years of Projected Participation taken into account under this paragraph will be _____ (may not be less than 25 and may not exceed 35). However, the number of Years of Projected Participation taken into account in the preceding sentence for any Participant may not exceed the Participant's cumulative permitted disparity limit. The Participant's cumulative permitted disparity limit is equal to 35 minus: (1) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (2) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer other than years counted in (1) or counted toward a Participant's Years of Projected Participation. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

    (2)    _____% (not to exceed the gross benefit percentage) of Average Monthly Compensation for each Year of Projected Participation after the period set forth in paragraph (1). (If the number of Years of Projected Participation set forth in paragraph (1) is less than 35 (as modified by the Participant's cumulative permitted disparity limit), then for each Year of Projected Participation after the Period set forth under paragraph (1) up to and including the 35th Year of Projected Participation (as modified by the Participant's cumulative permitted disparity limit), this percentage will be equal to the gross benefit percentage.) The maximum number of Years of Projected Participation taken into account under this paragraph will be _____.

The maximum offset allowance will not exceed the lesser of: (1) the applicable factor from Tables I or II in Question 30, and (2) one-half of the gross benefit percentage, multiplied by a fraction (not to exceed one), the numerator of which is the Participant's Average Monthly Compensation, and the denominator of which is the Participant's Final Average Compensation up to the offset level.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Overall permitted disparity limit: Notwithstanding the preceding paragraphs (1) and (2), for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the Target Benefit for all Participants under this Plan will be equal to the gross benefit percentage above (without regard to the offset) times the Participant's Average Monthly Compensation times the Participant's Years of Projected Participation under the Plan up to the maximum of Years of Projected Participation taken into account in paragraphs (1) and (2).

30. INTEGRATION (OR OFFSET) LEVEL means one-twelfth of...

   a. [ ] N/A. Plan is not integrated.

   b. [ ] the current Covered Compensation Table.

   c. [ ] the Frozen Covered Compensation Table for the year _____ (may not be prior to the later of 1989 or the Plan Year five years prior to the current Plan Year).

   d. [ ] the greater of $10,000 or one-half of the Covered Compensation of an individual who attains Social Security Retirement Age during the Plan Year.

   e. [ ] $_____ (not to exceed the greater of $10,000 or one-half of Covered Compensation for the current Plan Year).

   f. [ ] $_____ (more than $10,000 or one-half of Covered Compensation of any individual who attains Social Security Retirement Age during the calendar year in which the Plan Year begins, but not in excess of the greater of $25,450 or 150% of the Covered Compensation of an individual who attains Social Security Retirement Age in the current Plan Year).

   g. [ ] a uniform percentage equal to _____% (greater than 100%, but not greater than 150%) of each Participant's Covered Compensation for the current Plan Year, but in no event in excess of the Taxable Wage Base.

APPLICABLE FACTORS (FOR INTEGRATED PLANS)

The applicable factor is the factor derived from the applicable table below based on the Normal Retirement Age under the Plan. If the Employer elects as an integration level (or offset level) 30.f. or g., then Table II will apply. Otherwise, Table I will apply.

| Normal Retirement Age | TABLE I | TABLE II |
|---|---|---|
| 65 | 0.5200 | 0.4160 |
| 64 | 0.4856 | 0.3884 |
| 63 | 0.4504 | 0.3603 |
| 62 | 0.4160 | 0.3328 |
| 61 | 0.3816 | 0.3052 |
| 60 | 0.3464 | 0.2771 |
| 59 | 0.3296 | 0.2636 |
| 58 | 0.3120 | 0.2496 |
| 57 | 0.2944 | 0.2355 |
| 56 | 0.2776 | 0.2220 |
| 55 | 0.2600 | 0.2080 |

31. REDUCTIONS AND LIMITATIONS

The Target Benefit shall be modified as follows (select all that apply):

   a. [ ] N/A. No reductions or limitations.

   b. [ ] The Target Benefit shall be reduced by _____ (e.g., one-twenty-fifth) for each Year of Projected Participation less than _____ (e.g., 25) that the Participant is credited with at the Normal Retirement Date.

   c. [ ] The Target Benefit shall be calculated to the nearest
      1. [ ] dollar.
      2. [ ] ten (10) dollars.
      3. [ ] cent.

   d. [ ] The minimum Target Benefit shall be $_____ per month.

   e. [ ] The maximum Target Benefit shall be $_____ per month.

   f. [ ] The maximum Target Benefit shall be _____% of Average Monthly Compensation.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

32.    EMPLOYER CONTRIBUTIONS
   a.    For purposes of determining the Level Funding Amount, the interest rate and mortality table shall be:
   1.    Interest Rate:
        a.    [X]    7.5%
        b.    [ ]    8.0%
        c.    [ ]    8.5%
   2.    Mortality table:
        a.    [X]    UP-1984
        b.    [ ]    Other _____ (enter 1983 GAM, 1983 IAM, 1971 GAM or 1971 IAM
              and attach Tables I-IV as determined using such mortality table and the interest rate specified
              above)

   b.    The Employer will contribute the Level Funding Amount necessary to fund the Target Benefit of each Participant
         who has satisfied the conditions in Question 33. The Level Funding Amount shall be computed each year as set
         forth below using funding tables based on the interest and mortality table specified above.

         Step 1: If the Participant has not yet reached Normal Retirement Age, calculate the present value of the
         Participant's Target Benefit by multiplying the Target Benefit by the product of: (1) the applicable factor from
         Table I below (if attained (current age) is less than 65) or Table IA below (if attained age is greater than or equal
         to 65), and (2) the applicable factor in Table III below. If the Participant is at or beyond Normal Retirement Age,
         calculate the present value of the Target Benefit by multiplying the Target Benefit by the applicable factor in
         Table IV below.

         Step 2: Calculate the excess, if any, of the amount determined in Step 1 over the "theoretical reserve."

         Step 3: Amortize the result in Step 2 by multiplying it by the applicable factor from Table II below. For the Plan
         Year in which the Participant attains Normal Retirement Age and subsequent Plan Years, the applicable factor is
         1.0.

         For purposes of this section, the "theoretical reserve" is determined according to (1) and (2) below:

         (1)    Initial theoretical reserve. A Participant's theoretical reserve as of the last day of the Participant's
                first Year of Projected Participation (year 1) is zero. However, if this Plan is a "prior safe harbor
                plan" (as defined under the term "Years of Projected Participation") with a stated benefit formula
                that takes into account Plan Years prior to the first Plan Year this Plan satisfies the safe harbor in
                Regulations Section 1.401(a)(4)-8(b)(3)(c), the initial theoretical reserve is determined as follows:

                (i)     Calculate as of the last day of the Plan Year preceding year 1 the present value of the
                        Participant's Target Benefit using the actuarial assumptions, the provisions of the Plan,
                        and the Participant's compensation as of such date. For a Participant who is beyond
                        Normal Retirement Age during year 1, the Target Benefit will be determined using the
                        actuarial assumptions, the provisions of the Plan and the Participant's compensation as
                        of such date, except that the straight life annuity factor used in that determination will be
                        the factor applicable for the Participant's Normal Retirement Age.

                (ii)    Calculate as of the last day of the Plan Year preceding year 1 the present value of future
                        Employer contributions, i.e., the contributions due each Plan Year using the actuarial
                        assumptions, the provisions of the Plan, (disregarding those provisions of the Plan
                        providing for the limitations of Code Section 415 or the minimum contributions under
                        Code Section 416), and the Participant's compensation as of such date, beginning with
                        year 1 through the end of the Plan Year in which the Participant attains Normal
                        Retirement Age.

                (iii)   Subtract the amount determined in (ii) from the amount determined in (i).

         (2)    Accumulate the initial theoretical reserve determined in (1) and the Employer contribution (as
                limited by Code Section 415, but without regard to any required minimum contributions under
                Code Section 416) for each Plan Year beginning in year 1 up through the last day of the current
                Plan Year (excluding any contributions made for the current Plan Year) using the Plan's interest
                assumption in effect for each such year. In any Plan Year following the Plan Year in which the
                Participant attains Normal Retirement Age, the accumulation is calculated assuming an interest rate
                of 0%.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Standardized Target Benefit Plan**

For purposes of determining the annual Employer contribution necessary to fund the Target Benefit, the above calculations in (1) and (2) above shall be determined as of the last day of each Plan Year, on the basis of the Participant's age on the last birthday using the interest rate in effect on the last day of the prior Plan Year.

Table I: Present value factors (If a Participant's attained age is at or above 65 but below the Participant's Normal Retirement Age, use Table IA.)

| Number of Years from attained age to age 65 | Interest Rate | | |
|---|---|---|---|
| | 7.50% | 8.00% | 8.50% |
| 1 | 7.868 | 7.589 | 7.326 |
| 2 | 7.319 | 7.027 | 6.752 |
| 3 | 6.808 | 6.506 | 6.223 |
| 4 | 6.333 | 6.024 | 5.736 |
| 5 | 5.891 | 5.578 | 5.286 |
| 6 | 5.480 | 5.165 | 4.872 |
| 7 | 5.098 | 4.782 | 4.491 |
| 8 | 4.742 | 4.428 | 4.139 |
| 9 | 4.412 | 4.100 | 3.815 |
| 10 | 4.104 | 3.796 | 3.516 |
| 11 | 3.817 | 3.515 | 3.240 |
| 12 | 3.551 | 3.255 | 2.986 |
| 13 | 3.303 | 3.014 | 2.752 |
| 14 | 3.073 | 2.790 | 2.537 |
| 15 | 2.859 | 2.584 | 2.338 |
| 16 | 2.659 | 2.392 | 2.155 |
| 17 | 2.474 | 2.215 | 1.986 |
| 18 | 2.301 | 2.051 | 1.831 |
| 19 | 2.140 | 1.899 | 1.687 |
| 20 | 1.991 | 1.758 | 1.555 |
| 21 | 1.852 | 1.628 | 1.433 |
| 22 | 1.723 | 1.508 | 1.321 |
| 23 | 1.603 | 1.396 | 1.217 |
| 24 | 1.491 | 1.293 | 1.122 |
| 25 | 1.387 | 1.197 | 1.034 |
| 26 | 1.290 | 1.108 | 0.953 |
| 27 | 1.200 | 1.026 | 0.878 |
| 28 | 1.116 | 0.950 | 0.810 |
| 29 | 1.039 | 0.880 | 0.746 |
| 30 | 0.966 | 0.814 | 0.688 |
| 31 | 0.899 | 0.754 | 0.634 |
| 32 | 0.836 | 0.698 | 0.584 |
| 33 | 0.778 | 0.647 | 0.538 |
| 34 | 0.723 | 0.599 | 0.496 |
| 35 | 0.673 | 0.554 | 0.457 |
| 36 | 0.626 | 0.513 | 0.422 |
| 37 | 0.582 | 0.475 | 0.389 |
| 38 | 0.542 | 0.440 | 0.358 |
| 39 | 0.504 | 0.407 | 0.330 |
| 40 | 0.469 | 0.377 | 0.304 |
| 41 | 0.436 | 0.349 | 0.280 |
| 42 | 0.406 | 0.323 | 0.258 |
| 43 | 0.377 | 0.299 | 0.238 |
| 44 | 0.351 | 0.277 | 0.219 |
| 45 | 0.327 | 0.257 | 0.202 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

Table 1A: Present value factors for Participants below Normal Retirement Age (to be used only when attained age is greater than or equal to 65)

| Number of Years from age 65 to attained age | Interest Rate | | |
|---|---|---|---|
| | 7.50% | 8.00% | 8.50% |
| 0 | 8.458 | 8.196 | 7.949 |
| 1 | 9.092 | 8.852 | 8.625 |
| 2 | 9.774 | 9.560 | 9.358 |
| 3 | 10.507 | 10.325 | 10.153 |
| 4 | 11.295 | 11.151 | 11.016 |
| 5 | 12.143 | 12.043 | 11.953 |
| 6 | 13.053 | 13.006 | 12.969 |
| 7 | 14.032 | 14.047 | 14.071 |
| 8 | 15.085 | 15.170 | 15.267 |
| 9 | 16.216 | 16.384 | 16.565 |
| 10 | 17.432 | 17.695 | 17.973 |
| 11 | 18.740 | 19.110 | 19.500 |
| 12 | 20.145 | 20.639 | 21.158 |
| 13 | 21.656 | 22.290 | 22.956 |
| 14 | 23.280 | 24.073 | 24.907 |
| 15 | 25.026 | 25.999 | 27.025 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

Table II: Amortization factors

| Number of Years from attained age to Normal Retirement Age | Interest Rate | | |
|---|---|---|---|
| | 7.50% | 8.00% | 8.50% |
| 1 | 0.5181 | 0.5192 | 0.5204 |
| 2 | 0.3577 | 0.3593 | 0.3609 |
| 3 | 0.2777 | 0.2796 | 0.2814 |
| 4 | 0.2299 | 0.2319 | 0.2339 |
| 5 | 0.1982 | 0.2003 | 0.2024 |
| 6 | 0.1756 | 0.1778 | 0.1801 |
| 7 | 0.1588 | 0.1611 | 0.1634 |
| 8 | 0.1458 | 0.1482 | 0.1506 |
| 9 | 0.1355 | 0.1380 | 0.1405 |
| 10 | 0.1272 | 0.1297 | 0.1323 |
| 11 | 0.1203 | 0.1229 | 0.1255 |
| 12 | 0.1145 | 0.1171 | 0.1198 |
| 13 | 0.1096 | 0.1123 | 0.1151 |
| 14 | 0.1054 | 0.1082 | 0.1110 |
| 15 | 0.1018 | 0.1046 | 0.1075 |
| 16 | 0.0986 | 0.1015 | 0.1044 |
| 17 | 0.0958 | 0.0988 | 0.1018 |
| 18 | 0.0934 | 0.0964 | 0.0994 |
| 19 | 0.0912 | 0.0943 | 0.0974 |
| 20 | 0.0893 | 0.0924 | 0.0956 |
| 21 | 0.0876 | 0.0908 | 0.0940 |
| 22 | 0.0861 | 0.0893 | 0.0925 |
| 23 | 0.0847 | 0.0879 | 0.0912 |
| 24 | 0.0835 | 0.0867 | 0.0901 |
| 25 | 0.0823 | 0.0857 | 0.0890 |
| 26 | 0.0813 | 0.0847 | 0.0881 |
| 27 | 0.0804 | 0.0838 | 0.0872 |
| 28 | 0.0795 | 0.0830 | 0.0865 |
| 29 | 0.0788 | 0.0822 | 0.0858 |
| 30 | 0.0781 | 0.0816 | 0.0851 |
| 31 | 0.0774 | 0.0810 | 0.0846 |
| 32 | 0.0768 | 0.0804 | 0.0840 |
| 33 | 0.0763 | 0.0799 | 0.0836 |
| 34 | 0.0758 | 0.0794 | 0.0831 |
| 35 | 0.0753 | 0.0790 | 0.0827 |
| 36 | 0.0749 | 0.0786 | 0.0824 |
| 37 | 0.0745 | 0.0783 | 0.0820 |
| 38 | 0.0742 | 0.0779 | 0.0817 |
| 39 | 0.0739 | 0.0776 | 0.0815 |
| 40 | 0.0736 | 0.0774 | 0.0812 |
| 41 | 0.0733 | 0.0771 | 0.0810 |
| 42 | 0.0730 | 0.0769 | 0.0808 |
| 43 | 0.0728 | 0.0767 | 0.0806 |
| 44 | 0.0726 | 0.0765 | 0.0804 |
| 45 | 0.0724 | 0.0763 | 0.0802 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

Table III: Factors to be multiplied by those in Table I.

| Normal Retirement Age | Interest Rate | | |
|---|---|---|---|
| | 7.50% | 8.00% | 8.50% |
| 80 | 0.206 | 0.194 | 0.184 |
| 79 | 0.231 | 0.219 | 0.207 |
| 78 | 0.258 | 0.246 | 0.234 |
| 77 | 0.289 | 0.276 | 0.263 |
| 76 | 0.322 | 0.309 | 0.296 |
| 75 | 0.359 | 0.346 | 0.333 |
| 74 | 0.400 | 0.387 | 0.374 |
| 73 | 0.446 | 0.432 | 0.419 |
| 72 | 0.495 | 0.482 | 0.469 |
| 71 | 0.549 | 0.537 | 0.525 |
| 70 | 0.609 | 0.597 | 0.586 |
| 69 | 0.674 | 0.664 | 0.653 |
| 68 | 0.745 | 0.736 | 0.728 |
| 67 | 0.822 | 0.816 | 0.810 |
| 66 | 0.907 | 0.904 | 0.900 |
| 65 | 1.000 | 1.000 | 1.000 |
| 64 | 1.101 | 1.106 | 1.110 |
| 63 | 1.212 | 1.221 | 1.231 |
| 62 | 1.332 | 1.348 | 1.363 |
| 61 | 1.464 | 1.486 | 1.509 |
| 60 | 1.606 | 1.637 | 1.669 |
| 59 | 1.761 | 1.802 | 1.844 |
| 58 | 1.929 | 1.982 | 2.036 |
| 57 | 2.111 | 2.177 | 2.246 |
| 56 | 2.309 | 2.390 | 2.475 |
| 55 | 2.523 | 2.622 | 2.726 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

Table IV: Present value factors for Participants who are at or beyond Normal Retirement Age

| | Interest Rate | | |
|---|---|---|---|
| Normal Retirement Age | 7.50% | 8.00% | 8.50% |
| 80 | 5.151 | 5.053 | 4.959 |
| 79 | 5.370 | 5.264 | 5.162 |
| 78 | 5.591 | 5.476 | 5.366 |
| 77 | 5.814 | 5.690 | 5.572 |
| 76 | 6.039 | 5.905 | 5.777 |
| 75 | 6.266 | 6.122 | 5.985 |
| 74 | 6.494 | 6.339 | 6.192 |
| 73 | 6.721 | 6.556 | 6.398 |
| 72 | 6.947 | 6.771 | 6.603 |
| 71 | 7.171 | 6.983 | 6.804 |
| 70 | 7.392 | 7.192 | 7.003 |
| 69 | 7.610 | 7.399 | 7.198 |
| 68 | 7.825 | 7.601 | 7.389 |
| 67 | 8.037 | 7.801 | 7.577 |
| 66 | 8.248 | 7.999 | 7.764 |
| 65 | 8.458 | 8.196 | 7.949 |
| 64 | 8.666 | 8.390 | 8.131 |
| 63 | 8.870 | 8.581 | 8.311 |
| 62 | 9.072 | 8.770 | 8.485 |
| 61 | 9.270 | 8.954 | 8.657 |
| 60 | 9.463 | 9.133 | 8.825 |
| 59 | 9.651 | 9.307 | 8.986 |
| 58 | 9.834 | 9.477 | 9.143 |
| 57 | 10.012 | 9.641 | 9.295 |
| 56 | 10.186 | 9.801 | 9.442 |
| 55 | 10.354 | 9.955 | 9.585 |

33. REQUIREMENTS TO SHARE IN ALLOCATIONS OF EMPLOYER CONTRIBUTIONS

REQUIREMENTS FOR PARTICIPANTS WHO ARE ACTIVELY EMPLOYED AT THE END OF THE PLAN YEAR: Participants who are actively employed at the end of the Plan Year will share in allocations regardless of the service completed during such Plan Year.

REQUIREMENTS FOR PARTICIPANTS WHO ARE NOT ACTIVELY EMPLOYED AT THE END OF THE PLAN YEAR (except as otherwise provided in c. below).

a. [X] A Participant must complete more than _500_ Hours of Service (not more than 500) (or _____

months of service (not more than three (3)) if the Elapsed Time Method is elected).

b. [ ] Participants will share in such allocation, regardless of service.

PARTICIPANTS WHO ARE NOT ACTIVELY EMPLOYED AT THE END OF THE PLAN YEAR due to the following will be eligible to share in the allocation regardless of the above conditions (select all that apply):

c. [ ] Death.
d. [ ] Total and Permanent Disability.
e. [ ] Early or Normal Retirement.

34. FORFEITURES (Plan Sections 1.27 and 4.3(e))

Except as provided in Plan Section 1.27, a Forfeiture will occur (if no election is made, a. will apply):
a. [ ] as of the earlier of (1) the last day of the Plan Year in which the Former Participant incurs five (5) consecutive 1-Year Breaks in Service, or (2) the distribution of the entire Vested portion of the Participant's Account.
b. [X] as of the last day of the Plan Year in which the Former Participant incurs five (5) consecutive 1-Year Breaks in Service.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

**Standardized Target Benefit Plan**

35. ALLOCATIONS OF EARNINGS (Plan Section 4.3(c))

Allocations of earnings with respect to amounts which are not subject to Participant directed investments and which are contributed to the Plan after the previous Valuation Date will be determined...

a. [ ] N/A. All assets in the Plan are subject to Participant investment direction.

b. [ ] by using a weighted average based on the amount of time that has passed between the date a contribution or distribution was made and the date of the prior Valuation Date.

c. [ ] by treating one-half of all such contributions as being a part of the Participant's nonsegregated account balance as of the previous Valuation Date.

d. [X] by using the method specified in Plan Section 4.3(c) (balance forward method).

e. [ ] other: _____

(must be a definite predetermined formula that is not based on Compensation and that satisfies the nondiscrimination requirements of Regulation 1.401(a)(4)-4 and is applied uniformly to all Participants).

36. LIMITATIONS ON ALLOCATIONS (Plan Section 4.4)

If any Participant is covered under another qualified defined contribution plan maintained by the Employer, other than a Master or Prototype Plan, or if the Employer maintains a welfare benefit fund, as defined in Code Section 419(e), or an individual medical account, as defined in Code Section 415(l)(2), under which amounts are treated as Annual Additions with respect to any Participant in this Plan:

a. [X] N/A. The Employer does not maintain another qualified defined contribution plan other than a paired plan.

b. [ ] The provisions of Plan Section 4.4(b) will apply as if the other plan were a Master or Prototype Plan.

c. [ ] Specify the method under which the plans will limit total Annual Additions to the Maximum Permissible Amount, and will properly reduce any Excess Amounts, in a manner that precludes Employer discretion:

_____

NOTE: If b. or c. is selected, an Employer may not rely on the opinion letter issued by the Internal Revenue Service that this Plan is qualified under Code Section 401.

## DISTRIBUTIONS

37. FORM OF DISTRIBUTIONS (Plan Sections 6.5 and 6.6)

Distributions under the Plan may be made in annuities and (select all that apply)...

a. [X] lump-sums.

b. [X] substantially equal installments.

c. [X] partial withdrawals provided the minimum withdrawal is $_____.

AND, the normal form of the Qualified Joint and Survivor Annuity will be a joint and 50% survivor annuity unless otherwise elected below:

d. [X] N/A.

e. [ ] Joint and 100% survivor annuity.

f. [ ] Joint and 75% survivor annuity.

g. [ ] Joint and 66 2/3% survivor annuity.

AND, the Pre-Retirement Survivor Annuity (minimum spouse's death benefit) will be equal to:

h. [ ] 100% of Participant's interest in the Plan.

i. [ ] 50% of Participant's interest in the Plan.

j. [ ] _____ (may not be less than 50%) of a Participant's interest in the Plan.

AND, distributions may be made in...

k. [ ] cash only (except for insurance or annuity contracts).

l. [X] cash or property.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

38. CONDITIONS FOR DISTRIBUTIONS UPON TERMINATION OF EMPLOYMENT
Distributions upon termination of employment pursuant to Plan Section 6.4(a) of the Plan will not be made unless the following conditions have been satisfied:
   a. [X] No distributions may be made until a Participant has reached Early or Normal Retirement Date.
   b. [ ] Distributions may be made as soon as administratively feasible at the Participant's election.
   c. [ ] The Participant has incurred _____ 1-Year Break(s) in Service (or Period(s) of Severance if the Elapsed Time Method is elected).
   d. [ ] Distributions may be made at the Participant's election as soon as administratively feasible after the Plan Year coincident with or next following termination of employment.
   e. [ ] Distributions may be made at the Participant's election as soon as administratively feasible after the Plan Year quarter coincident with or next following termination of employment.
   f. [ ] Distributions may be made at the Participant's election as soon as administratively feasible after the Valuation Date coincident with or next following termination of employment.
   g. [ ] Distributions may be made at the Participant's election as soon as administratively feasible _____ months following termination of employment.
   h. [ ] Other _____
   (must be objective conditions which are ascertainable and are not subject to Employer discretion except as otherwise permitted in Regulation 1.411(d)-4 and may not exceed the limits of Code Section 401(a)(14) as set forth in Plan Section 6.7).

39. INVOLUNTARY DISTRIBUTIONS
Will involuntary distributions of amounts less than $5,000 be made in accordance with the provisions of Sections 6.4, 6.5 and 6.6?
   a. [ ] Yes
   b. [ ] No

40. MINIMUM DISTRIBUTION TRANSITIONAL RULES (Plan Section 6.5(e))
   **NOTE:** This Section does not apply to (1) a new Plan or (2) an amendment or restatement of an existing Plan that never contained the provisions of Code Section 401(a)(9) as in effect prior to the amendments made by the Small Business Job Protection Act of 1996 (SBJPA).
   The "required beginning date" for a Participant who is not a "five percent (5%) owner" is:
   a. [ ] N/A. (This is a new Plan or this Plan has never included the pre-SBJPA provisions.)
   b. [ ] April 1st of the calendar year following the year in which the Participant attains age 70 1/2. (The pre-SBJPA rules will continue to apply.)
   c. [ ] April 1st of the calendar year following the later of the year in which the Participant attains age 70 1/2 or retires (the post-SBJPA rules), with the following exceptions (select one or both and if no election is made, both will apply effective as of January 1, 1996):
      1. [ ] A Participant who was already receiving required minimum distributions under the pre-SBJPA rules as of _____ (not earlier than January 1, 1996) may elect to stop receiving distributions and have them recommence in accordance with the post-SBJPA rules. Upon the recommencement of distributions, the following will apply:
         a. [ ] Upon the recommencement of distributions, the original Annuity Starting Date will be retained.
         b. [ ] Upon the recommencement of distributions, a new Annuity Starting Date is created.
      2. [ ] A Participant who had not begun receiving required minimum distributions as of _____ (not earlier than January 1, 1996) may elect to defer commencement of distributions until retirement. The option to defer the commencement of distributions (i.e., to elect to receive in-service distributions upon attainment of age 70 1/2) will apply to all such Participants unless the option below is elected:
         a. [ ] N/A
         b. [ ] The in-service distribution option is eliminated with respect to Participants who attain age 70 1/2 in or after the calendar year that begins after the later of (1) December 31, 1998, or (2) the adoption date of the amendment and restatement to bring the Plan into compliance with SBJPA. (This option may only be elected if the amendment to eliminate the in-service distribution is adopted no later than the last day of the remedial amendment period that applies to the Plan for changes under SBJPA.)

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

41. DISTRIBUTIONS UPON DEATH (Plan Section 6.6(h))
Distributions upon the death of a Participant prior to receiving any benefits shall...
a. [ ] be made pursuant to the election of the Participant or beneficiary.
b. [ ] begin within 1 year of death for a designated beneficiary and be payable over the life (or over a period not exceeding the life expectancy) of such beneficiary, except that if the beneficiary is the Participant's spouse, begin prior to December 31st of the year in which the Participant would have attained age 70 1/2.
c. [ ] be made within 5 (or if lesser _____ ) years of death for all beneficiaries.
d. [ ] be made within 5 (or if lesser _____ ) years of death for all beneficiaries, except that if the beneficiary is the Participant's spouse, begin prior to December 31st of the year in which the Participant would have attained age 70 1/2 and be payable over the life (or over a period not exceeding the life expectancy) of such surviving spouse.

42. IN-SERVICE DISTRIBUTIONS (Plan Section 6.10)
a. [ ] In-service distributions may not be made.
b. [ ] In-service distributions may be made to a Participant who has reached Normal Retirement Age but has not separated from service.

AND, in-service distributions are permitted from the following accounts (select all that apply):
c. [ ] All accounts.
d. [ ] Participant's Rollover Account.
e. [ ] Participant's Transfer Account.
f. [ ] Participant's Voluntary Contribution Account.

AND, the minimum distribution shall be...
g. [ ] N/A. There is no minimum.
h. [ ] $_____ (may not exceed $1,000).

## TOP HEAVY REQUIREMENTS

43. TOP HEAVY DUPLICATIONS (Plan Section 4.3(i)): When a Non-Key Employee is a Participant in this Plan and a Defined Benefit Plan maintained by the Employer, indicate which method shall be utilized to avoid duplication of top heavy minimum benefits (If b., c., d. or e. is elected, f. must be completed)
a. [ ] N/A. The Employer does not maintain a Defined Benefit Plan other than a paired plan. (Go to next question.)
b. [ ] The full top heavy minimum will be provided in each plan (if selected, Plan Section 4.3(i) shall not apply).
c. [ ] 5% defined contribution minimum.
d. [ ] 2% defined benefit minimum.
e. [ ] Specify the method under which the Plans will provide top heavy minimum benefits for Non-Key Employees that will preclude Employer discretion and avoid inadvertent omissions:

_____

**NOTE:** If c. or d. is selected and both plans do not cover the same Employees, or if e. is selected, then an Employer may not rely on the opinion letter issued by the Internal Revenue Service that this Plan is qualified under Code Section 401.

**AND,** the "Present Value of Accrued Benefit" (Plan Section 9.2) for Top Heavy purposes shall be based on...

f. [ ] Interest Rate: _____

Mortality Table: _____

44. TOP HEAVY DUPLICATIONS (Plan Section 4.3(f)): When a Non-Key Employee is a Participant in this Plan and another defined contribution plan maintained by the Employer, indicate which method shall be utilized to avoid duplication of top heavy minimum benefits:
a. [ ] N/A. The Employer does not maintain another qualified defined contribution plan other than a paired plan.
b. [ ] The full top heavy minimum will be provided in each plan.
c. [ ] A minimum, non-integrated contribution of 3% of each Non-Key Employee's 415 Compensation shall be provided in the Money Purchase Plan (or other plan subject to Code Section 412), where the Employer maintains two (2) or more non-paired Defined Contribution Plans.
d. [ ] Specify the method under which the Plans will provide top heavy minimum benefits for Non-Key Employees that will preclude Employer discretion and avoid inadvertent omissions, including any adjustments required under Code Section 415:

_____

**NOTE:** If c. is selected and both plans do not cover the same Employees, or if d. is selected, then an Employer may not rely on the opinion letter issued by the Internal Revenue Service that this Plan is qualified under Code Section 401.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Standardized Target Benefit Plan

**MISCELLANEOUS**

45.  LOANS TO PARTICIPANTS (Plan Section 7.6)
     a.  [X]  Loans are not permitted.
     b.  [ ]  Loans are permitted.

     IF loans are permitted (select all that apply)...
     c.  [ ]  loans will be treated as a Participant directed investment.
     d.  [ ]  loans will only be made for hardship or financial necessity.

     e.  [ ]  the minimum loan will be $_____ (may not exceed $1,000).

     f.  [ ]  a Participant may only have _____ (e.g., one (1)) loan(s) outstanding at any time.
     g.  [ ]  all outstanding loan balances will become due and payable in their entirety upon the occurrence of a distributable event (other than satisfaction of the conditions for an in-service distribution).
     h.  [ ]  loans will only be permitted from the following accounts (select all that apply):
             1.  [ ]  All accounts.
             2.  [ ]  Participant's Rollover Account.
             3.  [ ]  Participant's Transfer Account.
             4.  [ ]  Participant's Voluntary Contribution Account.
             5.  [ ]  Participant's Account.
     NOTE:  Department of Labor Regulations require the adoption of a separate written loan program setting forth the requirements outlined in Plan Section 7.6.

46.  DIRECTED INVESTMENT ACCOUNTS (Plan Section 4.10)
     a.  [X]  Participant directed investments are not permitted.
     b.  [ ]  Participant directed investments are permitted for the following accounts (select all that apply):
             1.  [ ]  All accounts.
             2.  [ ]  Participant's Rollover Account.
             3.  [ ]  Participant's Transfer Account.
             4.  [ ]  Participant's Voluntary Contribution Account.

             5.  [ ]  Other: _____

     AND, is it intended that the Plan comply with Act Section 404(c) with respect to the accounts subject to Participant investment direction?
     c.  [ ]  No.
     d.  [ ]  Yes.

     AND, will voting rights on directed investments be passed through to Participants?
     e.  [ ]  No. Employer stock is not an alternative OR Plan is not intended to comply with Act Section 404(c).
     f.  [ ]  Yes, for Employer stock only.
     g.  [ ]  Yes, for all investments.

47.  ROLLOVERS (Plan Section 4.6)
     a.  [ ]  Rollovers will not be accepted by this Plan.
     b.  [X]  Rollovers will be accepted by this Plan.

     AND, if b. is elected, rollovers may be accepted...
     c.  [ ]  from any Eligible Employee, even if not a Participant.
     d.  [X]  from Participants only.

     AND, distributions from a Participant's Rollover Account may be made...
     e.  [ ]  at any time.
     f.  [ ]  only when the Participant is otherwise entitled to a distribution under the Plan.

48.  LIFE INSURANCE (Plan Section 7.5)
     a.  [ ]  Life insurance may not be purchased.
     b.  [X]  Life insurance may be purchased at the option of the Administrator.
     c.  [ ]  Life insurance may be purchased at the option of the Participant.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

AND, if b. or c. is elected, the purchase of initial or additional life insurance will be subject to the following limitations (select all that apply):

d. [ ] N/A, no limitations.

e. [ ] each initial Contract will have a minimum face amount of $_____.

f. [ ] each additional Contract will have a minimum face amount of $_____.

g. [ ] the Participant has completed _____ Years of Service (or Periods of Service).

h. [ ] the Participant has completed _____ Years of Service (or Periods of Service) while a Participant in the Plan.

i. [ ] the Participant is under age _____ on the Contract issue date.

j. [ ] the maximum amount of all Contracts on behalf of a Participant may not exceed $_____.

k. [ ] the maximum face amount of any life insurance Contract will be $_____.

## PLAN PROVISIONS

Notwithstanding anything in this Plan to the contrary, the following provisions apply to this Plan.

## DEFINITIONS

a. "Average Monthly Compensation" means with respect to a Participant, the monthly Compensation specified in this Adoption Agreement. If a Participant has less than the number of Years of Service or Plan Years of Service specified in the Adoption Agreement from the date of employment (or, if applicable, date of participation) to the Participant's date of termination, Average Monthly Compensation will be based on the monthly Compensation during the Participant's months of service from the date of employment (or, if applicable, date of participation). Compensation subsequent to termination of participation pursuant to Section 3.4 shall not be recognized. Furthermore, in determining Compensation used to calculate Average Monthly Compensation, the repeal of the family aggregation rules of Code Section 401(a)(17), as in effect prior to the Small Business Job Protection Act of 1996, shall not apply with respect to years prior to the date the rules no longer apply to this Plan unless otherwise elected in the Adoption Agreement.

b. "Covered Compensation" with respect to any Participant for a Plan Year means the average (without indexing) of the Taxable Wage Bases in effect for each calendar year during the 35-year period ending with the last day of the calendar year in which the Participant attains (or will attain) Social Security Retirement Age. A Participant's Covered Compensation shall be adjusted each Plan Year and no increase in Covered Compensation shall decrease a Participant's accrued benefit. In determining the Participant's Covered Compensation for a Plan Year, the Taxable Wage Base in effect for the current Plan Year and any subsequent Plan Year will be assumed to be the same as the Taxable Wage Base in effect as of the beginning of the Plan Year for which the determination is being made. A Participant's Covered Compensation for a Plan Year before the 35-year period described above is the Taxable Wage Base in effect as of the beginning of the Plan Year. A Participant's Covered Compensation for a Plan Year after the 35-year period described above is the Participant's Covered Compensation for the Plan Year during which the Participant attained Social Security Retirement Age.

However, if a frozen Covered Compensation table is selected in the Adoption Agreement, "Covered Compensation" with respect to any Participant for a Plan Year means the Participant's Covered Compensation under the table. For Plan Years beginning six (6) years after the year selected in the Adoption Agreement, the Participant's Covered Compensation shall be that determined under the Covered Compensation table for the Plan Year five (5) years prior to the current Plan Year. Any change in a Participant's Covered Compensation shall not cause any reduction in the Participant's accrued benefit.

c. "Final Average Compensation" means, with respect to any Participant, the average of the Participant's Compensation for the three-consecutive year period ending with or within the Plan Year. If a Participant's entire period of employment with the Employer is less than three consecutive years, compensation is averaged on an annual basis over the Participant's entire period of employment. Compensation for any year in excess of the Taxable Wage Base in effect at the beginning of such year will not be taken into account.

d. "Level Funding Amount" means that level annual amount necessary, using the individual level premium funding method and the factor table specified in the Adoption Agreement, to fund a Participant's Target Benefit. A Participant's Target Benefit at Normal Retirement Age shall accrue ratably over the period ending with the Plan Year in which the Participant is projected to reach Normal Retirement Age and beginning with the latest of: (a) the first Plan Year in which the Participant benefited under the Plan, (b) the first Plan Year taken into account under the Target Benefit, and (c) any Plan Year immediately following a Plan Year in which the Plan did not satisfy the target benefit safe harbor in the Code Section 401(a)(4) Regulations.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

e.  "Money Purchase Plan" shall refer to and include the Target Benefit Plan created under this Adoption Agreement, except that contributions and allocations shall be determined as provided herein to the extent the provisions herein are contrary to any other provision in the Plan.

f.  "Participant's Account" means the account established and maintained by the administrator with respect to a Participant's total interest under the Plan resulting from Employer contributions.

g.  "Plan Year of Service" means a Plan Year during which an Employee is a Participant and completes a Year of Service (or Period of Service if the Elapsed Time Method is elected).

h.  "Straight Life Annuity" means an annuity payable in equal installments for the life of a Participant that terminates upon the Participant's death.

i.  "Target Benefit" means the monthly benefit specified in the Adoption Agreement which, when annualized, shall be the basis for determining the Level Funding Amount, but which may be more or less than the benefit actually available upon a distributable event.

j.  "Years of Projected Participation" means, with respect to any Participant, the sum of (1) and (2), where (1) is the number of years during which the Participant benefited under this Plan beginning with the latest of: (a) the first Plan Year in which the Participant benefited under the Plan, (b) the first Plan Year taken into account in the Target Benefit formula, and (c) any Plan Year immediately following a Plan Year in which the Plan did not satisfy the safe harbor for target benefit plans in Regulation Section 1.401(a)(4)-8(b)(3), and ending with the last day of the current Plan Year, and (2) is the number of years, if any, subsequent to the current Plan Year through the end of the Plan Year in which the Participant attains Normal Retirement Age.

For purposes of this definition, if this Plan is a "prior safe harbor plan," the Plan is deemed to satisfy the safe harbor for target benefit plans in Regulation Section 1.401(a)(4)-8(b)(3) and a Participant is treated as benefiting under the Plan in any Plan Year beginning prior to January 1, 1994.

A "prior safe harbor plan" is a Plan that (1) was adopted and in effect as of September 19, 1991, (2) which on that date contained a Target Benefit formula that took into account service prior to that date, and (3) satisfied the applicable nondiscrimination requirements for target benefit plans for those prior years. For purposes of determining whether a Plan satisfies the applicable nondiscrimination requirements for target benefit plans for Plan Years beginning before January 1, 1994, no amendments after September 19, 1991, other than amendments necessary to satisfy Code Section 401(l), will be taken into account.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

## DETERMINATION AND ALLOCATION OF EMPLOYER CONTRIBUTION

a. The Employer shall contribute on behalf of each Participant eligible to share in allocations for each Plan Year, the Level Funding Amount that is projected to be necessary to fund the Participant's Target Benefit. If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than 500 Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year. The Employer shall be required to obtain a waiver from the Internal Revenue Service for any Plan Year in which it is unable to make the full required contribution to the Plan. In the event a waiver is obtained, this Plan shall be deemed to be an individually designed plan.

b. The Target Benefit at Normal Retirement Date for each Participant shall be equal to the monthly benefit based on the formula selected in this Adoption Agreement and shall be assumed to be a Straight Life Annuity commencing on the Participant's Retirement Date. However, with respect to Plan Years prior to the Plan Year in which this Plan is adopted, the Target Benefit for each Participant shall be determined in accordance with the provisions of the Plan then in effect. Regardless of the preceding, the form of distribution of such benefit shall be determined pursuant to the provisions of Section 6.5.

c. A Participant's actual benefit at any point in time shall be the value of the Participant's Account.

d. In the event of a change in the Participant's Target Benefit, the Level Funding Amount shall be increased or decreased by an amount equal to the level amount necessary to fund the increase or decrease in the Target Benefit from the Anniversary Date when the increase or decrease becomes effective to the Normal Retirement Date.

e. Notwithstanding the foregoing, the Employer's contribution for any Plan Year shall not exceed the maximum amount allowable as a deduction to the Employer under the provisions of Code Section 404. However, to the extent necessary to provide the top heavy minimum allocations, the Employer shall make a contribution even if it exceeds the amount which is deductible under Code Section 404.

## GUST TRANSITION RULES

The following questions only apply if this is a GUST restatement (i.e., Question 6.c. is selected). If this is not a GUST restatement, then this Plan will not be considered an individually designed plan merely because the following questions are deleted from the Adoption Agreement.

49. COMPENSATION
The family aggregation rules of Code Section 401(a)(17) as in effect under Code Section 414(q)(6) prior to the enactment of SBJPA do not apply to this Plan effective as of:

a. [X] The first day of the first Plan Year beginning after 1996.

b. [ ] _____ (may not be prior to the first day of the first Plan Year beginning in 1997 and may not be later than the first day of the Plan Year following the Plan Year in which this GUST restatement is adopted).

**NOTE:** If family aggregation continued to apply after 1996, the Plan is not a safe harbor plan for Code Section 401(a)(4) purposes and the Employer may not rely on the opinion letter issued by the Internal Revenue Service that this Plan is qualified under Code Section 401.

50. LIMITATION ON ALLOCATIONS AND TOP HEAVY RULES
If any Participant is a Participant in this Plan and a qualified defined benefit plan maintained by the Employer, then the limitations of Code Section 415(e) as in effect under Code Section 414(q)(6) prior to the enactment of SBJPA do not apply to this Plan effective with respect to Limitation Years beginning on or after:

a. [ ] N/A. The Employer does not maintain, and has never maintained, a qualified defined benefit plan OR the provisions of Code Section 415(e) have already been removed from this Plan.

b. [X] _____ (may not be prior to the first Limitation Year beginning in 2000 and may not be later than the first Limitation Year beginning after the Limitation Year in which this GUST restatement is adopted).

**NOTE:** If the Code Section 415(e) limits continued to apply to Limitation Years beginning after 1999, the Plan is not a safe harbor plan for Code Section 401(a)(4) purposes and the Employer may not rely on the opinion letter issued by the Internal Revenue Service that this Plan is qualified under Code Section 401.

AND, if b. is selected with a date that is later than the effective date of this GUST restatement, then with respect to the Limitation Year in which this restatement is adopted, if any Participant is a Participant in this Plan and a qualified defined benefit plan maintained by the Employer, specify the method under which the plans involved will provide top

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC3001ASTB

heavy minimum benefits for Non-Key Employees and will satisfy the limitations of Code Section 415(e) in a manner that precludes Employer discretion:

c. [ ]   N/A. The effective date of the GUST restatement is the date the provisions of Code Section 415(e) no longer apply to this Plan.

d. [ ]   _____

**NOTE:**   If the top heavy minimum benefit is only provided in one plan and the Defined Benefit Plan and this Plan do not benefit the same Participants, the uniformity requirement of the Section 401(a)(4) Regulations may be violated.

51.   INVOLUNTARY DISTRIBUTIONS

If the Plan provides for involuntary distributions (i.e., 39.a. is elected) then the increase in the involuntary amount threshold from $3,500 to $5,000 became effective with respect to distributions made on or after:

a. [X]   N/A. The plan doesn't provide for involuntary distributions less than $5,000.

b. [ ]   August 6, 1997, or if later _____ (leave blank if not applicable).

52.   MINIMUM DISTRIBUTIONS

The proposed Code Section 401(a)(9) Regulations issued in January 2001 apply with respect to distributions under the Plan made on or after January 1, 2001, unless a later date is specified below:

a. [ ]   N A

b. [ ]   _____ (may be any date in 2001 or the first day of any calendar year after 2001).

AND, if b. is selected, for years prior to the date specified above, life expectancies for minimum distributions required pursuant to Code Section 401(a)(9) shall...

c. [X]   be recalculated at the Participant's election.

d. [ ]   be recalculated.

e. [ ]   not be recalculated.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

The adopting Employer may rely on an opinion letter issued by the Internal Revenue Service as evidence that the plan is qualified under Code Section 401 except to the extent provided in Rev. Proc. 2000-20, 2000-6 I.R.B. 553 and Announcement 2001-77, 2001-30 I.R.B.

An Employer who has ever maintained or who later adopts any plan (including a welfare benefit fund, as defined in Code Section 419(e), which provides post-retirement medical benefits allocated to separate accounts for key employees, as defined in Code Section 419A(d)(3), or an individual medical account, as defined in Code Section 415(l)(2)) in addition to this Plan may not rely on the opinion letter issued by the National Office of the Internal Revenue Service with respect to the requirements of Code Sections 415 and 416.

If the Employer who adopts or maintains multiple plans wishes to obtain reliance with respect to the requirements of Code Sections 415 and 416, application for a determination letter must be made to Employee Plans Determinations of the Internal Revenue Service.

The Employer may not rely on the opinion letter in certain other circumstances, which are specified in the opinion letter issued with respect to the plan or in Revenue Procedure 2000-20 and Announcement 2001-77.

This Adoption Agreement may be used only in conjunction with basic Plan document #01. This Adoption Agreement and the basic Plan document shall together be known as The Manufacturers Life Insurance Company (U.S.A.) Prototype Standardized Target Benefit Plan and Trust #01-008.

The adoption of this Plan, its qualification by the IRS, and the related tax consequences are the responsibility of the Employer and its independent tax and legal advisors.

The Manufacturers Life Insurance Company (U.S.A.) will notify the Employer of any amendments made to the Plan or of the discontinuance or abandonment of the Plan. Furthermore, in order to be eligible to receive such notification, we agree to notify The Manufacturers Life Insurance Company (U.S.A.) of any change in address.

This Plan may not be used, and shall not be deemed to be a Prototype Plan, unless an authorized representative of The Manufacturers Life Insurance Company (U.S.A.) has acknowledged the use of the Plan. Such acknowledgment is for administerial purposes only. It acknowledges that the Employer is using the Plan but does not represent that this Plan, including the choices selected on the Adoption Agreement, has been reviewed by a representative of the sponsor or constitutes a qualified retirement plan.

The Manufacturers Life Insurance Company (U.S.A.)

By: _____

With regard to any questions regarding the provisions of the Plan, adoption of the Plan, or the effect of an opinion letter from the IRS, call or write (this information must be completed by the sponsor of this Plan or its designated representative):

Name:      The Manufacturers Life Insurance Company (U.S.A.)

Address:   Attn: Group Pension Compliance

           P.O. BOX 600, Niagara Station, Buffalo, New York   14201-0600

Telephone: (  416  )  926-6318

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

# CERTIFIED COPY RESOLUTIONS BY BOARD OF DIRECTORS
## OF
## SHIRLEY T. SHERROD M.P., P.C.

I hereby certify that I am duly appointed Shirley T. Sherrod M.P., P.C., a Michigan corporation, and that the following is a true and correct copy of the Resolutions adopted at a Special Meeting of Board of Directors of the Corporation, held in accordance with the By-laws of the Corporation at the office of the Corporation, in Southfield, Michigan on the 31 day of December 2002.

RESOLVED, that Shirley T. Sherrod M.P., P.C., (the "Corporation") did enter into and executes the Target Benefit Pension Plan, (the "Plan and Trust") for the benefit of its qualified employees, in accordance with the term of the Plan and Trust, as a affiliated employer.

BE IT FURTHER RESOLVED, that such Plan and Trust be hereby amended by the Board of Directors effective as of January 1, 2002.

BE IT FURTHER RESOLVED, that the President of the Corporation is hereby authorized to execute said amendment for and on behalf of the Corporation. The President shall take all steps necessary to put into effect said amendment including, but not limited to, submitting the Plan and trust to the internal Revenue Service for a determination of qualification under Sections 401(a), and 501(a) of the Internal Revenue Code of 1954, as amended.

BE IT FURTHER RESOLVED, that the following person(s) are hereby appointed Trustees of the Plan and Trust until their successors in office are duly appointed.

Shirley Sherrod

BE IT FURTHER RESOLVED, that the corporation hereby appointed Administrator of the Plan and Trust until a successor is duly appointed.

IN WITNESS WHEREOF, I have hereunto affixed my names as President of the Corporation the 31 day of December 2002.

_____

President

**Standardized Target Benefit Plan**

The Employer and Trustee hereby cause this Plan to be executed on _____ .
Furthermore, this Plan may not be used unless acknowledged by The Manufacturers Life Insurance Company (U.S.A.) or its authorized representative.

EMPLOYER

By: _____

[ ] The signature of the Trustee appears on a separate trust agreement attached to the Plan.

OR

_____
TRUSTEE

_____
TRUSTEE

_____
TRUSTEE

PARTICIPATING EMPLOYER

By: _____

PARTICIPATING EMPLOYER (attach additional signature pages as necessary):

By: _____

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001ASTB

# EGTRRA AMENDMENTS

Enclosed are two alternative Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA") amendments. Both amendments are based on the "sample language" from IRS Notice 2001-57. As a sponsor, you have the option to decide which amendment will be used in conjunction with your prototype.

The amendments can be identified by the header on the actual amendment: "EGTRRA – Employer" or "EGTRRA – Sponsor. The difference between the two amendments affects the action, if any, that each adopting employer must take. If the "EGTRRA-Employer" amendment is used, then each employer must adopt the amendment. If the "EGTRRA – Sponsor" amendment is used, then the amendment is adopted by your firm, as the prototype sponsor, and an employer only needs to adopt the amendment if certain elections are made. Thus, it is possible that in some cases no action will need to be taken by the employer if the "EGTRRA – Sponsor" amendment is used. A more detailed description of the amendments is below.

Note that the timing of the EGTRRA amendment could be an issue due to the anti-cutback rules of IRC Section 411(d)(6). For more information on this, see IRS Notice 2001-42 on our web site:
http://www.corbel.com/news/pensionupdatesdetail.asp?ID=141

## EGTRRA – Employer Amendment

Each employer **must** adopt this amendment. Note that this amendment automatically includes the following provisions (i.e., there is no election for the employer as to whether these should not apply):

1.      The compensation limit is increased to $200,000.

2.      If an employer's plan permits rollovers to be accepted, then the employer has the ability to determine, in a uniform and nondiscriminatory manner, the sources of rollovers (e.g., from regular IRAs) that will be accepted by the plan.

3.      The "same desk" rule is repealed in 2002, regardless of when the separation from service actually occurred.

## EGTRRA – Sponsor Amendment

In order to facilitate the process of updating plans for EGTRRA, the EGTRRA – sponsor amendment is structured to be adopted AT THE SPONSOR LEVEL. Rev. Proc. 2000-20 (and the predecessors for TRA '86 prototypes, Rev. Proc. 89-9 and 89-13) allows a prototype sponsor to adopt amendments on behalf of adopting employers. In many, but not all, cases adopting employers will not need to execute this amendment. A drawback to this approach is there is less flexibility for adopting employers because certain elections are made at the sponsor level. If this amendment is used, then the sponsor must adopt the amendment and provide it to employers using the prototype. If the amendment is being used for both a TRA '86 prototype and a GUST prototype, it should be adopted separately for each respective prototype.

The following "defaults" are automatically structured in the amendment:

1.      Unless the employer elects otherwise, the vesting schedule for matching contributions will be one of the following, and that schedule will apply to **all** matching contributions (even those made prior to 2002):

      (a)      a 6 year graded schedule (if the plan currently has a graded schedule that does not satisfy EGTRRA); or

      (b)      a 3 year cliff schedule (if the plan currently has a cliff schedule that does not satisfy EGTRRA).

2.      Unless the employer elects otherwise, rollovers are automatically excluded in determining whether the $5,000 threshold has been exceeded for automatic cash-outs (if the plan provides for automatic cash-outs). This is applied to all participants regardless of when the distributable event occurred.

3.      Unless the employer elects otherwise, the suspension period after a hardship distribution is made will be 6 months and this will only apply to hardship distributions made after 2001.

4.      Unless the employer elects otherwise, catch-up contributions will be allowed.

5.      The compensation limit is increased to $200,000. For target benefit plans, this will be applied retroactively (i.e., to years prior to 2002) unless the employer elects otherwise and executes the amendment.

6.      If an employer's plan permits rollovers to be accepted, then the employer has the ability to determine, in a uniform and nondiscriminatory manner, the sources of rollovers that will be accepted by the plan.

7.      The "same desk" rule is repealed in 2002, regardless of when the separation from service actually occurred.



**EGTRRA**
**AMENDMENT TO THE**

**THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)**
**DEFINED CONTRIBUTION PROTOTYPE PLAN AND TRUST**

© THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)



EGTRRA Employer

# ARTICLE I
# PREAMBLE

1.1 <u>Adoption and effective date of amendment</u>. This amendment of the plan is adopted to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). This amendment is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with EGTRRA and guidance issued thereunder. Except as otherwise provided, this amendment shall be effective as of the first day of the first plan year beginning after December 31, 2001.

1.2 <u>Supersession of inconsistent provisions</u>. This amendment shall supersede the provisions of the plan to the extent those provisions are inconsistent with the provisions of this amendment.

# ARTICLE II
# ADOPTION AGREEMENT ELECTIONS

**The questions in this Article II only need to be completed in order to override the default provisions set forth below. If all of the default provisions will apply, then these questions should be skipped.**

**Unless the employer elects otherwise in this Article II, the following defaults apply:**

1) **The vesting schedule for matching contributions will be a 6 year graded schedule (if the plan currently has a graded schedule that does not satisfy EGTRRA) or a 3 year cliff schedule (if the plan currently has a cliff schedule that does not satisfy EGTRRA), and such schedule will apply to all matching contributions (even those made prior to 2002).**
2) **Rollovers are automatically excluded in determining whether the $5,000 threshold has been exceeded for automatic cash-outs (if the plan is subject to the qualified joint and survivor annuity rules and provides for automatic cash-outs). This is applied to all participants regardless of when the distributable event occurred.**
3) **The suspension period after a hardship distribution is made will be 6 months and this will only apply to hardship distributions made after 2001.**
4) **Catch-up contributions will be allowed.**
5) **For target benefit plans, the increased compensation limit of $200,000 will be applied retroactively (i.e., to years prior to 2002).**

2.1 **Vesting Schedule for Matching Contributions**

If there are matching contributions subject to a vesting schedule that does not satisfy EGTRRA, then unless otherwise elected below, for participants who complete an hour of service in a plan year beginning after December 31, 2001, the following vesting schedule will apply to all matching contributions subject to a vesting schedule:

If the plan has a graded vesting schedule (i.e., the vesting schedule includes a vested percentage that is more than 0% and less than 100%) the following will apply:

| Years of vesting service | Nonforfeitable percentage |
|---|---|
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

If the plan does not have a graded vesting schedule, then matching contributions will be nonforfeitable upon the completion of 3 years of vesting service.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

**EGTRRA** Employer

In lieu of the above vesting schedule, the employer elects the following schedule:

a. [ ] 3 year cliff (a participant's accrued benefit derived from employer matching contributions shall be nonforfeitable upon the participant's completion of three years of vesting service).

b. [ ] 6 year graded schedule (20% after 2 years of vesting service and an additional 20% for each year thereafter).

c. [ ] Other (must be at least as liberal as a. or the b. above):

| Years of vesting service | Nonforfeitable percentage |
|---|---|
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

The vesting schedule set forth herein shall only apply to participants who complete an hour of service in a plan year beginning after December 31, 2001, and, unless the option below is elected, shall apply to **all** matching contributions subject to a vesting schedule.

d. [ ] The vesting schedule will only apply to matching contributions made in plan years beginning after December 31, 2001 (the prior schedule will apply to matching contributions made in prior plan years).

2.2 **Exclusion of Rollovers in Application of Involuntary Cash-out Provisions (for profit sharing and 401(k) plans only).** If the plan is not subject to the qualified joint and survivor annuity rules and includes involuntary cash-out provisions, then unless one of the options below is elected, effective for distributions made after December 31, 2001, rollover contributions will be excluded in determining the value of the participant's nonforfeitable account balance for purposes of the plan's involuntary cash-out rules.

a. [ ] Rollover contributions will not be excluded.

b. [ ] Rollover contributions will be excluded only with respect to distributions made after _____ (Enter a date no earlier than December 31, 2001).

c. [ ] Rollover contributions will only be excluded with respect to participants who separated from service after _____. (Enter a date. The date may be earlier than December 31, 2001.)

2.3 **Suspension period of hardship distributions.** If the plan provides for hardship distributions upon satisfaction of the safe harbor (deemed) standards as set forth in Treas. Reg. Section 1.401(k)-1(d)(2)(iv), then, unless the option below is elected, the suspension period following a hardship distribution shall only apply to hardship distributions made after December 31, 2001.

[ ] With regard to hardship distributions made during 2001, a participant shall be prohibited from making elective deferrals and employee contributions under this and all other plans until the later of January 1, 2002, or 6 months after receipt of the distribution.

2.4 **Catch-up contributions (for 401(k) profit sharing plans only):** The plan permits catch-up contributions (Article VI) unless the option below is elected.

[ ] The plan does not permit catch-up contributions to be made.

2.5 **For target benefit plans only:** The increased compensation limit ($200,000 limit) shall apply to years prior to 2002 unless the option below is elected.

[ ] The increased compensation limit will not apply to years prior to 2002.

## ARTICLE III
## VESTING OF MATCHING CONTRIBUTIONS

3.1 Applicability. This Article shall apply to participants who complete an Hour of Service after December 31, 2001, with respect to accrued benefits derived from employer matching contributions made in plan years beginning after December 31, 2001. Unless otherwise elected by the employer in Section 2.1 above, this Article shall also apply to all such participants with respect to accrued benefits derived from employer matching contributions made in plan years beginning prior to January 1, 2002.

3.2 Vesting schedule. A participant's accrued benefit derived from employer matching contributions shall vest as provided in Section 2.1 of this amendment.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA Employer

## ARTICLE IV
## INVOLUNTARY CASH-OUTS

4.1 Applicability and effective date. If the plan provides for involuntary cash-outs of amounts less than $5,000, then unless otherwise elected in Section 2.2 of this amendment, this Article shall apply for distributions made after December 31, 2001, and shall apply to all participants. However, regardless of the preceding, this Article shall not apply if the plan is subject to the qualified joint and survivor annuity requirements of Sections 401(a)(11) and 417 of the Code.

4.2 Rollovers disregarded in determining value of account balance for involuntary distributions. For purposes of the Sections of the plan that provide for the involuntary distribution of vested accrued benefits of $5,000 or less, the value of a participant's nonforfeitable account balance shall be determined without regard to that portion of the account balance that is attributable to rollover contributions (and earnings allocable thereto) within the meaning of Sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3)(A)(ii), and 457(e)(16) of the Code. If the value of the participant's nonforfeitable account balance as so determined is $5,000 or less, then the plan shall immediately distribute the participant's entire nonforfeitable account balance.

## ARTICLE V
## HARDSHIP DISTRIBUTIONS

5.1 Applicability and effective date. If the plan provides for hardship distributions upon satisfaction of the safe harbor (deemed) standards as set forth in Treas. Reg. Section 1.401(k)-1(d)(2)(iv), then this Article shall apply for calendar years beginning after 2001.

5.2 Suspension period following hardship distribution. A participant who receives a distribution of elective deferrals after December 31, 2001, on account of hardship shall be prohibited from making elective deferrals and employee contributions under this and all other plans of the employer for 6 months after receipt of the distribution. Furthermore, if elected by the employer in Section 2.3 of this amendment, a participant who receives a distribution of elective deferrals in calendar year 2001 on account of hardship shall be prohibited from making elective deferrals and employee contributions under this and all other plans until the later of January 1, 2002, or 6 months after receipt of the distribution.

## ARTICLE VI
## CATCH-UP CONTRIBUTIONS

Catch-up Contributions. Unless otherwise elected in Section 2.4 of this amendment, all employees who are eligible to make elective deferrals under this plan and who have attained age 50 before the close of the plan year shall be eligible to make catch-up contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code. Such catch-up contributions shall not be taken into account for purposes of the provisions of the plan implementing the required limitations of Sections 402(g) and 415 of the Code. The plan shall not be treated as failing to satisfy the provisions of the plan implementing the requirements of Section 401(k)(3), 401(k)(11), 401(k)(12), 410(b), or 416 of the Code, as applicable, by reason of the making of such catch-up contributions.

## ARTICLE VII
## INCREASE IN COMPENSATION LIMIT

Increase in Compensation Limit. The annual compensation of each participant taken into account in determining allocations for any plan year beginning after December 31, 2001, shall not exceed $200,000, as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code. Annual compensation means compensation during the plan year or such other consecutive 12-month period over which compensation is otherwise determined under the plan (the determination period). If this is a target benefit plan, then except as otherwise elected in Section 2.5 of this amendment, for purposes of determining benefit accruals in a plan year beginning after December 31, 2001, compensation for any prior determination period shall be limited to $200,000. The cost-of-living adjustment in effect for a calendar year applies to annual compensation for the determination period that begins with or within such calendar year.

## ARTICLE VIII
## PLAN LOANS

Plan loans for owner-employees or shareholder-employees. If the plan permits loans to be made to participants, then effective for plan loans made after December 31, 2001, plan provisions prohibiting loans to any owner-employee or shareholder-employee shall cease to apply.

EGTRRA  Employer

**ARTICLE IX**
**LIMITATIONS ON CONTRIBUTIONS (IRC SECTION 415 LIMITS)**

9.1    Effective date. This Section shall be effective for limitation years beginning after December 31, 2001.

9.2    Maximum annual addition. Except to the extent permitted under Article XIV of this amendment and Section 414(v) of the Code, if applicable, the annual addition that may be contributed or allocated to a participant's account under the plan for any limitation year shall not exceed the lesser of:

   a.    $40,000, as adjusted for increases in the cost-of-living under Section 415(d) of the Code, or

   b.    100 percent of the participant's compensation, within the meaning of Section 415(c)(3) of the Code, for the limitation year.

   The compensation limit referred to in b. shall not apply to any contribution for medical benefits after separation from service (within the meaning of Section 401(h) or Section 419A(f)(2) of the Code) which is otherwise treated as an annual addition.

**ARTICLE X**
**MODIFICATION OF TOP-HEAVY RULES**

10.1    Effective date. This Article shall apply for purposes of determining whether the plan is a top-heavy plan under Section 416(g) of the Code for plan years beginning after December 31, 2001, and whether the plan satisfies the minimum benefits requirements of Section 416(c) of the Code for such years. This Article amends the top-heavy provisions of the plan.

10.2    Determination of top-heavy status.

10.2.1    Key employee. Key employee means any employee or former employee (including any deceased employee) who at any time during the plan year that includes the determination date was an officer of the employer having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for plan years beginning after December 31, 2002), a 5-percent owner of the employer, or a 1-percent owner of the employer having annual compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code. The determination of who is a key employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

10.2.2    Determination of present values and amounts. This Section 10.2.2 shall apply for purposes of determining the present values of accrued benefits and the amounts of account balances of employees as of the determination date.

   a.    Distributions during year ending on the determination date. The present values of accrued benefits and the amounts of account balances of an employee as of the determination date shall be increased by the distributions made with respect to the employee under the plan and any plan aggregated with the plan under Section 416(g)(2) of the Code during the 1-year period ending on the determination date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

   b.    Employees not performing services during year ending on the determination date. The accrued benefits and accounts of any individual who has not performed services for the employer during the 1-year period ending on the determination date shall not be taken into account.

© 2001  The Manufacturers Life Insurance Company (U.S.A.)

EGTRRA Employer

10.3  Minimum benefits.

10.3.1  Matching contributions. Employer matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Section 416(c)(2) of the Code and the plan. The preceding sentence shall apply with respect to matching contributions under the plan or, if the plan provides that the minimum contribution requirement shall be met in another plan, such other plan. Employer matching contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Section 401(m) of the Code.

10.3.2  Contributions under other plans. The employer may provide, in an addendum to this amendment, that the minimum benefit requirement shall be met in another plan (including another plan that consists solely of a cash or deferred arrangement which meets the requirements of Section 401(k)(12) of the Code and matching contributions with respect to which the requirements of Section 401(m)(11) of the Code are met). The addendum should include the name of the other plan, the minimum benefit that will be provided under such other plan, and the employees who will receive the minimum benefit under such other plan.

## ARTICLE XI
## DIRECT ROLLOVERS

11.1  Effective date. This Article shall apply to distributions made after December 31, 2001.

11.2  Modification of definition of eligible retirement plan. For purposes of the direct rollover provisions of the plan, an eligible retirement plan shall also mean an annuity contract described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this plan. The definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Section 414(p) of the Code.

11.3  Modification of definition of eligible rollover distribution to exclude hardship distributions. For purposes of the direct rollover provisions of the plan, any amount that is distributed on account of hardship shall not be an eligible rollover distribution and the distributee may not elect to have any portion of such a distribution paid directly to an eligible retirement plan.

11.4  Modification of definition of eligible rollover distribution to include after-tax employee contributions. For purposes of the direct rollover provisions in the plan, a portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income. However, such portion may be transferred only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code, or to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

## ARTICLE XII
## ROLLOVERS FROM OTHER PLANS

Rollovers from other plans. The employer, operationally and on a nondiscriminatory basis, may limit the source of rollover contributions that may be accepted by this plan.

## ARTICLE XIII
## REPEAL OF MULTIPLE USE TEST

Repeal of Multiple Use Test. The multiple use test described in Treasury Regulation Section 1.401(m)-2 and the plan shall not apply for plan years beginning after December 31, 2001.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA Employer

## ARTICLE XIV
## ELECTIVE DEFERRALS

14.1    Elective Deferrals - Contribution Limitation. No participant shall be permitted to have elective deferrals made under this plan, or any other qualified plan maintained by the employer during any taxable year, in excess of the dollar limitation contained in Section 402(g) of the Code in effect for such taxable year, except to the extent permitted under Article VI of this amendment and Section 414(v) of the Code, if applicable.

14.2    Maximum Salary Reduction Contributions for SIMPLE plans. If this is a SIMPLE 401(k) plan, then except to the extent permitted under Article VI of this amendment and Section 414(v) of the Code, if applicable, the maximum salary reduction contribution that can be made to this plan is the amount determined under Section 408(p)(2)(A)(ii) of the Code for the calendar year.

## ARTICLE XV
## SAFE HARBOR PLAN PROVISIONS

Modification of Top-Heavy Rules. The top-heavy requirements of Section 416 of the Code and the plan shall not apply in any year beginning after December 31, 2001, in which the plan consists solely of a cash or deferred arrangement which meets the requirements of Section 401(k)(12) of the Code and matching contributions with respect to which the requirements of Section 401(m)(11) of the Code are met.

## ARTICLE XVI
## DISTRIBUTION UPON SEVERANCE OF EMPLOYMENT

16.1    Effective date. This Article shall apply for distributions and transactions made after December 31, 2001, regardless of when the severance of employment occurred.

16.2    New distributable event. A participant's elective deferrals, qualified nonelective contributions, qualified matching contributions, and earnings attributable to these contributions, shall be distributed on account of the participant's severance from employment. However, such a distribution shall be subject to the other provisions of the plan regarding distributions, other than provisions that require a separation from service before such amounts may be distributed.

This amendment has been executed this _____ day of _____, _____.

Name of Employer: _____

By: _____
         **EMPLOYER**

Name of Plan: _____

© 2001  The Manufacturers Life Insurance Company (U.S.A.)

6

**EGTRRA
AMENDMENT TO THE**

**THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)
DEFINED CONTRIBUTION PROTOTYPE PLAN AND TRUST**

© THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)

PC2001EG



EGTRRA Sponsor

## ARTICLE I
## PREAMBLE

1.1 <u>Adoption and effective date of amendment</u>. This amendment of the plan is adopted to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA"). This amendment is intended as good faith compliance with the requirements of EGTRRA and is to be construed in accordance with EGTRRA and guidance issued thereunder. Except as otherwise provided, this amendment shall be effective as of the first day of the first plan year beginning after December 31, 2001.

1.2 <u>Adoption by prototype sponsor</u>. Except as otherwise provided herein, pursuant to Section 5.01 of Revenue Procedure 2000-20 (or pursuant to the corresponding provision in Revenue Procedure 89-9 or Revenue Procedure 89-13), the sponsor hereby adopts this amendment on behalf of all adopting employers.

1.3 <u>Supersession of inconsistent provisions</u>. This amendment shall supersede the provisions of the plan to the extent those provisions are inconsistent with the provisions of this amendment.

## ARTICLE II
## ADOPTION AGREEMENT ELECTIONS

**The questions in this Article II only need to be completed in order to override the default provisions set forth below. If all of the default provisions will apply, then these questions should be skipped and the employer does not need to execute this amendment.**

Unless the employer elects otherwise in this Article II, the following defaults apply:
1) **The vesting schedule for matching contributions will be a 6 year graded schedule (if the plan currently has a graded schedule that does not satisfy EGTRRA) or a 3 year cliff schedule (if the plan currently has a cliff schedule that does not satisfy EGTRRA), and such schedule will apply to all matching contributions (even those made prior to 2002).**
2) **Rollovers are automatically excluded in determining whether the $5,000 threshold has been exceeded for automatic cash-outs (if the plan is subject to the qualified joint and survivor annuity rules and provides for automatic cash-outs). This is applied to all participants regardless of when the distributable event occurred.**
3) **The suspension period after a hardship distribution is made will be 6 months and this will only apply to hardship distributions made after 2001.**
4) **Catch-up contributions will be allowed.**
5) **For target benefit plans, the increased compensation limit of $200,000 will be applied retroactively (i.e., to years prior to 2002).**

2.1 **Vesting Schedule for Matching Contributions**

If there are matching contributions subject to a vesting schedule that does not satisfy EGTRRA, then unless otherwise elected below, for participants who complete an hour of service in a plan year beginning after December 31, 2001, the following vesting schedule will apply to all matching contributions subject to a vesting schedule:

If the plan has a graded vesting schedule (i.e., the vesting schedule includes a vested percentage that is more than 0% and less than 100%) the following will apply:

| Years of vesting service | Nonforfeitable percentage |
|---|---|
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

If the plan does not have a graded vesting schedule, then matching contributions will be nonforfeitable upon the completion of 3 years of vesting service.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

1

EGTRRA  Sponsor

In lieu of the above vesting schedule, the employer elects the following schedule:

a.  [ ]  3 year cliff (a participant's accrued benefit derived from employer matching  contributions shall be nonforfeitable upon the participant's completion of three years of vesting service).

b.  [ ]  6 year graded schedule (20% after 2 years of vesting service and an additional 20% for each year thereafter).

c.  [ ]  Other (must be at least as liberal as a. or the b. above):

| Years of vesting service | Nonforfeitable percentage |
|---|---|
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |
| _____ | _____ % |

The vesting schedule set forth herein shall only apply to participants who complete an hour of service in a plan year beginning after December 31, 2001, and, unless the option below is elected, shall apply to **all** matching contributions subject to a vesting schedule.

d.  [ ]  The vesting schedule will only apply to matching contributions made in plan years beginning after December 31, 2001 (the prior schedule will apply to matching contributions made in prior plan years).

2.2  **Exclusion of Rollovers in Application of Involuntary Cash-out Provisions (for profit sharing and 401(k) plans only).** If the plan is not subject to the qualified joint and survivor annuity rules and includes involuntary cash-out provisions, then unless one of the options below is elected, effective for distributions made after December 31, 2001, rollover contributions will be excluded in determining the value of the participant's nonforfeitable account balance for purposes of the plan's involuntary cash-out rules.

a.  [ ]  Rollover contributions will not be excluded.

b.  [ ]  Rollover contributions will be excluded only with respect to distributions made after _____ (Enter a date no earlier than December 31, 2001).

c.  [ ]  Rollover contributions will only be excluded with respect to participants who separated from service after _____. (Enter a date. The date may be earlier than December 31, 2001.)

2.3  **Suspension period of hardship distributions.** If the plan provides for hardship distributions upon satisfaction of the safe harbor (deemed) standards as set forth in Treas. Reg. Section 1.401(k)-1(d)(2)(iv), then, unless the option below is elected, the suspension period following a hardship distribution shall only apply to hardship distributions made after December 31, 2001.

[ ]  With regard to hardship distributions made during 2001, a participant shall be prohibited from making elective deferrals and employee contributions under this and all other plans until the later of January 1, 2002, or 6 months after receipt of the distribution.

2.4  **Catch-up contributions (for 401(k) profit sharing plans only):** The plan permits catch-up contributions (Article VI) unless the option below is elected.

[ ]  The plan does not permit catch-up contributions to be made.

2.5  **For target benefit plans only:** The increased compensation limit ($200,000 limit) shall apply to years prior to 2002 unless the option below is elected.

[ ]  The increased compensation limit will not apply to years prior to 2002.

## ARTICLE III
## VESTING OF MATCHING CONTRIBUTIONS

3.1  Applicability. This Article shall apply to participants who complete an Hour of Service after December 31, 2001, with respect to accrued benefits derived from employer matching contributions made in plan years beginning after December 31, 2001. Unless otherwise elected by the employer in Section 2.1 above, this Article shall also apply to all such participants with respect to accrued benefits derived from employer matching contributions made in plan years beginning prior to January 1, 2002.

3.2  Vesting schedule. A participant's accrued benefit derived from employer matching contributions shall vest as provided in Section 2.1 of this amendment.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA Sponsor

## ARTICLE IV
## INVOLUNTARY CASH-OUTS

4.1 Applicability and effective date. If the plan provides for involuntary cash-outs of amounts less than $5,000, then unless otherwise elected in Section 2.2 of this amendment, this Article shall apply for distributions made after December 31 2001, and shall apply to all participants. However, regardless of the preceding, this Article shall not apply if the plan is subject to the qualified joint and survivor annuity requirements of Sections 401(a)(11) and 417 of the Code.

4.2 Rollovers disregarded in determining value of account balance for involuntary distributions. For purposes of the Sections of the plan that provide for the involuntary distribution of vested accrued benefits of $5,000 or less, the value of a participant's nonforfeitable account balance shall be determined without regard to that portion of the account balance that is attributable to rollover contributions (and earnings allocable thereto) within the meaning of Sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3)(A)(ii), and 457(e)(16) of the Code. If the value of the participant's nonforfeitable account balance as so determined is $5,000 or less, then the plan shall immediately distribute the participant's entire nonforfeitable account balance.

## ARTICLE V
## HARDSHIP DISTRIBUTIONS

5.1 Applicability and effective date. If the plan provides for hardship distributions upon satisfaction of the safe harbor (deemed) standards as set forth in Treas. Reg. Section 1.401(k)-1(d)(2)(iv), then this Article shall apply for calendar years beginning after 2001.

5.2 Suspension period following hardship distribution. A participant who receives a distribution of elective deferrals after December 31, 2001, on account of hardship shall be prohibited from making elective deferrals and employee contributions under this and all other plans of the employer for 6 months after receipt of the distribution. Furthermore, if elected by the employer in Section 2.3 of this amendment, a participant who receives a distribution of elective deferrals in calendar year 2001 on account of hardship shall be prohibited from making elective deferrals and employee contributions under this and all other plans until the later of January 1, 2002, or 6 months after receipt of the distribution.

## ARTICLE VI
## CATCH-UP CONTRIBUTIONS

Catch-up Contributions. Unless otherwise elected in Section 2.4 of this amendment, all employees who are eligible to make elective deferrals under this plan and who have attained age 50 before the close of the plan year shall be eligible to make catch-up contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code. Such catch-up contributions shall not be taken into account for purposes of the provisions of the plan implementing the required limitations of Sections 402(g) and 415 of the Code. The plan shall not be treated as failing to satisfy the provisions of the plan implementing the requirements of Section 401(k)(3), 401(k)(11), 401(k)(12), 410(b), or 416 of the Code, as applicable, by reason of the making of such catch-up contributions.

## ARTICLE VII
## INCREASE IN COMPENSATION LIMIT

Increase in Compensation Limit. The annual compensation of each participant taken into account in determining allocations for any plan year beginning after December 31, 2001, shall not exceed $200,000, as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code. Annual compensation means compensation during the plan year or such other consecutive 12-month period over which compensation is otherwise determined under the plan (the determination period). If this is a target benefit plan, then except as otherwise elected in Section 2.5 of this amendment, for purposes of determining benefit accruals in a plan year beginning after December 31, 2001, compensation for any prior determination period shall be limited to $200,000. The cost-of-living adjustment in effect for a calendar year applies to annual compensation for the determination period that begins with or within such calendar year.

## ARTICLE VIII
## PLAN LOANS

Plan loans for owner-employees or shareholder-employees. If the plan permits loans to be made to participants, then effective for plan loans made after December 31, 2001, plan provisions prohibiting loans to any owner-employee or shareholder-employee shall cease to apply.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA    Sponsor

## ARTICLE IX
## LIMITATIONS ON CONTRIBUTIONS (IRC SECTION 415 LIMITS)

9.1    Effective date. This Section shall be effective for limitation years beginning after December 31, 2001.

9.2    Maximum annual addition. Except to the extent permitted under Article XIV of this amendment and Section 414(v) of the Code, if applicable, the annual addition that may be contributed or allocated to a participant's account under the plan for any limitation year shall not exceed the lesser of:

    a.    $40,000, as adjusted for increases in the cost-of-living under Section 415(d) of the Code, or

    b.    100 percent of the participant's compensation, within the meaning of Section 415(c)(3) of the Code, for the limitation year.

The compensation limit referred to in b. shall not apply to any contribution for medical benefits after separation from service (within the meaning of Section 401(h) or Section 419A(f)(2) of the Code) which is otherwise treated as an annual addition.

## ARTICLE X
## MODIFICATION OF TOP-HEAVY RULES

10.1    Effective date. This Article shall apply for purposes of determining whether the plan is a top-heavy plan under Section 416(g) of the Code for plan years beginning after December 31, 2001, and whether the plan satisfies the minimum benefits requirements of Section 416(c) of the Code for such years. This Article amends the top-heavy provisions of the plan.

10.2    Determination of top-heavy status.

10.2.1    Key employee. Key employee means any employee or former employee (including any deceased employee) who at any time during the plan year that includes the determination date was an officer of the employer having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code for plan years beginning after December 31, 2002), a 5-percent owner of the employer, or a 1-percent owner of the employer having annual compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code. The determination of who is a key employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

10.2.2    Determination of present values and amounts. This Section 10.2.2 shall apply for purposes of determining the present values of accrued benefits and the amounts of account balances of employees as of the determination date.

    a.    Distributions during year ending on the determination date. The present values of accrued benefits and the amounts of account balances of an employee as of the determination date shall be increased by the distributions made with respect to the employee under the plan and any plan aggregated with the plan under Section 416(g)(2) of the Code during the 1-year period ending on the determination date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

    b.    Employees not performing services during year ending on the determination date. The accrued benefits and accounts of any individual who has not performed services for the employer during the 1-year period ending on the determination date shall not be taken into account.

10.3    Minimum benefits.

10.3.1    Matching contributions. Employer matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Section 416(c)(2) of the Code and the plan. The preceding sentence shall apply with respect to matching contributions under the plan or, if the plan provides that the minimum contribution requirement will be met in another plan, such other plan. Employer matching contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Section 401(m) of the Code.

© 2001  The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA Sponsor

10.3.2 Contributions under other plans. The employer may provide, in an addendum to this amendment, that the minimum benefit requirement shall be met in another plan (including another plan that consists solely of a cash or deferred arrangement which meets the requirements of Section 401(k)(12) of the Code and matching contributions with respect to which the requirements of Section 401(m)(11) of the Code are met). The addendum should include the name of the other plan, the minimum benefit that will be provided under such other plan, and the employees who will receive the minimum benefit under such other plan.

## ARTICLE XI
## DIRECT ROLLOVERS

11.1 Effective date. This Article shall apply to distributions made after December 31, 2001.

11.2 Modification of definition of eligible retirement plan. For purposes of the direct rollover provisions of the plan, an eligible retirement plan shall also mean an annuity contract described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this plan. The definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Section 414(p) of the Code.

11.3 Modification of definition of eligible rollover distribution to exclude hardship distributions. For purposes of the direct rollover provisions of the plan, any amount that is distributed on account of hardship shall not be an eligible rollover distribution and the distributee may not elect to have any portion of such a distribution paid directly to an eligible retirement plan.

11.4 Modification of definition of eligible rollover distribution to include after-tax employee contributions. For purposes of the direct rollover provisions in the plan, a portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income. However, such portion may be transferred only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code, or to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

## ARTICLE XII
## ROLLOVERS FROM OTHER PLANS

Rollovers from other plans. The employer, operationally and on a nondiscriminatory basis, may limit the source of rollover contributions that may be accepted by this plan.

## ARTICLE XIII
## REPEAL OF MULTIPLE USE TEST

Repeal of Multiple Use Test. The multiple use test described in Treasury Regulation Section 1.401(m)-2 and the plan shall not apply for plan years beginning after December 31, 2001.

## ARTICLE XIV
## ELECTIVE DEFERRALS

14.1 Elective Deferrals - Contribution Limitation. No participant shall be permitted to have elective deferrals made under this plan, or any other qualified plan maintained by the employer during any taxable year, in excess of the dollar limitation contained in Section 402(g) of the Code in effect for such taxable year, except to the extent permitted under Article VI of this amendment and Section 414(v) of the Code, if applicable.

14.2 Maximum Salary Reduction Contributions for SIMPLE plans. If this is a SIMPLE 401(k) plan, then except to the extent permitted under Article VI of this amendment and Section 414(v) of the Code, if applicable, the maximum salary reduction contribution that can be made to this plan is the amount determined under Section 408(p)(2)(A)(ii) of the Code for the calendar year.

© 2001 The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

EGTRRA  Sponsor

## ARTICLE XV
## SAFE HARBOR PLAN PROVISIONS

Modification of Top-Heavy Rules. The top-heavy requirements of Section 416 of the Code and the plan shall not apply in any year beginning after December 31, 2001, in which the plan consists solely of a cash or deferred arrangement which meets the requirements of Section 401(k)(12) of the Code and matching contributions with respect to which the requirements of Section 401(m)(11) of the Code are met.

## ARTICLE XVI
## DISTRIBUTION UPON SEVERANCE OF EMPLOYMENT

16.1   Effective date. This Article shall apply for distributions and transactions made after December 31, 2001, regardless of when the severance of employment occurred.

16.2   New distributable event. A participant's elective deferrals, qualified nonelective contributions, qualified matching contributions, and earnings attributable to these contributions shall be distributed on account of the participant's severance from employment. However, such a distribution shall be subject to the other provisions of the plan regarding distributions, other than provisions that require a separation from service before such amounts may be distributed.

Except with respect to any election made by the employer in Article II, this amendment is hereby adopted by the prototype sponsor on behalf of all adopting employers on December 3, 2001.

*Jim O'Malley*

Sponsor Name: The Manufacturers Life Insurance Company (U.S.A.)

By: James P. O'Malley, Senior Vice President, Group Pensions

**NOTE: The employer only needs to execute this amendment if an election has been made in Article II of this amendment.**

This amendment has been executed this _____ day of _____, _____.

Name of Employer: _____

By: _____
             EMPLOYER

Name of Plan: _____

© 2001  The Manufacturers Life Insurance Company (U.S.A.)

PC2001EG

# The Manufacturers Life Insurance Company (U.S.A.)

## Plan Documents-2001
## Restated for G U S T

## Defined Contribution Plan and Trust

AMENDMENT TO
DEFINED CONTRIBUTION PLAN AND TRUST

Effective with respect to Employers adopting this prototype plan on or after July 1, 2002, Section 7.1(a) of the Plan is amended in its entirety to read as follows:

(a)　　The provisions of this Article, other than Section 7.6, shall not apply to this Plan if a separate trust agreement, that has been approved by the Internal Revenue Service for use with this Plan, is being used.

Pursuant to Section 8.1(c) of the Plan, the mass submitter of the prototype plan has made this amendment (as evidenced by the submission of the amendment to the Internal Revenue Service for inclusion with the mass submitter prototype plan) on behalf of minor modifier sponsors that received opinion letters prior to March 1, 2002, and all identical sponsors of the mass submitter prototype plan

2002 septrstC

PC2001PT (07/02)

**THE MANUFACTURERS LIFE INSURANCE COMPANY (U.S.A.)**
**DEFINED CONTRIBUTION PLAN AND TRUST**

Defined Contribution Prototype Plan

# TABLE OF CONTENTS

## ARTICLE I
### DEFINITIONS

## ARTICLE II
### ADMINISTRATION

| | | |
|---|---|---|
| 2.1 | POWERS AND RESPONSIBILITIES OF THE EMPLOYER | 12 |
| 2.2 | DESIGNATION OF ADMINISTRATIVE AUTHORITY | 12 |
| 2.3 | ALLOCATION AND DELEGATION OF RESPONSIBILITIES | 13 |
| 2.4 | POWERS AND DUTIES OF THE ADMINISTRATOR | 13 |
| 2.5 | RECORDS AND REPORTS | 14 |
| 2.6 | APPOINTMENT OF ADVISERS | 14 |
| 2.7 | INFORMATION FROM EMPLOYER | 14 |
| 2.8 | PAYMENT OF EXPENSES | 14 |
| 2.9 | MAJORITY ACTIONS | 14 |
| 2.10 | CLAIMS PROCEDURE | 14 |
| 2.11 | CLAIMS REVIEW PROCEDURE | 15 |

## ARTICLE III
### ELIGIBILITY

| | | |
|---|---|---|
| 3.1 | CONDITIONS OF ELIGIBILITY | 15 |
| 3.2 | EFFECTIVE DATE OF PARTICIPATION | 15 |
| 3.3 | DETERMINATION OF ELIGIBILITY | 15 |
| 3.4 | TERMINATION OF ELIGIBILITY | 16 |
| 3.5 | REHIRED EMPLOYEES AND BREAKS IN SERVICE | 16 |
| 3.6 | ELECTION NOT TO PARTICIPATE | 16 |
| 3.7 | CONTROL OF ENTITIES BY OWNER-EMPLOYEE | 17 |

## ARTICLE IV
### CONTRIBUTION AND ALLOCATION

| | | |
|---|---|---|
| 4.1 | FORMULA FOR DETERMINING EMPLOYER'S CONTRIBUTION | 17 |
| 4.2 | TIME OF PAYMENT OF EMPLOYER'S CONTRIBUTION | 17 |
| 4.3 | ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS | 17 |
| 4.4 | MAXIMUM ANNUAL ADDITIONS | 21 |
| 4.5 | ADJUSTMENT FOR EXCESSIVE ANNUAL ADDITIONS | 25 |
| 4.6 | ROLLOVERS | 25 |
| 4.7 | PLAN TO PLAN TRANSFERS FROM QUALIFIED PLANS | 26 |
| 4.8 | VOLUNTARY EMPLOYEE CONTRIBUTIONS | 27 |
| 4.9 | QUALIFIED VOLUNTARY EMPLOYEE CONTRIBUTIONS | 27 |
| 4.10 | DIRECTED INVESTMENT ACCOUNT | 27 |
| 4.11 | INTEGRATION IN MORE THAN ONE PLAN | 29 |
| 4.12 | QUALIFIED MILITARY SERVICE | 29 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

## ARTICLE V
## VALUATIONS

5.1   VALUATION OF THE TRUST FUND .................................................................... 29
5.2   METHOD OF VALUATION ............................................................................... 29

## ARTICLE VI
## DETERMINATION AND DISTRIBUTION OF BENEFITS

6.1   DETERMINATION OF BENEFITS UPON RETIREMENT ................................... 29
6.2   DETERMINATION OF BENEFITS UPON DEATH ............................................ 30
6.3   DETERMINATION OF BENEFITS IN EVENT OF DISABILITY ........................ 31
6.4   DETERMINATION OF BENEFITS UPON TERMINATION ............................... 31
6.5   DISTRIBUTION OF BENEFITS ........................................................................ 32
6.6   DISTRIBUTION OF BENEFITS UPON DEATH ............................................... 36
6.7   TIME OF DISTRIBUTION ................................................................................ 39
6.8   DISTRIBUTION FOR MINOR OR INCOMPETENT BENEFICIARY ................ 39
6.9   LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN ..................... 39
6.10  IN-SERVICE DISTRIBUTION ........................................................................ 39
6.11  ADVANCE DISTRIBUTION FOR HARDSHIP ................................................. 39
6.12  SPECIAL RULE FOR CERTAIN PROFIT SHARING PLANS ........................... 40
6.13  QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION ..................... 40
6.14  DIRECT ROLLOVERS ..................................................................................... 40
6.15  TRANSFER OF ASSETS FROM A MONEY PURCHASE PLAN ....................... 41
6.16  ELECTIVE TRANSFERS OF BENEFITS TO OTHER PLANS .......................... 41

## ARTICLE VII
## TRUSTEE AND CUSTODIAN

7.1   BASIC RESPONSIBILITIES OF THE TRUSTEE ............................................. 42
7.2   INVESTMENT POWERS AND DUTIES OF DISCRETIONARY TRUSTEE ........ 43
7.3   INVESTMENT POWERS AND DUTIES OF NONDISCRETIONARY TRUSTEE ... 45
7.4   POWERS AND DUTIES OF CUSTODIAN ....................................................... 46
7.5   LIFE INSURANCE ........................................................................................... 46
7.6   LOANS TO PARTICIPANTS ............................................................................ 47
7.7   MAJORITY ACTIONS ..................................................................................... 48
7.8   TRUSTEE'S COMPENSATION AND EXPENSES AND TAXES ....................... 48
7.9   ANNUAL REPORT OF THE TRUSTEE ........................................................... 48
7.10  AUDIT ............................................................................................................ 48
7.11  RESIGNATION, REMOVAL AND SUCCESSION OF TRUSTEE ..................... 49
7.12  TRANSFER OF INTEREST ............................................................................. 49
7.13  TRUSTEE INDEMNIFICATION ...................................................................... 49
7.14  EMPLOYER SECURITIES AND REAL PROPERTY ....................................... 49

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGERS

8.1   AMENDMENT .................................................................................................. 50
8.2   TERMINATION ............................................................................................... 50

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

8.3  MERGER, CONSOLIDATION OR TRANSFER OF ASSETS ................................................. 51

## ARTICLE IX
## TOP HEAVY PROVISIONS

9.1  TOP HEAVY PLAN REQUIREMENTS ................................................................. 51

9.2  DETERMINATION OF TOP HEAVY STATUS ................................................... 51

## ARTICLE X
## MISCELLANEOUS

10.1  EMPLOYER ADOPTIONS .................................................................... 52

10.2  PARTICIPANT'S RIGHTS .................................................................. 52

10.3  ALIENATION ............................................................................ 52

10.4  CONSTRUCTION OF PLAN ................................................................ 53

10.5  GENDER AND NUMBER ................................................................... 53

10.6  LEGAL ACTION ......................................................................... 53

10.7  PROHIBITION AGAINST DIVERSION OF FUNDS .......................................... 53

10.8  EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE ..................................... 54

10.9  INSURER'S PROTECTIVE CLAUSE ....................................................... 54

10.10  RECEIPT AND RELEASE FOR PAYMENTS ............................................... 54

10.11  ACTION BY THE EMPLOYER ............................................................ 54

10.12  NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY ........................... 54

10.13  HEADINGS ............................................................................ 54

10.14  APPROVAL BY INTERNAL REVENUE SERVICE ........................................... 54

10.15  UNIFORMITY .......................................................................... 55

10.16  PAYMENT OF BENEFITS ................................................................ 55

## ARTICLE XI
## PARTICIPATING EMPLOYERS

11.1  ELECTION TO BECOME A PARTICIPATING EMPLOYER ................................... 55

11.2  REQUIREMENTS OF PARTICIPATING EMPLOYERS ....................................... 55

11.3  DESIGNATION OF AGENT .............................................................. 55

11.4  EMPLOYEE TRANSFERS ................................................................. 55

11.5  PARTICIPATING EMPLOYER'S CONTRIBUTION AND FORFEITURES ....................... 55

11.6  AMENDMENT ........................................................................... 56

11.7  DISCONTINUANCE OF PARTICIPATION .................................................. 56

11.8  ADMINISTRATOR'S AUTHORITY ........................................................ 56

11.9  PARTICIPATING EMPLOYER CONTRIBUTION FOR AFFILIATE ............................ 56

## ARTICLE XII
## CASH OR DEFERRED PROVISIONS

12.1  FORMULA FOR DETERMINING EMPLOYER'S CONTRIBUTION ............................... 56

12.2  PARTICIPANT'S SALARY REDUCTION ELECTION ........................................ 57

12.3  ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS ........................ 59

12.4  ACTUAL DEFERRAL PERCENTAGE TESTS ................................................ 60

12.5  ADJUSTMENT TO ACTUAL DEFERRAL PERCENTAGE TESTS ............................... 62

12.6  ACTUAL CONTRIBUTION PERCENTAGE TESTS .......................................... 64

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

| 12.7 | ADJUSTMENT TO ACTUAL CONTRIBUTION PERCENTAGE TESTS | 66 |
| 12.8 | SAFE HARBOR PROVISIONS | 68 |
| 12.9 | ADVANCE DISTRIBUTION FOR HARDSHIP | 70 |

ARTICLE XIII
SIMPLE 401(K) PROVISIONS

| 13.1 | SIMPLE 401(k) PROVISIONS | 71 |
| 13.2 | DEFINITIONS | 71 |
| 13.3 | CONTRIBUTIONS | 71 |
| 13.4 | ELECTION AND NOTICE REQUIREMENTS | 72 |
| 13.5 | VESTING REQUIREMENTS | 72 |
| 13.6 | TOP-HEAVY RULES | 72 |
| 13.7 | NONDISCRIMINATION TESTS | 72 |

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

# ARTICLE I
## DEFINITIONS

As used in this Plan, the following words and phrases shall have the meanings set forth herein unless a different meaning is clearly required by the context:

1.1     "ACP" means the "Actual Contribution Percentage" determined pursuant to Section 12.6(e).

1.2     "Act" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.3     "ADP" means the "Actual Deferral Percentage" determined pursuant to Section 12.4(e).

1.4     "Administrator" means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer.

1.5     "Adoption Agreement" means the separate agreement which is executed by the Employer and sets forth the elective provisions of this Plan and Trust as specified by the Employer.

1.6     "Affiliated Employer" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Regulations under Code Section 414(o).

1.7     "Anniversary Date" means the last day of the Plan Year.

1.8     "Annuity Starting Date" means, with respect to any Participant, the first day of the first period for which an amount is paid as an annuity, or, in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitles the Participant to such benefit.

1.9     "Beneficiary" means the person (or entity) to whom all or a portion of a deceased Participant's interest in the Plan is payable, subject to the restrictions of Sections 6.2 and 6.6.

1.10    "Code" means the Internal Revenue Code of 1986, as amended.

1.11    "Compensation" with respect to any Participant means one of the following as elected in the Adoption Agreement:

(a)     Information required to be reported under Code Sections 6041, 6051 and 6052 (Wages, tips and other compensation as reported on Form W-2). Compensation means wages, within the meaning of Code Section 3401(a), and all other payments of compensation to an Employee by the Employer (in the course of the Employer's trade or business) for which the Employer is required to furnish the Employee a written statement under Code Sections 6041(d), 6051(a)(3) and 6052. Compensation must be determined without regard to any rules under Code Section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)).

(b)     Code Section 3401(a) Wages. Compensation means an Employee's wages within the meaning of Code Section 3401(a) for the purposes of income tax withholding at the source but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)).

(c)     415 Safe-Harbor Compensation. Compensation means wages, salaries, and fees for professional services and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan to the extent that the amounts are includible in gross income (including, but not limited to, commissions paid salespersons, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements, or other expense allowances under a nonaccountable plan (as described in Regulation 1.62-2(c))), and excluding the following:

(1)     Employer contributions to a plan of deferred compensation which are not includible in the Employee's gross income for the taxable year in which contributed, or Employer contributions under a simplified employee pension plan to the extent such contributions are excludable from the Employee's gross income, or any distributions from a plan of deferred compensation;

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(2) Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by the Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture;

(3) Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and

(4) Other amounts which receive special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement) towards the purchase of an annuity contract described in Code Section 403(b) (whether or not the contributions are actually excludable from the gross income of the Employee).

However, Compensation for any Self-Employed Individual shall be equal to Earned Income. Compensation shall include only that Compensation which is actually paid to the Participant during the determination period. Except as otherwise provided in this Plan, the determination period shall be the period elected by the Employer in the Adoption Agreement. If the Employer makes no election, the determination period shall be the Plan Year.

Notwithstanding the above, if elected in the Adoption Agreement, Compensation shall include all of the following types of elective contributions and all of the following types of deferred compensation:

(a) Elective contributions that are made by the Employer on behalf of a Participant that are not includible in gross income under Code Sections 125, 402(e)(3), 402(h)(1)(B), 403(b), and for Plan Years beginning on or after January 1, 2001 (or as of a date, no earlier than January 1, 1998, as specified in an addendum to the Adoption Agreement), 132(f)(4);

(b) Compensation deferred under an eligible deferred compensation plan within the meaning of Code Section 457(b); and

(c) Employee contributions (under governmental plans) described in Code Section 414(h)(2) that are picked up by the employing unit and thus are treated as Employer contributions.

For Plan Years beginning on or after January 1, 1989, and before January 1, 1994, the annual Compensation of each Participant taken into account for determining all benefits provided under the Plan for any Plan Year shall not exceed $200,000. This limitation shall be adjusted by the Secretary at the same time and in the same manner as under Code Section 415(d), except that the dollar increase in effect on January 1 of any calendar year is effective for Plan Years beginning in such calendar year and the first adjustment to the $200,000 limitation is effective on January 1, 1990.

For Plan Years beginning on or after January 1, 1994, Compensation in excess of $150,000 (or such other amount provided in the Code) shall be disregarded for all purposes other than for purposes of salary deferral elections. Such amount shall be adjusted by the Commissioner for increases in the cost-of-living in accordance with Code Section 401(a)(17)(B). The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If a determination period consists of fewer than twelve (12) months, the $150,000 annual Compensation limit will be multiplied by a fraction, the numerator of which is the number of months in the determination period, and the denominator of which is twelve (12).

If Compensation for any prior determination period is taken into account in determining a Participant's allocations for the current Plan Year, the Compensation for such prior determination period is subject to the applicable annual Compensation limit in effect for that prior period. For this purpose, in determining allocations in Plan Years beginning on or after January 1, 1989, the annual compensation limit in effect for determination periods beginning before that date is $200,000. In addition, in determining allocations in Plan Years beginning on or after January 1, 1994, the annual Compensation limit in effect for determination periods beginning before that date is $150,000.

Notwithstanding the foregoing, except as otherwise elected in a non-standardized Adoption Agreement, the family member aggregation rules of Code Sections 401(a)(17) and 414(q)(6) as in effect prior to the enactment of the Small Business Job Protection Act of 1996 shall not apply to this Plan effective with respect to Plan Years beginning after December 31, 1996.

If, in the Adoption Agreement, the Employer elects to exclude a class of Employees from the Plan, then Compensation for any Employee who becomes eligible or ceases to be eligible to participate during a determination period shall only include Compensation while the Employee is an Eligible Employee.

If, in connection with the adoption of any amendment, the definition of Compensation has been modified, then, except as otherwise provided herein, for Plan Years prior to the Plan Year which includes the adoption date of such amendment, Compensation means compensation determined pursuant to the terms of the Plan then in effect.

1.12 "Contract" or "Policy" means any life insurance policy, retirement income policy, or annuity contract (group or individual) issued by the Insurer. In the event of any conflict between the terms of this Plan and the terms of any contract purchased hereunder, the Plan provisions shall control.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**1.13** "**Designated Investment Alternative**" means a specific investment identified by name by the Employer (or such other Fiduciary who has been given the authority to select investment options) as an available investment under the Plan to which Plan assets may be invested by the Trustee pursuant to the investment direction of a Participant.

**1.14** "**Directed Investment Option**" means a Designated Investment Alternative and any other investment permitted by the Plan and the Participant Direction Procedures to which Plan assets may be invested pursuant to the investment direction of a Participant.

**1.15** "**Early Retirement Date**" means the date specified in the Adoption Agreement on which a Participant or Former Participant has satisfied the requirements specified in the Adoption Agreement (Early Retirement Age). If elected in the Adoption Agreement, a Participant shall become fully Vested upon satisfying such requirements if the Participant is still employed at the Early Retirement Age.

A Former Participant who separates from service after satisfying any service requirement but before satisfying the age requirement for Early Retirement Age and who thereafter reaches the age requirement contained herein shall be entitled to receive benefits under this Plan (other than any accelerated vesting and allocations of Employer Contributions) as though the requirements for Early Retirement Age had been satisfied.

**1.16** "**Earned Income**" means the net earnings from self-employment in the trade or business with respect to which the Plan is established, for which the personal services of the individual are a material income-producing factor. Net earnings will be determined without regard to items not included in gross income and the deductions allocable to such items. Net earnings are reduced by contributions made by the Employer to a qualified plan to the extent deductible under Code Section 404. In addition, net earnings shall be determined with regard to the deduction allowed to the taxpayer by Code Section 164(f), for taxable years beginning after December 31, 1989.

**1.17** "**Elective Deferrals**" means the Employer's contributions to the Plan that are made pursuant to a Participant's deferral election pursuant to Section 12.2, excluding any such amounts distributed as "excess annual additions" pursuant to Section 4.5. Elective Deferrals shall be subject to the requirements of Sections 12.2(b) and 12.2(c) and shall, except as otherwise provided herein, be required to satisfy the nondiscrimination requirements of Regulation 1.401(k)-1(b)(2), the provisions of which are specifically incorporated herein by reference.

**1.18** "**Eligible Employee**" means any Eligible Employee as elected in the Adoption Agreement and as provided herein. With respect to a non-standardized Adoption Agreement, an individual shall not be an "Eligible Employee" if such individual is not reported on the payroll records of the Employer as a common law employee. In particular, it is expressly intended that individuals not treated as common law employees by the Employer on its payroll records are not "Eligible Employees" and are excluded from Plan participation even if a court or administrative agency determines that such individuals are common law employees and not independent contractors. Furthermore, with respect to a non-standardized Adoption Agreement. Employees of an Affiliated Employer will not be treated as "Eligible Employees" prior to the date the Affiliated Employer adopts the Plan as a Participating Employer.

Except as otherwise provided in this paragraph, if the Employer does not elect in the Adoption Agreement to include Employees who became Employees as the result of a "Code Section 410(b)(6)(C) transaction, then such Employees will only be "Eligible Employees" after the expiration of the transition period beginning on the date of the transaction and ending on the last day of the first Plan Year beginning after the date of the transaction. A "Code Section 410(b)(6)(C) transaction" is an asset or stock acquisition, merger, or similar transaction involving a change in the Employer of the Employees of a trade or business that is subject to the special rules set forth in Code Section 410(b)(6)(C). However, regardless of any election made in the Adoption Agreement, if a separate entity becomes an Affiliate Employer as the result of a "Code Section 410(b)(6)(C) transaction," then Employees of such separate entity will not be treated as "Eligible Employees" prior to the date the entity adopts the Plan as a Participating Employer or, with respect to a standardized Adoption Agreement, if earlier, the expiration of the transition period set forth above.

If, in the Adoption Agreement, the Employer elects to exclude union employees, then Employees whose employment is governed by a collective bargaining agreement between the Employer and "employee representatives" under which retirement benefits were the subject of good faith bargaining and if two percent (2%) or less of the Employees covered pursuant to that agreement are professionals as defined in Regulation 1.410(b)-9, shall not be eligible to participate in this Plan. For this purpose, the term "employee representatives" does not include any organization more than half of whose members are employees who are owners, officers, or executives of the Employer.

If, in the Adoption Agreement, the Employer elects to exclude non-resident aliens, then Employees who are non-resident aliens (within the meaning of Code Section 7701(b)(1)(B)) who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)) shall not be eligible to participate in this Plan.

**1.19** "**Employee**" means any person who is employed by the Employer. The term "Employee" shall also include any person who is an employee of an Affiliated Employer and any Leased Employee deemed to be an Employee as provided in Code Section 414(n) or (o).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

 **1.20**   "**Employer**" means the entity specified in the Adoption Agreement, any successor which shall maintain this Plan and any predecessor which has maintained this Plan. In addition, unless the context means otherwise, the term "Employer" shall include any Participating Employer (as defined in Section 11.1) which shall adopt this Plan.

 **1.21**   "**Excess Aggregate Contributions**" means, with respect to any Plan Year, the excess of:

  (a)   The aggregate "Contribution Percentage Amounts" (as defined in Section 12.6) actually made on behalf of Highly Compensated Participants for such Plan Year and taken into account in computing the numerator of the ACP, over

  (b)   The maximum "Contribution Percentage Amounts" permitted by the ACP test in Section 12.6 (determined by reducing contributions made on behalf of Highly Compensated Participants in order of their "Contribution Percentages" beginning with the highest of such percentages).

  Such determination shall be made after first taking into account corrections of any Excess Deferrals pursuant to Section 12.2 and then taking into account adjustments of any Excess Contributions pursuant to Section 12.5.

 **1.22**   "**Excess Compensation**" means, with respect to a Plan that is integrated with Social Security (permitted disparity), a Participant's Compensation which is in excess of the integration level elected in the Adoption Agreement.

  However, if Compensation is based on less than a twelve (12) month determination period. Excess Compensation shall be determined by reducing the integration level by a fraction, the numerator of which is the number of full months in the short period and the denominator of which is twelve (12).

 **1.23**   "**Excess Contributions**" means, with respect to any Plan Year, the excess of:

  (a)   The aggregate amount of Employer contributions actually made on behalf of Highly Compensated Participants for such Plan Year and taken into account in computing the numerator of the ADP, over

  (b)   The maximum amount of such contributions permitted by the ADP test in Section 12.4 (determined by hypothetically reducing contributions made on behalf of Highly Compensated Participants in order of the actual deferral ratios, beginning with the highest of such ratios).

  In determining the amount of Excess Contributions to be distributed and/or recharacterized with respect to an affected Highly Compensated Participant as determined herein, such amount shall be reduced by any Excess Deferrals previously distributed to such affected Highly Compensated Participant for the Participant's taxable year ending with or within such Plan Year.

 **1.24**   "**Excess Deferrals**" means, with respect to any taxable year of a Participant, those elective deferrals (within the meaning of Code Section 402(g)) that are includible in the Participant's gross income under Code Section 402(g) to the extent such Participant's elective deferrals for the taxable year exceed the dollar limitation under such Code Section. Excess Deferrals shall be treated as an "Annual Addition" pursuant to Section 4.4 when contributed to the Plan unless distributed to the affected Participant not later than the first April 15th following the close of the Participant's taxable year in which the Excess Deferral was made. Additionally, for purposes of Sections 4.3(f) and 9.2, Excess Deferrals shall continue to be treated as Employer contributions even if distributed pursuant to Section 12.2(e). However, Excess Deferrals of Non-Highly Compensated Participants are not taken into account for purposes of Section 12.4.

 **1.25**   "**Fiduciary**" means any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

 **1.26**   "**Fiscal Year**" means the Employer's accounting year.

 **1.27**   "**Forfeiture**" means, with respect to a Former Participant who has severed employment, that portion of the Participant's Account that is not Vested. Unless otherwise elected in the Adoption Agreement, Forfeitures occur pursuant to (a) below.

  (a)   A Forfeiture will occur on the earlier of:

  (1)   The last day of the Plan Year in which a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service, or

  (2)   The distribution of the entire Vested portion of the Participant's Account of a Former Participant who has severed employment with the Employer. For purposes of this provision, if the Former Participant has

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

a Vested benefit of zero, then such Former Participant shall be deemed to have received a distribution of such Vested benefit as of the year in which the severance of employment occurs.

(b)    If elected in the Adoption Agreement, a Forfeiture will occur as of the last day of the Plan Year in which the Former Participant incurs five (5) 1-Year Breaks in Service.

Regardless of the preceding provisions, if a Former Participant is eligible to share in the allocation of Employer contributions or Forfeitures in the year in which the Forfeiture would otherwise occur, then the Forfeiture will not occur until the end of the first Plan Year for which the Former Participant is not eligible to share in the allocation of Employer contributions or Forfeitures. Furthermore, the term "Forfeiture" shall also include amounts deemed to be Forfeitures pursuant to any other provision of this Plan.

1.28    "Former Participant" means a person who has been a Participant, but who has ceased to be a Participant for any reason.

1.29    "414(s) Compensation" means any definition of compensation that satisfies the nondiscrimination requirements of Code Section 414(s) and the Regulations thereunder. The period for determining 414(s) Compensation must be either the Plan Year or the calendar year ending with or within the Plan Year. An Employer may further limit the period taken into account to that part of the Plan Year or calendar year in which an Employee was a Participant in the component of the Plan being tested. The period used to determine 414(s) Compensation must be applied uniformly to all Participants for the Plan Year.

1.30    "415 Compensation" means, with respect to any Participant, such Participant's (a) Wages, tips and other compensation on Form W-2, (b) Section 3401(a) wages or (c) 415 safe-harbor compensation as elected in the Adoption Agreement for purposes of Compensation. 415 Compensation shall be based on the full Limitation Year regardless of when participation in the Plan commences. Furthermore, regardless of any election made in the Adoption Agreement, with respect to Limitation Years beginning after December 31, 1997, 415 Compensation shall include any elective deferral (as defined in Code Section 402(g)(3)) and any amount which is contributed or deferred by the Employer at the election of the Participant and which is not includible in the gross income of the Participant by reason of Code Section 125, 457, and, for Limitation Years beginning on or after January 1, 2001 (or as of a date, no earlier than January 1, 1998, as specified in an addendum to the Adoption Agreement), 132(f)(4). For Limitation Years beginning prior to January 1, 1998, 415 Compensation shall exclude such amounts.

Except as otherwise provided herein, if, in connection with the adoption of any amendment, the definition of 415 Compensation has been modified, then for Plan Years prior to the Plan Year which includes the adoption date of such amendment, 415 Compensation means compensation determined pursuant to the terms of the Plan then in effect.

1.31    "Highly Compensated Employee" means, effective for Plan Years beginning after December 31, 1996, an Employee described in Code Section 414(q) and the Regulations thereunder, and generally means any Employee who:

(a)    was a "five percent (5%) owner" as defined in Section 1.37(c) at any time during the "determination year" or the "look-back year"; or

(b)    for the "look-back year" had 415 Compensation from the Employer in excess of $80,000 and, if elected in the Adoption Agreement, was in the Top-Paid Group for the "look-back year". The $80,000 amount is adjusted at the same time and in the same manner as under Code Section 415(d), except that the base period is the calendar quarter ending September 30, 1996.

The "determination year" means the Plan Year for which testing is being performed and the "look-back year" means the immediately preceding twelve (12) month period. However, if the calendar year data election is made in the Adoption Agreement, for purposes of (b) above, the "look-back year" shall be the calendar year beginning within the twelve (12) month period immediately preceding the "determination year." Notwithstanding the preceding sentence, if the calendar year data election is effective with respect to a Plan Year beginning in 1997, then for such Plan Year the "look-back year" shall be the calendar year ending with or within the Plan Year for which testing is being performed, and the "determination year" shall be the period of time, if any, which extends beyond the "look-back year" and ends on the last day of the Plan Year for which testing is being performed.

A highly compensated former employee is based on the rules applicable to determining highly compensated employee status as in effect for that "determination year," in accordance with Regulation 1.414(q)-1T, A-4 and IRS Notice 97-45 (or any superseding guidance).

In determining whether an employee is a Highly Compensated Employee for a Plan Year beginning in 1997, the amendments to Code Section 414(q) stated above are treated as having been in effect for years beginning in 1996.

For purposes of this Section, for Plan Years beginning prior to January 1, 1998, the determination of 415 Compensation shall be made by including amounts that would otherwise be excluded from a Participant's gross income by reason of the application of Code Sections 125, 402(e)(3), 402(h)(1)(B) and, for Plan Years beginning on or after January 1, 2001 (or as of a date, no earlier than January 1, 1998, as specified in an addendum to the Adoption Agreement), 132(f)(4), and, in the case of Employer contributions made pursuant to a salary reduction agreement, Code Section 403(b).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

In determining who is a Highly Compensated Employee, Employees who are non-resident aliens and who received no earned income (within the meaning of Code Section 911(d)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. Additionally, all Affiliated Employers shall be taken into account as a single employer and Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) shall be considered Employees unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and are not covered in any qualified plan maintained by the Employer. The exclusion of Leased Employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans.

1.32 "**Highly Compensated Participant**" means any Highly Compensated Employee who is eligible to participate in the component of the Plan being tested.

1.33 "**Hour of Service**" means (1) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for the performance of duties during the applicable computation period (these hours will be credited to the Employee for the computation period in which the duties are performed); (2) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer (irrespective of whether the employment relationship has terminated) for reasons other than performance of duties (such as vacation, holidays, sickness, incapacity (including disability), jury duty, lay-off, military duty or leave of absence) during the applicable computation period (these hours will be calculated and credited pursuant to Department of Labor regulation 2530.200b-2 which is incorporated herein by reference); (3) each hour for which back pay is awarded or agreed to by the Employer without regard to mitigation of damages (these hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made). The same Hours of Service shall not be credited both under (1) or (2), as the case may be, and under (3).

Notwithstanding (2) above, (i) no more than 501 Hours of Service are required to be credited to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (ii) an hour for which an Employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workers' compensation, or unemployment compensation or disability insurance laws; and (iii) Hours of Service are not required to be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee. Furthermore, for purposes of (2) above, a payment shall be deemed to be made by or due from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund or insurer, to which the Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer, or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

Hours of Service will be credited for employment with all Affiliated Employers and for any individual considered to be a Leased Employee pursuant to Code Section 414(n) or 414(o) and the Regulations thereunder. Furthermore, the provisions of Department of Labor regulations 2530.200b-2(b) and (c) are incorporated herein by reference.

Hours of Service will be determined on the basis of the method elected in the Adoption Agreement.

1.34 "**Insurer**" means any legal reserve insurance company which has issued or shall issue one or more Contracts or Policies under the Plan.

1.35 "**Investment Manager**" means a Fiduciary as described in Act Section 3(38).

1.36 "**Joint and Survivor Annuity**" means an annuity for the life of a Participant with a survivor annuity for the life of the Participant's spouse which is not less than fifty percent (50%), nor more than one-hundred percent (100%) of the amount of the annuity payable during the joint lives of the Participant and the Participant's spouse which can be purchased with the Participant's Vested interest in the Plan reduced by any outstanding loan balances pursuant to Section 7.6.

1.37 "**Key Employee**" means an Employee as defined in Code Section 416(i) and the Regulations thereunder. Generally, any Employee or former Employee (as well as each of such Employee's or former Employee's Beneficiaries) is considered a Key Employee if, the individual at any time during the Plan Year that contains the "Determination Date" (as defined in Section 9.2(c)) or any of the preceding four (4) Plan Years, has been included in one of the following categories:

(a) an officer of the Employer (as that term is defined within the meaning of the Regulations under Code Section 416) having annual 415 Compensation greater than fifty percent (50%) of the amount in effect under Code Section 415(b)(1)(A) for any such Plan Year;

(b) one of the ten Employees having annual 415 Compensation from the Employer for a Plan Year greater than the dollar limitation in effect under Code Section 415(c)(1)(A) for the calendar year in which such Plan Year ends and owning (or considered as owning within the meaning of Code Section 318) both more than one-half percent (1/2%) interest and the largest interests in the Employer;

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(c)    a "five percent (5%) owner" of the Employer. "Five percent (5%) owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent (5%) of the value of the outstanding stock of the Employer or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than five percent (5%) of the capital or profits interest in the Employer; and

(d)    a "one percent (1%) owner" of the Employer having annual 415 Compensation from the Employer of more than $150,000. "One percent (1%) owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent (1%) of the value of the outstanding stock of the Employer or stock possessing more than one percent (1%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than one percent (1%) of the capital or profits interest in the Employer.

In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers. In determining whether an individual has 415 Compensation of more than $150,000, 415 Compensation from each employer required to be aggregated under Code Sections 414(b), (c), (m) and (o) shall be taken into account. Furthermore, for purposes of this Section, for Plan Years beginning prior to January 1, 1998, the determination of 415 Compensation shall be made by including amounts that would otherwise be excluded from a Participant's gross income by reason of the application of Code Sections 125, 402(e)(3), 402(h)(1)(B) and, for Plan Years beginning on or after January 1, 2001 (or as of a date, no earlier than January 1, 1998, as specified in an addendum to the Adoption Agreement), 132(f)(4), and, in the case of Employer contributions made pursuant to a salary reduction agreement, Code Section 403(b).

**1.38**    "Late Retirement Date" means the date of, or the first day of the month or the Anniversary Date coinciding with or next following, whichever corresponds to the election in the Adoption Agreement for the Normal Retirement Date, a Participant's actual retirement after having reached the Normal Retirement Date.

**1.39**    "Leased Employee" means, effective with respect to Plan Years beginning on or after January 1, 1997, any person (other than an Employee of the recipient Employer) who, pursuant to an agreement between the recipient Employer and any other person or entity ("leasing organization"), has performed services for the recipient (or for the recipient and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the recipient Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer. Furthermore, Compensation for a Leased Employee shall only include Compensation from the leasing organization that is attributable to services performed for the recipient Employer.

A Leased Employee shall not be considered an employee of the recipient Employer if: (a) such employee is covered by a money purchase pension plan providing: (1) a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, as defined in Code Section 415(c)(3), but for Plan Years beginning prior to January 1, 1998, including amounts contributed pursuant to a salary reduction agreement which are excludable from the employee's gross income under Code Sections 125, 402(e)(3), 402(h)(1)(B), 403(b), or for Plan Years beginning on or after January 1, 2001 (or as of a date, no earlier than January 1, 1998, as specified in an addendum to the Adoption Agreement), 132(f)(4), (2) immediate participation, and (3) full and immediate vesting; and (b) leased employees do not constitute more than twenty percent (20%) of the recipient Employer's nonhighly compensated workforce.

**1.40**    "Limitation Year" means the determination period used to determine Compensation. However, the Employer may elect a different Limitation Year in the Adoption Agreement or by adopting a written resolution to such effect. All qualified plans maintained by the Employer must use the same Limitation Year. Furthermore, unless there is a change to a new Limitation Year, the Limitation Year will be a twelve (12) consecutive month period. In the case of an initial Limitation Year, the Limitation Year will be the twelve (12) consecutive month period ending on the last day of the period specified in the Adoption Agreement (or written resolution). If the Limitation Year is amended to a different twelve (12) consecutive month period, the new "Limitation Year" must begin on a date within the "Limitation Year" in which the amendment is made.

**1.41**    "Net Profit" means, with respect to any Fiscal Year, the Employer's net income or profit for such Fiscal Year determined upon the basis of the Employer's books of account in accordance with generally accepted accounting principles, without any reduction for taxes based upon income, or for contributions made by the Employer to this Plan and any other qualified plan.

**1.42**    "Non-Elective Contribution" means the Employer's contributions to the Plan other than Elective Deferrals, any Qualified Non-Elective Contributions and any Qualified Matching Contributions. Employer matching contributions which are not Qualified Matching Contributions shall be considered a Non-Elective Contribution for purposes of the Plan.

**1.43**    "Non-Highly Compensated Participant" means any Participant who is not a Highly Compensated Employee. However, if pursuant to Sections 12.4 or 12.6 the prior year testing method is used to calculate the ADP or the ACP, a Non-Highly Compensated Participant shall be determined using the definition of Highly Compensated Employee in effect for the preceding Plan Year.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

1.44    "Non-Key Employee" means any Employee or former Employee (and such Employee's or former Employee's Beneficiaries) who is not, and has never been, a Key Employee.

1.45    "Normal Retirement Age" means the age elected in the Adoption Agreement at which time a Participant's Account shall be nonforfeitable (if the Participant is employed by the Employer on or after that date).

1.46    "Normal Retirement Date" means the date elected in the Adoption Agreement.

1.47    "1-Year Break in Service" means, if the Hour of Service Method is elected in the Adoption Agreement, the applicable computation period during which an Employee or former Employee has not completed more than 500 Hours of Service. Further, solely for the purpose of determining whether an Employee has incurred a 1-Year Break in Service, Hours of Service shall be recognized for "authorized leaves of absence" and "maternity and paternity leaves of absence. For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefore is necessary to prevent the Employee from incurring a 1-Year Break in Service, or, in any other case, in the immediately following computation period. The Hours of Service credited for a "maternity or paternity leave of absence" shall be those which would normally have been credited but for such absence, or, in any case in which the Administrator is unable to determine such hours normally credited, eight (8) Hours of Service per day. The total Hours of Service required to be credited for a "maternity or paternity leave of absence" shall not exceed the number of Hours of Service needed to prevent the Employee from incurring a 1-Year Break in Service.

"Authorized leave of absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established nondiscriminatory policy, whether occasioned by illness, military service, or any other reason.

A "maternity or paternity leave of absence" means an absence from work for any period by reason of the Employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement.

If the Elapsed Time Method is elected in the Adoption Agreement, a 1-Year Break in Service" means a twelve (12) consecutive month period beginning on the severance from service date or any anniversary thereof and ending on the next succeeding anniversary of such date; provided, however, that the Employee or former Employee does not perform an Hour of Service for the Employer during such twelve (12) consecutive month period.

1.48    "Owner-Employee" means a sole proprietor who owns the entire interest in the Employer or a partner (or member in the case of a limited liability company treated as a partnership or sole proprietorship for federal income tax purposes) who owns more than ten percent (10%) of either the capital interest or the profits interest in the Employer and who receives income for personal services from the Employer.

1.49    "Participant" means any Eligible Employee who has satisfied the requirements of Section 3.2 and has not for any reason become ineligible to participate further in the Plan.

1.50    "Participant Directed Account" means that portion of a Participant's interest in the Plan with respect to which the Participant has directed the investment in accordance with the Participant Direction Procedures.

1.51    "Participant Direction Procedures" means such instructions, guidelines or policies, the terms of which are incorporated herein, as shall be established pursuant to Section 4.10 and observed by the Administrator and applied and provided to Participants who have Participant Directed Accounts.

1.52    "Participant's Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's total interest under the Plan resulting from (a) the Employer's contributions in the case of a Profit Sharing Plan or Money Purchase Plan, and (b) the Employer's Non-Elective Contributions in the case of a 401(k) Profit Sharing Plan. Separate accountings shall be maintained with respect to that portion of a Participant's Account attributable to Employer matching contributions and to Employer discretionary contributions made pursuant to Section 12.1(a)(3).

1.53    "Participant's Combined Account" means the total aggregate amount of a Participant's interest under the Plan resulting from Employer contributions (including Elective Deferrals).

1.54    "Participant's Elective Deferral Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's total interest in the Plan resulting from Elective Deferrals. Amounts in the Participant's Elective Deferral Account are nonforfeitable when made and are subject to the distribution restrictions of Section 12.2(c).

1.55    "Participant's Rollover Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's interest in the Plan resulting from amounts transferred from another qualified plan or "conduit" Individual Retirement Account in accordance with Section 4.6.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**1.56** **"Participant's Transfer Account"** means the account established and maintained by the Administrator for each Participant with respect to the total interest in the Plan resulting from amounts transferred to this Plan from a direct plan-to-plan transfer in accordance with Section 4.7.

**1.57** **"Period of Service"** means the aggregate of all periods commencing with an Employee's first day of employment or reemployment with the Employer or an Affiliated Employer and ending on the first day of a Period of Severance. The first day of employment or reemployment is the first day the Employee performs an Hour of Service. An Employee will also receive partial credit for any Period of Severance of less than twelve (12) consecutive months. Fractional periods of a year will be expressed in terms of days.

Periods of Service with any Affiliated Employer shall be recognized. Furthermore, Periods of Service with any predecessor employer that maintained this Plan shall be recognized. Periods of Service with any other predecessor employer shall be recognized as elected in the Adoption Agreement.

In determining Periods of Service for purposes of vesting under the Plan, Periods of Service will be excluded as elected in the Adoption Agreement and as specified in Section 3.5.

In the event the method of crediting service is amended from the Hour of Service Method to the Elapsed Time Method, an Employee will receive credit for a Period of Service consisting of:

(a) A number of years equal to the number of Years of Service credited to the Employee before the computation period during which the amendment occurs: and

(b) The greater of (1) the Periods of Service that would be credited to the Employee under the Elapsed Time Method for service during the entire computation period in which the transfer occurs or (2) the service taken into account under the Hour of Service Method as of the date of the amendment.

In addition, the Employee will receive credit for service subsequent to the amendment commencing on the day after the last day of the computation period in which the transfer occurs.

**1.58** **"Period of Severance"** means a continuous period of time during which an Employee is not employed by the Employer. Such period begins on the date the Employee retires, quits or is discharged, or if earlier, the twelve (12) month anniversary of the date on which the Employee was otherwise first absent from service.

In the case of an individual who is absent from work for "maternity or paternity" reasons, the twelve (12) consecutive month period beginning on the first anniversary of the first day of such absence shall not constitute a one year Period of Severance. For purposes of this paragraph, an absence from work for "maternity or paternity" reasons means an absence (a) by reason of the pregnancy of the individual, (b) by reason of the birth of a child of the individual, (c) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (d) for purposes of caring for such child for a period beginning immediately following such birth or placement.

**1.59** **"Plan"** means this instrument (hereinafter referred to as The Manufacturers Life Insurance Company (U.S.A.) Defined Contribution Plan and Trust Basic Plan Document #01) and the Adoption Agreement as adopted by the Employer, including all amendments thereto and any addendum which is specifically permitted pursuant to the terms of the Plan.

**1.60** **"Plan Year"** means the Plan's accounting year as specified in the Adoption Agreement. Unless there is a Short Plan Year, the Plan Year will be a twelve-consecutive month period.

**1.61** **"Pre-Retirement Survivor Annuity"** means an immediate annuity for the life of a Participant's spouse, the payments under which must be equal to the benefit which can be provided with the percentage, as specified in the Adoption Agreement, of the Participant's Vested interest in the Plan as of the date of death. If no election is made in the Adoption Agreement, the percentage shall be equal to fifty percent (50%). Furthermore, if less than one hundred percent (100%) of the Participant's Vested interest in the Plan is used to provide the Pre-Retirement Survivor Annuity, a proportionate share of each of the Participant's accounts shall be used to provide the Pre-Retirement Survivor Annuity.

**1.62** **"Qualified Matching Contribution"** means any Employer matching contributions that are made pursuant to Sections 12.1(a)(2) if elected in the Adoption Agreement, 12.5 and 12.7.

**1.63** **"Qualified Matching Contribution Account"** means the account established hereunder to which Qualified Matching Contributions are allocated. Amounts in the Qualified Matching Contribution Account are nonforfeitable when made and are subject to the distribution restrictions of Section 12.2(c).

**1.64** **"Qualified Non-Elective Contribution"** means the Employer's contributions to the Plan that are made pursuant to Sections 12.1(a)(4) if elected in the Adoption Agreement, 12.5 and 12.7.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

**1.65** "**Qualified Non-Elective Contribution Account**" means the account established hereunder to which Qualified Non-Elective Contributions are allocated. Amounts in the Qualified Non-Elective Contribution Account are nonforfeitable when made and are subject to the distribution restrictions of Section 12.2(c).

**1.66** "**Qualified Voluntary Employee Contribution Account**" means the account established hereunder to which a Participant's tax deductible qualified voluntary employee contributions made pursuant to Section 4.9 are allocated.

**1.67** "**Regulation**" means the Income Tax Regulations as promulgated by the Secretary of the Treasury or a delegate of the Secretary of the Treasury, and as amended from time to time.

**1.68** "**Retired Participant**" means a person who has been a Participant, but who has become entitled to retirement benefits under the Plan.

**1.69** "**Retirement Date**" means the date as of which a Participant retires for reasons other than Total and Permanent Disability, regardless of whether such retirement occurs on a Participant's Normal Retirement Date, Early Retirement Date or Late Retirement Date (see Section 6.1).

**1.70** "**Self-Employed Individual**" means an individual who has Earned Income for the taxable year from the trade or business for which the Plan is established, and, also, an individual who would have had Earned Income but for the fact that the trade or business had no net profits for the taxable year. A Self-Employed Individual shall be treated as an Employee.

**1.71** "**Shareholder-Employee**" means a Participant who owns (or is deemed to own pursuant to Code Section 318(a)(1)) more than five percent (5%) of the Employer's outstanding capital stock during any year in which the Employer elected to be taxed as a Small Business Corporation (S Corporation) under the applicable Code sections relating to Small Business Corporations.

**1.72** "**Short Plan Year**" means, if specified in the Adoption Agreement, a Plan Year of less than a twelve (12) month period. If there is a Short Plan Year, the following rules shall apply in the administration of this Plan. In determining whether an Employee has completed a Year of Service (or Period of Service if the Elapsed Time Method is used) for benefit accrual purposes in the Short Plan Year, the number of the Hours of Service (or months of service if the Elapsed Time Method is used) required shall be proportionately reduced based on the number of days (or months) in the Short Plan Year. The determination of whether an Employee has completed a Year of Service (or Period of Service) for vesting and eligibility purposes shall be made in accordance with Department of Labor regulation 2530.203-2(c). In addition, if this Plan is integrated with Social Security, then the integration level shall be proportionately reduced based on the number of months in the Short Plan Year.

**1.73** "**Super Top Heavy Plan**" means a plan which would be a Top Heavy Plan if sixty percent (60%) is replaced with ninety percent (90%) in Section 9.2(a). However, effective as of the first Plan Year beginning after December 31, 1999, no Plan shall be considered a Super Top Heavy Plan.

**1.74** "**Taxable Wage Base**" means, with respect to any Plan Year, the contribution and benefit base under Section 230 of the Social Security Act at the beginning of such Plan Year.

**1.75** "**Terminated Participant**" means a person who has been a Participant, but whose employment has been terminated other than by death, Total and Permanent Disability or retirement.

**1.76** "**Top Heavy Plan**" means a plan described in Section 9.2(a).

**1.77** "**Top Heavy Plan Year**" means a Plan Year commencing after December 31, 1983, during which the Plan is a Top Heavy Plan.

**1.78** "**Top-Paid Group**" shall be determined pursuant to Code Section 414(q) and the Regulations thereunder and generally means the top twenty percent (20%) of Employees who performed services for the Employer during the applicable year, ranked according to the amount of 415 Compensation received from the Employer during such year. All Affiliated Employers shall be taken into account as a single employer, and Leased Employees shall be treated as Employees if required pursuant to Code Section 414(n) or (o). Employees who are non-resident aliens who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. Furthermore, for the purpose of determining the number of active Employees in any year, the following additional Employees may also be excluded, however, such Employees shall still be considered for the purpose of identifying the particular Employees in the Top-Paid Group:

    (a)    Employees with less than six (6) months of service;

    (b)    Employees who normally work less than 17 1/2 hours per week;

    (c)    Employees who normally work less than six (6) months during a year; and

    (d)    Employees who have not yet attained age twenty-one (21).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

In addition, if ninety percent (90%) or more of the Employees of the Employer are covered under agreements the Secretary of Labor finds to be collective bargaining agreements between Employee representatives and the Employer, and the Plan covers only Employees who are not covered under such agreements, then Employees covered by such agreements shall be excluded from both the total number of active Employees as well as from the identification of particular Employees in the Top-Paid Group.

The foregoing exclusions set forth in this Section shall be applied on a uniform and consistent basis for all purposes for which the Code Section 414(q) definition is applicable. Furthermore, in applying such exclusions, the Employer may substitute any lesser service, hours or age.

1.79    "Total and Permanent Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months. The disability of a Participant shall be determined by a licensed physician chosen by the Administrator. However, if the condition constitutes total disability under the federal Social Security Acts, the Administrator may rely upon such determination that the Participant is Totally and Permanently Disabled for the purposes of this Plan. The determination shall be applied uniformly to all Participants.

1.80    "Trustee" means the person or entity named in the Adoption Agreement, or any successors thereto.

If the sponsor of this prototype is a bank, savings and loan, trust company, credit union or similar institution, a person or entity other than the prototype sponsor (or its affiliates or subsidiaries) may not serve as Trustee without the written consent of the sponsor.

1.81    "Trust Fund" means the assets of the Plan and Trust as the same shall exist from time to time.

1.82    "Valuation Date" means the date or dates specified in the Adoption Agreement. Regardless of any election to the contrary, the Valuation Date shall include the Anniversary Date and may include any other date or dates deemed necessary or appropriate by the Administrator for the valuation of Participants' Accounts during the Plan Year, which may include any day that the Trustee, any transfer agent appointed by the Trustee or the Employer, or any stock exchange used by such agent, are open for business.

1.83    "Vested" means the nonforfeitable portion of any account maintained on behalf of a Participant.

1.84    "Voluntary Contribution Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's total interest in the Plan resulting from the Participant's after-tax voluntary Employee contributions made pursuant to Section 4.7.

Amounts recharacterized as after-tax voluntary Employee contributions pursuant to Section 12.5 shall remain subject to the limitations of Section 12.2. Therefore, a separate accounting shall be maintained with respect to that portion of the Voluntary Contribution Account attributable to after-tax voluntary Employee contributions made pursuant to Section 4.8.

1.85    "Year of Service" means the computation period of twelve (12) consecutive months, herein set forth, and during which an Employee has completed at least 1,000 Hours of Service (unless a lower number of Hours of Service is specified in the Adoption Agreement).

For purposes of eligibility for participation, the initial computation period shall begin with the date on which the Employee first performs an Hour of Service (employment commencement date). The initial computation period beginning after a 1-Year Break in Service shall be measured from the date on which an Employee again performs an Hour of Service. Unless otherwise elected in the Adoption Agreement, the succeeding computation periods shall begin on the anniversary of the Employee's employment commencement date. However, unless otherwise elected in the Adoption Agreement, if one (1) Year of Service or less is required as a condition of eligibility, then the computation period after the initial computation period shall shift to the current Plan Year which includes the anniversary of the date on which the Employee first performed an Hour of Service, and subsequent computation periods shall be the Plan Year. If there is a shift to the Plan Year, an Employee who is credited with the number of Hours of Service to be credited with a Year of Service in both the initial eligibility computation period and the first Plan Year which commences prior to the first anniversary of the Employee's initial eligibility computation period will be credited with two (2) Years of Service for purposes of eligibility to participate.

If two (2) Years of Service are required as a condition of eligibility, a Participant will only have completed two (2) Years of Service for eligibility purposes upon completing two (2) consecutive Years of Service without an intervening 1-Year Break-in-Service.

For vesting purposes, and all other purposes not specifically addressed in this Section, the computation period shall be the period elected in the Adoption Agreement. If no election is made in the Adoption Agreement, the computation period shall be the Plan Year.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

In determining Years of Service for purposes of vesting under the Plan. Years of Service will be excluded as elected in the Adoption Agreement and as specified in Section 3.5.

Years of Service and 1-Year Breaks in Service for eligibility purposes will be measured on the same eligibility computation period. Years of Service and 1-Year Breaks in Service for vesting purposes will be measured on the same vesting computation period.

Years of Service with any Affiliated Employer shall be recognized. Furthermore. Years of Service with any predecessor employer that maintained this Plan shall be recognized. Years of Service with any other predecessor employer shall be recognized as elected in the Adoption Agreement.

In the event the method of crediting service is amended from the Elapsed Time Method to the Hour of Service Method. an Employee will receive credit for Years of Service equal to:

(a) The number of Years of Service equal to the number of 1-year Periods of Service credited to the Employee as of the date of the amendment; and

(b) In the computation period which includes the date of the amendment. a number of Hours of Service (using the Hours of Service equivalency method elected in the Adoption Agreement) to any fractional part of a year credited to the Employee under this Section as of the date of the amendment.

## ARTICLE II
## ADMINISTRATION

### 2.1     POWERS AND RESPONSIBILITIES OF THE EMPLOYER

(a) In addition to the general powers and responsibilities otherwise provided for in this Plan. the Employer shall be empowered to appoint and remove the Trustee and the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of the Plan, the Code, and the Act. The Employer may appoint counsel, specialists, advisers, agents (including any nonfiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan. The Employer may compensate such agents or advisers from the assets of the Plan as fiduciary expenses (but not including any business (settlor) expenses of the Employer), to the extent not paid by the Employer.

(b) The Employer shall establish a "funding policy and method. i.e., it shall determine whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need, or shall appoint a qualified person to do so. If the Trustee has discretionary authority, the Employer or its delegate shall communicate such needs and goals to the Trustee, who shall coordinate such Plan needs with its investment policy. The communication of such a "funding policy and method" shall not, however, constitute a directive to the Trustee as to the investment of the Trust Funds. Such "funding policy and method" shall be consistent with the objectives of this Plan and with the requirements of Title I of the Act.

(c) The Employer may appoint. at its option, an Investment Manager, investment adviser, or other agent to provide direction to the Trustee with respect to any or all of the Plan assets. Such appointment shall be given by the Employer in writing in a form acceptable to the Trustee and shall specifically identify the Plan assets with respect to which the Investment Manager or other agent shall have the authority to direct the investment.

(d) The Employer shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designated by the Employer. through day-to-day conduct and evaluation, or through other appropriate ways.

### 2.2     DESIGNATION OF ADMINISTRATIVE AUTHORITY

The Employer may appoint one or more Administrators. If the Employer does not appoint an Administrator. the Employer will be the Administrator. Any person, including, but not limited to, the Employees of the Employer, shall be eligible to serve as an Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. An Administrator may resign by delivering a written resignation to the Employer or be removed by the Employer by delivery of written notice of removal, to take effect at a date specified therein, or upon delivery to the Administrator if no date is specified. Upon the resignation or removal of an Administrator, the Employer may designate in writing a successor to this position.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

12

## 2.3 ALLOCATION AND DELEGATION OF RESPONSIBILITIES

If more than one person is appointed as Administrator, the responsibilities of each Administrator may be specified by the Employer and accepted in writing by each Administrator. In the event that no such delegation is made by the Employer, the Administrators may allocate the responsibilities among themselves, in which event the Administrators shall notify the Employer and the Trustee in writing of such action and specify the responsibilities of each Administrator. The Trustee thereafter shall accept and rely upon any documents executed by the appropriate Administrator until such time as the Employer or the Administrators file with the Trustee a written revocation of such designation.

## 2.4 POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and determine all questions arising in connection with the administration, interpretation, and application of the Plan. Benefits under this Plan will be paid only if the Administrator decides in its discretion that the applicant is entitled to them. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan continue to be deemed a qualified plan under the terms of Code Section 401(a), and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish its duties under this Plan.

The Administrator shall be charged with the duties of the general administration of the Plan and the powers necessary to carry out such duties as set forth under the terms of the Plan, including, but not limited to, the following:

(a)     the discretion to determine all questions relating to the eligibility of an Employee to participate or remain a Participant hereunder and to receive benefits under the Plan;

(b)     the authority to review and settle all claims against the Plan, including claims where the settlement amount cannot be calculated or is not calculated in accordance with the Plan's benefit formula. This authority specifically permits the Administrator to settle, in compromise fashion, disputed claims for benefits and any other disputed claims made against the Plan;

(c)     to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

(d)     to authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust Fund;

(e)     to maintain all necessary records for the administration of the Plan;

(f)     to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan that are consistent with the terms hereof;

(g)     to determine the size and type of any Contract to be purchased from any Insurer, and to designate the Insurer from which such Contract shall be purchased;

(h)     to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;

(i)     to consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion (if the Trustee has such discretion), in a manner designed to accomplish specific objectives;

(j)     to prepare and implement a procedure for notifying Participants and Beneficiaries of their rights to elect Joint and Survivor Annuities and Pre-Retirement Survivor Annuities if required by the Plan, Code and Regulations thereunder;

(k)     to assist Participants regarding their rights, benefits, or elections available under the Plan;

(l)     to act as the named Fiduciary responsible for communicating with Participants as needed to maintain Plan compliance with Act Section 404(c) (if the Employer intends to comply with Act Section 404(c)) including, but not limited to, the receipt and transmission of Participants' directions as to the investment of their accounts under the Plan and the formation of policies, rules, and procedures pursuant to which Participants may give investment instructions with respect to the investment of their accounts; and

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(m)    to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it.

## 2.5    RECORDS AND REPORTS

The Administrator shall keep a record of all actions taken and shall keep all other books of account, records, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law.

## 2.6    APPOINTMENT OF ADVISERS

The Administrator may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries and, if applicable, to Plan Participants.

## 2.7    INFORMATION FROM EMPLOYER

The Employer shall supply full and timely information to the Administrator on all pertinent facts as the Administrator may require in order to perform its functions hereunder and the Administrator shall advise the Trustee of such of the foregoing facts as may be pertinent to the Trustee's duties under the Plan. The Administrator may rely upon such information as is supplied by the Employer and shall have no duty or responsibility to verify such information.

## 2.8    PAYMENT OF EXPENSES

All expenses of administration may be paid out of the Trust Fund unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any Named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, agents (including nonfiduciary agents) appointed for the purpose of assisting the Administrator or Trustee in carrying out the instructions of Participants as to the directed investment of their accounts (if permitted) and other specialists and their agents, the costs of any bonds required pursuant to Act Section 412, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund.

## 2.9    MAJORITY ACTIONS

Except where there has been an allocation and delegation of administrative authority pursuant to Section 2.3, if there is more than one Administrator, then they shall act by a majority of their number, but may authorize one or more of them to sign all papers on their behalf.

## 2.10    CLAIMS PROCEDURE

Claims for benefits under the Plan may be filed in writing with the Administrator. Written notice of the disposition of a claim shall be furnished to the claimant within ninety (90) days after the application is filed, or such period as is required by applicable law or Department of Labor regulation. In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

## 2.11 CLAIMS REVIEW PROCEDURE

Any Employee, former Employee, or Beneficiary of either, who has been denied a benefit by a decision of the Administrator pursuant to Section 2.10 shall be entitled to request the Administrator to give further consideration to the claim by filing with the Administrator a written request for a hearing. Such request, together with a written statement of the reasons why the claimant believes such claim should be allowed, shall be filed with the Administrator no later than sixty (60) days after receipt of the written notification provided for in Section 2.10. The Administrator shall then conduct a hearing within the next sixty (60) days, at which the claimant may be represented by an attorney or any other representative of such claimant's choosing and expense and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claim. At the hearing (or prior thereto upon five (5) business days written notice to the Administrator) the claimant or the claimant's representative shall have an opportunity to review all documents in the possession of the Administrator which are pertinent to the claim at issue and its disallowance. Either the claimant or the Administrator may cause a court reporter to attend the hearing and record the proceedings. In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter. The full expense of any such court reporter and such transcripts shall be borne by the party causing the court reporter to attend the hearing. A final decision as to the allowance of the claim shall be made by the Administrator within sixty (60) days of receipt of the appeal (unless there has been an extension of sixty (60) days due to special circumstances, provided the delay and the special circumstances occasioning it are communicated to the claimant within the sixty (60) day period). Such communication shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based. Notwithstanding the preceding, to the extent any of the time periods specified in this Section are amended by law or Department of Labor regulation, then the time frames specified herein shall automatically be changed in accordance with such law or regulation.

If the Administrator, pursuant to the claims review procedure, makes a final written determination denying a Participant's or Beneficiary's benefit claim, then in order to preserve the claim, the Participant or Beneficiary must file an action with respect to the denied claim not later than one hundred eighty (180) days following the date of the Administrator's final determination.

## ARTICLE III
## ELIGIBILITY

## 3.1 CONDITIONS OF ELIGIBILITY

Any Eligible Employee shall be eligible to participate hereunder on the date such Employee has satisfied the conditions of eligibility elected in the Adoption Agreement.

## 3.2 EFFECTIVE DATE OF PARTICIPATION

An Eligible Employee who has satisfied the conditions of eligibility pursuant to Section 3.1 shall become a Participant effective as of the date elected in the Adoption Agreement. If said Employee is not employed on such date, but is reemployed before a 1-Year Break in Service has occurred, then such Employee shall become a Participant on the date of reemployment or, if later, the date that the Employee would have otherwise entered the Plan had the Employee not terminated employment.

Unless specifically provided otherwise in the Adoption Agreement, an Eligible Employee who satisfies the Plan's eligibility requirement conditions by reason of recognition of service with a predecessor employer will become a Participant as of the day the Plan credits service with a predecessor employer or, if later, the date the Employee would have otherwise entered the Plan had the service with the predecessor employer been service with the Employer.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise have become a Participant, shall go from a classification of a noneligible Employee to an Eligible Employee, such Employee shall become a Participant on the date such Employee becomes an Eligible Employee or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise become a Participant, shall go from a classification of an Eligible Employee to a noneligible class of Employees, such Employee shall become a Participant in the Plan on the date such Employee again becomes an Eligible Employee, or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee. However, if such Employee incurs a 1-Year Break in Service, eligibility will be determined under the Break in Service rules set forth in Section 3.5.

## 3.3 DETERMINATION OF ELIGIBILITY

The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan and the Act. Such determination shall be subject to review pursuant to Section 2.11.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

#### 3.4 TERMINATION OF ELIGIBILITY

In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Former Participant shall continue to vest in the Plan for each Year of Service (or Period of Service, if the Elapsed Time Method is used) completed while an ineligible Employee, until such time as the Participant's Account is forfeited or distributed pursuant to the terms of the Plan. Additionally, the Former Participant's interest in the Plan shall continue to share in the earnings of the Trust Fund in the same manner as Participants.

#### 3.5 REHIRED EMPLOYEES AND BREAKS IN SERVICE

(a)     If any Participant becomes a Former Participant due to severance from employment with the Employer and is reemployed by the Employer before a 1-Year Break in Service occurs, the Former Participant shall become a Participant as of the reemployment date.

(b)     If any Participant becomes a Former Participant due to severance from employment with the Employer and is reemployed after a 1-Year Break in Service has occurred, Years of Service (or Periods of Service if the Elapsed Time Method is being used) shall include Years of Service (or Periods of Service if the Elapsed Time Method is being used) prior to the 1-Year Break in Service subject to the following rules:

(1)     In the case of a Former Participant who under the Plan does not have a nonforfeitable right to any interest in the Plan resulting from Employer contributions, Years of Service (or Periods of Service) before a period of 1-Year Breaks in Service will not be taken into account if the number of consecutive 1-Year Breaks in Service equals or exceeds the greater of (A) five (5) or (B) the aggregate number of pre-break Years of Service (or Periods of Service). Such aggregate number of Years of Service (or Periods of Service) will not include any Years of Service (or Periods of Service) disregarded under the preceding sentence by reason of prior 1-Year Breaks in Service;

(2)     A Former Participant who has not had Years of Service (or Periods of Service) before a 1-Year Break in Service disregarded pursuant to (1) above, shall participate in the Plan as of the date of reemployment, or if later, as of the date the Former Participant would otherwise enter the Plan pursuant to Sections 3.1 and 3.2 taking into account all service not disregarded.

(c)     After a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service, the Vested portion of such Former Participant's Account attributable to pre-break service shall not be increased as a result of post-break service. In such case, separate accounts will be maintained as follows:

(1)     one account for nonforfeitable benefits attributable to pre-break service; and

(2)     one account representing the Participant's Employer-derived account balance in the Plan attributable to post-break service.

(d)     If any Participant becomes a Former Participant due to severance of employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, and such Former Participant had received a distribution of the entire Vested interest prior to reemployment, then the forfeited account shall be reinstated only if the Former Participant repays the full amount which had been distributed. Such repayment must be made before the earlier of five (5) years after the first date on which the Participant is subsequently reemployed by the Employer or the close of the first period of five (5) consecutive 1-Year Breaks in Service commencing after the distribution. If a distribution occurs for any reason other than a severance of employment, the time for repayment may not end earlier than five (5) years after the date of distribution. In the event the Former Participant does repay the full amount distributed, the undistributed forfeited portion of the Participant's Account must be restored in full, unadjusted by any gains or losses occurring subsequent to the Valuation Date preceding the distribution. The source for such reinstatement may be Forfeitures occurring during the Plan Year. If such source is insufficient, then the Employer will contribute an amount which is sufficient to restore the Participant's Account, provided, however, that if a discretionary contribution is made for such year, such contribution will first be applied to restore any such accounts and the remainder shall be allocated in accordance with the terms of the Plan. If a non-Vested Former Participant was deemed to have received a distribution and such Former Participant is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, then such Participant will be deemed to have repaid the deemed distribution as of the date of reemployment.

#### 3.6 ELECTION NOT TO PARTICIPATE

An Employee may, subject to the approval of the Employer, elect voluntarily not to participate in the Plan. The election not to participate must be irrevocable and communicated to the Employer, in writing, within a reasonable period of time before the beginning of the first Plan Year. For standardized Plans, a Participant or an Eligible Employee may not elect not to participate.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**3.7    CONTROL OF ENTITIES BY OWNER-EMPLOYEE**

Effective with respect to Plan Years beginning after December 31, 1996, if this Plan provides contributions or benefits for one or more Owner-Employees, the contributions on behalf of any Owner-Employee shall be made only with respect to the Earned Income for such Owner-Employee which is derived from the trade or business with respect to which such Plan is established.

**ARTICLE IV**
**CONTRIBUTION AND ALLOCATION**

**4.1    FORMULA FOR DETERMINING EMPLOYER'S CONTRIBUTION**

(a)    For a Money Purchase Plan:

(1)    The Employer will make contributions on the following basis. On behalf of each Participant eligible to share in allocations, for each year of such Participant's participation in this Plan, the Employer will contribute the amount elected in the Adoption Agreement. All contributions by the Employer will be made in cash. In the event a funding waiver is obtained, this Plan shall be deemed to be an individually designed plan.

(2)    Notwithstanding the foregoing, with respect to an Employer which is not a tax-exempt entity, the Employer's contribution for any Fiscal Year shall not exceed the maximum amount allowable as a deduction to the Employer under the provisions of Code Section 404. However, to the extent necessary to provide the top heavy minimum allocations, the Employer shall make a contribution even if it exceeds the amount that is deductible under Code Section 404.

(b)    For a Profit Sharing Plan:

(1)    For each Plan Year, the Employer may (or will in the case of a Prevailing Wage contribution) contribute to the Plan such amount as elected by the Employer in the Adoption Agreement.

(2)    Additionally, the Employer will contribute to the Plan the amount necessary, if any, to provide the top heavy minimum allocations, even if it exceeds current or accumulated Net Profit or the amount that is deductible under Code Section 404.

**4.2    TIME OF PAYMENT OF EMPLOYER'S CONTRIBUTION**

Unless otherwise provided by contract or law, the Employer may make its contribution to the Plan for a particular Plan Year at such time as the Employer, in its sole discretion, determines. If the Employer makes a contribution for a particular Plan Year after the close of that Plan Year, the Employer will designate to the Administrator the Plan Year for which the Employer is making its contribution.

**4.3    ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS**

(a)    The Administrator shall establish and maintain an account in the name of each Participant to which the Administrator shall credit as of each Anniversary Date, or other Valuation Date, all amounts allocated to each such Participant as set forth herein.

(b)    The Employer shall provide the Administrator with all information required by the Administrator to make a proper allocation of the Employer's contribution, if any, for each Plan Year. Within a reasonable period of time after the date of receipt by the Administrator of such information, the Administrator shall allocate any contributions as follows:

(1)    For a Money Purchase Plan (other than a Money Purchase Plan which is integrated by allocation):

(i)    The Employer's contribution shall be allocated to each Participant's Account in the manner set forth in Section 4.1 herein and as specified in the Adoption Agreement.

(ii)    However, regardless of the preceding, a Participant shall only be eligible to share in the allocations of the Employer's contribution for the year if the conditions set forth in the Adoption Agreement are satisfied, unless a top heavy contribution is required pursuant to Section 4.3(f). If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than five hundred (500) Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year. Furthermore, with respect to a non-standardized Adoption Agreement, regardless of any election in the Adoption Agreement to the contrary, for the Plan Year in which this Plan terminates, a Participant shall only be eligible to share in the allocation of the Employer's contributions for the

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

Plan Year if the Participant is employed at the end of the Plan Year and has completed a Year of Service (or Period of Service if the Elapsed Time Method is elected).

(2)     For an integrated Profit Sharing Plan allocation or a Money Purchase Plan which is integrated by allocation:

(i)     Except as provided in Section 4.3(f) for top heavy purposes and subject to the "Overall Permitted Disparity Limits, the Employer's contribution shall be allocated to each Participant's Account in a dollar amount equal to 5.7% of the sum of each Participant's Compensation plus Excess Compensation. If the Employer does not contribute such amount for all Participants, each Participant will be allocated a share of the contribution in the same proportion that each such Participant's Compensation plus Excess Compensation for the Plan Year bears to the total Compensation plus the total Excess Compensation of all Participants for that year. However, in the case of any Participant who has exceeded the "Cumulative Permitted Disparity Limit, the allocation set forth in this paragraph shall be based on such Participant's Compensation rather than Compensation plus Excess Compensation.

Regardless of the preceding, 4.3% shall be substituted for 5.7% above if Excess Compensation is based on more than 20% and less than or equal to 80% of the Taxable Wage Base. If Excess Compensation is based on less than 100% and more than 80% of the Taxable Wage Base, then 5.4% shall be substituted for 5.7% above.

(ii)    The balance of the Employer's contribution over the amount allocated above, if any, shall be allocated to each Participant's Account in the same proportion that each such Participant's Compensation for the Year bears to the total Compensation of all Participants for such year.

(iii)   However, regardless of the preceding, a Participant shall only be eligible to share in the allocations of the Employer's Contribution for the year if the conditions set forth in the Adoption Agreement are satisfied, unless a contribution is required pursuant to Section 4.3(f). If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than five hundred (500) Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year. Furthermore, with respect to a non-standardized Adoption Agreement, regardless of any election in the Adoption Agreement to the contrary, for the Plan Year in which this Plan terminates, a Participant shall only be eligible to share in the allocation of the Employer's contributions for the Plan Year if the Participant is employed at the end of the Plan Year and has completed a Year of Service (or Period of Service if the Elapsed Time Method is elected).

(3)     For a Profit Sharing Plan with a non-integrated allocation formula or a Prevailing Wage contribution:

(i)     The Employer's contribution shall be allocated to each Participant's Account in accordance with the allocation method elected in the Adoption Agreement.

(ii)    However, regardless of the preceding, a Participant shall only be eligible to share in the allocations of the Employer's contribution for the year if the conditions set forth in the Adoption Agreement are satisfied, unless a top heavy contribution is required pursuant to Section 4.3(f). If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than five hundred (500) Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year. Furthermore, with respect to a non-standardized Adoption Agreement, regardless of any election in the Adoption Agreement to the contrary, for the Plan Year in which this Plan terminates, a Participant shall only be eligible to share in the allocation of the Employer's contributions for the Plan Year if the Participant is employed at the end of the Plan Year and has completed a Year of Service (or Period of Service if the Elapsed Time Method is elected).

(4)     "Overall Permitted Disparity Limits":

"Annual Overall Permitted Disparity Limit": Notwithstanding the preceding paragraphs, if in any Plan Year this Plan "benefits" any Participant who "benefits" under another qualified plan or simplified employee pension, as defined in Code Section 408(k), maintained by the Employer that either provides for or imputes permitted disparity (integrates), then such plans will be considered to be one plan and will be considered to comply with the permitted disparity rules if the extent of the permitted disparity of all such plans does not exceed 100%. For purposes of the preceding sentence, the extent of the permitted disparity of a plan is the ratio, expressed as a percentage, which the actual benefits, benefit rate, offset rate, or employer contribution rate, whatever is applicable under

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

the Plan, bears to the limitation under Code Section 401(l) applicable to such Plan. Notwithstanding the foregoing, if the Employer maintains two or more standardized paired plans, only one plan may provide for permitted disparity.

"Cumulative Permitted Disparity Limit": With respect to a Participant who "benefits" or "has benefited" under a defined benefit or target benefit plan of the Employer, effective for Plan Years beginning on or after January 1, 1994, the cumulative permitted disparity limit for the Participant is thirty five (35) total cumulative permitted disparity years. Total cumulative permitted disparity years means the number of years credited to the Participant for allocation or accrual purposes under the Plan, any other qualified plan or simplified employee pension plan (whether or not terminated) ever maintained by the Employer, while such plan either provides for or imputes permitted disparity. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year. If the Participant has not "benefited" under a defined benefit or target benefit plan which neither provides for nor imputes permitted disparity for any year beginning on or after January 1, 1994, then such Participant has no cumulative disparity limit.

For purposes of this Section, "benefiting" means benefiting under the Plan for any Plan Year during which a Participant received or is deemed to receive an allocation in accordance with Regulation 1.410(b)-3(a).

(c) Except as otherwise elected in the Adoption Agreement or as provided in Section 4.10 with respect to Participant Directed Accounts, as of each Valuation Date, before allocation of any Employer contributions and Forfeitures, any earnings or losses (net appreciation or net depreciation) of the Trust Fund (exclusive of assets segregated for distribution) shall be allocated in the same proportion that each Participant's and Former Participant's nonsegregated accounts bear to the total of all Participants' and Former Participants' nonsegregated accounts as of such date. If any nonsegregated account of a Participant has been distributed prior to the Valuation Date subsequent to a Participant's termination of employment, no earnings or losses shall be credited to such account.

(d) Participants' Accounts shall be debited for any insurance or annuity premiums paid, if any, and credited with any dividends or interest received on Contracts.

(e) On or before each Anniversary Date, any amounts which became Forfeitures since the last Anniversary Date may be made available to reinstate previously forfeited account balances of Former Participants, if any, in accordance with Section 3.5(d) or used to satisfy any contribution that may be required pursuant to Section 6.9. The remaining Forfeitures, if any, shall be treated in accordance with the Adoption Agreement. If no election is made in the Adoption Agreement, any remaining Forfeitures will be used to reduce any future Employer contributions under the Plan. However, if the Plan provides for an integrated allocation, then any remaining Forfeitures will be added to the Employer's contributions under the Plan. Regardless of the preceding sentences, in the event the allocation of Forfeitures provided herein shall cause the "Annual Additions" (as defined in Section 4.4) to any Participant's Account to exceed the amount allowable by the Code, an adjustment shall be made in accordance with Section 4.5. Except, however, a Participant shall only be eligible to share in the allocations of Forfeitures for the year if the conditions set forth in the Adoption Agreement are satisfied, unless a top heavy contribution is required pursuant to Section 4.3(f). If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than five hundred (500) Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year.

(f) Minimum Allocations Required for Top Heavy Plan Years: Notwithstanding the foregoing, for any Top Heavy Plan Year, the sum of the Employer's contributions and Forfeitures allocated to the Participant's Combined Account of each Non-Key Employee shall be equal to at least three percent (3%) of such Non-Key Employee's 415 Compensation (reduced by contributions and forfeitures, if any, allocated to each Non-Key Employee in any defined contribution plan included with this Plan in a "required aggregation group" as defined in Section 9.2(f)). However, if (i) the sum of the Employer's contributions and Forfeitures allocated to the Participant's Combined Account of each Key Employee for such Top Heavy Plan Year is less than three percent (3%) of each Key Employee's 415 Compensation and (ii) this Plan is not required to be included in a "required aggregation group" (as defined in Section 9.2(f)) to enable a defined benefit plan to meet the requirements of Code Section 401(a)(4) or 410, the sum of the Employer's contributions and Forfeitures allocated to the Participant's Combined Account of each Non-Key Employee shall be equal to the largest percentage allocated to the Participant's Combined Account of any Key Employee.

However, for each Non-Key Employee who is a Participant in a paired Profit Sharing Plan or 401(k) Profit Sharing Plan and a paired Money Purchase Plan, the minimum three percent (3%) allocation specified above shall be provided in the Money Purchase Plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

If this is an integrated Plan, then for any Top Heavy Plan Year the Employer's contribution shall be allocated as follows and shall still be required to satisfy the other provisions of this subsection:

(1)     An amount equal to three percent (3%) multiplied by each Participant's Compensation for the Plan Year shall be allocated to each Participant's Account. If the Employer does not contribute such amount for all Participants, the amount shall be allocated to each Participant's Account in the same proportion that such Participant's total Compensation for the Plan Year bears to the total Compensation of all Participants for such year.

(2)     The balance of the Employer's contribution over the amount allocated under subparagraph (1) hereof shall be allocated to each Participant's Account in a dollar amount equal to three percent (3%) multiplied by a Participant's Excess Compensation. If the Employer does not contribute such amount for all Participants, each Participant will be allocated a share of the contribution in the same proportion that such Participant's Excess Compensation bears to the total Excess Compensation of all Participants for that year. For purposes of this paragraph, in the case of any Participant who has exceeded the cumulative permitted disparity limit described in Section 4.3(b)(4), such Participant's total Compensation will be taken into account.

(3)     The balance of the Employer's contribution over the amount allocated under subparagraph (2) hereof shall be allocated to each Participant's Account in a dollar amount equal to 2.7% multiplied by the sum of each Participant's total Compensation plus Excess Compensation. If the Employer does not contribute such amount for all Participants, each Participant will be allocated a share of the contribution in the same proportion that such Participant's total Compensation plus Excess Compensation for the Plan Year bears to the total Compensation plus Excess Compensation of all Participants for that year. For purposes of this paragraph, in the case of any Participant who has exceeded the cumulative permitted disparity limit described in Section 4.3(b)(4), such Participant's total Compensation rather than Compensation plus Excess Compensation will be taken into account.

Regardless of the preceding, 1.3% shall be substituted for 2.7% above if Excess Compensation is based on more than 20% and less than or equal to 80% of the Taxable Wage Base. If Excess Compensation is based on less than 100% and more than 80% of the Taxable Wage Base, then 2.4% shall be substituted for 2.7% above.

(4)     The balance of the Employer's contributions over the amount allocated above, if any, shall be allocated to each Participant's Account in the same proportion that such Participant's total Compensation for the Plan Year bears to the total Compensation of all Participants for such year.

For each Non-Key Employee who is a Participant in this Plan and another non-paired defined contribution plan maintained by the Employer, the minimum three percent (3%) allocation specified above shall be provided as specified in the Adoption Agreement.

(g)     For purposes of the minimum allocations set forth above, the percentage allocated to the Participant's Combined Account of any Key Employee shall be equal to the ratio of the sum of the Employer's contributions and Forfeitures allocated on behalf of such Key Employee divided by the 415 Compensation for such Key Employee.

(h)     For any Top Heavy Plan Year, the minimum allocations set forth in this Section shall be allocated to the Participant's Combined Account of all Non-Key Employees who are Participants and who are employed by the Employer on the last day of the Plan Year, including Non-Key Employees who have (1) failed to complete a Year of Service; or (2) declined to make mandatory contributions (if required) or, in the case of a cash or deferred arrangement, Elective Deferrals to the Plan.

(i)     Notwithstanding anything herein to the contrary, in any Plan Year in which the Employer maintains both this Plan and a defined benefit pension plan included in a "required aggregation group" (as defined in Section 9.2(f)) which is top heavy, the Employer will not be required (unless otherwise elected in the Adoption Agreement) to provide a Non-Key Employee with both the full separate minimum defined benefit plan benefit and the full separate defined contribution plan allocations. In such case, the top heavy minimum benefits will be provided as elected in the Adoption Agreement and, if applicable, as follows:

(1)     If the 5% defined contribution minimum is elected in the Adoption Agreement:

(i)     The requirements of Section 9.1 will apply except that each Non-Key Employee who is a Participant in the Profit Sharing Plan or Money Purchase Plan and who is also a Participant in the Defined Benefit Plan will receive a minimum allocation of five percent (5%) of such Participant's 415 Compensation from the applicable defined contribution plan(s).

(ii)     For each Non-Key Employee who is a Participant only in the Defined Benefit Plan the Employer will provide a minimum non-integrated benefit equal to two percent (2%) of such

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

Participant's highest five (5) consecutive year average 415 Compensation for each Year of Service while a participant in the plan, in which the Plan is top heavy, not to exceed ten (10).

(iii)     For each Non-Key Employee who is a Participant only in this defined contribution plan, the Employer will provide a minimum allocation equal to three percent (3%) of such Participant's 415 Compensation.

(2)     If the 2% defined benefit minimum is elected in the Adoption Agreement, then for each Non-Key Employee who is a Participant only in the defined benefit plan, the Employer will provide a minimum non-integrated benefit equal to two percent (2%) of such Participant's highest five (5) consecutive year average of 415 Compensation for each Year of Service while a participant in the plan, in which the Plan is top heavy, not to exceed ten (10).

(j)     For the purposes of this Section, 415 Compensation will be limited to the same dollar limitations set forth in Section 1.11 adjusted in such manner as permitted under Code Section 415(d).

(k)     Notwithstanding anything in this Section to the contrary, all information necessary to properly reflect a given transaction may not be available until after the date specified herein for processing such transaction, in which case the transaction will be reflected when such information is received and processed. Subject to express limits that may be imposed under the Code, the processing of any contribution, distribution or other transaction may be delayed for any legitimate business reason (including, but not limited to, failure of systems or computer programs, failure of the means of the transmission of data, force majeure, the failure of a service provider to timely receive values or prices, and correction for errors or omissions or the errors or omissions of any service providers). The processing date of a transaction will be binding for all purposes of the Plan.

(l)     Notwithstanding anything in this Section to the contrary, the provisions of this subsection apply for any Plan Year if, in the non-standardized Adoption Agreement, the Employer elected to apply the 410(b) ratio percentage failsafe provisions and the Plan fails to satisfy the "ratio percentage test" due to a last day of the Plan Year allocation condition or an Hours of Service (or months of service) allocation condition. A plan satisfies the "ratio percentage test" if, on the last day of the Plan Year, the "benefiting ratio" of the Non-Highly Compensated Employees who are "includible" is at least 70% of the "benefiting ratio" of the Highly Compensated Employees who are "includible. The "benefiting ratio" of the Non-Highly Compensated Employees is the number of "includible" Non-Highly Compensated Employees "benefiting" under the Plan divided by the number of "includible" Employees who are Non-Highly Compensated Employees. The "benefiting ratio" of the Highly Compensated Employees is the number of Highly Compensated Employees "benefiting" under the Plan divided by the number of "includible" Highly Compensated Employees. "Includible" Employees are all Employees other than: (1) those Employees excluded from participating in the plan for the entire Plan Year by reason of the collective bargaining unit exclusion or the nonresident alien exclusion described in the Code or by reason of the age and service requirements of Article III; and (2) any Employee who incurs a separation from service during the Plan Year and fails to complete at least 501 Hours of Service (or three (3) months of service if the Elapsed Time Method is being used) during such Plan Year.

For purposes of this subsection, an Employee is "benefiting" under the Plan on a particular date if, under the Plan, the Employee is entitled to an Employer contribution or an allocation of Forfeitures for the Plan Year.

If this subsection applies, then the Administrator will suspend the allocation conditions for the "includible" Non-Highly Compensated Employees who are Participants, beginning first with the "includible" Employees employed by the Employer on the last day of the Plan Year, then the "includible" Employees who have the latest separation from service during the Plan Year, and continuing to suspend the allocation conditions for each "includible" Employee who incurred an earlier separation from service, from the latest to the earliest separation from service date, until the Plan satisfies the "ratio percentage test" for the Plan Year. If two or more "includible" Employees have a separation from service on the same day, then the Administrator will suspend the allocation conditions for all such "includible" Employees, irrespective of whether the Plan can satisfy the "ratio percentage test" by accruing benefits for fewer than all such "includible" Employees. If the Plan for any Plan Year suspends the allocation conditions for an "includible" Employee, then that Employee will share in the allocation for that Plan Year of the Employer contribution and Forfeitures, if any, without regard to whether the Employee has satisfied the other allocation conditions set forth in this Section.

4.4     MAXIMUM ANNUAL ADDITIONS

(a)(1)     If a Participant does not participate in, and has never participated in another qualified plan maintained by the Employer, or a welfare benefit fund (as defined in Code Section 419(e)) maintained by the Employer, or an individual medical account (as defined in Code Section 415(l)(2)) maintained by the Employer, or a simplified employee pension (as defined in Code Section 408(k)) maintained by the Employer which provides "Annual Additions, the amount of "Annual Additions" which may be credited to the Participant's accounts for any Limitation Year shall not exceed the lesser of the "Maximum Permissible Amount" or any other limitation contained in this Plan. If the Employer contribution that would otherwise be contributed or allocated to the Participant's accounts would cause the "Annual Additions" for the Limitation Year to exceed the "Maximum Permissible Amount, the amount contributed or allocated will be reduced so that the "Annual Additions" for the Limitation Year will equal the "Maximum

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

Permissible Amount. and any amount in excess of the "Maximum Permissible Amount" which would have been allocated to such Participant may be allocated to other Participants.

(2)     Prior to determining the Participant's actual 415 Compensation for the Limitation Year. the Employer may determine the "Maximum Permissible Amount" for a Participant on the basis of a reasonable estimation of the Participant's 415 Compensation for the Limitation Year. uniformly determined for all Participants similarly situated.

(3)     As soon as is administratively feasible after the end of the Limitation Year the "Maximum Permissible Amount" for such Limitation Year shall be determined on the basis of the Participant's actual 415 Compensation for such Limitation Year.

(b)(1)     This subsection applies if, in addition to this Plan. a Participant is covered under another qualified defined contribution plan maintained by the Employer that is a "Master or Prototype Plan," a welfare benefit fund (as defined in Code Section 419(e)) maintained by the Employer, an individual medical account (as defined in Code Section 415(l)(2)) maintained by the Employer, or a simplified employee pension (as defined in Code Section 408(k)) maintained by the Employer, which provides "Annual Additions. during any Limitation Year. The "Annual Additions" which may be credited to a Participant's accounts under this Plan for any such Limitation Year shall not exceed the "Maximum Permissible Amount" reduced by the "Annual Additions" credited to a Participant's accounts under the other plans and welfare benefit funds, individual medical accounts. and simplified employee pensions for the same Limitation Year. If the "Annual Additions" with respect to the Participant under other defined contribution plans and welfare benefit funds maintained by the Employer are less than the "Maximum Permissible Amount" and the Employer contribution that would otherwise be contributed or allocated to the Participant's accounts under this Plan would cause the "Annual Additions" for the Limitation Year to exceed this limitation. the amount contributed or allocated will be reduced so that the "Annual Additions" under all such plans and welfare benefit funds for the Limitation Year will equal the "Maximum Permissible Amount. and any amount in excess of the "Maximum Permissible Amount" which would have been allocated to such Participant may be allocated to other Participants. If the "Annual Additions" with respect to the Participant under such other defined contribution plans. welfare benefit funds, individual medical accounts and simplified employee pensions in the aggregate are equal to or greater than the "Maximum Permissible Amount, no amount will be contributed or allocated to the Participant's account under this Plan for the Limitation Year.

(2)     Prior to determining the Participant's actual 415 Compensation for the Limitation Year. the Employer may determine the "Maximum Permissible Amount" for a Participant on the basis of a reasonable estimation of the Participant's 415 Compensation for the Limitation Year. uniformly determined for all Participants similarly situated.

(3)     As soon as is administratively feasible after the end of the Limitation Year. the "Maximum Permissible Amount" for the Limitation Year will be determined on the basis of the Participant's actual 415 Compensation for the Limitation Year.

(4)     If, pursuant to Section 4.4(b)(2) or Section 4.5. a Participant's "Annual Additions" under this Plan and such other plans would result in an "Excess Amount" for a Limitation Year. the "Excess Amount" will be deemed to consist of the "Annual Additions" last allocated, except that "Annual Additions" attributable to a simplified employee pension will be deemed to have been allocated first, followed by "Annual Additions" to a welfare benefit fund or individual medical account, and then by "Annual Additions" to a plan subject to Code Section 412, regardless of the actual allocation date.

(5)     If an "Excess Amount" was allocated to a Participant on an allocation date of this Plan which coincides with an allocation date of another plan, the "Excess Amount" attributed to this Plan will be the product of:

(i)     the total "Excess Amount" allocated as of such date, times

(ii)     the ratio of (1) the "Annual Additions" allocated to the Participant for the Limitation Year as of such date under this Plan to (2) the total "Annual Additions" allocated to the Participant for the Limitation Year as of such date under this and all the other qualified defined contribution plans.

(6)     Any "Excess Amount" attributed to this Plan will be disposed of in the manner described in Section 4.5.

(c)     If the Participant is covered under another qualified defined contribution plan maintained by the Employer which is not a "Master or Prototype Plan," "Annual Additions" which may be credited to the Participant's Combined Account under this Plan for any Limitation Year will be limited in accordance with Section 4.4(b). unless the Employer provides other limitations in the Adoption Agreement.

(d)     For any Limitation Year beginning prior to the date the Code Section 415(e) limits are repealed with respect to this Plan (as specified in the Adoption Agreement for the GUST transitional rules). if the Employer

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

maintains, or at any time maintained, a qualified defined benefit plan covering any Participant in this Plan, then the sum of the Participant's "Defined Benefit Plan Fraction" and "Defined Contribution Plan Fraction" may not exceed 1.0. In such event, the rate of accrual in the defined benefit plan will be reduced to the extent necessary so that the sum of the "Defined Contribution Fraction" and "Defined Benefit Fraction" will equal 1.0. However, in the Adoption Agreement the Employer may specify an alternative method under which the plans involved will satisfy the limitations of Code Section 415(e), including increased top heavy minimum benefits so that the combined limitation is 1.25 rather than 1.0.

(e)        For purposes of applying the limitations of Code Section 415, the transfer of funds from one qualified plan to another is not an "Annual Addition. In addition, the following are not Employee contributions for the purposes of Section 4.4(f)(1)(b): (1) rollover contributions (as defined in Code Sections 402(c), 403(a)(4), 403(b)(8) and 408(d)(3)); (2) repayments of loans made to a Participant from the Plan; (3) repayments of distributions received by an Employee pursuant to Code Section 411(a)(7)(B) (cash-outs); (4) repayments of distributions received by an Employee pursuant to Code Section 411(a)(3)(D) (mandatory contributions); and (5) Employee contributions to a simplified employee pension excludable from gross income under Code Section 408(k)(6).

(f)        For purposes of this Section, the following terms shall be defined as follows:

(1)        "Annual Additions" means the sum credited to a Participant's accounts for any Limitation Year of (a) Employer contributions, (b) Employee contributions (except as provided below), (c) forfeitures, (d) amounts allocated, after March 31, 1984, to an individual medical account, as defined in Code Section 415(l)(2), which is part of a pension or annuity plan maintained by the Employer, (e) amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a key employee (as defined in Code Section 419A(d)(3)) under a welfare benefit fund (as defined in Code Section 419(e)) maintained by the Employer and (f) allocations under a simplified employee pension. Except, however, the Compensation percentage limitation referred to in paragraph (f)(9)(ii) shall not apply to: (1) any contribution for medical benefits (within the meaning of Code Section 419A(f)(2)) after separation from service which is otherwise treated as an "Annual Addition, or (2) any amount otherwise treated as an "Annual Addition" under Code Section 415(l)(1). Notwithstanding the foregoing, for Limitation Years beginning prior to January 1, 1987, only that portion of Employee contributions equal to the lesser of Employee contributions in excess of six percent (6%) of 415 Compensation or one-half of Employee contributions shall be considered an "Annual Addition.

For this purpose, any Excess Amount applied under Section 4.5 in the Limitation Year to reduce Employer contributions shall be considered "Annual Additions" for such Limitation Year.

(2)        "Defined Benefit Fraction" means a fraction, the numerator of which is the sum of the Participant's "Projected Annual Benefits" under all the defined benefit plans (whether or not terminated) maintained by the Employer, and the denominator of which is the lesser of one hundred twenty-five percent (125%) of the dollar limitation determined for the Limitation Year under Code Sections 415(b)(1)(A) as adjusted by Code Section 415(d) or one hundred forty percent (140%) of the "Highest Average Compensation" including any adjustments under Code Section 415(b).

Notwithstanding the above, if the Participant was a Participant as of the first day of the first Limitation Year beginning after December 31, 1986, in one or more defined benefit plans maintained by the Employer which were in existence on May 6, 1986, the denominator of this fraction will not be less than one hundred twenty-five percent (125%) of the sum of the annual benefits under such plans which the Participant had accrued as of the end of the close of the last Limitation Year beginning before January 1, 1987, disregarding any changes in the terms and conditions of the plan after May 5, 1986. The preceding sentence applies only if the defined benefit plans individually and in the aggregate satisfied the requirements of Code Section 415 for all Limitation Years beginning before January 1, 1987.

Notwithstanding the foregoing, for any Top Heavy Plan Year, one hundred percent (100%) shall be substituted for one hundred twenty-five percent (125%) unless the extra top heavy minimum allocation or benefit is being made pursuant to the Employer's specification in the Adoption Agreement. However, for any Plan Year in which this Plan is a Super Top Heavy Plan, one hundred percent (100%) shall always be substituted for one hundred twenty-five percent (125%).

(3)        Defined Contribution Dollar Limitation means $30,000 as adjusted under Code Section 415(d).

(4)        Defined Contribution Fraction means a fraction, the numerator of which is the sum of the "Annual Additions" to the Participant's accounts under all the defined contribution plans (whether or not terminated) maintained by the Employer for the current and all prior "Limitation Years, (including the "Annual Additions" attributable to the Participant's nondeductible voluntary employee contributions to any defined benefit plans, whether or not terminated, maintained by the Employer and the "Annual Additions" attributable to all welfare benefit funds (as defined in Code Section 419(e)), individual medical accounts (as defined in Code Section 415(l)(2), and simplified employee pensions (as defined in Code Section 408(k)) maintained by the Employer), and the denominator of which is the sum of the "Maximum Aggregate

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

Amounts" for the current and all prior Limitation Years in which the Employee had service with the Employer (regardless of whether a defined contribution plan was maintained by the Employer). The maximum aggregate amount in any Limitation Year is the lesser of one hundred twenty-five percent (125%) of the dollar limitation determined under Code Section 415(c)(1)(A) as adjusted by Code Section 415(d) or thirty-five percent (35%) of the Participant's 415 Compensation for such year.

If the Employee was a Participant as of the end of the first day of the first Limitation Year beginning after December 31, 1986, in one or more defined contribution plans maintained by the Employer which were in existence on May 5, 1986, the numerator of this fraction will be adjusted if the sum of this fraction and the "Defined Benefit Fraction" would otherwise exceed 1.0 under the terms of this Plan. Under the adjustment, an amount equal to the product of (1) the excess of the sum of the fractions over 1.0 times (2) the denominator of this fraction, will be permanently subtracted from the numerator of this fraction. The adjustment is calculated using the fractions as they would be computed as of the end of the last Limitation Year beginning before January 1, 1987, and disregarding any changes in the terms and conditions of the plan made after May 5, 1986, but using the Code Section 415 limitation applicable to the first Limitation Year beginning on or after January 1, 1987.

For Limitation Years beginning prior to January 1, 1987, the "Annual Additions" shall not be recomputed to treat all Employee contributions as "Annual Additions.

Notwithstanding the foregoing, for any Top Heavy Plan Year, one hundred percent (100%) shall be substituted for one hundred twenty-five percent (125%) unless the extra top heavy minimum allocation or benefit is being made pursuant to the Employer's specification in the Adoption Agreement. However, for any Plan Year in which this Plan is a Super Top Heavy Plan, one hundred percent (100%) shall always be substituted for one hundred twenty-five percent (125%).

(5)     "Employer" means the Employer that adopts this Plan and all Affiliated Employers, except that for purposes of this Section, the determination of whether an entity is an Affiliated Employer shall be made by applying Code Section 415(h).

(6)     "Excess Amount" means the excess of the Participant's "Annual Additions" for the Limitation Year over the "Maximum Permissible Amount.

(7)     "Highest Average Compensation" means the average Compensation for the three (3) consecutive Years of Service with the Employer while a Participant in the Plan that produces the highest average. A Year of Service with the Employer is the twelve (12) consecutive month period ending on the last day of the Limitation Year.

(8)     "Master or Prototype Plan" means a plan the form of which is the subject of a favorable opinion letter from the Internal Revenue Service.

(9)     "Maximum Permissible Amount" means the maximum Annual Addition that may be contributed or allocated to a Participant's accounts under the Plan for any "Limitation Year," which shall not exceed the lesser of:

(i)     the "Defined Contribution Dollar Limitation, or

(ii)    twenty-five percent (25%) of the Participant's 415 Compensation for the "Limitation Year.

The Compensation Limitation referred to in (ii) shall not apply to any contribution for medical benefits (within the meaning of Code Sections 401(h) or 419A(f)(2)) which is otherwise treated as an "Annual Addition.

If a short Limitation Year is created because of an amendment changing the Limitation Year to a different twelve (12) consecutive month period, the "Maximum Permissible Amount" will not exceed the "Defined Contribution Dollar Limitation multiplied by a fraction, the numerator of which is the number of months in the short Limitation Year and the denominator of which is twelve (12).

(10)    "Projected Annual Benefit" means the annual retirement benefit (adjusted to an actuarially equivalent "straight life annuity" if such benefit is expressed in a form other than a "straight life annuity" or qualified joint and survivor annuity) to which the Participant would be entitled under the terms of the plan assuming:

(i)     the Participant will continue employment until Normal Retirement Age (or current age, if later), and

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(ii)   the Participant's 415 Compensation for the current Limitation Year and all other relevant factors used to determine benefits under the Plan will remain constant for all future Limitation Years.

For purposes of this subsection, "straight life annuity" means an annuity that is payable in equal installments for the life of the Participant that terminates upon the Participant's death.

(g)   Notwithstanding anything contained in this Section to the contrary, the limitations, adjustments and other requirements prescribed in this Section shall at all times comply with the provisions of Code Section 415 and the Regulations thereunder.

## 4.5   ADJUSTMENT FOR EXCESSIVE ANNUAL ADDITIONS

Allocation of "Annual Additions" (as defined in Section 4.4) to a Participant's Combined Account for a Limitation Year generally will cease once the limits of Section 4.4 have been reached for such Limitation Year. However, if as a result of the allocation of Forfeitures, a reasonable error in estimating a Participant's annual 415 Compensation, a reasonable error in determining the amount of elective deferrals (within the meaning of Code Section 402(g)(3)) that may be made with respect to any Participant under the limits of Section 4.4, or other facts and circumstances to which Regulation 1.415-6(b)(6) shall be applicable, the "Annual Additions" under this Plan would cause the maximum provided in Section 4.4 to be exceeded, the "Excess Amount" will be disposed of in one of the following manners, as uniformly determined by the Plan Administrator for all Participants similarly situated:

(a)   Any after-tax voluntary Employee contributions (plus attributable gains), to the extent they would reduce the Excess Amount, will be distributed to the Participant;

(b)   If, after the application of subparagraph (a), an "Excess Amount" still exists, any unmatched Elective Deferrals (and for Limitation Years beginning after December 31, 1995, any gains attributable to such Elective Deferrals), to the extent they would reduce the Excess Amount, will be distributed to the Participant;

(c)   To the extent necessary, matched Elective Deferrals and Employer matching contributions will be proportionately reduced from the Participant's Account. The Elective Deferrals (and for Limitation Years beginning after December 31, 1995, any gains attributable to such Elective Deferrals) will be distributed to the Participant and the Employer matching contributions (and for Limitation Years beginning after December 31, 1995, any gains attributable to such matching contributions) will be used to reduce the Employer's contributions in the next Limitation Year;

(d)   If, after the application of subparagraphs (a), (b) and (c), an "Excess Amount" still exists, and the Participant is covered by the Plan at the end of the Limitation Year, the "Excess Amount" in the Participant's Account will be used to reduce Employer contributions (including any allocation of Forfeitures) for such Participant in the next Limitation Year, and each succeeding Limitation Year if necessary;

(e)   If, after the application of subparagraphs (a), (b) and (c), an "Excess Amount" still exists, and the Participant is not covered by the Plan at the end of a Limitation Year, the "Excess Amount" will be held unallocated in a suspense account. The suspense account will be applied to reduce future Employer contributions (including allocation of any Forfeitures) for all remaining Participants in the next Limitation Year, and each succeeding Limitation Year if necessary; and

(f)   If a suspense account is in existence at any time during a Limitation Year pursuant to this Section, no investment gains and losses shall be allocated to such suspense account. If a suspense account is in existence at any time during a particular Limitation Year, all amounts in the suspense account must be allocated and reallocated to Participants' Accounts before any Employer contributions or any Employee contributions may be made to the Plan for that Limitation Year. Except as provided in (a), (b) and (c) above, "Excess Amounts" may not be distributed to Participants or Former Participants.

## 4.6   ROLLOVERS

(a)   If elected in the Adoption Agreement and with the consent of the Administrator, the Plan may accept a "rollover," provided the "rollover" will not jeopardize the tax-exempt status of the Plan or create adverse tax consequences for the Employer. The amounts rolled over shall be set up in a separate account herein referred to as a "Participant's Rollover Account." Such account shall be fully Vested at all times and shall not be subject to forfeiture for any reason. For purposes of this Section, the term Participant shall include any Eligible Employee who is not yet a Participant, if, pursuant to the Adoption Agreement, "rollovers" are permitted to be accepted from Eligible Employees. In addition, for purposes of this Section the term Participant shall also include former Employees if the Employer and Administrator consent to accept "rollovers" of distributions made to former Employees from any plan of the Employer.

(b)   Amounts in a Participant's Rollover Account shall be held by the Trustee pursuant to the provisions of this Plan and may not be withdrawn by, or distributed to the Participant, in whole or in part, except as elected in the Adoption Agreement and subsection (c) below. The Trustee shall have no duty or responsibility to inquire as to the

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

propriety of the amount, value or type of assets transferred, nor to conduct any due diligence with respect to such assets; provided, however, that such assets are otherwise eligible to be held by the Trustee under the terms of this Plan.

(c)     At Normal Retirement Date, or such other date when the Participant or Eligible Employee or such Participant's or Eligible Employee's Beneficiary shall be entitled to receive benefits, the Participant's Rollover Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary. Any distribution of amounts held in a Participant's Rollover Account shall be made in a manner which is consistent with and satisfies the provisions of Sections 6.5 and 6.6, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder. Furthermore, such amounts shall be considered to be part of a Participant's benefit in determining whether an involuntary cash-out of benefits may be made without Participant consent.

(d)     The Administrator may direct that rollovers made after a Valuation Date be segregated into a separate account for each Participant until such time as the allocations pursuant to this Plan have been made, at which time they may remain segregated, invested as part of the general Trust Fund or, if elected in the Adoption Agreement, directed by the Participant.

(e)     For purposes of this Section, the term "qualified plan" shall mean any tax qualified plan under Code Section 401(a), or any other plans from which distributions are eligible to be rolled over into this Plan pursuant to the Code. The term "rollover" means: (i) amounts transferred to this Plan in a direct rollover made pursuant to Code Section 401(a)(31) from another "qualified plan"; (ii) distributions received by an Employee from other "qualified plans" which are eligible for tax-free rollover to a "qualified plan" and which are transferred by the Employee to this Plan within sixty (60) days following receipt thereof; (iii) amounts transferred to this Plan from a conduit individual retirement account provided that the conduit individual retirement account has no assets other than assets which (A) were previously distributed to the Employee by another "qualified plan" (B) were eligible for tax-free rollover to a "qualified plan" and (C) were deposited in such conduit individual retirement account within sixty (60) days of receipt thereof; (iv) amounts distributed to the Employee from a conduit individual retirement account meeting the requirements of clause (iii) above, and transferred by the Employee to this Plan within sixty (60) days of receipt thereof from such conduit individual retirement account; and (v) any other amounts which are eligible to be rolled over to this Plan pursuant to the Code.

(f)     Prior to accepting any "rollovers" to which this Section applies, the Administrator may require the Employee to establish (by providing opinion of counsel or otherwise) that the amounts to be rolled over to this Plan meet the requirements of this Section.

4.7     PLAN-TO-PLAN TRANSFERS FROM QUALIFIED PLANS

(a)     With the consent of the Administrator, amounts may be transferred (within the meaning of Code Section 414(l)) to this Plan from other tax qualified plans under Code Section 401(a), provided the plan from which such funds are transferred permits the transfer to be made and the transfer will not jeopardize the tax-exempt status of the Plan or Trust or create adverse tax consequences for the Employer. Prior to accepting any transfers to which this Section applies, the Administrator may require an opinion of counsel that the amounts to be transferred meet the requirements of this Section. The amounts transferred shall be set up in a separate account herein referred to as a "Participant's Transfer Account." Furthermore, for Vesting purposes, the Participant's Transfer Account shall be treated as a separate "Participant's Account."

(b)     Amounts in a Participant's Transfer Account shall be held by the Trustee pursuant to the provisions of this Plan and may not be withdrawn by, or distributed to the Participant, in whole or in part, except as elected in the Adoption Agreement and subsection (d) below, provided the restrictions of subsection (c) below and Section 6.15 are satisfied. The Trustee shall have no duty or responsibility to inquire as to the propriety of the amount, value or type of assets transferred, nor to conduct any due diligence with respect to such assets; provided, however, that such assets are otherwise eligible to be held by the Trustee under the terms of this Plan.

(c)     Except as permitted by Regulations (including Regulation 1.411(d)-4), amounts attributable to elective contributions (as defined in Regulation 1.401(k)-1(g)(3)), including amounts treated as elective contributions, which are transferred from another qualified plan in a plan-to-plan transfer (other than a direct rollover) shall be subject to the distribution limitations provided for in Regulation 1.401(k)-1(d).

(d)     At Normal Retirement Date, or such other date when the Participant or the Participant's Beneficiary shall be entitled to receive benefits, the Participant's Transfer Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary. Any distribution of amounts held in a Participant's Transfer Account shall be made in a manner which is consistent with and satisfies the provisions of Sections 6.5 and 6.6, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder. Furthermore, such amounts shall be considered to be part of a Participant's benefit in determining whether an involuntary cash-out of benefits may be made without Participant consent.

(e)     The Administrator may direct that Employee transfers made after a Valuation Date be segregated into a separate account for each Participant until such time as the allocations pursuant to this Plan have been made, at

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

which time they may remain segregated, invested as part of the general Trust Fund or, if elected in the Adoption Agreement, directed by the Participant.

(f)     Notwithstanding anything herein to the contrary, a transfer directly to this Plan from another qualified plan (or a transaction having the effect of such a transfer) shall only be permitted if it will not result in the elimination or reduction of any "Section 411(d)(6) protected benefit" as described in Section 8.1(e).

## 4.8     VOLUNTARY EMPLOYEE CONTRIBUTIONS

(a)     Except as provided in subsection 4.8(b) below, this Plan will not accept after-tax voluntary Employee contributions. If this is an amendment to a Plan that had previously allowed after-tax voluntary Employee contributions, then this Plan will not accept after-tax voluntary Employee contributions for Plan Years beginning after the Plan Year in which this Plan is adopted by the Employer.

(b)     For 401(k) Plans, if elected in the Adoption Agreement, each Participant who is eligible to make Elective Deferrals may, in accordance with nondiscriminatory procedures established by the Administrator, elect to make after-tax voluntary Employee contributions to this Plan. Such contributions must generally be paid to the Trustee within a reasonable period of time after being received by the Employer.

(c)     The balance in each Participant's Voluntary Contribution Account shall be fully Vested at all times and shall not be subject to Forfeiture for any reason.

(d)     A Participant may elect at any time to withdraw after-tax voluntary Employee contributions from such Participant's Voluntary Contribution Account and the actual earnings thereon in a manner which is consistent with and satisfies the provisions of Section 6.5, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder. If the Administrator maintains sub-accounts with respect to after-tax voluntary Employee contributions (and earnings thereon) which were made on or before a specified date, a Participant shall be permitted to designate which sub-account shall be the source for the withdrawal. Forfeitures of Employer contributions shall not occur solely as a result of an Employee's withdrawal of after-tax voluntary Employee contributions.

In the event a Participant has received a hardship distribution pursuant to Regulation 1.401(k)-1(d)(2)(iii)(B) from any plan maintained by the Employer, then the Participant shall be barred from making any after-tax voluntary Employee contributions for a period of twelve (12) months after receipt of the hardship distribution.

(e)     At Normal Retirement Date, or such other date when the Participant or the Participant's Beneficiary is entitled to receive benefits, the Participant's Voluntary Contribution Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary.

(f)     To the extent a Participant has previously made mandatory Employee contributions under prior provisions of this Plan, such contributions will be treated as after-tax voluntary Employee contributions.

## 4.9     QUALIFIED VOLUNTARY EMPLOYEE CONTRIBUTIONS

(a)     If this is an amendment to a Plan that previously permitted deductible voluntary Employee contributions, then each Participant who made "Qualified Voluntary Employee Contributions" within the meaning of Code Section 219(e)(2) as it existed prior to the enactment of the Tax Reform Act of 1986, shall have such contributions held in a separate Qualified Voluntary Employee Contribution Account which shall be fully Vested at all times. Such contributions, however, shall not be permitted for taxable years beginning after December 31, 1986.

(b)     A Participant may, upon written request delivered to the Administrator, make withdrawals from such Participant's Qualified Voluntary Employee Contribution Account. Any distribution shall be made in a manner which is consistent with and satisfies the provisions of Section 6.5, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder.

(c)     At Normal Retirement Date, or such other date when the Participant or the Participant's Beneficiary is entitled to receive benefits, the Qualified Voluntary Employee Contribution Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary.

## 4.10     DIRECTED INVESTMENT ACCOUNT

(a)     If elected in the Adoption Agreement, all Participants may direct the Trustee as to the investment of all or a portion of their individual account balances as set forth in the Adoption Agreement and within limits set by the Employer. Participants may direct the Trustee, in writing (or in such other form which is acceptable to the Trustee), to invest their accounts in specific assets, specific funds or other investments permitted under the Plan and the Participant Direction Procedures. That portion of the account of any Participant that is subject to investment direction of such Participant will be considered a Participant Directed Account.

Defined Contribution Prototype Plan

(b)     The Administrator will establish a Participant Direction Procedure, to be applied in a uniform and nondiscriminatory manner, setting forth the permissible investment options under this Section, how often changes between investments may be made, and any other limitations and provisions that the Administrator may impose on a Participant's right to direct investments.

(c)     The Administrator may, in its discretion, include or exclude by amendment or other action from the Participant Direction Procedures such instructions, guidelines or policies as it deems necessary or appropriate to ensure proper administration of the Plan, and may interpret the same accordingly.

(d)     As of each Valuation Date, all Participant Directed Accounts shall be charged or credited with the net earnings, gains, losses and expenses as well as any appreciation or depreciation in the market value using publicly listed fair market values when available or appropriate as follows:

(1)     to the extent the assets in a Participant Directed Account are accounted for as pooled assets or investments, the allocation of earnings, gains and losses of each Participant's Account shall be based upon the total amount of funds so invested in a manner proportionate to the Participant's share of such pooled investment; and

(2)     to the extent the assets in a Participant Directed Account are accounted for as segregated assets, the allocation of earnings, gains on and losses from such assets shall be made on a separate and distinct basis.

(e)     Investment directions will be processed as soon as administratively practicable after proper investment directions are received from the Participant. No guarantee is made by the Plan, Employer, Administrator or Trustee that investment directions will be processed on a daily basis, and no guarantee is made in any respect regarding the processing time of an investment direction. Notwithstanding any other provision of the Plan, the Employer, Administrator or Trustee reserves the right to not value an investment option on any given Valuation Date for any reason deemed appropriate by the Employer, Administrator or Trustee. Furthermore, the processing of any investment transaction may be delayed for any legitimate business reason (including, but not limited to, failure of systems or computer programs, failure of the means of the transmission of data, force majeure, the failure of a service provider to timely receive values or prices, and correction for errors or omissions or the errors or omissions of any service provider). The processing date of a transaction will be binding for all purposes of the Plan and considered the applicable Valuation Date for an investment transaction.

(f)     If the Employer has elected in the Adoption Agreement that it intends to operate any portion of this Plan as an Act Section 404(c) plan, the Participant Direction Procedures should provide an explanation of the circumstances under which Participants and their Beneficiaries may give investment instructions, including but not limited to, the following:

(1)     the conveyance of instructions by the Participants and their Beneficiaries to invest Participant Directed Accounts in a Directed Investment Option;

(2)     the name, address and phone number of the Fiduciary (and, if applicable, the person or persons designated by the Fiduciary to act on its behalf) responsible for providing information to the Participant or a Beneficiary upon request relating to the Directed Investment Options;

(3)     applicable restrictions on transfers to and from any Designated Investment Alternative;

(4)     any restrictions on the exercise of voting, tender and similar rights related to a Directed Investment Option by the Participants or their Beneficiaries;

(5)     a description of any transaction fees and expenses which affect the balances in Participant Directed Accounts in connection with the purchase or sale of a Directed Investment Option; and

(6)     general procedures for the dissemination of investment and other information relating to the Designated Investment Alternatives as deemed necessary or appropriate, including but not limited to a description of the following:

(i)     the investment vehicles available under the Plan, including specific information regarding any Designated Investment Alternative;

(ii)     any designated Investment Managers; and

(iii)     a description of the additional information that may be obtained upon request from the Fiduciary designated to provide such information.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(g)       With respect to those assets in a Participant's Directed Account, the Participant or Beneficiary shall direct the Trustee with regard to any voting, tender and similar rights associated with the ownership of such assets (hereinafter referred to as the "Stock Rights") as follows based on the election made in the Adoption Agreement:

(1)       each Participant or Beneficiary shall direct the Trustee to vote or otherwise exercise such Stock Rights in accordance with the provisions, conditions and terms of any such Stock Rights;

(2)       such directions shall be provided to the Trustee by the Participant or Beneficiary in accordance with the procedure as established by the Administrator and the Trustee shall vote or otherwise exercise such Stock Rights with respect to which it has received directions to do so under this Section; and

(3)       to the extent to which a Participant or Beneficiary does not instruct the Trustee to vote or otherwise exercise such Stock Rights, such Participants or Beneficiaries shall be deemed to have directed the Trustee that such Stock Rights remain nonvoted and unexercised.

(h)       Any information regarding investments available under the Plan, to the extent not required to be described in the Participant Direction Procedures, may be provided to Participants in one or more documents (or in any other form, including, but not limited to, electronic media) which are separate from the Participant Direction Procedures and are not thereby incorporated by reference into this Plan.

## 4.11      INTEGRATION IN MORE THAN ONE PLAN

If the Employer maintains qualified retirement plans that provide for permitted disparity (integration), the provisions of Section 4.3(b)(4) will apply. Furthermore, if the Employer maintains two or more standardized paired plans, only one plan may provide for permitted disparity.

## 4.12      QUALIFIED MILITARY SERVICE

Notwithstanding any provisions of this Plan to the contrary, effective as of the later of December 12, 1994, or the Effective Date of the Plan, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code Section 414(u). Furthermore, loan repayments may be suspended under this Plan as permitted under Code Section 414(u)(4).

## ARTICLE V
## VALUATIONS

## 5.1      VALUATION OF THE TRUST FUND

The Administrator shall direct the Trustee, as of each Valuation Date, to determine the net worth of the assets comprising the Trust Fund as it exists on the Valuation Date. In determining such net worth, the Trustee shall value the assets comprising the Trust Fund at their fair market value (or their contractual value in the case of a Contract or Policy) as of the Valuation Date and may deduct all expenses for which the Trustee has not yet been paid by the Employer or the Trust Fund. The Trustee may update the value of any shares held in a Participant Directed Account by reference to the number of shares held on behalf of the Participant, priced at the market value as of the Valuation Date.

## 5.2      METHOD OF VALUATION

In determining the fair market value of securities held in the Trust Fund which are listed on a registered stock exchange, the Administrator shall direct the Trustee to value the same at the prices they were last traded on such exchange preceding the close of business on the Valuation Date. If such securities were not traded on the Valuation Date, or if the exchange on which they are traded was not open for business on the Valuation Date, then the securities shall be valued at the prices at which they were last traded prior to the Valuation Date. Any unlisted security held in the Trust Fund shall be valued at its bid price next preceding the close of business on the Valuation Date, which bid price shall be obtained from a registered broker or an investment banker. In determining the fair market value of assets other than securities for which trading or bid prices can be obtained, the Trustee may appraise such assets itself, or in its discretion, employ one or more appraisers for that purpose and rely on the values established by such appraiser or appraisers.

## ARTICLE VI
## DETERMINATION AND DISTRIBUTION OF BENEFITS

## 6.1      DETERMINATION OF BENEFITS UPON RETIREMENT

Every Participant may terminate employment with the Employer and retire for purposes hereof on the Participant's Normal Retirement Date or Early Retirement Date. However, a Participant may postpone the termination of employment with the Employer to a later date, in which event the participation of such Participant in the Plan, including the right to receive allocations pursuant to Section 4.3, shall continue until such Participant's Retirement Date. Upon a Participant's Retirement Date, or if elected in the Adoption Agreement, the attainment of Normal Retirement Date without termination of

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

employment with the Employer, or as soon thereafter as is practicable, the Administrator shall direct the distribution, at the election of the Participant, of the Participant's entire Vested interest in the Plan in accordance with Section 6.5.

**6.2     DETERMINATION OF BENEFITS UPON DEATH**

(a)     Upon the death of a Participant before the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Combined Account shall, if elected in the Adoption Agreement, become fully Vested. The Administrator shall direct, in accordance with the provisions of Sections 6.6 and 6.7, the distribution of the deceased Participant's Vested accounts to the Participant's Beneficiary.

(b)     Upon the death of a Former Participant, the Administrator shall direct, in accordance with the provisions of Sections 6.6 and 6.7, the distribution of any remaining Vested amounts credited to the accounts of such deceased Former Participant to such Former Participant's Beneficiary.

(c)     The Administrator may require such proper proof of death and such evidence of the right of any person to receive payment of the value of the account of a deceased Participant or Former Participant as the Administrator may deem desirable. The Administrator's determination of death and of the right of any person to receive payment shall be conclusive.

(d)     Unless otherwise elected in the manner prescribed in Section 6.6, the Beneficiary of the Pre-Retirement Survivor Annuity shall be the Participant's surviving spouse. Except, however, the Participant may designate a Beneficiary other than the spouse for the Pre-Retirement Survivor Annuity if:

(1)     the Participant and the Participant's spouse have validly waived the Pre-Retirement Survivor Annuity in the manner prescribed in Section 6.6, and the spouse has waived the right to be the Participant's Beneficiary,

(2)     the Participant is legally separated or has been abandoned (within the meaning of local law) and the Participant has a court order to such effect (and there is no "qualified domestic relations order" as defined in Code Section 414(p) which provides otherwise),

(3)     the Participant has no spouse, or

(4)     the spouse cannot be located.

In such event, the designation of a Beneficiary shall be made on a form satisfactory to the Administrator. A Participant may at any time revoke a designation of a Beneficiary or change a Beneficiary by filing written (or in such other form as permitted by the IRS) notice of such revocation or change with the Administrator. However, the Participant's spouse must again consent in writing (or in such other form as permitted by the IRS) to any change in Beneficiary unless the original consent acknowledged that the spouse had the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elected to relinquish such right.

(e)     A Participant may, at any time, designate a Beneficiary for death benefits, if any, payable under the Plan that are in excess of the Pre-Retirement Survivor Annuity without the waiver or consent of the Participant's spouse. In the event no valid designation of Beneficiary exists, or if the Beneficiary is not alive at the time of the Participant's death, the death benefit will be paid in the following order of priority, unless the Employer specifies a different order of priority in an addendum to the Adoption Agreement, to:

(1)     The Participant's surviving spouse;

(2)     The Participant's children, including adopted children, per stirpes

(3)     The Participant's surviving parents, in equal shares; or

(4)     The Participant's estate.

If the Beneficiary does not predecease the Participant, but dies prior to distribution of the death benefit, the death benefit will be paid to the Beneficiary's estate.

(f)     Notwithstanding anything in this Section to the contrary, if a Participant has designated the spouse as a Beneficiary, then a divorce decree or a legal separation that relates to such spouse shall revoke the Participant's designation of the spouse as a Beneficiary unless the decree or a qualified domestic relations order (within the meaning of Code Section 414(p)) provides otherwise or a subsequent Beneficiary designation is made.

(g)     If the Plan provides an insured death benefit and a Participant dies before any insurance coverage to which the Participant is entitled under the Plan is effected, the death benefit from such insurance coverage shall be limited to the premium which was or otherwise would have been used for such purpose.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(h)    In the event of any conflict between the terms of this Plan and the terms of any Contract issued hereunder, the Plan provisions shall control.

## 6.3    DETERMINATION OF BENEFITS IN EVENT OF DISABILITY

In the event of a Participant's Total and Permanent Disability prior to the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Combined Account shall, if elected in the Adoption Agreement, become fully Vested. In the event of a Participant's Total and Permanent Disability, the Administrator, in accordance with the provisions of Sections 6.5 and 6.7, shall direct the distribution to such Participant of the entire Vested interest in the Plan.

## 6.4    DETERMINATION OF BENEFITS UPON TERMINATION

(a)    If a Participant's employment with the Employer is terminated for any reason other than death, Total and Permanent Disability, or retirement, then such Participant shall be entitled to such benefits as are provided herein.

Distribution of the funds due to a Terminated Participant shall be made on the occurrence of an event which would result in the distribution had the Terminated Participant remained in the employ of the Employer (upon the Participant's death, Total and Permanent Disability, Early or Normal Retirement). However, at the election of the Participant, the Administrator shall direct that the entire Vested portion of the Terminated Participant's Combined Account be payable to such Terminated Participant provided the conditions, if any, set forth in the Adoption Agreement have been satisfied. Any distribution under this paragraph shall be made in a manner which is consistent with and satisfies the provisions of Section 6.5, including but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder.

Regardless of whether distributions in kind are permitted, in the event the amount of the Vested portion of the Terminated Participant's Combined Account equals or exceeds the fair market value of any insurance Contracts, the Trustee, when so directed by the Administrator and agreed to by the Terminated Participant, shall assign, transfer, and set over to such Terminated Participant all Contracts on such Terminated Participant's life in such form or with such endorsements, so that the settlement options and forms of payment are consistent with the provisions of Section 6.5. In the event that the Terminated Participant's Vested portion does not at least equal the fair market value of the Contracts, if any, the Terminated Participant may pay over to the Trustee the sum needed to make the distribution equal to the value of the Contracts being assigned or transferred, or the Trustee, pursuant to the Participant's election, may borrow the cash value of the Contracts from the Insurer so that the value of the Contracts is equal to the Vested portion of the Terminated Participant's Combined Account and then assign the Contracts to the Terminated Participant.

Notwithstanding the above, unless otherwise elected in the Adoption Agreement, if the value of a Terminated Participant's Vested benefit derived from Employer and Employee contributions does not exceed $5,000 (or, $3,500 for distributions made prior to the later of the first day of the first Plan Year beginning on or after August 5, 1997, or the date specified in the Adoption Agreement) the Administrator shall direct that the entire Vested benefit be paid to such Participant in a single lump-sum without regard to the consent of the Participant or the Participant's spouse. A Participant's Vested benefit shall not include Qualified Voluntary Employee Contributions within the meaning of Code Section 72(o)(5)(B) for Plan Years beginning prior to January 1, 1989. Furthermore, the determination of whether the $5,000 (or, if applicable, $3,500) threshold has been exceeded is generally based on the value of the Vested benefit as of the Valuation Date preceding the date of the distribution. However, if the "lookback rule" applies, the applicable threshold is deemed to be exceeded if the Vested benefit exceeded the applicable threshold at the time of any prior distribution. The "lookback rule" generally applies to all distributions made prior to March 22, 1999. With respect to distributions made on or after March 22, 1999, the "lookback rule" applies if either (1) the provisions of Section 6.12 do not apply or (2) a Participant has begun to receive distributions pursuant to an optional form of benefit under which at least one scheduled periodic distribution has not yet been made, and if the value of the Participant's benefit, determined at the time of the first distribution under that optional form of benefit exceeded the applicable threshold. However, the Plan does not fail to satisfy the requirements of this paragraph if, prior to the adoption of this Prototype Plan, the "lookback rule" was applied to all distributions. Notwithstanding the preceding, the "lookback rule" will not apply to any distributions made on or after October 17, 2000.

(b)    The Vested portion of any Participant's Account shall be a percentage of such Participant's Account determined on the basis of the Participant's number of Years of Service (or Periods of Service if the Elapsed Time Method is elected) according to the vesting schedule specified in the Adoption Agreement. However, a Participant's entire interest in the Plan shall be non-forfeitable upon the Participant's Normal Retirement Age (if the Participant is employed by the Employer on or after such date).

(c)    For any Top Heavy Plan Year, the minimum top heavy vesting schedule elected by the Employer in the Adoption Agreement will automatically apply to the Plan. The minimum top heavy vesting schedule applies to all benefits within the meaning of Code Section 411(a)(7) except those attributable to Employee contributions, including benefits accrued before the effective date of Code Section 416 and benefits accrued before the Plan became top heavy. Further, no decrease in a Participant's Vested percentage shall occur in the event the Plan's status as top heavy changes for any Plan Year. However, this Section does not apply to the account balances of any Employee who does not have

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

an Hour of Service after the Plan has initially become top heavy and the Vested percentage of such Employee's' Participant's Account shall be determined without regard to this Section 6.4(c).

If in any subsequent Plan Year the Plan ceases to be a Top Heavy Plan, then unless a specific Plan amendment is made to provide otherwise, the Administrator will continue to use the vesting schedule in effect while the Plan was a Top Heavy Plan.

(d)     Upon the complete discontinuance of the Employer's contributions to the Plan (if this is a profit sharing plan) or upon any full or partial termination of the Plan, all amounts then credited to the account of any affected Participant shall become 100% Vested and shall not thereafter be subject to Forfeiture.

(e)     If this is an amended or restated Plan, then notwithstanding the vesting schedule specified in the Adoption Agreement, the Vested percentage of a Participant's Account shall not be less than the Vested percentage attained as of the later of the effective date or adoption date of this amendment and restatement. The computation of a Participant's nonforfeitable percentage of such Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Article, or due to changes in the Plan's status as a Top Heavy Plan. Furthermore, if the Plan's vesting schedule is amended, then the amended schedule will only apply to those Participants who complete an Hour of Service after the effective date of the amendment.

(f)     If the Plan's vesting schedule is amended, or if the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage or if the Plan is deemed amended by an automatic change to a top heavy vesting schedule, then each Participant with at least three (3) Years of Service (or Periods of Service if the Elapsed Time Method is elected) as of the expiration date of the election period may elect to have such Participant's nonforfeitable percentage computed under the Plan without regard to such amendment or change. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

(1)     the adoption date of the amendment.

(2)     the effective date of the amendment, or

(3)     the date the Participant receives written notice of the amendment from the Employer or Administrator.

(g)     In determining Years of Service or Periods of Service for purposes of vesting under the Plan, Years of Service or Periods of Service shall be excluded as elected in the Adoption Agreement.

6.5     **DISTRIBUTION OF BENEFITS**

(a)(1)     Unless otherwise elected as provided below, a Participant who is married on the Annuity Starting Date and who does not die before the Annuity Starting Date shall receive the value of all Plan benefits in the form of a Joint and Survivor Annuity. The Joint and Survivor Annuity is an annuity that commences immediately and shall be equal in value to a single life annuity. Such joint and survivor benefits following the Participant's death shall continue to the spouse during the spouse's lifetime at a rate equal to either fifty percent (50%), seventy-five percent (75%) (or, sixty-six and two-thirds percent (66 2/3%)) if the Insurer used to provide the annuity does not offer a joint and seventy-five percent (75%) annuity), or one hundred percent (100%) of the rate at which such benefits were payable to the Participant. Unless otherwise elected in the Adoption Agreement, a joint and fifty percent (50%) survivor annuity shall be considered the designated qualified Joint and Survivor Annuity and the normal form of payment for the purposes of this Plan. However, the Participant may, without spousal consent, elect an alternative Joint and Survivor Annuity, which alternative shall be equal in value to the designated qualified Joint and Survivor Annuity. An unmarried Participant shall receive the value of such Participant's benefit in the form of a life annuity. Such unmarried Participant, however, may elect to waive the life annuity. The election must comply with the provisions of this Section as if it were an election to waive the Joint and Survivor Annuity by a married Participant, but without fulfilling the spousal consent requirement. The Participant may elect to have any annuity provided for in this Section distributed upon the attainment of the "earliest retirement age" under the Plan. The "earliest retirement age" is the earliest date on which, under the Plan, the Participant could elect to receive retirement benefits.

(2)     Any election to waive the Joint and Survivor Annuity must be made by the Participant in writing (or in such other form as permitted by the IRS) during the election period and be consented to in writing (or in such other form as permitted by the IRS) by the Participant's spouse. If the spouse is legally incompetent to give consent, the spouse's legal guardian, even if such guardian is the Participant, may give consent. Such election shall designate a Beneficiary (or a form of benefits) that may not be changed without spousal consent (unless the consent of the spouse expressly permits designations by the Participant without the requirement of further consent by the spouse). Such spouse's consent shall be irrevocable and must acknowledge the effect of such election and be witnessed by a Plan representative or a notary public. Such consent shall not be required if it is established to the satisfaction of the Administrator that the required consent cannot be obtained because there is no spouse, the spouse cannot be located, or other circumstances that may be prescribed by

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

Regulations. The election made by the Participant and consented to by such Participant's spouse may be revoked by the Participant in writing (or in such other form as permitted by the IRS) without the consent of the spouse at any time during the election period. A revocation of a prior election shall cause the Participant's benefits to be distributed as a Joint and Survivor Annuity. The number of revocations shall not be limited. Any new election must comply with the requirements of this paragraph. A former spouse's waiver shall not be binding on a new spouse.

(3)     The election period to waive the Joint and Survivor Annuity shall be the ninety (90) day period ending on the Annuity Starting Date.

(4)     For purposes of this Section, spouse or surviving spouse means the spouse or surviving spouse of the Participant, provided that a former spouse will be treated as the spouse or surviving spouse and a current spouse will not be treated as the spouse or surviving spouse to the extent provided under a qualified domestic relations order as described in Code Section 414(p).

(5)     With regard to the election, except as otherwise provided herein, the Administrator shall provide to the Participant no less than thirty (30) days and no more than ninety (90) days before the Annuity Starting Date a written (or such other form as permitted by the IRS) explanation of:

    (i)     the terms and conditions of the Joint and Survivor Annuity.

    (ii)     the Participant's right to make and the effect of an election to waive the Joint and Survivor Annuity,

    (iii)     the right of the Participant's spouse to consent to any election to waive the Joint and Survivor Annuity, and

    (iv)     the right of the Participant to revoke such election, and the effect of such revocation.

(6)     Any distribution provided for in this Section made on or after December 31, 1996, may commence less than thirty (30) days after the notice required by Code Section 417(a)(3) is given provided the following requirements are satisfied:

    (i)     the Administrator clearly informs the Participant that the Participant has a right to a period of thirty (30) days after receiving the notice to consider whether to waive the Joint and Survivor Annuity and to elect (with spousal consent) a form of distribution other than a Joint and Survivor Annuity;

    (ii)     the Participant is permitted to revoke any affirmative distribution election at least until the Annuity Starting Date or, if later, at any time prior to the expiration of the seven (7) day period that begins the day after the explanation of the Joint and Survivor Annuity is provided to the Participant;

    (iii)     the Annuity Starting Date is after the time that the explanation of the Joint and Survivor Annuity is provided to the Participant. However, the Annuity Starting Date may be before the date that any affirmative distribution election is made by the Participant and before the date that the distribution is permitted to commence under (iv) below; and

    (iv)     distribution in accordance with the affirmative election does not commence before the expiration of the seven (7) day period that begins the day after the explanation of the Joint and Survivor Annuity is provided to the Participant.

(b)     In the event a married Participant duly elects pursuant to paragraph (a)(2) above not to receive the benefit in the form of a Joint and Survivor Annuity, or if such Participant is not married, in the form of a life annuity, the Administrator, pursuant to the election of the Participant, shall direct the distribution to a Participant or Beneficiary any amount to which the Participant or Beneficiary is entitled under the Plan in one or more of the following methods which are permitted pursuant to the Adoption Agreement:

(1)     One lump-sum payment in cash or in property that is allocated to the accounts of the Participant at the time of the distribution;

(2)     Partial withdrawals;

(3)     Payments over a period certain in monthly, quarterly, semiannual, or annual cash installments. In order to provide such installment payments, the Administrator may (A) segregate the aggregate amount thereof in a separate, federally insured savings account, certificate of deposit in a bank or savings and loan association, money market certificate or other liquid short-term security or (B) purchase a nontransferable annuity contract for a term certain (with no life contingencies) providing for such payment. The period over

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

which such payment is to be made shall not extend beyond the Participant's life expectancy (or the life expectancy of the Participant and the Participant's designated Beneficiary).

(4)     Purchase of or providing an annuity. However, such annuity may not be in any form that will provide for payments over a period extending beyond either the life of the Participant (or the lives of the Participant and the Participant's designated Beneficiary) or the life expectancy of the Participant (or the life expectancy of the Participant and the Participant's designated Beneficiary).

(c)     Benefits may not be paid without the Participant's and the Participant's spouse's consent if the present value of the Participant's Joint and Survivor Annuity derived from Employer and Employee contributions exceeds, or has ever exceeded, $5,000 (or $3,500, for distributions made prior to the later of the first day of the first Plan Year beginning after August 5, 1997, or the date specified in the Adoption Agreement) and the benefit is "immediately distributable. However, spousal consent is not required if the distribution will made in the form a Qualified Joint and Survivor Annuity and the benefit is "immediately distributable. A benefit is "immediately distributable" if any part of the benefit could be distributed to the Participant (or surviving spouse) before the Participant attains (or would have attained if not deceased) the later of the Participant's Normal Retirement Age or age 62.

If the value of the Participant's benefit derived from Employer and Employee contributions does not exceed, and has never exceeded at the time of any prior distribution, $5,000 (or, if applicable, $3,500), then the Administrator will distribute such benefit in a lump-sum without such Participant's consent. No distribution may be made under the preceding sentence after the Annuity Starting Date unless the Participant and the Participant's spouse consent in writing (or in such other form as permitted by the IRS) to such distribution. Any consent required under this paragraph must be obtained not more than ninety (90) days before commencement of the distribution and shall be made in a manner consistent with Section 6.5(a)(2). Notwithstanding the preceding, the "lookback rule" (which provides that if the present value at the time of a prior distribution exceeded the applicable dollar threshold, then the present value at any subsequent time is deemed to exceed the threshold) will not apply to any distributions made on or after October 17, 2000.

(d)     The following rules will apply with respect to the consent requirements set forth in subsection (c):

(1)     No consent shall be valid unless the Participant has received a general description of the material features and an explanation of the relative values of the optional forms of benefit available under the Plan that would satisfy the notice requirements of Code Section 417;

(2)     The Participant must be informed of the right to defer receipt of the distribution. If a Participant fails to consent, it shall be deemed an election to defer the commencement of payment of any benefit. However, any election to defer the receipt of benefits shall not apply with respect to distributions that are required under Section 6.5(e);

(3)     Notice of the rights specified under this paragraph shall be provided no less than thirty (30) days and no more than ninety (90) days before the Annuity Starting Date;

(4)     Written (or such other form as permitted by the IRS) consent of the Participant to the distribution must not be made before the Participant receives the notice and must not be made more than ninety (90) days before the Annuity Starting Date; and

(5)     No consent shall be valid if a significant detriment is imposed under the Plan on any Participant who does not consent to the distribution.

(e)     Notwithstanding any provision in the Plan to the contrary, for Plan Years beginning after December 31, 1996, the distribution of a Participant's benefits, whether under the Plan or through the purchase of an annuity Contract, shall be made in accordance with the following requirements and shall otherwise comply with Code Section 401(a)(9) and the Regulations thereunder (including Regulation 1.401(a)(9)-2):

(1)     A Participant's benefits will be distributed or must begin to be distributed not later than the Participant's "required beginning date. Alternatively, distributions to a Participant must begin no later than the Participant's "required beginning date" and must be made over the life of the Participant (or the lives of the Participant and the Participant's designated Beneficiary) or the life expectancy of the Participant (or the life expectancies of the Participant and the Participant's designated Beneficiary) in accordance with Regulations. However, if the distribution is to be in the form of a joint and survivor annuity or single life annuity, then distributions must begin no later than the "required beginning date" and must be made over the life of the Participant (or the lives of the Participant and the Participant's designated Beneficiary) in accordance with Regulations.

(2)     The "required beginning date" for a Participant who is a "five percent (5%) owner" with respect to the Plan Year ending in the calendar year in which such Participant attains age 70 1/2 means April 1st of the calendar year following the calendar year in which the Participant attains age 70 1/2. Once distributions have

begun to a "five percent (5%) owner" under this subsection, they must continue to be distributed, even if the Participant ceases to be a "five percent (5%) owner" in a subsequent year.

(3)     The "required beginning date" for a Participant other than a "five percent (5%) owner" means, unless the Employer has elected to continue the pre-SBJPA rules in the Adoption Agreement, April 1st of the calendar year following the later of the calendar year in which the Participant attains age 70 1/2 or the calendar year in which the Participant retires.

(4)     If the election is made to continue the pre-SBJPA rules, then except as provided below, the "required beginning date" is April 1st of the calendar year following the calendar year in which a Participant attains age 70 1/2.

(i)     However, the "required beginning date" for a Participant who had attained age 70 1/2 before January 1, 1988, and was not a five percent (5%) owner (within the meaning of Code Section 416) at any time during the Plan Year ending with or within the calendar year in which the Participant attained age 66 1/2 or any subsequent Plan Year, is April 1st of the calendar year following the calendar in which the Participant retires.

(ii)     Notwithstanding (i) above, the "required beginning date" for a Participant who was a five percent (5%) owner (within the meaning of Code Section 416) at any time during the five (5) Plan Year period ending in the calendar year in which the Participant attained age 70 1/2 is April 1st of the calendar year in which the Participant attained age 70 1/2. In the case of a Participant who became a five percent (5%) owner during any Plan Year after the calendar year in which the Participant attained age 70 1/2, the "required beginning date" is April 1st of the calendar year following the calendar year in which such subsequent Plan Year ends.

(5)     If this is an amendment or restatement of a plan that contained the pre-SBJPA rules and an election is made to use the post-SBJPA rules, then the transition rules elected in the Adoption Agreement will apply.

(6)     Except as otherwise provided herein, "five percent (5%) owner" means, for purposes of this Section, a Participant who is a five percent (5%) owner as defined in Code Section 416 at any time during the Plan Year ending with or within the calendar year in which such owner attains age 70 1/2.

(7)     Distributions to a Participant and such Participant's Beneficiaries will only be made in accordance with the incidental death benefit requirements of Code Section 401(a)(9)(G) and the Regulations thereunder.

(8)     For purposes of this Section, the life expectancy of a Participant and/or a Participant's spouse (other than in the case of a life annuity) shall or shall not be redetermined annually as elected in the Adoption Agreement and in accordance with Regulations. If the Participant or the Participant's spouse may elect, pursuant to the Adoption Agreement, to have life expectancies recalculated, then the election, once made shall be irrevocable. If no election is made by the time distributions must commence, then the life expectancy of the Participant and the Participant's spouse shall not be subject to recalculation. Life expectancy and joint and last survivor life expectancy shall be computed using the return multiples in Tables V and VI of Regulation Section 1.72-9.

(9)     With respect to distributions under the Plan made for calendar years beginning on or after January 1, 2001, or if later, the date specified in the Adoption Agreement, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the Regulations under section 401(a)(9) that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary. This amendment shall continue in effect until the end of the last calendar year beginning before the effective date of final Regulations under section 401(a)(9) or such other date as may be specified in guidance published by the Internal Revenue Service.

However, if the date specified in the Adoption Agreement is a date in 2001 other than January 1, 2001, then with respect to distributions under the Plan made on or after such date for calendar years beginning on or after January 1, 2001, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the Regulations under section 401(a)(9) that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary. If the total amount of required minimum distributions made to a participant for 2001 prior to the specified date are equal to or greater than the amount of required minimum distributions determined under the 2001 Proposed Regulations, then no additional distributions are required for such participant for 2001 on or after such date. If the total amount of required minimum distributions made to a participant for 2001 prior to the specified date are less than the amount determined under the 2001 Proposed Regulations, then the amount of required minimum distributions for 2001 on or after such date will be determined so that the total amount of required minimum distributions for 2001 is the amount determined under the 2001 Proposed Regulations. This amendment shall continue in effect until the end of the last calendar year beginning before the effective date of final Regulations under section 401(a)(9) or such other date as may be specified in guidance published by the Internal Revenue Service.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(f)     All annuity Contracts under this Plan shall be non-transferable when distributed. Furthermore, the terms of any annuity Contract purchased and distributed to a Participant or spouse shall comply with all of the requirements of this Plan.

(g)     Subject to the spouse's right of consent afforded under the Plan, the restrictions imposed by this Section shall not apply if a Participant has, prior to January 1, 1984, made a written designation to have retirement benefits paid in an alternative method acceptable under Code Section 401(a) as in effect prior to the enactment of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA).

(h)     If a distribution is made to a Participant who has not severed employment and who is not fully Vested in the Participant's Account, and the Participant may increase the Vested percentage in such account, then at any relevant time the Participant's Vested portion of the account will be equal to an amount ("X") determined by the formula:

$$X \text{ equals } P (AB \text{ plus } D) \quad D$$

For purposes of applying the formula: P is the Vested percentage at the relevant time, AB is the account balance at the relevant time, D is the amount of distribution, and the relevant time is the time at which, under the Plan, the Vested percentage in the account cannot increase.

However, the Employer may attach an addendum to the Adoption Agreement to provide that a separate account shall be established for the Participant's interest in the Plan as of the time of the distribution, and at any relevant time the Participant's Vested portion of the separate account will be equal to an amount determined as follows: P (AB plus (R x D))  (R x D) where R is the ratio of the account balance at the relevant time to the account balance after distribution and the other terms have the same meaning as in the preceding paragraph. Any amendment to change the formula in accordance with the preceding sentence shall not be considered an amendment which causes this Plan to become an individually designed Plan.

(i)     If this is a Plan amendment that eliminates or restricts the ability of a Participant to receive payment of the Participant's interest in the Plan under a particular optional form of benefit, then the amendment shall not apply to any distribution with an annuity starting date earlier than the earlier of: (i) the 90th day after the date the Participant receiving the distribution has been furnished a summary that reflects the amendment and that satisfies the Act requirements at 29 CFR 2520.104b-3 relating to a summary of material modifications or (ii) the first day of the second Plan Year following the Plan Year in which the amendment is adopted.

6.6     **DISTRIBUTION OF BENEFITS UPON DEATH**

(a)     Unless otherwise elected as provided below, a Vested Participant who dies before the Annuity Starting Date and who has a surviving spouse shall have the Pre-Retirement Survivor Annuity paid to the surviving spouse. The Participant's spouse may direct that payment of the Pre-Retirement Survivor Annuity commence within a reasonable period after the Participant's death. If the spouse does not so direct, payment of such benefit will commence at the time the Participant would have attained the later of Normal Retirement Age or age 62. However, the spouse may elect a later commencement date. Any distribution to the Participant's spouse shall be subject to the rules specified in Section 6.6(h).

(b)     Any election to waive the Pre-Retirement Survivor Annuity before the Participant's death must be made by the Participant in writing (or in such other form as permitted by the IRS) during the election period and shall require the spouse's irrevocable consent in the same manner provided for in Section 6.5(a)(2). Further, the spouse's consent must acknowledge the specific nonspouse Beneficiary. Notwithstanding the foregoing, the nonspouse Beneficiary need not be acknowledged, provided the consent of the spouse acknowledges that the spouse has the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elects to relinquish such right.

(c)     The election period to waive the Pre-Retirement Survivor Annuity shall begin on the first day of the Plan Year in which the Participant attains age 35 and end on the date of the Participant's death. An earlier waiver (with spousal consent) may be made provided a written (or such other form as permitted by the IRS) explanation of the Pre-Retirement Survivor Annuity is given to the Participant and such waiver becomes invalid at the beginning of the Plan Year in which the Participant turns age 35. In the event a Participant separates from service prior to the beginning of the election period, the election period shall begin on the date of such separation from service.

(d)     With regard to the election, the Administrator shall provide each Participant within the applicable election period, with respect to such Participant (and consistent with Regulations), a written (or such other form as permitted by the IRS) explanation of the Pre-Retirement Survivor Annuity containing comparable information to that required pursuant to Section 6.5(a)(5). For the purposes of this paragraph, the term "applicable period" means, with respect to a Participant, whichever of the following periods ends last:

(1)     The period beginning with the first day of the Plan Year in which the Participant attains age 32 and ending with the close of the Plan Year preceding the Plan Year in which the Participant attains age 35;

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

(2)     A reasonable period after the individual becomes a Participant;

(3)     A reasonable period ending after the Plan no longer fully subsidizes the cost of the Pre-Retirement Survivor Annuity with respect to the Participant; or

(4)     A reasonable period ending after Code Section 401(a)(11) applies to the Participant.

For purposes of applying this subsection, a reasonable period ending after the enumerated events described in (2), (3) and (4) is the end of the two (2) year period beginning one (1) year prior to the date the applicable event occurs, and ending one (1) year after that date. In the case of a Participant who separates from service before the Plan Year in which age 35 is attained, notice shall be provided within the two (2) year period beginning one (1) year prior to separation and ending one (1) year after separation. If such a Participant thereafter returns to employment with the Employer, the applicable period for such Participant shall be redetermined.

(e)     The Pre-Retirement Survivor Annuity provided for in this Section shall apply only to Participants who are credited with an Hour of Service on or after August 23, 1984. Former Participants who are not credited with an Hour of Service on or after August 23, 1984, shall be provided with rights to the Pre-Retirement Survivor Annuity in accordance with Section 303(e)(2) of the Retirement Equity Act of 1984.

(f)     If the value of the Pre-Retirement Survivor Annuity derived from Employer and Employee contributions does not exceed, and has never exceeded at the time of any prior distribution, $5,000 (or, $3,500 for distributions made prior to the later of the first day of the first Plan Year beginning after August 5, 1997, or the date specified in the Adoption Agreement) the Administrator shall direct the distribution of such amount to the Participant's spouse as soon as practicable. No distribution may be made under the preceding sentence after the Annuity Starting Date unless the spouse consents in writing (or in such other form as permitted by the IRS). If the value exceeds, or has ever exceeded at the time of any prior distribution, $5,000 (or, if applicable, $3,500), an immediate distribution of the entire amount may be made to the surviving spouse, provided such surviving spouse consents in writing (or in such other form as permitted by the IRS) to such distribution. Any consent required under this paragraph must be obtained not more than ninety (90) days before commencement of the distribution and shall be made in a manner consistent with Section 6.5(a)(2). Notwithstanding the preceding, the "lookback rule" (which provides that if the present value at the time of a prior distribution exceeded the applicable dollar threshold, then the present value at any subsequent time is deemed to exceed the threshold) will not apply to any distributions made on or after October 17, 2000.

(g)     Death benefits may be paid to a Participant's Beneficiary in one of the following optional forms of benefits subject to the rules specified in Section 6.6(h) and the elections made in the Adoption Agreement. Such optional forms of distributions may be elected by the Participant in the event there is an election to waive the Pre-Retirement Survivor Annuity, and for any death benefits in excess of the Pre-Retirement Survivor Annuity. However, if no optional form of distribution was elected by the Participant prior to death, then the Participant's Beneficiary may elect the form of distribution:

(1)     One lump-sum payment in cash or in property that is allocated to the accounts of the Participant at the time of the distribution.

(2)     Partial withdrawals.

(3)     Payment in monthly, quarterly, semi-annual, or annual cash installments over a period to be determined by the Participant or the Participant's Beneficiary. In order to provide such installment payments, the Administrator may (A) segregate the aggregate amount thereof in a separate, federally insured savings account, certificate of deposit in a bank or savings and loan association, money market certificate or other liquid short-term security or (B) purchase a nontransferable annuity contract for a term certain (with no life contingencies) providing for such payment. After periodic installments commence, the Beneficiary shall have the right to reduce the period over which such periodic installments shall be made, and the cash amount of such periodic installments shall be adjusted accordingly.

(4)     In the form of an annuity over the life expectancy of the Beneficiary.

(5)     If death benefits in excess of the Pre-Retirement Survivor Annuity are to be paid to the surviving spouse, such benefits may be paid pursuant to (1), (2) or (3) above, or used to purchase an annuity so as to increase the payments made pursuant to the Pre-Retirement Survivor Annuity.

(h)     Notwithstanding any provision in the Plan to the contrary, distributions upon the death of a Participant shall be made in accordance with the following requirements and shall otherwise comply with Code Section 401(a)(9) and the Regulations thereunder.

(1)     If it is determined, pursuant to Regulations, that the distribution of a Participant's interest has begun and the Participant dies before the entire interest has been distributed, the remaining portion of such interest

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

shall be distributed at least as rapidly as under the method of distribution elected pursuant to Section 6.5 as of the date of death.

(2)    If a Participant dies before receiving any distributions of the interest in the Plan or before distributions are deemed to have begun pursuant to Regulations, then the death benefit shall be distributed to the Participant's Beneficiaries in accordance with the following rules subject to the elections made in the Adoption Agreement and subsections 6.6(h)(3) and 6.6(i) below:

(i)    The entire death benefit shall be distributed to the Participant's Beneficiaries by December 31st of the calendar year in which the fifth anniversary of the Participant's death occurs;

(ii)    The 5-year distribution requirement of (i) above shall not apply to any portion of the deceased Participant's interest which is payable to or for the benefit of a designated Beneficiary. In such event, such portion shall be distributed over the life of such designated Beneficiary (or over a period not extending beyond the life expectancy of such designated Beneficiary) provided such distribution begins not later than December 31st of the calendar year immediately following the calendar year in which the Participant died (or such later date as may be prescribed by Regulations);

(iii)    However, in the event the Participant's spouse (determined as of the date of the Participant's death) is the designated Beneficiary, the provisions of (ii) above shall apply except that the requirement that distributions commence within one year of the Participant's death shall not apply. In lieu thereof, distributions must commence on or before the later of: (1) December 31st of the calendar year immediately following the calendar year in which the Participant died; or (2) December 31st of the calendar year in which the Participant would have attained age 70 1/2. If the surviving spouse dies before distributions to such spouse begin, then the 5-year distribution requirement of this Section shall apply as if the spouse was the Participant.

(3)    Notwithstanding subparagraph (2) above, or any elections made in the Adoption Agreement, if a Participant's death benefits are to be paid in the form of a Pre-Retirement Survivor Annuity, then distributions to the Participant's surviving spouse must commence on or before the later of: (1) December 31st of the calendar year immediately following the calendar year in which the Participant died; or (2) December 31st of the calendar year in which the Participant would have attained age 70 1/2.

(i)    For purposes of Section 6.6(h)(2), the election by a designated Beneficiary to be excepted from the 5-year distribution requirement (if permitted in the Adoption Agreement) must be made no later than December 31st of the calendar year following the calendar year of the Participant's death. Except, however, with respect to a designated Beneficiary who is the Participant's surviving spouse, the election must be made by the earlier of: (1) December 31st of the calendar year immediately following the calendar year in which the Participant died or, if later, December 31st of the calendar year in which the Participant would have attained age 70 1/2; or (2) December 31st of the calendar year which contains the fifth anniversary of the date of the Participant's death. An election by a designated Beneficiary must be in writing (or in such other form as permitted by the IRS) and shall be irrevocable as of the last day of the election period stated herein. In the absence of an election by the Participant or a designated Beneficiary, the 5-year distribution requirement shall apply.

(j)    For purposes of this Section, the life expectancy of a Participant and a Participant's spouse (other than in the case of a life annuity) shall or shall not be redetermined annually as elected in the Adoption Agreement and in accordance with Regulations. If the Participant may elect, pursuant to the Adoption Agreement, to have life expectancies recalculated, then the election, once made shall be irrevocable. If no election is made by the time distributions must commence, then the life expectancy of the Participant and the Participant's spouse shall not be subject to recalculation. Life expectancy and joint and last survivor life expectancy shall be computed using the return multiples in Tables V and VI of Regulation Section 1.72-9.

(k)    For purposes of this Section, any amount paid to a child of the Participant will be treated as if it had been paid to the surviving spouse if the amount becomes payable to the surviving spouse when the child reaches the age of majority.

(l)    In the event that less than one hundred percent (100%) of a Participant's interest in the Plan is distributed to such Participant's spouse, the portion of the distribution attributable to the Participant's Voluntary Contribution Account shall be in the same proportion that the Participant's Voluntary Contribution Account bears to the Participant's total interest in the Plan.

(m)    Subject to the spouse's right of consent afforded under the Plan, the restrictions imposed by this Section shall not apply if a Participant has, prior to January 1, 1984, made a written designation to have death benefits paid in an alternative method acceptable under Code Section 401(a) as in effect prior to the enactment of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

## 6.7    TIME OF DISTRIBUTION

Except as limited by Sections 6.5 and 6.6, whenever a distribution is to be made, or a series of payments are to commence, the distribution or series of payments may be made or begun on such date or as soon thereafter as is practicable. However, unless a Former Participant elects in writing to defer the receipt of benefits (such election may not result in a death benefit that is more than incidental), the payment of benefits shall begin not later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs: (a) the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein; (b) the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or (c) the date the Participant terminates service with the Employer.

Notwithstanding the foregoing, the failure of a Participant and, if applicable, the Participant's spouse, to consent to a distribution that is "immediately distributable" (within the meaning of Section 6.5(d)), shall be deemed to be an election to defer the commencement of payment of any benefit sufficient to satisfy this Section.

## 6.8    DISTRIBUTION FOR MINOR OR INCOMPETENT BENEFICIARY

In the event a distribution is to be made to a minor or incompetent Beneficiary, then the Administrator may direct that such distribution be paid to the legal guardian, or if none in the case of a minor Beneficiary, to a parent of such Beneficiary, or to the custodian for such Beneficiary under the Uniform Gift to Minors Act or Gift to Minors Act, if such is permitted by the laws of the state in which said Beneficiary resides. Such a payment to the legal guardian, custodian or parent of a minor or incompetent Beneficiary shall fully discharge the Trustee, Employer, and Plan from further liability on account thereof.

## 6.9    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN

In the event that all, or any portion, of the distribution payable to a Participant or Beneficiary hereunder shall, at the later of the Participant's attainment of age 62 or Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent effort, to ascertain the whereabouts of such Participant or Beneficiary, the amount so distributable shall be treated as a Forfeiture pursuant to the Plan. Notwithstanding the foregoing, if the value of a Participant's Vested benefit derived from Employer and Employee contributions does not exceed $5,000, then the amount distributable may be treated as a Forfeiture at the time it is determined that the whereabouts of the Participant or the Participant's Beneficiary can not be ascertained. In the event a Participant or Beneficiary is located subsequent to the Forfeiture, such benefit shall be restored, first from Forfeitures, if any, and then from an additional Employer contribution, if necessary. Upon Plan termination, the portion of the distributable amount that is an "eligible rollover distribution" as defined in Plan Section 6.14(b)(1) may be paid directly to an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b). However, regardless of the preceding, a benefit that is lost by reason of escheat under applicable state law is not treated as a Forfeiture for purposes of this Section nor as an impermissible forfeiture under the Code.

## 6.10    IN-SERVICE DISTRIBUTION

For Profit Sharing Plans and 401(k) Profit Sharing Plans, if elected in the Adoption Agreement, at such time as the conditions set forth in the Adoption Agreement have been satisfied, then the Administrator, at the election of a Participant who has not severed employment with the Employer, shall direct the distribution of up to the entire Vested amount then credited to the accounts as elected in the Adoption Agreement maintained on behalf of such Participant. In the event that the Administrator makes such a distribution, the Participant shall continue to be eligible to participate in the Plan on the same basis as any other Employee. Any distribution made pursuant to this Section shall be made in a manner consistent with Section 6.5, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder. Furthermore, if an in-service distribution is permitted from more than one account type, the Administrator may determine any ordering of a Participant's in-service distribution from such accounts.

## 6.11    ADVANCE DISTRIBUTION FOR HARDSHIP

(a)    For Profit Sharing Plans and 401(k) Plans (except to the extent Section 12.9 applies), if elected in the Adoption Agreement, the Administrator, at the election of the Participant, shall direct the distribution to any Participant in any one Plan Year up to the lesser of 100% of the Vested interest of the Participant's Combined Account valued as of the last Valuation Date or the amount necessary to satisfy the immediate and heavy financial need of the Participant. Any distribution made pursuant to this Section shall be deemed to be made as of the first day of the Plan Year or, if later, the Valuation Date immediately preceding the date of distribution, and the account from which the distribution is made shall be reduced accordingly. Withdrawal under this Section shall be authorized only if the distribution is for an immediate and heavy financial need. The Administrator will determine whether there is an immediate and heavy financial need based on the facts and circumstances. An immediate and heavy financial need includes, but is not limited to, a distribution for one of the following:

(1)    Medical expenses described in Code Section 213(d) incurred by the Participant, the Participant's spouse, or any of the Participant's dependents (as defined in Code Section 152) or necessary for these persons to obtain medical care as described in Code Section 213(d);

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(2)     Costs directly related to the purchase (excluding mortgage payments) of a principal residence for the Participant;

(3)     Funeral expenses for a member of the Participant's family;

(4)     Payment of tuition, related educational fees, and room and board expenses, for the next twelve (12) months of post-secondary education for the Participant, the Participant's spouse, children, or dependents (as defined in Code Section 152); or

(5)     Payments necessary to prevent the eviction of the Participant from the Participant's principal residence or foreclosure on the mortgage on that residence.

(b)     If elected in the Adoption Agreement, no distribution shall be made pursuant to this Section from the Participant's Account until such Account has become fully Vested. Furthermore, if a hardship distribution is permitted from more than one account type, the Administrator may determine any ordering of a Participant's hardship distribution from such accounts.

(c)     Any distribution made pursuant to this Section shall be made in a manner which is consistent with and satisfies the provisions of Section 6.5, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder.

## 6.12     SPECIAL RULE FOR CERTAIN PROFIT SHARING PLANS

(a)     The provisions of this Section apply to a Participant in a Profit Sharing Plan or 401(k) Profit Sharing Plan to the extent elected in the Adoption Agreement.

(b)     If an election is made to not offer life annuities as a form of distribution, then a Participant shall be prohibited from electing benefits in the form of a life annuity and the Joint and Survivor Annuity provisions of Section 6.5 shall not apply.

(c)     Notwithstanding anything in Sections 6.2 and 6.6 to the contrary, upon the death of a Participant, the automatic form of distribution will be a lump-sum rather than a Qualified Pre-Retirement Survivor Annuity. Furthermore, the Participant's spouse will be the Beneficiary of the Participant's entire Vested interest in the Plan unless an election is made to waive the spouse as Beneficiary. The other provisions in Section 6.2 shall be applied by treating the death benefit in this subsection as though it is a Qualified Pre-Retirement Survivor Annuity.

(d)     Except to the extent otherwise provided in this Section, the provisions of Sections 6.2, 6.5 and 6.6 regarding spousal consent shall be inoperative with respect to this Plan.

(e)     If a distribution is one to which Code Sections 401(a)(11) and 417 do not apply, such distribution may commence less than thirty (30) days after the notice required under Regulation 1.411(a)-11(c) is given, provided that:

(1)     the Plan Administrator clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)     the Participant, after receiving the notice, affirmatively elects a distribution.

## 6.13     QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION

All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order." Furthermore, a distribution to an "alternate payee" shall be permitted if such distribution is authorized by a "qualified domestic relations order," even if the affected Participant has not reached the "earliest retirement age" under the Plan. For the purposes of this Section, "alternate payee," "qualified domestic relations order" and "earliest retirement age" shall have the meanings set forth under Code Section 414(p).

## 6.14     DIRECT ROLLOVERS

(a)     Notwithstanding any provision of the Plan to the contrary that would otherwise limit a "distributee's" election under this Section, a "distributee" may elect, at the time and in the manner prescribed by the Administrator, to have any portion of an "eligible rollover distribution" that is equal to at least $500 paid directly to an "eligible retirement plan" specified by the "distributee" in a "direct rollover."

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(b)    For purposes of this Section, the following definitions shall apply:

(1)    An "eligible rollover distribution" means any distribution described in Code Section 402(c)(4) and generally includes any distribution of all or any portion of the balance to the credit of the distributee, except that an "eligible rollover distribution" does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the "distributee" or the joint lives (or joint life expectancies) of the "distributee" and the "distributee's" designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); for distributions made after December 31, 1998, any hardship distribution described in Code Section 401(k)(2)(B)(i)(IV); and any other distribution reasonably expected to total less than $200 during a year.

(2)    An "eligible retirement plan" is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), an annuity plan described in Code Section 403(a), or a qualified plan described in Code Section 401(a), that accepts the "distributee's" "eligible rollover distribution." However, in the case of an "eligible rollover distribution" to the surviving spouse, an "eligible retirement plan" is an individual retirement account or individual retirement annuity.

(3)    A "distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(4)    A "direct rollover" is a payment by the Plan to the "eligible retirement plan" specified by the "distributee.

### 6.15    TRANSFER OF ASSETS FROM A MONEY PURCHASE PLAN

(a)    This Section shall be effective as of the following date:

(1)    for Plans not entitled to extended reliance as described in Revenue Ruling 94-76, the first day of the first Plan Year beginning on or after December 12, 1994, or if later, 90 days after December 12, 1994; or

(2)    for Plans entitled to extended reliance as described in Revenue Ruling 94-76, as of the first day of the first Plan Year following the Plan Year in which the extended reliance period applicable to the Plan ends. However, in the event of a transfer of assets to the Plan from a money purchase plan that occurs after the date of the most recent determination letter, the effective date of the amendment shall be the date immediately preceding the date of such transfer of assets.

(b)    Notwithstanding any provision of this Plan to the contrary, to the extent that any optional form of benefit under this Plan permits a distribution prior to the Employee's retirement, death, disability, or severance from employment, and prior to Plan termination, the optional form of benefit is not available with respect to benefits attributable to assets (including the post-transfer earnings thereon) and liabilities that are transferred, within the meaning of Code Section 414(l), to this Plan from a money purchase pension plan qualified under Code Section 401(a) (other than any portion of those assets and liabilities attributable to after-tax voluntary Employee contributions or to a direct or indirect rollover contribution).

### 6.16    ELECTIVE TRANSFERS OF BENEFITS TO OTHER PLANS

(a)    If a voluntary, fully-informed election is made by a Participant, then if the conditions set forth herein are satisfied, a Participant's entire benefit may be transferred between qualified plans (other than any direct rollover described in Q&A-3 of Regulation 1.401(a)(31)-1). As an alternative to the transfer, the Participant may elect to retain the Participant's "Section 411(d)(6) protected benefits" under the Plan (or, if the plan is terminating, to receive any optional form of benefit for which the Participant is eligible under the plan as required by Code Section 411(d)(6)). A transfer between qualified plans may only be made pursuant to this subsection if the following additional requirements are met:

(i)    The transfer occurs at a time at which the participant's benefits are distributable. A Participant's benefits are distributable on a particular date if, on that date, the Participant is eligible, under the terms of the Plan, to receive an immediate distribution of these benefits (e.g., in the form of an immediately commencing annuity) from that plan under provisions of the plan not inconsistent with Code Section 401(a);

(ii)    For transfers that occur on or after January 1, 2002, the transfer occurs at a time at which the Participant is not eligible to receive an immediate distribution of the participant's entire

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

nonforfeitable accrued benefit in a single-sum distribution that would consist entirely of an eligible rollover distribution within the meaning of Code Section 401(a)(31)(C);

(iii)    The participant is fully Vested in the transferred benefit in the transferee plan;

(iv)    In the case of a transfer from a defined contribution plan to a defined benefit plan, the defined benefit plan provides a minimum benefit, for each Participant whose benefits are transferred, equal to the benefit, expressed as an annuity payable at normal retirement age, that is derived solely on the basis of the amount transferred with respect to such Participant; and

(v)    The amount of the benefit transferred, together with the amount of any contemporaneous Code Section 401(a)(31) direct rollover to the transferee plan, equals the Participant's entire nonforfeitable accrued benefit under the Plan.

(b)    If a voluntary, fully-informed election is made by a Participant, then if the conditions set forth herein are satisfied, a Participant's entire benefit may be transferred between qualified defined contribution plans (other than any direct rollover described in Q&A-3 of Regulation 1.401(a)(31)-1). As an alternative to the transfer, the Participant may elect to retain the Participant's "Section 411(d)(6) protected benefits" under the Plan (or, if the plan is terminating, to receive any optional form of benefit for which the Participant is eligible under the plan as required by Code Section 411(d)(6)). A transfer between qualified plans may only be made pursuant to this subsection if the following additional requirements are met:

(i)    To the extent the benefits are transferred from a money purchase pension plan, the transferee plan must be a money purchase pension plan. To the extent the benefits being transferred are part of a qualified cash or deferred arrangement under Code Section 401(k), the benefits must be transferred to a qualified cash or deferred arrangement under Code Section 401(k). Benefits transferred from a profit-sharing plan other than from a qualified cash or deferred arrangement, or from a stock bonus plan other than from an employee stock ownership plan, may be transferred to any type of defined contribution plan; and

(ii)    The transfer must be made either in connection with an asset or stock acquisition, merger, or other similar transaction involving a change in employer of the employees of a trade or business (i.e., an acquisition or disposition within the meaning of Regulation 1.410(b)-2(f)) or in connection with the Participant's change in employment status to an employment status with respect to which the Participant is not entitled to additional allocations under the Plan.

## ARTICLE VII
## TRUSTEE AND CUSTODIAN

7.1    **BASIC RESPONSIBILITIES OF THE TRUSTEE**

(a)    The provisions of this Article, other than Section 7.6, shall not apply to this Plan if a separate trust agreement is being used as specified in the Adoption Agreement.

(b)    The Trustee is accountable to the Employer for the funds contributed to the Plan by the Employer, but the Trustee does not have any duty to see that the contributions received comply with the provisions of the Plan. The Trustee is not obligated to collect any contributions from the Employer, nor is it under a duty to see that funds deposited with it are deposited in accordance with the provisions of the Plan.

(c)    The Trustee will credit and distribute the Trust Fund as directed by the Administrator. The Trustee is not obligated to inquire as to whether any payee or distributee is entitled to any payment or whether the distribution is proper or within the terms of the Plan, or whether the manner of making any payment or distribution is proper. The Trustee is accountable only to the Administrator for any payment or distribution made by it in good faith on the order or direction of the Administrator.

(d)    In the event that the Trustee shall be directed by a Participant (pursuant to the Participant Direction Procedures if the Plan permits Participant directed investments), the Employer, or an Investment Manager or other agent appointed by the Employer with respect to the investment of any or all Plan assets, the Trustee shall have no liability with respect to the investment of such assets, but shall be responsible only to execute such investment instructions as so directed.

(1)    The Trustee shall be entitled to rely fully on the written (or other form acceptable to the Administrator and the Trustee, including but not limited to, voice recorded) instructions of a Participant (pursuant to the Participant Direction Procedures), the Employer, or any Fiduciary or nonfiduciary agent of the Employer, in the discharge of such duties, and shall not be liable for any loss or other liability resulting from such direction (or lack of direction) of the investment of any part of the Plan assets.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(2)      The Trustee may delegate the duty of executing such instructions to any nonfiduciary agent, which may be an affiliate of the Trustee or any Plan representative.

(3)      The Trustee may refuse to comply with any direction from the Participant in the event the Trustee, in its sole and absolute discretion, deems such direction improper by virtue of applicable law. The Trustee shall not be responsible or liable for any loss or expense that may result from the Trustee's refusal or failure to comply with any direction from the Participant.

(4)      Any costs and expenses related to compliance with the Participant's directions shall be borne by the Participant's Directed Account, unless paid by the Employer.

(5)      Notwithstanding anything herein above to the contrary, the Trustee shall not invest any portion of a Participant's Directed Account in "collectibles" within the meaning of Code Section 408(m).

(e)      The Trustee will maintain records of receipts and disbursements and furnish to the Employer and/or Administrator for each Plan Year a written annual report pursuant to Section 7.9.

(f)      The Trustee may employ a bank or trust company pursuant to the terms of its usual and customary bank agency agreement, under which the duties of such bank or trust company shall be of a custodial, clerical and record-keeping nature.

(g)      The Trustee may employ and pay from the Trust Fund reasonable compensation to agents, attorneys, accountants and other persons to advise the Trustee as in its opinion may be necessary. The Trustee may delegate to any agent, attorney, accountant or other person selected by it any non-Trustee power or duty vested in it by the Plan, and the Trustee may act or refrain from acting on the advice or opinion of any such person.

## 7.2      INVESTMENT POWERS AND DUTIES OF DISCRETIONARY TRUSTEE

(a)      This Section applies if the Employer, in the Adoption Agreement or as otherwise agreed upon by the Employer and the Trustee, designates the Trustee to administer all or a portion of the trust as a discretionary Trustee. If so designated, then the Trustee has the discretion and authority to invest, manage, and control those Plan assets except, however, with respect to those assets which are subject to the investment direction of a Participant (if Participant directed investments are permitted), or an Investment Manager, the Administrator, or other agent appointed by the Employer. The exercise of any investment discretion hereunder shall be consistent with the "funding policy and method" determined by the Employer.

(b)      The Trustee shall, except as otherwise provided in this Plan, invest and reinvest the Trust Fund to keep the Trust Fund invested without distinction between principal and income and in such securities or property, real or personal, wherever situated, as the Trustee shall deem advisable, including, but not limited to, common or preferred stocks, open-end or closed-end mutual funds, bonds and other evidences of indebtedness or ownership, and real estate or any interest therein. The Trustee shall at all times in making investments of the Trust Fund consider, among other factors, the short and long-term financial needs of the Plan on the basis of information furnished by the Employer. In making such investments, the Trustee shall not be restricted to securities or other property of the character expressly authorized by the applicable law for trust investments; however, the Trustee shall give due regard to any limitations imposed by the Code or the Act so that at all times this Plan may qualify as a qualified Plan and Trust.

(c)      The Trustee, in addition to all powers and authorities under common law, statutory authority, including the Act, and other provisions of this Plan, shall have the following powers and authorities to be exercised in the Trustee's sole discretion:

(1)      To purchase, or subscribe for, any securities or other property and to retain the same. In conjunction with the purchase of securities, margin accounts may be opened and maintained;

(2)      To sell, exchange, convey, transfer, grant options to purchase, or otherwise dispose of any securities or other property held by the Trustee, by private contract or at public auction. No person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition, with or without advertisement;

(3)      To vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to delegate discretionary powers, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property. However, the Trustee shall not vote proxies relating to securities for which it has not been assigned full investment management responsibilities. In those cases where another party has such investment authority or discretion, the Trustee will deliver all proxies to said party who will then have full responsibility for voting those proxies;

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(4)   To cause any securities or other property to be registered in the Trustee's own name, in the name of one or more of the Trustee's nominees, in a clearing corporation, in a depository, or in book entry form or in bearer form, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund;

(5)   To invest in a common, collective, or pooled trust fund (the provisions of which are incorporated herein by reference) maintained by any Trustee (or any affiliate of such Trustee) hereunder pursuant to Revenue Ruling 81-100, all or such part of the Trust Fund as the Trustee may deem advisable, and the part of the Trust Fund so transferred shall be subject to all the terms and provisions of the common, collective, or pooled trust fund which contemplate the commingling for investment purposes of such trust assets with trust assets of other trusts. The name of the trust fund may be specified in an addendum to the Adoption Agreement. The Trustee may withdraw from such common, collective, or pooled trust fund all or such part of the Trust Fund as the Trustee may deem advisable;

(6)   To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions, as the Trustee shall deem advisable; and for any sum so borrowed, to issue a promissory note as Trustee, and to secure the repayment thereof by pledging all, or any part, of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency, or propriety of any borrowing;

(7)   To accept and retain for such time as it may deem advisable any securities or other property received or acquired by it as Trustee hereunder, whether or not such securities or other property would normally be purchased as investments hereunder;

(8)   To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(9)   To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan, to commence or defend suits or legal or administrative proceedings, and to represent the Plan in all suits and legal and administrative proceedings;

(10)   To employ suitable agents and counsel and to pay their reasonable expenses and compensation, and such agents or counsel may or may not be an agent or counsel for the Employer;

(11)   To apply for and procure from the Insurer as an investment of the Trust Fund any annuity or other Contracts (on the life of any Participant, or in the case of a Profit Sharing Plan (including a 401(k) plan), on the life of any person in whom a Participant has an insurable interest, or on the joint lives of a Participant and any person in whom the Participant has an insurable interest) as the Administrator shall deem proper; to exercise, at any time or from time to time, whatever rights and privileges may be granted under such annuity, or other Contracts; to collect, receive, and settle for the proceeds of all such annuity, or other Contracts as and when entitled to do so under the provisions thereof;

(12)   To invest funds of the Trust in time deposits or savings accounts bearing a reasonable rate of interest or in cash or cash balances without liability for interest thereon, including the specific authority to invest in any type of deposit of the Trustee (or of a financial institution related to the Trustee);

(13)   To invest in Treasury Bills and other forms of United States government obligations;

(14)   To sell, purchase and acquire put or call options if the options are traded on and purchased through a national securities exchange registered under the Securities Exchange Act of 1934, as amended, or, if the options are not traded on a national securities exchange, are guaranteed by a member firm of the New York Stock Exchange regardless of whether such options are covered;

(15)   To deposit monies in federally insured savings accounts or certificates of deposit in banks or savings and loan associations including the specific authority to make deposit into any savings accounts or certificates of deposit of the Trustee (or a financial institution related to the Trustee);

(16)   To pool all or any of the Trust Fund, from time to time, with assets belonging to any other qualified employee pension benefit trust created by the Employer or any Affiliated Employer, and to commingle such assets and make joint or common investments and carry joint accounts on behalf of this Plan and Trust and such other trust or trusts, allocating undivided shares or interests in such investments or accounts or any pooled assets of the two or more trusts in accordance with their respective interests; and

(17)   To do all such acts and exercise all such rights and privileges, although not specifically mentioned herein, as the Trustee may deem necessary to carry out the purposes of the Plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

**7.3 INVESTMENT POWERS AND DUTIES OF NONDISCRETIONARY TRUSTEE**

(a) This Section applies if the Employer, in the Adoption Agreement or as otherwise agreed upon by the Employer and the Trustee, designates the Trustee to administer all or a portion of the trust as a nondiscretionary Trustee. If so designated, then the Trustee shall have no discretionary authority to invest, manage, or control those Plan assets, but must act solely as a directed Trustee of those Plan assets. A nondiscretionary Trustee, as directed Trustee of the Plan funds it holds, is authorized and empowered, by way of limitation, with the powers, rights and duties set forth herein and in Section 7.14, each of which the nondiscretionary Trustee exercises solely as directed Trustee in accordance with the direction of the party which has the authority to manage and control the investment of the Plan assets. If no directions are provided to the Trustee, the Employer will provide necessary direction. Furthermore, the Employer and the nondiscretionary Trustee may, in writing, limit the powers of the nondiscretionary Trustee to any combination of powers listed within this Section.

(b) The Trustee, in addition to all powers and authorities under common law, statutory authority, including the Act, and other provisions of this Plan, shall have the following powers and authorities:

(1) To invest the assets, without distinction between principal and income, in securities or property, real or personal, wherever situated, including, but not limited to, common or preferred stocks, open-end or closed-end mutual funds, bonds and other evidences of indebtedness or ownership, and real estate or any interest therein. In making such investments, the Trustee shall not be restricted to securities or other property of the character expressly authorized by the applicable law for trust investments; however, the Trustee shall give due regard to any limitations imposed by the Code or the Act so that at all times this Plan may qualify as a qualified Plan and Trust.

(2) To purchase, or subscribe for, any securities or other property and to retain the same. In conjunction with the purchase of securities, margin accounts may be opened and maintained;

(3) To sell, exchange, convey, transfer, grant options to purchase, or otherwise dispose of any securities or other property held by the Trustee, by private contract or at public auction. No person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition, with or without advertisement;

(4) At the direction of the party which has the authority or discretion, to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to delegate powers, and pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property;

(5) To cause any securities or other property to be registered in the Trustee's own name, in the name of one or more of the Trustee's nominees, in a clearing corporation, in a depository, or in book entry form or in bearer form, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund;

(6) To invest in a common, collective, or pooled trust fund (the provisions of which are incorporated herein by reference) maintained by any Trustee (or any affiliate of such Trustee) hereunder pursuant to Revenue Ruling 81-100, all or such part of the Trust Fund as the party which has the authority to manage and control the investment of the assets shall deem advisable, and the part of the Trust Fund so transferred shall be subject to all the terms and provisions of the common, collective, or pooled trust fund which contemplate the commingling for investment purposes of such trust assets with trust assets of other trusts. The name of the trust fund may be specified in an addendum to the Adoption Agreement;

(7) To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions, as the Trustee shall deem advisable; and for any sum so borrowed, to issue a promissory note as Trustee, and to secure the repayment thereof by pledging all, or any part, of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency, or propriety of any borrowing;

(8) To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(9) To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan, to commence or defend suits or legal or administrative proceedings, and to represent the Plan in all suits and legal and administrative proceedings;

(10) To employ suitable agents and counsel and to pay their reasonable expenses and compensation, and such agent or counsel may or may not be an agent or counsel for the Employer;

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(11)    To apply for and procure from the Insurer as an investment of the Trust Fund any annuity or other Contracts (on the life of any Participant, or in the case of a Profit Sharing Plan (including a 401(k) plan), on the life of any person in whom a Participant has an insurable interest, or on the joint lives of a Participant and any person in whom the Participant has an insurable interest) as the Administrator shall deem proper; to exercise, at the direction of the person with the authority to do so, whatever rights and privileges may be granted under such annuity or other Contracts; to collect, receive, and settle for the proceeds of all such annuity or other Contracts as and when entitled to do so under the provisions thereof;

(12)    To invest funds of the Trust in time deposits or savings accounts bearing a reasonable rate of interest or in cash or cash balances without liability for interest thereon, including the specific authority to invest in any type of deposit of the Trustee (or of a financial institution related to the Trustee);

(13)    To invest in Treasury Bills and other forms of United States government obligations;

(14)    To sell, purchase and acquire put or call options if the options are traded on and purchased through a national securities exchange registered under the Securities Exchange Act of 1934, as amended, or, if the options are not traded on a national securities exchange, are guaranteed by a member firm of the New York Stock Exchange regardless of whether such options are covered;

(15)    To deposit monies in federally insured savings accounts or certificates of deposit in banks or savings and loan associations including the specific authority to make deposit into any savings accounts or certificates of deposit of the Trustee (or a financial institution related to the Trustee); and

(16)    To pool all or any of the Trust Fund, from time to time, with assets belonging to any other qualified employee pension benefit trust created by the Employer or any Affiliated Employer, and to commingle such assets and make joint or common investments and carry joint accounts on behalf of this Plan and such other trust or trusts, allocating undivided shares or interests in such investments or accounts or any pooled assets of the two or more trusts in accordance with their respective interests.

## 7.4    POWERS AND DUTIES OF CUSTODIAN

If there is a discretionary Trustee, the Employer may appoint a custodian. A custodian has the same powers, rights and duties as a nondiscretionary Trustee. Any reference in the Plan to a Trustee also is a reference to a custodian unless the context of the Plan indicates otherwise. A limitation of the Trustee's liability by Plan provision also acts as a limitation of the custodian's liability. Any action taken by the custodian at the discretionary Trustee's direction satisfies any provision in the Plan referring to the Trustee taking that action. The resignation or removal of the custodian shall be made in accordance with Section 7.11 as though the custodian were a Trustee.

## 7.5    LIFE INSURANCE

(a)    The Trustee, at the direction of the Administrator and pursuant to instructions from the individual designated in the Adoption Agreement for such purpose and subject to the conditions set forth in the Adoption Agreement, shall ratably apply for, own, and pay all premiums on Contracts on the lives of the Participants or, in the case of Profit Sharing Plan (including a 401(k) plan), on the life of any person in whom the Participant has an insurable interest or on the joint lives of a Participant and any person in whom the Participant has an insurable interest. Any initial or additional Contract purchased on behalf of a Participant shall have a face amount of not less than $1,000, the amount set forth in the Adoption Agreement, or the limitation of the Insurer, whichever is greater. If a life insurance Contract is to be purchased for a Participant or Former Participant, then the aggregate premium for ordinary life insurance for each Participant or Former Participant must be less than 50% of the aggregate contributions and Forfeitures allocated to the Participant's or Former Participant's Combined Account. For purposes of this limitation, ordinary life insurance Contracts are Contracts with both non-decreasing death benefits and non-increasing premiums. If term insurance or universal life insurance is purchased, then the aggregate premium must be 25% or less of the aggregate contributions and Forfeitures allocated to the Participant's or Former Participant's Combined Account. If both term insurance and ordinary life insurance are purchased, then the premium for term insurance plus one-half of the premium for ordinary life insurance may not in the aggregate exceed 25% of the aggregate Employer contributions and Forfeitures allocated to the Participant's or Former Participant's Combined Account. Notwithstanding the preceding, the limitations imposed herein with respect to the purchase of life insurance shall not apply, in the case of a Profit Sharing Plan (including a 401(k) plan), to the portion of the Participant's Account that has accumulated for at least two (2) Plan Years or to the entire Participant's Account if the Participant has been a Participant in the Plan for at least five (5) years. Amounts transferred to this Plan in accordance with Section 4.6(e)(ii), (iii) or (v) and a Participant's or Former Participant's Voluntary Contribution Account may be used to purchase Contracts without limitation.

(b)    The Trustee must distribute the Contracts to the Participant or Former Participant or convert the entire value of the Contracts at or before retirement into cash or provide for a periodic income so that no portion of such value may be used to continue life insurance protection beyond commencement of benefits. Furthermore, if a Contract is purchased on the joint lives of the Participant and another person and such other person predeceases the Participant, then the Contract may not be maintained under this Plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(c)     Notwithstanding anything herein above to the contrary, amounts credited to a Participant's Qualified Voluntary Employee Contribution Account pursuant to Section 4.9, shall not be applied to the purchase of life insurance Contracts. Furthermore, no life insurance Contracts shall be required to be obtained on an individual's life if, for any reason (other than the nonpayment of premiums) the Insurer will not issue a Contract on such individual's life.

(d)     The Trustee will be the owner of any life insurance Contract purchased under the terms of this Plan. The Contract must provide that the proceeds will be payable to the Trustee; however, the Trustee shall be required to pay over all proceeds of the Contract to the Participant's designated Beneficiary in accordance with the distribution provisions of Article VI. A Participant's spouse will be the designated Beneficiary pursuant to Section 6.2, unless a qualified election has been made in accordance with Sections 6.5 and 6.6 of the Plan, if applicable. Under no circumstances shall the Trust retain any part of the proceeds that are in excess of the cash surrender value immediately prior to death. However, the Trustee shall not pay the proceeds in a method that would violate the requirements of the Retirement Equity Act of 1984, as stated in Article VI of the Plan, or Code Section 401(a)(9) and the Regulations thereunder. In the event of any conflict between the terms of this Plan and the terms of any insurance Contract purchased hereunder, the Plan provisions shall control.

## 7.6     LOANS TO PARTICIPANTS

(a)     If specified in the Adoption Agreement, the Trustee (or the Administrator if the Trustee is a nondiscretionary Trustee or if loans are treated as Participant directed investments pursuant to the Adoption Agreement) may, in the Trustee's (or, if applicable, the Administrator's) sole discretion, make loans to Participants or Beneficiaries under the following circumstances: (1) loans shall be made available to all Participants and Beneficiaries on a reasonably equivalent basis; (2) loans shall not be made available to Highly Compensated Employees in an amount greater than the amount made available to other Participants; (3) loans shall bear a reasonable rate of interest; (4) loans shall be adequately secured; and (5) loans shall provide for periodic repayment over a reasonable period of time. Furthermore, no Participant loan shall exceed the Participant's Vested interest in the Plan.

(b)     Loans shall not be made to any Shareholder-Employee or Owner-Employee (including an Owner-Employee's family members as defined in Code Section 267(c)(4)) unless an exemption for such loan is obtained pursuant to Act Section 408 or such loan would otherwise not be a prohibited transaction pursuant to Code Section 4975 and Act Section 408.

(c)     An assignment or pledge of any portion of a Participant's interest in the Plan and a loan, pledge, or assignment with respect to any insurance Contract purchased under the Plan, shall be treated as a loan under this Section.

(d)     If the Vested interest of a Participant is used to secure any loan pursuant to this Section, then the written (or such other form as permitted by the IRS) consent of the Participant's spouse shall be required in a manner consistent with Section 6.5(a), provided the spousal consent requirements of such Section apply to the Plan. Such consent must be obtained within the 90-day period prior to the date the loan is made. Any security interest held by the Plan by reason of an outstanding loan to the Participant or Former Participant shall be taken into account in determining the amount of the death benefit or Pre-Retirement Survivor Annuity. However, unless the loan program established pursuant to this Section provides otherwise, no spousal consent shall be required under this paragraph if the total interest subject to the security is not in excess of $5,000 (or, $3,500 effective for loans made prior to the later of the first day of the first Plan Year beginning after August 5, 1997, or the date specified in the Adoption Agreement).

(e)     The Administrator shall be authorized to establish a participant loan program to provide for loans under the Plan. The loan program shall be established in accordance with Department of Labor Regulation Section 2550.408(b)-1(d)(2) providing for loans by the Plan to parties-in-interest under said Plan, such as Participants or Beneficiaries. In order for the Administrator to implement such loan program, a separate written document forming a part of this Plan must be adopted, which document shall specifically include, but need not be limited to, the following:

(1)     the identity of the person or positions authorized to administer the Participant loan program;

(2)     a procedure for applying for loans;

(3)     the basis on which loans will be approved or denied;

(4)     limitations, if any, on the types and amounts of loans offered;

(5)     the procedure under the program for determining a reasonable rate of interest;

(6)     the types of collateral which may secure a Participant loan; and

(7)     the events constituting default and the steps that will be taken to preserve Plan assets in the event such default.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(f)    Notwithstanding anything in this Plan to the contrary, if a Participant or Beneficiary defaults on a loan made pursuant to this Section that is secured by the Participant's interest in the Plan, then a Participant's interest may be offset by the amount subject to the security to the extent there is a distributable event permitted by the Code or Regulations.

(g)    Notwithstanding anything in this Section to the contrary, if this is an amendment and restatement of an existing Plan, any loans made prior to the date this amendment and restatement is adopted shall be subject to the terms of the Plan in effect at the time such loan was made.

7.7    MAJORITY ACTIONS

Except where there has been an allocation and delegation of powers, if there shall be more than one Trustee, they shall act by a majority of their number, but may authorize one or more of them to sign papers on their behalf.

7.8    TRUSTEE'S COMPENSATION AND EXPENSES AND TAXES

The Trustee shall be paid such reasonable compensation as set forth in the Trustee's fee schedule (if the Trustee has such a schedule) or as agreed upon in writing by the Employer and the Trustee. However, an individual serving as Trustee who already receives full-time compensation from the Employer shall not receive compensation from this Plan. In addition, the Trustee shall be reimbursed for any reasonable expenses, including reasonable counsel fees incurred by it as Trustee. Such compensation and expenses shall be paid from the Trust Fund unless paid or advanced by the Employer. All taxes of any kind whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust Fund or the income thereof, shall be paid from the Trust Fund.

7.9    ANNUAL REPORT OF THE TRUSTEE

(a)    Within a reasonable period of time after the later of the Anniversary Date or receipt of the Employer's contribution for each Plan Year, the Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth:

(1)    the net income, or loss, of the Trust Fund;

(2)    the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets;

(3)    the increase, or decrease, in the value of the Trust Fund;

(4)    all payments and distributions made from the Trust Fund; and

(5)    such further information as the Trustee and/or Administrator deems appropriate.

(b)    The Employer, promptly upon its receipt of each such statement of account, shall acknowledge receipt thereof in writing and advise the Trustee and/or Administrator of its approval or disapproval thereof. Failure by the Employer to disapprove any such statement of account within thirty (30) days after its receipt thereof shall be deemed an approval thereof. The approval by the Employer of any statement of account shall be binding on the Employer and the Trustee as to all matters contained in the statement to the same extent as if the account of the Trustee had been settled by judgment or decree in an action for a judicial settlement of its account in a court of competent jurisdiction in which the Trustee, the Employer and all persons having or claiming an interest in the Plan were parties. However, nothing contained in this Section shall deprive the Trustee of its right to have its accounts judicially settled if the Trustee so desires.

7.10    AUDIT

(a)    If an audit of the Plan's records shall be required by the Act and the regulations thereunder for any Plan Year, the Administrator shall engage on behalf of all Participants an independent qualified public accountant for that purpose. Such accountant shall, after an audit of the books and records of the Plan in accordance with generally accepted auditing standards, within a reasonable period after the close of the Plan Year, furnish to the Administrator and the Trustee a report of the audit setting forth the accountant's opinion as to whether any statements, schedules or lists, that are required by Act Section 103 or the Secretary of Labor to be filed with the Plan's annual report, are presented fairly in conformity with generally accepted accounting principles applied consistently.

(b)    All auditing and accounting fees shall be an expense of and may, at the election of the Employer, be paid from the Trust Fund.

(c)    If some or all of the information necessary to enable the Administrator to comply with Act Section 103 is maintained by a bank, insurance company, or similar institution, regulated, supervised, and subject to periodic examination by a state or federal agency, then it shall transmit and certify the accuracy of that information to the

**Defined Contribution Prototype Plan**

Administrator as provided in Act Section 103(b) within one hundred twenty (120) days after the end of the Plan Year or such other date as may be prescribed under regulations of the Secretary of Labor.

## 7.11    RESIGNATION, REMOVAL AND SUCCESSION OF TRUSTEE

(a)    Unless otherwise agreed to by both the Trustee and the Employer, a Trustee may resign at any time by delivering to the Employer, at least thirty (30) days before its effective date, a written notice of resignation.

(b)    Unless otherwise agreed to by both the Trustee and the Employer, the Employer may remove a Trustee at any time by delivering to the Trustee, at least thirty (30) days before its effective date, a written notice of such Trustee's removal.

(c)    Upon the death, resignation, incapacity, or removal of any Trustee, a successor may be appointed by the Employer; and such successor, upon acceptance of such appointment in writing and delivering same to the Employer, shall, without further act, become vested with all the powers and responsibilities of the predecessor as if such successor had been originally named as a Trustee herein. Until such a successor is appointed, any remaining Trustee or Trustees shall have full authority to act under the terms of the Plan.

(d)    The Employer may designate one or more successors prior to the death, resignation, incapacity, or removal of a Trustee. In the event a successor is so designated by the Employer and accepts such designation, the successor shall, without further act, become vested with all the powers and responsibilities of the predecessor as if such successor had been originally named as Trustee herein immediately upon the death, resignation, incapacity, or removal of the predecessor.

(e)    Whenever any Trustee hereunder ceases to serve as such, the Trustee shall furnish to the Employer and Administrator a written statement of account with respect to the portion of the Plan Year during which the individual or entity served as Trustee. This statement shall be either (i) included as part of the annual statement of account for the Plan Year required under Section 7.9 or (ii) set forth in a special statement. Any such special statement of account should be rendered to the Employer no later than the due date of the annual statement of account for the Plan Year. The procedures set forth in Section 7.9 for the approval by the Employer of annual statements of account shall apply to any special statement of account rendered hereunder and approval by the Employer of any such special statement in the manner provided in Section 7.9 shall have the same effect upon the statement as the Employer's approval of an annual statement of account. No successor to the Trustee shall have any duty or responsibility to investigate the acts or transactions of any predecessor who has rendered all statements of account required by Section 7.9 and this subparagraph.

## 7.12    TRANSFER OF INTEREST

Notwithstanding any other provision contained in this Plan, the Trustee at the direction of the Administrator shall transfer the interest, if any, of a Participant to another trust forming part of a pension, profit sharing, or stock bonus plan that meets the requirements of Code Section 401(a), provided that the trust to which such transfers are made permits the transfer to be made.

## 7.13    TRUSTEE INDEMNIFICATION

The Employer agrees to indemnify and hold harmless the Trustee against any and all claims, losses, damages, expenses and liabilities the Trustee may incur in the exercise and performance of the Trustee's powers and duties hereunder, unless the same are determined to be due to gross negligence or willful misconduct.

## 7.14    EMPLOYER SECURITIES AND REAL PROPERTY

The Trustee shall be empowered to acquire and hold "qualifying Employer securities" and "qualifying Employer real property," as those terms are defined in the Act. However, no more than one hundred percent (100%), in the case of a Profit Sharing Plan or 401(k) Plan, or ten percent (10%), in the case of a Money Purchase Plan, of the fair market value of all the assets in the Trust Fund may be invested in "qualifying Employer securities" and "qualifying Employer real property."

Notwithstanding the preceding, for Plan Years beginning after December 31, 1998, if the Plan does not permit Participants to direct the investment of their Participants' Elective Deferral Accounts, then the Trustee shall only be permitted to acquire or hold "qualifying Employer securities" and "qualifying Employer real property" to the extent permitted under Act Section 407.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGERS

**8.1    AMENDMENT**

(a)    The Employer shall have the right at any time to amend this Plan subject to the limitations of this Section. However, any amendment that affects the rights, duties or responsibilities of the Trustee or Administrator may only be made with the Trustee's or Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution. The Trustee shall not be required to execute any such amendment unless the amendment affects the duties of the Trustee hereunder.

(b)    The Employer may (1) change the choice of options in the Adoption Agreement, (2) add any addendum to the Adoption Agreement that is specifically permitted pursuant to the terms of the Plan; (3) add overriding language to the Adoption Agreement when such language is necessary to satisfy Code Sections 415 or 416 because of the required aggregation of multiple plans, and (4) add certain model amendments published by the Internal Revenue Service which specifically provide that their adoption will not cause the Plan to be treated as an individually designed plan. An Employer that amends the Plan for any other reason, including a waiver of the minimum funding requirement under Code Section 412(d), will no longer participate in this Prototype Plan and this Plan will be considered to be an individually designed plan. Notwithstanding the preceding, the attachment to the Adoption Agreement of any addendum specifically authorized by the Plan or a list of any "Section 411(d)(6) protected benefits" which must be preserved shall not be considered an amendment to the Plan.

(c)    The Employer expressly delegates authority to the sponsor of this Prototype Plan, the right to amend each Employer's Plan by submitting a copy of the amendment to each Employer who has adopted this Prototype Plan, after first having received a ruling or favorable determination from the Internal Revenue Service that the Prototype Plan as amended qualifies under Code Section 401(a) and the Act (unless a ruling or determination is not required by the IRS). For purposes of this Section, the mass submitter shall be recognized as the agent of the sponsor. If the sponsor does not adopt any amendment made by the mass submitter, it will no longer be identical to, or a minor modifier of, the mass submitter plan.

(d)    No amendment to the Plan shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants or their Beneficiaries or estates; or causes any reduction in the amount credited to the account of any Participant; or causes or permits any portion of the Trust Fund to revert to or become property of the Employer.

(e)    Except as permitted by Regulations (including Regulation 1.411(d)-4) or other IRS guidance, no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" which results in a further restriction on such benefits unless such "Section 411(d)(6) protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit. A Plan amendment that eliminates or restricts the ability of a Participant to receive payment of the Participant's interest in the Plan under a particular optional form of benefit will be permissible if the amendment satisfies the conditions in (1) and (2) below:

(1)    The amendment provides a single-sum distribution form that is otherwise identical to the optional form of benefit eliminated or restricted. For purposes of this condition (1), a single-sum distribution form is otherwise identical only if it is identical in all respects to the eliminated or restricted optional form of benefit (or would be identical except that it provides greater rights to the Participant) except with respect to the timing of payments after commencement.

(2)    The amendment is not effective unless the amendment provides that the amendment shall not apply to any distribution with an Annuity Starting Date earlier than the earlier of: (i) the ninetieth (90th) day after the date the Participant receiving the distribution has been furnished a summary that reflects the amendment and that satisfies the Act requirements at 29 CFR 2520.104b-3 (relating to a summary of material modifications) or (ii) the first day of the second Plan Year following the Plan Year in which the amendment is adopted.

**8.2    TERMINATION**

(a)    The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. Upon any full or partial termination, all amounts credited to the affected Participants' Combined Accounts shall become 100% Vested and shall not thereafter be subject to forfeiture, and all unallocated amounts, including Forfeitures, shall be allocated to the accounts of all Participants in accordance with the provisions hereof.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(b)      Upon the full termination of the Plan, the Employer shall direct the distribution of the assets to Participants in a manner that is consistent with and satisfies the provisions of Section 6.5. Distributions to a Participant shall be made in cash (or in property if permitted in the Adoption Agreement) or through the purchase of irrevocable nontransferable deferred commitments from the Insurer. Except as permitted by Regulations, the termination of the Plan shall not result in the reduction of "Section 411(d)(6) protected benefits" as described in Section 8.1(e).

## 8.3      MERGER, CONSOLIDATION OR TRANSFER OF ASSETS

This Plan may be merged or consolidated with, or its assets and/or liabilities may be transferred to any other plan only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation and such transfer, merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 8.1(e).

## ARTICLE IX
## TOP HEAVY PROVISIONS

## 9.1      TOP HEAVY PLAN REQUIREMENTS

Notwithstanding anything in this Plan to the contrary, for any Top Heavy Plan Year, the Plan shall provide the special vesting requirements of Code Section 416(b) pursuant to Section 6.4 of the Plan and the special minimum allocation requirements of Code Section 416(c) pursuant to Section 4.3(f) of the Plan. Except as otherwise provided in the Plan, the minimum allocation shall be an Employer Non-Elective Contribution and, if no vesting schedule has been selected in the Adoption Agreement, shall be subject to the 6 Year Graded vesting schedule described in the Adoption Agreement.

## 9.2      DETERMINATION OF TOP HEAVY STATUS

(a)      This Plan shall be a Top Heavy Plan for any plan year beginning after December 31, 1983, if any of the following conditions exists:

(1)      if the "top heavy ratio" for this Plan exceeds sixty percent (60%) and this Plan is not part of any "required aggregation group" or "permissive aggregation group";

(2)      if this Plan is a part of a "required aggregation group" but not part of a "permissive aggregation group" and the "top heavy ratio" for the group of plans exceeds sixty percent (60%); or

(3)      if this Plan is a part of a "required aggregation group" and part of a "permissive aggregation group" and the "top heavy ratio" for the "permissive aggregation group" exceeds sixty percent (60%).

(b)      "Top heavy ratio" means, with respect to a "determination date":

(1)      If the Employer maintains one or more defined contribution plans (including any simplified employee pension plan (as defined in Code Section 408(k))) and the Employer has not maintained any defined benefit plan which during the 5-year period ending on the "determination date" has or has had accrued benefits, the top heavy ratio for this plan alone or for the "required aggregation group" or "permissive aggregation group" as appropriate is a fraction, the numerator of which is the sum of the account balances of all Key Employees as of the "determination date" (including any part of any account balance distributed in the 5-year period ending on the "determination date"), and the denominator of which is the sum of all account balances (including any part of any account balance distributed in the 5-year period ending on the "determination date"), both computed in accordance with Code Section 416 and the Regulations thereunder. Both the numerator and denominator of the top heavy ratio are increased to reflect any contribution not actually made as of the "determination date," but which is required to be taken into account on that date under Code Section 416 and the Regulations thereunder.

(2)      If the Employer maintains one or more defined contribution plans (including any simplified employee pension plan) and the Employer maintains or has maintained one or more defined benefit plans which during the 5-year period ending on the "determination date" has or has had any accrued benefits, the top heavy ratio for any "required aggregation group" or "permissive aggregation group" as appropriate is a fraction, the numerator of which is the sum of account balances under the aggregated defined contribution plan or plans for all Key Employees, determined in accordance with (1) above, and the present value of accrued benefits under the aggregated defined benefit plan or plans for all Key Employees as of the "determination date, and the denominator of which is the sum of the account balances under the aggregated defined contribution plan or plans for all participants, determined in accordance with (1) above, and the "present value" of accrued benefits under the defined benefit plan or plans for all participants as of the "determination date," all determined in accordance with Code Section 416 and the Regulations thereunder. The accrued benefits under a defined benefit plan in both the numerator and denominator of the top heavy

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

ratio are increased for any distribution of an accrued benefit made in the five-year period ending on the determination date.

(3)  For purposes of (1) and (2) above, the value of account balances and the present value of accrued benefits will be determined as of the most recent "valuation date" that falls within or ends with the 12-month period ending on the "determination date," except as provided in Code Section 416 and the Regulations thereunder for the first and second plan years of a defined benefit plan. The account balances and accrued benefits of a participant (i) who is not a Key Employee but who was a Key Employee in a prior year, or (ii) who has not been credited with at least one Hour of Service with any Employer maintaining the plan at any time during the 5-year period ending on the "determination date" will be disregarded. The calculation of the top heavy ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Code Section 416 and the Regulations thereunder. Deductible Employee contributions will not be taken into account for purposes of computing the top heavy ratio. When aggregating plans the value of account balances and accrued benefits will be calculated with reference to the "determination dates" that fall within the same calendar year.

The accrued benefit of a participant other than a Key Employee shall be determined under (i) the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the employer, or (ii) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Code Section 411(b)(1)(C).

(c)  "Determination date" means, for any Plan Year subsequent to the first Plan Year, the last day of the preceding Plan Year. For the first Plan Year of the Plan, "determination date" means the last day of that Plan Year.

(d)  "Permissive aggregation group" means the "required aggregation group" of plans plus any other plan or plans of the Employer which, when considered as a group with the required aggregation group, would continue to satisfy the requirements of Code Sections 401(a)(4) and 410.

(e)  "Present value" means the present value based only on the interest and mortality rates specified in the Adoption Agreement.

(f)  "Required aggregation group" means: (1) each qualified plan of the Employer in which at least one Key Employee participates or participated at any time during the determination period (regardless of whether the plan has terminated), and (2) any other qualified plan of the Employer which enables a plan described in (1) to meet the requirements of Code Sections 401(a)(4) or 410.

(g)  "Valuation date" means the date elected by the Employer in the Adoption Agreement as of which account balances or accrued benefits are valued for purposes of calculating the "top heavy ratio.

## ARTICLE X
## MISCELLANEOUS

**10.1  EMPLOYER ADOPTIONS**

(a)  Any organization may become the Employer hereunder by executing the Adoption Agreement in a form satisfactory to the Trustee, and it shall provide such additional information as the Trustee may require. The consent of the Trustee to act as such shall be signified by its execution of the Adoption Agreement or a separate agreement (including, if elected in the Adoption Agreement, a separate trust agreement).

(b)  Except as otherwise provided in this Plan, the affiliation of the Employer and the participation of its Participants shall be separate and apart from that of any other employer and its participants hereunder.

**10.2  PARTICIPANT'S RIGHTS**

This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan.

**10.3  ALIENATION**

(a)  Subject to the exceptions provided below and as otherwise permitted by the Code and the Act, no benefit which shall be payable to any person (including a Participant or the Participant's Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized except to such extent as may be required by law.

(b)      Subsection (a) shall not apply to the extent a Participant or Beneficiary is indebted to the Plan by reason of a loan made pursuant to Section 7.6. At the time a distribution is to be made to or for a Participant's or Beneficiary's benefit, such portion of the amount to be distributed as shall equal such indebtedness shall be paid to the Plan, to apply against or discharge such indebtedness. Prior to making a payment, however, the Participant or Beneficiary must be given notice by the Administrator that such indebtedness is to be so paid in whole or part from the Participant's interest in the Plan. If the Participant or Beneficiary does not agree that the indebtedness is a valid claim against the Participant's interest in the Plan, the Participant or Beneficiary shall be entitled to a review of the validity of the claim in accordance with procedures provided in Sections 2.10 and 2.11.

(c)      Subsection (a) shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a "qualified domestic relations order, a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

(d)      Notwithstanding any provision of this Section to the contrary, an offset to a Participant's accrued benefit against an amount that the Participant is ordered or required to pay the Plan with respect to a judgment, order, or decree issued, or a settlement entered into, on or after August 5, 1997, shall be permitted in accordance with Code Sections 401(a)(13)(C) and (D).

10.4     CONSTRUCTION OF PLAN

This Plan and Trust shall be construed and enforced according to the Code, the Act and the laws of the state or commonwealth in which the Employer's (or if there is a corporate Trustee, the Trustee's) principal office is located (unless otherwise designated in the Adoption Agreement), other than its laws respecting choice of law, to the extent not pre-empted by the Act.

10.5     GENDER AND NUMBER

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

10.6     LEGAL ACTION

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable.

10.7     PROHIBITION AGAINST DIVERSION OF FUNDS

(a)      Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Former Participants, or their Beneficiaries.

(b)      In the event the Employer shall make a contribution under a mistake of fact pursuant to Act Section 403(c)(2)(A), the Employer may demand repayment of such contribution at any time within one (1) year following the time of payment and the Trustee shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the contributions may not be returned to the Employer but any losses attributable thereto must reduce the amount so returned.

(c)      Except as specifically stated in the Plan, any contribution made by the Employer to the Plan (if the Employer is not tax-exempt) is conditioned upon the deductibility of the contribution by the Employer under the Code and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following a final determination of the disallowance, whether by agreement with the Internal Revenue Service or by final decision of a court of competent jurisdiction, demand repayment of such disallowed contribution and the Trustee shall return such contribution within one (1) year following the disallowance. Earnings of the Plan attributable to the contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**10.8    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE**

The Employer, Administrator and Trustee, and their successors, shall not be responsible for the validity of any Contract issued hereunder or for the failure on the part of the Insurer to make payments provided by any such Contract, or for the action of any person which may delay payment or render a Contract null and void or unenforceable in whole or in part.

**10.9    INSURER'S PROTECTIVE CLAUSE**

Except as otherwise agreed upon in writing between the Employer and the Insurer, an Insurer which issues any Contracts hereunder shall not have any responsibility for the validity of this Plan or for the tax or legal aspects of this Plan. The Insurer shall be protected and held harmless in acting in accordance with any written direction of the Administrator or Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Administrator or Trustee. Regardless of any provision of this Plan, the Insurer shall not be required to take or permit any action or allow any benefit or privilege contrary to the terms of any Contract which it issues hereunder, or the rules of the Insurer.

**10.10    RECEIPT AND RELEASE FOR PAYMENTS**

Any payment to any Participant, the Participant's legal representative, Beneficiary, or to any guardian or committee appointed for such Participant or Beneficiary in accordance with the provisions of this Plan, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer.

**10.11    ACTION BY THE EMPLOYER**

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

**10.12    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY**

The "named Fiduciaries" of this Plan are (1) the Employer, (2) the Administrator, (3) the Trustee (if the Trustee has discretionary authority as elected in the Adoption Agreement or as otherwise agreed upon by the Employer and the Trustee), and (4) any Investment Manager appointed hereunder. The named Fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference. In general, the Employer shall have the sole responsibility for making the contributions provided for under the Plan; and shall have the sole authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method"; and to amend the elective provisions of the Adoption Agreement or terminate, in whole or in part, the Plan. The Administrator shall have the sole responsibility for the administration of the Plan, which responsibility is specifically described in the Plan. If the Trustee has discretionary authority, it shall have the sole responsibility of management of the assets held under the Trust, except those assets, the management of which has been assigned to an Investment Manager or Administrator, who shall be solely responsible for the management of the assets assigned to it, all as specifically provided in the Plan. Each named Fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of the Plan, authorizing or providing for such direction, information or action. Furthermore, each named Fiduciary may rely upon any such direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action. It is intended under the Plan that each named Fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under the Plan. No named Fiduciary shall guarantee the Trust Fund in any manner against investment loss or depreciation in asset value. Any person or group may serve in more than one Fiduciary capacity.

**10.13    HEADINGS**

The headings and subheadings of this Plan have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

**10.14    APPROVAL BY INTERNAL REVENUE SERVICE**

Notwithstanding anything herein to the contrary, if, pursuant to a timely application filed by or on behalf of the Plan, the Commissioner of the Internal Revenue Service or the Commissioner's delegate should determine that the Plan does not initially qualify as a tax-exempt plan under Code Sections 401 and 501, and such determination is not contested, or if contested, is finally upheld, then if the Plan is a new plan, it shall be void ab initio and all amounts contributed to the Plan, by the Employer, less expenses paid, shall be returned within one (1) year and the Plan shall terminate, and the Trustee shall be discharged from all further obligations. If the disqualification relates to a Plan amendment, then the Plan shall operate as if it had not been amended. If the Employer's Plan fails to attain or retain qualification, such Plan will no longer participate in this prototype plan and will be considered an individually designed plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

**10.15    UNIFORMITY**

        All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner.

**10.16    PAYMENT OF BENEFITS**

        Except as otherwise provided in the Plan, benefits under this Plan shall be paid, subject to Sections 6.10, 6.11 and 12.9, only upon death, Total and Permanent Disability, normal or early retirement, termination of employment, or termination of the Plan.

<div align="center">

**ARTICLE XI**
**PARTICIPATING EMPLOYERS**

</div>

**11.1    ELECTION TO BECOME A PARTICIPATING EMPLOYER**

        Notwithstanding anything herein to the contrary, with the consent of the Employer and Trustee, any Affiliated Employer may adopt the Employer's Plan and all of the provisions hereof, and participate herein and be known as a Participating Employer, by a properly executed document evidencing said intent and will of such Participating Employer. Regardless of the preceding, an entity that ceases to be an Affiliated Employer may continue to be a Participating Employer through the end of the transition period for certain dispositions set forth in Code Section 410(b)(6)(C). In the event a Participating Employer is not an Affiliated Employer and the transition period in the preceding sentence, if applicable, has expired, then this Plan will be considered an individually designed plan.

**11.2    REQUIREMENTS OF PARTICIPATING EMPLOYERS**

        (a)    Each Participating Employer shall be required to select the same Adoption Agreement provisions as those selected by the Employer other than the Plan Year, the Fiscal Year, and such other items that must, by necessity, vary among employers.

        (b)    The Trustee may, but shall not be required to, commingle, hold and invest as one Trust Fund all contributions made by Participating Employers, as well as all increments thereof. However, the assets of the Plan shall, on an ongoing basis, be available to pay benefits to all Participants and Beneficiaries under the Plan without regard to the Employer or Participating Employer who contributed such assets.

        (c)    Unless the Employer otherwise directs, any expenses of the Plan which are to be paid by the Employer or borne by the Trust Fund shall be paid by each Participating Employer in the same proportion that the total amount standing to the credit of all Participants employed by such Employer bears to the total standing to the credit of all Participants.

**11.3    DESIGNATION OF AGENT**

        Each Participating Employer shall be deemed to be a part of this Plan; provided, however, that with respect to all of its relations with the Trustee and Administrator for purposes of this Plan, each Participating Employer shall be deemed to have designated irrevocably the Employer as its agent. Unless the context of the Plan clearly indicates otherwise, the word "Employer" shall be deemed to include each Participating Employer as related to its adoption of the Plan.

**11.4    EMPLOYEE TRANSFERS**

        In the event an Employee is transferred between Participating Employers, accumulated service and eligibility shall be carried with the Employee involved. No such transfer shall effect a termination of employment hereunder, and the Participating Employer to which the Employee is transferred shall thereupon become obligated hereunder with respect to such Employee in the same manner as was the Participating Employer from whom the Employee was transferred.

**11.5    PARTICIPATING EMPLOYER'S CONTRIBUTION AND FORFEITURES**

        Any contribution or Forfeiture subject to allocation during each Plan Year shall be allocated among all Participants of all Participating Employers in accordance with the provisions of this Plan. However, if a Participating Employer is not an Affiliated Employer (due to the transition rule for certain dispositions set forth in Code Section 410(b)(6)(C)) then any contributions made by such Participating Employer will only be allocated among the Participants eligible to share of the Participating Employer. On the basis of the information furnished by the Administrator, the Trustee may keep separate books and records concerning the affairs of each Participating Employer hereunder and as to the accounts and credits of the Employees of each Participating Employer. The Trustee may, but need not, register Contracts so as to evidence that a particular Participating Employer is the interested Employer hereunder, but in the event of an Employee transfer from one Participating Employer to another, the employing Participating Employer shall immediately notify the Trustee thereof.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

## 11.6    AMENDMENT

Amendment of this Plan by the Employer at any time when there shall be a Participating Employer that is an Affiliated Employer hereunder shall only be by the written action of each and every Participating Employer and with the consent of the Trustee where such consent is necessary in accordance with the terms of this Plan.

## 11.7    DISCONTINUANCE OF PARTICIPATION

Except in the case of a standardized Plan, any Participating Employer that is an Affiliated Employer shall be permitted to discontinue or revoke its participation in the Plan at any time. At the time of any such discontinuance or revocation, satisfactory evidence thereof and of any applicable conditions imposed shall be delivered to the Trustee. The Trustee shall thereafter transfer, deliver and assign Contracts and other Trust Fund assets allocable to the Participants of such Participating Employer to such new trustee or custodian as shall have been designated by such Participating Employer, in the event that it has established a separate qualified retirement plan for its employees provided, however, that no such transfer shall be made if the result is the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 8.1(e). If no successor is designated, the Trustee shall retain such assets for the Employees of said Participating Employer pursuant to the provisions of Article VII hereof. In no such event shall any part of the corpus or income of the Trust Fund as it relates to such Participating Employer be used for or diverted to purposes other than for the exclusive benefit of the employees of such Participating Employer.

## 11.8    ADMINISTRATOR'S AUTHORITY

The Administrator shall have authority to make any and all necessary rules or regulations, binding upon all Participating Employers and all Participants, to effectuate the purpose of this Article.

## 11.9    PARTICIPATING EMPLOYER CONTRIBUTION FOR AFFILIATE

If any Participating Employer is prevented in whole or in part from making a contribution which it would otherwise have made under the Plan by reason of having no current or accumulated earnings or profits, or because such earnings or profits are less than the contribution which it would otherwise have made, then, pursuant to Code Section 404(a)(3)(B), so much of the contribution which such Participating Employer was so prevented from making may be made, for the benefit of the participating employees of such Participating Employer, by other Participating Employers who are members of the same affiliated group within the meaning of Code Section 1504 to the extent of their current or accumulated earnings or profits, except that such contribution by each such other Participating Employer shall be limited to the proportion of its total current and accumulated earnings or profits remaining after adjustment for its contribution to the Plan made without regard to this paragraph which the total prevented contribution bears to the total current and accumulated earnings or profits of all the Participating Employers remaining after adjustment for all contributions made to the Plan without regard to this paragraph.

A Participating Employer on behalf of whose employees a contribution is made under this paragraph shall not be required to reimburse the contributing Participating Employers.

## ARTICLE XII
## CASH OR DEFERRED PROVISIONS

Except as specifically provided elsewhere in this Plan, the provisions of this Article shall apply with respect to any 401(k) Profit Sharing Plan regardless of any provisions in the Plan to the contrary.

## 12.1    FORMULA FOR DETERMINING EMPLOYER'S CONTRIBUTION

(a)    For each Plan Year, the Employer will (or may with respect to any discretionary contributions) contribute to the Plan:

(1)    The amount of the total salary reduction elections of all Participants made pursuant to Section 12.2(a), which amount shall be deemed Elective Deferrals, plus

(2)    If elected in the Adoption Agreement, a matching contribution equal to the percentage, if any, specified in the Adoption Agreement of the Elective Deferrals of each Participant eligible to share in the allocations of the matching contribution, which amount shall be deemed an Employer's matching contribution or Qualified Matching Contribution as elected in the Adoption Agreement, plus

(3)    If elected in the Adoption Agreement, a Prevailing Wage Contribution or a discretionary amount determined each year by the Employer, which amount if any, shall be deemed an Employer's Non-Elective Contribution, plus

(4)    If elected in the Adoption Agreement, a Qualified Non-Elective Contribution.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(b)     Notwithstanding the foregoing, if the Employer is not a tax-exempt entity, then the Employer's contributions for any Fiscal Year may generally not exceed the maximum amount allowable as a deduction to the Employer under the provisions of Code Section 404. However, to the extent necessary to provide the top heavy minimum allocations, the Employer shall make a contribution even if it exceeds current or accumulated Net Profit or the amount that is deductible under Code Section 404. All contributions by the Employer shall be made in cash or in such property as is acceptable to the Trustee.

## 12.2     PARTICIPANT'S SALARY REDUCTION ELECTION

(a)     Each Participant may elect to defer a portion of Compensation which would have been received in the Plan Year, but for the salary reduction election, subject to the limitations of this Section and the Adoption Agreement. A salary reduction election (or modification of an earlier election) may not be made with respect to Compensation which is currently available on or before the date the Participant executed such election, or if later, the later of the date the Employer adopts this cash or deferred arrangement or the date such arrangement first became effective. Any elections made pursuant to this Section shall become effective as soon as is administratively feasible. If the automatic election option is elected in the Adoption Agreement, then in the event a Participant fails to make a deferral election and does not affirmatively elect to receive cash, such Participant shall be deemed to have made a deferral election equal to the percentage of Compensation set forth in the Adoption Agreement. The automatic election may, in accordance with procedures established by the Administrator, be applied to all Participants or to Eligible Employees who become Participants after a certain date. For purposes of this Section, the annual dollar limitation of Code Section 401(a)(17) ($150,000 as adjusted) shall not apply.

Additionally, if elected in the Adoption Agreement, each Participant may elect to defer a different percentage or amount of any cash bonus to be paid by the Employer during the Plan Year. A deferral election may not be made with respect to cash bonuses which are currently available on or before the date the Participant executes such election.

The amount by which Compensation and/or cash bonuses are reduced shall be that Participant's Elective Deferrals and shall be treated as an Employer contribution and allocated to that Participant's Elective Deferral Account.

Once made, a Participant's election to reduce Compensation shall remain in effect until modified or terminated. Modifications may be made as specified in the Adoption Agreement, and terminations may be made at any time. Any modification or termination of an election will become effective as soon as is administratively feasible.

(b)     The balance in each Participant's Elective Deferral Account, Qualified Matching Contribution Account and Qualified Non-Elective Contribution Account shall be fully Vested at all times and, except as otherwise provided herein, shall not be subject to Forfeiture for any reason.

(c)     Amounts held in a Participant's Elective Deferral Account, Qualified Matching Contribution Account and Qualified Non-Elective Account may only be distributable as provided in (4), (5) or (6) below or as provided under the other provisions of this Plan, but in no event prior to the earlier of the following events or any other events permitted by the Code or Regulations:

(1)     the Participant's separation from service, Total and Permanent Disability, or death;

(2)     the Participant's attainment of age 59 1/2;

(3)     the proven financial hardship of the Participant, subject to the limitations of Section 12.9;

(4)     the termination of the Plan without the existence at the time of Plan termination of another defined contribution plan or the establishment of a successor defined contribution plan by the Employer or an Affiliated Employer within the period ending twelve months after distribution of all assets from the Plan maintained by the Employer. For this purpose, a defined contribution does not include an employee stock ownership plan (as defined in Code Section 4975(e)(7) or 409), a simplified employee pension plan (as defined in Code Section 408(k)), or a SIMPLE individual retirement account plan (as defined in Code Section 408(p));

(5)     the date of the sale by the Employer to an entity that is not an Affiliated Employer of substantially all of the assets (within the meaning of Code Section 409(d)(2)) with respect to a Participant who continues employment with the corporation acquiring such assets; or

(6)     the date of the sale by the Employer or an Affiliated Employer of its interest in a subsidiary (within the meaning of Code Section 409(d)(3)) to an entity that is not an Affiliated Employer with respect to a Participant who continues employment with such subsidiary.

Distributions that are made because of (4), (5), or (6) above must be made in a lump-sum.

(d)    A Participant's "elective deferrals" made under this Plan and all other plans, contracts or arrangements of the Employer maintaining this Plan during any calendar year shall not exceed the dollar limitation imposed by Code Section 402(g), as in effect at the beginning of such calendar year. This dollar limitation shall be adjusted annually pursuant to the method provided in Code Section 415(d) in accordance with Regulations. For this purpose, "elective deferrals" means, with respect to a calendar year, the sum of all employer contributions made on behalf of such Participant pursuant to an election to defer under any qualified cash or deferred arrangement as described in Code Section 401(k), any salary reduction simplified employee pension (as defined in Code Section 408(k)(6)), any SIMPLE IRA plan described in Code Section 408(p), any eligible deferred compensation plan under Code Section 457, any plans described under Code Section 501(c)(18), and any Employer contributions made on the behalf of a Participant for the purchase of an annuity contract under Code Section 403(b) pursuant to a salary reduction agreement. "Elective deferrals" shall not include any deferrals properly distributed as excess "Annual Additions" pursuant to Section 4.5.

(e)    If a Participant has Excess Deferrals for a taxable year, the Participant may, not later than March 1st following the close of such taxable year, notify the Administrator in writing of such excess and request that the Participant's Elective Deferrals under this Plan be reduced by an amount specified by the Participant. In such event, the Administrator shall direct the distribution of such excess amount (and any "Income" allocable to such excess amount) to the Participant not later than the first April 15th following the close of the Participant's taxable year. Any distribution of less than the entire amount of Excess Deferrals and "Income" shall be treated as a pro rata distribution of Excess Deferrals and "Income. The amount distributed shall not exceed the Participant's Elective Deferrals under the Plan for the taxable year. Any distribution on or before the last day of the Participant's taxable year must satisfy each of the following conditions:

(1)    the Participant shall designate the distribution as Excess Deferrals;

(2)    the distribution must be made after the date on which the Plan received the Excess Deferrals; and

(3)    the Plan must designate the distribution as a distribution of Excess Deferrals.

Regardless of the preceding, if a Participant has Excess Deferrals solely from elective deferrals made under this Plan or any other plan maintained by the Employer, a Participant will be deemed to have notified the Administrator of such excess amount and the Administrator shall direct the distribution of such Excess Deferrals in a manner consistent with the provisions of this subsection.

Any distribution made pursuant to this subsection shall be made first from unmatched Elective Deferrals and, thereafter, from Elective Deferrals which are matched. Matching contributions which relate to Excess Deferrals that are distributed pursuant to this Section 12.2(e) shall be treated as a Forfeiture to the extent required pursuant to Code Section 401(a)(4) and the Regulations thereunder.

For the purpose of this subsection, "Income" means the amount of income or loss allocable to a Participant's Excess Deferrals, which amount shall be allocated in the same manner as income or losses are allocated pursuant to Section 4.3(c). However, "Income" for the period between the end of the taxable year of the Participant and the date of the distribution (the "gap period") is not required to be distributed.

(f)    Notwithstanding the preceding, a Participant's Excess Deferrals shall be reduced, but not below zero, by any distribution and/or recharacterization of Excess Deferrals pursuant to Section 12.5(a) for the Plan Year beginning within or within the taxable year of the Participant.

(g)    In the event a Participant has received a hardship distribution pursuant to Regulation 1.401(k)-1(d)(2)(iii)(B) from any other plan maintained by the Employer or from the Participant's Elective Deferral Account pursuant to Section 12.9, then such Participant shall not be permitted to elect to have Elective Deferrals contributed to the Plan for a period of twelve (12) months following the receipt of the distribution. Furthermore, the dollar limitation under Code Section 402(g) shall be reduced, with respect to the Participant's taxable year following the taxable year in which the hardship distribution was made, by the amount of such Participant's Elective Deferrals, if any, made pursuant to this Plan (and any other plan maintained by the Employer) for the taxable year of the hardship distribution.

(h)    At Normal Retirement Date, or such other date when the Participant shall be entitled to receive benefits, the fair market value of the Participant's Elective Deferral Account shall be used to provide benefits to the Participant or the Participant's Beneficiary.

(i)    If during a Plan Year, it is projected that the aggregate amount of Elective Deferrals to be allocated to all Highly Compensated Participants under this Plan would cause the Plan to fail the tests set forth in Section 12.4, then the Administrator may automatically reduce the deferral amount of affected Highly Compensated Participants, beginning with the Highly Compensated Participant who has the highest actual deferral ratio until it is anticipated the Plan will pass the tests or until the actual deferral ratio equals the actual deferral ratio of the Highly Compensated Participant having the next highest actual deferral ratio. This process may continue until it is anticipated that the Plan

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

will satisfy one of the tests set forth in Section 12.4. Alternatively, the Employer may specify a maximum percentage of Compensation that may be deferred by Highly Compensated Participants.

    (j)    The Employer and the Administrator shall establish procedures necessary to implement the salary reduction elections provided for herein. Such procedures may contain limits on salary deferral elections such as limiting elections to whole percentages of Compensation or to equal dollar amounts per pay period that an election is in effect.

**12.3    ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS**

    (a)    The Administrator shall establish and maintain an account in the name of each Participant to which the Administrator shall credit as of each Anniversary Date, or other Valuation Date, all amounts allocated to each such Participant as set forth herein.

    (b)    The Employer shall provide the Administrator with all information required by the Administrator to make a proper allocation of Employer contributions for each Plan Year. Within a reasonable period of time after the date of receipt by the Administrator of such information, the Administrator shall allocate contributions as follows:

    (1)    With respect to Elective Deferrals made pursuant to Section 12.1(a)(1), to each Participant's Elective Deferral Account in an amount equal to each such Participant's Elective Deferrals for the year.

    (2)    With respect to the Employer's matching contribution made pursuant to Section 12.1(a)(2), to each Participant's Account, or Participant's Qualified Matching Contribution Account, as elected in the Adoption Agreement, in accordance with Section 12.1(a)(2).

Except, however, in order to be entitled to receive any Employer matching contribution, a Participant must satisfy the conditions for sharing in the Employer matching contribution as set forth in the Adoption Agreement. Furthermore, regardless of any election in the Adoption Agreement to the contrary, for the Plan Year in which this Plan terminates, a Participant shall only be eligible to share in the allocation of the Employer's contributions for the Plan Year if the Participant is employed at the end of the Plan Year and has completed a Year of Service (or Period of Service if the Elapsed Time Method is elected).

    (3)    With respect to the Employer's Non-Elective Contribution made pursuant to Section 12.1(a)(3), to each Participant's Account in accordance with the provisions of Section 4.3(b)(2) or (3) whichever is applicable.

    (4)    With respect to the Employer's Qualified Non-Elective Contribution made pursuant to Section 12.1(a)(4), to each Participant's (excluding Highly Compensated Employees, if elected in the Adoption Agreement) Qualified Non-Elective Contribution Account in accordance with the Adoption Agreement.

    (c)    Notwithstanding anything in the Plan to the contrary, in determining whether a Non-Key Employee has received the required minimum allocation pursuant to Section 4.3(f) such Non-Key Employee's Elective Deferrals and matching contributions used to satisfy the ADP tests in Section 12.4 or the ACP tests in Section 12.6 shall not be taken into account.

    (d)    Notwithstanding anything herein to the contrary, Participants who terminated employment during the Plan Year shall share in the salary deferral contributions made by the Employer for the year of termination without regard to the Hours of Service credited.

    (e)    Notwithstanding anything herein to the contrary (other than Sections 4.3(f) and 12.3(f)), Participants shall only share in the allocations of the Employer's matching contribution made pursuant to Section 12.1(a)(2), the Employer's Non-Elective Contributions made pursuant to Section 12.1(a)(3), the Employer's Qualified Non-Elective Contribution made pursuant to Section 12.1(a)(4), and Forfeitures as provided in the Adoption Agreement. If no election is made in the Adoption Agreement, then a Participant shall be eligible to share in the allocation of the Employer's contribution for the year if the Participant completes more than 500 Hours of Service (or three (3) Months of Service if the Elapsed Time method is chosen in the Adoption Agreement) during the Plan Year or who is employed on the last day of the Plan Year. Furthermore, regardless of any election in the Adoption Agreement to the contrary, for the Plan Year in which this Plan terminates, a Participant shall only be eligible to share in the allocation of the Employer's contributions for the Plan Year if the Participant is employed at the end of the Plan Year and has completed a Year of Service (or Period of Service if the Elapsed Time Method is elected).

    (f)    Notwithstanding anything in this Section to the contrary, the provisions of this subsection apply for any Plan Year if, in the non-standardized Adoption Agreement, the Employer elected to apply the 410(b) ratio percentage failsafe provisions and the Plan fails to satisfy the "ratio percentage test" due to a last day of the Plan Year allocation condition or an Hours of Service (or months of service) allocation condition. A plan satisfies the "ratio percentage test" if, on the last day of the Plan Year, the "benefiting ratio" of the Non-Highly Compensated Employees who are "includible" is at least 70% of the "benefiting ratio" of the Highly Compensated Employees who are "includible. The "benefiting ratio" of the Non-Highly Compensated Employees is the number of "includible" Non-

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

Highly Compensated Employees "benefiting" under the Plan divided by the number of "includible" Employees who are Non-Highly Compensated Employees. The "benefiting ratio" of the Highly Compensated Employees is the number of Highly Compensated Employees "benefiting" under the Plan divided by the number of "includible" Highly Compensated Employees. "Includible" Employees are all Employees other than: (1) those Employees excluded from participating in the plan for the entire Plan Year by reason of the collective bargaining unit exclusion or the nonresident alien exclusion described in the Code or by reason of the age and service requirements of Article III; and (2) any Employee who incurs a separation from service during the Plan Year and fails to complete at least 501 Hours of Service (or three (3) months of service if the Elapsed Time Method is being used) during such Plan Year.

For purposes of this subsection, an Employee is "benefiting" under the Plan on a particular date if, under the Plan, the Employee is entitled to an Employer contribution or an allocation of Forfeitures for the Plan Year.

If this subsection applies, then the Administrator will suspend the allocation conditions for the "includible" Non-Highly Compensated Employees who are Participants, beginning first with the "includible" Employees employed by the Employer on the last day of the Plan Year, then the "includible" Employees who have the latest separation from service during the Plan Year, and continuing to suspend the allocation conditions for each "includible" Employee who incurred an earlier separation from service, from the latest to the earliest separation from service date, until the Plan satisfies the "ratio percentage test" for the Plan Year. If two or more "includible" Employees have a separation from service on the same day, then the Administrator will suspend the allocation conditions for all such "includible" Employees, irrespective of whether the Plan can satisfy the "ratio percentage test" by accruing benefits for fewer than all such "includible" Employees. If the Plan for any Plan Year suspends the allocation conditions for an "includible" Employee, then that Employee will share in the allocation for that Plan Year of the Employer contribution and Forfeitures, if any, without regard to whether the Employee has satisfied the other allocation conditions set forth in this Section.

If the Plan includes Employer matching contributions subject to ACP testing, this subsection applies separately to the Code Section 401(m) portion of the Plan.

12.4    **ACTUAL DEFERRAL PERCENTAGE TESTS**

(a)    Except as otherwise provided herein, this subsection applies if the Prior Year Testing method is elected in the Adoption Agreement. The "Actual Deferral Percentage" (hereinafter "ADP") for a Plan Year for Participants who are Highly Compensated Employees (hereinafter "HCEs") for each Plan Year and the prior year's ADP for Participants who were Non-Highly Compensated Employees (hereinafter "NHCEs") for the prior Plan Year must satisfy one of the following tests:

(1)    The ADP for a Plan Year for Participants who are HCEs for the Plan Year shall not exceed the prior year's ADP for Participants who were NHCEs for the prior Plan Year multiplied by 1.25; or

(2)    The ADP for a Plan Year for Participants who are HCEs for the Plan Year shall not exceed the prior year's ADP for Participants who were NHCEs for the prior Plan Year multiplied by 2.0, provided that the ADP for Participants who are HCEs does not exceed the prior year's ADP for Participants who were NHCEs in the prior Plan Year by more than two (2) percentage points.

Notwithstanding the above, for purposes of applying the foregoing tests with respect to the first Plan Year in which the Plan permits any Participant to make Elective Deferrals, the ADP for the prior year's NHCEs shall be deemed to be three percent (3%) unless the Employer has elected in the Adoption Agreement to use the current Plan Year's ADP for these Participants. However, the provisions of this paragraph may not be used if the Plan is a successor plan or is otherwise prohibited from using such provisions pursuant to IRS Notice 98-1 (or superseding guidance).

(b)    Notwithstanding the foregoing, if the Current Year Testing method is elected in the Adoption Agreement, the ADP tests in (a)(1) and (a)(2), above shall be applied by comparing the current Plan Year's ADP for Participants who are HCEs with the current Plan Year's ADP (rather than the prior Plan Year's ADP) for Participants who are NHCEs for the current Plan Year. Once made, this election can only be changed if the Plan meets the requirements for changing to the Prior Year Testing method set forth in IRS Notice 98-1 (or superseding guidance). Furthermore, this Plan must use the same testing method for both the ADP and ACP tests for Plan Years beginning on or after the date the Employer adopts its GUST restated plan.

(c)    This subsection applies to prevent the multiple use of the test set forth in subsection (a)(2) above. Any HCE eligible to make Elective Deferrals pursuant to Section 12.2 and to make after-tax voluntary Employee contributions or to receive matching contributions under this Plan or under any other plan maintained by the Employer or an Affiliated Employer, shall have either the actual deferral ratio adjusted in the manner described in Section 12.5 or the actual contribution ratio adjusted in the manner described in Section 12.7 so that the "Aggregate Limit" is not exceeded pursuant to Regulation 1.401(m)-2. The amounts in excess of the "Aggregate Limit" shall be treated as either an Excess Contribution or an Excess Aggregate Contribution. The ADP and ACP of the HCEs are determined after any corrections required to meet the ADP and ACP tests and are deemed to be the maximum permitted under such tests for

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

the Plan Year. Multiple use does not occur if either the ADP or ACP of the HCEs does not exceed 1.25 multiplied by the ADP and ACP of the NHCEs.

"Aggregate Limit" means the sum of (i) 125 percent of the greater of the ADP of the NHCEs for the prior Plan Year or the ACP of such NHCEs under the plan subject to Code Section 401(m) for the Plan Year beginning with or within the prior Plan Year of the cash or deferred arrangement and (ii) the lesser of 200% or two (2) plus the lesser of such ADP or ACP. "Lesser" is substituted for "greater" in (i) above, and "greater" is substituted for "lesser" after "two (2) plus the" in (ii) above if it would result in a larger Aggregate Limit. If the Employer has elected in the Adoption Agreement to use the Current Year Testing method, then in calculating the "Aggregate Limit" for a particular Plan Year, the NHCEs ADP and ACP for that Plan Year, instead of the prior Plan Year, is used.

(d)     A Participant is an HCE for a particular Plan Year if the Participant meets the definition of an HCE in effect for that Plan Year. Similarly, a Participant is an NHCE for a particular Plan Year if the Participant does not meet the definition of an HCE in effect for that Plan Year.

(e)     For the purposes of this Section and Section 12.5, ADP means, for a specific group of Participants for a Plan Year, the average of the ratios (calculated separately for each Participant in such group) of (1) the amount of Employer contributions actually paid over to the Plan on behalf of such Participant for the Plan Year to (2) the Participant's 414(s) Compensation for such Plan Year. Employer contributions on behalf of any participant shall include: (1) any Elective Deferrals made pursuant to the Participant's deferral election (including Excess Deferrals of HCEs), but excluding (i) Excess Deferrals of NHCEs that arise solely from Elective Deferrals made under the plan or plans of this Employer and (ii) Elective Deferrals that are taken into account in the ACP tests set forth in Section 12.6 (provided the ADP test is satisfied both with and without exclusion of these Elective Deferrals); and (2) at the election of the Employer, Qualified Non-Elective Contributions and Qualified Matching Contributions to the extent such contributions are not used to satisfy the ACP test.

The actual deferral ratio for each Participant and the ADP for each group shall be calculated to the nearest one-hundredth of one percent. Elective Deferrals allocated to each Highly Compensated Participant's Elective Deferral Account shall not be reduced by Excess Deferrals to the extent such excess amounts are made under this Plan or any other plan maintained by the Employer.

(f)     For purposes of this Section and Section 12.5, a Highly Compensated Participant and a Non-Highly Compensated Participant shall include any Employee eligible to make salary deferrals pursuant to Section 12.2 for the Plan Year. Such Participants who fail to make Elective Deferrals shall be treated for ADP purposes as Participants on whose behalf no Elective Deferrals are made.

(g)     In the event this Plan satisfies the requirements of Code Sections 401(a)(4), 401(k), or 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of such sections of the Code only if aggregated with this Plan, then this Section shall be applied by determining the ADP of Employees as if all such plans were a single plan. Any adjustments to the NHCE ADP for the prior year will be made in accordance with IRS Notice 98-1 and any superseding guidance, unless the Employer has elected in the Adoption Agreement to use the Current Year Testing method. Plans may be aggregated in order to satisfy Code Section 401(k) only if they have the same Plan Year and use the same ADP testing method.

(h)     The ADP for any Participant who is an HCE for the Plan Year and who is eligible to have Elective Deferrals (and Qualified Non-Elective Contributions or Qualified Matching Contributions, or both, if treated as Elective Deferrals for purposes of the ADP test) allocated to such Participant's accounts under two (2) or more arrangements described in Code Section 401(k), that are maintained by the Employer, shall be determined as if such Elective Deferrals (and, if applicable, such Qualified Non-Elective Contributions or Qualified Matching Contributions, or both) were made under a single arrangement for purposes of determining such HCE's actual deferral ratio. However, if the cash or deferred arrangements have different Plan Years, this paragraph shall be applied by treating all cash or deferred arrangements ending with or within the same calendar year as a single arrangement. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under Regulations under Code Section 401.

(i)     For purposes of determining the ADP and the amount of Excess Contributions pursuant to Section 12.5, only Elective Deferrals, Qualified Non-Elective Contributions and Qualified Matching Contributions contributed to the Plan prior to the end of the twelve (12) month period immediately following the Plan Year to which the contributions relate shall be considered.

(j)     Notwithstanding anything in this Section to the contrary, the provisions of this Section and Section 12.5 may be applied separately (or will be applied separately to the extent required by Regulations) to each "plan" within the meaning of Regulation 1.401(k)-1(g)(11). Furthermore, for Plan Years beginning after December 31, 1998, the provisions of Code Section 401(k)(3)(F) may be used to exclude from consideration all Non-Highly Compensated Employees who have not satisfied the minimum age and service requirements of Code Section 410(a)(1)(A).

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

12.5    ADJUSTMENT TO ACTUAL DEFERRAL PERCENTAGE TESTS

(a)    In the event (or, with respect to subsection (c) when the Prior Year Testing method is being used, if it is anticipated) that for Plan Years beginning after December 31, 1996, the Plan does not satisfy one of the tests set forth in Section 12.4, the Administrator shall adjust Excess Contributions or the Employer shall make contributions pursuant to the options set forth below or any combination thereof. However, if the Prior Year testing method is being used and it is anticipated that the Plan might not satisfy one of such tests, then the Employer may make contributions pursuant to the options set forth in subsection (c) below.

(b)    On or before the fifteenth day of the third month following the end of each Plan Year, but in no event later than the close of the following Plan Year, the Highly Compensated Participant allocated the largest amount of Elective Deferrals shall have a portion of such Elective Deferrals (and "Income" allocable to such amounts) distributed (and/or, at the Participant's election, recharacterized as a after-tax voluntary Employee contribution pursuant to Section 4.8) until the total amount of Excess Contributions has been distributed, or until the amount of the Participant's Elective Deferrals equals the Elective Deferrals of the Highly Compensated Participant having the next largest amount of Elective Deferrals allocated. This process shall continue until the total amount of Excess Contributions has been distributed. Any distribution and/or recharacterization of Excess Contributions shall be made in the following order:

(1)    With respect to the distribution of Excess Contributions, such distribution:

(i)    may be postponed but not later than the close of the Plan Year following the Plan Year to which they are allocable;

(ii)    shall be made first from unmatched Elective Deferrals and, thereafter, simultaneously from Elective Deferrals which are matched and matching contributions which relate to such Elective Deferrals. Matching contributions which relate to Excess Contributions shall be forfeited unless the related matching contribution is distributed as an Excess Aggregate Contribution pursuant to Section 12.7;

(iii)    shall be adjusted for "Income"; and

(iv)    shall be designated by the Employer as a distribution of Excess Contributions (and "Income").

(2)    With respect to the recharacterization of Excess Contributions pursuant to (a) above, such recharacterized amounts:

(i)    shall be deemed to have occurred on the date on which the last of those Highly Compensated Participants with Excess Contributions to be recharacterized is notified of the recharacterization and the tax consequences of such recharacterization;

(ii)    shall not exceed the amount of Elective Deferrals on behalf of any Highly Compensated Participant for any Plan Year;

(iii)    shall be treated as after-tax voluntary Employee contributions for purposes of Code Section 401(a)(4) and Regulation 1.401(k)-1(b). However, for purposes of Sections 4.3(f) and 9.2 (top heavy rules), recharacterized Excess Contributions continue to be treated as Employer contributions that are Elective Deferrals. Excess Contributions (and "Income" attributable to such amounts) recharacterized as after-tax voluntary Employee contributions shall continue to be nonforfeitable and subject to the same distribution rules provided for in Section 12.2(c); and

(iv)    are not permitted if the amount recharacterized plus after-tax voluntary Employee contributions actually made by such Highly Compensated Participant, exceed the maximum amount of after-tax voluntary Employee contributions (determined prior to application of Section 12.6) that such Highly Compensated Participant is permitted to make under the Plan in the absence of recharacterization.

(3)    Any distribution and/or recharacterization of less than the entire amount of Excess Contributions shall be treated as a pro rata distribution and/or recharacterization of Excess Contributions and "Income."

(4)    For the purpose of this Section, "Income" means the income or losses allocable to Excess Contributions, which amount shall be allocated at the same time and in the same manner as income or losses are allocated pursuant to Section 4.3(c). However, "Income" for the period between the end of the Plan Year and the date of the distribution (the "gap period") is not required to be distributed.

(5)    Excess Contributions shall be treated as Employer contributions for purposes of Code Sections 404 and 415 even if distributed from the Plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(c)     Notwithstanding the above, within twelve (12) months after the end of the Plan Year (or, if the Prior Year Testing method is used, within twelve (12) months after the end of the prior Plan Year), the Employer may make a special Qualified Non-Elective Contribution or Qualified Matching Contribution in accordance with one of the following provisions which contribution shall be allocated to the Qualified Non-Elective Contribution Account or Qualified Matching Contribution Account of each Non-Highly Compensated Participant eligible to share in the allocation in accordance with such provision. The Employer shall provide the Administrator with written notification of the amount of the contribution being made and to which provision it relates.

(1)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated in the same proportion that each Non-Highly Compensated Participant's 414(s) Compensation for the year (or prior year if the Prior Year Testing method is being used) bears to the total 414(s) Compensation of all Non-Highly Compensated Participants for such year.

(2)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated in the same proportion that each Non-Highly Compensated Participant's 414(s) Compensation for the year (or prior year if the Prior Year Testing method is being used) bears to the total 414(s) Compensation of all Non-Highly Compensated Participants for such year. However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(3)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated in equal amounts (per capita).

(4)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated in equal amounts (per capita). However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(5)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Non-Elective Contribution Account of the Non-Highly Compensated Participant having the lowest 414(s) Compensation, until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied).

(6)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Non-Elective Contribution Account of the Non-Highly Compensated Participant having the lowest 414(s) Compensation, until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied). However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(7)     A Qualified Matching Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Matching Contribution Account of each Non-Highly Compensated Participant in the same proportion that each Non-Highly Compensated Participant's Elective Deferrals for the year bears to the total Elective Deferrals of all Non-Highly Compensated Participants.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(8)     A Qualified Matching Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Matching Contribution Account of each Non-Highly Compensated Participant in the same proportion that each Non-Highly Compensated Participant's Elective Deferrals for the year bears to the total Elective Deferrals of all Non-Highly Compensated Participants. However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(9)     A Qualified Matching Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Matching Contribution Account of the Non-Highly Compensated Participant having the lowest Elective Deferrals until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied).

(10)     A Qualified Matching Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated to the Qualified Matching Contribution Account of the Non-Highly Compensated Participant having the lowest Elective Deferrals until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied). However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(d)     Any Excess Contributions (and "Income") which are distributed on or after 2 1/2 months after the end of the Plan Year shall be subject to the ten percent (10%) Employer excise tax imposed by Code Section 4979.

12.6    **ACTUAL CONTRIBUTION PERCENTAGE TESTS**

(a)     Except as otherwise provided herein, this subsection applies if the Prior Year Testing method is elected in the Adoption Agreement. The "Actual Contribution Percentage" (hereinafter "ACP") for Participants who are Highly Compensated Employees (hereinafter "HCEs") for each Plan Year and the prior year's ACP for Participants who were Non-Highly Compensated Employees (hereinafter "NHCEs") for the prior Plan Year must satisfy one of the following tests:

(1)     The ACP for a Plan Year for Participants who are HCEs for the Plan Year shall not exceed the prior year's ACP for Participants who were NHCEs for the prior Plan Year multiplied by 1.25; or

(2)     The ACP for a Plan Year for Participants who are HCEs for the Plan Year shall not exceed the prior year's ACP for Participants who were NHCEs for the prior Plan Year multiplied by 2.0, provided that the ACP for Participants who are HCEs does not exceed the prior year's ACP for Participants who were NHCEs in the prior Plan Year by more than two (2) percentage points.

Notwithstanding the above, for purposes of applying the foregoing tests with respect to the first Plan Year in which the Plan permits any Participant to make Employee contributions, provides for matching contributions, or both, the ACP for the prior year's NHCEs shall be deemed to be three percent (3%) unless the Employer has elected in the Adoption Agreement to use the current Plan Year's ACP for these Participants. However, the provisions of this paragraph may not be used if the Plan is a successor plan or is otherwise prohibited from using such provisions pursuant to IRS Notice 98-1 (or superseding guidance).

(b)     Notwithstanding the preceding, if the Current Year Testing method is elected in the Adoption Agreement, the ACP tests in (a)(1) and (a)(2), above shall be applied by comparing the current Plan Year's ACP for Participants who are HCEs with the current Plan Year's ACP (rather than the prior Plan Year's ACP) for Participants who are NHCEs for the current Plan Year. Once made, this election can only be changed if the Plan meets the requirements for changing to the Prior Year Testing method set forth in IRS Notice 98-1 (or superseding guidance). Furthermore, this Plan must use the same testing method for both the ADP and ACP tests for Plan Years beginning on or after the date the Employer adopts its GUST restated plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(c)　　This subsection applies to prevent the multiple use of the test set forth in subsection (a)(2) above. Any HCE eligible to make Elective Deferrals pursuant to Section 12.2 and to make after-tax voluntary Employee contributions or to receive matching contributions under this Plan or under any other plan maintained by the Employer or an Affiliated Employer, shall have either the actual deferral ratio adjusted in the manner described in Section 12.5 or the actual contribution ratio reduced in the manner described in Section 12.7 so that the "Aggregate Limit" is not exceeded pursuant to Regulation 1.401(m)-2. The amounts in excess of the "Aggregate Limit" shall be treated as either an Excess Contribution or an Excess Aggregate Contribution. The ADP and ACP of the HCEs are determined after any corrections required to meet the ADP and ACP tests and are deemed to be the maximum permitted under such test for the Plan Year. Multiple use does not occur if either the ADP or ACP of the HCEs does not exceed 1.25 multiplied by the ADP and ACP of the NHCEs.

"Aggregate Limit" means the sum of (i) 125 percent of the greater of the ADP of the NHCEs for the Plan Year or the ACP of such NHCEs under the plan subject to Code Section 401(m) for the Plan Year beginning with or within the prior Plan Year of the cash or deferred arrangement and (ii) the lesser of 200% or two plus the lesser of such ADP or ACP. "Lesser" is substituted for "greater" in (i) above, and "greater" is substituted for "lesser" after "two plus the" in (ii) above if it would result in a larger Aggregate Limit. If the Employer has elected in the Adoption Agreement to use the Current Year Testing method, then in calculating the "Aggregate Limit" for a particular Plan Year, the NHCEs ADP and ACP for that Plan Year, instead of the prior Plan Year, is used.

(d)　　A Participant is a Highly Compensated Employee for a particular Plan Year if the Participant meets the definition of a Highly Compensated Employee in effect for that Plan Year. Similarly, a Participant is a Non-highly Compensated Employee for a particular Plan Year if the Participant does not meet the definition of a Highly Compensated Employee in effect for that Plan Year.

(e)　　For the purposes of this Section and Section 12.7, ACP for a specific group of Participants for a Plan Year means the average of the "Contribution Percentages" (calculated separately for each Participant in such group). For this purpose, "Contribution Percentage" means the ratio (expressed as a percentage) of the Participant's "Contribution Percentage Amounts" to the Participant's 414(s) Compensation. The actual contribution ratio for each Participant and the ACP for each group, shall be calculated to the nearest one-hundredth of one percent of the Participant's 414(s) Compensation.

(f)　　"Contribution Percentage Amounts" means the sum of (i) after-tax voluntary Employee contributions, (ii) Employer "Matching Contributions" made pursuant to Section 12.1(a)(2) (including Qualified Matching Contributions to the extent such Qualified Matching Contributions are not used to satisfy the tests set forth in Section 12.4), (iii) Excess Contributions recharacterized as nondeductible voluntary Employee contributions pursuant to Section 12.5, and (iv) Qualified Non-Elective Contributions (to the extent not used to satisfy the tests set forth in Section 12.4). However, "Contribution Percentage Amounts" shall not include "Matching Contributions" that are forfeited either to correct Excess Aggregate Contributions or due to Code Section 401(a)(4) and the Regulations thereunder because the contributions to which they relate are Excess Deferrals, Excess Contributions, or Excess Aggregate Contributions. In addition, "Contribution Percentage Amounts" may include Elective Deferrals provided the ADP test in Section 12.4 is met before the Elective Deferrals are used in the ACP test and continues to be met following the exclusion of those Elective Deferrals that are used to meet the ACP test.

(g)　　For purposes of determining the ACP and the amount of Excess Aggregate Contributions pursuant to Section 12.7, only Employer "Matching Contributions" (excluding "Matching Contributions" forfeited or distributed pursuant to Section 12.2(e), 12.5(b), or 12.7(b)) contributed to the Plan prior to the end of the succeeding Plan Year shall be considered. In addition, the Administrator may elect to take into account, with respect to Employees eligible to have Employer "Matching Contributions" made pursuant to Section 12.1(a)(2) or after-tax voluntary Employee contributions made pursuant to Section 4.7 allocated to their accounts, elective deferrals (as defined in Regulation 1.402(g)-1(b)) and qualified non-elective contributions (as defined in Code Section 401(m)(4)(C)) contributed to any plan maintained by the Employer. Such elective deferrals and qualified non-elective contributions shall be treated as Employer matching contributions subject to Regulation 1.401(m)-1(b)(2) which is incorporated herein by reference. The Plan Year must be the same as the plan year of the plan to which the elective deferrals and the qualified non-elective contributions are made.

(h)　　In the event that this Plan satisfies the requirements of Code Sections 401(a)(4), 401(m), or 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of such sections of the Code only if aggregated with this Plan, then this Section shall be applied by determining the ACP of Employees as if all such plans were a single plan. Plans may be aggregated in order to satisfy Code section 401(m) only if they have the same Plan Year.

Any adjustments to the NHCE ACP for the prior year will be made in accordance with IRS Notice 98-1 and any superseding guidance, unless the Employer has elected in the Adoption Agreement to use the Current Year Testing method. Plans may be aggregated in order to satisfy Code Section 401(k) only if they have the same Plan Year and use the same ACP testing method.

(i)　　For the purposes of this Section, if an HCE is a Participant under two (2) or more plans (other than an employee stock ownership plan as defined in Code Section 4975(e)(7)) which are maintained by the Employer or an

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

Affiliated Employer to which "Matching Contributions, nondeductible voluntary Employee contributions, or both, are made, all such contributions on behalf of such HCE shall be aggregated for purposes of determining such HCP's actual contribution ratio. However, if the plans have different plan years, this paragraph shall be applied by treating all plans ending with or within the same calendar year as a single plan.

(j) For purposes of this Section and Section 12.7, a Highly Compensated Participant and a Non-Highly Compensated Participant shall include any Employee eligible to have "Matching Contributions" made pursuant to Section 12.1(a)(2) (whether or not a deferral election was made or suspended pursuant to Section 12.2(g)) allocated to such Participant's account for the Plan Year or to make salary deferrals pursuant to Section 12.2 (if the Employer uses salary deferrals to satisfy the provisions of this Section) or after-tax voluntary Employee contributions pursuant to Section 4.7 (whether or not nondeductible voluntary Employee contributions are made) allocated to the Participant's account for the Plan Year.

(k) For purposes of this Section and Section 12.7, "Matching Contribution" means an Employer contribution made to the Plan, or to a contract described in Code Section 403(b), on behalf of a Participant on account of a nondeductible voluntary Employee contribution made by such Participant, or on account of a Participant's elective deferrals under a plan maintained by the Employer.

(l) For purposes of determining the ACP and the amount of Excess Aggregate Contributions pursuant to Section 12.7, only Elective Deferrals, Qualified Non-Elective Contributions, "Matching Contributions" and Qualified Matching Contributions contributed to the Plan prior to the end of the twelve (12) month period immediately following the Plan Year to which the contributions relate shall be considered.

(m) Notwithstanding anything in this Section to the contrary, the provisions of this Section and Section 12.7 may be applied separately (or will be applied separately to the extent required by Regulations) to each "plan" within the meaning of Regulation 1.401(k)-1(g)(11). Furthermore, for Plan Years beginning after December 31, 1998, the provisions of Code Section 401(k)(3)(F) may be used to exclude from consideration all Non-Highly Compensated Employees who have not satisfied the minimum age and service requirements of Code Section 410(a)(1)(A).

## 12.7    ADJUSTMENT TO ACTUAL CONTRIBUTION PERCENTAGE TESTS

(a) In the event (or, with respect to subsection (g) below when the Prior Year Testing method is being used, if it is anticipated) that for Plan Years beginning after December 31, 1996, the Plan does not satisfy one of the tests set forth in Section 12.6, the Administrator shall adjust Excess Aggregate Contributions or the Employer shall make contributions pursuant to the options set forth below or any combination thereof. However, if the Prior Year testing method is being used and it is anticipated that the Plan might not satisfy one of such tests, then the Employer may make contributions pursuant to the options set forth in subsection (c) below.

(b) On or before the fifteenth day of the third month following the end of the Plan Year, but in no event later than the close of the following Plan Year the Highly Compensated Participant having the largest allocation of "Contribution Percentage Amounts" shall have a portion of such "Contribution Percentage Amounts" (and "Income" allocable to such amounts) distributed or, if non-Vested, Forfeited (including "Income" allocable to such Forfeitures) until the total amount of Excess Aggregate Contributions has been distributed, or until the amount of the Participant's "Contribution Percentage Amounts" equals the "Contribution Percentage Amounts" of the Highly Compensated Participant having the next largest amount of "Contribution Percentage Amounts. This process shall continue until the total amount of Excess Aggregate Contributions has been distributed or forfeited. Any distribution and/or Forfeiture of "Contribution Percentage Amounts" shall be made in the following order:

(1) Employer matching contributions distributed and/or forfeited pursuant to Section 12.5(b)(1);

(2) After-tax voluntary Employee contributions including Excess Contributions recharacterized as after-tax voluntary Employee contributions pursuant to Section 12.5(b)(2);

(3) Remaining Employer matching contributions.

(c) Any distribution or Forfeiture of less than the entire amount of Excess Aggregate Contributions (and "Income") shall be treated as a pro rata distribution of Excess Aggregate Contributions and "Income. Distribution of Excess Aggregate Contributions shall be designated by the Employer as a distribution of Excess Aggregate Contributions (and "Income"). Forfeitures of Excess Aggregate Contributions shall be treated in accordance with Section 4.3. However, no such Forfeiture may be allocated to a Highly Compensated Participant whose contributions are reduced pursuant to this Section.

(d) For the purpose of this Section, "Income" means the income or losses allocable to Excess Aggregate Contributions, which amount shall be allocated at the same time and in the same manner as income or losses are allocated pursuant to Section 4.3(c). However, "Income" for the period between the end of the Plan Year and the date of the distribution (the "gap period") is not required to be distributed.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(e)     Excess Aggregate Contributions attributable to amounts other than nondeductible voluntary Employee contributions, including forfeited matching contributions, shall be treated as Employer contributions for purposes of Code Sections 404 and 415 even if distributed from the Plan.

(f)     The determination of the amount of Excess Aggregate Contributions with respect to any Plan Year shall be made after first determining the Excess Contributions, if any, to be treated as nondeductible voluntary Employee contributions due to recharacterization for the plan year of any other qualified cash or deferred arrangement (as defined in Code Section 401(k)) maintained by the Employer that ends with or within the Plan Year or which are treated as after-tax voluntary Employee contributions due to recharacterization pursuant to Section 12.5.

(g)     Notwithstanding the above, within twelve (12) months after the end of the Plan Year (or, if the Prior Year Testing method is used, within twelve (12) months after the end of the prior Plan Year), the Employer may make a special Qualified Non-Elective Contribution or Qualified Matching Contribution in accordance with one of the following provisions which contribution shall be allocated to the Qualified Non-Elective Contribution Account or Qualified Matching Contribution Account of each Non-Highly Compensated eligible to share in the allocation in accordance with such provision. The Employer shall provide the Administrator with written notification of the amount of the contribution being made and for which provision it is being made pursuant to.

(1)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated in the same proportion that each Non-Highly Compensated Participant's 414(s) Compensation for the year (or prior year if the Prior Year Testing method is being used) bears to the total 414(s) Compensation of all Non-Highly Compensated Participants for such year.

(2)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated in the same proportion that each Non-Highly Compensated Participant's 414(s) Compensation for the year (or prior year if the Prior Year Testing method is being used) bears to the total 414(s) Compensation of all Non-Highly Compensated Participants for such year. However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(3)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated in equal amounts (per capita).

(4)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated in equal amounts (per capita). However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(5)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated to the Qualified Non-Elective Contribution Account of the Non-Highly Compensated Participant having the lowest 414(s) Compensation, until one of the tests set forth in Section 12.6 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.6 is satisfied (or is anticipated to be satisfied).

(6)     A Qualified Non-Elective Contribution may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated to the Qualified Non-Elective Contribution Account of the Non-Highly Compensated Participant having the lowest 414(s) Compensation, until one of the tests set forth in Section 12.6 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.6 is satisfied (or is anticipated to be satisfied). However, for purposes of this contribution, Non-Highly Compensated Employees who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive

calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(7)     A "Matching Contribution" may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated on behalf of each Non-Highly Compensated Participant in the same proportion that each Non-Highly Compensated Participant's Elective Deferrals for the year bears to the total Elective Deferrals of all Non-Highly Compensated Participants. The Employer shall designate, at the time the contribution is made, whether the contribution made pursuant to this provision shall be a Qualified Matching Contribution allocated to a Participant's Qualified Matching Contribution Account or an Employer Non-Elective Contribution allocated to a Participant's Non-Elective Account.

(8)     A "Matching Contribution" may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.6. Such contribution shall be allocated on behalf of each Non-Highly Compensated Participant in the same proportion that each Non-Highly Compensated Participant's Elective Deferrals for the year bears to the total Elective Deferrals of all Non-Highly Compensated Participants. The Employer shall designate, at the time the contribution is made, whether the contribution made pursuant to this provision shall be a Qualified Matching Contribution allocated to a Participant's Qualified Matching Contribution Account or an Employer Non-Elective Contribution allocated to a Participant's Non-Elective Account. However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(9)     A "Matching Contribution" may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated on behalf of the Non-Highly Compensated Participant having the lowest Elective Deferrals until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied). The Employer shall designate, at the time the contribution is made, whether the contribution made pursuant to this provision shall be a Qualified Matching Contribution allocated to a Participant's Qualified Matching Contribution Account or an Employer Non-Elective Contribution allocated to a Participant's Non-Elective Account.

(10)     A "Matching Contribution" may be made on behalf of Non-Highly Compensated Participants in an amount sufficient to satisfy (or to prevent an anticipated failure of) one of the tests set forth in Section 12.4. Such contribution shall be allocated on behalf of the Non-Highly Compensated Participant having the lowest Elective Deferrals until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied), or until such Non-Highly Compensated Participant has received the maximum "Annual Addition" pursuant to Section 4.4. This process shall continue until one of the tests set forth in Section 12.4 is satisfied (or is anticipated to be satisfied). The Employer shall designate, at the time the contribution is made, whether the contribution made pursuant to this provision shall be a Qualified Matching Contribution allocated to a Participant's Qualified Matching Contribution Account or an Employer Non-Elective Contribution allocated to a Participant's Non-Elective Account. However, for purposes of this contribution, Non-Highly Compensated Participants who are not employed at the end of the Plan Year (or at the end of the prior Plan Year if the Prior Year Testing method is being used) and, if this is a standardized Plan, who have not completed more than 500 Hours of Service (or three (3) consecutive calendar months if the Elapsed Time Method is selected in the Adoption Agreement) during such Plan Year, shall not be eligible to share in the allocation and shall be disregarded.

(b)     Any Excess Aggregate Contributions (and "Income") which are distributed on or after 2 1/2 months after the end of the Plan Year shall be subject to the ten percent (10%) Employer excise tax imposed by Code Section 4979.

12.8     SAFE HARBOR PROVISIONS

(a)     The provisions of this Section will apply if the Employer has elected, in the Adoption Agreement, to use the "ADP Test Safe Harbor" or "ACP Test Safe Harbor." If the Employer has elected to use the "ADP Test Safe Harbor" for a Plan Year, then the provisions relating to the ADP test described in Section 12.4 and in Code Section 401(k)(3) do not apply for such Plan Year. In addition, if the Employer has also elected to use the "ACP Test Safe Harbor" for a Plan Year, then the provisions relating to the ACP test described in Section 12.6 and in Code Section 401(m)(2) do not apply for such Plan Year. Furthermore, to the extent any other provision of the Plan is inconsistent with the provisions of this Section, the provisions of this Section will govern.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

**Defined Contribution Prototype Plan**

(b)    For purposes of this Section, the following definitions apply:

(1)    "ACP Test Safe Harbor" means the method described in subsection (c) below for satisfying the ACP test of Code Section 401(m)(2).

(2)    "ACP Test Safe Harbor Matching Contributions" means "Matching Contributions" described in subsection (d)(1).

(3)    "ADP Test Safe Harbor" means the method described in subsection (c) for satisfying the ADP test of Code Section 401(k)(3).

(4)    "ADP Test Safe Harbor Contributions" means "Matching Contributions" and nonelective contributions described in subsection (c)(1) below.

(5)    "Compensation" means Compensation as defined in Section 1.11, except, for purposes of this Section, no dollar limit, other than the limit imposed by Code Section 401(a)(17), applies to the Compensation of a Non-Highly Compensated Employee. However, solely for purposes of determining the Compensation subject to a Participant's deferral election, the Employer may use an alternative definition to the one described in the preceding sentence, provided such alternative definition is a reasonable definition within the meaning of Regulation 1.414(s)-1(d)(2) and permits each Participant to elect sufficient Elective Deferrals to receive the maximum amount of "Matching Contributions" (determined using the definition of Compensation described in the preceding sentence) available to the Participant under the Plan.

(6)    "Eligible Participant" means a Participant who is eligible to make Elective Deferrals under the Plan for any part of the Plan Year (or who would be eligible to make Elective Deferrals but for a suspension due to a hardship distribution described in Section 12.9 or to statutory limitations, such as Code Sections 402(g) and 415) and who is not excluded as an "Eligible Participant" under the 401(k) Safe Harbor elections in the Adoption Agreement.

(7)    "Matching Contributions" means contributions made by the Employer on account of an "Eligible Participant's" Elective Deferrals.

(c)    The provisions of this subsection apply for purposes of satisfying the "ADP Test Safe Harbor.

(1)    The "ADP Test Safe Harbor Contribution" is the contribution elected by the Employer in the Adoption Agreement to be used to satisfy the "ADP Test Safe Harbor." However, if no contribution is elected in the Adoption Agreement, the Employer will contribute to the Plan for the Plan Year a "Basic Matching Contribution" on behalf of each "Eligible Employee. The "Basic Matching Contribution" is equal to (i) one-hundred percent (100%) of the amount of an "Eligible Participant's" Elective Deferrals that do not exceed three percent (3%) of the Participant's "Compensation" for the Plan Year, plus (ii) fifty percent (50%) of the amount of the Participant's Elective Deferrals that exceed three percent (3%) of the Participant's "Compensation" but do not exceed five percent (5%) of the Participant's "Compensation.

(2)    Except as provided in subsection (e) below, for purposes of the Plan, a Basic Matching Contribution or an Enhanced Matching Contribution will be treated as a Qualified Matching Contribution and a Nonelective Safe Harbor Contribution will be treated as a Qualified Non-Elective Contribution. Accordingly, the "ADP Test Safe Harbor Contribution" will be fully Vested and subject to the distribution restrictions set forth in Section 12.2(c) (i.e., may generally not be distributed earlier than separation from service, death, disability, an event described in Section 401(k)(1), or, in case of a profit sharing plan, the attainment of age 59 1/2.). In addition, such contributions must satisfy the "ADP Test Safe Harbor" without regard to permitted disparity under Code Section 401(l).

(3)    At least thirty (30) days, but not more than ninety (90) days, before the beginning of the Plan Year, the Employer will provide each "Eligible Participant" a comprehensive notice of the Participant's rights and obligations under the Plan, written in a manner calculated to be understood by the average Participant. However, if an Employee becomes eligible after the 90th day before the beginning of the Plan Year and does not receive the notice for that reason, the notice must be provided no more than ninety (90) days before the Employee becomes eligible but not later than the date the Employee becomes eligible.

(4)    In addition to any other election periods provided under the Plan, each "Eligible Participant" may make or modify a deferral election during the thirty (30) day period immediately following receipt of the notice described in subsection (3) above. Furthermore, if the "ADP Test Safe Harbor" is a "Matching Contribution" each "Eligible Employee" must be permitted to elect sufficient Elective Deferrals to receive the maximum amount of "Matching Contributions" available to the Participant under the Plan.

(d)    The provisions of this subsection apply if the Employer has elected to satisfy the "ACP Test Safe Harbor."

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(1)    In addition to the "ADP Test Safe Harbor Contributions, the Employer will make any "Matching" Contributions" in accordance with elections made in the Adoption Agreement. Such additional "Matching Contributions" will be considered "ACP Test Safe Harbor Matching Contributions.

(2)    Notwithstanding any election in the Adoption Agreement to the contrary, an "Eligible Participant's" Elective Deferrals in excess of six percent (6%) of "Compensation" may not be taken into account in applying "ACP Test Safe Harbor Matching Contributions." In addition, effective with respect to Plan Years beginning after December 31, 1999, any portion of an "ACP Test Safe Harbor Matching Contribution" attributable to a discretionary "Matching Contribution" may not exceed four percent (4%) of an "Eligible Participant's" "Compensation."

(e)    The Plan is required to satisfy the ACP test of Code Section 401(m)(2), using the current year testing method, if the Plan permits after-tax voluntary Employee contributions or if matching contributions that do not satisfy the "ACP Test Safe Harbor" may be made to the Plan. In such event, only "ADP Test Safe Harbor Contributions" or "ACP Test Safe Harbor Contributions" that exceed the amount needed to satisfy the "ADP Test Safe Harbor" or "ACP Test Safe Harbor" (if the Employer has elected to use the "ACP Test Safe Harbor") may be treated as Qualified Nonelective Contributions or Qualified Matching Contributions in applying the ACP test. In addition, in applying the ACP test, elective contributions may not treated as matching contributions under Code Section 401(m)(3). Furthermore, in applying the ACP test, the Employer may elect to disregard with respect to all "Eligible Participants" (1) all "Matching Contributions" if the only "Matching Contributions" made to the Plan satisfy the "ADP Test Safe Harbor Contribution" (the "Basic Matching Contribution" or the "Enhanced Matching Contribution") and (2) if the "ACP Test Safe Harbor" is satisfied, "Matching Contributions" that do not exceed four percent (4%) of each Participant's "Compensation.

12.9    ADVANCE DISTRIBUTION FOR HARDSHIP

(a)    The Administrator, at the election of a Participant, shall direct the Trustee to distribute to the Participant in any one Plan Year up to the lesser of (1) 100% of the accounts as elected in the Adoption Agreement valued as of the last Valuation Date or (2) the amount necessary to satisfy the immediate and heavy financial need of the Participant. Any distribution made pursuant to this Section shall be deemed to be made as of the first day of the Plan Year or, if later, the Valuation Date immediately preceding the date of distribution, and the account from which the distribution is made shall be reduced accordingly. Withdrawal under this Section shall be authorized only if the distribution is for one of the following or any other item permitted under Regulation 1.401(k)-1(d)(2)(iv):

(1)    Medical expenses described in Code Section 213(d) incurred by the Participant, the Participant's spouse, or any of the Participant's dependents (as defined in Code Section 152) or necessary for these persons to obtain medical care as described in Code Section 213(d);

(2)    Costs directly related to the purchase (excluding mortgage payments) of a principal residence for the Participant;

(3)    Payment of tuition and related educational fees, and room and board expenses, for the next twelve (12) months of post-secondary education for the Participant, the Participant's spouse, children, or dependents (as defined in Code Section 152); or

(4)    Payments necessary to prevent the eviction of the Participant from the Participant's principal residence or foreclosure on the mortgage on that residence.

(b)    No distribution shall be made pursuant to this Section unless the Administrator, based upon the Participant's representation and such other facts as are known to the Administrator, determines that all of the following conditions are satisfied:

(1)    The distribution is not in excess of the amount of the immediate and heavy financial need of the Participant (including any amounts necessary to pay any federal, state, or local taxes or penalties reasonably anticipated to result from the distribution);

(2)    The Participant has obtained all distributions, other than hardship distributions, and all nontaxable loans currently available under all plans maintained by the Employer (to the extent the loan would not increase the hardship);

(3)    The Plan, and all other plans maintained by the Employer, provide that the Participant's elective deferrals and nondeductible voluntary Employee contributions will be suspended for at least twelve (12) months after receipt of the hardship distribution; and

(4)    The Plan, and all other plans maintained by the Employer, provide that the Participant may not make elective deferrals for the Participant's taxable year immediately following the taxable year of the hardship distribution in excess of the applicable limit under Code Section 402(g) for such next taxable year less the amount of such Participant's elective deferrals for the taxable year of the hardship distribution.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

Defined Contribution Prototype Plan

(c)     Notwithstanding the above, distributions from the Participant's Elective Deferral Account, Qualified Matching Contribution Account and Qualified Non-Elective Account pursuant to this Section shall be limited solely to the Participant's Elective Deferrals and any income attributable thereto credited to the Participant's Elective Deferral Account as of December 31, 1988. Furthermore, if a hardship distribution is permitted from more than one account type, the Administrator may determine any ordering of a Participant's hardship distribution from such accounts.

(d)     Any distribution made pursuant to this Section shall be made in a manner which is consistent with and satisfies the provisions of Section 6.5, including, but not limited to, all notice and consent requirements of Code Sections 411(a)(11) and 417 and the Regulations thereunder.

## ARTICLE XIII
## SIMPLE 401(K) PROVISIONS

### 13.1   SIMPLE 401(k) PROVISIONS

(a)     If elected in the Adoption Agreement, this Plan is intended to be a SIMPLE 401(k) plan which satisfies the requirements of Code Sections 401(k)(11) and 401(m)(10).

(b)     The provisions of this Article apply for a "year" only if the following conditions are met:

(1)     The Employer adopting this Plan is an "eligible employer." An "eligible employer" means, with respect to any "year," an Employer that had no more than 100 Employees who received at least $5,000 of "compensation" from the Employer for the preceding "year. In applying the preceding sentence, all employees of an Affiliated Employer are taken into account.

An "eligible employer" that has elected to use the SIMPLE 401(k) provisions but fails to be an "eligible employer" for any subsequent "year, is treated as an "eligible employer" for the two (2) "years" following the last "year" the Employer was an "eligible employer. If the failure is due to any acquisition, disposition, or similar transaction involving an "eligible employer," the preceding sentence applies only if the provisions of Code Section 410(b)(6)(C)(i) are satisfied.

(2)     No contributions are made, or benefits accrued for services during the "year, on behalf of any "eligible employee" under any other plan, contract, pension, or trust described in Code Section 219(g)(5)(A) or (B), maintained by the Employer.

(c)     To the extent that any other provision of the Plan is inconsistent with the provisions of this Article, the provisions of this Article govern.

### 13.2   DEFINITIONS

(a)     "Compensation" means, for purposes of this Article, the sum of the wages, tips, and other compensation from the Employer subject to federal income tax withholding (as described in Code Section 6051(a)(3)) and the Employee's salary reduction contributions made under this or any other 401(k) plan, and, if applicable, elective deferrals under a Code Section 408(p) SIMPLE plan, a SARSEP, or a Code Section 403(b) annuity contract and compensation deferred under a Code Section 457 plan, required to be reported by the Employer on Form W-2 (as described in Code Section 6051(a)(8)). For self-employed individuals, "compensation" means net earnings from self-employment determined under Code Section 1402(a) prior to subtracting any contributions made under this Plan on behalf of the individual. The provisions of the plan implementing the limit on Compensation under Code Section 401(a)(17) apply to the "compensation" under this Article.

(b)     "Eligible employee" means, for purposes of this Article, any Participant who is entitled to make elective deferrals described in Code Section 402(g) under the terms of the Plan.

(c)     "Year" means the calendar year.

### 13.3   CONTRIBUTIONS

(a)     Salary Reduction Contributions

(1)     Each "eligible employee" may make a salary reduction election to have "compensation" reduced for the "year" in any amount selected by the Employee subject to the limitation in subsection (c) below. The Employer will make a salary reduction contribution to the Plan, as an Elective Deferral, in the amount by which the Employee's "compensation" has been reduced.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)

(2)    The total salary reduction contribution for the "year" cannot exceed $6,000 for any Employee. To the extent permitted by law, this amount will be adjusted to reflect any annual cost-of-living increases announced by the IRS.

(b)    Other Contributions

(1)    Matching Contributions. Unless (2) below is elected, each "year" the Employer will make a matching contribution to the Plan on behalf of each Employee who makes a salary reduction election under Section 13.3(a). The amount of the matching contribution will be equal to the Employee's salary reduction contribution up to a limit of three percent (3%) of the Employee's "compensation" for the full "year.

(2)    Nonelective Contributions. For any "year," instead of a matching contribution, the Employer may elect to contribute a nonelective contribution of two percent (2%) of "compensation" for the "year" for each "eligible employee" who received at least $5,000 of "compensation" from the Employer for the "year.

(c)    Limitation on Other Contributions

No Employer or Employee contributions may be made to this Plan for the "year" other than salary reduction contributions described in Section 13.3(a), matching or nonelective contributions described in Section 13.3(b) and rollover contributions described in Regulation Section 1.402(c)-2, Q&A-1(a). Furthermore, the provisions of Section 4.4 which implement the limitations of Code Section 415 apply to contributions made pursuant to this Section.

## 13.4    ELECTION AND NOTICE REQUIREMENTS

(a)    Election Period

(1)    In addition to any other election periods provided under the Plan, each "eligible employee" may make or modify a salary reduction election during the 60-day period immediately preceding each January 1st.

(2)    For the "year" an Employee becomes eligible to make salary reduction contributions under this Article, the 60-day election period requirement of subsection (a)(1) is deemed satisfied if the Employee may make or modify a salary reduction election during a 60-day period that includes either the date the Employee becomes eligible or the day before.

(3)    Each "eligible employee" may terminate a salary reduction election at any time during the "year.

(b)    Notice Requirements

(1)    The Employer will notify each "eligible employee" prior to the 60-day election period described in Section 13.4(a) that a salary reduction election or a modification to a prior election may be made during that period.

(2)    The notification described in (1) above will indicate whether the Employer will provide a matching contribution described in Section 13.3(b)(1) or a two percent (2%) nonelective contribution described in section 13.3(b)(2).

## 13.5    VESTING REQUIREMENTS

All benefits attributable to contributions made pursuant to this Article are nonforfeitable at all times, and all previous contributions made under the Plan are nonforfeitable as of the beginning of the Plan Year that the 401(k) SIMPLE provisions apply.

## 13.6    TOP-HEAVY RULES

The Plan is not treated as a top heavy plan under Code Section 416 for any year for which the provisions of this Article are effective and satisfied.

## 13.7    NONDISCRIMINATION TESTS

The Plan is treated as meeting the requirements of Code Sections 401(k)(3)(A)(ii) and 401(m)(2) for any "year" for which the provisions of this Article are effective and satisfied. Accordingly, Sections 12.4, 12.5, 12.6 and 12.7 shall not apply to the Plan.

© Copyright 2001 The Manufacturers Life Insurance Company (U.S.A.)



07

**Internal Revenue Service**

'an Description: Prototype Standardized Target Benefit Plan
J: 50235360701-008 Case: 200104710 EIN: 01-0233346
BPD: 01 Plan: 008 Letter Serial No: K203241a

> D
> MANUFACTURERS LIFE INSURANCE CO USA
>
> P O BOX 600 NIAGARA STATION
>
> BUFFALO, NY 14201

**Department of the Treasury**

Washington, DC 20224

Contact Person:    Ms. Arrington 50-00197

Telephone Number:   (202) 283-8811

In Reference to:  T:EP:RA:ICU

Date:  08/07/2001

Dear Applicant:

In our opinion, the form of the plan identified above is acceptable under section 401 of the Internal Revenue Code for use by employers for the benefit of their employees. This opinion relates only to the acceptability of the form of the plan under the Internal Revenue Code. It is not an opinion of the effect of other Federal or local statutes.

You must furnish a copy of this letter to each employer who adopts this plan. You are also required to send a copy of the approved form of the plan, any approved amendments and related documents to Employee Plans Determinations in Cincinnati at the address specified in section 9.11 of Rev. Proc. 2000-20, 2000-6 I.R.B. 553.

This letter considers the changes in qualifications requirements made by the Uruguay Round Agreements Act (GATT) Pub. L. 103-465, the Small Business Job Protection Act of 1996, Pub. L. 104-188, the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353, the Taxpayer Relief Act of 1997, Pub. L. 105-34, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206 and the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554. These laws are referred to collectively as GUST.

Our opinion on the acceptability of the form of the plan is not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a). However, an employer that adopts this plan may rely on this letter with respect to the qualification of its plan under Code section 401(a) except as provided below, provided the eligibility requirements and contribution or benefit provisions are not more favorable for highly compensated employees than for other employees. The terms of the plan must be followed in operation. Except as stated below, Employee Plans Determinations will not issue a determination letter with respect to this plan.

Our opinion does not apply for purposes of Code section 401(a)(10)(B) and section 401(a)(16) if an employer ever maintained another qualified plan for one or more employees who are covered by this plan, other than a specified paired plan within the meaning of section 4.13 of Rev. Proc. 2000-20, 2000-6 I.R.B. 553. For this purpose, the employer will not be considered to have maintained another plan merely because the employer has maintained another defined contribution plan(s) provided such other plan(s) has been terminated prior to the effective date of this plan and no annual additions have been credited to the account of any participant under such other plan(s) as of any date within the limitation year of this plan. Likewise, if this plan is first effective on or after the effective date of the repeal of Code section 415(e) the employer will not be considered to have maintained another plan merely because the employer has maintained a defined benefit plan(s) provided the defined benefit plan(s) has been terminated prior to the effective date of this plan. Our opinion also does not apply for purposes of Code section 401(a)(16) if, after December 31, 1985, the employer maintains a welfare benefit fund defined in Code section 419(e) which provides postretirement medical benefits allocated to separate accounts for key employees as defined in Code section 419A(d)(3)

An employer that adopts this plan may not rely on this opinion letter with respect to: (1) whether any amendment or series of amendments to the plan satisfies the nondiscrimination requirements of section 1.401(a)(4)-5(a) of the regulations, except with respect to plan amendments granting past service that meet the safe harbor described in section 1.401(a)(4)-5(a)(5) and are not part of a pattern of amendments that significantly discriminates in favor of highly compensated employees; or (2) whether the plan satisfies the effective availability requirement of section 1.401(a)(4)-4(c) of the regulations with respect to any benefit, right or feature.

·

MANUFACTURERS LIFE INSURANCE CO USA
FFN: 50235360701-008
Page 2

An employer that adopts this plan as an amendment to a plan other than a standardized plan may not rely on this opinion letter with respect to whether a benefit, right or other feature that is prospectively eliminated satisfies the current availability requirements of section 1.401(a)-4 of the regulations.

An employer that elects to continue to apply the pre-GUST family aggregation rules in years beginning after December 31, 1996, or the combined plan limit of section 415(e) in years beginning after December 31, 1999, will not be able to rely on the opinion letter without a determination letter.

The employer may request a determination (1) as to whether the plan, considered with all related qualified plans and, if appropriate, welfare benefit funds, satisfies the requirements of Code section 401(a)(16) as to limitations on benefits and contributions in Code section 415 and the requirements of Code section 401(a)(10)(B) as to the top-heavy plan requirements in Code section 416; (2) regarding the nondiscriminatory effect of grants of past service; (3) with respect to whether a prospectively eliminated benefit, right or feature satisfies the current availability requirements; and (4) with respect to the continued application of the pre-GUST family aggregation rules in years beginning after December 31, 1996, or the combined plan limit of section 415(e) in years beginning after December 31, 1999. The employer may request a determination letter by filing an application with Employee Plans Determinations on Form 5307, Application for Determination for Adopters of Master or Prototype or Volume Submitter Plans.

If you, the master or prototype sponsor, have any questions concerning the IRS processing of this case, please call the above telephone number. This number is only for use of the sponsor. Individual participants and/or adopting employers with questions concerning the plan should contact the master or prototype sponsor. The plan's adoption agreement must include the sponsor's address and telephone number for inquiries by adopting employers.

If you write to the IRS regarding this plan, please provide your telephone number and the most convenient time for us to call in case we need more information. Whether you call or write, please refer to the Letter Serial Number and File Folder Number shown in the heading of this letter.

You should keep this letter as a permanent record. Please notify us if you modify or discontinue sponsorship of this plan.

Sincerely yours,

Paul T. Shultz

Director
Employee Plans Rulings & Agreements

EXHIBIT 4**a**

# EXHIBIT 4
## Pt a

SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

**TABLE OF CONTENTS**

COMPANY INFORMATION........................................................................................................................1

PLAN INFORMATION.............................................................................................................................1

SECTION A. GENERAL INFORMATION...............................................................................................1
    Plan Name/Effective Date.................................................................................................................1
    Compensation....................................................................................................................................2
    Compensation Exclusions.................................................................................................................3
    Definitions.........................................................................................................................................4

SECTION B. ELIGIBILITY......................................................................................................................4
    Exclusions.........................................................................................................................................4
    Eligibility Service Rules...................................................................................................................4
    Pension Contributions......................................................................................................................5
    Eligibility Service Computation Rules.............................................................................................6

SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS........................................................6
    Pension - Allocation Service.............................................................................................................7
    Pension - Formula.............................................................................................................................7
    Miscellaneous.................................................................................................................................10
    Pension Contributions - Integration...............................................................................................11
    Determination of Value of Stated Benefit......................................................................................11
    Definitions.......................................................................................................................................12
    Other Contributions/415.................................................................................................................13

SECTION D. VESTING...........................................................................................................................14
    Vesting Service Rules.....................................................................................................................14
    Vesting Schedules...........................................................................................................................14

SECTION E. DISTRIBUTIONS..............................................................................................................15
    Normal/Early Retirement...............................................................................................................15
    Time & Form of Payment...............................................................................................................16
    Payments on Death.........................................................................................................................17
    Cash Out..........................................................................................................................................17
    Required Beginning Date................................................................................................................18

SECTION F. IN-SERVICE WITHDRAWALS.........................................................................................18
    In-Service Withdrawals..................................................................................................................18
    Other Withdrawals..........................................................................................................................18
    Conditions/Limitations...................................................................................................................19
    Loans...............................................................................................................................................19

SECTION G. PLAN OPERATIONS AND TOP-HEAVY.......................................................................19
    Plan Operations...............................................................................................................................19
    Top-Heavy.......................................................................................................................................21

SECTION H. MISCELLANEOUS...........................................................................................................21

SECTION I. EXECUTION PAGE............................................................................................................23

QLAC ADDENDUM...............................................................................................................................29

### ADOPTION AGREEMENT #008
## NON-STANDARDIZED TARGET BENEFIT PLAN

The undersigned adopting employer hereby adopts this Plan and its related Trust (to the extent an outside trust is not used). The Plan and Trust are intended to qualify as a tax-exempt target benefit plan and trust under Code sections 401(a) and 501(a), respectively. The Plan shall consist of this Adoption Agreement, its related Basic Plan Document and any related Addendum to the Adoption Agreement. Unless otherwise indicated, all Section references are to Sections in the Basic Plan Document.

## COMPANY INFORMATION

*NOTE: An amendment is not required to change the responses in items 1-13 below.*

1. Name of adopting employer (Plan Sponsor): <u>Shirley T Sherrod, M.D. P.C.</u>
2. Address: <u>P. O. Box 2423</u>
3. City: <u>Chicago</u>
4. State: <u>IL</u>
5. Zip: <u>60690</u>
6. Phone number: <u>248 341-5100</u>
7. Fax number: _____
8. Plan Sponsor EIN: <u>38-2174656</u>
9. Plan Sponsor fiscal year end: _____
10. **Entity Type**
    a. Plan Sponsor entity type:
       i. **[ X ]** C Corporation
       ii. **[ ]** S Corporation
       iii. **[ ]** Non Profit Organization
       iv. **[ ]** Partnership
       v. **[ ]** Limited Liability Company
       vi. **[ ]** Limited Liability Partnership
       vii. **[ ]** Sole Proprietorship
       viii. **[ ]** Union
       ix. **[ ]** Church (ERISA section 3(33))
       x. **[ ]** Other: _____ (must be a legal entity recognized under the Code)
    b. If "Union" (10a.viii) is selected, enter name of the representative of the parties who established or maintain the Plan:
11. State of organization of Plan Sponsor: <u>IL</u>
12. **Affiliated Service Groups**
    **[ ]** The Plan Sponsor is a member of an affiliated service group. List all members of the group (other than the Plan Sponsor): _____
    *NOTE: Affiliated service group members must adopt the Plan with the approval of the Plan Sponsor to participate.*
    *NOTE: Listing affiliated service group members is for information purposes only and is optional.*
13. **Controlled Groups**
    **[ ]** The Plan Sponsor is a member of a controlled group. List all members of the group (other than the Plan Sponsor): _____
    *NOTE: Controlled group members must adopt the Plan with the approval of the Plan Sponsor to participate.*
    *NOTE: Listing controlled group members is for information purposes only and is optional.*

## PLAN INFORMATION

## SECTION A. GENERAL INFORMATION

### Plan Name/Effective Date

1. Plan Number: <u>002</u>
2. Plan name:
    a. <u>Shirley T Sherrod, M.D., P.C. Target Pension Plan</u>

*SECTION A. GENERAL INFORMATION*

**b.** _____

**3. Effective Date**

    **a.** Original effective date of Plan: <u>January 01, 1987</u>

    **b.** [ X ] This is a restatement of a previously-adopted plan. Effective date of Plan restatement: <u>January 1, 2016</u>

    *NOTE: The date specified in A.3a for a new plan may not be earlier than the first day of the Plan Year during which the Plan is adopted by the Plan Sponsor.*

    *NOTE: If A.3b is not selected, the Effective Date of the terms of this document shall be the date specified in A.3a. If A.3b is selected, the Effective Date of the restatement shall be the date specified in A.3b. However if the Adoption Agreement states another specific effective date for any Plan provision, when a provision of the Plan states another effective date, such stated specific effective date shall apply as to that provision. The date specified in A.3b for an amended and restated plan (including the initial PPA restatement) may not be earlier than the first day of the Plan Year during which the amended and restated Plan is adopted by the Plan Sponsor.*

**4. Plan Year**

    **a.** Plan Year means each 12-consecutive month period ending on <u>December 31</u> (e.g. December 31)

    **b.** [ ] The Plan has a short Plan Year. The short Plan Year begins _____ and ends _____

**5. Limitation Year means**

    **a.** [ X ] Plan Year

    **b.** [ ] calendar year

    **c.** [ ] tax year of the Plan Sponsor

    **d.** [ ] other: _____

    *NOTE: If A.5d is selected, the limitation year must be a consecutive 12-month period. This includes a fiscal year with an annual period varying from 52 to 53 weeks, so long as the fiscal year satisfies the requirements of Code section 441(f).*

**6. Frozen Plan**

    [ X ] The Plan is frozen as to eligibility and benefits effective <u>January 1, 2012</u>

    *NOTE: If A.6 is selected, no Eligible Employee shall become a Participant, no Participant shall be eligible to further participate in the Plan and no contributions shall accrue as of and after the date specified.*

**Compensation**

**7. Compensation**

    **a.** Definition of Compensation for purposes of allocations:

        **i.** [ X ] W-2. Wages within the meaning of Code section 3401(a) and all other payments of compensation paid to an Employee by the Employer (in the course of the Employer's trade or business) for which the Employer is required to furnish the Employee a written statement under Code sections 6041(d), 6051(a)(3), and 6052.

        **ii.** [ ] Withholding. Wages paid to an Employee by the Employer (in the course of the Employer's trade or business) within the meaning of Code section 3401(a) for the purposes of income tax withholding at the source.

        **iii.** [ ] Section 415 Safe Harbor Option. As described in the definition of "Section 415 Safe Harbor Option" in Article 2 of the Basic Plan Document.

    **b.** Compensation is determined over the period specified below ending with or within the Plan Year:

        **i.** [ X ] Plan Year

        **ii.** [ ] calendar year

        **iii.** [ ] Plan Sponsor Fiscal Year

        **iv.** [ ] Limitation Year

        **v.** [ ] Other twelve-month period beginning on: _____ (enter month and day)

    **c.** [ X ] Include deferrals in the definition of Compensation

    **d.** [ ] Include deemed Code section 125 compensation in the definition of Compensation

    **e.** [ X ] Include differential military pay (as defined in Code section 3401(h)(2)) in the definition of Compensation

    **f.** [ ] Include other pay (not otherwise included in A.7a): _____

    *NOTE: A.7b must be "Plan Year" if the Plan is excluding compensation earned before entry (A.10 is selected).*

    *NOTE: If "Plan Year" is not selected in A.7b, for new/rehired Employees whose date of hire is less than 12 months before the end of the 12-month period designated, Compensation will be determined over the Plan Year.*

    *NOTE: If deferrals (A.7c) are selected, Compensation shall also include any amount which is contributed by the Company pursuant to a salary reduction agreement and which is not includable in the gross income of the Employee under Code sections 125, 402(e)(3), 402(h), 403(b), 132(f) or 457. If the Plan uses the 415 Safe Harbor definition of Compensation (A.7a.iii is selected) and A.7c is not selected deferrals will not be included in Compensation.*

SECTION A. GENERAL INFORMATION

*NOTE: If deemed 125 compensation (A.7d) is selected, Compensation shall include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that he or she has other health coverage. An amount will be treated as an amount under Code section 125 only if the Company does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan. This option is meant to be interpreted consistent with Revenue Ruling 2002-27 and any superseding guidance.*

*NOTE: If A.7e is not selected and differential military pay exists, the payments will be included in Statutory Compensation.*

*NOTE: If other pay (A.7f) is selected, A.7f should indicate for which class of Participants the Compensation is included, must be objectively determinable and may not be specified in a manner that is subject to Company discretion.*

**8. Post Severance Compensation**

[ ] Include Post Severance Compensation in definition of Compensation.

*NOTE: A.8 will also apply for purposes of Statutory Compensation.*

**9. Post Year End Compensation**

[ ] Determine Compensation using Post Year End Compensation.

*NOTE: If selected, amounts earned during the current year and paid during the first few weeks of the next year will be included in current year Compensation.*

*NOTE: A.9 will also apply for purposes of Statutory Compensation.*

## Compensation Exclusions

**10. Pay Before Participation**

[ ] Exclude pay earned before participation in the Plan from definition of Compensation.

*NOTE: If selected, Compensation shall include only that compensation which is actually paid to the Participant during that part of the Plan Year the Participant is eligible to participate in the Plan.  If not selected, Compensation shall include that compensation which is actually paid to the Participant during the period specified in A.7b.*

**11. 414(s) Safe Harbor Alternative Definition**

[ ] Exclude certain benefits from definition of Compensation.

*NOTE: If selected, Compensation shall exclude all of the following items (even if includable in gross income): reimbursements or other expense allowances, fringe benefits (cash and noncash), moving expenses, deferred compensation, and welfare benefits (Treas. Reg. section 1.414(s)-1(c)(3)).*

**12. Other Pay**

    **a.** Exclude other pay from definition of Compensation for the following Participants:

        **i.** [ X ] None

        **ii.** [ ] Highly Compensated Employees only

        **iii.** [ ] All Participants

    **b.** Describe other pay excluded from definition of Compensation: _____

*NOTE: If All Participants (A.12a.iii) is selected, the definition of Compensation will not be a safe harbor definition within the meaning of Treas. Reg. 1.414(s)-1(c).*

*NOTE: A.12b will only apply if A.12a.ii or iii is selected. A.12b should indicate for which class of Participants the Compensation is excluded.*

*NOTE: The pay specified above (A.12b) must be objectively determinable and may not be specified in a manner that is subject to Company discretion.*

*NOTE: See Section 4.01(c) for rules regarding elections for bonuses or other special pay.*

**13. Statutory Compensation**

    **a.** Definition of Statutory Compensation:

        **i.** [ X ] W-2.  Wages within the meaning of Code section 3401(a) and all other payments of compensation paid to an Employee by the Employer (in the course of the Employer's trade or business) for which the Employer is required to furnish the Employee a written statement under Code sections 6041(d), 6051(a)(3), and 6052.

        **ii.** [ ] Withholding.  Wages within the meaning of Code section 3401(a) for the purposes of income tax withholding at the source paid to the Employee by the Employer (in the course of the Employer's trade or business).

        **iii.** [ ] Section 415 Safe Harbor Option.  As described in the definition of "Section 415 Safe Harbor Option" in Article 2 of the Basic Plan Document.

    **b.** [ X ] Include deemed Code section 125 compensation in definition of Statutory Compensation:

*NOTE: See A.8 and A.9 to determine if Statutory Compensation will include Post Severance Compensation and/or be determined using Post Year End Compensation.*

*NOTE: If A.7e is not selected and differential military pay exists, the payments will be included in Statutory Compensation.*

*SECTION A. GENERAL INFORMATION*

## Definitions

**14. Highly Compensated Employee**
  **a.**  [ **X** ]  Use top-paid group election in determining Highly Compensated Employees
  **b.**  [ **X** ]  Use calendar year beginning with or within the preceding Plan Year in determining Highly Compensated Employees
  ***NOTE:*** *A.14b will only apply if the Plan Year end in A.4a is not December 31.*

**15. Disability**
  Definition of Disability:
  **a.**  [ ]  Under Code section 22(e). The Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. The permanence and degree of such impairment shall be supported by medical evidence.
  **b.**  [ **X** ]  Under the Social Security Act. The determination by the Social Security Administration that the Participant is eligible to receive disability benefits under the Social Security Act.
  **c.**  [ ]  Inability to engage in comparable occupation. The Participant suffers from a physical or mental impairment that results in his inability to engage in any occupation comparable to that in which the Participant was engaged at the time of his disability.  The permanence and degree of such impairment shall be supported by medical evidence.
  **d.**  [ ]  Pursuant to other Company Disability Plan. The Participant is eligible to receive benefits under a Company-sponsored disability plan.
  **e.**  [ ]  Under uniform rules established by the Plan Administrator. The Participant is mentally or physically disabled under a written non-discriminatory policy.
  **f.**  [ ]  Other: _____
  ***NOTE:*** *If A.21f is selected, provide the definition of Disability. The definition provided must be objectively determinable and may not be specified in a manner that is subject to discretion.*

**16. Choice of Law**
  Name of state or commonwealth for choice of law (Section 14.05): Illinois

## SECTION B. ELIGIBILITY

## Exclusions

The term "Eligible Employee" shall not include (Check items B.1 - B.4 as appropriate):

**1. Union Employees**
  [ **X** ]  Any Employee who is included in a unit of Employees covered by a collective bargaining agreement, if retirement benefits were the subject of good faith bargaining, and if the collective bargaining agreement does not provide for participation in this Plan.
**2. Leased Employees**
  [ **X** ]  Any Leased Employee.
**3. Non-Resident Aliens**
  [ **X** ]  Any Employee who is a non-resident alien who received no earned income (within the meaning of Code section 911(d)(2)) which constitutes income from services performed within the United States (within the meaning of Code section 861(a)(3)).
**4. Other Employees**
  [ ]  Other: _____
  ***NOTE:*** *If selected, describe other excluded Employees from definition of Eligible Employee. The definition provided must be objectively determinable and may not be specified in a manner that is subject to discretion.*
  ***NOTE:*** *See Section 3.06(a) for rules regarding excluded employees.*

## Eligibility Service Rules

**6. Other Employer Service**
  [ ]  Count years of service with employers other than the Employer for eligibility purposes. List other employers for which service applies along with any limitations: _____

**7. Break in Service**

*SECTION B. ELIGIBILITY*

    **a.**   [ ] Rule of parity. Exclude eligibility service before a period of five (5) consecutive One-Year Breaks in Service/Periods of Severance if an Employee does not have any nonforfeitable right to the Account balance derived from Employer contributions.

    **b.**   [ ] One-year holdout. If an Employee has a One-Year Break in Service/Period of Severance, exclude eligibility service before such period until the Employee has completed a Year of Eligibility Service after returning to employment with the Employer.

    **c.**   [ ] The following modifications shall be made to the requirements specified in B.7a-b: _____

    *NOTE: B.7c could be used, for example, to require less than 500 hours of service (but not more than 500 hours) for a One-Year Break in Service under B.7a and/or B.7b, or to specify that the break in service rule(s) only apply to certain contributions.*

**8.**   **Special Participation Date**

    **a.**   [ ] Allow immediate participation for all Eligible Employees employed on a specific date. All Eligible Employees employed on _____ shall become eligible to participate in the Plan as of _____

    **b.**   [ ] The Plan provides conditions or limitations on immediate participation: _____

    *NOTE: If B.8b applies (B.8a is selected) and is selected, describe the conditions or limitations that apply. The conditions/limitations must be objectively determinable and may not be specified in a manner that is subject to discretion.*

## Pension Contributions

An Eligible Employee shall be eligible to receive an allocation of Pension Contributions at the time specified in B.12 upon meeting the requirements of B.9 through B.11 (Section 3.03).

**9.**   **Age Requirement for Pension Contributions**

    Minimum age requirement for Pension Contributions: <u>none</u>

    *NOTE: Age 21 maximum; an age 26 maximum will apply instead if the Plan is maintained exclusively for employees of an educational institution (as defined in Code section 170(b)(1)(A)(ii)) by an employer which is exempt from tax under Code section 501(a) which provides that each Participant having at least 1 year of service has a right to 100 percent of his accrued benefit under the Plan which is nonforfeitable (within the meaning of Code section 411) at the time such benefit accrues.*

**10.**  **Service Requirement for Pension Contributions**

    **a.**   Minimum service requirement for Pension Contributions:

        **i.**   [ X ] None

        **ii.**  [ ] Completion of one Year of Eligibility Service - Hours of Service necessary for a Year of Eligibility Service: _____ (not to exceed 1,000).

        **iii.** [ ] Completion of one Year of Eligibility Service - elapsed time.

        **iv.** [ ] Completion of one and 1/2 Year of Eligibility Service - Hours of Service necessary for a Year of Eligibility Service: _____(not to exceed 1,000). An Eligible Employee shall be deemed to earn 1/2 Year of Eligibility Service on the date that is six months after the end of the Eligibility Computation Period during which he earns his first Year of Eligibility Service; provided, that the individual is an Eligible Employee on the applicable entry date.

        **v.**  [ ] Completion of one and 1/2 Year of Eligibility Service - elapsed time.

        **vi.** [ ] Completion of two Years of Eligibility Service - Hours of Service necessary for one Year of Eligibility Service: _____(not to exceed 1,000).

        **vii.** [ ] Completion of two Years of Eligibility Service - elapsed time.

        **viii.** [ ] Completion of _____ Hours of Service (not to exceed 1,000) within a twelve month period. The service requirement shall be deemed met at the time the specified number of Hours of Service are completed.

        **ix.** [ ] Completion of _____ months of service - elapsed time (not to exceed 24)

        **x.**  [ ] Completion of _____ Hours of Service (not to exceed 1,000) in a _____ month period (not to exceed 12 - hours of service failsafe applies)

        **xi.** [ ] Completion of _____ consecutive months of continuous service (not to exceed 12 - hours of service failsafe applies)

        **xii.** [ ] Other: _____ (hours of service failsafe applies if elapsed time is not specified)

    **b.**   Months of service. If the service requirement is not met in the first consecutive period of months, describe the next service requirement:

        **i.**   [ ] Rolling. Each successive period shall begin immediately after the preceding period and shall end on or before the first Eligibility Computation Period after which time the Plan will revert to 1,000 Hours of Service in an Eligibility Computation Period.

        **ii.**  [ ] Revert to 1,000 Hours of Service in an Eligibility Computation Period.

    *NOTE: Service taken into account for purposes of B.10 shall be determined under the terms and conditions specified for determining a Year of Eligibility Service.*

    *NOTE: B.10a cannot exceed 1 year, unless the Plan provides a nonforfeitable right to 100% of the Participant's Pension Contribution Account balance after not more than 2 years of service, in which case up to 2 years is permitted.*

*SECTION B. ELIGIBILITY*

**NOTE:** *If B.10a.vii is selected, the service requirements provided must comply with Code section 410(a), be definitely determinable and may not be specified in a manner that is subject to discretion.*

**NOTE:** *B.10b only applies if B.10a.x or B.10a.xi is selected.*

**NOTE:** *Hours of service failsafe: if B.10a.x - B.10a.xii is selected and the Plan uses the Hours of Service method, the service requirement under B.10 shall be deemed met no later than the end of an Eligibility Computation Period during which the Eligible Employee completes 1,000 Hours of Service; provided, that the individual is an Eligible Employee on the applicable entry date.*

11. **Additional Requirements for Pension Contributions**

[ ] Additional requirements, limitations, conditions or other modifications to B.9-10 (eligibility to receive Pension Contributions) apply: _____

**NOTE:** *See Section 3.06 for rules regarding eligibility requirements.*

**NOTE:** *The additional requirements provided must be objectively determinable and may not be specified in a manner that is subject to Company discretion and are subject to the same limits/requirements set out under options B.9-10.*

12. **Entry Dates for Pension Contributions**

   **a.** Frequency of entry dates for Pension Contributions:

      **i.** [ X ] immediate

      **ii.** [ ] first day of each calendar month

      **iii.** [ ] first day of each Plan quarter

      **iv.** [ ] first day of the first month and seventh month of the Plan Year

      **v.** [ ] first day of the Plan Year

      **vi.** [ ] other: _____

   **b.** An Eligible Employee shall become a Participant eligible to receive Pension Contributions on the entry date selected in B.12a that is:

      **i.** [ ] coincident with or next following the date the requirements of B.9 through B.11 are met

      **ii.** [ ] next following the date the requirements of B.9 through B.11 are met

      **iii.** [ ] coincident with or immediately preceding the date the requirements of B.9 through B.11 are met

      **iv.** [ ] immediately preceding the date the requirements of B.9 through B.11 are met

      **v.** [ ] nearest to the date the requirements of B.9 through B.11 are met

**NOTE:** *If immediate entry (B.12a.i) is selected, an Eligible Employee shall become a Participant eligible to receive Pension Contributions immediately upon meeting the requirements of B.9 through B.11.*

**NOTE:** *B.12b is not applicable if immediate or other entry (B.12a.i or B.12a.vi) is selected.*

**NOTE:** *The Plan must provide that an Eligible Employee who has attained age 21 and who has completed one Year of Eligibility Service shall commence participation in the Plan no later than the earlier of: (1) the first day of the first Plan Year beginning after the date on which such Eligible Employee satisfied such requirements; or (2) the date that is 6 months after the date on which he satisfied such requirements.*

## Eligibility Service Computation Rules

13. **Eligibility Service Computation Rules**

   **a.** [ ] Eligibility Computation Period switches to Plan Year.

   **b.** Select hours equivalency for eligibility purposes:

      **i.** [ ] None

   An Employee shall be credited with the following service with the Employer:

      **ii.** [ ] 10 Hours of Service for each day or partial day

      **iii.** [ ] 45 Hours of Service for each week or partial week

      **iv.** [ ] 95 Hours of Service for each semi-monthly payroll period or partial semi-monthly payroll period

      **v.** [ ] 190 Hours of Service for each month or partial month

   **c.** The hours equivalency shall apply to:

      **i.** [ ] All Employees

      **ii.** [ ] Only Employees not paid on a per-hour basis

   **d.** [ ] The following modifications shall be made to the requirements specified in B.13a-c: _____

**NOTE:** *B.13c will not apply if B.13b.i is selected ("None").*

**NOTE:** *The responses to B.13 are used only to the extent that the Plan determines eligibility service by the Hour of Service method and will apply uniformly to B.10, wherever Hours of Service is elected unless otherwise provided in B.13d.*

**NOTE:** *If B.13d is selected, the modifications must be objectively determinable and may not be specified in a manner that is subject to Company discretion. For example, B.13d could be used to restrict the Accounts where Eligibility Computation Periods switch to the Plan Year.*

## SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS

*SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS*

**Pension Contributions - Allocation Service**

*NOTE: An Eligible Employee who has met the requirements of B.9 through B.12 and who has satisfied the following requirements shall be eligible to receive an allocation of Pension Contributions during the applicable Plan Year.*

1. **Allocation Service Requirements for Pension Contributions**
   a. [ ] In order to share in the allocation of Pension Contributions, a Participant is required to complete the following Hours of Service in the applicable Plan Year \_\_\_\_\_
   b. [ ] In order to share in the allocation of Pension Contributions, a Participant is required to be employed by the Company on the last day of the Plan Year
   c. [ ] In order to share in the allocation of Pension Contributions, a Participant is required to be employed by the Company on the last day of the Plan Year or complete at least \_\_\_\_\_ Hours of Service in the applicable Plan Year
   d. [ X ] None
   *NOTE: C.1a and C.1b will be inapplicable if C.1c is selected.*
   *NOTE: C.1a and C.1c may not be more than 1,000.*

2. **Pension Allocation Service Computation Rules**
   a. Select hours equivalency:
      i. [ ] None.
      An Employee shall be credited with the following service with the Employer:
      ii. [ ] 10 Hours of Service for each day or partial day
      iii. [ ] 45 Hours of Service for each week or partial week
      iv. [ ] 95 Hours of Service for each semi-monthly payroll period or partial semi-monthly payroll period
      v. [ ] 190 Hours of Service for each month or partial month
   b. The hours equivalency shall apply to:
      i. [ ] All Employees
      ii. [ ] Only Employees not paid on a per-hour basis
   *NOTE: C.2 is only applicable if C.1a or C.1c is selected.*

3. **Exceptions to Allocation Service Requirements for Pension Contributions**
   a. Modify Hour of Service requirement and/or last day requirement for a Participant who terminates employment with the Employer during the Plan Year due to:
      i. [ ] death
      ii. [ ] Disability
      iii. [ ] attainment of Normal Retirement Date
   b. Any Hour of Service requirement and last day requirement shall be modified as follows:
      i. [ ] Waive both the Hour of Service requirement and last day requirement
      ii. [ ] Waive the Hour of Service requirement only
      iii. [ ] Waive last day requirement only
   c. [ ] The following other modifications shall be made to the requirements specified in C.1-3b: \_\_\_\_\_
   *NOTE: C.3a and C.3b is only applicable if C.1a, C.1b or C.1c is selected.*
   *NOTE: C.3c may only be used to make minor changes to the requirements specified in C.1-3b and must be specified in a manner that is objectively determinable and may not be specified in a manner that is subject to Company discretion. For example, C.3c could be used to clarify that last day but not Hours of Service is waived for death while Hours of Service and last day are waived for Disability and attainment of Normal Retirement Date.*

4. **Coverage Failures for Pension Contributions**
   Method to fix Pension Contribution Code section 410(b) ratio percentage coverage failures (Section 4.03(d)):
   a. [ X ] Do not automatically fix
   b. [ ] Add just enough Participants to meet the coverage requirements
   c. [ ] Add all non-excludable Participants

**Pension Contributions - Formula**

5. **Pension contribution formula. The Company's Pension Contribution shall be determined as follows:**

SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS

a.  **[ X ]  Flat Benefit.** Each Participant's stated benefit is equal to <u>70</u>% of Average Annual Compensation (reduced pro rata for the Participant's Years of Projected Participation less than 25) payable annually as a straight life annuity beginning at Normal Retirement Age.

b.  **[ ]  Unit Credit - No Step.** Each Participant's stated benefit is equal to \_\_\_\_\_% of Average Annual Compensation multiplied by the Participant's Years of Projected Participation, up to a maximum of \_\_\_\_\_ (no less than 25), payable annually as a straight life annuity beginning at Normal Retirement Age.

c.  **[ ]  Unit Credit - With Step.** Each Participant's stated benefit will be payable annually as a straight life annuity beginning at Normal Retirement Age, in an amount equal to \_\_\_\_\_ percent of Average Annual Compensation (R1) per year for the first \_\_\_\_\_ years of the Participant's Years of Projected Participation (y) and \_\_\_\_\_ percent (R2) of Average Annual Compensation per year for the next \_\_\_\_\_ years of the Participant's Years of Projected Participation (such that the total Years of Projected Participation taken into account under R1 and R2 is not less than 33).

If y is less than 33, R2 will be not less than:  <u>(R1) (25-y)</u> (but in no case less than 0); and not greater than:  <u>(R1) (44-y)</u>
33-y                                                                                                                              33-y.

d.  **[ ]  Excess Unit Credit.** Subject to the overall permitted disparity limit below, each Participant's stated benefit under the Plan is a straight life annuity commencing at Normal Retirement Age in an amount equal to the sum of (a) and (b) below:

(a) \_\_\_\_\_% (base benefit percentage) times Average Annual Compensation up to the integration level specified in C.8 for the Plan Year times the Participant's Years of Projected Participation; plus a benefit equal to \_\_\_\_\_% (excess benefit percentage, not to exceed the base benefit percentage by more than the maximum excess allowance) times Average Annual Compensation in excess of the integration level specified in C.8 for the Plan Year times the Participant's Years of Projected Participation. The maximum number of Years of Projected Participation taken into account under this paragraph will be \_\_\_\_\_ (may not be less than 25 and may not exceed 35). However, the number of Years of Projected Participation taken into account in the preceding sentence for any Participant may not exceed the Participant's cumulative permitted disparity limit.

The Participant's cumulative permitted disparity limit is equal to 35 minus: (1) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation; and (2) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer other than years counted in (1) above or counted toward a Participant's Years of Projected Participation. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

(b) \_\_\_\_\_% (not to exceed the excess benefit percentage) times Average Annual Compensation for each Year of Projected Participation after the period taken into account under paragraph (a). (If the number of Years of Projected Participation taken into account under paragraph (a) is less than 35 (as modified by the Participant's cumulative permitted disparity limit), then for each Year of Projected Participation after the period taken into account under paragraph (a) up to and including the 35th year of participation (as modified by the Participant's cumulative permitted disparity limit), this percentage will be equal to the excess benefit percentage.) The maximum number of Years of Projected Participation taken into account under this paragraph will be \_\_\_\_\_.

The maximum excess allowance is equal to the lesser of: (1) the base benefit percentage or (2) the applicable factor determined from Integration Tables I or II under the definition of Applicable Integration Factor below.

Overall permitted disparity limit: Notwithstanding paragraphs (a) and (b) above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the stated benefit for all Participants under this Plan will be equal to the excess benefit percentage above times the Participant's total Average Annual Compensation times the Participant's Years of Projected Participation under the Plan up to the maximum Years of Projected Participation taken into account in paragraphs (a) and (b).

e.  **[ ]  Excess Flat Benefit.** Subject to the overall permitted disparity limit below, each Participant's stated benefit under the Plan is a straight life annuity commencing at Normal Retirement Age in an amount equal to \_\_\_\_\_% times Average Annual Compensation up to the integration level specified in C.8 for the Plan Year (base benefit percentage); plus a benefit equal to \_\_\_\_\_% (excess benefit percentage) (not to exceed the base benefit percentage by more than the maximum excess allowance) times Average Annual Compensation in excess of the integration level specified in C.8 for the Plan Year.

The maximum excess allowance is equal to the lesser of: (1) the base benefit percentage; or (2) 35 times the applicable factor determined from Integration Tables I or II under the definition of Applicable Integration Factor below.

*SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS*

For a Participant with less than 35 Years of Projected Participation, the base benefit percentage and the excess benefit percentage will be reduced by being multiplied by a fraction, the numerator of which is the Participant's Years of Projected Participation, and the denominator of which is 35.

Cumulative permitted disparity reduction: If the number of the Participant's cumulative permitted disparity years exceeds 35, the excess benefit percentage will be further reduced as provided below. A Participant's cumulative permitted disparity years consists of the sum of: (1) the Participant's Years of Projected Participation (up to 35), (2) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (3) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer (other than years counted in (1) or (2) above). For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

If the cumulative permitted disparity reduction is applicable, the excess benefit percentage will be reduced as follows:
> (A) Subtract the Participant's base benefit percentage from the Participant's excess benefit percentage, (after modification in accordance with the paragraph preceding this cumulative permitted disparity reduction).
> (B) Multiply the result determined in (A) by a fraction (not less than 0), the numerator of which is 35 minus the sum of the years in (2) and (3) above, and the denominator of which is 35.
> (C) The Participant's excess benefit percentage is equal to the sum of the result in (B) and the Participant's base benefit percentage, as otherwise modified.

Overall permitted disparity limit: Notwithstanding the above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the current stated benefit for all Participants under this Plan will be equal to the excess benefit percentage entered into the benefit formula above multiplied by the Participant's total Average Annual Compensation under the Plan (prorated for Years of Projected Participation less than 35).

f.   [  ] **Offset Unit Credit.**  Subject to the overall permitted disparity limit below, each Participant's stated benefit under the Plan is a straight life annuity commencing at Normal Retirement Age in an amount equal to the sum of (a) and (b) below:

(a) _____% (gross benefit percentage) times Average Annual Compensation for the Plan Year times the Participant's Years of Projected Participation offset by _____% (not to exceed the maximum offset allowance) times Final Average Compensation up to the offset level specified in C.8 times the Participant's total Years of Projected Participation. The maximum number of Years of Projected Participation taken into account under this paragraph will be _____ (may not be less than 25 and may not exceed 35). However, the number of Years of Projected Participation taken into account in the preceding sentence for any Participant may not exceed the Participant's cumulative permitted disparity limit. The Participant's cumulative permitted disparity limit is equal to 35 minus: (1) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (2) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer other than years counted in (1) above or counted toward a Participant's Years of Projected Participation. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

(b) _____ (not to exceed the gross benefit percentage) times Average Annual Compensation for each Year of Projected Participation after the period set forth in paragraph (a). (If the number of Years of Projected Participation set forth in paragraph (a) is less than 35 (as modified by the Participant's cumulative permitted disparity limit), then for each Year of Projected Participation after the period set forth under paragraph (a) up to and including the 35th Year of Projected Participation (as modified by the Participant's cumulative permitted disparity limit), this percentage will be equal to the gross benefit percentage.) The maximum number of Years of Projected Participation taken into account under this paragraph will be _____.

The maximum offset allowance will not exceed the lesser of: (1) the applicable factor from Integration Tables I or II under the definition of Applicable Integration Factor below, and (2) one-half of the gross benefit percentage, multiplied by a fraction (not to exceed one), the numerator of which is the Participant's Average Annual Compensation, and the denominator of which is the Participant's Final Average Compensation up to the offset level specified in C.8.

Overall permitted disparity limit: Notwithstanding the preceding paragraphs (a) and (b), for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the stated benefit for all Participants under this Plan will be equal to the gross

benefit percentage above (without regard to the offset) times the Participant's total Average Annual Compensation times the Participant's Years of Projected Participation under the Plan up to the maximum of Years of Projected Participation taken into account in paragraphs (a) and (b).

G.   [ ] **Offset Flat Benefit.** Subject to the overall permitted disparity limit below, each Participant's stated benefit under the Plan is a straight life annuity commencing at Normal Retirement Age in an amount equal to _____% times Average Annual Compensation offset by _____ % (not to exceed the maximum offset allowance) times Final Average Compensation up to the offset level specified in C.8.

The maximum offset allowance will not exceed the lesser of: (1) the applicable factor from Integration Tables I or II under the definition of Applicable Integration Factor below, multiplied by 35, and (2) one-half of the gross benefit percentage, multiplied by a fraction (not to exceed one), the numerator of which is the Participant's Average Annual Compensation, and the denominator of which is the Participant's Final Average Compensation up to the offset level specified in C.8.

For a Participant with less than 35 Years of Projected Participation, both the gross benefit percentage and the offset percentage will be reduced by being multiplied by a fraction, the numerator of which is the number of the Participant's Years of Projected Participation, and the denominator of which is 35.

Cumulative permitted disparity reduction: If the number of the Participant's cumulative permitted disparity years exceeds 35, the gross benefit percentage and the offset will be further reduced as provided below. A Participant's cumulative permitted disparity years consists of the sum of: (1) the Participant's Years of Projected Participation (up to 35), (2) the number of years the Participant benefited or is treated as having benefited under this Plan prior to the Participant's first Year of Projected Participation, and (3) the number of years credited to the Participant for allocation or accrual purposes under one or more qualified plans or simplified employee pension plans (whether or not terminated) ever maintained by the Employer (other than years counted in (1) or (2) above. For purposes of determining the Participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.

If the cumulative permitted disparity reduction is applicable, the gross benefit percentage and the offset will be reduced as follows:
        (A) The offset will be reduced by multiplying it by a fraction (not less than 0), the numerator of which is 35 minus the sum of the years in (2) and (3) above, and the denominator of which is 35.
        (B) The gross benefit percentage will be reduced by the number of percentage points by which the offset was reduced in (A) above.

Overall permitted disparity limit: Notwithstanding the above, for any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension plan maintained by the Employer that provides for permitted disparity (or imputes permitted disparity), the stated benefit for all Participants under this Plan will be equal to the gross benefit percentage entered in the benefit formula above (without regard to the offset) multiplied by the Participant's total Average Annual Compensation under the Plan (prorated for Years of Projected Participation less than 35).

**Miscellaneous**

6.   **Average Annual Compensation** means:
   a.   [ ] **Specified Years.** The average of a Participant's annual Compensation over the _____ consecutive Plan Years which produce the highest average in:
      i.   [ ] All Plan Years of Plan participation
      ii.  [ ] The final _____ Plan Years of Plan participation (Must be greater than or equal to the number of years specified in C.6a)
   b.   [ X ] **All Plan Years.** The average of a Participant's annual Compensation for all Plan Years of participation in the Plan.
   *NOTE: If C.6a is selected and the Participant has less than the number of years of participation specified in C.6a, Compensation is averaged over the Participant's total period of Participation.*

7.   **Interest Rate.**
   For purposes of determining the annual Company contribution necessary to fund the stated benefit, the interest rate will be:
   a.   [ ] **7.50%**
   b.   [ ] **8.00%**
   c.   [ X ] **8.50%**
**NOTE:** A Plan Sponsor who wishes to provide interest rates in addition to those above in determining the annual Company contribution necessary to fund Participants' stated benefits for Plan Years beginning before January 1, 1994, may do so in an Addendum to the Adoption Agreement if the Plan: 1) limits their use to Plan Years beginning before 1994; and 2) provides that the additional interest rates are no less than 5% and no greater than 6%, as required by section 3.03 of Revenue Ruling 76-464, 1976-2 C.B. 115.

*SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS*

**Pension Contributions - Integration**

**8.    Integration Level/Offset Level**

If C.5d through C.5g is selected (integrated contribution formula), the integration level or offset level for each Plan Year for each Participant will be an amount equal to:

   **a.**   [ ]  Covered Compensation.  Such Participant's Covered Compensation for the Plan Year.

   **b.**   [ ]  Greater of $10,000 or 1/2 Covered Compensation.  The greater of $10,000 or one-half of the Covered Compensation of any individual who attains social security retirement age during the calendar year in which the Plan Year begins.

   **c.**   [ ]  Dollar amount not to exceed the greater of $10,000 or 1/2 Covered Compensation.  $_____ (a single dollar amount not to exceed the greater of $10,000 or one-half of Covered Compensation of any individual who attains social security retirement age during the calendar year in which the Plan Year begins).

   **d.**   [ ]  Dollar amount that exceeds the greater of $10,000 or 1/2 Covered Compensation.  $_____ (a single dollar amount that exceeds the greater of $10,000 or one-half of Covered Compensation of any individual who attains social security retirement age during the calendar year in which the Plan Year begins, but not to exceed the greater of $25,450 or 150% of the Covered Compensation of an individual attaining social security retirement age in the current Plan Year).

   **e.**   [ ]  Uniform Percentage.  A uniform percentage equal to _____% of each Participant's Covered Compensation for the current year (greater than 100% but not greater than 150%, and in no event in excess of the Taxable Wage Base).

**9.    Covered Compensation**

Covered Compensation will be determined based on the following year:

   **a.**   [ ]  current year.

   **b.**   [ ]  _____ year (may be the Covered Compensation for a Plan Year earlier than the current Plan Year, provided the earlier Plan Year is the same for all Participants and is not earlier than the later of (A) the Plan Year that begins 5 years before the current Plan Year, and (B) the Plan Year beginning in 1989. If the Plan Year entered is more than five years prior to the current Plan Year, the Participant's Covered Compensation will be that determined under the Covered Compensation table for the Plan Years five years prior to the current Plan Year).

**10.   Final Average Compensation**

   [ ]  In determining any Participant's Final Average Compensation, the Plan Year in which a Participant terminated employment shall be disregarded.

**Determination of Value of Stated Benefit**

For each Plan Year the Company will contribute for each eligible Participant who has met the requirements of B.9 through B.12 and C.1 through C.4, the annual Company contribution calculated below.  The annual Company contribution necessary to fund the stated benefit with respect to a Participant will be determined each Plan Year as follows:

**Step 1:** If the Participant has not yet reached Normal Retirement Age, calculate the present value of the stated benefit by multiplying the stated benefit by the factor that is the product of: (i) the applicable factor in Table I (if attained (current) age is less than 65) or Table IA (if attained age is greater than or equal to 65), multiplied by (ii) the applicable factor in Table III.  If the Participant is at or beyond Normal Retirement Age, calculate the present value of the stated benefit by multiplying the stated benefit by the factor in Table IV corresponding to that Normal Retirement Age.

**NOTE:** If the Plan provides options for Normal Retirement Ages other than those for which factors are provided in Tables III and IV, the Plan must contain the appropriate factors in an Addendum to the Adoption Agreement.

**Step 2:** Calculate the excess, if any, of the amount determined in **Step 1** over the theoretical reserve.

**Step 3:** Amortize the result in **Step 2** by multiplying it by the applicable factor from Table II. For the Plan Year in which the Participant attains Normal Retirement Age and for any subsequent Plan Year, the applicable factor is 1.0.

For purposes of this section, the theoretical reserve is determined according to (i) and (ii) below:

(i)        Initial theoretical reserve. A Participant's theoretical reserve as of the last day of the Participant's first Year of Projected Participation (year 1) is zero. However, if this Plan is a prior safe harbor plan with a stated benefit formula that takes into account Plan Years prior to the first Plan Year that this Plan satisfies the safe harbor in Treas. Reg. section 1.401(a)(4)-8(b)(3)(c), the initial theoretical reserve is determined as follows:

SECTION C. CONTRIBUTIONS - PENSION CONTRIBUTIONS

(A) Calculate as of the last day of the Plan Year immediately preceding year 1 the present value of the stated benefit, using the actuarial assumptions, the provisions of the Plan, and the Participant's compensation as of such date. For a Participant who is beyond Normal Retirement Age during year 1, the stated benefit will be determined using the actuarial assumptions, the provisions of the Plan, and the Participant's compensation as of such date, except that the straight life annuity factor used in that determination will be the factor applicable for the Participant's Normal Retirement Age.

(B) Calculate as of the last day of the Plan Year immediately preceding year 1 the present value of future Company contributions, i.e., the contributions due each Plan Year using the actuarial assumptions, the provisions of the Plan, (disregarding those provisions of the Plan providing for the limitations of Code section 415 or the minimum contributions under Code section 416), and the Participant's compensation as of such date, beginning with year 1 through the end of the Plan Year in which the Participant attains Normal Retirement Age.

(C) Subtract the amount determined in (B) from the amount determined in (A).

(ii)　　　Accumulate the initial theoretical reserve determined in (i) and the Company contribution (as limited by Code section 415, but without regard to any required minimum contributions under Code section 416) for each Plan Year beginning in year 1 up through the last day of the current Plan Year (excluding contribution(s) (if any) for the current Plan Year) using the Plan's interest assumption in effect for each such year. In any Plan Year following the Plan Year in which the Participant attains Normal Retirement Age, the accumulation is calculated assuming an interest rate of 0%.

For purposes of determining the level of annual Company contribution necessary to fund the stated benefit, the calculations in (i) and (ii) above will be made as of the last day of each Plan Year, on the basis of the Participant's age on the Participant's last birthday, using the interest rate in effect on the last day of the prior Plan Year.

**Definitions**

**Applicable Integration Factor.** The Applicable Integration Factor is the factor derived from the applicable table(s) below based on the Normal Retirement Age under the Plan. If the Plan Sponsor elects as an integration level (or offset level) C.8d or C.8e, Integration Table II will apply. Otherwise, Integration Table I will apply.

| Normal Retirement Age | Integration Table I | Integration Table II |
|---|---|---|
| 65 | 0.5200 | 0.4160 |
| 64 | 0.4856 | 0.3884 |
| 63 | 0.4504 | 0.3603 |
| 62 | 0.4160 | 0.3328 |
| 61 | 0.3816 | 0.3052 |
| 60 | 0.3464 | 0.2771 |
| 59 | 0.3296 | 0.2636 |
| 58 | 0.3120 | 0.2496 |
| 57 | 0.2944 | 0.2355 |
| 56 | 0.2776 | 0.2220 |
| 55 | 0.2600 | 0.2080 |

**Covered Compensation.** A Participant's Covered Compensation for a Plan Year is the average (without indexing) of the Taxable Wage Bases in effect for each calendar year during the 35-year period ending with the last day of the calendar year in which the Participant attains (or will attain) social security retirement age. In determining a Participant's Covered Compensation for a Plan Year, the Taxable Wage Base in effect for the current Plan Year and any subsequent Plan Year will be assumed to be the same as the Taxable Wage Base in effect as of the beginning of the Plan Year for which the determination is being made. Covered Compensation will be determined based on the year designated in C.9.

A Participant's Covered Compensation for a Plan Year before the 35-year period ending with the last day of the calendar year in which the Participant attains social security retirement age is the Taxable Wage Base in effect as of the beginning of the Plan Year. A Participant's Covered Compensation for a Plan Year after such 35-year period is the Participant's Covered Compensation for the Plan Year during which the 35-year period ends.

**Final Average Compensation.** A Participant's Final Average Compensation is the average of the Participant's annual Compensation from the Employer for the three-consecutive year period ending with or within the Plan Year. If a Participant's entire period of employment with the Employer is less than three consecutive years, compensation is averaged on an annual basis over the Participant's entire period of employment. Compensation for any year in excess of the Taxable Wage Base in effect at the beginning of such year will not be taken into account. See C.10.

**Taxable Wage Base.** Taxable Wage Base is the contribution and benefit base in effect under section 230 of the Social Security Act at the beginning of the Plan Year.

**Years of Projected Participation.** For purposes of determining a Participant's stated benefit, a Participant's Years of Projected Participation under the Plan is the sum of (1) and (2), where (1) is the number of years during which the Participant benefited under this Plan beginning with the latest of: (a) the first Plan Year in which the Participant benefited under the Plan, (b) the first Plan Year taken into account in the stated benefit formula, and (c) any Plan Year immediately following a Plan Year in which the Plan did not satisfy the safe harbor for target benefit plans in Treas. Reg. section 1.401(a)(4)-8(b)(3), and ending with the last day of the current Plan Year, and (2) is the number of years, if any, subsequent to the current Plan Year through the end of the Plan Year in which the Participant attains Normal Retirement Age.

For purposes of this definition of Years of Projected Participation, if this Plan is a prior safe harbor plan, the Plan is deemed to satisfy the safe harbor for target benefit plans in Treas. Reg. section 1.401(a)(4)-8(b)(3) and a Participant is treated as benefiting under the Plan in any Plan Year beginning prior to January 1, 1994.

A prior safe harbor plan is a plan that (1) was adopted and in effect on September 19, 1991, (2) which on that date contained a stated benefit formula that took into account service prior to that date, and (3) satisfied the applicable nondiscrimination requirements for target benefit plans for those prior years. For purposes of determining whether a plan satisfies the applicable nondiscrimination requirements for target benefit plans for Plan Years beginning before January 1, 1994, no amendments after September 19, 1991, other than amendments necessary to satisfy Code section 401(1), will be taken into account.

**11. Pension Contributions - Disability**

[ ] Allocate Pension Contributions to Disabled Participants who do not meet the allocation service requirements (Section 4.03(e)). Allocations to Disabled Participants end as of the earliest of: (i) the last day of the Plan Year in which occurs the \_\_\_\_\_ anniversary of the start of the Participant's Disability or (ii) such other time specified in Section 4.03(e).

*NOTE: C.11 shall not be more than "tenth".*

*NOTE: Allocations under C.11 may occur after Termination.*

## Other Contributions/415

**12. Rollovers**

Rollover Contributions are permitted (Section 4.05):

a.  [ X ] No

b.  [ ] Yes - All Eligible Employees may make a Rollover Contribution even if not yet a Participant in the Plan

c.  [ ] Yes - Only active Participants may make a Rollover Contribution

d.  [ ] Yes - \_\_\_\_\_ may make a Rollover Contribution

*NOTE: The Plan Administrator has discretion under Section 4.05 to limit the types of rollover contributions accepted by the Plan and must use that discretion in a consistent and non-discriminatory manner.*

**13. Deemed IRAs**

[ ] The Plan may accept Voluntary Contributions to deemed IRAs (Section 4.11) effective: \_\_\_\_\_

*NOTE: If C.13 is selected, see Section 4.11 for rules regarding deemed IRAs.*

**14. Death or Disability During Qualified Military Service**

[ ] For benefit accrual purposes, a Participant that dies or becomes Disabled while performing qualified military service will be treated as if he had been employed by the Company on the day preceding death or Disability and terminated employment on the day of death or Disability (Section 4.07)

**15. 415 Additional Language**

[ ] Additional language necessary to satisfy Code section 415 because of the required aggregation of multiple plans: \_\_\_\_\_.

## SECTION D. VESTING

*SECTION D. VESTING*

## Vesting Service Rules

1. **Vesting service computation method**
   a. **[ X ]** Hours of Service. Number of Hours of Service necessary for a Year of Vesting Service: <u>1000</u>
   b. **[ ]** Elapsed Time
   *NOTE: Unless D.1.b (Elapsed Time) is selected, the Plan will use the Hours of Service method for determining vesting service. If D.1.b (Elapsed Time) is selected, questions D.2 through D.3 are disregarded.*
   *NOTE: D.1a may not be more than 1,000. If left blank, the Plan will use 1,000 Hours of Service.*

2. **Vesting Service Equivalencies**
   a. Select equivalency for vesting purposes:
      i. **[ X ]** None.
      An Employee shall be credited with the following service with the Employer:
      ii. **[ ]** 10 Hours of Service for each day or partial day
      iii. **[ ]** 45 Hours of Service for each week or partial week
      iv. **[ ]** 95 Hours of Service for each semi-monthly payroll period or partial semi-monthly payroll period
      v. **[ ]** 190 Hours of Service for each month or partial month
   b. The hours equivalency selected in D.2a shall apply to:
      i. **[ ]** All Employees
      ii. **[ ]** Only Employees not paid on a per-hour basis
   *NOTE: D.2b does not apply if D.2a.i is selected.*

3. **Vesting Computation Period**
   a. **[ ]** Calendar year
   b. **[ X ]** Plan Year
   c. **[ ]** The twelve-consecutive month period commencing on the date the Employee first performs an Hour of Service; each subsequent twelve-consecutive month period shall commence on the anniversary of such date
   d. **[ ]** Other: _____
   *NOTE: D.3d must be a twelve-consecutive month period.*

4. **Other Employer Service**
   **[ ]** Count years of service with employers other than the Employer for vesting purposes. List other employers for which the service applies along with any limitations: _____

5. **Vesting Exceptions**
   a. **[ X ]** Death. Provide for full vesting for a Participant who terminates employment with the Employer due to death while an Employee (Section 6.02).
   b. **[ X ]** Disability. Provide for full vesting for a Participant who terminates employment with the Employer due to Disability while an Employee (Section 6.02).
   c. **[ X ]** Early Retirement. Provide for 100% vesting upon the attainment of Early Retirement Date while an Employee (Section 6.02).

6. **Vesting Exclusions**
   a. **[ ]** Exclude Years of Vesting Service earned before age 18.
   b. **[ ]** Exclude Years of Vesting Service earned before the Employer maintained this Plan or a predecessor plan.
   c. **[ ]** One-year holdout. If an Employee has a One-Year Break in Service/Period of Severance, exclude Years of Vesting Service earned before such period until the Employee has completed a Year of Vesting Service after returning to employment with the Employer.
   d. **[ ]** Rule of parity. If an Employee does not have any nonforfeitable right to the Account balance derived from Employer contributions, exclude Years of Vesting Service earned before a period of five (5) consecutive One-Year Breaks in Service/Periods of Severance.

7. **Special Vesting Provisions**
   **[ ]** Provide for special vesting provisions: _____
   *NOTE: Any special provisions must satisfy Code sections 401(a)(4) and 411.*

## Vesting Schedules

8. **Pension**
   Pension Contribution Account Vesting Schedule
   a. **[ X ]** 100%

*SECTION D. VESTING*

**b.** [ ] 2-6 Year Graded

**c.** [ ] 1-5 Year Graded

**d.** [ ] 1-4 Year Graded

**e.** [ ] 3 Year Cliff

**f.** [ ] 2 Year Cliff

**g.** [ ] Other:

    **i.** Other Pension Schedule - less than 1 year: _____%

    **ii.** Other Pension Schedule - 1 year but less than 2 years: _____%

    **iii.** Other Pension Schedule - 2 years but less than 3 years: _____%

    **iv.** Other Pension Schedule - 3 years but less than 4 years: _____%

    **v.** Other Pension Schedule - 4 years but less than 5 years: _____%

    **vi.** Other Pension Schedule - 5 years but less than 6 years: _____%

    **vii.** Other Pension Schedule - 6 or more years: <u>100</u>%

*NOTE: See Section 6.02 for definitions of the applicable vesting schedules.*

*NOTE: Any vesting schedule described in D.8g must provide vesting at least as rapidly as the "3 Year Cliff" vesting schedule or the "2-6 Year Graded" vesting schedule and D.8g.vii will be deemed to be 100%.*

**9. Other Vesting Schedule**

  **a.** [ ] The Plan has another vesting schedule: _____

  **b.** Describe the Participants to which the other vesting schedule applies: _____

  **c.** [ ] Retain pre-PPA Pension vesting schedule for pre 2007 contributions: _____

*NOTE: The vesting schedule in D.9 is in addition to the vesting schedules in D.8.*

*NOTE: D.9b must be applied in a consistent and non-discriminatory manner. For example, D.9b could be used to describe a prior vesting schedule, vesting for a transfer account, or a vesting schedule that applies to Participants covered by a collective bargaining agreement provided retirement benefits were the subject of good faith bargaining.*

*NOTE: The vesting schedule must satisfy the applicable minimum vesting requirements of Code section 411(a)(2) at every point in time, for all Participants' years of service.*

**10. Forfeitures**

Any forfeitures occurring will reduce employer contributions for the next Plan Year. (Articles 5 and 6):

## SECTION E. DISTRIBUTIONS

### Normal/Early Retirement

**1. Normal Retirement**

  **a.** Normal Retirement Age means:

    **i.** [ X ] Attainment of age <u>65</u>

    **ii.** [ ] Later of attainment of age _____ and the service specified in E.1b

  **b.** Select the type and length of service used to measure Normal Retirement Age:

    **i.** [ ] Eligibility. _____ Years of Eligibility Service

    **ii.** [ ] Vesting. _____ Years of Vesting Service

    **iii.** [ ] Participation. _____ anniversary of participation (e.g. third, fourth, etc.)

  **c.** Normal Retirement Date means:

    **i.** [ X ] Normal Retirement Age

    **ii.** [ ] First day of calendar month coincident or next following Normal Retirement Age

    **iii.** [ ] First day of calendar month nearest Normal Retirement Age

    **iv.** [ ] Anniversary date nearest Normal Retirement Age

    **v.** [ ] Other: _____

*NOTE: The age entered in E.1a may not be more than 65 and may not be less than 55.*

*NOTE: E.1b may not require more than the fifth anniversary of participation as defined in Treas. Reg. section 1.411(a)-7(b)(1) and any superseding guidance.*

*NOTE: The Normal Retirement Age shall be deemed met no later than the later of age 65 or the fifth anniversary of participation as defined in Treas. Reg. section 1.411(a)-7(b)(1) and any superseding guidance.*

**2. Early Retirement**

*SECTION E. DISTRIBUTIONS*

a. Early Retirement Age means:
   i. [ ] None. The Plan does not have an early retirement feature.
   ii. [ X ] Attainment of age <u>55</u>
   iii. [ ] Later of attainment of age _____ and the service specified in E.2b
b. Select the type and length of service used to measure Early Retirement Age:
   i. [ ] Eligibility. _____ Years of Eligibility Service
   ii. [ ] Vesting. _____ Years of Vesting Service
   iii. [ ] Participation. _____ anniversary of participation (e.g. third, fourth, etc.)
c. Early Retirement Date means:
   i. [ X ] Early Retirement Age
   ii. [ ] First day of calendar month coincident or next following Early Retirement Age
   iii. [ ] First day of calendar month nearest Early Retirement Age
   iv. [ ] Anniversary date nearest Early Retirement Age
   v. [ ] Other: _____
*NOTE: The age entered in E.2a may not be more than 65.*
*NOTE: E.2b is only applicable if E.2a.iii is selected.*
*NOTE: See related selections E.5c (vesting upon Early Retirement Date) and G.2b (in-service distributions upon Early Retirement Date).*

## Time & Form of Payment

3. **Time of Payment (Other than Death)**
Distributions after Termination of Employment for reasons other than death shall commence (Section 7.02):
a. [ X ] Immediate. As soon as administratively feasible with a final payment made consisting of any allocations occurring after such Termination of Employment
b. [ ] End of Plan Year. As soon as administratively feasible after all contributions have been allocated relating to the Plan Year in which the Participant's Account balance becomes distributable
c. [ ] Normal Retirement Date.
d. [ ] Other: _____
*NOTE: Any entry in E.3d must comply with Code section 401(a)(9), Section 7.02(e) and other requirements of Article 7.*

4. **Form of Payment (Other than Death)**
Medium of distribution from the Plan:
a. [ X ] Cash only
b. [ ] Cash or in-kind
c. [ ] Cash or in-kind rollover to an individual retirement account sponsored by the following vendor: _____

5. **Default Form of Payment (Other than Death)**
a. Unless otherwise elected by the Participant, distributions shall be made in the form of a Qualified Joint and <u>50</u> % Survivor Annuity (not less than 50% and not more than 100%)
b. In addition to the form of distribution described in Section 7.10, distributions from the Plan after Termination for reasons other than death may be made in the following forms (select all that apply):
   i. [ X ] Lump sum only
   ii. [ ] Lump sum payment or substantially equal annual, or more frequent installments over a period not to exceed the joint life expectancy of the Participant and his Beneficiary
   iii. [ ] Under a continuous right of withdrawal pursuant to which a Participant may withdraw such amounts at such times as he shall elect
   iv. [ ] Other: _____
*NOTE: E.5b.iii and any entry in E.5b.iv must comply with Code section 401(a)(9), Section 7.02(e) and other requirements of Article 7.*

6. **Distributions as an Annuity**
a. Permit Participants to make distributions in the form of an annuity
   i. [ X ] Yes - entire Account
   ii. [ ] Yes - the following conditions and/or limitations shall apply: _____
   iii. [ ] No
b. Permit Beneficiaries to make distributions in the form of an annuity
   i. [ X ] Yes - the entire Account
   ii. [ ] Yes - the following conditions and/or limitations shall apply: _____
   iii. [ ] No

*SECTION E. DISTRIBUTIONS*

**NOTE:** *If E.6a.i or E.6a.ii is selected, a Participant may elect to have the Plan Administrator apply his vested Account to the extent provided above toward the purchase of an annuity contract, which shall be distributed to the Participant. The terms of such annuity contract shall comply with the provisions of this Plan and any annuity contract shall be nontransferable.*

**NOTE:** *If E.6b.i or E.6b.ii is selected, a Beneficiary may elect to have the Plan Administrator apply his vested Account to the extent provided above toward the purchase of an annuity contract, which shall be distributed to the Beneficiary. The terms of such annuity contract shall comply with the provisions of this Plan (including Section 7.05)and any annuity contract shall be nontransferable.*

**NOTE:** *E.6a.ii and E.6b.ii must be applied in a consistent and non-discriminatory manner (for example, limiting annuity distributions to accounts in excess of a certain dollar amount.)*

## Payments on Death

7.  **Beneficiary Designation**
    The spouse of a married Participant shall be the beneficiary of <u>50</u>% of such Participant's Account unless the spouse waives his or her rights to such benefit pursuant to Section 7.10 (Section 7.04).
    **NOTE:** *E.7 may not be less than 50%.*
    **NOTE:** *E.7 only applies to Accounts subject to the joint and survivor annuity requirements of Section 7.10.*

8.  **Payment upon Participant's Death**
    Distributions on account of the death of the Participant shall be made in accordance with the following:
    a.  [ X ] Pay entire Account balance by end of fifth year for all Beneficiaries in accordance with Sections 7.02(b)(1)(A) and 7.02(b)(2)(A) only
    b.  [ ] Pay entire Account balance no later than the 60th day following the end of Plan Year in which the Participant dies
    c.  [ ] Allow extended payments for all beneficiaries in accordance with Sections 7.02(b)(1)(A), (B) and (C) and 7.02(b)(2)(A) and (B)
    d.  [ ] Pay entire Account balance by end of fifth year for Beneficiaries in accordance with Sections 7.02(b)(1)(A) and 7.02(b)(2)(A) and allow extended payments in accordance with Sections 7.02(b)(1)(B) and (C) and 7.02(b)(2)(B) only if the Participant's spouse is the Participant's sole primary Beneficiary
    e.  [ ] Other: _____
    **NOTE:** *Any entry in E.8e must comply with Code section 401(a)(9), Section 7.02(b) and other requirements of Article 7.*

9.  **Beneficiaries**
    a.  Death benefits when there is no designated beneficiary:
        i.   [ X ] Standard according to Section 7.04(c)
        ii.  [ ] Other: _____
    b.  [ ] Revocation. A beneficiary designation to a spouse shall be automatically revoked upon the following circumstances: _____
    c.  Domestic Partners are treated as a spouse under the terms of this Plan for purposes of death benefits to the extent applicable:
        i.   [ ] No
        ii.  [ ] Yes - limited to the following terms and conditions: _____
        iii. [ X ] Yes
    d.  [ ] The term "Domestic Partner" as defined in Article 2 is modified in the following manner: _____
    e.  [ ] For purposes of determining a Participant's spouse, the one-year rule in Code section 417(d), Treas. Reg. section 1.401(a)-20 applies.
    **NOTE:** *If E.9a.ii (Other) is selected, death benefits when there is no designated beneficiary shall be provided pursuant to E.9a.ii. The death benefits described must be definitely determinable and may not be specified in a manner that is subject to discretion.*
    **NOTE:** *If E.9c.i is selected, E.9d does not apply.*
    **NOTE:** *If E.9d is selected, the modifications must be non-discriminatory and definitely determinable.*
    **NOTE:** *Domestic Partners shall not be treated as a spouse under the following Sections of the Plan: 7.02(b) (distribution upon death), 7.05 (minimum distributions) and 7.06 (direct rollovers).*
    **NOTE:** *If revocation is selected (E.9b) you may use this item to indicate automatic revocation upon divorce.*

## Cash Out

10. **Cash Out**
    a.  [ ] Involuntary cash-out amount for purposes of Section 7.03: $ _____
    b.  Minimum Account balance for Qualified Joint and Survivor Annuity consent requirements (Section 7.10): $ _____
    c.  Involuntary cash-out of a terminated Participant's Account balance when it exceeds the cash-out amount specified in E.10a is deferred under Section 7.03(b) until:
        i.   [ ] Later of age 62 or Normal Retirement Date - payment made in a lump sum only
        ii.  [ ] Required Beginning Date - Participant may elect payment in a lump sum or installments

*SECTION E. DISTRIBUTIONS*

    **iii.** [ ] Required Beginning Date - payment made in a lump sum only

    **iv.** [ ] Other: _____

**d.** [ ] Exclude amounts attributable to Rollover Contributions in determining the value of the Participant's nonforfeitable account balance for purposes of E.10a and E.10b (Sections 7.03 and 7.10)

*NOTE: E.10a and E.10b have a $5,000 maximum, $5,000 will be entered unless otherwise specified.*

*NOTE: If E.10a is not selected and E.10b is zero, E.10d does not apply.*

*NOTE: E.10b only applies to Accounts subject to the joint and survivor annuity requirements of Section 7.10.*

*NOTE: If E.10a is less than $1,000, E.10d may not be selected.*

*NOTE: Any entry in E.10c.iv must comply with Code section 411(a)(11), Section 7.03 and other requirements of Article 7.*

## Required Beginning Date

**11. Required Beginning Date**

Required Beginning Date for a Participant other than a More Than 5% Owner:

**a.** [ X ] Retirement. April 1 of the calendar year following the later of the calendar year in which the Participant: (x) attains age 70-1/2, or (y) retires

**b.** [ ] Age 70-1/2. April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2

**c.** [ ] Election. The option provided in E.11a; provided that a Participant may elect to commence distributions pursuant to either E.11a or E.11b

*NOTE: A Participant's Required Beginning Date is a protected benefit under Code section 411(d)(6).*

## SECTION F. IN-SERVICE WITHDRAWALS

*NOTE: See Section 8.05 for limits on in-service distributions.*

*NOTE: In-service withdrawal options are meant as enabling rules. If an in-service distribution is permitted under any option specified below, the in-service withdrawal is permissible.*

## In-Service Withdrawals

**1. In-service Withdrawals (Section 8.02)**

The Plan permits a distribution to be made to a Participant who has attained age 62 and who has not separated from employment:

**a.** [ X ] Yes - under any distribution option offered to a Terminated Participant

**b.** [ ] Yes - limited to the following terms and conditions: _____

**c.** [ ] No

**d.** If F.1a or F.1b is selected, the effective date shall be the first day of the first Plan Year beginning on or after: _____

*NOTE: The date provided in F.1d may not be earlier than January 1, 2007.*

*NOTE: F.1 must be applied in a consistent and non-discriminatory manner. For example, F.1 could be used to specify the number of withdrawals permitted in a specified time period. See Section 8.05.*

**2. Retirement**

[ ] Allow in-service distributions after attainment of Normal Retirement Date (Section 7.01(b)) from the following Accounts: _____

## Other Withdrawals

**3. At Any Time (Section 8.03(b))**

In-service withdrawals are allowed from the following Accounts at any time:

**a.** [ ] Voluntary Contribution Account

**b.** [ ] Rollover Contribution Account

*NOTE: If nothing is indicated, no in-service withdrawals are allowed under this Section.*

**4. Disability**

[ ] Allow distributions upon Disability.

**Conditions/Limitations**

5. **Other Conditions/Limitations**
   [ ] The following limitations, conditions and/or special rules apply to in-service withdrawals: _____
   *NOTE: Unless otherwise specified, the limitations will apply to all in-service withdrawals (F.1 through F.4). F.5 must be applied in a consistent and non-discriminatory manner. For example, F.5 could be used to specify the number of withdrawals permitted in a specified time period. See Section 8.05.*

**Loans**

6. **Loans**
   Loans are permitted:
   [ ] Yes **[ X ]** No

## SECTION G. PLAN OPERATIONS AND TOP-HEAVY

**Plan Operations**

1. **Permitted Investments**
   a. [ ] Plan may invest in "qualifying employer securities" and "qualifying employer real property" (Section 9.04)
   b. [ ] Plan may invest in life insurance (Section 9.07)
   *NOTE: If G.1a is selected, the limitations of Section 9.04 may apply.*

2. **Participant Self-Direction**
   a. Specify the extent to which the Plan permits Participant self direction and indicate the Plan's intent to comply with ERISA section 404(c) (Section 9.02)
      i. [ ] All Accounts and 404(c) applies
      ii. [ ] All Accounts but 404(c) does not apply
      iii. [ ] Some Accounts and 404(c) applies
      iv. [ ] Some Accounts but 404(c) does not apply
      v. **[ X ]** None
   b. If Some Accounts is selected, a Participant may self-direct the following Accounts:
      i. [ ] Voluntary Contribution Account
      ii. [ ] Pension Contribution Account
      iii. [ ] Rollover Contribution Account
      iv. [ ] Transfer Account
      v. [ ] Other: _____
   c. [ ] Participants may also establish individual brokerage accounts.
   d. Participants may exercise voting rights with respect to the following investments (Section 9.06):
      i. [ ] Company stock only
      ii. [ ] All investments
      iii. [ ] Selected investments: _____
   *NOTE: If G.2a.v (None) is selected, G.2b through G.2d do not apply.*
   *NOTE: G.2b only applies if G.2a.iii or G.2a.iv is selected.*
   *NOTE: If G.1a is selected (employer securities) and G.2a.i or G.2a.iii (404(c) applies) is selected, then voting rights must be selected in G.2d.i, G.2d.ii or G.2d.iii.*

3. **Valuation Date**
   Enter Valuation Date:
   a. **[ X ]** Last day of Plan Year
   b. [ ] Last day of each Plan quarter
   c. [ ] Last day of each month
   d. [ ] Each business day
   e. [ ] Other: _____ (Must be at least annually).

*SECTION G. PLAN OPERATIONS AND TOP-HEAVY*

*NOTE:* If G.2a.i or G.2a.iii (404(c)) applies) is selected then Valuation Date must be at least quarterly.

4. **Plan Administration**
   a. Designation of Plan Administrator (Section 12.01):
      i. [ **X** ] Plan Sponsor
      ii. [ ] Committee appointed by Plan Sponsor
      iii. [ ] Other: _____
   b. Establishment of procedures for the Plan Administrator and the Investment Fiduciary (Sections 12.01(c) and 12.02(c)):
      i. [ **X** ] Plan Administrator and Investment Fiduciary adopt own procedures
      ii. [ ] Governing body of the Plan Sponsor sets procedures for Plan Administrator and Investment Fiduciary
   c. Type of indemnification for the Plan Administrator and Investment Fiduciary:
      i. [ ] None - the Company will not indemnify the Plan Administrator or the Investment Fiduciary
      ii. [ **X** ] Standard according to Section 12.06
      iii. [ ] Provided pursuant to an outside agreement
   d. [ ] The following modifications shall be made to the duties of the applicable parties: _____
   *NOTE:* G.4d may be used to reallocate duties between the Plan Sponsor and the Plan Administrator. It may also be used to designate additional parties to perform specific Plan Administrator and/or Plan Sponsor duties.

5. **Trust**
   a. Use the Trust agreement contained in the Basic Plan Document
      i. [ **X** ] Yes
      ii. [ ] No
      iii. [ ] Yes, but only for the following assets/Accounts: _____; other assets/Accounts will use an outside Trust or be held by an insurance company.
      iv. [ ] Not Applicable - assets are held solely by an insurance company
   b. Trustee Type
      i. [ **X** ] Corporate. Trustee name and address: Shirley T. Sherrod, M.D., P. O. Box 2423, Chicago, IL  60690
      ii. [ ] Individual. Trustee name(s): _____
   c. Type of Trustee Indemnification:
      i. [ **X** ] Standard according to Section 10.07(b)
      ii. [ ] None
   d. [ **X** ] The Trustees may designate one or more Trustees to act on behalf of all Trustees (Section 10.05(b)(2)).
   e. The Trustee is also the Investment Fiduciary (Section 10.06):
      i. [ **X** ] Yes
      ii. [ ] No. The Investment Fiduciary is: _____
   f. The special trustee for purposes of determining and collecting contributions under the Plan is:
      i. [ **X** ] the chief executive officer of the Plan Sponsor
      ii. [ ] the Trustee
      iii. [ ] other: _____
   *NOTE:* Section 10.09 shall apply to the extent assets are held in an outside trust agreement.
   *NOTE:* If the Trust agreement contained in the Basic Plan Document applies, then Trustee signature(s) is/are not necessary on amendments if the amendment does not affect Trustee duties.
   *NOTE:* If G.5a.iv is selected, G.5b - e shall not apply.
   *NOTE:* If a separate trust agreement is to be used (G.5a.ii or G.5a.iii is selected), the items in G.1-5 shall apply only to the extent that they are not superseded by the terms of the separate trust agreement.  Only the trust document(s) previously approved by the IRS may be utilized with this Plan and still rely on the Plan's opinion letter.
   *NOTE:* If G.5a.i or G.5a.iii (use trust in Basic Plan Document) is selected and G.5c.ii (no indemnification) is selected, indemnification for the Trustee may be pursuant to an agreement that is not a part of the Plan.
   *NOTE:* If G.5c.ii (no indemnification) Section 10.07(b) shall not apply and indemnification for the Trustee may be pursuant to an agreement that is not a part of the Plan.
   *NOTE:* G.5f must be an individual or a corporation with trust powers and is intended to comply with FAB 2008-01.

6. **Trust Administrative Modifications**
   a. [ ] The following modifications are made to the permitted investments under the Trust Fund: _____
   b. [ ] The following modifications are made to the duties of the Trustee, Investment Fiduciary or Investment Manager: _____
   c. [ ] The following modifications are made to other administrative provisions of the Trust Fund: _____
   *NOTE:* G.6 only applies if G.5a.i or G.5a.iii is selected (the Trust Agreement contained in the Basic Plan Document applies).

SECTION G. PLAN OPERATIONS AND TOP-HEAVY

*NOTE: The addition of language in G.6 cannot conflict with other provisions of the Plan and cannot cause the Plan to fail to qualify under Code section 401(a). Under no circumstances can a modification consist of: 1) removal or change to the prudent man rule, 2) addition of arbitration for Participant disputes, 3) addition of securities lending program, and 4) modification of the duties of the special trustee in Section 10.02(b) to determine and collect contributions under the Plan.*

## Top-Heavy

**7.** **Top-Heavy Allocations**
Top-Heavy allocations are made to
**a.** [ X ] This Plan.  Participants who share in Top-Heavy minimum allocations:
  **i.** [ X ] Non-Key only.  Any Participant who is employed by the Employer on the last day of the Plan Year and is not a Key Employee
  **ii.** [  ] All Participants.  Any Participant who is employed by the Employer on the last day of the Plan Year
  **iii.** [  ] Participants covered by a collective bargaining agreement will share in Top-Heavy minimum allocations provided retirement benefits were the subject of good faith bargaining.
**b.** [  ] Pursuant to the terms of _____
**c.** [  ] Other (include information about which plan allocations are made to and which Participants in this Plan will share in Top-Heavy minimums): _____
**d.** Other plan maintained by the Employer
  **i.** [ X ] N/A - no other plan
  **ii.** [  ] Defined Contribution
  **iii.** [  ] Defined Benefit
*NOTE: Choose one option, G.7a, b or c.*
*NOTE: G.7a.iii may be selected in addition to G.7a.i or G.7a.ii. If G.7a.iii applies and is not selected, Employees covered under a collective bargaining agreement that bargains in good faith for retirement benefits shall not be eligible to receive Top-Heavy minimum allocations.*
*NOTE: If G.7b is selected, include the name of the other plan.*
*NOTE: G.7d is not applicable if G.7c is selected.*

**8.** **Top-Heavy Vesting**
Top-Heavy vesting schedule:
**a.** [ X ] 100%
**b.** [  ] 2-6 Year Graded
**c.** [  ] 3 Year Cliff
**d.** [  ] Other:
  **i.** Other Top-Heavy Schedule - less than 1 year: _____%
  **ii.** Other Top-Heavy Schedule - 1 year but less than 2 years: _____%
  **iii.** Other Top-Heavy Schedule - 2 years but less than 3 years: _____%
  **iv.** Other Top-Heavy Schedule - 3 years but less than 4 years: _____%
  **v.** Other Top-Heavy Schedule - 4 years but less than 5 years: _____%
  **vi.** Other Top-Heavy Schedule - 5 years but less than 6 years: _____%
  **vii.** Other Top-Heavy Schedule - 6 or more years: 100%.
*NOTE: See Section 11.03 for definitions of the applicable vesting schedules.*
*NOTE: If G.8 is "Other", then any vesting schedule described in G.8d must provide vesting at least as rapidly as the "3 Year Cliff" vesting schedule or the "2-6 Year Graded" vesting schedule.*

**9.** **Present Value Assumptions**
  **a.** Enter the interest rate to be used for determining Present Value to compute the Top-Heavy ratio: _____%
  **b.** Enter the mortality table to be used for determining Present Value to compute the Top-Heavy ratio: _____

**10.** **416 Additional Language**
  [  ] Additional language necessary to satisfy Code section 416 because of the required aggregation of multiple plans: _____.

## SECTION H. MISCELLANEOUS

Failure to properly fill out the Adoption Agreement may result in disqualification of the Plan.

The Plan shall consist of this Adoption Agreement #008, its related Basic Plan Document #P-02 and any related Appendix and Addendum specifically created in response to a question within the Adoption Agreement.

The adopting Employer may rely on an opinion letter issued by the Internal Revenue Service as evidence that the Plan is qualified under Code section 401 only to the extent provided in Revenue Procedure 2011-49 and any superseding guidance. The Employer may not rely on the opinion letter in certain other circumstances or with respect to certain qualification requirements, which are specified in the opinion letter issued with respect to the Plan and in Revenue Procedure 2011-49 and any superseding guidance. In order to have reliance in such circumstances or with respect to such qualification requirements, application for a determination letter must be made to Employee Plans Determinations of the Internal Revenue Service. The prototype plan sponsor will inform the adopting Employer of any amendments made to the Plan or of the discontinuance or abandonment of the Plan. The prototype plan sponsor may be contacted at 700 W. Virginia St., Suite 305, Milwaukee, WI 53204; 414-226-2442.

## SECTION I. EXECUTION PAGE

The undersigned agree to be bound by the terms of this Adoption Agreement and Basic Plan Document and acknowledge receipt of same. The parties have caused this Plan to be executed this 30th  day of APRIL, 2016.

SHIRLEY T SHERROD,  M.D. P.C.:


Signature:___/s_____

Print Name: _SHIRLEY T SHERROD, MD PC___

Title/Position: Sponsor_____

**TRUSTEE:**


Shirley T. Sherrod, M.D.
_____/s_____


Its:  Sponsor_____

**TABLE I:** Present value factors (See * below)

Number of years from attained age to

| age 65<*> | 7.50% | 8.00% | 8.50% |
|---|---|---|---|
| 1 | 7.868 | 7.589 | 7.326 |
| 2 | 7.319 | 7.027 | 6.752 |
| 3 | 6.808 | 6.506 | 6.223 |
| 4 | 6.333 | 6.024 | 5.736 |
| 5 | 5.891 | 5.578 | 5.286 |
| 6 | 5.480 | 5.165 | 4.872 |
| 7 | 5.098 | 4.782 | 4.491 |
| 8 | 4.742 | 4.428 | 4.139 |
| 9 | 4.412 | 4.100 | 3.815 |
| 10 | 4.104 | 3.796 | 3.516 |
| 11 | 3.817 | 3.515 | 3.240 |
| 12 | 3.551 | 3.255 | 2.986 |
| 13 | 3.303 | 3.014 | 2.752 |
| 14 | 3.073 | 2.790 | 2.537 |
| 15 | 2.859 | 2.584 | 2.338 |
| 16 | 2.659 | 2.392 | 2.155 |
| 17 | 2.474 | 2.215 | 1.986 |
| 18 | 2.301 | 2.051 | 1.831 |
| 19 | 2.140 | 1.899 | 1.687 |
| 20 | 1.991 | 1.758 | 1.555 |
| 21 | 1.852 | 1.628 | 1.433 |
| 22 | 1.723 | 1.508 | 1.321 |
| 23 | 1.603 | 1.396 | 1.217 |
| 24 | 1.491 | 1.293 | 1.122 |
| 25 | 1.387 | 1.197 | 1.034 |
| 26 | 1.290 | 1.108 | 0.953 |
| 27 | 1.200 | 1.026 | 0.878 |
| 28 | 1.116 | 0.950 | 0.810 |
| 29 | 1.039 | 0.880 | 0.746 |
| 30 | 0.966 | 0.814 | 0.688 |
| 31 | 0.899 | 0.754 | 0.634 |
| 32 | 0.836 | 0.698 | 0.584 |
| 33 | 0.778 | 0.647 | 0.538 |
| 34 | 0.723 | 0.599 | 0.496 |
| 35 | 0.673 | 0.554 | 0.457 |
| 36 | 0.626 | 0.513 | 0.422 |
| 37 | 0.582 | 0.475 | 0.389 |
| 38 | 0.542 | 0.440 | 0.358 |
| 39 | 0.504 | 0.407 | 0.330 |
| 40 | 0.469 | 0.377 | 0.304 |
| 41 | 0.436 | 0.349 | 0.280 |
| 42 | 0.406 | 0.323 | 0.258 |
| 43 | 0.377 | 0.299 | 0.238 |
| 44 | 0.351 | 0.277 | 0.219 |
| 45 | 0.327 | 0.257 | 0.202 |

<*> If a Participant's attained age is at or above 65 but still
below the Participant's NRA, use Table IA.

**TABLE IA:** Present value factors for participants below Normal Retirement Age (to be used only when attained age is greater than or equal to 65.)

| Number of years from age 65 to attained age | 7.50% | 8.00% | 8.50% |
|---|---|---|---|
| 0 | 8.458 | 8.196 | 7.949 |
| 1 | 9.092 | 8.852 | 8.625 |
| 2 | 9.774 | 9.560 | 9.358 |
| 3 | 10.507 | 10.325 | 10.153 |
| 4 | 11.295 | 11.151 | 11.016 |
| 5 | 12.143 | 12.043 | 11.953 |
| 6 | 13.053 | 13.006 | 12.969 |
| 7 | 14.032 | 14.047 | 14.071 |
| 8 | 15.085 | 15.170 | 15.267 |
| 9 | 16.216 | 16.384 | 16.565 |
| 10 | 17.432 | 17.695 | 17.973 |
| 11 | 18.740 | 19.110 | 19.500 |
| 12 | 20.145 | 20.639 | 21.158 |
| 13 | 21.656 | 22.290 | 22.956 |
| 14 | 23.280 | 24.073 | 24.907 |
| 15 | 25.026 | 25.999 | 27.025 |

*SECTION I. EXECUTION PAGE*

**TABLE II:** Amortization factors

| Number of years from attained age to Normal Retirement Age | 7.50% | 8.00% | 8.50% |
|---|---|---|---|
| 1 | 0.5181 | 0.5192 | 0.5204 |
| 2 | 0.3577 | 0.3593 | 0.3609 |
| 3 | 0.2777 | 0.2796 | 0.2814 |
| 4 | 0.2299 | 0.2319 | 0.2339 |
| 5 | 0.1982 | 0.2003 | 0.2024 |
| 6 | 0.1756 | 0.1778 | 0.1801 |
| 7 | 0.1588 | 0.1611 | 0.1634 |
| 8 | 0.1458 | 0.1482 | 0.1506 |
| 9 | 0.1355 | 0.1380 | 0.1405 |
| 10 | 0.1272 | 0.1297 | 0.1323 |
| 11 | 0.1203 | 0.1229 | 0.1255 |
| 12 | 0.1145 | 0.1171 | 0.1198 |
| 13 | 0.1096 | 0.1123 | 0.1151 |
| 14 | 0.1054 | 0.1082 | 0.1110 |
| 15 | 0.1018 | 0.1046 | 0.1075 |
| 16 | 0.0986 | 0.1015 | 0.1044 |
| 17 | 0.0958 | 0.0988 | 0.1018 |
| 18 | 0.0934 | 0.0964 | 0.0994 |
| 19 | 0.0912 | 0.0943 | 0.0974 |
| 20 | 0.0893 | 0.0924 | 0.0956 |
| 21 | 0.0876 | 0.0908 | 0.0940 |
| 22 | 0.0861 | 0.0893 | 0.0925 |
| 23 | 0.0847 | 0.0879 | 0.0912 |
| 24 | 0.0835 | 0.0867 | 0.0901 |
| 25 | 0.0823 | 0.0857 | 0.0890 |
| 26 | 0.0813 | 0.0847 | 0.0881 |
| 27 | 0.0804 | 0.0838 | 0.0872 |
| 28 | 0.0795 | 0.0830 | 0.0865 |
| 29 | 0.0788 | 0.0822 | 0.0858 |
| 30 | 0.0781 | 0.0816 | 0.0851 |
| 31 | 0.0774 | 0.0810 | 0.0846 |
| 32 | 0.0768 | 0.0804 | 0.0840 |
| 33 | 0.0763 | 0.0799 | 0.0836 |
| 34 | 0.0758 | 0.0794 | 0.0831 |
| 35 | 0.0753 | 0.0790 | 0.0827 |
| 36 | 0.0749 | 0.0786 | 0.0824 |
| 37 | 0.0745 | 0.0783 | 0.0820 |
| 38 | 0.0742 | 0.0779 | 0.0817 |
| 39 | 0.0739 | 0.0776 | 0.0815 |
| 40 | 0.0736 | 0.0774 | 0.0812 |
| 41 | 0.0733 | 0.0771 | 0.0810 |
| 42 | 0.0730 | 0.0769 | 0.0808 |
| 43 | 0.0728 | 0.0767 | 0.0806 |
| 44 | 0.0726 | 0.0765 | 0.0804 |
| 45 | 0.0724 | 0.0763 | 0.0802 |

**TABLE III:** Factors to be multiplied by those in Table I.

| Normal Retirement Age | 7.50% | 8.00% | 8.50% |
|---|---|---|---|
| 80 | 0.206 | 0.194 | 0.184 |
| 79 | 0.231 | 0.219 | 0.207 |
| 78 | 0.258 | 0.246 | 0.234 |
| 77 | 0.289 | 0.276 | 0.263 |
| 76 | 0.322 | 0.309 | 0.296 |
| 75 | 0.359 | 0.346 | 0.333 |
| 74 | 0.400 | 0.387 | 0.374 |
| 73 | 0.446 | 0.432 | 0.419 |
| 72 | 0.495 | 0.482 | 0.469 |
| 71 | 0.549 | 0.537 | 0.525 |
| 70 | 0.609 | 0.597 | 0.586 |
| 69 | 0.674 | 0.664 | 0.653 |
| 68 | 0.745 | 0.736 | 0.728 |
| 67 | 0.822 | 0.816 | 0.810 |
| 66 | 0.907 | 0.904 | 0.900 |
| 65 | 1.000 | 1.000 | 1.000 |
| 64 | 1.101 | 1.106 | 1.110 |
| 63 | 1.212 | 1.221 | 1.231 |
| 62 | 1.332 | 1.348 | 1.363 |
| 61 | 1.464 | 1.486 | 1.509 |
| 60 | 1.606 | 1.637 | 1.669 |
| 59 | 1.761 | 1.802 | 1.844 |
| 58 | 1.929 | 1.982 | 2.036 |
| 57 | 2.111 | 2.177 | 2.246 |
| 56 | 2.309 | 2.390 | 2.475 |
| 55 | 2.523 | 2.622 | 2.726 |

**TABLE IV:** Factors for Participants who are at or beyond Normal Retirement Age.

| Normal Retirement Age | 7.50% | 8.00% | 8.50% |
|---|---|---|---|
| 80 | 5.151 | 5.053 | 4.959 |
| 79 | 5.370 | 5.264 | 5.162 |
| 78 | 5.591 | 5.476 | 5.366 |
| 77 | 5.814 | 5.690 | 5.572 |
| 76 | 6.039 | 5.905 | 5.777 |
| 75 | 6.266 | 6.122 | 5.985 |
| 74 | 6.494 | 6.339 | 6.192 |
| 73 | 6.721 | 6.556 | 6.398 |
| 72 | 6.947 | 6.771 | 6.603 |
| 71 | 7.171 | 6.983 | 6.804 |
| 70 | 7.392 | 7.192 | 7.003 |
| 69 | 7.610 | 7.399 | 7.198 |
| 68 | 7.825 | 7.601 | 7.389 |
| 67 | 8.037 | 7.801 | 7.577 |
| 66 | 8.248 | 7.999 | 7.764 |
| 65 | 8.458 | 8.196 | 7.949 |
| 64 | 8.666 | 8.390 | 8.131 |
| 63 | 8.870 | 8.581 | 8.311 |
| 62 | 9.072 | 8.770 | 8.485 |
| 61 | 9.270 | 8.954 | 8.657 |
| 60 | 9.463 | 9.133 | 8.825 |
| 59 | 9.651 | 9.307 | 8.986 |
| 58 | 9.834 | 9.477 | 9.143 |
| 57 | 10.012 | 9.641 | 9.295 |
| 56 | 10.186 | 9.801 | 9.442 |
| 55 | 10.354 | 9.955 | 9.585 |

## QLAC ADDENDUM

**A.  Effective Date**

Effective 1/1/2016 the Plan shall allow Participants to invest in qualifying longevity annuity contracts ("QLACs").

**B.  DEFINITIONS**

(1)  The following is added as a new definition:

"QLAC" means a qualifying longevity annuity contract as defined in Treasury Regulation 1.401(a)(9)-6, Q&A 17.

**C.  MINIMUM DISTRIBUTION REQUIREMENTS**

(1)  Plan Section 7.05(c) is amended by adding the following to the end of the section.

3.  The amount of the Required Minimum Distribution shall include the amount payable under a QLAC that has passed its annuity starting date (as defined in the QLAC).

(2)  Plan Section 7.05(d) is amended by adding the following to the end of the section.

3.  The amount of the Required Minimum Distribution shall include the amount payable under a QLAC that has passed its annuity starting date (as defined in the QLAC).

(3)  Plan Section 7.05(e)(4) is replaced in its entirety with the following.

4.  Participant's Account Balance. The Account balance as of the last Valuation Date in the calendar year immediately preceding the distribution calendar year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Account as of dates in the valuation calendar year after the Valuation Date and decreased by (1) distributions made in the valuation calendar year after the Valuation Date and (2) any amount held in a QLAC that has not reached its annuity starting date (as defined in the QLAC). The Account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the distribution calendar year if distributed or transferred in the valuation calendar year.

**D.  QUALIFYING LONGEVITY ANNUITY CONTRACT (QLAC)**

Plan Section 9.08 is added as follows.

(a)  Purchase of QLAC. To the extent provided in the Adoption Agreement, a Participant may request that a portion of his Account be invested in a QLAC. The QLAC must meet all requirements as stated under Treasury Regulation 1.401(a)(9)-6.

(b)  Maximum QLAC Amount.  The total amount of all QLACs purchased for a Participant under this Plan or any other plan cannot exceed the limits as specified in Treasury Regulation 1.401(a)(9)-6, A-17(b). The Plan Administrator may rely on information provided by the Participant with regard to QLACs purchased for the Participant under any other plan.

(c)  Excess Premiums.  If a QLAC fails to meet the maximum QLAC amount under Treasury Regulation 1.401(a)(9)-6, A-17(b), the amount will no longer be considered a QLAC and will be included in the Participant's Account Balance for purposes of distributions under Plan Section 7.05 as of the date the excess premium payment is made unless the amount is returned to a non-QLAC portion of the Participant's Account by the end of the calendar year following the calendar year in which the excess premium payment was made.

EXHIBIT 4b

**CCH INCORPORATED, DBA FTWILLIAM.COM**

**BASIC PLAN DOCUMENT #P-02**

Copyright © 2002-2016 All Rights Reserved.

# CCH INCORPORATED, DBA FTWILLIAM.COM

## TABLE OF CONTENTS

ARTICLE 1. INTRODUCTION ................................................................................................................. 1
    Section 1.01  Plan ............................................................................................................................ 1
    Section 1.02  Application of Plan .................................................................................................... 1

ARTICLE 2. DEFINITIONS .................................................................................................................... 2

ARTICLE 3. PARTICIPATION ............................................................................................................... 15
    Section 3.01  Elective Deferrals and Voluntary Contributions .................................................. 15
    Section 3.02  Matching Contributions ......................................................................................... 15
    Section 3.03  Employer Contributions ......................................................................................... 15
    Section 3.04  Transfers ................................................................................................................. 15
    Section 3.05  Termination and Rehires ........................................................................................ 15
    Section 3.06  Limitations on Exclusions ..................................................................................... 16
    Section 3.07  Procedures for Admission ...................................................................................... 16
    Section 3.08  Participants Receiving Differential Military Pay ................................................. 16

ARTICLE 4. CONTRIBUTIONS ............................................................................................................. 17
    Section 4.01  Elective Deferrals and Voluntary Contributions .................................................. 17
    Section 4.02  Matching Contributions ......................................................................................... 19
    Section 4.03  Employer Contributions ......................................................................................... 20
    Section 4.04  Safe Harbor Contributions and Qualified Non-Elective/Matching Contributions .......... 22
    Section 4.05  Rollover Contributions ........................................................................................... 23
    Section 4.06  Transfers ................................................................................................................. 24
    Section 4.07  Military Service ...................................................................................................... 25
    Section 4.08  Timing of Contributions ........................................................................................ 25
    Section 4.09  Arrangements Adopted by More Than One Employer ......................................... 25
    Section 4.10  SIMPLE 401(k) Provisions .................................................................................... 27
    Section 4.11  Deemed IRAs .......................................................................................................... 29

ARTICLE 5. LIMITATIONS ON CONTRIBUTIONS ............................................................................. 31
    Section 5.01  Annual Limitation on Elective Deferrals .............................................................. 31
    Section 5.02  Nondiscrimination .................................................................................................. 32
    Section 5.03  Special Rules ........................................................................................................... 33
    Section 5.04  Correction of Discriminatory Contributions ......................................................... 35
    Section 5.05  Maximum Amount of Annual Additions .............................................................. 37

ARTICLE 6. VESTING ........................................................................................................................... 38
    Section 6.01  Participant Contributions ....................................................................................... 38
    Section 6.02  Employer Contributions ......................................................................................... 38
    Section 6.03  Forfeitures ............................................................................................................... 39

ARTICLE 7. DISTRIBUTIONS .............................................................................................................. 41
    Section 7.01  Commencement of Distributions ........................................................................... 41
    Section 7.02  Timing and Form of Distributions ........................................................................ 41
    Section 7.03  Cash-Out of Small Balances .................................................................................. 43
    Section 7.04  Beneficiary ............................................................................................................. 43
    Section 7.05  Minimum Distribution Requirements .................................................................... 44
    Section 7.06  Direct Rollovers ..................................................................................................... 47
    Section 7.07  Minor or Legally Incompetent Payee .................................................................... 49
    Section 7.08  Missing Payee ........................................................................................................ 49
    Section 7.09  Distributions Upon Termination of Plan ............................................................... 49
    Section 7.10  Joint and Survivor Annuities ................................................................................. 49

ARTICLE 8. IN-SERVICE DISTRIBUTIONS AND LOANS ................................................................ 52
    Section 8.01  Hardship ................................................................................................................. 52
    Section 8.02  Specified Age, Specified Age and Service ........................................................... 53
    Section 8.03  Other Withdrawals ................................................................................................. 53
    Section 8.04  Transfer Account .................................................................................................... 54
    Section 8.05  Rules Regarding In-Service Distributions ............................................................ 54
    Section 8.06  Loans ...................................................................................................................... 55

ARTICLE 9. INVESTMENT AND VALUATION OF TRUST FUND .................................................. 57
    Section 9.01  Investment of Assets .............................................................................................. 57

Section 9.02  Participant Self-Direction .............................................................................................. 57
Section 9.03  Individual Accounts ........................................................................................................ 58
Section 9.04  Qualifying Employer Investments .................................................................................. 58
Section 9.05  Allocation of Earnings and Losses ................................................................................. 58
Section 9.06  Voting Rights .................................................................................................................. 59
Section 9.07  Life Insurance ................................................................................................................. 59

ARTICLE 10. TRUST FUND ......................................................................................................................... 61
Section 10.01  Trust Fund ..................................................................................................................... 61
Section 10.02  Duties of the Trustee ..................................................................................................... 61
Section 10.03  General Investment Powers ........................................................................................... 62
Section 10.04  Other Investment Powers ............................................................................................... 64
Section 10.05  Instructions ..................................................................................................................... 64
Section 10.06  Investment of the Fund .................................................................................................. 65
Section 10.07  Compensation and Indemnification ............................................................................... 66
Section 10.08  Resignation and Removal .............................................................................................. 66
Section 10.09  Other Trust Agreement .................................................................................................. 67

ARTICLE 11. SPECIAL TOP-HEAVY RULES ............................................................................................ 68
Section 11.01  Top-Heavy Status .......................................................................................................... 68
Section 11.02  Minimum Allocations .................................................................................................... 68
Section 11.03  Minimum Vesting ........................................................................................................... 69

ARTICLE 12. PLAN ADMINISTRATION .................................................................................................... 71
Section 12.01  Plan Administrator ......................................................................................................... 71
Section 12.02  Investment Fiduciary ..................................................................................................... 72
Section 12.03  Compensation of Plan Administrator and Investment Fiduciary .................................. 72
Section 12.04  Plan Expenses ................................................................................................................ 73
Section 12.05  Allocation of Fiduciary Responsibility ......................................................................... 73
Section 12.06  Indemnification .............................................................................................................. 73
Section 12.07  Claims Procedure ........................................................................................................... 73
Section 12.08  Written Communication ................................................................................................. 74

ARTICLE 13. AMENDMENT, MERGER AND TERMINATION ................................................................. 75
Section 13.01  Amendment .................................................................................................................... 75
Section 13.02  Merger and Transfer ...................................................................................................... 76
Section 13.03  Termination .................................................................................................................... 76

ARTICLE 14. MISCELLANEOUS ................................................................................................................. 78
Section 14.01  Nonalienation of Benefits .............................................................................................. 78
Section 14.02  Rights of Alternate Payees ............................................................................................ 78
Section 14.03  No Right to Employment ............................................................................................... 79
Section 14.04  No Right to Trust Assets ................................................................................................ 79
Section 14.05  Governing Law .............................................................................................................. 79
Section 14.06  Severability of Provisions .............................................................................................. 79
Section 14.07  Headings and Captions .................................................................................................. 79
Section 14.08  Gender and Number ....................................................................................................... 79
Section 14.09  Disaster Relief ............................................................................................................... 79

## ARTICLE 1 INTRODUCTION

<u>Section 1.01</u>  <u>PLAN</u>

  This document ("Basic Plan Document"), its related Adoption Agreement and Trust are intended to qualify as a tax-exempt "Plan" under Code sections 401(a) and 501(a), respectively.

<u>Section 1.02</u>  <u>APPLICATION OF PLAN</u>

  Except as otherwise specifically provided herein, the provisions of this Plan shall apply to those individuals who are Eligible Employees of the Company on or after the Effective Date. Except as otherwise specifically provided for herein, the rights and benefits, if any, of former Eligible Employees of the Company whose employment terminated prior to the Effective Date, shall be determined under the provisions of the Plan, as in effect from time to time prior to that date.

## ARTICLE 2 DEFINITIONS

"Account" means the balance of a Participant's interest in the Trust Fund as of the applicable date as adjusted pursuant to Article 9. "Account" or "Accounts" shall include to the extent provided in the Adoption Agreement, an Elective Deferral Account, Pre-tax Elective Deferral Account, Roth Elective Deferral Account, Matching Contribution Account (and a Qualified Matching Contribution Account, if necessary), Profit Sharing Contribution Account, Pension Contribution Account, Voluntary Contribution Account, Rollover Contribution Account, Qualified Non-Elective Contribution Account, Transfer Account, In-Plan Roth Rollover Account and such other Account(s) or subaccount(s) as the Plan Administrator, in its discretion, deems appropriate.

"Actual Contribution Ratio" means the ratio (expressed as a percentage) of Matching Contributions and Voluntary Contributions for a Participant for the Plan Year to the Participant's Section 414(s) Compensation for such year.

A Matching Contribution shall be considered "for the Plan Year" only if (a) it is made on account of the Participant's Elective Deferral/Voluntary Contribution for that Plan Year, (b) it is allocated to his Matching Contribution Account during such Plan Year, and (c) it is paid to the Trust Fund by the last day of the 12th month after the end of such Plan Year.

Voluntary Contributions are considered to have been made in the Plan Year in which contributed to the Trust Fund. For purposes of the preceding sentence, an amount withheld from an Employee's pay (or a payment by the Employee to an agent of the Plan) is treated as contributed at the time of such withholding (or payment) if the funds paid are transmitted to the Trust Fund within a reasonable period after the withholding (or payment). For purposes of determining the Actual Contribution Ratio, Elective Deferrals recharacterized pursuant to Section 5.04 shall be treated as a Voluntary Contribution.

Elective Deferrals, Qualified Non-Elective Contributions and Qualified Matching Contributions shall be counted in the Actual Contribution Ratio only if they meet the requirements of Section 5.03(b). The Actual Contribution Ratio of a Participant who does not receive a Matching Contribution or make a Voluntary Contribution shall be zero.

Notwithstanding the foregoing, if the Plan is automatically deemed to meet the nondiscrimination requirements of Section 5.02 with respect to Matching Contributions, the Actual Contribution Ratio shall be determined solely with respect to Voluntary Contributions. A Participant's Actual Contribution Ratio shall not include: (a) contributions treated as disproportionate within the meaning of Section 5.03(f); (b) additional contributions made pursuant to Code section 414(u) by reason of a Participant's Qualified Military Service for the Plan Year for which the contributions are made, or for any other Plan Year; or (c) Matching Contributions that are forfeited either to correct excess aggregate contributions or because the contributions to which they relate are excess deferrals, excess contributions, or excess aggregate contributions.

"Actual Deferral Ratio " means the ratio (expressed as a percentage) of Elective Deferrals made on behalf of a Participant for the Plan Year to the Participant's Section 414(s) Compensation for that year.

An Elective Deferral shall be considered "for the Plan Year" only if the Elective Deferral is allocated to the Participant's Account under the Plan as of a date within that year. For purposes of this rule, an Elective Deferral is considered allocated as of a date within a year only if: (a) the allocation is not contingent on the Participant's participation in the Plan or performance of services on any date subsequent to that date; (b) the Elective Deferral is actually paid to the Trust Fund no later than the end of the 12-month period immediately following the year to which the contribution relates; and (c) the Elective Deferral relates to Compensation that would have been received by the Participant in the year but for the Participant's election to defer under the arrangement. Qualified Non-Elective Contributions and Qualified Matching Contributions shall be counted in the Actual Deferral Ratio only if they meet the requirements of Section 5.03(b).

The Actual Deferral Ratio of a Participant who is eligible but does not make an Elective Deferral and, if applicable, who does not receive an allocation of Qualified Non-Elective Contributions and Qualified Matching Contributions shall be zero. A Participant's Actual Deferral Ratio shall not include: (a) contributions treated as disproportionate within the meaning of Section 5.03(f); (b) a Nonhighly Compensated Employee's Excess Elective Deferrals; (c) Elective Deferrals treated as Catch-up Contributions for the Plan Year for which the contributions were made or for any other Plan Year; (d) additional Elective Deferrals made pursuant to Code section 414(u) by reason of a Participant's Qualified Military Service for the Plan Year for which the contributions are made, or for any other Plan Year; or (e) to the extent necessary to demonstrate satisfaction of the requirement of Treas. Reg. section 1.401(m)-2(a)(6)(ii), Elective Deferrals taken into account for the Actual Contribution Percentage (ACP) test under Treas. Reg. section 1.401(m)-2(a)(6).

*ARTICLE 2 DEFINITIONS*

"Adoption Agreement" means the document executed in conjunction with this Basic Plan Document that contains the optional features selected by the Plan Sponsor.

"Alternate Payee" means the person entitled to receive payment of benefits under the Plan pursuant to a Qualified Domestic Relations Order.

"Annual Addition" means the sum of the following amounts credited to a Participant's Account for the Limitation Year:

(a)     Company contributions allocated to a Participant's Account, including Elective Deferrals, Matching Contributions, Profit Sharing Contributions, Pension Contributions and Qualified Non-Elective Contributions.  Company contributions shall also include Excess Elective Deferrals, unless such amounts are distributed no later than the first April 15 following the close of the Participant's taxable year;

(b)     Voluntary Contributions;

(c)     forfeitures;

(d)     amounts allocated, after March 31, 1984, to an individual medical account, as defined in Code section 415(l)(2), which is part of a pension or annuity plan maintained by the Employer;

(e)     amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits, allocated to the separate Account of a Key Employee, as defined in Code section 419A(d)(3), under a welfare benefit fund, as defined in Code section 419(e), maintained by the Employer; and

(f)     allocations under a simplified employee pension plan.

Notwithstanding the foregoing, an Annual Addition shall not include a restorative payment within the meaning of IRS Revenue Ruling 2002-45 and any superseding guidance.

"Annuity Starting Date" means the first day of the first period for which an amount is paid as an annuity or any other form.

"Average Contribution Percentage" means the average (expressed as a percentage) of the Actual Contribution Ratios of the Participants in a specified group.

"Average Deferral Percentage" means the average (expressed as a percentage) of the Actual Deferral Ratios of the Participants in a specified group.

"Beneficiary" means the person(s) entitled to receive benefits, under Section 7.04 of the Plan, upon the Participant's death.

"Board" means the governing body of the Plan Sponsor.  If the Plan Sponsor is a sole proprietorship, the Board means the sole proprietor.

"Catch-up Contribution" means the contribution described in Section 5.01(d).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Committee" means the committee that may be appointed by the Plan Sponsor pursuant to Section 12.01 to serve as Plan Administrator.

"Company" means the Plan Sponsor and any other entity that has adopted the Plan with the approval of the Plan Sponsor. Notwithstanding the foregoing, if the Adoption Agreement provides that the Plan Sponsor is a union, Company shall mean any Employer who is a party to collective bargaining agreement with the Plan Sponsor which provides for participation in the Plan by Employees of the Employer.

"Compensation" shall have the meaning set forth in the Adoption Agreement.

Compensation shall include other compensation paid by the later of: (a) 2-1/2 months after an Employee's severance from employment with the Company or (b) the end of the Limitation Year that includes the date of the Employee's severance from employment with the Company if: (1) the payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the

Participant's regular working hours (e.g., overtime or shift differential), commissions, bonuses, or other similar payments; and (2) the payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Company.

The exclusions from Compensation for payments after severance from employment do not apply to payments to a Participant who does not currently perform services for the Company by reason of Qualified Military Service to the extent those payments do not exceed the amounts the Participant would have received if the individual had continued to perform services for the Company rather than entering Qualified Military Service. To the extent selected in the Adoption Agreement and pursuant to Code section 414(u)(12), IRS Notice 2010-15 and any superseding guidance, differential wage payments shall be treated as Compensation.

To the extent provided in Section 4.03(e), Compensation shall include compensation paid to a Participant who is permanently and totally disabled.

Compensation must be determined without regard to any rules under Code section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code section 3401(a)(2)). For any Self-Employed Individual covered under the Plan, Compensation shall mean Earned Income.

For any Plan Year, the annual compensation of each Participant taken into account in determining allocations for any Plan Year beginning after December 31, 2001, shall not exceed $200,000, as adjusted for cost-of-living increases in accordance with Code section 401(a)(17)(B). Annual compensation means Compensation during the Plan Year or such other consecutive 12-month period over which Compensation is otherwise determined under the Plan (the determination period). The cost-of-living adjustment in effect for a calendar year applies to annual compensation for the determination period that begins with or within such calendar year.

If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

"Determination Date" means the last day of the preceding Plan Year. Notwithstanding the foregoing, the Determination Date for the first Plan Year shall be the last day of such year.

"Disabled" or "Disability" shall have the meaning specified in the Adoption Agreement. The determination of Disability shall be made by the Plan Administrator.

"Domestic Partner" means, unless otherwise specified in the Adoption Agreement, a partner of the Participant if the Participant is in a civil union or similar relationship recognized under the laws of any state. A Participant may only have one Domestic Partner. A Participant may not have a Domestic Partner if the Participant is legally married to a person. If Domestic Partners are treated as a spouse under this Plan, Section 7.10 applies and a Domestic Partner instead of a spouse is the Beneficiary of the survivor annuity, the term "Qualified Joint and Survivor Annuity" shall be modified to "Joint and Survivor Annuity", "qualified preretirement survivor annuity" shall be modified to "preretirement survivor annuity", and Qualified Optional Survivor Annuity" shall be modified to "Optional Survivor Annuity".

"Early Retirement Age" shall have the meaning set forth in the Adoption Agreement.

"Early Retirement Date" shall have the meaning set forth in the Adoption Agreement.

"Earned Income" means the net earnings from self-employment in the trade or business with respect to which the Plan is established, for which personal services of the individual are a material income-producing factor. Net earnings will be determined without regard to items not included in gross income and the deductions allocable to such items. Net earnings are reduced by contributions by the Employer to a qualified plan to the extent deductible under Code section 404. Net earnings shall be determined with regard to the deduction allowed to the taxpayer by Code section 164(f) for taxable years beginning after December 31, 1989.

"Effective Date" shall have the meaning set forth in Section A.3 of the Adoption Agreement except as otherwise specified in the Plan or Adoption Agreement.

"Elective Deferral" means an Employee contribution made to the Plan as a Pre-tax Elective Deferral or a Roth Elective Deferral pursuant to Article 4 of the Plan.

*ARTICLE 2 DEFINITIONS*

"Elective Deferral Account" means so much of a Participant's Account as consists of a Participant's Elective Deferrals (and corresponding earnings) made to the Plan. Except as expressly provided elsewhere in the Plan, the Elective Deferral Account shall also include Catch-up Contributions described in Section 5.01 of the Plan.

"Eligibility Computation Period" means a 12-consecutive month period beginning with an Employee's Employment Commencement Date and each anniversary thereof. Notwithstanding the foregoing, if the Adoption Agreement provides that the Eligibility Computation Period switches to the Plan Year his succeeding Eligibility Computation Period for such purpose will switch to the Plan Year, beginning with the Plan Year that includes the first anniversary of his Employment Commencement Date. If the Eligibility Computation Period switches to the Plan Year, an Employee who is credited with a Year of Eligibility Service in both the initial Eligibility Computation Period and the first Plan Year which commences prior to the first anniversary of the Employee's initial Eligibility Computation Period will be credited with two Years of Eligibility Service.

"Eligible Employee" means any Employee employed by the Company, subject to the modifications and exclusions described in the Adoption Agreement.

If the Adoption Agreement provides that the Plan is not a standardized plan and if an individual is subsequently reclassified as, or determined to be, an Employee by a court, the Internal Revenue Service or any other governmental agency or authority, or if the Company is required to reclassify such individual as an Employee as a result of such reclassification or determination (including any reclassification by the Company in settlement of any claim or action relating to such individual's employment status), such individual shall not become an Eligible Employee by reason of such reclassification or determination.

If the Adoption Agreement provides that the Plan is not a standardized plan, an individual who becomes employed by the Employer in a transaction between the Employer and another entity that is a stock or asset acquisition, merger, or other similar transaction involving a change in the employer of the employees of the trade or business shall not become eligible to participate in the Plan until the Plan Sponsor specifically authorizes such participation.

If the Adoption Agreement provides that the Plan is a standardized plan, an individual who becomes employed by the Employer in a transaction between the Employer and another entity that is a stock or asset acquisition, merger, or other similar transaction involving a change in the employer of the employees of the trade or business shall not become eligible to participate in the Plan until after the end of the Plan Year following the Plan Year in which the transaction occurs unless the Plan Sponsor specifically authorizes such participation prior to the end of such period.

"Employee" means any individual who is employed by the Employer, including a Self-Employed Individual. The term "Employee" includes any Leased Employee of the Employer. If the Adoption Agreement provides that the Plan is not a standardized plan, no Leased Employee may become a Participant hereunder unless he becomes an Eligible Employee. The term "Employee" shall not include a person who is classified by the Employer as an independent contractor or a person (other than a Self-Employed Individual) who is not treated as an employee for purposes of withholding federal employment taxes.

"Employer" means the Company or any other employer required to be aggregated with the Company under Code sections 414(b), (c), (m) or (o) and the regulations thereunder; provided, however, that "Employer" shall not include any entity or unincorporated trade or business prior to the date on which such entity, trade or business satisfies the affiliation or control tests described above. In identifying "Employer" for purposes of Section 5.05, the definition in Code sections 414(b) and (c) shall be modified as provided in Code section 415(h).

"Employment Commencement Date" means the first date on which the Eligible Employee performs an Hour of Service.

"ERISA" means the Employee Retirement Income Security Act of 1974, all amendments thereto and all federal regulations promulgated pursuant thereto.

"Excess Compensation" means the amount by which an Eligible Employee's Compensation for a Plan Year exceeds the integration level described in the Adoption Agreement.

"Excess Elective Deferral" means Elective Deferrals made in excess of the limit described in Section 5.01.

"Highly Compensated Employee" means, effective for Plan Years beginning after December 31, 1996, any Employee who during the Plan Year performs services for the Employer and who:

(a)        was a More Than 5% Owner at any time during the Plan Year or the preceding Plan Year; or

(b)        during the preceding Plan Year (the Adoption Agreement may provide that the foregoing determination may be made with respect to the calendar year beginning with or within the preceding Plan Year) received Statutory Compensation in excess of the Code section 414(q)(1) amount ($80,000 as adjusted) and, if provided in the Adoption Agreement, was a member of the top paid group of Employees within the meaning of Code section 414(q)(3).

The determination of who is a Highly Compensated Employee will be made in accordance with Code section 414(q) and the regulations thereunder to the extent they are not inconsistent with the method established above.

The term Highly Compensated Employee also includes a former Employee who was a Highly Compensated Employee when he separated from service or at any time after attaining age 55.

"Hour of Service" means:

(a)        Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer.  These hours will be credited to the Employee for the computation period in which the duties are performed.

(b)        Each hour for which an Employee is paid, or entitled to payment, by the Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence.  No more than 501 Hours of Service will be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period).  Hours under this paragraph will be calculated and credited pursuant to DOL Reg. section 2530.200b-2 and any superseding guidance which is incorporated herein by this reference.

(c)        Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer.  The same Hours of Service will not be credited both under paragraph (a) or paragraph (b), as the case may be, and under this paragraph (c).  These hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made.

Solely for purposes of determining whether a One-Year Break in Service has occurred, an individual who is absent from work for maternity or paternity reasons shall receive credit for the Hours of Service which would otherwise have been credited to such individual but for such absence, or in any case in which such hours cannot be determined, eight (8) Hours of Service per day of such absence. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (a) by reason of the pregnancy of the individual, (b) by reason of a birth of a child of the individual, (c) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (d) for purposes of caring for such child for a period beginning immediately following such birth or placement.  The Hours of Service credited under this paragraph shall be credited (a) in the computation period in which the absence begins if the crediting is necessary to prevent a break in service in that period, or (b) in all other cases, in the following computation period.

If the Employer is a member of an affiliated service group (under Code section 414(m)), a controlled group of corporations (under Code section 414(b)), a group of trades or businesses under common control (under Code section 414(c)) or any other entity required to be aggregated with the Employer pursuant to Code section 414(o), service will be credited for any employment with such groups during the time the Employer is a member of the applicable group. Service will also be credited for any individual considered an Employee for purposes of this Plan under Code sections 414(n) or 414(o).

If the Employer maintains the plan of a predecessor employer, service with such employer will be treated as service for the Employer.

Service with respect to Qualified Military Service shall be credited in accordance with Code section 414(u) and service shall also be determined to the extent required by the Family and Medical Leave Act of 1993.

Notwithstanding the foregoing, for determining service under the elapsed time method, an Hour of Service means each hour for which an Employee is paid or entitled to payment for the performance of duties for the Employer.

"In-Plan Roth Rollover" means an Employee contribution made to the Plan as a rollover from another Account in the Plan pursuant to Section 4.05(b).

"In-Plan Roth Rollover Account" means so much of a Participant's Account as consists of a Participant's In-Plan Roth Rollover contributions (and corresponding earnings) made to the Plan.

"Investment Fiduciary" means the person(s) designated in the Adoption Agreement. The fiduciary shall be subject to standards of conduct as prescribed under ERISA.

"Investment Funds" means the funds in which the Trust Fund is invested.

"Investment Manager" means an investment manager as described in section 3(38) of ERISA.

"Key Employee" means for Plan Years beginning after December 31, 2001, any Employee or former Employee (including any deceased Employee) who at any time during the Plan Year that includes the Determination Date is an officer of the Employer having an annual Statutory Compensation greater than $130,000 (as adjusted under Code section 416(i)(1) for Plan Years beginning after December 31, 2002), a More Than 5% Owner of the Employer, or a 1% owner of the Employer having Statutory Compensation of more than $150,000. The determination of who is a Key Employee will be made in accordance with Code section 416(i)(1) and the applicable regulations and other guidance of general applicability issued thereunder.

"Leased Employee" means any person (other than an Employee of the Employer) who, pursuant to an agreement between the Employer and any other person ("leasing organization"), has performed services for the Employer (or for the Employer and related persons determined in accordance with Code section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the Employer shall be treated as provided by the Employer. A person shall not be considered a Leased Employee if: (a) such person is covered by a money purchase pension plan providing: (1) a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Code section 415(c)(3), but including amounts contributed pursuant to a salary reduction agreement which are excludable from the employee's gross income under Code sections 125, 402(e)(3), 402(h), 403(b), 132(f) or 457; (2) immediate participation; and (3) full and immediate vesting; and (b) Leased Employees do not constitute more than 20% of the Employer's nonhighly compensated work force.

"Limitation Year" means the year specified in the Adoption Agreement for purposes of determining Annual Additions limits pursuant to Article 5. All qualified plans maintained by the Employer must use the same Limitation Year. If the Limitation Year is amended to a different 12-consecutive month period, the new Limitation Year must begin on a date within the Limitation Year in which the amendment is made.

"Matched Employee Contribution" means a Participant's Elective Deferrals and such other Employee contributions specified in the Adoption Agreement.

"Matching Contribution" means an Employer Matching Contribution made to the Plan on behalf of the Participant pursuant to Article 4 of the Plan.

"Matching Contribution Account" means so much of a Participant's Account as consists of Matching Contributions (and corresponding earnings) made to the Plan.

"More Than 5% Owner" means any person who (a) owns (either directly or by attribution, under Code section 318) more than 5% of the outstanding stock of the Employer or stock possessing more than 5% of the total combined voting power of all stock of the Employer or, (b) in the case of an unincorporated business, any person who owns more than 5% of the capital or profits interest in the Employer. For purposes of Section 7.05, a Participant is treated as a More Than 5% Owner if such Participant is a More Than 5% Owner at any time during the Plan Year ending with or within the calendar year in which such owner attains age 70-1/2 and shall continue to be considered a More Than 5% Owner (and distributions must continue under Section 7.05) even if the Participant ceases to be a 5% owner in a subsequent year.

"Non-Key Employee" means any Employee or former Employee who is not a Key Employee.

"Non-Elective Contribution" means a Profit Sharing Contribution, a Pension Contribution, a Qualified Non-Elective Contribution and a minimum allocation made pursuant to Article 11.

"Nonhighly Compensated Employee" means an Employee who is not a Highly Compensated Employee.

"Normal Retirement Age" shall have the meaning set forth in the Adoption Agreement.

"Normal Retirement Date" shall have the meaning set forth in the Adoption Agreement.

*ARTICLE 2 DEFINITIONS*

"One-Year Break in Service" means, unless otherwise provided in the Adoption Agreement, for purposes of determining eligibility service, an Eligibility Computation Period or, for purposes of determining a Year of Vesting Service, a Vesting Computation Period during which an Employee is credited with 500 or fewer Hours of Service.

"One-Year Period of Severance" means a Period of Severance of at least 12-consecutive months. In the case of an individual who is absent from work for maternity or paternity reasons, the 12-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a One-Year Period of Severance. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (a) by reason of the pregnancy of the individual, (b) by reason of the birth of a child of the individual, (c) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (d) for purposes of caring for such child for a period beginning immediately following such birth or placement.

"Participant" means an Eligible Employee who participates in the Plan in accordance with Article 3.

"Pension Contribution" means a contribution made by the Company that is allocated to a Participant's Pension Contribution Account pursuant to Article 4.

"Pension Contribution Account" means so much of a Participant's Account as consists of Pension Contributions (and corresponding earnings) made to the Plan.

"Period of Severance" means a continuous period of time during which the Employee does not perform an Hour of Service for the Employer. Such period begins on the date the Employee retires, dies, quits or is discharged, or if earlier, the 12 month anniversary of the date on which the Employee was otherwise first absent from service.

"Permissive Aggregation Group" means the Required Aggregation Group of plans, plus any other plan or plans of the Employer which, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Code sections 401(a)(4) and 410.

"Plan Administrator" means the person(s) designated pursuant to the Adoption Agreement and Section 12.01. The Plan Administrator shall also be the named fiduciary within the meaning of ERISA section 402.

"Plan Sponsor" means the entity described in the Adoption Agreement.

"Plan Year" means the 12-consecutive month period described in the Adoption Agreement. In the event the Plan incurs a short Plan Year of less than 12-consecutive months, the requirements of the Department of Labor Regulations in 2530.202 and 2530.203 and corresponding Treas. Reg. section 1.410(a) shall be satisfied.

"Post Severance Compensation" means amounts paid by the later of: (a) 2-1/2 months after an Employee's severance from employment with the Company or (b) the end of the applicable Limitation Year/Plan Year that includes the date of severance from employment with the Company; and those amounts would have been included in the definition of Compensation if they were paid prior to the Participant's severance from employment with the Company. However the payment must be for (a) unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if the Employee had continued in employment; or (b) received by a Participant pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid to the Participant at the same time if the Participant had continued in employment with the Company and only to the extent that the payment is includible in the Participant's gross income.

"Post Year End Compensation" means amounts earned during a year but not paid during that year solely because of the timing of pay periods and pay dates if: (a) these amounts are paid during the first few weeks of the next year; (b) the amounts are included on a uniform and consistent basis with respect to all similarly situated Employees; and (c) no compensation is included in more than one year.

"Pre-tax Elective Deferral" means Elective Deferrals that are not includible in the Participant's gross income at the time deferred.

"Pre-tax Elective Deferral Account" means so much of a Participant's Account as consists of a Participant's Pre-tax Elective Deferrals (and corresponding earnings) made to the Plan.

"Present Value" means a benefit in a defined benefit plan of equivalent value and shall be based only on the interest and mortality rates specified in the Adoption Agreement.

*ARTICLE 2 DEFINITIONS*

"Profit Sharing Contribution" means a contribution made by the Company that is allocated to a Participant's Profit Sharing Contribution Account pursuant to Article 4.

"Profit Sharing Contribution Account" means so much of a Participant's Account as consists of Profit Sharing Contributions (and corresponding earnings) made to the Plan.

"Qualified Automatic Contribution Arrangement" or "QACA" means a Plan that is a safe harbor plan exempt from most testing under Code section 401(k)(13) and/or Code section 401(m)(12).

"Qualified Domestic Relations Order" means any judgment, decree, or order (including approval of a property settlement agreement) that constitutes a "qualified domestic relations order" within the meaning of Code section 414(p).

"Qualified Joint and Survivor Annuity" means for a married Participant, an immediate annuity for the life of the Participant with a survivor annuity for the life of the Participant's spouse that is not less than 50% and not more than 100% of the amount of the annuity and which is payable during the joint lives of the Participant and the spouse and is the amount of benefit that can be purchased with the Participant's vested Account balance subject to Section 7.10. The percentage of the survivor annuity under the Plan shall be at least 50% unless a different percentage is elected in the Adoption Agreement. For a single Participant, a Qualified Joint and Survivor Annuity means an immediate annuity for the life of the Participant and which is the amount of benefit which can be purchased with the Participant's vested Account balance subject to Section 7.10.  The terms of such annuity contract shall comply with the provisions of this Plan and the annuity contract shall be nontransferable.

"Qualified Matching Contribution" means a Matching Contribution made by the Company pursuant to Section 4.04.

"Qualified Military Service" means qualified military service as defined in Code section 414(u).

"Qualified Non-Elective Contribution" means a Non-Elective Contribution made by the Company pursuant to Section 4.04.

"Qualified Non-Elective Contribution Account" means so much of a Participant's Account as consists of Qualified Non-Elective Contributions (and corresponding earnings) made to the Plan.

"Qualified Optional Survivor Annuity" means an immediate annuity for the life of the Participant with a survivor annuity that is equal to the applicable percentage of the amount of the annuity that is payable during the joint lives of the Participant and the spouse, and that is the actuarial equivalent of a single life annuity for the life of the Participant. The survivor percentage of the Qualified Optional Survivor Annuity shall be determined in accordance with the following:

(a)      If the Plan provides for a specific Qualified Joint and Survivor Annuity survivor annuity percentage and such percentage is less than 75%, then the Plan's Qualified Optional Survivor Annuity shall be 75%.

(b)      If the Plan provides for a specific Qualified Joint and Survivor Annuity survivor annuity percentage and such percentage is greater than or equal to 75%, then the Plan's Qualified Optional Survivor Annuity shall be 50%.

(c)      If the Plan does not provide for a specific Qualified Joint and Survivor Annuity survivor annuity percentage, then the Qualified Joint and Survivor Annuity survivor annuity percentage shall be 50% and the Qualified Optional Survivor Annuity survivor annuity percentage shall be 75%.

"Qualified Reservist Distributions" means the distributions described in Section 8.03(c).

"Required Aggregation Group" means (a) each qualified plan of the Employer in which at least one Key Employee participates or participated at any time during the Plan Year containing the Determination Date or any of the four preceding Plan Years (regardless of whether the Plan has terminated), and (b) any other qualified plan of the Employer which enables a plan described in (a) to meet the requirements of Code sections 401(a)(4) or 410.

"Required Beginning Date" means April 1 of the calendar year following the later of the calendar year in which the Participant attains age 70-1/2 or the calendar year in which the Participant retires, except that benefit distributions to a More Than 5% Owner must commence by April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2. The Adoption Agreement may provide that for a Participant other than a More Than 5% Owner: (a) the Required Beginning Date is the April 1 of the calendar year following the calendar year in which the

Participant attains age 70-1/2; or (b) the Participant may elect to begin receiving distributions at the date specified in the preceding sentence or the date specified in clause (a) of this sentence.

"Rollover Contribution" means an Employee contribution made to the Plan as a rollover from another eligible retirement plan or individual retirement account pursuant to Article 4 of the Plan.

"Rollover Contribution Account" means so much of a Participant's Account as consists of a Participant's Rollover Contributions (and corresponding earnings) made to the Plan.

"Roth Elective Deferral" means an Elective Deferral that is: (a) designated irrevocably by the Participant at the time of the cash or deferred election as a Roth Elective Deferral that is being made in lieu of all or a portion of the Pre-tax Elective Deferrals the Participant is otherwise eligible to make under the Plan; and (b) treated by the Company as includible in the Participant's income at the time the Participant would have received that amount in cash if the Participant had not made a cash or deferred election. Except as otherwise provided, Roth Elective Deferrals shall be subject to the same conditions and limitations as apply to Elective Deferrals.

"Roth Elective Deferral Account" means so much of a Participant's Account as consists of a Participant's Roth Elective Deferrals (and corresponding earnings) made to the Plan. The Plan will maintain a record of the amount of Roth Elective Deferrals in each Participant's Roth Elective Deferral Account.

"Safe Harbor Notice" means the notice described in Treas. Reg. section 1.401(k)-3(d) and any superseding guidance. The Safe Harbor Notice must provide comprehensive notice of the Employee's rights and obligations under the Plan and must be written in a manner calculated to be understood by the average Eligible Employee. The Safe Harbor Notice must be provided within a reasonable period before the beginning of the Plan Year (or, in the year an Employee becomes eligible, within a reasonable period before the Employee becomes eligible). A Safe Harbor Notice that is provided at least 30 days, but not more than 90 days is deemed to be provided in a reasonable period. If the Plan is a Qualified Automatic Contribution Arrangement, the Safe Harbor Notice must contain the additional requirements of and be provided within the timeframe required under Treas. Reg. section 1.401(k)-3(k)(4) and any superseding guidance.

"Section 414(s) Compensation" means compensation as defined in Code section 414(s) and Treas. Reg. section 1.414(s)-1. The period used to determine an Employee's compensation for a Plan Year must be either the Plan Year or the calendar year ending within the Plan Year. Whichever period is selected by the Plan Administrator must be applied uniformly to determine the compensation of every Eligible Employee under the Plan for that Plan Year. The Plan Administrator may, however, limit the period taken into account under either method to that portion of the Plan Year or calendar year in which the Employee was an Eligible Employee, provided that this limit is applied uniformly to all Eligible Employees under the Plan for the Plan Year. In the case of a Highly Compensated Employee whose Actual Deferral Ratio is determined under Treas. Reg. section 1.401(k)-2(a)(3)(ii), period of participation includes periods under another plan for which Elective Deferrals are aggregated under Treas. Reg. section 1.401(k)-2(a)(3)(ii). Section 414(s) Compensation shall be limited by any dollar limits described in Code section 401(a)(17) applicable under the definition of Compensation. The Plan Administrator may include Post Severance Compensation and/or determine Section 414(s) Compensation using Post Year End Compensation.

"Section 415 Safe Harbor Option" means a definition of Compensation that:

(a)        Includes all of the following:

(1)        The Employee's wages, salaries, fees for professional services, and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Employer maintaining the Plan, to the extent that the amounts are includible in gross income (or to the extent amounts would have been received and includible in gross income but for an election under Code section 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457(b)). These amounts include, but are not limited to, commissions paid to salespersons, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan as described in Treas. Reg. section 1.62-2(c).

(2)        Amounts described in Code section 104(a)(3), 105(a), or 105(h), but only to the extent that these amounts are includible in the gross income of the Employee.

(3)        Amounts paid or reimbursed by the Employer for moving expenses incurred by an Employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are not deductible by the Employee under Code section 217.

(4)      The value of a nonstatutory option (which is an option other than a statutory option as defined in Treas. Reg. section 1.421-1(b)) granted to an Employee by the Employer, but only to the extent that the value of the option is includible in the gross income of the Employee for the taxable year in which granted.

(5)      The amount includible in the gross income of an Employee upon making the election described in Code section 83(b).

(6)      Amounts that are includible in the gross income of an Employee under the rules of Code section 409A or 457(f)(1)(A) or because the amounts are constructively received by the Employee.

(b)      Excludes all of the following:

(1)      Contributions (other than elective contributions described in Code section 402(e)(3), 408(k)(6), 408(p)(2)(A)(i), or 457(b)) made by the Employer to a plan of deferred compensation (including a simplified employee pension plan described in Code section 408(k) or a simple retirement account described in Code section 408(p), and whether or not qualified) to the extent that the contributions are not includible in the gross income of the Employee for the taxable year in which contributed. In addition, any distributions from a plan of deferred compensation (whether or not qualified) are not considered as compensation for Code section 415 purposes, regardless of whether such amounts are includible in the gross income of the Employee when distributed.

(2)      Amounts realized from the exercise of a nonstatutory option (which is an option other than a statutory option as defined in Treas. Reg. section 1.421-1(b)), or when restricted stock or other property held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture (see Code section 83 and regulations promulgated thereunder).

(3)      Amounts realized from the sale, exchange, or other disposition of stock acquired under a statutory stock option (as defined in Treas. Reg. section 1.421-1(b)).

(4)      Other amounts that receive special tax benefits, such as premiums for group-term life insurance (but only to the extent that the premiums are not includible in the gross income of the Employee and are not salary reduction amounts that are described in Code section 125).

(5)      Other items of remuneration that are similar to any of the items listed in paragraphs (b)(1) through (b)(4) of this section.

"Self-Employed Individual" means any individual who has Earned Income for the taxable year from the trade or business for which the Plan is established, including an individual who would have Earned Income but for the fact that the trade or business had no net profits for the taxable year. An individual shall not be a Self-Employed Individual unless he or she is also an owner of the Company.

"Statutory Compensation" shall have the meaning set forth in the Adoption Agreement.

Statutory Compensation must be determined without regard to any rules under Code section 3401(a) that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code section 3401(a)(2)). For any Self-Employed Individual, Statutory Compensation shall mean Earned Income.

Statutory Compensation shall include any amount which is contributed by the Company pursuant to a salary reduction agreement and which is not includible in the gross income of the Participant under Code sections 125, 402(e)(3), 402(h), 403(b), 132(f) or 457.

Statutory Compensation shall include other compensation paid by the later of: (a) 2-1/2 months after an Employee's severance from employment with the Company or (b) the end of the Limitation Year that includes the date of the Employee's severance from employment with the Company if: (1) the payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (e.g., overtime or shift differential), commissions, bonuses, or other similar payments; and (2) the payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Company. The exclusions from Compensation for payments after severance from employment do not apply to payments to a Participant who does not currently perform services for the Company by reason of Qualified Military Service to the extent those payments do not exceed the amounts the Participant would have received if the individual had continued to perform services for the Company rather than entering Qualified Military Service. To the extent applicable, Statutory Compensation shall include compensation paid to a Participant who is permanently and totally disabled. Back pay (as defined in Treas. Reg. section 1.415(c)-2(g)(8)) shall be treated as Statutory Compensation for the Limitation Year to which the back pay relates to the extent the back pay represents wages and compensation that would otherwise be included under this definition.

Notwithstanding any other provision hereof to the contrary, the annual Statutory Compensation of each Employee taken into account under the Plan for any Plan Year shall not exceed $200,000, (as adjusted under Code section 401(a)(17) for such year). If a Plan Year consists of fewer than 12 months, the applicable limitation under Code section 401(a)(17) will be multiplied by a fraction, the numerator of which is the number of months in such year, and the denominator of which is 12.

"<u>Termination</u>" and "<u>Termination of Employment</u>" means any absence from service that ends the employment of the Employee with the Employer.

"<u>Top-Heavy</u>" means a Plan that for any Plan Year beginning after 1983 meets the definition in Section 11.01.

"<u>Top-Heavy Ratio</u>" means:

(a)     If the Employer maintains one or more defined contribution plans (including any simplified employee pension plan) and the Employer has not maintained any defined benefit plan which during the 5-year period ending on the Determination Date(s) has or has had accrued benefits, the Top-Heavy Ratio for this Plan alone or for the Required or Permissive Aggregation Group, as appropriate, is a fraction, the numerator of which is the sum of the Account balances of all Key Employees as of the Determination Date(s), including any part of any Account balance distributed in the one-year period ending on the Determination Date(s) (5-year period ending on the Determination Date in the case of a distribution made for a reason other than severance from employment, death or Disability), and the denominator of which is the sum of all Account balances including any part of any Account balance distributed in the 1-year period ending on the Determination Date(s) (5-year period ending on the Determination Date in the case of a distribution made for a reason other than severance from employment, death or Disability), both computed in accordance with Code section 416 and the regulations thereunder. Both the numerator and denominator of the Top-Heavy Ratio are increased to reflect any contribution not actually made as of the Determination Date, but which is required to be taken into account on that date under Code section 416 and the regulations thereunder.

(b)     If the Employer maintains one or more defined contribution plans (including any simplified employee pension plan) and the Employer maintains or has maintained one or more defined benefit plans which during the 5-year period ending on the Determination Date(s) has or has had any accrued benefits, the Top-Heavy Ratio for any Required or Permissive Aggregation group, as appropriate, is a fraction, the numerator of which is the sum of Account balances under the aggregated defined contribution plan or plans for all Key Employees, determined in accordance with (a) above, and the Present Value of accrued benefits under the aggregated defined benefit plan or plans for all Key Employees as of the Determination Date(s), and the denominator of which is the sum of the Account balances under the aggregated defined contribution plan or plans for all Participants, determined in accordance with (a) above, and the Present Value of accrued benefits under the defined benefit plan or plans for all Participants as of the Determination Date(s), all determined in accordance with Code section 416 and the regulations thereunder. The accrued benefits under a defined benefit plan in both the numerator and denominator of the Top-Heavy Ratio are increased for any distribution of an accrued benefit made in the one-year period ending on the Determination Date.

(c)     For purposes of (a) and (b) above the value of Account balances and the Present Value of accrued benefits will be determined as of the most recent Valuation Date that falls within or ends with the 12-month period ending on the Determination Date, except as provided in Code section 416 and the regulations thereunder for the first and second Plan Years of a defined benefit plan. The Account balances and accrued benefits of a Participant (1) who is a Non-Key Employee but who was a Key Employee in a prior year, or (2) who has not been credited with at least one Hour of Service with any Employer maintaining the Plan at any time during the one-year period ending on the Determination Date will be disregarded. The calculation of the Top-Heavy Ratio, and the extent to which distributions, in-service withdrawals, rollovers, and transfers are taken into account will be made in accordance with Code section 416 and the regulations thereunder. Deductible Employee contributions will not be taken into account for purposes of computing the Top-Heavy Ratio. When aggregating plans the value of account balances and accrued benefits will be calculated with reference to the determination dates that fall within the same calendar year.

The accrued benefit of a Non-Key Employee shall be determined under: (x) the method, if any, that uniformly applies for accrual purposes under all defined benefit plans maintained by the Employer; or (y) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional rule of Code section 411(b)(1)(C).

"<u>Transfer Account</u>" means so much of a Participant's Account as consists of amounts transferred from another eligible retirement plan (and corresponding earnings) pursuant to Article 4 in a transaction that was not an eligible rollover distribution within the meaning of Code section 402.

"<u>Trust</u>" means the trust agreement specified in the Adoption Agreement. The Trust agreement contained in the Basic Plan Document will be used unless otherwise specified in the Adoption Agreement.

"Trust Fund" means all of the assets of the Plan held by the Trustee pursuant to Article 10 or held by an insurance company pursuant to section 403 of ERISA.

"Trustee" means the person or persons designated by the Plan Sponsor to serve as the Trustee of the Trust Fund to the extent the assets of the Plan are not held solely by an insurance company. If the Trustee is a corporate Trustee the Trustee will be a directed Trustee unless otherwise indicated in a separate agreement. If the Trustee is an individual Trustee, the Trustee will be a discretionary Trustee unless otherwise indicated in a separate agreement.

"Valuation Date" has the meaning specified in the Adoption Agreement. Notwithstanding anything in the Adoption Agreement to the contrary and in the event that there is to be a distribution, transfer of assets and/or division of assets from the Plan, the Plan Administrator may in its sole discretion declare a special Valuation Date, but only for that portion of the Plan that is not daily-valued to protect the interests of Participants in the Plan or the Participant receiving the distribution.

"Vesting Computation Period" means, for purposes of determining Years of Vesting Service, the period described in the Adoption Agreement.

"Voluntary Contribution" means an Employee contribution made to the Plan on an after-tax basis. The term Voluntary Contribution shall not include Roth Elective Deferrals.

"Voluntary Contribution Account" means so much of a Participant's Account as consists of a Participant's Voluntary Contributions (and corresponding earnings) made to the Plan.

"Year of Eligibility Service" means, with respect to any Employee, an Eligibility Computation Period during which he completes at least the service specified in the Adoption Agreement. If the Plan uses the elapsed time method: (a) "Year of Eligibility Service" means a twelve month period of time beginning on an Employee's Employment Commencement Date and ending on the date on which eligibility service is being determined; (b) in order to determine the number of whole Years of Eligibility Service under the elapsed time method, nonsuccessive periods of service and less than whole year periods of service shall be aggregated on the basis that twelve months of service (30 days are deemed to be a month in the case of the aggregation of fractional months) or 365 days of service are equal to a whole year of service; (c) an Employee will also receive credit for any Period of Severance of less than twelve consecutive months; and (d) if less than one Year of Eligibility Service is required in Article 3, such service shall be determined by substituting such period for "twelve month" and "Year" where they appear in this paragraph.

All eligibility service with the Employer is taken into account except that if permitted in the Adoption Agreement, the following service shall be disregarded in determining Years of Eligibility Service:

(a) One-Year Holdout. If an Employee has a One-Year Break in Service (One-Year Period of Severance to the extent the Plan uses the elapsed time method), Years of Eligibility Service before such period will not be taken into account until the Employee has completed a Year of Eligibility Service after returning to employment with the Employer.

(b) Rule of Parity. If an Employee does not have any nonforfeitable right to the Account balance derived from Employer contributions, Years of Eligibility Service before a period of five (5) consecutive One-Year Breaks in Service (One-Year Periods of Severance to the extent the Plan uses the elapsed time method) will not be taken into account in computing eligibility service. Elective Deferrals are taken into account for purposes of determining whether a Participant is a nonvested Participant for purposes of Code section 411(a)(6)(D)(iii).

If a Participant's Years of Eligibility Service are disregarded pursuant to the foregoing, such Participant will be treated as a new Employee for eligibility purposes. If a Participant's Years of Eligibility Service may not be disregarded pursuant to the foregoing, such Participant shall participate in the Plan pursuant to the terms of Article 3.

To the extent provided in the Adoption Agreement, eligibility service may also include service with employers other than the Employer.

"Year of Vesting Service" means a Vesting Computation Period during which the Employee completes at least the number of hours specified in the Adoption Agreement. If the Plan uses the elapsed time method: (a) "Year of Vesting Service" means a twelve month period of time beginning on an Employee's Employment Commencement Date and ending on the date on which vesting service is being determined; (b) in order to determine the number of whole Years of Vesting Service under the elapsed time method, nonsuccessive periods of service and less than whole year periods of service shall be aggregated on the basis that 12 months of service (30 days are deemed to be a month in the case of the aggregation of fractional months) or 365 days of service are equal to a whole year of service; and (c) an Employee will also receive credit for any Period of Severance of less than 12-consecutive months.

All Years of Vesting Service with the Employer are taken into account except that for an Employee who has five consecutive One-Year Breaks in Service (One-Year Periods of Severance to the extent the Plan uses the elapsed time method) all periods of service after such breaks in service/periods of severance shall be disregarded for the purpose of vesting the Employee's Employer-derived Account balance that accrued before such breaks in service/periods of severance, but except as otherwise expressly provided, both the service before and after such breaks in service/periods of severance shall count for purposes of vesting the Employee's Employer-derived Account balance that accrues after such breaks in service/periods of severance pursuant to Article 6.

In addition, if permitted in the Adoption Agreement, the following service shall be disregarded in determining Years of Vesting Service:

(a)     One-Year Holdout.  If an Employee has a One-Year Break in Service (One-Year Period of Severance to the extent the Plan uses the elapsed time method), Years of Vesting Service before such period will not be taken into account until the Employee has completed a Year of Vesting Service after returning to employment with the Employer.

(b)     Rule of Parity.  If an Employee does not have any nonforfeitable right to the Account balance derived from Employer contributions, Years of Vesting Service before a period of five (5) consecutive One-Year Breaks in Service (One-Year Periods of Severance to the extent the Plan uses the elapsed time method) will not be taken into account in computing vesting service. Elective Deferrals are taken into account for purposes of determining whether a Participant is a nonvested Participant for purposes of Code section 411(a)(6)(D)(iii).

(c)     Years of Vesting Service before age 18 and/or Years of Vesting Service before the Employer maintained this Plan or a predecessor plan will not be taken into account in computing vesting service to the extent provided in the Adoption Agreement.

To the extent provided in the Adoption Agreement, vesting service may also include service with employers other than the Employer.

## ARTICLE 3 PARTICIPATION

Section 3.01      ELECTIVE DEFERRALS AND VOLUNTARY CONTRIBUTIONS

Each Eligible Employee as of the Effective Date who was eligible to participate in the Plan with respect to Elective Deferrals and Voluntary Contributions on or before the Effective Date shall be a Participant eligible to make Elective Deferrals and Voluntary Contributions pursuant to Article 4 on the Effective Date. Each other Eligible Employee who was not a Participant in the Plan with respect to Elective Deferrals and Voluntary Contributions on the Effective Date shall become a Participant eligible to make Elective Deferrals and Voluntary Contributions on the date specified in the Adoption Agreement; provided that he is an Eligible Employee on such date. Notwithstanding the foregoing, a Participant shall be eligible to make Elective Deferrals and/or Voluntary Contributions only to the extent such contributions are permitted in the Adoption Agreement.

Section 3.02      MATCHING CONTRIBUTIONS

Each Eligible Employee as of the Effective Date who was eligible to participate in the Plan with respect to Matching Contributions on or before the Effective Date shall be a Participant eligible to receive Matching Contributions pursuant to Article 4 on the Effective Date. Each other Eligible Employee who was not a Participant in the Plan with respect to Matching Contributions on the Effective Date shall become a Participant eligible to receive Matching Contributions on the date specified in the Adoption Agreement; provided that he is an Eligible Employee on such date. Notwithstanding the foregoing, a Participant shall be eligible to receive Matching Contributions only to the extent such contributions are permitted in the Adoption Agreement.

Each Eligible Employee as of the Effective Date who was eligible to participate in the Plan with respect to safe harbor contributions on or before the Effective Date shall be a Participant eligible to receive safe harbor contributions pursuant to Article 4 on the Effective Date. Each other Eligible Employee who was not a Participant in the Plan with respect to safe harbor contributions on the Effective Date shall become a Participant eligible to receive safe harbor contributions on the date specified in the Adoption Agreement; provided that he is an Eligible Employee on such date. Notwithstanding the foregoing, a Participant shall be eligible to receive safe harbor contributions only to the extent such contributions are permitted in the Adoption Agreement.

Section 3.03      EMPLOYER CONTRIBUTIONS

(a)      Profit Sharing Contributions. Each Eligible Employee as of the Effective Date who was eligible to participate in the Plan with respect to Profit Sharing Contributions on or before the Effective Date shall be a Participant eligible to receive Profit Sharing Contributions pursuant to Article 4 on the Effective Date. Each other Eligible Employee who was not a Participant in the Plan with respect to Profit Sharing Contributions on the Effective Date shall become a Participant eligible to receive Profit Sharing Contributions on the date specified in the Adoption Agreement; provided that he is an Eligible Employee on such date. Notwithstanding the foregoing, a Participant shall be eligible to receive Profit Sharing Contributions only to the extent such contributions are permitted in the Adoption Agreement.

(b)      Pension Contributions. Each Eligible Employee as of the Effective Date who was eligible to participate in the Plan with respect to Pension Contributions on or before the Effective Date shall be a Participant eligible to receive Pension Contributions pursuant to Article 4 on the Effective Date. Each other Eligible Employee who was not a Participant in the Plan with respect to Pension Contributions immediately on the Effective Date shall become a Participant eligible to receive Pension Contributions on the date specified in the Adoption Agreement; provided that he is an Eligible Employee on such date. Notwithstanding the foregoing, a Participant shall be eligible to receive Pension Contributions only to the extent such contributions are permitted in the Adoption Agreement.

Section 3.04      TRANSFERS

If a change in job classification or a transfer results in an individual no longer qualifying as an Eligible Employee, such Employee shall cease to be a Participant for purposes of Article 4 (or shall not become eligible to become a Participant) as of the effective date of such change of job classification or transfer. Should such Employee again qualify as an Eligible Employee or if an Employee who was not previously an Eligible Employee becomes an Eligible Employee, he shall become a Participant with respect to the contributions for which the eligibility requirements have been satisfied as of the later of the effective date of such subsequent change of status or the date the Employee meets the eligibility requirements of this Article 3.

Section 3.05      TERMINATION AND REHIRES

If an Employee has a Termination of Employment, such Employee shall cease to be a Participant for purposes of Article 4 (or shall not become eligible to become a Participant; except as provided in Article 4) as of his Termination of Employment. An individual who has satisfied the applicable eligibility requirements set forth in Article 3, including passing an entry date, before his Termination date, and who is subsequently reemployed by the Company as an Eligible Employee, shall resume or become a Participant immediately upon his rehire date with respect to the contributions for which the eligibility requirements of this Article 3 have been satisfied. An individual who has not so qualified for participation on his Termination date, and who is subsequently reemployed by the Company as an Eligible Employee, shall be eligible to participate as of the later of the effective date of such reemployment or the date the individual meets the eligibility requirements of this Article 3. The determination of whether a rehired Eligible Employee satisfies the requirements of Article 3 shall be made after the application of any applicable break in service rules.

Section 3.06      <u>LIMITATIONS ON EXCLUSIONS</u>

(a)      Exclusions. Any Employee exclusion entered in the Adoption Agreement shall not be valid to the extent that such exclusion results in only Nonhighly Compensated Employees participating with the lowest amount of Compensation and/or lowest amount of service so that the Plan still meets the coverage requirements of Code section 410(b).

(b)      Coverage. The Plan must provide that an Eligible Employee who has attained age 21 and who has completed one Year of Eligibility Service (two Years of Eligibility Service may be used for contributions other than Elective Deferrals if the Plan provides a nonforfeitable right to 100% of the Participant's applicable Account balance after not more than 2 Years of Eligibility Service) shall commence participation in the Plan no later than the earlier of: (1) the first day of the first Plan Year beginning after the date on which such Eligible Employee satisfied such requirements; or (2) the date that is 6 months after the date on which he satisfied such requirements.

(c)      A Participant shall be treated as benefiting under the Plan for any Plan Year during which the Participant received or is deemed to receive an allocation in accordance with Treas. Reg. section 1.410(b)-3(a). Notwithstanding any provision of the Plan to the contrary, no Participant shall earn an allocation hereunder except as provided under the terms of the Plan as in effect on the last day of the Plan Year after giving effect to all retroactive amendments that may be permitted under applicable Internal Revenue Service procedures and other applicable law; including, without limitation, any amendment permitted under Treas. Reg. section 1.401(a)(4)-11.

(d)      Eligibility Waiver. If the Adoption Agreement provides that the Plan uses a New Comparability allocation formula, the Company may waive any of the Eligibility requirements to participate in the Plan with respect to Profit Sharing Contributions for an Employee who does not otherwise satisfy such requirements for purposes of the Company satisfying the Minimum Allocation Gateway requirement of Treasury regulations sections 1.401(a)(4)-8(b)(1)(vi) or 1.401(a)(4)-9(b)(2)(v)(D). However, in order to qualify for the waiver of the previous sentence, the Employee must also be: (1) a Nonhighly Compensated Employee, and (2) eligible for a non-elective allocation other than Profit Sharing Contributions (including, but not limited to, a Top-Heavy minimum or a 401(k) safe harbor non-elective allocation) that is taken into account in determining whether the Plan satisfies the nondiscrimination requirements of Code section 401(a)(4) with respect to Non-Elective Contributions.

(e)      Modifications. The completion of a 'fill-in' blank in the Adoption Agreement shall not be considered to be a modification to the Volume Submitter/Prototype document unless the language used to complete the 'fill-in' blank is contrary to the notes and guidelines that accompany the option. If a completed 'fill-in' blank violates/is contrary to the notes and guidelines that accompany the option, the language is a modification to the Volume Submitter/Prototype document.

Section 3.07      <u>PROCEDURES FOR ADMISSION</u>

The Plan Administrator shall prescribe such forms and may require such data from Participants as are reasonably required to enroll a Participant in the Plan or to effectuate any Participant elections made pursuant to this Article 3.

Section 3.08      <u>PARTICIPANTS RECEIVING DIFFERENTIAL MILITARY PAY</u>

To the extent selected in the Adoption Agreement and pursuant to Code section 414(u)(12), IRS Notice 2010-15 and any superseding guidance, a Participant receiving differential wage payments (as defined in Code section 3401(h)(2)) shall be treated as an Employee of the Employer making the payment and the differential wage payments may be treated as Compensation under the Plan to the extent selected in the Adoption Agreement.

## ARTICLE 4 CONTRIBUTIONS

Section 4.01          ELECTIVE DEFERRALS AND VOLUNTARY CONTRIBUTIONS

(a)          Elections.  Each Participant may execute elections pursuant to this Section 4.01 in the form and manner prescribed by the Plan Administrator.  The Plan Administrator shall provide each Participant with the forms necessary to elect the amount of Elective Deferrals and Voluntary Contributions.  Such election shall provide that a Participant may elect to reduce his Compensation by amounts specified in the Adoption Agreement.  Elective Deferrals may only be made with respect to amounts that are compensation under Code section 415(c)(3). Notwithstanding the foregoing, a Participant shall be eligible to make Elective Deferrals and/or Voluntary Contributions only to the extent such contributions are permitted in the Adoption Agreement.

(b)          Modifications.  As of the date a Participant first meets the eligibility requirements of Section 3.01, he may elect to contribute to the Plan.  Subsequent to that date, a Participant may elect to start, increase, reduce or totally suspend his elections pursuant to this Section 4.01, effective as of the dates specified in the Adoption Agreement.  If the Adoption Agreement specifies that the Plan is a safe harbor 401(k) plan, a Participant may modify his election during the 30 day period following receipt of the Safe Harbor Notice. However, if the Plan is a Qualified Automatic Contribution Arrangement, a Participant may modify his election during the timeframe outlined in section 4.01(g)(2) below.

(c)          Procedures.  A Participant shall make an election described in Subsection (b) in such form and manner as may be prescribed by procedures established by the Plan Administrator. Such procedures may include, but not be limited to: specifying that elections be made at such time in advance as the Plan Administrator may require, allowing on a nondiscriminatory basis a Participant to make a separate election as to any bonuses or other special pay, and/or requiring elections be made in a dollar amount or percentage of pay. A Participant's election regarding Elective Deferrals may be made only with respect to an amount which the Participant could otherwise elect to receive in cash and which is not currently available to the Participant. The Plan Administrator may allow Participants, on a nondiscriminatory basis, to defer on Compensation actually received after Termination of Employment.

(d)          Reduction in Elections.  The Plan Administrator may reduce or totally suspend a Participant's election if the Plan Administrator determines that such election may cause the Plan to fail to satisfy any of the requirements of Article 5.

(e)          Catch-up Contributions. If elected in the Adoption Agreement, all Participants who are eligible to make Elective Deferrals under this Plan shall be eligible to make Catch-up Contributions pursuant to Section 5.01(d).

(f)          Roth Elective Deferrals. To the extent provided in the Adoption Agreement, Participants shall be eligible to irrevocably designate some or all of their Elective Deferrals as either Pre-tax Elective Deferrals or Roth Elective Deferrals. However, the Plan Administrator may, on a nondiscriminatory basis, require a Participant to elect all of their Elective Deferrals as either Pre-tax Elective Deferrals or Roth Elective Deferrals. All elections shall be subject to the same election procedures, limits on modifications and other terms and conditions on elections as specified in the Plan. If Roth Elective Deferrals are not permitted, all Elective Deferrals shall be designated as Pre-tax Elective Deferrals.

(g)          Automatic Enrollment.  To the extent provided in the Adoption Agreement, upon the initial satisfaction of the eligibility requirements of Article 3 with respect to Elective Deferrals (and at the effective date of the addition of an automatic enrollment feature for current Participants), an Eligible Employee described in the Adoption Agreement shall be deemed to have made an Elective Deferral election in the amount provided in the Adoption Agreement; provided however that:

(1)          In a reasonable period of time before the deemed election takes place the Eligible Employee shall receive a notice that explains the automatic Elective Deferral election, his or her Compensation reduction percentage and the individual's right to elect to have no such Elective Deferrals made to the Plan or to alter the amount of those contributions, including the procedure for exercising that right and the timing for implementation of any such election. The Eligible Employee must have a reasonable opportunity to file an election to receive cash in lieu of Elective Deferrals before such deemed election is made. If the Adoption Agreement indicates the Plan intends to be an eligible automatic contribution arrangement (EACA), the notice must meet the additional requirements below:

(A)          The notice must be provided within a reasonable period before the beginning of each Plan Year or, in the Plan Year the Employee is first eligible to make a cash or deferred election (or first becomes covered under the automatic contribution arrangement as a result of a change in employment status), within a reasonable period before the Employee becomes a covered Employee. A notice satisfies the timing requirements of this paragraph only if it is provided sufficiently early so that the Employee has a reasonable period of time after receipt of the notice in order to make the election described under Treas. Reg. section 1.414(w)-1(e)(2).

(B)        The notice must describe how contributions made under the arrangement will be invested in the absence of any investment election.

(C)        The notice must describe the right to make a permissible withdrawal (as described in Section 4.01(g)(5)(B)), if applicable, and the procedures to elect such a withdrawal.

(2)        If the default election is pursuant to a Qualified Automatic Contribution Arrangement, the default election must be effective no later than the earlier of (i) the pay date for the second payroll period that begins after the date the notice is provided, or (ii) the first pay date that occurs at least 30 days after the notice is provided. Notwithstanding any delay in when the first default contribution is made, Non-Elective Contributions that are based on a full year's contributions and any rate of Matching Contributions that varies based on Compensation must be based on Compensation earned since the Participant was first eligible under the Plan.

(3)        Unless otherwise selected in the Adoption Agreement, if the Plan provides for Roth Elective Deferrals, all Elective Deferrals made under Subsection (g) shall be designated as Pre-tax Elective Deferrals.

(4)        Administrator Discretion. The Plan Administrator may, on a uniform and nondiscriminatory basis, provide that a new initial period shall begin for an Employee who is terminated for a full Plan Year and is rehired in a subsequent Plan Year. The Plan Administrator may also, on a uniform and nondiscriminatory basis, provide that an affirmative election expires at the end of each Plan Year and that the Employee must make a new affirmative election if he or she wants the prior rate of Elective Deferral to continue.

(5)        Elections to End or Reduce Automatic Enrollment

(A)        If the Adoption Agreement indicates the Plan is not an Eligible Automatic Contribution Arrangement (EACA) and the Plan Administrator elects to allow withdrawals, the Eligible Employee may file an election to receive cash in lieu of Elective Deferrals at the time such deemed election is made or within the 60 day period thereafter. Upon an election to receive cash in lieu of Elective Deferrals, the Participant shall not receive a refund of any Elective Deferral made. The Eligible Employee may make a subsequent affirmative election to make Elective Deferrals at a later date that is effective as provided in Section 4.01(b).

(B)        Eligible Automatic Contribution Arrangement (EACA). To the extent the Adoption Agreement indicates the Plan intends to be an eligible automatic contribution arrangement (EACA), if the Adoption Agreement allows for permissible withdrawals, an Employee for whom Elective Deferrals have been automatically made may elect to withdraw all of the contributions made on his or her behalf including earnings thereon to the date of the withdrawal. This withdrawal right is available only if the withdrawal election is made within the earlier of 90 or the number of days specified in the Adoption Agreement after the date of the first contribution under an EACA. Any Matching Contribution made with respect to the amount withdrawn (adjusted for allocable gains and losses) shall be forfeited. A withdrawal request will be treated as an affirmative election to stop having Elective Deferrals made unless the Employee affirmatively elects otherwise.

(i)        Election Period. The Plan Administrator may, on a uniform and nondiscriminatory basis, require an election period shorter than 90 days, provided that such election period be at least 30 days.

(ii)        Treatment of Refunds. Elective Deferrals refunded pursuant to this Subsection and any related Matching Contributions forfeited, shall not be taken into account in determining an Employee's Actual Deferral Ratio and Actual Contribution Ratio under the Actual Deferral Percentage(ADP) and ACP tests, and shall be disregarded in determining limitations under Code section 402(g). Any amounts refunded under this Paragraph are not eligible rollover contributions. No spousal consent is required for a refund under this Section.

(iii)        The provisions of this Section are separately applied to each portion of the Plan after the application of the mandatory disaggregation rules of Code section 410(b).

(iv)        Rehires. The Plan Administrator may, on a uniform and nondiscriminatory basis, for an Employee who is terminated for a full Plan Year and is rehired in a subsequent Plan Year provide that such Employee be treated as a new hire.

(v)        Fees. The amount distributed may be reduced by fees pursuant to Treas. Reg. section 1.414(w)-1(c)(3)(ii).

(vi) Refund Deadline. Effective for Plan Years beginning on or after January 1, 2010, the extended testing deadline of Code section 4979 shall apply only if all Employees eligible to make Elective Deferrals are covered under the EACA for the entire Plan Year (or the portion of the Plan Year the Employees are Eligible Employees).

(vii) The provisions of this Subsection are subject to any requirements under Code section 414(w), Code section 4979, the final Treasury Regulations issued February 24, 2009 and any corresponding guidance or regulations issued thereunder.

(h) Contribution and Allocation of Elective Deferrals and Voluntary Contributions. The Company shall contribute to the Plan with respect to each pay period an amount equal to the Elective Deferrals and Voluntary Contributions of Participants for such pay period, as determined pursuant to the elections in force pursuant to this Section. There shall be directly and promptly allocated to the Elective Deferral Account and Voluntary Contribution Account of each Participant the Elective Deferrals and Voluntary Contributions, respectively, contributed by the Company to the Plan by reason of any election in force with respect to that Participant.

Section 4.02 <u>MATCHING CONTRIBUTIONS</u>

(a) Amount of Matching Contributions. Subject to the limitations described in Article 5, the Company shall contribute to the Plan an amount specified in the Adoption Agreement on behalf of each Participant who made a Matched Employee Contribution and who has completed any service requirements specified in the Adoption Agreement. Notwithstanding the foregoing, a Participant shall be eligible to receive an allocation of Matching Contributions only to the extent such contributions are permitted in the Adoption Agreement.

(b) Contribution and Allocation of Matching Contributions. Matching Contributions shall be made to the Plan and promptly allocated to the Matching Contribution Accounts of Participants who meet the requirements of Subsection (a) and in the amount determined pursuant to Subsection (a) as soon as administratively feasible after the end of the periods described in the Adoption Agreement.

(1) The Company may make an additional Matching Contribution ("true up") on behalf of each Participant in the amount of the positive difference, if any, between the Matching Contributions that would have been allocated to his Account had such contributions been determined on the basis of Compensation for the entire Plan Year and the Matching Contributions previously allocated to such Participant's Account.

(2) If the Adoption Agreement specifies that the Catch-up Contributions specified in Section 5.01 shall not be matched, any Matching Contributions made on an Elective Deferral and, if applicable, a Voluntary Contribution that are subsequently classified as a Catch-up Contribution shall be forfeited to the extent allocated.

(3) If the Adoption Agreement provides that the Plan is intended to be a safe harbor 401(k) plan and safe harbor Matching Contributions are made separately with respect to each payroll period (or with respect to all payroll periods ending with or within each month or quarter of a Plan Year), such safe harbor Matching Contributions must be contributed to the Plan by the last day of the immediately following Plan Year quarter.

(c) Participant. For purposes of this Section, "Participant" shall mean an Eligible Employee who has met the eligibility requirements of Article 3 with respect to Matching Contributions.

(d) Coverage Failures. If the application of the rules described above causes the Plan to fail to meet the minimum coverage requirements of Code section 410(b)(1)(B) as of the last day of the Plan Year (the Plan does not benefit a percentage of Nonhighly Compensated Employees that is at least 70% of the percentage of Highly Compensated Employees who benefit under the Plan) for any Plan Year with respect to Matching Contributions because the Company's Matching Contributions have not been allocated to a sufficient number or percentage of Participants for such year, then the list of Participants eligible to share in such contributions for such year shall be expanded to include the Participants described in the Adoption Agreement.

(1) If the Adoption Agreement specifies that all non-excludable Participants shall be entitled to share in such contributions for such year, then the following additional Participants shall be eligible to share in such contributions:

(A) Any Participant who remains in the Employer's employ on the last day of such Plan Year; and

(B) Any Participant who completes at least 501 Hours of Service during such Plan Year (whether or not he remains in the Employer's employ on the last day of such Plan Year).

*ARTICLE 4 CONTRIBUTIONS*

       (2)      If the Adoption Agreement specifies that just enough Participants shall be entitled to share in such contributions for such year, then the following additional Participants shall be eligible to share in such contributions:

           (A)      The list of Participants eligible to share in the Company's Matching Contributions for such Plan Year shall be expanded to include the minimum number of Participants who would not otherwise be eligible as are necessary to satisfy the minimum coverage requirements under Code section 410(b)(1)(B). The specific Participants who shall become eligible to share in the Company's Matching Contribution for such Plan Year pursuant to this Paragraph (A) shall be those Participants who remain in the Company's employ on the last day of such Plan Year and who have completed the greatest amount of service during the Plan Year.

           (B)      If, after the application of Paragraph (A) above, the minimum coverage requirements of Code section 410(b)(1)(B) are still not satisfied, then the list of Participants eligible to share in the Company's Matching Contribution for such Plan Year shall be further expanded to include the minimum number of Participants who do not remain in the Company's employ on the last day of the Plan Year as are necessary to satisfy such requirements. The specific Participants who shall become eligible to share in the Company's contribution for such Plan Year pursuant to this Paragraph (B) shall be those Participants who had completed the greatest amount of service during the Plan Year before terminating their employment with the Employer.

       Notwithstanding the foregoing, the Plan Administrator always retains the option to meet the minimum coverage requirements of Code section 410(b) by using the average benefits test of Code section 410(b)(1)(C).

Section 4.03      <u>EMPLOYER CONTRIBUTIONS</u>

      (a)      Amount.

       (1)      Profit Sharing Contributions. Subject to the limitations described in Article 5, the Company shall, to the extent specified in the Adoption Agreement, make Profit Sharing Contributions to the Plan on behalf of each Participant who has completed any service requirements specified in the Adoption Agreement. Notwithstanding the foregoing, a Participant shall be eligible to receive an allocation of Profit Sharing Contributions only to the extent such contributions are permitted in the Adoption Agreement.

       (2)      Pension Contributions. Subject to the limitations described in Article 5, the Company shall make Pension Contributions to the Plan on behalf of each Participant who has completed any service requirements specified in the Adoption Agreement. Notwithstanding the foregoing, a Participant shall be eligible to receive an allocation of Pension Contributions only to the extent such contributions are permitted in the Adoption Agreement.

      (b)      Allocation of Employer Contributions.

       (1)      Allocation of Profit Sharing Contributions. Profit Sharing Contributions shall be allocated to the Profit Sharing Contribution Accounts of each Participant eligible to share in such allocations pursuant to Subsection (a)(1) in the manner described in the Adoption Agreement. If the Adoption Agreement provides that the Plan uses a New Comparability allocation formula, the Company may waive any requirements to receive an allocation for a Participant who does not otherwise satisfy such requirements for purposes of the Company satisfying the Minimum Allocation Gateway requirement of Treasury regulations section 1.401(a)(4)-8(b)(1)(vi) or 1.401(a)(4)-9(b)(2)(v)(D). However, in order to qualify for the waiver of the previous sentence, a Participant must also be: (1) a Nonhighly Compensated Employee; and (2) eligible for another allocation (including, but not limited to, a Top-Heavy minimum or a 401(k) safe harbor non-elective allocation) that is taken into account in determining whether the Plan satisfies the nondiscrimination requirements of Code section 401(a)(4) with respect to Non-Elective Contributions.

       (2)      Allocation of Pension Contributions. Pension Contributions shall be allocated to the Pension Contribution Accounts of each Participant eligible to share in such allocations pursuant to Subsection (a)(2) in the manner described in the Adoption Agreement.

       (3)      Notwithstanding the foregoing, for any Plan Year this Plan is integrated and benefits any Participant who benefits under another qualified plan or simplified employee pension plan, as defined in Code section 408(k), maintained by the Employer that provides for permitted disparity (or imputes disparity), Employer contributions shall be allocated to the Profit Sharing Account/Pension Contribution Account of each Participant in the ratio that such Participant's total Compensation bears to the total Compensation of all Participants. Effective for Plan Years beginning on or after January 1, 1995, the allocation to a Participant who exceeds his cumulative disparity limit shall be determined in accordance with applicable Treasury Regulations. The cumulative permitted disparity limit for a Participant is 35 total cumulative permitted disparity years. Total cumulative permitted disparity years means the number of years credited to the Participant for allocation or accrual purposes under this Plan or any other qualified plan or simplified employee pension plan (whether or not terminated) ever maintained by the Employer that provided for permitted disparity. For purposes of determining the Participant's cumulative permitted disparity limit, all Plan Years ending in the same calendar

year are treated as the same year. If the Participant has not benefited under a defined benefit or target benefit plan for any year beginning on or after January 1, 1994, the Participant has no cumulative disparity limit.

(c)     Participant.  For purposes of this Section, "Participant" shall mean an Eligible Employee who has met the eligibility requirements of Article 3 with respect to Profit Sharing Contributions or Pension Contributions, as applicable.

(d)     Coverage Failures.  If the application of the rules described above causes the Plan to fail to meet the minimum coverage requirements of Code section 410(b)(1)(B) as of the last day of the Plan Year (the Plan does not benefit a percentage of Non highly Compensated Employees that is at least 70% of the percentage of Highly Compensated Employees who benefit under the Plan) for any Plan Year with respect to contributions described in this Section 4.03 because such contributions have not been allocated to a sufficient number or percentage of Participants for such year, then the list of Participants eligible to share in such contributions for such year shall be expanded to include the Participants described in the Adoption Agreement.

(1)     If the Adoption Agreement specifies that all non-excludable Participants shall be entitled to share in such contributions for such year, then the following additional Participants shall be eligible to share in such contributions:

(A)     Any Participant who remains in the Employer's employ on the last day of such Plan Year; and

(B)     Any Participant who completes at least 501 Hours of Service during such Plan Year (whether or not he remains in the Employer's employ on the last day of such Plan Year).

(2)     If the Adoption Agreement specifies that just enough Participants shall be entitled to share in such contributions for such year, then the following additional Participants shall be eligible to share in such contributions:

(A)     The list of Participants eligible to share in such contributions for such Plan Year shall be expanded to include the minimum number of Participants who would not otherwise be eligible as are necessary to satisfy the minimum coverage requirements under Code section 410(b)(1)(B).  The specific Participants who shall become eligible to share in such contributions for such Plan Year pursuant to this Paragraph (A) shall be those Participants who remain in the Company's employ on the last day of such Plan Year and who have completed the greatest amount of service during the Plan Year.

(B)     If, after the application of Paragraph (A) above, the minimum coverage requirements of Code section 410(b)(1)(B) are still not satisfied, then the list of Participants eligible to share in such contributions for such Plan Year shall be further expanded to include the minimum number of Participants who do not remain in the Company's employ on the last day of the Plan Year as are necessary to satisfy such requirements.  The specific Participants who shall become eligible to share in the Company's contribution for such Plan Year pursuant to this Paragraph (B) shall be those Participants who had completed the greatest amount of service during the Plan Year before terminating their employment with the Employer.  Individuals similarly situated will be treated the same.

Notwithstanding the foregoing, the Plan Administrator always retains the option to meet the minimum coverage requirements of Code section 410(b) by using the average benefits test of Code section 410(b)(1)(C).

(e)     Disability.  In addition to the foregoing, if the Adoption Agreement specifies that contributions described in this Section shall be allocated to Disabled Participants, a Participant who does not meet the requirements of Subsection (a) due to Disability shall be eligible to share in such contributions (including Disabled Participants that have Terminated Employment); provided that such Disability would also constitute a disability pursuant to Code section 22(e).  The Company shall allocate the applicable contributions on behalf of each such Disabled Participant on the basis of the Compensation each such Participant would have received for the Limitation Year if the Participant had been paid at the rate of Compensation paid immediately before suffering a Disability.  Contributions allocated to Participants suffering a Disability pursuant to this Subsection shall be fully (100%) vested when made.  Such allocations shall cease on the first to occur of the following:

(1)     the last day of the Plan Year in which occurs the anniversary specified in the Adoption Agreement of the date the Plan Administrator determines that the Participant's Disability commenced;

(2)     the date the Participant ceases to suffer from a Disability;

(3)     the date the Participant refuses to submit to a periodic examination by the Company or its agent to determine the existence of a Disability; or

(4)     the date the Participant dies.

Section 4.04     SAFE HARBOR CONTRIBUTIONS AND QUALIFIED NON-ELECTIVE/MATCHING CONTRIBUTIONS

(a)     Amount of Safe Harbor Contributions.

(1)     In General. If the Adoption Agreement specifies that the Plan will satisfy the 401(k) safe harbor provisions, the Company shall, subject to the limitations described in Article 5, make Qualified Non-Elective Contributions and/or Qualified Matching Contributions on behalf of each Employee who is eligible to make Elective Deferrals during the Plan Year, and meets any additional requirements provided in the Adoption Agreement to receive safe harbor contributions. In the absence of an election in the Adoption Agreement such Qualified Non-Elective Contributions shall be made on behalf of each Employee who is eligible to make Elective Deferrals during the Plan Year. Qualified Non-Elective Contributions described in this Subsection (1) shall be allocated to the Qualified Non-Elective Contribution Account of each Participant eligible to share in such allocations in the ratio that such Participant's Compensation bears to the Compensation of all eligible Participants.

(2)     Contingent Amendment. This Subsection shall apply if the Adoption Agreement specifies that a Non-Elective Contribution described in Subsection (1) will be made to the Plan only if the Plan Sponsor amends the Plan pursuant to Section 4.04(a)(2). An amendment to the Plan pursuant to Section 13.01 that requires that the Company make the Qualified Non-Elective Contributions described in Subsection (1) shall be deemed to be an amendment of the Plan but only with respect to the Plan Year for which such amendment is made. Such amendment shall be made after the first day of the Plan Year and no later than 30 days before the last day of the Plan Year and shall be effective as of the first day of the Plan Year. The Plan Administrator shall provide a contingent notice each year and shall provide a follow-up notice only in the event that such amendment is adopted. The contingent notice and, if applicable, the follow-up notice, shall be provided pursuant to Treas. Reg. section 1.401(k)-3(f) and any superseding guidance. If the amendment described in this Subsection is not made, the Plan will not satisfy the 401(k) safe harbor provisions and the Plan will be subject to the nondiscrimination requirements of Section 5.02.

(b)     Additional Qualified Non-Elective Contributions. In addition to the safe harbor contributions described above, the Company in its discretion may make additional Qualified Non-Elective Contributions for the benefit of such Participants as determined by the Company. A Qualified Non-Elective Contribution of a Nonhighly Compensated Employee will not be taken into account in satisfying the requirements of Section 5.02 to the extent it: (1) does not qualify for inclusion in the Actual Deferral Ratio; or (2) is a disproportionate contribution within the meaning of Treas. Reg. sections 1.401(k)-2(a)(6)(iv) and/or 1.401(m)-2(a)(6)(iv) and any superseding guidance. Notwithstanding the foregoing, Qualified Non-Elective Contributions that are made in connection with an Employer's obligation to pay prevailing wages under the Davis-Bacon Act (46 Stat. 1494), Public Law 71-798, Service Contract Act of 1965 (79 Stat. 1965), Public Law 89-286, or similar legislation can be taken into account for a plan year for a Nonhighly Compensated Employee to the extent such contributions do not exceed 10% of that Nonhighly Compensated Employee's Compensation.

(1)     Participants Eligible to Receive Qualified Non-Elective Contributions. The Company may determine, in its discretion whether allocations of Qualified Non-Elective Contributions shall be limited to Participants who are credited with at least a certain number of Hours of Service during the Plan Year and/or who remain in the Company's employ on the last day of the Plan Year. The Company may limit Qualified Non-Elective Contributions contributed under this Subsection to Nonhighly Compensated Employees eligible to make Elective Deferrals during the Plan Year that meet any additional requirements determined by the Company. The Company may also provide Qualified Non-Elective Contributions to those in any or all portions of a disaggregated plan as provided in Section 5.03.

(2)     Permissible Methods of Allocation. The Company in its discretion may make additional Qualified Non-Elective Contributions in such manner as specified in the Adoption Agreement. If the Company decides to make Bottom Up Qualified Non-Elective Contributions, the Qualified Non-Elective Contributions may be allocated as follows:

(A)     First to the Qualified Non-Elective Contribution Account of the Participant who is a Nonhighly Compensated Employee with the lowest Compensation and is eligible to share in such allocations in an amount determined by the Company not to exceed 5% of such Participant's Compensation (the "Base QNEC Rate"). If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to other Participants who are Nonhighly Compensated Employees eligible to share in such allocations with the next lowest Compensation in the amount of the Base QNEC Rate of Compensation until such contributions are fully allocated to one half of eligible Nonhighly Compensated Employees within the meaning of Treas. Reg. section 1.401(k)-2(a)(6)(iv)(B) (the "Base NHCEs"). Notwithstanding the foregoing, the Base QNEC Rate may exceed 5%; provided, that the Company contribution is sufficient to provide the Base QNEC Rate to all Base NHCEs.

(B)     If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to the Participant who is a Nonhighly Compensated Employee with the lowest Compensation and is eligible to

share in such allocations in an additional amount not to exceed the Base QNEC Rate contributed pursuant to Paragraph (1) above (the "Additional QNEC Rate") of such Participant's Compensation. The total of the Base QNEC Rate and the Additional QNEC Rate may not exceed twice the Plan's representative contribution rate as defined in Treas. Reg. section 1.401(m)-2(a)(6)(v)(B). If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to other Participants who are Nonhighly Compensated Employees eligible to share in such allocations with the next lowest Compensation in the amount of the Additional QNEC Rate of such Participant's Compensation until such contributions are fully allocated to the Base NHCEs.

(C)     If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to the Participant who is a Nonhighly Compensated Employee eligible to share in such allocations with the lowest Compensation and who is not a Base NHCE in the amount equal to the sum of the Base QNEC Rate and the Additional QNEC Rate of such Participant's Compensation. If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to other Participants who are Nonhighly Compensated Employees eligible to share in such allocations with the next lowest Compensation and who are not a Base NHCEs in the amount equal to the sum of the Base QNEC Rate and the Additional QNEC Rate of such Participant's Compensation until such contributions are fully allocated to all eligible Nonhighly Compensated Employees who are not Base NHCEs.

(D)     If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to Participants eligible to share in such allocations in the ratio that each Participant's Compensation bears to the Compensation of all eligible Participants.

(E)     Notwithstanding the foregoing, the Company may instead allocate the Qualified Non-Elective Contributions as a flat dollar amount pursuant to this Subsection (2). The Company may first allocate a flat dollar amount determined by the Company (the "Base QNEC Dollar Amount") to the Qualified Non-Elective Contribution Account of the Participant who is a Nonhighly Compensated Employee with the lowest Compensation and is eligible to share in such allocations. If any Qualified Non-Elective Contributions remain after the foregoing, the Company may then allocate Qualified Non-Elective Contributions to other Participants who are Nonhighly Compensated Employees eligible to share in such allocations with the next lowest Compensation in the amount of the Base QNEC Dollar Amount until such contributions are fully allocated to the eligible Nonhighly Compensated Employees. Such Qualified Non-Elective Contributions may be used to satisfy the provisions of Section 5.02 to the extent not considered disproportionate under Subsection 5.03(f) below.

(c)     Qualified Non-Elective Contributions: (1) shall be allocated to the Participant's Account as of a date within that year within the meaning of Treas. Reg. section 1.401(k)-2(a)(4)(i)(A); (2) shall be nonforfeitable when made unless attributable to withdrawal rights under an Eligible Automatic Contribution Arrangement or Qualified Automatic Contribution Arrangement; and (3) shall be distributed only under the rules applicable for Elective Deferrals in accordance with Treas. Reg. section 1.401(k)-1(d) (attainment of age 59-1/2, severance from employment, death, or Disability, but not hardship).

(d)     Qualified Matching Contributions. In addition to any Qualified Matching Contributions provided in the Adoption Agreement, the Company in its discretion may make Matching Contributions designated as Qualified Matching Contributions for the benefit of such Participants and in such manner determined at the discretion of the Company. The Company may determine, in its discretion whether allocations of Qualified Matching Contributions shall be limited to Participants who are credited with at least a certain number of Hours of Service during the Plan Year and/or who remain in the Company's employ on the last day of the Plan Year. Such Qualified Matching Contributions shall be nonforfeitable when made unless attributable to withdrawal rights under an Eligible Automatic Contribution Arrangement or Qualified Automatic Contribution Arrangement and may only be distributed upon the Participant's: (1) attainment of age 59-1/2; or (2) severance from employment, death, or Disability.

(e)     In addition, the Company may, in its discretion, make Qualified Non-Elective Contributions or Qualified Matching Contributions for a Plan Year that shall be allocated in the manner prescribed by the Company to correct any operational or demographic failure pursuant to any correction program or policy established by the Internal Revenue Service or the Department of Labor.

Section 4.05     <u>ROLLOVER CONTRIBUTIONS</u>

(a)     To the extent provided in the Adoption Agreement, the Plan Administrator may direct the Trustee to accept Rollover Contributions made in cash or other form acceptable to the Trustee. Rollover Contributions shall be allocated to the Participant's/Eligible Employee's (to the extent elected in the Adoption Agreement) Rollover Contribution Account. The Plan may accept the following Rollover Contributions to the extent allowed by the Plan Administrator in its sole discretion:

*ARTICLE 4 CONTRIBUTIONS*

(1)       A rollover from a plan qualified under Code section 401(a) or 403(a) if the contribution qualifies as a tax-free rollover as defined in Code section 402(c).  If it is later determined that the amount received does not qualify as a tax-free rollover, the amount shall be refunded to the Eligible Employee.

(2)       A rollover from a "Conduit Individual Retirement Account", as determined in accordance with procedures established by the Plan Administrator and only if the contribution qualifies as a tax-free rollover as defined in Code section 402(c). If it is later determined that the amount received does not qualify as a tax-free rollover, the amount shall be refunded to the Eligible Employee.

(3)       A direct rollover of an eligible rollover distribution of after-tax employee contributions from a qualified plan described in Code section 401(a) or 403(a). The Plan shall separately account for amounts so transferred, including separately accounting for the portion of such contribution which is includible in gross income and the portion of such contribution which is not so includible.

(4)       Any rollover of an eligible rollover distribution from an annuity contract described in Code section 403(b).  The Plan shall separately account for after-tax amounts so transferred, including separately accounting for the portion of such contribution which is includible in gross income and the portion of such contribution which is not so includible.

(5)       Any rollover of an eligible rollover distribution from an eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

(6)       Any rollover contribution of the portion of a distribution from an individual retirement account or annuity described in Code sections 408(a) or 408(b) that is eligible to be rolled over and would otherwise be includible in gross income.

(7)       If the Plan permits Roth Elective Deferrals, the Plan may accept a Rollover Contribution to a Roth Elective Deferral Account only if it is a direct rollover from another Roth elective deferral account under an applicable retirement plan described in Code section 402A(e)(1) and only to the extent the rollover is permitted under the rules of Code section 402(c).

(8)       Any additional rollover contribution as may be permitted by applicable law.

(b)       In-Plan Roth Rollovers. To the extent provided in the Adoption Agreement and to the extent permitted by Code section 402A(c), Notice 2010-84 and any superseding guidance, a distribution from the Plan other than from a designated Roth Account that is an eligible rollover distribution (as defined in Code section 408A(e)) may be rolled over to a designated Roth Account maintained under this Plan for the benefit of the individual to whom the distribution is made. The Plan will maintain such records as are necessary for the proper reporting of In-Plan Roth Rollovers. If In-Plan Roth Rollovers are permitted for all distributions permitted under the Code and to the extent provided in the Adoption Agreement, In-Plan Roth Rollovers are permitted at the following times:

(1)       Upon the attainment of the age specified in the Adoption Agreement except Elective Deferrals, Qualified Non-Elective Contributions, Qualified Matching Contributions and the portion of any Account that has been used to satisfy the safe harbor requirements of Code sections 401(k)(12) or 401(k)(13) and/or 401(m)(11) or 401(m)(12) shall not be eligible for withdrawal until the Participant attains age 59-1/2.

(2)       After-tax, Rollover and Voluntary Accounts can be converted to an In-Plan Roth Rollover Account at any time.

(3)       From a Participant's Matching Contribution Account and/or Profit Sharing Contribution Account after 5 years of Participation. In-service withdrawals are allowed from a Participant's Matching Contribution Account and/or Profit Sharing Contribution Account on funds held for at least 2 years. Withdrawals after 5 years of Participation and/or 2 years of accumulation are only permitted from the Matching Contribution Account to the extent such Account has not been used to satisfy the requirements of Code sections 401(k)(12) or 401(k)(13) and/or 401(m)(11) or 401(m)(12) or to the extent such contributions has not been treated as Qualified Matching Contributions.

(4)       Immediately after Termination of Employment.

(c)       Plan Administrator Procedures. The Plan Administrator may establish uniform procedures that include, but are not limited to, prescribing limitations on the frequency and minimum amount of rollovers; provided, that no procedures involving minimum amounts shall prescribe a minimum withdrawal greater than $1,000.

Section 4.06       TRANSFERS

The Trustee may be directed to accept a direct transfer of assets, made without the consent of the affected Employees, from the trustee of any other qualified plan described in Code section 401(a) to the extent permitted by the Code and the regulations and rulings thereunder. In the event assets are transferred to the Plan pursuant to the foregoing sentence, the transferred assets shall be accounted for separately in the Transfer Account of the affected Employees to the extent necessary to preserve a more favorable vesting schedule or any other legally-protected benefits available to such Employees under the transferor plan. The Plan Administrator shall establish a vesting schedule for the Transfer Account; provided that such schedule is not less favorable than the vesting schedule under the transferor plan.

Section 4.07     MILITARY SERVICE

(a)     In General. Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to Qualified Military Service shall be provided in accordance with Code section 414(u).

(b)     Death or Disability During Qualified Military Service. To the extent provided in the Adoption Agreement, pursuant to Code section 414(u)(9), IRS Notice 2010-15 and any superseding guidance; a Participant who dies or becomes Disabled while performing Qualified Military Service will be treated as if he had been employed by the Company on the day preceding death or Disability and terminated employment on the day of death or Disability and receive benefit accruals related to the period of Qualified Military Service as provided under Code section 414(u)(8), except as provided below:

(1)     All Participants eligible for benefits under the Plan by reason of this Section shall be provided benefits on reasonably equivalent terms.

(2)     For the purposes of applying Code section 414(u)(8)(C), a Participant's Elective Deferrals shall be determined based on the Participant's average actual contributions for:

(A)     the 12-month period of service with the Employer immediately prior to Qualified Military Service, or

(B)     if service with the Employer is less than such 12-month period, the actual length of continuous service with the Employer.

Section 4.08     TIMING OF CONTRIBUTIONS

Amounts contributed to the Plan with funds provided by Participants will be remitted to the Trustee as soon as practicable, but no later than the fifteenth (15th) business day of the month following the month in which such contributions were received or withheld from the Participant's Compensation unless a longer period is permitted under applicable law or regulation.

Section 4.09     ARRANGEMENTS ADOPTED BY MORE THAN ONE EMPLOYER

In General. This Section applies to arrangements adopted by more than one unrelated entity. Unrelated entities may participate in the Plan as described under Section 4.09(a) as a multiple employer plan within the meaning of ERISA section 3(2) and Code section 413(c) ("Multiple Employer Plan") or 4.09(b) as an aggregated plan arrangement for multiple plans sharing a Master Adoption Agreement and who are not a Multiple Employer Plan ("Aggregated Plan Arrangement"). The provisions of Section 4.09(c) shall apply to plans described under 4.09(a) or 4.09(b).

(a)     Multiple Employer Plans. This Section shall apply if the Plan is a Multiple Employer Plan.

(1)     Method of Adoption. The Plan Sponsor shall execute a Master Adoption Agreement and each Adopting Entity shall execute a joinder/participation agreement which contains only those Adoption Agreement provisions, if any, which may be overridden by an entity other than the Plan Sponsor. The execution of the joinder/participation agreement by an Adopting Entity shall constitute the adoption of the same plan as the Plan Sponsor and not the adoption of a separate plan for the Adopting Entity. An Adopting Entity may amend its joinder/participation agreement at any time with the approval of the Plan Sponsor. However, an Adopting Entity may not modify the definition of Plan Administrator, Limitation Year or Plan Sponsor. If the Adoption Agreement provides that the Plan is a prototype plan, an Adopting Entity that modifies the Plan (except to the extent necessary to satisfy section 415 and 416 because of the required aggregation of multiple plans, and other amendments as permitted by section 5.06, 5.09 & 19.03 of Rev. Proc. 2011-49) will be considered to have terminated its participation in the Plan. The Plan Sponsor and all Adopting Entities acknowledge that the Plan is a Multiple Employer Plan subject to the rules of Code section 413(c) and the regulations thereunder which are herein incorporated by reference. Plan Sponsor and all Adopting Entities also acknowledge the specific annual reporting requirements, and different procedures for obtaining determination letters from the Internal Revenue Service regarding the qualified status of the Plan.

(2)     Definitions. The following terms are modified as used in the Plan:

    (A)     "Adopting Entity" means an entity who executes a joinder/participation agreement.

    (B)     "Adoption Agreement" means the Adoption Agreement for the Plan Sponsor. For any Adopting Entity, Adoption Agreement means the Adoption Agreement as amended in that entity's joinder/participation agreement (as provided in Section 4.09(a)(1)).

    (C)     "Plan Sponsor" means the executor of the Master Adoption Agreement described in Section 4.09(a)(1).

(3)     Application of Code section 413(c). The provisions of Code section 413(c) shall apply to the Plan and this Section shall be interpreted consistent with Code section 413(c) and any applicable guidance.

    (A)     Eligibility Service. Code section 410(a) shall be applied as if all Employees of each Employer who maintains the Plan were employed by a single Employer. An Employee who transfers employment between Adopting Entities and/or the Plan Sponsor shall not be considered to have a Termination of Employment.

    (B)     Exclusive Benefit. For purposes of Code section 401(a), in determining whether the Plan of an Employer is for the exclusive benefit of its Employees and their Beneficiaries all Participants shall be considered to be its Employees.

    (C)     Vesting. Code section 411 shall be applied as if all Employers who maintain the Plan constituted a single Employer, except that the application of any rules with respect to breaks in service shall be made under regulations prescribed by the Secretary of Labor.

    (D)     Funding. To the extent the Plan is subject to Code section 412, the provisions of Code section 413(c)(4) and 413(c)(5) shall apply.

(4)     Other Rules.

    (A)     Contributions and forfeitures arising hereunder must be restricted to Participants who are employed by the entity under which the forfeitures arose.

    (B)     Each Employer will separately determine Actual Contribution and Actual Deferral Ratios, the minimum coverage requirements of Code section 410(b) and Code section 401(a)(4) testing as provided in Treas. Reg. section 1.413-2(a)(3)(ii).

    (C)     Top-Heavy. Article 11 applies separately to each Employer as provided in Treas. Reg. section 1.416-1, Q&A G-2.

    (D)     Maximum Annual Additions. Except as provided in Treas. Reg. section 1.415(f)-1(g)(2)(i) (regarding aggregation of multiemployer plans with plans other than multiemployer plans), for purposes of applying Section 5.05, Annual Additions attributable to a Participant from all of the Employers maintaining the Plan must be taken into account. Furthermore, in applying the limitations of Section 5.05 with respect to a Participant, the total Statutory Compensation received by the Participant from all of the Employers maintaining the Plan is taken into account under the Plan, unless Treas. Reg. section 1.415-1(e) and any superseding guidance specifies otherwise.

    (E)     For purposes of determining a Participant's Required Beginning Date in a Prototype plan, under Section 7.05, a Participant shall be considered a 5% owner in a year in which the Participant is both a 5% Owner and an Employee of an Adopting Entity. For purposes of determining a Participant's Required Beginning Date under Section 7.05 in a Volume Submitter plan, a Participant may be considered a More Than 5% Owner with one Employer and not a More Than 5% Owner with another Employer.

(b)     Aggregated Plan Arrangements. This Section shall apply if the Plan is an Aggregated Plan Arrangement.

(1)     Method of Adoption. Each Adopting Entity shall execute a joinder/participation agreement in which the Adopting Entity adopts the Master Adoption Agreement. The joinder/participation agreement may also contain Adoption Agreement provisions, if any, which may be overridden by an Adopting Entity. However, an Adopting Entity may not modify the definition of Plan Administrator. The execution of the joinder/participation agreement by an Adopting Entity shall constitute the adoption of a separate plan for the Adopting Entity and not the adoption of the same plan as any other Adopting Entity. An Adopting Entity may amend its joinder/participation agreement at any time with the approval of the Plan Administrator. The Adopting Entity may choose to allow the Plan Administrator to amend the Master Adoption Agreement on its behalf.

*ARTICLE 4 CONTRIBUTIONS*

(2)      Definitions for purposes of this Subsection 4.09(b):

(A)      "Adopting Entity" means an entity who adopts a joinder/participation agreement as its separate plan.

(B)      "Master Adoption Agreement" means an Adoption Agreement that contains a complete set of responses to all possible Plan provisions.

(3)      Application of Code section 413(c). The provisions of Code section 413(c) shall not apply to the Plan. Each Adopting Entity's plan shall constitute a separate plan.

(c)      Provisions that apply to Multiple Employer Plans and Aggregated Plan Arrangements.

(1)      No Modification to Pre-Approved Language. The execution of a joinder/participation agreement shall not be considered a modification to the IRS pre-approved language of the Plan.

(2)      Termination of Participation. If an Adopting Entity terminates its participation in the Plan (or is terminated by the Plan Administrator) the Plan Administrator may require the terminating entity to do any of the following:

(A)      Successor Plan. Set up a successor plan unless the entity sponsors another eligible plan to receive a transfer of assets.

(B)      Proof of Dissolution. In the event the Adopting Entity terminates its participation in the Plan by reason of ceasing business operations, the managing officials of such entity shall present the Plan Administrator articles of dissolution or other documentation as required by the Plan Administrator. Once acceptable documentation has been provided to the Plan Administrator, the Account balance of each affected Participant will be nonforfeitable and the affected Participant Accounts shall be distributed in a single lump sum payment unless otherwise required pursuant to Article 7.

(C)      Hold Assets for Twelve Months. The Plan Administrator may hold the assets of Participants that are not otherwise eligible for distribution for a period of twelve months. Thereafter, provided the Adopting Entity has not set-up a plan eligible to receive the assets, the Account balance of each affected Participant will be nonforfeitable and the affected Participant Accounts shall be distributed in a single lump sum payment unless otherwise required pursuant to Article 7.

(D)      The determination of whether or not there is a termination, within the meaning of Code section 411(d)(3), is made solely by reference to the rules of Code sections 411(d)(3) and 413(c)(3).

(3)      Fiduciary Act to Join the Plan. By executing a joinder/participation agreement, each Adopting Entity, acting as a fiduciary with respect to its current and future Employees, thereby ratifies and confirms the appointment of all parties to the Plan and all action taken to establish and maintain the Plan. The term parties to the Plan in the preceding sentence shall include, but not be limited to, the Plan Administrator, Trustee and Investment Fiduciary.

(4)      Each Adopting Entity shall be jointly and severally liable for Plan expenses.

(5)      Each Adopting Entity shall indemnify and hold harmless the Plan Administrator (and their delegates), any other Adopting Entities, any person serving as the Trustee and/or Investment Fiduciary from all claims, liabilities, losses, damages and expenses, including reasonable attorneys' fees and expenses for its failure to operate in accordance with the Plan or any intentional or negligent act or omission with respect to the Plan including but not limited to failure of oversight and or appointment. The Plan Administrator may in its discretion utilize any IRS or DOL correction program and any fees or costs associated with such program are the responsibility of the offending Adopting Entity.

Section 4.10      <u>SIMPLE 401(K) PROVISIONS</u>

(a)      This Section 4.10 shall apply only if the Adoption Agreement provides that this is a SIMPLE 401(k) Plan. Rules of Application:

(1)      The provisions of this Section 4.10 shall apply for a year only if:

(A)      The Employer is an "eligible employer"; and

(B)    No contributions are made, or benefits accrued, for services during the year, on behalf of any Eligible Employee under any other plan, contract, pension, or trust described in Code section 219(g)(5)(A) or (B), maintained by the Employer.

(2)    To the extent that any other provision of the Plan is inconsistent with the provisions of this Section, the provisions of this Section govern.

(b)    Definitions.

(1)    "Compensation" means, for purposes of Subsections (b)(2), (c)(1) and (c)(2) of this Section, the sum of the wages, tips, and other compensation from the Employer subject to federal income tax withholding (as described in Code section 6051(a)(3)) and the Employee's salary reduction contributions made under this or any other Code section 401(k) plan, and, if applicable, elective deferrals under a Code section 408(p) SIMPLE IRA Plan, a SARSEP, or a Code section 403(b) annuity contract, compensation deferred under a Code section 457 plan required to be reported by the Employer on Form W-2 (as described in Code section 6051(a)(8)). Compensation also includes amounts paid for domestic service (as described in Code section 3401(a)(3)). For Self-Employed Individuals, Compensation means net earnings from self-employment determined under Code section 1402(a) prior to subtracting any contributions made under this Plan on behalf of the individual. The provisions of the Plan implementing the limit on Compensation under Code section 401(a)(17) apply to the Compensation under Subsection (c).

(2)    An "eligible employer" means, with respect to any year, an Employer that had no more than 100 Employees who received at least the amount of Compensation from the Employer specified in the Adoption Agreement for the preceding year. In applying the preceding sentence, all Employees of controlled groups of corporations under Code section 414(b), all Employees of trades or businesses (whether incorporated or not) under common control under Code section 414(c), all Employees of affiliated service groups under Code section 414(m), and leased employees required to be treated as the Employer's Employees under Code section 414(n), are taken into account. An eligible employer that elects to have this Section 4.10 apply to the Plan and that fails to be an eligible employer for any subsequent year, is treated as an eligible employer for the two (2) years following the last year the Employer was an eligible employer.  If the failure is due to any acquisition, disposition, or similar transaction involving an eligible employer, the preceding sentence applies only if the provisions of Code section 410(b)(6)(C)(i) are satisfied.

(3)    "Eligible Employee" means, for purposes of this Section 4.10, any Employee who is entitled to make Elective Deferrals under the terms of the Plan.

(4)    "Year" means the calendar year.

(c)    Contributions.

(1)    Salary Reduction Contributions.

(A)    Each Eligible Employee may make a salary reduction election to have his or her Compensation reduced for the year in any amount selected by the Employee subject to the limitation in Subsection (c)(1)(B). The Employer will make a salary reduction contribution to the Plan, as an Elective Deferral, in the amount by which the Employee's Compensation has been reduced.

(B)    The total salary reduction contribution for any Employee cannot exceed the limitation on salary reduction contributions in effect for the year. The limitation on salary reduction contributions was $10,000 for 2005. After 2005, the $10,000 limit is adjusted by the Secretary of the Treasury for cost-of-living increases under Code section 408(p)(2)(E). Any such adjustments will be in multiples of $500. The amount of an Employee's salary reduction contributions permitted for a year is increased for Employees aged 50 or over by the end of the Year by the amount of allowable Catch-up Contributions. Allowable Catch-up Contributions was $2,500 for 2006. After 2006, the $2,500 limit is adjusted by the Secretary of the Treasury for cost-of-living increases under Code section 414(v)(2)(C). Any such adjustments will be in multiples of $500. Catch-up contributions are otherwise treated the same as other salary reduction contributions.

(2)    Other Contributions.

(A)    Matching Contributions.  Each year, the Company will contribute a Matching Contribution to the Plan on behalf of each Employee who makes a salary reduction election under Subsection (c)(1). The amount of the Matching Contribution will be equal to the Employee's salary reduction contribution up to a limit of 3% of the Employee's Compensation for the full year.

(B)     Non-Elective contribution.  For any year, instead of a Matching Contribution, the Company may elect to contribute a Non-Elective Contribution of 2% of Compensation for the full year for each Eligible Employee who received at least the amount of Compensation from the Employer specified in the Adoption Agreement for the year.

(3)     Limitation on Other Contributions.  No Employer or Employee contributions may be made to this Plan for the year other than salary reduction contributions described in Subsection (c)(1), Matching or Non-Elective Contributions described in Subsection (c)(2) and Rollover Contributions described in Treas. Reg. section 1.402(c)-2, Q&A-1(a).

(4)     The provisions of the Plan implementing the limitations of Code section 415 apply to contributions made pursuant to Subsections (c)(1) (other than Catch-up Contributions) and (c)(2).

(d)     Election and Notice Requirements.

(1)     Election Period.

(A)     In addition to any other election periods provided under the Plan, each Eligible Employee may make or modify a salary reduction election during the 60-day period immediately preceding each January 1.

(B)     For the year an Employee becomes eligible to make salary reduction contributions under this Section 4.10, the 60-day election period requirement of Subsection (d)(1)(A) is deemed satisfied if the Employee may make or modify a salary reduction election during a 60-day period that includes either the date the Employee becomes eligible or the day before.

(C)     Each Employee may terminate a salary reduction election at any time during the year.

(2)     Notice requirements.

(A)     The Company will notify each Eligible Employee prior to the 60-day election period described in Subsection (d)(1) that he or she can make a salary reduction election or modify a prior election during that period.

(B)     The notification described in Subsection (d)(2)(A) will indicate whether the Company will provide a 3% Matching Contribution described in Subsection (c)(2)(A) or a 2-% Non-Elective Contribution described in Subsection (c)(2)(B).

(e)     Vesting Requirements.  All benefits attributable to contributions described in Subsections (c)(1) and (c)(2) are nonforfeitable at all times, and all previous contributions made under the Plan are nonforfeitable as of the beginning of the year the Section 4.10 provisions apply.

(f)     Top-Heavy Rules.  The Plan is not treated as a Top-Heavy plan under Code section 416 for any year for which this Section 4.10 applies.

(g)     Nondiscrimination tests.  The ADP and ACP tests described in section 5.02 of the Plan are treated as satisfied for any year for which this Section 4.10 applies.

Section 4.11     DEEMED IRAs

(a)     Applicability and Effective Date. This Section 4.11 shall apply only if the Adoption Agreement provides that Deemed IRAs are permitted. Effective for Plan Years beginning on or after the date specified in the Adoption Agreement, the Plan Administrator may permit a Participant to make voluntary Employee contributions to a traditional IRA established under Code section 408 or a Roth IRA established under Code section 408A. The Plan shall establish a separate Account or annuity for the designated IRA contributions of each Participant and any earnings properly allocable to the contributions, and maintain separate recordkeeping with respect to each such IRA.

(b)     Reporting Duties. The Plan Administrator shall cause the trustee of a trust established pursuant to Subsection (d) or annuity contract issuer to comply with the reporting requirements of Code section 408(i) with respect to all IRAs that are established and maintained under the Plan.

(c)     Voluntary Employee Contributions. For purposes of this Section, a voluntary Employee contribution means any contribution (other than a mandatory contribution within the meaning of Code section 411(c)(2)) that is made by the Participant and which the Participant has designated, at or prior to the time of making the contribution, as a contribution to which this Section applies.

(d)    IRAs established pursuant to this Section shall be held in a trust or an annuity separate from the Trust Fund established under the Plan to hold contributions other than deemed IRA contributions and shall satisfy the applicable requirements of Code sections 408 and 408A, which requirements are set forth in the Deemed IRA Addendum to the Adoption Agreement. The Deemed IRA Addendum shall be comprised of IRS Form 5305 or other applicable IRA document that contains model language or IRS-approved language. The language contained in the Deemed IRA Addendum shall be interpreted consistent with the provisions of this Plan. The addition of such Addendum shall not be considered a modification to the Volume Submitter/Prototype document.

## ARTICLE 5 LIMITATIONS ON CONTRIBUTIONS

Section 5.01       ANNUAL LIMITATION ON ELECTIVE DEFERRALS

(a)      Amount.  Notwithstanding anything herein to the contrary, elective deferrals made under this Plan, or any other qualified plan maintained by the Employer may not exceed, during any taxable year, the dollar limitation contained in Code section 402(g) in effect at the beginning of such taxable year. For purposes of this Section 5.01, elective deferrals shall mean qualified cash or deferred arrangements described in Code section 401(k), any salary reduction simplified employee pension plan described in Code section 408(k)(6), any SIMPLE IRA plan described in Code section 408(p) and any plan described under Code section 501(c)(18), and any Employer contributions made on the behalf of a Participant for the purchase of an annuity contract under Code section 403(b) pursuant to a salary reduction agreement.

(b)      Refund of Excess Elective Deferrals.  In the event that Elective Deferrals under this Plan when added to a Participant's other elective deferrals under any other plan or arrangement (whether or not maintained by the Employer) exceed the limit described in the preceding Subsection, the Plan Administrator shall distribute, by April 15 of the following calendar year, the excess amount of Elective Deferrals plus income thereon.

(1)      The income/loss allocable to excess deferrals is equal to the sum of the allocable gain or loss for (i) the Plan Year and, (ii) effective as of such date as specified in a prior document, the "gap period" (i.e., the period after the close of the Plan Year and prior to the distribution). Income for the gap period shall be the allocable gain or loss during that period to the extent that the excess deferrals would otherwise be credited with gain or loss if the total Account were to be distributed. The Plan Administrator may use any reasonable method for computing the income allocable to excess deferrals, provided that the method does not violate Code section 401(a)(4), is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income to Participant's Accounts. The Plan will not fail to use a reasonable method for computing the income allocable to excess deferrals merely because the income allocable to excess deferrals is determined on a date that is no more than 7 days before the actual distribution. In addition, the Plan Administrator may allocate income in any manner permitted under Treas. Reg. section 1.401(k)-2(b)(2)(iv).

(2)      Effective for taxable years beginning after December 31, 2006 (excesses distributed after December 31, 2007), any refunds of Elective Deferrals that exceed the dollar limitation contained in Code section 402(g) shall be adjusted for income or loss up to the date of distribution. Effective for taxable years beginning after December 31, 2007, gap period income described in this Subsection 5.01(b)(2) shall not be distributed. The income/loss allocable to excess deferrals is equal to the sum of the allocable gain or loss for the Plan Year and, to the extent that such excess deferrals would otherwise be credited with gain or loss for the gap period (i.e., the period after the close of the Plan Year and prior to the distribution) if the total Account were to be distributed, the allocable gain or loss during that period. The Plan Administrator may use any reasonable method for computing the income allocable to excess deferrals, provided that the method does not violate Code section 401(a)(4), is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income to Participant's Accounts. The Plan will not fail to use a reasonable method for computing the income allocable to excess contributions merely because the income allocable to excess contributions is determined on a date that is no more than 7 days before the actual distribution. In addition, the Plan Administrator may allocate income in any manner permitted under applicable Treasury Regulations.

A Participant's claim that the excess was caused by elective deferrals made under a plan or arrangement not maintained by the Employer shall be made in writing and shall be submitted to the Plan Administrator no later than the date specified by the Plan Administrator following the calendar year in which such deferrals occurred.  For purposes of determining the necessary reduction, Elective Deferrals previously distributed or recharacterized pursuant to Section 5.04 or returned to the Participant pursuant to Section 5.04 shall be treated as distributed under this Section 5.01. If the Plan permits Roth Elective Deferrals, the Plan Administrator shall determine the ordering rule for refunds of Excess Elective Deferrals. Such ordering rule may provide that the Participant may elect to have refunds made either from his Pre-tax Elective Deferrals or Roth Elective Deferrals or any combination thereof.

(c)      Forfeiture of Matching Contributions Related to Excess Elective Deferrals.  In the event a Participant receives a distribution of Excess Elective Deferrals pursuant to Subsection (b), the Participant shall forfeit any Matching Contributions allocated to the Participant by reason of the distributed Elective Deferrals to the extent that additional Matching Contributions are not made pursuant to Treas. Reg. section 1.401(a)(4)-11(g)(3)(vii)(B). Elective Deferrals not taken into account in determining Matching Contributions under Section 4.02 shall be treated as being reduced first. Amounts forfeited shall be used pursuant to Section 6.03(d).

(d)      Catch-up Contributions. If elected in the Adoption Agreement, all Participants who are eligible to make Elective Deferrals under this Plan shall be eligible to make Catch-up Contributions in accordance with, and subject to the limitations of, Code section 414(v). "Catch-up

Contributions" are Elective Deferrals made to the Plan that are in excess of an otherwise applicable Plan limit and that are made by Participants who are aged 50 or over by the end of their taxable years. An otherwise applicable Plan limit is a limit in the Plan that applies to Elective Deferrals without regard to Catch-up Contributions, such as the limits on Annual Additions, the dollar limitation on Elective Deferrals under Code section 402(g) (not counting Catch-up Contributions) and the limit imposed by the ADP test under Code section 401(k)(3). Catch-up Contributions for a Participant for a taxable year may not exceed the dollar limit on Catch-up Contributions under Code section 414(v)(2)(B)(i) for the taxable year as adjusted for cost-of-living increases. Catch-up Contributions are not subject to the limits on Annual Additions, are not counted in the ADP test and are not counted in determining the minimum allocation under Code section 416 (but Catch-up Contributions made in prior years are counted in determining whether the Plan is Top-Heavy).

Section 5.02   NONDISCRIMINATION

  (a)  Elective Deferrals. If the Adoption Agreement specifies that the Plan is a safe harbor 401(k) plan, the Plan shall comply with the Safe Harbor Notice requirements as described in Article 2 and the Plan shall be deemed to meet the requirements of this Subsection 5.02(a) with respect to Elective Deferrals. However, if the Adoption Agreement does not specify that the Plan is a safe harbor 401(k) plan, the Plan is not deemed to meet the requirements of this Subsection 5.02(a) and the Plan must meet one of the following two tests with respect to Elective Deferrals for any Plan Year:

    (1)  The Average Deferral Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the prior Plan Year's Average Deferral Percentage for Participants who were Nonhighly Compensated Employees for the prior Plan Year multiplied by 1.25; or

    (2)  The Average Deferral Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the prior Plan Year's Average Deferral Percentage for Participants who were Nonhighly Compensated Employees for the prior Plan Year multiplied by 2.0; provided that the Average Deferral Percentage for Participants who are Highly Compensated Employees does not exceed the prior Plan Year's Average Deferral Percentage for Participants who were Nonhighly Compensated Employees for the prior Plan Year by more than two percentage points or such lesser amount as the Secretary of the Treasury shall prescribe.

    To the extent specified in the Adoption Agreement or, if the Adoption Agreement specifies that the Plan is a safe harbor 401(k) plan (and ADP testing is required pursuant to Section 5.03(g)), the Average Deferral Percentage test specified in Subsections (1) and (2), above, will be applied by comparing the current Plan Year's Average Deferral Percentage for Participants who are Highly Compensated Employees with the current Plan Year's Average Deferral Percentage for Participants who are Nonhighly Compensated Employees. The Employer must issue a supplemental notice if the Plan suspends safe harbor contributions and changes to a current year ADP testing method in accordance with Treas. Reg. section 1.401(k)-3(d), (f) and (g).

    The Company may elect prior year testing for purposes of this Subsection 5.02(a) for a Plan Year only if the Plan has used current year testing for purposes of this Subsection 5.02(a) for each of the preceding 5 Plan Years (or if lesser, the number of Plan Years the Plan has been in existence) or if, as a result of a merger or acquisition described in Code section 410(b)(6)(C)(i), the Employer maintains both a plan using prior year testing and a plan using current year testing and the change is made within the transition period described in Code section 410(b)(6)(C)(ii).

    If the Adoption Agreement provides that testing will be performed using the prior year data, for the first Plan Year the Plan permits any Participant to make Elective Deferrals and this Plan is not a successor Plan, the prior Plan Year's Average Deferral Percentage for Participants who are Nonhighly Compensated Employees shall be specified in the Adoption Agreement.

    If, for the applicable year for determining the ratios of the Nonhighly Compensated Employees for a Plan Year, there are no eligible Nonhighly Compensated Employees (i.e., all of the Eligible Employees under the cash or deferred arrangement for the applicable year are Highly Compensated Employees), the tests described in this Subsection (a) are deemed to be satisfied for the Plan Year.

  (b)  Matching Contributions and Voluntary Contributions. If the Adoption Agreement specifies that the Plan is a safe harbor 401(k) plan with respect to the ACP safe harbor of Code section 401(m)(11) or 401(m)(12), the Plan shall comply with the Safe Harbor Notice requirements as described in Article 2 and the Plan shall be deemed to meet the requirements of this Subsection 5.02(b) with respect to Matching Contributions and the Plan shall meet one of the following two tests with respect to Voluntary Contributions. However, if the Adoption Agreement does not specify that the Plan is a safe harbor 401(k) plan with respect to the ACP safe harbor of Code section 401(m)(11) or 401(m)(12), the Plan is not deemed to meet the requirements of this Subsection 5.02(b) and the Plan must meet one of the following two tests with respect to Matching Contributions and Voluntary Contributions for any Plan Year:

*ARTICLE 5 LIMITATIONS ON CONTRIBUTIONS*

(1)    The Average Contribution Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the prior Plan Year's Average Contribution Percentage for Participants who were Nonhighly Compensated Employees for the prior Plan Year multiplied by 1.25; or

(2)    The Average Contribution Percentage for Participants who are Highly Compensated Employees for the Plan Year shall not exceed the prior Plan Year's Average Contribution Percentage for Participants who were Nonhighly Compensated Employees for the prior Plan Year multiplied by 2.0; provided that the Average Contribution Percentage for Participants who are Highly Compensated Employees does not exceed the prior Plan Year's Average Contribution Percentage for Participants who were Nonhighly Compensated Employees for the Prior Plan Year by more than two percentage points or such lesser amount as the Secretary of the Treasury shall prescribe.

To the extent specified in the Adoption Agreement or. if the Adoption Agreement specifies that the Plan is a safe harbor 401(k) plan with respect to the ACP safe harbor of Code section 401(m)(11) or 401(m)(12) (and ACP testing is required pursuant to Section 5.03(g)), the Average Contribution Percentage test in Subsection (1) and (2), above, will be applied by comparing the current Plan Year's Average Contribution Percentage for Participants who are Highly Compensated Employees for each Plan Year with the current Plan Year's Average Contribution Percentage for Participants who are Nonhighly Compensated Employees. The Employer must issue a supplemental notice if the Plan suspends safe harbor Matching Contributions and changes to a current year ADP (and ACP) testing method in accordance with 1.401(k)-3(d), (f) and (g).

The Company may elect prior year testing for purposes of this Subsection 5.02(b) for a Plan Year only if the Plan has used current year testing for purposes of this Subsection 5.02(b) for each of the preceding 5 Plan Years (or if lesser, the number of Plan Years the Plan has been in existence) or if, as a result of a merger or acquisition described in Code section 410(b)(6)(C)(i), the Employer maintains both a plan using prior year testing and a plan using current year testing and the change is made within the transition period described in Code section 410(b)(6)(C)(ii).

If the Adoption Agreement provides that testing will be performed using the prior year data, for the first Plan Year the Plan permits any Participant to make Elective Deferrals or make contributions subject to this Section 5.02(b) and this Plan is not a successor Plan, the prior Plan Year's Average Contribution Percentage for Participants who are Nonhighly Compensated Employees shall be specified in the Adoption Agreement.

If, for the applicable year there are no eligible Nonhighly Compensated Employees (i.e., all of the Eligible Employees under the cash or deferred arrangement for the applicable year are Highly Compensated Employees), the tests described in this Subsection (b) are deemed to be satisfied for the Plan Year. The Plan shall also be deemed to meet the requirements of this Subsection 5.02(b) with respect to Matching Contributions and Voluntary Contributions under a collectively bargained plan (or the portion of a plan) that automatically satisfies Code section 410(b).

(c)    Safe Harbor Plans. Pursuant to Treas. Reg. sections 1.401(k)-1(e)(7) and 1.401(m)-1(c)(2), the Plan may not use the nondiscrimination testing described in this Section for a Plan Year to the extent the Plan through its written terms is intended to be a Code section 401(k) safe harbor plan or a Code section 401(m) safe harbor plan and the Plan fails to satisfy the requirements of such safe harbors for such Plan Year.

<u>Section 5.03</u>    <u>SPECIAL RULES</u>

(a)    Highly Compensated Employee in More Than One Plan. The Actual Deferral Ratio and Actual Contribution Ratio for any Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to have Elective Deferrals, Matching Contributions and Voluntary Contributions (and Qualified Non-Elective Contributions if used to satisfy the tests described in Subsections 5.02(a) and (b)) allocated to his Accounts under two or more arrangements described in Code sections 401(k) and 401(m) that are maintained by the Employer, shall be determined as if such Elective Deferrals and contributions were made under a single arrangement. If a Highly Compensated Employee participates in two or more arrangements, whether or not they have different Plan Years, all such elective deferrals and contributions made during the Plan Year under all such arrangements shall be aggregated. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under regulations under Code section 401(k) and/or 401(m).

(b)    Contributions Used in Determining Ratios. All or part of the Qualified Non-Elective Contributions and Qualified Matching Contributions that are made with respect to any or all Participants may be treated as Elective Deferrals and/or Matching Contributions for purposes of meeting the requirements of Subsections 5.02(a) and (b). In addition, the Plan Administrator may use any Employer and/or Employee contribution to meet the requirements of the ADP and ACP tests of Section 5.02 to the extent permitted by applicable Treasury Regulations. The Company may make additional contributions that are taken into account for the ACP test under Subsection 5.02(b) that, in combination with the other contributions taken into account under this Subsection 5.03(b), will allow the Plan to satisfy the requirements of such Subsection. However, to the extent the Plan uses the prior year testing method, in order to be included in Actual Deferral Ratios and the Actual Contribution Ratios of Nonhighly Compensated

Employees, Qualified Non-Elective Contributions and Qualified Matching Contributions must be made no later than the last day of the Plan Year being tested.

(c)    Contributions Only Used Once. Qualified Non-Elective Contributions and Qualified Matching Contributions shall not be taken into account under the ADP test to the extent such contributions are taken into account for purposes of satisfying any other ADP test, any other ACP test, or the requirements of Treas. Reg. sections 1.401(k)-3, 1.401(m)-3 or 1.401(k)-4. In order to be taken into account for purposes of satisfying the ADP test, Matching Contributions must be (1) allocated to the Employee's Account under the terms of the Plan as of a date within that year; (2) made on account of (or on the basis of) the Participant's Matched Employee Contributions for that year; and (3) actually paid to the Plan no later than the end of the 12-month period immediately following the year that contains that date. If the Plan switches from the current year testing method to the prior year testing method, Qualified Non-Elective Contributions and Qualified Matching Contributions that are taken into account under the current year testing method for a year may not be taken into account under the prior year testing method for the next year.

(d)    Aggregation of Plans.  In the event that this Plan satisfies the requirements of Code sections 401(k), 401(m), 401(a)(4), or 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of such sections of the Code only if aggregated with this Plan, then Section 5.02 shall be applied as if all such plans were a single plan. The Plan may not be aggregated for testing purposes if the plans to be aggregated use differing testing methods (i.e., current year/prior year). For example, a plan (within the meaning of Treas. Reg. section 1.410(b)-7(b)) that applies the current year testing method may not be aggregated with another plan that applies the prior year testing method. Similarly, an Employer may not aggregate a plan (within the meaning of Treas. Reg. section 1.410(b)-7(b)): (1) using the ADP safe harbor provisions of Code section 401(k)(12) or 401(k)(13) and another plan that is using the ADP test of Code section 401(k)(3); or (2) using the ACP safe harbor provisions of Code section 401(m)(11) or 401(m)(12) and another plan that is using the ACP test of Code section 401(m)(2). The Company may also treat two or more separate collective bargaining units as a single collective bargaining unit, provided that the combinations of units are determined on a basis that is reasonable and reasonably consistent from year to year.

(e)    Matching Contributions in a Safe Harbor Plan. If the Plan satisfies the ACP safe harbor requirements of Code section 401(m)(11) or 401(m)(12) for a Plan Year but nonetheless must satisfy the requirements of Section 5.02(b) because it provides for Voluntary Contributions, the Plan Administrator may elect to perform the tests under Section 5.02(b) with regard to Matching Contributions and Voluntary Contributions. If the Plan satisfies the ADP safe harbor requirements of Code section 401(k)(12) or 401(k)(13) using Qualified Matching Contributions but does not satisfy the ACP safe harbor requirements of Code section 401(m)(11) or 401(m)(12), the Plan Administrator is permitted to perform the tests under Section 5.02(b) by excluding Matching Contributions with respect to all Participants that do not exceed 4% of each Employee's Compensation.

(f)    Disproportionate Contributions.

(1)    Qualified Non-Elective Contributions. All or part of a Nonhighly Compensated Employee's Qualified Non-Elective Contributions may be taken into account in meeting the ADP test under Section 5.02(a) only to the extent that such contributions are not treated as disproportionate within the meaning of Treas. Reg. section 1.401(k)-2(a)(6). All or part of a Nonhighly Compensated Employee's Qualified Non-Elective Contributions may be taken into account in meeting the ACP test under Section 5.02(b) only to the extent that such contributions are not treated as disproportionate within the meaning of Treas. Reg. section 1.401(m)-2(a)(6).

(2)    Matching Contributions. Qualified Matching Contributions may be taken into account in meeting the ADP test under Section 5.02(a) only to the extent that such Qualified Matching Contributions are Matching Contributions that are not precluded from being taken into account under the ACP test for the Plan Year under the rules of Treas. Reg. section 1.401(m)-2(a)(5)(ii). All or part of a Nonhighly Compensated Employee's Matching Contributions may be taken into account in meeting the ACP test only to the extent that such contributions are not treated as disproportionate within the meaning of Treas. Reg. section 1.401(m)-2(a)(5)(ii).

(g)    Code Section 410(a) Excludable Employees.  The Company may treat, pursuant to applicable Treasury Regulations, Participants who have not met the minimum age and service requirements of Code section 410(a)(1)(A) as comprising a separate plan for purposes of Section 5.02 pursuant to Subsection (1) or (2), provided the disaggregated Plan separately satisfies the requirements of Code section 410(b) and the Plan does not utilize Section 5.03(h).

(1)    Annual Entry Date. The Plan Administrator may treat Participants who have not met the minimum age and service requirements of Code section 410(a)(1)(A) before the first day of the seventh month of the Plan Year as comprising a separate plan. If the Plan provides safe harbor contributions, Participants not considered in the separate plan must be eligible for safe harbor contributions for the entire Plan Year.

(2)    Semi-Annual or More Frequent Entry Date. The Plan Administrator may treat Participants who have not met the minimum age and service requirements of Code section 410(a)(1)(A) using one of the entry dates specified in the Plan (not less frequently than semi-

*ARTICLE 5 LIMITATIONS ON CONTRIBUTIONS*

annual) before the last day of the Plan Year as comprising a separate plan. Contributions of Participants who have an entry date during the applicable Plan Year shall not be counted in the separate plan.

(h)     Excludable Nonhighly Compensated Employees. The Company may also, pursuant to applicable Treasury Regulations, exclude all Nonhighly Compensated Employees who have not met the minimum age and service requirements of Code section 410(a)(1)(A) (pursuant to Subsection (g)(1) or (2)) from consideration in determining whether the requirements of Section 5.02 are met, provided the disaggregated Plan consisting of such excludable Nonhighly Compensated Employees separately satisfies the requirements of Code section 410(b) and the Plan does not utilize Section 5.03(g).

(i)     Correction Methods. The Plan may, pursuant to applicable Treasury Regulations, do any of the following to avoid or correct excess contributions and/or excess aggregate contributions: (1) provide for the use of any of the correction methods described herein; (2) limit contributions in a manner designed to prevent excess contributions from being made; or (3) use a combination of these methods.

(j)     Plans Using Differing Testing Methods. A Plan may use differing testing methods (i.e., current year/prior year) for the ADP and ACP tests of Section 5.02. For example, the Plan may use the prior year testing method for the ADP test of Section 5.02(a) and the current year testing method for its ACP test of Section 5.02(b) for a Plan Year. In addition to the prohibition on recharacterization specified in Section 5.04(a), a Plan that uses differing methods may not use Elective Deferrals in the ACP test of Section 5.02(b) and may not use Qualified Matching Contributions in the ADP test of Section 5.02(a).

(k)     Special Rules Regarding Prior Year Data. If the Plan uses the prior year testing method for either the ADP or ACP test in Section 5.02 and is involved in a Plan coverage change as defined in Treas. Reg. section 1.401(k)-2(c)(4) and/or 1.401(m)-2(c)(4), then any adjustments to the Nonhighly Compensated Employees' prior year percentages will be made in accordance with such regulations.

(l)     Plan Year Requirements for Safe Harbor Plans. To the extent the Plan is designed to satisfy Code section 401(k)(12) or 401(k)(13), the Plan Year must satisfy the requirements of Treas. Reg. section 1.401(k)-3(e)(1), taking into account the special provisions of 1.401(k)-3(e)(2) for the initial Plan Year. A short Plan Year may exist provided the requirements of Treas. Reg. section 1.401(k)-3(e)(3) are satisfied. The final Plan Year of a terminating plan may be less than twelve months provided the requirements of Treas. Reg. section 1.401(k)-3(e)(4) are satisfied. A safe harbor Plan Year may also be less than twelve months if the Plan is amended out of safe harbor status pursuant to Treas. Reg. section 1.401(k)-3(g).

(m)     Regulations. Sections 5.02 through 5.04 shall be interpreted in accordance with applicable IRS regulations.

Section 5.04     CORRECTION OF DISCRIMINATORY CONTRIBUTIONS

(a)     Elective Deferrals.  In the event the nondiscrimination tests of Section 5.02(a) are not satisfied with respect to Elective Deferrals for any Plan Year, Excess Elective Deferrals for the Plan Year determined as set forth in Paragraph (1) shall be corrected as set forth in Paragraph (2):

(1)     Determination of Excess Deferrals.  The Elective Deferrals of the Highly Compensated Employee with the highest Actual Deferral Ratio shall be reduced until the nondiscrimination tests imposed by Section 5.02(a) would be satisfied, or until the Actual Deferral Ratio of the Highly Compensated Employee would equal the Actual Deferral Ratio of the Highly Compensated Employee with the next highest Actual Deferral Ratio.  This process shall be repeated until the nondiscrimination tests imposed by Section 5.02(a) are satisfied.  The amount of excess deferrals is equal to the sum of these hypothetical reductions multiplied, in each case, by the respective Highly Compensated Employee's Section 414(s) Compensation (including deferrals to the extent that they are taken into account in determining testing ratios).

(2)     Distribution of Excess Deferrals.  Excess deferrals shall be allocated to the Highly Compensated Employees with the largest dollar amounts of contributions taken into account in calculating the Average Deferral Percentage test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest dollar amount of such contributions and continuing in descending order until all the excess deferrals have been allocated. To the extent a Highly Compensated Employee has not reached his or her Catch-up Contribution limit as specified in Section 5.01(d), excess deferrals allocated to such Highly Compensated Employee are deemed Catch-up Contributions and will not be treated as excess contributions. The amount of excess deferrals is reduced by any amounts previously distributed from the Plan to correct excess deferrals under Section 5.01 for the Employee's taxable year ending with or within the Plan Year. The distribution of the amount allocated to each Highly Compensated Employee, as adjusted for income allocable to the excess deferrals, shall occur within twelve (12) months of the close of the Plan Year for which the Elective Deferrals were made. The income/loss allocable to excess deferrals is equal to the sum of the allocable gain or loss for the Plan Year. Effective for taxable years beginning after December 31, 2007, the Plan shall not allocate gains and losses on distributions of excess contributions for the period after the end of the Plan Year in which such excess contributions arose. The Plan Administrator may use any

reasonable method for computing the income allocable to excess deferrals, provided that the method does not violate Code section 401(a)(4), is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income to Participant's Accounts. The Plan will not fail to use a reasonable method for computing the income allocable to excess deferrals merely because the income allocable to excess deferrals is determined on a date that is no more than 7 days before the actual distribution. In addition, the Plan Administrator may allocate income in any manner permitted under Treas. Reg. section 1.401(k)-2(b)(2)(iv). Elective Deferrals not taken into account in determining Matching Contributions under Section 4.02 shall be distributed first. In the event a Participant receives a distribution of Elective Deferrals that were taken into account in determining Matching Contributions, the Participant shall forfeit such Matching Contributions that were allocated to the Participant by reason of the distributed Elective Deferrals to the extent that additional Matching Contributions are not made pursuant to Treas. Reg. section 1.401(a)(4)-11(g)(3)(vii)(B). Amounts forfeited shall be used pursuant to Section 6.03(d). If the Plan does not correct excess deferrals within 2-1/2 months (6 months in the case of certain eligible automatic contribution arrangements), or such other time frame as may be prescribed by the Secretary of the Treasury, after the close of the Plan Year for which the excess deferrals are made, the Employer will be liable for a 10% excise tax on the amount of the excess deferrals to the extent provided in Code section 4979.

(3)     Recharacterization. If the Plan permits Voluntary Contributions and if the Plan uses the same testing methods (current year/prior year) in Subsection 5.02(a) and (b), the Plan Administrator may treat Excess Elective Deferrals as an amount distributed to the Participant and then contributed by the Participant to the Plan as a Voluntary Contribution. Recharacterized amounts will remain nonforfeitable and subject to the same distribution requirements as Elective Deferrals. Amounts may not be recharacterized by a Highly Compensated Employee to the extent that such amount in combination with other Voluntary Contributions made by that Employee would exceed any stated limit under the Plan on Voluntary Contributions. Recharacterization must occur no later than two and one-half months after the last day of the Plan Year in which such Excess Elective Deferrals arose and is deemed to occur no earlier than the date the last Highly Compensated Employee is informed in writing of the amount recharacterized and the consequences thereof. Recharacterized amounts will be taxable to the Participant for the Participant's tax year in which the Participant would have received them in cash.

(4)     Refunds. If the Plan permits Roth Elective Deferrals, the Plan Administrator shall determine the ordering rule for refunds of Elective Deferrals made as a result of any testing failure; provided that such ordering rule is nondiscriminatory. Such ordering rule may provide that the Participant may elect to have refunds made either from his Pre-tax Elective Deferrals or Roth Elective Deferrals or any combination thereof.

(b)     Matching Contributions and Voluntary Contributions. In the event the nondiscrimination tests of Section 5.02(b) are not satisfied with respect to Matching Contributions and Voluntary Contributions for any Plan Year, excess Matching Contributions and Voluntary Contributions for the Plan Year determined as set forth in Paragraph (1) shall be corrected as set forth in Paragraph (2).

(1)     Determination of Excess Contributions. The Matching Contributions and Voluntary Contributions of the Highly Compensated Employee with the highest Actual Contribution Ratio shall be reduced until the nondiscrimination tests imposed by Section 5.02(b) would be satisfied, or until the Actual Contribution Ratio of the Highly Compensated Employee would equal the Actual Contribution Ratio of the Highly Compensated Employee with the next highest Actual Contribution Ratio. This process shall be repeated until the nondiscrimination tests imposed by Section 5.02(b) are satisfied. The amount of excess Matching Contributions and Voluntary Contributions is equal to the sum of these hypothetical reductions multiplied, in each case, by the respective Highly Compensated Employee's Section 414(s) Compensation (including deferrals to the extent that they are taken into account in determining testing ratios).

(2)     Correction of Excess Contributions. Excess Matching Contributions and Voluntary Contributions shall be allocated to the Highly Compensated Employees with the largest dollar amounts of contributions taken into account in calculating the Average Contribution Percentage test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest dollar amount of such contributions and continuing in descending order until all the excess contributions have been allocated. The correction of the amount allocated to each Highly Compensated Employee, as adjusted for income allocable to the excess contributions, shall occur within twelve (12) months of the close of the Plan Year for which the Matching Contributions and Voluntary Contributions were made. The income/loss allocable to excess contributions is equal to the sum of the allocable gain or loss for the Plan Year. Effective for Plan Years beginning after December 31, 2007 (excess aggregate contributions distributed after December 31, 2008), the Plan shall not allocate gains and losses on distributions of excess aggregate contributions (as defined in Code section 401(m)(6)(B)) for the period after the end of the Plan Year in which such excess aggregate contributions arose. The Plan Administrator may use any reasonable method for computing the income allocable to excess contributions, provided that the method does not violate Code section 401(a)(4), is used consistently for all Participants and for all corrective distributions under the Plan for the Plan Year, and is used by the Plan for allocating income to Participants' Accounts. The Plan will not fail to use a reasonable method for computing the income allocable to excess contributions merely because the income allocable to excess contributions is determined on a date that is no more than 7 days before the actual distribution. In addition, the Plan Administrator may allocate income in any manner permitted under Treas. Reg. section 1.401(m)-2(b)(2)(iv). Excess Matching Contributions and Voluntary Contributions shall be corrected in the following order: (i) Voluntary Contributions not taken into account in determining Matching Contributions under Article 4 shall be distributed; (ii) any other Voluntary Contributions not described in clause (i) shall be

distributed and their related Matching Contributions shall be forfeited to the extent that additional Matching Contributions are not made pursuant to Treas. Reg. section 1.401(a)(4)-11(g)(3)(vii)(B); and (iii) vested Matching Contributions shall be distributed and nonvested Matching Contributions forfeited. Amounts forfeited shall be used pursuant to Section 6.03(d). If the Plan does not correct excess contributions within 2-1/2 months (6 months in the case of certain eligible automatic contribution arrangements), or such other time frame as may be prescribed by the Secretary of the Treasury, after the close of the Plan Year for which the excess contributions are made, the Employer will be liable for a 10% excise tax on the amount of the excess contributions to the extent provided in Code section 4979.

Section 5.05      MAXIMUM AMOUNT OF ANNUAL ADDITIONS

(a)      General Rule.

(1)      One Plan. If the Participant does not participate in, and has never participated in another qualified plan maintained by the Employer or a welfare benefit fund, as defined in Code section 419(e) maintained by the Employer, or an individual medical account, as defined in Code section 415(l)(2), maintained by the Employer, or a simplified employee pension plan, as defined in Code section 408(k), maintained by the Employer, which provides an Annual Addition, the amount of Annual Additions which may be credited to the Participant's Account for any Limitation Year will not exceed the lesser of the maximum permissible amount specified in Section 5.05(b) or any other limitation contained in this Plan. If the Employer contribution that would otherwise be contributed or allocated to the Participant's Account would cause the Annual Additions for the Limitation Year to exceed such maximum permissible amount, the amount contributed or allocated will be reduced so that the Annual Additions for the Limitation Year will equal the maximum permissible amount.

(2)      Multiple Plans. This Subsection 5.05(a)(2) applies if, in addition to this Plan, the Participant is covered under another qualified defined contribution plan maintained by the Employer, a welfare benefit fund maintained by the Employer, an individual medical account maintained by the Employer, or a simplified employee pension plan maintained by the Employer, that provides an Annual Addition during any Limitation Year. The Annual Additions which may be credited to a Participant's Account under this Plan for any such Limitation Year will not exceed the maximum permissible amount specified in Section 5.05(b) reduced by the Annual Additions credited to a Participant's account under the other qualified defined contribution plans, welfare benefit funds, individual medical accounts, and simplified employee pension plans for the same Limitation Year.

(b)      Maximum Permissible Amount.  For Limitation Years beginning on or after January 1, 2002, the maximum permissible amount is the lesser of:

(1)      $40,000, as adjusted for increases in the cost-of-living under Code section 415(d); or

(2)      100% of the Participant's Statutory Compensation for the Limitation Year.  The Compensation limit referred to in this Subsection (b)(2) shall not apply to any contribution for medical benefits after separation from service (within the meaning of Code sections 401(h) or 419A(f)(2)) which is otherwise treated as an Annual Addition. Notwithstanding the preceding sentence, Statutory Compensation for purposes of Section 5.05 for a Participant in a defined contribution plan who is permanently and totally disabled (as defined in Code section 22(e)(3)) is the Compensation such Participant would have received for the Limitation Year if the Participant had been paid at the rate of Compensation paid immediately before becoming permanently and totally disabled.

Prior to determining the Participant's actual Statutory Compensation for the Limitation Year, the Employer may determine the maximum permissible amount for a Participant on the basis of a reasonable estimation of the Participant's Statutory Compensation for the Limitation Year, uniformly determined for all Participants similarly situated. As soon as is administratively feasible after the end of the Limitation Year, the maximum permissible amount for the Limitation Year will be determined on the basis of the Participant's actual Statutory Compensation for the Limitation Year.

(c)      Correction of Excess.  If there is an allocation in excess of the Maximum Permissible Amount, the Plan Administrator shall correct such excess pursuant to the procedures outlined under EPCRS as described in Rev. Proc. 2013-12 and any superseding guidance.

## ARTICLE 6 VESTING

### Section 6.01     PARTICIPANT CONTRIBUTIONS

A Participant shall have a fully (100%) vested and nonforfeitable interest in his Elective Deferral Account, Voluntary Contribution Account, Rollover Contribution Account, In-Plan Roth Rollover Account, Qualified Non-Elective Contribution Account, Qualified Matching Contribution Account and Matching and Qualified Non-Elective Contributions used to satisfy ADP safe harbor contribution criteria.

### Section 6.02     EMPLOYER CONTRIBUTIONS

The Participant's interest in his Matching Contribution Account, Profit Sharing Contribution Account and Pension Contribution Account shall vest based on his Years of Vesting Service in accordance with the terms of the Adoption Agreement.

For purposes of the Adoption Agreement, "2-6 Year Graded", "1-5 Year Graded", "1-4 Year Graded", "3 Year Cliff" and "2 Year Cliff" shall be determined in accordance with the following schedules:

| | Years of Vesting Service | Vesting Percentage |
|---|---|---|
| "2-6 Year Graded": | | |
| | Less than Two Years | 0% |
| | Two Years but less than Three Years | 20% |
| | Three Years but less than Four Years | 40% |
| | Four Years but less than Five Years | 60% |
| | Five Years but less than Six Years | 80% |
| | Six or More Years | 100% |
| | | |
| "1-5 Year Graded": | | |
| | Less than One Year | 0% |
| | One Year but less than Two Years | 20% |
| | Two Years but less than Three Years | 40% |
| | Three Years but less than Four Years | 60% |
| | Four Years but less than Five Years | 80% |
| | Five or More Years | 100% |
| | | |
| "1-4 Year Graded": | | |
| | Less than One Year | 0% |
| | One Year but less than Two Years | 25% |
| | Two Years but less than Three Years | 50% |
| | Three Years but less than Four Years | 75% |
| | Four or More Years | 100% |
| | | |
| "3 Year Cliff": | | |
| | Less than Three Years | 0% |
| | Three or More Years | 100% |
| | | |
| "2 Year Cliff": | | |
| | Less than Two Years | 0% |
| | Two or More Years | 100% |

Notwithstanding the foregoing, a Participant shall become fully (100%) vested upon his attainment of Normal Retirement Age while an Employee. In addition, the Adoption Agreement may provide that a Participant will become fully (100%) vested upon (a) his death while an Employee, (b) his suffering a Disability while an Employee, or (c) attaining his Early Retirement Age while an Employee. Effective January 1, 2007, if a Participant dies while performing Qualified Military Service, the survivors of the Participant are entitled to any additional benefits provided under the Plan as if the Participant had resumed and then terminated employment on account of death pursuant to Code section 401(a)(37). If

*ARTICLE 6 VESTING*

Participants become fully (100%) vested upon death while an Employee, Participants shall also become fully (100%) vested upon death while performing Qualified Military Service.

A Participant's Transfer Account, if any, shall remain subject to the vesting schedule that applied to the Account immediately prior to the transfer.

Section 6.03    FORFEITURES

(a)    Participants Receiving a Distribution.  A Participant who receives a distribution of the value of the entire vested portion of his Account shall forfeit the nonvested portion of such Account as soon as administratively feasible after such distribution; but no later than the end of the Plan Year following the Plan Year during which such distribution occurred.  If the Participant elects to the extent permitted by Article 7 to have distributed less than the entire vested portion of the Account balance derived from Employer contributions, the part of the nonvested portion that will be treated as a forfeiture is the total nonvested portion multiplied by a fraction, the numerator of which is the amount of the distribution attributable to Employer contributions and the denominator of which is the total value of the vested Employer-derived Account balance.  No forfeitures will occur solely as a result of a Participant's withdrawal of Employee contributions.

For purposes of this Section, if the value of a Participant's vested Account balance is zero upon Termination, the Participant shall be deemed to have received a distribution of such vested Account.

(b)    Participants Not Receiving a Distribution.  The nonvested portion of the Account balance of a Participant who has a Termination of Employment and does not receive a complete distribution of the vested portion of his Account shall be forfeited as soon as administratively feasible after the date he incurs five consecutive One-Year Breaks in Service (One-Year Periods of Severance if the Plan uses the elapsed time method); but no later than the end of the Plan Year following the Plan Year during which such break in service occurred.

(c)    Reemployment.

(1)    Before Five One-Year Breaks.  If a Participant receives or is deemed to receive a distribution pursuant to this Section and the Participant resumes employment covered under this Plan and who also meets the requirements of Code sections 411(a)(7)(B) and (C), the Participant's Employer-derived Account balance will be restored to the amount on the date of distribution if the Participant repays to the Plan the full amount of the distribution attributable to Employer contributions before the earlier of 5 years after the first date on which the Participant is subsequently reemployed by the Employer, or the date the Participant incurs 5 consecutive One-Year Breaks in Service (One-Year Periods of Severance if the Plan uses the elapsed time method) following the date of the distribution.  If a zero-vested Participant is deemed to receive a distribution pursuant to this Section, and the Participant resumes employment covered under this Plan before the date the Participant incurs 5 consecutive One-Year Breaks in Service (One-Year Periods of Severance if the Plan uses the elapsed time method), upon the reemployment of such Participant, the Employer-derived Account balance of the Participant will be restored to the amount on the date of such deemed distribution.  Forfeitures that are restored pursuant to the foregoing shall be accomplished by an allocation of forfeitures, or if such forfeitures are insufficient, by a special Company contribution.

(2)    After Five One-Year Breaks.  If a Participant resumes employment as an Eligible Employee after forfeiting the nonvested portion of his Account balance after 5 consecutive One-Year Breaks in Service (One-Year Periods of Severance if the Plan uses the elapsed time method) and is not fully (100%) vested upon reemployment, the Participant's Account balance attributable to his pre-break service shall be kept separate from that portion of his Account balance attributable to his post-break service until such time as his post-break Account balance becomes fully (100%) vested. A Participant with a balance in his Elective Deferral Account shall be considered a vested Participant for purposes of Code section 411(a)(6)(D)(iii).

(d)    Disposition of Forfeitures.  Amounts forfeited from a Participant's Account shall be used to restore forfeitures or reduce Company contributions (or reallocate as Company contributions) made pursuant to Article 4, or to pay reasonable Plan expenses to the extent specified in the Adoption Agreement.  Effective for Plan Years beginning after the adoption of the 2010 Cumulative List (IRS Notice 2010-90) restatement, forfeitures cannot be used as Qualified Non-Elective Contributions, Qualified Matching Contributions, Elective Deferrals, or ADP test safe harbor contributions (Code section 401(k)(12)). Any such disposition of forfeitures from a Participant's Account shall be made no later than the end of the Plan Year following the Plan Year during which the forfeiture occurred.

(e)    Vesting Following In-Service Withdrawals or Payment in Installments.  If a distribution is made at a time when a Participant has a nonforfeitable right to less than 100% of his Account derived from Employer contributions and the Participant may increase the nonforfeitable percentage in the Account:

*ARTICLE 6 VESTING*

(1)      A separate Account will be established for the Participant's interest in the Plan as of the time of the distribution, and

(2)      At any relevant time the Participant's nonforfeitable portion of the separate Account will be equal to an amount ("X") determined by the formula:

$$X = P(AB + (R \times D)) - (R \times D)$$

For purposes of applying the formula: P is the nonforfeitable percentage at the relevant time; AB is the Account balance at the relevant time; D is the amount of the distribution; and R is the ratio of the Account balance at the relevant time to the Account balance after distribution.

## ARTICLE 7 DISTRIBUTIONS

Section 7.01        COMMENCEMENT OF DISTRIBUTIONS

(a)        Early and Normal Retirement.  A Participant, upon attainment of his Normal Retirement Date, shall be entitled to retire and to receive his Account as his benefit hereunder pursuant to Section 7.02. To the extent permitted in the Adoption Agreement, a Participant may, at any time after reaching his Early Retirement Date but before Termination, elect to have the Plan Administrator commence the distribution of his benefit pursuant to Section 7.02 by providing the Plan Administrator with a written election to that effect.  Any such written election shall state the date upon which distribution of benefits is to commence and shall be effective upon delivery to the Plan Administrator.

(b)        Late Retirement.  If a Participant continues in the employ of the Company beyond his Normal Retirement Date, his participation under the Plan shall continue, and his benefits under the Plan shall commence following his actual Termination of Employment pursuant to Section 7.02.  To the extent permitted in the Adoption Agreement, a Participant may, at any time after reaching his Normal Retirement Date but before actual retirement, elect to have the Plan Administrator commence the distribution of his benefit pursuant to Section 7.02 by providing the Plan Administrator with a written election to that effect.  Any such written election shall state the date upon which distribution of benefits is to commence and shall be effective upon delivery to the Plan Administrator.

(c)        Disability Retirement.  Except as may be otherwise provided in the Adoption Agreement, if a Participant becomes Disabled, he shall become entitled to receive his vested Account pursuant to Section 7.02 following the date he has a Termination of Employment.

(d)        Death.  If a Participant dies, either before or after his Termination of Employment, his Beneficiary designated pursuant to Section 7.04 shall become entitled to receive the Participant's vested Account pursuant to Section 7.02.

(e)        Termination of Employment.  A Participant shall become entitled to receive his vested Account pursuant to Section 7.02 following the date he has a Termination of Employment.  Effective for distributions and severances from employment occurring after December 31, 2001, a Participant shall not be entitled to a distribution from his Elective Deferral Account, Qualified Non-Elective Contribution Account or Qualified Matching Contributions (and earnings attributable to these contributions) unless he has had a "severance from employment" within the meaning of Code section 401(k)(2)(B)(i)(I).

Section 7.02        TIMING AND FORM OF DISTRIBUTIONS

(a)        Distribution for Reasons Other Than Death.  If a Participant's Account balance becomes distributable pursuant to Section 7.01 for any reason other than death and such amount is not required to be distributed in the form of a Qualified Joint and Survivor Annuity pursuant to Section 7.10, payment of his vested Account shall commence at such times and shall be payable in the form and at such times as specified in the Adoption Agreement.  To the extent permitted in the Adoption Agreement, a Participant may elect to have the Plan Administrator apply his entire Account toward the purchase of an annuity contract.  The terms of such annuity contract shall comply with the provisions of this Plan and any annuity contract shall be nontransferable and shall be distributed to the Participant.

The method of distribution shall be selected by the Participant on a form prescribed by the Plan Administrator.  If no such selection is made by the Participant, payment shall be made in the form of a lump sum distribution unless the Adoption Agreement provides for different normal form of payment or payment is required to be made in the form of a Qualified Joint and Survivor Annuity pursuant to Section 7.10 of the Adoption Agreement. No distribution shall be made if the Participant is rehired by the Company before payments commence.

(b)        Distribution on Account of Death.

(1)        Before Distribution Has Begun.  If the Participant dies before distribution of his Account begins and such amount is not required to be distributed in the form of a qualified preretirement survivor annuity pursuant to Section 7.10, distribution of the Participant's entire Account shall be completed by the time and in the manner specified in the Adoption Agreement.  To the extent permitted in the Adoption Agreement, payments may be made at least as rapidly as over the following periods:

(A)        A complete distribution shall be made by December 31 of the calendar year containing the fifth anniversary of the Participant's death;

(B)       Distributions may be made over the life or over a period certain not greater than the life expectancy of the Beneficiary commencing on or before December 31 of the calendar year immediately following the calendar year in which the Participant died; and/or

(C)       If the Beneficiary is the Participant's surviving spouse, the date distributions are required to begin in accordance with Subparagraph (B) above shall not be earlier than the later of (i) December 31 of the calendar year immediately following the calendar year in which the Participant died and (ii) December 31 of the calendar year in which the Participant would have attained age 70-1/2.

If the Plan permits Participant elections under this Subsection (b)(1) and the Participant has not made an election as to form of payment by the time of his death, the Participant's Beneficiary must elect the method of distribution no later than the earlier of (1) December 31 of the calendar year in which distributions would be required to begin under this Section, or (2) December 31 of the calendar year which contains the fifth anniversary of the date of death of the Participant.  If the Participant has no designated beneficiary, pursuant to applicable Treasury Regulations, or if the designated Beneficiary does not elect a method of distribution, distribution of the Participant's entire interest must be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

If the surviving spouse dies after the Participant, the provisions of this Subsection (b)(1), with the exception of Subparagraph (C) therein, shall be applied as if the surviving spouse were the Participant.

(2)       After Distribution Has Begun.  If the Participant dies after distribution of his Account has begun, the remaining portion of such Account will continue to be distributed at least as rapidly as the method of distribution being used prior to the Participant's death.  If the Participant's Account was not being distributed in the form of an annuity at the time of his death: (i) distribution of the Participant's entire Account shall be completed by the time and in the manner specified in the Adoption Agreement; and (ii) the Beneficiary may elect to receive the Participant's remaining vested Account balance in a lump sum distribution.  To the extent permitted in the Adoption Agreement, payments may be made at least as rapidly as over the following periods:

(A)       A complete distribution shall be made by December 31 of the calendar year containing the fifth anniversary of the Participant's death; and/or

(B)       Distributions shall continue to be distributed at least as rapidly as the method of distribution being used prior to the Participant's death.

The Beneficiary shall provide the Plan Administrator with the death notice or other sufficient documentation before any payments are made pursuant to this Subsection.

(c)       Valuation Date. The distributable amount of a Participant's Account is the vested portion of his Account as of the Valuation Date coincident with or next preceding the date distribution is made to the Participant or Beneficiary as reduced by any subsequent distributions, withdrawals or loans.

(d)       Ordering Rule. The Plan Administrator shall determine the ordering rule for distributions; provided that such ordering rule is nondiscriminatory. Such ordering rule may provide that the Participant or Beneficiary may elect to have payments made first or last from his Roth Elective Deferral Account or Voluntary Contribution Account or in any combination of such Accounts and any other Account.

(e)       Restriction on Deferral of Payment.  Unless otherwise elected, benefit payments under the Plan will begin to a Participant not later than the 60th day after the latest of the close of the Plan Year in which:

(1)       the Participant attains his Normal Retirement Date;

(2)       occurs the 10th anniversary of the year in which his participation commenced; or

(3)       the Participant has a Termination of Employment.

Notwithstanding the foregoing, the failure of a Participant and spouse to consent to a distribution while a benefit is immediately distributable shall be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this section.

(f)    Minimum Distribution Requirements. Distributions shall be made in a method that is in conformance with the requirements set forth in Section 7.05. Section 7.05 shall not be deemed to create a type of benefit (e.g., installment payments, lump sum within five years or immediate lump sum payment) to any class of Participants and Beneficiaries that is not otherwise permitted by the Plan.

Section 7.03    CASH-OUT OF SMALL BALANCES

(a)    Vested Account Balance Does Not Exceed $5,000.  Notwithstanding the foregoing, if involuntary cash-out is selected in the Adoption Agreement and the vested amount of an Account payable to a Participant or Beneficiary does not exceed $5,000 (or such lesser amount specified in the Adoption Agreement) at the time such individual becomes entitled to a distribution hereunder (or at any subsequent time established by the Plan Administrator to the extent provided in applicable Treasury Regulations), such vested Account shall be paid in a lump sum to the extent it is not subject to the automatic rollover provisions of Section 7.06(c) below.

(b)    Vested Account Balance Exceeds $5,000.  If the value of a Participant's vested Account balance exceeds $5,000 or such lesser amount as specified in the Adoption Agreement and the Account balance is immediately distributable, the Participant must consent to any distribution of such Account balance.  Notwithstanding the foregoing and unless otherwise specified in the Adoption Agreement, payments shall commence as of the Participant's Required Beginning Date in the form of a lump sum or installment payments.  The Participant's consent shall be obtained in writing within the 180-day period ending on the Annuity Starting Date.  The Plan Administrator shall notify the Participant of the right to defer any distribution until the date specified in the Adoption Agreement.  Such notification shall include a general description of the material features, and an explanation of the relative values of, the optional forms of benefit available under the Plan, and shall be provided no less than 30 days and no more than 180 days prior to the Annuity Starting Date.  Except to the extent provided in Section 7.10, distribution may commence less than 30 days after the notice described in the preceding sentence is given, provided the Plan Administrator clearly informs the Participant that he has a right to a period of at least 30 days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and the Participant, after receiving the notice, affirmatively elects a distribution.  In the event a Participant's vested Account balance becomes distributable without consent pursuant to this Subsection (b), and the Participant fails to elect a form of distribution, the vested Account balance of such Participant shall be paid in a single sum except to the extent provided in Section 7.10.

(c)    For purposes of this Section 7.03, the Participant's vested Account balance shall not include amounts attributable to accumulated deductible Employee contributions within the meaning of Code section 72(o)(5)(B).

(d)    Required Distributions and Plan Termination.  Consent of the Participant or his spouse shall not be required to the extent that a distribution is required to satisfy Code sections 401(a)(9), 401(k), 401(m), 402(g) or 415.  In addition, upon termination of this Plan the Participant's Account balance shall be distributed to the Participant in a lump sum distribution unless payment is made in the form of a Qualified Joint and Survivor Annuity pursuant to Section 7.10.  However, if the Employer maintains another defined contribution plan (other than an employee stock ownership plan as defined in Code section 4975(e)(7)), then the Participant's Account balance will be transferred, without the Participant's consent, to the other plan if the Participant does not consent to an immediate distribution.

(e)    Treatment of Rollovers. If elected in the Adoption Agreement, Rollovers shall be disregarded in determining the value of the Account balance for involuntary distributions.  For purposes of this Section 7.03, the Participant's vested Account balance shall not include that portion of the Account balance that is attributable to Rollover Contributions (and earnings allocable thereto) within the meaning of Code sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3)(A)(ii), and 457(e)(16).

Section 7.04    BENEFICIARY

(a)    Beneficiary Designation Right.  Except as provided in Section 7.04(b) and Section 7.10, each Participant, and if the Participant has died, the Beneficiary of such Participant, shall have the right to designate one or more primary and one or more secondary Beneficiaries to receive any benefit becoming payable upon such individual's death.  To the extent that a Participant's Account is not subject to Section 7.10, the spouse of a married Participant shall be the sole primary Beneficiary of such Participant unless the requirements of Subsection (b) are met.  To the extent that a Participant's Account is subject to Section 7.10, the spouse of a married Participant shall be the Beneficiary of such portion of the Participant's Account as specified in the Adoption Agreement unless the spouse waives his or her rights to such benefit pursuant to Section 7.10.  All Beneficiary designations shall be in writing in a form satisfactory to the Plan Administrator and shall only be effective when filed with the Plan Administrator during the Participant's lifetime (or if the Participant has died, during the lifetime of the Beneficiary of such Participant who desires to designate a further Beneficiary).  Except as provided in Section 7.04(b) or Section 7.10, as applicable, each Participant (or Beneficiary) shall be entitled to change his Beneficiaries at any time and from time to time by filing written notice of such change with the Plan Administrator.

(b)    Form and Content of Spouse's Consent.  To the extent that a Participant's Account is not subject to Section 7.10, the Participant may designate a Beneficiary other than his spouse pursuant to this Subsection if: (1) the spouse has waived the spouse's right to be the Participant's

Beneficiary in accordance with this Subsection; (2) the Participant has no spouse; or (3) the Plan Administrator determines that the spouse cannot be located or such other circumstances exist under which spousal consent is not required, as prescribed by Treasury Regulations. If required, such consent: (1) shall be in writing; (2) shall relate only to the specific alternate Beneficiary or Beneficiaries designated (or permits Beneficiary designations by the Participant without the spouse's further consent); (3) shall acknowledge the effect of the consent; and (4) shall be witnessed by a Plan representative or notary public. Any consent by a spouse, or establishment that the consent of a spouse may not be obtained, shall not be effective with respect to any other spouse. Any spousal consent that permits subsequent changes by the Participant to the Beneficiary designation without the requirement of further spousal consent shall acknowledge that the spouse has the right to limit such consent to a specific Beneficiary, and that the spouse voluntarily elects to relinquish such right.

(c)     No Designated Beneficiary.   Unless otherwise provided in the Adoption Agreement, in the event that the Participant fails to designate a Beneficiary, or in the event that the Participant is predeceased by all designated primary and secondary Beneficiaries, the death benefit shall be payable to the Participant's spouse or, if there is no spouse, to the Participant's children in equal shares or, if there are no children to the Participant's estate.

<u>Section 7.05</u>          <u>MINIMUM DISTRIBUTION REQUIREMENTS</u>

(a)     General Rules.

(1)     Effective Date. Subject to Section 7.10, the requirements of this Section shall apply to any distribution of a Participant's interest and will take precedence over any inconsistent provisions of this Plan.

(2)     Construction. All distributions required under this Section shall be determined and made in accordance with the regulations under Code section 401(a)(9) and the minimum distribution incidental benefit requirement of Code section 401(a)(9)(G). Nothing contained in this Section shall be deemed to create a type of benefit (e.g., installment payments, lump sum within five years or immediate lump sum payment) to any class of Participants and/or Beneficiaries that is not otherwise permitted by the Plan.

(3)     Limits on Distribution Periods. As of the first distribution calendar year, distributions to a Participant, if not made in a single sum, may only be made over one of the following periods:

(i)     the life of the Participant;

(ii)     the joint lives of the Participant and a designated Beneficiary;

(iii)     a period certain not extending beyond the life expectancy of the Participant; or

(iv)     a period certain not extending beyond the joint life and last survivor expectancy of the Participant and a designated Beneficiary.

(b)     Time and Manner of Distribution.

(1)     Required Beginning Date. Unless an earlier date is specified in Section 7.02(b), the Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(2)     Death of Participant Before Distributions Begin. If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(i)     If the Participant's surviving spouse is the Participant's sole designated Beneficiary, then unless an earlier date is specified in Section 7.02(b), distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70-1/2, if later.

(ii)     If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, then, unless otherwise specified in Section 7.02(b), distributions to the designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(iii)     If there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death unless an earlier date is specified in Section 7.02(b).

(iv)     If the Participant's surviving spouse is the Participant's sole designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse are required to begin, this Subsection (b)(2), other than Subsection (b)(2)(i), will apply as if the surviving spouse were the Participant except as otherwise provided in Section 7.02(b).

For purposes of this Subsection (b)(2) and Subsection (d), unless Subsection (b)(2)(iv) applies, distributions are considered to begin on the Participant's Required Beginning Date. If Subsection (b)(2)(iv) applies, distributions are considered to begin on the date distributions are required to begin to the surviving spouse under Subsection (b)(2)(i). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under Subsection (b)(2)(i)), the date distributions are considered to begin is the date distributions actually commence.

(3)     Forms of Distribution. Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, distributions will be made in accordance with Subsections (c) and (d) to the extent otherwise permitted by the Plan. If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code 401(a)(9) and the regulations.

(c)     Required Minimum Distributions During Participant's Lifetime.

(1)     Amount of Required Minimum Distribution For Each Distribution Calendar Year. During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

(i)     the quotient obtained by dividing the Participant's Account balance by the distribution period in the Uniform Lifetime Table set forth in Treas. Reg. section 1.401(a)(9)-9, Q&A-2 using the Participant's age as of the Participant's birthday in the distribution calendar year; or

(ii)     if the Participant's sole designated Beneficiary for the distribution calendar year is the Participant's spouse, the quotient obtained by dividing the Participant's Account balance by the number in the Joint and Last Survivor Table set forth in Treas. Reg. section 1.401(a)(9)-9, Q&A-3 using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

(2)     Lifetime Required Minimum Distributions Continue Through Year of Participant's Death. Required minimum distributions will be determined under this Subsection (c) beginning with the first distribution calendar year and continuing up to, and including, the distribution calendar year that includes the Participant's date of death.

(d)     Required Minimum Distributions After Participant's Death.

(1)     Death On or After Date Distributions Begin.

(i)     Participant Survived by Designated Beneficiary. If the Participant dies on or after the date distributions begin and there is a designated Beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's designated Beneficiary, determined as follows:

(A)     The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)     If the Participant's surviving spouse is the Participant's sole designated Beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For distribution calendar years after the year of the surviving spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(C)     If the Participant's surviving spouse is not the Participant's sole designated Beneficiary, the designated Beneficiary's remaining life expectancy is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(ii)     No Designated Beneficiary. If the Participant dies on or after the date distributions begin and there is no designated Beneficiary as of the September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account balance by the Participant's remaining life expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(2)     Death Before Date Distributions Begin.

(i)     Participant Survived by Designated Beneficiary. If the Participant dies before the date distributions begin and there is a designated Beneficiary, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account balance by the remaining life expectancy of the Participant's designated Beneficiary, determined as provided in Subsection (d)(1).

(ii)     No Designated Beneficiary. If the Participant dies before the date distributions begin and there is no designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(iii)     Death of Surviving Spouse Before Distributions to Surviving Spouse Are Required to Begin. If the Participant dies before the date distributions begin, the Participant's surviving spouse is the Participant's sole designated Beneficiary, and the surviving spouse dies before distributions are required to begin to the surviving spouse under Subsection (b)(2)(i), this Subsection (d)(2) will apply as if the surviving spouse were the Participant.

(e)     Definitions.

(1)     Designated Beneficiary. The individual who is designated by the Participant (or the Participant's surviving spouse) as the Beneficiary of the Participant's interest under the Plan and who is the designated Beneficiary under Code section 401(a)(9) and Treas. Reg. section 1.401(a)(9)-4.

(2)     Distribution Calendar Year. A calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin under Subsection (b)(2). The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's Required Beginning Date. The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's Required Beginning Date occurs, will be made on or before December 31 of that distribution calendar year.

(3)     Life expectancy. Life expectancy is computed by use of the Single Life Table in Treas. Reg. section 1.401(a)(9)-9, Q&A-1.

(4)     Participant's Account Balance. The Account balance as of the last Valuation Date in the calendar year immediately preceding the distribution calendar year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Account as of dates in the valuation calendar year after the Valuation Date and decreased by distributions made in the valuation calendar year after the Valuation Date. The Account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the distribution calendar year if distributed or transferred in the valuation calendar year.

(f)     TEFRA Section 242(b)(2) Elections.

(1)     Notwithstanding any provision in the Plan to the contrary and subject to the requirements of Section 7.10, distribution on behalf of any Employee, including a More Than 5% Owner, who has made a designation under section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (a "section 242(b)(2) election") may be made in accordance with all of the following requirements (regardless of when such distribution commences):

(i)      The distribution by the Plan is one which would not have disqualified such plan under Code section 401(a)(9) as in effect prior to amendment by the Deficit Reduction Act of 1984.

(ii)      The distribution is in accordance with a method of distribution designated by the Employee whose interest in the Plan is being distributed or, if the Employee is deceased, by a Beneficiary of such Employee.

(iii)      Such designation was in writing, was signed by the Employee or the Beneficiary, and was made before January 1, 1984.

(iv)      The Employee had accrued a benefit under the Plan as of December 31, 1983.

(v)      The method of distribution designated by the Employee or the Beneficiary specifies the time at which distribution will commence, the period over which distributions will be made, and in the case of any distribution upon the Employee's death, the Beneficiaries of the Employee listed in order of priority.

(2)      A distribution upon death will not be covered by this transitional rule unless the information in the designation contains the required information described above with respect to the distributions to be made upon the death of the Employee.

(3)      For any distribution which commences before January 1, 1984, but continues after December 31, 1983, the Employee, or the Beneficiary, to whom such distribution is being made, will be presumed to have designated the method of distribution under which the distribution is being made if the method of distribution was specified in writing and the distribution satisfies the requirements in Subsections (f)(1)(i) and (v).

(4)      If a designation is revoked, any subsequent distribution must satisfy the requirements of Code section 401(a)(9) and the regulations thereunder. If a designation is revoked subsequent to the date distributions are required to begin, the Plan must distribute by the end of the calendar year following the calendar year in which the revocation occurs the total amount not yet distributed which would have been required to have been distributed to satisfy Code section 401(a)(9) and the regulations thereunder, but for the section 242(b)(2) election. For calendar years beginning after December 31, 1988, such distributions must meet the minimum distribution incidental benefit requirements. Any changes in the designation will be considered to be a revocation of the designation. However, the mere substitution or addition of another Beneficiary (one not named in the designation) under the designation will not be considered to be a revocation of the designation, so long as such substitution or addition does not alter the period over which distributions are to be made under the designation, directly or indirectly (for example, by altering the relevant measuring life).

(5)      In the case in which an amount is transferred or rolled over from one plan to another plan, the rules in Treas. Reg. section 1.401(a)(9)-8, Q&A-14 and Q&A-15, shall apply.

(g)      Application of Five Year Rule.

(1)      To the extent permitted in Section 7.02(b), if the Participant dies before distributions are required to begin and there is a designated Beneficiary, distributions to the designated Beneficiary are not required to begin by the date specified in Subsection (b)(2), but the Participant's entire interest may be distributed to the designated Beneficiary by December 31 of the calendar year containing the fifth anniversary of the Participant's death. If the Participant's surviving spouse is the Participant's sole designated Beneficiary and the surviving spouse dies after the Participant but before distributions to either the Participant or the surviving spouse begin, this election will apply as if the surviving spouse were the Participant.

(2)      To the extent permitted in Section 7.02(b), Participants or Beneficiaries may elect on an individual basis whether the 5-year rule or the life expectancy rule in Subsections (b)(2), (d)(2) and (g)(1) applies to distributions after the death of a Participant who has a designated Beneficiary. The election must be made no later than the earlier of September 30 of the calendar year in which distributions would be required to begin under Subsections (b)(2), or September 30 of the calendar year which contains the fifth anniversary of the Participant's (or, if applicable, surviving spouse's) death. If neither the Participant nor Beneficiary makes an election under this paragraph, distributions will be made in accordance with Subsections (b)(2), (d)(2) and (g)(1).

Section 7.06      <u>DIRECT ROLLOVERS</u>

(a)      In General. This Section applies to distributions made after December 31, 2001. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover distribution that is equal to at least $500 (or such lesser amount as determined by the

Plan Administrator in a nondiscriminatory manner) paid directly to an eligible retirement plan specified by the distributee in a direct rollover. If an eligible rollover distribution is less than $500 (or such lesser amount as determined by the Plan Administrator in a nondiscriminatory manner), a distributee may not make the election described in the preceding sentence to roll over a portion of the eligible rollover distribution. This Paragraph shall be subject to Code sections 401(a)(31) and 402(f); Treas. Reg. sections 1.401(a)(31)-1, 1.402(c)-2 and 1.401(k)-1(f); and IRS Notices 2005-5, 2008-30, 2009-69, and 2009-75.

Effective January 1, 2007, a non-spouse Beneficiary who is a designated Beneficiary within the meaning of Code section 401(a)(9)(E) may, after the death of the Participant, make a direct rollover of a distribution to an IRA established on behalf of the designated Beneficiary; provided the distributed amount satisfies all the requirements to be an eligible rollover distribution other than the requirement that the distribution be made to the Participant or the Participant's spouse. Such direct rollovers shall be subject to the terms and conditions of IRS Notice 2007-7 and superseding guidance, including but not limited to the provision in Q&A-17 regarding required minimum distributions. Effective January 1, 2010, the distributions described in this Paragraph shall be subject to Code sections 401(a)(31), 402(f) and 3405(c).

(b)     Definitions.

(1)     Eligible Rollover Distribution. An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated Beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code section 401(a)(9); any hardship distribution; the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution(s) that is reasonably expected to total less than $200 (or such lesser amount as determined by the Plan Administrator in a nondiscriminatory manner) during a year. For purposes of the $200 rule in the preceding sentence, a distribution from a Roth Elective Deferral Account and a distribution from other Accounts under the Plan are treated as made under separate plans.

A portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax Employee contributions which are not includible in gross income. However, such portion may be transferred only to an individual retirement account or annuity described in Code section 408(a) or (b), an annuity contract described in Code section 403(b), or to a qualified defined contribution plan described in Code section 401(a) or 403(a) that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(2)     Eligible Retirement Plan. An eligible retirement plan is an eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, an individual retirement account described in Code section 408(a), individual retirement annuity described in Code section 408(b), an annuity plan described in Code section 403(a), an annuity contract described in Code section 403(b), or a qualified plan described in Code section 401(a), that accepts the distributee's eligible rollover distribution. The definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the Alternate Payee under a Qualified Domestic Relations Order, as defined in Code section 414(p).

If any portion of an eligible rollover distribution is attributable to payments or distributions from a Roth Elective Deferral Account, an eligible retirement plan shall only include another Roth elective deferral account under an applicable retirement plan described in Code section 402A(e)(1) or to a Roth IRA described in Code section 408A and only to the extent the rollover is permitted under the rules of Code section 402(c). The Plan will not provide for a direct rollover (including an automatic rollover) for distributions from a Participant's Roth Elective Deferral Account if the amount of the distributions that are eligible rollover distributions are reasonably expected to total less than $200 (or such lesser amount as determined by the Plan Administrator in a nondiscriminatory manner) during a year. In addition, if elected by the Plan Administrator in a nondiscriminatory manner, any distribution from a Participant's Roth Elective Deferral Account is not taken into account in determining whether distributions from a Participant's other Accounts are reasonably expected to total less than $200 during a year. The provisions of this Section that allow a Participant to elect a direct rollover of only a portion of an eligible rollover distribution but only if the amount rolled over is at least $500 are applied by treating any amount distributed from the Participant's Roth Elective Deferral Account as a separate distribution from any amount distributed from the Participant's other Accounts in the Plan, even if the amounts are distributed at the same time.

(3)     Distributee. A distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the Alternate Payee under a Qualified Domestic Relations Order, as defined in Code section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(4)     Direct Rollover. A direct rollover is a payment by the Plan to the eligible retirement plan specified by the distributee.

(c)     Automatic Rollovers. In the event of a mandatory distribution greater than $1,000 (or such lesser amount as determined by the Plan Administrator in a nondiscriminatory manner) in accordance with the provisions of Section 7.03(a), if the Participant does not elect to have such distribution paid directly to an eligible retirement plan specified by the Participant in a direct rollover or to receive the distribution directly in accordance with Section 7.02, then the Plan Administrator will pay the distribution in a direct rollover to an individual retirement plan designated by the Plan Administrator. Unless otherwise elected in the Adoption Agreement, for purposes of determining whether a mandatory distribution is greater than $1,000, the portion of the Participant's distribution attributable to any Rollover Contribution is included. Eligible rollover distributions from a Participant's Roth Elective Deferral Account are separately taken into account in determining whether the total amount of the Participant's Account balances under the Plan exceeds $1,000 for purposes of mandatory distributions from the Plan.

## Section 7.07     MINOR OR LEGALLY INCOMPETENT PAYEE

If a distribution is to be made to an individual who is either a minor or legally incompetent, the Plan Administrator may direct that such distribution be paid to the legal guardian.  If a distribution is to be made to such person and there is no legal guardian, the Plan Administrator may direct that payment be made to: (a) a parent, (b) a person holding a power of attorney; (c) a person authorized to act on behalf of such person under state law, or (d) the custodian for such person under the Uniform Transfer to Minors Act, if such is permitted by the laws of the state in which such minor resides.  Such payment shall fully discharge the Trustee, Plan Administrator, Trust Fund, and the Employer from further liability on account thereof.

## Section 7.08     MISSING PAYEE

If all or any portion of the distribution payable to a Participant or Beneficiary remains unpaid because the Plan Administrator has been unable to ascertain the whereabouts of the Participant or Beneficiary after making reasonable efforts to contact the Participant or Beneficiary (which may include, but not be limited to, sending a registered letter, return receipt requested, to the last known address of such Participant or Beneficiary; using the Social Security Administration letter forwarding service; and/or a commercial locating service) the Plan Administrator may use a reasonable method to remove the assets from the Plan that is consistent with ERISA and the Code. Such methods may include, but not be limited to, (a) creating an individual retirement plan designated by the Plan Administrator; or (b) if, for a period of more than five years after such distribution becomes payable or six months after all attempts to locate the Participant or Beneficiary, the Plan Administrator is still unable to ascertain the whereabouts of the Participant or Beneficiary, the amount so distributable may be treated as a forfeiture under Article 6 hereof.  Notwithstanding the foregoing, if a claim is subsequently made by the Participant or Beneficiary for the forfeited benefit pursuant to clause (b) of the preceding sentence, such benefit shall be reinstated without any credit or deduction for earnings and losses.  Amounts forfeited from a Participant's Account under this Section shall be used pursuant to Section 6.03(d).

## Section 7.09     DISTRIBUTIONS UPON TERMINATION OF PLAN

Except as provided in Sections 7.10 and 13.03, a Participant shall receive the balance of his Account in a lump sum payment upon termination of the Plan without the establishment of an alternative defined contribution plan (as described in Treas. Reg. section 1.401(k)-1(d)(4)) other than an employee stock ownership plan (as defined in Code section 4975(e) or Code section 409), a simplified employee pension plan (as defined in Code section 408(k)), a SIMPLE IRA Plan (defined in Code section 408(p)), a plan or contract that satisfies the requirements of Code section 403(b), or a plan that is described in Code section 457(b) or (f).

## Section 7.10     JOINT AND SURVIVOR ANNUITIES

(a)     Application.  Notwithstanding any provision to the contrary, this Section shall apply if: (1) the Adoption Agreement used in conjunction with this Basic Plan Document provides for a Money Purchase Pension Plan or a Target Benefit Plan; (2) the normal form of benefit selected in the Adoption Agreement is a Qualified Joint and Survivor Annuity, (3) if a Participant elects benefits in the form of a single life annuity; or (4) to the portion of the Participant's Transfer Account attributable to funds subject to the survivor annuity requirements of Code section 401(a)(11) and section 417 that were transferred from another plan (or to such other Accounts if the amounts were subject to such survivor annuities and were not separately accounted for).  This Section shall only apply if the Participant's Account exceeds $5,000 (or such lesser amount specified in the Adoption Agreement) at the time such individual becomes entitled to a distribution hereunder (or at any subsequent time established by the Plan Administrator to the extent provided in applicable Treasury Regulations). If elected in the Adoption Agreement, for purposes of this Section 7.10(a), the Participant's vested Account balance shall not include that portion of the Account balance that is attributable to Rollover Contributions (and earnings allocable thereto) within the meaning of Code sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3)(A)(ii), and 457(e)(16).

(b)     Qualified Joint and Survivor Annuity.  Unless otherwise elected pursuant to Subsection (d) below, a Participant's vested Account balance, to the extent provided in Subsection (a) above, will be paid to him by the purchase and delivery of an annuity in the form of a Qualified Joint

and Survivor Annuity. Effective for Annuity Starting Dates in Plan Years beginning after December 31, 2007, to the extent that the Plan must offer a Qualified Joint and Survivor Annuity, the Plan shall also offer a Qualified Optional Survivor Annuity as another optional form of benefit.

A Participant may waive the Qualified Joint and Survivor Annuity during a period that begins on the first day of the 180-day period ending on the Annuity Starting Date and ends on the later of the Annuity Starting Date or the 30th day after the Plan Administrator provides the Participant with a written explanation of the Qualified Joint and Survivor Annuity. The Plan Administrator shall no less than 30 days and no more than 180 days prior to the Annuity Starting Date provide each Participant a written explanation of: (1) the terms and conditions of a Qualified Joint and Survivor Annuity; (2) the Participant's right to make and the effect of an election to waive the Qualified Joint and Survivor Annuity form of benefit; (3) the rights of a Participant's spouse; (4) the right to make, and the effect of, a revocation of a previous election to waive the Qualified Joint and Survivor Annuity; and (5) the relative values of the various optional forms of benefits under the Plan pursuant to Treas. Reg. section 1.417(a)(3)-1(c)(2).

The Annuity Starting Date for a distribution in a form other than a Qualified Joint and Survivor Annuity may be less than 30 days after receipt of the written explanation described in the preceding paragraph provided: (1) the Participant has been provided with information that clearly indicates that the Participant has at least 30 days to consider whether to waive the Qualified Joint and Survivor Annuity and elect (with spousal consent) a form of distribution other than a Qualified Joint and Survivor Annuity; (2) the Participant is permitted to revoke any affirmative distribution election at least until the Annuity Starting Date or, if later, at any time prior to the expiration of the 7-day period that begins the day after the explanation of the Qualified Joint and Survivor Annuity is provided to the Participant; and (3) the Annuity Starting Date is a date after the date that the written explanation was provided to the Participant.

(c)     Qualified Preretirement Survivor Annuity.  Unless otherwise elected within the applicable election period and to the extent provided in Subsection (a) above, if a Participant dies before the Annuity Starting Date then at least 50% of the Participant's vested Account balance shall be applied toward the purchase of an annuity for the life of the surviving spouse which shall be distributed to the spouse.  The surviving spouse may direct the commencement of payments under the qualified preretirement survivor annuity within a reasonable time after the Participant's death. The terms of such annuity contract shall comply with the provisions of this Plan and the annuity contract shall be nontransferable.  The applicable election period shall be the period which begins on the first day of the Plan Year in which the Participant attains age 35 and ends on the date of the Participant's death.  If a Participant separates from service prior to the first day of the Plan Year in which he attains age 35, the election period shall begin on the date of separation.  A Participant who has not yet attained age 35 may waive the annuity specified in this Subsection (c) provided that (1) the Participant receives a written explanation pursuant to the following paragraph and (2) such election is not effective as of the first day of the Plan Year in which the Participant attains age 35. Any new waiver on or after such date shall be subject to the full requirements of this Subsection. Notwithstanding anything in this Section to the contrary, the surviving spouse may elect, in writing, to have the Account balance be distributed pursuant to Section 7.02(b).

The Plan Administrator shall provide each Participant within the applicable period for such Participant a written explanation of the annuity described in this Subsection (c) in such terms and in such manner as would be comparable to the explanation provided for meeting the requirements of Subsection (b) applicable to a Qualified Joint and Survivor Annuity.  The applicable period for a Participant is whichever of the following periods ends last: (1) the period beginning with the first day of the Plan Year in which the Participant attains age 32 and ending with the close of the Plan Year preceding the Plan Year in which the Participant attains age 35; (2) a reasonable period ending after the individual becomes a Participant; or (3) within a reasonable period ending after Termination of Employment in the case of a Participant who separates from service before attaining age 35.

For purposes of applying the preceding paragraph, a reasonable period ending after the enumerated events described in (2) and (3) is the end of the two-year period beginning one year prior to the date the applicable event occurs, and ending one year after that date.  If a Participant who separates from service before the Plan Year in which he attains age 35 thereafter returns to employment with the Employer, the applicable period for such Participant shall be redetermined.

(d)     Elections.  Any waiver of the annuities described in Subsections (b) and (c) above shall not be effective unless: (1) the Participant's spouse consents in writing to the election; (2) the election designates a specific Beneficiary, including any class of Beneficiaries or any contingent Beneficiaries, which may not be changed without spousal consent (or the spouse expressly permits designations by the Participant without any further spousal consent); (3) the spouse's consent acknowledges the effect of the election; and (4) the spouse's consent is witnessed by a Plan representative or notary public.  Additionally, a Participant's waiver of the Qualified Joint and Survivor Annuity shall not be effective unless the election designates a form of benefit payment which may not be changed without spousal consent (or the spouse expressly permits designations by the Participant without any further spousal consent).  If it is established to the satisfaction of a Plan representative that there is no spouse (within the meaning of Code section 417) or that the spouse cannot be located, a waiver will be deemed a qualified election.

Any consent by a spouse obtained under this provision (or establishment that the consent of a spouse may not be obtained) shall be effective only with respect to such spouse.  A consent that permits designations by the Participant without any requirement of further consent by such spouse must acknowledge that the spouse has the right to limit consent to a specific Beneficiary, and a specific form of benefit where applicable, and that the spouse voluntarily elects to relinquish either or both such rights.  A revocation of a prior waiver may be made by a Participant without the consent of the spouse at any time before the commencement of benefits.  The number of revocations shall not be limited.  No consent obtained under this provision shall be valid unless the Participant has received notice as provided in Subsections (b) and (c).

For purposes of determining a Participant's spouse, the Plan Administrator shall apply the one-year rule in Code section 417(d), Treas. Reg. section 1.401(a)-20 to the extent selected in the Adoption Agreement.

## ARTICLE 8 IN-SERVICE DISTRIBUTIONS AND LOANS

Section 8.01          HARDSHIP

(a)          Hardship.  A Participant may receive a distribution on account of hardship from the Accounts specified in the Adoption Agreement.  Notwithstanding anything in the Plan to the contrary if the Adoption Agreement permits a hardship distribution from an Account, the amount available for a hardship distribution from such Account shall include any amounts grandfathered under Treas. Reg. section 1.401(k)-1(d)(3)(ii)(B). Unless otherwise specified in the Adoption Agreement, a Participant shall only be permitted to receive a hardship distribution pursuant to this Section 8.01 from Accounts that are fully (100%) vested.

(b)          Hardship - Safe Harbor.  If the Adoption Agreement provides that the Plan has adopted safe harbor criteria for hardship withdrawal or if the Adoption Agreement provides that the Plan is a prototype plan, the following shall apply:

(1)          Immediate and Heavy Financial Need.  A hardship distribution shall only be made upon the finding by the Plan Administrator of an immediate and heavy financial need where such Participant lacks other available resources.  The following are the only financial needs considered immediate and heavy:

(A)          Expenses for (or necessary to obtain) medical care that would be deductible under Code section 213(d) (determined without regard to whether the expenses exceed 7.5% of adjusted gross income) for the Employee, or the Employee's spouse, children, or dependents (as defined in Code section 152, and, for taxable years beginning on or after January 1, 2005, without regard to Code section 152(b)(1), (b)(2) and (d)(1)(B));

(B)          Costs directly related to the purchase of a principal residence for the Employee (excluding mortgage payments);

(C)          Payment of tuition, related educational fees, and room and board expenses, for up to the next 12 months of post-secondary education for the Employee, or the Employee's spouse, children, or dependents (as defined in Code section 152, and, for taxable years beginning on or after January 1, 2005, without regard to Code section 152(b)(1), (b)(2) and (d)(1)(B));

(D)          Payments necessary to prevent the eviction of the Employee from the Employee's principal residence or foreclosure on the mortgage on that residence;

(E)          Payments for burial or funeral expenses for the Employee's deceased parent, spouse, children or dependents (as defined in Code section 152, and, for taxable years beginning on or after January 1, 2005, without regard to Code section 152(d)(1)(B));

(F)          Expenses for the repair of damage to the Employee's principal residence that would qualify for the casualty deduction under Code section 165 (determined without regard to whether the loss exceeds 10% of adjusted gross income); and

(G)          Other expenses as provided by the Commissioner as specified in Treas. Reg. section 1.401(k)-1(d)(3)(v).

(2)          Amount Necessary to Satisfy Need.  A distribution will be considered as necessary to satisfy an immediate and heavy financial need of the Participant only if:

(A)          The distribution is not in excess of the amount of the immediate and heavy financial need (including amounts necessary to pay any federal, state or local income taxes or penalties reasonably anticipated to result from the distribution);

(B)          The Participant has obtained all distributions, other than hardship distributions, and all nontaxable loans under all plans maintained by the Employer; and

(C)          Provided any amount is removed from the Participant's Elective Deferral Account, all plans maintained by the Employer provide that the Participant's Elective Deferrals (and after tax contributions) will be suspended for 6 months after the receipt of the hardship distribution.

*ARTICLE 8 IN-SERVICE DISTRIBUTIONS AND LOANS*

(c)      Hardship - Non Safe Harbor.  If the Adoption Agreement provides that the Plan has adopted the non-safe harbor criteria for hardship for permitted Accounts, the following shall apply:

(1)      Immediate and Heavy Financial Need.  A hardship distribution shall only be made upon the finding by the Plan Administrator of an immediate and heavy financial need where such Participant lacks other available resources.  Whether a Participant has an immediate and heavy financial need is to be determined based on all relevant facts and circumstances.  The need to pay the funeral expenses of a family member would constitute an immediate and heavy financial need and a distribution made to a Participant for the purchase of a boat or television would not constitute a distribution made on account of an immediate and heavy financial need.  A financial need may be immediate and heavy even if it was reasonably foreseeable or voluntarily incurred by the Participant.

(2)      Amount Necessary to Satisfy Need.  A distribution is not treated as necessary to satisfy an immediate and heavy financial need of a Participant to the extent the amount of the distribution is in excess of the amount required to relieve the financial need or to the extent the need may be satisfied from other resources that are reasonably available to the Participant.  This determination generally is to be made on the basis of all relevant facts and circumstances.  For purposes of this Subsection, the Participant's resources are deemed to include those assets of the Participant's spouse and minor children that are reasonably available to the Participant.  A vacation home jointly owned (regardless of the nature of legal title) by the Participant and the Participant's spouse will be deemed a resource of the Participant.  However, property held for the Participant's child under an irrevocable trust or under the Uniform Gifts to Minors Act is not treated as a resource of the Participant.  The amount of an immediate and heavy financial need may include any amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the distribution.  A distribution generally may be treated as necessary to satisfy a financial need if the Employer relies upon the Participant's written representation, unless the Employer has actual knowledge to the contrary, that the need cannot reasonably be relieved:

(A)      Through reimbursement or compensation by insurance or otherwise;

(B)      By liquidation of the Participant's assets;

(C)      By cessation of all Participant contributions under the Plan;

(D)      By other currently available distributions (including distribution of ESOP dividends under Code section 404(k)) and nontaxable (at the time of the loan) loans, under plans maintained by the Employer or by any other employer; or

(E)      By borrowing from commercial sources on reasonable commercial terms in an amount sufficient to satisfy the need.

For purposes of this Subsection, a need cannot reasonably be relieved by one of the actions listed above if the effect would be to increase the amount of the need.  For example, the need for funds to purchase a principal residence cannot reasonably be relieved by a Plan loan if the loan would disqualify the Employee from obtaining other necessary financing.

Section 8.02      SPECIFIED AGE; SPECIFIED AGE AND SERVICE

(a)      A Participant may receive a distribution on attainment of a specified age from the Accounts specified in the Adoption Agreement. Unless otherwise specified in the Adoption Agreement, a Participant shall only be permitted to receive a specified age distribution pursuant to this Section 8.02 from Accounts that are fully (100%) vested.

(b)      A Participant may receive a distribution on attainment of a specified age and service from the Accounts specified in the Adoption Agreement.  Unless otherwise specified in the Adoption Agreement, a Participant shall only be permitted to receive a specified age and service distribution pursuant to this Section 8.02 from Accounts that are fully (100%) vested.

Section 8.03      OTHER WITHDRAWALS

(a)      After a Period Certain.  To the extent provided in the Adoption Agreement, a Participant may receive a distribution from his Matching Contribution Account and his Profit Sharing Contribution Account which has accumulated for at least twenty-four (24) months; and an individual who has been a Participant for five (5) or more Plan Years shall be entitled to receive a distribution of his Matching Contribution Account and Profit Sharing Contribution Account regardless of the length of time the funds have accumulated.  Unless otherwise specified in the Adoption Agreement, a Participant shall only be permitted to receive a distribution pursuant to this Section 8.03(a) from Accounts that are fully (100%) vested. Notwithstanding the foregoing, a Participant may receive a distribution from his Matching Contribution Account only to the extent such Account has

not been used to satisfy the requirements of Code sections 401(k)(12) or 401(k)(13) and/or 401(m)(11) or 401(m)(12) or to the extent such contributions have not been treated as Qualified Matching Contributions.

(b)    At Any Time.  To the extent provided in the Adoption Agreement, a Participant may receive a distribution from his Voluntary Contribution Account and his Rollover Contribution Account at any time.

(c)    Qualified Reservist Distributions. To the extent Qualified Reservist Distributions are provided for in the Adoption Agreement, as provided in Code section 72(t)(2)(G)(iii), Notice 2010-15 and any superseding guidance, the following shall apply:

(1)    For purposes of Code section 401(k)(2)(B)(i) (distributions of Elective Deferrals), a Participant who is a member of the reserves who has been ordered or called to active duty for a period of more than 179 days or for an indefinite period may receive a distribution during such active duty period.

(d)    Deemed Severance Distributions. To the extent Deemed Severance Distributions are provided for in the Adoption Agreement, as provided in Code section 414(u)(12)(B), Notice 2010-15 and any superseding guidance, the following shall apply:

(1)    For purposes of Code section 401(k)(2)(B)(i)(I) (distributions of Elective Deferrals), a Participant performing service in the uniformed services while on active duty for a period of more than 30 days will be treated as having terminated from employment during any period the Participant is performing services described in Code section 3401(h)(2)(A).

(2)    If a Participant elects to receive a distribution by reason of Subsection (d), the Participant may not make an Elective Deferral or Voluntary Contribution during the 6-month period beginning on the date of distribution.

Section 8.04    TRANSFER ACCOUNT

In addition to the foregoing a Participant may receive a distribution from his Transfer Account, to the extent applicable, as permitted under the terms of any plan from which funds in such Account were transferred to the extent that such optional forms of benefit must be preserved pursuant to Code section 411(d)(6) and to the extent permitted in the Adoption Agreement.

Section 8.05    RULES REGARDING IN-SERVICE DISTRIBUTIONS

(a)    In General.  This Section shall apply only to the extent that in-service withdrawals are otherwise permitted pursuant to this Article 8.

(b)    Frequency and Amount of Withdrawals.  The Plan Administrator may establish uniform procedures that include, but are not limited to, prescribing limitations on the frequency and minimum amount of withdrawals; provided, that no procedures involving minimum amounts shall prescribe a minimum withdrawal greater than $1,000.

(c)    Form of Withdrawals.  Unless otherwise provided in the Adoption Agreement, all distributions of amounts withdrawn pursuant to this Article 8 shall be made in the form of a single sum as soon as practicable following the Valuation Date as of which such withdrawal is made. Unless otherwise provided in the Adoption Agreement, such distributions may be paid in cash or in-kind.

(d)    Active Employment.  Unless otherwise specified, only Employees shall be eligible to receive in-service distributions pursuant to this Article 8.

(e)    Ordering Rule. The Plan Administrator shall determine the ordering rule for in-service distributions. Such ordering rule may provide that the Participant may elect to have payments made first or last from his Roth Elective Deferral Account or Voluntary Contribution Account or in any combination of such Accounts and any other Account, to the extent permitted by the Adoption Agreement.

(f)    Transfer Account.  A Participant may receive a distribution from the vested portion of his Transfer Account only to the extent such Account was not transferred from a qualified plan subject to Code section 412, to the extent Section 8.04 applies or to the extent the Adoption Agreement permits distributions to be made to a Participant who has attained age 62 and who has not separated from employment.

(g)    Spousal Consent.  If Section 7.10 applies to the Account distributed a Participant must obtain the consent of his or her spouse, if any, to obtain an Account balance as an in-service distribution.  Spousal consent shall be obtained no earlier than the beginning of the 180-day period that ends on the date on which the in-service distribution is to be so secured.  The consent must be in writing, must acknowledge the effect of the in-

service distribution, and must be witnessed by a Plan representative or notary public. Such consent shall thereafter be binding with respect to the consenting spouse or any subsequent spouse with respect to that in-service distribution.

Section 8.06          LOANS

(a)          Eligible Participants. If allowed in the Adoption Agreement, a Participant may apply for a loan from the Plan and the provisions of Code section 72(p) and Treas. Reg. section 1.72(p)-1 shall apply to the Plan and are hereby incorporated by reference. The Plan Administrator may provide that a loan may only be granted for the purpose of enabling the Participant to meet a financial hardship or an unusual or special situation in his financial affairs. Loans shall only be granted pursuant to the terms of this Section to persons who the Plan Administrator determines have the ability to repay the loan. Loans shall not be made available to Participants who are or were Highly Compensated Employees in an amount greater than the amount available to other Participants, and loans shall be made available to all Participants on a nondiscriminatory and reasonably equivalent basis.

(b)          Maximum Loan Amount. No loan to any Participant can be made to the extent that such loan when added to the outstanding balance of all other loans to the Participant would exceed the lesser of:

(1)          $50,000 reduced by the excess (if any) of the highest outstanding balance of loans during the one year period ending on the day before the loan is made, over the outstanding balance of loans from the Plan on the date the loan is made; or

(2)          one-half the present value of the vested Account balance of the Participant or, if greater and so provided by the Plan Administrator, the total vested Account balance up to $10,000; provided that additional security is given to the extent such loan exceeds 50% of the vested Account balance.

For the purpose of the above limitation, all loans from all qualified plans of the Employer are aggregated.

(c)          Loan Term and Amortization. Any loan shall by its terms require that repayment (principal and interest) be amortized in level payments, not less frequently than quarterly, over a period not extending beyond five years from the date of the loan. If so provided by the Plan Administrator, a loan term may extend beyond five years if the loan is used to acquire a dwelling unit which within a reasonable time (determined at the time the loan is made) will be used as the principal residence of the Participant.

(d)          Minimum Loan Amount - Maximum Number of Loans. The Plan Administrator shall specify a minimum loan amount and the maximum number of loans outstanding at any one time.

(e)          Interest Rate. Interest shall be charged at a rate to be fixed by the Plan Administrator and, in determining the interest rate, the Plan Administrator shall take into consideration interest rates currently being charged on similar commercial loans by persons in the business of lending money.

(f)          Security. All loans shall be secured by no more than one-half of the vested portion of the Participant's Accounts (determined immediately after the origination of the loan) and such additional security as the Plan Administrator may deem necessary. All loans made to Participants under this Section are to be considered Trust Fund investments and shall be segregated as provided in Article 9 hereof unless the Plan Administrator provides otherwise.

(g)          Repayment. Loans shall be repaid in accordance with the foregoing and the Plan Administrator may require as a condition to granting such loan that it be repaid through payroll deductions. Unless the loan note provides otherwise, the principal amount of the loan and accrued interest shall become immediately due and payable upon a Termination of Employment. Repayment may be suspended pursuant to Code section 414(u).

(h)          Loan Fees. Fees properly chargeable in connection with a loan may be charged, in accordance with a uniform and nondiscriminatory policy established by the Plan Administrator, against the Account of the Participant to whom the loan is granted.

(i)          Default. In the event of default, foreclosure on the note and attachment of security shall not occur until a distributable event occurs in the Plan.

(j)          Loans to Self-Employed Persons. For Plan loans made before January 1, 2002, no loans will be made to any shareholder-employee or owner-employee. For purposes of this requirement, a shareholder-employee means an employee or officer of an electing small business (Subchapter S) corporation who owns (or is considered as owning within the meaning of Code section 318(a)(1), on any day during the taxable year

of such corporation, more than 5% of the outstanding stock of the corporation. An owner-employee means, if the Employer is a sole proprietorship, an individual who is the sole proprietor, or, if the Employer is a partnership, a partner owning more than 10% of either the capital or profits interest of the partnership.

(k)     Loan Procedures. The Plan Administrator is authorized to adopt any administrative rules or procedures that it deems necessary or appropriate with respect to the granting and administering of loans under this Article 8.

(l)     Ordering Rule. The Plan Administrator shall determine from which Accounts a Participant may receive a loan and the ordering rule for loans. Such ordering rule may provide that the Participant may elect to have loans made first or last from his Roth Elective Deferral Account or Voluntary Contribution Account or in any combination of such Accounts and any other Account.

(m)     Spousal Consent. If Section 7.10 applies or if so provided by the Plan Administrator, a Participant must obtain the consent of his or her spouse, if any, to use the Account balance as security for a loan. Spousal consent shall be obtained no earlier than the beginning of the 180-day period that ends on the date on which the loan is to be so secured. The consent must be in writing, must acknowledge the effect of the loan, and must be witnessed by a Plan representative or notary public. Such consent shall thereafter be binding with respect to the consenting spouse or any subsequent spouse with respect to that loan. A new consent shall be required if the Account balance is used for renegotiation, extension, renewal, or other revision of the loan.

If Section 7.10 applies and a valid spousal consent has been obtained, then, notwithstanding any other provision of this Plan, the portion of the Participant's vested Account balance used as a security interest held by the Plan by reason of a loan outstanding to the Participant shall be taken into account for purposes of determining the amount of the Account balance payable at the time of death or distribution, but only if the reduction is used as repayment of the loan. If less than 100% of the Participant's vested Account balance (determined without regard to the preceding sentence) is payable to the surviving spouse, then the Account balance shall be adjusted by first reducing the vested Account balance by the amount of the security used as repayment of the loan, and then determining the benefit payable to the surviving spouse.

# ARTICLE 9 INVESTMENT AND VALUATION OF TRUST FUND

Section 9.01        INVESTMENT OF ASSETS

All existing assets of the Trust Fund and all future contributions shall be invested in accordance with the terms of this Article 9.  All assets of the Trust Fund may be commingled for investment purposes with the assets of any retirement plan which is maintained by the Company and which qualifies under Code section 401(a) and may be held as a single fund under one or more trust instruments; provided that the value of each plan's assets can be determined at any time.  The assets allocable to each such plan shall in no event be used for the benefit of Participants in the other plans.

Section 9.02        PARTICIPANT SELF-DIRECTION

(a)        In General.  To the extent provided for in the Adoption Agreement, the Plan Administrator may permit Participants to direct the investment of their Accounts pursuant to this Section 9.02.  Any Participant self-direction shall be made pursuant to such uniform guidelines and procedures as the Plan Administrator may establish from time to time.

(b)        Investment Elections.  To the extent provided in Subsection (a), each Participant shall direct in the form and manner and at the time or times prescribed by the Plan Administrator the percentage of the applicable Accounts to be invested in one or more of the available Investment Funds, subject to such rules and limitations as the Plan Administrator may prescribe.  After the death of the Participant, a Beneficiary shall be entitled to make investment elections as if the Beneficiary were the Participant.  Notwithstanding the foregoing, the Plan Administrator may restrict investment transfers to the extent required to comply with applicable law.

(c)        Loans.  If the Adoption Agreement does not permit Participant self-direction, any assets that are held in the form of a Participant loan made pursuant to Article 8 shall be treated as a segregated investment unless otherwise provided by the Plan Administrator.

(d)        Right to Divest Publicly Traded Employer Securities. This Subsection shall apply to the extent that the Plan holds publicly traded employer securities and shall be interpreted in accordance with Code section 401(a)(35)(H), IRS Notice 2006-107, Treas. Reg. section 1.401(a)(35)-1. This Subsection shall not apply if the Plan is a one-participant plan.

(1)        Right to Divest. An applicable individual may elect to direct the Plan to divest any publicly traded employer securities held in the applicable portion of his or her Account and to reinvest an equivalent amount in other investment options offered under the Plan. This diversification right only applies to publicly traded employer securities that are held in the Account for which the individual meets the definition of applicable individual. The investment options offered shall include not less than three investment options, other than employer securities, to which the applicable individual may direct the proceeds of the divestment of employer securities, and each investment option must be diversified and have materially different risk and return characteristics. The opportunity to divest and reinvest shall be offered no less frequently than quarterly. The Plan shall not impose any restrictions or conditions with respect to the investment of employer securities in violation of Code section 401(a)(35)(D)(ii)(II).

(2)        Notice. The Plan Administrator shall provide a notice to applicable individuals not later than 30 days before the first date on which the individuals are eligible to exercise their rights. The notice shall describe the diversification rights provided under Code section 401(a)(35) and describe the importance of diversifying the investment of retirement account assets. Plans with Plan Years beginning on or after January 1, 2007, but before February 1, 2007, are not required to furnish the notice earlier than January 1, 2007.

(3)        Transition Rules. The transition rules described in IRS Notice 2006-107 (extended by IRS Notice 2008-7) and Code section 401(a)(35)(H) shall apply.

(4)        Definitions.

(i)        The term publicly traded employer securities means employer securities which are readily tradable on an established securities market. Employer securities shall be treated as publicly traded employer securities if any employer corporation, or any member of the controlled group of corporations that includes an Employer corporation, has issued a class of stock that is a publicly traded employer security. However, the Plan is not treated as holding Employer securities with respect to any securities held by either an investment company registered under the Investment Company Act of 1940 or a similar pooled investment vehicle that is regulated and subject to periodic examination by a State or Federal agency.

(ii)      The term applicable individual means:

(A)      With respect to Elective Deferrals and Employee contributions, including rollovers (and earnings thereon): (1) any Participant, (2) any Alternate Payee who has an Account under the Plan, and (3) any Beneficiary of a deceased Participant.

(B)      With respect to other Employer contributions (and earnings thereon): (1) a Participant who has completed at least three years of service, (2) an Alternate Payee who has an Account under the Plan with respect to a Participant who has completed at least three years of service, or (3) a Beneficiary of a deceased Participant.

## Section 9.03      INDIVIDUAL ACCOUNTS

To the extent provided in the Adoption Agreement, there shall be maintained on the books of the Plan with respect to each Participant, as applicable, an Elective Deferral Account, Matching Contribution Account (and Qualified Matching Contribution Account), Profit Sharing Contribution Account, Pension Contribution Account, Voluntary Contribution Account, Rollover Contribution Account, In-Plan Roth Rollover Account, Qualified Non-Elective Contribution Account, Transfer Account and any other Account established by the Plan Administrator. Each such Account shall separately reflect the Participant's interest in the Trust Fund relating to such Account. Each Participant shall receive, at least annually, or as otherwise required, a statement of his Account. A Participant's interest in the Trust Fund shall be determined and accounted for based on his beneficial interest in such fund.

## Section 9.04      QUALIFYING EMPLOYER INVESTMENTS

(a)      To the extent directed by the Investment Fiduciary, the Trustee may invest up to 10% of the fair market value of the assets of the Trust Fund in "qualifying employer securities" or "qualifying employer real property" as those terms are defined in ERISA.

(b)      In addition, to the extent provided for in the Adoption Agreement and directed by the Investment Fiduciary, the Trustee may invest up to 100% of the fair market value of the assets of the Trust Fund in "qualifying employer securities" or "qualifying employer real property". This subsection shall not apply to assets that are not "eligible individual account plans" under section 407 of ERISA and shall not apply to assets subject to section 407(b)(2) of ERISA.

## Section 9.05      ALLOCATION OF EARNINGS AND LOSSES

(a)      Reinvestment. The dividends, capital gains distributions, and other earnings received on the Trust Fund shall be allocated to such fund and reinvested.

(b)      Valuation. The assets of each Investment Fund shall be valued at their current fair market value as of each Valuation Date, and Accounts of each Participant with interests in that Investment Fund shall be credited with such Participant's allocable share of the earnings and losses of each Investment Fund since the immediately preceding Valuation Date. Such allocation shall be done on the basis of such Participant's interest in the applicable Investment Fund. For purposes of the allocation of investment earnings and losses, the Plan Administrator may adjust the value of interests of Investment Funds in Accounts as of the preceding Valuation Date to account for any contributions, distributions or withdrawals that occur after such preceding Valuation Date.

(c)      Allocation to Individual Accounts. The Accounts of each Participant shall be adjusted as of each Valuation Date by: (1) reducing such Accounts by any distributions and withdrawals made therefrom since the preceding Valuation Date; (2) increasing or reducing such Accounts by the Participant's share of earnings and losses and reasonable fees charged against such Accounts at the direction of the Plan Administrator; and (3) crediting such Accounts with any contributions made thereto since the preceding Valuation Date.

(d)      Allocation of Expenses. The Plan Administrator may allocate all, none or any portion of the Plan's expenses to Participant Accounts. When allocating expenses among Participant Accounts, the Plan Administrator may allocate such expenses using any reasonable method that does not violate Title I of ERISA and does not discriminate in favor of Highly Compensated Employees within the meaning of applicable provisions of Code section 401(a)(4). Such methods may include, but not be limited to: (1) allocating expenses only to current or former Employees (or among any other classification(s) of Employees); (2) allocating expenses directly to individual Employees; (3) allocating expenses using the per capita or pro rata method; and (4) any combination of the foregoing.

(e)      Valuation for Distribution. For the purposes of paying the amounts to be distributed to a Participant or Beneficiary pursuant to Articles 7 and 8, the value of the Participant's interest shall be determined in accordance with the provisions of this Article as of the Valuation Date related to the date benefits are paid.

*ARTICLE 9 INVESTMENT AND VALUATION OF TRUST FUND*

(f)     No Rights Created by Allocation.  An allocation of contributions or earnings to the separate Account of a Participant under this Article 9 shall not cause the Participant to have any right, title or interest in any assets of the Plan except at the time and under the terms and conditions expressly provided for in the Plan.

(g)     Dividends and Credits.  Any dividends or credits earned on insurance contracts will be allocated to the Participant's Account for whose benefit the contract is held.  No contract will be purchased under the Plan unless such contract or a separate definite written agreement between the Company and the insurer provides that no value under contracts providing benefits under the Plan or credits determined by the insurer (on account of dividends, earnings, or other experience rating credits, or surrender or cancellation credits) with respect to such contracts may be paid or returned to the Company or diverted to or used for other than the exclusive benefit of the Participants or their Beneficiaries.  However, any contribution made by the Company may be returned to the Company pursuant to Article 10.

Section 9.06     VOTING RIGHTS

To the extent provided in the Adoption Agreement, a Participant and a Beneficiary of a deceased Participant shall have the right to direct the person designated by the Company (for purposes of this Section the "Designee") as to the exercise of voting rights with respect to his allocable share of any investment in the Trust Fund that provides for such voting.  An individual's allocable share shall be determined in a nondiscriminatory manner in the discretion of the Plan Administrator.  As soon as practicable prior to the occasion for the exercise of such voting rights, the Designee shall deliver or cause to be delivered, to each Participant and Beneficiary of a deceased Participant entitled to vote all notices, prospectuses, financial statements, proxies and proxy soliciting material relating to such investment allocated to the Participant's Account.  Instructions by Participants and Beneficiaries to the Designee shall be in such form and pursuant to such regulations as the Plan Administrator shall prescribe.  Any such instructions shall remain in the strict confidence of the Designee.  Any investments for which no instructions are received by the Designee within such time specified by notice and, unless otherwise required by applicable law, any shares which are not allocated to Participants' Accounts shall be voted in the same proportion that the shares for which instructions are received are voted.  With respect to fractional shares for which instructions are received by the Designee, the Designee shall aggregate all such fractional shares for which the same instructions are received into whole shares and shall vote such whole shares as instructed.  Any remaining fractional shares shall be voted in the same proportion that the shares for which instructions are received are voted.

Section 9.07     LIFE INSURANCE

(a)     Purchase of Life Insurance.  To the extent provided in the Adoption Agreement, a Participant may request that a portion of his Account be invested in insurance on his life, and if the Plan Administrator, in its discretion, approves such request, it shall direct the Trustee to apply for and be the owner of any insurance contract purchased under the terms of this Section.  The insurance contract(s) must provide that proceeds will be payable to the Trust; however, the Plan Administrator shall direct the Trustee to pay over all proceeds of the contract(s) to the Participant's Beneficiary in accordance with the distribution provisions of this Plan.  The form and type of contract purchased shall be determined by the Plan Administrator.  The Plan Administrator may also establish rules that prohibit the purchase of life insurance where the annual premium is estimated to be less than a certain minimum amount.  If the Plan Administrator directs the Trustee to borrow against such contracts, such borrowings shall be on a uniform and nondiscriminatory basis. Any discretion shall be exercised in a nondiscriminatory manner.

(b)     Maximum Insurance Amounts.  The total premiums paid for a Participant's ordinary life insurance shall be less than 50% of the aggregate Company contributions allocated to such Participant's Account.  If term insurance or universal life insurance is purchased, the aggregate premiums shall not exceed 25% of aggregate Company contributions allocated to the insured Participant's Account.  If both ordinary life insurance and either term insurance or universal life insurance is purchased for a Participant, the aggregate premiums for such term insurance and/or universal life insurance plus one-half of the total premiums for such ordinary life insurance shall not in the aggregate exceed 25% of the aggregate Company contributions allocated to the insured Participant's Account.  However, the foregoing restrictions shall not apply to funds that may be withdrawn or distributed from the Plan in accordance with applicable law even if such withdrawals/distributions are not permitted under the terms of the Plan.

(c)     Beneficiary.  The Trust Fund shall be designated as the beneficiary to receive death benefits payable pursuant to the provisions of any life insurance policy purchased pursuant to this Section.  Any death proceeds received by the Trust Fund shall be added to the deceased Participant's Account and distributed pursuant to Article 7 hereof.  Under no circumstances shall the Trust Fund retain any part of the proceeds.  In the event of any conflict between the terms of this Plan and the terms of any insurance contract purchased hereunder, the Plan provisions shall control.

(d)     Conversion of Policies.  If an insured Participant does not die prior to retirement, the Plan Administrator may direct the Trustee to: (1) convert the entire value of any such life insurance contract at or before retirement into cash to provide the retirement benefits set forth in Article 7 so that no portion of such value may be used to continue life insurance protection beyond retirement; or (2) distribute any such contract to

*ARTICLE 9 INVESTMENT AND VALUATION OF TRUST FUND*

the Participant.  Nothing provided herein shall be construed to prohibit the purchase, sale, transfer or exchange of any individual life insurance contract which would otherwise be permitted under applicable prohibited transaction class exemptions or Department of Labor Regulations.

(e)  Distributions.  Any distribution of an insurance policy or the proceeds of an insurance policy purchased pursuant to this Section shall be subject to the requirements of Article 7.

## ARTICLE 10 TRUST FUND

Section 10.01      TRUST FUND

(a)      Continuation of Trust Fund. A Trust is hereby established or continued under the Plan and the Trustee will maintain a trust account for the Plan and, as part thereof, Participants' Accounts for such individuals as the Company shall from time to time give written notice to the Trustee are Participants in the Plan. The Trustee will accept and hold in the Trust Fund such contributions on behalf of Participants as it may receive from time to time from the Company, including amounts transferred by any prior trustee of the Plan, and such earnings, income and appreciation as may accrue thereon; less losses, depreciation and payments made by the Trustee to carry out the purposes of the Plan. The Trust Fund shall be fully invested and reinvested in accordance with the applicable provisions of the Plan.

(b)      Exclusive Benefit. All contributions made to the Plan are made for the exclusive benefit of the Participants and their Beneficiaries, and such contributions shall not be used for, nor diverted to, purposes other than for the exclusive benefit of the Participants and their Beneficiaries (including the costs of maintaining and administering the Plan and corresponding Trust).

(c)      Return of Contributions. Notwithstanding any other provision of the Plan: (1) as contributions made prior to the receipt of an initial determination letter are conditional upon a favorable determination as to the qualified status of the Plan under Code section 401(a), if the Plan receives an adverse determination with respect to its initial qualification, then any such contribution may be returned to the Company within one year after such determination, provided the application for determination is made by the time prescribed by law; (2) contributions made by the Company based upon mistake of fact may be returned to the Company within one year of such contribution; (3) as all contributions to the Plan are conditioned upon their deductibility under the Code, if a deduction for such a contribution is disallowed, such contribution may be returned to the Company within one year of the disallowance of such deduction; and (4) after all liabilities under the Plan have been satisfied, the remaining assets of the Trust shall be distributed to the Company if such distribution does not contravene any provision of applicable law.

In the case of the return of a contribution due to mistake of fact or the disallowance of a deduction, the amount that may be returned is the excess of the amount contributed over the amount that would have been contributed had there not been a mistake or disallowance. Earnings attributable to the excess contributions may not be returned to the Company but losses attributable thereto must reduce the amount to be so returned. Any return of contribution or distribution of assets made by the Trustee pursuant to this Section shall be made only upon the direction of the Company, which shall have exclusive responsibility for determining whether the conditions of such return or distribution have been satisfied and for the amount to be returned.

(d)      Assets Not Held by Trustee. The Trustee shall not be responsible for any assets of the Plan that are held outside of the Trust Fund. The Trustee is expressly hereby relieved of any responsibility or liability for any losses resulting to the Plan arising from any acts or omissions on the part of any insurance company holding assets outside of the Trust Fund. The Trustee may require the Company to serve as custodian for all promissory notes and related documents issued in connection with the Plan's Participant loan program and require the Company to be responsible for the safekeeping of same.

(e)      Group Trust. In the event that the Trust is a part of any group trust (within the meaning of Internal Revenue Service Revenue Rulings 81-100 and 2011-1): (1) participation in the Trust is limited to (i) individual retirement accounts which are exempt under Code section 408(e), (ii) pension and profit-sharing trusts which are exempt under Code section 501(a) by qualifying under Code section 401(a) and (iii) accounts under Code sections 403(b)(7), 403(b)(9) and governmental retiree benefit plans under Code section 401(a)(24) to the extent the requirements of Revenue Ruling 2011-1 are met; (2) no part of the corpus or income which equitably belongs to any individual retirement account or Employer's trust may be used for or diverted to any purposes other than for the exclusive benefit of the individual or the Employees, respectively, or their Beneficiaries who are entitled to benefits under such participating individual retirement account or Employer's trust; (3) no part of the equity or interest in the Trust Fund shall be subject to assignment by a participating individual retirement account or Employer's trust; and (4) the Trustee shall maintain separate accounts for each participating trust or individual retirement account.

Section 10.02      DUTIES OF THE TRUSTEE

(a)      In General. The Trustee is not a party to, and has no duties or responsibilities under the Plan, other than those that may be expressly contained in this Article. The Trustee shall have no duties, responsibilities or liability with respect to the acts or omissions of any prior trustee. The Trustee shall discharge its assigned duties and responsibilities under this Article and the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*ARTICLE 10 TRUST FUND*

(b)     Contributions.  The Trustee agrees to accept contributions that are paid to it by the Company (as well as Rollover Contributions and direct transfers from other eligible retirement plans) in accordance with the terms of this Article.  Such contributions shall be in cash or in such other form that may be acceptable to the Trustee. In-kind contributions of other than qualifying employer securities are permitted only in non-pension plans provided that the contribution is discretionary and unencumbered. Qualifying employer securities may be contributed to both pension and non-pension plans subject to the requirements of ERISA section 408(e). The Trustee shall have no responsibility for any property until it is received by the Trustee.  The special trustee specified in the Adoption Agreement has the duty to determine and collect contributions under the Plan. The Company shall have the sole duty and responsibility for the determination of the accuracy or sufficiency of the contributions to be made under the Plan, the transmittal of the same to the Trustee and compliance with any statute, regulation or rule applicable to contributions.

(c)     Distributions.  The Trustee shall make distributions out of the Trust Fund pursuant to instructions described in Section 10.05. The Trustee shall not have any responsibility or duty under this Article for determining that such are in accordance with the terms of the Plan and applicable law, including without limitation, the amount, timing or method of payment and the identity of each person to whom such payments shall be made.  The Trustee shall have no responsibility or duty to determine the tax effect of any payment or to see to the application of any payment.  In making payments, the Company acknowledges that the Trustee is acting as a paying agent and not as the payor, for tax information reporting and withholding purposes.  In the event that any dispute shall arise as to the persons to whom payment or delivery of any assets shall be made by the Trustee, the Trustee may withhold such payment or delivery until such dispute shall have been settled by the parties concerned or shall have been determined by a court of competent jurisdiction.

(d)     Records.  The Trustee shall keep full and accurate accounts of all receipts, investments, disbursements and other transactions hereunder, including such specific records as may be agreed upon in writing between the Company and the Trustee.  All such accounts, books and records shall be open to inspection and audit at all reasonable times by any authorized representative of the Company or the Plan Administrator.  A Participant may examine only those individual account records pertaining directly to him.

(e)     Accounting.  The Trustee shall file with the Plan Administrator a written account of the administration of the Trust Fund showing all transactions effected by the Trustee subsequent to the period covered by the last preceding account and all property held at the end of the accounting period.  The Trustee shall use its best effort to file such written account within ninety (90) days, but not later than one hundred twenty (120) days after the end of each Plan Year.  Upon approval of such accounting by the Plan Administrator, neither the Company nor the Plan Administrator shall be entitled to any further accounting by the Trustee.  The Plan Administrator may approve such accounting by written notice of approval delivered to the Trustee or by failure to express objection to such accounting in writing delivered to the Trustee within six (6) months from the date on which the accounting is delivered to the Plan Administrator.

(f)     Participant Eligibility.  The Trustee shall not be required to determine the facts concerning the eligibility of any Participant to participate in the Plan, the amount of benefits payable to any Participant or Beneficiary under the Plan, or the date or method of payment or disbursement.  The Trustee shall be fully entitled to rely in good faith solely upon the written advice and directions of the Plan Administrator as to any such question of fact.

(g)     Indicia of Ownership.  The Trustee shall not hold the indicia of ownership of any assets of the Trust Fund outside of the jurisdiction of the District Courts of the United States, unless in compliance with section 404(b) of ERISA and regulations thereunder.

(h)     Notice.  The Trustee shall provide the Company with advance notice of any legal actions the Trustee may take with respect to the Plan and Trust and shall promptly notify the Company of any claim against the Plan and Trust.

(i)     Other Fiduciaries.  The Trustee shall not be responsible for the acts or omissions of any other persons except as may be required by ERISA section 405.

Section 10.03    GENERAL INVESTMENT POWERS

In addition to all powers and authority under common law, statutory authority and other provisions of this Article, the Trustee shall have the following powers and authorities to be exercised in accordance with and subject to the provisions of Section 10.04 hereof:

(a)     Invest and reinvest the Trust Fund in any property, real, personal or mixed, wherever situated, and whether situated, and whether or not productive of income or consisting of wasting assets, including, without limitation, common and preferred stock, bonds, notes, debentures, options, mutual funds, leaseholds, mortgages (including without limitation, any collective or part interest in any bond and mortgage or note and mortgage), certificates of deposit, and oil, mineral or gas properties, royalties, interests or rights (including equipment pertaining thereto), without

*ARTICLE 10 TRUST FUND*

being limited to the classes of property in which trustees are authorized by law or any rule of court to invest trust funds and without regard to the proportion any such property may bear to the entire amount of the Trust Fund;

(b)     Hold property in nominee name, in bearer form, or in book entry form, in a clearinghouse corporation or in a depository, provided that such property is held in conformance with DOL Reg. section 2550-403a-1(b) and that such property is held by (i) a bank or trust company that is subject to supervision by the United States or a state, or a nominee of such bank or trust company, (ii) a broker or dealer registered under the Securities Exchange Act of 1934, or a nominee of such broker or dealer; (iii) a "clearing agency," as defined in section 3(a)(23) of the Securities Exchange Act of 1934, or its nominee; or (iv) any other entity as provided in DOL Reg. section 2550-403a-1(b);

(c)     Collect income payable to and distributions due to the Trust Fund and sign on behalf of the Trust any declarations, affidavits, certificates of ownership and other documents required to collect income and principal payments, including but not limited to, tax reclamations, rebates and other withheld amounts;

(d)     To sell, exchange, convey, transfer, grant options to purchase, or otherwise dispose of any securities or other property held by the Trustee.  No person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(e)     Pursuant to the terms of Section 10.06, to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to delegate discretionary powers, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property;

(f)     Take all action necessary to pay for authorized transactions or make authorized distributions, including exercising the power to borrow or raise monies from any lender, upon such terms and conditions as are necessary to settle such transactions or distributions;

(g)     To keep such portion of the Trust Fund uninvested in cash or cash balances as the Trustee may, from time to time, deem to be in the best interests of the Plan, without liability for interest thereon;

(h)     To accept and retain for such time as the Trustee may deem advisable any securities or other property received or acquired as Trustee hereunder, whether or not such securities or other property would normally be purchased as investments hereunder;

(i)     To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(j)     To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Trust Fund, to commence or defend suits or legal or administrative proceedings, and to represent the Plan and/or Trust Fund in all suits and legal and administrative proceedings (arbitration shall not be permitted to the extent the claim involves a Participant);

(k)     To invest in Treasury Bills and other forms of United States government obligations;

(l)     To deposit cash in accounts in the banking department of the Trustee or an affiliated banking organization;

(m)     To deposit monies in federally insured savings accounts or certificates of deposit in banks or savings and loan associations;

(n)     To invest and reinvest all or any portion of the Trust Fund collectively with funds of other retirement plan trusts exempt from tax under Code section 501(a), including, without limitation, the power to invest collectively with such other funds through the medium of one or more common, collective or commingled trust funds which have been or may hereafter be operated by the Trustee, the instrument or instruments establishing such trust fund or funds, as amended from time to time, being made part of this Trust so long as any portion of the Trust Fund shall be invested through the medium thereof;

(o)     To sell, either at public or private sale, option to sell, mortgage, lease for a term of years less than or continuing beyond the possible date of the termination of the Trust created hereunder, partition or exchange any real property which may from time to time constitute a portion of the Trust Fund, for such prices and upon such terms as it may deem best, and to make, execute and deliver to the purchasers thereof good and sufficient deeds of conveyance therefor and all assignments, transfers and other legal instruments, either necessary or convenient for the passing

of the title and ownership thereof to the purchaser, free and discharged of all trusts and without liability on the part of such purchasers to see to the proper application of the purchase price;

(p)     To repair, alter, improve or demolish any buildings which may be on any real estate forming part of the Trust Fund or to erect entirely new structures thereon;

(q)     To renew, extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable, and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage or of any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Trust Fund or the preservation of the value of the investment; to waive any default, whether in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid on property in foreclosure, to take a deed in lieu of foreclosure with or without paying a consideration therefor, and in connection therewith to release the obligation on the bond or note secured by the mortgage; and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any mortgage or guarantee;

(r)     To purchase any authorized investment at a premium or at a discount;

(s)     To purchase any annuity contract; and

(t)     To do all such acts and exercise all such rights and privileges, although not specifically mentioned herein, as the Trustee may deem necessary to carry out the purposes of the Plan.

Section 10.04     OTHER INVESTMENT POWERS

(a)     Requirement for Preapproval.  The powers granted the Trustee under Section 10.03 shall be exercised by the Trustee upon the written direction from the Investment Fiduciary pursuant to Sections 10.05 and 10.06.  Any written direction of the Investment Fiduciary may be of a continuing nature, but may be revoked in writing by the Investment Fiduciary at any time.  The Trustee shall comply with any direction as promptly as possible, provided it does not contravene the terms of the Plan or the provision of any applicable law.  The Investment Fiduciary, by written direction, may require the Trustee to obtain written approval of the Investment Fiduciary before exercising such of its powers as may be specified in such direction.  Any such direction may be of a continuing nature or otherwise and may be revoked in writing by the Investment Fiduciary at any time.  The Trustee shall not be responsible for any loss that may result from the failure or refusal of the Investment Fiduciary to give any such required direction or approval.

(b)     Prohibited Transactions.  The Trustee shall not engage in any prohibited transaction within the meaning of the Code and ERISA.

(c)     Legal Actions.  The Trustee is authorized to execute all necessary receipts and releases and shall be under the duty to make efforts to collect such sums as may appear to be due (except contributions hereunder); provided, however, that the Trustee shall not be required to institute suit or maintain any litigation to collect the proceeds of any asset unless it has been indemnified to its satisfaction for counsel fees, costs, disbursements and all other expenses and liabilities to which it may in its judgment be subjected by such action.  Notwithstanding anything to the contrary herein contained, the Trustee is authorized to compromise and adjust claims arising out of any asset held in the Trust Fund upon such terms and conditions as the Trustee may deem just, and the action so taken by the Trustee shall be binding and conclusive upon all persons interested in the Trust Fund.

(d)     Retention of Advisors.  The Trustee, with the consent of the Investment Fiduciary, may retain the services of investment advisors to invest and reinvest the assets of the Trust Fund, as well as employ such legal, actuarial, medical, accounting, clerical and other assistance as may be required in carrying out the provisions of the Plan.  The Trustee may also appoint custodians, subcustodians or subtrustees as to part or all of the Trust Fund.

Section 10.05     INSTRUCTIONS

(a)     Reliance on Instructions.  Whenever the Trustee is permitted or required to act upon the directions or instructions of the Investment Fiduciary, Plan Administrator or Company, the Trustee shall be entitled to act in good faith upon any written communication signed by any person or agent designated to act as or on behalf of the Investment Fiduciary, Plan Administrator or Company.  Such person or agent shall be so designated either under the provisions of the Plan or in writing by the Company and their authority shall continue until revoked in writing.  The Trustee shall incur no liability for failure to act in good faith on such person's or agent's instructions or orders without written communication, and

the Trustee shall be fully protected in all actions taken in good faith in reliance upon any instructions, directions, certifications and communications believed to be genuine and to have been signed or communicated by the proper person.

      (b)     Designation of Agent.

          (1)     Plan Sponsor. The Plan Sponsor shall notify the Trustee in writing as to the appointment, removal or resignation of any person designated to act as or on behalf of the Investment Fiduciary, Plan Administrator or Plan Sponsor. After such notification, the Trustee shall be fully protected in acting in good faith upon the directions of, or dealing with, any person designated to act as or on behalf of the Investment Fiduciary, Plan Administrator or Plan Sponsor until it receives notice to the contrary. The Trustee shall have no duty to inquire into the qualifications of any person designated to act as or on behalf of the Investment Fiduciary, Plan Administrator or Plan Sponsor.

          (2)     Trustee. To the extent provided in the Adoption Agreement, if there is more than one Trustee, the Trustees may designate one or more of the Trustees to act on behalf of the Trustees. Such designated Trustee shall be authorized to take any and all actions and execute and deliver such documents as may be necessary or appropriate.

      (c)     Procedures. The Trustee may adopt such rules and procedures as it deems necessary, desirable, or appropriate including, but not limited to: (1) taking action with or without formal meetings; and (2) in the event that there is more than one Trustee, a procedure specifying whether action may be taken by a less than unanimous vote.

      (d)     Payment of Benefits. The Trustee shall pay benefits and expenses from the Trust Fund only upon the written direction of the Plan Administrator. The Trustee shall be fully entitled to rely in good faith on such directions furnished by the Plan Administrator, and shall be under no duty to ascertain whether the directions are in accordance with the provisions of the Plan.

<u>Section 10.06</u>      <u>INVESTMENT OF THE FUND</u>

      (a)     Investment Funds. The Investment Fiduciary shall have the exclusive authority and discretion to select the Investment Funds available for investment under the Plan. In making such selection, the Investment Fiduciary shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Subject to the first sentence of Subsection (b) below, the available investments under the Plan shall be sufficiently diversified so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. The Investment Fiduciary shall notify the Trustee in writing of the selection of the Investment Funds currently available for investment under the Plan, and any changes thereto.

      (b)     Participant Self-Direction. To the extent permitted by the Plan Administrator and the Adoption Agreement pursuant to Section 9.02, each Participant shall have the right, in accordance with the provisions of the Plan, to direct the investment by the Trustee of all amounts allocated to the separate Accounts of the Participant under the Plan among any one or more of the available Investment Funds; provided, however, that during any transition period as may be determined by the Investment Fiduciary, the Investment Fiduciary may direct the investment by the Trustee into the Investment Funds available during such period with respect to which individual Participants' directions shall not have been made or shall not have been permitted to be made under the Plan. All investment directions by Participants shall be timely furnished to the Trustee by the Plan Administrator, except to the extent such directions are transmitted telephonically or otherwise by Participants directly to the Trustee or its delegate in accordance with rules and procedures established and approved by the Plan Administrator and communicated to the Trustee. In making any investment of the assets of the Fund, the Trustee shall be fully entitled to rely on such directions furnished to it by the Plan Administrator or by Participants in accordance with the Plan Administrator's approved rules and procedures, and shall be under no duty to make any inquiry or investigation with respect thereto. If the Trustee receives any contribution under the Plan that is not accompanied by instructions directing its investment, the Trustee shall notify the Plan Administrator of that fact, and the Trustee may, in its discretion, hold all or a portion of the contribution uninvested without liability for loss of income or appreciation pending receipt of proper investment directions.

      (c)     Investment Managers.

          (1)     Appointment of Investment Managers. The Investment Fiduciary may appoint one or more Investment Managers with respect to some or all of the assets of the Trust Fund as contemplated by section 402(c)(3) of ERISA. Any such Investment Manager shall acknowledge to the Investment Fiduciary in writing that it accepts such appointment and that it is an ERISA fiduciary with respect to the Plan and the Trust Fund. The Investment Fiduciary shall provide the Trustee with a copy of the written agreement (and any amendments thereto) between the Investment Fiduciary and the Investment Manager. By notifying the Trustee of the appointment of an Investment Manager, the Investment Fiduciary shall be deemed to certify that such Investment Manager meets the requirements of section 3(38) of ERISA. The authority of the Investment Manager shall continue until the Investment Fiduciary rescinds the appointment or the Investment Manager has resigned.

*ARTICLE 10 TRUST FUND*

(2)      Separation of Duties.  The assets with respect to which a particular Investment Manager has been appointed shall be specified by the Investment Fiduciary and shall be segregated in a separate account for the Investment Manager (the "Separate Account") and the Investment Manager shall have the power to direct the Trustee in every aspect of the investment of the assets of the Separate Account.  The Trustee shall not be liable for the acts or omissions of an Investment Manager and shall have no liability or responsibility for acting pursuant to the direction of, or failing to act in the absence of, any direction from an Investment Manager, unless the Trustee knows that by such action or failure to act it would be itself committing a breach of fiduciary duty or participating in a breach of fiduciary duty by such Investment Manager, it being the intention of the parties that each party shall have the full protection of section 405(d) of ERISA.

(d)      Proxies.

(1)      Delivery of Information.  The Trustee shall deliver, or cause to be delivered, to the Company or Plan Administrator all notices, prospectuses, financial statements, proxies and proxy soliciting materials received by the Trustee relating to securities held by the Trust or, if applicable, deliver these materials to the appropriate Participant or the Beneficiary of a deceased Participant.

(2)      Voting. The Trustee shall not vote any securities held by the Trust except in accordance with the written instructions of the Company, the Investment Fiduciary, or to the extent provided in the Adoption Agreement, the Participant or the Beneficiary of the Participant, if the Participant is deceased.  However, the Trustee may, in the absence of instructions, vote "present" for the sole purpose of allowing such shares to be counted for establishment of a quorum at a shareholders' meeting.  The Trustee shall have no duty to solicit instructions from Participants, Beneficiaries, the Investment Fiduciary or the Company.

(3)      Investment Manager.  To the extent not delegated to Participants pursuant to Subsection (b), the Investment Manager shall be responsible for making any proxy voting or tender offer decisions with respect to securities held in the Separate Account and the Investment Manager shall maintain a record of the reasons for the manner in which it voted proxies or responded to tender offers.

(e)      Life Insurance.  Any life insurance investment allowed under Article 9 shall be a permitted Investment Fund.

Section 10.07      COMPENSATION AND INDEMNIFICATION

(a)      Compensation.  The Trustee shall be entitled to reasonable compensation for its services as is mutually agreed upon with the Plan Sponsor; provided that such compensation does not result in a prohibited transaction within the meaning of the Code and ERISA. If the Trustee and the Company mutually agree that the Trustee may retain as additional compensation for its services any earnings resulting from the anticipated short-term investment of funds ("float") on Plan assets deposited in or transferred to a Trustee general or omnibus account, then the Trustee shall be authorized to retain such float; provided, that such agreement: (i) discloses the specific circumstances under which float will be earned and retained, (ii) in the case of float on distributions, discloses when the float period commences and ends, and (iii) discloses the rate of the float or the specific manner in which such rate will be determined. If approved by the Plan Administrator, the Trustee shall also be entitled to reimbursement for all direct expenses properly and actually incurred on behalf of the Plan.  Such compensation or reimbursement shall be paid to the Trustee out of the Trust Fund unless paid directly by the Company.

(b)      Indemnification.  Unless otherwise provided in an Addendum to the Adoption Agreement, each Company shall indemnify and hold harmless the Trustee (and its delegates) from all claims, liabilities, losses, damages and expenses, including reasonable attorneys' fees and expenses, incurred by the Trustee in connection with its duties hereunder to the extent not covered by insurance, except when the same is due to the Trustee's own gross negligence, willful misconduct, lack of good faith, or breach of its fiduciary duties under the Plan or ERISA.

Section 10.08      RESIGNATION AND REMOVAL

(a)      Resignation.  The Trustee may resign at any time by written notice to the Plan Sponsor which shall be effective 60 days after delivery unless prior thereto a successor Trustee assumes the responsibilities of Trustee hereunder.

(b)      Removal. The Trustee may be removed by the Plan Sponsor at any time.

(c)      Successor Trustee.  The appointment of a successor Trustee hereunder shall be accomplished by and shall take effect upon the delivery to the resigning or removed Trustee, as the case may be, of written notice of the Plan Sponsor appointing such successor Trustee, and an acceptance in writing of the office of successor Trustee hereunder executed by the successor so appointed.  Any successor Trustee may be either a corporation authorized and empowered to exercise trust powers or one or more individuals.  All of the provisions set forth herein with respect to the Trustee shall relate to each successor Trustee so appointed with the same force and effect as if such successor Trustee had been originally named

herein as the Trustee hereunder.  If within 45 days after notice of resignation shall have been given under the provisions of this Article a successor Trustee shall not have been appointed, the resigning Trustee or the Plan Sponsor may apply to any court of competent jurisdiction for the appointment of a successor Trustee.

(d)     Transfer of Trust Fund.  Upon the appointment of a successor Trustee, the resigning or removed Trustee shall transfer and deliver the Trust Fund to such successor Trustee, after reserving such reasonable amount as it shall deem necessary to provide for its expenses in the settlement of its account, the amount of any compensation due to it and any sums chargeable against the Trust Fund for which it may be liable.  If the sums so reserved are not sufficient for such purposes, the resigning or removed Trustee shall be entitled to reimbursement for any deficiency from the Plan Sponsor.

Section 10.09        OTHER TRUST AGREEMENT

(a)     General.  This Section 10.09 shall apply only to the extent provided in the Adoption Agreement. If this Section applies, the terms of a separate trust agreement shall apply and Sections 9.06, 10.01 through 10.08 and Article 12 shall apply only to the extent that they are not superseded by the terms of the separate trust agreement. Other Sections of the Plan shall be construed in a manner compatible with the separate trust agreement.

(b)     Trustee.  The Trustee shall be the person(s) or entity listed in the separate trust agreement. The Trustee shall be obligated under the terms and conditions of the separate trust agreement as executed by the Trustee and the Plan Administrator or Sponsor.

## ARTICLE 11 SPECIAL TOP-HEAVY RULES

Section 11.01     TOP-HEAVY STATUS

The special provisions set forth in this Article 11 shall apply during any Plan Year in which this Plan, together with any other retirement plans required to be aggregated under Code section 416(g) and the Treasury Regulations promulgated thereunder, is "Top-Heavy." This Plan is Top-Heavy for any Plan Year beginning after 1983:

(a)     If the Top-Heavy Ratio for this Plan exceeds 60% and this Plan is not part of any Required Aggregation Group or Permissive Aggregation Group of plans;

(b)     If this Plan is a part of a Required Aggregation Group of plans but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group of plans exceeds 60%; or

(c)     If this Plan is a part of a Required Aggregation Group and part of a Permissive Aggregation Group of plans and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

Section 11.02     MINIMUM ALLOCATIONS

(a)     In General. Notwithstanding other provisions of this Plan, for any Plan Year during which this Plan is Top-Heavy and the Top-Heavy minimum allocation is not met solely or partially in another plan, the following shall apply:

(1)     Unless otherwise provided in the Adoption Agreement and subject to (a)(4) and (a)(5) below, a Participant specified in Subsection (a)(2) below shall receive the minimum allocation or benefit requirement applicable to Top-Heavy plans specified in (a)(3) below.

(2)     Participants Receiving Minimum Allocation/Benefit. If the Participant is not eligible to participate in a defined benefit plan in a group specified in Section 11.01 other than a frozen plan in which no additional accruals are being made, he or she shall receive the minimum allocation or benefit in this Plan or any other defined contribution plan that is sponsored by the Employer provided, he or she is (i) an Eligible Employee as described in the Adoption Agreement; and (ii) employed by the Employer on the last day of the Plan Year. If the Participant is eligible to participate in a defined benefit plan in a group specified in Section 11.01, and the Top-Heavy minimum is to be made in this Plan for such Participant, he or she shall receive the minimum allocation or benefit in this Plan or any other defined contribution plan that is sponsored by the Employer provided, he or she is (i) an Eligible Employee as described in the applicable plan document; and (ii) has completed 1,000 Hours of Service (in accordance with such defined benefit plan) during such Plan Year. In the event a Participant is entitled to a Top-Heavy minimum benefit accrual under a defined benefit plan and is not otherwise eligible for a Top-Heavy minimum allocation under this Plan because of severance of employment prior to the last day of the Plan Year, such requirement shall be waived in this Plan solely to the extent the Top-Heavy minimum is required to be given in this Plan.

(3)     Amount of Minimum Allocation/Benefit. If the Participant is not eligible to participate in a defined benefit plan in a group specified in Section 11.01, the Top-Heavy minimum allocation ("defined contribution minimum") shall not be less than the lesser of 3% of such Participant's Statutory Compensation or the largest percentage of Company contributions (including Elective Deferrals) and forfeitures, as a percentage of Key Employee's Statutory Compensation, as limited by Code section 401(a)(17), allocated on behalf of any Key Employee for that Plan Year. If: (i) the Participant is eligible to participate in a defined benefit plan in a group specified in Section 11.01, (ii) satisfies the requirement in the defined benefit plan to receive the Top-Heavy minimum under the terms of that plan, and (iii) the Top-Heavy minimum is to be given in this Plan, the Top-Heavy minimum benefit ("defined benefit minimum") shall be determined under one of the following methods:

(A)     Defined Benefit Minimum. A defined benefit minimum, which is an accrued benefit at any point in time equal to at least the product of (i) a Participant's average annual compensation for the period of consecutive years (not exceeding five) when the Participant had the highest aggregate compensation from the Employer and (ii) the lesser of 2% per year of service or 1-year period of service (within the meaning of Code section 416), as applicable, with the Employer or 20%, subject to the rules of Code section 416 and the Regulations thereunder;

(B)     Floor Offset. A floor offset approach, pursuant to Revenue Ruling 76-259, 1976-2 C.B. 111, under which the defined benefit minimum of the defined benefit plan that is provided pursuant to Subsection (A) above is offset by the benefits provided under the defined contribution plan (or plans);

(C)     Comparability Analysis. A demonstration, using a comparability analysis of Rev. Rul. 81-202, that the plans are providing benefits at least equal to the defined benefit minimum that is provided pursuant to Subsection (A) above; or

(D)     Defined Contribution Minimum. An allocation of Employer contributions and forfeitures that are made on behalf of such Participant under this Plan (or any defined contribution plan that is sponsored by the Employer) equal to 5% of the Participant's Statutory Compensation unless off-setting a portion of the minimum allocation in another plan or the Participant in this Plan is not a participant in the defined benefit plan. If the Plan allocates its Profit Sharing or Pension Contribution using permitted disparity (integration), it may, therefore, substitute the 3% in the first step of its allocation process with 5% (or such other amount required) in order to satisfy the Top-Heavy minimum allocation.

(4)     The minimum allocation is determined without regard to any Social Security contribution. The Top-Heavy minimum shall be made even though, under other Plan provisions, the Participant would not otherwise be entitled to receive an allocation, or would have received a lesser allocation for the Plan Year because of: (i) the Participant's failure to complete 1,000 Hours of Service (or any equivalent provided in the Plan); (ii) the Participant's failure to make mandatory Employee contributions to the Plan; or (iii) Compensation less than a stated amount. Except as provided in Subsections (b) and (c) below, neither Elective Deferrals nor Matching Contributions may be taken into account for the purpose of satisfying the minimum Top-Heavy contribution requirement.

(5)     Contributions under other Plans. To the extent provided in the Adoption Agreement, the minimum allocation requirement discussed in Subsection 11.02(a) may be met solely or partially in another plan. If the minimum allocation requirement of this Section 11.02 for any Plan Year is met partially in another plan, this Plan may offset the minimum required allocation in Subsection 11.02(a) by the amount allocated in or the benefit accrued in the other plan. If, after applying the requirements of Code section 416, corresponding regulations and this Article 11, the Top-Heavy minimum allocation is not satisfied, then additional contributions may be made to this Plan and/or to one or more plans that are part of the Required Aggregation Group or Permissive Aggregation Group.

(b)     Matching Contributions. Employer Matching Contributions may be taken into account for purposes of satisfying the minimum contribution requirements of Code section 416(c)(2) and the Plan. The preceding sentence shall apply with respect to Matching Contributions under the Plan or, if the Plan provides that the minimum contribution requirement shall be met in another plan, such other plan. Employer Matching Contributions that are used to satisfy the minimum contribution requirements shall be treated as Matching Contributions for purposes of the ACP test and other requirements of Code section 401(m).

(c)     The Top-Heavy requirements of Code section 416 and this Section shall not apply in any year beginning after December 31, 2001, in which the Plan consists solely of a cash or deferred arrangement which meets the requirements of Code sections 401(k)(11), 401(k)(12) or 401(k)(13) and Matching Contributions with respect to which the requirements of Code sections 401(m)(10), 401(m)(11) or 401(m)(12) are met; or in which the Plan is part of an "eligible combined plan" in compliance with Code section 414(x), IRS Notice 2009-71, and any superseding/subsequent guidance.

Section 11.03     MINIMUM VESTING

(a)     For any Plan Year in which this Plan is Top-Heavy, the Top-Heavy vesting schedule specified in the Adoption Agreement shall automatically apply to the Plan to the extent that it is more favorable than the vesting schedule provided for in Article 6.

For purposes of the Adoption Agreement, "2-6 Year Graded" and "3 Year Cliff" shall be determined in accordance with the following schedules:

|  | Years of Vesting Service | Vesting Percentage |
|---|---|---|
| "2-6 Year Graded": | | |
| | Less than Two Years | 0% |
| | Two Years but less than Three Years | 20% |
| | Three Years but less than Four Years | 40% |
| | Four Years but less than Five Years | 60% |
| | Five Years but less than Six Years | 80% |
| | Six or More Years | 100% |
| "3 Year Cliff": | | |
| | Less than Three Years | 0% |
| | Three or More Years | 100% |

      (b)      The minimum vesting schedule applies to all benefits within the meaning of Code section 411(a)(7) except those attributable to Employee contributions or those already subject to a vesting schedule which vests at least as rapidly as the schedule listed above, including benefits accrued before the effective date of Code section 416 and benefits accrued before the Plan became Top-Heavy. Further, no decrease in a Participant's nonforfeitable percentage may occur in the event the Plan's status as Top-Heavy changes for any Plan Year. However, this Section does not apply to the Account balances of any Employee who does not have an Hour of Service after the Plan initially became Top-Heavy and such Employee's Account balance attributable to Company contributions and forfeitures will be determined without regard to this Section. The minimum allocation required (to the extent required to be nonforfeitable under Code section 416(b)) may not be forfeited under Code sections 411(a)(3)(B) or 411(a)(3)(D).

## ARTICLE 12 PLAN ADMINISTRATION

Section 12.01        PLAN ADMINISTRATOR

(a)        Designation.  The Plan Administrator shall be specified in the Adoption Agreement.  In the absence of a designation in the Adoption Agreement, the Plan Sponsor shall be the Plan Administrator.  If a Committee is designated as the Plan Administrator, the Committee shall consist of one or more individuals who may be Employees appointed by the Plan Sponsor and the Committee may elect a chairman and may adopt such rules and procedures as it deems desirable.  The Committee may also take action with or without formal meetings and may authorize one or more individuals, who may or may not be members of the Committee, to execute documents in its behalf.

(b)        Authority and Responsibility of the Plan Administrator.  The Plan Administrator shall be the Plan "administrator" as such term is defined in section 3(16) of ERISA and as such shall have total and complete discretionary power and authority:

(1)        to make factual determinations, to construe and interpret the provisions of the Plan, to correct defects and resolve ambiguities and inconsistencies therein and to supply omissions thereto.  Any construction, interpretation or application of the Plan by the Plan Administrator shall be final, conclusive and binding;

(2)        to determine the amount, form or timing of benefits payable hereunder and the recipient thereof and to resolve any claim for benefits in accordance with this Article 12;

(3)        to determine the amount and manner of any allocations and/or benefit accruals hereunder, including whether the Plan maintains an ERISA account and the manner in which amounts deposited in such ERISA account shall be allocated;

(4)        to maintain and preserve records relating to Participants, former Participants, and their Beneficiaries and Alternate Payees;

(5)        to prepare and furnish to Participants, Beneficiaries and Alternate Payees all information and notices required under applicable law or the provisions of this Plan;

(6)        to prepare and file or publish with the Secretary of Labor, the Secretary of the Treasury, their delegates and all other appropriate government officials all reports and other information required under law to be so filed or published;

(7)        to approve and enforce any loan hereunder including the repayment thereof;

(8)        to provide directions to the Trustee with respect to the purchase of life insurance (to the extent permitted in the Adoption Agreement), methods of benefit payment, valuations at dates other than regular Valuation Dates and on all other matters where called for in the Plan or requested by the Trustee;

(9)        to hire such professional assistants and consultants as it, in its sole discretion, deems necessary or advisable; and shall be entitled, to the extent permitted by law, to rely conclusively on all tables, valuations, certificates, opinions and reports which are furnished by same;

(10)        to determine all questions of the eligibility of Employees and of the status of rights of Participants, Beneficiaries and Alternate Payees;

(11)        to arrange for bonding, if required by law;

(12)        to adjust Accounts in order to correct errors or omissions;

(13)        to determine whether any domestic relations order constitutes a Qualified Domestic Relations Order and to take such action as the Plan Administrator deems appropriate in light of such domestic relations order;

(14)        to retain records on elections and waivers by Participants, their spouses and their Beneficiaries and Alternate Payees;

*ARTICLE 12 PLAN ADMINISTRATION*

(15)      to supply such information to any person as may be required;

(16)      to establish, revise from time to time, and communicate to the Trustee and/or the Investment Fiduciary and Investment Manager(s), a funding policy and method for the Plan; and

(17)      to perform such other functions and duties as are set forth in the Plan that are not specifically given to the Investment Fiduciary or Trustee.

(c)      In performing its duties, the Plan Administrator shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(d)      Procedures.  Unless otherwise provided in the Adoption Agreement and to the extent that the Adoption Agreement provides that the Board adopts procedures for the Plan Administrator and the Board fails to adopt such procedures, the Plan Administrator may adopt such rules and procedures as it deems necessary, desirable, or appropriate for the administration of the Plan.  When making a determination or calculation, the Plan Administrator shall be entitled to rely upon information furnished to it.  The Plan Administrator's decisions shall be binding and conclusive as to all parties.

(e)      Allocation of Duties and Responsibilities.  The Plan Administrator and/or the Adoption Agreement may designate other persons to carry out any of the duties and responsibilities of the Plan Administrator.

Section 12.02      INVESTMENT FIDUCIARY

(a)      Designation.  The Investment Fiduciary shall be specified in the Adoption Agreement.  In the absence of a designation in the Adoption Agreement, the Plan Sponsor shall be the Investment Fiduciary.  The Investment Fiduciary may consist of a committee consisting of one or more individuals who may be Employees appointed by the Plan Sponsor.  If a committee is appointed, the committee may elect a chairman and may adopt such rules and procedures as it deems desirable.  The committee may take action with or without formal meetings and may authorize one or more individuals, who may or may not be members of the committee, to execute documents in its behalf.

(b)      Authority and Responsibility of the Investment Fiduciary.  The Investment Fiduciary shall have the following discretionary authority and responsibility:

(1)      to manage the investment of the Trust Fund;

(2)      to appoint one or more Investment Managers;

(3)      to hire such professional assistants and consultants as it, in its sole discretion, deems necessary or advisable;

(4)      to establish, revise from time to time, and communicate to the Trustee and/or Investment Manager(s), an investment policy for the Plan; and

(5)      to supply such information to any person as may be required.

(c)      Procedures.  Unless otherwise provided in the Adoption Agreement and to the extent that the Adoption Agreement provides that the Board adopts procedures for the Investment Fiduciary and the Board fails to adopt such procedures, the Investment Fiduciary may adopt such rules and procedures as it deems necessary, desirable, or appropriate in furtherance of its duties hereunder.  When making a determination or calculation, the Investment Fiduciary shall be entitled to rely upon information furnished to it. Except as otherwise provided in a separate trust agreement, the Investment Fiduciary's decisions shall be binding and conclusive as to all parties.

(d)      Allocation of Duties and Responsibilities.  The Adoption Agreement may designate more than one person to carry out any of the duties and responsibilities of the Investment Fiduciary.

Section 12.03      COMPENSATION OF PLAN ADMINISTRATOR AND INVESTMENT FIDUCIARY

The Plan Administrator and Investment Fiduciary shall be entitled to reasonable compensation for their services as is mutually agreed upon to the extent that such compensation would not constitute a prohibited transaction within the meaning of the Code and ERISA.

Section 12.04      PLAN EXPENSES

All direct expenses of the Plan, Trustee, Plan Administrator and Investment Fiduciary or any other person in furtherance of their duties hereunder shall be paid or reimbursed by the Company, and if not so paid or reimbursed, shall be proper charges to the Trust Fund and shall be paid therefrom.

Section 12.05      ALLOCATION OF FIDUCIARY RESPONSIBILITY

A Plan fiduciary shall have only those specific powers, duties, responsibilities and obligations as are explicitly given him under the Plan and Trust Agreement.  It is intended that each fiduciary shall not be responsible for any act or failure to act of another fiduciary.  A fiduciary may serve in more than one fiduciary capacity with respect to the Plan.

Section 12.06      INDEMNIFICATION

Unless otherwise provided in an Addendum to the Adoption Agreement, the Company shall indemnify and hold harmless any person serving as the Investment Fiduciary and/or Plan Administrator (and their delegates) from all claims, liabilities, losses, damages and expenses, including reasonable attorneys' fees and expenses, incurred by such persons in connection with their duties hereunder to the extent not covered by insurance, except when the same is due to such person's own gross negligence, willful misconduct, lack of good faith, or breach of its fiduciary duties under this Plan or ERISA.

Section 12.07      CLAIMS PROCEDURES

(a)      Application for Benefits.  A Participant or any other person entitled to benefits from the Plan (a "Claimant") may apply for such benefits by completing and filing a claim with the Plan Administrator.  Any such claim shall be in writing and shall include all information and evidence that the Plan Administrator deems necessary to properly evaluate the merit of and to make any necessary determinations on a claim for benefits.  The Plan Administrator may request any additional information necessary to evaluate the claim.

(b)      Timing of Notice of Denied Claim. The Plan Administrator shall notify the Claimant of any adverse benefit determination within a reasonable period of time, but not later than 90 days (45 days if the claim relates to a disability determination) after receipt of the claim. This period may be extended one time by the Plan for up to 90 days (30 additional days if the claim relates to a disability determination), provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial review period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. If the claim relates to a disability determination, the period for making the determination may be extended for up to an additional 30 days if the Plan Administrator notifies the Claimant prior to the expiration of the first 30-day extension period.

(c)      Content of Notice of Denied Claim.  If a claim is wholly or partially denied, the Plan Administrator shall provide the Claimant with a written notice identifying (1) the reason or reasons for such denial, (2) the pertinent Plan provisions on which the denial is based, (3) any material or information needed to grant the claim and an explanation of why the additional information is necessary, and (4) an explanation of the steps that the Claimant must take if he wishes to appeal the denial including a statement that the Claimant may bring a civil action under ERISA.

(d)      Appeals of Denied Claim.  If a Claimant wishes to appeal the denial of a claim, he shall file a written appeal with the Plan Administrator on or before the 60th day (180th day if the claim relates to a disability determination) after he receives the Plan Administrator's written notice that the claim has been wholly or partially denied.  The written appeal shall identify both the grounds and specific Plan provisions upon which the appeal is based.  The Claimant shall be provided, upon request and free of charge, documents and other information relevant to his claim.  A written appeal may also include any comments, statements or documents that the Claimant may desire to provide.  The Plan Administrator shall consider the merits of the Claimant's written presentations, the merits of any facts or evidence in support of the denial of benefits, and such other facts and circumstances as the Plan Administrator may deem relevant.  The Claimant shall lose the right to appeal if the appeal is not timely made.  The Plan Administrator shall ordinarily rule on an appeal within 60 days (45 days if the claim relates to a disability determination).  However, if special circumstances require an extension and the Plan Administrator furnishes the Claimant with a written extension notice during the initial period, the Plan Administrator may take up to 120 days (90 days if the claim relates to a disability determination) to rule on an appeal.

(e)      Denial of Appeal.  If an appeal is wholly or partially denied, the Plan Administrator shall provide the Claimant with a notice identifying (1) the reason or reasons for such denial, (2) the pertinent Plan provisions on which the denial is based, (3) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits, and (4) a statement describing the Claimant's right to bring an action under section 502(a) of ERISA. The

determination rendered by the Plan Administrator shall be binding upon all parties. If the Plan Administrator provides the claimant with a final notice of denial of appeal, in order to preserve his or her claim, the Claimant must file an action with respect to the denied claim no later than 180 days following the date of the Plan Administrator's final notice of denial of appeal.

(f)      Determinations of Disability.  If the claim relates to a disability determination, determinations of the Plan Administrator shall include the information required under applicable United States Department of Labor regulations.

Section 12.08      WRITTEN COMMUNICATION

To the extent permitted by applicable Treasury and/or Department of Labor Regulations and accepted by the Plan Administrator and, as applicable, the Trustee, all provisions of the Plan and Trust that require written notices and elections shall be interpreted to mean authorized electronic and telephonic notices and elections.  Any notice made under the terms of the Plan may be made in any electronic or telephonic method.

September 28, 2016

## ARTICLE 13 AMENDMENT, MERGER AND TERMINATION

Section 13.01        AMENDMENT

The provisions of the Plan may be amended at any time and from time to time by the Plan Sponsor, provided, however, that:

(a)        No amendment to the Plan shall be effective to the extent that it has the effect of decreasing a Participant's accrued benefit and no amendment shall increase the duties and liabilities of the Trustee without the Trustee's consent. For purposes of this Subsection, a Plan amendment which has the effect of decreasing a Participant's Account balance, with respect to benefits attributable to service before the amendment, shall be treated as reducing an accrued benefit.

A Plan amendment may not decrease a Participant's accrued benefits, or otherwise place greater restrictions or conditions on a Participant's rights to Code section 411(d)(6) protected benefits, even if the amendment merely adds a restriction or condition that is permitted under the vesting rules in Code section 411(a)(3) through (11).  Notwithstanding the foregoing, an amendment described in the previous sentence does not violate Code section 411(d)(6) to the extent: (1) it applies with respect to benefits that accrue after the applicable amendment date; (2) the Plan amendment changes the Plan's Vesting Computation Period and it satisfies the applicable requirements under 29 CFR 2530.203-2(c); or (3) permitted under Code section 412(d)(2) or Treas. Reg. sections 1.411(d)-3 and 1.411(d)-4 and any superseding guidance.

No amendment to the Plan shall be effective to eliminate or restrict an optional form of benefit. The preceding sentence shall not apply to a Plan amendment that eliminates or restricts the ability of a Participant to receive payment of his or her Account balance under a particular optional form of benefit if the amendment is permitted under applicable Treasury Regulations.

A Plan amendment may also provide exceptions from the general prohibition against the elimination or restriction of optional forms of benefit for in-kind distributions and elective transfers as specified under Treas. Reg. section 1.411(d)-4 Q&A 2 and 3.

(b)        Amendment by Prototype Sponsor/Volume Submitter Practitioner. The prototype plan sponsor/volume submitter practitioner may amend any part of the Plan on behalf of the adopting Employer for changes in the Code, regulations, revenue rulings, other statements published by the Internal Revenue Service, including model, sample or other required good faith amendments, but only if their adoption will not cause the Plan to be individually designed, and for corrections of prior plans.

The prototype plan sponsor/volume submitter practitioner will no longer have the authority to amend the Plan on behalf of any adopting Employer as of either: (1) the date the Internal Revenue Service requires the Employer to file Form 5300 as an individually designed plan as a result of an Employer amendment to the Plan to incorporate a type of plan not allowable in the Master and Prototype/Volume Submitter program, as described in Rev. Proc. 2007-44 and Rev. Proc. 2011-49 and superseding guidance, or (2) as of the date the Plan is otherwise considered an individually designed plan due to the nature and extent of the amendments.

The prototype plan sponsor/volume submitter practitioner will maintain a record of the Employers that have adopted the Plan, and such sponsor/practitioner will make reasonable and diligent efforts to ensure that adopting Employers have actually received and are aware of all Plan amendments and that such Employers adopt new documents when necessary. In the event that prototype plan sponsor/volume submitter practitioner licenses this document to a middleman who has not filed for a letter in their own name as an identical adopter, such middleman will be responsible for duties described in the preceding sentence.

(c)        The Plan Sponsor may: (1) change the choice of options in the Adoption Agreement; (2) add overriding language in the Adoption Agreement when such language is necessary to satisfy Code sections 415 or 416 because of the required aggregation of multiple plans; (3) amend administrative provisions of the Trust or custodial document in the case of a volume submitter plan or nonstandardized prototype plan, and the name of any pooled trust in which the Plan's Trust will participate; (4) add certain sample or model amendments published by the Internal Revenue Service or other required good faith amendments which specifically provide that their adoption will not cause the Plan to be treated as individually designed; (5) add or change provisions permitted under the Plan and/or specify or change the effective date of a provision as permitted under the Plan and (6) adopt other amendments permitted under Revenue Procedure 2011-49 and any superseding guidance that do not cause the Plan to become individually designed (this would include, but not be limited to, situations where a closing agreement under the Audit Closing Agreement Program or a compliance statement under the Voluntary Correction Program has been issued with respect to the Employer's Plan with regard to the amendment). An Employer that amends a plan other than a volume submitter plan for any other reason other than amendments permitted under Revenue Procedure 2011-49 and any superseding guidance, including a waiver of the minimum funding requirement under Code section 412(d), will no longer participate in this master or prototype plan and will be considered to have an individually designed plan.

(d)　　　If the Plan's vesting schedule is amended, in the case of an Employee who is a Participant as of the later of the date the amendment is adopted or the date it becomes effective, the nonforfeitable percentage (determined as of such date) of such Employee's Employer-derived accrued benefit will not be less than the percentage computed under the Plan without regard to such amendment.

(e)　　　If the Plan's vesting schedule is amended, or the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage or if the Plan is deemed amended by an automatic change to or from a Top-Heavy vesting schedule, each Participant with at least 3 Years of Vesting Service with the Employer may elect, within a reasonable period after the adoption of the amendment or change, to have the nonforfeitable percentage computed under the Plan without regard to such amendment or change. For Participants who do not have at least 1 Hour of Service in any Plan Year beginning after December 31, 1988, the preceding sentence shall be applied by substituting "5 Years of Vesting Service" for "3 Years of Vesting Service" where such language appears. The period during which the election may be made shall commence with the date the amendment is adopted or deemed to be made and shall end on the latest of:

(1)　　　60 days after the amendment is adopted;

(2)　　　60 days after the amendment becomes effective; or

(3)　　　60 days after the Participant is issued written notice of the amendment by the Plan Administrator.

The election provided for in this Section 13.01 shall be made in writing and shall be irrevocable when made.

(f)　　　Code section 411(d)(6) protected benefits will be available without regard to Employer discretion in accordance with Treas. Reg. section 1.411(d)(4), Q & A's #8 & 9.

(g)　　　An amendment or restatement of the Plan may be made by any method including a formal record of action by the Board or other written document and execution of such amendment or restatement may be made by written or electronic means.

Section 13.02　　　MERGER AND TRANSFER

(a)　　　Merger. In the event of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant shall have a benefit in the surviving or transferee plan (as if such plan were then terminated immediately after such merger, consolidation or transfer) that is equal to or greater than the benefit he would have had immediately before such merger, consolidation or transfer in the plan in which he was then a Participant had such plan been terminated at that time.

(b)　　　Transfer. The Plan Administrator may direct the Trustee to accept assets and related liabilities from another qualified plan in a form acceptable to the Trustee; provided that the Trustee receives sufficient evidence that the transferor plan is a tax-qualified plan and further provided that the Trustee shall not be liable for any breach of duty or error in respect of the other qualified plan. The Plan Administrator may direct the Trustee to transfer assets and related liabilities to another qualified plan provided that it receives sufficient evidence that the transferee plan is a tax-qualified plan.

Section 13.03　　　TERMINATION

(a)　　　It is the intention of the Plan Sponsor that this Plan will be permanent. However, the Plan Sponsor reserves the right to terminate the Plan at any time for any reason.

(b)　　　Each entity constituting the Company reserves the right to terminate its participation in this Plan. Each such entity constituting the Company shall be deemed to terminate its participation in the Plan if: (1) it is a party to a merger in which it is not the surviving entity and the surviving entity is not an affiliate of another entity constituting the Company; or (2) it sells all or substantially all of its assets to an entity that is not an affiliate of another entity constituting the Company.

(c)　　　Any termination of the Plan shall become effective as of the date designated by the Plan Sponsor. Except as expressly provided elsewhere in the Plan, prior to the satisfaction of all liabilities with respect to the benefits provided under this Plan, no termination shall cause any part of the funds or assets held to provide benefits under the Plan to be used other than for the benefit of Participants or to meet the administrative expenses of the Plan. In the event of the termination of the Plan the Account balance of each affected Participant will be nonforfeitable. In the event of a partial termination of the Plan the Account balance of each affected Participant will be nonforfeitable. In the event of a complete discontinuance

of contributions under the Plan, the Account balance of each affected Participant will be nonforfeitable.  Upon termination of the Plan, Participant Accounts shall be distributed in a single lump sum payment unless otherwise required pursuant to Article 7.

## ARTICLE 14 MISCELLANEOUS

Section 14.01     NONALIENATION OF BENEFITS

(a)     Except as provided in Section 14.01(b), the Trust Fund shall not be subject to any form of attachment, garnishment, sequestration or other actions of collection afforded creditors of the Company, Participants or Beneficiaries under the Plan and all payments, benefits and rights shall be free from attachment, garnishment, trustee's process, or any other legal or equitable process available to any creditor of such Company, Participant or Beneficiary. Except as provided in Section 14.01(b), no Participant or Beneficiary shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingently or otherwise, under the Plan, except the right to designate a Beneficiary. Any reference to a Participant or Beneficiary shall include an Alternate Payee or the Beneficiary of an Alternate Payee.

(b)     Notwithstanding the foregoing, the Trustee (to the extent permitted in a separate trust agreement) and/or Plan Administrator may:

(1)     Subject to Section 14.02 below, comply with the provisions and conditions of any Qualified Domestic Relations Order pursuant to the provisions of Code section 414(p).

(2)     Comply with any federal tax levy made pursuant to Code section 6331.

(3)     Subject to the provisions of Code section 401(a)(13), comply with the provisions and conditions of a judgment, order, decree or settlement agreement issued on or after August 5, 1997 between the Participant and the Secretary of Labor or the Pension Benefit Guaranty Corporation relating to a violation (or alleged violation) of part 4 of subtitle B of title I of ERISA.

(4)     Bring action to recover benefit overpayments.

Section 14.02     RIGHTS OF ALTERNATE PAYEES

(a)     General. An Alternate Payee shall have no rights to a Participant's benefit and shall have no rights under this Plan other than those rights specifically granted to the Alternate Payee pursuant to a Qualified Domestic Relations Order that are consistent with this Section 14.02.

(b)     Distribution. Notwithstanding any provision of the Plan to the contrary, the Plan Administrator may direct the Trustee to distribute all or a portion of a Participant's benefits under the Plan to an Alternate Payee in accordance with the terms and conditions of a Qualified Domestic Relations Order. The Plan hereby specifically permits and authorizes distribution of a Participant's benefits under the Plan to an Alternate Payee in accordance with a Qualified Domestic Relations Order prior to the date the Participant has a Termination of Employment, or prior to the date the Participant attains his earliest retirement age as defined in Code section 414(p).

(c)     Investment Funds. If the Qualified Domestic Relations Order does not specify the Participant's Accounts, or Investment Funds in which such Accounts are invested, from which amounts that are separately accounted for shall be paid to an Alternate Payee, such amounts shall be distributed, or segregated, from the Participant's Accounts, and the Investment Funds in which such Accounts are invested (excluding any amounts invested as a Participant loan), on a pro rata basis. A Qualified Domestic Relations Order may not provide for the assignment to an Alternate Payee of an amount that exceeds the balance of the Participant's vested Accounts after deduction of any outstanding loan.

(d)     Default Rules. Unless a Qualified Domestic Relations Order provides to the contrary:

(1)     Death Benefits. An Alternate Payee shall have the right to designate a Beneficiary who shall receive benefits payable to an Alternate Payee which have not been distributed at the time of the Alternate Payee's death. If the Alternate Payee does not designate a Beneficiary, or if the Beneficiary predeceases the Alternate Payee, benefits payable to the Alternate Payee which have not been distributed shall be paid pursuant to Section 7.04(c) (substituting "Alternate Payee" for "Participant"). Any death benefit payable to the Beneficiary of an Alternate Payee shall be paid in a single sum as soon as administratively practicable after the Alternate Payee's death.

(2)     Investment Direction. An Alternate Payee shall have the right to direct the investment of any portion of a Participant's Accounts payable to the Alternate Payee under such order in the same manner with respect to a Participant, which amounts shall be separately accounted for by the Trustee in the Alternate Payee's name.

*ARTICLE 14 MISCELLANEOUS*

(3)     Voting Rights.  An Alternate Payee shall have the right to direct the Trustee as to the exercise of voting rights in the same manner as provided with respect to a Participant.

(e)     Withdrawals/Loans. An Alternate Payee shall not be permitted to make any withdrawals under Article 8 and shall not be permitted to make a loan from the separate Account established for the Alternate Payee pursuant to the Qualified Domestic Relations Order.

(f)     Treatment as Spouse.  A former spouse may be treated as the spouse or surviving spouse and a current spouse will not be treated as the spouse or surviving spouse to the extent provided under a Qualified Domestic Relations Order.

(g)     Plan Procedures.  The Plan Administrator shall be responsible for establishing reasonable procedures for determining whether any domestic relations order received with respect to the Plan qualifies as a Qualified Domestic Relations Order, and for administering distributions in accordance with the terms and conditions of such procedures and any Qualified Domestic Relations Order. Effective April 6, 2007, pursuant to DOL regulation 2530.206, a domestic relations order will not fail to be a Qualified Domestic Relations Order solely because the domestic relations order: (1) revises or is issued after another domestic relations order or Qualified Domestic Relations Order, or (2) the domestic relations order is issued after the Participant's death, divorce or Annuity Starting Date.

## Section 14.03     NO RIGHT TO EMPLOYMENT

Nothing contained in this Plan shall be construed as a contract of employment between the Employer and the Participant, or as a right of any Employee to continue in the employment of the Employer, or as a limitation of the right of the Employer to discharge any of its Employees, with or without cause.

## Section 14.04     NO RIGHT TO TRUST ASSETS

No Employee, Participant, former Participant, Beneficiary or Alternate Payee shall have any rights to, or interest in, any assets of the Trust upon Termination of Employment or otherwise, except as specifically provided under the Plan.  All payments of benefits under the Plan shall be made solely out of the assets of the Trust.

## Section 14.05     GOVERNING LAW

This Plan shall be construed in accordance with and governed by the laws of the state or commonwealth specified in the Adoption Agreement to the extent not preempted by Federal law.

## Section 14.06     SEVERABILITY OF PROVISIONS

If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and the Plan shall be construed and enforced as if such provisions had not been included.

## Section 14.07     HEADINGS AND CAPTIONS

The headings and captions herein are provided for reference and convenience only, shall not be considered part of the Plan, and shall not be employed in the construction of the Plan.

## Section 14.08     GENDER AND NUMBER

Except where otherwise clearly indicated by context, the masculine and the neuter shall include the feminine and the neuter, the singular shall include the plural, and vice-versa.

## Section 14.09     DISASTER RELIEF

The Plan may grant temporary disaster relief in compliance with Code sections 1400M and 1400Q, and subsequent guidance and/or law, to the extent provided in a resolution by the Plan Sponsor.  Such resolution by the Plan Sponsor may include, but is not limited to: (a) increasing the statutory limits on, delaying the repayment of, and/or waiving the adequate security requirement for Participants loans; (b) permitting qualified disaster distributions; and/or (c) permitting the re-contribution of prior disaster distributions by Participants.

EXHIBIT 4c

**SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN**

**SUMMARY PLAN DESCRIPTION**

January 1, 2016

SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

SUMMARY PLAN DESCRIPTION

TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

ELIGIBILITY FOR PARTICIPATION ...................................................................................... 1
    Eligible Employee ................................................................................................................. 1
    Pension Contributions .......................................................................................................... 1

CONTRIBUTIONS TO THE PLAN ........................................................................................... 1
    Account .................................................................................................................................. 1
    Pension Contributions .......................................................................................................... 1
    Military Service .................................................................................................................... 2
    Limits on Contributions ....................................................................................................... 2
    Compensation ....................................................................................................................... 2
    Average Annual Compensation ............................................................................................ 2

VESTING ................................................................................................................................... 2
    Voluntary Contribution Account and Pension Contribution Account .................................... 2

DISTRIBUTIONS ...................................................................................................................... 2
    Commencement of Distributions .......................................................................................... 2
    Normal Retirement Age ........................................................................................................ 2
    Early Retirement Age ........................................................................................................... 2
    Timing and Form of Payment ............................................................................................... 2
    Beneficiary ............................................................................................................................ 3
    Domestic Partners ................................................................................................................. 3
    Qualified Joint and Survivor Annuity ................................................................................... 3
    Qualified Preretirement Survivor Annuity ............................................................................ 3
    Loans .................................................................................................................................... 3

INVESTMENTS ......................................................................................................................... 3
    Pooled Accounts ................................................................................................................... 3
    Qualifying Employer Securities ............................................................................................ 3
    Voting Rights ........................................................................................................................ 3
    Qualifying Longevity Annuity Contract ............................................................................... 4
    Valuation Dates .................................................................................................................... 4

SPECIAL TOP-HEAVY RULES ............................................................................................... 4
    Minimum Allocations ........................................................................................................... 4
    Minimum Vesting ................................................................................................................. 4

CLAIM PROCEDURES ............................................................................................................. 4

YOUR RIGHTS UNDER ERISA ................................................................................................ 5

MISCELLANEOUS ................................................................................................................... 5
    Domestic Relations Orders ................................................................................................... 6
    Assignment and Alienation of Benefits ................................................................................ 6
    Amendment and Termination ................................................................................................ 6
    Fees ...................................................................................................................................... 6
    Insurance .............................................................................................................................. 6
    Administrator Discretion ...................................................................................................... 6
    Plan Not a Contract of Employment ..................................................................................... 7
    Waiver .................................................................................................................................. 7
    Errors ................................................................................................................................... 7

ADMINISTRATIVE INFORMATION ....................................................................................... 7

Copyright © 2002-2016

## INTRODUCTION

Shirley T Sherrod,  M.D. P.C. (the "Company") established the Shirley T Sherrod, M.D., P.C. Target Pension Plan (the "Plan") effective January 01, 1987.  This Summary Plan Description describes the Plan as restated effective January 1, 2016.

This revised Summary Plan Description supersedes all previous Summary Plan Descriptions.  Although the purpose of this document is to summarize the more significant provisions of the Plan, the Plan document will prevail in the event of any inconsistency. In addition, the terms of the Plan cannot be modified by written or oral statements made to you by the Plan Administrator or other personnel.

Effective January 1, 2012 the Plan is frozen as to eligibility and benefits. This means no new employees can become eligible for participation in the Plan and no contributions can be made to the Plan as of January 1, 2012. Distributions will continue to be provided as described in this Summary Plan Description.

## ELIGIBILITY FOR PARTICIPATION

### Eligible Employee

You are an "Eligible Employee" if you are employed by Shirley T Sherrod,  M.D. P.C. or any affiliate who has adopted the Plan. However, you are not an "Eligible Employee" if you are a member of any of the following classes of employees:

Any employee who is included in a unit of employees covered by a collective bargaining agreement, if retirement benefits were the subject of good faith bargaining, and if the collective bargaining agreement does not provide for participation in this Plan.

Any leased employee.

Any employee who is a non-resident alien who received no earned income which constitutes income from services performed within the United States.

### Pension Contributions

You will become a Participant with respect to Pension Contributions on the date you first perform an Hour of Service as an Eligible Employee.

All eligibility service with the Company is taken into account.

## CONTRIBUTIONS TO THE PLAN

### Account

"Account" means all of the contributions, of whatever type, made to the Plan for a Participant, including the earnings and losses on those contributions.

### Pension Contributions

The Company will make a Pension Contribution to the Plan on your behalf  You will be eligible to receive an allocation if you have completed at least one (1) hour of service during the Plan Year.

Pension Contributions will be allocated to the Pension Contribution Accounts of each Participant eligible to share in such allocations after the end of the Plan Year. Such contributions will be allocated so that your benefit is equal to 70% of your "Average Annual Compensation" (defined below), payable annually as a straight life annuity beginning at Normal Retirement Age.  If your "Years of Projected Participation" (defined below) are less than 25, the amount of your benefit will be reduced proportionately.

Your Average Annual Compensation is the average of three years' of Compensation with the final year being the current plan year (or any other three-consecutive year period that produces the highest average.) If you have less than three years' of participation the Compensation will be averaged over the total time you have been a participant.

Your Years of Projected Participation will be the sum of your years of participation under the Plan while the current formula has been in place and the number of years left until you reach your Normal Retirement Age.

Copyright © 2002-2016

Military Service

If you serve in the United States armed forces and must miss work as a result of such service, you may be eligible to receive contributions, benefits and service credit with respect to any qualified military service. In addition, your survivors may be eligible to receive benefits or service credit if you die while performing qualified military service.

Limits on Contributions

The amount that may be contributed to the Plan on your behalf in any year is limited to a fixed dollar amount ($53,000 in 2016). In addition, contributions cannot exceed 100% of your total Compensation.

Compensation

"Compensation" means wages that are shown as taxable wages on your IRS Form W-2. For any self-employed individual, Compensation will mean earned income. Compensation will include wages paid during any period in which you are performing service in the uniformed services while on active duty for a period of more than 30 days that represents all or a portion of the wages you would have received if you were performing service for the Company. Compensation will also include any amount you elect to defer on a tax-preferred basis to any Company benefit plan.

No more than $265,000 (in 2016) of Compensation may be taken into account in determining your benefits under the Plan.

Average Annual Compensation

"Average Annual Compensation" means the average of a Participant's annual Compensation for all Plan Years of participation in the Plan.

## VESTING

Voluntary Contribution Account and Pension Contribution Account

You are always fully (100%) vested in your Voluntary Contribution Account and Pension Contribution Account.

## DISTRIBUTIONS

Commencement of Distributions

Termination of Employment. You are entitled to receive a distribution from your Account after you terminate employment. This includes termination due to Disability. The distribution will start at the time specified in the section titled "Timing and Form of Payment" below.

Late Retirement. If you continue working for the Company after your Normal Retirement Age, your participation under the Plan will continue, and your benefits will begin following the date you terminate employment. You generally may not begin distributions until the time specified in the section titled "Timing and Form of Payment" below.

Death. If you die, your beneficiary will become entitled to receive your vested Account balance. The distribution will start at the time specified in the section titled "Timing and Form of Payment" below.

Normal Retirement Age

"Normal Retirement Age" means the date you reach age 65.

Early Retirement Age

"Early Retirement Age" means the date you reach age 55.

Timing and Form of Payment

Distribution for Reasons Other Than Death. If you become entitled to receive your benefit for any reason other than death, your Account will be paid to you in the form of a 50% "Qualified Joint and Survivor Annuity" (defined below). This is your normal form of payment. You may also elect to receive your distribution in the form of a lump sum payment. If your Account balance exceeds $5,000, your spouse, if applicable, must consent to any payment that is not a Qualified Joint and Survivor Annuity. Payment of your vested Account may start as soon as administratively feasible with a final payment made consisting of any allocations occurring after your termination of employment. Your Account is payable in cash. You may also choose to have the Plan Administrator use your entire Account balance to purchase an annuity contract, which will then be distributed to you. If you do not choose a form of payment, payment will be made in the form of a Qualified Joint and Survivor Annuity unless your Account balance does not exceed $5,000.

Copyright © 2002-2016

Distribution on Account of Death. If you die before distribution of your Account begins, your Account will be distributed in the form of a "Qualified Preretirement Survivor Annuity" (defined below). In addition, distribution of your entire Account must be completed by December 31 of the calendar year containing the fifth anniversary of your death.

If the Qualified Preretirement Survivor Annuity has been waived or is not required, as specified below, your beneficiary will be entitled to a distribution in any form that is available to you prior to your death.

If you die after distribution of your Account has begun, the remaining portion of your Account will continue to be distributed under the method of distribution being used prior to your death. If your Account was not being distributed in the form of an annuity at the time of your death, the remaining balance must be distributed by December 31 of the calendar year containing the fifth anniversary of your death.

<u>Beneficiary</u>

You have the right to designate, in a written form acceptable to the Plan Administrator, one or more primary and one or more secondary beneficiaries to receive any benefit becoming payable upon your death. Your spouse must be the sole beneficiary of your Account unless he or she consents to the designation of another beneficiary. You may change your beneficiaries at any time and from time to time by filing written notice of such change with the Plan Administrator.

If you fail to designate a beneficiary, or in the event that all designated primary and secondary beneficiaries die before you, the death benefit will be payable to your spouse, or if there is no spouse, to your children in equal shares, or if there are no children to your estate.

<u>Domestic Partners</u>

Domestic Partners are treated as a spouse under the terms of this Plan for purposes of death benefits to the extent allowable under Federal Law. A Domestic Partner is your partner if you are in a civil union or similar relationship recognized under the laws of any state. You may only have one Domestic Partner. You may not have a Domestic Partner if you are legally married.

<u>Qualified Joint and Survivor Annuity</u>

The Plan generally provides that if you are married, your Account balance will be paid in the form of a Qualified Joint and Survivor Annuity in which the benefit payable to your spouse for life after your death will be 50% of the monthly retirement income paid during your life. In addition, there is a qualified optional survivor annuity available in which the benefit payable to your spouse for life after your death will be 75% of the monthly retirement income paid during your life. However, if you obtain the written consent of your spouse or your Account balance does not exceed $5,000, your Account balance may be paid in a form other than a Qualified Joint and Survivor Annuity.

For a single Participant, a Qualified Joint and Survivor Annuity means an immediate annuity for the life of the Participant and which is the amount of benefit which can be purchased with the Participant's vested Account balance.

<u>Qualified Preretirement Survivor Annuity</u>

If you die before the commencement of your benefits under the Plan, 50% of your Account balance will automatically be applied to the purchase of a survivor annuity for your spouse (the Qualified Preretirement Survivor Annuity) unless (1) your Account balance does not exceed $5,000, (2) you, with the written consent of your spouse, waive the survivor annuity for a non-spousal beneficiary, or (3) your surviving spouse waives such survivor annuity.

<u>Loans</u>

Loans are not permitted.

## INVESTMENTS

<u>Pooled Accounts</u>

Except for segregated accounts specifically authorized under other provisions of this Plan, all assets are pooled for investment purposes, and your Account is not segregated from other Participants' Accounts.

<u>Qualifying Employer Securities</u>

The Trustee may not invest the assets of the trust fund in "qualifying employer securities" or "qualifying employer real property".

<u>Voting Rights</u>

You may not direct the Trustee as to the exercise of voting rights with respect to any Trust Fund Investment.

Copyright © 2002-2016

Qualifying Longevity Annuity Contract

A portion of your Account may be used to purchase a qualifying longevity annuity contract (QLAC). A QLAC is an annuity contract that is designed to defer payment of a portion of your retirement saving until a later age than is otherwise required under the terms of the Plan.

If you chose to purchase a QLAC, the amount held in the QLAC will not be subject to the normal distribution rules specified under "Timing and Form of Payment" The starting date for payments under the QLAC will be specified in the QLAC. For further information regarding the allowable payment options and payment starting dates in a QLAC please request information from the insurance company providing the QLAC.

The amount you may invest in a QLAC is either (1) 25% of your Account balance under this Plan or (2) $125,000 (for 2016), whichever is less. When determining if the dollar limit has been exceeded, amounts held in all of your QLACs in all retirement plans will be counted. If you have purchased a QLAC in another retirement plan you must inform the Plan Administrator and provide the dollar amount of the premiums paid. You must inform the Plan Administrator if you have QLACs in any other retirement plan (including an individual retirement account) to ensure the limits are not exceeded. The Plan Administrator will rely on the information you provide and will not be responsible for any excess due to QLACs held under another plan. If you exceed the limits stated above, the contract will cease to be a QLAC as of the date the excess payment was made, and the amount held in the contract will be subject to the distribution requirements discussed "Timing and Form of Payment" unless the excess amount is removed from the QLAC and moved back into your non-QLAC Account balance. This movement must happen by the end of the calendar year following the calendar year when the excess amount was put in the QLAC.

Valuation Dates

Accounts are valued on the last day of the Plan Year. The Plan Administrator may in its sole discretion declare a special Valuation Date for that portion of the Plan that is not daily-valued in extraordinary situations to protect the interests of Participants in the Plan or the Participant receiving the distribution. Such extraordinary circumstances include a significant change in economic conditions or market value of the Trust Fund.

## SPECIAL TOP-HEAVY RULES

### Minimum Allocations

If the Plan is Top-Heavy, the Company will generally allocate a minimum of 3% of your Compensation to the Plan if you are a Participant who is (i) employed by the Company on the last day of the Plan Year and (ii) not a key employee.

Note that if you are covered by a collective bargaining agreement you will not share in Top-Heavy minimum allocations, provided retirement benefits were the subject of good faith bargaining.

### Minimum Vesting

If you complete an hour of service while this Plan is Top-Heavy, all of your Accounts will be 100% vested and nonforfeitable.

## CLAIM PROCEDURES

Application for Benefits. You or any other person entitled to benefits from the Plan (a "Claimant") may apply for such benefits by completing and filing a claim with the Plan Administrator. Any such claim must be in writing and must include all information and evidence that the Plan Administrator deems necessary to properly evaluate the merit of and to make any necessary determinations on a claim for benefits. The Plan Administrator may request any additional information necessary to evaluate the claim.

Timing of Notice of Denied Claim. The Plan Administrator will notify the Claimant of any adverse benefit determination within a reasonable period of time, but not later than 90 days (45 days if the claim relates to a disability determination) after receipt of the claim. This period may be extended one time by the Plan for up to 90 days (30 additional days if the claim relates to a disability determination), provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial review period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. If the claim relates to a disability determination, the period for making the determination may be extended for up to an additional 30 days if the Plan Administrator notifies the Claimant prior to the expiration of the first 30-day extension period.

Content of Notice of Denied Claim. If a claim is wholly or partially denied, the Plan Administrator will provide the Claimant with a written notice identifying (1) the reason or reasons for such denial, (2) the pertinent Plan provisions on which the denial is based, (3) any material or information needed to grant the claim and an explanation of why the additional information is necessary, and (4) an explanation of the steps that the Claimant must take if he wishes to appeal the denial including a statement that the Claimant may bring a civil action under ERISA.

Appeals of Denied Claim. If a Claimant wishes to appeal the denial of a claim, he must file a written appeal with the Plan Administrator on or before the 60th day (180th day if the claim relates to a disability determination) after he receives the Plan Administrator's written notice that the claim has been wholly or partially denied. The written appeal must identify both the grounds and specific Plan provisions upon which the appeal is based. The Claimant will be provided, upon request and free of charge, documents and other information relevant to his claim. A written appeal may also include any comments, statements or documents that the Claimant may desire to provide. The Plan Administrator will consider the merits

Copyright © 2002-2016

of the Claimant's written presentations, the merits of any facts or evidence in support of the denial of benefits, and such other facts and circumstances as the Plan Administrator may deem relevant. The Claimant will lose the right to appeal if the appeal is not timely made. The Plan Administrator will ordinarily rule on an appeal within 60 days (45 days if the claim relates to a disability determination). However, if special circumstances require an extension and the Plan Administrator furnishes the Claimant with a written extension notice during the initial period, the Plan Administrator may take up to 120 days (90 days if the claim relates to a disability determination) to rule on an appeal.

Denial of Appeal. If an appeal is wholly or partially denied, the Plan Administrator will provide the Claimant with a notice identifying (1) the reason or reasons for such denial, (2) the pertinent Plan provisions on which the denial is based, (3) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits, and (4) a statement describing the Claimant's right to bring an action under section 502(a) of ERISA. The determination rendered by the Plan Administrator will be binding upon all parties.

Determinations of Disability. If the claim relates to a disability determination, determinations of the Plan Administrator will include the information required under applicable United States Department of Labor regulations.

## YOUR RIGHTS UNDER ERISA

As a participant, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). This federal law provides that you have the right to:

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

Obtain, once a year, a statement from the Plan Administrator regarding your Accrued Benefit under the Plan and the nonforfeitable (vested) portion of your Accrued Benefit, if any. This statement must be requested in writing and is not required to be given more than once every 12 months. The Plan must provide the statement free of charge.

In addition, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining your benefits or exercising your rights under ERISA.

If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## MISCELLANEOUS

Copyright © 2002-2016

Domestic Relations Orders

Under certain circumstances, a court may issue a domestic relations order assigning a portion of your benefits under the Plan to a spouse, former spouse, child or other dependent. The Plan Administrator will determine whether the order is a qualified domestic relations order ("QDRO"). If the Plan Administrator determines that the order is a QDRO, it will implement the terms of the QDRO and divide your Account accordingly. You may obtain, without charge, a copy of the Plan's QDRO procedures from the Plan Administrator.

Assignment and Alienation of Benefits

Except as provided below, your Account is held in trust and cannot be assigned and, to the extent permitted by law, is not subject to any form of attachment, garnishment, sequestration or other actions of collection. You may not alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which you may expect to receive, contingently or otherwise, under the Plan, except that you may designate a beneficiary.

However, you may lose all or part of your balance:

-         pursuant to the terms of a QDRO;

-         to comply with any federal tax levy; or

-         to comply with the provisions and conditions of a judgment, order, decree or settlement agreement between you and the Secretary of Labor or the Pension Benefit Guaranty Corporation relating to your violation (or alleged violation) of ERISA fiduciary responsibilities.

Amendment and Termination

Although the Company intends to maintain the Plan indefinitely, the Company may amend or terminate the Plan at any time in its sole discretion. If any of these actions is taken, you will be notified. However, no such action may permit any part of Plan assets to be used for any purpose other than the exclusive benefit of participants and beneficiaries or cause any reduction in your vested Account balance as of the date of the amendment or termination. If the Plan is terminated, all amounts credited to your Account will become 100% vested.

Fees

Your Account may be charged for some of the costs and expenses of operating the Plan. Such expenses include the following:

The Plan may charge affected Participants only for the expenses of receiving a distribution following termination of employment (if applicable to the Participant) in the following manner: preparation of joint and survivor equivalents .

The Plan may charge affected Participants only for the expenses of determining required minimum distributions (if applicable to the Participant) in the following manner: calculation of required minimum distribution.

The Plan may charge affected Participants only for the expenses of processing a domestic relations order (if applicable to the Participant) in the following manner: administration of QDRO.

The Plan may charge all Participants for the expenses of operating the Plan in the following manner: cost of restating plan document, cost of preparation of Form 5500.

Fees listed above are subject to change. Please check with the Plan Administrator to be sure you have a current fee listing.

Insurance

The Plan is not insured by the Pension Benefit Guaranty Corporation (PBGC) because it is not a defined benefit pension plan.

Administrator Discretion

The Plan Administrator has the authority to make factual determinations, to construe and interpret the provisions of the Plan, to correct defects and resolve ambiguities in the Plan and to supply omissions to the Plan. Any construction, interpretation or application of the Plan by the Plan Administrator is final, conclusive and binding.

Copyright © 2002-2016

Plan Not a Contract of Employment

The Plan does not constitute, and is not to be deemed to constitute, an employment contract between the Company and any employee or an inducement or condition of employment of any employee. Nothing in the Plan is to be deemed to give any employee the right to be retained in the Company's service or to interfere with the Company's right to discharge any employee at any time.

Waiver

Any failure by the Plan or the Plan Administrator to insist upon compliance with any of the Plan's provisions at any time or under any set of circumstances does not operate to waive or modify the provision or in any other manner render it unenforceable as to any other time or as to any other occurrence, whether the circumstances are the same or different. No waiver of any term or condition of the Plan is valid or of any force or effect unless it is expressed in writing and signed by a person authorized by the Plan Administrator to grant a waiver.

Errors

Any clerical or similar error by the Plan Administrator cannot give coverage under the Plan to any individual who otherwise does not qualify for coverage under the Plan. An error cannot give a benefit to an individual who is not actually entitled to the benefit.

## ADMINISTRATIVE INFORMATION

1.    The Plan Sponsor Shirley T Sherrod, M.D. P.C.

Address: P. O. Box 2423, Chicago, IL 60690
Phone number: 313-341-5100
Employer Identification Number: 38-2174656

The Plan Administrator is L J Consulting Services LLC
Address: 1146 S Waukegan Rd, STE 278, Waukegan, IL 60085
Phone number: 313-320-7200
Employer Identification Number: 38-2171344

2.    The Plan is a pension plan. The Plan number is 002.

3.    The Plan's designated agent for service of legal process is the President of the corporation named in item 1. Any legal papers should be delivered to such person at the address listed in item 1. However, service may also be made upon the Plan Administrator or a Trustee.

4.    The Plan's assets are held in a trust created under the terms of the Plan. The Trustee is Shirley T. Sherrod, M.D.. Its principal place of business is P. O. Box 2423, Chicago, IL 60690.

5.    The Company's fiscal year ends on CompanyTaxYear December 31 - and the Plan Year ends on December 31.

6.    If the Plan is established or maintained by two or more employers, you can obtain a complete list of the employers sponsoring the Plan upon written request to the Plan Administrator (this list is also available for examination by participants and beneficiaries); you may also receive from the Plan Administrator, upon written request, information as to whether a particular employer is a sponsor of the Plan and, if the employer is a plan sponsor, the sponsor's address.

Copyright © 2002-2016

**SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN**
**PLAN HIGHLIGHTS**

**IMPORTANT:** *This is a summary of the plan features. For full details, please refer to the Summary Plan Description.*

| Eligibility | |
|---|---|
| **Excluded Employees:** | The following employees are excluded from the Plan:<br>• Employees covered by a collective bargaining agreement<br>• Leased employees<br>• Non-resident aliens |
| **Pension Contributions:** | You must meet the following criteria to be eligible to receive a Pension Contribution:<br>• You must attain age none |

| Enrollment Periods | |
|---|---|
| **Pension Contributions:** | On the date you meet the eligibility criteria specified above for purposes of Pension Contributions. |

| Contributions | |
|---|---|
| **Pension Contributions:** | The Company will make a Pension Contribution on your behalf. Such contribution will be allocated so that your benefit is equal to 70% of your Average Annual Compensation), payable annually as a straight life annuity beginning at Normal Retirement Age. If your Years of Projected Participation is less than 25, the amount of your benefit will be reduced proportionally. (Please refer to the Summary Plan Description for more information.) |

| Vesting | |
|---|---|
| **Fully Vested Accounts:** | You will have a fully vested and nonforfeitable interest in your Voluntary Contribution Account and Pension Contribution Account. |

| Investing Plan Contributions | |
|---|---|
| **Investments:** | All plan assets are pooled for investment purposes. A plan fiduciary is responsible for selecting investments. |

| Distributions | |
|---|---|
| **Distributions from the plan:** | You may receive a distribution from your account under the following circumstances:<br>Immediately after your employment terminates<br>Death |

| Contact Information |
|---|
| Plan Administrator:<br><br>    Address:  L J Consulting Services LLC 1146 S Waukegan Rd, STE 278, Waukegan, IL 60085<br>    Phone number:  313-320-720 |

*Note: These plan highlights are intended to be a very concise overview of plan features. For a detailed description of plan features, please review the Summary Plan Description or contact the Plan Administrator for more information. The plan features described in these plan highlights are subject to change and in the event of a discrepancy between the legal plan document and these highlights (or any other summary of plan features), the plan document shall control.*

Copyright © 2002-2016

EXHIBIT 4d

**SHIRLEY T SHERROD, M.D. P.C.**
**CONSENT ACTION OF THE DIRECTORS**

The following actions are hereby taken by the unanimous written consent of the directors of Shirley T Sherrod, M.D. P.C. (the "Company") in lieu of a meeting of the directors.

With respect to the amendment and restatement of the Shirley T Sherrod, M.D., P.C. Target Pension Plan (the "Plan"), the following resolutions are hereby adopted:

**RESOLVED**: That the Plan be amended and restated in the form attached hereto, which Plan is hereby adopted and approved;

**RESOLVED FURTHER**: That the appropriate officers of the Company be, and they hereby are, authorized and directed to execute the Plan on behalf of the Company;

**RESOLVED FURTHER**: That Shirley T. Sherrod, M.D. is hereby retained as the Trustee of the Plan; and

**RESOLVED FURTHER**: That the officers of the Company be, and they hereby are, authorized and directed to take any and all actions and execute and deliver such documents as they may deem necessary, appropriate or convenient to effect the foregoing resolutions including, without limitation, causing to be prepared and filed such reports documents or other information as may be required under applicable law.

Dated this 30th day of April, 2016.

LJ CONSULTING SERVICES, LLC, Administrator

by /s Leroy Johnson

_ITS: President

**BENEFICIARY DESIGNATION**
SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

## Section 1: PARTICIPANT INFORMATION

| | | | |
|---|---|---|---|
| Last Name | First Name | MI | Employee ID Number |

Address - Number and Street      City      State      Zip

Date of Birth: _____/_____/_____

Current Marital Status: ☐ Single ☐ Married

( )
Work Phone

( )
Home Phone

## Section 2: NOTICE OF SURVIVING SPOUSE'S MINIMUM BENEFIT

*In General*. If you die before payments to you have begun 50% of your vested account balance will be paid in the form of a Qualified Preretirement Survivor Annuity ("QPSA") to your surviving spouse. The QPSA is not available if: (i) you and your spouse waive the benefit as provided below, or (ii) the terms of a qualified domestic relations order provide otherwise. The QPSA is an annuity payable for the life of your surviving spouse that is purchased with 50% of your vested account balance at the time of death. The annuity payments may be postponed until the time benefits must commence under the terms of the Plan. In addition, your spouse may elect any other form of benefit permitted by the Plan after your death instead of a QPSA.

*Amount of QPSA*. The QPSA will be provided by purchasing an annuity contract from an insurance company with 50% of your vested account balance under the Plan. The following is a chart indicating the estimated amount of the monthly QPSA for a surviving spouse using the UP-84 Mortality table, a 5% interest rate and various representative ages for your surviving spouse at the date payments begin.

Annuity Factors (monthly benefit per $1,000 of account balance)

| Age | 30 | 35 | 40 | 45 | 50 | 55 | 60 | 65 | 70 |
|---|---|---|---|---|---|---|---|---|---|
| Factor | $4.71 | $4.89 | $5.14 | $5.47 | $5.90 | $6.48 | $7.25 | $8.30 | $9.73 |

For example, if your spouse is age 50 when the QPSA begins and your vested account balance is $10,000, the amount of the monthly benefit will be $29.50 (10 x 50% x $5.90). Please note that there is no guarantee that an annuity contract purchased from an insurer will provide the monthly amounts set forth in the table above. Any commissions or sales charges that are paid to the insurance company in connection with the purchase of the annuity contract will reduce your spouse's monthly benefit. You may obtain more accurate information about the levels of monthly income that would be paid to your surviving spouse by contacting Plan Administrator at the address listed below under "Waiver."

*Beneficiary Designation*. Unless the QPSA is waived, you may not designate that more than 50% of your vested account balance be paid as a death benefit to a beneficiary or beneficiaries other than your surviving spouse. For example, if you designate your parents as beneficiaries and later marry but die without having changed your beneficiary designation, the surviving spouse's QPSA will be deducted automatically before the other 50% of the Participant's vested account balance is paid to your parents. Similarly, if you are married and designate that your vested account balance be divided in equal shares among your surviving spouse and your three children but the QPSA is not waived, your spouse must receive his or her minimum benefit and the remaining 50% of the vested account balance will be divided equally among the three children. Please note that after your death your spouse may elect any other form of benefit permitted by the Plan (e.g., lump sum) instead of a QPSA.

*Waiver*. The QPSA cannot be waived until after (1) the December 31 preceding the Participant's 35th birthday, or (2) the last day on which the Participant is employed by a sponsor of the Plan. Even then, the waiver will not be effective unless the spouse gives his or her written consent (Section 4 of this form) or the Participant certifies that he or she does not know the whereabouts of the spouse. To become effective, this form must be properly completed and received by the Plan Administrator, Shirley T Sherrod, M.D. P.C.,P. O. Box 2423, Chicago, IL 60690.

## Section 3: DESIGNATION OF BENEFICIARY

As a Participant in the above Plan, I hereby revoke any prior beneficiary designation and direct that any benefits payable upon my death be paid to the following beneficiary/beneficiaries. The total share for the Primary Beneficiaries must equal 100% and the total share for the Secondary Beneficiaries, if any, must equal 100%.

Copyright © 2002-2016

PRIMARY BENEFICIARY(IES):

| Name and Social Security Number | Share | Relation | Address |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

If none of the Primary Beneficiaries designated above survive me, payment shall be made to the following Secondary Beneficiaries.

SECONDARY BENEFICIARY(IES):

| Name and Social Security Number | Share | Relation | Address |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Unless otherwise specified above, if none of the beneficiaries designated above survive me, payment shall be made pursuant to the applicable provisions of the Plan.

(You must check A, B, C or D below):

[ ]    A.  I am not married. I understand that if I do marry, my surviving spouse will be entitled to 50% of my vested account balance unless I file a new Beneficiary Designation with my spouse's written consent.

[ ]    B.  I am married but Section 4 of this form is not completed because I have designated my spouse as the Primary Beneficiary of at least 50% of my vested account balance.

[ ]    C.  I am married and subject to my spouse's written consent (Section 4 of this form), I have designated that a portion of my vested account balance be paid to one or more Primary Beneficiaries other than my spouse.

[ ]    D.  I am married and I have designated that a portion of my vested account balance be paid to one or more Primary Beneficiaries other than my spouse. Section 4 of this form has not been completed because I do not know the whereabouts of my spouse. I agree to inform the Plan Administrator if I learn the location of my spouse.

Dated at _____, this _____ day of _____, 2016.
                                      [City, State]

Witnessed by: _____          _____
                                                                                      Signature of Participant

                                                                              _____
                                                                              Name of Participant (print or type)

## Section 4: SPOUSE'S CONSENT (Must be completed if Participant checks C above)

I am the spouse of the Participant identified above. I hereby consent to my spouse's designation of the beneficiary(ies) identified above and understand that I am designated to receive less than 50% of the vested account balance. I further acknowledge my understanding that:

1.    My spouse's designation that a portion of his or her vested account balance be paid to one or more Primary Beneficiaries other than myself is not valid unless I consent to it;

2.    My consent is irrevocable unless my spouse changes his or her designation of beneficiary(ies); and

Copyright © 2002-2016

3.      I am waiving the right to the QPSA described in Section 2 of this form.

Dated at _____, this _____ day of _____, 2016.
               [City, State]

<div align="right">

_____
Signature of Participant's Spouse

_____
Name of Participant's Spouse
(print or type)

</div>

Witnessed by:
Notary Public, State of _____
My Commission (is permanent/expires)

_____    **OR**    _____
                                                    Authorized Representative of Plan Administrator

Copyright © 2002-2016

## YOUR ROLLOVER OPTIONS

You are receiving this notice because all or a portion of a payment you are receiving from the Shirley T Sherrod, M.D., P.C. Target Pension Plan (the "Plan") is eligible to be rolled over to an IRA or an employer plan. This notice is intended to help you decide whether to do such a rollover.

This notice describes the rollover rules that apply to payments from the Plan that are not from a designated Roth account (a type of account with special tax rules in some employer plans). If you also receive a payment from a designated Roth account in the Plan, you will be provided a different notice for that payment, and the Plan administrator or the payor will tell you the amount that is being paid from each account. Rules that apply to most payments from a plan are described in the "General Information About Rollovers" section. Special rules that only apply in certain circumstances are described in the "Special Rules and Options" section.

### GENERAL INFORMATION ABOUT ROLLOVERS

**How can a rollover affect my taxes?**

You will be taxed on a payment from the Plan if you do not roll it over. If you are under age 59-1/2 and do not do a rollover, you will also have to pay a 10% additional income tax on early distributions (unless an exception applies). However, if you do a rollover, you will not have to pay tax until you receive payments later and the 10% additional income tax will not apply if those payments are made after you are age 59-1/2 (or if an exception applies).

**Where may I roll over the payment?**

You may roll over the payment to either an IRA (an individual retirement account or individual retirement annuity) or an employer plan (a tax-qualified plan, section 403(b) plan, or governmental section 457(b) plan) that will accept the rollover. The rules of the IRA or employer plan that holds the rollover will determine your investment options, fees, and rights to payment from the IRA or employer plan (for example, no spousal consent rules apply to IRAs and IRAs may not provide loans). Further, the amount rolled over will become subject to the tax rules that apply to the IRA or employer plan.

**How do I do a rollover?**

There are two ways to do a rollover. You can do either a direct rollover or a 60-day rollover.

If you do a direct rollover, the Plan will make the payment directly to your IRA or an employer plan. You should contact the IRA sponsor or the administrator of the employer plan for information on how to do a direct rollover.

If you do not do a direct rollover, you may still do a rollover by making a deposit into an IRA or eligible employer plan that will accept it. You will have 60 days after you receive the payment to make the deposit. If you do not do a direct rollover, the Plan is required to withhold 20% of the payment for federal income taxes (up to the amount of cash and property received other than employer stock). This means that, in order to roll over the entire payment in a 60-day rollover, you must use other funds to make up for the 20% withheld. If you do not roll over the entire amount of the payment, the portion not rolled over will be taxed and will be subject to the 10% additional income tax on early distributions if you are under age 59-1/2 (unless an exception applies).

**How much may I roll over?**

If you wish to do a rollover, you may roll over all or part of the amount eligible for rollover. Any payment from the Plan is eligible for rollover, except:

- Certain payments spread over a period of at least 10 years or over your life or life expectancy (or the lives or joint life expectancy of you and your beneficiary)
- Required minimum distributions after age 70-1/2 (or after death)
- Hardship distributions
- ESOP dividends
- Corrective distributions of contributions that exceed tax law limitations
- Loans treated as deemed distributions (for example, loans in default due to missed payments before your employment ends)
- Cost of life insurance paid by the Plan
- Payments of certain automatic enrollment contributions requested to be withdrawn within 90 days of the first contribution
- Amounts treated as distributed because of a prohibited allocation of S corporation stock under an ESOP (also, there will generally be adverse tax consequences if you roll over a distribution of S corporation stock to an IRA)

The Plan administrator or the payor can tell you what portion of a payment is eligible for rollover.

**If I don't do a rollover, will I have to pay the 10% additional income tax on early distributions?**

Copyright © 2002-2016

If you are under age 59-1/2, you will have to pay the 10% additional income tax on early distributions for any payment from the Plan (including amounts withheld for income tax) that you do not roll over, unless one of the exceptions listed below applies. This tax is in addition to the regular income tax on the payment not rolled over.

The 10% additional income tax does not apply to the following payments from the Plan:

- Payments made after you separate from service if you will be at least age 55 in the year of the separation
- Payments that start after you separate from service if paid at least annually in equal or close to equal amounts over your life or life expectancy (or the lives or joint life expectancy of you and your beneficiary)
- Payments from a governmental defined benefit pension plan made after you separate from service if you are a public safety employee and you are at least age 50 in the year of the separation
- Payments made due to disability
- Payments after your death
- Payments of ESOP dividends
- Corrective distributions of contributions that exceed tax law limitations
- Cost of life insurance paid by the Plan
- Payments made directly to the government to satisfy a federal tax levy
- Payments made under a qualified domestic relations order (QDRO)
- Payments up to the amount of your deductible medical expenses
- Certain payments made while you are on active duty if you were a member of a reserve component called to duty after September 11, 2001 for more than 179 days
- Payments of certain automatic enrollment contributions requested to be withdrawn within 90 days of the first contribution

**If I do a rollover to an IRA, will the 10% additional income tax apply to early distributions from the IRA?**

If you receive a payment from an IRA when you are under age 59-1/2, you will have to pay the 10% additional income tax on early distributions from the IRA, unless an exception applies. In general, the exceptions to the 10% additional income tax for early distributions from an IRA are the same as the exceptions listed above for early distributions from a plan. However, there are a few differences for payments from an IRA, including:

- There is no exception for payments after separation from service that are made after age 55
- The exception for qualified domestic relations orders (QDROs) does not apply (although a special rule applies under which, as part of a divorce or separation agreement, a tax-free transfer may be made directly to an IRA of a spouse or former spouse)
- The exception for payments made at least annually in equal or close to equal amounts over a specified period applies without regard to whether you have had a separation from service
- There are additional exceptions for (1) payments for qualified higher education expenses, (2) payments up to $10,000 used in a qualified first-time home purchase, and (3) payments for health insurance premiums after you have received unemployment compensation for 12 consecutive weeks (or would have been eligible to receive unemployment compensation but for self-employed status)

**Will I owe State income taxes?**

This notice does not describe any State or local income tax rules (including withholding rules)

## SPECIAL RULES AND OPTIONS

**If your payment includes after-tax contributions**

After-tax contributions included in a payment are not taxed. If a payment is only part of your benefit, an allocable portion of your after-tax contributions is included in the payment, so you cannot take a payment of only after-tax contributions. However, if you have pre-1987 after-tax contributions maintained in a separate account, a special rule may apply to determine whether the after-tax contributions are included in a payment. In addition, special rules apply when you do a rollover, as described below.

You may roll over to an IRA a payment that includes after-tax contributions through either a direct rollover or a 60-day rollover. You must keep track of the aggregate amount of the after-tax contributions in all of your IRAs (in order to determine your taxable income for later payments from the IRAs). If you do a direct rollover of only a portion of the amount paid from the Plan and at the same time the rest is paid to you, the portion directly rolled over consists first of the amount that would be taxable if not rolled over. For example, assume you are receiving a distribution of $12,000, of which $2,000 is after-tax contributions. In this case, if you directly roll over $10,000 to an IRA that is not a Roth IRA, no amount is taxable because the $2,000 amount not directly rolled over is treated as being after-tax contributions. If you do a direct rollover of the entire amount paid from the Plan to two or more destinations at the same time, you can choose which destination receives the after-tax contributions.

If you do a 60-day rollover to an IRA of only a portion of a payment made to you, the after-tax contributions are treated as rolled over last. For example, assume you are receiving a distribution of $12,000, of which $2,000 is after-tax contributions, and no part of the distribution is directly rolled over. In this case, if you rolled over $10,000 to an IRA that is not a Roth IRA in a 60-day rollover, no amount is taxable because the $2,000 amount not rolled over is treated as being after-tax contributions.

Copyright © 2002-2016

You may roll over to an employer plan all of a payment that includes after-tax contributions, but only through a direct rollover (and only if the receiving plan separately accounts for after-tax contributions and is not a governmental section 457(b) plan). You can do a 60-day rollover to an employer plan of part of a payment that includes after-tax contributions, but only up to the amount of the payment that would be taxable if not rolled over.

**If you miss the 60-day rollover deadline**

Generally, the 60-day rollover deadline cannot be extended. However, the IRS has the limited authority to waive the deadline under certain extraordinary circumstances, such as when external events prevented you from completing the rollover by the 60-day rollover deadline. To apply for a waiver, you must file a private letter ruling request with the IRS. Private letter ruling requests require the payment of a nonrefundable user fee. For more information, see IRS Publication 590-A, *Contributions Individual Retirement Arrangements (IRAs)*.

**If your payment includes employer stock that you do not roll over**

If you do not do a rollover, you can apply a special rule to payments of employer stock (or other employer securities) that are either attributable to after-tax contributions or paid in a lump sum after separation from service (or after age 59-1/2, disability, or the participant's death). Under the special rule, the net unrealized appreciation on the stock will not be taxed when distributed from the Plan and will be taxed at capital gain rates when you sell the stock. Net unrealized appreciation is generally the increase in the value of employer stock after it was acquired by the Plan. If you do a rollover for a payment that includes employer stock (for example, by selling the stock and rolling over the proceeds within 60 days of the payment), the special rule relating to the distributed employer stock will not apply to any subsequent payments from the IRA or employer plan. The Plan administrator can tell you the amount of any net unrealized appreciation.

**If you have an outstanding loan that is being offset**

If you have an outstanding loan from the Plan, your Plan benefit may be offset by the amount of the loan, typically when your employment ends. The loan offset amount is treated as a distribution to you at the time of the offset and will be taxed (including the 10% additional income tax on early distributions, unless an exception applies) unless you do a 60-day rollover in the amount of the loan offset to an IRA or employer plan.

**If you were born on or before January 1, 1936**

If you were born on or before January 1, 1936 and receive a lump sum distribution that you do not roll over, special rules for calculating the amount of the tax on the payment might apply to you. For more information, see IRS Publication 575, *Pension and Annuity Income*.

**If your payment is from a governmental section 457(b) plan**

If the Plan is a governmental section 457(b) plan, the same rules described elsewhere in this notice generally apply, allowing you to roll over the payment to an IRA or an employer plan that accepts rollovers. One difference is that, if you do not do a rollover, you will not have to pay the 10% additional income tax on early distributions from the Plan even if you are under age 59-1/2 (unless the payment is from a separate account holding rollover contributions that were made to the Plan from a tax-qualified plan, a section 403(b) plan, or an IRA). However, if you do a rollover to an IRA or to an employer plan that is not a governmental section 457(b) plan, a later distribution made before age 59-1/2 will be subject to the 10% additional income tax on early distributions (unless an exception applies). Other differences are that you cannot do a rollover if the payment is due to an "unforeseeable emergency" and the special rules under "If your payment includes employer stock that you do not roll over" and "If you were born on or before January 1, 1936" do not apply.

**If you are an eligible retired public safety officer and your pension payment is used to pay for health coverage or qualified long-term care insurance**

If the Plan is a governmental plan, you retired as a public safety officer, and your retirement was by reason of disability or was after normal retirement age, you can exclude from your taxable income plan payments paid directly as premiums to an accident or health plan (or a qualified long-term care insurance contract) that your employer maintains for you, your spouse, or your dependents, up to a maximum of $3,000 annually. For this purpose, a public safety officer is a law enforcement officer, firefighter, chaplain, or member of a rescue squad or ambulance crew.

**If you roll over your payment to a Roth IRA**

If you roll over the payment from the Plan to a Roth IRA, a special rule applies under which the amount of the payment rolled over (reduced by any after-tax amounts) will be taxed. However, the 10% additional income tax on early distributions will not apply (unless you take the amount rolled over out of the Roth IRA within 5 years, counting from January 1 of the year of the rollover).

If you roll over the payment to a Roth IRA, later payments from the Roth IRA that are qualified distributions will not be taxed (including earnings after the rollover). A qualified distribution from a Roth IRA is a payment made after you are age 59-1/2 (or after your death or disability, or as a qualified first-time homebuyer distribution of up to $10,000) and after you have had a Roth IRA for at least 5 years. In applying this 5-year rule, you count from January 1 of the year for which your first contribution was made to a Roth IRA. Payments from the Roth IRA that are not qualified distributions will be taxed to the extent of earnings after the rollover, including the 10% additional income tax on early distributions (unless an exception applies). You do not have to take required minimum distributions from a Roth IRA during your lifetime. For more information, see IRS

Copyright © 2002-2016

Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs)* and IRS Publication 590-B, *Distributions from Individual Retirement Arrangements (IRAs)*.

You cannot roll over a payment from the Plan to a designated Roth account in an employer plan.

**If you are not a plan participant**

<u>Payments after death of the participant</u>. If you receive a distribution after the participant's death that you do not roll over, the distribution will generally be taxed in the same manner described elsewhere in this notice. However, the 10% additional income tax on early distributions and the special rules for public safety officers do not apply, and the special rule described under the section "If you were born on or before January 1, 1936" applies only if the participant was born on or before January 1, 1936.

> **If you are a surviving spouse**. If you receive a payment from the Plan as the surviving spouse of a deceased participant, you have the same rollover options that the participant would have had, as described elsewhere in this notice. In addition, if you choose to do a rollover to an IRA, you may treat the IRA as your own or as an inherited IRA.
>
> An IRA you treat as your own is treated like any other IRA of yours, so that payments made to you before you are age 59-1/2 will be subject to the 10% additional income tax on early distributions (unless an exception applies) and required minimum distributions from your IRA do not have to start until after you are age 70-1/2.
>
> If you treat the IRA as an inherited IRA, payments from the IRA will not be subject to the 10% additional income tax on early distributions. However, if the participant had started taking required minimum distributions, you will have to receive required minimum distributions from the inherited IRA. If the participant had not started taking required minimum distributions from the Plan, you will not have to start receiving required minimum distributions from the inherited IRA until the year the participant would have been age 70-1/2.
>
> **If you are a surviving beneficiary other than a spouse**. If you receive a payment from the Plan because of the participant's death and you are a designated beneficiary other than a surviving spouse, the only rollover option you have is to do a direct rollover to an inherited IRA. Payments from the inherited IRA will not be subject to the 10% additional income tax on early distributions. You will have to receive required minimum distributions from the inherited IRA.

<u>Payments under a qualified domestic relations order</u>. If you are the spouse or former spouse of the participant who receives a payment from the Plan under a qualified domestic relations order (QDRO), you generally have the same options the participant would have (for example, you may roll over the payment to your own IRA or an eligible employer plan that will accept it). Payments under the QDRO will not be subject to the 10% additional income tax on early distributions.

**If you are a nonresident alien**

If you are a nonresident alien and you do not do a direct rollover to a U.S. IRA or U.S. employer plan, instead of withholding 20%, the Plan is generally required to withhold 30% of the payment for federal income taxes. If the amount withheld exceeds the amount of tax you owe (as may happen if you do a 60-day rollover), you may request an income tax refund by filing Form 1040NR and attaching your Form 1042-S. See Form W-8BEN for claiming that you are entitled to a reduced rate of withholding under an income tax treaty. For more information, see also IRS Publication 519, *U.S. Tax Guide for Aliens*, and IRS Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Other special rules**

If a payment is one in a series of payments for less than 10 years, your choice whether to make a direct rollover will apply to all later payments in the series (unless you make a different choice for later payments).

If your payments for the year are less than $200 (not including payments from a designated Roth account in the Plan), the Plan is not required to allow you to do a direct rollover and is not required to withhold for federal income taxes. However, you may do a 60-day rollover.

You may have special rollover rights if you recently served in the U.S. Armed Forces. For more information, see IRS Publication 3, *Armed Forces' Tax Guide*.

<div align="center">

**FOR MORE INFORMATION**

</div>

You may wish to consult with the Plan administrator or payor, or a professional tax advisor, before taking a payment from the Plan. Also, you can find more detailed information on the federal tax treatment of payments from employer plans in: IRS Publication 575, *Pension and Annuity Income*; IRS Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs)*; IRS Publication 590-B, *Distributions from Individual Retirement Arrangements(IRAs)*; and IRS Publication 571, *Tax-Sheltered Annuity Plans (403(b) Plans)*. These publications are available from a local IRS office, on the web at www.irs.gov, or by calling 1-800-TAX-FORM.

Copyright © 2002-2016

### DISTRIBUTION ELECTION FORM
SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

## Section 1: PARTICIPANT INFORMATION

| | | | |
|---|---|---|---|
| Last Name | First Name | MI | Employee ID Number |

| | | | |
|---|---|---|---|
| Address - Number and Street | City | State | Zip |

Date of Birth: _____/_____/_____

Date of Hire: _____/_____/_____

Current Marital Status: [ ] Single [ ] Married

( )
Work Phone

( )
Home Phone

## Section 2: REASON FOR DISTRIBUTION

**Please check the reason for the distribution:**

[ ]  Termination of Employment (Incl. Retirement and Plan Termination)  Date: _____
[ ]  Disability  Date: _____
[ ]  Death  Date: _____
[ ]  Qualified Domestic Relations Order (QDRO) (Please attach a QDRO Checklist)
[ ]  Required Minimum Distributions

Note to Participant:  Sections 4 and 5 must be completed prior to any distribution or rollover from your account. However, if your vested Account balance exceeds $5,000, you should carefully review the entire form and also complete Section 3 (if applicable). *This form remains valid for up to 180 days.*

## Section 3: JOINT AND SURVIVOR ANNUITY NOTICE / WAIVER

If you are married and your vested account balance is greater than $5,000, your account generally must be paid in the form of a qualified joint and survivor annuity. Similarly, if you are single your vested account balance is automatically payable in the form of a single life annuity if it is greater than $5,000. The annuities mentioned in the preceding sentence are not available if: (i) you (and your spouse if you are married) waive the benefit as provided below, or (ii) the terms of a qualified domestic relations order provide otherwise. A qualified joint and survivor annuity is defined as an annuity for your life with a survivor annuity for the life of your spouse that is 50% of the annuity payable during your life. In addition the plan offers a qualified optional joint and survivor annuity which is an annuity for your life with a survivor annuity for the life of your spouse that is 75% of the annuity payable during your life. Unless you waive such an annuity and your spouse consents in writing to the waiver, your entire vested account balance will be utilized to purchase an annuity. The annuity payments may be postponed until the time benefits must commence under the terms of the Plan. However, if your vested account balance is less than $5,000, your vested account balance will be paid in the form of a lump sum.

You have the right to waive the required form of benefit described above and receive your benefit in the forms described in Section 4. FORM OF PAYMENT.

Any annuity form of benefit will be provided by purchasing an annuity contract from an insurance company with your vested account balance under the Plan. The following is a chart indicating the estimated amount of the monthly annuities using the UP-84 Mortality table, a 5% interest rate and various representative ages for you (and for your spouse for the joint and survivor annuity) at the date payments begin.

Annuity Factors (monthly benefit per $1,000 of account balance)

| Participant Age | 30 | 35 | 40 | 45 | 50 | 55 | 60 | 65 | 70 |
|---|---|---|---|---|---|---|---|---|---|
| Spouse's Age | 28 | 33 | 38 | 43 | 48 | 53 | 58 | 63 | 68 |
| Single Life | $4.71 | $4.89 | $5.14 | $5.47 | $5.90 | $6.48 | $7.25 | $8.30 | $9.73 |
| Life w/5 yrs certain | $4.71 | $4.89 | $5.13 | $5.45 | $5.87 | $6.42 | $7.15 | $8.10 | $9.31 |
| Life w/10 yrs certain | $4.70 | $4.88 | $5.11 | $5.41 | $5.79 | $6.28 | $6.87 | $7.57 | $8.36 |
| Life w/15 yrs certain | $4.68 | $4.85 | $5.07 | $5.34 | $5.67 | $6.05 | $6.48 | $6.91 | $7.30 |
| Joint and 100% survivor | $4.42 | $4.52 | $4.67 | $4.86 | $5.11 | $5.46 | $5.92 | $6.57 | $7.45 |

Copyright © 2002-2016

| Joint and 50% survivor* | $4.56 | $4.70 | $4.89 | $5.14 | $5.48 | $5.92 | $6.52 | $7.33 | $8.44 |
| Joint and 75% survivor* | $4.49 | $4.61 | $4.78 | $5.00 | $5.29 | $5.68 | $6.21 | $6.93 | $7.91 |

*The monthly survivor benefit would be 100%/50%/75% of the amount shown.

For example, if you are age 50 and your spouse is age 48 when the joint and 50% survivor annuity begins and your vested account balance is $10,000, the amount of the monthly benefit will be $54.80 (10 X $5.48). Please note that there is no guarantee that an annuity contract purchased from an insurer will provide the monthly amounts set forth in the table above. Any commissions or sales charges that are paid to the insurance company in connection with the purchase of the annuity contract will reduce your monthly benefit. You may obtain more accurate information about the levels of monthly income that would be paid in the form of an annuity by completing the "REQUEST FOR JOINT AND SURVIVOR ANNUITY INFORMATION" section below and returning this form to the Plan Administrator.

In order for a married Participant to obtain the benefits in a form other than a qualified joint and survivor annuity (such as a single sum distribution), the Participant must waive the joint and survivor annuity and his or her spouse must consent in writing (unless the Participant certifies that he or she cannot locate the spouse). Parts III and IV of this form must be used for these purposes. The Participant has at least thirty days to consider whether to waive the joint and survivor annuity. The Participant may revoke such waiver prior to the date on which payments begin (or, if later, seven days after the date he or she waives the qualified joint and survivor annuity), but any revocation must be in writing. Waivers (properly completed copies of this form) and revocations of waivers are not effective until they are received by the Plan Administrator. In order for a single Participant to obtain the benefits in a form other than a single life annuity, the Participant must waive the annuity. The Plan Administrator is Shirley T Sherrod, M.D. P.C.P. O. Box 2423, Chicago, IL 60690 and 248 341-5100

REQUEST FOR JOINT AND SURVIVOR ANNUITY INFORMATION

I hereby request information about the levels of income that would be paid to me and, if married, to my spouse following my death (if he or she survives me) under a qualified joint and survivor annuity. I certify that the following information is correct:

Name of Spouse_____ Date of Birth_____

_____
Signature of Participant

ELECTION TO WAIVE JOINT AND SURVIVOR ANNUITY

As a Participant in the plan identified above, I hereby acknowledge that I have been informed by the Plan Administrator that if I am married at the time my benefits commence they must be paid in the form of a joint and survivor annuity (or in the form of a single life annuity if I am not married) unless I waive that form of payment and my spouse consents in writing. I have been further informed by the Plan Administrator that I have at least thirty days to consider whether to waive the joint and survivor annuity. If I am married and I waive the qualified joint and survivor annuity with my spouse's consent, I understand that I may revoke my waiver prior to the date on which payments begin (or, if later, seven days after the date I waive the qualified joint and survivor annuity).

(You must check one item below and sign below):

[ ]     A. I am married and I hereby elect to waive the payment of my benefits in the form of a qualified joint and survivor annuity with my spouse, subject to my spouse's written consent (below).

[ ]     B. I am married, but I hereby waive payment of my benefit in the form of a qualified joint and survivor annuity. The "SPOUSE'S CONSENT" section of this form (below) has not been completed because I do not know the whereabouts of my spouse. I agree to notify the Plan Administrator if I learn the location of my spouse before my benefit commences.

[ ]     C. I am not married, but I will notify the Plan Administrator if I do marry before receiving benefits under the Plan. I hereby elect to waive the payment of my benefits in the form of a single life annuity.

[ ]     D. I am married, but my spouse and I do not wish to waive the qualified joint and survivor annuity form of benefit. However, I understand that we may do so prior to the date on which payments begin or an annuity contract is purchased.

Copyright © 2002-2016

Dated at _____, this _____ day of _____, 2016.
               City, State

Witnessed by:

                                        _____
                                        Signature of Participant

_____
                                        _____
                                        Name of Participant (print or type)

SPOUSE'S CONSENT (Must be completed if Participant checks A above)

I am the spouse of the Participant identified above.  I hereby consent to my spouse's waiver of the payment of benefits in the form of a qualified joint and survivor annuity.  I further acknowledge my understanding that:

        1.       My spouse's waiver of the qualified joint and survivor annuity is not valid unless I consent to it; and

        2.       My consent is irrevocable unless my spouse revokes the waiver.

Dated at _____, this _____ day of _____, 2016.
               City, State

                                          _____
                                        Signature of Participant's Spouse

                                          _____
                                        Name of Participant's Spouse (print or type)

Witnessed by:

Notary Public, State of _____  OR
My Commission (is permanent/expires)

_____
                                        _____
                                        Authorized Representative of
                                        Plan Administrator

## Section 4: FORM OF PAYMENT

Note:      This section should only be completed after consultation with your personal tax advisor.

      I have received a "Your Rollover Options" handout which explains the tax consequences of, and the direct rollover option available with respect to, the distribution of my vested account balance under the Shirley T Sherrod, M.D., P.C. Target Pension Plan (the "Plan").  I understand I have the right to defer distribution of my account if my account balance is greater than $5,000 (see "ELECTION TO CONTINUE TO DEFER" below) until the later of age 62 or the day I reach Normal Retirement Age; and I have the right to consider the information provided in that notice for a period of at least 30 days.

      If your account balance is greater than the amount specified in the preceding paragraph, please note the investment options available under the Plan may not be available to you on similar terms outside the plan. For more information about the investment options that may be available to you under the Plan if you do defer a distribution of your account please contact the Plan Administrator, !@!Name - NOT VALID, at Shirley T Sherrod, M.D. P.C., P. O. Box 2423, Chicago, IL 60690 (248 341-5100). Please refer to the Summary Plan Description (particularly the sections entitled "VESTING-Forfeitures", "DISTRIBUTIONS", "INVESTMENTS", "MISCELLANEOUS-Loss of Benefit" and MISCELLANEOUS-Fees) for any special rules that might affect your decision to defer payment. Please note that your account may be distributed without your consent if your account falls below the amount specified in the preceding paragraph.

      The Plan will impose the following charges on your account after you terminate employment: cost of restating plan document, cost of preparation of Form 5500.

      Before taking a distribution, you should compare the expenses associated with leaving your funds in the Plan with the expenses associated with investing the funds in alternative retirement plans such as your new employer's plan or an IRA. In some cases the Plan may offer an investment vehicle that provides lower fees than is available to you in an IRA or other retirement plan. Alternatively, your new employer's plan may provide lower fees for comparable investments, particularly if your new employer's plan is significantly larger than the Plan. In addition, you should compare the investment options available to you in the Plan with the options available to you in alternative retirement plans. Keep in mind that the Plan

Copyright © 2002-2016

Administrator may change at any time the manner in which expenses are allocated to your account as well as the investments offered in the Plan. In addition, the fees associated with investments offered in the Plan are also subject to change at any time.

I hereby elect to have my vested account balance paid in the following manner and, to the extent distribution can be made prior to the expiration of 30 days from the date I received the notice of my rights, I waive my right to consider the contents of that notice for 30 days and consent to the distribution of my benefit as soon as administratively feasible. Please distribute the benefit as follows:

[ ]    A.    Rollover to [ ]IRA [ ]Eligible Retirement Plan
The rollover check will be mailed to the rollover institution specified below.

| | |
|---|---|
| Name of IRA or Plan: | _____ |
| Address: | _____ |
| City, State, Zip: | _____ |
| Contact Name: | _____ |
| Contact Phone Number: | _____ |
| Account Number: | _____ |

Please note that some payments are not eligible for rollover such as required minimum distributions.

Amount to be rolled over:

[ ]    1.    All of my account balance.

[ ]    2.    _____ (Enter a dollar amount or percentage.)

[ ]    B.    The balance (after any rollover in A) to be paid to me in the following manner (if your vested account balance is less than $5,000, your balance will be paid in a single lump sum):

[ ]    Qualified Joint and Survivor Annuity described in Section 3

[ ]    Qualified Optional Joint and Survivor Annuity described in Section 3

[ ]    Single Life Annuity described in Section 3 (Also available to you if you are the spouse of a deceased participant).

[ ]    in a single lump sum payment.

[ ]    the Plan Administrator will purchase a non-transferable annuity and distribute the contract to me. I understand that the terms of the annuity contract will comply with the provisions of the Plan.

[ ]    Required Minimum Distributions.

## WITHHOLDING

A.    If an "eligible rollover distribution" is not rolled over to an IRA or another eligible retirement plan, it will be subject to 20% federal income tax withholding.

B.    A distributee who will receive a payment which is not an "eligible rollover distribution" generally must complete the attached Form W-4P. The "Your Rollover Options" handout describes payments which are not eligible rollover distributions.

C.    No withholding is required if the distribution is less than $200.

## ELECTION TO CONTINUE TO DEFER

[ ]    I do not wish to take my distribution at this time. I will notify you when I wish to receive my distribution.

Copyright © 2002-2016

**Section 5: SIGNATURES**

       I hereby consent to the distribution requested on this form.  I understand that if I do not roll over this distribution that a 10% penalty tax may apply unless I am at least 59-1/2 years old (or some other exception to the tax applies).  If I am requesting that a portion of my distributions be rolled over, I hereby certify that the IRA or plan identified above is an "eligible retirement plan" authorized to accept the direct rollover I have specified and that it will accept a direct rollover of my Plan distribution. I understand that a rollover to a Roth IRA may be subject to taxation.

     Dated _____, 2016.


_____
Participant's Signature


_____
Print Name

If you would like Electronic Funds Transfer for your distribution, please complete the information below (any transfer fee will be deducted from your account):

          Bank name_____
          ABA Routing # (nine digit #) _____
          Account # _____
          Type of account (checking or savings) _____

As Plan Administrator, I hereby authorize the above distribution.

     Dated _____, 2016.


_____
Plan Administrator's Signature


_____
Print Name & Title

Copyright © 2002-2016

## BENEFICIARY DISTRIBUTION ELECTION
### SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

### Section 1: PARTICIPANT INFORMATION

| | | | |
|---|---|---|---|
| Last Name | First Name | MI | Employee ID Number |

| | |
|---|---|
| Address - Number and Street | City          State          Zip |

Date of Birth: _____/_____/_____          Date of Death: _____/_____/_____

### BENEFICIARY INFORMATION

| | | | |
|---|---|---|---|
| Last Name | First Name | MI | Employee ID Number |

| | |
|---|---|
| Relationship to Participant | Percentage of Account |

| | |
|---|---|
| Address - Number and Street | City          State          Zip |

Date of Birth: _____/_____/_____          Current Marital Status: ☐ Single ☐ Married

( )                                              ( )
Work Phone                                       Home Phone

### Section 2: NOTICE OF SURVIVING SPOUSE'S BENEFIT

*In General.* If you were married to the Participant at the time of the Participant's death, the Participant died before payments had begun and the vested account balance is greater than $5,000, your share of the account balance will be paid to you in the form of a Qualified Preretirement Survivor Annuity ("QPSA"). The QPSA will not be paid if: (i) the QPSA is waived, or (ii) the terms of a qualified domestic relations order provide otherwise. The QPSA is an annuity payable for the life of a surviving spouse that is purchased with his or her share of the account balance at the time of death. The annuity payments may be postponed until the time benefits must commence under the terms of the Plan. In addition, the spouse may elect any other form of benefit permitted by the Plan after the death of the Participant instead of a QPSA. However, if the vested account balance at the time of death is less than $5,000, the vested account balance will be paid in the form of a lump sum.

*Amount of QPSA.* The QPSA will be provided by purchasing an annuity contract from an insurance company with your share of the vested account balance under the Plan. The following is a chart indicating the estimated amount of the monthly QPSA for using the UP-84 Mortality table, a 5% interest rate and various representative ages at the date payments begin.

Annuity Factors (monthly benefit per $1,000 of account balance)

| Age | 30 | 35 | 40 | 45 | 50 | 55 | 60 | 65 | 70 |
|---|---|---|---|---|---|---|---|---|---|
| Factor | $4.71 | $4.89 | $5.14 | $5.47 | $5.90 | $6.48 | $7.25 | $8.30 | $9.73 |

For example, if you are age 50 when the QPSA begins and your share of the vested account balance is $10,000, the amount of the monthly benefit will be $59.00 (10 x $5.90). Please note that there is no guarantee that an annuity contract purchased from an insurer will provide the monthly amounts set forth in the table above. Any commissions or sales charges that are paid to the insurance company in connection the purchase of the annuity contract will reduce the monthly benefit. You may obtain more accurate information about the levels of monthly income that would be paid by contacting the Plan Administrator, Shirley T Sherrod, M.D. P.C., P. O. Box 2423, Chicago, IL 60690.

You have the right to waive the required form of benefit described above and receive your benefit in the forms described below in Section 3.

### Section 3: FORM OF PAYMENT

Note: This section should only be completed after consultation with your personal tax advisor.

Copyright © 2002-2016

I hereby elect to have my share of the account balance paid in the following manner (If no option is selected, you will be deemed to have selected a lump sum payment):

[ ] Rollover (Complete Section A)       [ ] Lump Sum (Complete Section B)

## A:  Complete if selected  ROLLOVER

Rollover to:  [ ]IRA   [ ]Roth IRA   [ ]Eligible Retirement Plan (**Qualified Plan may be elected by a spousal beneficiary only**.)

Name of IRA or Plan:       _____
Address: _____
City, State, Zip:   _____
Contact Name:   _____
Contact Phone Number:   _____
Account Number:   _____

Please note that some payments are not eligible for rollover such as required minimum distributions.

If you are a non-spouse beneficiary and are requesting a rollover to an IRA: (i) the rollover must be done as a direct trustee-to-trustee transfer to the new IRA, and (ii) the new 'inherited' IRA must identify both the deceased participant and the beneficiary; e.g., "Tom Smith as beneficiary of John Smith."

Amount to be rolled over:

[ ]     1.       All of my account balance.

[ ]     2.       _____ (Enter a dollar amount or percentage.)

## B:  Complete if selected LUMP SUM

The balance to be paid to me in the following manner (if the Participant's vested account balance is less than $5,000, the balance will be paid in a single lump sum):

[ ]     in a single lump sum payment.

[ ]     in the form of a Qualified Preretirement Survivor Annuity (**May be paid to a surviving spouse only and only if the surviving spouse has not previously waived the QPSA**).

[ ]     in the form of an annuity.

NOTE: If the Participant has no designated beneficiary, or if the designated beneficiary does not elect a method of distribution, distribution of the Participant's entire interest must be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

## Section 4: WITHHOLDING

Installment (or annuity) payments that are expected to be paid over a period of ten years or more are subject to 10% withholding, which may be waived. Any other payment that is not rolled over to an IRA or another qualified plan will be subject to mandatory 20% federal income tax withholding.

*[NOTE: Complete A or B below only if payments are being made in annuity or installment payments that are expected to be paid over a period of ten years or more.]*

[ ]     A.       I elect not to have federal income taxes withheld from my payment.
[ ]     B.       I elect to have the standard 10% withheld from my payment for federal income taxes.

## Section 5: SIGNATURE

I hereby consent to the distribution requested on this form. If I am requesting that a portion of my share of the account be rolled over to a qualified plan, I hereby certify that I am the surviving spouse of the Participant and that the plan identified above is an "eligible retirement plan" authorized to accept the direct rollover I have specified and that it will accept a direct rollover of the distribution. If I am not the spouse of the Participant and I am requesting that a portion of my share of the account be rolled over to an IRA, I hereby certify that the IRA has been established in accordance with the requirements set forth above. If applicable, I have received a "Your Rollover Options" handout which explains the tax consequences of the distribution of my share of the account. If I am a surviving spouse I hereby waive my right to receive my share of the account in the form of a QPSA.

Copyright © 2002-2016

Dated this _____ day of _____, 2016.

_____
Signature of Beneficiary

_____
Print Name of Beneficiary

If you would like Electronic Funds Transfer for your distribution, please complete the information below (any transfer fee will be deducted from your account):

        Bank name_____
        ABA Routing # (nine digit #) _____
        Account # _____
        Type of account (checking or savings) _____

As Plan Administrator, I hereby authorize the above withdrawal.

Dated this _____ day of _____, 2016.

_____
Signature of Plan Administrator

_____
Print Name & Title of Plan Administrator

Copyright © 2002-2016

# EXHIBIT 4e



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION

Plan Description: Prototype Non-standardized Target Benefit Plan
FFN: 313C083FT02-008 Case: 201200247 EIN: 13-3504158
Letter Serial No: J399278a
Date of Submission: 03/30/2012

CCH INCORPORATED DBA FTWILLIAM COM
700 W. VIRGINIA STREET, SUITE 305
MILWAUKEE, WI 53204

Contact Person:
  Janell Hayes
Telephone Number:
  513-263-3602
In Reference To: TEGE:EP:7521
Date: 03/31/2014

Dear Applicant:

In our opinion, the form of the plan identified above is acceptable under section 401 of the Internal Revenue Code for use by employers for the benefit of their employees. This opinion relates only to the acceptability of the form of the plan under the Internal Revenue Code. It is not an opinion of the effect of other Federal or local statutes.

You must furnish a copy of this letter, a copy of the approved plan, and copies of any subsequent amendments to each employer who adopts this plan. Effective on or after 10/31/2011, interim amendments adopted by the sponsor on behalf of employers must provide the date of adoption by the sponsor.

This letter considers the changes in qualification requirements contained in the 2010 Cumulative List of Notice 2010-90, 2010-52 I.R.B. 909.

Our opinion on the acceptability of the form of the plan is not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a). However, an employer that adopts this plan may rely on this letter with respect to the qualification of its plan under Code section 401(a), as provided for in Rev. Proc. 2011-49, 2011-44 I.R.B. 608, and outlined below. The terms of the plan must be followed in operation.

Except as provided below, our opinion does not apply with respect to the requirements of Code sections 401(a)(4), 401(l), 410(b), and 414(s). Our opinion does not apply for purposes of Code section 401(a)(10)(B) and section 401(a)(16) if an employer ever maintained another qualified plan for one or more employees who are covered by this plan. For this purpose, the employer will not be considered to have maintained another plan merely because the employer has maintained another defined contribution plan(s), provided such other plan(s) has been terminated prior to the effective date of this plan and no annual additions have been credited to the account of any participant under such other plan(s) as of any date within the limitation year of this plan. Also, for this purpose, an employer is considered as maintaining another plan, to the extent that the employer maintains a welfare benefit fund defined in Code section 419(e), which provides postretirement medical benefits allocated to separate accounts for key employees as defined in Code section 419A(d)(3), or an individual medical account as defined in Code section 415(l)(2), which is part of a pension or annuity plan maintained by the employer, or a simplified employee pension plan.

Our opinion does not apply for purposes of the requirement of section 1.401(a)-1(b)(2) of the regulations applicable to a money purchase plan or target benefit plan where the normal retirement age under the employer's plan is lower than age 62.

Letter 4334

CCH INCORPORATED DBA FTWILLIAM COM
FFN: 313C083FT02-008
Page: 2

This is not a ruling or determination with respect to any language in the plan that reflects Section 3 of the Defense of Marriage Act, Pub. L. 104-199, 110 Stat. 2419 (DOMA) or U.S. v. Windsor, 133 S. Ct. 2675 (2013), which invalidated that section.

Our opinion applies with respect to the requirements of Code section 410(b) if 100 percent of all nonexcludable employees benefit under the plan. Employers that elect a safe harbor allocation formula and a safe harbor compensation definition can also rely on an opinion letter with respect to the nondiscriminatory amounts requirement under section 401(a)(4). If this plan includes a CODA or otherwise provides for contributions subject to sections 401(k) and/or 401(m), the opinion letter can be relied on with respect to the form of the nondiscrimination tests of 401(k)(3) and 401(m)(2) if the employer uses a safe harbor compensation definition. In the case of plans described in section 401(k)(12) or (13) and/or 401(m)(11) or (12), employers may also rely on the opinion letter with respect to whether the form of the plan satisfies the requirements of those sections unless the plan provides for the safe harbor contribution to be made under another plan.

The employer may request a determination (1) as to whether the plan, considered with all related qualified plans and, if appropriate, welfare benefit funds, individual medical benefit accounts, and simplified employee pension plans, satisfies the requirements of Code section 401(a)(16) as to limitations on benefits and contributions in Code section 415 and the requirements of Code section 401(a)(10)(B) as to the top-heavy plan requirements in Code section 416; (2) with respect to whether a money purchase or target benefit plan's normal retirement age which is earlier than age 62 satisfies the requirements of section 401(a)-1(b)(2) of the Income Tax Regulations; (3) that the plan is a multiple employer plan; (4) whether there has been a partial termination; and (5) to comply with published procedures of the Service (e.g. minimum funding waiver request). The employer may request a determination letter in these circumstances by filing an application with Employee Plans Determinations on Form 5300, without restating for the Cumulative List in effect when the application is filed.

If you, the master or prototype sponsor, have any questions concerning the IRS processing of this case, please call the above telephone number. This number is only for use of the sponsor. Individual participants and/or adopting employers with questions concerning the plan should contact the master or prototype sponsor. The plan's adoption agreement must include the sponsor's address and telephone number for inquiries by adopting employers.

If you write to the IRS regarding this plan, please provide your telephone number and the most convenient time for us to call in case we need more information. Whether you call or write, please refer to the Letter Serial Number and File Folder Number shown in the heading of this letter.

You should keep this letter as a permanent record. Please notify us if you modify or discontinue sponsorship of this plan.

Sincerely Yours,

Andrew E. Zuckerman
Director, Employee Plans Rulings and Agreements

Letter 4334

EXHIBIT 5

## CORPORATE RESOLUTION OF SOLE OFFICER AND SOLE OWNER OF SHIRLEY T. SHERROD M.D. P.C.[1]

The undersigned being the sole officer and sole owner of Shirley T. Sherrod M.D. P.C. ("Employer"), duly organized and existing under the laws of Michigan, **DOES HEREBY CERTIFY** the following:

**WHEREAS**, the Employer maintains the Shirley T. Sherrod M.D. P.C. Target Benefit Pension Plan and Trust ("Plan" or "Plan and Trust") for the benefit of eligible employees; and

**WHEREAS**, Section 8.1 of that certain Plan and Trust document made and entered into on April 30, 2010, effective as of January 1, 2009 ("Plan Document") reserves for the Employer "the right at any time to amend this Plan;" and

**WHEREAS**, Section 2.7 of the Plan Document provides, in relevant part, "All reasonable expenses of administration may be paid out of the Plan assets unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, and other specialists and their agents, the costs of any bonds required pursuant to Act Section 412, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund;" and

**WHEREAS**, Section 7.7 of the Plan Document provides, in relevant part, "the Trustee shall be reimbursed for any reasonable expenses, including reasonable counsel fees incurred by it as Trustee. Such compensation and expenses shall be paid from the Trust Fund unless paid or advanced by the Employer;" and

**WHEREAS**, the undersigned deems it advisable and in the best interests of the Employer to amend the Plan to further provide for indemnification of any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator, by the Plan ("Fiduciary Indemnification Provision"); and

**WHEREAS**, Section 410 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") permits a plan to indemnify or hold harmless a plan fiduciary, including the advancement of reasonable attorney fees, so long as any such agreement does not purport "to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty" under part 4 of Title I of ERISA; and

**WHEREAS**, the undersigned, acting in her capacity as the Plan sponsor, deems it advisable and in the best interests of the Employer to amend the Plan to provide that, if any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator, receives an advancement of fees or expenses from the Plan pursuant to

---

[1] Unless defined herein, the capitalized terms set forth herein have the meaning ascribed to them in the Plan Document.

1

Sections 2.7, 7.7, or the Fiduciary Indemnification Provision, the Plan fiduciary shall reimburse the Plan for such advancements in the event of any claim, damage, expense, liability, or loss that is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have directly resulted either from the gross negligence, fraud, criminal act, or willful misconduct of the Plan fiduciary or from the violation or breach by the Plan fiduciary of his, her, or its fiduciary duties under ERISA; and

**WHEREAS**, the undersigned, acting in her capacity as the Plan sponsor, deems it advisable and in the best interests of the Employer to amend the Plan to include a severability clause; and

**WHEREAS**, the undersigned, acting in her capacity as the Plan sponsor, deems it advisable and in the best interests of the Employer to adopt the above-described amendments ("Amendments"), and to execute such other instruments, documents and agreements as relate to and facilitate the contemplated amendment, and to take all other reasonable steps necessary or advisable for the adoption of the same.

**NOW, THEREFORE**, be it:

**RESOLVED**, that Shirley T. Sherrod M.D., the sole officer and sole owner of Shirley T. Sherrod M.D. P.C., is hereby authorized to amend the Plan on behalf of the Employer; and

**FURTHER RESOLVED**, that the Amendments substantially in the form annexed hereto as Exhibit A be, and hereby are, in all respects approved and adopted; and

**FURTHER RESOLVED**, that the authority of any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator, to receive reimbursement of expenses actually and properly incurred in connection with their responsibilities under the Plan pursuant to Sections 2.7 and 7.7 of the Plan, including litigation expenses, shall not be affected by the adoption of the Fiduciary Indemnification Provision; and

**FURTHER RESOLVED**, that Shirley T. Sherrod M.D. is hereby authorized and directed to execute and deliver such documents, instruments and agreements and to take other actions as may be necessary or desirable and proper to carry out the intent of, the foregoing resolutions, the necessity or desirability and propriety thereof being conclusively evidenced by the execution and delivery of such documents, instruments and agreements of the taking of such actions.

**WHEREFORE**, I, Shirley T. Sherrod M.D., the sole officer and sole owner of Shirley T. Sherrod M.D. P.C., hereby certify that the foregoing is a true and complete copy of a resolution duly adopted by the Employer on the 20th day of October, 2016, and that the same has not been repealed or amended and remains in full force and effect.

[signature page follows]

2

Plan Sponsor
Shirley T. Sherrod M.D. P.C.

By: _____     Date: __10/20/2016_____
Shirley T. Sherrod, M.D.
President

Agreed:

Trustee
Shirley T. Sherrod M.D. P.C. Target Benefit
Pension Plan

By: _____     Date: __10/20/2016_____
Shirley T. Sherrod, M.D.

Agreed:

Plan Administrator
Shirley T. Sherrod M.D. P.C. Target Benefit
Pension Plan

By: _____ Date: __10/20/2016_____
Leroy Johnson, in his individual capacity and
on behalf of LJ Consulting Services, LLC

3

# EXHIBIT A

**AMENDMENT TO**
**SHIRLEY T. SHERROD M.D. P.C.**
**TARGET BENEFIT PENSION PLAN**

Pursuant to and in exercise of the amendment provisions of Section 8.1 of the Shirley T. Sherrod M.D. P.C. Target Benefit Pension Plan and Trust, effective as of January 1, 2009 ("Plan"), the Plan is hereby amended in the following respects ("Amendments"):

1.  Article VII is revised to add the following Sections:

"**7.13    FIDUCIARY INDEMNIFICATION**.    For purposes of this Section 7.13, the term "Indemnitees" shall mean any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator.  Subject to the applicable provisions of ERISA, the Plan shall indemnify and hold harmless the Indemnitees for any claim, damage, expense, liability, or loss, including the advancement of attorney's fees and costs, suffered by any of the Indemnitees resulting from or incurred in connection with any legal proceedings related in any way to the performance of services by any one or more of the Indemnitees pursuant to the Plan.  To the extent the Plan is unable to indemnify and hold harmless the Indemnitees in accordance with this Section 7.13, the Employer shall indemnify the Indemnitees in accordance with Section 7.12.  The indemnification provided for in this Section 7.13 shall cover, but not be limited to:  (a) any action taken or not taken by the Indemnitees at the direction or request of the Employer, any agent of the Employer, or any fiduciary under this Plan; and (b) all reasonable costs and expenses incurred by the Indemnitees in enforcing the indemnification provisions of this Section 7.13, including attorney's fees and costs.

**7.14  EFFECTIVE DATE**.  Section 7.13 is effective as of April 29, 2016.

**7.15  INTERACTION WITH OTHER PLAN PROVISIONS**.  Nothing in Section 7.13 shall create any interference with respect to or otherwise deprive any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator, of their authority or rights under Sections 2.7 and 7.7 of the Plan.

**7.16  EFFECTIVE DATE**.  Section 7.15 is effective as of April 29, 2016.

**7.17  PLAN REIMBURSEMENT**.  Notwithstanding Sections 2.7, 7.7, and 7.13, nothing in this Plan shall relieve any current or former Plan fiduciary, including but not limited to any current or former Plan trustee or Plan administrator, from any obligation or liability imposed by ERISA.  Sections 2.7, 7.7, and 7.13 shall not apply with respect to the Plan fiduciary to any claim, damage, expense, liability, or loss that is held by a court of competent jurisdiction, in a final judgment from which no appeal

1

can be taken, to have resulted either from the gross negligence, fraud, criminal act, or willful misconduct of the Plan fiduciary or from the violation or breach by the Plan fiduciary of his, her, or its fiduciary duties under ERISA.  In the event of such a finding, the Plan shall be entitled to recover from the Plan fiduciary any and all costs, expenses, and fees paid on behalf of the Plan fiduciary pursuant to Sections 2.7, 7.7, or 7.13.  If the Plan fiduciary receives an advancement of fees or expenses from the Plan pursuant to Sections 2.7, 7.7, or 7.13, the Plan fiduciary shall reimburse the Plan for such advancements in the event of any claim, damage, expense, liability, or loss that is held by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have directly resulted either from the gross negligence, fraud, criminal act, or willful misconduct of the Plan fiduciary or from the violation or breach by the Plan fiduciary of his, her, or its fiduciary duties under ERISA.

**7.18  EFFECTIVE DATE**.  Section 7.17 is effective as of April 29, 2016."

2.  Article X is revised to add the following Sections:

"**10.18  SEVERABILITY**.  In case any one or more of the provisions contained in this Plan should be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**10.19  EFFECTIVE DATE**.  Section 10.18 is effective as of January 1, 2009."

3.  Except to the extent necessary to give effect to these Amendments, the Plan shall remain unchanged.


IN WITNESS WHEREOF, these Amendments to the Plan have been executed this <u>20th</u> day of October, 2016.

Plan Sponsor
Shirley T. Sherrod M.D. P.C.


By: _____

Shirley T. Sherrod, M.D.
President

Agreed:

Trustee
Shirley T. Sherrod M.D. P.C. Target Benefit
Pension Plan


By: _____

Shirley T. Sherrod, M.D.

Agreed:

Plan Administrator
Shirley T. Sherrod M.D. P.C. Target Benefit
Pension Plan


By: _____

Leroy Johnson, in his individual capacity and
on behalf of LJ Consulting Services, LLC

3

# EXHIBIT 6

U.S. Department of Labor

**Employee Benefits Security Administration**

**Generated by: BRUBAKE, KARL J**

**Report Date:** 04/08/2015 02:24:39 PM



Visitor
201243-15151
CIN
Closed
05/14/2012

03/12/2012
03/13/2012
PARKER, LINDA M

[52-012288]

Participant/Beneficiary
O

No                                                                          No

No

Shirley
Sherrod

P.O. Box 515

SOUTHFIELD          **State:**   Michigan                    **Zip Code:**    48037

(313) 715-6606                                        Mobile

**E-Mail Addresses**
sshe464538@aol.com

Benefit Distributions          03/12/2012

03/12/2012

| | | | |
|---|---|---|---|
| In-person | Yes | 03/12/2012 | |
| Telephone | No | 03/26/2012 | with pa |
| Telephone | No | 03/27/2012 | SBA |
| Reassigned | No | 04/06/2012 | to SBA |
| Telephone | No | 04/12/2012 | |
| Telephone | No | 04/12/2012 | to R. Morad |
| E-Mail | No | 04/12/2012 | |
| Telephone | No | 04/16/2012 | from R. Morad |

Page 3 of 5

03/28/2012 04:34:20 PM spoke with Attorney Morad and Attorney Clarence Poser. The are the attorney's representing Merrill Lynch. We apparently have a state/county judge that doesn't understand ERISA. (Judge Gillis) They (attorneys) did file an interpleader motion with County/State Judge and the motion was denied. The judge ordered Merrill Lynch to dispurse funds from the pension plan to the plaintiff - under the garnishment order. The participant/owner/doctor/plan administrator (Shirley Sherrod) filed an appeal of the order to dispurse pension funds in state appeals court - matter is pending. They-Merrill Lynch continue to keep plan assets frozen. They would love to have these funds removed. They would be please to talk with DOL and provide copies of documents from their files. There was no thought or action to remove this to Federal Court. Merrill Lynch has been trying to work informally with the parties in the law suit to get the judge to drop the order....but that has not happened as yet. Told them I would address this situation with my CRO....and pass on the contact information to use as needed. They stated the garnishment amount is just under $200,000.

Note to file - copy of garnishment order is attached to the CRO TAIS.

03/29/2012

03/29/2012

03/29/2012 05:26:59 PM spoke with Rob he to e-mail same (sent my e-mail for response)

03/29/2012 05:29:43 PM spoke with Shirley - updated on calls.

4.2.12 rec. e-mail from atty Morad - attached. (forwarded to SBA - Chicago)

04/12/2012 spoke with Dr. S....told her docs sent to CRO and SBA reviewed - they intend to contact the attorney's to see what documents the court/plaintiff's counsel needs in order to understand this is an ERISA plan. Dr. S said there is a hearing tomorrow about the interpleader again - and merrill lynch wants to turn over the funds to the county court - which she doesn't want to happen.

04/12/2012 sent e-mail to SBA about the hearing tomorrow.

Discussed w/SBA that Merrill Lynch said that defendant (Dr. Sherrod) was represented by counsel and that her counsel object to the unfreezing of the accounts at the 4/13/2012 hearing.

04/17/2012 Dr. Sherrod called 2 times to discuss the hearing on last Friday. First - I asked if she is represented by counsel and she said no - I told that did not comport with comments from Merrill Lynch's attorney - she said that she did have attorney but "just for the day" a friend doing a favor. Told her that it seems her attorney argued to not have the freeze relinquished on her account ----this didn't make sense.....she stated that there were conditions to the release that she was not willing to accept. Wanted to know what the department was going to do about this clear violation of the law....asked if we would open an investigation....told her that typically we would open an investigation on a plan and that would mean her as trustee....and that didn't seem appropriate at this time...she agreed. Told her that as trustee she has an obligation to make sure her plan is operating properly and to protect as needed....she stated that she was going to get a copy of the transcript of the motion hearing so we could see what is going on....she will get that certified and it will take about a week. Told her that I would be speaking with CRO-SBA later today and we would see what we could do to assist....she can try to reach me tomorrow.

04/23/2012 11:07:11 AM spoke to Dr. Sherrod - still has not gotten the transcript....told her we would talk with our legal unit to see if there is anything that we can do to assist further.

05/01/2012 Dr. S called to let me know that she still has not received the transcript.

05/17/2012 12:32:31 PM spoke w/ Dr. S....she has the transcripts now and will e-mail them to me.

06/13/2012 12:59:23 PM

on 5/21/2092 -

08/07/2012 received a call from Shirley Sherrod....wanted to know what we were doing....said I'd get back with her.                          08/09/2012 spoke with Shirley Sherrod and told you can expect to hear from Detroit District office w/in 2 weeks....she indicated that she is presently residing in Chicago and the address on the 5500 is no longer good for contact her. gave me 2631 South Indiana Apt 1911, Chicago, IL 60616 for her home address.



| Name: | 2012040200075.pdf | | |
|---|---|---|---|
| Box Number: | e-mail 4.2.2012 attorney Morad (represents Merrill Lyncy) | Document Number: | e-mail 4.2.2012 attorney Morad | Last Modified: 04/02/2012 02:00:17 PM EDT |



EXHIBIT

DOL003656
3/8/2017

individual benefit dispute and that pa should seek legal counsel if she wants to pursue the matter. afh advised that sba not in today and she will probably let afh know her final decision sometime this week and afh will then call her (the pa).

03/27/2012 11:24:27 AM email from patty arroyo that dr. sherrod has called again. jb advised that if dr calls again, front desk should route her to jean.

03/27/2012 01:23:33 PM SBA spoke with P who wanted to know what EBSA was going to do about her situation. SBA advised P that she had reviewed the letter her attorney wrote, as well as the court order, and it was her initial opinion that P needed to seek legal counsel. SBA also advised P that she asked the enforcement side of the office to look at her documents, since the Benefits Advisors informally resolve disputes and they agree. P advised SBA that she does not have the money to hire an attorney, and three attorneys have told her that this is a violation of ERISA needs to investigate. SBA advised P that Merrill Lynch has interpreted a court order as preventing them for making distributions, and the only way that will get cleared up is through the court system. SBA offered to send P the list of lawyers from the National Pension Lawyer Network, and P asked if it could be emailed to her. P gave SBA her email address.

███████████████████████████████████████████████████████Merrill Lynch filed a Motion for Interpleader, which the court denied, and P has filed an appeal and had to post bond. Everything is stayed pending the outcome of P's appeal.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

04/02/2012 01:34:32 PM D. Lovendale received 170 pages electronically from Merrill Lynch's attorneys and forwarded them to SBA. The documents are attached to the inquiry. SBA reviewed the documents and it appears that the parties are willing to drop the attempted garnishment of the Plan if P will provide proof that the plan is an ERISA covered plan. P has not complied with the requests for documents, which is why the judge ultimately denied Merrill Lynch's motion for Interpleader.

04/12/2012 11:43:30 AM JB called Robert Morad, Merrill Lynch's attorney, regarding documents sent to D. Lovendale and left message requesting return call. JB called P and she claims that she had the "manual" and the Form 5500. JB clarified that when P says "manual" she means the plan document. According to P, the plaintiff does not care whether it is an ERISA covered plan or not, he just wants money. P claims that Merrill Lynch has had the plan for 30 years. P has the largest balance in the plan but there are 18 participants in the plan with account balances. P says that plan was updated in 2008, she believes. P is resistant to providing any information that might pertain to account balances or other participants. P is going to email some documents to JB.

04/12/2012 02:08:02 PM JB spoke with Mr. Morad about the court proceedings tomorrow. Merrill Lynch has a motion in the Michigan court asking the judge to release the freeze on the plan. P intends to object to the motion on the grounds that the court does not have jurisdiction over the plan. Mr. Morad had gotten the plaintiff to agree to stipulate to releasing their garnishment and allowing the court to release the freeze and P refused to go along with that as well. Mr. Morad also advised JB that P filed a federal lawsuit against Merrill Lynch in the Northern District of Illinois on 4/6/2012. Mr. Morad agreed to call JB tomorrow to let her know what happens in state court. He also indicated that P's Chicago lawyer had indicated that he was going to withdraw the federal lawsuit.

04/12/2012 02:11:54 PM JB received email from P with nine items attached. P called JB and she confirmed receipt of the email.

4/16/2012 JB retrieved vm msg from Mr. Morad advising that the judge denied Merrill Lynch's motion to release the freeze on the plan because P's lawyer objected to the court's jurisdiction, among other things. Mr. Morad believes that the judge would have granted the motion but for P's objections. Mr. Morad would like to discuss what Merrill Lynch should do next with the DOL.

04/17/2012 09:30:13 AM JB attached P's email with its attachments to the record.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

04/17/2012 05:05:19 PM JB called Mr. Morad and asked him about the proceedings on Friday. Mr. Morad indicated that the motion was included in the 170 pages he previously provided, but he agreed to send it separately by email to JB. JB gave him her direct email address. Mr. Morad sent an email to JB with the motion attached. He also sent a second email containing the proposed order that the plaintiff was willing to agree to and which Dr. Sherrod refused to sign. Mr. Morad explained to JB that the money for the appeal bond was taken out of the plan's assets and is no longer part of the account. Mr. Morad feels that the judge should have released the garnishment at that point because the plaintiff's judgment is protected by the appeal bond. Mr. Morad also indicated that P wants the plaintiff to drop their underlying judgment before she will agree to any of their proposals, which they are not willing to do. JB attached the motion from Mr. Morad and the email with the proposed order to the record.

04/18/2012 08:33:14 AM JB retrieved email from Mr. Morad advising that he sent the wrong proposed order regarding P. The email had another proposed order attached. JB attached email and new order to the record.

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

05/10/2012 04:22:42 PM ████████████████████████ JB called P and advised her that the Chicago inquiry was going to be closed and that D. Lovendale would be her contact from now on regarding the issue of the freezing of the

**Page 1**

1       IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF ILLINOIS

3              EASTERN DIVISION

4    R. ALEXANDER ACOSTA,          )

5    Secretary of Labor, United    )

6    States Department of Labor,   )

7          Plaintiff,              )

8    -vs-                    ) Case No:

9    SHIRLEY T. SHERROD; LEROY      ) 1:16-cv-04825

10   JOHNSON; and SHIRLEY T.       )

11   SHERROD, M.D., P.C. TARGET    )

12   PENSION PLAN,                 )

13          Defendants.            )

14       The deposition of LEROY JOHNSON, called for

15   examination, taken pursuant to the Federal Rules of

16   Civil Procedure of the United States District

17   Courts pertaining to the taking of depositions,

18   taken before ALICE M. SCHWINGER, CSR NO. 84-2913, a

19   Notary Public within and for the County of DuPage,

20   State of Illinois, and a Certified Shorthand

21   Reporter of said state, at Suite 844, 230 South

22   Dearborn Street, Chicago, Illinois, on the 3rd day

23   of May, A.D. 2018, commencing at 9:05 a.m.

24

**Page 2**

1    PRESENT:

2        UNITED STATES DEPARTMENT OF LABOR,

3        OFFICE OF THE SOLICITOR,

4        (230 South Dearborn Street, Room 844,

5        Chicago, Illinois 60604,

6        312/353-3271), by:

7        MR. BRUCE C. CANETTI,

8            appeared on behalf of the Plaintiff;

9

10       OLIVER CLOSE, LLC,

11       (124 North Water Street,

12       Suite 300 Waterside Center,

13       Rockford, Illinois 61107-3974,

14       815/963-0009), by:

15       MR. JOHN REARDEN, JR.,

16           appeared on behalf of the Defendants.

17

18   ALSO PRESENT:  Scott C. Stieritz, Auditor

19

20

21

22

23   REPORTED BY:  ALICE M. SCHWINGER, CSR

24            CSR No. 84-2913

**Page 3**

1        (WHEREUPON, the witness was

2        duly sworn.)

3        LEROY JOHNSON,

4    having been first administered an oath, was

5    examined and testified as follows:

6        EXAMINATION

7    BY MR. CANETTI:

8    Q.   Could you state and spell your name for

9    the record.

10   A.   Leroy Johnson.

11   Q.   Could you spell your name.

12   A.   L-e-r-o-y J-o-h-n-s-o-n.

13   Q.   Are you represented by counsel today?

14   A.   Yes, I am.

15   MR. CANETTI:  This deposition is being taken

16   pursuant to Federal Rule of Civil Procedure 30

17   regarding allegations of ERISA violations with

18   respect to the Shirley T. Sherrod, M.D., P.C.

19   Target Pension Plan in the matter of Acosta V.

20   Sherrod, et al., 1:16-CV- --

21       (WHEREUPON, there was a brief

22       interruption.)

23   MR. CANETTI:  As I was saying, in the matter

24   of Acosta V. Sherrod, et al., 1:16-CV-04825 in the

**Page 4**

1    Northern District of Illinois.

2    BY MR. CANETTI:

3    Q.   My name is Bruce Canetti.  I'm an

4    attorney for the plaintiff, U.S. Department of

5    Labor.  With me is Mr. Scott Stieritz.  He's an

6    auditor with the Employee Benefits Security

7    Administration known as EBSA.

8        Have you ever been deposed before,

9    Mr. Johnson?

10   A.   I don't believe so.

11   Q.   Have you ever testified at a hearing

12   before a judge or jury?

13   A.   I have.

14   Q.   How many times have you done that?

15   A.   Maybe twice.

16   Q.   Well, in depositions, we need oral

17   answers.  The court reporter is writing down what

18   you and I say, so we need to make sure we verbalize

19   our responses.  Also, we need to make sure we don't

20   speak over each other.  So if I'm asking a

21   question, let me finish it and I'll do my best to

22   let you finish your answers so we're not speaking

23   at the same time.

24       I want to make sure you understand my



LEROY JOHNSON                                        May 03, 2018
ACOSTA vs SHERROD, et al.                            5–8

Page 5

1  question.  So if I ask you something you don't
2  understand, just let me know.  I'm happy to try to
3  rephrase it.  I want to remind you that this is
4  your deposition, so don't look to anybody else to
5  answer the questions.  You must provide answers
6  yourself.
7        If you later need to clarify one of your
8  earlier answers, just let us know, and you are able
9  to do that.
10        We'll take breaks regularly.  One thing,
11  if I have asked a question, you need to answer the
12  question or finish the line of questions before we
13  go on a break.  I do want to remind you, you're
14  sworn in under oath and subject to prosecution for
15  perjury.
16        Are you currently taking any medication,
17  drugs, or alcohol or anything that would impair
18  your ability to answer my questions truthfully and
19  accurately?
20    A.   I am not.
21    Q.   And I use the term "ERISA," and I'll be
22  using throughout the day, and that refers to the
23  Employee Retirement Income Security Act.  And I'll
24  be using the term "plan" in short just to refer to

Page 6

1  the Shirley T. Sherrod, M.D., P.C. Target Pension
2  Plan.
3        Did you do anything to prepare today for
4  this deposition?
5    A.   In what way do you mean "prepare"?
6    Q.   Did you review any documents to prepare
7  for today?
8    A.   Yes, I did.
9    Q.   What documents did you review?
10    A.   The documents that were furnished by my
11  attorney.
12    Q.   That's Mr. Rearden?
13    A.   Yes.  Correct.
14    Q.   What documents were those?
15    A.   There were a number of documents.  I
16  can't name them -- name them all.
17    Q.   Can you name some of them?
18    A.   There were several files, large files,
19  with different names, "Sherrod Production,"
20  "DOL Production," to name a couple.
21    Q.   And so what documents were in the
22  Sherrod production that you reviewed?
23    A.   I don't remember all those documents.
24    Q.   Do you remember any of the ones in the

Page 7

1  DOL production that you reviewed?
2    A.   No, there were many in there.
3    Q.   But you can't -- as you sit here today,
4  you don't recall a single document that you
5  reviewed?
6    A.   There were many.  If you let me sit
7  here, I can probably name several of them, but not
8  right now.
9    Q.   Did you speak with anyone besides your
10  attorney to prepare for today's deposition?
11    A.   No.
12    Q.   Was anybody else present when you met
13  with your attorney?
14    A.   Yes.
15    Q.   Who else was present?
16    A.   Dr. Sherrod.
17    Q.   Was anybody else present besides
18  yourself and Dr. Sherrod?
19    A.   No.
20    Q.   Now, you said you testified before,
21  possibly two times.
22        In what type of proceeding did you
23  testify previously?
24    A.   That was in -- that was in a bankruptcy

Page 8

1  proceeding.
2    Q.   And whose bankruptcy was it?
3    A.   I was a partner with a group of
4  individuals that had purchased a tract of land that
5  got involved in litigation.
6    Q.   And so was it this partnership that
7  filed for bankruptcy?
8    A.   Yes.
9    Q.   What was the name of it?
10    A.   Equestrian Estates Limited Partnership,
11  and the case was Reed v. Reed.
12    Q.   R-e-e-d?
13    A.   Yes.
14    Q.   And what jurisdiction was that filed in?
15    A.   That was in Michigan.
16    Q.   In the Detroit area?
17    A.   Yes.
18    Q.   Do you know what year that was, roughly?
19    A.   Roughly, it would be 2002 to 2008.
20    Q.   Was Ms. Sherrod a member of that
21  partnership?
22    A.   No, sir.
23    Q.   So you testified as someone who was part
24  of the entity that filed for a bankruptcy?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
9–12

Page 9

1   A.   That is correct.

2   Q.   And you said you may have testified

3   another time. What other case was that?

4   A.   It was really in the same case. Part of

5   it was in the bankruptcy and part of it was in the

6   state court, but it was still the same case.

7   Q.   What was the state court action called?

8   A.   Same.

9   Q.   Re v. Reed?

10  A.   That is correct.

11  Q.   R-E?

12  A.   R-e-e-d.

13  Q.   Reed v. Reed?

14  A.   Yes.

15  Q.   I didn't catch that.

16       That was a state Michigan case then?

17  A.   That is correct.

18  Q.   Where do you currently reside?

19  A.   1201 Woodslea Drive, Flint, Michigan.

20  Q.   What's the ZIP code?

21  A.   48507.

22  Q.   Are you currently married?

23  A.   Yes, I am.

24  Q.   Do you have children?

Page 10

1   A.   Yes.

2   Q.   And what's the highest level of

3   education you've completed?

4   A.   Medical school.

5   Q.   And what school was that?

6   A.   Wayne State University.

7   Q.   What area of medicine do you practice

8   in?

9   A.   I practice -- specialty, ophthalmology.

10  Q.   And have you known Ms. Sherrod since

11  medical school?

12  A.   Yes.

13  Q.   Are you currently employed?

14  A.   Yes, I am.

15  Q.   What's your current occupation -- where

16  are you currently employed?

17  A.   I am employed at the Hamilton Community

18  Health Network Center.

19  Q.   As an ophthalmologist?

20  A.   That is correct.

21  Q.   And is that in Flint?

22  A.   That is correct.

23  Q.   How long have you been there?

24  A.   I started there in about 2011.

Page 11

1   Q.   Is that a full-time position?

2   A.   Yes, it is.

3   Q.   Did you ever work with Dr. Sherrod?

4   A.   No.

5   Q.   Did you work in any capacity with the

6   Sherrod M.D., P.C. entity?

7   A.   No.

8   Q.   Have you ever provided any services to

9   any ERISA covered plans before?

10  MR. REARDEN: Before?

11  BY MR. CANETTI:

12  Q.   Before today.

13  A.   Before this plan we're involved in?

14  Q.   L.J. Consulting is currently the plan

15  administrator for the plan; correct?

16  A.   That is correct.

17  Q.   And starting in 2012, I believe, you

18  personally were the plan administrator for the

19  plan; correct?

20  A.   That is correct, sir.

21  Q.   Prior to that, had you provided any

22  services to any ERISA-covered plans?

23  A.   No.

24  Q.   And since 2012 to the present, have you

Page 12

1   provided any services to any other ERISA-covered

2   plans besides the plan in this litigation?

3   A.   No.

4   Q.   Do you have any training with respect to

5   ERISA?

6   A.   No.

7   Q.   Have you done any courses or any type of

8   educational opportunities to learn about ERISA?

9   A.   No more than what I took upon myself to

10  read.

11  Q.   What did you take upon yourself to read?

12  A.   Articles on the internet.

13  Q.   And when did you read those articles?

14  A.   I can't give you an exact date, sir.

15  Q.   Do you still have copies of any of those

16  articles?

17  A.   I don't believe so.

18  Q.   So what do you do as the plan

19  administrator for the plan?

20  A.   I strictly follow the plans.

21  Q.   Follow the plan document?

22  A.   That is correct.

23  Q.   Do you have a copy of that document?

24  A.   Yes, I do.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
13–16

Page 13

1    Q.    Where do you keep that at?
2    A.    On my iPad.
3    Q.    So what are some of your day-to-day
4  activities that you do as plan administrator?
5    A.    I don't have any day-to-day activities
6  as a plan administrator.
7    Q.    Do you have any annual activities that
8  you do?
9    A.    There is an annual activity.
10   Q.    What's your annual activity that you do?
11   A.    The main annual activity is to get that
12  5500 filed.
13   Q.    Anything else?
14   A.    That's the primary one.
15   Q.    What are the ones that aren't primary?
16   A.    Meaning?
17   Q.    You said that there are annual
18  activities, and the primary one was to get the 5500
19  filed.  What are the other ones besides that
20  primary one?
21   A.    I don't recall all of them right now.
22   Q.    Can you think of any other activity you
23  do besides getting the 5500 filed?
24   A.    No.

Page 14

1    Q.    Do you have any involvement with -- are
2  you aware that there are participant statements
3  that are done?
4    A.    I'm aware of those.
5    Q.    Do you have any involvement with those
6  participant statements getting done?
7    A.    I delegated that responsibility, as
8  administrator, to Dr. Sherrod to get those done.
9    Q.    Are you involved with any communications
10  with the participants in the plan?
11   A.    No, I'm not.
12   Q.    Have you ever sent any letters to
13  participants in the plan?
14   A.    I delegated all of those
15  responsibilities to Dr. Sherrod.
16   Q.    So all communications with the
17  participants you delegated to Dr. Sherrod to
18  handle?
19   A.    That is correct, sir.
20   Q.    Have you seen any communications that
21  were sent to participants?
22   A.    No, I have not.
23   Q.    Do you ever review those participant
24  statements after you delegated the responsibility

Page 15

1  for them to Sherrod?
2    A.    I've not received any.
3    Q.    Never seen any?
4    A.    If she got them back, then we may have
5  talked about them.
6    Q.    But you personally haven't looked at any
7  of them?
8    A.    The statements from?  Repeat that
9  question again, sir.
10   Q.    There are these annual kind of
11  participant summary statements that we've seen, and
12  we can look at some of those and you can answer my
13  question more precisely.  I'm just wondering if
14  you've ever seen any of those types of things?
15   A.    Yes, I have.  Yes, I have, yes.
16   Q.    Why did you see those?
17   A.    I don't understand the question.
18   Q.    Did you see them in some capacity to
19  help you do your work as the plan administrator?
20   A.    There wasn't really much for me to do
21  because, as I stated before, I delegated those
22  responsibilities to Dr. Sherrod.
23   Q.    So did you have any reason in performing
24  your duties to review those statements?

Page 16

1    A.    Only in terms of since I asked for them
2  to be done, that they were done.
3    Q.    Just to know that they were completed?
4    A.    That is correct.
5    Q.    Are you involved at all with
6  distributions to participants in the plan?
7    A.    Involved in what way?
8    Q.    Are you aware that there have been
9  distributions to some participants in this plan?
10   A.    Yes, I am.
11   Q.    And have you been involved in any of
12  those distributions?
13   A.    I have.
14   Q.    And what was that involvement?
15   A.    I met with Dr. Sherrod and we discussed
16  it.
17   Q.    When was the first time you met with
18  Dr. Sherrod to discuss distributions?
19   A.    I don't recall that.
20   Q.    When was the first time you were aware
21  that there were distributions from the plan?
22   A.    I believe the first distributions
23  occurred -- you're speaking in terms of a
24  distribution to a participant?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
17—20

Page 17

1    Q.    To any participant in the plan.
2    A.    That would occur around 2014.
3    Q.    Was that distribution to Dr. Sherrod?
4    A.    Yes.
5    Q.    And so what did you discuss with
6    Dr. Sherrod regarding the distributions to her in
7    2014?
8    A.    I didn't discuss anything with her
9    regarding the distributions to her.
10    Q.    Did you have any involvement with the
11    distributions to Dr. Sherrod in 2014?
12    A.    I know that she was getting the
13    distributions because that had been previously set
14    up, you know, with her -- you know, with the
15    actuary.
16    Q.    Did you see any requests for
17    distributions?
18    A.    Yes, I have seen requests.
19    Q.    From 2014 from Dr. Sherrod?
20    A.    I don't recall.
21    Q.    Is there anything that would help you to
22    remember that?
23    A.    No.
24    Q.    Did you see any distribution requests

Page 18

1    for 2015?
2    A.    To?
3    Q.    For a participant to get a distribution
4    from the plan for 2015.
5    A.    I may have.  I would have to look at --
6    I may have.  I don't know.
7    Q.    Is there anything that would help you
8    to -- any documents that would help you answer that
9    question?
10    A.    No.
11    Q.    Which participants received
12    distributions in 2015?
13    A.    That would be Dr. Sherrod.
14    Q.    And then in 2016, did you see any
15    distribution requests for a participant to receive
16    a distribution in 2016?
17    A.    No.
18    Q.    And was it just Dr. Sherrod who received
19    distributions in 2016?
20    A.    I'm confused.  I don't understand
21    exactly -- there are different types of
22    distributions that take place --
23    Q.    I apologize for interrupting.
24    So in 2016, who do you think received a

Page 19

1    distribution from the plan?
2    A.    When you say "a distribution," would you
3    please define distribution so I know exactly what
4    you are referring to, because there are different
5    types of distributions.
6    Q.    A distribution in ERISA refers to
7    getting benefits paid under the plan.
8    So who received a distribution in 2016
9    as a participant in the plan?
10    A.    I don't recall.
11    Q.    Is there anything that would help you
12    recall that?
13    A.    No.
14    Q.    In 2017, did some participants receive
15    distributions from the plan?
16    A.    Yes.
17    Q.    Who received distributions from the plan
18    in 2017?
19    A.    I can't name them.
20    Q.    Was it more than just Dr. Sherrod?
21    A.    Yes.
22    Q.    And in 2016, do you know if Dr. Sherrod
23    received distributions?
24    A.    I believe she did.

Page 20

1    Q.    And I think we talked about 2015 about
2    whether there was any documents you saw requesting
3    distributions, and you say you didn't see any for
4    2015.  Was that right?
5    A.    Is that what I said?
6    Q.    I believe so.  If that's something
7    different, correct me if I'm wrong.
8    A.    I'll have to stay with my answer, sir.
9    Q.    Well, if you said something you think is
10    incorrect, you're free to change your answer.
11    There's nothing binding upon you.  If you said
12    something you think it was wrong, you should, you
13    know, feel free to state what you think is more
14    accurate.
15    What about 2016?  Did you see any
16    distribution requests in 2016?
17    A.    I don't recall.
18    Q.    In 2017, did you see some distribution
19    requests?
20    A.    I don't recall.
21    Q.    Is there anything that would help you
22    recall that for 2016 or 2017?
23    A.    No.
24    Q.    Does the plan have an accountant or



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
21–24

Page 21

1   actuary that does some work for the plan?
2       A.   Yes, it does.
3       Q.   And do you know who that person or
4   entity was in 2012?
5       A.   That would be the Sinclair Agency.
6       Q.   As plan administrator, did you work at
7   all with Sinclair in 2012?
8       A.   No.
9       Q.   In 2013, do you know who the accountant
10  or actuary was for the plan?
11      A.   I believe it was still Sinclair.
12      Q.   Did you do any work with Mr. Sinclair or
13  the Sinclair firm as a plan administrator in 2013?
14      A.   No.  I delegated those duties to
15  Dr. Sherrod.
16      Q.   So all the interactions with the
17  accountant or actuary in 2012 or 2013, you
18  delegated that to Dr. Sherrod?
19      A.   That is correct.
20      Q.   In 2014, do you know who the accountant
21  or actuary was?
22      A.   There was a transition year and I'm not
23  so sure of the year.  I really can't answer that
24  question.

Page 22

1       Q.   Well, if it helps you, Mr. Sinclair
2   passed away in December of 2014.  Was that what
3   started the transition, the passing of
4   Mr. Sinclair?
5       A.   Well, I knew that he had passed.  I just
6   didn't know exactly, you know, the date.
7       Q.   So you spoke about there was a
8   transition.  Did that relate at all to his passing?
9       A.   Yes, I had to get another actuary.
10      Q.   So who was the actuary that followed
11  Mr. Sinclair?
12      A.   I delegated that to Dr. Sherrod.
13      Q.   So Dr. Sherrod selected the accountant
14  or actuary that did work for the plan after
15  Sinclair?
16      A.   That is correct.
17      Q.   Do you know who the entity was that she
18  chose?
19      A.   M.S. Associates comes to mind, but I'm
20  not sure.
21      Q.   Do you know where M.S. Associates is
22  located?
23      A.   In Illinois.
24      Q.   Do you know where in Illinois?

Page 23

1       A.   No.
2       Q.   Do you know what city?
3       A.   No.
4       Q.   Do you know what M.S. Associates does?
5       A.   An actuary.
6       Q.   Is it a firm or just an individual?
7       A.   That, I don't know.
8       Q.   Do you know who the point of contact was
9   that worked with the plan at M.S. Associates?
10      A.   No, I do not.
11      Q.   Did you ever meet anybody at all from
12  M.S. Associates?
13      A.   No, I did not.
14      Q.   And so is it your understanding that
15  either Sinclair or M.S. Associates did work for the
16  plan as the accountant or actuary in 2014?
17      A.   Repeat that again.
18      Q.   Is it your understanding that it either
19  was Sinclair or M.S. Associates that did work for
20  the plan in 2014?
21      A.   Yes.
22      Q.   And if, in fact, Mr. Sinclair -- like I
23  said, I can show you the obituary if you want to
24  look at it.  He died in December of 2014.

Page 24

1            Was M.S. Associates the accountant or
2   actuary that did the work in 2015?
3       A.   Yes.
4       Q.   Has there been -- do you know who did
5   the accounting or actuarial work for the plan in
6   2016?
7       A.   There was another transition period, but
8   I'm not exactly sure on the date at this time.
9       Q.   Was there another actuary firm after
10  M.S. Associates?
11      A.   Yes.
12      Q.   Who was that?
13      A.   That would be the Reed-Ramsey firm.
14      Q.   And are they located in Illinois as
15  well?
16      A.   Yes, they are.
17      Q.   Do you know who the point of contact is
18  at the Reed-Ramsey firm?
19      A.   No, I do not.
20      Q.   Is there an individual named Reed-Ramsey
21  at that firm?
22      A.   I do not know.
23      Q.   Have you ever met anybody from the
24  Reed-Ramsey firm?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
25–28

Page 25

1    A.    I have not.
2    Q.    Have you ever talked on the phone or
3  e-mailed at all with anybody from Reed-Ramsey?
4    A.    No.
5    Q.    Have you ever talked on the phone or
6  e-mailed with anybody from M.S. Associates?
7    A.    No.
8    Q.    And who selected Reed-Ramsey?
9    A.    Dr. Sherrod.
10    Q.    Do you know why there was a change from
11  M.S. Associates to Reed-Ramsey?
12    A.    No, I do not.
13    Q.    And so you're saying all the hiring or
14  firing of the accountant-actuary firm was something
15  you delegated to Dr. Sherrod to handle?
16    A.    That is correct.
17    Q.    And then all the work that is done by
18  that accounting or actuary firm, you delegated that
19  be overseen by Dr. Sherrod?
20    A.    Yes.
21    Q.    Do you know who was the accounting or
22  actuary firm for 2017?
23    A.    That would still be the Reed-Ramsey
24  firm.

Page 26

1    Q.    So 2017 is definitely Reed-Ramsey, and
2  2016 you're not sure; it's either M.S. Associates
3  or Reed-Ramsey?
4    A.    I'm not sure of the transition period
5  and the dates.
6    Q.    And who would be able to answer that
7  question?
8    A.    I could answer if I had access to
9  documents.
10    Q.    And what documents would those be?
11    A.    Calendar.
12    Q.    Looking at a calendar, you would be able
13  to answer it?
14    A.    My private calendar at home.
15    Q.    And what's on your private calendar at
16  home?
17    A.    Not very much.
18    Q.    What's on there that would help you to
19  answer the questions?
20    A.    By correlating the dates.
21    Q.    What was the word you said?
22    A.    By correlating the dates with other
23  dates. That might help, but I'm not sure.
24    Q.    So it's not that you wrote down

Page 27

1  somewhere on your calendar M.S. Associates is the
2  new actuary firm and you wrote that in May 14,
3  2015?
4    A.    No, I did not. I did not, no.
5    Q.    So you're thinking maybe, I don't know,
6  you had your wife's birthday in June, and you're
7  like, oh, yeah, it was around my wife's birthday or
8  something, and you know that would -- what is it
9  that would help trigger when this occurred?
10    A.    I'm not so sure that it would trigger
11  it, but I thought it might help.
12    Q.    Is there anything else that would help
13  you be able to remember those dates?
14    A.    No.
15    Q.    Do you know if there was any contracts
16  or engagement letters that were entered into with
17  M.S. Associates?
18    A.    I don't know.
19    Q.    Do you know who would be able to answer
20  that question?
21    A.    That would be Dr. Sherrod.
22    Q.    Do you know if there were any contracts
23  or engagement letters entered with Reed-Ramsey and
24  the plan?

Page 28

1    A.    I do not know.
2    Q.    And who would be able to answer that
3  question?
4    A.    Dr. Sherrod.
5    Q.    And do you have anything in your
6  possession that would have the address of
7  M.S. Associates?
8    A.    No. Dr. Sherrod, she interfaced with
9  M.S. Associates.
10    Q.    She told us she doesn't have it.
11         Do you have anything in your possession
12  that would have the address or contact information
13  with Reed-Ramsey?
14    A.    No, I do not.
15    Q.    To the extent anybody has that contact
16  information on behalf of the plan, it would be
17  Dr. Sherrod?
18    A.    Repeat that again.
19    Q.    To the extent anybody has that contact
20  information on behalf of the plan, it would be
21  Dr. Sherrod?
22    A.    I believe so, yes.
23    Q.    Do you know how much was paid to
24  M.S. Associates?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
29–32

Page 29

1    A.   No.  I'd have to look at it.
2    Q.   What would you have to look at?
3    A.   The canceled checks.
4    Q.   Have you seen canceled checks for
5  payments to M.S. Associates?
6    A.   I believe I have.
7    Q.   Who wrote checks to M.S. Associates?
8    A.   Dr. Sherrod.
9    Q.   And why did you see those checks?
10   A.   I don't understand.  What do you mean by
11  why I would see those checks?
12   Q.   Why did you have the opportunity to see
13  those checks?
14   A.   I've seen checks once a year that were
15  canceled.  I've seen checks even -- go ahead.
16   Q.   When you're referring to checks, those
17  are checks from Dr. Sherrod's personal bank
18  accounts?
19   A.   There were different types of checks,
20  and I'm not sure whether it was a personal check or
21  money order or what it was that she used to pay.
22   Q.   So the checks or money orders from
23  Dr. Sherrod, she would -- gave copies of those to
24  you?

Page 30

1    A.   Eventually.
2    Q.   And why would she give you copies of
3  those?
4    A.   For documentation that it had been done.
5    Q.   And what were you documenting?
6    A.   For instance, the work that had been
7  done by the actuary had to be paid.
8    Q.   And what did you do with the information
9  that you got from those checks?
10   A.   Specifically, at that point in time, I
11  didn't do anything.  I just wanted to know that it
12  was done.
13   Q.   At a subsequent point in time, did you
14  use that information for any other purpose?
15   A.   No, I did not.
16   Q.   So each year that an accountant or
17  actuary firm was paid for work they did,
18  Dr. Sherrod would give you proof of that payment
19  from 2012 to the present?
20   A.   In one way or another, I would be aware
21  that the payments had been made.
22   Q.   Did you keep copies of those checks or
23  money orders or notifications to you that the
24  payments were made?

Page 31

1    A.   No.
2    Q.   What did you do with those after you saw
3  them?
4    A.   It's not that I saw -- I may have only
5  seen one or -- you know, one or two.
6    Q.   So what did you do with the one or two
7  money orders or canceled checks that were given to
8  you from Dr. Sherrod?
9    A.   I would imagine it's somewhere in my
10  cloud storage.
11   Q.   And by saying your cloud storage, are
12  you saying you got electronic versions of the
13  canceled checks or money orders?
14   A.   Yes.
15   Q.   And how would those be sent to you from
16  Dr. Sherrod?
17   A.   I need to double-check to see if I
18  actually got it in the e-mail or when we met.  I'm
19  not sure.
20   Q.   Do you recall you got some documents
21  from Dr. Sherrod by e-mail?
22   A.   I may have.
23   Q.   And if you got those documents, you said
24  you maintained them in the cloud.  What do you mean

Page 32

1  by that?
2    A.   I don't have to tell you they have
3  different storage.
4    Q.   Did you do a search for these documents
5  as part of this litigation?
6    A.   No, I did not do a search.
7    Q.   So it's possible if you conducted a
8  search of your cloud or storage devices, there may
9  be documents related to the plan that you got from
10  Dr. Sherrod?
11   A.   No.  I believe that I have all of the
12  documents.
13   Q.   Were all the documents you have provided
14  in discovery?
15   A.   Yes, they were.
16   Q.   So if you did get an e-mail from
17  Dr. Sherrod or got a hard copy of some canceled
18  checks or money orders that went to an accountant
19  or actuary, your understanding is those were all
20  turned over in discovery?
21   A.   Yes.
22   Q.   Because related to M.S. Associates and
23  Reed-Ramsey, we have not seen any documents related
24  to those accounting firms.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
33–36

Page 33

1    Do you believe that such documents exist
2  for payments to M.S. Associates?
3    A.   Would you repeat?  I'm not following
4  you.
5    Q.   I have not seen any documents related to
6  any payments to M.S. Associates.  Do you believe
7  such documents showing the payments made to
8  M.S. Associates exist?
9    A.   I'm sure that there must be something
10 that exists since Dr. Sherrod, you know,
11 interacted, you know, with that entity.
12   Q.   Do you have any of those documents in
13 your possession?
14   A.   No, I do not.
15   Q.   We have not seen any documentation
16 showing any payments to Reed-Ramsey.  Do you think
17 such documents exist?
18   A.   I believe such documents exist.
19   Q.   Do you have any of those documents in
20 your possession?
21   A.   No, I do not.
22   Q.   Apart from the accountants and
23 actuaries, are there any other entities or people
24 that provided assistance or advice to the plan?

Page 34

1    A.   The attorneys.
2    Q.   The attorneys.
3    And what attorneys have you worked with
4  that provided assistance to the plan?
5    A.   Mr. Conger.
6    Q.   Is there anyone else?
7    A.   I primarily worked with him.
8    Q.   Are there any ones that you did not work
9  primarily with that you worked with as well?
10   A.   Repeat that.
11   Q.   You said you primarily worked with
12 Mr. Conger; right?
13   A.   That is correct.
14   Q.   Is there somebody else, any other
15 attorneys, that you worked with besides Mr. Conger?
16   A.   The only other attorney that comes to
17 mind would be Mr. Washington that we hired to...
18   His duty was to go after the bond money
19 to make a request, you know, for those funds to be
20 returned to the pension account.  Him, I recall,
21 sir.
22   Q.   And you're referring to the $250,000
23 bond in the litigation Sherman v. Sherrod?
24   A.   That is correct.

Page 35

1    Q.   Do you recall what year or years that
2  you worked with Mr. Washington?
3    A.   No, I don't.
4    Q.   Is it possible it was 2014?
5    A.   I don't know.
6    Q.   Is there something that would help you
7  recall that?
8    A.   I think the only thing that might help
9  me recall that would be to see his canceled check
10 or something.
11   Q.   Do you know how Mr. Washington was paid?
12   A.   I don't recall exactly.  It's not really
13 clear.
14   Q.   Were you involved in making the payments
15 to Mr. Washington?
16   A.   I was involved.
17   Q.   But just as you sit here today, you
18 can't recall how the payments were made to him?
19   A.   When you say "how the payments," I don't
20 understand what you mean, how it was made.
21   Q.   Well, for example, did you write a
22 personal check the him?  Did Sherrod send a money
23 order?  How was money paid to him?
24   A.   I'm sorry.

Page 36

1    Q.   Now that you know what I'm talking
2  about, do you know how he was paid?
3    A.   Yes, I know how he was paid.
4    Q.   How was he paid?
5    A.   She sent either a check or a money
6  order, you know, to me.  And I went to the bank and
7  I got a money order to pay Mr. Washington.
8    Q.   Why was it done in that fashion?  Why
9  didn't she just send a check to Mr. Washington?
10   A.   I don't recall the situation at that
11 time.
12   Q.   Is there anything that would help you
13 remember why it was done in that fashion?
14   A.   I just don't know.
15   Q.   Were there any other payments made to
16 Mr. Washington in that fashion?
17   A.   I don't recall.
18   Q.   So you think maybe it was just one time?
19   A.   I don't know for sure.
20   Q.   Do you know if there's any other ways
21 that Mr. Washington was paid?
22   A.   What do you mean "other ways"?
23   Q.   Well, it's possible that Sherrod sent a
24 check just to Mr. Washington rather than going



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
37–40

Page 37

1 through you. Do you know if that occurred?

2     A.   I do not believe that occurred.

3     Q.   Do you know if Sherrod paid

4 Mr. Washington directly with a money order?

5     A.   That, I do not know for sure.

6     Q.   Did you ever see an accounting that

7 showed how much Mr. Washington had been paid for

8 the work he did?

9     A.   There's a document that was created. It

10 was an Excel spreadsheet. It had a number of

11 individuals on it and how much, you know, they were

12 paid.

13     Q.   Do you have any documents in your

14 possession that show payments made to

15 Mr. Washington?

16     A.   The only document that I might have, I'm

17 not sure, since he was paid with a cashier's check,

18 that would be a copy, you know, the -- of that

19 money order.

20     Q.   You think you may have a copy of a money

21 order that you sent to Mr. Washington?

22     A.   I may have.

23     Q.   And you think if there is one, it's only

24 one of those?

Page 38

1     A.   There may be one.

2     MR. CANETTI: Let's take a short break here.

3 Go off the record.

4         (WHEREUPON, a short break was

5         taken.)

6 BY MR. CANETTI:

7     Q.   Sir, I'll remind you you're still under

8 oath.

9     We talked about -- you mentioned out of

10 the attorneys you had worked with, you said

11 Mr. Conger and Mr. Washington. Were there any

12 other attorneys that you worked with?

13     A.   I don't recall any other attorneys.

14     Q.   Is there anything that would help you

15 remember that?

16     A.   No, I don't think so.

17     Q.   And what work were you involved with

18 with Mr. Conger?

19     A.   He is the gentleman that filed, you

20 know, the lawsuit to free up the account.

21     Q.   The lawsuit you're referring to was

22 filed as Sherrod v. Merrill Lynch in the Northern

23 District of Illinois?

24     A.   Yes, sir.

Page 39

1     Q.   And that was related to a freeze on

2 Sherrod's assets in the plan?

3     A.   That's what they said.

4     Q.   What do you think it related to?

5     A.   They said it was a freeze on just, you

6 know, her assets. And according to attorneys,

7 Mr. Conger felt that the whole plan was frozen, not

8 just her assets.

9     Q.   And did Mr. Conger do any other work

10 besides the work related to that lawsuit?

11     A.   I called him many times.

12     Q.   In relation to that lawsuit or to other

13 topics?

14     A.   Just other topics, questions.

15     Q.   What other questions did you call to

16 talk to him about?

17     A.   I don't recall all of the questions that

18 I...

19     Q.   Did it relate to the work you're doing

20 as a plan administrator?

21     A.   Sometimes.

22     Q.   Was it advice on how to do your work as

23 a plan administrator?

24     A.   It may have been.

Page 40

1     Q.   Was there any specific advice you

2 received on how to do your work as a plan

3 administrator?

4     A.   No.

5     Q.   So then it wasn't about that?

6     A.   About what?

7     Q.   You just said it may have been?

8     A.   I said it may have been, correct.

9     Q.   And then when I said what, if any,

10 advice did you receive, you said you didn't receive

11 any advice; is that right?

12     A.   That's correct.

13     Q.   Did you receive any advice or guidance

14 at all from Mr. Conger related in any way

15 whatsoever for your work as a plan administrator?

16     A.   I'm sure that I did.

17     Q.   Do you recall what year that was?

18     A.   No, I do not.

19     Q.   And to the extent you had communicated

20 with Mr. Conger about a topic related to your work

21 as a plan administrator, would that have just been

22 a phone call?

23     A.   A phone call, yes.

24     Q.   Did you ever send e-mails to Mr. Conger



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
41–44

Page 41

1  asking for advice or consulting with him on doing
2  any work related to the plan?
3      A.   I don't believe I did.
4      Q.   Did he ever send you any letters or
5  other type of communication providing advice or
6  counsel to you on doing work for the plan?
7      A.   I don't believe so.
8      Q.   So it sounds like to the extent you got
9  any guidance from him, it would have been one phone
10 call?
11     A.   Only one phone call?
12     Q.   I thought that's what you said; it would
13 have been a phone call?
14     A.   Well, I called him many times.
15     Q.   It sounds like what I thought you were
16 saying -- and maybe I understood you -- is that you
17 talked to him many times, but only one time did you
18 talk to him about getting any advice or guidance on
19 doing work related to the plan.
20     A.   That's been a few years ago, and my
21 memory is kind of fuzzy on that.  I can't answer
22 that with certainty, sir.
23     Q.   So you talked to him many times, but it
24 sounds like you're saying most of the time you

Page 42

1  talked to him about things that did not relate to
2  doing work for the plan; is that right?
3      A.   There may have been sometimes for the
4  plan.  I'm not sure.
5      Q.   So it may not have ever happened, but if
6  it did happen, it may have been sometimes.  Is that
7  what you're saying?
8      A.   That's possible.
9      Q.   Okay.  Regardless, there is no e-mails
10 or documents or anything ever generated that would
11 document any work or advice he gave you related to
12 the plan; correct?
13     A.   I believe that to be true.
14     Q.   So apart from you calling him on the
15 phone from time to time and the litigation in the
16 Northern District of Illinois against Merrill
17 Lynch, did Mr. Conger do any other work related to
18 the plan?
19     A.   He may have.
20     Q.   And what else may he have worked on?
21     A.   That, I'm not sure.
22     Q.   Was he involved with the 5500s at all?
23     A.   I do not believe that he was.
24     Q.   Was he involved at all with those annual

Page 43

1  participant statements that the accountant or
2  actuaries did?
3      A.   I do not believe that he was.
4      Q.   Was he involved with any communications
5  with participants in the plan?
6      A.   I'm not sure.
7      Q.   Is there anything that would -- any
8  documents that would help you answer that question?
9      A.   No.
10     Q.   You never personally told Dr. Conger
11 [sic] review some letters or draft letters to go to
12 participants is that true?
13     A.   That is true.
14     Q.   Now, you said the primary work that you
15 did related to the 5500s.  What work did you do for
16 the 5500s?
17     A.   Primarily, I didn't do anything,
18 because, as I stated before, I delegated that
19 responsibility, you know, to Dr. Sherrod.
20     Q.   We talked earlier about your -- well,
21 you said get the 5500 filed?
22     A.   That is correct.
23     Q.   So as far as putting the 5500 together
24 and getting the information on the 5500, you were

Page 44

1  not involved with that?
2      A.   No, sir, I was not.
3      Q.   So your only primary duty was just
4  filing it with the Department of Labor?
5      A.   I didn't even have to file it with the
6  Department of Labor.
7      Q.   Who did the filing?
8      A.   As I stated before, I delegated that
9  responsibility to Dr. Sherrod and she interfaced
10 with the actuary.  And once that had been done,
11 then it was filed.
12     Q.   So what did you mean by the primary
13 annual task you did was to get the 5500 filed?
14 What did you mean by that?
15     A.   Dr. Sherrod, make sure you do that.
16 Please get the job done.
17     Q.   So that was just you communicating with
18 Dr. Sherrod telling her to make sure she got it
19 done?
20     A.   That is correct.
21     Q.   Did you review the information on the
22 2012 5500 to make sure it was accurate?
23     A.   I may have looked at it.  But when you
24 say "review," I don't know exactly what you mean,



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
45–48

Page 45

1   review for accuracy?
2       Q.   Did you read it to make sure everything
3   on there made sense and was correct?
4       A.   I looked at it.  I can't vouch for the
5   correctness of it because that was prepared by a
6   professional.
7       Q.   I believe it was in 2013 -- and we can
8   look at it -- you started signing the 5500; is that
9   right?
10      A.   That I was authorizing her to sign, yes,
11  that's correct.
12      Q.   So from 2013, I think, to the last one
13  that was filed was 2016, you authorized your
14  signature to be put on those documents; is that
15  right?
16      A.   Yes.
17      Q.   And so when you put your signature on
18  those documents, what did you think was the purpose
19  of you signing those?
20      A.   Well, I was a plan administrator.
21      Q.   Do you think that by signing those, you
22  were representing that the information on there was
23  true and accurate?
24      A.   Yes, I do.

Page 46

1       Q.   And so what did you do to make sure that
2   information was true and accurate?
3       A.   There's nothing that I could do to make
4   sure that that information was accurate.  I would
5   have to assume that the information is accurate
6   because we'd hired a professional to do so.
7       Q.   Do you know who actually filled out the
8   5500s and put the information on it?
9       A.   I can't answer that with certainty.
10      Q.   Who do you think did it?
11      A.   I think Dr. Sherrod did it.
12      Q.   Is that for 2012 to 2016?
13      A.   That is correct.
14  MR. CANETTI:  Go off the record for a second.
15          (WHEREUPON, a short break was
16           taken.)
17  BY MR. CANETTI:
18      Q.   Now, were you ever paid for any of the
19  work you did as the plan administrator?
20      A.   No, sir.
21      Q.   Was L.J. Consulting ever paid for any
22  work as a plan administrator?
23      A.   No, sir.
24      Q.   And why were you selected to be the plan

Page 47

1   administrator in 2012?
2       A.   I was selected because the call came in
3   from Mr. Conger's office because, as I understood
4   it, a great wrong had been done and I felt that I
5   needed to do something because in my -- you know,
6   in my opinion, it was a great injustice had been
7   done to Dr. Sherrod.
8       Q.   Are you finished?
9       A.   I am finished.
10      Q.   And before being selected to be the plan
11  administrator for this plan, you had never worked
12  as a plan administrator before; is that right?
13  MR. REARDEN:  Objection.  Asked and answered.
14  BY MR. CANETTI:
15      Q.   Is that right?
16      A.   I have not worked before as a plan
17  administrator.
18      Q.   So what qualified you to work as a plan
19  administrator?
20  MR. REARDEN:  Objection.  Asked and answered.
21  BY THE WITNESS:
22      A.   My compassion, my desire to help others,
23  the ability to see that things are done.
24

Page 48

1   BY MR. CANETTI:
2       Q.   Are you finished?
3       A.   I am finished.
4       Q.   Now, in 2014 you started the entity
5   L.J. Consulting; is that right?
6       A.   That is correct.
7       Q.   Why did you start that entity?
8       A.   There was a discussion with the
9   attorney, Mr. Conger, at that time.
10      Q.   And what was the rationale for starting
11  L.J. Consulting with Mr. Conger at that time?
12  MR. REARDEN:  I am going to object to this to
13  the extent it calls for attorney-client
14  communication.
15  BY MR. CANETTI:
16      Q.   Did he provide advice to you as a plan
17  administrator of the plan in setting up L.J.
18  Consulting?
19      A.   No.
20      Q.   So what do you understand to be the
21  reason why you started L.J. Consulting?
22      A.   I don't have a specific reason as to why
23  I did it at that time.
24      Q.   Why did you just not continue as Leroy



LEROY JOHNSON                                    May 03, 2018
ACOSTA vs SHERROD, et al.                        49–52

Page 49

1  Johnson as the plan administrator in 2014?
2     A.   I don't know why.
3     Q.   You have no reason why you did that?
4     A.   Correct.
5     Q.   And L.J. Consulting, does it have any
6  employees?
7     A.   One.
8     Q.   And is that you?
9     A.   That is correct.
10    Q.   Are you paid for your work at L.J.
11 Consulting?
12    A.   No, I am not.
13    Q.   Does L.J. Consulting have any clients
14 other than the plan?
15    A.   It does not.
16    Q.   And has that been true from the
17 inception of L.J. Consulting to the present?
18    A.   Repeat that again.
19    Q.   Has that been true that the only client
20 has been the plan from the start of L.J. Consulting
21 to the present?
22    A.   That is correct.
23    Q.   Does L.J. Consulting have any office
24 space?

Page 50

1     A.   No.
2     Q.   Is the address L.J. Consulting uses in
3  Illinois a box at a UPS store?
4     A.   Yes, it is.
5     Q.   And why did you set up L.J. Consulting
6  in Illinois if you live in Michigan?
7     A.   Everything that I've done with this plan
8  has always been in Illinois.
9     Q.   And do you know why that is?
10    A.   Why what is?
11    Q.   Why you set things up to do work with
12 the plan in Illinois when you reside in Michigan?
13    A.   I reside more than in Michigan.
14    Q.   Where else do you reside besides Flint,
15 Michigan?
16    A.   I reside here in Illinois.
17    Q.   You have another address here in
18 Illinois?
19    A.   Yes, I do.
20    Q.   What's your address here?
21    A.   The address is 105 Wood Lake Boulevard,
22 Apartment 3111, Gurnee, Illinois.
23    Q.   So do you also work here in Illinois as
24 part of your medical practice?

Page 51

1     A.   No, I do not.
2     Q.   All the work you do is in Michigan?
3     A.   That is correct.
4     Q.   That's a full-time position?
5     A.   Yes.
6         MR. REARDEN:  Objection.  Asked and answered.
7  BY MR. CANETTI:
8     Q.   And you mentioned you have a copy of the
9  plan document.  Are there any records that
10 L.J. Consulting keeps related to the plan?
11    A.   There are documents.  There are many
12 documents that have been turned -- you know, turned
13 over.  I don't know specifically which ones you
14 want, you're asking about.
15    Q.   Are there any documents L.J. Consulting
16 maintains as part of its -- to assist in doing its
17 work as the plan administrator?
18    A.   No.
19    Q.   Are there any records it keeps as part
20 of its role as the plan administrator?
21
22    A.   No.
23
24

Page 52

1         (WHEREUPON, a certain document was
2         marked Johnson Deposition Exhibit
3         No. 1, for identification, as of
4         May 3, 2018.)
5  BY MR. CANETTI:
6     Q.   I'm going to show you what's marked as
7  Exhibit 1.  This is Sherrod 1 through 71.  This was
8  the plan document that you filed in the Illinois
9  litigation.  In the complaint with Mr. Conger, this
10 also is the document that was identified as a plan
11 document in your interrogatory responses.
12        Is this a copy of the plan document that
13 you referred to earlier?
14    A.   It is the one that was filed, as you say
15 it was.  It is.
16    Q.   It has the marking on the top that's the
17 case number for that, 1:12-CV-02545, Document 11,
18 filed on April 6, 2012.
19        Do you see that?  Did I read that
20 correctly?
21    A.   Yes, I see.
22    Q.   And so you did attach the plan document
23 to the complaint as part of the Illinois litigation
24 against Merrill Lynch; correct?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
53–56

Page 53

1    A.   Oh, I don't know that -- this is the
2 first time that I've been aware that a document was
3 really filed with that lawsuit.
4    Q.   Are you aware that you identified in
5 your interrogatory responses that this document was
6 the plan document?
7    A.   Could I see where I said that in the
8 interrogatories?
9    Q.   Sure.  Page 5 of interrogatory
10 responses, answer to Interrogatory No. 1.  I'll let
11 him look at this in a minute, read it for the
12 record.
13       It says, "Article 2 of the plan document
14 effective January 1, 2009, set forth the duties and
15 responsibilities of plan administrator."
16       And you cite Sherrod 36 to Sherrod 71
17 down there at the bottom of the page.
18    A.   Yes, I see it.
19    Q.   Again, this is -- Sherrod 36 actually
20 starts in the middle of this document where it
21 starts with some more information.  Sherrod 1
22 actually is the first page and it goes to, as we
23 said here, to 71.
24       So is this the copy of the plan document

Page 54

1 referred to earlier that you have and use as the
2 plan administrator?
3    A.   It appears to be.
4    Q.   Now, on page 36 is where you identified
5 where your duties are described.  And I believe
6 that may have been a -- may have put the wrong page
7 numbers in there.  Let's see if we can locate what
8 you're referring to.
9       So I believe what you were referring to
10 is on page Sherrod 15, Section 2.4, you turn to
11 Sherrod 15, that describes the power and duties of
12 the administrator.  Do you see that at the top of
13 the page?
14       You're on Sherrod 18.  It also has the
15 page number 15 on the bottom of the document, the
16 page number is 12 and the Bates-stamped number is
17 Sherrod 15.  I know it gets confusing having the
18 duplicate page numbers.  It says "Power and Duties
19 of the Administrator" at the top.
20       Is this a list of your powers and duties
21 as the administrator of the plan?
22    A.   I've not read all of this before.
23    Q.   Have you seen this before?
24    A.   I have seen it, but to sit down and go

Page 55

1 through it line by line and checking off doing this
2 and doing that.
3    MR. REARDEN:  You have the right to read it.
4 If he's going to ask you questions about it, you
5 can read it right now before you answer any
6 questions about it.  So I suggest you read
7 Section 2.4 because I think he's going to ask you
8 questions about it.
9    MR. CANETTI:  Let's go off the record and let
10 me know when you're done reading and we'll go back
11 on the record.
12    THE WITNESS:  Yes.
13       (Witness reviews document.)
14 BY MR. CANETTI:
15    Q.   You had time to review Section 2.4, 2.5,
16 2.6 and 2.7 of Sherrod 00015 and 16?
17    A.   Yes.
18    Q.   In 2.5, it lists, "The administrator
19 shall be charged with the duties of the general
20 administration of the plan as set forth under the
21 terms of plan, including but not limited to the
22 following."
23       Under A, it says, "The discretion to
24 determine all questions" --

Page 56

1    MR. REARDEN:  I think you said 2.5.  I think
2 you mean 2.4.
3    MR. CANETTI:  Correct.  Thank you, John.
4 BY MR. CANETTI:
5    Q.   2.4, "The discretion to determine all
6 questions relating to the eligibility of employees
7 to participate or remain a participant herein under
8 and to receive benefits under the plan."
9       What do you do with respect to your duty
10 under 2.4(a)?
11    A.   I'm not so sure of what the question
12 that you're asking is.  Will you be a little bit
13 more specific?
14    Q.   What do you do with your duty to
15 determine all questions relating to participants
16 receiving benefits under the plan?
17    A.   For now, for the present, you know,
18 there are no employees other than Dr. Sherrod.
19    Q.   So do you do anything to determine if
20 participants can receive benefits under the plan?
21    A.   I don't do any of that myself.
22    Q.   Who does that?
23    A.   That would be -- the actuary has
24 actually done that.



LEROY JOHNSON
May 03, 2018
ACOSTA vs SHERROD, et al.
57–60

Page 57

1    Q.    So it's up to the actuary to determine
2  if participants can receive benefits under the
3  plan?
4    A.    The one document that I know for sure,
5  and I don't know which one it is, but one of the
6  documents stated that those employees that
7  Dr. Sherrod had, that they would be eligible once
8  they reach retirement age, you know, for their --
9  start receiving their benefits.
10   Q.    So before they actually receive
11  benefits, do you do anything to determine it's
12  proper to pay benefits to a participant?
13   A.    No.
14   Q.    Now, in 2.4(d) it says one of your other
15  duties is to authorize and direct the trustee with
16  respect to all discretionary or otherwise directed
17  disbursements from the trust.
18       Do you understand money has been paid
19  out or taken out of the trust since 2011 to the
20  present?
21   A.    Correct.
22   Q.    And have you had any involvement in
23  directing the trustee on disbursements from the
24  trust?

Page 58

1    A.    None other than verbal.
2    Q.    And what verbal direction have you given
3  the trustee regarding disbursements from the trust?
4    A.    Primarily the -- in conversation with
5  meeting is those monies removed to pay the expenses
6  of the plan.
7    Q.    And what expenses have been removed or
8  disbursed from the trust to pay expenses?
9        I'm sorry.
10       What disbursements have you directed to
11  be made from the trust to pay expenses?
12   A.    Oh, I can't do that right now off the
13  top of my head.  I don't recall.
14   Q.    And you have nothing to document any of
15  the direction you gave regarding the disbursements
16  from the trust?
17   A.    No, I do not.
18   Q.    Did you approve every disbursement from
19  the trust?
20   A.    No, I did not.
21   Q.    Approximately how many disbursements did
22  you approve or authorize or direct be made from the
23  trust?
24   A.    I don't know the number.

Page 59

1    Q.    Was it most of them or only a few of
2  them?
3    A.    I can't be sure.
4    Q.    If we go through and look at the
5  disbursements from the trust, would that help you
6  to answer that question?
7    A.    I don't know.
8    Q.    Did you authorize or direct
9  disbursements of the trust on a weekly basis?
10   A.    No.
11   Q.    Did you do it on a monthly basis?
12   A.    I don't recall.
13   Q.    Did you do it on an annual basis?
14   A.    I do not have any documentation as to
15  the number of times that that was directed.  I
16  don't know.
17   Q.    In 2.4(e) it says "to maintain all
18  necessary records for the administration of the
19  plan."
20       Do you maintain all necessary records
21  for the administration of the plan?
22   A.    When you say all records to the
23  administration of the plan, could you be more
24  specific?

Page 60

1    Q.    Well, this is your document that you
2  said you used to help you do your work; correct?
3    A.    That is true, I did say that.
4    Q.    So what does that mean to you and how do
5  you read that to do your work?
6    MR. REARDEN:  Objection.  Calls for a legal
7  conclusion.
8  BY THE WITNESS:
9    A.    The things that I did, as I stated
10  before, and Dr. Sherrod, you know, worked, you
11  know, very hard to see that these participants,
12  things were done properly and service providers
13  paid -- paid for.
14  BY MR. CANETTI:
15   Q.    Did you have any files or recordkeeping
16  that you maintained records for the plan?
17   A.    There may be some documents.
18   Q.    Do you have, like, a file or book or
19  binder, something wherein you keep all the records
20  for the plan?
21   A.    When you say "all records," specifically
22  when you say "all," what are you referring to when
23  you say "all"?
24   Q.    You said there may be some documents you



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
61–64

Page 61

1  have related to the administration of the plan;
2  correct?
3      A.    That may be some papers that I have,
4  correct.
5      Q.    All documents that you have, are they
6  kept in some type of organized fashion such as a
7  binder or folder or some other technique such as
8  that?
9      A.    I don't think that I'm that organized.
10     Q.    Has a participant ever contacted you
11 regarding the plan besides Dr. Sherrod?
12     A.    No.
13           Stop.  That's not true.  That's not
14 true.  One did.
15     Q.    Who was that?
16     A.    Caine -- Caine Everett, I believe is the
17 name.
18     Q.    Caine Everett?  And what, if anything,
19 did you do in response to him contacting you?
20     A.    He called me because he eventually did
21 an IRA rollover, I believe.
22     Q.    So did you work with him to effectuate
23 that IRA rollover?
24     A.    No, I did not work with him.  He was

Page 62

1  only -- his main concern was if I was a legitimate
2  person, you know, involved in this process.  And I
3  gave him reassurance that we only wanted him to
4  receive what funds that he had coming to him.
5      Q.    Did you provide any records or documents
6  to him?
7      A.    No, I did not.
8      Q.    Did he request that?
9      A.    Not from me.
10     Q.    Do you know if he requested it from
11 somebody else?
12     A.    He may have.
13     Q.    Who else did he speak with for the plan?
14     A.    Dr. Sherrod.
15     Q.    Anyone else besides Dr. Sherrod?
16     A.    Not that I know of.
17     Q.    Now, under 2.6 it says "Appointment of
18 Advisors."  It says, "The administrator or the
19 trustee with the consent of the administrator may
20 appoint counsel, specialists, advisors, agents,
21 including nonfiduciary agents, and other persons as
22 the administrator or the trustee deems necessary or
23 desirable in connection with the administration of
24 this plan."  And it continues on basically saying

Page 63

1  the same thing.
2      MR. REARDEN:  I will object to counsel's
3  characterization.
4      MR. CANETTI:  All right.  I will read the full
5  thing.  No problem.
6  BY MR. CANETTI:
7      Q.    (Continuing) -- "including but not
8  limited to agents and advisors to assist with the
9  administration and management of the plan and
10 thereby to provide amongst such other duties as the
11 administrator may appoint, assistance with
12 maintaining plan record and the providing of
13 investment information to the plan's investment
14 fiduciaries."
15           Did you provide your consent to the
16 appointment of any counsel, specialists, advisors
17 or agents that did work for the plan?
18     MR. REARDEN:  Objection.  Calls for a legal
19 conclusion.
20 BY THE WITNESS:
21     A.    I don't recall that I did.
22 BY MR. CANETTI:
23     Q.    Now, 2.7 details a payment of expenses.
24 Are you involved in overseeing the payment of

Page 64

1  expenses for the plan?
2      A.    No, I'm not.
3      Q.    And who's responsible for that?
4      A.    Dr. Sherrod is the responsible party for
5  that.
6      Q.    Were you involved at all with the
7  litigation involving Mr. Sherman and Dr. Sherrod?
8      A.    No.
9      MR. REARDEN:  I'm going to object.  I'm not
10 involved with it, but I know that's a lawsuit
11 that's gone on for many years, has involved a
12 Michigan state case, and potentially may be related
13 to a federal case.  So I consider the question to
14 be vague.
15 BY MR. CANETTI:
16     Q.    For the state case involving Sherman v.
17 Sherrod, were you involved in any aspect of the
18 state case involving Sherman v. Sherrod?
19     A.    No, I was not.
20     Q.    Have you ever seen the bond, the 250,000
21 bond that's involved in that case?
22     A.    When you say "seen," what do you mean?
23     Q.    Seeing the actual documents that
24 represents that bond.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
65–68

Page 65

1    A.   I have seen documents.  Yes, I have.
2    Q.   And is it true that the principal who
3  that bond would be paid out on if Mr. -- if it does
4  not get paid to Mr. Sherman would be Dr. Sherrod?
5    A.   Repeat that again.
6    Q.   Is it true that the principal who would
7  be paid out on the bond, if it's not paid to
8  Mr. Sherman, that that principal is Dr. Sherrod?
9    MR. REARDEN:  Calls for a legal conclusion.
10        You can answer.
11  BY THE WITNESS:
12    A.   No.  No, that's not true.  No.  That's
13  not -- that's incorrect.
14        (WHEREUPON, a certain document was
15          marked Johnson Deposition Exhibit
16          No. 2, for identification, as of
17          May 3, 2018.)
18  BY MR. CANETTI:
19    Q.   I'll show you what we're marking as
20  Exhibit 2.
21        This is a copy of a motion that was
22  filed by Merrill Lynch to release the freeze on
23  defendant Sherrod's account.  And if you turn to --
24  on the bottom right, it says "DOL" and has a series

Page 66

1  of numbers.  If you turn to DOL2037, there's also a
2  handwritten 14 on the bottom as well.
3    A.   You said 02 --
4    Q.   DOL002037.  It also says Exhibit 3 and
5  14 on the bottom.
6        Is this the bond that you've seen
7  before?
8    A.   No.  I have not seen this document
9  before.
10    Q.   What is the document you've seen before
11  that is the bond as you described it?
12    A.   I saw the -- just the notation of the
13  $250,000, but I've not really particularly seen
14  this.  There's been much talk about the $250,000.
15    Q.   You're referring to some document from
16  the bank that shows the money coming out of the
17  account?
18    A.   I've seen that document, yes.
19    Q.   This is the bond that was obtained, that
20  $250,000.  And if you look in the middle of the
21  page, it says amount of bond, it says $250,000.
22        Do you see that?
23    A.   Yes.
24    Q.   If you go over to the right, it says

Page 67

1  "principal."  And it says "Dr. Shirley T. Sherrod."
2        Do you see that?
3    A.   I do see it.
4    Q.   And do you have any reason to dispute
5  the accuracy of that?
6    A.   I don't understand the setting -- the
7  clear setting of this and what this really, you
8  know, means here.
9    Q.   Who do you think the principal is if it
10  is not Dr. Shirley T. Sherrod as it states in this
11  document?
12    A.   I don't know.
13    Q.   Is there some other document that you've
14  seen that you think defines the principal
15  differently than this?
16    A.   There were a lot of legal goings-on with
17  this case and around this bond, and I don't think
18  that what I say about what I see means very much.
19  I'm going to leave that to -- leave that to the
20  attorneys.
21    Q.   So as you sit here today, you cannot
22  recall any documents that states different a
23  principal than Dr. Shirley T. Sherrod for this
24  bond --

Page 68

1    A.   When you say "the principal," would you
2  please define exactly what you mean?
3    Q.   This bond shows the principal on it,
4  principal for bond is who the bond would pay out to
5  if it doesn't get paid to the court that the bond
6  was posted to.
7    A.   I don't really understand that.
8    Q.   Okay.  Are there any documents that
9  you've seen that show that this bond would pay out
10  to somebody other than the courts, Mr. Sherman, or
11  Dr. Sherrod?
12    A.   The only thing that I know about the
13  bond is that we have been fighting to retain -- to
14  try to get that bond back into the pension account,
15  and that once it's released, you know, from this
16  Wells Fargo Bank, it goes back to the pension
17  account because Dr. Sherrod can't get it.  There's
18  some paperwork somewhere with all of that legal
19  stuff in it.
20        Now, that's what I know about the bond.
21    Q.   So my question is, you said because
22  there's some paperwork that says it goes to the
23  plan, and I've not seen any such paperwork that
24  contradicts what's on the bond --



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018

69–72

Page 69

1    A.   I don't think I said there was paperwork
2    that went to the plan.
3        Q.   Have you seen any documents to support
4    your statement there that you think the bond can
5    get paid to the plan?
6        A.   That it can get paid to the plan?
7        Q.   Mm-hmm.
8        A.   I just know that Dr. Sherrod can't
9    receive it.
10       Q.   And why do you say that?
11       A.   There's some affidavit somewhere that I
12   saw, because I wasn't really involved in it, but I
13   do know that there's some affidavit somewhere.
14       Q.   An affidavit by whom?
15       A.   It had something to do with Merrill
16   Lynch.
17       Q.   An affidavit by Dr. Sherrod related to
18   this bond and Merrill Lynch?
19       A.   I believe so.
20       Q.   Well, that's included in this set of
21   documents here.  You believe something that
22   affidavit says that it can't get paid to
23   Dr. Sherrod?
24       A.   I believe that it cannot be paid to

Page 70

1    Dr. Sherrod.
2        Q.   If you go just a couple more pages down
3    on 2041 to 2043 is the affidavit of Shirley Sherrod
4    related to releasing the freeze on the account
5    filed by Merrill Lynch.  I think you just went --
6    right there is where it starts.  If you want to
7    take the time to review these three pages, see if
8    there's anything in here that says that the money
9    can or should be paid to the plan or states that it
10   cannot be paid to Dr. Sherrod.
11       MR. REARDEN:  Objection.  Calls for a legal
12   conclusion.
13   BY MR. CANETTI:
14       Q.   Did you have a chance to review that?
15       A.   Most of it, but I don't really want to
16   make any comment on it.
17       Q.   So other than this affidavit by
18   Shirley Sherrod, which you don't have any comment
19   of it having anything to support your statement
20   that the bond should be paid to the plan, is there
21   anything else that supports that belief you have?
22       MR. REARDEN:  Objection.  Argumentative.
23           You can answer.
24

Page 71

1    BY THE WITNESS:
2        A.   Because that was always our intent to
3    put those funds back into the plan.
4    BY MR. CANETTI:
5        Q.   Are there any other documents that
6    support that view on that issue?
7        A.   I don't think you need a document.
8        Q.   Why do you think you don't need a
9    document?
10       A.   To put money back into the plan that was
11   illegally taken out of the plan?  In my -- I'm
12   sorry.
13       Q.   Why do you think it was taken out of the
14   plan illegally?
15       A.   Number one, she had a gun at her head.
16   It was under a court order.
17       Q.   So the court ordered that money to come
18   out of the plan?
19       A.   I believe it did.
20       Q.   Do you know that the order about the
21   bond also stated that Ms. Sherrod could sit for a
22   deposition instead of paying the bond?
23       A.   I'm not familiar with all of that.  That
24   is something that took place in that state court,

Page 72

1    and I really don't want to comment on it because
2    I'm not knowledgeable enough to comment on it.
3        Q.   Is there anything besides the order
4    itself that explains why the bond had to get paid?
5        A.   There may very well be, but I'm not
6    going to make any comment on it.
7        Q.   Can you identify any other documents to
8    me besides the court order that explains why the
9    bond needed to be paid?
10       A.   No, I can't.
11       Q.   And you're saying it was illegal because
12   there was a court order asking her -- requiring her
13   to pay a bond.  Was there anything else that made
14   it illegal?
15       A.   I don't know.  I'm not knowledgeable
16   enough in this area and about this particular part
17   of the case.
18       Q.   You stated all she -- there was a gun to
19   her head.  Was there anything else besides the
20   court order that gave you the belief that she had a
21   gun to her head about paying this bond?
22       A.   That was enough.
23       Q.   The court order?
24       A.   Yes.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
73–76

Page 73

1    Q.    Was there anything else, any other
2  documents or court orders, you're referring to?
3    A.    I don't know, sir.
4    Q.    Is there anything that would help you to
5  recall that?
6    A.    No, sir.
7    Q.    If the bond -- the amount of money the
8  bond gets paid to Mr. Sherman, how would the money
9  get put back into the plan?
10   A.    I have no idea.
11   Q.    Would Ms. Sherrod pay the $250,000 back
12  to the plan?
13   A.    I don't know.
14   Q.    Has she signed any documents, to your
15  knowledge, saying that she would do that if that
16  bond was paid to Mr. Sherman?
17   A.    I'm not aware of such documents.
18   Q.    Were you aware that after this
19  Exhibit 2, which if you look at page 1 that was
20  filed in February, right here, February 28, 2012,
21  are you aware that this motion culminated in a
22  hearing with the judge wherein Merrill Lynch and
23  Mr. Sherman and the Court agreed to lift the freeze
24  that was placed on Sherrod's assets in the plan?

Page 74

1    A.    No, I'm not.
2    Q.    Were you aware that they all had agreed
3  to that, but then Ms. Sherrod's attorneys objected
4  and said they did not want the freeze lifted in
5  April of 2012?
6    A.    I'm not aware.
7    Q.    Did you read the Seventh Circuit
8  decision related to the litigation you're involved
9  with in Illinois against Merrill Lynch?
10   A.    I read some of it.
11   Q.    Did the Seventh Circuit state in that
12  decision that the freeze could have been lifted in
13  April of 2012 if Dr. Sherrod had agreed to it?
14   A.    That might be true.
15   Q.    And do you think that was accurate what
16  the Seventh Circuit said then?
17   A.    I can't argue with these judges.
18   Q.    And do you know the freeze on
19  Dr. Sherrod's assets with Merrill Lynch was, in
20  fact, lifted in May of 2013?
21   A.    I don't believe that they were ever
22  lifted. It's my understanding that Merrill Lynch
23  just dropped off as a custodian.
24   Q.    Is the money still with Merrill Lynch

Page 75

1  today?
2    A.    No, it is not.
3    Q.    Was it transferred to Comerica in June
4  of 2013?
5    A.    If that is the correct date that you're
6  quoting. I don't know that's the correct date.
7    Q.    Around June 2013, was the money
8  transferred to Comerica?
9    A.    That may be true. It sounds correct.
10   Q.    So if they were transferred out of that
11  point, wouldn't you agree that the freeze on her
12  assets had to have been lifted at that point?
13   MR. REARDEN:  Objection.  Calls for a legal
14  conclusion.
15  BY THE WITNESS:
16   A.    I just know that the freeze order is
17  still in effect.
18  BY MR. CANETTI:
19   Q.    Do you know if checks were written to
20  Dr. Sherrod in 2013 off the Comerica account and
21  that she cashed them?
22   A.    The only checks that I'm aware that
23  Dr. Sherrod initially got were in 2014, I believe.
24   Q.    I can show you the checks if it helped

Page 76

1  you at all.  We talked about them yesterday.  There
2  were two checks, one for $18,000 and one for
3  $32,000, totaling $50,000 that were addressed to
4  Shirley Sherrod.  She said she cashed those and it
5  was her signature on the checks in July of 2013.
6    MR. REARDEN:  I'm going to object to counsel's
7  testimony.
8  BY MR. CANETTI:
9    Q.    Did you have any knowledge of that
10  occurring?
11   A.    I don't recall having any knowledge of
12  that occurring.
13   Q.    Now, you stated the first time you're
14  aware that Dr. Sherrod got money out of the account
15  was in 2014; is that right?
16   A.    Yes.
17   Q.    So --
18   A.    I did say that.
19   Q.    So you believe when she took money out
20  in 2014 that the freeze was lifted at that point?
21   MR. REARDEN:  Objection.  Calls for a legal
22  conclusion.
23  BY THE WITNESS:
24   A.    Yes.



LEROY JOHNSON                                          May 03, 2018
ACOSTA vs SHERROD, et al.                              77—80

Page 77

1  BY MR. CANETTI:
2     Q.   So you think that her -- she did not
3  have a right to that money in 2014, but she still
4  took the money out in 2014?  Is that what you're
5  saying?
6     A.   No.  She had a right to the money.
7     Q.   Was it in compliance with the court
8  order freezing her account that she took money out
9  of it in 2014?
10    A.   I'm not going to comment on that because
11 I'm not an attorney.  I'm not a lawyer.
12    Q.   So you believe the account was still her
13 right to -- her assets were still frozen under the
14 court order in 2014 and she was taking money out in
15 2014?
16    A.   I'm not -- the exact date that the
17 freeze was lifted on that account, I need to see
18 that date.
19    Q.   Do you know if Dr. Sherrod paid any
20 expenses on behalf of the plan in 2011?
21    A.   I believe she did.
22    Q.   And why do you believe that?
23    A.   Because during that period, the account
24 was frozen and she utilized some of her own private

Page 78

1  funds to do so.
2     Q.   Did she provide you any copies of any
3  checks or money orders or invoices for amounts she
4  paid in 2011 that she thought were plan expenses?
5     A.   I came on as administrator in May
6  of 2012, I think.  I don't recall that she gave me
7  anything from 2011.
8     Q.   Did she pay any expenses -- did she
9  believe she paid any expenses on behalf of the plan
10 in 2012?
11    A.   I believe she did.
12    Q.   Did she provide you copies of any
13 invoices, checks or money orders related to those
14 expenses?
15    A.   No.
16    Q.   In 2013, does Sherrod believe she paid
17 any expenses on behalf of the plan?
18    A.   I believe she did.
19    Q.   Did she provide you any copies of
20 invoices, checks, or money orders related to those
21 expenses?
22    A.   No.
23    Q.   In 2014, did Dr. Sherrod take money from
24 the plan to reimburse herself for some expenses she

Page 79

1  believed she incurred in 2011, 2012, and 2013?
2     A.   She may have.
3     Q.   Did you provide any oversight of her
4  doing that?
5     A.   No.
6     Q.   Did you do anything to verify the amount
7  she was taking out to reimburse herself was, in
8  fact, expenses that were incurred?
9     A.   I knew what Dr. Sherrod did was
10 justified and correct.
11    Q.   What did you do to come to the
12 conclusion that what she did was justified and
13 correct?
14    A.   Because she is an honorable, honest
15 woman, and that is not her makeup to be a
16 law-breaker.
17    Q.   So other than your view of her being an
18 honorable and honest person, did you do anything to
19 verify that those amounts were correct?
20    A.   At the time that they were done, no.
21    Q.   Did you do anything to review any of
22 these expenses to decide that those were reasonable
23 expenses that should be paid from the plan's
24 assets?

Page 80

1     A.   When we met, we always discussed bills
2  and trying to keep things at a minimum.  That was
3  always a discussion topic.
4     Q.   I'm talking just specifically about in
5  2014, you said she took money out of the plan to
6  reimburse herself for expenses from 2011, 2012, and
7  2013.  And I'm asking what, if anything, you did to
8  determine those were reasonable expenses that
9  should be paid from the plan's assets?
10    MR. REARDEN:  Objection.  Asked and answered.
11 BY THE WITNESS:
12    A.   I just know that whatever was taken, it
13 was necessary to pay those persons who had done
14 work for the plan.
15 BY MR. CANETTI:
16    Q.   And you never saw any documents, though,
17 that substantiated those amounts; correct?
18    A.   Dr. Sherrod kept all of the documents.
19    Q.   But to make your decision that it was
20 correct, you didn't review any documents to assist
21 you in making that decision; correct?
22    A.   I only needed to hear what she had to
23 say.
24    Q.   And, in fact, that's all you did was



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
81–84

Page 81

1  hear what she had to say.  You didn't do anything
2  beyond that; correct?
3      A.    Usually that would be true.
4      Q.    Specifically about in 2014 where she
5  took money out to repay herself for the expenses in
6  2011, '12 and '13, you just took her word that
7  those were proper expenses to pay.  You didn't do
8  anything other than taking her word to review that
9  those were proper expenses to pay; correct?
10     A.    That is correct.
11     Q.    Now, in 2014, did Dr. Sherrod also take
12  money out to pay for expenses she thought the plan
13  incurred in 2014?
14     A.    I believe she did.
15     Q.    And did you do anything to review those
16  expenses and see that those are reasonable and
17  necessary expenses of the plan in 2014?
18     A.    No.
19     Q.    So was it the same for any expenses
20  incurred in 2014 that you took Dr. Sherrod's word
21  that those were proper expenses for the plan?
22     A.    Yes.
23     Q.    For 2015 and 2016 and 2017, is it your
24  understanding that Dr. Sherrod also took money out

Page 82

1  of the plan to pay for expenses that she thought
2  were reasonable and necessary for the plan?
3      A.    She did.
4      Q.    And did you do anything other than take
5  Dr. Sherrod's word that those were proper,
6  reasonable, and necessary expenses for the plan and
7  that she should pay those?
8      A.    No.
9      Q.    So you only took her word.  You didn't
10  review any documents for expenses paid in 2015,
11  2016, and 2017; correct?
12     A.    That is correct.
13     Q.    Do you know if attorney Mr. Turco did
14  any work for the plan?
15     A.    I'm not sure.
16     Q.    Is there anything that would help you to
17  remember?
18     A.    Only thing that I know for sure in the
19  state court proceedings there, there were a number
20  of individuals involved.  He may have been one of
21  them.
22     Q.    And you're referring to the state court
23  proceeding of Sherman v. Sherrod?
24     A.    Yes.

Page 83

1      Q.    Apart from his possibly being involved
2  in that, was he involved with any other work for
3  the plan, to your knowledge?
4      A.    Not to my knowledge he was not.
5      Q.    Do you know if an attorney named John
6  Redfield did any work for the plan?
7      A.    He did not do any work for the plan.  He
8  was...
9            Something happened in a bankruptcy
10  proceeding that he was representing Dr. Sherrod in.
11  Something came up about the plan in that situation.
12  And I don't know exactly what the situations were,
13  but certain individuals at certain points had to do
14  certain things or made certain statements, you
15  know, about the account.
16     Q.    Was Mr. John Redfield Dr. Sherrod's
17  attorney for her bankruptcy filing?
18     A.    I believe he was.
19     Q.    And you believe her bankruptcy filing
20  had something to do with the bond in the Sherman v.
21  Sherrod litigation?
22     A.    I don't have any of that belief.  I
23  don't know what the connection is.
24     Q.    I thought you just said you thought he

Page 84

1  had something to do with the bond in the bankruptcy
2  filing?
3      A.    No.
4      Q.    Did Mr. Redfield have any --
5      A.    Wait.
6      Q.    Sorry.  Go ahead.
7      A.    Not the bond -- yes, he did.  That's
8  where I'm confused.  I don't think I should be
9  commenting because I don't know that case that well
10  to make these types of remembrances about it.
11     Q.    Do you have any personal knowledge of
12  any work that Mr. Redfield did related to the plan?
13     A.    There is some paperwork and maybe we can
14  get that and show it to you later on.
15     Q.    So I need to understand what is it that
16  you think he did for the plan.
17     A.    When you say "work for the plan," in
18  what way?
19     Q.    I don't know.  You keep saying you think
20  there's something.  I'm trying to figure out what
21  it is you think it is.
22     A.    There was some argument, you know, in
23  the court, either with -- it is probably
24  centering -- I'm not sure.  It centers something



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
85–88

Page 85

1  around that bond issue.

2  Q.  So you think it's possible that
3  Mr. Redfield, as part of Dr. Sherrod's bankruptcy,
4  did some type of work related to the bond in the
5  Sherman v. Sherrod litigation; correct?

6  A.  And I may be wrong on that, too.

7  Q.  Apart from any work he may have done
8  with the bond, is there anything else that you
9  think may have related to the plan for the work
10  that he did?

11  A.  Not that I know of, sir.

12  Q.  Do you know if Mr. -- an attorney named
13  Mark Granzotto did any work related to the plan?

14  A.  When you say "work for the plan," as I
15  said before, there were these arguments that came
16  up in court, and he may have been involved in some
17  way.

18  Q.  And, again, are you referring to the
19  state court action of Sherman v. Sherrod?

20  A.  Yeah, it centers around that.

21  Q.  So you're saying he was involved in some
22  way with the Sherman v. Sherrod litigation;
23  correct?

24  A.  Now that I don't know for sure.  I don't

Page 86

1  know if it was some -- some appeal work or what.
2  That, I don't know for sure to comment on.

3  Q.  So apart from some involvement he had
4  with Sherman v. Sherrod litigation, either at the
5  appellate level or the trial level, was he involved
6  in any other way in doing any services for the
7  plan?

8  A.  No, no.

9  Q.  Do you know if an attorney named Michael
10  Bartolic did any work related to the plan?

11  A.  He was the -- I believe he was the first
12  attorney that Dr. Sherrod went to when the account
13  was frozen.

14  Q.  So he was an attorney that Dr. Sherrod
15  consulted with about the freeze on her assets with
16  Merrill Lynch?

17  A.  Yes.  Correct.

18  Q.  Did he do any work related to the plan
19  apart from that?

20  A.  No, he did not.

21  Q.  Did an attorney named Ben Gonek do
22  any -- provide any services to the plan?

23  A.  No.

24  Q.  Apart from those attorneys we just

Page 87

1  discussed and the two you mentioned before,
2  Mr. Conger and Mr. Washington, were there any other
3  attorneys you think provided any services to the
4  plan?

5  A.  Not that I can recall, sir.

6  Q.  Do you know if plan assets had been used
7  to pay attorneys at the law firm called The Groom
8  Law Group?

9  A.  Yes.  Yes.

10  Q.  And do you know why it was decided to
11  use plan assets to pay them?

12  A.  My understanding was that it could be
13  done.

14  Q.  And why do you think it could be done?

15  A.  Because it was -- I believe it was
16  specified in the plan document.

17  Q.  You have the plan document in front of
18  you, but I assume you don't know what part of the
19  plan document that's in; is that right?

20  A.  I do not.  I'd have to look it up.

21  Q.  Do you think you'd be able to locate
22  that information for me by reviewing that plan
23  document?

24  A.  There was -- it's slowly coming back to

Page 88

1  me.  There was an amendment to the plan so that
2  those payments could be made.

3  Q.  So after this current case started,
4  there was an amendment to the plan that allowed the
5  plan assets to be used to pay for the attorneys in
6  this litigation?

7  A.  Yes.

8  Q.  Do you have a copy of that amendment?

9  A.  I have seen it.

10  Q.  Do you know who would maintain a copy of
11  that?

12  A.  I would have a copy of it.

13  Q.  So you do have a copy of that?

14  A.  I should have a copy of it in the plan
15  manual.

16  Q.  And do you know who drafted that
17  amendment?

18  A.  That was The Groom Law Firm.

19  Q.  Do you know the total amount of expenses
20  that were reimbursed to Dr. Sherrod in 2014?

21  A.  They're written down somewhere.  I don't
22  have that figure in my head.

23  Q.  In your interrogatory responses, I put a
24  box and star on page 6, it says, "In 2014,



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
89–92

Page 89

1  consistent with the advice of the plan's legal
2  counsel, the plan paid $193,905 to Dr. Sherrod to
3  reimburse her for the attorneys' fees and expenses
4  she personally assumed over a roughly three-year
5  period in connection with unfreezing the plan and
6  for the fees and expenses she assumed in paying
7  plan service providers."
8      Is that what you're referring to?
9  A.   I recall I read this. I recall that.
10  Q.   Now, on the 5500, which we're going to
11  mark as Exhibit No. 16, this is DOL002480, 2482,
12  this is the 5500 from 2014. And that has your
13  authorized or valid electronic signature at the
14  bottom; correct?
15  A.   Yes.
16      (WHEREUPON, a certain document was
17      marked Johnson Deposition Exhibit
18      No. 16, for identification, as of
19      May 3, 2018.)
20  BY MR. CANETTI:
21  Q.   Now, on the second page of this
22  document, it states under 8(f), it says,
23  "Administrative service providers," and it says
24  they were paid $129,438. And it says "Other

Page 90

1  Expenses: 12,562." If you total that up, it comes
2  out to $142,000.
3      Was Dr. Sherrod reimbursed $142,000 that
4  it states in the form 5500, or was she reimbursed
5  the $193,000, as it says in interrogatory
6  responses?
7  MR. REARDEN: I'm going the object because
8  this is a misleading question. Read the documents,
9  both documents carefully, and answer the best way
10  you can.
11      It's also calling for a legal
12  conclusion.
13  BY THE WITNESS:
14  A.   Repeat the question again.
15  BY MR. CANETTI:
16  Q.   According to 5500, there were $142,000
17  in expenses paid in 2014. Was Dr. Sherrod
18  reimbursed $142,000 in 2014?
19  MR. REARDEN: Confusing. Misleading.
20  BY THE WITNESS:
21  A.   I've seen the numbers. I just don't
22  have them clearly in my mind. The only two figures
23  that stick out in my mind was $142,000 that she was
24  reimbursed for legal fees, and then there was an

Page 91

1  additional amount that might be 57,000. That's
2  what I --
3  BY MR. CANETTI:
4  Q.   This form is saying that there were
5  benefits paid in 2014 of $57,000. Is that the
6  amount that Dr. Sherrod received as a distribution
7  from the plan?
8  A.   I believe it is.
9  Q.   And then the 142,000 you're saying
10  represents the amount that was reimbursed to
11  Dr. Sherrod in 2014?
12  A.   For legal fees.
13  Q.   For legal fees?
14  A.   Yes, sir.
15  Q.   And were those legal fees that were
16  incurred prior to 2014?
17  A.   That is correct, sir.
18  Q.   And when Dr. Sherrod paid these expenses
19  she believed on the plan's behalf, did she execute
20  any loan documents, to your knowledge, for that?
21  A.   No, she did not, sir.
22  Q.   Can you explain to me why it's your
23  understanding she was reimbursed $142,000 as
24  reported on the 5500, why it then states in

Page 92

1  interrogatory responses that she was reimbursed
2  $193,905?
3  A.   I can't explain it.
4  Q.   Is there any documents that would help
5  you to be able to explain that?
6  A.   During this litigation, there -- one of
7  the focus points is what goes in which column, and
8  there's been some argument as to where you think
9  something should go one place and then there's an
10  argument where it should go into another place.
11      Now, I guess maybe that needs to be
12  looked at and determined what is the proper place
13  for it to go.
14  Q.   Just so we're clear, the documents we're
15  looking at are what you filed and said what the
16  expenses did in 2014 and what you said were how the
17  expenses were explained in your interrogatory
18  responses; right?
19  A.   Yes, sir.
20  Q.   So this is not capturing the Department
21  of Labor's view on these expenses in these
22  documents; correct?
23  A.   I don't know.
24  Q.   Is there something among these documents



LEROY JOHNSON                                          May 03, 2018
ACOSTA vs SHERROD, et al.                              93–96

Page 93

1  you think that presents the Department of Labor's
2  view that there were expenses paid of $196,000 or
3  $142,000?
4      A.   I do know that there were expenses paid
5  and that's why she was reimbursed that $142,000.
6      Q.   So you think it was 142, not the 193
7  that we saw in your responses?
8      A.   I'm not sure.
9      Q.   Do you know for the 5500s what documents
10 are used to complete the 5500?
11     A.   Yes, I do know, sir.
12     Q.   What documents are used?
13     A.   Number one would be the beginning
14 balance of the account for that year ending
15 balance, you know, for that year.
16     Q.   Are you referring to bank documents that
17 show those?
18     A.   That is correct, yes.
19     Q.   And what other documents are used?
20     A.   A listing of the disbursements from the
21 account.
22     Q.   And who generates a list of
23 disbursements from the account?
24     A.   The custodial institution.

Page 94

1      Q.   Are you referring to the bank where the
2  money is deposited?  You're referring to the list
3  of all the checks that were written from that
4  account?
5      A.   That were taken from that account, yes.
6      Q.   So other than the bank documents related
7  to where the monies are held, are there any other
8  documents that are used to complete the 5500?
9      A.   Those are the main ones.
10     Q.   And apart from the main ones, are there
11 any other ones?
12     A.   Not that I can recall right now.
13     Q.   Just looking at Exhibit 16 here, it
14 lists the plan administrator's name as L.J.
15 Consultants.  Is the name of your company actually
16 L.J. Consulting?
17     A.   Yes.
18     Q.   And is that the correct address there,
19 Waukegan Road in Waukegan, Illinois?
20     A.   That address is not correct.
21     Q.   Do you know why this has the wrong name
22 and wrong address for you as the plan
23 administrator?
24     A.   No, I do not.

Page 95

1      Q.   For the numbers on the second page in
2  the financial information section, do you review
3  any of those bank statements and these numbers to
4  ensure that these numbers are accurate?
5      A.   Not always, sir.
6      Q.   Did you do that for this one?
7      A.   I don't recall.
8      Q.   Is it your understanding that
9  Dr. Sherrod is the one that put these numbers in
10 this 5500?
11     A.   I don't know if she's the one that put
12 them in this 5500.
13     Q.   Did you review this 5500 before you
14 authorized your signature to be put on it?
15     A.   I may have.
16     Q.   And it's possible you didn't review it
17 before authorizing or putting your electronic
18 signature on it?
19     A.   That's possible.
20     Q.   And if you did review it, how would it
21 have come to you so you had the opportunity to
22 review it?
23     A.   I would meet with her and go over it.
24     Q.   So Dr. Sherrod would have a printed out

Page 96

1  hard copy of it and hand it to you for you to
2  review?
3      A.   Yes.
4      Q.   Was it ever sent to you by e-mail?
5      A.   I don't recall.
6      Q.   Did you ever sit down with Dr. Sherrod
7  and fill out the 5500 by hand?
8      A.   No.
9          (WHEREUPON, a certain document was
10         marked Johnson Deposition Exhibit
11         No. 10, for identification, as of
12         May 3, 2018.)
13 BY MR. CANETTI:
14     Q.   I'm going to show you what we're marking
15 as Exhibit 10, just to keep it consistent with our
16 deposition yesterday.  This is the form 5500 for
17 2012.
18         And this also has your name listed as
19 the authorized electronic signature; is that right?
20     A.   Yes, sir.
21     Q.   Now, the plan administrator lists you
22 Leroy Johnson.  It says your address was the P.O.
23 Box at 515 Southfield, Michigan.  Was that
24 accurate?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
97–100

Page 97

1   A.   No.
2   Q.   Did you review this 5500 before
3   authorizing or putting your electronic signature on
4   it?
5   A.   No, I did not.
6   Q.   Do you know who completed this 5500?
7   A.   No, I do not.
8   Q.   So it says for 2012, that there -- if
9   you look on page 2, that there was income of
10  $69,000, but there were no benefits paid or any
11  expenses.  Do you see that?
12  A.   I see that.
13  Q.   Is that accurate?
14  A.   I don't know.
15  Q.   Is there anything that would help you
16  answer that question?
17  A.   No.
18        (WHEREUPON, a certain document was
19        marked Johnson Deposition Exhibit
20        No. 7, for identification, as of
21        May 3, 2018.)
22  BY MR. CANETTI:
23  Q.   I'm going to show you what has been
24  marked as Exhibit No. 7.  This is the 5500 for

Page 98

1   2011.  Did you ever review this document?
2   A.   No.
3   Q.   It states in the second page that
4   Ms. Sherrod gave her valid electronic signature,
5   authorized signature in October of 2012.  Do you
6   see that?
7   A.   Repeat that again.
8   Q.   On the bottom of the second page, it
9   says in October 12, 2012 --
10  A.   Yes.
11  Q.   -- Shirley T. Sherrod filed it with her
12  authorized or valid electronic signature.  Do you
13  see that?
14  A.   I do see that.
15  Q.   And at that time you were the plan
16  administrator; correct?
17  A.   That is correct.
18  Q.   But you did not review this 5500 prior
19  to it being filed?
20  A.   I did not.
21        (WHEREUPON, a certain document was
22        marked Johnson Deposition Exhibit
23        No. 12, for identification, as of
24        May 3, 2018.)

Page 99

1   BY MR. CANETTI:
2   Q.   We are going to look at the 5500 for
3   2013, which is marked as Exhibit No. 12.  Here you
4   are.
5        This is the 5500 for the plan in 2013.
6   Now, this lists the plan administrator's name and
7   address as L. Johnson and lists an address in
8   Waukegan, Illinois.  Was that address accurate?
9   A.   No.
10  Q.   And you did file this with your
11  authorized or valid electronic signature on
12  October 13, 2014; correct?
13  A.   Correct.
14  Q.   Do you know who completed this document?
15  A.   No, I do not.
16  Q.   Did you review this document to ensure
17  that it's accurate?
18  A.   I assumed its accuracy.
19  Q.   Did you compare this with any bank
20  statements to make sure the information here was
21  accurate with the bank statements?
22  A.   No.
23  Q.   And, again, in Part 3 on the second
24  page, financial information, it states that no

Page 100

1   benefits were paid and doesn't list any
2   administrative fees or expenses or any other
3   expenses; is that right?
4   A.   Which line are you looking at?
5   Q.   8(f) and 8(g) are empty and don't say
6   any expenses; correct?
7   A.   I see.
8   Q.   And 8(d) for benefits paid, that's also
9   blank and doesn't say any benefits were paid?
10  A.   I see.  Mm-hmm.
11  Q.   So is it your understanding that -- if
12  we go back to 2011 just for a second.
13        In 2011, as well in Exhibit No. 7, under
14  8(d), it does not list any benefits paid; correct?
15  A.   Which one are you looking at?
16  Q.   I'm sorry.  I thought you had it in
17  front of you.  Exhibit 7 right here, sir.
18        On the first page on this one, this one
19  is a little bit different.  On 8(d), where it says
20  "benefits paid" at the bottom, it says there were
21  none paid in 2011; correct?
22  A.   I see that.
23  Q.   And it doesn't list anything for the
24  administrative expenses or other expenses in 8(f)



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
101–104

Page 101

1  and 8(g); correct?
2      A.   I see that.
3      Q.   So to the extent any expenses were paid
4  in '11, '12 and '13, they are not captured in the
5  5500s; correct?
6      A.   It would appear so.
7      Q.   So to the extent any expenses that were
8  paid in those years or in 2014, those were all
9  captured in the 2014 5500; is that correct?
10     A.   I don't know the accuracy of that, sir.
11     Q.   Do you know who would know the
12  accuracy -- who would be able to answer that
13  question?
14     A.   At all times, an actuary was used to, I
15  guess, get these figures together, you know, for
16  the 5500. So it would have to be that individual.
17     Q.   Now, for example, in 2014, on
18  Exhibit No. 16, if you just look at the bank
19  statements and looked at the withdrawals coming
20  out.
21     A.   Which one are you looking at?
22     Q.   I'm looking at 2014, No. 16.
23          You said the primary document you would
24  look at to put these numbers in here in Part 3 on

Page 102

1  page 2 of the 5500, that would come primarily from
2  the bank statements; correct?
3      A.   The beginning of the year balance and
4  end of the year.
5      Q.   As well as any of the money that came
6  out of the plan that are listed below and any
7  income for the plan; correct?
8      A.   Yes.
9      Q.   That would all come from the bank
10  statements?
11     A.   A large majority would.
12     Q.   If you look at the bank statements, how
13  is it possible to know on the bank statements or
14  checks alone what is a benefit payment or an
15  administrative service fee or any other expenses
16  that were paid?
17     A.   There obviously would be some other
18  supporting documents.
19     Q.   And so who would have those supporting
20  documents to determine that there were $12,562 and
21  other expenses?
22     A.   As I have stated, you know, before, I
23  gave this -- delegated this to Dr. Sherrod and have
24  her do this.

Page 103

1      Q.   So to the extent there are supporting
2  documents, for example, for the number in 8(g) that
3  says $12,562, Dr. Sherrod would be the one that
4  knows why that number was there and would have the
5  documents that supports that figure; correct?
6      A.   I believe so.
7      Q.   Is there anybody else besides
8  Dr. Sherrod that would have that information?
9      A.   The preparer of the document.
10     Q.   Who may have been Dr. Sherrod or
11  somebody else? We're not sure who prepared it?
12     A.   The actuary.
13     Q.   It's possible the actuary prepared this?
14     A.   Yes. It is my understanding that the
15  actuary always, you know, prepared the forms 5500
16  to be turned in.
17     Q.   I thought you had testified earlier that
18  it may have been Dr. Sherrod who filled out some of
19  the 5500?
20     A.   No. No. That would not be true.
21     Q.   So for the actuary to know what were the
22  expenses or payments of service providers, somebody
23  would have to supply the documents to them to make
24  that determination; correct?

Page 104

1      A.   That is correct.
2      Q.   And I believe you said that to the
3  extent somebody did that, it would have been
4  Dr. Sherrod and not yourself; correct?
5      A.   That is correct.
6      Q.   And is that true for all of the time
7  that you were a fiduciary -- or, I'm sorry, when
8  you were the plan administrator from 2012 to the
9  present?
10     A.   Yes, as she interfaced with the plan
11  actuary on preparing the form 5500.
12     Q.   Although you authorized to put your
13  electronic signature, you did not, on your own,
14  look at any bank documents or review any of these
15  invoices or payments for these expenses to verify
16  that these number are accurate; right?
17     A.   That is correct.
18          (WHEREUPON, a certain document was
19          marked Johnson Deposition Exhibit
20          No. 24, for identification, as of
21          May 3, 2018.)
22  BY MR. CANETTI:
23     Q.   I'll show you what I'm marking as
24  Exhibit 24, the 5500 for 2015.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
105–108

Page 105

1    Now, again, this was filed with your
2  authorized or valid electronic signature on
3  October 14, 2016; correct?
4    A.   Yes.
5    Q.   And in 3(a), it says the plan
6  administrator is LJ -- looks like even Consultants
7  is misspelled.  That's, again, incorrect; right?
8    A.   Correct.
9    Q.   That's not your correct address there
10  either; correct?
11    A.   No.  That is the correct address.
12    Q.   This is a correct address?
13    A.   Yes, it is.
14    Q.   And what address is that?
15    A.   1146 --
16    Q.   I'm sorry.  I mean, is that the address
17  of your home or the address of the P.O. Box?
18    A.   That's the address of the P.O. Box.
19    Q.   And it's in Waukegan, not Gurnee,
20  Illinois?
21    A.   That is correct.
22    Q.   Now, it says down by preparer's name, it
23  says "M.S. Associates."  Do you know if that name
24  is the correct name of the entity that prepared

Page 106

1  this?
2    A.   I don't know.  You would have to ask
3  Dr. Sherrod that.
4    Q.   Do you know if the address is correct
5  for M.S. Associates or not?
6    A.   I do not know.
7    Q.   Now, in 2015, if you go to the second
8  page under financial information, it said there are
9  benefits paid under 8(d) of $59,000.  Is that
10  amount of distributions to Dr. Sherrod?
11    A.   I don't know.
12    Q.   Is there anything that would help you to
13  answer that question?
14    A.   To look at the listing of checks which
15  came out of that account for that period of time.
16    Q.   Did you review the checks that came out
17  of the accounts in 2015?
18    A.   I don't believe I did.
19    Q.   So what about reviewing those checks
20  would help you to answer that question?
21    A.   You mean -- right now if I saw the
22  checks, we would know the answer to the question.
23    Q.   Which is where the money went in 2015?
24    A.   Where it went?  I thought you said where

Page 107

1  it came from.
2    Q.   I'm asking was $59,000 paid to
3  Dr. Sherrod as a distribution in 2015?
4    A.   I would have to see the listing of
5  checks coming out of the account.
6    MR. CANETTI:  Mark this as Exhibit 26.
7        (WHEREUPON, a certain document was
8        marked Johnson Deposition Exhibit
9        No. 26, for identification, as of
10        May 3, 2018.)
11  BY MR. CANETTI:
12    Q.   These Bates numbers are not in order,
13  but they're in chronological order.  These were all
14  the checks that were taken out of the plan account
15  in 2016.
16    So the first check at DOL2432 is a check
17  for $5,000 that went to Dr. Sherrod?
18    MR. REARDEN:  When he's talking about "DOL
19  numbers," those are the upside-down numbers up at
20  the top of the page.
21  BY MR. CANETTI:
22    Q.   Was this check, then, to Dr. Sherrod for
23  $5,000 one of the distributions to her?
24    A.   Yes.

Page 108

1    Q.   And then second page was her signature.
2  And then the third page is another check for
3  $5,000, January 5, 2015, to Dr. Sherrod.  And the
4  page after that has her signature.  That's 2434 and
5  2435.  Is that another distribution to Dr. Sherrod?
6    A.   Which page are we on now?
7    Q.   It says 2434.  It's a check dated
8  January 5, 2015, for $5,000.
9    A.   I believe so, yes.
10    Q.   And then if you go to DOL2436, there's a
11  check on January 5, 2016, for $4,400 to
12  Dr. Sherrod.  Is that also a distribution to her?
13    A.   There was an Excel worksheet, I believe
14  it is.
15    Q.   That it is a distribution to her?
16    A.   Yes.
17    Q.   DOL2438, there's a check on February 5,
18  2015, for $5,000 to Dr. Sherrod.  Was this a
19  distribution to her as well?
20    A.   I believe so.
21    Q.   On February 5, 2015, DOL2440, there's a
22  check for $5,000 on February 5, 2016, to
23  Shirley Sherrod.  Is that a distribution to her?
24    MR. REARDEN:  Calls for a legal conclusion.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
109–112

Page 109

1 BY THE WITNESS:
2    A.   There's some notations here.  I don't
3 know if that has any significance of -- that money
4 is going to her or some other --
5 BY MR. CANETTI:
6    Q.   So do you have any reason to -- do you
7 know who put these notes that you're talking about
8 on here?
9    A.   No.  No.
10    Q.   So this is the check written to
11 Dr. Sherrod for $5,000, and on page DOL2441 that's
12 her signature on the check.
13        Is that a distribution to her?
14    A.   It may be.
15    MR. REARDEN:  Objection.  Calls for legal
16 conclusion.
17 BY THE WITNESS:
18    A.   I have --
19 BY MR. CANETTI:
20    Q.   It may be.  Okay.
21        So that one we're not sure about.
22 February 5, 2015, there's another check for $4,440
23 on DOL2442.
24    MR. REARDEN:  Calls for a legal conclusion.

Page 110

1 BY MR. CANETTI:
2    Q.   Is this a distribution to Dr. Sherrod?
3    MR. REARDEN:  Calls for a legal conclusion.
4 BY THE WITNESS:
5    A.   It may very well be.
6 BY MR. CANETTI:
7    Q.   On the next page, DOL2444, is a check on
8 March 2, 2015, for $5,000 to Dr. Sherrod.  Is that
9 a distribution to Dr. Sherrod?
10    MR. REARDEN:  Calls for a legal conclusion.
11 BY THE WITNESS:
12    A.   It may very well be.  Could we just
13 total up the whole -- these checks to see if it
14 comes up to this number here?
15 BY MR. CANETTI:
16    Q.   If the total for all these checks, if
17 you go through them, they're all written to
18 Dr. Sherrod and she verified those -- it's her
19 signature that she did sign off and take the money
20 from all these checks.
21    MR. REARDEN:  I'll object to counsel's
22 testimony.
23 BY MR. CANETTI:
24    Q.   And the -- I have the total amounts.

Page 111

1 The total amount of the checks, $120,016.
2    MR. REARDEN:  Object, again, to counsel's
3 testimony.
4    MR. CANETTI:  We can total them all up.  Would
5 you like to do that?
6    MR. REARDEN:  I'm just going to make
7 objections.
8 BY MR. CANETTI:
9    Q.   If we want to take the time to look at
10 Exhibit No. 26 and total up the checks that are
11 listed here, it totals up $120,016.  Does that help
12 answer the question?
13    A.   I'm a little confused right now because
14 you keep saying "distribution," and these checks, I
15 thought we were just talking about this one figure
16 of $59,000.  That's why I stopped and said what do
17 all these checks add up to?
18    Q.   And I supplied you that information.
19 Does that help you to answer my question then?
20    A.   Could we take a break and then I can sit
21 here and add them up?
22    Q.   Sure.  If you would like to add them up,
23 go right ahead.
24    MR. CANETTI:  Let's go off the record.

Page 112

1        (WHEREUPON, a short break was
2        taken.)
3 BY MR. CANETTI:
4    Q.   Were you able to do some addition of the
5 checks in Exhibit 26?
6    A.   No.
7    Q.   And why were you not able to do that?
8    A.   I don't have an appropriate calculator.
9 And in addition, I don't feel that I am competent
10 in this area.  I think something like this needs to
11 be left to experts.
12    Q.   So you are not competent enough to
13 review the bank statements and compare them to the
14 information on the 5500 to determine if it's
15 accurate?
16    MR. REARDEN:  Well, I'm going to object
17 because these are not bank statements.
18 BY THE WITNESS:
19    A.   With what I have before me, no.
20 BY MR. CANETTI:
21    Q.   So you don't feel comfortable or
22 competent enough to compare the checks in 2015 to
23 the information on the 5500 to determine if it is
24 accurate on the 5500?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
113–116

Page 113

1    A.   The only thing I know about checks is
2  that some checks went for different things.  And
3  although the checks were really written directly to
4  her, some of the checks were earmarked for other
5  things, plan expenses and different things and not
6  directly a direct distribution that went into
7  Dr. Sherrod's pocket.
8    Q.   Were there other documents besides the
9  checks or the bank statements that demonstrated
10  that to you?
11    A.   Repeat that again.
12    Q.   Are there other documents besides the
13  bank statements and the checks that show how the
14  money was distributed in 2015?
15    A.   I'm not so sure what you're getting -- I
16  understand your question.
17    Q.   You said that if you just look at all
18  these checks, all the checks were paid to
19  Dr. Sherrod; right?
20    A.   That is correct.
21    Q.   But you're saying actually although the
22  money all went to her, after that, some of the
23  money went to other people as well; right?
24    A.   I believe that's true.

Page 114

1    Q.   And so are there any documents to show
2  how that money traveled after it was with
3  Dr. Sherrod?
4    A.   I don't have a clear view of that.
5    Q.   Did you ever have those documents?
6    A.   No.
7    Q.   So without those documents, it's not
8  possible to determine if the information on the
9  5500 is accurate.  Is that what you're saying?
10    A.   I can't determine its accuracy.  That
11  would have to be left to someone who's -- the
12  preparer of this document and the documents that
13  they were looking at to put this together.
14    Q.   If you had all the bank statements and
15  the documents that they had to put that together,
16  would you be able to review those documents and
17  ensure that the 5500 is accurate?
18    A.   I don't think that I'm qualified to
19  really get down to that type of accuracy.  That's
20  why we had a professional do it in the first place.
21    Q.   So if you did have all the documents the
22  professionals had, you would not be able to review
23  those documents and compare it to the information
24  on the 5500 to determine if the 5500 is accurate;

Page 115

1  correct?
2    MR. REARDEN:  Objection.  Asked and answered.
3  BY MR. CANETTI:
4    Q.   Is that correct?
5    A.   Repeat that again.
6    MR. CANETTI:  Could you read the question
7  back?
8         (WHEREUPON, the record was read as
9         requested.)
10    MR. REARDEN:  Same objection.
11  BY THE WITNESS:
12    A.   I would still say my same response.
13  BY MR. CANETTI:
14    Q.   What's your response?
15    MR. REARDEN:  Objection.  Asked and answered.
16  BY THE WITNESS:
17    A.   The preparer of the document and getting
18  everything in the proper category to get the right
19  figure.
20  BY MR. CANETTI:
21    Q.   My question was, if you had all that
22  information they had, could you look at that
23  information and extract from that whatever
24  information is necessary for the 5500 to determine

Page 116

1  if the information in the 5500 accurately
2  represents the information that's in the supporting
3  documents?
4    MR. REARDEN:  Objection.  Asked and answered.
5  BY THE WITNESS:
6    A.   That might be possible.
7    MR. REARDEN:  Objection.  Asked and answered
8  three times.
9  BY MR. CANETTI:
10    Q.   It might be possible?
11    A.   It might be possible.
12    Q.   And you never have done that before,
13  though; correct?
14    A.   That is correct.  That's because I
15  relied upon the accuracy of the work, you know,
16  that the actuary did in putting the document
17  together.
18    Q.   Do you ensure that the actuary has all
19  the documents it needs to put the information in
20  correctly?
21    A.   As I stated, you know, before,
22  Dr. Sherrod turned all of the documents over to the
23  actuary for the preparation of the 5500.
24    MR. REARDEN:  It's noon.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
117—120

Page 117

1    MR. CANETTI: You want to take a break? We
2    can go off the record and go to lunch.
3         (WHEREUPON, a short break was
4         taken.)
5    BY MR. CANETTI:
6    Q.   I'll remind you you're still under oath,
7    Mr. Johnson.
8         We were talking about the 2015
9    statements and bank statements. We do have a bank
10   summary statement, which I'll mark as Exhibit 25.
11        (WHEREUPON, a certain document was
12        marked Johnson Deposition Exhibit
13        No. 25, for identification, as of
14        May 3, 2018.)
15   BY MR. CANETTI:
16   Q.   This is a one-page excerpt of the
17   account summary from 2015 for the plan.
18        Have you seen anything like this page
19   before?
20   A.   I don't believe I have.
21   Q.   It shows there's a beginning value of
22   approximately 1.7 million. Then under additions
23   and withdrawals, it shows there's withdrawals
24   totalling approximately $120,000. Then it says

Page 118

1    there's income of approximately $65,000. Taxes,
2    fees, and expenses, expense of $5, and then a
3    change in investment value which is a loss of
4    approximately $60,000.
5    Do you see where I just read
6    approximately those terms from?
7    A.   I see where you read it from.
8    Q.   So the change in the investment value in
9    the income, if you add those together, it looks
10   like there's an increase of about $5,000 to the
11   account; is that right?
12   A.   If you say it is. My mental arithmetic
13   is not that fast. Go ahead.
14   Q.   If the income is about $65,000 -- I'm
15   rounding up -- and then the change in investment
16   value was a loss of about 60,000 -- I'm rounding
17   down -- the difference between $60,000 and $65,000
18   is a $5,000 positive net gain; right?
19   A.   That's $5,000, sure.
20   Q.   Then it says $120,000, like we talked
21   about before, came out of the account in 2015;
22   right?
23   A.   I see that figure there.
24   Q.   And then just looking at the 2015 5500,

Page 119

1    Exhibit No. 24, if you look at -- is that it? If
2    you look at 8(b) under other income, it's saying
3    there was a $16,000 loss, not a $5,000 gain.
4    Do you have any idea why there is that
5    difference in that value compared to what's on this
6    bank statement?
7    A.   No, I do not, sir.
8    Q.   And then if you total up the benefits
9    paid, which was $59,000, and the expenses, which is
10   $40,000, you can see in 8(h), it totaled up to
11   $99,000. Do you see that there?
12   A.   Did you say 8?
13   Q.   8(h). I'm on the second page.
14   A.   I see that number.
15   Q.   8(h) says 99,000 which appears to
16   represent the benefits paid of 59,000 and 40,000 in
17   expenses, showing that $99,000 came out of the
18   account in 2015; correct?
19   A.   I don't know if these numbers are
20   correct or not, sir.
21   Q.   If it's saying $99,000 came out and this
22   bank statement is saying $120,000 came out, can you
23   explain the $21,000 difference?
24   A.   I cannot explain the $21,000 difference.

Page 120

1    Q.   And based on your earlier testimony,
2    would it be either Dr. Sherrod or the accountant
3    and actuary who would be able to answer that
4    question?
5    A.   More likely the actuary.
6    Q.   Now, did you authorize or direct any of
7    those disbursements we looked at in Exhibit 26 out
8    of the plan in 2015?
9    A.   What is Exhibit 26?
10   Q.   Exhibit 26 are the checks from 2015.
11        Did you authorize or direct any of these
12   disbursements out of the plan in 2015 that are
13   represented by the checks in Exhibit 26?
14   A.   We may have talked about some of them.
15   Q.   Are there any that you recall that you
16   authorized or directed that came out of the plan?
17   A.   Not specifically.
18   Q.   Are some of these disbursements that
19   came out of the plan ones that you did not
20   authorize or direct?
21   A.   I don't know for sure.
22   Q.   Is there anyone that could help you
23   answer that question?
24   A.   No.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
121–124

Page 121

1    Q.   And to the extent you authorized or
2  directed any of the disbursements, who would you
3  have authorized or directed that to?
4    A.   Dr. Sherrod.
5    Q.   And you would have just done that
6  verbally, you're saying?
7    A.   Yes.
8    Q.   Did she always consult with you on every
9  single check that was written from the plan?
10    A.   I don't believe she did.
11    Q.   And so how do you know what
12  disbursements -- for the disbursements that came
13  out of the plan in 2015, how do you know what
14  checks were distributions to Sherrod as opposed to
15  any payments of expenses in 2015?
16    A.   I would have to see the breakdown on the
17  actual check that is written.
18    Q.   You have the checks in Exhibit 26.
19    A.   I see them.
20    Q.   Is there any checks -- if you look at
21  these checks, do any of these show any payments of
22  expenses that were made in 2015?
23    A.   I don't know by looking at the check
24  itself.

Page 122

1    Q.   What else would you need to look at
2  besides the checks?
3    A.   If there was a notation on the front of
4  the check that would say distribution amount, this
5  is an expense amount, what that figured totaled up
6  to, that would help a lot.
7    Q.   And if you look at Exhibit 26, are there
8  any checks that have that notation to you that
9  clarified whether it was a distribution or payment
10  of expense?  You have reviewed all the checks in
11  Exhibit 26?
12    A.   I've looked at them.
13    Q.   Do any of them have the notation you
14  referenced that would show whether it was a
15  distribution or benefits payment to Sherrod as
16  opposed to a disbursements of payment of an expense
17  for the plan?
18    A.   I do not see that breakdown indicated on
19  the check.
20    Q.   Is there any other information that
21  would clarify that issue?
22    A.   Not that I know of at this time.
23    Q.   So how do you know as the plan
24  administrator whether any of these checks

Page 123

1  represented a payment of a -- benefit payment to
2  Dr. Sherrod versus a payment to some service
3  provider for a plan expense?
4    A.   By looking at the check itself?  I don't
5  know.
6    Q.   And is there any other source of
7  information that would be able to be provided to
8  you to answer that question?
9    MR. REARDEN:  Objection.  Asked and answered.
10  BY THE WITNESS:
11    A.   The only thing that I would know would
12  be a bill that she received that she would have to
13  pay.
14  BY MR. CANETTI:
15    Q.   So say, for example, on this first check
16  on the first page of Exhibit 26 for $5,000, if
17  there was a bill from some service provider for
18  $5,000 around this time, do you think that may
19  correlate with a check written for $5,000?
20    A.   That's possible.
21    Q.   And, to your knowledge, do any of those
22  such invoices exist for 2015?
23    A.   I'm sure there are invoices that she has
24  because she wrote the check.

Page 124

1    Q.   Have you ever seen any of those
2  invoices?
3    A.   I don't recall.
4    Q.   So you don't know if she has these
5  invoices; right?
6    A.   I'm sure that she has some.
7    Q.   For 2015?
8    A.   I can't imagine that she wouldn't have
9  any.
10    Q.   And do you know who provided services to
11  the plan in 2015?
12    A.   I'm sure that there were services
13  provided, but I would have to see -- I don't have
14  that information.  I'm sure Dr. Sherrod has that
15  information.
16    Q.   Were you ever provided that information
17  at any point in 2015?
18    A.   I don't recall that I was.
19    Q.   Is there anything that would help you to
20  recall that?
21    A.   No.
22    MR. CANETTI:  I'll show you what I'm marking
23  as Exhibit 15.
24



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
125–128

Page 125

1      (WHEREUPON, a certain document was
2      marked Johnson Deposition Exhibit
3      No. 15, for identification, as of
4      May 3, 2018.)
5 BY MR. CANETTI:
6    Q.   This is a two-page document, a document
7 you provided to us, Sherrod 231 and 232.
8        Have you seen those two pages before?
9    A.   Yes, I have seen these pages before,
10 sir.
11    Q.   Is that your signature on Sherrod 231?
12    A.   Yes, it is.
13    Q.   Is this a document where you appointed
14 L.J. Consulting Services to be the plan
15 administrator on August 24, 2014?
16    A.   Yes, sir.
17    Q.   Did you have the authority to appoint
18 your firm as the administrator?
19    A.   When you say "authority," what do you
20 mean "the authority"?
21    MR. REARDEN:  Calls for a legal conclusion.
22 BY MR. CANETTI:
23    Q.   Was it your decision or Sherrod's
24 decision to appoint L.J. Consulting Services to be

Page 126

1 the plan administrator?
2    A.   I don't know for sure.
3    Q.   Is there anything that would help you to
4 answer that question?
5    A.   No.
6    Q.   Then on 232, is that your signature on
7 the bottom?
8    A.   Yes, it is.
9    Q.   And this is a document whereby Shirley
10 Sherrod appointed you to be the plan administrator
11 on May 30, 2012?
12    A.   Yes.
13    Q.   Do you know who drafted this document?
14    A.   I'm looking at it.  Dr. Sherrod and I.
15    Q.   You and Dr. Sherrod typed up or made
16 this document?
17    A.   I would assume one of us did.
18    Q.   And --
19    A.   I'm not for sure.
20    Q.   And on the first page, 231, did you
21 draft that document?
22    A.   I don't remember.
23    Q.   Again, would it have either been you or
24 Dr. Sherrod who drafted it?

Page 127

1    A.   Yes.
2        (WHEREUPON, a certain document was
3        marked Johnson Deposition Exhibit
4        No. 27, for identification, as of
5        May 3, 2018.)
6 BY MR. CANETTI:
7    Q.   I'll show you what I marked as
8 Exhibit 27.  This is the form 5500 from 2016.
9        It says it was filed with your
10 authorized or valid electronic signature on
11 October 14, 2017; is that correct?
12    A.   Yes.
13    Q.   And, again, in 3(a), it incorrectly
14 states the name of your company there; correct?
15        It says L.J. Consulting, instead of L.J.
16 Consulting?
17    A.   It should be L.J. Consulting.
18    Q.   But the address is correct on this one?
19    A.   Yes, it is.
20    Q.   Do you know why under 5(a) it says at
21 the beginning of the year there was one participant
22 and at the end of the year there was one
23 participant?
24    A.   I don't know why.

Page 128

1    Q.   Did you review this document before
2 authorizing your signature on it?
3    A.   No, I did not.
4    Q.   Do you know who prepared this document?
5    A.   No, I do not.
6        (WHEREUPON, a certain document was
7        marked Johnson Deposition Exhibit
8        No. 28, for identification, as of
9        May 3, 2018.)
10 BY MR. CANETTI:
11    Q.   I'm going to show you an exhibit we
12 marked as Exhibit 28.  This is titled "Shirley
13 Sherrod Target Benefit Pension Plan."  And on the
14 second page, it's also referred to as the asset
15 reconciliation as of 12/31/16.
16        Have you seen this document before?
17    A.   The format of this looks different.
18    Q.   Have you seen this document before?
19    A.   Not exactly in this format.
20    Q.   Do you know who created this document?
21    A.   I believe Reed-Ramsey.  I'm not sure,
22 but I believe Reed-Ramsey created this document.
23    Q.   So you're saying you've seen a document
24 like this before from Reed-Ramsey, but it's in a



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
129–132

Page 129

1  different format?
2      A.   I didn't say it was from Reed-Ramsey.  I
3  just seen some numbers.  I recognize these names,
4  you know, here.
5          (WHEREUPON, a certain document was
6           marked Johnson Deposition Exhibit
7           No. 17, for identification, as of
8           May 3, 2018.)
9  BY MR. CANETTI:
10     Q.   I'll show you a document marked as
11 Exhibit 17.  This is an account summary statement
12 for the plan as of December 31, 2014.  This is a
13 document received from you or Dr. Sherrod in your
14 production.
15         Have you seen this document before?
16     A.   I have seen this document before.
17     Q.   Is this the format that you were
18 referring to?
19     A.   No, I don't believe so.  I don't believe
20 so.
21     Q.   So you've seen documents that have
22 similar information to Exhibit 17 as well but in a
23 different format?
24     A.   This document here just shows

Page 130

1  participants and, you know, what their holdings
2  are.  And this one has some of the same and those
3  that have been turned over to the state.  I don't
4  think it is exactly, you know, the same.
5      Q.   For Exhibit 17, have you seen
6  information about the plan as of December 31, 2014,
7  in a different format than what you've seen in
8  Exhibit 17?
9      A.   I don't recall.
10     Q.   But you do recall seeing this document,
11 Exhibit 17?
12     A.   Yes.  I've seen this.
13     Q.   And is that something you have seen as
14 you performed your duties as the plan
15 administrator?
16     A.   I believe so, yes.
17     Q.   Or did you only see it for this
18 litigation?
19     A.   No.  I've seen this before.
20     Q.   Now, the one that's Exhibit 28, when you
21 saw this in a different format, what do you mean?
22 Can you describe for me what format you're talking
23 about?
24     A.   My eye doesn't catch it.

Page 131

1      Q.   So you're not saying you've seen this
2  information in some format that's like Exhibit 17,
3  some other type of format; correct?
4      A.   I'm not sure on the comparison between
5  these two.
6      Q.   But you believe there's some type of
7  end-of-the-year statement for the plan talking
8  about the plan participant balances that's in a
9  different format than what we have here in
10 Exhibit 28; right?
11     A.   This one shows those that were sent off
12 to the state.  That's not in that one over there.
13     Q.   So you're referring to the column on the
14 right-hand side of Exhibit 28 that's titled
15 "2017 Activity"?  You're saying that's something
16 different and doesn't have information like that in
17 Exhibit 17; right?
18     A.   Where are you looking right now?
19     Q.   On Sherrod JR00692 to 696.  On
20 right-hand column of all those pages, it says "2017
21 Activity" at the top.
22     A.   Sure.
23     Q.   That's what you were referring to as
24 having different information than what's in

Page 132

1  Exhibit 17?
2      A.   It looks different.
3      Q.   I'm just confused.
4          Are you saying it just looks different?
5  It's the same information, just a different format,
6  or are you saying it's different information?
7      A.   It just looks different to me.
8      Q.   Did you review this document as part of
9  your work as a plan administrator, Exhibit 28?
10     A.   This was -- Dr. Sherrod did the work,
11 you know, on this.  She communicated with me.  I
12 knew it was being done.
13     Q.   So this is referring to -- are you
14 referring to the 2017 activity, that there were
15 rollovers and something called escheat down in
16 2017?
17     A.   That is correct.
18     Q.   As far as the information in this thing
19 relating to 2016, did you review any of the
20 information for 2016?
21     A.   I thought this was 2017.  This is 2016?
22     Q.   If you looked at the column to the left
23 where it says "2017 Activity," it says "Balance on
24 12/31/16."



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
133–136

Page 133

1    A.   Yes.
2    Q.   Did you review any of that information
3  in performing your duties as the plan administrator
4  for what the end balances were as of December 31,
5  2016?
6    A.   No, I did not.
7    Q.   Now, as far as the distribution -- there
8  were distributions made in 2017.  I think we talked
9  about that earlier; right?
10   A.   There were some distributions made.
11   Q.   And then were there also payments to the
12  State of Michigan for participants that you didn't
13  locate?
14   A.   That is correct.
15   Q.   And were you involved at all in trying
16  to locate participants in 2016 or 2017?
17   A.   I again -- I had delegated that, you
18  know, to Dr. Sherrod to do.
19   Q.   So Dr. Sherrod was responsible for
20  trying to locate the participants in 2016 and 2017;
21  correct?
22   A.   I gave the duty to her.  I don't know
23  all what was involved in her, you know, locating
24  these individuals.

Page 134

1    Q.   But your understanding is either Sherrod
2  did it herself or she oversaw somebody else doing
3  it on her behalf; correct?
4    A.   That would be correct.
5    Q.   You weren't involved in it in any
6  fashion; right?
7    A.   That is correct.
8    Q.   Do you know what steps either
9  Dr. Sherrod or somebody working on her behalf took
10  to try to locate the participants?
11   A.   No, I don't.
12   Q.   Did you maintain a list of any of the
13  addresses for the participants?
14   A.   I don't have a list of addresses.
15   Q.   Do you have --
16   A.   I do know that Dr. Sherrod may have had
17  the list because she was closer to this than I was.
18   Q.   Do you have a list of any contact
19  information, be it addresses, phone numbers, e-mail
20  addresses, for the participants in the plan?
21   A.   Dr. Sherrod retains that information.
22   Q.   So L.J. Consulting does not have any of
23  that information; correct?
24   A.   It does not have any of that

Page 135

1  information.
2    Q.   And you personally don't have any
3  contact information for any of the participants in
4  the plan; correct?
5    A.   That is correct.
6    Q.   Except Dr. Sherrod, she's a participant.
7  You have her contact information, I assume?
8    A.   Yes.
9    Q.   So to the extent anyone has any contact
10  information for these people, that would only be
11  Dr. Sherrod or somebody she retained to help her
12  with having the contact information for them;
13  correct?
14   A.   I believe so.
15   Q.   And do you know any person or entity
16  that she did engage to help locate these
17  participants?
18   A.   No, I do not.
19   Q.   Do you know any of the activities she
20  undertook to try to locate contact information for
21  these participants?
22   A.   No, I do not.
23   Q.   Now, it looks like for some of these
24  people there's not an entry.  So if you look at

Page 136

1  page 1, Mr. Alexander, says escheat.
2  Mr. Armstrong, there's nothing by his name.  And
3  then on the third one, for example, Ollie Bottropf,
4  B-o-t-t-r-o-p-f, says "rollover."
5        Do you know why there is no entry for
6  John Armstrong?
7    A.   I do not know why.
8    Q.   Were you involved in the decision at all
9  to escheat some of the money for the participants?
10   A.   No.
11   Q.   Again, that was just Dr. Sherrod?
12   A.   Yes.
13   Q.   Do you know if she consulted with
14  anybody to get advice on making these distributions
15  to the participants?
16   A.   I'm sure that she must have.
17   Q.   But do you have personal knowledge of
18  any person she actually did talk to to get advice
19  about making these distributions?
20   A.   No, I do not.
21   MR. CANETTI:  I'll show you Exhibit 32.
22
23
24



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
137–140

Page 137

1    (WHEREUPON, a certain document was
2    marked Johnson Deposition Exhibit
3    No. 32, for identification, as of
4    May 3, 2018.)
5  BY MR. CANETTI:
6    Q.   This is titled "The Michigan Annual
7  Report of Unclaimed Cash."  And it says the holder
8  name is the plan, "The Sherrod Benefit Trust."
9    Have you seen Exhibit 32 before, the
10  document you produced to us, Bates-stamped as
11  Sherrod JR000688 and 689?
12   A.   I may have seen it.  I'm not for sure.
13   Q.   What was your involvement with this
14  document?
15   A.   I didn't have any involvement with the
16  document.
17   Q.   And why would you have seen this
18  document?
19   A.   I knew that she was working on, you
20  know, doing this and may have seen it at some
21  meeting, you know, with her.
22   Q.   Did you authorize or direct any of these
23  distributions as listed on this form?
24   A.   No.

Page 138

1    Q.   And back to Exhibit 28, it also lists
2  several participants as having a rollover.
3    Did you authorize or direct the rollover
4  of any of those amounts to those participants in
5  2017?
6    A.   No.
7    Q.   In 2016, is it your understanding the
8  only person that received any distributions was
9  Dr. Sherrod?
10   A.   When you say "distribution," the
11  definition, define.
12   Q.   Were benefits distributed only to
13  Dr. Sherrod as a participant in the plan in 2016?
14   A.   Could I see everything that was taken
15  out of that account in 2016?
16   Q.   See the check?
17   A.   There must be some service advisors, you
18  know, in there.
19   Q.   As far as benefit distributions, was
20  Sherrod the only participant that received a
21  benefit distribution in 2016?  If you look --
22   MR. REARDEN:  He's talking about was there any
23  of the people that are identified as former
24  employees, did any of them receive any benefit

Page 139

1  payments in 2016, if you know?
2  BY THE WITNESS:
3    A.   That's a good question.  I don't know
4  right now for sure.
5  BY MR. CANETTI:
6    Q.   If you look at Exhibit 27, which is
7  the -- I think it's under here, right there.  If
8  you pull the top and look at the second page, the
9  5500 for 2016, on line 8(d) under benefits paid on
10  the second page.
11   A.   Yes.
12   Q.   It says there is $62,550 paid in
13  benefits.
14   A.   Sure.
15   Q.   If you look at Exhibit 28 and you go to
16  the page that's Sherrod JR000694.
17   A.   Yes.
18   Q.   It says under Shirley Sherrod's name
19  under withdrawals, negative $62,550.
20   A.   I see that.
21   Q.   Based on what's on the form 5500 and
22  this statement from Exhibit 28, do you have any
23  reason to doubt that Dr. Sherrod received the
24  benefits payment of $62,550 as reported in the

Page 140

1  form 5500 for 2016?
2    A.   I'm not sure.
3    Q.   Is there anything that would help you to
4  be able to answer that question?
5    A.   The only thing I would know is a
6  detailed look at a slower pace than what's here.
7    Q.   And what else would you need to look at?
8    A.   Probably the same documents, just more
9  time.
10   Q.   Would you like to take the time so you
11  can answer that question?
12   A.   I don't believe that I can answer that
13  question.  This is something that was assembled by,
14  you know, actuaries and people with that expertise.
15  I don't think I would be able to do it accurately.
16   Q.   So looking at the two exhibits, 27 and
17  28, you can't look at those documents on your own
18  and determine what the benefit payments were for
19  2016?
20   A.   That is correct.
21   Q.   Now, you also mentioned in 2016 that you
22  thought other people received disbursements out of
23  the plan; correct?
24   A.   Go ahead.



LEROY JOHNSON
May 03, 2018
ACOSTA vs SHERROD, et al.
141–144

Page 141

1    Q.    Is that correct?

2    A.    They may have.

3    Q.    And if you look again at Exhibit 27, it
4    was reported on the form 5500 on the second page,
5    part H under F, that there were $133,922 paid to
6    administrative service providers; correct?

7    A.    I see that.

8    Q.    Do you know what service providers were
9    paid out of the $133,000 in 2016?

10   A.    This is 2018.  20 -- we were with The
11   Groom Law Firm in 2016.

12   Q.    You paid The Groom Law Firm in 2016?

13   A.    They received funds.

14   Q.    And that's captured with this $132,922;
15   correct?  I mean, that's part of that amount;
16   right?

17   A.    Without seeing their bill and that, I
18   assume that it is part of that.

19   Q.    Apart from The Groom Law Group, were
20   there any other service providers that were paid
21   that would be represented in this $133,000?

22   A.    The only other would be an actuary.  It
23   should be.

24   Q.    And that's Reed-Ramsey?

Page 142

1    A.    I'd have to look at the dates as to when
2    we first started with them.

3    Q.    So it either would have been M.S.
4    Associates or Reed-Ramsey that got paid for the
5    actuary work done in 2016?

6    A.    Yes.

7    Q.    Do you know approximately how much they
8    were paid for the actuary work in 2016?

9    A.    No, I do not.

10   Q.    Do you have a ballpark figure?

11   A.    No, I do not.

12   Q.    Did you ever authorize or direct any
13   payments to Reed-Ramsey or M.S. Associates?

14   A.    No.

15   Q.    And do you know how much was paid to The
16   Groom Law Group in 2016?

17   A.    I don't know that exact amount.

18   Q.    Did you ever authorize or direct the
19   disbursement of funds out of the plan to pay The
20   Groom Law Group?

21   A.    There was a lot of talk between
22   Dr. Sherrod and I about their billing.  I'll say
23   yes to that.

24   Q.    And did you authorize or direct any of

Page 143

1    the benefits that were paid to Dr. Sherrod in 2016?

2    A.    No, I didn't.

3    Q.    And, again, I think you answered this,
4    but it's late in the day, the only people that
5    would have been paid in 2016 to the best of your
6    recollection is The Groom Law Group or an actuary
7    firm which was Reed-Ramsey or M.S. Associates; is
8    that right?

9    A.    That's all I can recollect at this
10   point.

11   Q.    And do you have any other -- are there
12   any documents that would help you to remember that,
13   who else may have been paid, if anyone?

14   A.    There was that Excel spreadsheet.

15   Q.    So the Excel spreadsheet, you know, was
16   created looking at some type of documents; right?

17   A.    Yes.

18   Q.    So are there any underlying documents
19   related to 2016 that you know exist that would help
20   you to know whether anybody else was paid out of
21   that plan's expenses as a service provider?

22   A.    I don't recall any.

23   Q.    Now, in 2017, were benefits paid to
24   Dr. Sherrod as well?

Page 144

1    A.    I believe so.

2    Q.    And did you authorize or direct any
3    benefit payments to Dr. Sherrod in 2017?

4    A.    No.

5    Q.    Were any service providers paid any
6    money from the plan in 2017?

7    A.    I believe so.

8    Q.    Would that, again, be The Groom Law
9    Group?  And they were still in this litigation
10   until, I think it was, April 2017.

11   A.    They would have been paid.

12   Q.    And then an accounting firm?

13   A.    Yes.

14   Q.    Which would have been Reed-Ramsey or
15   M.S. Associates in 2017?

16   A.    That's correct.

17   Q.    And then Mr. Kofoed also represented you
18   for part of 2017.  Would he have been paid out of
19   the plan expenses?

20   A.    That is correct.

21   Q.    Apart from those three entities, were
22   there any other people that were paid as service
23   providers to the plan last year, 2017?

24   A.    Not that I can recall.



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
145–148

Page 145

1    Q.   Did you authorize and direct any
2  payments to The Groom Law Group in 2017?
3    A.   Yes.
4    Q.   Did you authorize and direct any
5  payments to Reed-Ramsey or M.S. Associates in 2017?
6    A.   No.
7    Q.   Did you authorize or direct any payments
8  to Russell Kofoed in 2017?
9    A.   No.
10    MR. CANETTI:  Let's go off the record and take
11  a short break.
12       (WHEREUPON, a short break was
13       taken.)
14       (WHEREUPON, a certain document was
15       marked Johnson Deposition Exhibit
16       No. 21, for identification, as of
17       May 3, 2018.)
18  BY MR. CANETTI:
19    Q.   I'll remind you that you're still under
20  oath.
21       Showing you what's marked as Exhibit 21,
22  this is a communication related to the plan's
23  account at Comerica.  It's stating as of January
24  14, 2016, at the top of the page on Sherrod 663,

Page 146

1  that there are uncashed checks.  And then 663 talks
2  about a check from December 2013 for $12,603.  664
3  talks about an uncashed check from February 11,
4  2014, for $10,000.  665, 666, and 667 additionally
5  talk about checks on February 11th for $10,000 that
6  weren't cashed.
7       Have you seen these documents before?
8    A.   I believe I have seen these.
9    Q.   And these were documents that were
10  produced to us from your attorneys.  And this is
11  saying that as of January 14, 2016, there were
12  these five checks that were uncashed and they were
13  unable to credit that money back to the account
14  because the Comerica account was closed at that
15  time.  Is that your understanding?
16    A.   No, that was not my understanding.
17    Q.   What do you think these documents are
18  saying?
19    A.   I know that there were just uncashed
20  checks.  Why they weren't cashed, I don't know.
21    Q.   The second sentence says, "Currently
22  your investment account is closed and we are unable
23  to credit back the funds to your account at this
24  time."

Page 147

1  So this money came out of the account,
2  even though it was never cashed, and they were
3  unable to credit the money back to the account
4  because the account was closed.  Is that a fair
5  summary of what this is saying?
6    A.   If the document says that.
7    Q.   Well, you have it in front of you.  Do
8  you agree that's what the document says?
9    A.   I agree with what the document says.
10    Q.   Did you undertake any efforts to go get
11  these funds to get it credited back to the plan?
12    A.   No, I did not.  This is something that
13  Dr. Sherrod would have taken care of.
14    Q.   And do you know, did she provide any
15  evidence to you that she obtained these funds and
16  got them deposited back into the plan?
17    A.   I'm not sure of that.
18    Q.   So as you sit here today, you don't know
19  if this money's still sitting there, could be
20  claimed, or if that money was claim by Dr. Sherrod;
21  correct?
22    A.   I'm not 100 percent sure.
23    Q.   Is there any documents that would help
24  you to answer that question?

Page 148

1    A.   No, sir.
2    Q.   I'm showing you what we'll mark as
3  Exhibit 13.  These are checks from Comerica from
4  2013.  These are DOL4391, 4396, and also 2031, and
5  an unmarked page from the Comerica broker's account
6  statements.
7       (WHEREUPON, a certain document was
8       marked Johnson Deposition Exhibit
9       No. 13, for identification, as of
10       May 3, 2018.)
11  BY MR. CANETTI:
12    Q.   For the first page, DOL4391, it's a
13  check to Shirley Sherrod from July 13, 2016, signed
14  by Shirley Sherrod.
15       Have you seen this check before?
16    A.   No, I have not.
17    Q.   And on the second page, DOL4396, it's a
18  check dated July 16, 2013, for $32,000 to
19  Dr. Sherrod and signed by Dr. Sherrod.
20       Have you seen that check before?
21    A.   No.
22    Q.   Do you know why these two checks
23  totalling $50,000 were disbursed from the plan
24  account?



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
149–152

Page 149

1    A.   I do not know for sure, no.
2    Q.   Did you authorize or direct either one
3  of these disbursements?
4    MR. REARDEN:  First of all, I object because
5  you said they total $52,000.
6    MR. CANETTI:  50,000, I misspoke.
7  BY MR. CANETTI:
8    Q.   Did you authorize or direct the
9  disbursements of either one of these checks?
10    A.   No, I did not.
11    Q.   And then on DOL2301, the third page of
12  this document, it's a letter from Dr. Sherrod to
13  Keith dated December 23, 2013, asking to have two
14  checks drawn on the account, one approximately for
15  12,000, one for 3,000.
16    Did you authorize or direct these
17  disbursements from the account?
18    A.   No, I did not.  This would have been
19  something delegated to Dr. Sherrod.
20    Q.   Were you aware that these checks were
21  issued in 2013?
22    A.   Yes.
23    Q.   And who informed you of that?
24    A.   Dr. Sherrod.

Page 150

1    Q.   Do you know the current status of the
2  bond in the Sherman-Sherrod litigation?
3    A.   You mean where it's located or what?
4    Q.   Do you know if it still exists or if
5  it's been paid out?
6    A.   The bond -- my understanding is that the
7  bond exists.
8    Q.   No one's been paid from that bond;
9  correct?
10    A.   The bond is sitting in Wells Fargo Bank.
11  The money is sitting in Wells Fargo Bank.
12    Q.   Do you know why the distributions were
13  made to the other participant that we saw in
14  Exhibit 28 in 2017?
15    A.   Why --
16    Q.   In Exhibit 28, it describes
17  distributions to participants as either being an
18  escheat going to the State or a rollover account.
19  Do you recall that?
20    A.   I knew that Dr. Sherrod was working on
21  that.
22    Q.   Do you know why that was done in 2017?
23    A.   I don't know exactly why.
24    Q.   Do you know why it was not done earlier,

Page 151

1  say, in 2008 or 2009 or any year prior to after the
2  company closed down and before 2017?
3    A.   No.  You would have to ask Dr. Sherrod
4  that question.
5    Q.   So you weren't involved in the
6  decisionmaking for making the distributions in
7  2017; is that correct?
8    A.   We talked.  I knew that there -- these
9  were going on.
10    Q.   So you were informed that it was going
11  to happen, but you were not involved in the
12  decision to make those distributions; correct?
13    A.   Primarily, Dr. Sherrod.
14    Q.   Well, what was your involvement in the
15  decisionmaking?
16    A.   I wasn't directly -- had any great
17  decisionmaking process going on there.  She was
18  informing me of what was going on.
19    Q.   So she informed you, but you did not
20  make any of the decision to make those
21  distributions; correct?
22    A.   Well, we knew from our discussion, we
23  knew that they had to be made.
24    Q.   Did you make the decision to make those

Page 152

1  distributions?
2    A.   No, I did not.
3    Q.   Was it Sherrod who made that decision?
4    A.   I believe she did.
5    Q.   Well, if it wasn't you and it wasn't
6  Sherrod, was there anybody else who could have made
7  that decision?
8    MR. REARDEN:  Objection.
9  BY THE WITNESS:
10    A.   This was turned over to Dr. Sherrod and
11  I believe she made the decision.
12  BY MR. CANETTI:
13    Q.   And you don't know why the decision was
14  made to make those distributions in 2017; correct?
15    A.   I do not know.
16    MR. CANETTI:  I have no further questions.
17    EXAMINATION
18  BY MR. REARDEN:
19    Q.   Mr. Johnson, I want to refer you back to
20  Deposition Exhibit No. 26.
21    You previously reviewed all the checks
22  in Deposition Exhibit 26; correct?
23    A.   I did.
24    Q.   Can you tell from looking at the checks



Page 153

1 in Deposition Exhibit 26 what those payments were

2 for?

3    A.   No, I cannot.

4    Q.   You previously were asked some questions

5 about maintaining records for the plan.  Do you

6 recall those questions?

7    A.   I do recall.

8    Q.   Does the Target Pension Plan maintain

9 records?

10   A.   Yes, it does maintain records.

11   Q.   And who maintains the records for the

12 Target Pension Plan?

13   A.   Dr. Sherrod maintains records.

14   MR. REARDEN:  I don't have any other questions

15 for you, Mr. Johnson.

16   MR. CANETTI:  I have no more questions.

17   THE COURT REPORTER:  Signature?

18   MR. REARDEN:  We will reserve signature.

19        (WHEREUPON, the proceedings

20        concluded at 1:55 p.m.)

21

22

23

24

Page 154

1   STATE OF ILLINOIS   )

2                       )  SS:

3   COUNTY OF DUPAGE    )

4        I, ALICE M. SCHWINGER, CSR No. 84-2913,

5   a Notary Public within and for the County of

6   DuPage, State of Illinois, and a Certified

7   Shorthand Reporter of said state, do hereby

8   certify:

9        That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13        That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18        That the said deposition was taken

19  before me at the time and place specified;

20        That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in

24  the outcome of this action.

Page 155

1        IN WITNESS WHEREOF, I do hereunto set my

2   hand and affix my seal of office at Woodridge,

3   Illinois, this 22nd day of May, A.D. 2018.

4

5

6

7

8        Notary Public, DuPage County, Illinois.

9        My commission expires 8/21/18.

10

11   ALICE M. SCHWINGER, CSR No. 84-2913

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 156

1                    INDEX

2   WITNESS                          EXAMINATION

3

4   LEROY JOHNSON

5   EXAMINATION BY MR. CANETTI          3

5   EXAMINATION BY MR. REARDEN        152

6

7

8                    EXHIBITS

9   NUMBER                      MARKED FOR ID

10  Johnson Deposition Exhibit

11  No. 1                            52

    No. 2                            65

12  No. 16                           89

    No. 10                           96

13  No. 7                            97

    No. 12                           98

14  No. 24                          104

    No. 26                          107

15  No. 25                          117

    No. 15                          125

16  No. 27                          127

    No. 28                          128

17  No. 17                          129

    No. 32                          137

18  No. 21                          145

    No. 13                          148

19

20

21

22

23

24



LEROY JOHNSON
ACOSTA vs SHERROD, et al.

May 03, 2018
157–159

Page 157

```
 1            DEPOSITION ERRATA SHEET
 2    Our Assignment No.  2127409
 3    Case Caption:  Acosta
 4    vs.  Sherrod
 5        DECLARATION UNDER PENALTY OF PERJURY
 6        I declare under penalty of perjury
 7    that I have read the entire transcript of
 8    my deposition taken in the captioned matter
 9    or the same has been read to me, and
10    the same is true and accurate, save and
11    except for changes and/or corrections, if
12    any, as indicated by me on the deposition
13    errata sheet hereof, with the understanding
14    that I offer these changes as if still under
15    oath.
16        Signed on the _____ day of
17    _____, 2018.
18
19    _____
20        Leroy Johnson
21
22
23
24
```

Page 159

```
 1            DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24        Leroy Johnson
```

Page 158

```
 1            DEPOSITION ERRATA SHEET
 2    Page No._____Line No._____Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____Line No._____Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____Line No._____Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24        Leroy Johnson
```



EXHIBIT **8**

EXHIBIT 8

## *MARK GRANZOTTO, P.C.*

### *Attorney At Law*

**225 South Troy Street, Suite 120**

**Royal Oak, Michigan  48067**

**(248) 546-4649**

**(248) 544-3438 (fax)**

September 22, 2011

Jeffrey A. Sherman, Esq.

30700 Telegraph Road

Bingham Farms, MI  48025          VIA US MAIL AND E-MAIL

Dennis Levasseur, Esq.

6 th Floor at Ford Field

1901 St. Antoine Street

Detroit, MI  48226

      Re:   *Sherman v Sherrod*

             Court of Appeals Nos. 299045, 299775

Gentlemen:

      In light of the rulings made by the circuit court last Friday, it has become impossible for Shirley Sherrod, M.D., P.C., to post a bond necessary to secure the judgments in this case.  I have today filed an emergency appeal in the Court of Appeals, seeking review of the circuit court's rulings.

      However, because of the uncertainty with respect to the results in the Court of Appeals and my client's intention to fully comply with the Court of Appeals August 24, 2011 order, it will be necessary to schedule the creditor's examination of Dr. Sherrod. That examination will have to take place on or before September 28, 2011.

Please contact me with times and dates on which Dr. Sherrod's creditor's examination can be taken.

Very truly yours,

Mark Granzotto

MG/ppm

cc (w/encls):   Jonathan D. Sweik, Esq.

Pasquale Ciccodicola, Esq.

-----Original Message-----
From: Mark Granzotto <mgranzotto@covad.net>
To: sshe464538 <sshe464538@aol.com>; pciccodicola <pciccodicola@comcast.net>
Sent: Fri, Sep 23, 2011 10:42 am
Subject: RE: schedule for creditors exam

Shirley –

Just so you know, I filed the motions that needed to be filed yesterday and I sent the letter that we discussed.  I am attaching copies.

Mark

---

From: sshe464538@aol.com [mailto:sshe464538@aol.com]
Sent: Thursday, September 22, 2011 10:56 PM
To: pciccodicola@comcast.net
Subject: schedule for creditors exam

Dear Pasquale: As it appears that a creditors exam will now be necessary to comply with the Court of Appeals order will you kindly endeavor to schedule same while you are in the presence of all the parties tomorrow.

Strictly for the your information I am presently in the vicinity at an "undisclosed location" and will assume the risks involved to comply with the directives set forth in the order. I shall await your reply.
Shirley Sherrod

**Pasquale Ciccodicola**
Attorney at Law
31250 Plymouth Road
Livonia, Michigan 48150

Telephone: 734 427 7999                                        Fax: 734 427 7917
Internet E-Mail:
pciccodicola@comcast.net
                                September 19, 2011

Via Email and First Class Mail
Jeffrey A. Sherman, Esq.
30700 Telegraph Rd.
Bingham Farms, Michigan 48025

Dennis J. Levasseur
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226

Re: Creditor's Exam

Counsel,

Dr. Shirley T. Sherrod will make herself available for a creditor's examination on Friday, September 23, 2011 at the CAYM Building immediately following the motions currently scheduled for that date before the Honorable John H. Gillis, Jr. If you have any questions please call or write.


Yours truly,



Pasquale Ciccodicola

**MICHAEL BARTOLIC**, LLC

(312) 635-1600
(312) 635-1601 Fax
mbartolic@michaelbartolic.com

EXHIBIT **9**

February 14, 2012

**VIA U.S. FIRST-CLASS MAIL, FAX & EMAIL**

Robert J. Morad
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road
Suite 200
Troy, Michigan 48098
Fax: (248) 879-2001
morad@millercanfield.com

> **RE: SHIRLEY T SHERROD MD PC TRGT PENSION PLAN U/A DTD 6/3/88;**
> **RCMA Account Number ▮▮▮5C64**

Dear Mr. Morad:

This firm has been retained by Shirley Sherrod, in her capacity as Plan Administrator of the Shirley Sherrod MD PC Trgt Pension Plan U/A Dtd 6/3/88 (hereinafter "the Plan"). The plan sponsor of this plan is Shirley T Sherrod MD, P.C. Ms. Sherrod or previous counsel on her behalf have made several attempts to direct Merrill Lynch, the directed trustee of the plan, to distribute the plan assets to a retired participant, Shirley Sherrod. In all instances, your firm, acting on behalf of Merrill Lynch, has refused to follow the directions from the Plan Administrator, except once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stating the funds would be used to post a bond in a state court proceeding.

In this instance, Merrill Lynch and the Miller Canfield firm have exceeded the scope of any directed trustee status and have assumed fiduciary status with respect to the Plan by exercising control over Plan assets. *See* ERISA § 3(21)(A)(1) (stating a person is a fiduciary of a plan to the extent that person exercises any authority or control over management or disposition of plan assets). ERISA's definition of fiduciary is functional in nature, such that even if a party did not contract to be a fiduciary, where it performs the acts that meet the definition of fiduciary under ERISA§ 3(21), the law will make that person a "functional fiduciary." *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Acosta v. Pac. Enter.*, 950 F.2d 611, 618 (9th Cir. 1991) (a person's "actions, not the official designation of his role, determine whether he enjoys fiduciary status"). My understanding is that there is a state court action pending, Michael S. Sherman DO v. Shirley T. Sherrod M.D., & Shirley T. Sherrod, M.D. P.C., and that a judgment has been entered against the two defendants, and the court has issued an order, directed to those two defendants, prohibiting them from transferring away any assets. This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets. An ERISA plan is a separate and distinct entity from its plan sponsor and from any participant in the plan. *See* ERISA § 502(d) ("Status of employee benefit plan as entity"). Merrill Lynch's interpretation of a state court order which expressly applies to the Plan sponsor and a Plan participant, as prohibiting Merrill Lynch from distributing Plan assets, is so

unreasonable, that it appears Merrill Lynch is abandoning its status as a directed trustee and assuming fiduciary status of the Plan. ERISA mandates a plan prohibits any alienation of plan assets for the benefit of any creditors of the participant or plan sponsor. See ERISA § 206(d) (prohibiting the assignment or alienation of benefits). This plan does so in Section 10.2. In this case, Merrill Lynch has gone so far in assuming fiduciary status that it drafted an affidavit for Shirley Sherrod to sign indicating she would only use her Plan assets, benefits to which she was otherwise entitled, to post bond to satisfy a judgment in favor of third parties with no connection to the plan. Merrill Lynch has essentially engaged in an assignment or alienation of Ms. Sherrod's benefits.

If your position is that Merrill Lynch is merely a directed trustee, then Merrill Lynch has no discretion to decide whether or not to obey the Administrator's instructions. Because Merrill Lynch and the firm have decided to disobey the Administrator, Ms. Sherrod is obligated pursuant to her fiduciary obligations under ERISA § 404 as the Plan Administrator to bring a civil action against all parties acting as fiduciaries for a breach of fiduciary duty and for a clarification of rights under ERISA § 502(a). ERISA also allows for the recovery of attorneys fees incurred in prosecuting a civil action, which Ms. Sherrod will demand from Merrill Lynch if

Ms. Sherrod has also obtained information indicating some working and or personal relationship between the Miller Canfield firm and the law firm, Muller Muller Richmond Harms Myers PC, representing a judgment creditor of Ms. Sherrod personally and the Plan sponsor, in the state court action entitled Michael S. Sherman DO v. Shirley T. Sherrod M.D., & Shirley T. Sherrod, M.D. P.C. If the Miller Canfield firm is refusing to distribute Plan assets to Ms. Sherrod in order to assist the Muller firm's position in unrelated litigation, this would also constitute a prohibited transaction under ERISA § 406(b)(1) ("A fiduciary with respect to a plan shall not—deal with the assets of the plan in his own interest or for his own account.").

Ms. Sherrod requires your written response either refusing to distribute Plan assets, or acknowledging directed trustee status and obeying the Plan Administrator within 14 days. After 14 days, Ms. Sherrod will file a civil lawsuit against all functional fiduciaries, and will demand reimbursement for all costs and attorneys fees.

I have enclosed with this mailing a disc including various documents that will be referenced in a lawsuit, should this matter require escalation to that level. I look forward to hearing from you, and am hopeful the matter will be expeditiously resolved without any necessary litigation.

Sincerely,

THE LAW OFFICES OF MICHAEL BARTOLIC, LLC

By: _____

Michael Bartolic

Encl.

EXHIBIT 10

EXHIBIT 10

```
 1                      STATE OF MICHIGAN

 2          IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

 3   SHERMAN,

 4        Plaintiff,

 5
     vs.                          Case No. 08-014212-CK
 6

 7   SHERROD,

 8        Defendant.

 9

10   _____/

11                          MOTION

12        Before the Honorable John Gillis, Circuit Judge,

13   on April 13, 2012, Detroit, Michigan.

14

15   APPEARANCES:

16        JEFFREY SHERMAN

17              Appearing on behalf of the Plaintiff

18        PASQUALE CICCODICOLA

19              Appearing on behalf of the Defendant

20        ROBERT MORAD

21              Appearing on behalf of Merrill Lynch

22
     REPORTED BY:
23
24        DAVID A. CUCINELLA
          Court Reporter, CSMR-3614
25
```

<div align="center">

TABLE OF CONTENTS

</div>

| WITNESS: | | PAGE: |
|---|---|---|
| None | | |
| EXHIBITS: | MARKED | RECEIVED |
| None | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    Detroit, Michigan

2    April 13, 2012

3    (At about 9:40 a.m.)

4    THE COURT:  Sherman versus Sherrod.

5    MR. SHERMAN:  Ready, your Honor.  Good morning,

6    your Honor.  May it please the court, Jeffrey Sherman

7    appearing on behalf of the plaintiffs and the

8    third-party defendant Garden City Hospital.

9    MR. CICCODICOLA:  Pasquale Ciccodicola on behalf

10   of Dr. Sherrod and her P.C.

11   MR. MORAD:  Good morning, your Honor.  May it

12   please this Honorable Court, my name is Rob Morad, I

13   appear on behalf of third-party garnishee defendant

14   Merrill Lynch.

15   Your Honor, this is my motion, Merrill Lynch's

16   motion to release the freeze over the accounts in this

17   matter.  Your Honor, I believe this court has

18   jurisdiction to hear this matter, pursuant to MCR 7.208.

19   If the court indicates -- if the court needs to take a

20   look at that, it indicates that when an appeal is filed,

21   while property is being held for conservation or

22   management under the order or judgment of the trial

23   court, that court retains jurisdiction over the property

24   pending the outcome of the appeal, except as the Court

25   of Appeals otherwise orders.  Obviously, your Honor,

1   this matter is up on appeal with respect to --

2       THE COURT: How much is in the account?

3       MR. MORAD: Your Honor, there is still one point

4   five million dollars in the one account, and there is, I

5   believe, seventy thousand dollars in the other account.

6       THE COURT: And what's the balance on the

7   judgment?

8       MR. SHERMAN: There is a hundred and ninety-five

9   thousand dollars that's due and owing to the plaintiffs.

10   And there is about eight thousand due and owing to the

11   third-party defendants. However, an appeal bond was

12   finally filed with the court. So, we're not -- the

13   plaintiffs and third-parties are not opposing their

14   motion. As a matter of fact, we feel very badly about

15   the fact that Merrill Lynch, a third party, is now

16   excessively involved in this case. They're being sued

17   by Dr. Sherrod in Federal Court. And part of that suit

18   is, is you won't release the funds from the Merrill

19   Lynch account. And now she's opposing us, or Merrill

20   Lynch from releasing the funds. So as far as the

21   plaintiffs are concerned, we have no objection to

22   Merrill Lynch releasing the funds from the Merrill Lynch

23   account. We are withdrawing our garnishment of those

24   accounts -- from those accounts.

25       THE COURT: Yeah. But then where will you get

1    the judgment money from?

2         MR. SHERMAN:  The stay bond -- the appeal bond.

3    An appeal bond has been filed.

4         THE COURT:  Okay.  For the total amount?  More

5    than one point five times the judgment?

6         MR. SHERMAN:  Well, the appeal bond is, what, two

7    fifty?

8         MR. MORAD:  Two fifty.

9         MR. SHERMAN:  Two fifty.

10        THE COURT:  Oh, so enough to cover the judgment?

11        MR. SHERMAN:  Enough to cover.

12        THE COURT:  Okay.  I'll grant the motion.

13        MR. CICCODICOLA:  Can I say something?

14        THE COURT:  Go ahead.

15        MR. CICCODICOLA:  This court has no jurisdiction

16   whatsoever to hear this motion, because under 7.2 this

17   court made a decision back in December.  That decision

18   was taken on appeal.  The Court of Appeals has accepted

19   it, your decision, for a decision as an appeal.  2.8

20   says you can't modify it now.  You can't play with it

21   anymore.  It's funny that everybody on this side of the

22   bench believes the court was wrong now back in December.

23   But what we need to do is let the --

24        THE COURT:  (Interposing)  Well, his judgment

25   hasn't been paid.  I'll deny the motion.  You can bring

1   the motion again once the Court of Appeals makes a

2   decision.

3          MR. CICCODICOLA:  Thank you, your Honor.

4          MR. MORAD:  Judge, your Honor, your Honor, is the

5   court indicating that the court does not have

6   jurisdiction over the matter at this time?  The

7   defendant -- it seems kind of odd that the defendant

8   wants access to her accounts, enough to call in the

9   Department of Labor on Merrill Lynch.  She has filed a

10  federal lawsuit in the Northern District of Illinois.

11         THE COURT:  I don't write the court rules.

12         MR. MORAD:  I understand, your Honor.  However,

13  it's funny that she's asking for access to her accounts.

14  Yet, here she comes in when we say we'll give her access

15  to accounts.

16         THE COURT:  Well, she can dismiss the appeal and

17  get access to the accounts.  You can come back to court

18  if she dismisses the appeal.

19         MR. SHERMAN:  Your Honor, can I add one thing?

20         THE COURT:  I'm denying it.  That's it.

21         MR. CICCODICOLA:  Thank you, your Honor.

22         (Proceedings concluded)

23
24

25

## CERTIFICATE PAGE

STATE OF MICHIGAN )
                  )SS
COUNTY OF WAYNE   )

        I, DAVID A. CUCINELLA, Certified Court Reporter acting in the County of Wayne, State of Michigan, do hereby certify that the foregoing pages 1 through 6, inclusive, comprise a full, true, and correct transcript of the proceedings and testimony taken in the above-entitled matter on April 13, 2012.

        I FURTHER CERTIFY THAT MY CERTIFICATION ANNEXED HERETO APPLIES ONLY TO THE ORIGINAL TYPEWRITTEN, SIGNED, CERTIFIED TRANSCRIPT.  THE UNDERSIGNED ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OF ANY REPRODUCED COPIES NOT MADE UNDER MY CONTROL OR SUPERVISION.


DAVID A. CUCINELLA-CSMR-3614
Certified Court Reporter

7

EXHIBIT    11

# EXHIBIT 11

No. 12-3869

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | | |
|---|---|---|
| LEROY JOHNSON, administrator | ) | |
| SHIRLEY T. SHERROD MD PC | ) | Appeal from the United States |
| Target Benefits Pension Plan and Trust, | ) | District Court for the Northern |
| Plaintiff-Appellant | ) | District of Illinois, Eastern Division |
| | ) | |
| v. | ) | |
| | ) | No. 12-3869 |
| MERRILL LYNCH, PIERCE FENNER | ) | |
| & SMITH INCORPORATED, | ) | John W. Darrah, |
| Defendant- Appellee | ) | Judge |

---

## **PLAINTIFF-APPELLANT'S REPLY BRIEF**

Edwin H. Conger
Tenney & Bentley, LLC
111 West Washington Street
Suite 1900
Chicago, IL 60602
(312)407-7800

Attorney for Plaintiff-Appellant
Leroy Johnson

## Table of Contents

Page

Argument

Merrill Lynch's Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Merrill Lynch's Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Merrill Lynch's Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The February 28, 2012 Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Delayed Application for Leave to Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Construing the Freeze Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Grier Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Darr Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Merrill Lynch's Supplemental Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . 6

## Table of Authorities

Page

Statutes, Regulations and Rules

29 U.S.C. §1104(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

29 U.S.C. §1132(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cases

*In re Delphi Corp. Securities, Derivative & ERISA Litigation,*
602 F.Supp.2d 810 (E.D. Mich. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Honda of America Mfg., Inc. ERISA Fees* Litigation, 2009
WL 3294828 (S.D. Ohio) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

i

*In re Worldcom, Inc. ERISA* Litigation, 2005 WL 3116188
(S.D. N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 406
(7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Trustees of Carpenters' Health and Welfare Trust Fund
of St. Louis v. Darr*, 694 F.3d 803 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

**<u>Argument</u>**

<u>Merrill Lynch's Statement of the Case</u>

Merrill Lynch's statement of the case (pages 2-4) although lengthy is misleading. It makes an argument rather than stating the nature of the case and the proceedings below. <u>Cf.</u> FRAP Rule 28(a)(4).

The statement fails to support defendant's contention that Merrill Lynch was not adverse to the plaintiff plan in the Michigan proceedings. At pages 2-3, defendant relies on a transcript of proceedings of October 21, 2011 before Judge Gillis (A124-39) to support its statement regarding the judge's ruling on plaintiff's motion to have Merrill Lynch pay enough money to satisfy the plaintiff's judgment out of the ERISA pension account. Mr. Morad, counsel for Merrill Lynch, responded to the judge's question about the Merrill Lynch motion to interplead by saying, in effect, that the custodian didn't care who got the money. Mr. Morad said: "We have one party that's saying I get the money and the other party that says no, you don't get the money, I get the money. And Merrill Lynch is saying it's not our money, you guys hash it out." (A128) The judge ruled that he would "simply grant the motion" and order Merrill Lynch to pay the plaintiff directly rather than "move it from Merrill Lynch to the county clerk just to give it to you." Dr. Sherrod's counsel tried to make a record; Mr. Morad did not. (A129) Merrill Lynch's position was that it was indifferent to who got the funds it was holding as custodian for an ERISA plan's participants.

<u>Merrill Lynch's Statement of Facts</u>

Merrill Lynch's statement of facts (pages 5-11) is misleading.

1

Merrill Lynch's Position

Instead of responding to the garnishment summons with an answer of "no funds subject to garnishment" with regard to the Plan assets, Merrill Lynch engaged in an elaborate motion practice complete with supporting brief and requested relief against Dr. Sherrod, including seeking an order requiring Dr. Sherrod to submit an accounting to Merrill Lynch and offering to deposit with the circuit court the funds in the 18 participants' accounts without the consent of any of them. (Motion filed February 28, 2012.) In doing so, Merrill Lynch ignored its obligations to the participants.

The February 28, 2012 Motion

In its February 28, 2012 motion entitled Garnishee Defendant's Motion to Release Freeze on Defendant Shirley T. Sherrod's Accounts Held with Garnishee Defendant and for Other Relief and Supporting Brief (A162-167), Merrill Lynch notes in paragraph 15 that it "has recently been served with another garnishment against Sherrod in the amount of $42,255.04. . .". In paragraph 19, Merrill Lynch requests that the court "continue the freeze with respect to the $42,255.04 amount of the new pending garnishment." In its prayer (A166), Merrill Lynch asks the court to order "Sherrod to produce and accounting of each plan participant's plan account balance" and to direct that the $42,255.04 "remain subject to the Orders of the Court." Finally, Merrill Lynch offered to interplead the assets from the "RCMA account to the court and await further direction from the Court."

The February 2012 motion was filed by Merrill Lynch 12 months after the February 4, 2011 order prohibiting Dr. Sherrod and her professional corporation from transferring or disposing of assets. This order was entered on the motion of a creditor holding a $4,865.20

2

judgment entered in 2010 by the same judge in Case No. 08-014212-CK who entered that year two summary judgments in favor of the plaintiffs totaling $189,722.00.  Instead of being "caught in the middle" it was by this motion that Merrill Lynch asked the court *inter alia* to order Dr. Sherrod to submit an accounting and to order a continuation of the freeze as to $42,255.00 in order to secure a garnishment served on Merrill Lynch which was filed on February 13, 2012.

The order proposed by Merrill Lynch would have released garnishments on accounts ending in 64 and 93 but leave in force the garnishments on the remaining two Sherrod accounts ending in 45 and 48.  The Sherrod Appeal Bond would also remain in "full force and effect" while the Sherrod appeals from the freeze orders of February 4 and December 14, 2011 would be withdrawn by the Sherrod defendants and dismissed.

<u>Delayed Application for Leave to Appeal</u>

The delayed application for leave to appeal (A142-161) makes clear why the Sherman plaintiffs (and apparently Merrill Lynch) wanted the Sherrod appeals from the freeze orders dismissed.  The facts and argument contained in the application demonstrate the errors committed in entering the original freeze and the later refusal to vacate it.  Among the facts disclosed was that plaintiff Sherman's garnishment served in October 2010 on Merrill Lynch directed at the Shirley T. Sherrod, M.D., P.C. Target Benefit Plan and Trust from which Dr. Sherman sought full payment of his judgment.  (Application, page 3.)  It discloses that Dr. Sherman in August 2011 filed a motion for an order requiring Merrill Lynch to pay his judgment from the pension funds of which Merrill Lynch was a directed trustee.  This motion was orally granted by Judge Gillis without any consideration of the issue of a levy on an ERISA-qualified pension plan.

<u>Construing the Freeze Order</u>

Although Judge Darrah assumed that Judge Gillis intended his freeze order to apply to an ERISA plan (Opinion, page 8, fn4), the transcript of proceedings held on September 23, 2011 (page 12) suggests otherwise. When Dr. Sherrod's counsel advised the judge that he had provided both plaintiff's counsel and Merrill Lynch a copy of the Form 5500 which had been filed for the plan, Judge Gillis adjourned the hearing until October 7, 2011.

<u>The Grier Judgment</u>

On March 11, 2011, Judge Gillis entered a Default Judgment in the sum of $41,278.45 and costs of $290.00 in favor of Grier, Copeland and Williams, P.C. and against Dr. Sherrod and her professional corporation. The order contained a freeze clause. On February 13, 2012, the Grier plaintiff had garnishments issue for service on Merrill Lynch as garnishee. (A248-249)

<u>The *Darr* Case</u>

Merrill Lynch does not discuss *Trustees of Carpenters' Health and Welfare Trust Fund of St. Louis v. Darr*, 694 F.3d 803 (7th Cir. 2012), where the court concluded that ERISA §502(a)(3)(A) (29 U.S.C. §1132(a)(3)(A)) does not expressly authorize injunctions against state courts unless the state court suit 'will have the effect of making it impossible for a fiduciary of a pension plan to carry out its responsibilities under ERISA.'" Id. at 807-08. Thus an ancient federal statute – the Anti-Injunction Act – would not bar Johnson from seeking redress in federal court, but Merrill Lynch concludes that a moribund creation of the judiciary – the Rooker-Feldman doctrine – would. Perhaps Merrill Lynch really believes that it is merely a custodian (ML Brief, p. 18, n. 3) and not an ERISA fiduciary and thus *Darr* is inapposite. But under Section 7.1(a)(21) of the plan, Merrill Lynch has the responsibility to invest, manage, and control

4

plan assets "subject, however, to the direction of the employer. . . ". Under ERISA, Merrill Lynch is what is known as a directed trustee, subject to proper direction of a named fiduciary. ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)). <u>See</u>, <u>e.g.</u>, *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir. 2006). It's a familiar role for Merrill Lynch. See *In re Honda of America Mfg., Inc. ERISA Fees* Litigation, 2009 WL 3294828 (S.D. Ohio) (Merrill Lynch served as directed trustee); *In re Delphi Corp. Securities, Derivative & ERISA Litigation*, 602 F.Supp.2d 810 (E.D. Mich. 2009) (same); and *In re Worldcom, Inc. ERISA* Litigation, 2005 WL 3116188 (S.D. N.Y.) (same).

<div align="center">Merrill Lynch's Supplemental Appendix</div>

Circuit Rule 30(e) provides in part as follows:

> An appendix should not be lengthy, and costs for a lengthy appendix shall not be awarded.

The Supplemental Appendix filed by Merrill Lynch consists of 345 pages. It includes the entire Amended Complaint with six exhibits, including the plan of benefits (Exhibit A) running to 72 printed pages, 10 exhibits to Merrill Lynch's motion to dismiss, running to 221 pages, a brief on appeal by appellees in the Michigan Court of Appeals (A286-A297) and counsel's correspondence (A336-A345) evidencing the plaint of Merrill Lynch's counsel regarding the failure of appellant to agree to include the lengthy documents submitted by counsel in the appendix to be filed by appellant. Appellee has disregarded the Court's admonition in FRAP Rule 30(b)(1) that "parties must not engage in unnecessary designation of parts of the record, because the entire record is available to the court."

<div align="center">5</div>

## <u>Conclusion</u>

The orders below should be reversed and the cause remanded with instructions to enter an order requiring Merrill Lynch to answer the Amended Complaint.

Respectfully submitted,

Leroy Johnson, administrator Shirley T. Sherrod
MD PC Target Benefits Pension Plan and Trust

/s/ Edwin H. Conger
By:_____
One of His Attorneys

Edwin H. Conger
111 West Washington Street, Suite 1900
Chicago, IL  60602
312 407 7800
312 507 4858
tcichantk@hotmail.com

Attorney  for Appellant
Leroy Johnson, administrator Shirley T. Sherrod
MD PC Target Benefits Pension Plan and Trust

Dated: April 10, 2013

EXHIBIT   12

# Tenney & Bentley, LLC

## Law Offices

**111 West Washington Street • Suite 1900**
**Chicago, Illinois 60602**

TELEPHONE (312) 407-7800
FAX (312) 807-4858

July 13, 2012

Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, IL 60616

      Re:  Johnson v  Merrill Lynch
           Case No. 12 cv 2545

Dear Dr. Sherrod:

      I am enclosing our statement for services rendered through June 30, 2012. Payment of this statement will be made after 30 days from the funds we are holding except to the extent you object in writing within 30 days.

      There are a number of time entries for which I am making no charge. I am doing so in order to stay within a budget which I have set for myself in light of the amount of the retainer. If you have questions about it, please let me know.

      As the invitation to waive service was served on June 1, 2012, the 60 days for Merrill Lynch to respond to the complaint will expire on July 30, 2012.

                    Very truly yours,

                    Edwin H. Conger

cc:    David R. Shannon

Encl.

*Tenney & Bentley,* LLC
111 West Washington Street, Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 807-4858
F.E.I.N. 36-4211386

Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, IL 60616

July 13, 2012
Billed through  06/30/12

Client #:       S12066-001
Invoice #:    12317   EHC

RE:   Johnson v. Merrill Lynch, 12 cv 2545

FOR PROFESSIONAL SERVICES RENDERED

| DATE | LAWYER | DESCRIPTION | HOURS | AMOUNT |
|------|--------|-------------|-------|--------|
| 05/25/12 | EHC | Sherrod: meet with Sherrod and accept $7,500 retainer; conferences with Mr. Shannon - NO CHARGE | 0.90 | 0.00 |
| 05/29/12 | EHC | Sherrod: located street address for Sherrod - NO CHARGE | 0.10 | 0.00 |
| 05/30/12 | EHC | Sherrod: telephone conference with Sherrod re: appointment form - NO CHARGE | 0.10 | 0.00 |
| 06/01/12 | EHC | Sherrod:  Conference with Mr. Shannon regarding Sherrod e-mail; making contact with ML attorneys and serving invitation to waive service; call to Sherrod regarding status, internet service down, etc. - NO CHARGE | 0.10 | 0.00 |
| 06/05/12 | DRS | file appearance, draft and file amended complaint and waiver of summons request, tele. Rob Morad and prepare draft order | 1.50 | 375.00 |
| 06/05/12 | EHC | Enter appearance in 12 cv 2545 | 0.10 | 25.00 |
| 06/05/12 | EHC | Sherrod:  conferences with Mr. Shannon regarding actions today; draft appearance in 12 cv 2545 - NO CHARGE | 0.30 | 0.00 |
| 06/07/12 | EHC | Telephone conference Sherrod regarding status hearing 6-7-12 in Rm. 1203 before Judge Darrah | 0.10 | 0.00 |
| 06/07/12 | EHC | Sherrod:  conferences with Mr. Shannon regarding status of service, amended complaint and substitution of plaintiff; review state court injunctive order - NO CHARGE | 0.60 | 0.00 |

TENNEY&BENTLEY_000206

| Invoice #: | 12317 | Page   2 | | July 13, 2012 |
|---|---|---|---|---|

| 06/08/12 | DRS | revise and file amended complaint | 1.50 | 375.00 |
|---|---|---|---|---|
| 06/08/12 | EHC | Review Mr. Shannon's draft complaint - NO CHARGE | 0.10 | 0.00 |
| 06/08/12 | EHC | Sherrod:  Review Mr. Shannon's draft complaint; conference with Mr. Shannon; file appearance (Doc. #10) - NO CHARGE | 0.50 | 0.00 |
| 06/11/12 | DRS | review Morad letter and exhibit, revise draft federal order | 0.75 | 187.50 |
| 06/11/12 | EHC | Conference with Mr. Shannon; draft/send letter to Sherrod regarding proposed dft. order; telephone conference with Sherrod regarding her approval with letter to Mr. Shannon regarding same | 0.40 | 100.00 |
| 06/11/12 | EHC | Sherrod: conferences with Mr. Shannon; partial review of MI documents sent by MI counsel - NO CHARGE | 1.00 | 0.00 |
| 06/12/12 | DRS | tele. calls Rob Morad re state court freeze and review docs re same, review emails re draft order, tele. district court re Conger appearance | 0.75 | 187.50 |
| 06/12/12 | EHC | Letter to Sherrod regarding proposed order applying to to her participants' accounts as well as hers; extended telephone conference with Sherood regarding her lack of comfort with proposed order and changing "with" to "without" | 0.50 | 125.00 |
| 06/12/12 | EHC | Sherrod:  two conferences with Mr. Shannon regarding his home call with Dr. Sherrod and her objection to form of order and mode of disposition; examine 1/2" thick stack of documents sent to Mr. Shannon by MI attorney - NO CHARGE | 1.20 | 0.00 |
| 06/13/12 | DRS | tele. Morad re Darrah hearing, file appearances for Leroy Johnson | 0.50 | 125.00 |
| 06/14/12 | DRS | court appearance -- status hearing, conf. w/ ML attorney | 1.00 | 250.00 |
| 06/14/12 | EHC | Attend status hearing in Room 1203 before Judge Darrah; conference with client afterwards | 0.90 | 225.00 |
| 06/18/12 | EHC | Conference with Mr. Shannon regarding Magistrate Mason's order; examine MI litigation papers; work on memo regarding same and ML's contention it has been "caught in the middle" - NO CHARGE | 1.50 | 0.00 |

TENNEY&BENTLEY_000207

| Invoice #: | 12317 | Page 3 | | July 13, 2012 |
|---|---|---|---|---|
| 06/19/12 | DRS | tele. Morad re complaint, summons, appearance, tele. Bob Levels re settlement conference | 0.25 | 62.50 |
| 06/19/12 | EHC | Sherrod: conference with DRS regarding Morad's query regarding waiver/summons and conference befgore Magistrate Mason; conference call with Mr. Shannon and Robert Levels (ML Chicago counsel) in effort to set date with Magistrate Mason; review MI papers; prepare notes regarding prior ML actions - NO CHARGE | 2.00 | 0.00 |
| 06/20/12 | DRS | conf. Conger re Mason settlement, research re ERISA and directed trustee provisions | 0.50 | 125.00 |
| 06/20/12 | EHC | Draft agreed order for USDCt; draft agreed order for COA No. 308263 - NO CHARGE | 0.70 | 0.00 |
| 06/20/12 | EHC | Sherrod: examine Mason's standing order for settlement conferences; conference with Mr. Shannon regarding division of labor regarding draft settlement demand; prepare notes regarding prior ML actions - NO CHARGE | 3.00 | 0.00 |
| 06/21/12 | EHC | Initial work on settlement demand letter | 0.50 | 125.00 |
| 06/21/12 | EHC | Sherrod: work on settlement demand letter; draft and send letter to Sherrod with copy of standing order - NO CHARGE | 0.80 | 0.00 |
| 06/22/12 | EHC | Consider Dr. Sherrod's three proposals; prepare and send response | 0.40 | 100.00 |
| 06/22/12 | EHC | Sherrod: Work on draft of settlement demand letter - NO CHARGE | 1.70 | 0.00 |
| 06/25/12 | EHC | Draft settlement demand letter; examine DOL Field Assist. Bull 2004-03 | 1.10 | 275.00 |
| 06/25/12 | EHC | Sherrod: Conference with Mr. Sherrod regarding applicable authorities; examine same; review dft settlement demand; prepare and send e-mail to Dr. Sherrod - NO CHARGE | 1.10 | 0.00 |
| 06/26/12 | EHC | Sherrod: Put settlement demand letter in final form; forward copy to Dr. Sherrod; examine fee award auth. - NO CHARGE | 0.90 | 0.00 |
| | | Total Fees | | $2,662.50 |

**DISBURSEMENTS**

TENNEY&BENTLEY_000208

Invoice #:    12317                    Page    4                         July 13, 2012

|  |  |
|---|---|
| PHOTOCOPYING CHARGE | 18.20 |
| POSTAGE CHARGE | 5.16 |
| Total Disbursements | $23.36 |
| **Total Charges** | **$2,685.86** |
| Balance Forward | $0.00 |
| **Balance Now Due** | **$2,685.86** |

TENNEY&BENTLEY_000209

Invoice #:    12317              Page    5                          July 13, 2012

## TRUST STATEMENT

|  |  | Disbursements | Receipts |
|---|---|---|---|
| May-31-12 | Received From: Shirley Sherrod RETAINER |  | 7,500.00 |
|  | Total Trust | $0.00 | $7,500.00 |
|  | **Trust Balance** |  | **$7,500.00** |

TENNEY&BENTLEY_000210

**Additional retainer**

Edwin Conger

A-26

Dear Dr. Sherrod,

Our bills sent to date (dated 07/13, 08/29, 10/02 and 11/30/12) total fees and disbursements of $5,953.66 a nd cover time through 10/31/12.

November time and December time total an additional 2.0 hours or $500, leaving a credit balance of appro ximately $1,000.

An additional retainer of $6,500 hopefully should cover the cost of an appeal, including brief, reply brief and oral argument.

E. H. Conger

**+$875-INV 12747 FILING FEES**

**TOTAL CONGER FEES Y 2012=14829
PAID /BOA AND CITI CREDIT**



**Tenney & Bentley,** LLC
111 West Washington Street, Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 807-4858
F.E.I.N. 36-4211386

Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, Il. 60616

November 30, 2012
Billed through   10/31/12

Client #.      S12066-001
Invoice #:     12747   EHC

RE: Johnson v. Merrill Lynch. 12 cv 2545

FOR PROFESSIONAL SERVICES RENDERED

| DATE | LAWYER | DESCRIPTION | HOURS | AMOUNT |
|------|--------|-------------|-------|--------|
| 09/04/12 | DRS | response to motion to dismiss and research re same, review motion to dismiss and cases cited | 2.00 | 500.00 |
| 09/04/12 | EHC | Telephone conference with Leroy Johnson; telephone conferences with Dr. Sherrod re F5500; eletter to Sherrod re F5500 | 0.20 | 50.00 |
| 09/04/12 | EHC | Examine authorities and Mr. Shannon's draft response; conferences with Mr. Shannon; drafting declaration re F5500; examine and forward to Mr. Shannon 2010 F5500-SF with acceptance on October 23, 2011 - NO CHARGE | 2.10 | 0.00 |
| 09/05/12 | EHC | Eletter to Sherrod - NO CHARGE | 0.10 | 0.00 |
| 09/05/12 | EHC | Review and suggest changes to Mr. Shannon's draft response; conferences with Mr. Shannon - NO CHARGE | 0.50 | 0.00 |
| 09/17/12 | EHC | Conference with Mr. Shannon re request for and grant of extension of time - NO CHARGE | 0.10 | 0.00 |
| 09/27/12 | EHC | Examine Merrill Lynch's reply; letter to Dr Sherrod with copy of reply | 0.60 | 150.00 |
| 09/27/12 | EHC | Review documents - NO CHARGE | 0.50 | 0.00 |
| 09/28/12 | EHC | Telephone conference with Leroy Johnson re possibility of moving the judge to declare Merrill Lynch did wrong and expected time of decision on motion; telephone conference with Dr. Sherrod re "what next?" - NO CHARGE | 0.30 | 0.00 |

| Invoice #: | 12747 | Page 2 | November 30, 2012 | |
|---|---|---|---|---|

A-26

| 10/02/12 | EHC | Conference with Mr. Shannon regarding calling ML's bluff, removing it and appointing a new trustee | 0.20 | 50.00 |
|---|---|---|---|---|
| 10/02/12 | EHC | Examine ML's argument (reply p. 8) that Sherrod never delivered a notice to remove; conference with Mr. Eskilson regarding same - NO CHARGE | 0.30 | 0.00 |
| 10/03/12 | DRS | research re resignation/removal of directed trustee | 0.50 | 125.00 |
| 10/03/12 | EHC | Examine authorities located by Mr. Shannon regarding "adequate provision for continued prudent management of assets" - NO CHARGE | 0.30 | 0.00 |

| | Total Fees | | | $875.00 |
|---|---|---|---|---|
| | Total Charges | | | $875.00 |

**Tenney & Bently**

$ 7,500 00

DOLLARS

A-26



Tenney & Bentley, LLC
111 West Washington Street, Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 807-4628
FEIN 36-4211386

Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, IL 60616

May 24, 2013
Billed through    05/23/13

Client #:        S12066-001
Invoice #:       13383    EHC

RE: Johnson v. Merrill Lynch, 12 cv 2545 and 12-3859

FOR PROFESSIONAL SERVICES RENDERED

| DATE | LAWYER | DESCRIPTION | HOURS | AMOUNT |
|------|--------|-------------|-------|--------|
| 03/11/13 | EHC | Telephone conference with Dr. Johnson regarding Dr. Sherrod and latest bill; telephone conference with Dr. Sherrod regarding same; e-letter to Dr. Sherrod regarding misunderstanding - NO CHARGE | 0.50 | 0.00 |
| 03/28/13 | EHC | Examine papers electronically filed 3/27/13 by Merrill Lynch; e-letter to Sherrod regarding same; conference with Mr. Shannon regarding reply brief - NO CHARGE | 0.50 | 0.00 |
| 03/29/13 | EHC | Examine Dr. Sherrod's e-mail; furnish copy to Mr. Shannon - NO CHARGE | 0.10 | 0.00 |
| 03/30/13 | EHC | Memo to Mr. Shannon regarding Sherrod's analysis - NO CHARGE | 0.10 | 0.00 |
| 03/30/13 | EHC | Examine Sherrod's 3/29 analysis of Level's argument - NO CHARGE | 0.50 | 0.00 |
| 04/01/13 | EHC | Examine order setting oral argument for 5/22/13 at 10:30 am; conference with Mr. Shannon regarding same; docket date and e-letter to Dr. Sherrod regarding same - NO CHARGE | 0.30 | 0.00 |
| 04/01/13 | EHC | Two telephone conferences with Dr. Sherrod regarding significance of CA7 order and point Dr. Sherrod wanted emphasized; parties are adverse due to 2nd pending garnishment | 0.40 | 0.00 |
| 04/02/13 | EHC | Telephone conference with Dr. Johnson regarding his concerns about money and issues; review and consider Dr. Sherrod's | 0.50 | 125.00 |

Invoice #   13383                          Page   3                    May 24, 2013

A-44

| 04/23/13 | EHC | Conference with Mr. Shannon regarding oral argument; left voice message for Dr. Johnson at 810/394-3415 regarding same; telephonic conference with Dr. Johnson - NO CHARGE | 0.40 | 0.00 |
| 04/25/13 | EHC | Telephone conference with Dr. Sherrod regarding oral argument - NO CHARGE | 0.20 | 0.00 |
| 05/03/13 | EHC | Telephone conference with Dr. Sherrod regarding Brubaker's telephone conference with actuary and DOL subpoena for names; telephone conference with Dr. Johnson regarding (1) his exposure as plan administrator and (2) a "strong case" vs. Merrill Lynch - NO CHARGE | 0.60 | 0.00 |
| 05/08/13 | EHC | Examine email to Dr. Sherrod from actuary Sinclair regarding DOL subpoena - NO CHARGE | 0.20 | 0.00 |
| 05/20/13 | EHC | Examining 7th Circuit May 20, 2013 opinion affirming order below for lack of subject matter jurisdiction; eletter to Drs. Sherrod and Johnson regarding same; second extended telephone conference with Dr. Sherrod regarding factual errors in opinion; swipes taken at her by Judge Tinder and lack of further effective recourse in this appeal - NO CHARGE | 1.40 | 0.00 |
| 05/20/13 | EHC | Reviewing 7th Circuit May 20, 2013 opinion - NO CHARGE | 0.80 | 0.00 |
| 05/21/13 | EHC | Telephone conference with Dr. Johnson regarding his five questions - NO CHARGE | 0.20 | 0.00 |
| 05/22/13 | EHC | Telephone conference with Dr. Sherrod regarding her questions - NO CHARGE | 0.60 | 0.00 |

Total Fees                                                        $5,978.50

Total Charges                                                     $5,978.50
Less Retainer Balance Applied                                    -$929.16

Balance Now Due                                                   $5,049.34

PLEASE RETURN A COPY OF THIS INVOICE WITH YOUR PAYMENT



### Tenney & Bentley, LLC

Law Offices

111 West Washington Street • Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 807-4859

March 14, 2014

VIA EMAIL    leroy_j48507@iyahoo.com

Dy: Leroy Johnson

# CHASE ◆

Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
### MONEY ORDER

**Customer Copy**

9167315130

**Service Instructions**
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER
INFORMATION ABOUT THIS ITEM.

**Michigan**

02/13/2013

Pay To The
Order Of

$ *********230.00 ***

Pay       TWO HUNDRED THIRTY DOLLARS AND 00 CENTS

NON NEGOTIABLE

EXHIBIT 13

EXHIBIT 13

# **Pershing**

One Pershing Plaza
Jersey City, NJ 07399
pershing.com

January 14, 2016

Account Number: ████ 886-1

SHIRLEY T SHERROD MD PC TARGET
PENSIONPLANANDTRUST
SHIRLEY T SHERROD MD TTEE
PO BOX 515
SOUTHFIELD, MI 48037-0515

## Uncashed Check Notification

This notice is to inform you that a check drawn from your investment account has remained uncashed for 180 days or more. As a result, the check has been voided.

Currently, your investment account is closed and we are unable to credit back the funds to your account at this time.

Details are as follows:

| | |
|---|---|
| **Issue Date of Check** | 12/24/2013 |
| **Check Number** | 4015447616 |
| **Check Amount** | $12,603.88 |

- If you are holding the check, do not cash or deposit it. Instead, return it back to Pershing in the envelope provided to have funds placed back into your investment account.

- If you did not receive the check or lost the check before cashing it, please complete the enclosed Affidavit of Uncashed Check and Indemnity Agreement to have the funds placed back into your investment account. Please note, the agreement must be notarized and returned in the envelope provided.

  Once the physical check or Affidavit is received, Pershing will re-open your investment account, credit back the funds, and notify the introducing firm that serviced your investment account. Please contact your investment firm, COMERICA SECURITIES INC, if you require a new check to be issued or if you have any questions regarding this notification.

- If you have cashed the check or are not entitled to the funds, please sign the statement below and return this letter in the envelope provided. Thank you for your cooperation in responding promptly to this letter.

_____ I (we) have cashed the check.

_____ I (we) am (are) not entitled to the above described check.

_____  _____  _____  _____
(Signature)                      (Date)                     (Signature)                          (Date)
                                                                                    *If joint account, both must sign



## BNY MELLON

Pershing LLC, a BNY Mellon company
Member FINRA, NYSE, SIPC

 **Pershing®**

One Pershing Plaza
Jersey City, NJ 07399
pershing.com

January 14, 2016

Account Number: ███ 886-1

SHIRLEY T SHERROD MD PC TARGET
PENSIONPLANANDTRUST
SHIRLEY T SHERROD MD TTEE
PO BOX 515
SOUTHFIELD MI 48037-0515
ARGENTINA

## Uncashed Check Notification

This notice is to inform you that a check drawn from your investment account has remained uncashed for 180 days or more. As a result, the check has been voided.

Currently, your investment account is closed and we are unable to credit back the funds to your account at this time.

Details are as follows:

| | |
|---|---|
| **Issue Date of Check** | 02/11/2014 |
| **Check Number** | 4015705847 |
| **Check Amount** | $10,000.00 |

- If you are holding the check, do not cash or deposit it. Instead, return it back to Pershing in the envelope provided to have funds placed back into your investment account.

- If you did not receive the check or lost the check before cashing it, please complete the enclosed Affidavit of Uncashed Check and Indemnity Agreement to have the funds placed back into your investment account. Please note, the agreement must be notarized and returned in the envelope provided.

  Once the physical check or Affidavit is received, Pershing will re-open your investment account, credit back the funds, and notify the introducing firm that serviced your investment account. Please contact your investment firm, COMERICA SECURITIES INC, if you require a new check to be issued or if you have any questions regarding this notification.

- If you have cashed the check or are not entitled to the funds, please sign the statement below and return this letter in the envelope provided. Thank you for your cooperation in responding promptly to this letter.

_____ I (we) have cashed the check.

_____ I (we) am (are) not entitled to the above described check.

_____     _____     _____     _____
(Signature)                    (Date)          (Signature)                    (Date)
                                        **If joint account, both must sign**

 **BNY MELLON**

Pershing LLC, a BNY Mellon company
Member FINRA, NYSE, SIPC

**Pershing**

One Pershing Plaza
Jersey City, NJ 07399
pershing.com

January 14, 2016

Account Number: ███████886-1

SHIRLEY T SHERROD MD PC TARGET
PENSION PLAN AND TRUST
SHIRLEY T SHERROD MD TTEE
PO BOX 515
SOUTHFIELD MI 48037-0515
ARGENTINA

# Uncashed Check Notification

This notice is to inform you that a check drawn from your investment account has remained uncashed for 180 days or more. As a result, the check has been voided.

Currently, your investment account is closed and we are unable to credit back the funds to your account at this time.

Details are as follows:

| | |
|---|---|
| **Issue Date of Check** | 02/11/2014 |
| **Check Number** | 4015705854 |
| **Check Amount** | $10,000.00 |

- If you are holding the check, do not cash or deposit it. Instead, return it back to Pershing in the envelope provided to have funds placed back into your investment account.

- If you did not receive the check or lost the check before cashing it, please complete the enclosed Affidavit of Uncashed Check and Indemnity Agreement to have the funds placed back into your investment account. Please note, the agreement must be notarized and returned in the envelope provided.

  Once the physical check or Affidavit is received, Pershing will re-open your investment account, credit back the funds, and notify the introducing firm that serviced your investment account. Please contact your investment firm, COMERICA SECURITIES INC, if you require a new check to be issued or if you have any questions regarding this notification.

- If you have cashed the check or are not entitled to the funds, please sign the statement below and return this letter in the envelope provided. Thank you for your cooperation in responding promptly to this letter.

_____ I (we) have cashed the check.

_____ I (we) am (are) not entitled to the above described check.

_____    _____    _____    _____
(Signature)                         (Date)              (Signature)                         (Date)
                                                        **If joint account, both must sign*



**BNY MELLON**

Pershing LLC, a BNY Mellon company
Member FINRA, NYSE, SIPC

**Pershing**®

One Pershing Plaza
Jersey City, NJ 07399
pershing.com

January 14, 2016

Account Number: ▓▓▓886-1

SHIRLEY T SHERROD MD PC TARGET
PENSIONPLANANDTRUST
SHIRLEY T SHERROD MD TTEE
PO BOX 515
SOUTHFIELD MI 48037-0515
ARGENTINA

# Uncashed Check Notification

This notice is to inform you that a check drawn from your investment account has remained uncashed for 180 days or more. As a result, the check has been voided.

Currently, your investment account is closed and we are unable to credit back the funds to your account at this time.

Details are as follows:

| | |
|---|---|
| **Issue Date of Check** | 02/11/2014 |
| **Check Number** | 4015705858 |
| **Check Amount** | $10,000.00 |

- If you are holding the check, do not cash or deposit it. Instead, return it back to Pershing in the envelope provided to have funds placed back into your investment account.

- If you did not receive the check or lost the check before cashing it, please complete the enclosed Affidavit of Uncashed Check and Indemnity Agreement to have the funds placed back into your investment account. Please note, the agreement must be notarized and returned in the envelope provided.

  Once the physical check or Affidavit is received, Pershing will re-open your investment account, credit back the funds, and notify the introducing firm that serviced your investment account. Please contact your investment firm, COMERICA SECURITIES INC, if you require a new check to be issued or if you have any questions regarding this notification.

- If you have cashed the check or are not entitled to the funds, please sign the statement below and return this letter in the envelope provided. Thank you for your cooperation in responding promptly to this letter.

_____ I (we) have cashed the check.

_____ I (we) am (are) not entitled to the above described check.

_____   _____   _____   _____
(Signature)                (Date)          (Signature)                (Date)
                                           **\*If joint account, both must sign**



**BNY MELLON**

Pershing LLC, a BNY Mellon company
Member FINRA, NYSE, SIPC

# Pershing

One Pershing Plaza
Jersey City, NJ 07399
pershing.com

January 14, 2016

Account Number: ████ 886-1

SHIRLEY T SHERROD MD PC TARGET
PENSIONPLANANDTRUST
SHIRLEY T SHERROD MD TTEE
PO BOX 515
SOUTHFIELD MI 48037-0515
ARGENTINA

## Uncashed Check Notification

This notice is to inform you that a check drawn from your investment account has remained uncashed for 180 days or more. As a result, the check has been voided.

Currently, your investment account is closed and we are unable to credit back the funds to your account at this time.

Details are as follows:

| | |
|---|---|
| **Issue Date of Check** | 02/11/2014 |
| **Check Number** | 4015704911 |
| **Check Amount** | $10,000.00 |

- If you are holding the check, do not cash or deposit it. Instead, return it back to Pershing in the envelope provided to have funds placed back into your investment account.

- If you did not receive the check or lost the check before cashing it, please complete the enclosed Affidavit of Uncashed Check and Indemnity Agreement to have the funds placed back into your investment account. Please note, the agreement must be notarized and returned in the envelope provided.

  Once the physical check or Affidavit is received, Pershing will re-open your investment account, credit back the funds, and notify the introducing firm that serviced your investment account. Please contact your investment firm, COMERICA SECURITIES INC, if you require a new check to be issued or if you have any questions regarding this notification.

- If you have cashed the check or are not entitled to the funds, please sign the statement below and return this letter in the envelope provided. Thank you for your cooperation in responding promptly to this letter.

_____ I (we) have cashed the check.

_____ I (we) am (are) not entitled to the above described check.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| (Signature) | (Date) | (Signature) | (Date) |
| | | **\*If joint account, both must sign** | |



## BNY MELLON

Pershing LLC, a BNY Mellon company
Member FINRA, NYSE, SIPC

Exhibit 1**4**

June 22, 2018

Bruce Canetti
U.S. Department of Labor, Office of
230 S. Dearborn St., Suite 844
Chicago, IL 60604-1779

**Re:** **Sherrod/Johnson, No. 16 C 04825**

Dear Mr. Canetti:

Defendants recently produced additional documents numbered SherrodJR000697-760. You have asked for an explanation of what the documents are, and why they were not previously produced.

SherrodJR000697-731 are documents showing communications with plan participants. SherrodJR000732-54 are documents showing Mr. Johnson's classes involving securities and other related financial issues. SherrodJR000755-60 are receipts for payments to Valdemar Washington, an engagement letter concerning Valdemar Washington and an invoice concerning Valdemar Washington.

Documents SherrodJR000732-54 are not called for by any of the Requests for Production, but have been voluntarily produced. Documents SherrodJR000697-731 and SherrodJR000755-60 are documents that Defendants previously provided to prior counsel, and which Defendants believed had been produced by prior counsel. The documents were not provided to me by prior counsel. After their depositions, Defendants checked again to ensure that all responsive documents had been produced, provided these documents to me and Defendants have produced them.

Sincerely,

John Rearden, Jr.

JR/sap

cc:     Shirley Sherrod, M.D.
        Leroy Johnson, M.D.

# Exhibit 14

## VALDEMAR L. WASHINGTON PLLC

**Attorney At Law**
**718 Beach Street**
**P.O. Box 187**
**Flint, Michigan 48501-0187**
**Phone 810.407.6868 • Fax 810.265.7315**
**VLWLEGAL@AOL.COM**

January 6, 2014


American Contractors Indemnity Company
C/O Resident Agent
National Registered Agents Inc.
30600 Telegraph Rd. Suite 2345
Bingham Farms, MI 48025
CERTIFIED MAIL NO. 70121640000158161557 – Return Receipt Requested

Re:    Release of Bond Collateral - Wayne County Circuit Court Case Number
       08-014212-CK *Michael Sherman et all vs. Shirley Sherrod et.al*

To Whom It May Concern:

Please be advised that this office represents Leroy Johnson, Plan Administrator of the
Shirley T. Sherrod MD PC Target Benefits Pension Plan and Trust.

Dr. Johnson was appointed Plan Administrator on May 30, 2012.

I have reviewed the Collateral Security Agreement and Receipt Number 21679 section D
related to Release of Collateral and note that Court Bonds may be exonerated in several
ways, which must be proven to the Surety by written documents. A copy of the May 30,
2013 Michigan Court of Appeals Opinion under Docket Numbers 299045, 299775, and
308263, that reversed the Trial Court's $181,048.58 Judgment is included with this letter
for your review. Your Stay Bond in the amount of $250,000 was issued relative to the
$181,048.58 judgment, which has now been reversed.

It is Dr. Johnson's position as the Plan Administrator that the $250,000 cash collateral
that was posted by the Plan on November 10, 2011 should now be returned to the Plan.
Please contact me by close of business on January 16, 2014 to obtain wire transfer
instructions for returning the Plan's collateral.

Should the collateral not be returned to the Plan by January 17, 2014 we will avail
ourselves of all legal, equitable, and DIFS Administrative remedies.

Thank you for your attention to this matter.

Sincerely,

Valdemar L. Washington
Attorney At Law

CC:    Client
       HCC via Facsimile only 310.649.0891
       Bologna Agency via Facsimile Only 313.962.0426
       Dr. Shirley T. Sherrod, MD
       Mark Granzotto, Esq.

# EXHIBIT 15

*To Whom It May Concern:*

*As per agreement with Leroy Johnson, plan Administrator of Shirley T Sherrod MD PC Target Pension Plan a sum in the amount of $250,000.00 plus accrued interest earned from deposit at Wells Fargo Bank, CA is to be re deposited to the pension holdings immediately and in full upon decision of the Michigan Court of Appeals.*

*These withheld monies were required per order of the court and not to be acquired by Shirley T Sherrod.*

8-3-2012

EXHIBIT 1**6**

 **Gmail**

S T Sherr <ssherrod7@gmail.com>

## Fwd: Sherrod/Johnson
1 message

**John Rearden, Jr.** <jrearden@oliverclose.com>                              Tue, Feb 27, 2018 at 4:58 PM
To: Shirley Sherrod <SSherrod7@gmail.com>, leroy johnson <leroy_j48507@yahoo.com>
Cc: "Harbert, James D." <jharbert@hinshawlaw.com>, SSohn@hinshawlaw.com

> FYI.
>
> Thanks,
>
> John
>
>
>
> -------- Forwarded Message --------
> **Subject:** Sherrod/Johnson
>      **Date:** Tue, 27 Feb 2018 15:56:06 -0600
>  **From:** John Rearden, Jr. <jrearden@oliverclose.com>
>        **To:** Canetti, Bruce - SOL <Canetti.Bruce@dol.gov>
>
>
> Bruce,
>
> Attached you will find documents numbered SherrodJR000688-696 concerning the above-
> referenced case.
>
> Thanks,
>
> John
>
> --
> John Rearden, Jr.
> Oliver|Close LLC
> 124 N. Water St., P.O. Box 4749
> Rockford, IL 61110-4749
> 815-963-0009

IRS Circular 230 Disclosure: To ensure compliance with requirements

# EXHIBIT 16

## eport of Unclaimed Cash and/or Safe Deposit Boxes

is mandatory.

*jan Holder Transmittal* (Form 2011). Complete this report
deposit box contents *only*. All items less than $50 may be
jregate filing instructions). If you are reporting more than ten
your report on diskette/CD-ROM. See instructions for
separately (Form 3164).

or each property. You must report all available owner information.

| Page __1__ of __2__ | |
| --- | --- |
| **Holder Name** SHIRLEY T SHERROD MD PC TARGET BENEFIT TRUST | **Report Year** 2016 |
| **Federal Employer ID Number** 382174656 | **Report Number** ☒1 ☐2 ☐3 |

| c. Owner's Name (Last, First, MI), Last Known Address | d. Rel. Code | e. Social Security No. or FEIN | f. Safekeeping Fees (Enter Below) | g. Date of Last Activity (YYYYMMDD) | k. Amount Remitted |
| --- | --- | --- | --- | --- | --- |
| **Alexander Torey** **Detroit MI** | P | 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 | | | |
| | | j. If interest bearing, enter %. | Type DR | Fees Owed $ | 12/31/2008 | $ 2031 |
| **Anna Flis Calderon** **Macomb Twsp MI** | P | 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 | | | |
| | | j. If interest bearing, enter %. | Type DR | Fees Owed $ | 12/31/2008 | $ 3446 |
| **Derrick Herbert** **MI** | P | UNKNOWN | | | |
| | | j. If interest bearing, enter %. | Type DR | Fees Owed $ | 12/31/2008 | $ 1338 |
| **Iwona Polek Olzewski** **Hamtramck MI** | P | 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 | | | |
| | | j. If interest bearing, enter %. | Type DR | Fees Owed $ | 12/31/2008 | $ 7178 |
| **Dona Pietsch** **MI** | P | 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 | | | |
| | | j. If interest bearing, enter %. | Type DR | Fees Owed $ | 12/31/2008 | $ 6396 |

| Complete this item only on the *last page* of the report. Enter the total dollars you are submitting with this report. $ | Total: This page only |

# rt of Unclaimed Cash and/or Safe Deposit Boxes

ndatory.

*Holder Transmittal* (Form 2011). Complete this report
sit box contents *only*. All items less than $50 may be
te filing instructions). If you are reporting more than ten
s, you must submit your report on diskette/CD-ROM. See

| Holder Name | **Shirley T Sherrod MD PC** | Page __2__ of __2__ |
| Federal Employer ID Number | **Target Benefit Trust** | Report Year **2016** |
| | **382174656** | Report Number ☒1 ☐2 ☐3 |

ch property. You must report all available owner information.

| ner's Name (Last, First, MI), Last Known Address | d. Rel. Code | e. Social Security No. or FEIN | f. Safekeeping Fees (Enter Below) | g. Date of Last Activity (YYYYMMDD) | k. Amount Remitted |
|---|---|---|---|---|---|
| **Mary Smarczewski MI** | P | 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 | j. If interest bearing, enter %. — Type DR — Fees Owed $ | 12/31/2008 | $ 802 |
| **Robin Wilson MI** | P | 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 | j. If interest bearing, enter %. — Type DR — Fees Owed $ | 12/31/2008 | $ 1484 |
| **Kha Xiong Warren MI** | P | 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 | j. If interest bearing, enter %. — Type DR — Fees Owed $ | 12/31/2008 | $ 6025 |
| | P | | j. If interest bearing, enter %. — Type DR — Fees Owed $ | 12/31/2008 | $ |
| | P | | j. If interest bearing, enter %. — Type DR — Fees Owed $ | 12/31/2008 | $ |

| Complete this item only on the *last page* of the report. Enter the total dollars you are submitting with this report. $ | Total: This page only |

**SHIRLEY T. SHERROD, M.D., P.C.**

**TARGET BENEFIT PENSION PLAN**

## TABLE OF CONTENTS

Balance Sheet      I

Summary of Accounts      II

SHERRODJR000690

**Shirley T. Sherrod, M.D., P.C. Target Benefit Plan**
**Asset Reconciliation as of 12/31/16**

## ASSETS

| | |
|---|---|
| Assets 01/01/16 | $1,647,070.26 |
| Deposits | 0.00 |
| Gain/(Loss) | 107,041.67 |
| Fees | (133,921.50) |
| Distributions | (62,550.00) |
| Assets 12/31/16 | $1,557,640.43 |

## EMPLOYEE ACCOUNTS

| | |
|---|---|
| Balances 01/01/16 | $1,647,070.27 |
| Contributions | 0.00 |
| Allocated earnings | 107,041.66 |
| Expenses | (133,921.50) |
| Withdrawals | -62,550.00 |
| Balances 12/31/16 | $1,557,640.43 |

SHIRLEY T. SHERROD, M.D., P.C.

TARGET BENEFIT PENSION PLAN

| Balance on 01/01/16 | Contribution | Forfeitures | Investment Earnings | Expenses | Withdrawals | Balance on 12/31/16 | 2017 ACTIVITY |
|---|---|---|---|---|---|---|---|
| $2,539.84 | $0.00 | $0.00 | $168.25 | -$214.67 | $0.00 | 100% Vested $2,493.42 | ~ESCHEAT |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $2,539.84 | $0.00 | $0.00 | $168.25 | -$214.67 | $0.00 | $2,493.42 | |
| | | | | Vested Balance 12/31/16 | | $2,493.42 | |
| $1,516.57 | $0.00 | $0.00 | $100.47 | -$128.18 | $0.00 | 100% Vested $1,488.86 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $1,516.57 | $0.00 | $0.00 | $100.47 | -$128.18 | $0.00 | $1,488.86 | |
| | | | | Vested Balance 12/31/16 | | $1,488.86 | |
| $1,720.93 | $0.00 | $0.00 | $114.00 | -$145.45 | $0.00 | 100% Vested $1,689.48 | ~ROLLOVER |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $1,720.93 | $0.00 | $0.00 | $114.00 | -$145.45 | $0.00 | $1,689.48 | |
| | | | | Vested Balance 12/31/16 | | $1,689.48 | |
| $11,798.93 | $0.00 | $0.00 | $781.64 | -$997.22 | $0.00 | 100% Vested $11,583.35 | ~ROLLOVER |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $11,798.93 | $0.00 | $0.00 | $781.64 | -$997.22 | $0.00 | $11,583.35 | |
| | | | | Vested Balance 12/31/16 | | $11,583.35 | |

SHIRLEY T. SHERROD, M.D., P.C.

TARGET BENEFIT PENSION PLAN

| Balance on 01/01/16 | Contribution | Forfeitures | Investment Earnings | Expenses | Withdrawals | Balance on 12/31/16 | 2017 ACTIVITY |
|---|---|---|---|---|---|---|---|
| $4,308.58 | $0.00 | $0.00 | $285.43 | -$364.16 | $0.00 | 100% Vested $4,229.85 | ~ESCHEAT |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $4,308.58 | $0.00 | $0.00 | $285.43 | -$364.16 | $0.00 | $4,229.85 | |
| | | | | Vested Balance 12/31/16 | | $4,229.85 | |
| $710.14 | $0.00 | $0.00 | $47.04 | -$60.02 | $0.00 | 100% Vested $697.16 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $710.14 | $0.00 | $0.00 | $47.04 | -$60.02 | $0.00 | $697.16 | |
| | | | | Vested Balance 12/31/16 | | $697.16 | |
| $1,673.40 | $0.00 | $0.00 | $110.86 | -$141.43 | $0.00 | 100% Vested $1,642.83 | ~ESCHEAT |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $1,673.40 | $0.00 | $0.00 | $110.86 | -$141.43 | $0.00 | $1,642.83 | |
| | | | | Vested Balance 12/31/16 | | $1,642.83 | |
| $8,905.67 | $0.00 | $0.00 | $589.98 | -$752.70 | $0.00 | 100% Vested $8,742.95 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $8,905.67 | $0.00 | $0.00 | $589.98 | -$752.70 | $0.00 | $8,742.95 | |
| | | | | Vested Balance 12/31/16 | | $8,742.95 | |

SHIRLEY T. SHERROD, M.D., P.C.

TARGET BENEFIT PENSION PLAN

**2017 ACTIVITY**

| Balance on 01/01/16 | Contribution | Forfeitures | Investment Earnings | Expenses | Withdrawals | Balance on 12/31/16 | |
|---|---|---|---|---|---|---|---|
| $8,972.44 | $0.00 | $0.00 | $594.40 | -$758.34 | $0.00 | 100% Vested $8,808.50 | ~ESCHEAT |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $8,972.44 | $0.00 | $0.00 | $594.40 | -$758.34 | $0.00 | $8,808.50 | |
| | | | | Vested Balance 12/31/16 | | $8,808.50 | |
| $7,995.64 | $0.00 | $0.00 | $529.69 | -$675.79 | $0.00 | 100% Vested $7,849.54 | ~ESCHEAT |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $7,995.64 | $0.00 | $0.00 | $529.69 | -$675.79 | $0.00 | $7,849.54 | |
| | | | | Vested Balance 12/31/16 | | $7,849.54 | |
| $17,865.82 | $0.00 | $0.00 | $1,183.56 | -$1,510.00 | $0.00 | 100% Vested $17,539.38 | BENEFICIARY LOCATED/PAID |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $17,865.82 | $0.00 | $0.00 | $1,183.56 | -$1,510.00 | $0.00 | $17,539.38 | |
| | | | | Vested Balance 12/31/16 | | $17,539.38 | |
| $730,934.70 | $0.00 | $0.00 | $48,422.27 | -$61,777.61 | $0.00 | 100% Vested $717,579.36 | |
| 830,557.19 | 0.00 | 0.00 | 52,950.08 | -64,910.92 | -62,550.00 | 756,046.35 | |
| $1,561,491.89 | $0.00 | $0.00 | $101,372.35 | -$126,688.53 | -$62,550.00 | $1,473,625.71 | |
| | | | | Vested Balance 12/31/16 | | $1,473,625.71 | |

SHIRLEY T. SHERROD, M.D., P.C.

TARGET BENEFIT PENSION PLAN

| Balance on 01/01/16 | Contribution | Forfeitures | Investment Earnings | Expenses | Withdrawals | Balance on 12/31/16 | 2017 ACTIVITY |
|---|---|---|---|---|---|---|---|
| | | | | | | 100% Vested | |
| $1,003.37 | $0.00 | $0.00 | $66.47 | −$84.80 | $0.00 | $985.04 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $1,003.37 | $0.00 | $0.00 | $66.47 | −$84.80 | $0.00 | $985.04 | ~ESCHEAT |
| | | | | Vested Balance 12/31/16 | | $985.04 | |
| | | | | | | 100% Vested | |
| $4,478.28 | $0.00 | $0.00 | $296.67 | −$378.49 | $0.00 | $4,396.46 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $4,478.28 | $0.00 | $0.00 | $296.67 | −$378.49 | $0.00 | $4,396.46 | ~PAYOUT |
| | | | | Vested Balance 12/31/16 | | $4,396.46 | |
| | | | | | | 100% Vested | |
| $2,701.69 | $0.00 | $0.00 | $178.98 | −$228.34 | $0.00 | $2,652.33 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $2,701.69 | $0.00 | $0.00 | $178.98 | −$228.34 | $0.00 | $2,652.33 | ~ROLLOVER |
| | | | | Vested Balance 12/31/16 | | $2,652.33 | |
| | | | | | | 100% Vested | |
| $1,855.16 | $0.00 | $0.00 | $122.90 | −$156.79 | $0.00 | $1,821.27 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $1,855.16 | $0.00 | $0.00 | $122.90 | −$156.79 | $0.00 | $1,821.27 | ~ESCHEAT |
| | | | | Vested Balance 12/31/16 | | $1,821.27 | |

SHIRLEY T. SHERROD, M.D., P.C.

TARGET BENEFIT PENSION PLAN

| Balance on 01/01/16 | Contribution | Forfeitures | Investment Earnings | Expenses | Withdrawals | Balance on 12/31/16 | 2017 ACTIVITY |
|---|---|---|---|---|---|---|---|
| | | | | | | 100% Vested | |
| $7,531.92 | $0.00 | $0.00 | $498.97 | -$636.59 | $0.00 | $7,394.30 | |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| $7,531.92 | $0.00 | $0.00 | $498.97 | -$636.59 | $0.00 | $7,394.30 | ~ESCHEAT |
| | | | | Vested Balance 12/31/16 | | $7,394.30 | |
| | | | | | | | |
| $816,513.08 | $0.00 | $0.00 | $54,091.58 | -$69,010.58 | $0.00 | $801,594.08 | |
| 830,557.19 | 0.00 | 0.00 | 52,950.08 | -64,910.92 | -62,550.00 | 756,046.35 | |
| $1,647,070.27 | $0.00 | $0.00 | $107,041.66 | -$133,921.50 | -$62,550.00 | $1,557,640.43 | |

EXHIBIT 17

EXHIBIT 17

 **TOKIO MARINE HCC**

**Surety Group**
601 S. Figueroa Street, Suite 1600
Los Angeles, CA 90017 USA
Tel: 310-649-0990

**VIA REGULAR MAIL**

February 3, 2017

Natasha S. Fedder, Esq.
GROOM LAW GROUP
1701 Pennsylvania Avenue, N.W.
Washington D.C. 20006-5811

Re:   **Principal**    :    **Shirley T. Sherrod**
     **Obligee**    :    **Michael S. Sherman**
     **Bond No.**    :    **1000908672 – Appeal**
     **Bond Amount:**    **$250,000.00**
     **Claim No.**    :    **AC 45529-1**

**MICHAEL S. SHERMAN, D.O., P.C., et al v SHIRLEY T. SHERROD, M.D., P.C., et al**
**Wayne County Circuit Court - Case No. 2008-014212-CK**
**Appellate Case Nos. 18994, 299775, 299045, and 308263**

Dear Ms. Fedder,

American Contractors Indemnity Company ("ACIC") is the surety that issued the above-referenced appeal bond to Dr. Shirley T. Sherrod in 2011. ACIC required $250,000.00 cash collateral as a condition precedent to issuing State of Michigan Bond on Appeal No. 1000908672 for Dr. Shirley T. Sherrod. On November 10, 2011, ACIC received a wire of $250,000.00 from "Shirley T. Sherrod MD PC Trgt Pension Plan" into the surety's Wells Fargo collateral account established in San Francisco, California. The cash collateral is being held in accordance with the November 4, 2011 Indemnity Agreement and the November 10, 2011 Collateral Security agreement executed by Dr. Shirley Sherrod. The cash collateral was assigned CSA No. 21679. The surety has not issued any disbursements or claim payments from CSA 21679.

We reserve all rights and defenses under the bond, the law, the Indemnity Agreement, the Collateral Security Agreement, or otherwise.

Very Truly Yours,

*Deborah Reese*

Deborah Reese, VP – Collateral Manager
American Contractors Indemnity Company

EXHIBIT 18

EXHIBIT 18

**From:** pciccodicola@comcast.net,
**To:** sshe464538@aol.com,
**Subject:** Re: Sherrod
**Date:** Tue, Nov 8, 2011 6:34 pm
**Attachments:**

---

We may have another version of the affidavit so sit tight.  We will file sometime tomorrow if this doesn't work out.

On 11/8/11 2:38 PM, "Robert Morad" <Morad@millercanfield.com> wrote:

I am still working on it

# Robert J. Morad
Senior Counsel

🔲 <http://www.millercanfield.com/>
840 West Long Lake Rd, Suite 200
Troy, MI 48098
Telephone: 248-267-3219
Facsimile: 248-879-2001
morad@millercanfield.com
www.millercanfield.com <http://www.millercanfield.com/>

---

From: Pasquale Ciccodicola [mailto:pciccodicola@comcast.net]
Sent: Tuesday, November 08, 2011 11:31 AM
To: Morad, Robert J.
Cc: Dr. Sherrod
Subject: Re: Sherrod

I do not know the percentage of her interest in the fund and it is not important to the issue of the trustee having access to the account. Merrill Lynch is simply a custodial institution without any duties with respect to the governance of the plan. That is between the IRS and my client.  I know that is not what you want to hear but this quagmire is exactly the same as put forth by the plaintiff's during that rather long period that the garnishment was pending.  We need access to the fund today (now) to file this bond and comply with a valid court order of the COA. I think it is only appropriate that your client do the same.  According to my client

EXHIBIT 1**9**

EXHIBIT 19

**From:** pciccodicola@comcast.net,
**To:** mgranzotto@covad.net, sshe464538@aol.com,
**Subject:** Order to compel discovery in garnishment
**Date:** Mon, Oct 10, 2011 9:12 am
**Attachments:** production order.pdf (343K)

Here is a copy of the order entered by Gillis last Friday for discovery in the garnishment of the plan. I think it is time to contact the other plan participants and join them in this fight. The Court ruled against my objection as to privacy and privilege. The rest of the order is self explanatory. I provided Sherman with a copy of the plan Friday and they have the extension letter. All other items need to be produced under the order in two weeks on the adjourned date of October 21, 2011

--
Thank you,
Pasquale Ciccodicola P-32604
Attorney at Law
31250 Plymouth Road
Livonia, Michigan 48150
pciccodicola@comcast.net
Voice: 734-427-7999
Fax: 313-733-8987
Cell: 313-663-7774


This email is intended only for the person(s) or entity to which it is addressed and may contain confidential, proprietary and/or privileged material. Any review, distribution, reliance on, or other use of this information by persons or entities other than the intended recipient is prohibited. If you receive this message in error, please immediately notify the sender and delete it and all copies of it from your system. Thank you.

EXHIBIT 20

EXHIBIT 20

In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-3869

LeRoy Johnson, administrator,
Shirley T. Sherrod MD PC Target Benefits
Pension Plan and Trust,

*Plaintiff-Appellant,*

v.

Merrill, Lynch, Pierce, Fenner & Smith, Inc.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 11:2-cv-0256—John W. Darrah, *Judge.*

Argued April 22, 2013—Decided May 20, 2013

Before Wood, Tinder, and Hamilton, *Circuit Judges.*

Tinder, *Circuit Judge.* Leroy Johnson, the administrator
of the Shirley T. Sherrod MD PC Target Benefit Pension
Plan and Trust (hereinafter "the Plan"), brings this suit
against the Plan's custodian, Merrill, Lynch, Pierce,
Fenner & Smith, Inc. (hereinafter "Merrill Lynch").

2                                    No. 12-3869

Despite the fact that he is the Plan's administrator and
sole fiduciary, Johnson alleges that Merrill Lynch has
refused to abide by his instructions and "has exercised
control over Plan assets by refusing to make distribution
to Shirley T. Sherrod." As a result, Johnson asks the
federal court to "[o]rder Merrill Lynch to abide by John-
son's directions regarding any disposition of Plan assets."

Although Johnson has sued Merrill Lynch—sug-
gesting that Johnson and Merrill Lynch have a dis-
pute—in reality, the two parties seem to agree on all
the major issues. For instance, both Johnson and Merrill
Lynch agree that the Plan is a retirement account that
is exempt from garnishment under the anti-alienation
provision of the Employment Retirement Income Security
Act (ERISA), 29 U.S.C. § 1056(d). Both parties also
agree that a single Plan participant, Sherrod, has made
a claim for benefits from the Plan but has been unable
to collect anything due to a freeze on distributions to
her from the account. Moreover, both parties agree
that this freeze is the result of a Michigan state court
order in a post-judgment collection proceeding.

In sum, although Merrill Lynch concedes that a Plan
participant has been injured, Johnson concedes that the
Plan participant's injury is fairly traceable to a Michigan
state court order, *and not the defendant,* Merrill Lynch.
U.S. Const. art. III § 2, requires a plaintiff to have an
injury that is "fairly . . . trace[able] to the challenged
action of the defendant, and not . . . th[e] result [of] the
independent action of some third party not before the
court." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560

No. 12-3869   3

(1992) (quotation and citation omitted). If the plaintiff's injury is not fairly traceable to the defendant, the plaintiff lacks standing to bring suit against the defendant, and the federal court lacks subject-matter jurisdiction to adjudicate the matter. *Id.* Here, Johnson has failed to identify an injury that is fairly traceable to the defendant, so Johnson does not have standing to bring suit against Merrill Lynch. Thus, we affirm the district court's dismissal of the case for lack of subject-matter jurisdiction.

I

Because the freeze order at the center of the present case arose from a post-judgment proceeding in Michigan state court, a brief review of the related state litigation is warranted. Michael S. Sherman and his affiliated medical practice filed suit against Shirley T. Sherrod and her affiliated medical practice over a contract dispute in the Wayne County, Michigan, Circuit Court. On June 25, 2010, the Wayne County Circuit Court granted summary judgment to Sherman and entered a judgment of $181,048.58 against Sherrod. Sherman filed a writ of garnishment on Sherrod's accounts at Merrill Lynch approximately four months later. Merrill Lynch, as a result, disclosed to Sherman the four accounts in which Sherrod had an interest: a personal account, an account in the name of her medical practice, an individual retirement account, and the Plan (described in the disclosure as "self-directed retirement account" in the name of "SHIRLEY T SHERROD MD PC"). Never-

4   No. 12-3869

theless, Merrill Lynch warned Sherman in its disclosure that it did "not have control over and therefore c[ould] not freeze or otherwise restrain or liquidate" the assets of the Plan.

Although Merrill Lynch did not believe that it could exercise control over the Plan, the Wayne County Circuit Court believed that it could. On February 4, 2011, the Circuit Court judge issued a blanket order prohibiting Sherrod (or anyone "acting for or on [her] behalf or in active concert or participation" with her) "from directly or indirectly selling, transferring, assigning, destroying, concealing, encumbering, hypothecating, or otherwise disposing of . . . assets, real or personal property, money, or things in action *now held or hereafter acquired by or becoming due to them*" (emphasis added). The state-court order did not specifically mention the Plan account, but understandably, Merrill Lynch read the order's broad and inclusive language—ordering a freeze on all assets becoming due to Sherrod—to include distributions from the Plan account. As a result, Merrill Lynch froze the Plan account with respect to Sherrod and, despite her retirement, prohibited any distributions to her until further court order. (Note that Merrill Lynch only froze the Plan account with respect to Sherrod. The Plan account also contains assets that will become due to the seventeen employees of Sherrod's former medical practice upon their retirements. Merrill Lynch emphasizes that if any of Sherrod's former employees requests a distribution, it will "not . . . refuse instructions from the Plan administrator relating to any Plan Participant other than Dr. Sherrod.")

Merrill Lynch never prohibited distributions to Sherrod from the Plan account until it was compelled to do so by Wayne County Circuit Court order. Moreover, when the Plan administrator filed a motion to quash the garnishment proceeding with respect to the Plan account, Merrill Lynch supported the Plan administrator. (Incidentally, the Plan administrator was Sherrod herself until May 30, 2012; Johnson only took over as Plan administrator after the instant suit was filed in federal court—in an apparent attempt to render the state-court and federal-court parties non-identical.) In this motion, the Plan administrator argued that the garnishment proceeding and resulting freeze should be quashed because the Plan was an "employee pension benefit plan" as defined by ERISA, 29 U.S.C. § 1002(2). Therefore, 29 U.S.C. § 1056(d) prohibited its benefits from being "assigned or alienated" by state-court order. When arguing the motion to quash, the administrator even acknowledged that Merrill Lynch supported the Plan's position, in an attempt to strengthen its argument that federal law prohibited the freeze (and ultimately, the garnishment) of the Plan account.

In spite of the fact that both the Plan administrator and Merrill Lynch viewed the Plan as an "ERISA-qualified pension account" not subject to garnishment, the Wayne County judge denied the administrator's motion to quash. The new Plan administrator, Johnson, decries this denial as erroneous and clearly contrary to federal law, but it appears that the former Plan administrator was at least partially responsible for the denial. Before denying the motion to quash, the Wayne

County judge had ordered Sherrod (in her former capacity as Plan administrator) to produce documents proving that the Plan was an ERISA "qualified retirement account," but she never did. Without sufficient documentation, Sherrod apparently hoped the judge would take her on her word.[1]

Notwithstanding Sherrod's failure to produce adequate documentation demonstrating that the Plan was protected from garnishment under 29 U.S.C. § 1056(d), Merrill Lynch continued to side with Sherrod and the Plan. On February 28, 2012, Merrill Lynch filed a motion to release the freeze on the Plan account in the Wayne County Circuit Court. As part of its effort to release the freeze, Merrill Lynch drafted and circulated an order proposing that the garnishment on the Plan account be "hereby released and further withholdings discontinued." Merrill Lynch successfully negotiated this order with Sherman, and as a result, Sherman stated at a hearing in the Wayne County Circuit Court on April 13, 2012, that he had "no objection to Merrill Lynch releasing the funds . . . [and] withdrawing our garnishment" of the Plan account. After Sherman's statement, the Wayne County judge initially agreed to grant the motion to release and enter Merrill Lynch's proposed order. It seemed that Sherman, Merrill

* * * *

[1] It is still not clear whether the Plan is actually an ERISA-qualified account protected from garnishment by 29 U.S.C. § 1056(d). Fortunately, we need not decide here whether the Plan is truly ERISA-qualified.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**EDWARD C. HUGLER**, Secretary of Labor,
United States Department of Labor,

Plaintiff

v.                                                          Civil Action No. 1:16-cv-04825-MIS

**SHIRLEY T. SHERROD**, *et al.*,

Defendants.

### DEFENDANT LEROY JOHNSON'S AMENDED RESPONSES AND OBJECTIONS TO SECRETARY OF LABOR'S FIRST SET OF INTERROGATORIES

Defendant Leroy Johnson ("Defendant"), by and through his undersigned counsel and

pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 33.1, provides

the following amended objections and responses to the Secretary of Labor's ("Plaintiff" or

"Secretary") First Set of Interrogatories (the "Interrogatories").

### GENERAL OBJECTIONS

1.     Defendant objects to the Interrogatories to the extent they seek to circumvent or

exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of

Civil Procedure 33.

2.     Defendant objects to the Interrogatories to the extent they seek information that is

subject to the attorney-client privilege, the work product doctrine, or any other applicable

privileges or immunities against discovery.  Nothing in these responses is intended to be, or shall

be construed as, a waiver of any privilege or immunity from discovery.

3.     Defendant objects to the Interrogatories to the extent they seek information beyond

the scope of discovery permitted under the Federal Rules of Civil Procedure, the Local Rules of

this Court, or this Court's Orders, or otherwise seek information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

4. Defendant objects to the Interrogatories to the extent they are overly broad, unduly burdensome, or otherwise seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.

5. Defendant objects to the use of the word "all," including, but not limited to, in the phrases, "all facts," "all documents," "all withdrawals" and "all Plan distributions" on the grounds that such requests are vague, ambiguous, overly broad, and unduly burdensome.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1. Defendant objects to the definition of "Defendant" (Definition (1)) on the grounds that it is overly broad, vague, ambiguous, and calls for a legal conclusion. Defendant further objects to the definition of "Defendant" to the extent that it purports to require Defendant to produce documents or information that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders. In responding to the Subpoena, Defendant will interpret the term "Defendant" to mean Leroy Johnson.

2. Defendant objects to the definition of "document" or "documents" (Definition (2)) as overly broad and unduly burdensome, and as calling for a legal conclusion. Defendant further objects to the definition of "document" or "documents" on the grounds that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Evidence, the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders. Defendant further objects to the definition of "document" or "documents" to the extent that it purports to require the

2

production of documents protected from disclosure by the attorney-client privilege, or any other applicable privilege or immunity against discovery.

3.      Defendant objects to the definition of the term "identify" (Definition (3)) as used with reference to a natural person and any person other than a natural person on the grounds that it imposes obligations beyond those imposed under the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders, and it is overly broad and unduly burdensome.  In responding to the Interrogatories, Defendant will interpret "identify" to mean the person's name and last known address, to the extent that such information is readily available to Defendant. Defendant objects to the definition of the term "identify" as used with reference to documents on the grounds that it imposes obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders, and on the grounds that it is overly broad and unduly burdensome.  In responding to the Interrogatories, Defendant will interpret "identify" to mean the document's Bates range.

4.      Defendant objects to Instruction 4 on the grounds that it is vague and ambiguous in purporting to require Defendant to "describe with particularity the privilege you believe is applicable."  Defendant further objects to Instruction 4 on the grounds that it is overly broad to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.  To the extent that Defendant claims privilege, Defendant will produce a privilege log in accordance with Federal Rule of Civil Procedure 26(b)(5).

5.      Defendant objects to Instruction 5 on the grounds that it is overly broad, unduly burdensome, and seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.  Defendant further objects to Instruction 5 on the grounds that it is overly broad in seeking documents or information that are

3

outside of Defendant's possession, custody, or control on the grounds that he did not become the Plan Administrator until May 30, 2012.

6.      Defendant objects to the definition of "Sherrod P.C." and "employer" (Definition (6)) on the grounds that it is overly broad, vague, ambiguous, and calls for a legal conclusion. Defendant further objects to the definition of "Sherrod P.C." and "employer" to the extent that it purports to require Defendant to produce documents that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders. In responding to the Subpoena, Defendant will interpret the terms "Sherrod P.C." and "employer" to mean Shirley T. Sherrod, M.D., P.C.

7.      Defendant objects to the definition of "related to" (Definition (8)) on the grounds that it is overly broad and unduly burdensome. Defendant further objects to the definition of "related to" on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

8.      Defendant objects to Instruction 12 as vague, ambiguous, and confusing in purporting to require Defendant to construe "and" and "or" "conjunctively" and in purporting to prohibit Defendant from interpreting "and" and "or" "disjunctively so as to exclude any information otherwise within the scope of these Interrogatories."

9.      Defendant objects to the definition of "person" (Definition (14)) as overly broad, vague, ambiguous, and calling for a legal conclusion. Defendant further objects to the definition of "person" to the extent that it purports to require Defendant to produce documents that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.

4

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

To avoid the necessity of restating in full each of the foregoing General Objections and Objections to Instructions and Definitions, the foregoing General Objections and Objections to Definitions and Instructions are hereby adopted and incorporated, to the extent that they may apply, into the following responses to the Interrogatories. The assertion of additional Specific Objections to Interrogatories shall not be construed as waiving any applicable General Objection. Any responses subsequently served by Defendant are subject to these General and Specific Objections, and Defendant reserves the right to supplement the objections at that time. Subject to and without waiving the foregoing, Defendant, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Local Rule 33.1, responds to the numbered items in the Interrogatories as follows:

Interrogatory No. 1

Describe Defendant's duties as plan administrator to the Plan during the relevant time period, including why and how these duties changed, if at all.

Answer to Interrogatory No. 1

Defendant objects to Interrogatory No. 1 on the grounds that it is vague and ambiguous in its use of the phrase "why and how those duties changed, if at all."

Subject to the foregoing objections, Defendant responds as follows: Article II of the Plan document effective January 1, 2009 sets forth the duties and responsibilities of the Plan Administrator. SHERROD_0000036-SHERROD_0000071. The Plan document effective January 1, 2009 remains in effect. The duties and responsibilities of the Plan Trustee have not changed since the Plan document's effective date of January 1, 2009.

Interrogatory No. 2

State all facts and identify all documents on which Defendant relies in support of any denial of any paragraph in the Plaintiff's complaint, including all subparts, and address each individual denial separately.

Answer to Interrogatory No. 2

Defendant objects to Interrogatory No. 2 on the grounds that it is compound and, as such, it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33 by purporting to require Defendant to provide a separate response for each of the twenty-four denials set forth in Defendant's Answer.  Based on the compound nature of this Interrogatory, Defendant will treat Interrogatory No. 2 as twenty-four separate interrogatory requests.  Defendant further objects to Interrogatory No. 2 on the grounds that it is overly broad and unduly burdensome in requesting "all facts" and "all documents," and that it seeks discovery that is duplicative.

Subject to the foregoing objections, Defendant responds to Interrogatory No. 2 with the following numbered paragraphs:

1. In denying that the Secretary is entitled to the relief that is requested in the Complaint (Answer ¶ 1), Defendant Johnson relies on the following facts and documents:  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  On February 4, 2011, the Wayne County, Michigan, Circuit Court issued an order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]" (the "Order").  SHERROD_0000072-SHERROD_0000074.  Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod.  SHERROD_0000084-SHERROD_0000089.  The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments  Thus, the Plan assets could not be invested

optimally during the freeze period. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, sought to unfreeze the Plan account in both federal and state court. SHERROD_0000084-SHERROD_0000089; SHERROD_0000428-SHERROD_0000463. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371. Pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo Bank, N.A. ("Wells Fargo") to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to the Bologna Surety Agency, Inc. ("Bologna") to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-

SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. SHERROD_0000372-SHERROD_0000391; SHERROD_0000469-SHERROD_0000469. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. SHERROD_0000668-SHERROD_0000668. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-

SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500.  SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.  It is Defendant's understanding that the $250,000 that was wired from the Plan to Wells Fargo on November 10, 2011 for the purpose of posting a bond is currently held in a Wells Fargo account.  The Plan's account balance has grown from $1,553,151.70 at the end of Plan year 2012 to $1,762,149.89 at the end of Plan year 2014.  SHERROD_0000243-SHERROD_0000243.  There is no monetary loss associated with the purported reporting and recordkeeping violations the Secretary identifies.  Any alleged failure to administer benefits for employees terminated in 2008 in accordance with the Plan took place on or about May 23, 2008.  It is Defendant's belief that the Secretary had actual knowledge of any alleged failure to administer benefits for terminated employees in accordance with the Plan as early as 2012.  As early as February 2012, Dr. Sherrod, in her capacity as a Plan fiduciary, sought the Secretary's assistance in unfreezing her Plan account.  SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.  Based upon communications from Dr. Sherrod and the Plan's legal counsel, the Secretary had actual knowledge that the bond was posted from Plan assets as early as 2012.  SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.

2.      In denying that Mr. Johnson has been the Plan administrator from August 4, 2014 to the present (Answer ¶ 8), Defendant Johnson relies on the following facts and documents:  LJ Consulting Services, LLC ("LJ Consulting") was appointed Plan Administrator on August 4, 2014,

and continues to serve as Plan Administrator.  SHERROD_0000231-SHERROD_0000232;
SHERROD_0000094-SHERROD_0000094; SHERROD_0000682-SHERROD_0000687.

3.      In denying that Sherrod PC ceased business operations in 2008 (Answer ¶ 10),
Defendant Johnson relies on the following facts and documents:  Sherrod PC did not cease
business operations in 2008, or at any time.  Dr. Sherrod sold only a portion of Sherrod PC in
2008.  The portion she retained continues to operate as a viable going concern.
SHERROD_0000090-SHERROD_0000091.

4.      In denying that Sherrod PC ceased business operations in 2008 or at any time
(Answer ¶ 11), Defendant Johnson relies on the following facts and documents:  Sherrod PC did
not cease business operations in 2008, or at any time.  Dr. Sherrod sold only a portion of Sherrod
PC in 2008.  The portion she retained continues to operate as a viable going concern.
SHERROD_0000090-SHERROD_0000091.

5.      In denying that the allegations in paragraph 12 of the Complaint properly
characterize the Plan document in effect for Plan years 2002 to and including 2008 (Answer ¶ 12),
Defendant Johnson relies on the following facts and documents:  Section 38 of the Adoption
Agreement for the Plan document in effect for Plan years 2002 to and including 2008, titled
"CONDITIONS FOR DISTRIBUTIONS UPON TERMINATION OF EMPLOYMENT,"
provides, "No distributions may be made until a Participant has reached Early or Normal
Retirement Date."  SHERROD_0000097-SHERROD_0000230.  Section 6.4 of the Plan document
in effect for Plan years 2002 to and including 2008, titled "Determination of Benefits Upon
Termination," provides, "Distribution of the funds due to a Terminated Participant shall be made
on the occurrence of an event which would result in the distribution had the Terminated Participant
remained in the employ of the Employer (upon the Participant's death, Total and Permanent
Disability, Early or Normal Retirement).  However, at the election of the Participant, the

10

Administrator shall direct that the entire Vested portion of the Terminated Participant's Combined Account be payable to such Terminated Participant provided the conditions, if any, set forth in the Adoption Agreement have been satisfied." SHERROD_0000097-SHERROD_0000230. Section 6.4 of the Plan document in effect for Plan years 2002 to and including 2008, titled "Determination of Benefits Upon Termination," further provides, "Notwithstanding the above, unless otherwise elected in the Adoption Agreement, if the value of a Terminated Participant's Vested benefit derived from Employer and Employee contributions does not exceed $5,000 (or, $3,500 for distributions made prior to the later of the first day of the first Plan Year beginning on or after August 5, 1997, or the date specified in the Adoption Agreement) the Administrator shall direct that the entire Vested benefit be paid to such Participant in a single lump-sum without regard to the consent of the Participant or the Participant's spouse." SHERROD_0000097-SHERROD_0000230.

6.     In denying that the allegations in paragraph 12 of the Complaint properly characterize the Plan document in effect for Plan years 2002 to and including 2008 (Answer ¶ 13), Defendant Johnson relies on the following facts and documents:  Section 2.4(d) of the Plan document in effect for Plan years 2002 to and including 2008 provides that the Plan administrator's powers and duties include the following:  "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust Fund." SHERROD_0000097-SHERROD_0000230.

7.     In denying that Dr. Sherrod served as the Plan administrator prior to May 30, 2012 (Answer ¶ 14), Defendant relies on the following facts and documents:  Section 1.6 of the Plan document effective January 1, 2009 provides, "'Administrator' means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer." SHERROD_0000001-SHERROD_0000071. Section 1.26 of the

11

Plan document effective January 1, 2009 further provides, "'Employer' means Shirley T. Sherrod MD PC." SHERROD_0000001-SHERROD_0000071.

8.     In denying that Dr. Sherrod processed her own request for a Plan distribution and withdrew $253,114 from the Plan on or about November 10, 2011 (Answer ¶ 16), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

9.     In denying that on or around September 27, 2012, the $253,114 was accounted for incorrectly because the chosen methodology caused all of the participants' vested benefits to be decreased (Answer ¶ 17), and a proper accounting should have allocated this amount solely from Defendant Sherrod's individual participant account, Defendant relies on the following facts and documents: On about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond,  and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan

expense properly paid from the Plan and charged to participant accounts.

10.    In denying that the federal action styled *Sherrod v. Merrill Lynch, Pierce Fenner & Smith Inc.*, Case No. 1:12-cv-02545 (N.D. Ill.) ("Federal Action") sought to lift a state court order that froze the plan assets in an effort to make distributions to Sherrod (Answer ¶ 18), Defendant relies on the following facts and documents:  The Federal Action was brought against Merrill Lynch, Pierce Fenner & Smith Inc. in the Northern District of Illinois.  SHERROD_0000084-SHERROD_0000089.  The Federal Action sought the following relief:  "That the Court enter judgment in favor of Sherrod and against Merrill Lynch, and Order Merrill Lynch to abide by Sherrod's directions regarding any disposition of Plan assets."  SHERROD_0000084-SHERROD_0000089.

11.    In denying that Mr. Johnson was the Plan administrator as of August 4, 2014 (Answer ¶ 19), Defendant relies on the following facts and documents:  LJ Consulting was appointed Plan Administrator on August 4, 2014, and continues to serve as Plan Administrator.  SHERROD_0000231-SHERROD_0000232; SHERROD_0000682-SHERROD_0000687; SHERROD_0000094-SHERROD_0000094.

12.    In denying that on or about July 16, 2013, Defendant Sherrod withdrew $50,000 from the Plan (Answer ¶ 20), Defendant relies on the following facts and documents:  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards to pay Plan service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees

13

and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667; SHERROD_0000354-SHERROD_0000371. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371.

13.     In denying that the $50,000 has not been accounted for properly in the Plan's records and should be allocated solely from Defendant Sherrod's individual participant account (Answer ¶ 21), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the

14

advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

14.     In denying that the Plan's bank account statements for Plan Year 2014, January 1, 2014 to December 31, 2014 show that the only withdrawals from the Plan were distributions made to Defendant Sherrod that totaled approximately $296,000 (Answer ¶ 22), Defendant relies on the following facts and documents:  the statement reflecting the additions and withdrawals to the Plan account for the period January 1, 2014 to December 31, 2014 ("2014 Statement") does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts.  Consistent with the advice of the Plan's legal counsel, $193,905 of the withdrawals reflected on the 2014 Statement were paid to Dr. Sherrod from the Plan to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers.  SHERROD_0000604-

SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

15. In denying that the Plan incorrectly identified $142,000 in administrative expenses and $57,000 in distributions and should have accounted for $296,000 in distributions and no administrative expenses in the Plan's records and allocated the $296,000 in distributions solely from Defendant Sherrod's individual participant account for Plan Year 2014 (Answer ¶ 23), Defendant relies on the following facts and documents: the 2014 Statement does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Consistent with the advice of the Plan's legal counsel, $193,905 of the withdrawals reflected on the 2014 Statement were paid to Dr. Sherrod from the Plan to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

16. In denying that from January 1, 2015 to the present, Defendant Sherrod continues to withdraw funds from the Plan and Defendants Sherrod and Johnson fail to account for these

16

distributions properly (Answer ¶ 25), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687.

17.     In denying that the allegations in paragraph 26 of the Complaint properly characterize the Plan document effective January 1, 2009 (Answer ¶ 26), Defendant relies on the following facts and documents: Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071.

18.     In denying that from May 30, 2012 to the present Defendant Johnson failed to perform his duties as stated in paragraph 26 (Answer ¶ 27), Defendant relies on the following facts and documents: At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-

17

SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500.  SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

19.     In denying that the allegations in paragraph 28 of the Complaint properly characterize the Plan document effective January 1, 2009 (Answer ¶ 28), Defendant relies on the following facts and documents:  Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust."  SHERROD_0000001-SHERROD_0000071.  Section 7.8 of the Plan document effective January 1, 2009 requires the following: "[T]he Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth: (1) the net income, or loss, of the Trust Fund; (2) the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets; (3) the increase, or decrease, in the value of the Trust Fund; (4) all payments and distributions made from the Trust Fund; and (5) such further information as the Trustee and/or Administrator deems appropriate."  SHERROD_0000001-SHERROD_0000071.

20.     In denying that from May 30, 2012 to the present, Defendant Sherrod failed to perform her duties as stated in paragraph 28 (Answer ¶ 29), Defendant relies on the following facts and documents:  At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire

18

date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

21.     In denying that Dr. Sherrod violated ERISA by the failures to act described in paragraphs 28 and 29 of the Complaint from May 30, 2012, to the present (Answer ¶ 30), Defendant relies on the following facts and documents: Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 7.8 of the Plan document effective January 1, 2009 requires the following: "[T]he Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth: (1) the net income, or loss, of the Trust Fund; (2) the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets; (3) the increase, or decrease, in the value of the Trust Fund; (4) all payments and distributions made from the Trust Fund; and (5) such further information as the Trustee and/or Administrator deems appropriate." SHERROD_0000001-SHERROD_0000071. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426;

19

SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

22.     In denying that Mr. Johnson violated ERISA by the actions and failures to act as described in paragraphs 16, 17, and 21 through 27 of the Complaint from May 30, 2012, to the present (Answer ¶ 31), Defendant relies on the following facts and documents:  On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond,  and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081.  On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo.  SHERROD_0000427-SHERROD_0000427.  Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards to pay Plan service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-

SHERROD_0000661. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371. The 2014 Statement does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each

21

participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

23.     In denying that Dr. Sherrod is liable for the breaches of her co-fiduciary Mr. Johnson (Answer ¶ 32), Defendant relies on the following facts and documents: On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards

22

to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371. The 2014 Statement does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071. At all

23

times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

24.     In denying that the Secretary is entitled to the relief sought in paragraphs (A) through (I) of his Prayer for Relief, or to any relief whatsoever (Answer to Prayer for Relief), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. On February 4, 2011, the Wayne County, Michigan, Circuit Court issued the Order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]." SHERROD_0000072-SHERROD_0000074. Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod. SHERROD_0000084-SHERROD_0000089. The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments Thus, the Plan assets could not be invested optimally during the freeze period. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, sought to unfreeze the Plan account in both federal and state court. SHERROD_0000084-SHERROD_0000089; SHERROD_0000428-SHERROD_0000463. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan

24

fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371. Pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair

& Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. SHERROD_0000372-SHERROD_0000391; SHERROD_0000469-SHERROD_0000469. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. SHERROD_0000668-SHERROD_0000668. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements

reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597. It is Defendant's understanding that the $250,000 that was wired from the Plan to Wells Fargo on November 10, 2011 for the purpose of posting a bond is currently held in a Wells Fargo account. The Plan's account balance has grown from $1,553,151.70 at the end of Plan year 2012 to $1,762,149.89 at the end of Plan year 2014. SHERROD_0000243-SHERROD_0000243. There is no monetary loss associated with the purported reporting and recordkeeping violations the Secretary identifies. Any alleged failure to administer benefits for employees terminated in 2008 in accordance with the Plan took place on or about May 23, 2008. It is Defendant's belief that the Secretary had actual knowledge of any alleged failure to administer benefits for terminated employees in accordance with the Plan as early as 2012. As early as February 2012, Dr. Sherrod, in her capacity as a Plan fiduciary, sought the Secretary's assistance in unfreezing her Plan account. SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468. Based upon communications from Dr. Sherrod and legal counsel, the Secretary had actual knowledge that the bond was posted from Plan assets as early as 2012. SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.


Interrogatory No. 3

Describe Defendant's performance or attempts to locate participants, make distributions to participants, or notify participants of their rights and benefits under the Plan during the relevant time period.

Answer to Interrogatory No. 3

Defendant objects to Interrogatory No. 3 on the grounds that it is compound, and vague and ambiguous in its use of the term "performance." Defendant further objects to Interrogatory No. 3

on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date.

Interrogatory No. 4

Describe the Trustee's performance or attempts to locate participants, make distributions to participants, or notify participants or their rights and benefits under the Plan during the relevant time period.

Answer to Interrogatory No. 4

Defendant objects to Interrogatory No. 4 on the grounds that it is compound, and vague and ambiguous in its use of the term "performance." Defendant further objects to Interrogatory No. 4 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

28

Subject to the foregoing objections, Defendant responds as follows: Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date.

Interrogatory No. 5

Describe the substantive facts and circumstances for the withdrawal of $253,000 from the Plan's account on or around November 15, 2011, including

    (a) detailing all discussions with Merrill Lynch or its attorneys related to the withdrawal;

    (b) explaining why the Court of Appeals for the State of Michigan stated on October 28, 2011, that it modified the stay from the Trial Court's Order to allow Sherrod to use only her assets exclusively to post a $250,000 bond as security for the underlying judgment against her in order to stay any collection and enforcement proceedings against her ("The motion is . . . DENIED with respect to the order prohibiting the transfer of appellants assets, EXCEPT that the Court orders that appellants' assets may be used to post the stay bond as modified by this order.");

29

(c) explaining why Sherrod stated in an affidavit that she directed the distributions for "the sole purpose of securing a bond pursuant to the Appeal Order;" and that "the two distributions . . . do not exceed my individual interest in the Plan";

(d) explaining why Merrill Lynch represented to the State of Michigan, on Feb. 28, 2012, that Defendant stated to them that "The $250,000 [from the Plan] was released based on Sherrod's representations and assurances that the money released was allocated to her account and not in excess of her account balance";

(e) explaining why Sherrod's attorney Michael Bartolic stated in a letter on Feb. 14,2012, that Sherrod directed Merrill Lynch to make a distribution to her on several occasions, but only received a distribution "once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stated the funds would be used to post a bond in a state court proceeding."

<u>Answer to Interrogatory No. 5</u>

Defendant objects to Interrogatory No. 5 on the grounds that it is compound, and seeks information outside of Defendant's possession, custody, or control. Defendant further objects to Interrogatory No. 5 on the grounds that it is vague and ambiguous in its use of the terms "withdrawal" and "distribution(s)." Defendant further objects to Interrogatory No. 5 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 5 on the grounds that it seeks information that is subject to the attorney-client privilege. Defendant further objects to Interrogatory No. 5 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: There was no withdrawal of $253,000 from the Plan's account on November 15, 2011. By way of further response, Defendant states that pursuant to a court order issued in connection with the legal actions

to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. Dr. Sherrod was advised by the Plan's legal counsel Edwin Conger that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

In response to Interrogatory No. 5(a), Defendant responds that there was no withdrawal of $253,000 from the Plan's account on November 15, 2011, and therefore there were no discussions with Merrill Lynch or its attorneys related to such a withdrawal. Defendant further states that he lacks knowledge or information sufficient to form a belief about the details of "all discussions with Merrill Lynch or its attorneys related to" any withdrawal. Defendant further states that, in their capacities as Plan fiduciaries, he and Dr. Sherrod were represented by legal counsel that would have engaged in discussions with Merrill Lynch on their behalf. Copies of written communications legal counsel had with Merrill Lynch on their behalf have been produced, including SHERROD_0000467-SHERROD_0000468.

In response to Interrogatory No. 5(b), Defendant lacks knowledge or information sufficient to form a belief about why the Court of Appeals for the State of Michigan stated on October 28, 2011, that it modified the stay from the Trial Court's Order to allow Dr. Sherrod to use only her assets exclusively to post a $250,000 bond as security for the underlying judgment against her in order to stay any collection and enforcement proceedings against her ("The motion is . . . DENIED with respect to the order prohibiting the transfer of appellants assets, EXCEPT that the Court orders that appellants' assets may be used to post the stay bond as modified by this order.").

In response to Interrogatory No. 5(c), Defendant states that Merrill Lynch forced Dr. Sherrod to sign an affidavit stating that she directed the distributions for "the sole purpose of

31

securing a bond pursuant to the Appeal Order;" and that "the two distributions . . . do not exceed my individual interest in the Plan." Defendant further states that Merrill Lynch drafted an affidavit for Dr. Sherrod to sign indicating she would only use her Plan assets, benefits to which she was otherwise entitled, to post bond to satisfy a judgment in favor of third parties with no connection to the plan. Merrill Lynch thus essentially engaged in an assignment or alienation of Defendant's benefits.

In response to Interrogatory No. 5(d), Defendant states that he lacks knowledge or information sufficient to form a belief about why Merrill Lynch represented to the State of Michigan, on Feb. 28, 2012, that Defendant stated to them that "The $250,000 [from the Plan] was released based on Sherrod's representations and assurances that the money released was allocated to her account and not in excess of her account balance."

In response to Interrogatory No. 5(e), Defendant states that he lacks knowledge or information sufficient to form a belief about why attorney Michael Bartolic stated in a letter on Feb. 14, 2012, that Dr. Sherrod directed Merrill Lynch to make a distribution to her on several occasions, but only received a distribution "once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stated the funds would be used to post a bond in a state court proceeding." Defendant Johnson further states that Mr. Bartolic represented Dr. Sherrod in her capacity as a Plan fiduciary.

Interrogatory No. 6

Describe the substantive facts and circumstances for all withdrawals from the Plan for Plan year 2014, including items claimed as "Total expenses" for Plan year 2014 on the Plan's Form 5500, including $57,000 in Benefits paid, $129,438 in Administrative service provider expenses and $12,562 in Other expenses, including all withdrawals from the Plan that are not captured in the amounts reported on the Plan's Form 5500, and including the $296,000 that was withdrawn from

the Plan's account and paid to Defendant Sherrod for Plan year 2014.

Answer to Interrogatory No. 6

Defendant objects to Interrogatory No. 6 on the grounds that it is compound, and vague and ambiguous in its use of the terms "withdrawals" and "withdrawn." Defendant further objects to Interrogatory No. 6 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 6 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 6 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to Interrogatory No. 6 may be determined by examining, auditing, compiling, abstracting, or summarizing business records including the following: SHERROD_0000243-SHERROD_0000243; SHERROD_0000354-SHERROD_0000371; SHERROD_0000470-SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000663-SHERROD_0000667; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to Interrogatory No. 6 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further responds that, in 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. The Plan additionally issued payments of $40,000 to Dr. Sherrod in 2014, however, those amounts were

33

never cashed and remain Plan assets. The Plan additionally paid Dr. Sherrod $57,000 in benefit

distributions in 2014. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was

and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit

payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014.

Defendant further states that no additional amounts were paid from the Plan in 2014.

Interrogatory No. 7

Describe the use of any Plan assets from January 1, 2011, to present and identify all parties that

received Plan assets during this time, including every amount paid, the date paid for each amount,

to whom payment was made, who authorized the payment on behalf of the Plan, and why the

payment was reasonable and necessary for the Plan.

Answer to Interrogatory No. 7

Defendant objects to Interrogatory No. 7 on the grounds that it is compound, and vague and

ambiguous in its use of the phrase "use of Plan assets." Defendant further objects to Interrogatory

No. 7 on the grounds that it is overly broad and unduly burdensome in requesting information

"from January 1, 2011, to present." Defendant further objects to Interrogatory No. 7 on the

grounds that it seeks information outside of Defendant's possession, custody, or control.

Defendant further objects to Interrogatory No. 7 on the grounds that it is overly broad and unduly

burdensome. Defendant further objects to Interrogatory No. 7 on the grounds that it seeks to

circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in

Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to

Interrogatory No. 7 may be determined by examining, auditing, compiling, abstracting, or

summarizing business records including the following: SHERROD_0000072-

SHERROD_0000074; SHERROD_0000079-SHERROD_0000081; SHERROD_0000243-SHERROD_0000243; SHERROD_0000321-SHERROD_0000335; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371; SHERROD_0000372-SHERROD_0000391; SHERROD_0000470-SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000663-SHERROD_0000667; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to Interrogatory No. 7 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further responds that, on February 4, 2011, the Wayne County, Michigan, Circuit Court issued an order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]" (the "Order"). Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod. The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments. Thus, the Plan assets could not be invested optimally during the freeze period. Pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo Bank, N.A. ("Wells Fargo") to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. Dr. Sherrod was advised by the Plan's legal counsel Edwin Conger that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

Defendant further responds that only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod wrote a letter to Keith Uhler dated December 23, 2013 requesting benefit payments for Ms. Riggleman.

Defendant further responds that, in 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. The Plan additionally issued payments of $40,000 to Dr. Sherrod in 2014, however, those amounts were never cashed and remain Plan assets. The Plan additionally paid Dr. Sherrod $57,000 in benefit distributions in 2014. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Defendant further states that no additional amounts were paid from the Plan in 2014.

Defendant further states that Dr. Sherrod received benefit payments from the Plan in 2015 and 2016.


Interrogatory No. 8

Identify any party that gave you advice concerning the Plan, including distributions to participants and any use of Plan assets, and describe and explain the advice received.

Answer to Interrogatory No. 8

Defendant objects to Interrogatory No. 8 on the grounds that it is compound, and vague and ambiguous in its use of the term "distributions" and the phrase "use of Plan assets." Defendant further objects to Interrogatory No. 8 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 8 on the grounds that it seeks

36

information that is subject to the attorney-client privilege. Defendant further objects to Interrogatory No. 8 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant received advice from Plan service providers identified in his response to Interrogatory No. 13. Defendant does not recall all of the advice received. In general, Defendant was advised that the Plan is an ERISA-governed Plan, that the Plan freeze violated ERISA's anti-alienation provisions, and that the attorneys' fees and costs Dr. Sherrod assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod was further advised that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod has produced invoices and written communications with Plan service providers in her possession, custody, and control that reflect their advice to her in her capacity as a Plan fiduciary, including SHERROD_0000598-SHERROD_0000599; SHERROD_0000600-SHERROD_0000601; SHERROD_0000602-SHERROD_0000603; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000662-SHERROD_0000662.


Interrogatory No. 9

Describe your understanding as to why you were selected to serve as the Plan Administrator to the Plan, including all due diligence conducted before the selection and the history of any personal relationship between you and Shirley Sherrod.

Answer to Interrogatory No. 9

Defendant objects to Interrogatory No. 9 on the grounds that it is vague and ambiguous in

its use of the term "personal relationship." Defendant further objects to Interrogatory No. 9 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 9 on the grounds that it is overly broad and unduly burdensome in its request for "all due diligence conducted" and "the history of any personal relationship." Defendant further objects to Interrogatory No. 9 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 9 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Mr. Edwin Conger advised the Plan and Dr. Sherrod, in her capacity as a Plan fiduciary, to retain Mr. Johnson as Plan Administrator. Mr. Johnson believes he was selected to serve as the Plan Administrator based upon qualifications including his over forty years of experience with investing, including taking classes pertaining to investing, and based upon the advice and recommendation of Edwin Conger, following consideration of other candidates.


Interrogatory No. 10

Describe your understanding of the reasons for selecting LJ Consulting Services, LLC ("LJ Consulting") to serve as the Plan Administrator to the Plan, including all due diligence conducted before the selection.

Answer to Interrogatory No. 10

Defendant objects to Interrogatory No. 10 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 10 on the grounds that it is overly broad and unduly burdensome in its request for "all due diligence conducted." Defendant further objects

38

to Interrogatory No. 10 on the grounds that it seeks information not relevant to the issues raised in

this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to Interrogatory No. 10 on the grounds that it seeks to circumvent or

exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of

Civil Procedure 33.

 Subject to the foregoing objections, Defendant responds as follows: Mr. Edwin Conger

advised the Plan and Dr. Sherrod, in her capacity as a Plan fiduciary, to retain LJ Consulting as

Plan Administrator.  Mr. Johnson believes that LJ Consulting was selected to serve as Plan

Administrator based upon his qualifications as owner, including his over forty years of experience

with investing, including taking classes pertaining to investing, and based upon the advice and

recommendation of Edwin Conger, following consideration of other candidates.


Interrogatory No. 11

From Plan Year 2011 to present, describe your process for reviewing the Plan's Form 5500 before

filing, including your efforts to ensure all the information on the Form 5500 was reported

accurately, including how this process changed, if at all, at any point.

Answer to Interrogatory No. 11

 Defendant objects to Interrogatory No. 11 on the grounds that it is vague and ambiguous in

its use of the phrase "how this process changed."  Defendant objects to Interrogatory No. 11 on the

grounds that it is overly broad and unduly burdensome in requesting information regarding "how

this process changed, if at all, at any point."  Defendant further objects to Interrogatory No. 11 on

the grounds that it is overly broad and unduly burdensome in requesting information "[f]rom Plan

Year 2011 to the present."  Defendant further objects to Interrogatory No. 11 on the grounds that it

seeks information outside of Defendant's possession, custody, or control.   Defendant further

objects to Interrogatory No. 11 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: During the period when he served as Plan Administrator, Defendant obtained the Plan's asset information, and provided that information to the Plan's actuary. The Plan's actuary prepared the Form 5500, and Defendant reviewed the Form 5500 and discussed its content and any questions he may have had with the Plan's actuary. Once he was satisfied that it was accurate, Defendant signed the Form 5500, and the Plan's actuary filed the Form 5500 on his behalf. This process did not change at any point.

Interrogatory No. 12

Identify your contact person with each asset custodian during the period from May 30, 2012 to present and describe the circumstances for changing to different asset custodians during this time period.

Answer to Interrogatory No. 12

Defendant objects to Interrogatory No. 12 on the grounds that it is compound, and seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 12 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant responds that the following financial institutions provided asset custodian services to the Plan from May 30, 2012 to the present: Merrill Lynch; Comerica. Defendant further responds that, to the extent the Plan needs or needed to contact asset custodians, the customer service contact information

provided on the asset custodian account statements is or was used.

On or about June 6, 2013, Merrill Lynch resigned as asset custodian to the Plan. Defendant lacks knowledge or information sufficient to form a belief as to why Merrill Lynch resigned. Defendant further states that Merrill Lynch transferred all Plan assets to a trust account at Comerica. Comerica was selected as Plan custodian upon the advice and recommendation of Edwin Conger.

Interrogatory No. 13

Identify all contracts between the Plan and any service providers (this includes any lawyers and law firms), identify each service provider, describe the reason and circumstances for the Plan's engagement of each of these service providers, describe the duties performed by each service provider, and identify your point of contact with each service provider, from May 30, 2012 to present.

Answer to Interrogatory No. 13

Defendant objects to Interrogatory No. 13 on the grounds that it is compound. Defendant further objects to Interrogatory No. 13 on the grounds that it is overly broad and unduly burdensome in requesting Defendant to identify "all contracts" and "each service provider" with no limitation as to service provided. Defendant further objects to Interrogatory No. 13 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 13 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant previously produced the following contracts to the Secretary: SHERROD_0000231 - SHERROD_0000232.

Defendant states that he is not aware of any additional contracts in his possession, custody, or control. Defendant further responds that the following law firms were retained to represent himself and/or Dr. Sherrod, in their capacity as Plan fiduciaries, in connection with legal action they took in those capacities to unfreeze the Plan: Tenney & Bentley, LLC (Edwin Conger (deceased), David Shannon); Roberts Bartolic, LLP (Michael Bartolic); Valdemar L. Washington, PLLC (Valdemar Washington); Brooks Wilkins Sharkey & Turco PLLC (Michael Turco); The Law Office of Pasquale Ciccodicola PLLC (Pasquale Ciccodicola); Crane, Heyman, Simon, Welch & Clar (John H. Redfield); The Law Offices of Ben M. Gonek PLLC (Ben Gonek); and Mark Granzotto PC (Mark Granzotto). Defendant lacks knowledge or information sufficient to form a belief about the specific duties performed by each service provider. Defendant further responds that he has produced copies of invoices and written communications in his possession, custody, and control that contain this information, including SHERROD_0000598-SHERROD_0000599; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000662-SHERROD_0000662. Any filings these service providers prepared are publicly available.

Defendant further responds that the following firms were retained to provide actuarial services to the Plan: Jeffrey L. Sinclair & Company (Jeffrey Sinclair (deceased)); M.S Assoc, 200 S Michigan Ave, Chicago, IL 60602. Defendant lacks knowledge or information sufficient to form a belief about the specific duties performed by each service provider. Defendant further responds that he has produced copies of invoices and written communications in his possession, custody, and control that contain this information, including SHERROD_0000600-SHERROD_0000601; SHERROD_0000602-SHERROD_0000603; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Any Form 5500s these service providers prepared are publicly available.

42

Defendant further responds that the following financial institutions were retained to provide asset custodian services to the Plan: Merrill Lynch; Comerica. Defendant further responds that, to the extent the Plan needs or needed to contact asset custodians, the customer service contact information provided on the asset custodian account statements is or was used.

Interrogatory No. 14

Describe all Plan distributions from the Plan from January 1, 2011 to present, including identifying the distribution request, identifying the distribution authorization, listing the amount of each distribution, the date of each distribution, and the participant that received each distribution.

Answer to Interrogatory No. 14

Defendant objects to Interrogatory No. 14 on the grounds that it is compound, and vague and ambiguous in its use of the phrase "distribution(s)." Defendant further objects to Interrogatory No. 14 on the grounds that it is overly broad and unduly burdensome in requesting "all Plan distributions" from "January 1, 2011 to the present." Defendant further objects to Interrogatory No. 14 on the grounds that it seeks information outside of Defendant's possession, custody, or control. Defendant further objects to Interrogatory No. 14 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to Interrogatory No. 14 may be determined by examining, auditing, compiling, abstracting, or summarizing business records including the following: SHERROD_0000243-SHERROD_0000243; SHERROD_0000354-SHERROD_0000371; SHERROD_0000470-SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to

43

Interrogatory No. 14 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further states that only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod wrote a letter to Keith Uhler dated December 23, 2013 requesting benefit payments for Ms. Riggleman.

Defendant further responds that, in 2014, the Plan made benefit distributions to Dr. Sherrod. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014.

Defendant further states that Dr. Sherrod received benefit payments from the Plan in 2015 and 2016.


Interrogatory No. 15

Describe all substantive facts related to the creation, purpose, and business of LJ Consulting, including identifying all employees of LJ Consulting and all clients of LJ Consulting.

Answer to Interrogatory No. 15

Defendant objects to Interrogatory No. 15 on the grounds that it is compound, and vague and ambiguous in its use of the terms "creation," "purpose," and "business." Defendant further objects to Interrogatory No. 15 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 15 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 15 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as

44

outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Mr. Edwin Conger advised Mr. Johnson to establish LJ Consulting, LLC. LJ Consulting has one employee. Presently, Mr. Johnson is LJ Consulting's only employee. Presently, LJ Consulting's sole client is the Shirley T. Sherrod M.D., P.C. Target Benefit Pension Plan.

Interrogatory No. 16

Describe all your experience, training, and qualifications to serve as a Plan Administrator to retirement plans, such as the Plan.

Answer to Interrogatory No. 16

Defendant objects to Interrogatory No. 16 on the grounds that it is compound, and overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 16 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 16 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Mr. Johnson sought advice from ERISA professionals including Mr. Edwin Conger, the Plan's attorney. Mr. Johnson has over forty years of experience with investing, including taking classes pertaining to investing. Mr. Johnson additionally possesses a genuine desire to help others save for retirement.

45

Dated: April 4, 2017

Respectfully submitted,

By: */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 861-6615
Facsimile: (202) 659-4503
E-Mail: lcg@groom.com
E-Mail: nfedder@groom.com

Daniel Broderick Jr
Bradford D. Roth
**CASSIDAY SCHADE LLP**
20 N. Wacker Drive
Chicago, IL 60606
Telephone: (312) 444-1612
Facsimile: (312) 444-1669
E-Mail: dbroder@cassiday.com
E-Mail: broth@cassiday.com

*Attorneys for Defendants*
*Shirley T. Sherrod, Leroy Johnson, and the*
*Shirley T. Sherrod, M.D., P.C. Target Benefit*
*Pension Plan*

**VERIFICATION**

    I have read the foregoing Defendant Leroy Johnson's Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories and declare under penalty of perjury that the answers given are true and correct.

Date: _____     _____
                                                      Mr. Leroy Johnson

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2017, I served via electronic mail the foregoing

**DEFENDANT LEROY JOHNSON'S AMENDED RESPONSES AND OBJECTIONS TO**

**SECRETARY OF LABOR'S FIRST SET OF INTERROGATORIES** on the following

counsel of record for Plaintiff Thomas E. Perez, Secretary of Labor, United States Department of

Labor:

Bruce C. Canetti
U.S. Department Of Labor, Office Of The Solicitor
230 S. Dearborn St.
Rm 844
Chicago, IL 60604
(312) 353-3271
Email: canetti.bruce@dol.gov

By: */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Groom Law Group
1701 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 861-6615
Fax: (202) 659-4503
Email: lcg@groom.com

*Attorney for Defendants Shirley T. Sherrod,*
*Leroy Johnson, and the Shirley T. Sherrod,*
*M.D., P.C. Target Benefit Pension Plan*

EXHIBIT 22

# Form 5500-SF

## Short Form Annual Return/Report of Small Employee Benefit Plan

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA), and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).

▶ **Complete all entries in accordance with the instructions to the Form 5500-SF.**

OMB Nos. 1210-0110
1210-0089

**2014**

**This Form is Open to Public Inspection**

---

| Part I | Annual Report Identification Information |
|---|---|

For calendar plan year 2014 or fiscal plan year beginning    01/01/2014                    and ending    12/31/2014

**A** This return/report is for:

- [X] a single-employer plan
- [ ] a multiple-employer plan (not multiemployer) (Filers checking this box must attach a list of participating employer information in accordance with the form instructions)
- [ ] a one-participant plan
- [ ] a foreign plan

**B** This return/report is

- [ ] the first return/report
- [ ] the final return/report
- [ ] an amended return/report
- [ ] a short plan year return/report (less than 12 months)

**C** Check box if filing under:

- [X] Form 5558
- [ ] automatic extension
- [ ] DFVC program
- [ ] special extension (enter description)

---

| Part II | Basic Plan Information—enter all requested information |
|---|---|

**1a** Name of plan

SHIRLEY T SHERROD, M.D., P.C. TARGET PENSION PLAN

**1b** Three-digit plan number (PN) ▶    002

**1c** Effective date of plan
01/01/1987

**2a** Plan sponsor's name and address; include room or suite number (employer, if for a single-employer plan)

SHIRLEY T SHERROD MD PC
SAME

PO BOX 2423                           PO BOX 2423
CHICAGO, IL 60690                      CHICAGO, IL 60690

**2b** Employer Identification Number (EIN)    38-2174656

**2c** Sponsor's telephone number
248-341-5100

**2d** Business code (see instructions)
621111

**3a** Plan administrator's name and address  [ ] Same as Plan Sponsor.

LJ CONSULTANTS                         148 WAUKEGAN RD
                                       WAUKEGAN, IL 60031

**3b** Administrator's EIN
38-2171344

**3c** Administrator's telephone number

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN, and the plan number from the last return/report.

**a** Sponsor's name

**4b** EIN

**4c** PN

| | | | |
|---|---|---|---|
| **5a** Total number of participants at the beginning of the plan year | **5a** | 17 |
| **b** Total number of participants at the end of the plan year.................................................. | **5b** | 17 |
| **c** Number of participants with account balances as of the end of the plan year (defined benefit plans do not complete this item) | **5c** | 17 |
| **d(1)** Total number of active participants at the beginning of the plan year............................. | **5d(1)** | 17 |
| **d(2)** Total number of active participants at the end of the plan year.................................... | **5d(2)** | 17 |
| **e** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested.................................................................................. | **5e** | 0 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including, if applicable, a Schedule SB or Schedule MB completed and signed by an enrolled actuary, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | | | |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |

Preparer's name (including firm name, if applicable) and address (include room or suite number ) (optional)

Preparer's telephone number (optional)

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500-SF.**

Form 5500-SF (2014)
v. 140124

Form 5500-SF 2014                                                    Page **2**

| | | | Yes | No |
|---|---|---|---|---|
| **6a** | Were all of the plan's assets during the plan year invested in eligible assets? (See instructions.) ........................... | | X | |
| **b** | Are you claiming a waiver of the annual examination and report of an independent qualified public accountant (IQPA) under 29 CFR 2520.104-46? (See instructions on waiver eligibility and conditions.)............................... | | X | |
| | **If you answered "No" to either line 6a or line 6b, the plan cannot use Form 5500-SF and must instead use Form 5500.** | | | |

| | | Yes | No | Not determined |
|---|---|---|---|---|
| **c** | If the plan is a defined benefit plan, is it covered under the PBGC insurance program (see ERISA section 4021)? ...... | | | |

| Part III | Financial Information |
|---|---|

| **7** | Plan Assets and Liabilities | | **(a) Beginning of Year** | **(b) End of Year** |
|---|---|---|---|---|
| **a** | Total plan assets .......................................... | **7a** | 1795236 | 1762150 |
| **b** | Total plan liabilities .......................................... | **7b** | | |
| **c** | Net plan assets (subtract line 7b from line 7a) ..... | **7c** | 1795236 | 1762150 |

| **8** | Income, Expenses, and Transfers for this Plan Year | | **(a) Amount** | **(b) Total** |
|---|---|---|---|---|
| **a** | Contributions received or receivable from: | | | |
| | (1) Employers ......................................... | **8a(1)** | | |
| | (2) Participants ...................................... | **8a(2)** | | |
| | (3) Others (including rollovers) ................. | **8a(3)** | | |
| **b** | Other income (loss)................................... | **8b** | 165914 | |
| **c** | Total income (add lines 8a(1), 8a(2), 8a(3), and 8b)........................ | **8c** | | 165914 |
| **d** | Benefits paid (including direct rollovers and insurance premiums to provide benefits)............................ | **8d** | 57000 | |
| **e** | Certain deemed and/or corrective distributions (see instructions) ... | **8e** | | |
| **f** | Administrative service providers (salaries, fees, commissions)........ | **8f** | 129438 | |
| **g** | Other expenses .......................................... | **8g** | 12562 | |
| **h** | Total expenses (add lines 8d, 8e, 8f, and 8g)................................ | **8h** | | 199000 |
| **i** | Net income (loss) (subtract line 8h from line 8c)......................... | **8i** | | -33086 |
| **j** | Transfers to/ (from) the plan (see instructions) ......................... | **8j** | | |

| Part IV | Plan Characteristics |
|---|---|

**9a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristic Codes in the instructions:
2B

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristic Codes in the instructions:

| Part V | Compliance Questions |
|---|---|

| **10** | During the plan year: | Yes | No | Amount |
|---|---|---|---|---|
| **a** | Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? (See instructions and DOL's Voluntary Fiduciary Correction Program) .............. **10a** | | X | |
| **b** | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 10a.) **10b** | | X | |
| **c** | Was the plan covered by a fidelity bond? ................................................. **10c** | | X | |
| **d** | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? **10d** | | X | |
| **e** | Were any fees or commissions paid to any brokers, agents, or other persons by an insurance carrier, insurance service, or other organization that provides some or all of the benefits under the plan? (See instructions.) **10e** | | X | |
| **f** | Has the plan failed to provide any benefit when due under the plan? ................... **10f** | | X | |
| **g** | Did the plan have any participant loans? (If "Yes," enter amount as of year end.)................ **10g** | | X | |
| **h** | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) **10h** | | X | |
| **i** | If 10h was answered "Yes," check the box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3............................ **10i** | | | |

| Part VI | Pension Funding Compliance |
|---|---|

| | | Yes | No |
|---|---|---|---|
| **11** | Is this a defined benefit plan subject to minimum funding requirements? (If "Yes," see instructions and complete Schedule SB (Form 5500) and line 11a below)............................ | | X |

| **11a** | Enter the unpaid minimum required contribution for current year from Schedule SB (Form 5500) line 39 ................... | **11a** | |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| **12** | Is this a defined contribution plan subject to the minimum funding requirements of section 412 of the Code or section 302 of ERISA? .. | | X |

(If "Yes," complete line 12a or lines 12b, 12c, 12d, and 12e below, as applicable.)

**a** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions, and enter the date of the letter ruling granting the waiver. ............................................................................................ Month _____ Day _____ Year _____

**SHIRLEY T. SHERROD, M.D., P.C.**
**TARGET PENSION PLAN**

Updated: 9/25/19

Parts I and II of invoices from trust operating and defense expenses are enclosed with alpha-numeric enumeration. The trust proceeds listed below were applied towards the lengthy years of debt created to ensure that the Trust was protected for its participants by its fiduciaries. All debts required access-off loans-from sources either cash as in money orders or charge cards – all remaining debts required repayment as even at the present date this unsustainable act of cruelty against the fund-and-aged-retired participants has recurred.

These reimbursement amounts are applied to each of the numerous invoices that were not originally paid by the trust.

| Date | Check Number | EXHIBIT | Payee / Vendor | Receipt | Disbursement | Description | Cumulative Total |
|---|---|---|---|---|---|---|---|
| 1/22/14 | 4015600963 | DOL004392 loan repay clt -1633 | SHIRLEY T. SHERROD | | 10,000.00 | | |
| 1/22/14 | 4015600977 | DOL004393 loan repay-citi | SHIRLEY T. SHERROD | | 10,000.00 | | |
| 1/22/14 | 4015600959 | DOL004394 loan repay cit -1633 | SHIRLEY T. SHERROD | | 10,000.00 | | |
| 1/22/14 | 4015600972 | DOL004395 ref invoices pts I and II | SHIRLEY T. SHERROD | | 10,000.00 | | |
| 1/22/14 | 4015600961 | DOL004397,DOL002298,DOL004398 | SHIRLEY T. SHERROD | | 10,000.00 | ref invoices pts I and II | |
| 2/11/14 | 4012704911 | DOL002312,DOL002298,DOL004398 | SHIRLEY T. SHERROD | ** | 10,000.00 | UNCASHED CHECK | |
| 2/11/14 | 4015705847 | DOL002312,DOL002298,DOL004398 | SHIRLEY T. SHERROD | ** | 10,000.00 | UNCASHED CHECK | |
| 2/11/14 | 4015705854 | DOL002312,DOL002298,DOL004398 | SHIRLEY T. SHERROD | * | 10,000.00 | UNCASHED CHECK | |
| 2/11/14 | 4015705858 | DOL002312 | SHIRLEY T. SHERROD | * | 10,000.00 | UNCASHED CHECK | |
| 3/4/14 | 202927383 | DOL2374 & DOL2375 | SHIRLEY T. SHERROD P/ADM | | 57,405.00 | | |
| 3/4/14 | 202927402 | DOL2376 & DOL2377 loan repay clt - 1633 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 3/4/14 | 202927403 | DOL2378 & DOL2379 loan repay cit -1633 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 3/4/14 | 202927404 | DOL2380 & DOL2381 loan repay cit -1633 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 3/4/14 | 202927407 | DOL2382 & DOL2383 loan repay cit -1633 | SHIRLEY T. SHERROD P/ADM | | 3,000.00 | | |
| 3/4/14 | 202927408 | DOL2384 & DOL2385 | EDWIN CONGER / C/O S.T.SHERROD | * | 3,000.00 | ATTORNEY - TENNEY & BENTLEY | |
| 4/15/14 | 324972964 | DOL2386 & DOL2387 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/15/14 | 324972966 | DOL2388 & DOL2389 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/15/14 | 324972966 | DOL2390 & DOL2391 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/15/14 | 324972969 | DOL2392 & DOL2393 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/15/14 | 324972972 | DOL2396 & DOL2397 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/15/14 | 324972975 | DOL2398 & DOL2399 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 2,000.00 | | |
| 4/28/14 | 324924360 | DOL2400 & DOL2401 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/28/14 | 202940361 | DOL2402 & DOL2403 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/28/14 | 202940362 | DOL2404 & DOL2405 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/28/14 | 202940365 | DOL2406 & DOL2407 loan repay-citi | SHIRLEY T. SHERROD P/ADM | | 2,000.00 | | |
| 5/27/14 | 325019689 | DOL2408 & DOL2409 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 10,000.00 | | |
| 5/27/14 | 325019690 | DOL2410 & DOL2411 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 10,000.00 | | |
| 5/27/14 | 325029691 | DOL2412 & DOL2413 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 10,000.00 | | |
| 5/27/14 | 325019692 | DOL2414 & DOL2415 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 10,000.00 | | |
| 5/27/14 | 325019693 | DOL2416 & DOL2417 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 10,000.00 | | |
| 6/17/14 | 325047634 | DOL2418 & DOL2419 | EDWIN CONGER / C/O S.T.SHERROD | * | 1,000.00 | ATTORNEY - TENNEY & BENTLEY | |
| 7/28/14 | 325097478 | DOL2420 & DOL2421 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 9/23/14 | 202970019 | DOL2422 & DOL2423 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,500.00 | | |
| 10/21/14 | 202976268 | DOL2424 & DOL2425 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 4,000.00 | | |
| 10/27/14 | 202976270 | DOL2426 & DOL2427 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 3,000.00 | | |
| 11/24/14 | 202981350 | DOL2428 & DOL2429 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 11/24/14 | 202981351 | DOL2430 & DOL2431 ref invoices pts I and II | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |

# PART I-TRUST EXPENSES 2011-13

**THE FOLLOWING INVOICES AND SOME ACCOMPANYING PAYMENT RECEIPTS WHERE CASH WAS REQUIRED ARE ENCLOSED. THESE REPRESENT EXPENSES INCURRED BY THE TRUST WITH NORMAL OPERATIONS INCLUDING ACCOUNTING FOR MANDATORY IRS 5500 FILING AND PARTICIPANT VALUATIONS.**

**ALSO INCLUDED ARE INVOICES FOR LEGAL SERVICES REQUIRED WHEN THE ERISA FUND WAS ALIENATED IN ENTIRETY AT THE BEHEST OF A LEGAL OPPONENT AND ON THE PART OF A STATE COURT JUDGE. ALL EFFORTS WERE MADE TO CORRECT THIS INJUSTICE THAT PERMANENTLY HARMED THE TRUST AND ALL ITS PARTICIPANTS. THIS SET OF INVOICES PREVIOUSLY PRESENTED IS SHOWN HERE WITH EXPLANATORY NOTES IN AN ATTEMPT TO ELIMINATE THE CONFUSION ON THE PART OF THE DOL AT DEPOSITION.**

**INVOICE TOTAL OVER 3 YEARS OF DEFENSE ON THE PART OF THE TRUST WAS $24,600.**

**THESE PAYMENTS WERE ACCOMPLISHED BY LOANS THAT REQUIRED REIMBURSEMENT UPON ACCESS TO THE TRUST FUNDS. THESE REIMBURSEMENTS FOR THREE YEARS OF DEBT ASSUMPTION IS REFLECTED IN THE EXPENSE AMOUNT NOTED ON THE ACCOMPANYING FORM 5500.**

# ACTUARY PAYMENT

JEFFREY L. SINCLAIR & COMPANY
PO BOX 510843
LIVONIA, MI 48151

PREPARATION OF TERMINATION PAPERWORK FOR
C FOR INCLUDING IRS FORM 1099R, 1096 AND 945

PAST DUE

PREPARATION OF TARGET PENSION PLAN & TRUST
PLAN ACTUARIAL VALUATION IRS FORM 5500 AND
RELATED SCHEDULES, SUMMARY OF BENEFIT
ILLUSTRATIONS, AND CONSULTATION WITH ADVISORS
FOR PLAN YEAR ENDING DECEMBER 31, 2002

## $1500.00

PAID $1610-2 CHECKS ATTACHED

$1,510.00

TOTAL                                    $1,610.00

REMITTANCE ADVICE

| DATE | ISSUED TO | GROSS | FICA SOC. SEC. | MEDI-CARE | INC. TAX | ST. TAX | CHECK NUMBER | NET AMOUNT |
|------|-----------|-------|----------------|-----------|----------|---------|--------------|------------|
| 3/29 | Jeffrey Sinclair & Co | | | | | | 546 | 700 |

DESCRIPTION

REMITTANCE ADVICE

| DATE | ISSUED TO | GROSS | FICA SOC. SEC. | MEDI-CARE | INC. TAX | ST. TAX | CHECK NUMBER | NET AMOUNT |
|------|-----------|-------|----------------|-----------|----------|---------|--------------|------------|
| | Sinclair Co | | | | | | 4955 | 700 |

DESCRIPTION

NON-NEGOTIABLE
RECORD OF EARNINGS OR PAYMENTS

FORM NO. A-16-BPD-4          Pay Period From          To
Rate Of Pay

# ACTUARY PAYMENT



## JEFFREY L. SINCLAIR & COMPANY
### PO BOX 510843
### LIVONIA, MI 48151

**Invoice Submitted to:**
DR SHERROD SHIRLEY
SHIRLEY SHERROD MD PC
PO BOX 515
SOUTHFIELD MI 48037

August 1, 2010

## PROFESSIONAL SERVICES

# $1,000.00

PREPARATION OF TARGET PENSION PLAN & TRUST
PLAN ACTUARIAL VALUATION IRS FORM 5500 AND
RELATED SCHEDULES, SUMMARY OF BENEFIT
ILLUSTRATIONS, AND CONSULTATION WITH ADVISORS

$1,000.00

**UNITED STATES POSTAL SERVICE®**

## CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION
**NOT NEGOTIABLE**

KEEP THIS RECEIPT FOR YOUR RECORDS

Pay to

Address

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 8407967930 | 2010-11-16 | 294141 | $1000.00 | 0009 |

INFORMATION
Address
**NOT NEGOTIABLE**

YOUR RECORDS

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 8407967930 | 2010-11-16 | 294141 | $1000.00 | 0009 |

**UNITED STATES POSTAL SERVICE**

## POSTAL MONEY ORDER

| Serial Number | Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|---|
| 8407967930 | 2010-11-16 | 294141 | $1000.00 |

Amount ONE THOUSAND DOLLARS & 00¢ *******************

to

ress

Clerk
0009

From

Address

no    2009 Dep

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑆000000800 2⑈    ⑆8407967930⑈

A-10

# ACTUARY PAYMENT

## JEFFREY L. SINCLAIR & COMPANY
### PO BOX 510843
### LIVONIA, MI 48151

**Invoice Submitted to:**
DR SHERROD SHIRLEY
SHIRLEY SHERROD MD PC
PO BOX 515
SOUTHFIELD MI 48037

August 12, 2010

**PROFESSIONAL  SERVICES**

CMAA

**$1850.00**

PREPARATION OF TARGET PENSION PLAN & TRUST
PLAN DOCUMENT AND OTHER SUCH AMENDMENTS AS
PROVIDED

$1,850.00



A-14

# ACTUARY PAYMENT

### JEFFREY L. SINCLAIR & COMPANY
### PO BOX 510843
### LIVONIA, MI 48151

**$1500.00**

Invoice Submitted to:

DR SHERROD SHIRLEY
SHIRLEY SHERROD MD PC
PO BOX 515
SOUTHFIELD MI 48037

October 12, 2011

## PROFESSIONAL SERVICES

PREPARATION OF TARGET PENSION PLAN & TRUST
PLAN ACTUARIAL VALUATION IRS FORM 5500 AND
RELATED SCHEDULES, SUMMARY OF BENEFIT
ILLUSTRATIONS, AND CONSULTATION WITH ADVISORS
FOR PLAN YEAR ENDING DECEMBER 31, 2010
REDUCED FEE AS AGRE...

Paid @ 1500

**UNITED STATES POSTAL SERVICE** — CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

Pay to
Address

NOT NEGOTIABLE

Serial Number 20291410451   Year, Month, Day 2012-09-26   Post Office 483332   Amount $1000.00

**UNITED STATES POSTAL SERVICE** — CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

Pay to
Address

NOT NEGOTIABLE

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number 19379862516   Year, Month, Day 2011-12-24   Post Office 480670   Amount $500.00   Clerk 0014

A-22

# ACTUARY PAYMENT

## JEFFREY L. SINCLAIR & COMPANY
### PO BOX 510843
### LIVONIA, MI 48151

**Invoice Submitted to:**
DR SHERROD SHIRLEY
SHIRLEY SHERROD MD PC
PO BOX 515
SOUTHFIELD MI 48037

July 25, 2012

### PROFESSIONAL  SERVICES

PREPARATION OF TARGET PENSION PLAN & TRUST
PLAN ACTUARIAL VALUATION IRS FORM 5500 AND
RELATED SCHEDULES, SUMMARY OF BENEFIT
ILLUSTRATIONS, AND CONSULTATION WITH ADVISORS
FOR PLAN YEAR ENDING DECEMBER 31, 2011
REDUCED FEE AS AGREED
$1,000.00

A-22

3/-8

**UNITED STATES POSTAL SERVICE**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to

Address

Serial Number
030072273

**UNITED STATES POSTAL SERVICE**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to

Address

Serial Number
17494523730

**UNITED STATES POSTAL SERVICE**

Serial Number
030072273

Serial Number
17494523730

Pay to

Address

Memo

⑈00000800 2⑈

© 2008 United States Postal Service. All Rights Reserved.

**CUSTOMER'S RECEIPT**

KEEP THIS RECEIPT FOR YOUR RECORDS

Clerk
0034

Amount
$500.00

Post Office
480340

Year, Month, Day
2010-05-28

**POSTAL MONEY ORDER**

U.S. Dollars and Cents
$500.00

Clerk
0034

Post Office
480340

Year, Month, Day
2010-05-28

FIVE HUNDRED DOLLARS & 00¢

Amount

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

17388598 52 2⑈

**UNITED STATES POSTAL SERVICE**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to

Address

Serial Number
17388598577

**UNITED STATES POSTAL SERVICE**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to

Address

Serial Number
17388598522

**UNITED STATES POSTAL SERVICE**

Serial Number
17388598522

Pay to

Address

Memo

⑈000800 2⑈

UNITED STATES POSTAL SERVICE®

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Serial Number

17388598566

Pay to

Address

UNITED STATES POSTAL SERVICE®

Serial Number

17388598566

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Pay to

Address

Year, Month, Day

2010-05-28

Post Office

480340

Amount

$500.00

Clerk

0034

UNITED STATES POSTAL SERVICE®

POSTAL MONEY ORDER

Year, Month, Day

2010-05-28

Post Office

480340

Amount

$500.00

Clerk

0034

Amount

FIVE HUNDRED DOLLARS & 00¢

$500.00
**************

:2008000000:

UNITED STATES POSTAL SERVICE®

CUSTOMER'S RECEIPT

KEEP THIS
RECEIPT FOR
YOUR RECORDS

© 2009 United States Postal Service. All Rights Reserved.

Serial Number

17388598533

UNITED STATES POSTAL SERVICE®

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Serial Number

17388598533

Pay to

Address

:2008000000:

© 2009 United States Postal Service. All Rights Reserved.



Serial Number

17388598555

UNITED STATES POSTAL SERVICE®

Serial Number

17388598555

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Pay to

Address

UNITED STATES POSTAL SERVICE®

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Serial Number

17388598544

Pay to

Address

UNITED STATES POSTAL SERVICE®

Serial Number

17388598544

NOT NEGOTIABLE

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Pay to

Address

# ACTUARY

*A 39*

**PAID $900 BANK OF AMERICA CHARGE**

Dear Actuary

As per our telephone discussion I am providing the information for preparation of form 5500 for year-end 2012.

Please note that the plan is inactive and that there are no ongoing payouts or deposits since 2008.

We also discussed that your fee is $900.

*12/18/12*

Kindly find enclosed the following documents.

1-5500 for year-end 2011
2-Bank year-end statement for year-end 2012
3-Pension documents referencing the individual
   participants and their  balances through year end 2011.
   (There is an inclusion of rollover documents for U Yang
   that occurred in 2008 in full however this error was not
   picked up by the former actuary and the participant has
   been erroneously included in current reporting.  This
   error needs to be corrected as per the document that
   are provided on that transaction.)

Kindly note that the plan administrator is Leroy Johnson and I am the plan sponsor. Thank you.

Shirley T Sherrod
2631 S Indiana Av
#1911
Chicago, Illinois 60616
313 715 6606

December 18, 2013

**ACTUARY/ACCOUNTANT INVOICE**
**12/2013 FOR 5500 PREP**
**PARTICIPANT VALIATIONS**

**PAID=$1400.00**

Dr. Shirley T. Sherrod
P. O. Box 515
Southfield, MI 48037-0515

PAID
12/2013
BOA CHECK- ACCT 4766

## INVOICE

For actuarial consulting fees and expenses in conjunction with the

*SHIRLEY T. SHERROD, M.D., P.C. TARGET BENEFIT PENSION PLAN*

for the period from July to December 2013

| | |
|---|---|
| | $ 900 |
| Preparation of 2012 Form 5500-SF | 450 |
| Preparation of Participant Certificates | 50 |
| Calculation of Minimum Required Distribution | |
| | $1,400 |
| TOTAL DUE | |

ACTUARY -YEAR END ACCOUNTING

PAID $900 12/28/2014 BANK AMERICA CHG



1-29-11

**P CICCIDICOLA-LEGAL**

**FOR ERISA TRUST FREEZE**

**$2500**



UNITED STATES POSTAL SERVICE

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

NOT NEGOTIABLE

Pay to Pasquale, Jone
Address

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number
17582759684

| Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|
| 2011-01-12 | 294550 | $100.00 | 0002 |

UNITED STATES POSTAL SERVICE

**POSTAL MONEY ORDER**

Serial Number
17582759684

| Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|
| 2011-01-12 | 294550 | $100.00 |

Amount ONE HUNDRED DOLLARS & 00¢ ***********************

Pay to Pasquale Cicciodicola, Esq
Address 2008 Lane
apt 4 #24
Memo 1/6
From
Address
Clerk 0002

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑈000000800 2⑈ 17582759684⑈

UNITED STATES POSTAL SERVICE

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

NOT NEGOTIABLE

Pay to Pasquale
Address

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number
17582759673

| Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|
| 2011-01-12 | 294550 | $100.00 | 0002 |

UNITED STATES POSTAL SERVICE

**POSTAL MONEY ORDER**

Serial Number
17582759673

| Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|
| 2011-01-12 | 294550 | $100.00 |

Amount ONE HUNDRED DOLLARS & 00¢ ***********************

Pay to Pasquale Cicciodicola
Address 2008 Lane
apt 4 #254
Memo 1/6
From
Address
Clerk 0002

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑈000000800 2⑈ 17582759673⑈

1-29-11

**UNITED STATES POSTAL SERVICE** ®

## CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to

Address

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number
17582759695

| Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|
| 2011-01-12 | 294550 | $1000.00 | 0002 |

**UNITED STATES POSTAL SERVICE** ®

## POSTAL MONEY ORDER

Serial Number
17582759695

| Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|
| 2011-01-12 | 294550 | $1000.00 |

Amount   ONE THOUSAND DOLLARS & 00¢ ********************

Pay to

Address

Memo

© 2006 United States Postal Service. All Rights Reserved.

Clerk
0002

From

Address

SEE REVERSE WARNING ▪ NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑈:000000800 2⑈:      ⑈75827596 95⑈



---

*(lower portion — inverted/upside-down money order)*

SEE REVERSE WARNING ▪ NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑈75827596 95⑈      :⑈2 00800000⑈:

© 2006 United States Postal Service. All Rights Reserved.

Memo

From

Address

Pay to

Clerk
0005

Amount   FIFTY DOLLARS & 00¢ ********************

| U.S. Dollars and Cents | Post Office | Year, Month, Day |
|---|---|---|
| $50.00 | 480721 | 2010-09-14 |

Serial Number
17574134150

## POSTAL MONEY ORDER

**UNITED STATES POSTAL SERVICE** ®

| Clerk | Amount | Post Office | Year, Month, Day |
|---|---|---|---|
| 0005 | $50.00 | 480721 | 2010-09-14 |

Serial Number
17574134150

KEEP THIS RECEIPT FOR YOUR RECORDS

**NOT NEGOTIABLE**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

Address

Pay to

## CUSTOMER'S RECEIPT

**UNITED STATES POSTAL SERVICE** ®

January 29, 2011

Dear Pasquale:

Kindly find enclosed papers from Mr. Rogg the Merrill Lynch attorney and communications that I saved to/from the IRS regarding the pension account.

One of the pages that has the name (Williams) at the top, shows the plan name and number assigned by the IRS/Department of labor Erisa division. These denote that it is a filed, accepted and qualified plan. The other required qualifications were that my corporation be active which it is.

I note that Mr. Rogg has given the Judge two options, neither, which are in my interests or the interest of the plan participants who have heavily invested are now vested with this pension plan for over 30 years...

SHIRLEY T. SHERROD, M.D., P.C.
**OPHTHALMOLOGY**
STE 321 GRACE PROFESSIONAL BLDG.
6001 W. OUTER DRIVE • DETROIT, MI 48235
TELEPHONE 313-341-5100

4976

TCF 037

| EXPLANATION | AMOUNT |
| --- | --- |
| | |
| | |

DOLLARS

TO THE ORDER OF

31250 plym

CHECK AMOUNT

$ 500.-

DESCRIPTION

CHECK NUMBER 4976

SHIRLEY T. SHERROD, M.D., P.C.

94863 2

000000 50000

determi...
humbly ...
jurisdict...

...e only entity to
... plans and I am
...f Judge Gillis has any

Fwd: Rogg/Merrill

From: ~~Sherrod <sshe464538@aol.com>~~
To: xwu <xwu@ledfordwu.com>
Subject: Fwd: Rogg/Merrill
Date: ~~Wed, Jun 29, 2011 11:29 pm~~

**ATTY P CICCODICOLA=LEGAL FOR TRUST IN STATE COURT**

**$350.00**

-----Original Message-----
From: Ciccodicola <pciccodicola@comcast.net>
To: Dr. Sherrod <sshe464538@aol.com>
Sent: Thu, Feb 17, 2011 9:45 am
Subject: Re: Rogg/Merrill

Rogg has taken this course of action because he believed it was the best course. I exp
attorney representing Sherman will back off before the hearing. I indicated to you that i
not and the Circuit Court is foolish enough to violate federal law then we can file an actio
Federal Court to stop Merrill transferring and the Circuit Court from controlling the assets
told you in the past this Federal Court action will incur expenses, but it will stop all of the
shenanigans. However why spend the money until we actually have to. The filing fee alo
$350.00. But then If the judge gillis violates federal law in this case it may even give Gr
has a reason to argue a change in judges when you win your appeal.

I hope this explains the matter in a little different way than I tried to explain in a few
emails.
Other than this matter I hope all is well.
Pasquale

On 2/17/11 12:09 PM, "sshe464538@aol.com" <sshe464538@aol.com> wrote:

Dear Pasquale-I would appreciate your insight on this e-mail be
create

    problems that are avoidable. This comes up in a

down the

    wrong path. Please reply-Shirley Sherrod



-----Original Message-----
From: sshe464538 <sshe464538@aol.com>
To: pciccodicola <pciccodicola@comcast.net>
Sent: Tue, Feb 15, 2011 6:59 am
Subject: Rogg/Merrill

Dear Pasquale:: Thank you for the clarification. Apparently I linked
Mr Rogg

    is doing. Also, I think what he is proposing to the court is not in my best interes

**Pasquale Ciccodicola**
Attorney at Law
11700 Merriman Road
Livonia, Michigan 48150

**$2500.00**

Telephone 734 427 7999

Fax 734 427 7917
Ciccodicola@comcast.net

12/22/11

Received of Dr. Shirley Sherrod Five Hundred and no/100 Dollars as partial payment on a $2500.00 retainer for a declaratory judgment action in Federal District Court.

Pasquale Ciccodicola

cash payment

**LEGAL WORK FOR TRUST STATE COURT**

Fwd: warrant

7/19/11 5:43 PM

**From:** sshe464538 <sshe464538@aol.co
**To:** xwu <xwu@ledfordwu.com>
**Subject:** Fwd: warrant
**Date:** Tue, Jul 5, 2011 11:48 am

A 16

**$2,000.00**

**ATTY P CICCODICOLA**

**FOR LEGAL WORK FOR TRUST**

-----Original Message-----
**From:** Pasquale Ciccodicola <pciccodicola@comcast.net>
**To:** Dr. Sherrod <sshe464538@aol.com>
**Sent:** Wed, Jun 15, 2011 12:26 am
**Subject:** Re: warrant

Sorry for the delay but I have been swamped with several matters some of which have taken me away from the office. I have spent a few hours this morning trying to figure out a way to get this issue before this judge. There is little in the literature that helps so any action is novel and I cannot support by case law.
The court could be moved simply to recognize that the collection action out of which your contempt citation was issued is stayed by the bankruptcy court of Illinois and that for that reason his warrant should also be stayed not necessarily dismissed, but stayed and that order staying the warrant would be provided to the Sheriff and added to the lien network. Other than that he does have the stay from your attorneys, but little guarantee he has rescinded or stayed the warrant on his own.
At the same time, you could argue lack of service. Lack of service is jurisdictional and could only be shown by the documents in the file which would mean devoting a couple hours getting to and looking at the file at the courthouse.
As I indicated to you in a prior conversation I would need 2500 to put all of this together. I have probably 25 hours of billable time since February which I am willing to wait for as long it is contact like this or by phone, but putting pen to paper and hitting the sidewalk is a different matter.
Will it work. It should but the law in this courtroom, as I said from the first day you brought this case into my office, is illusive.

*Paid $2,000 Cash + 500 money order*

On 6/14/11 1:11 PM, "Dr. Sherrod" <sshe464538@aol.com> wrote:

Hi Pasquale~I sent this a few days ago and didn't hear back from you so I'm resending. I would sincerely appreciate hearing from you~Shirley Sherrod

-----Original Messa---
Fro
To:
Sent
Subj

Dear

http://mail.aol.com

**UNITED STATES POSTAL SERVICE**

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

**NOT NEGOTIABLE**

Pay to _Pasquale P3123_

Address

KEEP THIS RECEIPT FOR YOUR RECORDS

Serial Number 18006254256

| Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|
| 2010-05-20 | 482381 | $500.00 | 0027 |

Par

April 20, 2012

Received of Dr. Shervon

$500.00 for Objections to Entry

Of ORder AND AppeaRance At

court on Motion.

**$500**

**RECEIPT ATTY P CICCODICOLA**
**FOR LEGAL WORK FOR TRUST**

**balance for followup**

**COURT REPORTER TRANSCRIPT**

**$50.00**

A-27

April 16, 2012

Dear Mr. Cucinella

Upon receipt of the enclosed money order in the amount of $50.00 will you kindly forward a copy of the transcript from proceedings of case no 08-014212-CK that took place in the court room of judge Gillis this past Friday, April 13 2012.

Kindly forward the doc

SpecialtyMD.com™
The Internet Source for Medical Devices

Shirley T Sherrod, MD
PO Box 515
Southfield, MI 48037
Ph. no. 313 715 6606

Thank yo

**UNITED STATES POSTAL SERVICE**

**CUSTOMER'S RECEIPT**

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

Pay to _Pasquale_
Address _for 4-13-12_

KEEP THIS RECEIPT FOR YOUR RECORDS

NOT NEGOTIABLE

Serial Number
17388598500

| Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|
| 2010-05-28 | 480340 | $1000.00 | 0034 |

**UNITED STATES POSTAL SERVICE**

**POSTAL MONEY ORDER**

17388598500

| Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|
| 2010-05-28 | 4903 | $1000.00 |

ONE THOUSAND DOLLARS & 00c **********

Clerk
0034

Pay to
Address
Memo _4-13x-4-_

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

:000000800 2!: 17388598500!!



**ATTY P CICCODICOLA**
**LEGAL -STATE COURT TRUST**



The Law Offices of
MICHAEL
BARTOLIC, LLC

29 South LaSalle
Suite 1120
Chicago, Illinois 60603

mbartolic@michaelbartolic.com

ERISA ATTORNEY FILING
FEDERAL COURT FOR TRUST

February 14, 2012

**A-25**

VIA U.S. FIRST-CLASS MAIL, FAX & EMAIL

Robert J. Morad
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road
Suite 200
Troy, Michigan 48098
Fax: (248) 879-2001
morad@millercanfield.com

**RETAINED @ $2500/CASH**

RE:  SHIRLEY T SHERROD MD PC TRGT PENSION PLAN U/A DTD 6/3/88;
RCMA Account Number ███5C64

Dear Mr. Morad:

This firm has been retained by Shirley Sherrod, in her capacity as Plan Administrator of the Shirley Sherrod MD PC Trgt Pension Plan U/A Dtd 6/3/88 (hereinafter "the Plan"). The plan sponsor of this plan is Shirley T Sherrod MD, P.C. Ms. Sherrod or previous counsel on her behalf have made several attempts to direct Merrill Lynch, the directed trustee of the plan, to distribute the plan assets to a retired participant, Shirley Sherrod. In all instances, your firm, acting on behalf of Merrill Lynch, has refused to follow the directions from the Plan Administrator, except once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stating the funds would be used to post a bond in a state court proceeding.

In this instance, Merrill Lynch and the Miller Canfield firm have exceeded the scope of any directed trustee status and have assumed fiduciary status with respect to the Plan by exercising control over Plan assets. See ERISA § 3(21)(A)(1) (stating a person is a fiduciary of a plan to the extent that person exercises any authority or control over management or disposition of plan assets). ERISA's definition of fiduciary is functional in nature, such that even if a party did not contract to be a fiduciary, where it performs the acts that meet the definition of fiduciary under ERISA§ 3(21), the law will make that person a "functional fiduciary." See Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993); Acosta v. Pac. Enter., 950 F.2d 611, 618 (9th Cir. 1991) (a person's "actions, not the official designation of his role, determine whether he enjoys fiduciary status"). My understanding is that there is a state court action pending, Michael S. Sherman DO v. Shirley T. Sherrod M.D., & Shirley T. Sherrod, M.D. P.C., and that a judgment has been entered against the two defendants, and the court has issued an order, directed to those two defendants, prohibiting them from transferring away any assets. This order has previously been submitted to Merrill Lynch, which Merrill Lynch and the Miller Canfield firm have construed to mean the Plan cannot distribute any assets. An ERISA plan is a separate and distinct entity from its plan sponsor and from any participant in the plan. See ERISA § 502(d) ("Status of employee benefit plan as entity"). Merrill Lynch's interpretation of a state court order which expressly applies to the Plan sponsor and a Plan participant, as prohibiting Merrill Lynch from distributing Plan assets, is so

To: sshe464538 <sshe464538@aol.com>
Sent: Tue, Mar 20, 2012 10:49 am
Subject: RE: Service of e-filing in case 08-014212-CK

Dr. Sherrod,

FEDERAL ERISA
FILING FOR TRUST-
FEES PAID $300

I'd get a complaint filed and served for a flat fee of $2500. The filing fee is $35
expenses of service are about $75. But this would be all inclusive in the flat fe
charge of about 6.5 hours of time. I'm sure I'd spend more time than that, bec
to make a complaint perfect, but that's as reasonable of a charge as I can just
Thereafter, we could expect either an answer to the complaint or a motion to d
Given I've already anticipated what arguments ML would raise, the cost of res
a motion to dismiss or striking any affirmative defenses raised would be pretty
reasonable.

I can afford to be pretty reasonable with the charges because I'm very familiar
law already. I don't have to sink the kind of time into research that others may

Best,

Mike

**We Moved!**
*The Law Offices of Michael Bartolic, LLC*
29 South LaSalle Suite 1120
Chicago, Illinois 60603
Tel:     (312) 635-1600
Direct: (312) 635-0948
Fax:     (312) 635-1601
mbartolic@michaelbartolic.com
www.michaelbartolic.com
www.illinoiserisalawyerblog.com

ERISA Law Firm Representing Executives and Professionals in Employee Ber
Disputes and Executive Compensation

Follow us on Facebook, Twitter, and YouTube here:



**UNITED STATES POSTAL SERVICE**

CUSTOMER'S RECEIPT

KEEP THIS RECEIPT FOR YOUR RECORDS

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

Pay to

Address

NOT NEGOTIABLE

Serial Number
1 9 9 1 3 7 9 8 9 4 6

Year, Month, Day 2012-03-30

Post Office 480340

Amount $800.00

Clerk 0017

**UNITED STATES POSTAL SERVICE**

POSTAL MONEY ORDER

Serial Number
1 9 9 1 3 7 9 8 9 4 6

2012-03-30

480340

$800.00

Clerk 0017

Pay to

Address

Memo

© 2006 United States Postal Service. All Rights Reserved.

ONLY IN THE U.S. AND POSSESSIONS

1:00000800 2:

1 9 9 1 3 7 9 8 9 4 6



WESTERN UNION | MONEY ORDER

WESTERN UNION FINANCIAL SERVICES INC. - ISSUER
Englewood, Colorado

Payable at Wells Fargo Bank Grand Junction - Downtown, N.A. Grand Junction, Colorado

**meijer.**
(ISSUING AGENT)

A 408636 D 040212
T 2116 06
1445738B7444 L 000109

14-457388744

$ 500.00

PAY EXACTLY    FIVE HUNDRED DOLLARS AND NO CENTS

PAY TO THE
ORDER OF    M. Butchie Eze

PAYMENT FOR/ACCT. #

PURCHASER'S ADDRESS

PURCHASER'S SIGNATURE

⑆102100400⑆ 401445738B7444⑈

---

MONEY ORDER RECEIPT - NON NEGOTIABLE

Try the new Western Union Payments service for all your bills
and get guaranteed proof of payment. To learn more and to
search over 10,000 billers, goto WesternUnionPaysMyBills.com.

AGT 408636 LOC 000109 DT 040212 $500.00 5HUNDREDDOLLARS AND
NO CENTS

Payable to:

**TO CASH THIS MONEY ORDER RECEIPT, IT MUST BE INCLUDED WITH ALL REFUND REQUESTS. BE SURE TO READ IMPORTANT
INFORMATION BELOW AND ON BACK.**

**PURCHASER AGREEMENT:** You the purchaser agree that Western Union Financial Services Inc. (WUFSI) need not stop payment
on or replace or refund a lost or stolen WUFSI Money Order unless (1) you fill in the face of the Money Order at the time of
purchase, and (2) you report the loss or theft to WUFSI promptly. WUFSI Money Orders issued by Western Union Financial Services Inc. in Englewood, Colorado. For customer
service call 1-800-999-9660

* 1 4 4 5 7 3 8 8 7 4 4 *

WESTERN UNION | MONEY ORDER

WESTERN UNION FINANCIAL SERVICES INC. ISSUER
Englewood, Colorado

Payable at Wells Fargo Bank Grand Junction - Downtown, N.A., Grand Junction, Colorado

**meijer.**
(ISSUING AGENT)

A 408636 D 040212
T 2114 06
144573887453 L 000109

14-457388745

$ **500.00**

PAY EXACTLY   FIVE HUNDRED DOLLARS AND NO CENTS

PAY TO THE
ORDER OF _____

PURCHASER'S ADDRESS

PAYMENT FOR/ACCT. #

PURCHASER'S SIGNATURE

⑇⑆021004006 401445738874530

---

MONEY ORDER RECEIPT   NON NEGOTIABLE

Try the new Western Union Payments service for all your bills
and get guaranteed proof of payment. To learn more and to
search over 10,000 billers, goto WesternUnionPaysMyBills.com.

AGT 408636 LOC 000109 DT 040212 $500.00 5HUNDREDDOLLARS AND
NO CENTS

* 1 4 4 5 7 3 8 8 7 4 5 *

LOAD THIS DIRECTION, THIS SIDE UP

LOAD THIS DIRECTION, THIS SIDE UP

**UNITED STATES POSTAL SERVICE®** — CUSTOMER'S RECEIPT

| SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION **NOT NEGOTIABLE** | Pay to | | | KEEP THIS RECEIPT FOR YOUR RECORDS |
|---|---|---|---|---|
| | Address | | | |

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 20033475366 | 2012-03-27 | 480340 | $700.00 | 0012 |

**UNITED STATES POSTAL SERVICE** — POSTAL MONEY ORDER

| Serial Number | Year, Month, Day | | U.S. Dollars and Cents | |
|---|---|---|---|---|
| 20033475366 | 2012-03-27 | 480340 | $700.00 | |

Pay to    Clerk 0012

Address

Memo

© 2006 United States Postal Service. All Rights Reserved. — NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

⑊000000800 2⑊        20033475366⑊

# PROFESSIONAL FEES ASSOCIATED WITH SERVICES RENDERED TO THE TRUST ACCOUNT IN THE INTEREST OF ALL PARTICIPANTS FOR A PERIOD BETWEEN FEBRUARY 2011 AND JULY 2013.

# THE TOTAL SUM OF THIS SET OF INVOICES DURING THIS TIMEFRAME WAS $92991.02.

PART II TRUST EXPENSES INCURRED 2011-13

THESE PAYMENTS WERE ACCOMPLISHED BY LOANS THAT REQUIRED REIMBURSEMENT UPON ACCESS TO THE TRUST FUNDS. THESE REIMBURSEMENTS FOR THREE YEARS OF DEBT ASSUMPTION IS REFLECTED IN THE EXPENSE AMOUNT REPORTED ON THE ACCOMPANYING FORM 5500.

**$15704=FEES-RELEVANT RECEIPTSAND INVOICES LABELED A-26**

**WHICH REFERRED TO ENTRY COLUMN ON EXCEL SHEET**

# LEGAL-CONGER-FOR FED CASE TO UNFREEZE TRUST FED COURT + APPEAL

Additional retainer

Edwin Conger

A-26

Dear Dr. Sherrod,

Our bills sent to date (dated 07/13, 08/29, 10/02 and 11/30/12) total fees and disbursements of $5,953.66 a nd cover time through 10/31/12.

November time and December time total an additional 2.0 hours or $500, leaving a credit balance of appro ximately $1,000.

An additional retainer of $6,500 hopefully should cover the cost of an appeal, including brief, reply brief and oral argument.

E. H. Conger

**+$875-INV 12747 FILING FEES**

**TOTAL CONGER FEES Y 2012=14829**
**PAID /BOA AND CITI CREDIT**

# LEGAL FEES PAID–SEE EXPLANATION ABOVE PAGE

Tenney & Bentley, LLC

111 West Washington Street, Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 807-4858
F.E.I.N. 36-4211386



Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, Il. 60616

November 30, 2012
Billed through   10/31/12

Client #.         S12066-001
Invoice  #:       12747   EHC

RE: Johnson v. Merrill Lynch, 12 cv 2545

FOR PROFESSIONAL SERVICES RENDERED

| DATE | LAWYER | DESCRIPTION | HOURS | AMOUNT |
|------|--------|-------------|-------|--------|
| 09/04/12 | DRS | response to motion to dismiss and research re same, review motion to dismiss and cases cited | 2.00 | 500.00 |
| 09/04/12 | EHC | Telephone conference with Leroy Johnson; telephone conferences with Dr. Sherrod re F5500; eletter to Sherrod re F5500 | 0.20 | 50.00 |
| 09/04/12 | EHC | Examine authorities and Mr. Shannon's draft response; conferences with Mr. Shannon; drafting declaration re F5500; examine and forward to Mr. Shannon 2010 F5500-SF with acceptance on October 23, 2011 – NO CHARGE | 2.10 | 0.00 |
| 09/05/12 | EHC | Eletter to Sherrod - NO CHARGE | 0.10 | 0.00 |
| 09/05/12 | EHC | Review and suggest changes to Mr. Shannon's draft response; conferences with Mr. Shannon - NO CHARGE | 0.50 | 0.00 |
| 09/17/12 | EHC | Conference with Mr. Shannon re request for and grant of extension of time - NO CHARGE | 0.10 | 0.00 |
| 09/27/12 | EHC | Examine Merrill Lynch's reply; letter to Dr Sherrod with copy of reply | 0.60 | 150.00 |
| 09/27/12 | EHC | Review documents - NO CHARGE | 0.50 | 0.00 |
| 09/28/12 | EHC | Telephone conference with Leroy Johnson re possibility of moving the judge to declare Merrill Lynch did wrong and expected time of decision on motion; telephone conference with Dr. Sherrod re "what next?" – NO CHARGE | 0.30 | 0.00 |

**PAID LEGAL FEES –SEE EXPLANATION ABOVE**

Invoice #:  12747                     Page  2                     November 30, 2012

*A-26*

| Date | | | | |
|---|---|---|---|---|
| 10/02/12 | EHC | Conference with Mr. Shannon regarding calling ML's bluff, removing it and appointing a new trustee | 0.20 | 50.00 |
| 10/02/12 | EHC | Examine ML's argument (reply p. 8) that Sherrod never delivered a notice to remove; conference with Mr. Eskilson regarding same - NO CHARGE | 0.30 | 0.00 |
| 10/03/12 | DRS | research re resignation/removal of directed trustee | 0.50 | 125.00 |
| 10/03/12 | EHC | Examine authorities located by Mr. Shannon regarding "adequate provision for continued prudent management of assets" - NO CHARGE | 0.30 | 0.00 |

Total Fees                                                                $875.00

Total Charges                                                          $875.00

**LEGAL-PAYMENT**

DATE 5-18-2016

Tenney & Bently

$ 7,500 00

DOLLARS

A-26

**$5045**
**LEGAL PAYMENT–CONGER TO UNFREEZE TRUST**

Tenney & Bentley, LLC
111 West Washington Street, Suite 1900
Chicago, Illinois 60602
TELEPHONE (312) 407-7800
FAX (312) 407-4658
FE IN  36-4211386

Dr. Shirley T. Sherrod
2631 South Indiana, #1911
Chicago, IL 60616

May 24, 2013
Billed through   05/27/13

Client #:        S12066-001
Invoice #:       13383   EHC

RE:   Johnson v. Merrill Lynch, 12 cv 2545 and 12-3859

FOR PROFESSIONAL SERVICES RENDERED

| DATE | LAWYER | DESCRIPTION | HOURS | AMOUNT |
|------|--------|-------------|-------|--------|
| 03/11/13 | EHC | Telephone conference with Dr. Johnson regarding Dr. Sherrod and latest bill; telephone conference with Dr. Sherrod regarding same; e-letter to Dr. Sherrod regarding misunderstanding - NO CHARGE | 0.50 | 0.00 |
| 03/28/13 | EHC | Examine papers electronically filed 3/27/13 by Merrill Lynch, e-letter to Sherrod regarding same; conference with Mr. Shannon regarding reply brief - NO CHARGE | 0.50 | 0.00 |
| 03/29/13 | EHC | Examine Dr. Sherrod's e-mail; furnish copy to Mr. Shannon - NO CHARGE | 0.10 | 0.00 |
| 03/30/13 | EHC | Memo to Mr. Shannon regarding Sherrod's analysis - NO CHARGE | 0.10 | 0.00 |
| 03/30/13 | EHC | Examine Sherrod's 3/29 analysis of Level's argument - NO CHARGE | 0.50 | 0.00 |
| 04/01/13 | EHC | Examine order setting oral argument for 5/22/13 at 10:30 am; conference with Mr. Shannon regarding same; docket date and e-letter to Dr. Sherrod regarding same - NO CHARGE | 0.30 | 0.00 |
| 04/01/13 | EHC | Two telephone conferences with Dr. Sherrod regarding significance of CA7 order and point Dr. Sherrod wanted emphasized; parties are adverse due to 2nd pending garnishment | 0.40 | 0.00 |
| 04/02/13 | EHC | Telephone conference with Dr. Johnson regarding his concerns about money and issues; review and consider Dr. Sherrod's | 0.50 | 125.00 |

**LEGAL PAYMENT–AS NOTED ABOVE**

| Invoice # | 13383 | Page 3 | May 24, 2013 |
|---|---|---|---|

A-44

| Date | | Description | Hours | Amount |
|---|---|---|---|---|
| 04/23/13 | EHC | Conference with Mr. Shannon regarding oral argument; left voice message for Dr. Johnson at 810/394-3415 regarding same; telephone conference with Dr. Johnson - NO CHARGE | 0.40 | 0.00 |
| 04/25/13 | EHC | Telephone conference with Dr. Sherrod regarding oral argument - NO CHARGE | 0.20 | 0.00 |
| 05/07/13 | EHC | Telephone conference with Dr. Sherrod regarding Brubaker's telephone conference with actuary and DOL subpoena for names; telephone conference with Dr. Johnson regarding (1) his exposure as plan administrator and (2) a "strong case" vs. Merrill Lynch - NO CHARGE | 0.60 | 0.00 |
| 05/09/13 | EHC | Examine email to Dr. Sherrod from actuary Sinclair regarding DOL subpoena - NO CHARGE | 0.20 | 0.00 |
| 05/20/13 | EHC | Examining 7th Circuit May 20, 2013 opinion affirming order below for lack of subject matter jurisdiction; eletter to Drs. Sherrod and Johnson regarding same; second extended telephone conference with Dr. Sherrod regarding factual errors in opinion; swipes taken at her by Judge Tinder and lack of further effective recourse in this appeal - NO CHARGE | 1.40 | 0.00 |
| 05/20/13 | EHC | Reviewing 7th Circuit May 20, 2013 opinion - NO CHARGE | 0.80 | 0.00 |
| 05/21/13 | EHC | Telephone conference with Dr. Johnson regarding his five questions - NO CHARGE | 0.20 | 0.00 |
| 05/22/13 | EHC | Telephone conference with Dr. Sherrod regarding her questions - NO CHARGE | 0.60 | 0.00 |

Total Fees      $5,978.50

Total Charges      $5,978.50
Less Retainer Balance Applied      -$929.16

Balance Now Due      **5945.34**      $5,049.34

PLEASE RETURN A COPY OF THIS INVOICE WITH YOUR PAYMENT

PAID cash

# LEGAL FEE-$230-TO UNFREEZE TRUST



Tenney & Bentley, LLC

Law Offices

111 West Washington Street • Suite 1900
Chicago, Illinois 60602

TELEPHONE (312) 407-7800
FAX (312) 807-1958

March 14, 2014

VIA EMAIL   leroy_j48507@yahoo.com

Dy, Leroy Johnson

---

**CHASE** ⬡

Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY
**MONEY ORDER**

Service Instructions
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER
INFORMATION ABOUT THIS ITEM.

**Customer Copy**

9167315130

02/13/2013

**Michigan**

Pay To The
Order Of

$  *********230.00 ***

Pay        TWO HUNDRED THIRTY DOLLARS AND 00 CENTS

NON NEGOTIABLE

NOT VALID FOR MORE THAN $1000.00                        SENDER

**TERMS**

# $6930-LEGAL FEE TO RECOVER TRUST BOND EXPENSE MICHIGAN

**LAW OFFICES OF BEN M. GONEK, PLLC**
500 Griswold Street, Suite 3500
Detroit, Michigan 48226
(313) 962-5210



July 28, 2014

Re:  Michael S. Sherman, et al vs Shirley T. Sherrod, M.D., P.C., et al
Wayne County Circuit Court Case No: 08-014212-CK

| Date | Description | Time |
|------|-------------|------|
| 7/14/2014 | Meeting with Client; Review of File | 1.5 |
| 7/16/2014 | Review of file, Court of Appeals case.  Review of Plaintiffs' Motion for Discovery and other measures.  Review, revise response and brief to same | 1.5 |
| 7/16/2014 | Review Court of Appeals docket and opinion by the Court of Appeals; Research on appealed orders and final orders. | 1.2 |
| 7/16/2014 | Drafting response brief and research to motion | 4.0 |
| 7/17/2014 | Review of file in advance of oral argument on motion to Enjoin Assets and for Request of Information | 1.0 |
| 7/18/2014 | Review of file. Attend hearing in front of Gillis.  Review of e-mail from Nitzkin regarding proposed language to order | 3.4 |
| 7/21/2014 | Review of Emails, review of materials re ERISA matters and Trust issues; research attachment/garnishment issues | 2.25 |
| 7/24/2014 | Draft email to Gary Nitzkin Re hearing | .45 |
| 7/25/2014 | Review of file, additional preparation for hearing before Judge Gillis, attend hearing | 3.5 |
| 7/26/2014 | E-mails to and from client; telephone conferences | 1.0 |

**TOTAL HOURS**   19.80

19.80 hours at $350.00 per hour = $6,930.00
- $2,500.00

CASH

**AMOUNT DUE & OWING - $4,430.00**

No charges for completion of garnishment disclosure or responses to interrogatories issued to Garnishee Defendant.

M Gmail

**$1575 CASH PAYMENT-LEGAL FEE TO RETAIN TRUST BOND EXPENSE-MI COURT**

Retainer

**Ben Gonek** <ben@goneklaw.com>                    Fri, Jun 6, 2014 at 10:44 AM
To: "ssherrod7@gmail.com" <ssherrod7@gmail.com>

Dear Dr. Sherrod:

As I indicated in my other email, today Judge Gillis denied the Plaintiff's Motion to
attach and take the appeal bond. I have spent approximately 4.5 hours on this
matter. Please have someone send me a payment of $1,575.00. Thank you. I will
forward you a copy of the order when I have it entered next week. Thank you. If you
have any questions, please feel free to call me. Ben

Ben M. Gonek

Law Offices of Ben M. Gonek

500 Griswold, Suite 3500

Detroit, Michigan 48226

(313) 962-5210 (Office)

(313) 962-4559 (Facsimile)

(313) 574-3355 (Cell)

Ben@Goneklaw.com

# PAYMENT RECEIPT FOR ABOVE



# PAYMENT RECEIPT FOR ABOVE



NON NEGOTIABLE

# PAYMENT RECEIPT FOR ABOVE



## PAYMENT RECEIPT FOR ABOVE



BEN M. GONEK, PLLC
Street, Suite 3500
chigan 48226
962-5210

July 28,

Re:  M
     W

ley T. Sherrod, M.D., P.C., et al
e No: 08-014212-CK

| Date | | Time |
|---|---|---|
| 7/14/2011 | of File | 1.5 |
| 7/16/201 | eals case. Review of Plaintiffs' ner measures. Review, revise | 1.5 |
| 7/16/2014 | Review Court of Appeals cket and opinion by the Court of Appeals; Research on appealed orders and final orders | 1.2 |
| 7/16/2014 | Drafting response brief and research to motion | 4.0 |
| 7/17/2014 | Review of file in advance of oral argument on motion to Enjoin Assets and for Request of Information | 1.0 |
| 7/18/2014 | Preview of file, Attend hearing in front of Gillis. Review of e-mail from Nitzkin regarding proposed language to order | 1.4 |
| 7/21/2014 | Review of Emails, review of materials re ERISA matters and Trust issues; research attachment/garnishment issues | 2.25 |
| 7/24/2014 | Draft email to Gary Nitzkin Re hearing | .45 |
| 7/25/2014 | Review of file, additional preparation for hearing before Judge Gillis, attend hearing | 3.5 |
| 7/28/2014 | E-mails to and from client; telephone conferences | 1.0 |

**TOTAL HOURS**   19.80

19.80 hours at $350.00 per hour = $6,930.00

## 6937.00

# PAYMENT RECEIPT FOR ABOVE



LOAD THIS DIRECTION, THIS SIDE UP ➡

MONEY ORDER

17-135162112

$ 500.00

PUBLIX #0472

**PAY EXACTLY** FIVE HUNDRED DOLLARS AND NO CENTS

PAY TO THE
ORDER OF

MONEY ORDER • U.S. DEPT. • NON NEGOTIABLE

*171351621 12*

Try the new Western Union Payments service for all your bills
and get guaranteed proof of payment. To learn more visit to.com
to reach over 10,000 billers, goto Westernunion.com

NOT VALID ONE OVER $500.00 FIVE HUNDRED DOLLARS AND NO CENTS

# PAYMENT RECEIPT FOR ABOVE

**PAYMENT RECEIPT FOR ABOVE**



Previous Invoice of 7/28/2014 -    $ 4,430.00

Payments received -    ($ 2,000.00)

AMOUNT DUE & OWING -    $ 4,825.46    **4825.46**

-1,000.00 PYMT 8/13
= 3825.46

-$500 REMITTED 9/6/14
BAL=3325.46

-500 10/10= 2825.46
-500 11/5=2325.46
-500  12/10=1825.46

CRANE, HEYMAN, SIMON, WELCH & CLAR

**$9594=PAID**

**LEGAL FEES TO SECURE TRUST BOND EXPENSE**

Invoice #: Sample                    Page 3                    June 11, 2014

|  |  |  |  |  |
|---|---|---|---|---|
|  | Drafting of complaint to enjoin Sherman and bonding company. | 0.80 | 312.00 | JHR |
| Mar-18-14 | Correspondence to bonding company re: automatic stay. | 0.30 | 117.00 | JHR |
|  | Drafting of certification emergency | 0.30 | 117.00 | JHR |
|  | Drafting of complaint for injunction and motion for TRO and preliminary injunction. | 1.10 | 429.00 | JHR |
|  | Drafting of application for emergency motion. | 0.70 | 273.00 | JHR |
|  | Research section 105 and supersedeas bonds. | 0.60 | 234.00 | JHR |
| Mar-19-14 | Telephone conference with Judge's Chambers re: emergency motion application. | 0.20 | 78.00 | JHR |
|  | Drafting of application for emergency. | 0.20 | 78.00 | JHR |
|  | Email to Mike Turro re: emergency motion and creditors motion. | 0.30 | 117.00 | JHR |
|  | Drafting of motion to modify stay and order re: appeal. | 1.20 | 468.00 | JHR |
|  | Telephone conference with Gib Payten, attorney for surety. | 0.20 | 78.00 | JHR |
|  | Review of state court brief filed by Sherrod's attorney. | 0.30 | 117.00 | JHR |
|  | Telephone conference with Mike Turro re: brief and supersedeas bond on remand when no damages. | 0.30 | 117.00 | JHR |
|  | Email to client re: TRO hearing. | 0.20 | 78.00 | JHR |
|  | Review of Sherman's response to TRO. | 0.40 | 156.00 | JHR |

*CRANE, HEYMAN, SIMON, WELCH & CLAR*

| Invoice 0: Sample | | Page 15 | | June 11, 2014 |
|---|---|---|---|---|
| Jun-03-14 | Postage - Motion to Quash Subpoena (10 x $1.40) | 14.00 | | |
| Jun-10-14 | Photocopies - 817 copies @ $0.10/per copy | 81.70 | | |
| | Totals | $1,520.14 | | $0.00 |
| | **Total Fees & Disbursements** | | | $39,584.14 |
| | Previous Balance | | | $0.00 |
| | Previous Payments | | | $0.00 |
| | **Balance Due Now** | | | $39,584.14 |

# $9594-pertain to pension + retained bond matters=paid

**$3000**
**LEGAL EXPENSE TO SECURE RETAINED**
**TRUST PROPERTY**

A-65

## VALDEMAR L. WASHINGTON PLLC

Attorney At Law
718 Beach Street
P.O. Box 187
Flint, Michigan 48501-0187

Phone 810.407.6868 • Fax 810.265.7315

January 6, 2014

American Contractors Indemnity Company
C/O Resident Agent
National Registered Agents Inc.
30600 Telegraph Rd. Suite 2345
Bingham Farms, MI 48025
CERTIFIED MAIL NO. 7012 1640 0001 5816 5557     Return Receipt Requested

Re:    Release of Bond Collateral – Wayne County Circuit Court Case Number:
       08-014212-CK (Michael Sherman et all vs. Shirley Sherrod et.al)

To Whom It May Concern:

Please be advised that this office represents Leroy Johnson, Plan Administrator of the
Shirley T. Sherrod MD PC Target Benefits Pension Plan and Trust.

Dr. Johnson was appointed Plan Administrator on May 30, 2012.

I have reviewed the Collateral Security Agreement and Receipt Number 21679 section D
related to Release of Collateral and note that Court Bonds may be exonerated in several
ways, which must be proven to the Surety by written documents. A copy of the May 30,
2013 Michigan Court of Appeals Opinion under Docket Numbers 299045, 299775, and
308263, thus reversed the Trial Court's $181,048.58 Judgment is included with this letter
for your review. Your Stay Bond in the amount of $250,000 was issued relative to the
$181,048.58 judgment, which has now been reversed.

It is Dr. Johnson's position as the Plan Administrator that the $250,000 cash collateral
that was posted by the Plan on November 19, 2011 should now be returned to the Plan.
Please contact me by close of business on January 16, 2014 to obtain wire transfer
instructions for returning the Plan's collateral.

Should the collateral not be returned to the Plan by January 17, 2014 we will avail
ourselves of all legal, equitable, and DHS Administrative remedies.

Thank you for your attention to this matter.

## PAID RECEIPT FOR ABOVE

47-65

Pay To The Order Of *Levy Johnson MD*

*Three Thousand & zero* $3,000

reimbursement to V Washington

**$5500 LEGAL FEES REFERRABLE TO RETAINED TRUST BOND PROPERTY-MICHIGAN COURT DATES JULY-2014=PAID**

**Brooks Wilkins Sharkey & Turco, PLLC**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009 USA

Ph:  248.971.1800        Fax:  248.971.1801

Shirley Sherrod
P.O. Box 515                                                          August 3, 2014
Southfield, MI 48037

Attention:                                          Inv #:          22396

RE:    Michael S. Sherman

| Date | Individual | | Time | Rate | Amount |
|------|-----------|---|------|------|--------|
| 07-01-14 | MRT | Call with Dr. Sherman and B. Gonek; Call with South Carolina counsel. | 0.70 | $355.00 | 248.50 |
| 07-08-14 | MRT | Call with Dr. Sherrod. | 0.30 | $355.00 | 106.50 |
| 07-09-14 | MRT | Review writs of garnishment. | 0.20 | $355.00 | 71.00 |
| 07-10-14 | MRT | Review filings. | 0.40 | $355.00 | 142.00 |
| 07-14-14 | MRT | Strategy call with B. Gonek and Dr. Sherrod. | 0.70 | $355.00 | 248.50 |
| 07-15-14 | JMM | Review electronic docket and file re: all writs issued; exchange emails with M. Turco re: same. | 0.50 | $260.00 | 130.00 |
| 07-28-14 | MRT | Review multiple email and pleadings filed on July 28; Conference call with Mark, Ben, and Dr. Sherrod. | 1.30 | $355.00 | 461.50 |
| 07-30-14 | MRT | Call with Mark Granzotto. | 0.30 | $355.00 | 106.50 |

**DISBURSEMENTS**

| | | |
|---|---|---|
| | ECF Printing | 10.60 |
| Jun-09-14 | Federal Express | 57.43 |

## RECEIPT FOR BILLINGS ABOVE



*Balance Now Due* — $9,679.22

**9679.22**

TAX ID Number — 26-4243140

## SHERROD INVOICE

# RECEIPT FOR BILLINGS ABOVE

**Brooks Wilkins Sharkey & Turco, PL**
401 S. Old Woodward Ave
Suite 400
Birmingham, MI 48009 USA

Ph: 248.971.1800          Fax: 248.971

**Shirley Sherrod**
P.O. Box 515
Southfield, MI 48037

July 1, 2014

Attention:

Inv #:          22126

RE:     Michael S. Sherman

| Date | Individual | | Time | Rate | Amount |
|------|-----------|--|------|------|--------|
| 06-30 14 | MRT | Calls with Dr. Sherrod & Gosek. | 1.00 | $355.00 | 355.00 |

Total F:

$355.00

Previous Balance          500.00

**Balance Now Due**          $855.00

TAX ID Number:          26-4243140

**855.00**

UNITED STATES POSTAL SERVICE

CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT FOR IMPORTANT CLAIM INFORMATION

NOT NEGOTIABLE

KEEP THIS RECEIPT FOR YOUR RECORDS

21403692617

**$24,200-LEGAL FEE-APPELLATE TO UNFREEZE TRUST FUND IN MICHIGAN -RECEIPTS NOTED A64/6 FOLLOW**

Sherrod, p.

| | | |
|---|---|---|
| 11/15/14 | Work re: Brief on Appeal; phone conversation with S. Sherrod | 3.5 |
| 11/19/14 | Phone conversation with Edwin Conger; email to E. Conger and related work. | 0.5 |
| 12/05/14 | Phone conversation with S. Sherrod. | 0.3 |
| | | 60.8 |

## COSTS

| Date | Description | Amount |
|---|---|---|
| 08/21/14 | State of Michigan (e-file Application) | $ 391.40 |
| 08/28/14 | Wayne County Circuit Court (e-file garnishment) | 8.24 |
| 8/15-9/22/14 | Westlaw research | 13.00 |
| 08/21/14 | Reba Hooper (court reporter) | 50.00 |
| 10/21-11/3 2014 | Westlaw research | 30.00 |
| 11/11/14 | Sherry Baker (court reporter) | 31.80 |
| 11/11/14 | Reliable Delivery Service | 30.34 |
| 11/12/14 | State of Michigan (e-file Application) | 391.50 |
| 11/13/14 | State of Michigan (e-file Motion) | 108.50 |
| 11/4-12/9/14 | Westlaw research | 244.30 |
| | | $ 1,299.08 |

| | | |
|---|---|---|
| 60.8 hours at $275.00 per hour: | $ 16,720.00 | |
| Costs: | 1,299.08 | |
| Total: | 18,019.08 | |
| Outstanding Balance: | 6,530.48 | |
| Total Fees and Costs Due: | $ 24,549.56 | |

**24549.56**

# LEGAL APPELLATE=PAID





# CHASE ⬤

## LEGAL-APPELLATE=PAID

### Terms and Conditions:

* Please keep this copy for your record of the transaction
* Money Orders are not valid for more than $1000
* The sender/drawer agrees to enter the name of the payee and to sign the instrument immediately upon purchase
    - Failure to do so will result in the sender/drawer bearing the risk of any loss or theft of this instrument.
* The laws of a specific state will consider these funds to be "abandoned" if this Money Order is not cashed by a certain time
* Placing a Stop Payment on a Money Order
    - Sender/Drawer can place a stop payment on an unpaid Money Order
    - Please visit a Chase Branch to place a stop and have the item re-issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Money Order or for any other information about this item

FOR YOUR PROTECTION SAVE THIS COPY          Customer Copy

**MONEY ORDER**

94 26902078

05/09/2014

Pay To The
Order Of: _____          $** 1,000.00 **

Pay:   ONE THOUSAND DOLLARS AND 00 CENTS

Memo: _____          **NON NEGOTIABLE**

LEGAL APPELLATE-PAID



**LEGAL APPELLATE=PAID**

LEGAL APPELLATE=PAID



**LEGAL APPELLATE=PAID**

POSTAL MONEY ORDER

$1000.00

ONE THOUSAND DOLLARS & 00¢

Mark Grugotta PC

Sheynge
PO Box 516
Jenkno Mn 47087

POSTAL MONEY ORDER

$1000.00

# LEGAL APPELLATE=PAID



**LEGAL APPELLATE=PAID**



NOT
NEGOTIABLE

21695493554

UNITED STATES
POSTAL SERVICE

21695493554

2014-06-11    294121    $1000.00    0017

POSTAL MONEY ORDER

2014-06-11    294121    $1000.00

ONE THOUSAND DOLLARS & 000    *******************

Mark Gran with Eq

SHERRO    0017

PO Box 517

Southold NY 11971

21695493554

:000000800 2:

UNITED STATES
POSTAL SERVICE

NOT
NEGOTIABLE

1069584436

CUSTOMER'S RECEIPT

UNITED STATES
POSTAL SERVICE

1069584436

POSTAL MONEY ORDER

2014-06-11    294120    $1000.00

ONE THOUSAND DOLLARS & 000    *******************

Mark Gran with Eq

SHERRO

PO Box 517

Southold NY 11971

00000800 2:

21069584436

**LEGAL APPELLATE=PAID**





**LEGAL APPELLATE=PAID**

# legal representation retainer



Bank of America

**Capture Date: 12/16/2013 Sequence #: 4892329441**

SHIRLEY T. SHERROD, M.D., P.C.
OPTHAMOLOGY
GRACE PROFESSIONAL BLDG.   PH. (313) 341-5100
6001 W. OUTER DR., SUITE 321
DETROIT, MI 48235

7597

9-80/720

DATE _December 12, 20__

PAY TO THE ORDER OF _Brooks Wilkins Sherley & Turco PC_

$ 5,000

_Five Thousand and no/100_ DOLLARS

Standard Federal Bank N.A.
Troy, MI 48084
standardfederalbank.com

FOR _Mr Turco - Retainer_

⑈007597⑈ ⑆072000805⑆ 6815848632⑈

HUNTINGTON • COLUMBUS, OH
X EASTON OVAL     >044115126<
521001006 12-16-13
065 521001006 4942 06 521001006

>044115126<
12-16-13
521001006

ENDORSE HERE

FOR DEPOSIT ONLY
Brooks Wilkins Sharkey & Turco, PLLC

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE

No Electronic Endorsements Found

8

# LEGAL SERVICES TRUST

IM - DDA Inclearing Debits - 3/26/2014 - 56001255 - 800 - 741 - 74150152 - $1,500.00



IM - DDA Inclearing Debits - 3/26/2014 - 56001255 - 800 - 741 - 74150152 - $1,500.00



S T SHERROD MD

## citi 8-2013

## Fees charged

| | |
|---|---|
| **Total fees charged in this billing period** | **$0.00** |

## Interest charged

| Date | Description | Amount |
|---|---|---|
| 07/09 | INTEREST CHARGED TO STANDARD PURCH | $195.58 |
| 00000000 84 | 0000 | |
| 07/09 | INTEREST CHARGED TO OFFER-007 | $0.40 |
| 00000000 84 | 0000 | |
| **Total interest charged in this billing period** | | **$195.98** |

### 2013 totals year-to-date

| | |
|---|---|
| Total fees charged in 2013 | **$152.59** |
| Total interest charged in 2013 | **$841.24** |

### Interest charge calculation

Days in billing cycle: 29

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance type | Annual percentage rate (APR) | Balance subject to interest rate | Interest charge | |
|---|---|---|---|---|
| PURCHASES | | | | |
| Standard Purch | 15.24% | $16,153.24 (D) | $195.58 | |
| Offer 5 | 0.00% | $2,656.88 (D) | $0.00 | loan |
| (Rate Expired 07/01/13) | | | | |
| Offer 6 | 0.00% | $3,165.41 (D) | $0.00 | loan |
| (Rate Expires 02/01/14) | | | | |
| Offer 7 | 0.99% | $509.55 (D) | $0.40 | |
| (Rate Expires 09/01/14) | | | | |
| Offer 9 | 0.00% | $2,073.86 (D) | $0.00 | loan |
| (Rate Expires 03/01/14) | | | | |
| ADVANCES | | | | |
| Standard Adv | 25.24% (V) | $0.00 (D) | $0.00 | |

Your Annual Percentage Rate (APR) is the annual interest rate on your account. APRs followed by (V) vary with the market based on the Prime Rate. Balances followed by (D) are determined by the daily balance method (including current transactions).

A promotional offer has expired. This month's statement shows a debit transaction and a credit transaction to move the remaining offer balance from the promotional APR to the standard APR for your account for each expired offer. Individual transactions made before the offer's expiration date may also have corresponding debit and credit transactions if the transaction was received by us after the expiration date.

## Account messages

Remember, you MUST PAY IN FULL any charges over your revolving credit limit by your statement's Payment Due Date.

You may pay all or part of your account balance at any time. However, you must pay, by the payment due date, at least the minimum payment due.

For customers who qualify for benefits for the same transaction under Citi Price Rewind, Internet Price Protection and Price Protection coverages, or any combination of those coverages, the Company will only pay under the coverage providing the highest benefit and no benefits will be due under the other coverages.

S 1 SHERROD MD

www.citicards.com
1-888-766-CITI(2484)

Page 2 of 3

# LOAN REPAY

## Account Summary

| Trans. date | Post date | Description | Amount |
|---|---|---|---|
| **Payments, Credits and Adjustments** | | | |
| 02/25 | | PAYMENT THANK YOU | -$21,000.00 |
| I0000000 | 70 | N0000 0002 | |
| | 03/03 | OFFER 09 PROMOTIONAL APR ENDED 03/01/14 | -$1,709.86 |
| 00000000 | 72 | 0000 | |
| **Standard Purchases** | | | |
| 02/20 | 02/20 | SQ *STARBUCKS #16309 C Chicago IL | $8.73 |
| WT9LH7O0 | 61 | A5814USA 2222 | |
| 02/21 | 02/21 | BEST WESTERN HOTELS CHICAGO IL | $73.32 |
| HKGM9XS5 | 61 | B3502USA 2222 | |
| | | PHONE NUMBER: 3129222900 | |
| | | FOLIO NUMBER: 421066 | |
| | | ARRIVE: 02/20/14 DEPART: 02/21/14 | |
| 02/27 | 02/27 | BEST WESTERN HOTELS CHICAGO IL | $81.47 |
| XKGM9XS5 | 61 | B3502USA 2222 | |
| | | PHONE NUMBER: 3129222900 | |
| | | FOLIO NUMBER: 421681 | |
| | | ARRIVE: 02/26/14 DEPART: 02/27/14 | |
| 02/28 | 02/28 | BEST WESTERN HOTELS CHICAGO IL | $81.47 |
| 2LGM9XS5 | 61 | B3502USA 2222 | |
| | | PHONE NUMBER: 3129222900 | |
| | | FOLIO NUMBER: 422168 | |
| | | ARRIVE: 02/27/14 DEPART: 02/28/14 | |
| 03/07 | 03/07 | MICHIGAN CABLE PARTNER 02318937500 MI | $46.27 |
| LKBX2T06 | 61 | A4899USA 2222 | |
| | 03/03 | OFFER 09 MOVED TO STANDARD PURCH | $1,709.86 |
| 00000000 | 64 | 0000 | |
| **Balance Transfer-Offer 4 (0.000%)** | | | |
| 03/03 | 03/03 | BAL XFER CHECK # 1244 | $20,000.00 |
| 00000000 | 61 | 0000US | |

## Fees charged

| Date | Description | Amount |
|---|---|---|
| 03/10 | BALANCE TRANSFER FEE | $600.00 |
| 00000000 88 | 0000 | |
| **Total fees charged in this billing period** | | **$600.00** |

## Interest charged

| Date | Description | Amount |
|---|---|---|
| 03/10 | INTEREST CHARGED TO STANDARD PURCH | $284.49 |
| 00000000 84 | 0000 | |
| 03/10 | INTEREST CHARGED TO OFFER-007 | $0.39 |
| 00000000 84 | 0000 | |
| **Total interest charged in this billing period** | | **$284.88** |

AAdvantage® Miles Reported to

American Airlines: 291

| | |
|---|---|
| Purchase Miles | 291 |
| Accumulated This Month | 291 |

» Visit aa.com/aadvantage to redeem miles, book flights and much more

American Airlines reserves the right to change the AAdvantage® program and its terms and conditions at any time without notice, and to end the AAdvantage® program with six months notice. Any such changes may affect your ability to use the awards or mileage credits that you have accumulated. Unless specified, AAdvantage miles earned through this promotion/offer do not count toward elite-status qualification or Million Miler SM status. American Airlines is not responsible for products or services offered by other participating companies. For complete details about the AAdvantage program, visit www.aa.com/aadvantage

AAdvantage, AAdvantage with Scissor Eagle design and Million Miler are marks of American Airlines, Inc.

# LOAN REPAYMENT



| Profile Bankcard (IBS) | Processing Date: Batch Number: | Apr 29, 2014 141745 | Envelope : 8 |
|---|---|---|---|

**PAYMENT**

| | | | |
|---|---|---|---|
| Acct Number: | 5424181028773914 | Check Item Ref: | 16 |
| Check Group Number: | 14174506001 | Check Amount: | 2000.00 |
| Routing & Transit: | 031100351 | Check Account: | 0300974219 |
| Microfilm Id: | 0 | MICR PC Code: | 0 |
| Pmt Rejector: | 0 | Pmt Reject Code: | 0 |
| MICR Val: | 0 | Amount Val: | 0.00 |
| Virtual Validate: | 0 | Bundle Total: | 117542.25 |
| Trunc: | 0 | Check Amt1: | 2000.00 |
| Check Amt2: | 0.00 | Check Amt3: | 0.00 |
| Check Amt5: | 0.00 | Check Amt Opld: | KM93587a,cca |
| Check Reject Reason: | 0 | Check Audit Trail: | 0 |
| Arc Reason: | NARC-BOA_ICL21 | Arcinfo: | 941191417450016 |
| P2 Sequence: | 8 | | |

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. ▪ CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM.

BNY MELLON TRUST OF DELAWARE
NEWARK, DELAWARE

**National Financial Services LLC**
499 Washington Boulevard
Jersey City, NJ 07310

NO. 324972975
62-35/311

April 15, 2014

PAY *Two Thousand Dollars and 00 Cents*

EXACTLY
*$2,000.00*
Not Valid After 90 Days

TO THE
ORDER OF

SHIRLEY T SHERROD P/ADM
1387 PELICAN WATCH VILLAS
JOHNS ISLAND SC 29455-6072

National Financial Services LLC

CBIA941191417450016

AUTHORIZED SIGNATURE

⑈324972975⑈ ⑆031100351⑆ ⑈0300974219⑈

02810233

For Deposit Only
06 01 00 141745 042814      PEG CITIBANK N.A.
24181028773914   800   9000   DES MOINESIA
042814     086097     QUEF  >122401710<

SITE:SD-CI TM:LG-5000 ACID:P7891187
05/06/16      12:49:09

S T SHERROD MD
Member Since 1987  Account number ending in: 1633
Billing Period: 02/11/14-03/10/14

How to reach us
www.citicards.com
1-888-766-CITI(2484)
BOX 6500 SIOUX FALLS, SD 57117

Minimum payment due:        $650.88
New balance:                $36,633.54
Payment due date:           04/06/14

## Account Summary

| | |
|---|---|
| Previous balance | $36,457.40 |
| Payments   loan repay | -$21,000.00 |
| Credits | -$1,709.86 |
| Purchases | +$22,001.12 |
| Cash advances | +$0.00 |
| Fees | +$600.00 |
| Interest | +$284.88 |
| **New balance** | **$36,633.54** |

## Credit Limit

| | |
|---|---|
| Revolving Credit limit | $43,100 |
| Includes $24,300 cash advance limit | |
| Available Revolving credit | $6,466 |
| Includes $6,466 available for cash advances | |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35 and your APRs may be increased up to the variable Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 36 year(s) | $78,943 |
| $1,184 | 3 year(s) | $42,621 (Savings=$36,322) |

For information about credit counseling services, call 1-877-337-8187.

AAdvantage® Miles Reported to
American Airlines:

## 291

» See page 3 for more information about your rewards

Please print **Address Changes** on the reverse side

Minimum payment due        $650.88
New balance                $36,633.54
Payment due date           04/06/14

Amount enclosed:

Account number ending in 1633

000000 PW 00 A 0

S T SHERROD MD
PO BOX 515
SOUTHFIELD MI  48037-0515

CITI CARDS
PO BOX 78045
Phoenix, AZ 85062-8045

S T SHERROD MD
Member Since 1987   Account number ending in: 1633
Billing Period: 01/09/14-02/10/14

How to reach us
**www.citicards.com**
1-888-766-CITI(2484)
BOX 6500 SIOUX FALLS, SD 57117

| Minimum payment due: | $713.36 |
|---|---|
| New balance: | $36,457.40 |
| Payment due date: | 03/06/14 |

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35 and your APRs may be increased up to the variable Penalty APR of 29.99%.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 36 year(s) | $81,440 |
| $1,266 | 3 year(s) | $45,573 (Savings=$35,867) |

For information about credit counseling services, call 1-877-337-8187.

### Account Summary

| | |
|---|---|
| Previous balance | $24,581.82 |
| Payments  *loan repayment* | -$10,000.00 |
| Credits | -$1,447.41 |
| Purchases | +$22,973.63 |
| Cash advances | +$0.00 |
| Fees | +$0.00 |
| Interest | +$349.36 |
| **New balance** | **$36,457.40** |

### Credit Limit

| | |
|---|---|
| Revolving Credit limit | $43,100 |
| Includes $24,300 cash advance limit | |
| Available Revolving credit | $6,642 |
| Includes $6,642 available for cash advances | |

AAdvantage® Miles Reported to American Airlines:

**21,526**

» See page 3 for more information about your rewards

Please print **Address Changes** on the reverse side

| Minimum payment due | $713.36 |
|---|---|
| New balance | $36,457.40 |
| Payment due date | 03/06/14 |

Amount enclosed:

Account number ending in 1633

000000 PW 00 A 0

S T SHERROD MD
PO BOX 515
SOUTHFIELD MI 48037-0515

CITI CARDS
PO BOX 78045
Phoenix, AZ 85062-8045

# loan repay



| Profile Bankcard (IBS) | | Processing Date: | Jan 27, 2014 | Envelope : 24 |
| --- | --- | --- | --- | --- |
| | | Batch Number: | 165042 | |

**PAYMENT**

| | | | |
| --- | --- | --- | --- |
| Acct Number: | 5466160280361633 | Check Item Ref: | 48 |
| Check Group Number: | 16504206001 | Check Amount: | 10000.00 |
| Routing & Transit: | 031100351 | Check Account: | 0300956497 |
| Microfilm Id: | 0 | MICR PC Code: | 0 |
| Pmt Rejector: | 0 | Pmt Reject Code: | 0 |
| MICR Val: | 0 | Amount Val: | 0.00 |
| Virtual Validate: | 0 | Bundle Total: | 35601.58 |
| Trunc: | 0 | Check Amt1: | 10000.00 |
| Check Amt2: | 10000.00 | Check Amt3: | 0.00 |
| Check Amt5: | 0.00 | Check Amt OpId: | HV04749A,cc2 |
| Check Reject Reason: | 0 | Check Audit Trail: | 0 |
| Arc Reason: | NARC-BOA_ICL21 | ArcInfo: | 940271650420048 |
| P2 Sequence: | 24 | | |

**Pershing®**
AN AFFILIATE OF THE BANK OF NEW YORK MELLON
One Pershing Plaza, Jersey City, NJ 07399
Pershing LLC, member FINRA, NYSE, SIPC

Account No: P1R-128886-1
BANK OF NEW YORK
DELAWARE

COMERICA SECURITIES INC
201 W FORT STREET
DETROIT MI 48226-3230

4015600977

62-35
311

Date: 01/22/14

****TEN THOUSAND AND NO/100 DOLLARS*****

PAY TO THE ORDER OF

SHIRLEY T SHERROD
PO BOX 515
SOUTHFIELD MI 48037-0515

EXACTLY
$****10,000.00

VOID AFTER 180 DAYS
CBIA940271650420048 Two Signatures Required For
Amounts Over $250,000

Authorized Representative
Authorized Representative

C 7791361

⑈4015600977⑈ ⑆031100351⑆ ⑈0300956497⑈

For Deposit Only
06 01 00 165042 012614   PEG CITIBANK N.A.
66160280361633  240  9000  DES MOINESIA
012614  083620  CARF >122401710<

ENDORSE HERE

EXHIBIT 23

**Form 5500-SF**

**Short Form Annual Return/Report of Small Employee Benefit Plan**

OMB Nos. 1210-0110
1210-0089

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA), and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).

▶ Complete all entries in accordance with the instructions to the Form 5500-SF.

**2015**

**This Form is Open to Public Inspection**

| Part I | Annual Report Identification Information |
|---|---|

For calendar plan year 2015 or fiscal plan year beginning 01/01/2015 and ending 12/31/2015

**A** This return/report is for:
- [X] a single-employer plan
- [ ] a multiple-employer plan (not multiemployer) (Filers checking this box must attach a list of participating employer information in accordance with the form instructions)
- [ ] a one-participant plan
- [ ] a foreign plan

**B** This return/report is
- [ ] the first return/report
- [ ] the final return/report
- [ ] an amended return/report
- [ ] a short plan year return/report (less than 12 months)

**C** Check box if filing under:
- [X] Form 5558
- [ ] automatic extension
- [ ] DFVC program
- [ ] special extension (enter description)

| Part II | Basic Plan Information—enter all requested information |
|---|---|

**1a** Name of plan
SHIRLEY T SHERROD MD PC TARGET BENEFIT PENSION PLAN

**1b** Three-digit plan number (PN) ▶ 002

**1c** Effective date of plan
01/01/1987

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

SHIRLEY T. SHERROD, M.D., P.C.
SAME
DR SHERROD
PO BOX 515
SOUTHFIELD, MI 48037-0515

P O BOX 515
SOUTHFIELD, MI 48037

**2b** Employer Identification Number (EIN)
38-2174656

**2c** Sponsor's telephone number
248-341-5100

**2d** Business code (see instructions)
621111

**3a** Plan administrator's name and address [ ] Same as Plan Sponsor.
L J CONSLTANTS
SAME

1146 S WAUKEGAN RD
WAUKEGAN, IL 60085-6731

**3b** Administrator's EIN
38-2171344

**3c** Administrator's telephone number
248-872-7172

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN, and the plan number from the last return/report.

**4b** EIN

**a** Sponsor's name

**4c** PN

| | | | |
|---|---|---|---|
| **5a** | Total number of participants at the beginning of the plan year | **5a** | 17 |
| **b** | Total number of participants at the end of the plan year | **5b** | 17 |
| **c** | Number of participants with account balances as of the end of the plan year (defined benefit plans do not complete this item) | **5c** | 17 |
| **d(1)** | Total number of active participants at the beginning of the plan year | **5d(1)** | 17 |
| **d(2)** | Total number of active participants at the end of the plan year | **5d(2)** | 17 |
| **e** | Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | **5e** | 0 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including, if applicable, a Schedule SB or Schedule MB completed and signed by an enrolled actuary, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 10/14/2016 | LEROY JOHNSON |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |

| SIGN HERE | | | |
|---|---|---|---|
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |

Preparer's name (including firm name, if applicable) and address (include room or suite number )
M.S ASSOC

200 S MICHIGAN AVE
CHICAGO, IL 60602

Preparer's telephone number

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500-SF.

Form 5500-SF (2015)
v. 150123

Form 5500-SF 2015 | Page **2**

**6a** Were all of the plan's assets during the plan year invested in eligible assets? (See instructions.) .............................................. ☒ Yes ☐ No

**b** Are you claiming a waiver of the annual examination and report of an independent qualified public accountant (IQPA) under 29 CFR 2520.104-46? (See instructions on waiver eligibility and conditions.) ............................................. ☒ Yes ☐ No

**If you answered "No" to either line 6a or line 6b, the plan cannot use Form 5500-SF and must instead use Form 5500.**

**c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (see ERISA section 4021)? ...... ☐ Yes ☒ No ☐ Not determined

| Part III | Financial Information | | | |
|---|---|---|---|---|
| **7** | Plan Assets and Liabilities | | **(a) Beginning of Year** | **(b) End of Year** |
| **a** | Total plan assets............................................................ | **7a** | 1762150 | 1647070 |
| **b** | Total plan liabilities ....................................................... | **7b** | | |
| **c** | Net plan assets (subtract line 7b from line 7a)............... | **7c** | 1762150 | 1647070 |
| **8** | Income, Expenses, and Transfers for this Plan Year | | **(a) Amount** | **(b) Total** |
| **a** | Contributions received or receivable from:<br>**(1)** Employers ............................................................. | **8a(1)** | 0 | |
| | **(2)** Participants ......................................................... | **8a(2)** | 0 | |
| | **(3)** Others (including rollovers) ................................. | **8a(3)** | 0 | |
| **b** | Other income (loss) ....................................................... | **8b** | -16080 | |
| **c** | Total income (add lines 8a(1), 8a(2), 8a(3), and 8b) ...... | **8c** | | -16080 |
| **d** | Benefits paid (including direct rollovers and insurance premiums to provide benefits) | **8d** | 59000 | |
| **e** | Certain deemed and/or corrective distributions (see instructions).... | **8e** | 0 | |
| **f** | Administrative service providers (salaries, fees, commissions)........ | **8f** | 32000 | |
| **g** | Other expenses ............................................................. | **8g** | 8000 | |
| **h** | Total expenses (add lines 8d, 8e, 8f, and 8g)................. | **8h** | | 99000 |
| **i** | Net income (loss) (subtract line 8h from line 8c) ............ | **8i** | | -115080 |
| **j** | Transfers to (from) the plan (see instructions)............... | **8j** | | |

| Part IV | Plan Characteristics |
|---|---|
| **9a** | If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristic Codes in the instructions:<br>2B |
| **B** | If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristic Codes in the instructions: |

| Part V | Compliance Questions | | | | | |
|---|---|---|---|---|---|---|
| **10** | During the plan year: | | **Yes** | **No** | **N/A** | **Amount** |
| **a** | Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? (See instructions and DOL's Voluntary Fiduciary Correction Program) .......................................................................... | **10a** | | X | | |
| **b** | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 10a.) .......................................................................... | **10b** | | X | | |
| **c** | Was the plan covered by a fidelity bond? .......................................................... | **10c** | | X | | |
| **d** | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? .......................................................................... | **10d** | | X | | |
| **e** | Were any fees or commissions paid to any brokers, agents, or other persons by an insurance carrier, insurance service, or other organization that provides some or all of the benefits under the plan? (See instructions). .......................................................................... | **10e** | | X | | |
| **f** | Has the plan failed to provide any benefit when due under the plan? ......................... | **10f** | | X | | |
| **g** | Did the plan have any participant loans? (If "Yes," enter amount as of year end.) .......... | **10g** | | X | | |
| **h** | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) .......................................................................... | **10h** | | X | | |
| **i** | If 10h was answered "Yes," check the box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3......................... | **10i** | | | | |
| **j** | Did the plan trust incur unrelated business taxable income? .................................. | **10j** | | X | | |

| Part VI | Pension Funding Compliance | | |
|---|---|---|---|
| **11** | Is this a defined benefit plan subject to minimum funding requirements? (If "Yes," see instructions and complete Schedule SB (Form 5500) and line 11a below). | | ☐ Yes ☒ No |
| **11a** | Enter the unpaid minimum required contribution for all years from Schedule SB (Form 5500) line 40............................. | **11a** | |
| **12** | Is this a defined contribution plan subject to the minimum funding requirements of section 412 of the Code or section 302 of ERISA?... | | ☐ Yes ☒ No |

Form 5500-SF 2015      Page **3** - [1]

(If "Yes," complete line 12a or lines 12b, 12c, 12d, and 12e below, as applicable.)

**a** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions, and enter the date of the letter ruling granting the waiver. ......................................................... Month _____ Day _____ Year _____

**If you completed line 12a, complete lines 3, 9, and 10 of Schedule MB (Form 5500), and skip to line 13.**

| | | |
|---|---|---|
| **b** Enter the minimum required contribution for this plan year ......................................... | **12b** | |
| **c** Enter the amount contributed by the employer to the plan for this plan year ......................... | **12c** | |
| **d** Subtract the amount in line 12c from the amount in line 12b. Enter the result (enter a minus sign to the left of a negative amount) | **12d** | |

**e** Will the minimum funding amount reported on line 12d be met by the funding deadline?............................. ☐ Yes ☐ No ☐ N/A

## Part VII  Plan Terminations and Transfers of Assets

| | | |
|---|---|---|
| **13a** Has a resolution to terminate the plan been adopted in any plan year? ...................................... | | ☐ Yes ☒ No |
| If "Yes," enter the amount of any plan assets that reverted to the employer this year ........................... | **13a** | |

**b** Were all the plan assets distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC?      ☐ Yes ☒ No

**c** If during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| **13c(1)** Name of plan(s): | **13c(2)** EIN(s) | **13c(3)** PN(s) |
|---|---|---|
| | | |

## Part VIII  Trust Information

| | |
|---|---|
| **14a** Name of trust | **14b** Trust's EIN |
| **14c** Name of trustee or custodian | **14d** Trustee's or custodian's telephone number |

## Part IX  IRS Compliance Questions

| | |
|---|---|
| **15a** Is the plan a 401(k) plan? ............................................................................ | ☐ Yes ☒ No |
| **15b** If "Yes," how does the 401(k) plan satisfy the nondiscrimination requirements for employee deferrals and employer matching contributions (as applicable) under sections 401(k)(3) and 401(m)(2)?.................................. | ☐ Design-based safe harbor method ☐ ADP/ACP test |
| **15c** If the ADP/ACP test is used, did the 401(k) plan perform ADP/ACP testing for the plan year using the "current year testing method" for nonhighly compensated employees (Treas. Reg sections 1.401(k)-2(a)(2)(ii) and 1.401(m)-2(a)(2)(ii))? | ☐ Yes ☐ No |
| **16a** Check the box to indicate the method used by the plan to satisfy the coverage requirements under section 410(b): ...... | ☐ Ratio percentage test ☐ Average benefit test |
| **16b** Does the plan satisfy the coverage and nondiscrimination tests of sections 410(b) and 401(a)(4) by combining this plan with any other plans under the permissive aggregation rules? ........................................ | ☐ Yes ☐ No |
| **17a** Has the plan been timely amended for all required tax law changes?............................................ | ☒ Yes ☐ No ☐ N/A |

**17b** Date the last plan amendment/restatement for the required tax law changes was adopted \_\_\_\_/\_\_\_\_/\_\_\_\_. Enter the applicable code \_\_\_\_ (See instructions for tax law changes and codes).

**17c** If the plan sponsor is an adopter of a pre-approved master and prototype (M&P) or volume submitter plan that is subject to a favorable IRS opinion or advisory letter, enter the date of that favorable letter _____/_____/_____ and the letter's serial number _____.

**17d** If the plan is an individually-designed plan and received a favorable determination letter from the IRS, enter the date of the plan's last favorable determination letter _____/_____/_____.

| | | |
|---|---|---|
| **18** Is the Plan maintained in a U.S. territory (i.e., Puerto Rico (if no election under ERISA section 1022(i)(2) has been made), American Samoa, Guam, the Commonwealth of the Northern Mariana Islands or the U.S. Virgin Islands)?......... | | ☐ Yes ☒ No |
| **19** Were in-service distributions made during the plan year? ................................................... | | ☐ Yes ☒ No |
| If "Yes," enter amount ............................................................................... | **19** | |
| **20** Were required minimum distributions made to 5% owners who have attained age 70 ½ (regardless of whether or not retired), as required under section 401(a)(9)? | | ☐ Yes ☐ No ☒ N/A |

**SHIRLEY T. SHERROD, M.D., P.C.**
**TARGET PENSION PLAN**

Updated: 9/25/19

| Date | Check Number | EXHIBIT | | Payee / Vendor | Receipt | Disbursement | Description | Cumulative Total |
|------|------|------|------|------|------|------|------|------|
| | | | | SHIRLEY T. SHERROD P/ADM | | | | |
| 1/5/15 | 202989558 | DOL2432 & DOL2433 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 1/5/15 | 202989559 | DOL2434 & DOL2435 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 1/5/15 | 202989560 | DOL2436 & DOL2437 | | SHIRLEY T. SHERROD P/ADM | X | 4,440.00 | | |
| 2/5/15 | 202995568 | DOL2438 & DOL2439 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 2/5/15 | 202995569 | DOL2440 & DOL2441 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 2/5/15 | 202995570 | DOL2442 & DOL2443 | | SHIRLEY T. SHERROD P/ADM | X | 4,440.00 | | |
| 3/2/15 | 2040036 | DOL2444 & DOL2445 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 3/2/15 | 204003667 | DOL2446 & DOL2447 | | SHIRLEY T. SHERROD P/ADM | X | 4,000.00 | | |
| 4/6/15 | 204010400 | DOL2448 & DOL2449 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 4/6/15 | 204010405 | DOL2450 & DOL2451 | X | SHIRLEY T. SHERROD P/ADM | X | 4,444.00 | | |
| 4/22/15 | 325460857 | DOL2 2 & DOL2453 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 4/22/15 | 325460863 | DOL2 4 & DOL2455 | | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 6/1/15 | 204022191 | DOL2 6 & DOL2457 | X | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 6/1/15 | 204022195 | DOL2 8 & DOL2459 | | SHIRLEY T. SHERROD P/ADM | | 2,700.00 | | |
| 7/1/15 | 204028163 | DOL2 0 & DOL2461 | X | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 7/1/15 | 204028164 | DOL2 2 & DOL2463 | X | SHIRLEY T. SHERROD P/ADM | | 4,440.00 | | |
| 8/10/15 | 204034983 | 9.16000354 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 8/10/15 | 204034982 | 9.16000353 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 8/19/15 | 204036871 | 9.16000352 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 8/19/15 | 204036870 | 9.16000351 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 10/8/15 | 204046558 | 9.16000350 | X | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 10/8/15 | 204046560 | 9.16000349 | X | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 10/21/15 | 325694796 | 9.16000348 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 10/21/15 | 325694789 | 9.16000347 | | SHIRLEY T. SHERROD P/ADM | X | 4,444.00 | | |
| 11/30/15 | 204056886 | 9.16000357 | | SHIRLEY T. SHERROD P/ADM | X | 5,000.00 | | |
| 11/30/15 | 204055951 | 9.16000356 | | SHIRLEY T. SHERROD P/ADM | X | 4,440.00 | | |
| | AR 55 | BENEFITS PAID | *** | SHIRLEY T. SHERROD P/ADM | | -59,000.00 | | |

LAW OFFICES

# CRANE, HEYMAN, SIMON, WELCH & CLAR

EUGENE CRANE
ARTHUR G. SIMON
DAVID K. WELCH
SCOTT R. CLAR
JEFFREY C. DAN

JOHN H. REDFIELD
BRIAN P. WELCH

GLENN R. HEYMAN, OF COUNSEL
THOMAS W. GOEDERT, OF COUNSEL

**pd**

**202989558, 202989559,
202989560, 202995568,
202995569,202995570 ,
204003667, 204010400**

SUITE 3705
135 SOUTH LASALLE STREET
CHICAGO, ILLINOIS 60603-4297

(312) 641-6777
FAX (312) 641-7114

WWW.CRANEHEYMAN.COM

August 1, 2014

**VIA EMAIL** - ssherrod7@gmail.com
**VIA FIRST CLASS MAIL**

Shirley T. Sherrod, M.D.
2631 S. Indiana, Unit 1911
Chicago, IL 60616

Re:   Shirley T. Sherrod, M.D. ·

Dear Dr. Sherrod,

Enclosed is the Court's Findings of Fact and Conclusions of Law in Support of the
Order awarding our firm's fees and expenses for legal services rendered for the period
February 27, 2014 through June 10, 2014.  The Court has allowed fees in the amount
of $37,088.14 and costs in the amount of $1,520.14 for a total of $37,088.14.

Very truly yours,

CRANE, HEYMAN, SIMON, WELCH & CLAR

By: _____
John H. Redfield

JHR/mjo
Encl.

pd—204036—

# Richard Hirschtritt

Attorney at Law

500 North Michigan Ave., Suite 600
Chicago, Illinois 60611

E-mail to: Leroy Johnson
LEROY_J48507@YAHOO.COM

Cc: Dr. Sherrod

In answer to your comments on my invoice:

1) On 6/16 I requested certain documentation whereupon you sent me a disk which you said would provide me with the requested items. The disk contained over 1000 unidentified entries which I took the time to review, only to find that it provided me with only 3 of the items that I had requested. My original report was based on the limited information which the disk provided. The report was the basis for the July 5th invoice. Although you contend that the information provided in the report was information which you already had, nevertheless you repeatedly requested additional information regarding the items discussed in my report.

2) On 3 separate occasions thereafter and by telephone conference on 7/12 I answered all of the questions which you posed. These items were the basis for the July 25th invoice. Whether you found my answers useful is of no impart. The fact that you requested the information and I provided it to you is all that is necessary to justify my fee.

While I believe that the total of $4,700 is properly due and owing, in an attempt to resolve this matter amicably.

Richard Hirschtritt

Telephone (312) 645-9001 ~ Email: oldtaxpro@msn.com ~ Facsimile (561) 270-2122



325694796  325694789    **S T Sherr <ssherrod7@gmail.com>**
204056886  204056951

### RE: 7/24 Billing
1 message                                    pd - check nos

**Peggy McGregor** <PMcGregor@granzottolaw.com>                    Mon, Aug 7, 2017 at 10:55 AM
To: Shirley Sherrod <ssherrod7@gmail.com>

Here are the payments that I have recorded from 2016 to the present.  As you can see, on 09/13/2016, I
recorded a $1,000.00 payment as $100.00.  The total amount due is $9,314.96.  Thanks for keeping me honest
and my apologies for the inconvenience.


| 01/14/16 | rec'd 2,000.00 | ~~15,657.92~~ |
| 01/26/16 | rec'd 2,000.00 | ~~13,657.92~~ |


Peggy McGregor

Assistant to Mark Granzotto

**Bank of America** ✓

pd-#204056951 reimburse

Account number ending
7486

Account information
View your account
information

For any questions regarding
your account
Please call the customer
service number on the back
of your credit card.

Online Account Tools
Change email
Change street address/
phone number
More services

## 2015 Year End Summary

Prepared for:
SHIRLEY T SHERROD MD

Thank you for your business

# pd-actuary /5500 + valuations

The Year-End Summary is
for informational purposes
only.

### 2015 Year-End Summary of Credit Card Transactions

This summary recaps when and where you used your credit card ending in 7486 between January 1, 2015, and December 31, 2015. It includes transaction activity from any upgraded, lost, or stolen accounts. Charges from December 2015 that did not post until January 2016, are not included in this recap.

### Account snapshot

Total spent
**$900.00**

Total interest
Refer to your credit card statement for total interest on your account.

### 2015 Summary of Transactions

**$900.00**



*Bank transactions*

$0.00
*Utilities*

$0.00
*All other categories*

SHIRLEY T SHERROD MD PC

www.citicards.com
1-800-823-4086

Page 2 of 3

# LOAN REPAYMENT

**pd w #
204056951
reimbursement**

## Account Summary

| Trans. date | Post date | Description | Amount |
|---|---|---|---|
| **Payments, Credits and Adjustments** | | | |
| | 10/05 | PAYMENT THANK YOU | -$200.00 |
| 98049667 | 70 | 0000        0000 | |
| | 09/29 | OFFER 07 PROMOTIONAL APR ENDED 09/29/15 | -$3,776.90 |
| 00000000 | 72 | 0000 | |
| **Standard Purchases** | | | |
| | 09/29 | OFFER 07 MOVED TO STANDARD PURCH | $3,776.90 |
| 00000000 | 64 | 0000 | |

**LOAN LEGAL**

**From This Billing Period:**

Interest.                     $18.69

## Fees charged

| | |
|---|---|
| **Total fees charged in this billing period** | **$0.00** |

## Interest charged

| Date | Description | Amount |
|---|---|---|
| 10/12 | INTEREST CHARGED TO STANDARD PURCH | $97.56 |
| 00000000 | 84         0000 | |
| 10/12 | INTEREST CHARGED TO OFFER-007 | $11.20 |
| 00000000 | 84         0000 | |
| **Total interest charged in this billing period** | | **$108.76** |



TOTAL
SAVINGS

## 2015 totals year-to-date

| | |
|---|---|
| **Total fees charged in 2015** | **$0.00** |
| **Total interest charged in 2015** | **$929.86** |

## Interest charge calculation

Days in billing cycle: **32**

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance type | Annual percentage rate (APR) | Balance subject to interest rate | Interest charge |
|---|---|---|---|
| PURCHASES | | | |
| Standard Purch | 15.99% (V) | $6,959.37 (D) | $97.56 |
| Offer 7 | 5.99% | $2,132.37 (D) | $11.20 |
| (Promotional Rate Expired 09/29/15) | | | |
| ADVANCES | | | |
| Standard Adv | 25.24% (V) | $0.00 (D) | $0.00 |

**LOAN LEGAL**

Your Annual Percentage Rate (APR) is the annual interest rate on your account. APRs followed by (V) may vary. Balances followed by (D) are determined by the daily balance method (including current transactions).

An offer has expired. For each expired offer, this month's statement shows a corresponding debit and credit transaction to move the remaining offer balance to the standard APR for purchases. Individual transactions made before offer expiration may also have corresponding debit and credit transactions if the transaction was received by us after the expiration date.

Total points as of 10/01/15:

4,514

Points transferred to your
Citi Easy Deals℠ Account:

0

**Citi Easy Deals
Member ID:      8648-16878026**

| Earned this period | 0 |
|---|---|
| Adjusted this period | 0 |
| **Total Earned this period** | **0** |
| **Total Earned year to date** | **418** |

» Visit citieasydeals.com to redeem points or for complete program details

No Citi Easy Deals Points were transferred this month to your Citi Easy Deals account. This may be because you made no eligible purchases or because a credit/adjustment/dispute exceeded the amount of eligible purchases.

Written disputes must be sent within 60 days of the first statement listing the transaction. The Year-End Summary does not extend an expired billing period. See your monthly statement, your Credit Card Agreement for the annual Your Billing Rights notice for details.

## Preparing your taxes

Here is a list of all your transactions between January 1, 2015 and December 31, 2015. To find out more information about itemized deductions such as travel expenses or medical and dental expenses, search "Topic 500" at www.irs.gov. To easily track deductions, just mark the "Deduct" column next to each charge. Please note: Here is a list of all your posted transactions.

**Bank transactions**
**$900.00**

**Cash transactions**

| Date | Description | Location | Amount | Deduct |
|------|-------------|----------|--------|--------|
| 12/29/15 | | | 900.00 | ☐ |
| | | | **$900.00** | |

This credit card program is issued and administered by Bank of America, N.A. Bank of America and the Bank of America logo are registered trademarks of Bank of America Corporation.
©2016 Bank of America Corporation

EXHIBIT 24

Case: 1:16-cv-04825 Document #: 216 Filed: 11/09/20 Page 671 of 741 PageID #:2764

# Form 5500-SF

## Short Form Annual Return/Report of Small Employee Benefit Plan

Department of the Treasury
Internal Revenue Service

Department of Labor
Employee Benefits Security Administration

Pension Benefit Guaranty Corporation

This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA), and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code).

▶ Complete all entries in accordance with the instructions to the Form 5500-SF.

OMB Nos. 1210-0110
1210-0089

**2016**

This Form is Open to Public Inspection

| **Part I** | **Annual Report Identification Information** |

For calendar plan year 2016 or fiscal plan year beginning 01/01/2016 and ending 12/31/2016

**A** This return/report is for:
- [X] a single-employer plan
- [ ] a multiple-employer plan (not multiemployer) (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)
- [ ] a one-participant plan
- [ ] a foreign plan

**B** This return/report is
- [ ] the first return/report
- [ ] an amended return/report
- [ ] the final return/report
- [ ] a short plan year return/report (less than 12 months)

**C** Check box if filing under:
- [X] Form 5558
- [ ] automatic extension
- [ ] DFVC program
- [ ] special extension (enter description)

| **Part II** | **Basic Plan Information**—enter all requested information |

**1a** Name of plan
TARGET BENEFIT PENSION PLAN-SHIRLEY T SHERROD MD PC

**1b** Three-digit plan number (PN) ▶ 002

**1c** Effective date of plan
01/01/1987

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

SHIRLEY T SHERROD MD PC

PO BOX 2423
CHICAGO, IL 60690-2423

PO BOX 2423
CHICAGO, IL 60690-2423

**2b** Employer Identification Number (EIN)
38-2164756

**2c** Sponsor's telephone number
248-872-7172

**2d** Business code (see instructions)
621111

**3a** Plan administrator's name and address [ ] Same as Plan Sponsor.
LJ CONSULTANTS
1146 S WAUKEGAN RD
WAUKEGAN, IL 60085-6731

**3b** Administrator's EIN
38-2171344

**3c** Administrator's telephone number
248-872-7172

**4** If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN, and the plan number from the last return/report.

**a** Sponsor's name

**4b** EIN

**4c** PN

| | | |
|---|---|---|
| **5a** Total number of participants at the beginning of the plan year | **5a** | 17 |
| **b** Total number of participants at the end of the plan year | **5b** | 17 |
| **c** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | **5c** | 17 |
| **d(1)** Total number of active participants at the beginning of the plan year | **5d(1)** | 0 |
| **d(2)** Total number of active participants at the end of the plan year | **5d(2)** | 0 |
| **e** Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | **5e** | 0 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including, if applicable, a Schedule SB or Schedule MB completed and signed by an enrolled actuary, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 10/14/2017 | LEROY JOHNSON |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |

Preparer's name (including firm name, if applicable) and address (include room or suite number )

Preparer's telephone number

For Paperwork Reduction Act Notice, see the Instructions for Form 5500-SF.

Form 5500-SF (2016)
v.160927

Form 5500-SF 2016        Page **2**

| | | | |
|---|---|---|---|
| **6a** | Were all of the plan's assets during the plan year invested in eligible assets? (See instructions.) ...................................................... | | X Yes ☐ No |
| **b** | Are you claiming a waiver of the annual examination and report of an independent qualified public accountant (IQPA) under 29 CFR 2520.104-46? (See instructions on waiver eligibility and conditions.).................................... | | X Yes ☐ No |
| | **If you answered "No" to either line 6a or line 6b, the plan cannot use Form 5500-SF and must instead use Form 5500.** | | |
| **c** | If the plan is a defined benefit plan, is it covered under the PBGC insurance program (see ERISA section 4021)? ...... | | ☐ Yes ☐ No ☐ Not determined |

## Part III   Financial Information

| **7** | Plan Assets and Liabilities | | **(a) Beginning of Year** | **(b) End of Year** |
|---|---|---|---|---|
| **a** | Total plan assets ........................................................ | 7a | 1647070 | 1557640 |
| **b** | Total plan liabilities .................................................... | 7b | | |
| **c** | Net plan assets (subtract line 7b from line 7a)................ | 7c | 1647070 | 1557640 |

| **8** | Income, Expenses, and Transfers for this Plan Year | | **(a) Amount** | **(b) Total** |
|---|---|---|---|---|
| **a** | Contributions received or receivable from: | | | |
| | (1)   Employers........................................................... | 8a(1) | | |
| | (2)   Participants........................................................ | 8a(2) | | |
| | (3)   Others (including rollovers)................................ | 8a(3) | | |
| **b** | Other income (loss) ................................................... | 8b | 107042 | |
| **c** | Total income (add lines 8a(1), 8a(2), 8a(3), and 8b)....... | 8c | | 107042 |
| **d** | Benefits paid (including direct rollovers and insurance premiums to provide benefits).................................................... | 8d | 62550 | |
| **e** | Certain deemed and/or corrective distributions (see instructions) . | 8e | | |
| **f** | Administrative service providers (salaries, fees, commissions)..... | 8f | 133922 | |
| **g** | Other expenses.......................................................... | 8g | | |
| **h** | Total expenses (add lines 8d, 8e, 8f, and 8g)................ | 8h | | 196472 |
| **i** | Net income (loss) (subtract line 8h from line 8c) ............ | 8i | | -89430 |
| **j** | Transfers to (from) the plan (see instructions) ............... | 8j | | |

## Part IV   Plan Characteristics

| | | |
|---|---|---|
| **9a** | If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristic Codes in the instructions: | |
| | 2B | |
| **b** | If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristic Codes in the instructions: | |

## Part V   Compliance Questions

| **10** | During the plan year: | | **Yes** | **No** | **N/A** | **Amount** |
|---|---|---|---|---|---|---|
| **a** | Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? (See instructions and DOL's Voluntary Fiduciary Correction Program) ......................................................................... | 10a | | X | | |
| **b** | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 10a.)................................................................ | 10b | | X | | |
| **c** | Was the plan covered by a fidelity bond? ............................. | 10c | | X | | |
| **d** | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? .................................................................. | 10d | | X | | |
| **e** | Were any fees or commissions paid to any brokers, agents, or other persons by an insurance carrier, insurance service, or other organization that provides some or all of the benefits under the plan? (See instructions.) ................................................ | 10e | | X | | |
| **f** | Has the plan failed to provide any benefit when due under the plan? ..................................... | 10f | | X | | |
| **g** | Did the plan have any participant loans? (If "Yes," enter amount as of year-end.) ..................... | 10g | | X | | |
| **h** | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) .................................................................. | 10h | | X | | |
| **i** | If 10h was answered "Yes," check the box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3........................... | 10i | | | | |

Form 5500-SF 2016     Page **3-** | 1 |

| Part VI | **Pension Funding Compliance** | | |
|---|---|---|---|
| **11** | Is this a defined benefit plan subject to minimum funding requirements? (If "Yes," see instructions and complete Schedule SB (Form 5500) and line 11a below) | | ☐ Yes ☐ No |
| **11a** | Enter the unpaid minimum required contributions for all years from Schedule SB (Form 5500) line 40 ...................... | **11a** | |
| **12** | Is this a defined contribution plan subject to the minimum funding requirements of section 412 of the Code or section 302 of ERISA? ....................................................................................................................................................<br>(If "Yes," complete line 12a or lines 12b, 12c, 12d, and 12e below, as applicable.) | | ☐ Yes ☒ No |
| **a** | If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions, and enter the date of the letter ruling granting the waiver. .............................................................................................. Month _____ Day _____ Year _____ | | |

**If you completed line 12a, complete lines 3, 9, and 10 of Schedule MB (Form 5500), and skip to line 13.**

| | | | |
|---|---|---|---|
| **b** | Enter the minimum required contribution for this plan year ............................. | **12b** | |
| **c** | Enter the amount contributed by the employer to the plan for this plan year ............ | **12c** | |
| **d** | Subtract the amount in line 12c from the amount in line 12b. Enter the result (enter a minus sign to the left of a negative amount) | **12d** | |
| **e** | Will the minimum funding amount reported on line 12d be met by the funding deadline?............................ | | ☐ Yes ☐ No ☐ N/A |

| Part VII | **Plan Terminations and Transfers of Assets** | | |
|---|---|---|---|
| **13a** | Has a resolution to terminate the plan been adopted in any plan year? ............................................................. | | ☐ Yes ☒ No |
| | If "Yes," enter the amount of any plan assets that reverted to the employer this year .......................... | **13a** | |
| **b** | Were all the plan assets distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC? ...................................................................................................................... | | ☐ Yes ☒ No |
| **c** | If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.) | | |

| **13c(1)** Name of plan(s): | **13c(2)** EIN(s) | **13c(3)** PN(s) |
|---|---|---|
| | | |

| Part VIII | **Trust Information** |
|---|---|

| **14a** Name of trust | **14b** Trust's EIN |
|---|---|
| | |
| **14c** Name of trustee or custodian | **14d** Trustee's or custodian's telephone number |
| | |

| Part IX | **IRS Compliance Questions** | | |
|---|---|---|---|
| **15a** | Is the plan a 401(k) plan? If "No," skip b.............................................................. | ☐ Yes | ☒ No |
| **15b** | How did the plan satisfy the nondiscrimination requirements for employee deferrals under section 401(k)(3) for the plan year? Check all that apply: ......................... | ☐ Design-based safe harbor<br>☐ "Current year" ADP test | ☐ "Prior year" ADP test<br>☐ N/A |
| **16a** | What testing method was used to satisfy the coverage requirements under section 410(b) for the plan year? Check all that apply: ......................................................... | ☐ Ratio percentage test | ☐ Average benefit test   ☒ N/A |
| **16b** | Did the plan satisfy the coverage and nondiscrimination requirements of sections 410(b) and 401(a)(4) for the plan year by combining this plan with any other plan under the permissive aggregation rules?......... | ☒ Yes | ☐ No |
| **17a** | If the plan is a master and prototype plan (M&P) or volume submitter plan that received a favorable IRS opinion letter or advisory letter, enter the date of the letter _____/_____/_____ and the serial number _____. | | |
| **17b** | If the plan is an individually-designed plan that received a favorable determination letter from the IRS, enter the date of the most recent determination letter _____/_____/_____. | | |
| **18** | Defined Benefit Plan or Money Purchase Pension Plan Only:<br>Were any distributions made during the plan year to an employee who attained age 62 and had not separated from service? ............................................................................................................................... | ☐ Yes | ☐ No |
| **19** | Was any plan participant a 5% owner who had attained at least age 70 ½ during the prior plan year? ...................... | ☐ Yes | ☒ No |

| | | SHIRLEY T. SHERROD, M.D., P.C. | Updated: 9/25/19 | | | | | |
| | | TARGET PENSION PLAN | | | | | | |

| Date | Check Number | EXHIBIT | Payee / Vendor | Receipt | Disbursement | Description | Cumulative Total |
|------|--------------|---------|----------------|---------|--------------|-------------|------------------|
| 1/6/16 | 20406f512 | SUN.12.9.16000364 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 1/6/16 | 20406f511 | SUN.12.9.16000363 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 2/1/16 | 325852290 | SUN.12.9.16000362 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 2/1/16 | 325852289 | SUN.12.9.16000361 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 2/22/16 | 204076342 | SUN.12.9.16000360 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 2/22/16 | 204076205 | SUN.12.9.16000359 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 4/4/16 | 204085476 | SUN.12.9.16000373 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/4/16 | 204085479 | SUN.12.9.16000372 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 4/18/16 | 325964645 | SUN.12.9.16000371 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 4/18/16 | 325964642 | SUN.12.9.16000370 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 5/18/16 | 326007954 | SUN.12.9.16000369 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 5/18/16 | 326007952 | SUN.12.9.16000368 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 6/28/16 | 326064519 10103956 | SUN.12.9.16000367 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |
| 6/28/16 | 326064518 10106211 | SUN.12.9.16000366 | SHIRLEY T. SHERROD P/ADM 10106211 | | 4,444.00 | | |
| 7/29/16 | 326109553 10106211 | SUN.12.9.16000380 | SHIRLEY T. SHERROD P/ADM 10106211 | | 5,000.00 | | |
| 7/29/16 | 326109551 10106211 | SUN.12.9.16000379 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | |
| 9/1/16 | 326158478 10106212 | SUN.12.9.16000377 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | |

**SHIRLEY T. SHERROD, M.D., P.C.**
**TARGET PENSION PLAN**  Updated: 9/25/19

| Date | Check Number | EXHIBIT | | Payee / Vendor | Receipt | Disbursement | Description | Cumulative Total |
|---|---|---|---|---|---|---|---|---|
| 9/1/16 | 326158475 | SUN.12.9.16000378 | 10106212 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | 698,115.85 |
| 9/27/16 | 326189398 | SUN.12.9.16000376 | 10106212 | SHIRLEY T. SHERROD P/ADM | 10106212 | 5,000.00 | | 703,115.85 |
| 9/27/16 | 326189394 | SUN.12.9.16000375 | 10106212 | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | 707,559.85 |
| 10/17/16 | 204130836 | SUN.12.9.16000390 | 10106212 | SHIRLEY T. SHERROD, MD PC TARGET PENSION PLAN TRUST | EXPX | 18,255.50 | PAID TO: GROOM LAW GROUP, CHARTERED | 725,815.35 |
| 10/27/16 | 326230721 | SUN.12.9.16000389 | 10106141 | SHIRLEY T. SHERROD P/ADM | | 5,000.00 | | 730,815.35 |
| 10/27/16 | 326230720 | SUN.12.9.16000388 | 10106141 | SHIRLEY T. SHERROD P/ADM | INV28894 | 4,444.00 | | 735,259.35 |
| 11/22/16 | 326267708 | SUN.12.9.16000387 | 10107068 | SHIRLEY T. SHERROD P/ADM | EXP INV28894 | 20,000.00 | | 755,259.35 |
| 11/22/16 | 326267704 | SUN.12.9.16000386 | 10106141 | SHIRLEY T. SHERROD P/ADM | 10106141 | 5,000.00 | | 760,259.35 |
| 11/22/16 | 326267701 | SUN.12.9.16000385 | | SHIRLEY T. SHERROD P/ADM | | 4,444.00 | | 764,703.35 |
| 12/21/16 | 326339910 | SUN.12.9.16000391 | 10107068 | NO CHECK COPY | 10107068 | 18,000.00 | | 782,703.35 |
| 12/21/16 | 326339906 | SUN.12.9.16000384 | | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | 787,703.35 |
| 12/21/16 | 326339903 | SUN.12.9.16000383 | | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | 792,147.35 |
| 12/27/16 | 204148192 | SUN.12.9.16000382 | 10107068 | SHIRLEY T. SHERROD, MD PC TARGET PENSION PLAN TRUST | | 18,000.00 | | 810,147.35 |
| | | AR 5500 BENEFITS PAID | | | | -62,550.00 | | 747,597.35 |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

July 18, 2016

Bill Number: 10103956
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, Illinois 60085

Professional services rendered during the period ending June 30, 2016.

| | |
|---|---|
| DOL LITIGATION | $4,872.00 |
| Total Fees | $4,872.00 |
| | |
| DOL LITIGATION | $100.00 |
| Total Disbursements | $100.00 |
| Total | $4,972.00 |
| Less retainer | $- 4,972.00 |
| TOTAL DUE THIS STATEMENT | $0.00 |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C.  20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC  20073-0589 |

# GROOM LAW GROUP, CHARTERED
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C.  20006-5811**
FEI #52-1219029

August 30, 2016

Bill Number 10106211
File Number 024700-00001

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL  60085

Professional services rendered for the period ending July 31, 2016.

DOL LITIGATION                                              $ 18,810.00

Total Fees                                                         $ 18,810.00

Total Disbursements                                          $ 0.00

Total                                                                 $ 18,810.00

Less retainer                                                     $ -18,810.00

TOTAL DUE THIS STATEMENT                          $ 0.00

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C.  20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC  20073-0589 |

# GROOM LAW GROUP, CHARTERED
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C.  20006-5811**
FEI #52-1219029

September 30, 2016

Bill Number 10106212
File Number 024700-00001

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL  60085

Professional services rendered for the period ending August 31, 2016.

| | | |
|---|---|---|
| DOL LITIGATION | $ 14,695.00 | |
| Total Fees | | $ 14,695.00 |
| DOL LITIGATION | $ 4,227.50 | |
| Total Disbursements | | $ 4,227.50 |
| Total | | $ 18,922.50 |
| Less remaining balance from first retainer | | $ -1,218.00 |
| Less second payment | | $ -15,000.00 |
| TOTAL DUE THIS STATEMENT | | $ 2,704.50 |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C.  20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC  20073-0589 |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

October 14, 2016

Bill Number: 10106141
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL 60085

Professional services rendered during the period ending September 30, 2016.

| | |
|---|---|
| DOL LITIGATION | $15,551.00 |
| Total Fees | $15,551.00 |
| Total Disbursements | $0.00 |
| | _____ |
| Total | $15,551.00 |
| | ========= |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C. 20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC 20073-0589 |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

# PD-326267708, 326339910,204148192

November 18, 2016

Bill Number: 10107068
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL 60085

Professional services rendered during the period ending October 31, 2016.

| | | |
|---|---|---|
| DOL LITIGATION | $39,055.00 | |
| Total Fees | | $39,055.00 |
| DOL LITIGATION | $2,025.80 | |
| Total Disbursements | | $2,025.80 |
| | | _____ |
| Total | | $41,080.80 |
| | | ========== |
| Less Credit | | $ -582.00 |
| **Total Due This Statement** | | **$40,498.80** |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C. 20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC 20073-0589 |

September 19, 2016

Writer's Direct Dial (312) 444-1878

Groom Law Group, Chtd.

Attn: Lars C. Golumbic

1701 Pennsylvania Avenue, N.W.

Washington, DC 20006

Re:     Our File Number: 19526/040851/BDR/288954
        **Thomas E. Perez, Secretary of Labor,**
        **United States Department of Labor v. Shirley T. Sherrod; Leroy Johnson, and**
        **Shirley T. Sherrod, M.D., P.C., and**
        **Target Pension Plan**
        Court Number: 2016 cv 4825
        D/L: 12/31/2008

Dear Lars C. Golumbic:

Enclosed please find our interim bill for services rendered and costs advanced in the above-captioned matter.

We would appreciate it if you would please place this invoice in line for prompt payment.

Very truly yours,

Cassiday Schade LLP

Karen L. Peacock

Controller

Enclosure

Client ID: 19526                                                           Page: 3
Groom Law Group, Chtd.                                            September 19, 2016
                                                                Invoice No.: 288954

Matter No.: 40851
Thomas Perez, Sec. of Labor, U.S. Debt. of Labor vs. Shirley
T. Sherrod, M.D., PC., et al.

| Date | Timekeeper | Hours | Description |
|------|-----------|-------|-------------|
| 08/23/2016 | Roth, Bradford D. | .20 | Follow up re rule 7 issues and review emails re same. |
| 08/23/2016 | Broderick, Daniel J. | .70 | Attorney conference regarding initial status conference and Rule 26 disclosures; exchange correspondence with Natasha Fedder regarding Rule 26 disclosures and potential for Rule 7.1 dosclosure |

|  |  |
|---|---|
| **Total Hours** | **8.80** |
| **Total for Services** | **3,522.50** |

**Disbursements**

| Date |  | Description | Amount |
|------|--|-------------|--------|
| 08/16/2016 |  | 2 item(s) at $0.20 each; Photocopy | .40 |
| 08/17/2016 |  | 19 item(s) at $0.20 each; Photocopy | 3.80 |
|  |  | **Total  Disbursements** | **4.20** |

| Attorney | Billed Per Hour | Hours Worked | Amount Billed |
|----------|----------------|--------------|---------------|
| Jeffrey A. Hesser | 450.00 | 4.90 | 2,205.00 |
| Bradford D. Roth | 450.00 | 1.40 | 630.00 |
| Daniel J. Broderick | 275.00 | 2.50 | 687.50 |
| Total All Attorneys |  | 8.80 | $3,522.50 |

**Invoice Summary**

| | |
|---|---|
| Total Fees | $ 3,522.50 |
| Total Expenses | $ 4.20 |
| **Total This Invoice** | **$ 3,526.70** |



EXHIBIT 25

| Form **5500-SF** | | **Short Form Annual Return/Report of Small Employee Benefit Plan** | OMB Nos. 1210-0110 1210-0089 |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA), and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code). | **2017** |
| Department of Labor Employee Benefits Security Administration | | | **This Form is Open to Public Inspection** |
| Pension Benefit Guaranty Corporation | | ▶ **Complete all entries in accordance with the instructions to the Form 5500-SF.** | |

| **Part I** | **Annual Report Identification Information** |
|---|---|

For calendar plan year 2017 or fiscal plan year beginning **01/01/2017** and ending **12/31/2017**

**A** This return/report is for: ☒ a single-employer plan ☐ a multiple-employer plan (not multiemployer) (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)

☐ a one-participant plan ☐ a foreign plan

**B** This return/report is ☐ the first return/report ☐ the final return/report

☐ an amended return/report ☐ a short plan year return/report (less than 12 months)

**C** Check box if filing under: ☒ Form 5558 ☐ automatic extension ☐ DFVC program

☐ special extension (enter description)

| **Part II** | **Basic Plan Information**—enter all requested information |
|---|---|

**1a** Name of plan

SHIRLEY T. SHERROD, M.D., P.C. TARGET BENEFIT PENSION PLAN

**1b** Three-digit plan number (PN) ▶ **002**

**1c** Effective date of plan **01/01/1987**

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)

SHIRLEY T. SHERROD, M.D., P.C.

P.O. BOX 2423

CHICAGO          IL          60690-2423

**2b** Employer Identification Number (EIN) 38-2164756

**2c** Sponsor's telephone number 248-872-7172

**2d** Business code (see instructions) 621111

**3a** Plan administrator's name and address ☐ Same as Plan Sponsor.
LJ CONSULTING SERVICES, LLC

1146 S WAUKEGAN RD, STE 278

WAUKEGAN          IL          60085

**3b** Administrator's EIN 38-2171344

**3c** Administrator's telephone number 248-872-7172

**4** If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report.

**a** Sponsor's name

**c** Plan Name

**4b** EIN

**4d** PN

| | | |
|---|---|---|
| **5a** Total number of participants at the beginning of the plan year | **5a** | 17 |
| **b** Total number of participants at the end of the plan year | **5b** | 4 |
| **c** Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item). | **5c** | 4 |
| **d(1)** Total number of active participants at the beginning of the plan year | **5d(1)** | 1 |
| **d(2)** Total number of active participants at the end of the plan year | **5d(2)** | 1 |
| **e** Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested | **5e** | 0 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including, if applicable, a Schedule SB or Schedule MB completed and signed by an enrolled actuary, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | *LJ Consulting Services, LLC* *J Johnson* | Date *10/10/2018* | LEROY JOHNSON |
|---|---|---|---|
| | Signature of plan administrator | | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500-SF.

Form 5500-SF (2017)
v.170203

Form 5500-SF 2017          **Page 2**

| | | | |
|---|---|---|---|
| **6a** | Were all of the plan's assets during the plan year invested in eligible assets? (See instructions.) | | ☒ Yes ☐ No |
| **b** | Are you claiming a waiver of the annual examination and report of an independent qualified public accountant (IQPA) under 29 CFR 2520.104-46? (See instructions on waiver eligibility and conditions.) | | ☒ Yes ☐ No |
| | If you answered "No" to either line 6a or line 6b, the plan cannot use Form 5500-SF and must instead use Form 5500. | | |
| **c** | If the plan is a defined benefit plan, is it covered under the PBGC insurance program (see ERISA section 4021)? ...... ☐ Yes ☐ No    ☐ Not determined | | |
| | If "Yes" is checked, enter the My PAA confirmation number from the PBGC premium filing for this plan year_____. (See instructions.) | | |

## Part III    Financial Information

| 7 | Plan Assets and Liabilities | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| **a** | Total plan assets | **7a** | 1,557,640 | 1,656,751 |
| **b** | Total plan liabilities | **7b** | 0 | 8,076 |
| **c** | Net plan assets (subtract line 7b from line 7a) | **7c** | 1,557,640 | 1,648,675 |

| 8 | Income, Expenses, and Transfers for this Plan Year | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **a** | Contributions received or receivable from: | | | |
| | (1) Employers | **8a(1)** | 0 | |
| | (2) Participants | **8a(2)** | 0 | |
| | (3) Others (including rollovers) | **8a(3)** | 0 | |
| **b** | Other income (loss) | **8b** | 273,112 | |
| **c** | Total income (add lines 8a(1), 8a(2), 8a(3), and 8b) | **8c** | | 273,112 |
| **d** | Benefits paid (including direct rollovers and insurance premiums to provide benefits) | **8d** | 135,187 | |
| **e** | Certain deemed and/or corrective distributions (see instructions) | **8e** | 0 | |
| **f** | Administrative service providers (salaries, fees, commissions) | **8f** | 46,890 | |
| **g** | Other expenses | **8g** | 0 | |
| **h** | Total expenses (add lines 8d, 8e, 8f, and 8g) | **8h** | | 182,077 |
| **i** | Net income (loss) (subtract line 8h from line 8c) | **8i** | | 91,035 |
| **j** | Transfers to (from) the plan (see instructions) | **8j** | 0 | |

## Part IV    Plan Characteristics

| **9a** | If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristic Codes in the instructions: 2B |
|---|---|
| **b** | If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristic Codes in the instructions: |

## Part V    Compliance Questions

| 10 | During the plan year: | | Yes | No | Amount |
|---|---|---|---|---|---|
| **a** | Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? (See instructions and DOL's Voluntary Fiduciary Correction Program) | **10a** | | X | |
| **b** | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 10a.) | **10b** | | X | |
| **c** | Was the plan covered by a fidelity bond? | **10c** | | X | |
| **d** | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? | **10d** | | X | |
| **e** | Were any fees or commissions paid to any brokers, agents, or other persons by an insurance carrier, insurance service, or other organization that provides some or all of the benefits under the plan? (See instructions.) | **10e** | | X | |
| **f** | Has the plan failed to provide any benefit when due under the plan? | **10f** | | X | |
| **g** | Did the plan have any participant loans? (If "Yes," enter amount as of year-end.) | **10g** | | X | |
| **h** | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.) | **10h** | | X | |
| **i** | If 10h was answered "Yes," check the box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3 | **10i** | | | |

Form 5500-SF 2017        Page **3**-[ ]

| Part VI | Pension Funding Compliance |
|---|---|

**11** Is this a defined benefit plan subject to minimum funding requirements? (If "Yes," see instructions and complete Schedule SB (Form 5500) and line 11 below)......................................................................................................................    [ ] Yes [ ] No

**11a** Enter the unpaid minimum required contributions for all years from Schedule SB (Form 5500) line 40.................... | **11a** | |

**12** Is this a defined contribution plan subject to the minimum funding requirements of section 412 of the Code or section 302 of ERISA?.........................................................................................................................    [ ] Yes [X] No
(If "Yes," complete line 12a or lines 12b, 12c, 12d, and 12e below, as applicable.)

**a** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions, and enter the date of the letter ruling granting the waiver. ............................................................................................. Month     Day     Year

**If you completed line 12a, complete lines 3, 9, and 10 of Schedule MB (Form 5500), and skip to line 13.**

**b** Enter the minimum required contribution for this plan year .......................................... | **12b** | |

**c** Enter the amount contributed by the employer to the plan for this plan year ...................... | **12c** | |

**d** Subtract the amount in line 12c from the amount in line 12b. Enter the result (enter a minus sign to the left of a negative amount) ........................................................................................ | **12d** | |

**e** Will the minimum funding amount reported on line 12d be met by the funding deadline?............................    [ ] Yes   [ ] No   [ ] N/A

| Part VII | Plan Terminations and Transfers of Assets |
|---|---|

**13a** Has a resolution to terminate the plan been adopted in any plan year? ................................................    [ ] Yes [X] No

If "Yes," enter the amount of any plan assets that reverted to the employer this year ...................... | **13a** | |

**b** Were all the plan assets distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC? ...............................................................................................................    [ ] Yes [X] No

**c** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| 13c(1) Name of plan(s): | 13c(2) EIN(s) | 13c(3) PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| | | SHIRLEY T. SHERROD, M.D., P.C. | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | TARGET PENSION PLAN | Updated: 9/25/19 | | | | | |
| | | | | | | | | |
| | | | | | | | | Cumulative |
| Date | Check Number | EXHIBIT | Payee / Vendor | Receipt | Disbursement | Description | | Total |
| 2/2/17 | 326403508 | SunTrust2018000203 & SunTrust2018000204 | SHIRLEY T. SHERROD P/ADM **EXP** | | 4,444.00 | 10108725 | | |
| 2/2/17 | 326403509 | SunTrust2018000205 & SunTrust2018000206 | SHIRLEY T. SHERROD P/ADM **EXP** | | 5,000.00 | 10108725 | | |
| 3/2/17 | 326442329 | SunTrust2018000207 & SunTrust2018000208 | SHIRLEY T. SHERROD P/ADM **EXP** | | 4,444.00 | 10108725 | | |
| 3/2/17 | 326442330 | SunTrust2018000209 & SunTrust2018000210 | SHIRLEY T. SHERROD P/ADM **EXP** | | 4,444.00 | 10108725 | | |
| 4/3/17 | 326495122 | SunTrust2018000213 & SunTrust2018000214 | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | | |
| 4/3/17 | 326495118 | SunTrust2018000211 & SunTrust2018000212 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | | |
| 4/4/17 | 326499614 | SunTrust2018000217 & SunTrust2018000218 | PAULA KEASEY C/O SHIRLEY SHERROD **DISTRIB** | | 8,932.91 | 12/24/13 CHECKS PAID TO RIGGLEMAN HEIRS | | |
| 4/4/17 | 326499608 | SunTrust2018000215 & SunTrust2018000216 | ALBERT WATERS C/O SHIRLEY SHERROD **DISTRIB** | | 8,932.91 | 12/24/13 CHECKS PAID TO RIGGLEMAN HEIRS | | |
| 5/1/17 | 326535454 | SunTrust2018000219 & SunTrust2018000220 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | | |
| 5/1/17 | 326535456 | SunTrust2018000221 & SunTrust2018000222 | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | | |
| 6/2/17 | 326577949 | SunTrust2018000223 & SunTrust2018000224 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | | |
| 6/2/17 | 326577950 | SunTrust2018000225 & SunTrust2018000226 | SHIRLEY T. SHERROD P/ADM **EXP** | | 5,000.00 | | | |
| 6/7/17 | 326586248 | SunTrust2018000227 & SunTrust2018000228 | FIIOC FBO CAINE EVERETT **DISTRIB** | | 11,798.93 | ROLLOVER TO PARTICIPANT | | |
| 6/13/17 | 326592317 | SunTrust2018000229 & SunTrust2018000230 | FIIOC FBO CAINE EVERETT **DISTRIB** | | 2,701.69 | ROLLOVER TO PARTICIPANT | | |
| 6/21/17 | 326602204 | SunTrust2018000231 & SunTrust2018000232 | WESLEY SMITH **DISTRIB** | | 3,582.62 | DISTRIBUTION | | |
| 6/26/17 | 326605744 | SunTrust2018000233 & SunTrust2018000234 | PCI FBO HOLLIE HOWELL **DISTRIB** | | 1,720.93 | DISTRIBUTION | | |
| 6/27/17 | 204191281 | SunTrust2018000179 & SunTrust2018000180 | STATE OF MICHIGAN **DISTRIB** | | 28,700.00 | ESCHEAT TO STATE FOR DISTRIBUTION | | |
| 7/24/17 | 204195981 | SunTrust2018000181 & SunTrust2018000182 | SHIRLEY T. SHERROD P/ADM | * | 9,000.00 | | | |
| 7/24/17 | 204195982 | SunTrust2018000183 & SunTrust2018000184 | SHIRLEY T. SHERROD P/ADM | * | 9,000.00 | **CITI** 10107889 | | |
| 7/24/17 | 204195996 | SunTrust2018000185 & SunTrust2018000186 | SHIRLEY T. SHERROD P/ADM **EXP** | | 5,000.00 | 10108725 | | |
| 8/29/17 | 204202478 | SunTrust2018000187 & SunTrust2018000188 | SHIRLEY T. SHERROD P/ADM **EXP** | | 4,444.00 | 10108725 | | |
| 9/18/17 | 204207160 | SunTrust2018000186 & SunTrust2018000190 | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | | |
| 10/5/17 | 204210814 | SunTrust2018000191 & SunTrust2018000192 | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | | |
| 10/5/17 | 204210815 | SunTrust2018000193 & SunTrust2018000194 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | | |
| 11/2/17 | 326782257 | SunTrust2018000237 & SunTrust2018000238 | SHIRLEY T. SHERROD P/ADM | * | 5,000.00 | | | |
| 11/2/17 | 326782253 | SunTrust2018000235 & SunTrust2018000236 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | | | |

| | | SHIRLEY T. SHERROD, M.D., P.C. | | | | |
|---|---|---|---|---|---|---|
| | | TARGET PENSION PLAN | Updated: 9/25/19 | | | |
| | | | | | | |
| | | | | | | |
| Date | Check Number | EXHIBIT | Payee / Vendor | Receipt | Disbursement | Description |
| 12/4/17 | 204222763 | SunTrust2018000195 & SunTrust2018000196 | SHIRLEY T. SHERROD P/ADM | **EXP** | 5,000.00 | **10110361** |
| 12/4/17 | 204222764 | SunTrust2018000197 & SunTrust2018000198 | SHIRLEY T. SHERROD P/ADM | * | 4,444.00 | |
| | | AR 5500 BENEFITS PAID | | | -135,187.00 | |
| | | | * | | **74120=SHERROD BENEFIT** | |
| | | | | | | |
| | | | | | | |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

January 23, 2017

Bill Number: 10108725
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL 60085

Professional services rendered during the period ending December 31, 2016.

| | | |
|---|---|---|
| DOL LITIGATION | $37,104.00 | |
| Total Fees | | $37,104.00 |
| | | |
| DOL LITIGATION | $4,450.58 | |
| Total Disbursements | | $4,450.58 |
| | | _____ |
| Total | | $41,554.58 |
| | | ========== |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C. 20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC 20073-0589 |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

March 22, 2017

Bill Number: 10110361
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL 60085

Professional services rendered during the period ending February 28, 2017.

| | |
|---|---:|
| DOL LITIGATION | $7,846.00 |
| Total Fees | $7,846.00 |
| | |
| DOL LITIGATION | $3,019.20 |
| Total Disbursements | $3,019.20 |
| Total | $10,865.20 |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C.  20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC  20073-0589 |

**Groom Law Group, Chartered**
**1701 Pennsylvania Avenue, N.W.**
**Suite 1200**
**Washington, D.C. 20006-5811**
FEI #52-1219029

December 20, 2016

Bill Number: 10107889
File Number: 024700

SHIRLEY T. SHERROD, LEROY JOHNSON, AND SHIRLEY T. SHERROD, M.D. P.C. TARGET PENSION
PLAN
LJ Consulting Services, LLC
Leroy Johnson
1146 S Waukegan Rd, Suite 278
Waukegan, IL 60085

Professional services rendered during the period ending November 30, 2016.

| | |
|---|---|
| DOL LITIGATION | $12,510.00 |
| Total Fees | $12,510.00 |
| | |
| DOL LITIGATION | $2,867.87 |
| Total Disbursements | $2,867.87 |
| | —————— |
| Total | $15,377.87 |
| | ========== |

| Payment may be made by wire transfer or ACH to: | Remittance address: |
|---|---|
| Groom Law Group, Chartered<br>PNC Financial Services Group, Inc.<br>Washington, D.C. 20006<br>ABA Transit Number 054000030 (ACH)<br>ABA Transit Number 031000053 (WIRE)<br>Account Number 5300759951 | Groom Law Group, Chartered<br>Department # 0589<br>Washington, DC 20073-0589 |



**1633**

# PD-204222764

Citi® / AAdvantage® Platinum Select® World EliteTM
Mastercard®-1633



**Total Available Miles:**

| Aug. 08, 2017 | INTEREST CHARGED TO OFFER-007 | $ 5.13 |
| Jul. 29, 2017 | ONLINE PAYMENT, THANK YOU | -$ 9,000.00 |

**VOUCHER**
No. 204191281

## National Financial Services LLC

| DATE | DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|
| | SHIRLEY T SHERROD P/ADM | | |
| | SHIRLEY T SHERROD MD PC TARGET | | |
| | PEN PL & TST | | |
| | FBO SHIRLEY T SHERROD | | |
| | PO BOX 809 | | |
| | JOHNS ISLAND          SC 29457 | | |
| | | | |
| | Please overnight | | |
| | FEDEX 146422667 | | |
| 06/27 | CREDIT BALANCE | | 28,700.00 |

| ACCOUNT NO. | SC1-153375 | | TOTAL | 28,700.00 |
|---|---|---|---|---|

*DETACH THIS PORTION BEFORE CASHING CHECK*
VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. ■ CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM. ■

BNY MELLON TRUST OF DELAWARE
NEWARK, DELAWARE

**National Financial Services LLC**
499 Washington Boulevard
Jersey City, NJ 07310

No. **204191281**
62-35 /311

June 27, 2017

**\*\*$28,700.00**

PAY   *Twenty Eight Thousand Seven Hundred Dollars and 00 Cents*

Not valid after 90 days

TO
THE
ORDER
OF

STATE OF MICHIGAN
C/O MICHIGAN DEPT OF TREASURY

National Financial Services LLC

Authorized Signature(s)

⑈204191281⑈ ⑆031100351⑆ ⑈0300974219⑈

HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

PARTICIPANT CUMULATIVE BALANCES

| NAMES | ENDING BALANCE 2011 | ENDING BALANCE 2017 | EMPLOYEE LIFETIME CONTRIBUTION | GAIN/LOSS |
|---|---|---|---|---|
| J ARMSTRONG | 1,271.43 | $1,723.76 | $0.00 | 452.33 |
| T ALEXANDER | 2,129.29 | 2,539.84 | $0.00 | 410.55 |
| H BOTTROFF | 1,442.76 | 1,720.93 | $0.00 | 278.17 |
| C EVERETT | 9,891.72 | 11,798.93 | $0.00 | 1,907.21 |
| A F CALDERON | 3,612.13 | 4,308.58 | $0.00 | 696.45 |
| B FAIR | 595.34 | $807.15 | $0.00 | $211.81 |
| D HERBERT | 1,402.90 | 1,673.40 | $0.00 | 270.5 |
| R MITCHELL | 7,466.14 | $10,122.35 | $0.00 | 2,656.21 |
| D PIETSCH | 6,703.23 | 7,995.64 | $0.00 | 1,292.41 |
| I P OLZEWSKI | 7,522.11 | 8,972.44 | $0.00 | 1,450.33 |
| C RIGGLEMAN | 14,977.95 | 17,865.82 | $0.00 | 2,887.87 |
| M SMARCZEWSKI | 841.19 | 1,003.37 | $0.00 | 162.18 |
| A SPORSZ | 2,264.98 | 2,701.69 | $0.00 | 436.71 |
| W SMITH | 3,754.40 | 4,478.28 | $0.00 | 723.88 |
| R WILSON | 1,555.29 | 1,855.16 | $0.00 | 299.87 |
| K XIONG | 6,314.45 | 7,531.92 | $0.00 | 1,217.47 |

EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**EDWARD C. HUGLER**, Secretary of Labor,
United States Department of Labor,

Plaintiff

v.

**SHIRLEY T. SHERROD**, *et al.*,

Defendants.

Civil Action No. 1:16-cv-04825-MIS

**DEFENDANT SHIRLEY T. SHERROD'S AMENDED RESPONSES AND OBJECTIONS**
**TO SECRETARY OF LABOR'S FIRST SET OF INTERROGATORIES**

Defendant Shirley T. Sherrod ("Defendant"), by and through her undersigned counsel and

pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 33.1, provides

the following amended objections and responses to the Secretary of Labor's ("Plaintiff" or

"Secretary") First Set of Interrogatories (the "Interrogatories").

**GENERAL OBJECTIONS**

1.      Defendant objects to the Interrogatories to the extent they seek to circumvent or

exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of

Civil Procedure 33.

2.      Defendant objects to the Interrogatories to the extent they seek information that is

subject to the attorney-client privilege, the work product doctrine, or any other applicable

privileges or immunities against discovery.  Nothing in these responses is intended to be, or shall

be construed as, a waiver of any privilege or immunity from discovery.

3.      Defendant objects to the Interrogatories to the extent they seek information beyond

the scope of discovery permitted under the Federal Rules of Civil Procedure, the Local Rules of

1

this Court, or this Court's Orders, or otherwise seek information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

4.     Defendant objects to the Interrogatories to the extent they are overly broad, unduly burdensome, or otherwise seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.

5.     Defendant objects to the use of the word "all," including, but not limited to, in the phrases, "all facts," "all documents," "all withdrawals" and "all Plan distributions" on the grounds that such requests are vague, ambiguous, overly broad, and unduly burdensome.

**<u>OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS</u>**

1.     Defendant objects to the definition of "Defendant" (Definition (1)) on the grounds that it is overly broad, vague, ambiguous, and calls for a legal conclusion.  Defendant further objects to the definition of "Defendant" to the extent that it purports to require Defendant to produce documents or information that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.  In responding to the Subpoena, Defendant will interpret the term "Defendant" to mean Shirley T. Sherrod.

2.     Defendant objects to the definition of "document" or "documents" (Definition (2)) as overly broad and unduly burdensome, and as calling for a legal conclusion.  Defendant further objects to the definition of "document" or "documents" on the grounds that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Evidence, the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.  Defendant further objects to the definition of "document" or "documents" to the extent that it purports to require the

production of documents protected from disclosure by the attorney-client privilege, or any other applicable privilege or immunity against discovery.

3.      Defendant objects to the definition of the term "identify" (Definition (3)) as used with reference to a natural person and any person other than a natural person on the grounds that it imposes obligations beyond those imposed under the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders, and it is overly broad and unduly burdensome.  In responding to the Interrogatories, Defendant will interpret "identify" to mean the person's name and last known address, to the extent that such information is readily available to Defendant. Defendant objects to the definition of the term "identify" as used with reference to documents on the grounds that it imposes obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders, and on the grounds that it is overly broad and unduly burdensome.  In responding to the Interrogatories, Defendant will interpret "identify" to mean the document's Bates range.

4.      Defendant objects to Instruction 4 on the grounds that it is vague and ambiguous in purporting to require Defendant to "describe with particularity the privilege you believe is applicable."  Defendant further objects to Instruction 4 on the grounds that it is overly broad to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.  To the extent that Defendant claims privilege, Defendant will produce a privilege log in accordance with Federal Rule of Civil Procedure 26(b)(5).

5.      Defendant objects to Instruction 5 on the grounds that it is overly broad, unduly burdensome, and seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.  Defendant further objects to

3

Instruction 5 on the grounds that it seeks documents dating prior to the six-year period preceding the filing of the Secretary's Complaint.

6.      Defendant objects to the definition of "Sherrod P.C." and "employer" (Definition (6)) on the grounds that it is overly broad, vague, ambiguous, and calls for a legal conclusion. Defendant further objects to the definition of "Sherrod P.C." and "employer" to the extent that it purports to require Defendant to produce documents that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.  In responding to the Subpoena, Defendant will interpret the terms "Sherrod P.C." and "employer" to mean Shirley T. Sherrod, M.D., P.C.

7.      Defendant objects to the definition of "related to" (Definition (8)) on the grounds that it is overly broad and unduly burdensome.  Defendant further objects to the definition of "related to" on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

8.      Defendant objects to Instruction 12 as vague, ambiguous, and confusing in purporting to require Defendant to construe "and" and "or" "conjunctively" and in purporting to prohibit Defendant from interpreting "and" and "or" "disjunctively so as to exclude any information otherwise within the scope of these Interrogatories."

9.      Defendant objects to the definition of "person" (Definition (14)) as overly broad, vague, ambiguous, and calling for a legal conclusion.  Defendant further objects to the definition of "person" to the extent that it purports to require Defendant to produce documents that are outside of Defendant's possession, custody, or control, and to the extent that it purports to impose duties or obligations beyond those set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or this Court's Orders.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

To avoid the necessity of restating in full each of the foregoing General Objections and Objections to Instructions and Definitions, the foregoing General Objections and Objections to Definitions and Instructions are hereby adopted and incorporated, to the extent that they may apply, into the following responses to the Interrogatories.  The assertion of additional Specific Objections to Interrogatories shall not be construed as waiving any applicable General Objection. Any responses subsequently served by Defendant are subject to these General and Specific Objections, and Defendant reserves the right to supplement the objections at that time.  Subject to and without waiving the foregoing, Defendant, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Local Rule 33.1, responds to the numbered items in the Interrogatories as follows:

Interrogatory No. 1

Describe Defendant's duties as trustee to the Plan during the relevant time period, including why and how these duties changed, if at all.

Answer to Interrogatory No. 1

Defendant objects to Interrogatory No. 1 on the grounds that it is vague and ambiguous in its use of the phrase "why and how those duties changed, if at all."

Subject to the foregoing objections, Defendant responds as follows:  Article VII of the Plan document effective January 1, 2009 sets forth the duties and responsibilities of the Plan Trustee. SHERROD_0000036-SHERROD_0000071.  The Plan document effective January 1, 2009 remains in effect.  The duties and responsibilities of the Plan Trustee have not changed since the Plan document's effective date of January 1, 2009.

<u>Interrogatory No. 2</u>

State all facts and identify all documents on which Defendant relies in support of any denial of any paragraph in the Plaintiff's complaint, including all subparts, and address each individual denial separately.

<u>Answer to Interrogatory No. 2</u>

Defendant objects to Interrogatory No. 2 on the grounds that it is compound and, as such, it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33 by purporting to require Defendant to provide a separate response for each of the twenty-four denials set forth in Defendant's Answer. Based on the compound nature of this Interrogatory, Defendant will treat Interrogatory No. 2 as twenty-four separate interrogatory requests. Defendant further objects to Interrogatory No. 2 on the grounds that it is overly broad and unduly burdensome in requesting "all facts" and "all documents," and that it seeks discovery that is duplicative.

Subject to the foregoing objections, Defendant responds to Interrogatory No. 2 with the following numbered paragraphs:

1.     In denying that the Secretary is entitled to the relief that is requested in the Complaint (Answer ¶ 1), Defendant Sherrod relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. On February 4, 2011, the Wayne County, Michigan, Circuit Court issued an order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]" (the "Order"). SHERROD_0000072-SHERROD_0000074. Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod. SHERROD_0000084-SHERROD_0000089. The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments. Thus, the Plan assets could not be invested

6

optimally during the freeze period. Dr. Sherrod and Mr. Johnson, in their capacity as Plan

fiduciaries, sought to unfreeze the Plan account in both federal and state court.

SHERROD_0000084-SHERROD_0000089; SHERROD_0000428-SHERROD_0000463. Dr.

Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with

the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the

Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.

Dr. Sherrod also used her own cash and charge cards to pay Plan service providers.

SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr.

Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in

connection with unfreezing the Plan and paying Plan service providers were Plan expenses,

properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive

any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471;

SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's

legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and

expenses she personally assumed over a roughly three-year period in connection with unfreezing

the Plan, and for the fees and expenses she assumed in paying Plan service providers.

SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661;

SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

Pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr.

Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells

Fargo Bank, N.A. ("Wells Fargo") to be used for the purpose of securing a bond, and that $3,000

be paid from the Plan to the Bologna Surety Agency, Inc. ("Bologna") to cover the costs

associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November

10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-

SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. SHERROD_0000372-SHERROD_0000391; SHERROD_0000469-SHERROD_0000469. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. SHERROD_0000668- SHERROD_0000668. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244- SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. SHERROD_0000233- SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311- SHERROD_0000320. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-

SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500.  SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.  It is Defendant's understanding that the $250,000 that was wired from the Plan to Wells Fargo on November 10, 2011 for the purpose of posting a bond is currently held in a Wells Fargo account.  The Plan's account balance has grown from $1,553,151.70 at the end of Plan year 2012 to $1,762,149.89 at the end of Plan year 2014.  SHERROD_0000243-SHERROD_0000243.  There is no monetary loss associated with the purported reporting and recordkeeping violations the Secretary identifies.  Any alleged failure to administer benefits for employees terminated in 2008 in accordance with the Plan took place on or about May 23, 2008.  It is Defendant's belief that the Secretary had actual knowledge of any alleged failure to administer benefits for terminated employees in accordance with the Plan as early as 2012.  As early as February 2012, Dr. Sherrod, in her capacity as a Plan fiduciary, sought the Secretary's assistance in unfreezing her Plan account.  SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.  Based upon communications from Dr. Sherrod and the Plan's legal counsel, the Secretary had actual knowledge that the bond was posted from Plan assets as early as 2012.  SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.

    2.    In denying that Mr. Johnson has been the Plan administrator from August 4, 2014 to the present (Answer ¶ 8), Defendant Sherrod relies on the following facts and documents:  LJ Consulting Services, LLC ("LJ Consulting") was appointed Plan Administrator on August 4, 2014,

and continues to serve as Plan Administrator. SHERROD_0000231-SHERROD_0000232;
SHERROD_0000094-SHERROD_0000094; SHERROD_0000682-SHERROD_0000687.

3. In denying that Sherrod PC ceased business operations in 2008 (Answer ¶ 10),
Defendant Sherrod relies on the following facts and documents: Sherrod PC did not cease
business operations in 2008, or at any time. Dr. Sherrod sold only a portion of Sherrod PC in
2008. The portion she retained continues to operate as a viable going concern.
SHERROD_0000090-SHERROD_0000091.

4. In denying that Sherrod PC ceased business operations in 2008 or at any time
(Answer ¶ 11), Defendant Sherrod relies on the following facts and documents: Sherrod PC did
not cease business operations in 2008, or at any time. Dr. Sherrod sold only a portion of Sherrod
PC in 2008. The portion she retained continues to operate as a viable going concern.
SHERROD_0000090-SHERROD_0000091.

5. In denying that the allegations in paragraph 12 of the Complaint properly
characterize the Plan document in effect for Plan years 2002 to and including 2008 (Answer ¶ 12),
Defendant Sherrod relies on the following facts and documents: Section 38 of the Adoption
Agreement for the Plan document in effect for Plan years 2002 to and including 2008, titled
"CONDITIONS FOR DISTRIBUTIONS UPON TERMINATION OF EMPLOYMENT,"
provides, "No distributions may be made until a Participant has reached Early or Normal
Retirement Date." SHERROD_0000097-SHERROD_0000230. Section 6.4 of the Plan document
in effect for Plan years 2002 to and including 2008, titled "Determination of Benefits Upon
Termination," provides, "Distribution of the funds due to a Terminated Participant shall be made
on the occurrence of an event which would result in the distribution had the Terminated Participant
remained in the employ of the Employer (upon the Participant's death, Total and Permanent
Disability, Early or Normal Retirement). However, at the election of the Participant, the

Administrator shall direct that the entire Vested portion of the Terminated Participant's Combined Account be payable to such Terminated Participant provided the conditions, if any, set forth in the Adoption Agreement have been satisfied." SHERROD_0000097-SHERROD_0000230. Section 6.4 of the Plan document in effect for Plan years 2002 to and including 2008, titled "Determination of Benefits Upon Termination," further provides, "Notwithstanding the above, unless otherwise elected in the Adoption Agreement, if the value of a Terminated Participant's Vested benefit derived from Employer and Employee contributions does not exceed $5,000 (or, $3,500 for distributions made prior to the later of the first day of the first Plan Year beginning on or after August 5, 1997, or the date specified in the Adoption Agreement) the Administrator shall direct that the entire Vested benefit be paid to such Participant in a single lump-sum without regard to the consent of the Participant or the Participant's spouse." SHERROD_0000097-SHERROD_0000230.

6.      In denying that the allegations in paragraph 12 of the Complaint properly characterize the Plan document in effect for Plan years 2002 to and including 2008 (Answer ¶ 13), Defendant Sherrod relies on the following facts and documents: Section 2.4(d) of the Plan document in effect for Plan years 2002 to and including 2008 provides that the Plan administrator's powers and duties include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust Fund." SHERROD_0000097-SHERROD_0000230.

7.      In denying that Dr. Sherrod served as the Plan administrator prior to May 30, 2012 (Answer ¶ 14), Defendant relies on the following facts and documents: Section 1.6 of the Plan document effective January 1, 2009 provides, "'Administrator' means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer." SHERROD_0000001-SHERROD_0000071. Section 1.26 of the

11

Plan document effective January 1, 2009 further provides, "'Employer' means Shirley T. Sherrod MD PC." SHERROD_0000001-SHERROD_0000071.

8.      In denying that Dr. Sherrod processed her own request for a Plan distribution and withdrew $253,114 from the Plan on or about November 10, 2011 (Answer ¶ 16), Defendant relies on the following facts and documents:  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond.  SHERROD_0000079-SHERROD_0000081.  On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo.  SHERROD_0000427-SHERROD_0000427.  Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

9.      In denying that on or around September 27, 2012, the $253,114 was accounted for incorrectly because the chosen methodology caused all of the participants' vested benefits to be decreased (Answer ¶ 17), and a proper accounting should have allocated this amount solely from Defendant Sherrod's individual participant account, Defendant relies on the following facts and documents:  On about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond,  and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond.  SHERROD_0000079-SHERROD_0000081.  On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo.  SHERROD_0000427-SHERROD_0000427.  Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan

expense properly paid from the Plan and charged to participant accounts.

10.     In denying that the federal action styled *Sherrod v. Merrill Lynch, Pierce Fenner & Smith Inc.*, Case No. 1:12-cv-02545 (N.D. Ill.) ("Federal Action") sought to lift a state court order that froze the plan assets in an effort to make distributions to Sherrod (Answer ¶ 18), Defendant relies on the following facts and documents:  The Federal Action was brought against Merrill Lynch, Pierce Fenner & Smith Inc. in the Northern District of Illinois.  SHERROD_0000084-SHERROD_0000089.  The Federal Action sought the following relief:  "That the Court enter judgment in favor of Sherrod and against Merrill Lynch, and Order Merrill Lynch to abide by Sherrod's directions regarding any disposition of Plan assets."  SHERROD_0000084-SHERROD_0000089.

11.     In denying that Mr. Johnson was the Plan administrator as of August 4, 2014 (Answer ¶ 19), Defendant relies on the following facts and documents:  LJ Consulting was appointed Plan Administrator on August 4, 2014, and continues to serve as Plan Administrator. SHERROD_0000231-SHERROD_0000232; SHERROD_0000682-SHERROD_0000687; SHERROD_0000094-SHERROD_0000094.

12.     In denying that on or about July 16, 2013, Defendant Sherrod withdrew $50,000 from the Plan (Answer ¶ 20), Defendant relies on the following facts and documents:  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards to pay Plan service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees

13

and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667; SHERROD_0000354-SHERROD_0000371. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

13.     In denying that the $50,000 has not been accounted for properly in the Plan's records and should be allocated solely from Defendant Sherrod's individual participant account (Answer ¶ 21), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the

14

advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

14.     In denying that the Plan's bank account statements for Plan Year 2014, January 1, 2014 to December 31, 2014 show that the only withdrawals from the Plan were distributions made to Defendant Sherrod that totaled approximately $296,000 (Answer ¶ 22), Defendant relies on the following facts and documents: the statement reflecting the additions and withdrawals to the Plan account for the period January 1, 2014 to December 31, 2014 ("2014 Statement") does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Consistent with the advice of the Plan's legal counsel, $193,905 of the withdrawals reflected on the 2014 Statement were paid to Dr. Sherrod from the Plan to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-

15

SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

15.     In denying that the Plan incorrectly identified $142,000 in administrative expenses and $57,000 in distributions and should have accounted for $296,000 in distributions and no administrative expenses in the Plan's records and allocated the $296,000 in distributions solely from Defendant Sherrod's individual participant account for Plan Year 2014 (Answer ¶ 23), Defendant relies on the following facts and documents:  the 2014 Statement does not list withdrawals totaling $296,000.  SHERROD_0000470-SHERROD_0000471.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts.  Consistent with the advice of the Plan's legal counsel, $193,905 of the withdrawals reflected on the 2014 Statement were paid to Dr. Sherrod from the Plan to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371.

16.     In denying that from January 1, 2015 to the present, Defendant Sherrod continues to withdraw funds from the Plan and Defendants Sherrod and Johnson fail to account for these

distributions properly (Answer ¶ 25), Defendant relies on the following facts and documents: Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687.

17.     In denying that the allegations in paragraph 26 of the Complaint properly characterize the Plan document effective January 1, 2009 (Answer ¶ 26), Defendant relies on the following facts and documents: Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071.

18.     In denying that from May 30, 2012 to the present Defendant Johnson failed to perform his duties as stated in paragraph 26 (Answer ¶ 27), Defendant relies on the following facts and documents: At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-

17

SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500.  SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

19.    In denying that the allegations in paragraph 28 of the Complaint properly characterize the Plan document effective January 1, 2009 (Answer ¶ 28), Defendant relies on the following facts and documents:  Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust."  SHERROD_0000001-SHERROD_0000071.  Section 7.8 of the Plan document effective January 1, 2009 requires the following: "[T]he Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth: (1) the net income, or loss, of the Trust Fund; (2) the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets; (3) the increase, or decrease, in the value of the Trust Fund; (4) all payments and distributions made from the Trust Fund; and (5) such further information as the Trustee and/or Administrator deems appropriate."  SHERROD_0000001-SHERROD_0000071.

20.    In denying that from May 30, 2012 to the present, Defendant Sherrod failed to perform her duties as stated in paragraph 28 (Answer ¶ 29), Defendant relies on the following facts and documents:  At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire

18

date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-
SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-
SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-
SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator
has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-
SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has
maintained Plan account statements reflecting the Plan's beginning and ending account balances.
SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

  21. In denying that Dr. Sherrod violated ERISA by the failures to act described in
paragraphs 28 and 29 of the Complaint from May 30, 2012, to the present (Answer ¶ 30),
Defendant relies on the following facts and documents: Section 2.4(d) of the Plan document
effective January 1, 2009 provides that the Plan administrator's responsibilities include the
following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise
directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 7.8
of the Plan document effective January 1, 2009 requires the following: "[T]he Trustee, or its
agent, shall furnish to the Employer and Administrator a written statement of account with respect
to the Plan Year for which such contribution was made setting forth: (1) the net income, or loss, of
the Trust Fund; (2) the gains, or losses, realized by the Trust Fund upon sales or other disposition
of the assets; (3) the increase, or decrease, in the value of the Trust Fund; (4) all payments and
distributions made from the Trust Fund; and (5) such further information as the Trustee and/or
Administrator deems appropriate." SHERROD_0000001-SHERROD_0000071. At all times
relevant to the above-captioned action, the Plan has maintained records reflecting each
participant's beginning and ending account balance, gains and losses, hire date, and retirement
date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426;

<div align="center">19</div>

SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

22. In denying that Mr. Johnson violated ERISA by the actions and failures to act as described in paragraphs 16, 17, and 21 through 27 of the Complaint from May 30, 2012, to the present (Answer ¶ 31), Defendant relies on the following facts and documents: On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. SHERROD_0000427-SHERROD_0000427. Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod did not "withdraw" any amount from the Plan at any time. Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013. Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod also used her own cash and charge cards to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-

20

SHERROD_0000661. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371. The 2014 Statement does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each

participant's beginning and ending account balance, gains and losses, hire date, and retirement date.  SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

23.     In denying that Dr. Sherrod is liable for the breaches of her co-fiduciary Mr. Johnson (Answer ¶ 32), Defendant relies on the following facts and documents:  On or about November 10, 2011, pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond,  and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. SHERROD_0000079-SHERROD_0000081.  On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo.  SHERROD_0000427-SHERROD_0000427.  Dr. Sherrod was advised by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  Dr. Sherrod did not receive any amount from the Plan on or about July 16, 2013.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan fiduciaries, to unfreeze the Plan.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards

to pay Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661. Dr. Sherrod did not receive any reimbursement from the Plan until 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000663-SHERROD_0000667. In 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-SHERROD_0000371. The 2014 Statement does not list withdrawals totaling $296,000. SHERROD_0000470-SHERROD_0000471. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Section 2.4(d) of the Plan document effective January 1, 2009 provides that the Plan administrator's responsibilities include the following: "[T]o authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust." SHERROD_0000001-SHERROD_0000071. Section 2.5 of the Plan document effective January 1, 2009 provides that the Plan administrator "shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." SHERROD_0000001-SHERROD_0000071. At all

times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date.  SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371.  At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500.  SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462.  At all times relevant to the above-captioned action, the Plan has maintained Plan account statements reflecting the Plan's beginning and ending account balances.  SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597.

24.     In denying that the Secretary is entitled to the relief sought in paragraphs (A) through (I) of his Prayer for Relief, or to any relief whatsoever (Answer to Prayer for Relief), Defendant relies on the following facts and documents:  Dr. Sherrod did not "withdraw" any amount from the Plan at any time.  On February 4, 2011, the Wayne County, Michigan, Circuit Court issued the Order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]."  SHERROD_0000072-SHERROD_0000074.  Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod.  SHERROD_0000084-SHERROD_0000089.  The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments.  Thus, the Plan assets could not be invested optimally during the freeze period.  Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, sought to unfreeze the Plan account in both federal and state court.  SHERROD_0000084-SHERROD_0000089; SHERROD_0000428-SHERROD_0000463.  Dr. Sherrod used her own cash and charge cards to pay the attorneys' fees and costs associated with the legal action she and Mr. Johnson took, in their capacity as Plan

fiduciaries, to unfreeze the Plan.  SHERROD_0000604-SHERROD_0000627;
SHERROD_0000628-SHERROD_0000661.  Dr. Sherrod also used her own cash and charge cards
to pay Plan service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-
SHERROD_0000661.  Dr. Sherrod was advised by the Plan's legal counsel that the attorneys' fees
and costs she assumed in connection with unfreezing the Plan and paying Plan service providers
were Plan expenses, properly reimbursed by the Plan and charged to participant accounts.  Dr.
Sherrod did not receive any reimbursement from the Plan until 2014.  SHERROD_0000470-
SHERROD_0000471; SHERROD_0000663-SHERROD_0000667.  In 2014, consistent with the
advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for
the attorneys' fees and expenses she personally assumed over a roughly three-year period in
connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan
service providers.  SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-
SHERROD_0000661; SHERROD_0000470-SHERROD_0000471; SHERROD_0000354-
SHERROD_0000371.  Pursuant to a court order issued in connection with the legal actions to
unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid
from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be
paid from the Plan to Bologna to cover the costs associated with the filing of the bond.
SHERROD_0000079-SHERROD_0000081.  On November 10, 2011, $250,000 was wired from
the Plan to Wells Fargo.  SHERROD_0000427-SHERROD_0000427.  Dr. Sherrod was advised
by the Plan's legal counsel that the $253,000 amount paid to secure the bond was a Plan expense
properly paid from the Plan and charged to participant accounts.  Dr. Sherrod is a participant in the
Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan.
SHERROD_0000001-SHERROD_0000071; SHERROD_0000354-SHERROD_0000371.  The
amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair

25

& Company, in 2014. Dr. Sherrod began receiving benefit distributions from the Plan in 2014. SHERROD_0000470-SHERROD_0000471; SHERROD_0000354- SHERROD_0000371; SHERROD_0000669-SHERROD_0000687. Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. SHERROD_0000372-SHERROD_0000391; SHERROD_0000469-SHERROD_0000469. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. SHERROD_0000668-SHERROD_0000668. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. SHERROD_0000233-SHERROD_0000242; SHERROD_0000244-SHERROD_0000248; SHERROD_0000311-SHERROD_0000320. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date. SHERROD_0000278-SHERROD_0000310; SHERROD_0000392-SHERROD_0000426; SHERROD_0000321-SHERROD_0000335; SHERROD_0000372-SHERROD_0000391; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371. At all times relevant to the above-captioned action, the Plan administrator has filed a Form 5500. SHERROD_0000669-SHERROD_0000687; SHERROD_0000462-SHERROD_0000462. At all times relevant to the above-captioned action, the Plan has maintained Plan account statements

26

reflecting the Plan's beginning and ending account balances. SHERROD_0000243-SHERROD_0000243; SHERROD_0000472-SHERROD_0000597. It is Defendant's understanding that the $250,000 that was wired from the Plan to Wells Fargo on November 10, 2011 for the purpose of posting a bond is currently held in a Wells Fargo account. The Plan's account balance has grown from $1,553,151.70 at the end of Plan year 2012 to $1,762,149.89 at the end of Plan year 2014. SHERROD_0000243-SHERROD_0000243. There is no monetary loss associated with the purported reporting and recordkeeping violations the Secretary identifies. Any alleged failure to administer benefits for employees terminated in 2008 in accordance with the Plan took place on or about May 23, 2008. It is Defendant's belief that the Secretary had actual knowledge of any alleged failure to administer benefits for terminated employees in accordance with the Plan as early as 2012. As early as February 2012, Dr. Sherrod, in her capacity as a Plan fiduciary, sought the Secretary's assistance in unfreezing her Plan account. SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468. Based upon communications from Dr. Sherrod and legal counsel, the Secretary had actual knowledge that the bond was posted from Plan assets as early as 2012. SHERROD_0000465-SHERROD_0000466; SHERROD_0000467-SHERROD_0000468.


Interrogatory No. 3

Describe Defendant's performance or attempts to locate participants, make distributions to participants, or notify participants of their rights and benefits under the Plan during the relevant time period.

Answer to Interrogatory No. 3

Defendant objects to Interrogatory No. 3 on the grounds that it is compound, and vague and ambiguous in its use of the term "performance." Defendant further objects to Interrogatory No. 3

on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date.

Interrogatory No. 4

Describe the Plan Administrator's performance or attempts to locate participants, make distributions to participants, or notify participants or their rights and benefits under the Plan during the relevant time period.

Answer to Interrogatory No. 4

Defendant objects to Interrogatory No. 4 on the grounds that it is compound, and vague and ambiguous in its use of the term "performance." Defendant further objects to Interrogatory No. 4 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

28

Subject to the foregoing objections, Defendant responds as follows: Only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, have conducted a diligent search for all Plan participants. For example, when Ms. Riggleman attained retirement age, Dr. Sherrod and Mr. Johnson, in their capacity as Plan fiduciaries, and with the assistance of legal counsel Edwin Conger, sent a mailing to the best address available for Ms. Riggleman via certified mail. All terminating employees of Sherrod PC, regardless of the size of their Plan account balances, were informed of their distribution options with respect to the benefits they had accrued under the Plan. Some terminating employees of Sherrod PC elected to roll over or cash out their benefits. At all times relevant to the above-captioned action, the Plan has maintained records reflecting each participant's beginning and ending account balance, gains and losses, hire date, and retirement date.

Interrogatory No. 5

Describe the substantive facts and circumstances for the withdrawal of $253,000 from the Plan's account on or around November 15, 2011, including

(a) detailing all discussions with Merrill Lynch or its attorneys related to the withdrawal;

(b) explaining why the Court of Appeals for the State of Michigan stated on October 28, 2011, that it modified the stay from the Trial Court's Order to allow Sherrod to use only her assets exclusively to post a $250,000 bond as security for the underlying judgment against her in order to stay any collection and enforcement proceedings against her ("The motion is . . . DENIED with respect to the order prohibiting the transfer of appellants assets, EXCEPT that the Court orders that appellants' assets may be used to post the stay bond as modified by this order.");

29

(c) explaining why Sherrod stated in an affidavit that she directed the distributions for "the sole purpose of securing a bond pursuant to the Appeal Order;" and that "the two distributions . . . do not exceed my individual interest in the Plan";

(d) explaining why Merrill Lynch represented to the State of Michigan, on Feb. 28, 2012, that Defendant stated to them that "The $250,000 [from the Plan] was released based on Sherrod's representations and assurances that the money released was allocated to her account and not in excess of her account balance";

(e) explaining why Sherrod's attorney Michael Bartolic stated in a letter on Feb. 14,2012, that Sherrod directed Merrill Lynch to make a distribution to her on several occasions, but only received a distribution "once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stated the funds would be used to post a bond in a state court proceeding."

<u>Answer to Interrogatory No. 5</u>

Defendant objects to Interrogatory No. 5 on the grounds that it is compound, and seeks information outside of Defendant's possession, custody, or control. Defendant further objects to Interrogatory No. 5 on the grounds that it is vague and ambiguous in its use of the terms "withdrawal" and "distribution(s)." Defendant further objects to Interrogatory No. 5 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 5 on the grounds that it seeks information that is subject to the attorney-client privilege. Defendant further objects to Interrogatory No. 5 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: There was no withdrawal of $253,000 from the Plan's account on November 15, 2011. By way of further response, Defendant states that pursuant to a court order issued in connection with the legal actions

to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. Dr. Sherrod was advised by the Plan's legal counsel Edwin Conger that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

In response to Interrogatory No. 5(a), Defendant responds that there was no withdrawal of $253,000 from the Plan's account on November 15, 2011, and therefore there were no discussions with Merrill Lynch or its attorneys related to such a withdrawal. Defendant further states that she lacks knowledge or information sufficient to form a belief about the details of "all discussions with Merrill Lynch or its attorneys related to" any withdrawal. Defendant further states that, in her capacity as a Plan fiduciary, she retained legal counsel that would have engaged in discussions with Merrill Lynch on her behalf. Defendant has produced copies of written communications her legal counsel had with Merrill Lynch on her behalf, including SHERROD_0000467-SHERROD_0000468.

In response to Interrogatory No. 5(b), Defendant lacks knowledge or information sufficient to form a belief about why the Court of Appeals for the State of Michigan stated on October 28, 2011, that it modified the stay from the Trial Court's Order to allow Sherrod to use only her assets exclusively to post a $250,000 bond as security for the underlying judgment against her in order to stay any collection and enforcement proceedings against her ("The motion is . . . DENIED with respect to the order prohibiting the transfer of appellants assets, EXCEPT that the Court orders that appellants' assets may be used to post the stay bond as modified by this order.").

In response to Interrogatory No. 5(c), Defendant states that Merrill Lynch forced her to sign an affidavit stating that she directed the distributions for "the sole purpose of securing a bond

31

pursuant to the Appeal Order;" and that "the two distributions . . . do not exceed my individual interest in the Plan." Defendant further states that Merrill Lynch drafted an affidavit for her to sign indicating she would only use her Plan assets, benefits to which she was otherwise entitled, to post bond to satisfy a judgment in favor of third parties with no connection to the plan. Merrill Lynch thus essentially engaged in an assignment or alienation of Defendant's benefits.

In response to Interrogatory No. 5(d), Defendant states that she lacks knowledge or information sufficient to form a belief about why Merrill Lynch represented to the State of Michigan, on Feb. 28, 2012, that Defendant stated to them that "The $250,000 [from the Plan] was released based on Sherrod's representations and assurances that the money released was allocated to her account and not in excess of her account balance."

In response to Interrogatory No. 5(e), Defendant states that she lacks knowledge or information sufficient to form a belief about why attorney Michael Bartolic stated in a letter on Feb. 14, 2012, that Sherrod directed Merrill Lynch to make a distribution to her on several occasions, but only received a distribution "once where Merrill Lynch forced Ms. Sherrod to sign an affidavit stated the funds would be used to post a bond in a state court proceeding." Defendant Sherrod further states that Mr. Bartolic represented Dr. Sherrod in her capacity as a Plan fiduciary.


Interrogatory No. 6

Describe the substantive facts and circumstances for all withdrawals from the Plan for Plan year 2014, including items claimed as "Total expenses" for Plan year 2014 on the Plan's Form 5500, including $57,000 in Benefits paid, $129,438 in Administrative service provider expenses and $12,562 in Other expenses, including all withdrawals from the Plan that are not captured in the amounts reported on the Plan's Form 5500, and including the $296,000 that was withdrawn from the Plan's account and paid to Defendant Sherrod for Plan year 2014.

Answer to Interrogatory No. 6

Defendant objects to Interrogatory No. 6 on the grounds that it is compound, and vague and ambiguous in its use of the terms "withdrawals" and "withdrawn." Defendant further objects to Interrogatory No. 6 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 6 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 6 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to Interrogatory No. 6 may be determined by examining, auditing, compiling, abstracting, or summarizing business records including the following: SHERROD_0000243-SHERROD_0000243; SHERROD_0000354-SHERROD_0000371; SHERROD_0000470-SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000663-SHERROD_0000667; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to Interrogatory No. 6 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further responds that, in 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing the Plan, and for the fees and expenses she assumed in paying Plan service providers. The Plan additionally issued payments of $40,000 to Dr. Sherrod in 2014, however, those amounts were never cashed and remain Plan assets. The Plan additionally paid Dr. Sherrod $57,000 in benefit

33

distributions in 2014. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Defendant further states that no additional amounts were paid from the Plan in 2014.

Interrogatory No. 7

Describe the use of any Plan assets from January 1, 2011, to present and identify all parties that received Plan assets during this time, including every amount paid, the date paid for each amount, to whom payment was made, who authorized the payment on behalf of the Plan, and why the payment was reasonable and necessary for the Plan.

Answer to Interrogatory No. 7

Defendant objects to Interrogatory No. 7 on the grounds that it is compound, and vague and ambiguous in its use of the phrase "use of Plan assets." Defendant further objects to Interrogatory No. 7 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 7 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to Interrogatory No. 7 may be determined by examining, auditing, compiling, abstracting, or summarizing business records including the following: SHERROD_0000072-SHERROD_0000074; SHERROD_0000079-SHERROD_0000081; SHERROD_0000243-SHERROD_0000243; SHERROD_0000321-SHERROD_0000335; SHERROD_0000336-SHERROD_0000353; SHERROD_0000354-SHERROD_0000371; SHERROD_0000372-SHERROD_0000391; SHERROD_0000470-SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-

SHERROD_0000661; SHERROD_0000663-SHERROD_0000667; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to Interrogatory No. 7 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further responds that, on February 4, 2011, the Wayne County, Michigan, Circuit Court issued an order prohibiting Dr. Sherrod from disposing of any "assets, real or personal property, money, or things in action now held or hereafter acquired by or becoming due to [her]" (the "Order"). Pursuant to the Order, the Plan's custodian froze the Plan account with respect to Dr. Sherrod. The freeze harmed *all* Plan participants because it prevented the purchase and sale of Plan investments. Thus, the Plan assets could not be invested optimally during the freeze period. Pursuant to a court order issued in connection with the legal actions to unfreeze the Plan, Dr. Sherrod, in her capacity as a Plan fiduciary, directed that $250,000 be paid from the Plan to Wells Fargo Bank, N.A. ("Wells Fargo") to be used for the purpose of securing a bond, and that $3,000 be paid from the Plan to Bologna to cover the costs associated with the filing of the bond. On November 10, 2011, $250,000 was wired from the Plan to Wells Fargo. Dr. Sherrod was advised by the Plan's legal counsel Edwin Conger that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts.

Defendant further responds that only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod wrote a letter to Keith Uhler dated December 23, 2013 requesting benefit payments for Ms. Riggleman.

Defendant further responds that, in 2014, consistent with the advice of the Plan's legal counsel, the Plan paid $193,905.00 to Dr. Sherrod to reimburse her for the attorneys' fees and expenses she personally assumed over a roughly three-year period in connection with unfreezing

the Plan, and for the fees and expenses she assumed in paying Plan service providers. The Plan additionally issued payments of $40,000 to Dr. Sherrod in 2014, however, those amounts were never cashed and remain Plan assets. The Plan additionally paid Dr. Sherrod $57,000 in benefit distributions in 2014. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014. Defendant further states that no additional amounts were paid from the Plan in 2014.

Defendant further states that Dr. Sherrod received benefit payments from the Plan in 2015 and 2016.

Interrogatory No. 8

Identify any party that gave you advice concerning the Plan, including distributions to participants and any use of Plan assets, and describe and explain the advice received.

Answer to Interrogatory No. 8

Defendant objects to Interrogatory No. 8 on the grounds that it is compound, and vague and ambiguous in its use of the term "distributions" and the phrase "use of Plan assets." Defendant further objects to Interrogatory No. 8 on the grounds that it is overly broad and unduly burdensome. Defendant further objects to Interrogatory No. 8 on the grounds that it seeks information that is subject to the attorney-client privilege. Defendant further objects to Interrogatory No. 8 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant received advice from the Plan service providers identified in her response to Interrogatory No. 13. Defendant does not recall all of the advice received. In general, Defendant was advised that the

36

Plan is an ERISA-governed Plan, that the Plan freeze violated ERISA's anti-alienation provisions, and that the attorneys' fees and costs she assumed in connection with unfreezing the Plan and paying Plan service providers were Plan expenses, properly reimbursed by the Plan and charged to participant accounts. Dr. Sherrod was further advised that the $253,000 amount paid to secure the bond was a Plan expense properly paid from the Plan and charged to participant accounts. Dr. Sherrod has produced invoices and written communications with Plan service providers in her possession, custody, and control that reflect their advice to her in her capacity as a Plan fiduciary, including SHERROD_0000598-SHERROD_0000599; SHERROD_0000600-SHERROD_0000601; SHERROD_0000602-SHERROD_0000603; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000662-SHERROD_0000662.

Interrogatory No. 9

Describe your reasons for selecting LeRoy Johnson to serve as the Plan Administrator to the Plan, including all due diligence conducted before the selection and the history of any personal relationship between you and LeRoy Johnson.

Answer to Interrogatory No. 9

Defendant objects to Interrogatory No. 9 on the grounds that it is vague and ambiguous in its use of the term "personal relationship." Defendant further objects to Interrogatory No. 9 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 9 on the grounds that it is overly broad and unduly burdensome in its request for "all due diligence conducted" and "the history of any personal relationship." Defendant further objects to Interrogatory No. 9 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant

37

further objects to Interrogatory No. 9 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Prior to appointing Mr. Johnson as Plan Administrator, Defendant was both a Plan fiduciary and a Plan participant. In her capacity as a Plan fiduciary, Defendant had initiated legal action to unfreeze the Plan in the Northern District of Illinois styled *Sherrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* Upon the advice of legal counsel Edwin Conger, to eliminate any possible appearance of a conflict of interest in connection with that action, Defendant selected and appointed Mr. Johnson to serve as Plan Administrator. Mr. Johnson, in his capacity as Plan Administrator, replaced Defendant as the Plaintiff in the action newly styled *Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* Mr. Johnson did not, at any time, charge the Plan any fee for his services. Defendant selected Mr. Johnson for the Plan Administrator role based upon his over forty years of experience with investing, including taking classes pertaining to investing. Defendant additionally selected Mr. Johnson for the Plan Administrator role based upon his genuine desire to help others save for retirement, his integrity, his availability, and based upon the advice and recommendation of Edwin Conger. Several other candidates were considered for the role of Plan Administrator in addition to Mr. Johnson. To the best of Defendant's recollection, Mr. David Shannon was one other candidate considered. Defendant does not recall the names of other candidates.

Interrogatory No. 10

Describe your reasons for selecting LJ Consulting Services LLC to serve as the Plan Administrator to the Plan, including all due diligence conducted before the selection.

Answer to Interrogatory No. 10

Defendant objects to Interrogatory No. 10 on the grounds that it assumes facts not in evidence. Defendant further objects to Interrogatory No. 10 on the grounds that it is overly broad and unduly burdensome in its request for "all due diligence conducted." Defendant further objects to Interrogatory No. 10 on the grounds that it seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 10 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Mr. Johnson is the owner of LJ Consulting. Mr. Johnson served as the Plan Administrator from May 30, 2012 to August 4, 2014. Defendant appointed LJ Consulting Services LLC as Plan Administrator on August 4, 2014. LJ Consulting Services LLC did not, at any time, charge the Plan any fee for its services. Defendant selected LJ Consulting for the Plan Administrator role based upon Mr. Johnson's over forty years of experience with investing, including taking classes pertaining to investing. Defendant additionally selected LJ Consulting for the Plan Administrator role based upon Mr. Johnson's genuine desire to help others save for retirement, his integrity, his availability, and based upon the advice and recommendation of Edwin Conger. Several other candidates were considered for the role of Plan Administrator in addition to Mr. Johnson. To the best of Defendant's recollection, Mr. David Shannon was one other candidate considered. Defendant does not recall the names of other candidates.


Interrogatory No. 11

From Plan Year 2011 to present, describe your process for reviewing the Plan's Form 5500 before

39

filing, including your efforts to ensure all the information on the Form 5500 was reported accurately, including how this process changed, if at all, at any point.

Answer to Interrogatory No. 11

Defendant objects to Interrogatory No. 11 on the grounds that it is vague and ambiguous in its use of the phrase "how this process changed." Defendant objects to Interrogatory No. 11 on the grounds that it is overly broad and unduly burdensome in requesting information regarding "how this process changed, if at all, at any point." Defendant further objects to Interrogatory No. 11 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant obtained the Plan's asset information, and provided that information to the Plan's actuary. The Plan's actuary prepared the Form 5500, and Defendant reviewed the Form 5500 and discussed its content and any questions she may have had with the Plan's actuary. Once she was satisfied that it was accurate, Defendant signed the Form 5500, and the Plan's actuary filed the Form 5500 on her behalf. This process did not change at any point.


Interrogatory No. 12

Identify your contact person with each asset custodian during the period from January 1, 2012 to present and describe the circumstances for changing to different asset custodians during this time period.

Answer to Interrogatory No. 12

Defendant objects to Interrogatory No. 12 on the grounds that it is compound, and seeks information not relevant to the issues raised in this litigation and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 12 on the

grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The following financial institutions provided asset custodian services to the Plan from January 1, 2012 to the present: Merrill Lynch; Comerica. Defendant further responds that, to the extent the Plan needs or needed to contact asset custodians, the customer service contact information provided on the asset custodian account statements is or was used. On or about June 6, 2013, Merrill Lynch resigned as asset custodian to the Plan. Defendant lacks knowledge or information sufficient to form a belief as to why Merrill Lynch resigned. Defendant further states that Merrill Lynch transferred all Plan assets to a trust account at Comerica. Comerica was selected as Plan custodian upon the advice and recommendation of Edwin Conger.

Interrogatory No. 13

Identify all contracts between the Plan and any service providers (this includes any lawyers and law firms), identify each service provider, describe the reason and circumstances for the Plan's engagement of each of these service providers, describe the duties performed by each service provider, and identify your point of contact with each service provider, from January 1, 2011 to present.

Answer to Interrogatory No. 13

Defendant objects to Interrogatory No. 13 on the grounds that it is compound. Defendant further objects to Interrogatory No. 13 on the grounds that it is overly broad and unduly burdensome in requesting Defendant to identify "all contracts" and "each service provider" with no limitation as to service provided. Defendant further objects to Interrogatory No. 13 on the grounds that it seeks information not relevant to the issues raised in this litigation and not

41

reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Interrogatory No. 13 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: Defendant previously produced the following contracts to the Secretary: SHERROD_0000231 - SHERROD_0000232. Defendant states that she is not aware of any additional contracts in her possession, custody, or control. Defendant further responds that the following law firms were retained to represent herself and/or Mr. Johnson, in their capacity as Plan fiduciaries, in connection with legal action they took in those capacities to unfreeze the Plan: Tenney & Bentley, LLC (Edwin Conger (deceased), David Shannon); Roberts Bartolic, LLP (Michael Bartolic); Valdemar L. Washington, PLLC (Valdemar Washington); Brooks Wilkins Sharkey & Turco PLLC (Michael Turco); The Law Office of Pasquale Ciccodicola PLLC (Pasquale Ciccodicola); Crane, Heyman, Simon, Welch & Clar (John H. Redfield); The Law Offices of Ben M. Gonek PLLC (Ben Gonek); and Mark Granzotto PC (Mark Granzotto). Defendant lacks knowledge or information sufficient to form a belief about the specific duties performed by each service provider. Defendant further responds that she has produced copies of invoices and written communications in her possession, custody, and control that contain this information, including SHERROD_0000598-SHERROD_0000599; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661; SHERROD_0000662-SHERROD_0000662. Any filings these service providers prepared are publicly available.

Defendant further responds that the following firms were retained to provide actuarial services to the Plan: Jeffrey L. Sinclair & Company (Jeffrey Sinclair (deceased)); M.S Assoc, 200 S Michigan Ave, Chicago, IL 60602. Defendant lacks knowledge or information sufficient to form a belief about the specific duties performed by each service provider. Defendant further responds

42

that she has produced copies of invoices and written communications in her possession, custody, and control that contain this information, including SHERROD_0000600-SHERROD_0000601; SHERROD_0000602-SHERROD_0000603; SHERROD_0000604-SHERROD_0000627; SHERROD_0000628-SHERROD_0000661.  Any Form 5500s these service providers prepared are publicly available.

Defendant further responds that the following financial institutions were retained to provide asset custodian services to the Plan:  Merrill Lynch; Comerica.  Defendant further responds that, to the extent the Plan needs or needed to contact asset custodians, the customer service contact information provided on the asset custodian account statements is or was used.


Interrogatory No. 14

Describe all Plan distributions from the Plan from January 1, 2011 to present, including identifying the distribution request, identifying the distribution authorization, listing the amount of each distribution, the date of each distribution, and the participant that received each distribution.

Answer to Interrogatory No. 14

Defendant objects to Interrogatory No. 14 on the grounds that it is compound, and vague and ambiguous in its use of the phrase "distribution(s)."  Defendant further objects to Interrogatory No. 14 on the grounds that it is overly broad and unduly burdensome.  Defendant further objects to Interrogatory No. 14 on the grounds that it seeks to circumvent or exceed the limit on the number of interrogatories a party may issue as outlined in Federal Rule of Civil Procedure 33.

Subject to the foregoing objections, Defendant responds as follows: The answer to Interrogatory No. 14 may be determined by examining, auditing, compiling, abstracting, or summarizing business records including the following:  SHERROD_0000243-SHERROD_0000243; SHERROD_0000354-SHERROD_0000371; SHERROD_0000470-

43

SHERROD_0000471; SHERROD_0000472-SHERROD_0000597; SHERROD_0000669-SHERROD_0000687. Defendant further responds that the burden of ascertaining the answer to Interrogatory No. 14 is substantially the same for either Defendant or the Secretary. Defendant further responds that the Secretary has already undertaken this exercise, as is evidenced by his Responses to Dr. Sherrod's First Set of Interrogatories.

Defendant further states that only one Plan participant in addition to Dr. Sherrod, Carol Riggleman, has attained retirement age. Dr. Sherrod wrote a letter to Keith Uhler dated December 23, 2013 requesting benefit payments for Ms. Riggleman.

Defendant further responds that, in 2014, the Plan made benefit distributions to Dr. Sherrod. Dr. Sherrod is a participant in the Plan, has attained retirement age, and was and is eligible for benefit distributions from the Plan. The amount of Dr. Sherrod's benefit payments was calculated by the Plan's actuary, Jeffrey L. Sinclair & Company, in 2014.

Defendant further states that Dr. Sherrod received benefit payments from the Plan in 2015 and 2016.

Dated: April 4, 2017

Respectfully submitted,

By: */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Natasha S. Fedder (*pro hac vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 861-6615
Facsimile: (202) 659-4503
E-Mail: lcg@groom.com
E-Mail: nfedder@groom.com

Daniel Broderick Jr
Bradford D. Roth
**CASSIDAY SCHADE LLP**
20 N. Wacker Drive
Chicago, IL 60606
Telephone: (312) 444-1612
Facsimile: (312) 444-1669
E-Mail: dbroder@cassiday.com
E-Mail: broth@cassiday.com

*Attorneys for Defendants*
*Shirley T. Sherrod, Leroy Johnson, and the*
*Shirley T. Sherrod, M.D., P.C. Target Benefit*
*Pension Plan*

45

## <u>VERIFICATION</u>

I have read the foregoing Defendant Shirley T. Sherrod's Amended Responses and Objections to Secretary of Labor's First Set of Interrogatories and declare under penalty of perjury that the answers given are true and correct.

Date:  APRIL 4, 2017                    /s/ Shirley T Sherrod, MD

Dr. Shirley T. Sherrod

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2017, I served via electronic mail the foregoing

**DEFENDANT SHIRLEY T. SHERROD'S AMENDED RESPONSES AND OBJECTIONS**

**TO SECRETARY OF LABOR'S FIRST SET OF INTERROGATORIES** on the following

counsel of record for Plaintiff Thomas E. Perez, Secretary of Labor, United States Department of

Labor:

<div align="center">

Bruce C. Canetti
U.S. Department Of Labor, Office Of The Solicitor
230 S. Dearborn St.
Rm 844
Chicago, IL 60604
(312) 353-3271
Email: canetti.bruce@dol.gov

</div>

By: */s/ Lars C. Golumbic*
Lars C. Golumbic (*pro hac vice*)
Groom Law Group
1701 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 861-6615
Fax: (202) 659-4503
Email: lcg@groom.com

*Attorney for Defendants Shirley T. Sherrod,*
*Leroy Johnson, and the Shirley T. Sherrod,*
*M.D., P.C. Target Benefit Pension Plan*