IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARTIN J. WALSH, Secretary of Labor, ) <br> United States Department of Labor, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SHIRLEY T. SHERROD, et al., ) <br> ) <br> Defendants. ) | No. 16-cv-04825 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiff Martin J. Walsh, in his capacity as Secretary of the U.S. Department of Labor ("Secretary"), has brought this civil enforcement action under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), to address alleged misconduct with respect to the Shirley T. Sherrod, M.D., P.C. Target Pension Plan ("Plan"). Specifically, the Secretary alleges that Defendants Shirley T. Sherrod, M.D., and Leroy Johnson breached their duty of loyalty, duty of due care, and duty to follow the governing plan documents under 29 U.S.C. § 1104. Now before the Court is the Secretary's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 167.) For the reasons that follow, the motion is granted.

### BACKGROUND

For purposes of summary judgment, the Court views the evidence in the light most favorable to Dr. Sherrod and Johnson as the nonmoving parties and draws all reasonable inferences from the facts in their favor. *Weber v. Univs. Rsch. Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Except where otherwise noted, the following facts are undisputed.

I.      **Factual Background**

At all times relevant to the case, Dr. Sherrod owned Shirley T. Sherrod, M.D., P.C. ("Company") in Detroit, Michigan. (Def. Sherrod's Resp. to Pl.'s Statement of Material Facts ("Sherrod RPSOMF") ¶¶ 4, 17, Dkt. No. 214.) The Company offered ophthalmology services. (*Id.* ¶ 18.) Beginning January 1, 1987, the Company established the Plan to provide retirement benefits to its employees, including Dr. Sherrod herself. (*Id.* ¶¶ 5–6.) Dr. Sherrod reached retirement age under the Plan's language (65 years old) in May 2011. (*Id.* ¶ 20.) She has also been the trustee of the Plan since its establishment. (*Id.* ¶ 19.) Johnson was named as the Plan administrator on May 30, 2012. (Sherrod's RPSOMF ¶ 22; Def. Johnson's Resp. to Pl.'s Statement of Material Facts ("Johnson RPSOMF") ¶ 22, Dkt. No. 216.) The Plan was funded by Company contributions, but the Company stopped making distributions in 2011 through at least 2017. (*Id.* ¶ 7.)

All Plan participants apart from Dr. Sherrod were terminated from their employment with the Company on December 31, 2008. (*Id.* ¶ 6.) In April 2010, the Plan language was amended. (*Id.* ¶ 8.) The 2010 Plan is the version that was effective during the time relevant to the Secretary's complaint. (*Id.*) Under the language of the Plan, the trustee, Dr. Sherrod, was responsible for (1) investing, managing, and controlling Plan assets subject to the direction of the employer or investment manager; (2) paying benefits to participants or their beneficiaries at the direction of the administrator; and (3) maintaining records of receipts and disbursements to furnish to the employer or administrator. (Pl.'s Statement of Material Facts ("PSOMF"), Ex. E, Plan ("2010 Plan") § 7.1(a), Dkt. No. 168-6.) The job of the administrator, Johnson, was to administer the Plan for the exclusive benefit of the participants and beneficiaries. (*Id.* § 2.4.) The administrator was required to determine the payment of benefits and to authorize and direct the trustee with respect to disbursements. (*Id.*) The 2010 Plan language states that the trustee "shall be reimbursed for any

2

reasonable expenses, including reasonable counsel fees incurred by it as Trustee. Such compensation shall be paid from the Trust Fund unless paid or advanced by the Employer." (Pl.'s Resp. to Def. Sherrod's Statement of Additional Facts ("Pl.'s Resp. Sherrod Facts") ¶ 6, Dkt. No. 221 (internal quotation marks omitted).)

Dr. Sherrod eventually sold her company in Michigan[1] to an individual named Michael Sherman, and a dispute between the two led to litigation in Michigan state court. (Sherrod RPSOMF ¶ 44.) On June 25, 2010, Sherman received a judgment against Dr. Sherrod in the amount of $181,048. (*Id.*) The Secretary claims that the judgment was against Dr. Sherrod individually, while Dr. Sherrod insists that the judgment was also entered against the Company. (*Id.* (citing PSOMF, Ex. Q, State of Mich. Cir. Ct. Filings ("Mich. Filings") at 9, Dkt. No. 168-18).) The language of the court's order provides that "third-party plaintiffs Shirley T. Sherrod, M.D., and Shirley T. Sherrod, M.D., P.C. . . . are prohibited from directly or indirectly selling, transferring" or otherwise disposing of any of their assets. (Mich. Filings at 10.)

At the time of the Michigan litigation, Merrill Lynch, Pierce, Fenner, and Smith, Inc. ("Merrill Lynch") was the Plan custodian. (Sherrod RPSOMF ¶ 36.) After obtaining a judgment against Dr. Sherrod in Michigan, Sherman secured a garnishment of all Dr. Sherrod's assets at Merrill Lynch on October 12, 2010. (*Id.* ¶ 45.) On February 4, 2011, the Michigan court ordered all Dr. Sherrod's assets at Merrill Lynch frozen. (*Id.*) Dr. Sherrod appealed the judgment against her. (Sherrod RPSOMF ¶ 46.) Michigan's court of appeals allowed Dr. Sherrod's appeal to proceed and to stay the enforcement of the judgment only if she did one of following: either (1)

---

[1] The parties agree that at some point before June 2010, "Sherrod sold her company in Michigan." (Sherrod RPSOMF ¶ 44.) But the parties also agree that Dr. Sherrod was the owner of the Company, Shirley T. Sherrod, M.D., P.C., "[f]rom at least January 1, 2008 to present." (*Id.* ¶ 17.) It is not clear from the parties' materials whether the company Dr. Sherrod sold was the Company at issue in this case and, if so, whether the sale was actually effectuated. The Court assumes for purposes of the present ruling that Dr. Sherrod owned the Company at all times relevant to the Secretary's complaint.

3

appear for a creditor's examination with certain documents or (2) post a $250,000 cash or surety bond. (*Id.*; Mich. Filings at 12.) According to Dr. Sherrod, she had willingly agreed to sit for the creditor's examination, but it "did not come to fruition." (Sherrod RPSOMF ¶ 46.) Instead, Dr. Sherrod decided to post the bond, for which the court allowed her to use her frozen assets. (*Id.*) Consequently, on November 10, 2011, Dr. Sherrod signed an affidavit swearing that she was directing Merrill Lynch to make two distributions from the Plan: first, a $250,000 distribution to secure a bond pursuant to the Michigan court's order, and second, a $3,000 distribution to cover the costs associated with filing the bond. (Mich. Filings at 18–20.) In the affidavit, Dr. Sherrod also confirmed that the requested distributions did not exceed her individual interest in the plan. (*Id.* at 19.) For the year 2011, Defendants reported a $246,291 Plan loss and no benefit distributions paid. (Sherrod RPSOMF ¶ 78.)

On February 28, 2012, Merrill Lynch filed a motion to have the freeze on Dr. Sherrod's accounts released. (*Id.* ¶ 54.) In April, the Michigan court stated that it would lift the freeze on the Plan's assets. (*Id.* ¶ 55.) But Dr. Sherrod's then-attorney objected on the grounds that the court lacked jurisdiction to lift the freeze because of her pending appeal. (*Id.*) For reasons that are unclear based on the record before this Court, the Michigan state court lifted the freeze on Dr. Sherrod's assets at Merrill Lynch in May 2013. (*Id.* ¶ 60.)

The parties dispute the effect of the Michigan court's order on the Plan assets and, consequently, the propriety of $250,000 distribution from the Plan to post the bond in the underlying litigation. The Secretary claims that the freeze of Dr. Sherrod's assets included only "the amount of her retirement benefit in the Plan account." (Sherrod RPSOMF ¶ 45.) But Dr. Sherrod asserts that the freeze applied to all Plan funds held at Merrill Lynch. (*Id.*) In its filing to lift the freeze, Merrill Lynch indicated that the Plan account was frozen, although in parallel

4

proceedings before the Seventh Circuit Merrill Lynch maintained that only Dr. Sherrod's interests were affected by the order.[2] (Mich. Filings at 3; *Johnson v. Merrill Lynch*, 719 F.3d 601, 602 (7th Cir. 2013).)

Shortly after the freeze on Dr. Sherrod's assets was lifted, she started directing payments to herself from the Plan's funds. In July 2013, the Plan distributed two payments to Dr. Sherrod totaling $50,000. (*Id.* ¶ 63.) The following year, Dr. Sherrod directed the Plan to issue her thirty-seven checks totaling $286,905. (*Id.* ¶ 64.) But according to Dr. Sherrod, she never cashed $40,000 worth of checks included in that amount from the year 2014. (*Id.*) And Dr. Sherrod also asserts that she used some amount of those payments to reimburse herself for the Plan's legal expenses, which she had covered using her own cash and credit cards. (*Id.*) Also in 2014, Dr. Sherrod instructed the Plan to issue two checks totaling $4,000.00 payable directly to her attorneys. (*Id.* ¶ 70.) For the year 2014, Defendants reported that the Plan paid $57,000 in benefit distributions and $142,000 in expenses. (*Id.* ¶ 81.)

The Secretary asserts that in 2015, the Plan made twenty-six distributions totaling $120,016 to Dr. Sherrod. (*Id.* ¶ 65.) Dr. Sherrod claims that she only received distributions totaling $59,000 in 2015 and that the remaining $61,764 were attributable to Plan expenses.[3] (*Id.*) For the year 2015, Defendants reported $59,000 in benefit distributions and $40,000 in expenses paid. (*Id.* ¶ 82.) In the year 2016, the Plan distributed funds to Dr. Sherrod thirty times, totaling $196,471.50. (*Id.* ¶ 66.) Again, Dr. Sherrod asserts that $133,922.00 of that total went to Plan

---

[2] On April 6, 2012, Dr. Sherrod also filed suit against Merrill Lynch in the United States District Court for the Northern District of Illinois related to the freeze on her accounts. (Sherrod RPSOMF ¶ 56.) That district court granted Merrill Lynch's motion to dismiss on jurisdictional grounds. (*Id.* ¶ 57.) The Seventh Circuit subsequently affirmed that ruling. (*Id.* ¶¶ 58–59); *see also Johnson*, 719 F.3d at 602. In so doing, the Seventh Circuit noted that "Merrill Lynch only froze the Plan account with respect to Sherrod," as Merrill Lynch represented in the briefing that it would not refuse instructions to distribute funds to any Plan participant other than Dr. Sherrod. *Id* at 603.

[3] The Court notes that $61,764 added to $59,000 totals $120,764, not $120,016.

5

expenses. (*Id.*) For the 2016 Plan year, Defendants reported $62,550.00 in benefit distributions and $133,922.00 in expenses paid (totaling $186,472.00). (*Id.* ¶ 83.) Finally, in 2017, the Plan made twenty-eight distributions to Dr. Sherrod totaling $173,809.99—$104,144.99 of which Dr. Sherrod asserts went to Plan expenses and other Plan beneficiaries. (*Id.* ¶ 67.) In 2017, Dr. Sherrod also directed two checks to other Plan participants or their beneficiaries, but those checks were sent to Dr. Sherrod's address in South Carolina. (*Id.* ¶ 72.) Dr. Sherrod testified that the Plan mailed the checks to her and she sent the checks to the beneficiaries. (Def. Sherrod's Mem. in Opp'n, Corrected Ex. 1, Dep. of Dr. Sherrod 228:1–4, Dkt. No. 218.)

No deposits went into the Plan from 2014 through 2017. (Sherrod RPSOMF ¶ 71.) But Dr. Sherrod notes that the account was closed to deposits beginning in 2008. (*Id.*)

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *see also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (explaining that the non-moving party must present "more than mere conclusions and allegations"). The party opposing the motion must also "go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or

6

admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013) (internal quotation marks and citation omitted).

In ruling on a motion for summary judgment, the Court "must construe the facts in favor of the nonmovant, and may not make credibility determinations or weigh the evidence." *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019). "[S]ummary judgment may be granted based on any ground that finds support in the record, so long as the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013) (internal quotation marks omitted); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("At the summary-judgment stage, the court can properly narrow the individual *factual* issues for trial by identifying the material disputes of fact that continue to exist.").

The Secretary argues that it is entitled to summary judgment, including injunctive relief removing Defendants as fiduciaries, because the undisputed facts show that Defendants violated their duties to the Plan under § 404 of ERISA. *See* 29 U.S.C. § 1104. The Secretary alleges that Dr. Sherrod and Johnson breached three duties: (1) their duty of loyalty to the Plan under § 404(a)(1)(A); (2) their duty of due care under § 404(a)(1)(B); and (3) their duty to act in accordance with Plan documents under § 404(a)(1)(D). To prevail, the Secretary must establish "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Bator v. Dist. Council 4*, 972 F.3d 924, 929 (7th Cir. 2020) (internal quotation marks omitted).

Dr. Sherrod does not dispute that she was Plan fiduciary at all relevant times. (Sherrod RPSOMF ¶ 19.) And Johnson admits that, from May 30, 2012 through August 4, 2014, he also

7

qualified as a Plan fiduciary. (Johnson RPSOMF ¶ 34.) For the period of time after August 2014, however, Johnson contends that he was no longer a Plan fiduciary. Instead, Johnson asserts, he had properly delegated the position of Plan Administrator to LJ Consulting Services LLC ("LJ Consulting"), an entity that Johnson formed in August 2014. (Johnson Decl. in Opp. to Mot. for Summary Judg. ¶ 3–4, Dkt. No. 216.) LJ Consulting has never had any employees, maintained any office space, or had any other client besides the Plan, and Johnson is the sole owner. (Johnson RPSOMF ¶ 24.) There is no apparent distinction between Johnson and LJ Consulting, and Johnson cannot evade his fiduciary duties by attempting to insulate himself behind a corporate form. Regardless, the Plan's governing documents did not permit Johnson to appoint a new Plan administrator.[4] Accordingly, both Dr. Sherrod and Johnson meet the first element, although they dispute the second and third elements of breach and harm.

The Secretary asserts that Defendants breached their fiduciary duties in three ways. First, the Secretary claims they failed to maintain proper records and distribute assets in accordance with Plan documents. Second, the Secretary asserts that Dr. Sherrod used Plan funds to pay for the bond in her Michigan action and Johnson failed to stop her. Finally, according to the Secretary, Dr. Sherrod made numerous distributions to herself from the years 2013 through 2017, which she falsely treated as "plan expenses," and Johnson failed to stop her. The Court considers each alleged breach in turn.[5]

---

[4] Johnson argues that there is no non-delegation clause in the Plan, relying on language in the 2009 Plan document that allows the Administrator to "appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator [] deems necessary or desirable in connection with the administration of this Plan . . .." (Johnson RPSOMF ¶ 33.) But that the Plan permitted Johnson to appoint third parties to *assist* him in administering the Plan does not mean that he was entitled to unilaterally appoint another to replace him as Plan Administrator.

[5] Dr. Sherrod contends that the Secretary has waived its right to rely on evidence concerning Plan years 2015 through 2017 because the complaint only includes allegations about the years 2012 through 2014. Dr. Sherrod points to *Holman v. Revere Electric Supply Co.*, in which another court in this District denied the plaintiff's motion for summary judgment as to a retaliatory discharge claim because it was not included in

## I. Maintenance of Records in Accordance with Plan Documents

Section 404(a)(1)(D) of ERISA requires fiduciaries to discharge their duties with respect to a plan "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The Secretary contends that the undisputed facts show Defendants violated § 404(a)(1)(D) by failing to follow the Plan documents.

It is undisputed that the Plan language required Dr. Sherrod, as the trustee, to maintain records of receipts and disbursements to furnish to the employer and the administrator and to pay benefits due under the Plan only at the direction of the administrator. (Sherrod RPSOMF ¶ 10; Johnson RPSOMF ¶ 10.) Dr. Sherrod does not dispute that Johnson, acting as the administrator, did not direct, approve, oversee, or question her payments out of the Plan from 2012 through 2017 because she never provided information for his review. (Sherrod RPSOMF ¶ 40; *see also* PSOMF, Ex. D, Dep. of Leroy Johnson ("Johnson Dep.") 77:19–82:12, Dkt. No. 168-5.) For his part, Johnson admits that, between 2011 and 2013, Dr. Sherrod never provided him copies of invoices, checks, or money orders related to purported Plan expenses. (*See* Johnson RPSOMF ¶ 40; Johnson Dep. 78:8–79:10 (Johnson's testimony responding to a question about whether he verified Dr. Sherrod's reimbursements by stating, "I knew what Dr. Sherrod did was justified and correct.").) Rather, Johnson simply "took her word" that those expenses were properly paid out of the Plan. (Johnson Dep. 81:4–10.)

---

the relevant complaint. No. 02 C 6351, 2005 WL 638085, at *26 (N.D. Ill. Mar. 15, 2005). The *Holman* court concluded that the defendant was never given notice of that claim as required under Federal Rule of Civil Procedure 8(a). *Id.* But in this case, the Secretary's complaint (filed in 2016) alleges that, "[f]rom January 1, 2015 to the present, Defendant Sherrod continues to withdraw funds from the Plan and Defendants Sherrod and Johnson fail to account for these distributions properly." (Compl. ¶ 25, Dkt. No. 1.) Though brief, the complaint's allegation concerning ongoing withdrawals from the Plan is sufficient to put Defendants on notice that the Secretary is alleging ongoing violations. The Court will therefore consider the Secretary's evidence for the years after 2014. Dr. Sherrod also contends that the Secretary's complaint is barred by the statute of limitations. However, Dr. Sherrod recognizes that the Court has already rejected that argument in denying Defendants' motion for leave to amend and their motion for reconsideration. (*See* Dkt. Nos. 43, 128.) The Court sees no reason to revisit the prior rulings.

Dr. Sherrod argues that the undisputed evidence does not show she violated § 404(a)(1)(D) because the Plan does not specify how records are to be kept and "[t]he fact that Dr. Sherrod did not administer the Plan exactly how the Secretary would have preferred in this case does not lead to liability." (Dr. Sherrod's Resp. in Opp'n at 14, Dkt. No. 210.) Indeed, "ERISA does not require a sole recordkeeper or mandate any specific recordkeeping arrangement at all." *Divane v. Nw. Univ.*, 953 F.3d 980, 990 (7th Cir. 2020). But under the language of the Plan, Dr. Sherrod and Johnson were required to follow a certain procedure, with Johnson as the administrator directing Dr. Sherrod as the trustee to make payments out of Plan funds only when appropriate. And Defendants do not dispute that Dr. Sherrod instead took actions with respect to the Plan without conferring with Johnson. Johnson, for his part, merely accepted Dr. Sherrod's actions as proper without reviewing any of the relevant documents. That conduct was inconsistent with the language of the Plan. Accordingly, the Court finds that the Secretary has established it is entitled to summary judgment with respect to Defendants' violations of ERISA § 404(a)(1)(D).

## II.  Dr. Sherrod's Use of Plan Funds for the Bond in Michigan

The Secretary next argues that the undisputed facts show Defendants breached their general duties of loyalty and prudence under §§ 404(a)(1)(A) and (B) of ERISA by allowing Dr. Sherrod to appropriate $253,000 of Plan funds to pay for a bond in connection with her personal litigation in Michigan.

Dr. Sherrod does not dispute that she used Plan funds to pay for the bond in Michigan, but she contends that it was a reasonable expense authorized by the Plan. The 2010 Plan language provides that the trustee "shall be reimbursed for any reasonable expenses, including reasonable counsel fees incurred by it as Trustee." (Pl.'s Resp. Sherrod Facts ¶ 6, Dkt. No. 221.) ERISA also explicitly exempts from its listed prohibited transactions any reasonable legal fees necessary for

the establishment or operation of the benefit plan. *See* 29 U.S.C. § 1108(b)(2)(A). Accordingly, courts have allowed fiduciaries to use plan funds to pay for legal services when such services were necessary to protect the plan or were incurred by the trustee in performance with her plan duties. *See Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 861 (6th Cir. 2000); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 913–14 (8th Cir. 1994). Thus, the critical question is whether there is a genuine dispute as to whether Dr. Sherrod's payment of the bond in the Michigan case was necessary to protect the Plan or otherwise reasonably connected to her duties as a fiduciary.

The parties first dispute whether the Michigan state court in 2010 froze only Dr. Sherrod's personal assets or also the assets of her Company. (*See* Sherrod RPSOMF ¶¶ 44–45.) That court's order states "third-party plaintiffs Shirley T. Sherrod, M.D., and Shirley T. Sherrod, M.D., P.C. . . . are prohibited from directly or indirectly selling, transferring" or otherwise disposing of any of their assets. (Mich. Filings at 10.) Therefore, it appears from the language of the order that the court froze the assets of the Company, as well as Dr. Sherrod's personal assets. But even an ERISA fiduciary's use of plan funds for the benefit of the company sponsoring the plan, rather than for the sole benefit of plan participants, violates the duty of loyalty under § 404(a)(1)(A). *See Frahm v. Equitable Life Assurance Soc'y of the U.S.*, 137 F.3d 955, 959 (7th Cir. 1998) ("Deliberately favoring the corporate treasury when administering . . . a plan is inconsistent with the statute."); *Perez v. Wallis*, 77 F. Supp. 3d 730, 744 (N.D. Ill. 2014) (concluding that the defendants breached their duty of loyalty under ERISA when they failed to remit employee contributions to the plan and instead "retained those contributions in [the company's] operating budget and used them to pay general expenses"); *Solis v. Hartmann*, No. 10 C 123, 2012 WL 3779050, at *6–7 (N.D. Ill. Aug. 31, 2012) (finding that fiduciaries breached their duty of loyalty by using plan assets to pay company expenses rather than for the exclusive benefit of plan

11

participants and beneficiaries). The undisputed evidence shows that Dr. Sherrod directed the Plan to pay a $250,000 bond (and $3,000 in fees) in connection with litigation to which the Plan itself was not a party. That alone demonstrates that Dr. Sherrod breached her duty of loyalty to the Plan. The evidence is also sufficient to show that Johnson, who was supposed to be overseeing the Plan's funds, breached his duty of due care and duty to follow Plan documents by allowing Dr. Sherrod to make such a withdrawal on her own initiative.

Dr. Sherrod nonetheless contends that that the payment of the bond was a necessary expense because, while the Michigan state court may have intended only to freeze Dr. Sherrod's assets (including her interest in Plan funds) Merrill Lynch had frozen all the Plan's assets and was not allowing distributions to be paid to any Plan participants and beneficiaries. (*See* Mich. Filings at 3..) Payment of the bond, therefore, was necessary to avert harm to Plan participants (other than Dr. Sherrod) as the freeze order could possibly bar any distributions to them. But the freeze applied only so long as judgment in the underlying action was unpaid—the appeal of the freeze was primarily an appeal of the merits of the judgment against Dr. Sherrod and the Company. (*See*, PSOMF, Ex. R**,** State Mot. Hearing on Dec. 2, 2011 and State Mot. Hearing on Apr. 13, 2011 at 8, Dkt. No. 168-19.) (denying, in December 2011, the motion to unfreeze Dr. Sherrod's assets on the basis that "[t]here is a judgment against her and the freeze will remain in effect until she pays that judgment . . . [a]ll she has to do is pay and all these problems go away") Indeed, in its motion to release the freeze on Dr. Sherrod's accounts, Merrill Lynch acknowledged that "not all of the assets [of the Plan] are available to secure the judgment since the plan filing shows 18 participants." (Mich. Filings at 4.) In other words, even if the freeze had affected the Plan, the primary purpose of the $250,000 bond was to appeal the underlying judgment against Dr. Sherrod and the Company, with the unfreezing of the assets a secondary effect of any positive ruling for

them both. This is, in fact, exactly what occurred—the freeze was terminated in May 2013 when the Michigan Appellate Court ruled on the freeze order. (Sherrod RPSOMF ¶ 60; PSOMF, Ex. S, Merrill Lynch Resignation Letter at 1, Dkt. No. 168-20.) In sum, the primary purpose of the bond remained to address concerns in the litigation against Dr. Sherrod and the Company, not to benefit the Plan.

Defendants argue that even if Dr. Sherrod's actions constituted a breach of the fiduciary duty of loyalty, the Secretary has not established the required element of harm or loss. Dr. Sherrod points to *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 472 (7th Cir. 1997). There, the Seventh Circuit found that defendants were not liable for clear breaches of their fiduciary duties because the plaintiffs had failed to demonstrate a loss to the plan trust. *Id.* In *Mira*, the defendants "used the funds that should have been applied to pay the insurance premiums for the day-to-day expenses that were necessary to keep the business afloat and thus keep its entire workforce employed." *Id.* Although the Seventh Circuit found this to be a violation of their fiduciary duty, it held that the plaintiffs could not recover damages for those breaches because the "plan was reinstated and the [plaintiffs] were reimbursed for any and all claims filed during the period in question." *Id.* at 473. As the plaintiffs had already been made whole, they could not satisfy the third element of economic loss. *Id.* Awarding damages was therefore improper, as any monetary payout would give the plaintiffs a windfall in the form of double recovery. *Id.*

This case, however, can be distinguished from *Mira* on several grounds. Here, the undisputed facts show that the Company terminated all employees apart from Dr. Sherrod in 2008. (*See* Sherrod RPSOMF ¶ 6.) Thus, unlike in *Mira*, where employees would have lost their jobs and any future benefits had the company gone out of business due to the financial strain, the Plan participants were no longer dependent upon the continued existence of the Company. Moreover,

13

while the plaintiffs in *Mira* were made whole when the defendant company retroactively reinstated the lapsed coverage and paid all the past premiums due, here, Dr. Sherrod does not dispute that the Plan was never reimbursed for the $250,000 used to post the bond. In other words, the Plan has indeed suffered economic loss.[6]

In short, Dr. Sherrod's use of Plan funds in connection with litigation that involved only herself and the Company was a clear violation of her duty of loyalty to Plan participants, and the Secretary has presented sufficient proof as to the element of loss or harm. The Secretary's motion for summary judgment is therefore granted with respect to Dr. Sherrod's use of Plan funds to pay her bond in Michigan.

### III. Checks from Plan Funds Addressed to Dr. Sherrod for the Years 2013 Through 2017

After the Michigan state court lifted the freeze on Dr. Sherrod's assets, including the assets of the Plan, she began making frequent payments to herself out of Plan funds. The Secretary asserts that Defendants violated their duties of loyalty and due care, and their duty to follow Plan documents, by improperly allocating those distributions to "expenses" or "losses." Put more simply, the Secretary contends that Dr. Sherrod wrote herself checks out of the Plan accounts and falsely reported that those payments were reimbursements for reasonable expenses. The Secretary also argues that Johnson is liable for such conduct because he failed to fulfill his duties as Plan administrator to oversee Dr. Sherrod.

Between 2013 and 2017, the Plan distributed checks to Dr. Sherrod totaling hundreds of thousands of dollars. Dr. Sherrod asserts that many of those payments were, in fact, reimbursements for necessary and reasonable Plan expenses. Dr. Sherrod also argues that to the

---

[6] Dr. Sherrod does point to a letter from counsel to the bond agency requesting that the $250,000 bond be returned to the Plan (Sherrod RPSOMF, Ex. 3, Jan. 6, 2014 Letter, Dkt. No. 218.) There is no indication in the record, however, that the Plan ever received these funds.

14

extent she did receive benefits, she was entitled to those benefits as a Plan participant. In other words, Dr. Sherrod does not dispute the Secretary's evidence that she made such withdrawals from the Plan, Rather, she maintains that it is not her burden to prove such withdrawals were proper. Certainly, as the plaintiff, the Secretary bears the burden of establishing each element of the breach of fiduciary duty claims. And in seeking summary judgment, the Secretary bears the burden of demonstrating that the undisputed material facts show the Secretary is entitled to judgment. *See Hummel*, 817 F.3d at 1015. But the Secretary has presented undisputed facts showing that between 2013 and 2017, Dr. Sherrod, a Plan fiduciary, directed hundreds of thousands of dollars to be paid to herself out of Plan funds. That evidence is sufficient to prove that Dr. Sherrod put her own interests above those of Plan participants and beneficiaries in violation of §404(a)(1)(A). Indeed, those types of transactions qualify as self-dealing, a *per se* prohibited transaction under ERISA § 406.[7] *See* 29 U.S.C. § 1106(a)(1)(D) ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction . . . [that] constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"); *see also id.* § 1002(14)(A) (defining "party in interest" as "any fiduciary"). An ERISA fiduciary

---

[7] In her surreply, Dr. Sherrod argues that the Secretary's arguments concerning *per se* prohibited transactions under § 406 are improper new arguments, falling outside the scope of the complaint and the Secretary's opening memorandum in support of summary judgment. But the Secretary's complaint in this case clearly alleges that Dr. Sherrod directed multiple payments to herself from the Plan fund. (*See* Compl. ¶¶ 16, 201.) Therefore, Defendants have been on notice since the beginning of the case that the Secretary has accused Dr. Sherrod of self-dealing—precisely the type of conduct prohibited under § 406 of ERISA. *See McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 428 (7th Cir.2005) ("The real question [is] whether relief [is] possible based on any legal theory . . . under any set of facts that could be established consistent with the allegations."); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal."). In addition, the Seventh Circuit has explained that § 406 merely "supplements an ERISA fiduciary's general duties of loyalty and prudence to the plan's beneficiaries, as set forth in [§] 404, 29 U.S.C. § 1104, by categorically barring certain transactions deemed likely to injure the pension plan." *Keach v. U.S. Tr. Co.*, 419 F.3d 626, 635 (7th Cir. 2005) (internal quotation marks omitted). Section 406 is intended to "make much simpler the enforcement of ERISA's more general fiduciary obligations." *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984). The Court thus finds it appropriate to consider whether Defendants have engaged in the kind of conduct prohibited under § 406.

who engages in a prohibited transaction like self-dealing bears the burden of demonstrating that the transaction was actually permissible under ERISA. *See Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016); *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1217 (2d Cir. 1987) ("In response to the overwhelming evidence of kickbacks, defendants offered largely conclusory statements that fell far short of carrying the heavy burden they face.").

As discussed above, the Secretary has presented evidence that Dr. Sherrod breached her duty of loyalty to the Plan by making checks to herself drawn out of Plan funds. In opposing summary judgment on those grounds, Dr. Sherrod must come forward with evidence showing at least a genuine dispute of material fact as to whether she was entitled to those funds. Dr. Sherrod's assertion that she was entitled to take distributions as a Plan participant who had reached the age of retirement does not meet that burden. *See Lowen*, 89 F.2d at 1217. In the years 2013 through 2017, Dr. Sherrod has acknowledged that she directed the Plan to pay her distributions totaling $241,215. (*See* Sherrod RPSOMF ¶¶ 63, 65–67.) Dr. Sherrod has not presented any evidence that she was entitled to benefits in that amount or that the amount of distributions reflects her actual interest in the Plan.

Dr. Sherrod also contends that many of the funds she paid to herself out of the Plan were intended as reimbursements for reasonable legal fees on behalf of the Plan. For instance, the Secretary has shown that the Plan made thirty-seven payments to Dr. Sherrod in the year 2014, totaling $286,905. (Sherrod RPSOMF ¶ 64.) Dr. Sherrod disputes the assertion concerning those payments by stating that she "used her own cash and charge cards to pay the attorneys' fees and costs associated with freeing up the Plan's assets and defending the instant lawsuit, and then had to seek reimbursement from the Plan." (*Id.* (citing Sherrod's Resp. in Opp'n, Ex. 5, Dkt. No. 211).)

16

The Court has reviewed the exhibit that Dr. Sherrod offers in support of her assertion that the 2014 Plan withdrawals reimbursed her for reasonable legal fees incurred on the Plan's behalf. The exhibit includes more than seventy pages and shows various copies (in some cases, faded and illegible) of postal money orders, invoices, and communications with counsel regarding attorneys' fees. (*See* Sherrod's Resp. in Opp'n, Ex. 5, 60–134 of 134.) Defendants have not offered an accounting of these documents or matched them to Dr. Sherrod's withdrawals, and it is not the Court's job to piece together an argument for them. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). Nonetheless, the Court has reviewed all the relevant exhibits pertaining to the year 2014 and concludes that they do not create a genuine issue as to whether all the funds Dr. Sherrod withdrew actually went towards reasonable legal fees that she had incurred on the Plan's behalf. The evidence that various attorneys invoiced Dr. Sherrod in certain amounts does not demonstrate that she used her personal funds to pay those fees. And the numerous copies of postal money orders offered—which the Court assumes Dr. Sherrod has offered to prove that she herself paid those bills—contain little information. They do not list, for instance, the account the money is coming from or the account to which the money is going.

The Court similarly has reviewed the exhibits Dr. Sherrod submitted to demonstrate that she reimbursed herself for reasonable Plan legal fees in the years 2015, 2016, and 2017. After briefing concluded, the Secretary moved for sanctions against Dr. Sherrod and Johnson to exclude the exhibits offered for those years, arguing that they failed to disclose them during discovery.[8] (Dkt. No. 229.) In opposing sanctions, Defendants essentially respond that they acted in good faith

---

[8] In connection with the Court's prior ruling (Dkt. No. 259), this includes consideration of the surreply filed by Dr. Sherrod. (Dkt. No. 225.)

and attempted to respond fully to the Secretary's discovery requests throughout the litigation.[9] (*See* Def. Sherrod's Resp. in Opp'n to Sanctions at 2, Dkt. No. 234 ("Dr. Sherrod produced what she believed to be responsive and what was available to her at the time."[10])); *see Johnson v. J.B. Hunt Transp., Inc.*, 280 F.3d 1125, 1132 (7th Cir. 2002) ("Litigants are expected to act in good faith in complying with their discovery obligations . . . .").

The rationale for excluding evidence that parties failed to timely produce during discovery "is to avoid an unfair 'ambush' in which a party advances new theories or evidence to which its opponent has insufficient time to formulate a response." *Rowe Int'l Corp. v. Ecast, Inc.*, 586 F. Supp. 2d 924, 934 (N.D. Ill. 2008) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). But because the Court concludes that the exhibits the Secretary seeks to exclude do not aid Defendants' case, the Secretary's motion to strike such exhibits is denied. *See Only The First, Ltd. v. Seiko Epson Corp.*, 822 F. Supp. 2d 767, 780 (N.D. Ill. 2011) (denying motion to strike new declarations submitted for the first time at summary judgment because the declarations did not prejudice the plaintiff). As with the exhibits in support of reimbursements for the year 2014, the exhibits on which Defendants rely for the years 2015 through 2017 include only bills for legal fees. The exhibits do not show that Dr. Sherrod paid those bills in full using her personal finances; nor do they prove that such legal fees were accrued on behalf of the Plan, rather than on Dr. Sherrod's personal behalf or that of the Company.

---

[9] After the sanctions motion was fully briefed, Johnson also moved for leave to file a surreply in opposition to the Secretary's motion. (Dkt. No. 242.) The Court has considered Johnson's surreply in its present ruling and his motion for leave is therefore granted.

[10] While Dr. Sherrod's response implies that she has not had the benefit of counsel during this litigation, she has been represented throughout the case by various attorneys. Dr. Sherrod has had more than one retained counsel who eventually sought and was granted leave to withdraw. (*See* Dkt. Nos. 59, 85, 107, 114, 174.) Most recently, the Court granted Dr. Sherrod's motion for attorney representation and recruited counsel on her behalf so that she could respond effectively to the Secretary's motion for summary judgment. (*See* Dkt. No. 199.)

In sum, no reasonable jury could conclude from the evidence Dr. Sherrod has offered that she was entitled to reimbursement out of Plan funds for thousands of dollars of legal fees, as she asserts. And no reasonable jury could conclude that Dr. Sherrod's distributions from the Plan in the years 2013 through 2017 were appropriate in light of her status as a Plan participant. *See Modrowski*, 712 F.3d at 1167 (explaining that the court will enter summary judgment against a party who cannot "come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question" (internal quotation marks omitted)). The Secretary's motion for summary judgment is therefore granted with respect to those distributions. And because the undisputed evidence shows that the Plan required Johnson to direct and oversee Dr. Sherrod, and that instead he allowed her to exercise unfettered control over the Plan funds, the Court concludes that Johnson is also liable for such distributions under § 404(a).

### IV.     Injunctive Relief

Having found that the Secretary is entitled to summary judgment against both Defendants, the Court turns to the requested relief. In his memorandum in support of his motion, the Secretary requests that the Court immediately remove Defendants from their fiduciary positions with the Plan; permanently bar them from providing any further services to any ERISA-covered plan, as fiduciaries or otherwise; and appoint an independent fiduciary to administer and terminate the Plan, and to perform an accounting of the use of all Plan assets from January 11, 2011 to the present, with the cost borne by Dr. Sherrod.

Although the Secretary provides a brief discussion of why each component of the requested relief is appropriate, neither Dr. Sherrod nor Johnson responds to those arguments in their response briefs. Given the nature of the relief sought, including permanent bars against any future association with ERISA-covered plans, the Court will give Defendants an opportunity to

file supplemental memoranda limited to the subject of whether the Secretary's requested relief should be granted.

## CONCLUSION

Accordingly, for the reasons discussed above, the Secretary's motion for summary judgment (Dkt. No. 167) is granted. Defendants shall have fourteen days to file a supplemental memorandum for the limited purpose of responding to the Secretary's request for injunctive and other equitable relief.

ENTERED:

Dated: March 31, 2022

Andrea R. Wood
United States District Judge